UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

    - v. -                                      :

LAURENCE F. DOUD III,                       :

        Defendant.                          :

- - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: APR 2 2 2019

**SEALED INDICTMENT**

19 Cr.

## 19 CRIM 285

### COUNT ONE
### (Narcotics Conspiracy)

The Grand Jury charges:

### The Defendant

1.    From in or about September 1991 through in or about April 2017, LAURENCE F. DOUD III, the defendant, was the chief executive officer ("CEO") of Rochester Drug Co-operative, Inc. ("RDC" or the "Company").  As the CEO of RDC, DOUD was responsible for, among other things, supervising the Company's compliance with federal narcotics laws.

### Overview

2.    At all times relevant to this Indictment, RDC was a wholesale distributor of pharmaceutical products, including controlled substances, headquartered in Rochester, New York.  At various times relevant to this Indictment, RDC was the fourth largest wholesale distributor in New York and one of the nation's



ten largest distributors, with at least approximately 1,300 pharmacy customers and over $1 billion in revenue per year.

3.   For at least half a decade, RDC distributed dangerous, highly addictive opioids to pharmacy customers that its senior management, including LAURENCE F. DOUD III, the defendant, knew were being sold and used illicitly.  Among other things, and at the direction of DOUD, RDC supplied tens of millions of oxycodone, fentanyl, and other dangerous opioids to pharmacy customers that its own compliance personnel determined, and reported to DOUD, were dispensing those drugs to individuals who had no legitimate medical need for them.  DOUD directed the Company to supply pharmacies he knew were dispensing controlled substances in contravention of the Controlled Substances Act ("CSA"), in order to maximize the Company's revenues and DOUD's compensation.

4.   To perpetuate this scheme, RDC, acting at the direction of LAURENCE F. DOUD III, the defendant, violated the CSA and RDC's own written polices in an effort to conceal the Company's illicit distribution of controlled substances from the Drug Enforcement Administration ("DEA") and other law enforcement authorities. Among other things, DOUD and other members of RDC's senior management made the deliberate decision not to investigate, monitor, or report to the DEA pharmacy customers that they knew were diverting controlled substances for illegitimate use.

Because DOUD knew that reporting these pharmacies would likely result in the DEA investigating and shutting down the Company's customers, DOUD directed the Company's compliance department not to report them, and instead to continue supplying those customers with dangerous controlled substances that the Company knew were being dispensed and used for illicit purposes.

### The Opioid Epidemic

5.     Oxycodone and fentanyl are two highly addictive, narcotic-strength opioids.  These opioids are used to treat severe and chronic pain conditions, such as post-operative pain, serious back and orthopedic injuries, as well as pain associated with certain forms of cancer and other terminal illnesses.  Oxycodone, which is distributed as a pill, and fentanyl, which is distributed as a patch or spray, can only be obtained from pharmacies with a prescription written by a treating physician, or other authorized health care practitioner.

6.     Because of their highly addictive qualities, opioids such as oxycodone and fentanyl are frequently abused, which abuse can lead to opioid dependence, addiction, and the use of illicit narcotics such as heroin.  LAURENCE F. DOUD III, the defendant, was well aware of these facts.  Indeed, in October 2014, DOUD received a report stating that "[t]he United States is in the midst of a prescription drug abuse epidemic as addiction, overdoses and

deaths associated with medical drug use have risen dramatically." Because they are highly addictive and available pursuant only to a prescription, oxycodone and fentanyl products have enormous cash value to drug dealers who sell oxycodone pills or fentanyl products to addicted individuals on the street for thousands of dollars.

### Responsibilities under the Federal Narcotics Laws

7.    The CSA regulates the manufacturing, distribution, and use of substances that can have a detrimental effect on public health and welfare. *See* 21 U.S.C. § 801, et seq.  Some of those controlled substances, including opioids such as oxycodone and fentanyl, may be manufactured, distributed, or used lawfully in accordance with the requirements and limitations of the CSA.

8.    To distribute controlled substances like oxycodone and fentanyl, a company such as RDC must register with the DEA and comply with laws and regulations imposed by the CSA.  Throughout the time period relevant to this Indictment, the DEA was responsible for enforcing the CSA and its implementing regulations including by, among other things, approving distributors' registrations, conducting audits and inspections, reviewing sales data and suspicious order reports, and bringing enforcement actions against registrants who failed to comply with the CSA.

