*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 13, 2022

**BY ECF**

The Honorable George B. Daniels
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:     *United States v. Laurence F. Doud III*, No. S1 19 Cr. 285 (GBD)

Dear Judge Daniels:

      The Government writes concerning witnesses Barbara Castro and Michael Paulsen. As the Court stated at the final pretrial conference, testimony that drugs were in fact being diverted, when "coupled with the evidence . . . that there were red flags that would indicate that this was likely or was, in fact, occurring," is relevant to proving the existence of a conspiracy. (*See* Jan. 10, 2022 Tr. at 13.) During jury selection, the Court added that "to the extent that [the Government] can show a connection between the drugs that [Michael] Paulsen sold and the drugs that were sold by RDC, that witness can testify" and "that also applies to [Barbara] Castro." (Jan. 12, 2022 Tr. at 121.) But for their testimony to be admissible, there needs to be an offer of proof establishing that the connection exists. (*Id.*) The Government writes to provide that offer of proof in advance of the witnesses' testimony next week.

      The Government anticipates calling Castro as early as Tuesday, January 18, 2022, in the afternoon, and is planning to call Paulsen near the end of its case.

      A.   Barbara Castro

      Around 1998, following a surgery, Castro was prescribed Vicodin, an opioid, and she became addicted. She abused opioids until 2003, when she got clean, but then in 2006 she had a relapse and began taking opioids, principally oxycodone. While she received oxycodone from several doctors who were illegally dispensing narcotics, from approximately 2006 until after 2017, Castro was prescribed oxycodone exclusively by Carl Anderson, a physician in Staten Island. She is expected to testify about how Dr. Anderson's practice displayed all the classic signs of diversion: he did not take appointments; he saw "patients" in the middle of the night, often at 2 a.m. or later; he let multiple "patients" at a time into the examination room; he had a noisy waiting room and a line outside his office, filled with people who were visibly on drugs or suffering from withdrawal; "patients" were bribing receptionists to jump the line to see the doctor; and the doctor only took cash. Castro is expected to testify that she was abusing drugs at the time and that it would be plainly evident to any doctor or pharmacist who saw her.

Case 1:19-cr-00285-GBD   Document 136   Filed 01/13/22   Page 2 of 5

Page 2

Castro got the pills to fuel her addiction from pharmacies supplied by RDC, including Old Town Pharmacy. According to dispensing data, from at least January 2013 through at least January 2017, Castro filled approximately 48 prescriptions written by Dr. Anderson, all but one of which were for large quantities of oxycodone 30mg tablets. In early 2013, Castro filled a few prescriptions at New Dorp Pharmacy in Staten Island – which was an RDC customer – but then from May 2013 through April 2015 and from September 2015 through January 2017, Castro filled her prescriptions at Old Town Pharmacy in Staten Island. Castro is expected to testify that at Old Town Pharmacy she would see the same people she saw at Dr. Anderson's office the night before. She is expected to testify that many of those people were young – i.e., not the type you would expect to be taking oxycodone – and many were also visibly on drugs or suffering from withdrawal. While Old Town Pharmacy would take insurance for most prescriptions, Castro is expected to testify that Old Town Pharmacy only took cash for oxycodone prescriptions.

Old Town Pharmacy was an RDC customer during the period of the charged conspiracy. According to ARCOS data, which is controlled substance sales data that will be in evidence at trial, RDC was a supplier to Old Town Pharmacy during the duration of the charged conspiracy. Importantly, RDC was the *exclusive* supplier of oxycodone to Old Town Pharmacy from October 2015 onward. At trial, the Government is prepared to prove that RDC was Old Town Pharmacy's exclusive supplier of oxycodone during that period through the ARCOS data and the testimony of Kerry Whitmore, a DEA diversion investigator, and/or Professor David Cutler, an expert who has reviewed the ARCOS and dispensing data.

Internal RDC emails and witness testimony from a former RDC employee will establish that RDC was concerned that Old Town Pharmacy was illegally dispensing controlled substances. For example, on April 5, 2016, Elizabeth Cullen, an RDC employee in the compliance department, emailed the rest of the compliance department that she did a "breakdown of Old Town's most recent dispensing" and she "noticed they had several problematic prescribers," including Dr. Anderson. (GX 104C.) She noted that during the time period she analyzed there were "35 scripts, all 180ct Oxy 30mg" by Dr. Anderson, "40% of which filled cash." (*Id.*) In response, Jessica Pompeo, another compliance department employee, noted that there were "multiple" physicians on RDC's "suspicious list," and that Old Town Pharmacy had significantly exceeded its oxycodone limit. (*Id.*) Nonetheless, RDC did not report suspicious Old Town Pharmacy orders to the DEA until December 20, 2017. (GX 104D.) Pompeo is expected to testify that she was concerned that Old Town Pharmacy was illegitimately dispensing controlled substances. She is expected to testify that Dr. Anderson was one of the physicians that RDC had flagged as suspicious. She will also testify that RDC did not report or terminate Old Town Pharmacy during the period of the charged conspiracy.

