

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 19, 2022

Hon. George B. Daniels
United States District Court
500 Pearl Street
New York, NY 10007

      Re:    <u>**United States** v. **Laurence Doud III**</u>, 19 Cr. 285 (GBD)

Dear Judge Daniels:

      The Government respectfully submits this letter in support of its intention to offer certain evidence regarding certain suspicious-order reports ("SORs") and pharmacy terminations that occurred after the defendant left Rochester Drug Cooperative ("RDC").

### A. Applicable Law

      To begin, the law is clear that facts that arose *after* the existence of conspiracy are admissible, so long as they bear on the existence of the conspiracy or the intentions of the conspirators. In *Anderson v. United States*, the Supreme Court established the principle that acts of a conspirator may be admitted "against the other conspirators, if relevant to prove the existence of the conspiracy, 'even though they might have occurred after the conspiracy ended." 417 U.S. 211 (1974). The Second Circuit applied that principle in the context of business-related offenses in *United States v. Koppers*, 652 F.2d 290 (1981). In that criminal antitrust case, the Government alleged that two companies entered a bid-rigging conspiracy. *Id.* at 292. To prove the existence of the conspiracy, the Government offered "evidence documenting the demise of the conspiracy . . . and the subsequent change in bidding patterns." *Id.* at 298. The Second Circuit upheld the trial court's decision to admit that evidence, holding that "post-conspiracy evidence is admissible if it is probative of the existence of the conspiracy," and the fact that the "bidding pattern" in the "post-conspiracy" period "differed significantly from the patterns observed during the life of the conspiracy," was probative as to whether a conspiracy existed." *Id.* at 298-99; *see also United States v. Mendez*, 165 F.3d 15 (2d Cir. 1998) ("Evidence of postconspiracy conduct is admissible where, as here, it had real probative value regarding [defendants'] willingness and intent to enter into the proven conspiracy.").

### B. Discussion

      The post-conspiracy evidence the Government intends to introduce is probative as to the existence of a conspiracy to illegally distribute narcotics and a conspiracy to defraud the Drug Enforcement Administration ("DEA").

1. **Evidence About Suspicious Order Reports**

The Government intends to offer SORs filed after the defendant left RDC that are about companies to which RDC sold during the defendant's tenure. The Government also intends to offer a log of SORs that RDC maintained in the regular course of its busines, which documents SORs that RDC filed after the defendant left, limited to pharmacies to which RDC sold during the defendant's tenure. (*See* GX 263-266.) The Government also intends to offer the following testimony:

- The individuals responsible for identifying suspicious orders and filing SORs after the defendant left RDC were largely the same people who had that responsibility during the defendant's tenure.

- The SORs that RDC filed after the defendant left RDC addressed the same categories of suspicious practices that compliance employees routinely identified during the defendant's tenure, but did not report. For example, compliance employees regularly saw pharmacies exceed their purchasing limits during the defendant's tenure and, at times, even stopped orders over those limits, but did not file suspicious order reports. After the defendant left, compliance employees regularly filed suspicious order reports for orders that exceeded ordering limits and the company did not ship. Similarly, during the defendant's tenure, RDC regularly saw pharmacies filling prescriptions written by suspicious doctors, but did not file suspicious order reports about those observations. After the defendant left, compliance employees regularly filed suspicious order reports after identifying pharmacies filling prescriptions written by suspicious doctors.

- The reason compliance employees filed suspicious order reports for these categories of issues after the defendant left the company was because they began following RDC's written due diligence policies. Compliance employees did not file suspicious order reports for these categories of issues while the defendant ran RDC because they were directed not to do so, rather than because of any confusion about what constitutes a "suspicious order."

- Many of the SORs that RDC filed after the defendant left the company were actually about the same issues at the same pharmacies that compliance employees had identified earlier. For example, in September 2015, RDC's compliance department held, but then released, an order of interest for ProHealth without reporting a SOR to the DEA. In April 2016, Jessica Pompeo sent an email alerting RDC's compliance team that ProHealth was filling prescriptions written by a number of suspicious doctors. In 2018, RDC filed SORs stating that ProHealth was ordering large amounts of controlled substances, exceeding RDC's thresholds, and filling prescriptions written by a number of suspicious doctors, including the same suspicious doctors whom Jessica Pompeo had identified in her April 2016 email.