9.    As a registered distributor, RDC is required to maintain "effective control[s] against diversion of particular controlled

substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. § 823(b)(1). As a registered distributor, RDC is also responsible for reporting suspicious orders to the DEA, which are defined by regulation as including "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

10. LAURENCE F. DOUD III, the defendant, was aware of the legal requirements imposed on pharmaceutical distributors. On multiple occasions during the period relevant to this Indictment, RDC's compliance department personnel and attorneys advised DOUD of RDC's obligations under the CSA. For example, in 2014, a compliance consultant instructed DOUD and others that "[a]s a distributor, [the Company] need[ed] to comply with the DEA 'Know-Your-Customer' Due Diligence policy," which requires RDC to collect and analyze customers' controlled substances dispensing data in order to prevent diversion. The compliance consultant further warned that RDC could be placed in the DEA's "cross-hairs . . . because of [its] willful blindness and deliberate ignorance." The compliance consultant explained that RDC could be in legal jeopardy by distributing controlled substances to customers "that are dispensing controlled substances not for legitimate medical purposes, accepting controlled substances prescriptions from bad

doctors or accepting 'cash' only for bad prescriptions."
Similarly, later that year, in a memorandum addressed to DOUD,
RDC's outside legal counsel explained RDC's obligations under the
CSA and noted that RDC could face legal sanctions for failure to
comply with the CSA.

11.   At various times relevant to this Indictment, and as
required by the CSA and its implementing regulations, RDC
promulgated policies purported to control against diversion of
controlled substances and report suspicious orders to the DEA.
Those policies were shown to and reviewed by LAURENCE F. DOUD III,
the defendant.  RDC informed the DEA of these policies and, from
time to time, provided copies of those policies to the DEA.

12.   At various times relevant to this Indictment, RDC also
notified its customers that it was required to report suspicious
orders for controlled substances to the DEA, and that it would not
ship orders that were deemed suspicious.   LAURENCE F. DOUD III,
the defendant, was aware of the fact that RDC provided such notice
to its customers.

### DOUD's Participation in the Unlawful
### Distribution of Controlled Substances

13.   Between in or about 2012 and in or about March 2017,
LAURENCE F. DOUD III, the defendant, participated in a conspiracy
to violate the federal narcotics laws by, among other things,
directing that RDC distribute to its pharmacy customers controlled

6

substances -- including dangerous opioids such as oxycodone and fentanyl -- that were being sold and used illicitly. DOUD did so to, among other things, maximize RDC's revenues and his personal compensation.

14. Throughout the relevant time period, LAURENCE F. DOUD III, the defendant, directed that RDC dispense controlled substances to customers that the Company's compliance department had concluded displayed "red flags" indicating that a pharmacy was dispensing controlled substances for other than legitimate medical purposes to individuals who were selling or abusing the substances. Those "red flags," which were identified in RDC's own policies, included, among other things, "[d]ispensing highly-abused controlled substances" in large quantities, purchasing "only controlled substances and little else," "[d]ispensing quantities consistently higher than accepted medical standards," "[a]ccepting a high percentage of cash from patients," "[d]ispensing to out-of-area or out-of-state patients," and "[f]illing controlled substance prescriptions issued by practitioners acting outside the scope of their medical practice or specialty." RDC's compliance department personnel repeatedly reported to DOUD that many of its largest customers were dispensing controlled substances that were being diverted from legitimate channels of distribution. Nonetheless, DOUD directed the compliance department and sales

personnel to continue supplying these pharmacies with oxycodone, fentanyl, and other controlled substances.

15. In almost every case, RDC continued to distribute controlled substances to the pharmacies it identified as displaying "red flags" of unlawful dispensing of controlled substances even after LAURENCE F. DOUD, the defendant, and RDC's chief compliance officer (the "Compliance Officer") became aware of these problems. On multiple occasions, the Compliance Officer confirmed to DOUD that RDC would not terminate sales to a customer without first obtaining approval from DOUD. When compliance employees did, in fact, notify DOUD that they were troubled by the large quantities of controlled substances being purchased by some of the Company's customers, DOUD dismissed the concerns and rarely authorized the termination of business with the customers.