Castro's testimony is relevant and admissible. Her testimony is probative of the fact that Old Town Pharmacy was illegally dispensing controlled substances. Specifically, the jury can conclude that Old Town Pharmacy was diverting controlled substances because Castro will say that she was getting oxycodone from the pharmacy and the drugs were not medically necessary, and that there were many other customers in the pharmacy that were plainly addicted or selling their oxycodone. That testimony not only establishes that Old Town Pharmacy was diverting controlled substances, but it is also probative of what RDC would have learned through due diligence. Indeed, Castro will say the signs of diversion were obvious to a person who simply

stepped in the pharmacy. Castro's testimony is also probative of the fact that Dr. Anderson was an illegitimate prescriber of oxycodone, and that he was diverting in the manner that RDC's compliance department believed. As the First Circuit recently explained in affirming the convictions of pharmaceutical executives for, among other things, violating the Controlled Substance Act, "The evidence of the patients' altered behavior, addiction, and withdrawal symptoms was plainly relevant to show that the doctors' treatment was outside the course of professional practice. . . . [and] evidence that the doctors prescribed [a fentanyl product] outside the usual course of professional practice . . . constitutes evidence relevant to show that the defendants had entered into an agreement to bring about exactly that result." *United States v. Simon*, 12 F.4th 1, 40 (1st Cir. 2021). In short, Castro's testimony will establish that Old Town Pharmacy was diverting in the manner that RDC's compliance department believed it was, which is evidence relevant to show that the defendant and his co-conspirators entered into the charged conspiracy.

The Government has also established the requisite connection between RDC and Castro. The Court said that "[i]f there's evidence that all of the drugs that Old Town received and distributed were RDC drugs, then you may have a sufficient connection to have [Castro] testify[.]" (Jan. 12, 2022 Tr. at 124.) The Government had made that showing: RDC was the exclusive supplier of Old Town Pharmacy from late 2015 onwards. From the same period through the end of the charged conspiracy, Castro got her oxycodone exclusively form Old Town Pharmacy. Thus, Castro was literally taking RDC-supplied pills every time she abused oxycodone from Old Town Pharmacy in 2016.

Finally, the defendant has significantly overstated the purported prejudice of Castro's testimony. Castro has certainly struggled with addition over the last two decades. Drug use has negatively affected her health, relationship with her family, personal finances, and employment. But the witness's background will not be the focus of her testimony. The focus will be Old Town Pharmacy and Dr. Anderson. "The fact that addiction is ugly does not bar the government from offering evidence about it when — as in this case — the defendants' scheme has made addiction relevant and probative." *Simon*, 12 F.4th at 42 (patient-harm testimony was more probative than prejudicial under Rule 403). Testimony about the witness's background is necessary to understand how she was using oxycodone for unlawful purposes, and how the doctor and pharmacy would know that. Castro's possible testimony about other "patients" of Dr. Anderson who went to Old Town Pharmacy is similarly relevant to proving diversion of controlled substances. While Castro knows individuals who have died from opioid addiction – as have many New Yorkers – that will not be the principal focus of her testimony. The "court is not required to scrub the trial clean of all evidence that may have an emotional impact, where the evidence is part of the Government's narrative." *Id.*

B. <u>Michael Paulsen</u>

In March 2016, Michael Paulsen opened Regal Remedies, a pharmacy located in Staten Island. RDC was Regal Remedies' exclusive supplier of controlled substances, including

oxycodone, from the pharmacy's opening through 2017.[1] While Paulsen was not a registered pharmacist, he both did the purchasing of controlled substances from RDC, and he personally dispensed controlled substances to customers. From the beginning, Paulsen diverted controlled substances at Regal Remedies. He filled prescriptions, written by suspicious doctors, that he knew were not medically necessary and also sold oxycodone pills to individuals who did not have prescriptions.

The evidence at trial will establish that RDC's compliance department identified signs of illegal diversion at Regal Remedies during the period of the charged conspiracy, but that RDC kept supplying the pharmacy and did not report it. For instance, in November 2016, RDC's compliance department identified red flags of diversion such as "21% cash" and filling prescriptions for "high Oxy counts (180, 240 du) for cash written by a number of questionable docs, including Martin Techer, David Taylor, Anthony Pietropinto, Joseph Olivieri, [and] Raja Bhatai." (GX 103A.) Jessica Bouck, from RDC's compliance department, is expected to testify that RDC did not terminate Regal Remedies' ability to purchase controlled substances, did not investigate further and did not report Regal Remedies to the DEA at the time. Rather, the evidence at trial will establish that it was not until September 2017 – after the defendant had left RDC – that RDC first suspended Regal Remedies' ability to purchase controlled substances and also filed a Suspicious Order Activity Report with the DEA. (GX 103D.)

Paulsen's testimony is relevant to the issues at trial. It is testimony that diversion was "in fact [] occurring" at a pharmacy supplied by RDC. (*See* Jan. 10, 2022 Tr. at 13.) That is highly probative evidence of the existence of the charged conspiracy because he will establish that one of RDC's customers was in fact diverting controlled substances. Moreover, because RDC was Regal Remedies' exclusive supplier of controlled substances during the relevant time period, there is a direct connection between RDC's supplied drugs and illegal diversion. (*See* Jan. 12, 2022 Tr. at 121.) On the other hand, the risk of prejudice is minimal. As the Court observed, while evidence of criminal conduct can be prejudicial, that does not mean it is unfairly prejudicial or inadmissible. There is nothing about Paulsen's commission of crimes that is necessarily more prejudicial than the rest of the evidence in the case. Thus, Paulsen's testimony is admissible at trial.

\* \* \*

---

[1] After 2017, Regal Remedies began purchasing controlled substances from another distributor.

In sum, because the pills sold to Castro and Paulsen came from RDC either directly (in the case of Paulsen) or via Old Town Pharmacy (in the case of Castro), the Government has established the requisite connection to make the testimony admissible. If Castro and Paulsen were not permitted to testify, it would prejudice the Government's ability to prove diversion was in fact happening at pharmacies. The Government has previously offered that it is will curtail or not call certain pharmacy witnesses if the defendant will stipulate to the fact that certain pharmacies were diverting controlled substances. Absent such a stipulation, the Government should be permitted to put on its case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/
Thomas Burnett
Nicolas Roos
Alexandra Rothman
Assistant United States Attorneys