This evidence is relevant to show that, while the defendant ran RDC, he participated in a conspiracy to defraud the DEA by, among other things, not filing suspicious order reports. Just

like the change in bidding practices in *Koppers* helped establish the existence of a conspiracy, here, the fact that, after the defendant left, RDC began filing SORs for the same issues that they regularly saw while the defendant ran RDC—including the same issues at the same pharmacies— is relevant evidence to support that the defendant participated in a conspiracy *not* to file SORs before his departure. As outlined above, the witness testimony will also corroborate that the defendant's departure was the key variable in the significant increase in SORs. The Government's ability to offer this evidence is also particularly important in light of the defendant's cross-examination of Ruth Carter. During that examination, the defendant's attorneys clearly suggested that the rules about what constitutes a suspicious order and when such an order should be reported are vague. *See, e.g.*, Tr. 165-166; 169-170; 175-77; 192-96.[1]

The fact that compliance employees routinely filed SORs after the defendant left about the same categories of problems they identified during his tenure is important evidence to rebut the suggestion that RDC filed hardly any SORs during the conspiracy period because of confusion about what constituted a suspicious order. *See United States v. Galanis*, 844 F. App'x 400, 402 (2d Cir. 2021) (Government permitted to introduce evidence after defense opened door by raising knowledge defense).

The evidence and testimony outlined above is also relevant to proving the existence of a conspiracy to illegally distribute narcotics for two reasons. First, it shows that employees in RDC's compliance department, including Jessica Pompeo, Bill Pietruszewski, and Julius Morton—all of whom played a key role in carrying out the conspiracy and conveying information to the defendant—understood that RDC was shipping suspicious orders during the conspiracy period, which goes to their knowledge of and intent to illegally distribute opioids. And second, the evidence is relevant to showing that the defendant and his co-conspirators attempted to cover up their plan to illegally distribute narcotics by hiding information from the DEA. As Ruth Carter testified, "the purpose" of requiring distributors to file SORs is "to alert the DEA that this particular pharmacy or customer is placing suspicious orders . . . so the DEA could conduct investigations." Tr. 92:8-13. The evidence and testimony outlined above support the inference that the defendant and his co-conspirators intentionally did not file SORs, from which the jury can infer they were trying to keep the DEA from taking investigative steps that would have exposed the bad pharmacies to which RDC sold.

   2. **Evidence About Terminations**

Moving from SORS, to pharmacy terminations, the Government intends to offer the following testimony through Jessica Pompeo:

- After the defendant left RDC, the individuals responsible for recommending whether pharmacies should be terminated from controlled substances were largely the same people who had that responsibility during the defendant's tenure.

---

[1] To the extent the defense believes the increase in SORs was due to factors other than the defendant's departure, the proper way to make that argument is through cross examination, the defense case, and closing argument—not to keep the jury from seeing relevant evidence.

- After the defendant left RDC, the company terminated many pharmacies' abilities to order controlled substances due to compliance problems that employees in compliance had identified and discussed—including with the defendant—during the defendant's tenure.

This evidence is relevant to proving the existence of a conspiracy to illegally distribute narcotics during the defendant's tenure at RDC. The fact that, after the defendant left, RDC terminated customers for reasons that compliance employees had previously identified supports the inference that the defendant and employees in compliance knowingly worked together to sell controlled substances to pharmacies they knew were diverting those drugs, or that showed clear signs of lawbreaking. Indeed, far from being irrelevant, the fact that these terminations occurred *after* the defendant left is helpful—in the context of other testimony and evidence introduced at trial—to support the inference that RDC did not cut off the pharmacies earlier because the defendant was directing his co-conspirators not to do so.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: _/s/_____
Thomas Burnett
Nicolas Roos
Alexandra Rothman
Assistant United States Attorney
(212) 637-1064