16. In particular, for years throughout the time period relevant to this Indictment, RDC's compliance department staff and members of the Company's senior management warned LAURENCE F. DOUD III, the defendant, that they believed RDC's largest pharmacy customer ("Pharmacy-1") was distributing controlled substances that were being diverted for illegitimate purposes. Nonetheless, DOUD repeatedly disregarded these warnings and instructed RDC's employees to ship increasingly large orders of controlled substances to Pharmacy-1.

a. In 2012, shortly after Pharmacy-1 became a customer, it began ordering oxycodone that exceeded the limits that had been set by RDC's compliance department. While, pursuant to RDC's own written policies, RDC's compliance department was supposed to hold back orders that exceeded those limits, the Compliance Officer, at the direction of DOUD, regularly released Pharmacy-1's orders for shipment. On one occasion, the Compliance Officer informed DOUD that while he had released an order for shipment the following day, they needed to "discuss [Pharmacy-1's] ordering amounts" because "they are getting to a point where we may not want to go." DOUD, however, disregarded the Compliance Officer's warning, and instead insisted that the order be shipped that night because Pharmacy-1 was a "big account."

b. Over the next several years, Pharmacy-1's orders of oxycodone and fentanyl grew exponentially. During the relevant time period, Pharmacy-1 became one of the nation's largest dispensers of Subsys, a highly-additive fentanyl spray, and RDC was its primary supplier. Toward the end of 2013, the Company's chief operating officer ("Executive-2") told DOUD that Executive-2 was "very concerned with the growth of Subsys" at Pharmacy-1, and that his "gut feeling is the risk is to [sic] great versus the reward" and "that [the pharmacy] could potentially become a real problem for RDC." DOUD, however, disregarded those warnings, and

when Executive-2 continued to question whether RDC should maintain a financial relationship with Pharmacy-1, DOUD told Executive-2, "Kill it and die!"

c.    By mid-2014, the manufacturers who supplied RDC began warning the Company that if it continued to distribute to Pharmacy-1, they would "sanction" or even terminate sales to RDC. Internally at RDC, the Company's compliance and sales personnel discussed "slowing down" on fentanyl sales to Pharmacy-1 in order to appease the manufacturers that supplied RDC.   DOUD was aware of the manufacturers' complaints, but he nonetheless insisted that RDC continue to ship orders to Pharmacy-1.   Indeed, even when Pharmacy-1 started refusing to provide reports of its sales to RDC in 2014, DOUD refused to curtail sales to Pharmacy-1.   Instead, RDC continued -- and in fact grew -- its sales to Pharmacy-1 throughout DOUD's tenure as CEO.

d.    Despite all of the warning signs associated with Pharmacy-1, DOUD insisted that RDC continue sales to Pharmacy-1, and DOUD continued to personally profit from the business relationship.   Specifically, DOUD received a substantial bonus based on RDC's earnings, and because Pharmacy-1 was RDC's largest customer, DOUD had a financial incentive for RDC to continue filling Pharmacy-1's orders for exponentially increasing quantities of controlled substances.

17.   In addition to RDC's unlawful sales of certain dangerous controlled substances to Pharmacy-1, LAURENCE F. DOUD III, the defendant, knew that RDC was distributing controlled substances to other pharmacy customers who were diverting controlled substances for illicit purposes.  For instance, in 2013, RDC's head of sales observed to DOUD that "we have some VERY suspicious customers due to their buying" of large quantities of controlled substances. Nonetheless, the Company continued to supply the customers with controlled substances and did not report the pharmacies to the DEA.   Similarly, the Compliance Officer and other compliance department employees repeatedly noted to DOUD that the Company's customers were filling prescriptions written by doctors who were under DEA investigation or were on RDC's "watch list," *i.e.*, doctors whom RDC had identified as potentially diverting controlled substances.   Despite the fact that the Compliance Officer told DOUD that some of RDC's customers were filling prescriptions written by these problematic doctors -- and even mentioned some of the doctors by name to DOUD -- RDC nonetheless continued to supply these customers with controlled substances and did not report the pharmacies to the DEA.

18.   RDC also supplied pharmacies that LAURENCE F. DOUD III, the defendant, knew were dispensing controlled substances to patients traveling to the pharmacies from out-of-state and who

were paying for controlled substances in cash, both of which are "red flags" that the patients using those controlled substances had no legitimate medical need for them. For instance, in 2012, the Company began supplying a pharmacy that admitted it did not do any due diligence on its opioid prescriptions. By 2014, RDC observed that over sixty percent of the prescriptions filled by the pharmacy were paid for in cash and nearly all cash-paying patients were traveling to the pharmacy from out of state. In an email to DOUD and others, one of RDC's compliance auditors described the pharmacy as a "DEA investigation in the making," to which DOUD replied, "I don't think this is going to end well." Nonetheless, RDC continued to supply the pharmacy with controlled substances for approximately another four years, and did not stop supplying the pharmacy until 2018, after the DEA began a criminal investigation of the Company.

19. LAURENCE F. DOUD III, the defendant, directed RDC's continued distribution of controlled substances to these pharmacy customers that he knew were dispensing narcotics for illicit purposes, despite knowing that the pharmacies' dispensing practices were in contravention of the CSA.

<u>Statutory Allegation</u>

20. From at least in or about January 2012, up to and including in or about March 2017, in the Southern District of New

York and elsewhere, LAURENCE F. DOUD III, the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

21.   It was a part and an object of the conspiracy that LAURENCE F. DOUD III, the defendant, and others known and unknown, would and did distribute and possess with intent to distribute controlled substances, outside the scope of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1).

22.   The controlled substances that LAURENCE F. DOUD III, the defendant, and others known and unknown, conspired to distribute and possess with intent to distribute were (i) a quantity of mixtures and substances containing a detectable amount of oxycodone, in violation of 21 U.S.C. § 841(b)(1)(C), and (ii) 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of 21 U.S.C. § 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

## COUNT TWO
### (Conspiracy to Defraud the United States)

The Grand Jury further charges:

23.   The allegations contained in paragraphs 1 through 22 of this Indictment are repeated and realleged as if fully set forth herein.

## The Scheme to Defraud the DEA

24.   Between in or about 2012 and in or about March 2017,
LAURENCE F. DOUD III, the defendant, sought to obstruct and hinder
DEA oversight of RDC's practices in order to prevent the DEA's
enforcement of the narcotics laws against the Company and its
customers.  Despite the statutory and regulatory requirements that
RDC guard against diversion and report suspicious orders to the
DEA, of which DOUD was aware, DOUD caused RDC to make material
misrepresentations to the DEA about its due diligence practices
and controls against diversion, and did not report to the DEA
thousands of suspicious orders from its customers.

25.   In order for the DEA to properly oversee the distribution
of controlled substances and carry out its mandate under the CSA
and implementing regulations, distributors -- such as RDC -- are
required to monitor their customers by investigating suspicious
activity and reporting such activity to the DEA.  Beginning in or
about 2007, the DEA notified RDC in writing that it was required
by law to maintain a program to guard against diversion of
controlled substances by its customers, and needed to report to
the DEA those orders and customers that appeared suspicious.  Those
notices were shared with LAURENCE F. DOUD III, the defendant.

26.   RDC created standard operating procedures for the
detection and reporting of diversion of controlled substances

14

because RDC was required to do so by law.   Specifically, on multiple occasions during the relevant time period, RDC represented to the DEA that it had standard operating procedures for conducting due diligence on new customer accounts and reporting suspicious orders to the DEA.   For example, on multiple instances including during DEA audits and in connection with RDC's application for a license to operate a new facility in Fairfield, New Jersey, the Company provided the DEA with copies of its due diligence and suspicious order reporting standard operating procedures.   Among other things, RDC's standard operating procedures relating to customer due diligence, which LAURENCE F. DOUD III, the defendant, reviewed and was aware of, represented that the Company would conduct due diligence on new customer accounts prior to selling new customers controlled substances.   In addition, the Company's standard operating procedures relating to suspicious order reporting, which DOUD reviewed and was aware of, represented that the Company would report orders in a manner consistent with the DEA's regulations.

27.   Despite these representations to the DEA, as well as the statutory and regulatory obligations on distributors of controlled substances, RDC, at the direction of LAURENCE F. DOUD III, the defendant, acted in direct contravention of, among other things, the policies that the Company shared with the DEA and represented

15

it followed. DOUD and other members of senior management instructed RDC employees to contravene its policies and DEA regulations so that the Company could continue doing business with customers DOUD knew were likely diverting controlled substances, and to increase DOUD's compensation.

<u>Misrepresentations About the Company's Due Diligence</u>

28. First, despite RDC's statutory obligation to maintain effective controls against diversion, and the Company's specific representations to the DEA that it would conduct due diligence on new customer accounts before opening them by, among other things, reviewing multiple months' worth of controlled substance dispensing data, LAURENCE F. DOUD III, the defendant, directed RDC to open multiple new accounts without conducting any due diligence. For example, in or about July 2015, in response to delays in new account openings, DOUD began pushing to open new accounts immediately, without conducting due diligence, and remarked that even though he had "no idea if this [new pharmacy customer] is a good guy or bad guy . . . it is taking too long [to open the account] no matter what the problem is."   DOUD added in a subsequent email, "I know we have to do due diligence but we have the tail wagging the dog . . . this HAS to stop . . . Good or bad."

29. At the direction of LAURENCE F. DOUD III, the defendant, RDC opened multiple new customer accounts without conducting due

diligence in advance of making sales of controlled substances. Many of these new customers, however, had dispensing practices indicating that they were unlawfully distributing controlled substances. Indeed, since at least 2012, DOUD was aware that pharmacy customers were -- as one RDC salesperson told DOUD -- "scrambling to RDC as . . . other suppliers are cutting them off due to their high [controlled substance] percentage of sales." Those problems continued into 2015 as DOUD was pushing RDC to open new customer accounts without conducting due diligence.  As the Compliance Officer noted to other members of the compliance department, "all the new stores we are bringing on have baggage." That was, according to what another compliance department employee had heard, at least in part, because "everyone is being cut off by [other distributors] and running over to RDC . . . we are picking up rejects from other distributors."

30.  In multiple cases, after opening new customer accounts without conducting due diligence and selling controlled substances for months, RDC discovered significant problems in the dispensing records for those customers -- including high dosage opioid prescriptions and accepting a high percentage of cash from patients -- that suggested the pharmacies were unlawfully distributing controlled substances.  Nonetheless, LAURENCE F. DOUD III, the defendant, continued to push RDC's compliance personnel to

17

"explore the opportunities" to do business with new customers that had been terminated by other distributors, and were "not even . . . on the borderline in terms of proper compliance standards," because he viewed RDC as "the knight in shining armor for Independent[] [pharmacies]."

31. LAURENCE F. DOUD III, the defendant, intended to defraud the DEA with respect to RDC's account opening due diligence procedures.  Specifically, the decision to open new accounts without conducting due diligence, in contravention of the Company's representations to the DEA, was motivated, at least in part, by DOUD's perception that RDC could avoid DEA oversight because of changing enforcement priorities.  In or about June 2016, DOUD told Executive-2 and the Compliance Officer that "[b]ased on recent government changed [sic] I want to accelerate our account opening process.  As soon as our credit managers completely approve our credit app we will open an account right away."  DOUD justified the change in the Company's practice based on his perception that "the government has recently told the DEA to lay off wholesalers."

32. In response to the direction of LAURENCE F. DOUD, the defendant, that the Company open new accounts without conducting due diligence, the Compliance Officer reminded DOUD that the Company's standard operating procedure that it had provided to the DEA "states that RDC will conduct a review prior to opening [a

18

customer] to controls," and suggested that any change to the company's policy "be documented so we may show DEA." Nonetheless, and in order to conceal the Company's change in practice, DOUD did not amend, or instruct the Company to amend, its written policies or notify the DEA of its change in procedures. At DOUD's direction, and in contravention of its explicit representations to the DEA, RDC began to open accounts without conducting due diligence into the new customers' ordering and prescribing practices, and compliance employees subsequently determined that some of those customers displayed "red flags" of diversion of controlled substances.

## Willful Failure to File Suspicious Order Reports

33.   Second, in furtherance of the scheme to defraud the DEA, LAURENCE F. DOUD III, the defendant, directed RDC to avoid filing suspicious order reports with the DEA, and RDC did avoid filing such reports at DOUD's direction. DOUD directed RDC not to report suspicious orders in order to protect the profit being generated by customers dispensing large quantities of controlled substances. Indeed, at the direction of DOUD, the Compliance Officer instructed compliance department employees by email that "we do not turn in a store" merely based on suspicions of wrongdoing by the customer, but rather choose "to educate and work with our customers."

34.   At the direction of LAURENCE F. DOUD III, the defendant, rather than reporting suspicious orders, RDC's compliance department undertook to prevent the reporting of suspicious orders.   During the relevant time period, the Company maintained an automated "order of interest" program, which flagged customer orders for controlled substances that exceeded a customer's pre-established limits based on past order size.   RDC represented to the DEA that it used this system to identify suspicious orders. But, in fact, the Company rarely investigated or held these potentially suspicious orders, and willfully avoided filing suspicious order reports with the DEA.   For example, as DOUD well knew, the compliance department regularly marked flagged orders "not suspicious" and release orders to pharmacies without reviewing the pharmacies' dispensing data.   Additionally, in order to prevent the generation of future "orders of interest," and therefore avoid reporting suspicious orders to the DEA, the Company's compliance department regularly increased the threshold limit of controlled substances a pharmacy could purchase from RDC. DOUD knew that such a practice was contrary to law.   For example, in 2012, following a conference hosted by the DEA, an RDC employee told DOUD, Executive-2, and the Compliance Officer that the DEA has stated that "if we currently have stores that are constantly hitting our suspicious order report [threshold] . . . we cannot

just simply cut them back, on the drug that is causing the alert. . . . by cutting them back, we are telling the account[] [t]hat a little bit of Diversion, is okay." Nonetheless, throughout the relevant time period, the Company did just that.

35. Indeed, in some instances, RDC also eliminated customers' controlled substance order limit thresholds from the Company's automated system entirely. For example, in March 2013, when RDC's largest customer exceeded its order limit for oxycodone, the Compliance Officer wrote to LAURENCE F. DOUD III, the defendant, and Executive-2 that while "[t]echnically by our [standard operating procedure] we should make a call and stop selling," the Company continued to supply controlled substances to the customer. Even after RDC terminated pharmacy customers for failing to comply with the CSA, the Company did not report those customers to the DEA.

36. Despite its obligations under the CSA and its representations in its own policies and to the DEA, during the relevant time period, RDC only filed four suspicious order reports with the DEA. During the same period, however, the Company should have reported hundreds of suspicious orders to the DEA, including orders associated with customers that the Company's compliance department determined had "red flags," or customers that were

terminated, but it instead knowingly and willfully failed to do so.

Statutory Allegation

37.  From at least in or about January 2012, up to and including in or about March 2017, in the Southern District of New York and elsewhere, LAURENCE F. DOUD III, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to defraud the United States and an agency thereof, to wit, the DEA, in violation of 18 U.S.C. § 371.

38.  It was a part and an object of the conspiracy that LAURENCE F. DOUD III, the defendant, and others known and unknown, willfully and knowingly, using deceit, craft, trickery, and dishonest means, would and did defraud the United States and an agency thereof, to wit, the DEA, by willfully failing to report suspicious orders of controlled substances to the DEA and advise the DEA of customers diverting controlled substances, thereby impeding, impairing, defeating and obstructing the lawful function of the agency, in violation of 18 U.S.C. § 371.

Overt Acts

39.  In furtherance of the conspiracy and to effect its illegal objects, LAURENCE F. DOUD III, the defendant, and his co-

22

conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. During the relevant time period, RDC received approximately 8,700 "orders of interest," including at least 412 flagged orders of fentanyl and approximately 2,530 flagged orders of oxycodone, from its pharmacy customers. During that time period, however, RDC reported only four suspicious orders to the DEA.

b. During the relevant time period, DOUD directed RDC to open new customer accounts for customers located in the Southern District of New York and elsewhere, and to sell those customers controlled substances, without conducting due diligence on the customers, as RDC had represented to the DEA that it would do.

c. During the relevant time period, at the direction of DOUD, RDC supplied customers located in the Southern District of New York and elsewhere with controlled substances, despite knowing that those controlled substances were being distributed outside the scope of professional practice and not for a legitimate medical purpose, and failed to report those customers to the DEA.

(Title 18, United States Code, Section 371.)

### FORFEITURE ALLEGATION

40. As a result of committing the offense alleged in Count One of this Indictment, LAURENCE F. DOUD III, the defendant, shall

forfeit to the United States, pursuant to 21 U.S.C § 853, any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of said offense and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense that the defendant personally obtained.

### Substitute Assets Provision

41.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

GEOFFREY S. BERMAN
United States Attorney

24

Form No. USA-33s-274 (Ed. 9-25-58)

---

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

### UNITED STATES OF AMERICA

**v.**

### LAURENCE F. DOUD III,

**Defendant.**

---

### SEALED INDICTMENT

19 Cr.

(18 U.S.C. § 371;
21 U.S.C. § 846)

GEOFFREY S. BERMAN
United States Attorney

_FOREPERSON_

4/22/19 — Filed Sealed Indictment
A/W issued