M1I3DOU1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4                v.                        19 Cr. 285 (GBD)

 5   LAURENCE F. DOUD III,

 6                   Defendant.
                                           Trial
 7   ------------------------------x

 8                                         New York, N.Y.
                                           January 18, 2022
 9                                         9:30 a.m.

10   Before:

11
                     HON. GEORGE B. DANIELS,
12
                                           District Judge
13                                         -and a Jury-

14                         APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  NICOLAS T. ROOS
17        ALEXANDRA ROTHMAN
          THOMAS S. BURNETT
18        Assistant United States Attorneys

19   ROBERT C. GOTTLIEB
     DERRELLE M. JANEY
20   PAUL R. TOWNSEND
          Attorneys for Defendant
21
     Also Present:  Sunny Drescher
22                   Jacqueline Hauck
                     Paralegal Specialists
23                   Special Agent George Burdzy, DEA
                     Investigator Kathleen Whitmore, DEA
24

25
```

M1I3DOU1

1           (In open court; jury not present)

2           THE DEPUTY CLERK:  19 CR 285, United States v.

3   Laurence F. Doud III.

4           MR. ROOS:  Good morning.  For the government, Nicolas

5   Roos, Alexandra Rothman, and Thomas Burnett.

6           MR. GOTTLIEB:  Good morning.  Robert C. Gottlieb &

7   Associates by Robert Gottlieb for Mr. Doud.

8           MR. JANEY:  Also for Mr. Doud, the Janey Law Firm by

9   Derrelle Janey.

10           MR. TOWNSEND:  And Paul Townsend.

11           THE COURT:  Three things that we'll address right now

12   while we're waiting for jurors.  One, I understand the defense

13   would like a room that they can use.  What I think I may do is

14   I'm going to give the witness room to the government, since

15   they'll be bringing in their witnesses.  I will give you the

16   attached jury room to this courtroom, which is a smaller jury

17   room than what we're using, so you can utilize that.

18           MR. GOTTLIEB:  Thank you.

19           THE COURT:  And we'll lock it up if need be.

20           I know there is an issue with regard to Paulsen and

21   Castro that the parties wanted to address.  And one other

22   issue.  We have four jurors so far.  I have a letter if the

23   defense still thinks this is a relevant consideration.  I have

24   a letter from the jury department with regard to the breakdown

25   in the numbers of the jurors.  I will give you both sides a

M1I3DOU1

1    copy of that letter.  I'll give it to you now.

2              MR. GOTTLIEB:  Thank you.

3              THE COURT:  You're welcome.  We have two jurors who

4    raised issues with regard to timing.  One raised an issue last

5    week which I think I communicated to the parties, Juror No. 8

6    who says she has -- I think she is the film producer or

7    something.  She says she has some event the 24th and the 28th.

8    Now we've gotten some indication this morning from I believe

9    Juror No. 6 who says that he has a, I believe a son or a

10   daughter who is graduating from basic training on February 4.

11   That's the only information that I have.

12             As you remember, we do have 17, we need to go down to

13   16.  So, we can either excuse one or both of them or not.

14   Quite frankly, I don't think that either one of their reasons

15   are particularly compelling at this point, given that they've

16   been chosen as jurors, but since we do have to get rid of one

17   person, I'm willing to be a little bit more flexible and take

18   direction from the parties on this issue.  But as soon as we

19   swear in these 16 jurors, or 15 or 16 jurors, I'm going to let

20   them know clearly we're not going to hear any more excuses.

21             You can tell me what your position is, if you have one

22   now, with regard to the juror who says she has some job related

23   thing I guess it would be next Monday and next Friday.  Some

24   kind of a press event with regard to her job.  And Juror No. 6,

25   he says, it's only been communicated to me so far that this

1    event is on February 4., which is a Friday.  I don't know if

2    that means he needs travel time if we can accommodate him.

3         My inclination would be is to maybe, if we're going to

4    accommodate either one of them, rather than telling them it's

5    just too bad they have to be here, is excuse the one who has

6    the two day event starting next week.  And considering keeping

7    the other person, and as we get closer, I'll hear your

8    suggestions, but my first reaction would be is that I would be

9    willing to keep him until we get closer, and then as we get

10   close, if the parties agree to go ahead and excuse him prior to

11   February 4, or to take February 4 off if it's only that day

12   that we need.

13        But, I can bring them in here and we can get some more

14   information, but why don't I get a reaction first.  What's the

15   government's position?

16        MR. ROOS:  Well, on the first juror, the one with the

17   press conference or whatever it is that your Honor's chambers

18   informed us of last week.  Our view is that, at least based on

19   the information we have right now, that it's not a basis to

20   excuse her.  We should just keep her on the jury.

21        I talked briefly with Mr. Gottlieb, I think that's his

22   view unless it's changed.

23        As to the other one, I think there is a possibility,

24   frankly, we are not even still going on February 4 or I think

25   maybe you would give a Friday off or something.  My initial

M1I3DOU1

1    reaction is just leave both of them on for now.

2              THE COURT:  The only thing is if we leave both of them

3    on for now we'll still have to excuse a juror.  So, it didn't

4    make a whole lot of sense to excuse another juror who has got

5    no problem and then keep two jurors that do have a problem.

6    That's my only reaction to that.  But I'm willing to

7    accommodate the parties if that's what you prefer to do.  We're

8    going to have to get rid of somebody today.

9              MR. ROOS:  I guess not everyone is in yet.

10             THE COURT:  Say it again?

11             MR. ROOS:  Not everyone is in yet.

12             THE COURT:  Not everyone is in.  It could be someone

13   else who has a problem too.

14             MR. ROOS:  If we are going to excuse someone and your

15   Honor is inclined to excuse one of them, I guess maybe it would

16   be appropriate to do some further followup to understand, is

17   she being told by her employer this is something she has to do

18   or is it necessary for her own income, questions like that just

19   to get a better sense.  Same with the gentleman.  Does he need

20   to travel for this or is it just one day off?

21             THE COURT:  Mr. Gottlieb, what's your reaction?

22             MR. GOTTLIEB:  My reaction, your Honor, it may

23   surprise you, I'm actually in agreement with the government at

24   least this morning.  And I think at this point, everyone worked

25   very hard to select the jurors.  I don't believe it rises to

M1I3DOU1

1    the level to excuse them at this point.  Those are the types of

2    excuses that oftentimes your Honor learns that, within a day,

3    if they're told you have to be here, they manage somehow to

4    rearrange their schedule.

5            So, I would ask that we proceed with the plan that we

6    discussed last week when we selected the jurors.  And I know we

7    have one extra in case something happened today where we had to

8    fill a seat.  If that doesn't occur, the two jurors who have

9    raised questions, I don't believe there is reason to excuse

10   them.

11           THE COURT:  You think we should go ahead and excuse

12   the last alternate and keep these two?

13           MR. GOTTLIEB:  Correct, your Honor.

14           THE COURT:  All right.  Well, why don't I do this.

15   Let's see if one or both of them have arrived already.  I'll

16   bring them each up and tell them, I'll hear what they have to

17   say, but we'll send it back to the jury room.  Let's see where

18   we are after we talk to them.  I still feel it is a little

19   awkward to sort of say to them they should stay and excuse

20   someone who hasn't complained about it.  It sends the wrong

21   signal than I want to send.

22           I agree with you, I don't think at this point, and,

23   clearly, if there was a need for these jurors to stay here,

24   what we've been told and the timing which we've been told about

25   this, is not a compelling reason at this point to make their

M1I3DOU1

1    personal and professional business a priority over this jury

2    trial.  But let me see who is here, check and see if one or

3    both of those are here.

4             I understand defense wanted to be heard further with

5    regard to this Paulsen and Castro application.

6             MR. JANEY:  Yes, good morning, your Honor.

7             THE COURT:  Good morning.

8             MR. JANEY:  I'm not sure if the Court has received any

9    type of letter of correction, I know the defense has not,

10   pertaining to the government's submission dated the 13th.  But

11   we felt it important before the decision is made, your Honor,

12   to raise with the Court late Sunday night as well as late last

13   night we received additional 3500 material that bears on this

14   issue, and I think demonstrates some of the statements that

15   were made in the government's submission are simply factually

16   inaccurate.

17            More particularly, your Honor, as it pertains to

18   Barbara Castro, the government's submission, in particular page

19   two of the submission, indicates that, number one, Barbara

20   Castro bought her drugs from Old Town Pharmacy.  And she in her

21   3500 material produced late last night or Sunday night, I

22   forget which, the hours are drawing close together.  But, she

23   indicates in the 3500 material, your Honor, that she bought her

24   drugs from several -- one, two, three, four different

25   pharmacies, in addition to Old Town.

M1I3DOU1

1          The most that she can testify about, based on the 3500

2     material, your Honor, is that maybe she bought most of her

3     narcotics from Old Town.  And as to the government's statement

4     in its submission on page two that she also bought her drugs

5     from another RDC customer indicated as New Dorp, she indicates

6     in the 3500 material that she can't even recall New Dorp

7     Pharmacy.  So, your Honor, that's important.  Because it puts a

8     different perspective on the government's offer of proof.

9          Further, your Honor, an additional 3500 material from

10    another witness, I believe it's the H.D. Smith witness, and

11    this goes to the issue as to whether RDC was the exclusive

12    supplier of oxycodone to Old Town.  There, this witness

13    indicates that H.D. Smith sold these narcotics, certainly

14    through September of 2015, but indicates it may have continued

15    to sell them after September.  She doesn't know what the sales

16    were after September.

17         For the purposes of the record, your Honor, and for

18    the government's perspective, I'm referring to 3500 material

19    Bates stamped at the first document 3523-039.  And the Barbara

20    Castro related 3500 material at 3552-175.

21         So, your Honor, you have our submission in response to

22    the government's document that we filed before noon on Sunday.

23    I don't have to repeat our statements there, your Honor.  But

24    certainly, as we say in those papers, and certainly in concert

25    with the 3500 material that we received late Sunday night and

M1I3DOU1

1    late last night, the government continues to strain, to strain

2    to demonstrate the relevance of Barbara Castro as a witness in

3    this case, strains to demonstrate that it's probative in any

4    way, that it's not misleading, that it doesn't create unfair

5    prejudice for the jury and for this defendant.

6          Based on this 3500 material, your Honor, in addition

7    to the case law that we explicated in our submission, that

8    relevance certainly isn't there, it's not probative, the

9    witness cannot testify to all of the statements that the

10   government indicates in its submission by way of its offer of

11   proof.  Thank you, your Honor.

12         THE COURT:  The government want to be heard further?

13         MR. ROOS:  Yes, your Honor.  A few things.  So, for

14   starters, I think there are some factual inaccuracies in the

15   defense submission.

16         Let me just lay out for the Court the connection to

17   Barbara Castro.  There is going to be evidence in the case that

18   RDC was a supplier of Old Town Pharmacy for several years, the

19   entirety of the conspiracy period, 2013 to 2017.  The ARCOS

20   data, which is the data that distributors, so Rochester Drug

21   and other --

22         THE COURT:  Close the door, please.

23         MR. ROOS:  Rochester Drug and other companies submit

24   to the DEA, that indicates who is supplying which pharmacy.

25         So the defense submission is inaccurate when saying we

M1I3DOU1

1    don't know if a criminal enterprise like Old Town is correctly

2    reporting things.  It is not Old Town that's doing the

3    reporting; it is the distributor.  According to all of the data

4    that the DEA has regarding distributors, it shows who is

5    selling to which stores when.

6             So we look at that data, and we see, as the 3500 for

7    the H.D. Smith witnesses, H.D. Smith did sell to Old Town as

8    did RDC up to 2015.  But from the end of 2015 to the end of the

9    conspiracy period, there is one supplier for Old Town, and that

10   is RDC.

11            Now, during that period, during the entirety of that

12   period, but in particular when RDC is the sole supplier,

13   Barbara Castro goes to Old Town Pharmacy.  The only pills she

14   is getting are the ones that are supplied by RDC.

15            Why is her testimony relevant?  She will establish two

16   important parts of the case:  Number one, that the

17   prescriptions she was getting were not medically necessary from

18   Dr. Anderson.  That's probative because Dr. Anderson shows up

19   all over the RDC files.  We'll see that in e-mail records and

20   dispensing records.  And second, she will set forth evidence

21   that Old Town was distributing not just to her, but to other

22   people she observed there, who did not need prescriptions,

23   those were not medically necessary prescriptions.

24            THE COURT:  I'm not sure how she can testify to that.

25            MR. ROOS:  She can certainly testify to her own

M1I3DOU1

1   prescription.

2              THE COURT:  How can she testify whether or not other

3   people sitting in the waiting room had a valid prescription?

4              MR. ROOS:  She can't testify definitively.  I'll give

5   that to your Honor.  Certainly she can testify about her

6   observations, from which there is relevant evidence from which

7   the jury can conclude there were other people diverting their

8   pills.  What will she say?  She'll say she saw the same people

9   going to Dr. Anderson at 2 in the morning to get pills, paying

10  cash, and the next morning she'd see them at Old Town filling

11  their prescriptions.  She'll say some of those people looked

12  like they were 18 and 19 years old and looked to be healthy.

13  Some appeared to be junkies.

14             From that, that's first-hand direct evidence relating

15  to the fact that Old Town was diverting its pills.

16             THE COURT:  The part that you describe as her opinion

17  about whether or not they were drug users or they appeared to

18  be healthy or sick.  It doesn't seem she's particularly

19  qualified to give that kind of opinion.

20             MR. ROOS:  A person walking down the street could say

21  that their observation is somebody looks like they are high or

22  they have track marks or something like that.

23             THE COURT:  Yeah, but you don't necessarily manifest.

24  If you have a prescription for oxycodone, I couldn't tell you

25  if there is a person in this room who does not have a

1    prescription for oxycodone and is not presently on oxycodone.

2    How would I know that?  I'm not qualified to tell that.

3             If somebody is sleeping or somebody's talking or

4    someone's just observing, I don't see how she is qualified to

5    describe somebody as somebody, one, who is on drugs, or two,

6    who doesn't genuinely need that drug, or three, can say that

7    that drug was dispensed to them illegally.

8             Maybe there's circumstantial evidence, as you say.

9    She can testify as to what appears her observations were, who

10   was in the room and that she saw the same people the next day.

11   But her opinions and conclusions about that, I don't think that

12   she's competent, that's competent evidence for the jury to

13   accept.

14            MR. ROOS:  That's fair, your Honor.  I think still it

15   is highly relevant that she herself was diverting pills.  There

16   is other people she knows first-hand.  Her brother is going to

17   the exact same doctor and the same pharmacy.  She'll testify he

18   was diverting.  She can name other people who were to Old Town

19   doing the same thing.  There she has first-hand knowledge.  It

20   is not just opinion testimony.

21            THE COURT:  How does she have first-hand knowledge?

22            MR. ROOS:  Other people she was swapping pills with

23   and things like that.  There is a group of them, four, five,

24   six people, all of whom would be getting max prescriptions,

25   then going, filling them, trading pills.

M1I3DOU1

1          THE COURT:  I'm not sure the extent of the testimony

2     that you want from her.  There are a couple of things that

3     concern me.  I don't find compelling the argument that this is

4     or isn't the only pharmacy where she was getting pills.  The

5     question is, is this one of the pharmacies that she was getting

6     the pills, and if the pills that she was getting from this

7     pharmacy are pills that were distributed by RDC, that seems to

8     be sufficient connection with RDC.  Whether or not she's

9     getting pills also from some other place, quite frankly, I'm

10    not sure it's relevant one way or the other.  As long as it's

11    established that she is being given pills that RDC distributed

12    through this pharmacy.  And I think that is sufficient

13    connection.

14          Yes, sir.

15          MR. JANEY:  Your Honor, the reason that we raise it is

16    because, as I understood it, your Honor put to the government

17    as its offer of proof to show the direct connection both with

18    respect to Castro and with respect to Paulsen.

19          THE COURT:  Why isn't that a direct connection?

20          MR. JANEY:  Well --

21          THE COURT:  If RDC is the only drug distributor giving

22    drugs to that pharmacy, and she's getting drugs from that

23    pharmacy, she's getting RDC drugs.  Isn't she?

24          MR. JANEY:  Yes, your Honor.  If that were in fact

25    factually correct.  Which I'm suggesting this morning, based on

M1I3DOU1

1    the 3500 material, and I'm happy to offer it up to your Honor.

2              THE COURT:  I didn't hear you describe the 3500

3    material as being inconsistent with that.

4              MR. JANEY:  Let me be clearer.  It is consistent with

5    raising the question as to whether Old Town exclusively got

6    these pills --

7              THE COURT:  That's what I say.  I understand your

8    argument whether they exclusively got the pills.

9              MR. JANEY:  That's the government's offer of proof in

10   their submission to the Court.

11             THE COURT:  I'm sorry.  I'm not sure what evidence

12   that you just articulated that you say you just got that goes

13   to that issue of whether or not Old Town was exclusively --

14   that the only pills that Old Town was selling was from RDC.

15             MR. JANEY:  The second document, your Honor, in the

16   3500 material that I described pertaining to Deborah Komoroski

17   raises a question.

18             THE COURT:  How does it raise that question?

19             MR. JANEY:  Because she says that she doesn't recall

20   whether H.D. Smith did or did not continue to provide the

21   narcotics in question to Old Town Pharmacy during the time

22   frame that the government says RDC was the exclusive provider.

23             THE COURT:  What she remembers and what she doesn't

24   remember does not put the truth or the lie to the testimony of

25   someone else who says it happened.

M1I3DOU1

1          MR. JANEY:  What it does undermine, and correct, your

2     Honor, is that the government's statement that RDC was the

3     exclusive provider in that time frame.  Her statement says

4     otherwise.

5          MR. ROOS:  It doesn't.  It says she can't remember

6     what happened afterwards.  But we have the data.  We have the

7     data that says who was the exclusive supplier, and we have the

8     data in Castro's 3500 that says she was filling at Old Town

9     during that period.

10          MR. JANEY:  In its offer of proof attached to the

11     submission dated the 13th, the government does not attach

12     anything, articulate anything, describe anything, with respect

13     to this ARCOS data that would substantiate exactly what

14     Mr. Roos just described.

15          THE COURT:  I don't understand from what the

16     information that you have, I don't understand how it in any way

17     casts doubt on the fact that this pharmacy got their drugs

18     exclusively from RDC.

19          MR. JANEY:  Your Honor, I think that it's fair to

20     infer from the 3500 material that the witness was asked when

21     did you provide these drugs to Old Town.

22          THE COURT:  Which witness?

23          MR. JANEY:  Deborah Komoroski.  And I think it's fair

24     and reasonable to infer she is saying, in sum and substance, I

25     know we did it through September of 2015.

M1I3DOU1

1          THE COURT:  Right.

2          MR. JANEY:  And then, I think it's fair to infer from

3     the 3500 material that she was asked did H.D. Smith provide it

4     at any time thereafter, and she is saying, and I think it's

5     fair to infer, she's saying I'm not exactly sure what happened

6     after that, but it could have been.

7          THE COURT:  Okay.  So, she can't establish that.  The

8     fact that she can't establish that, how does that cast doubt on

9     the records that do indicate that?

10          MR. JANEY:  I'm not sure the government's actually

11     produced records in its offer of proof.

12          THE COURT:  I don't know.

13          MR. JANEY:  But the question, the question put to the

14     government in their burden for the purpose of the motion was,

15     show me.  Show me the information that substantiates that RDC

16     was the exclusive provider.  And what I am suggesting to the

17     Court this morning is that the government didn't carry that

18     burden.  The government's own witnesses are saying we're not

19     really sure.

20          THE COURT:  One of the government's own witnesses says

21     I'm not sure, but the records that they say that they have and

22     they have produced to you indicate only one thing, that this

23     was the exclusive supplier.  RDC was the exclusive supplier to

24     this pharmacy.

25          MR. JANEY:  I'll tell you --

M1I3DOU1

1          THE COURT:  Do the records reflect that?  Have you

2     received those records?

3          MR. JANEY:  I don't see anything in this letter

4     from --

5          THE COURT:  I didn't ask you about that.  I am asking

6     you, did they produce the records to you?

7          MR. JANEY:  Yes.

8          THE COURT:  And do the records reflect that?

9          MR. JANEY:  What I would say is the defense, we can't

10     discern whether RDC was the exclusive provider to Old Town

11     Pharmacy during this time frame.

12          THE COURT:  The question isn't whether you can discern

13     it.  The question is, is there evidence of it.  And is that

14     evidence probative to be put before the jury.  And I don't hear

15     you saying that you have any evidence to the contrary that

16     contradicts any of the records that they say, and I don't know

17     what testimony is going to be, but whatever testimony it's

18     going to be that, or you attempting to dispute the fact that

19     you have no evidence and no reason to believe that this

20     pharmacy was receiving drugs from someone other than RDC,

21     despite the fact that they say that that's what the records and

22     the testimony supports.

23          MR. JANEY:  Certainly the testimony of Barbara Castro,

24     your Honor, based on her 3500 material submitted last night

25     cannot be that I only bought my drugs from Old Town that was

M1I3DOU1

1   supplied by RDC.

2           THE COURT:  That's fine.  I don't know if she --

3           MR. JANEY:  She has no knowledge of that.  She has no

4   knowledge.

5           THE COURT:  I agree with you.  She has no knowledge of

6   that and we discussed that even last week.  That, look, she's

7   not the person who can say where all the RDC drugs came from.

8   So, if they can't establish that, they can't give credible

9   evidence that the RDC drugs were given to this pharmacy, or if

10  you have some evidence to the contrary that you, despite their

11  evidence, that they say that they have proffered to you, and

12  that they say will be available to present at this trial, then

13  what you're arguing goes to its weight, not to its

14  admissibility.

15          MR. JANEY:  Just to further the point, your Honor, the

16  witness cannot --

17          THE COURT:  Which witness?

18          MR. JANEY:  Barbara Castro.  She cannot argue that she

19  knows that all of the Old Town Pharmacy drugs that she

20  purchased came from RDC.

21          THE COURT:  I agree with that.

22          MR. JANEY:  She cannot testify to that.

23          THE COURT:  I agree with that.  She has no way to know

24  that.

25          MR. ROOS:  She's not going to say she knows who the

M1I3DOU1

1    supplier was.

2            THE COURT:  Right.  My position is this.  That if they

3    can establish that the drugs that she bought from this

4    pharmacy -- she got from this pharmacy were drugs supplied by

5    RDC, if they have credible evidence for which a jury could

6    reasonably conclude that, then they have a basis for having her

7    testify that she in fact did not have a medically necessary

8    reason to get these drugs and were given these drugs, even

9    though there were red flags that the company saw that gave them

10   an indication that they shouldn't keep supplying these drugs.

11   That's what the real issue comes down to.  And the question

12   really is, is there testimony specifically with regard to what

13   evidence of red flag and diversion that the government is going

14   to present with regard to these drugs, supplied to those

15   pharmacies, that you say that Mr. Doud was part of the

16   conspiracy.  Is there going to be testimony that there was red

17   flags about both of these pharmacies?

18           MR. ROOS:  Just to give you a sense of sort of the

19   places in the case where the testimony about Old Town Pharmacy

20   will come in.  We'll have, as you know, Barbara Castro who will

21   testify going to Old Town Pharmacy.  We'll have Jessica Pompeo

22   who was one of the compliance analysts at Rochester Drug,

23   she'll testify about the red flags relating to Old Town

24   Pharmacy.  And also some of the prescribers, such as Anderson

25   and others.  And then we'll have the expert David Cutler who

M1I3DOU1

1    will testify about the data around RDC.  And that's where

2    you'll see -- around Old Town -- and that's where you'll see an

3    analysis related to both dispensing data and the ARCOS data,

4    which is where the facts relating to sole supplier is.

5              THE COURT:  What do you anticipate will be the nature

6    of the proof of Mr. Doud's participations in this conspiracy?

7              MR. ROOS:  In Old Town?

8              THE COURT:  In this conspiracy.

9              MR. ROOS:  In the overall conspiracy?  Throughout the

10   case?

11             THE COURT:  Well, related to these pharmacies.

12             MR. ROOS:  With respect to the pharmacies, I think the

13   proof is going to come in a few different forms.  The witness

14   testimony --

15             THE COURT:  What is going to be the proof of his

16   participation?

17             MR. ROOS:  With respect to the overall scheme?

18             THE COURT:  Yes.  What role did he play?

19             MR. ROOS:  The testimony is going to come from a few

20   different witnesses that he directed them to not terminate and

21   not report pharmacies, to open new pharmacies without doing due

22   diligence.  There is also e-mail evidence that will come

23   through a summary witness that we'll see similar type

24   communications and writing.

25             THE COURT:  And these two pharmacies, Paulsen's

M1I3DOU1

pharmacy and Castro, pharmacy that she attended, did RDC in

fact have information that would have been red flags for them

to either terminate, further investigate, or notify DEA?

MR. ROOS:  I'm going to let my colleague speak to

Paulsen Regal Remedies.  But let me say on Old Town, there will

be e-mails in the record where they describe not just the red

flags about that pharmacy, but they even name Dr. Anderson in

particular and how he's highly concerning.

THE COURT:  And is this e-mails among whom?

MR. ROOS:  That is amongst the compliance department.

THE COURT:  Okay.

MR. ROOS:  And Ms. Rothman can speak to Paulsen.

THE COURT:  All right.

MS. ROTHMAN:  Your Honor, Mr. Paulsen was the owner of

Regal Remedies, a pharmacy in Staten Island.

THE COURT:  I know that.

MS. ROTHMAN:  The RDC compliance department exchanged

e-mails about the red flags of diversion at Regal Remedies in

2016, during a time period when he was diverting illegal

prescriptions.  So I'm thinking of specifically an e-mail in

which there is flags about the amount of cash, the amount of

oxycodone being prescribed at that pharmacy.  And yet, during

the relevant time period, they didn't shut off Regal Remedies.

They kept supplying oxycodone to the pharmacy.

THE COURT:  You were saying he was a party to this,

M1I3DOU1

1    these e-mails or he was the person giving them directions not

2    to report?

3             MS. ROTHMAN:  Who was a party to the e-mails?

4             THE COURT:  Mr. Doud.

5             MS. ROTHMAN:  Mr. Doud is not copied on the specific

6    e-mails with respect to Regal Remedies, but employees in his

7    compliance department will explain they were directed to not

8    shut off pharmacies like Regal Remedies by Mr. Doud.  That they

9    were directed to not report pharmacies like Regal Remedies by

10   Mr. Doud.

11            THE COURT:  Okay.  Well, my position is --

12            MR. GOTTLIEB:  Your Honor?

13            THE COURT:  Yes, sir.

14            MR. GOTTLIEB:  I'm sorry.  Separate and apart from the

15   argument that you've already heard.  I implore your Honor to

16   remember what was just said by Mr. Roos and now Ms. Rothman in

17   response to your question about what Mr. Doud's involvement

18   was.  It was -- and I wrote it down -- he told the employees

19   not to terminate pharmacies.  That's the representations the

20   government has just made to you.

21            Now, thank God we have a trial.  But I point that out,

22   because going back to Castro, the real issue, your Honor, is

23   what is the relevance.  Because in the documents we received

24   regarding their interviews, she talks about being addicted

25   going back to '99, in the early 2000s, long before this.

M1I3DOU1

1       So, I would ask your Honor to just clarify, so I can

2   be sure, because I am going to be cross-examining Ms. Castro,

3   what are the limits of the direct examination.  Are they really

4   going to be able to put this woman, who has had an unbelievably

5   sad and tragic life, on the stand to talk about, as in her 3500

6   material, about all the years beginning in '99 or 2000 that she

7   was strung out and she went to all these doctors, long before

8   the time of this indictment, having nothing to do with buying

9   prescription drugs from Old Town.

10      If she's going to be limited to what appears to be the

11  basis for the government's request to introduce this, just to

12  show the connection during the time of this indictment, 2012 to

13  2017, there was a period of time when she purchased narcotics

14  from Old Town and then they can put all the ARCOS stuff in.  If

15  that's the limits, I just want it clarified to the extent of

16  their testimony, which is so over the top, your Honor, quite

17  frankly.

18      THE COURT:  I understand your argument.  I'm getting

19  ready to address it.

20      MR. ROOS:  Just to be clear, the 3500 is a debriefing

21  of Castro.  So there is stuff in there that I don't plan to

22  attempt to elicit from her on the stand.  A little bit of her

23  background is relevant, just to establish that she doesn't

24  actually need the oxycodone, that she became addicted, not that

25  it is a pain that she needs.  And the history about these other

M1I3DOU1

1    doctors is relevant to establish she is a doctor shopper.  But,

2    first of all, no one is alleging, for instance, that one of the

3    prior doctors, this Dr. Felix Lanting, no one is saying that

4    that's Doud or RDC's fault or anything like that.  We are going

5    to move through it very quickly.  It's just to establish she is

6    a doctor hopper.

7         I'm going to in fact say to her I want to focus on the

8    period, after a little bit of the background, I want to focus

9    on the period of 2013 to 2016.

10        THE COURT:  I think limited testimony from her is

11   relevant and its probative value outweighs the potential

12   prejudice given the issues in this case.

13        First of all, I think she can testify that she went to

14   this pharmacy, and the period during the conspiracy that she

15   obtained these prescriptions from Dr. Anderson and/or other

16   doctors that were not medically necessary, that she went and

17   filled those prescriptions at the pharmacy, and that there is

18   evidence that RDC, if there is evidence to connect that RDC,

19   they knew there were red flags here that they should have acted

20   differently.

21        She can testify minimally that she, prior to this,

22   that she had whatever condition that warranted her getting a

23   prescription, and that she filled those prescriptions, and at a

24   point in time she was addicted and started filling those

25   prescriptions to satisfy her addiction, rather than for a

M1I3DOU1

medically necessary condition.

Beyond that, the testimony should concentrate on the period of time of the conspiracy, and her activities in obtaining the prescription that was not medically necessary in obtaining the drugs from the pharmacy, if there is evidence to indicate that that pharmacy gave her drugs RDC drugs.

With regard to, specifically in the letter, there are certain things I will preclude.  She can testify as to her observations of individuals, other individuals also there when she was there.  Very limited testimony.  Clearly she's not in a position to testify that there were many other customers in the pharmacy that were plainly addicted or selling the OxyContin. She has no basis to make such a statement, unless she saw somebody selling OxyContin.  So there is nothing about an individual in a pharmacy that supports that conclusion.  She also cannot testify that the signs of diversion were obvious to a person who simply stepped in the pharmacy.

She can testify as to what she did, what she saw.  If the reasonable inference for the jury to draw is that one would have clearly known that this was being dispensed improperly, although, quite frankly, that's not really the real issue here. The real issue is whether or not, regardless of who the individuals were that were selling or buying the drugs, that the issue is whether or not Mr. Doud was part of a conspiracy in which he actively participated in directing or acting in a

M1I3DOU1

1    manner that would defraud the DEA and/or distribute drugs that

2    he had a good reason and knew that these drugs were not being

3    properly dispensed.

4            So, I think that her limited testimony, and primarily

5    with regard to her activities of obtaining her own

6    prescriptions, and filling those prescriptions at the pharmacy,

7    as long as there's a connection to the particular pharmacy, as

8    I've indicated, that testimony is relevant.

9            With regard to Paulsen, I think Paulsen is pretty much

10   the same thing.  Paulsen owns the pharmacy, he knows where he

11   got the drugs.  If he says that he got drugs from RDC, and he

12   was selling those drugs improperly and there is evidence that

13   RDC during that period of time of the conspiracy, there is

14   testimony and/or records that indicate that they knew or should

15   have known this, and Mr. Doud knew or should have known this,

16   and participated in a conspiracy to distribute those drugs,

17   that evidence is relevant.

18           Although, I think neither one of these witnesses, the

19   evidence is particularly lengthy and it needn't go

20   significantly beyond the activities and personal observations

21   of those witnesses.

22           Could we bring in Ms. Robins?  8.

23           I believe all our jurors are here.

24           MR. JANEY:  If I may, while we're waiting for the

25   juror, just an administrative question.  My understanding is

M1I3DOU1

1    that when we are in the box, that we can remove the mask.

2              THE COURT:  That's correct.  Even with the witness.

3              (Juror present)

4              THE COURT:  Ms. Robin?  Just take a seat in the first

5    seat there.

6              JUROR NO. 8:  Here?

7              THE COURT:  Yes.  My understanding is that you called

8    last week and brought to our attention that you believe you had

9    some conflict.

10             Does that still exist or and what's the nature of

11   that?

12             JUROR NO. 8:  Yes, it only came up on Friday.  That's

13   why I didn't know about it when I was seated as a juror.

14             As I had said, I'm a film producer.  And we have a

15   film opening on Friday, and the publicist resigned two weeks

16   ago, and they've been putting together a press junket which

17   always happens before a film, although smaller now because of

18   COVID.  And I am the one now as the producer that has to

19   oversee it, to be with the director for two days, Monday and

20   Tuesday of next week.

21             THE COURT:  Monday and Tuesday of next week?  And is

22   this something they can do without you, and is there a reason

23   that this can't be rescheduled?

24             JUROR NO. 8:  It can't be rescheduled for sure.

25             THE COURT:  Excuse me?

M1I3DOU1

1      JUROR NO. 8:  It cannot be rescheduled for sure.  As

2  far as doing it without me, I'm the highest person in the

3  ranks, other than the director at this point, who has worked

4  for him for 40 years and that's why we wants me to oversee it

5  with him.  Since the publicist who had been with him for many,

6  many years cannot be, because she's gone.

7      THE COURT:  All right.

8      JUROR NO. 8:  We're on a very limited staff now, since

9  this is a film we made three years ago, first coming out now in

10  the United States.  And because we haven't been able to make a

11  film since then, I'm one of the few people that's been kept on

12  employ.

13      THE COURT:  And when did they decide that they were

14  going to schedule this and how did it get scheduled without

15  you?

16      JUROR NO. 8:  They had been talking about it on and

17  off for some time.  I had -- I didn't realize that the

18  publicist had withdrawn from the -- from working with this

19  director.

20      THE COURT:  Well, I'll discuss it with the lawyers.

21  But, I can tell you that I'm not sure that we can accommodate

22  you, now that you've already been selected as a juror.

23      JUROR NO. 8:  Okay.

24      THE COURT:  But I'll discuss it with them.  As I say,

25  it may be that they're just going to have to do without you at

M1I3DOU1

1    this point given where we are, that we're ready to start this

2    trial today.  But let me speak to the lawyers and I'll get back

3    to you in a second.

4              JUROR NO. 8:  Okay.

5              THE COURT:  Okay.

6              (Juror No. 8 not present)

7              (Juror No. 6 present)

8              THE COURT:  Mr. Brown, just take a seat in the first

9    seat for a second.  My law clerk told me you had an issue.

10             JUROR NO. 6:  Yes.

11             THE COURT:  With timing.  What's that?

12             JUROR NO. 6:  My son just informed me through letter

13   that he will be graduating from boot camp on February 4, it is

14   a Friday.  That's the only issue I've got.

15             THE COURT:  Where is that?

16             JUROR NO. 6:  Great Lakes, Illinois.

17             THE COURT:  So, what is the day that you say is the --

18   day or days that you say would be the conflict?

19             JUROR NO. 6:  February 4th.  It would be one day.

20   Like I would leave on the 3rd and go to the 4th.  It is a

21   Friday.

22             THE COURT:  All right.  If we either finish before

23   that date or we're able to accommodate that day for you, could

24   you serve?

25             JUROR NO. 6:  Yes.

M1I3DOU1

1          THE COURT:  All right.  Let me talk to the lawyers

2     about it and I'll give you further instructions with regard to

3     that later on.  At least we have a little bit of time.  I want

4     to see what our schedule looks like and see whether or not it

5     makes sense that if we proceed with you, and we don't sit that

6     day.  We're a team.  We can't work unless everybody is here.

7     I'd have to give everybody that day off and that would push us

8     back until the next week.  Let me talk to the lawyers and why

9     don't you wait and I'll give you further instructions.

10          JUROR NO. 6:  Yes, sir.

11          (Juror No. 6 not present)

12          THE COURT:  What's your reaction at this point?

13          MR. ROOS:  I guess the first question is, did we get

14     17 jurors?

15          THE COURT:  We can't hold 17 jurors.  We'll have to

16     get rid of somebody.  Our choice is either him, her or

17     Alternate No. 5.

18          MR. ROOS:  That's why I ask.  If we have 17, we have

19     to get rid of someone.  If the Court is inclined to let the

20     juror who has the work conflict go, we are okay picking that

21     person as the person of the 17 to be excused.  It sounds like

22     for the second juror that was up here, that we could, if we're

23     still even going at that point, we could just take that Friday

24     off.

25          THE COURT:  Mr. Gottlieb, what's your position?

M1I3DOU1

1          MR. GOTTLIEB:  Your Honor, thank you.  My position is

2     the same as I indicated before.  In fact during the questioning

3     of Juror No. 8, she clearly did not react vociferously that

4     there was no way she could possibly miss this press conference.

5     In fact, your Honor, if you listen to hear what she's talking

6     about is this director apparently wants somebody to hold his

7     hand.  He is a little unsteady, he is a little unsure.  They

8     fired the publicist.  She did not indicate that she could not

9     serve.  She was bringing something to the Court's attention.

10    We don't believe -- we selected these jurors, we took our time,

11    and they were then selected.  To have her now be excused for

12    the reason that she presented, there is simply no basis for it.

13          I would ask that she remain, Juror No. 8.  The next

14    juror, I'm sorry.  Juror 6.  Clearly that doesn't seem to be a

15    problem.  Because who knows where we're going to be.  And if it

16    is a real problem and we need to take a Friday off, I think we

17    probably all would relish that thought during a lengthy trial.

18          So, I would ask that they both remain and that, as we

19    had planned, the last juror be excused today, your Honor.

20          THE COURT:  Okay.  Well, I'm not inclined to excuse

21    her, unless you both agree.  And the simpler thing would be to

22    keep the alternate that we know has no problem and doesn't give

23    me an excuse or reason not to be here.

24          The things that I don't like in trials are unknown

25    factors.  I agree with you, Mr. Gottlieb, that I don't think

M1I3DOU1

1    that that's a good excuse at this point.  But she is an unknown

2    factor, and I don't know, I would hope she can still be an

3    attentive and appropriate juror.  But, if you want to take the

4    chance with her, when you know we have the alternate, I'll tell

5    her, I'll take the weight and tell her she has to serve.  But

6    whatever, obviously, that would be at the defense request.

7              So, I'm giving you an option of taking somebody who

8    you know who has no problem, as opposed to somebody who doesn't

9    want to be here.

10             MR. GOTTLIEB:  Your Honor, I appreciate you giving me

11   that option.  I would ask that both jurors continue to serve,

12   be sworn and continue, your Honor.

13             THE COURT:  All right.  The government want to be

14   heard any further?

15             MR. ROOS:  I think your Honor has our position.  One

16   thing I am not sure we heard was whether this costs her money.

17   But, she didn't say it, so it probably doesn't.

18             THE COURT:  Okay.  Well, then I'm prepared, I'm

19   prepared to go ahead and excuse the fifth alternate that we

20   had.  And tell the jurors that they will all be serving.  If it

21   gets any more complicated than what we already have, or you

22   reconsider that position, we could always excuse her, we would

23   be down one alternate during the trial.  But, she's talking

24   about next Monday and Tuesday.

25             So, I'm going to bring them all in and tell them that

M1I3DOU1

1    they will be serving.  So, what I'm going to do is I don't want

2    a reaction from that juror.  I'm going to leave Alternate No. 5

3    in the jury room and bring up the other 16.  Obviously, sooner

4    or later it's going to dawn on everybody and particularly on

5    her that we excused him and made her stay.  But, for now, I'm

6    not going to bring him up, I'll tell him to wait in the jury

7    room.  I'll bring up the other 16, we'll seat them in the

8    appropriate seats, we'll swear them in, give preliminary

9    instructions, and we'll start with the opening statement.

10              Who is going to make the opening statement on behalf

11   of the government?

12              MR. BURNETT:  I am, your Honor.

13              THE COURT:  Did you want me to introduce you,

14   Ms. Rothman, or do you want to do that yourselves?

15              MS. ROTHMAN:  I'm sorry, your Honor?

16              THE COURT:  Did you, you weren't here last week so I

17   wanted to know whether you wanted me to introduce you or

18   whether or not that's going to be handled in opening statement.

19              MS. ROTHMAN:  Maybe your Honor could just reintroduce

20   counsel to the jury.

21              THE COURT:  I don't need to go through everybody.

22              MS. ROTHMAN:  I think it's fine.  Thank you for the

23   offer.

24              THE COURT:  If you need a short break, take it now.

25   Otherwise I'll bring the jurors up.

M1I3DOU1

| 1 | MR. GOTTLIEB:  Your Honor, just very quickly,

2  Mr. Janey will be doing the opening.  But I would like to point

3  out before, if we are going to go into witnesses immediately,

4  which I know we will, before cross-examination, as I understand

5  it from my group here, the deputy in charge of the way the

6  electronics works has said there is a problem with the cable

7  here.  So for cross-examination, we need a -- they're going to

8  repair so we can use and cross-examine and display exhibits.

9  So I wanted your Honor to know that until that is done, we

10  wouldn't be able to begin cross.

11          THE COURT:  I didn't know there was a problem.

12          MR. JANEY:  If I could just add briefly, he didn't

13  want to disturb the Court.  So there are two gentlemen who are

14  going to come up.  We tested it, everything worked during

15  testing, but the cable in the floor was changed and he has to

16  fix it.

17          THE COURT:  All right.

18          MR. ROOS:  Apparently it's not working for the

19  government either.

20          THE COURT:  Do we need that for opening statements?

21          MR. BURNETT:  No, your Honor.

22          MR. JANEY:  Not for the defense, your Honor.

23          THE COURT:  All right.  Then let's get the jury.

24          MR. BURNETT:  Your Honor, just a moment for the

25  restroom.

M1I3DOU1

1          THE COURT:  Sure.

2          (Pause)

3          THE COURT:  Are we ready to proceed?

4          MR. GOTTLIEB:  We're ready.

5          THE COURT:  Let's bring the jury in then.

6          (Jury present)

7          THE COURT:  Swear in the jurors, please.

8          (A jury of 12 and four alternates sworn)

9          THE COURT:  Ladies and gentlemen, members of the jury,

10   at this point I'm required by law to instruct you generally

11   concerning your basic functions, duties, and certain rules

12   which apply to every jury so you'll be better able to assess

13   and weigh the evidence as it's presented and reach a proper

14   verdict.

15          Now the trial has commenced with the selection of the

16   jury.  At this point, you will be the jury that will be hearing

17   this case.  I cannot accommodate at this point any further

18   personal or professional reasons not to continue on this trial,

19   so I would ask that you give your full attention to this case,

20   and, as best you can, adjust your own personal and professional

21   lives in a manner consistent with what I've indicated to you

22   this trial, the length of this trial and how we should proceed.

23          Again, I think the case will take about three weeks to

24   try.  I'm going to try to keep us moving along so we can speed

25   up that time and not get behind schedule, but at this point,

M1I3DOU1

1   this is going to be the priority and commitment for the next

2   three weeks, at least that period of time.

3         Now, ladies and gentlemen, the trial has commenced

4   with the selection of the jury as I indicated.  So the next

5   step in the trial will be an opening statement by the

6   government to outline for you what the prosecution intends to

7   prove by way of evidence in the case.  After counsel for the

8   government makes their opening statement, counsel for the

9   defendant, if they desire, may also, but is not required to,

10  make an opening statement.

11        What counsel for either side says in opening statement

12  is not evidence.  You may consider the opening statement as a

13  preview of what each side intends to prove by way of evidence

14  in the case.

15        Now, after the opening statement or statements, the

16  assistant United States attorneys will present one or more

17  witnesses who will be questioned by them.  This is called

18  direct examination.  After the assistant United States attorney

19  completes their questioning of the witness, defense counsel

20  will be given an opportunity to question that witness.  This is

21  called cross-examination.  And after the government has

22  concluded the calling of its witnesses and the introduction of

23  any exhibits which are admissible into evidence, the defendant

24  may, but is not required to, offer evidence in his own defense.

25  After both sides rest, the government's attorney may make a

M1I3DOU1

closing argument followed by the closing argument of the
defendant's attorney, then the government may have a brief
rebuttal in response, and then I will instruct you on the law
and you will retire to deliberate for the purpose of reaching a
verdict.  This is a general outline of the trial procedure.

I ask you to listen carefully to the testimony.  You
don't need to take any notes.  You'll have the court reporter
read back any testimony and give you any exhibits during your
deliberation that you may want to see.  But, it's up to you
whether you want to take any notes, but it's not necessary.

The evidence in this case consists of testimony of the
witnesses under oath, and exhibits which are admitted into
evidence, plus any stipulations agreed upon by the attorneys.

Questions in and of themselves are not evidence.
Therefore, you cannot infer any fact from the mere asking of a
question.  It is the answer coupled with the question that
constitutes evidence.  For example, if a witness was asked a
question "Don't you own an automobile," and the witness answers
"No," you may not infer from the mere asking of the question
that the witness does own an automobile.

During the course of the trial, the assistant United
States attorney or defense counsel may object to a question or
answer on the ground that somehow it is improper or
inadmissible.  If I sustain the objection, this means I believe
the question or the answer was in some way improper.  If an

M1I3DOU1

answer has already been given, I'll instruct you to disregard
it and therefore the answer is no longer evidence in the case.
If I overrule the objection, then it means that the question is
proper and I'll permit it to be answered.  Or, if already
answered, I will permit the answer to remain as evidence in the
case.

Please do not resent the fact that an attorney makes
an objection.  This is their duty, and do not hold it against
them if I rule against either side.

As I will explain to you in detail in my instructions
at the end of the case, as jurors in this case, you are the
sole judges of the facts, and I am the sole judge of the law.
And you must accept the law as I give it to you, without
hesitation or reservation, even if you privately disagree with
me.

You must keep an open mind.  Throughout the trial you
must not converse among yourselves or with anyone else upon any
subject connected with the trial.  You must neither offer or
express an opinion about the guilt or innocence of the
defendant or reach any conclusion about what the verdict should
be until I finally give the case to you.  You must not read or
listen to any accounts or discussions of the case in the event
that it's reported by newspapers or other news media.  You must
not visit or view any promises or place where the offense
charged was allegedly committed or any other place or premises

M1I3DOU1                          Opening - Mr. Burnett

1    involved in the case.  You must not do any research or

2    investigation on your own about the case.  You must decide this

3    case solely on the evidence presented at this trial.  And you

4    must speak to no one about the case until the trial is

5    completely ended, and you must promptly report to the Court any

6    incident within your knowledge involving an attempt by any

7    person to speak with any members of the jury about the case.

8         During the trial, you should not speak with any of the

9    parties in this case, nor any individuals associated with them.

10   They are instructed not to speak with you.  So don't consider

11   it rude if they see you outside of this courtroom and don't

12   acknowledge your presence.  Obviously, if someone were to see

13   you speaking to one of the parties involved in the case, they

14   might draw an improper inference, even though it might be a

15   perfectly innocent conversation unrelated to the case.

16        Now, at this point, I want to keep us on schedule.

17   We'll now proceed with the next step in the trial, which will

18   be the opening statement by the government.

19        MR. BURNETT:  Thank you, your Honor.

20        For years, bad pharmacies flooded communities across

21   the northeast and right here in New York City with dangerous

22   drugs.  Powerful opioids like OxyContin and fentanyl.  Those

23   bad pharmacies sold drugs illegally fueling addiction, ruining

24   lives.

25        That man, Laurence Doud, the defendant, supplied

M1I3DOU1                    Opening - Mr. Burnett

opioids to many of those pharmacies.  He and the people who
worked for him shipped the opioids, knowing that some of those
pharmacies were selling them illegally, and turning a blind eye
to clear signs that others were breaking the law.  Then he had
his employees lie to the government about what they were doing.

     The defendant was the CEO of Rochester Drug
Cooperative, or RDC.  The defendant's company shipped
prescription drugs to pharmacies, including tens of millions of
opioids.

     The defendant knew that his company had a
responsibility when it sold those drugs.  A duty to make sure
they didn't go to pharmacies that were breaking the law.  But
the defendant, he didn't care about the responsibilities that
came along with shipping dangerous drugs.  He didn't care about
taking the steps to make sure pharmacies weren't breaking the
law, like investigating pharmacies, cutting them off when there
were signs they were acting illegally, and reporting them to
law enforcement.  That was bad for his business.

     So the defendant put sales over safety.  He directed
his employees to keep shipping drugs to pharmacies they knew
were selling those drugs illegally, and to pharmacies where
there were clear signs of law breaking.  And then he had his
employees cover it up.

     The defendant made clear that his employees should not
report bad pharmacies to the Drug Enforcement Administration --

M1I3DOU1                        Opening – Mr. Burnett

the DEA –– even though they were required to.  And at the

defendant's direction, his company lied to the DEA.  He had his

employees tell the DEA that things were above board, that his

company followed a written policy and investigated pharmacies

before selling them opioids, that his company would stop

selling dangerous drugs to bad pharmacies.  Those were lies.

          That's what the defendant did.  He worked with others

to illegally sell dangerous drugs, and had his employees lie to

the DEA to cover it up.

          This morning I'm going to talk for a few minutes about

what we expect you'll see in this trial.  First, I'll tell you

in more detail about what we expect the evidence will show, and

then I'll tell you about how we plan to prove it to you.

          (Continued on next page)

M1IBDOUDT2                    Opening - Mr. Burnett

1          MR. BURNETT:  First, so what will the evidence show

2     you'll start by learning a bit about how the pharmaceutical

3     industry works, the company that makes the drug.  The

4     manufacturers usually don't sell those drugs right to

5     pharmacies.  Instead, they sell them to a company called a

6     distributor.

7          That distributor buys drugs from the manufacturers,

8     then resells them to the pharmacies.  The defendant was the

9     head of one of those drug distributors, a company called

10     Rochester Drug Co-Operative or RDC.  You'll hear that RDC was a

11     small company, only about 50 people in its main office, and the

12     defendant kept a close watch over what went on there.

13          Now, even though RDC was a small company, it still

14     sold lots of drugs, billions of dollars worth.  Some of those

15     drugs were harmless, like allergy medications or Tylenol, but

16     RDC also sold hundreds of millions of dollars worth of opioids.

17     Those powerful addictive pain medications I mentioned earlier.

18     You probably heard of them, drugs like oxycodone, fentanyl or

19     percocet.

20          The defendant didn't have to get into the business of

21     making money by selling opioids, he chose to.  And because he

22     chose to sell those drugs, he took on responsibilities.

23     Because opioids are so dangerous, you'll learn that they're

24     called controlled substances under the law.  That means there

25     are rules, strict rules about how they can be sold, and those

M1IBDOUDT2                    Opening - Mr. Burnett

1   rules apply to every one who sells opioids, including the

2   defendant and his company.

3        You see, opioids can be abused.  There are bad doctors

4   and pharmacies out there who prescribe and sell opioids to

5   people without any real medical need for them, to drug dealers

6   or to people suffering from addictions.  Selling opioids like

7   that is illegal.  It's called diversion, and diversion is

8   against the law.

9        The rules against diversion, against selling opioids

10   illegally also apply to distributors like the defendant's

11   company.  You'll hear that the drug distributors play an

12   important role.  Remember, they're the ones who sell to the

13   pharmacies.  So under the law, the defendants's company had to

14   maintain effective control against diversion.

15        And what does that mean?  Well, you'll hear it just

16   means, the defendant's company needed to make sure it was

17   shipping drugs to pharmacies that were selling them legally.

18   They couldn't just ship drugs to bad pharmacies, to pharmacies

19   that were breaking the law and wash their heads of

20   responsibility.  It didn't work that way.

21        Instead, the rules required the defendant's company to

22   investigate their pharmacy customers, to make sure those

23   customers weren't acting illegally and to have a system in

24   place to detect something called suspicious orders, orders

25   where there was a red flag assigned that the pharmacy might be

M1IBDOUDT2                    Opening - Mr. Burnett

breaking the law.

If the defendant's company found a red flag, it was supposed to investigate.  And if the order was suspicious, report it to the DEA and not ship the drugs.  You'll learn that the defendant understood his responsibilities.  He knew the rules.  He also knew the dangers that came along with selling opioids, that there were bad doctors and pharmacies out there.  People would do anything to make a buck, even if it meant selling those drugs to drug dealers or people suffering from addiction.

He knew that people across the country were dieing from opioids, but the defendant, he broke the rules.  Why?  Greed.  You see, the defendant had a deal with his company, and under that deal the more money his company made, the more money he made.  You'll learn that investigating a pharmacy's customers' opioid purchases or holding up an order, that was bad for his bottom line.

His company would lose those opioid sales, or even worse, lose all of that pharmacies business.  So what did he do?  You'll learn the defendant corrupted his company.  He made sure that the rules wouldn't get in the way of his sales.  The defendant started by undermining RDC's compliance department.  That's the department that was supposed to make sure RDC followed the law.

He put a person in charge of compliance who had no

M1IBDOUDT2                    Opening - Mr. Burnett

1    experience, not a clue what he was doing.  Then the defendant

2    made sure the head of compliance knew that the defendant called

3    the shots.  The compliance should not stop pharmacies from

4    getting opioids unless the defendant said it was okay.  Then at

5    the defendant's direction, his company ignored its written

6    policies about preventing diversion.  Policies that it had

7    given to the DEA.

8         You'll learn that RDC had some policies that gave the

9    impression it was careful about selling opioids.  They even had

10   lawyers come in and help write one of those policies.  Said all

11   the right things, said that RDC would look out for red flags of

12   diversion; that when it saw a red flag, it would stop to

13   investigate; that it would stop selling to suspicious

14   pharmacies and report those pharmacies to the DEA.

15        Those policies, they weren't worth the paper they were

16   printed on.  You'll hear the defendant gave different marching

17   orders to his employees in the compliance department.  He told

18   them, compliance was a waste of time and money, that his

19   company shouldn't risk losing business by investigating opioid

20   orders, no pharmacy could get cut off from opioids without the

21   defendant's approval, and RDC should not report pharmacies to

22   the DEA.

23        The employees in compliance, they did what the

24   defendant wanted.  He was the boss and his demands were clear.

25   His company should keep opioids going out the door, even if it

M1IBDOUDT2                       Opening - Mr. Burnett

meant they were going to pharmacies that were selling those

drugs illegally or showed serious red flags of diversion.  So

the defendant's employees kept the drugs flowing.

        Take just a few examples.  RDC's policies said that if

a pharmacy ordered over a certain amount of opioids, RDC would

stop selling to investigate.  Hitting that limit was a sign the

pharmacy might be misusing the drugs.  Again and again, the

defendant's employees saw pharmacies go over those limits but

kept selling.  No investigation.

        RDC's policies said another red flag was if a pharmacy

sold to suspicious doctors.  Those are bad doctors, doctors who

had no business prescribing opioids or who seem to give opioids

to every patient who walked in the door.  The defendant's

employees knew certain pharmacies were magnets for those bad

doctors, but they kept selling at his direction.  The defendant

supervised all of this.  The red flags were obvious.

        The defendant's own son who worked at the company even

told the defendant that RDC had some very suspicious customers,

but the defendant directed compliance to keep shipping opioids.

And you'll hear that at the same time he pushed for even more

dangerous practices.  The defendant had RDC start selling

opioids to pharmacies that other distributors had cut off from

those drugs.

        He told his employees that when RDC got a new

customer, they should start selling opioids to that pharmacy

M1IBDOUDT2                    Opening - Mr. Burnett

right away without doing any research on whether that pharmacy
was illegally diverting drugs.  The defendant's scheme, it
worked.  His company's opioid sales skyrocketed.  Revenues from
opioids grew over six times.  And because pharmacies don't just
buy opioids, lots of other sales came along with it.  The
defendant, he pocketed millions of dollars, money from bonuses
tied to RDC's sales.

          Now, the defendant knew that he had to be careful.
The DEA was on the look out for distributors who were selling
to bad pharmacies.  That's why he had a compliance department
and a written policy.  You'll even hear that every once in a
while, RDC actually stopped selling opioids to a pharmacy,
usually when it was so obviously breaking the law that the
defendant and his employees worried that pharmacy would get
caught by the DEA.

          But make no mistake, that's not a meaningful
compliance process.  You'll hear that the rules didn't allow
the defendant to pick and choose when he wanted to stop
diversion.  He didn't get to decide when he wanted to follow
the law.  He had to do it all the time with every pharmacy that
his company sold opioids to.  But instead, his company shipped
out thousands of dangerous opioid orders, ignoring red flags
that they were going to pharmacies where diversion was
happening.

          Now, remember what I mentioned earlier, selling

M1IBDOUDT2                    Opening - Mr. Burnett

opioids to bad pharmacies, that was only one part of the

scheme.  The other part was lying, lying to the DEA, and the

two parts of that scheme went together hand and hand.  Keep in

mind, the DEA was out looking for distributors who were

breaking the law.  You'll learn that the DEA asked the

defendant's company about how it made sure it was taking steps

to prevent diversion.  That's where those policies I mentioned

earlier, the one that the defendant's company didn't follow,

that's where it came in handy.

     The defendant's employees gave that policy to the DEA

and said they followed it.  That was a lie.  They routinely

ignored that policy at the defendant's direction.  The

defendant also had his employees hide critical information from

the DEA.  Distributors like RDC are supposed to report

suspicious opioid orders from pharmacies.  Those reports are an

important tool that the DEA uses to stop pharmacies from

selling drugs illegally.

     But the defendant, he didn't want his customers

getting reported to the DEA, so his employees didn't do it.  In

the years when RDC's opioid sales were skyrocketing, when the

defendant's company was selling to bad pharmacies across the

northeast, the company filed just a handful of those suspicious

order reports.  That's what the evidence will show, that the

defendant with the help of others sold opioids to pharmacies

knowing that some of those pharmacies were selling the drugs

M1IBDOUDT2                    Opening - Mr. Burnett

1    illegally and turning a blind eye to red flags of diversion at

2    others.   Then, they lied to the DEA to protect themselves and

3    their pharmacy customers.

4         For those acts, the defendant is charged in two

5    counts.   First, for conspiracy or agreeing with others to

6    illegally distribute controlled substances; and second, for

7    agreeing with others to defraud or lie to the DEA.

8         So how are we going to prove it to you?   Over the

9    course of this trial, you'll hear from a number of witnesses.

10   You'll hear from a former supervisor in the DEA.   She'll tell

11   you about the rules that distributors have to follow when they

12   sell opioids and how the DEA told distributors about those

13   rules.   You'll hear from an employee in the compliance

14   department.   She'll tell you all the ways the defendant's

15   company broke those rules, how his company shipped opioids to

16   pharmacies knowing that those pharmacies had the telltale sign

17   of diversion.

18        She'll tell you about times when the defendant came

19   into her office and had her ship controlled substance orders

20   even though she didn't want to, didn't want to because she knew

21   it was against RDC's written policies, and because those

22   pharmacies showed clear signs of diversion.

23        You'll hear from the man the defendant made head of

24   compliance.   He'll tell you that the direction to sell to bad

25   pharmacies came from the top, from the defendant, that the

M1IBDOUDT2                    Opening - Mr. Burnett

defendant told him how to run the compliance department, that

the defendant made it clear, the compliance employees should

ship opioids to pharmacies, even when there were red flags that

those pharmacies were selling the drugs illegally.

He'll also tell you that at the defendant's direction,

he and others lied to the DEA.  They lied about the way RDC

investigated suspicious pharmacies and they hid information

from the DEA about those pharmacies.  Now both of those

compliance employees I mentioned, they committed crimes at RDC.

They went along with the defendant's schemes to keep their

jobs.

The head of compliance, for instance, will tell you

that he's pled guilty to illegally selling opioids and lying to

the DEA and he's cooperating with the government in the hopes

of receiving a lighter sentence.  You should pay careful

attention to what these witnesses say, just like with any other

witness at trial.  See if their testimony lines up with the

other evidence.

What is that other evidence?  Well, you'll hear from

an expert, an economist who analyzed data about RDC's opioids

sales.  He'll tell you that RDC's opioid sales increased

dramatically while the defendant was in charge and that the

company shipped out thousands of opioid orders that had been

flagged for investigation.  He'll also show you information

about some of the pharmacies that RDC sold to, how those

M1IBDOUDT2                    Opening - Mr. Burnett

pharmacies had many of the problems that RDC's own policy said

were red flags for diversion.  You'll hear some examples,

examples of what's behind those red flags that RDC was selling

drugs to, bad pharmacies that were diverting them.  They were

hurting people.  You'll hear from a pharmacy owner who bought

opioids from RDC and sold those pills illegally.

He'll tell you that he sold pills to drug dealers

straight out of his pharmacy, and he'll tell you that when the

defendant was in charge of RDC, the pharmacy owner got his

pills from the defendant's company, no questions asked.  You'll

hear from a victim of opioid addiction.  Someone who became

addicted to oxycodone and got those pills without any real

medical need for them.

You'll hear that she got her pills at another pharmacy

that RDC supplied.  You'll see RDC's documents and reports, the

due diligence policies that RDC did not follow, reports listing

thousands of opioid orders that RDC flagged for investigation

but then shipped without pausing to investigate.  The

defendant's employment contracts which paid him more money as

his company sold more drugs, hard evidence of his motives to

commit these crimes.

You'll see the defendant's own words in black and

white in emails he sent while he was at RDC.  You'll see that

he described compliance as a waste of time and money, that he

got angry if employees tried to follow RDC's written compliance

M1IBDOUDT2                    Opening - Mr. Burnett

1   policies, that he supervised RDC's sales closely as the company

2   shipped more and more opioids to pharmacies that showed clear

3   signs of selling those drugs illegally.

4           You'll hear that when he found out the DEA might be

5   paying less attention to distributors like his company, that he

6   directed his compliance employees to start shipping opioids to

7   new pharmacy customers without any due diligence, even though

8   RDC's policies, the written policies, said the exact opposite.

9           Finally, you'll see emails between employees in the

10  compliance department where they discussed problems at the

11  pharmacies where the defendant's company was selling opioids.

12          This made employees sick to ship opioids to some of those

13  pharmacies, but you'll see that they kept sending the drugs,

14  that they knew the defendant wanted opioid orders sent even if

15  it meant selling them to pharmacies they knew were selling the

16  drugs illegally or that showed red flags of diversion, so they

17  did what he wanted.

18          Now, the evidence that I've outlined, it won't come in

19  like a movie in chronological order.  It's going to come in

20  piece by piece, and different witnesses will tell you different

21  parts of what happened.  At the end of this trial, you'll have

22  an opportunity to put those pieces together.  Between now and

23  then, I'd like to ask you to do three things.

24          First, pay close attention to the evidence.

25          Second, follow Judge Daniel's instructions on the law.

1          And third, use your common sense, the same common

2     sense and good judgment you use everyday in your own lives.

3          If you do those three things, you'll reach the only

4     verdict consistent with the evidence and the law, that the

5     defendant is guilty.

6          THE COURT:  Mr. Janey, would you like to make an

7     opening statement.

8          MR. JANEY:  Yes, your Honor.  Thank you.

9          May it please the Court, the Honorable Judge Daniels,

10    counsel, ladies and gentlemen.

11         Well, I too listened to what the government claims

12    this case is about and what the government claims the evidence

13    will show.  By the time this trial is over, this is what you

14    will conclude, the defendant, Laurence Doud, Larry Doud, is

15    falsely accused of the charged crimes in this case.  Based on

16    the evidence, the government's own witnesses, the

17    cross-examination of those witnesses, the direct examination of

18    defendant witnesses, testimony from experts, the documents

19    admitted in evidence in this case, you'll hear, you'll read,

20    you will learn and come to know that the accusation that Larry

21    Doud is a drug dealer is absurd.

22         You, the jury, not the prosecutors, you will decide

23    what really happened based on the evidence, not based on

24    argument, but on actual proveable facts.  At the end of this

25    trial, the evidence will have established that the government,

1    that the government failed to show beyond a reasonable doubt

2    that Larry Doud knowingly and intentionally agreed and joined

3    with others at RDC to illegally distribute oxycodone and

4    fentanyl or to defraud the United States government.

5           The defendant Larry Doud was the chief executive

6    officer of RDC, the most senior manager.  You will learn that

7    when Larry Doud retired as CEO after 30 years of experience and

8    service starting as a sales manager, a graduate of Keystone

9    Junior College in Scranton, Pennsylvania, that the company

10   employed a 140 people, 140 jobs, and generated more than

11   $2 billion in sales.  It had become one of the largest

12   distributors to pharmacies in the country.

13          You will learn that among the hundreds of products

14   sold by RDC, some of the products were Oxycodone, the 30

15   milligram pack, and fentanyl, the spray placed commonly under

16   the tongue.  Oxycodone and fentanyl are pain medications as

17   you'll hear.  And as a distributor, as the evidence will show,

18   RDC played an important role in helping people get their pain

19   medication.

20          As a distributor, RDC bought the oxycodone and

21   fentanyl from the companies that make the drug, the

22   manufacturers.  RDC in turn sold and distributed the drugs to

23   pharmacies.  Now, you'll hear discussion about large quantities

24   of drugs in this case, and that might seem in and of itself

25   unusual; however, you will learn that RDC had a license from

M1IBDOUDT2                    Opening - Mr. Janey

1    the Drug Enforcement Administration, the DEA, to be in

2    possession of and distribute these drugs to others that had a

3    similar license.

4           You will learn, ladies and gentlemen, that Larry Doud

5    respected that license, contrary to the government's narrative.

6    You will hear from witnesses and learn from documents that RDC

7    had a compliance program to oversee distribution of these drugs

8    to pharmacies under its license.  It wasn't a perfect program,

9    but you will learn that any idea that the compliance program

10   was a sham or a front for peddling drugs illegally is false.

11          Ladies and gentlemen, that's important because we're

12   in criminal court.  You'll learn why it doesn't matter whether

13   the compliance program was perfect.  Here in this case, it is

14   important because the government alleges that Larry Doud

15   knowingly and intentionally joined a conspiracy to send

16   oxycodone and fentanyl to the pharmacy customers of RDC, even

17   though he knew -- that Larry Doud knew that those prescriptions

18   were not for a medically justified purpose, that the drugs were

19   being abused, that he entered into an agreement with his

20   employees to send those drugs to pharmacies even though he knew

21   they were being abused.

22          However, by the end of this trial, the evidence will

23   show that Larry Doud never knowingly and intentionally

24   participated in an illegal scheme to distribute oxycodone or

25   fentanyl.  That is what this case is about, whether Larry Doud,

M1IBDOUDT2                     Opening - Mr. Janey

1    this man, knowingly and intentionally joined a conspiracy to

2    distribute narcotics illegally and to defraud the government of

3    the United States.

4         Ladies and gentlemen, my name is Derrelle Janey.  I

5    along with my colleagues Robert Gottlieb and Paul Townsend

6    seated here at the defense table, we represent Larry Doud.  In

7    this trial, we will ask you to ask lots of critical questions,

8    critical questions about the evidence put before you by the

9    government, both the documents they show you and the witnesses

10   the government puts in the witness box.

11        Critical questions about what the government presents

12   are important for several reasons.  First, the evidence will

13   show that employees at RDC sometimes pointed out to Larry Doud

14   that certain customers were buying large amounts of oxycodone

15   and fentanyl.  Sometimes employees at RDC pointed out to Larry

16   Doud that certain RDC pharmacy customers were permitting

17   patients to pay only in cash for their prescription.  Sometimes

18   they pointed out to Larry Doud that sometimes patients

19   frequented out of state pharmacies, and those pharmacies

20   fulfilled those out of state prescriptions.  These are the

21   so-called red flags.

22        You will learn that none of this means that Larry Doud

23   was an illegal narcotics dealer.  You will learn and the

24   evidence will show what Larry Doud actually did when presented

25   with red flag information, and that what he did was consistent

M1IBDOUDT2                          Opening - Mr. Janey

1    with the law.  You will learn how Larry Doud's employed

2    consultants to visit pharmacies to ensure they were following

3    the law.

4           You will learn that consultant recommendations were

5    imposed on pharmacies after those inspections.  You will learn

6    that countless, countless, pharmacies were shut down under

7    Larry Doud's watch as CEO, and you will conclude that Larry

8    Doud, the person here in this case charged with illegally

9    distributing narcotics is falsely accused by the government of

10   the United States.

11          There will be lots of names of pharmacies described

12   and referred to in this case.  In any of those instances,

13   please ask yourself, what is being said about what Larry Doud,

14   what Larry Doud did in connection with that pharmacy.

15          Plainfield pharmacy, for example, ask yourself, the

16   evidence will show that when presented with information that

17   Plainfield showed the risk that it was selling oxycodone for a

18   non-medical purpose, Larry Doud agreed with other RDC employees

19   to shut down distribution to that pharmacy.

20          Vogel pharmacy, when RDC's consultants themselves,

21   former DEA agents, recommended further audits of Vogel, Larry

22   Doud was all over it.  You will find that the emails show it.

23   Not just my attorney argument, you will hear.  You'll hear

24   Larry Doud say, keep me posted, be sure to update me on the

25   audits.  The evidence will show that when, for example,

1    presented with information about Browns Drug, a potential new

2    customer wanting to acquire oxycodone.  Larry Doud expressed to

3    his employees that he wanted to try to do business with Browns,

4    but did not want to take any risk from the DEA in doing so.

5         So, again, ladies and gentlemen, we ask that you ask

6    critical questions, critical questions about the documents put

7    before you by the prosecutors in this case, about the witness

8    testimony and the motivations.  And the evidence will show with

9    respect to a group of pharmacies called Linden Care, Larry Doud

10   time and time again agreed and pushed for close monitoring of

11   the Linden Care demand for oxycodone.

12        You'll hear that sometimes Larry Doud could be a

13   demanding CEO, demanding more information from his compliance

14   department before pharmacy customer might be cut off for

15   oxycodone, pushing his team to think about the sales

16   relationship.  But you will conclude that none of that meant

17   based on the evidence that Larry Doud knowingly and

18   intentionally joined a conspiracy to illegally distribute

19   oxycodone or fentanyl or to defraud the government of the

20   United States.

21        The evidence will clearly show that not only did Larry

22   Doud ask lots of questions to his employees, that not only did

23   he caution employees to follow the law, the evidence will also

24   show that Larry Doud caused consultants, former agents of the

25   DEA, to go out to different parts of the country to visit RDC's

M1IBDOUDT2                         Opening - Mr. Janey

1   pharmacy customers to ensure that they were dispensing

2   oxycodone and fentanyl to patients who needed help managing

3   their pain, severe enough pain requiring daily around the clock

4   treatment, chronic pain, lower back pain, cancer related pain,

5   arthritis related pain, breakthrough pain.

6          You will see with your own eyes that the former DEA

7   agent hired by RDC audited Linden Care, RDC's largest purchaser

8   of oxycodone and fentanyl four times.  And dates, ladies and

9   gentlemen, are important in this case.  They are important

10  because the chronology is important to understand what Larry

11  Doud did and when Larry Doud did it.

12         So you will hear the dates of the Linden Care audits

13  by the RDC consultant.  You will hear that those dates occurred

14  during the timeframe in which Larry Doud was supposedly

15  involved in a conspiracy that resulted in Linden Care diverting

16  drugs; July 2013, March 2014, May 2014, September 2014, each

17  time the former DEA agent turn consultant met with the Linden

18  Care chief operating officer, the chief compliance officer, the

19  supervising pharmacist and their DEA regulatory compliance

20  director, all the head honchos.

21         You'll learn the consultants' recommendation to RDC.

22  With regards to required DEA records, Linden Care has met all

23  the required regulations imposed by federal laws and

24  regulations pertaining to records required by DEA of a pharmacy

25  each and every time the former DEA agent consultant visited

M1IBDOUDT2                      Opening - Mr. Janey

1   Linden Care.  You will learn that he never reported Linden Care

2   was or likely was selling oxycodone or fentanyl for non-medical

3   purposes none of the four times.

4            And importantly, ladies and gentlemen, the evidence

5   will show and you will hear that the DEA itself, the actual

6   government agency never told Larry Doud, be careful, caution,

7   Linden Care is selling oxycodone or fentanyl for non-medical

8   purposes.

9            In fact, you will learn and I will read and you will

10  hear that none of the DEA investigations of Linden Care during

11  the timeframe in this indictment in this case ever found Linden

12  Care was diverting oxycodone.

13           Not in 2013 when you will learn that the DEA concluded

14  the investigation, found no evidence of a pattern of disregard

15  for the regulations of the Controlled Substances Act; not in

16  2014 when it concluded no finding of a problem with diversion

17  of oxycodone after review of two months worth of records and a

18  review of thousands of oxycodone prescriptions.

19           This is important because one of the key pharmacy

20  examples you will hear about in this case is Linden Care and

21  the diversion of oxycodone at Linden Care supposedly with

22  oxycodone linden Care obtained from RDC.  This is important

23  because this case is about whether Larry Doud acted criminally,

24  criminally, knowingly and intentionally joined with others at

25  RDC to help Linden Care, for example, the company's largest

customer, sell oxycodone for none-medical purposes illegally,
illegally.

As you critically listen to the government's witnesses
and as you examine the evidence, please listen for why these
criminal charges were brought against Larry Doud, were they
brought because he knowingly and intentionally joined with
others to sell oxycodone and fentanyl illegitimately and for
person financial gain; or as the government described in its
narrative this morning, for greed; or are there other reasons
that work.

And as for Larry Doud's personal financial gain or his
greed, you will hear about Larry Doud's compensation at RDC
that he had a long-term employment contract negotiated with and
approved by the board of directors at RDC.

Yes, you will hear that during the timeframe of the
indictment Larry Doud made more money than he had made at the
beginning of the indictment period.  Yes, in years when
oxycodone and fentanyl shipments to pharmacy customers
increased, Larry Doud's yearend bonus also increased.

However, importantly, you will learn incredibly that
Larry Doud's bonus compensation had practically nothing to do
with increased sales or oxycodone or fentanyl contrary to the
government's entire narrative in this case.

Instead, his bonus compensation was driven by
none-controlled drugs, drugs that have nothing to do with the

M1IBDOUDT2                     Opening - Mr. Janey

1    allegations in this case.  That is what you will hear from the

2    experts.  That is what you will learn from the evidence that

3    drugs like lipitor, a cholesterol lowering drug; drugs like

4    albuterol, a drug that provides relief from asthma attack.

5    Those are the drugs you will learn that drove Larry Doud's

6    bonus compensation.

7           This is important because you will hear that the

8    government's theory of this case is that Larry Doud was

9    motivated to distribute illicit drugs out of greed.  You will

10   hear -- and ladies and gentlemen, the evidence will certainly

11   show, that such a narrative is absolutely false.  You will

12   learn that the actual analysis shows that narrative to be

13   totally wrong.

14          Finally, ladies and gentlemen, at the close of this

15   trial, taking into account all that the evidence will show, the

16   witness testimony, the documents, the questions, the

17   cross-examinations, the evidence will show that this man,

18   Laurence Doud, III, Larry Doud is falsely accused by the

19   government of the United States.

20          You will hear and you will learn from the evidence

21   that Laurence Doud, III, did not knowingly and intentionally

22   join with others at RDC to illegally distribute oxycodone or

23   fentanyl, and he certainly did not intentionally defraud our

24   government.

25          Ladies and gentlemen, your role as juror is actually

M1IBDOUDT2                    Opening - Mr. Janey

1   even bigger than your role as a mere citizen.  As a juror,

2   Judge Daniels will give you instructions and further explain

3   your duty as a juror.  That is part of his role as the

4   presiding judge in this case.  However, there is no question

5   that you will be deciding the guilt or innocence of this man in

6   criminal court on criminal charges.  That is an incredible

7   responsibility.

8          I only request that you take it seriously.  Larry Doud

9   requests that you take it seriously because his life is at

10  stake.  Your Honor, thank you.

11         THE COURT:  All right.  Ladies and gentlemen, we'll

12  take a 10 minute break before we hear the first witness.  Don't

13  discuss the case.  Keep an open mind.  They'll take you to the

14  jury room and we'll bring you back out in 10 minutes.

15         (Jury not present)

16         MS. ROTHMAN:  Your Honor, I didn't want to object

17  during Mr. Janey's opening, but I do think that his statement

18  about the motives for the government's prosecutor here was

19  entirely inappropriate.

20         THE COURT:  You'll have to quote me that language that

21  you're referring to.

22         MS. ROTHMAN:  Yes, your Honor.  What I recall

23  Mr. Janey saying is he being charged because he committed a

24  crime -- and I'm paraphrasing -- or is there something else,

25  another reason, something else going on here.

M1IBDOUDT2                        Opening - Mr. Janey

1              I think the implication here is that the motives by

2     the government are improper.  And as the Court knows, it is

3     entirely inappropriate for the defense to put the government on

4     trial or impeach the motive of the government here.  So I would

5     hope we're not going to see more of that type of argument

6     during cross examination or during direct examination or

7     closing arguments from defense counsel.

8              THE COURT:  Did you want to respond, Mr. Janey?

9              MR. JANEY:  Very simply, your Honor.  I disagree that

10    there was any type of improper motive assigned to the

11    government.  I think the record will reflect that there was a

12    comment in the government's opening that the motivation on the

13    part of the defendant was greed, and I addressed that, and

14    that's a part of the evidence that we have long presumed that

15    they would present.

16             THE COURT:  All right.

17             MS. ROTHMAN:  I'm not sure that's actually responsive.

18    The defendant's motive are important here and relevant.  He is

19    on trial.  The government is not on trial.  I believe the Court

20    will instruct the jury of that before they begin their

21    deliberations.  Any suggestion that the government's

22    prosecution here is improper is inappropriate.

23             THE COURT:  Well, are we getting daily copy?

24             MS. ROTHMAN:  Yes, your Honor.

25             THE COURT:  Why don't you, when we get the daily copy,

M1IBDOUDT2                        Opening - Mr. Janey

1      just point to me what pages that you're referring to so we're

2      all clear about what the issue is, and I think everyone here

3      knows what their responsibilities are and stay within those

4      boundaries.

5              MR. GOTTLIEB:  Your Honor, before we break.

6              THE COURT:  Yes.

7              MR. GOTTLIEB:  In regard to the witnesses, I would

8      like to put on the record, while we have agreed to a number of

9      stipulations, there's also an agreement that the government is

10     not going to reference or elicit any testimony with regard to a

11     civil matter, a civil fine that was paid by RDC prior to the

12     indictment.  I just wanted to make sure that that information

13     will not be elicited in the government's case in chief.

14             MR. ROOS:  I think we may have to go back and have

15     further discussions with counsel.  Our agreement was that we're

16     not going to try to introduce the document of any of the

17     corporate resolutions.

18             MR. GOTTLIEB:  Your Honor, we have an agreement that

19     the government in its case in chief was not going to elicit

20     testimony with regard to a unrelated -- that have to deal with

21     administrative, an RDC fine.

22             If there's any question about that, I would ask that

23     we take a break and we'll pull out the emails.

24             THE COURT:  If you have such an agreement in writing,

25     you should talk to each other first.  And then before we

M1IBDOUDT2                    Opening - Mr. Janey

1    continue with the jury, I'll get to this issue and we'll

2    address it.

3              MR. ROOS:  Two things, your Honor. We did exchange

4    emails.  If my recollection of what the email say is wrong,

5    then shame on me.  We should certainly consult what the

6    government wrote previously.

7              And second, I think it's okay because I don't think

8    the first three witnesses are going to go to this at all.  To

9    the extent the government did not agree to that and defense

10   wants to make a motion, there certainly is time for that.  It's

11   not going to --

12             THE COURT:  Why don't you agree to what you agreed to

13   or agree to disagree and then you can show me the emails that

14   you said this is what was done in writing, or you can tell me

15   what the nature of the discussion was before I have to resolve

16   the motion to include or exclude this testimony.

17             MR. GOTTLIEB:  I'm happy to do that as long as nothing

18   is going to be raised this afternoon.  We don't have to rush

19   now to gather the --

20             MR. ROOS:  The first three witnesses are Carter,

21   Masseth, Castro, and it's not going to come up during any of

22   them.

23             THE COURT:  Let's resolve it as early as possible.

24             All right.

25             (Recess)

M1i3dou3

1           (In open court; jury not present)

2           THE COURT:  Is there anything we need to address now

3    that the jurors are on their way?

4           MS. ROTHMAN:  Not from the government, your Honor.

5           MR. GOTTLIEB:  No, your Honor.

6           THE COURT:  Did you get the room, the jury room?

7           MR. GOTTLIEB:  Yes, thank you.

8           MR. ROOS:  Just for our planning purposes, what time

9    do you typically take lunch and how late do you plan to go?

10           THE COURT:  I take lunch between 12:30 and 1 o'clock.

11    We've ordered lunch from 12:30, so somewhere between 12:30 and

12    12:45 we hope the lunch will be here.  Maybe an hour five, an

13    hour and 10 minutes for lunch.

14           Jury entering.

15           (Jury present)

16           THE COURT:  Would you call the government's first

17    witness.

18           MS. ROTHMAN:  Yes, your Honor.  The government calls

19    Ruth Carter.

20           THE COURT:  Step up into the box.  You can remove your

21    mask while you are in the box.

22           (Witness sworn)

23           THE COURT:  You can be seated.  Would you state and

24    spell your name for the court reporter.

25           THE WITNESS:  It's Ruth Carter.  And that's R-U-T-H

M1i3dou3                         Carter - Direct

1   C-A-R-T-E-R.

2              THE COURT:  You can inquire.

3              MS. ROTHMAN:  Thank you, your Honor.

4    RUTH CARTER,

5         called as a witness by the Government,

6         having been duly sworn, testified as follows:

7   DIRECT EXAMINATION

8   BY MS. ROTHMAN:

9   Q.  Good afternoon, Ms. Carter?

10  A.  Good afternoon.

11  Q.  Where do you live?

12  A.  I live in northern Virginia.

13  Q.  What do you do for work?

14  A.  I am a consultant, a pharmaceutical consultant.

15  Q.  Where did you work before becoming a consultant?

16  A.  I worked for the Drug Enforcement Administration for 31,

17  almost 31 years.

18  Q.  What is the Drug Enforcement Administration?

19  A.  The Drug Enforcement Administration is the federal agency

20  responsible for enforcing the drug laws, the federal drug laws.

21  Q.  Did your work in the DEA focus in a particular area?

22  A.  Yes.  I worked in the diversion control division, which is

23  the division of the DEA that enforces the regulations and the

24  law regarding pharmaceutical controlled substances.

25  Q.  I want to start with some of the different roles that you

M1i3dou3                          Carter - Direct

1    held at the DEA, Ms. Carter.

2              In what year did you join the DEA?

3    A.  1988.

4    Q.  What was your first role?

5    A.  I was a diversion investigator in the Oklahoma City office.

6    Q.  What did you do as a diversion investigator?

7    A.  We conducted administrative, civil, and criminal

8    investigations against DEA registrants who were violating the

9    Controlled Substances Act.

10   Q.  In sort of layman's terms, what types of cases did you

11   investigate?

12   A.  So the cases could involve doctors that were writing bad

13   prescriptions or it could involve a pharmacist that was

14   knowingly filling bad prescriptions or the pharmacist could be

15   selling drugs out the back door.  Those types of

16   investigations.

17   Q.  After your time in Oklahoma City, where did you go?

18   A.  I was then, I was transferred to the Riverside, California,

19   office, and I worked there as a diversion investigator as well.

20   Q.  After that, what was your next role at the DEA?

21   A.  I was transferred to the Las Vegas office, and I became the

22   group supervisor for the diversion group in the Las Vegas

23   office.

24   Q.  What did you do as the group supervisor there?

25   A.  So the group supervisor just coordinates the group.  So

M1i3dou3                        Carter - Direct

1    they manage, ensure that the investigations are being conducted

2    in the appropriate manner, and that investigations are actually

3    being conducted when they need to be conducted.

4    Q.  For how long were you in that role?

5    A.  I was in the Las Vegas office for -- two years I believe.

6    No, four years.  I'm sorry, four years.

7    Q.  What did you do after that?

8    A.  After that, I was transferred to DEA headquarters where I

9    worked in our domestic chemical division.

10   Q.  After your time at headquarters, where did you go?

11   A.  I then went back to the field and worked in the Seattle

12   field division, where I was the group supervisor for the

13   diversion group in Seattle as well.

14   Q.  After your time in Seattle, where did you go?

15   A.  After Seattle I went back to DEA headquarters, and I

16   ultimately became a section chief in the diversion control

17   division at our DEA headquarters.

18   Q.  What types of things did you do at headquarters in that

19   second stint there?

20   A.  I was as a section chief.  I was in the regulatory drafting

21   section initially.  And in that section, I oversaw the

22   rescheduling of hydrocodone from Schedule II to Schedule III,

23   and I oversaw the scheduling of tramadol.  And then, after that

24   I was put in the liaison and policy section, and in that

25   section I dealt with the registrants in the field.  The liaison

 1   unit, pretty much it is the -- liaises with the field,

 2   basically.  And that was what I, that was my role.

 3   Q.  What types of things did you do in the liaison policy

 4   section of the DEA?

 5   A.  So, I attended a lot of national conferences, well over 100

 6   national conferences during my time while I was the section

 7   chief of that section.  I gave a lot of presentations to DEA

 8   registrants regarding the requirements of the regulations.  And

 9   a lot of the conferences, they were either DEA sponsored or

10   industry sponsored.  I went to universities and taught students

11   that were going to be graduating from either dental school or

12   medical school.

13   Q.  Were the obligations placed on distributors one of the

14   topics discussed in those presentations you gave?

15   A.  Yes, absolutely.  So, if -- the topics depend upon the

16   audience.  So, if the audience was distributors, then our

17   primary topic was the distributors' role in the supply chain

18   and what their responsibilities were in order to keep their DEA

19   registration.

20   Q.  We'll talk about those responsibilities a bit later in your

21   testimony.

22              Was that your last role at the DEA?

23   A.  No.  After that, I was transferred to be the diversion

24   program manager in the Washington field division, which is

25   located in Washington, D.C.

M1i3dou3                           Carter - Direct

1    Q.  What do you did in that role?

2    A.  That role, I reported directly to our special agent in

3    charge, and I handled and coordinated all matters relating to

4    pharmaceutical controlled substances, and I oversaw all of our

5    investigations for the entire division, which did include

6    Maryland, Virginia, and the District of Columbia.

7    Q.  When did you leave the DEA?

8    A.  I left June 8 of 2019.

9    Q.  Ms. Carter, during your time at the DEA, did you have any

10   involvement in the investigation of Laurence Doud or Rochester

11   Drug Co-Operative for diversion?

12   A.  No.

13   Q.  So, Ms. Carter, I want to start with some basics.  Are you

14   familiar with the Controlled Substances Act?

15   A.  Yes.

16   Q.  What is that act?

17   A.  It's the federal law that regulates the controlled

18   substances.

19   Q.  How does the Controlled Substances Act, or the CSA,

20   regulate controlled substances in this country?

21   A.  So, the Controlled Substances Act classifies drugs, the

22   controlled substances, into schedules.  It also requires

23   entities and individuals who want to handle controlled

24   substances legally, they are required by the Controlled

25   Substances Act to be registered with the DEA.

M1i3dou3                          Carter - Direct

1    Q.  So let's talk about the schedules first.  How many

2    schedules are there under the CSA?

3    A.  There are five schedules under the CSA, and the Schedule I

4    controlled substances are illegal, so they cannot be legally

5    used or distributed or possessed in the United States.  And

6    then the Sections II through V are the pharmaceutical

7    controlled substances that you have to have a DEA registration

8    in order to handle.

9    Q.  Focusing just for a moment on Schedule I.  What's an

10   example of a drug that would fall within Schedule I?

11   A.  Heroin.

12   Q.  So now let's focus on Schedule II.  What types of drugs go

13   into Schedule II?

14   A.  So the Schedule II drugs are the most highly abused and the

15   most -- they have the most potential for abuse and the most

16   potential for addiction.  So the Schedule II controlled

17   substances have narcotics and non-narcotics.  The narcotics do

18   contain -- some of the narcotics are opioids.  And these are

19   the drugs that are the most abused drugs in the United States,

20   the Schedule II drugs.

21   Q.  Can an individual legally possess a Schedule II controlled

22   substance?

23   A.  The only way an individual can legally possess a Schedule

24   II controlled substance is to pursuant to a prescription that

25   was issued by a DEA -- a DEA registered practitioner.

M1i3dou3                      Carter - Direct

1   Q.   What are some common Schedule II prescription drugs?

2   A.   Oxycodone, hydrocodone, fentanyl, Dilaudid.

3   Q.   What is the medical purpose of those prescription drugs?

4   A.   The medical purpose for those drugs is pain.

5   Q.   Are they dangerous?

6   A.   They are very dangerous.  That's why they're controlled

7   substances.  So, in order to -- any of the drugs that are

8   scheduled in Schedules II through V are dangerous controlled

9   substances.

10          MS. ROTHMAN:  Ms. Drescher, can you please pull up for

11   the witness what's been marked as Government Exhibit 624, 634,

12   631, and then 635.

13   Q.   And Ms. Carter, if you'll take a moment and look at your

14   screen at those four image as Ms. Drescher cycles through them

15   and I'll ask you a few questions.  Let's start with Government

16   Exhibit 634, if we can Ms. Drescher.

17          Let's do 631.  That's okay.

18   A.   Okay.

19   Q.   Do you recognize this image?

20   A.   Yes, this is -- I do recognize this.

21   Q.   What is it an image of?

22   A.   This is an image of Subsys.  The packaging of Subsys and

23   the actual Subsys.

24   Q.   Is that a fair and accurate depiction of Subsys?

25   A.   Yes.

M1i3dou3                        Carter - Direct

1          MS. ROTHMAN:  The government offers Government Exhibit

2    631 into evidence.

3          THE COURT:  Any objection?

4          MR. GOTTLIEB:  No objection.

5          THE COURT:  It's admitted in evidence.

6          (Government's Exhibit 631 received in evidence)

7          MS. ROTHMAN:  May we publish to the jury?

8          THE COURT:  Yes.

9          MS. ROTHMAN:  Thank you, your Honor.

10   Q.  I think it's now on everyone's screen.

11         Now that the jury can see, can you remind us what we

12   are looking at here, Ms. Carter?

13   A.  This is a picture of Subsys.

14   Q.  What is the medical purpose of Subsys?

15   A.  Subsys is used for breakthrough cancer pain.

16   Q.  What is the controlled substance found within Subsys?

17   A.  It's fentanyl.

18   Q.  Is it dangerous?

19   A.  Yes, it's very dangerous.

20   Q.  Is it addictive?

21   A.  Very addictive.

22   Q.  We can take that down and pull up what's been marked for

23   identification as Government Exhibit 635, please.

24         Let's do 624.  That's okay.

25   Q.  Do you recognize this image, Ms. Carter?

M1i3dou3                          Carter - Direct

1   A.   Yes.

2   Q.   What is it an image of?

3   A.   This is an image of a bottle of OxyContin 30 milligram and

4   it's got two tablets on the side.

5   Q.   Is it a fair and accurate depiction of OxyContin?

6   A.   Yes.

7           MS. ROTHMAN:  The government offers 624 into evidence.

8           THE COURT:  Any objection?

9           MR. GOTTLIEB:  No.

10          THE COURT:  It will be admitted in evidence.

11          (Government's Exhibit 624 received in evidence)

12          MS. ROTHMAN:  May we publish to the jury?

13          THE COURT:  Yes.

14          MS. ROTHMAN:  Thank you, your Honor.

15  Q.   Now that we all can see, Ms. Carter, what are we looking

16  at?

17  A.   This is a picture of a bottle of OxyContin, 30 milligram,

18  100 tablets, and to the right are two actual tablets of

19  OxyContin.

20  Q.   What is OxyContin?

21  A.   OxyContin is a Schedule II opioid.  It contain oxycodone.

22  Q.   What is the relationship between OxyContin that we are

23  seeing here and oxycodone?

24  A.   Well, this is -- OxyContin is an extended release form of

25  oxycodone.

M1i3dou3                         Carter – Direct

1   Q.  Is it a branded name of oxycodone?

2   A.  It is also a branded name.  It is the same active

3   ingredient, that being oxycodone.

4   Q.  What is the medical purpose of this drug?

5   A.  This is used for pain as well.

6   Q.  Is it dangerous?

7   A.  Very dangerous.

8   Q.  Is it addictive?

9   A.  Very addictive.

10  Q.  Looking at the photograph, there is a kind of a C with the

11  number II inside.  What does that refer to?

12  A.  Any time you have a controlled substance, on the bottle

13  they're required to label -- on the label it's required to have

14  the schedule listed, so that this is a C with II, Roman numeral

15  II, which mean it is a Schedule II controlled substance.

16  Q.  Ms. Carter, we'll leave that on the screen, but I am going

17  to ask you to look at your binder which is at the front.  There

18  are two photographs that are marked for identification as

19  Government Exhibit 634 and 635.  Do you see those?

20  A.  Yes.

21  Q.  What are they?

22  A.  So, the 634 is a picture of a bottle of oxycodone 30

23  milligram.  And 635 is a picture of a bottle of oxycodone 20

24  milligram and oxycodone 40 milligram.

25  Q.  Is that a fair and accurate depictions of those oxycodone

M1i3dou3                    Carter - Direct

1   products?

2   A.  Yes.

3           MS. ROTHMAN:  At this time the government offers into

4   evidence Government Exhibits 634 and 635.

5           THE COURT:  Any objection?

6           MR. GOTTLIEB:  Your Honor, I believe I have an

7   objection but it wasn't on the screen so let me just check.

8           THE COURT:  Sure.

9           MR. GOTTLIEB:  No objection, your Honor.

10          THE COURT:  It will be admitted into evidence.

11          (Government's Exhibit 634, 635 received in evidence)

12          MS. ROTHMAN:  May I publish to the jury?

13          THE COURT:  Yes.

14  Q.  Ms. Carter, what are we looking at in Government Exhibit

15  634?

16  A.  It is a bottle of oxycodone, 30 milligrams.

17  Q.  Again, how does oxycodone compare to the OxyContin that we

18  just saw?

19  A.  Well, it's the same active ingredient, which is oxycodone.

20  And I believe the other one was 30 milligrams as well, so it is

21  the same milligrams.  Just that the OxyContin was an extended

22  release and it was a branded product by a certain company.  And

23  this is a generic form of oxycodone.

24  Q.  And the 30 milligram, what does that refer to, Ms. Carter?

25  A.  The 30 milligram is the amount of oxycodone that's

M1i3dou3                     Carter - Direct

1    contained in that tablet.

2    Q.  How do drugs like oxycodone or Subsys compare to

3    over-the-counter drugs like Tylenol?

4    A.  Well, there is really no comparison.  So, the oxycodone and

5    Subsys and OxyContin are controlled substances, and they're

6    dangerous controlled substances.  They're highly addictive,

7    they are highly abused.  And they have been Schedule II

8    controlled substances, which means they're regulated by the

9    DEA.  And the DEA only regulates the drugs that are dangerous.

10   So all of the drugs are dangerous.  But these particular drugs

11   are in Schedule II, which is the most stringent schedule and

12   these are the most -- the most highly addictive drugs that the

13   DEA regulates.

14   Q.  How do they compare to an illicit drug like heroin?

15   A.  Well, these drugs are similar -- similar to heroin.  In

16   fact, the heroin is a semisynthetic opioid that's made from the

17   poppy plant, and so is oxycodone.  Oxycodone is a semisynthetic

18   opioid.  They both come from the poppy plant.  So they're very

19   similar.

20   Q.  What does the DEA regulate?

21   A.  Well, the purpose of the regulation is to ensure that the

22   drugs aren't diverted from legal channels into illicit

23   channels, so they're not abused any more than they can

24   potentially be abused when they are used legally.

25   Q.  In your time at the DEA, did you notice any trends with

M1i3dou3                          Carter - Direct

1   respect to the frequency that prescription pain medication like

2   oxycodone was being prescribed?

3   A.   Yes.  So, when I first started at the DEA, there really

4   wasn't, people didn't even know what these drugs were.  The

5   average person didn't even know it.  But everyone knows what

6   these drugs are today, because we've been in the middle of an

7   opioid epidemic and a public health crisis for years now.

8          And what happened is, doctors started writing more

9   prescriptions for these drugs, and then they started being

10  dispensed more by the pharmacies, and a lot of time -- when I

11  say writing more prescriptions, they were writing them

12  illegally.  So they started writing them illegally, and people

13  started getting addicted to them, and then the pharmacies

14  started filling the prescriptions, and then the distributors

15  started selling the prescriptions to the pharmacies.

16         So, it just became a cycle that ended up being -- that

17  culminated into the opioid epidemic.

18  Q.   Can you give the jury a sense of how big of a problem this

19  was.

20  A.   Well, it is a huge problem, because just since, between

21  2000 and 2019, according to the CDC, I mean, almost 850,000

22  people have died of a drug overdose.  And out of those, if you

23  look at just prescription opioids, and that's the drugs like

24  these, it's almost 250,000 people that they can attribute to

25  having died from these drugs.  And when I say they can

1   attribute it, that means they listed the cause of death as

2   being a prescription opioid.  That's not going to cover it all.

3   There are a lot more people that likely died from the opioids,

4   but the coroner maybe didn't catch it or didn't list it as the

5   cause of death.

6   Q.  What, if any, relationship is there between these

7   prescription pain medications and illicit drugs like heroin,

8   for example?

9   A.  Can you repeat that?

10  Q.  So does somebody who gets addicted to these types of pain

11  medications only use prescription pain medications?

12  A.  No.  Unfortunately, what happens when they get addicted to

13  these, these opioids like the oxycodone, the fentanyl, the

14  Dilaudids, when they get addicted to those, they become --

15  there is many reasons that they end up switching to illicit

16  drugs like heroin and fentanyl.  But, one of the primary

17  reasons is because they, their habits, as they continue to take

18  the drug, they develop a tolerance and then they need more and

19  more of the drug.  As they need more and more of the drugs, the

20  drugs become too expensive for them to be able to afford to pay

21  for the pills, because pills cost more.  It is a lot cheaper to

22  get the heroin off the street and to get the fentanyl off

23  street.

24          So that's what we've seen.  If you look at what's

25  happened, the prescription opioids have decreased and declined,

M1i3dou3                    Carter - Direct

1   but the heroin and fentanyl has risen dramatically.

2   Q.   Thank you, Ms. Carter.  So we spoke about the scheduling of

3   controlled substances.  You also mentioned that the CSA places

4   restrictions on who can sell and distribute controlled

5   substances.  So I want to talk about that now.

6            Are you familiar with the term DEA registrant?

7   A.   Yes.

8   Q.   What does that term refer to?

9   A.   A DEA registrant is any entity or individual who is

10  registered by the DEA to handle controlled substances.

11  Q.   If you're not a DEA registrant, are you allowed to

12  distribute or sell controlled substances?

13  A.   No.

14  Q.   If you lose your DEA registration, are you allowed to

15  distribute or sell controlled substances?

16  A.   No.

17  Q.   We'll come back to this later.  But, does the fact that a

18  company has a DEA registration mean that they're complying with

19  their obligations under the law?

20  A.   No.

21  Q.   I'm going to pull up for the witness what's been marked for

22  identification as Government Exhibit 901.

23            Do you see that on your screen?

24  A.   I do.

25  Q.   Do you recognize this?

1    A.   Yes.

2    Q.   What is it?

3    A.   This is a depiction of the supply chain, that's the supply

4    chain that pretty much from the manufacturer down to the

5    patient as far as the -- how the controlled substances get from

6    the manufacturer all the way to the patient.

7    Q.   Is it a fair and accurate depiction of that supply chain?

8    A.   Yes.

9            MS. ROTHMAN:  The government offers Government Exhibit

10   901 into evidence.

11           THE COURT:  Any objection?

12           MR. GOTTLIEB:  No, your Honor.

13           THE COURT:  It will be admitted into evidence.

14           (Government's Exhibit 901 received in evidence)

15           MS. ROTHMAN:  May we publish to the jury?

16           THE COURT:  Yes.

17           MS. ROTHMAN:  Thank you.

18   Q.   Now that we all can see Government Exhibit 901.  What are

19   we looking at, Ms. Carter?

20   A.   So, again, this is a depiction of the supply chain, and it

21   shows you how the drug gets from the manufacturer, and they are

22   the ones that take the raw material and create the substances.

23   And in this instance, we are talking about opioids, so creates

24   the controlled substances.

25           So the manufacturer creates the controlled substances,

they then sell them typically to wholesale distributors and
also other types of distributors.  They sell them to the
distributors, and then the distributors take those and they
distribute those to retail pharmacies, hospitals, and all of
the entities that ultimately will dispense those to the
ultimate user, which is the patient.

Q.  There is one other entity on this chart, the medical
provider.  What's their role in the supply chain of getting
controlled substances from manufacturer to patient?

A.  Well, the medical provider has to write the prescription or
the order, if they are in the hospital.  But they have to write
the prescription for the controlled substance to the patient.

Q.  Who on this chain is required to register with the DEA in
connection with controlled substances?

A.  So everyone on this chain has to be registered with the
DEA, except the patient.

Q.  Are there certain requirements that come with being
authorized to distribute controlled substances as a registrant?

A.  Yes.  Each registrant in the supply chain has specific
responsibilities and requirements, based upon their position
within the supply chain.

Q.  We are going to talk about those requirements in a moment,
but before we do, I want to focus on the wholesale distributor
for a moment.

          Are the wholesale distributors required to sell

M1i3dou3                          Carter - Direct

1   controlled substances?

2   A.  No.  They're not required.  It is a voluntary decision to

3   sell controlled substances in the United States.

4   Q.  Do some distributors not sell controlled substances?

5   A.  Yes.  There are multiples and hundreds and hundreds of

6   distributors out there that do not sell controlled substances

7   at all.

8   Q.  I want to talk about some requirements placed on DEA

9   registrants.  Have you heard of something called ARCOS data?

10  A.  Yes.

11  Q.  What is ARCOS data?

12  A.  ARCOS data is data -- is data that the distributors and

13  manufacturers transmit to the DEA.  It is transactions by those

14  entities that they transmit to the DEA.  And the transactions

15  they transmit are all Schedule II transactions, and then all

16  Schedule III narcotic transactions.  All of those are

17  transmitted to the DEA.

18  Q.  Who is required to report ARCOS data?

19  A.  The manufacturers and the distributors.

20  Q.  Why does the DEA require manufacturers and distributors to

21  report ARCOS data?

22  A.  Well, the data is required to be reported because it gives

23  the -- first of all, it provides the information to the DEA,

24  the DEA can then use that information to look at trends across

25  the country, look at if there are pockets of areas in the

M1i3dou3                          Carter - Direct

country where there are issues.  This data can help provide the
DEA that picture.

          But one thing I would note, it is not realtime data.
It does get transmitted after the fact.

Q.  Are registrants like wholesalers also subject to inspection
by the DEA?

A.  Yes.

Q.  How often dos that happen?

A.  So the DEA conducts what they call scheduled
investigations, and those are -- during my time at the DEA
those were conducted between every three to five years, so just
depended on what the policy was at that time.  But when I left
the DEA, it was every three years.

Q.  Can you give us a sense of what happens during those
inspections?

A.  So those inspections are, they conduct -- they conduct a
review of the physical security at the facility, as far as it
relates to the controlled substances.  They conduct an
accountability audit, and the audit is conducted eight to 10
drugs.  Eight to 10 controlled substances.  And then they also
review the recordkeeping that is done by the registrant.

Q.  In your experience, are those scheduled investigations a
comprehensive assessment of whether or not a particular
distributor is following the law?

A.  No.  I mean, in -- you will -- in those inspections you

1    could see that certain laws aren't being followed, such as some

2    of the recordkeeping requirements aren't being followed.  But

3    it's not going to give you an over-comprehensive view of

4    whether or not the registrant, particularly when it relates to

5    distributors, whether or not they're maintaining effective

6    controls against diversion.  The scheduled investigation

7    typically won't give you that comprehensive review.

8    Q.  Why not?

9    A.  Because the scheduled investigation is an investigation

10   that it is almost like a picture in time.  And so, you're

11   looking at that point of time that you're looking at, is that

12   point of time, obviously.  But you also, when the DEA comes in,

13   they're reliant upon what the registrant gives them.  So they

14   ask the registrant for the data and the information.  And then

15   the registrant provides that information to the DEA.  So the

16   DEA won't know if information is not provided, and they only

17   know what information is provided.

18        The only other way that they would know would be to

19   get a search warrant, and they wouldn't be able to do that

20   unless they were conducting a criminal investigation.

21   Q.  I now want to talk about diversion, Ms. Carter.  Is there a

22   particular division -- withdrawn.

23        What is diversion?

24   A.  Well, diversion is any time the controlled substances, and

25   in this case the opioids, are removed from this legitimate

M1i3dou3                        Carter - Direct

1   supply chain that we just went over.  Any time they were

2   removed from the supply chain and go into the illicit market,

3   that's called diversion.

4   Q.  Is there a particular division of the DEA that focuses on

5   diversion?

6   A.  Yes.  It is called the diversion control division.

7   Q.  Is that where you spent all of your time at the DEA?

8   A.  Yes, all in my entire career.

9   Q.  What is the mission of the diversion control division of

10  the DEA?

11  A.  So the mission is to prevent, investigate and prevent the

12  diversion of controlled substances from this legitimate supply

13  chain into the legitimate market.  While at the same time

14  ensuring that there is an adequate amount of controlled

15  substances available for legitimate medical, educational, and

16  industrial purposes, scientific purposes.

17  Q.  Do registrants such as wholesale distributors have any

18  responsibilities to prevent diversion?

19  A.  Yes.  Each registrant in the supply chain that's depicted,

20  they each have their own set of responsibilities.

21  Q.  So, let's talk about those responsibilities.  Why don't we

22  start with the medical provider on the right side of the chart.

23  What is his or her responsibility to prevent diversion?

24  A.  The medical provider's responsibility is to only write

25  prescriptions for controlled substances if there is a

1   legitimate medical need or purpose for that controlled

2   substance.  So if there's not a legitimate medical need for the

3   controlled substance, they shouldn't write a prescription for

4   that controlled substance.

5   Q.  Let's talk about the pharmacy.  What is a pharmacy's

6   responsibility to prevent diversion?

7   A.  So the pharmacy's responsibility is what's called a

8   corresponding responsibility.  And that responsibility is they

9   are to review the prescriptions that are presented by patients

10  to the pharmacy from the medical providers, and they are to

11  review the facts and circumstances surrounding the

12  prescriptions, and then they have a corresponding

13  responsibility to use their professional judgment and determine

14  whether or not they believe that prescription is actually in

15  fact legitimate.  And if they don't feel that prescription is

16  legitimate, they should not fill that prescription.

17  Q.  Thank you.  Let me ask you about the wholesale distributor.

18  What is the wholesale distributor's responsibility with respect

19  to diversion?

20  A.  So the wholesale distributor has a responsibility to

21  maintain effective controls against diversion.  And that

22  involves, part of maintaining effective controls against

23  diversion is to have a system, they are required to design a

24  system that identifies to them suspicious orders, and they are

25  to report those suspicious orders to the DEA upon discovery.

1    And when part -- the system doesn't consist of just identifying

2    orders.  The orders -- when they look, they have to look at the

3    orders, they have to investigate the orders to determine if the

4    orders that they flag are indeed suspicious.  If they cannot

5    dispel the suspicion, that then they should not ship those

6    orders and those orders should be reported to the DEA as

7    suspicious.

8          The other thing part of their system should include

9    the proper resources for their compliance department.  They

10   should provide proper training to their employees.  And they

11   should have all of the tools they need to conduct onsite

12   investigations.  I mean, so it's not just identifying the

13   order.  The system involves the review of the order, and making

14   sure that that order is actually suspicious or is it not.

15   Q.  I want to unpack some of what you said, Ms. Carter.  What

16   is a suspicious order?

17   A.  A suspicious order is an order that is of unusual size,

18   frequency or pattern.

19   Q.  When you say an order of an unusual size, what do you mean

20   by that?

21   A.  Well, of an unusual quantity.  "Quantity" is probably a

22   word that's more easily understood.  But the volume of the

23   prescriptions.  So is the prescription -- is the distribution

24   to the pharmacy.  So, is this volume higher than it should be.

25   Is it -- is it excessive.  Is it excessive for that area, that

M1i3dou3                      Carter - Direct

demographic area.  So is the population, are they ordering

above average of what a normal pharmacy orders for that

demographic population.

Q.   You also mentioned pattern.  What does a pattern mean with

respect to a suspicious order?

A.   A pattern is they should compare -- one example of a

pattern would be if they're ordering above the average of other

pharmacies that are of the same size, and again, way above the

average or above the average.  If it is even above the average,

that's a red flag and is something they should look at.  That's

an example of a pattern.

Q.   What about frequency, what does that mean?

A.   Frequency just refers to the number of times they order.

So, it's how many times they've ordered, is it changing.

Q.   What is a distributor required to do under the law with

respect to suspicious orders?

A.   Well, the requirements are that they are to review the

order, investigate it, and determine if it's suspicious.  And

if it is suspicious, if they can't dispel the suspicion that

originally caused it to be flagged by their system, then they

should not ship that order.  And they shouldn't ship any

subsequent orders until and unless they can dispel that

suspicion.  So if they never dispel the suspicion, they

shouldn't ship the orders to that customer.

Q.   Is the distributor required to report that order to anyone?

M1i3dou3                        Carter - Direct

1   A.  Yes.  They are required to report that order to the DEA

2   upon discovery.

3   Q.  Why does the DEA require that suspicious orders be

4   reported?

5   A.  Well, the DEA requires the orders be reported because the

6   federal regulations require that -- the federal law requires

7   they be reported.

8   Q.  I guess more broadly, what is the purpose of the reporting

9   requirement?  Thank you, Ms. Carter.

10  A.  Yes.  So the purpose of the reporting would be to alert the

11  DEA that this particular pharmacy or customer is placing

12  suspicious orders, and it would alert the DEA so the DEA could

13  conduct investigations.

14  Q.  Does the DEA inform distributors that they are required to

15  have a system in place to disclose suspicious orders?

16  A.  Yes.

17  Q.  Does the DEA inform distributors that they are required to

18  report suspicious orders to the DEA?

19  A.  Yes.

20  Q.  How does the DEA inform wholesale distributors of these

21  obligations?

22  A.  The DEA informs their registrants of their obligations from

23  the time they're registered.  So when they first are

24  registered, the DEA actually sends investigators out and they

25  meet with the company at the facility.  They go to their

1   facility.  They meet with them, they look at their facility.

2   They then go over what the requirements are at that time.  But

3   then after that, the DEA has sent guidance letters, the DEA

4   holds DEA-sponsored conferences, the DEA also sends out

5   representatives to attend national conferences.

6   Q.  Does the DEA tell distributors what their suspicious order

7   monitoring program needs to look like?

8   A.  No.  The DEA, the DEA -- because the regulation requires

9   that the registrant design the system, and it does say "the

10  registrant shall design," the DEA does not tell the registrant

11  how to design its suspicious order monitoring system.  And this

12  is because the -- every registrant's business is different.

13  And the DEA relies upon the registrant to know its own

14  business, to know its own customers, and to also know what the

15  customer has purchased in the past.  So, the DEA doesn't have

16  all that information.  So the DEA wouldn't be able to design

17  each registrant's system.  Every system could be different.  No

18  registrant system has to be the same.

19  Q.  Does a distributor having a system that monitors order size

20  alone mean that that distributor is maintaining effective

21  controls against diversion?

22  A.  No.

23  Q.  Why not?

24  A.  Because just having the system doesn't mean that the

25  registrant is maintaining effective controls against diversion.

M1i3dou3                         Carter - Direct

1  Because you can have a system in place, but if you are not

2  following the system, if you're not actually carrying through

3  with your requirements and identifying the suspicious orders,

4  investigating the suspicious orders, and then if you can't

5  dispel the suspicions then report those suspicious orders to

6  the DEA, then your system is not effective.  Therefore, it's

7  not maintaining effective controls against diversion.

8  Q.  If a distributor allows a little bit of diversion to occur,

9  is that maintaining effective controls against diversion?

10 A.  No.  A little -- a distributor shouldn't allow any

11 diversion to occur.  So if a distributor sees diversion, they

12 should immediately cease all sales to that registrant.  If it

13 is diversion that they see, and it is a result of orders that

14 have been sent to that registrant over a period of time, then

15 they probably need to take a strong look at their system,

16 because their system obviously has issues.

17        MS. ROTHMAN:  Your Honor, I'm about to move into a

18 topic about red flags of diversion.  Would you like me to keep

19 going or should I stop for lunch?

20        THE COURT:  Go another five, 10 minutes.  I think the

21 lunches should be here soon.

22        MS. ROTHMAN:  Thank you, your Honor.

23 Q.  Are you familiar with the phrase red flags of diversion?

24 A.  Yes.

25 Q.  What does that mean?

M1i3dou3                          Carter - Direct

A.  Red flags are just, they're warning signs.  So signals,
this is something you need to stop and take a look at.
Q.  I am going to ask you about some red flags of diversion.
But before I do, how is a distributor able to see these red
flags of diversion?
A.  Well, the distributor can see the red flags by looking at
their own sales information, which is their own -- the
information of the sales that they're making to their
customers.  They can see a lot of red flags by just reviewing
their sales information and looking at it closely and comparing
it to the customer and the information that they should have
gathered about that customer before they even brought the
customer on board as a customer.  The other way, I mean, in
what they can't see from their sales information, they can see
from dispensing information that they can get from their
customer.  Should get from their customer.
Q.  What is dispensing data or information?
A.  Dispensing data is data that shows what's been dispensed by
a pharmacy.  So, the distributor can ask for that data, for
lack of a better way to get it.  But the data, it will show
what was dispensed, on what date, what the drugs were.  They
should be obtaining dispensing data that shows the prescriber
name.  The only thing they should leave off of this dispensing
information is the patient name, because that's protected by
HIPAA and they should not get that information from the

M1i3dou3                          Carter - Direct

1   pharmacy.  But they should definitely get the prescriber

2   information.

3   Q.  So now I want to ask you about some red flags of diversion.

4   What are some red flags of diversion that a distributor can

5   see?

6   A.  Well, some red flags that a distributor can see by just

7   looking at its own data.  One of them is to compare the amount

8   of controlled substances that they are dispensing to a

9   customer, compare that as compared to the non-controlled

10  substances.  So what is the percentage that they're selling of

11  controlled substances to that customer.

12         So there's certain percentages, if it's going above

13  20 percent, then that's, they should be taking a very strong

14  look at that, because that's a significant red flag.  And

15  actually, I mean, I would say 15 percent is when the red flags

16  begin.

17  Q.  Why is a high percentage of controlled substance sales a

18  red flag of diversion?

19  A.  Because a normal retail pharmacy has, they sell all

20  substances, anything that can be prescribed, you know, they

21  like to have -- the most prescribed items they are going to

22  keep in stock.  They are going to keep a little bit in stock.

23  And a normal pharmacy has a wide variety of substances.  And

24  the percentages of controlled substances is significantly lower

25  than the percentages of non-controlled substances that are

M1i3dou3                          Carter - Direct

1    dispensed.

2    Q.  What's the problem with a pharmacy primarily or

3    significantly dispensing controlled substances and not

4    non-controlled substances?

5    A.  If they're dispensing high percentages of controlled

6    substances, it is highly likely that the prescriptions that

7    they're receiving, that they're dispensing are coming from pill

8    mills.  And if that's the case, they shouldn't be dispensing

9    those prescriptions.

10   Q.  Ms. Carter, what is a pill mill?

11   A.  A pill mill is a doctor, it could be one doctor, it could

12   be multiple doctors, but doctors that are basically writing bad

13   prescriptions.

14   Q.  So what are some other red flags of diversion, separate and

15   apart from the percentage of controlled substances being

16   dispensed at a pharmacy?

17   A.  Another red flag is the high percentage of cash payments

18   for controlled substances.

19   Q.  Why is that a red flag of diversion?

20   A.  Because typically, the normal customer has some form of

21   assistance with their payment, whether it be insurance,

22   Medicare, Medicaid, payment vouchers, or, you know, credit

23   vouchers.  Whatever, there is usually some type of assistance.

24   It is not that common to use cash to pay for prescriptions.

25   And a lot of times drug seekers will use cash because either,

M1i3dou3                       Carter - Direct

1    number one, they can no longer use their insurance because

2    they -- the insurance only lets you purchase a 30-day supply

3    for a 30-day period.  Or, they don't want to alert their

4    insurance company that they're actually obtaining these

5    controlled substances.

6    Q.  What percentage of cash should be a red flag for a

7    distributor?

8    A.  I mean, any time they start getting into 8 to 10 percent of

9    cash, then that should start being a red flag for cash

10   purchasers of controlled substances.

11   Q.  Other than a high percentage of controlled substances, and

12   cash, what are some other red flags of diversion?

13   A.  Some other red flags would be the -- the dosage, the high

14   dosages versus low dosages.  What that means is if a pharmacy

15   is buying more oxycodone 30 milligrams than they're buying

16   oxycodone 5 milligram, that's a significant red flag because

17   most pharmacies, the average pharmacy is going to dispense more

18   of the lower dose oxycodone than they will dispense oxycodone

19   30 milligram.

20   Q.  Why is that a red flag of diversion?

21   A.  That's a red flag because that would be abnormal, and that

22   wouldn't be normal behavior of a retail pharmacy.  And the

23   oxycodone 30 milligram is a highly abused controlled substance

24   and it's highly sought after by drug abusers.  So when they're

25   seeing more of those prescriptions than they are of 5

M1i3dou3                     Carter - Direct

1   milligram, that's a significant red flag.

2   Q.  Is there anything about pill count or the amount of pills

3   in a prescription that could be seen as a red flag of

4   diversion?

5   A.  Yes.  So high pill counts, I mean, depending on if the

6   doctor's writing a prescription for a 90-day supply or a 30-day

7   supply.  The amounts should match what they're legally or what

8   the standard medical practice is for that state.  So, it should

9   not -- the amount they prescribe should not exceed that.

10        Also, it should also not exceed the medical condition.

11  So if it is a medical condition that's an acute condition and

12  it's not going to last forever, then there is no reason they

13  are getting a 90-day supply of that drug.

14        So the quantity is something that could be a very

15  significant red flag.

16  Q.  Could a 30-day supply of 180 pills of oxycodone 30, would

17  that it be a red flag of diversion?

18  A.  Yes.

19  Q.  Why is that?

20  A.  Because, that's, that's, that would be prescribing more

21  than four tablets a day oxycodone 30 milligram, and that is a

22  high, that would be a high dosage amount to prescribe.

23  Q.  What about the location of the patients who are filling

24  prescriptions as compared to the pharmacy or the medical

25  provider?

M1i3dou3                          Carter - Direct

A.   The location of the pharmacy and the medical provider could

be another red flag.  So if the patients are traveling long

distances from their residences, and it's not some type of

oncology or some type of orthopedic specialist or some reason

like that, then there is no reason, really, that a patient

would travel long distances, unless typically it's to obtain

the pills that they want to obtain, basically.

Q.   Is there a certain percentage of out-of-state patients that

would be a red flag of diversion for distributors?

A.   Yes.  So unless, unless it is a border state and they're

literally right on the border, any out-of-state prescription at

a pharmacy is going to be questioned by the pharmacy.

Q.   Then, finally, what, if anything, about the doctors who are

writing these prescriptions that could be a red flag of

diversion?

A.   Well, the doctors, if the doctors have been disciplined by

the boards in the state, or they are, you know, arrested or

convicted by a law enforcement entity, then that's obviously

something that needs to be looked at immediately.

        But even if a doctor is one of the doctors that -- so

say they look at the dispensing records and they notice that

one or two or even three or four of the practitioners are

writing most of the oxycodone prescriptions, I am just using

that as an example.  If you see one or two doctors and they're

writing the majority of those prescriptions, that's a

significant red flag, because you should see an average, like a

normal amount that's disbursed by all the doctors.  You

shouldn't see it all, you know, relegated down to one or two

doctors or a few doctors.  That's a significant red flag and

that should be investigated.

Q.  Does a pharmacy need to have all of these red flags of

diversion to be a concern for distributors?

A.  No.  Just one red flag should be a concern.

Q.  What is a distributor supposed to do when they see red

flags of diversion?

A.  When they see the red flags, they should dispel that red

flag.  And if they can't dispel the suspicion surrounding that

red flag, then they shouldn't ship the order.

Q.  Is a distributor required to send controlled substances to

their pharmacy customers?

A.  No.

Q.  Is a distributer allowed to rely upon the fact that a

pharmacy has a DEA registration to sell controlled substances

to that pharmacy?

A.  No.  Just having the DEA registration doesn't fulfill their

requirement to maintain effective controls against diversion.

They do have to maintain effective controls against diversion.

Q.  Ms. Carter, is a distributor allowed to turn a blind eye to

red flags of diversion?

A.  No.  Absolutely not.

M1i3dou3                         Carter - Direct

1    Q.  Why not?

2    A.  Because they do -- the distributors in order -- their

3    registration's predicated upon the fact they do have to

4    maintain effective controls against diversion.  And all of that

5    involves the system that we've been talking about.  They have

6    to look at each order, if the order is suspicious, they have to

7    dispel that suspicion or they should not ship that order.

8             MS. ROTHMAN:  Now might be a good time to break for

9    lunch.

10            THE COURT:  We are going to take a lunch break at this

11   time.  Your lunch is running a little late.  It should be here

12   in the next five, 10 minutes.

13            Don't discuss the case.  Keep an open mind.  We'll

14   continue at 2:10.

15            (Jury excused)

16            THE COURT:  We'll continue at 2:10.

17            MS. ROTHMAN:  May the witness step down?

18            THE COURT:  Yes.  Thank you.

19            (Luncheon recess)

20            (Continued on next page)

21

22

23

24

25

M1IBDOUT4                     Carter – Direct

1          THE COURT:  You can continue, Ms. Rothman.

2          MS. ROTHMAN:  Thank you, your Honor.

3   BY MS. ROTHMAN:

4   Q.  Welcome back, Ms. Carter.

5   A.  Thank you.

6   Q.  Before we broke for lunch, I asked you some questions about

7   red flags of diversion.  I now want to talk about some

8   communications from the DEA that was sent to wholesale

9   distributors.

10          Ms. Drescher, can you please pull up for the witness

11   Government Exhibit 272 and then 273.

12   Q.  Ms. Carter, do you recognize those documents?

13   A.  Yes.

14   Q.  What are they?

15   A.  These are letters that were sent from the DEA to all DEA

16   registered distributors and manufacturers in the United States.

17   Q.  Are they fair and accurate copies of those letters?

18   A.  Yes.

19          MS. ROTHMAN:  Your Honor, the government offers

20   Government 272 and 273 into evidence.

21          THE COURT:  Any objection?

22          MR. GOTTLIEB:  No objection, your Honor.

23          THE COURT:  They will be entered into evidence.

24          (Government's Exhibits 272 and 273 received in

25   evidence)

M1IBDOUT4                    Carter - Direct

1          MS. ROTHMAN:  Can you please pull for everyone

2    Government 272 to start.  Once it loads, I'll ask you to zoom

3    in on the top third of the letter.

4          Thank you.

5    Q.  All right.  Ms. Carter, now that we all can see, let's go

6    through this letter step by step.  What's the date of the

7    letter?

8    A.  September 27, 2006.

9    Q.  Who's the letter from?

10   A.  The Drug Enforcement Administration.

11   Q.  Who is this letter sent to?

12   A.  Rochester Drug Co-Operative, Inc.

13   Q.  Ms. Carter, can you please read the first paragraph of the

14   letter beginning with this letter?

15   A.  This letter is being sent to every commercial entity in the

16   United States registered with the Drug Enforcement

17   Administration to distribute controlled substances.  The

18   purpose of this letter is to reiterate the responsibilities of

19   controlled substance distributors in view of the prescription

20   drug abuse problem our nation currently faces.

21   Q.  Thank you.

22          If we can zoom out and then zoom in on the second

23   section.  Thank you, Ms. Drescher.

24          I'm going to ask you to read the second paragraph in

25   the background section.

M1IBDOUT4                    Carter - Direct

A.   The CSA was designed by Congress to combat diversion by

providing for a closed system of drug distribution, in which

all legitimate handlers of controlled substances must obtain a

DEA registration, and as a condition of maintaining such

registration, must take reasonable steps to ensure that their

registration is not being utilized as a source of diversion.

          Distributors are, of course, one of the key components

of the distribution chain.  If the closed system is to function

properly as Congress envisioned, distributors must be vigilant

in deciding whether a prospective customer can be trusted to

deliver controlled substances only for lawful purposes.

          This responsibility is critical, as Congress has

expressly declared that the illegal distribution of controlled

substances has a substantial and detrimental effect on the

health and general well fair of the American people.

Q.   What does the closed system of drug distribution refer to

in this paragraph?

A.   The closed system of distribution is the -- it's the supply

chain, if you will.  The supply chain that we looked at earlier

today, if you take all of those DEA registrants that's are

within that supply chain, that's what called the closed system

of distribution.  There are certain requirements that are part

of that closed system of distribution, such as the ARCOS and

the recordkeeping that we talked about.

          But in order for the drugs -- the goal is to ensure

M1IBDOUT4                    Carter - Direct

1   that the drugs are not diverted outside of that closed system

2   of distribution.

3           MS. ROTHMAN:  Thank you.  Ms. Drescher, if we go to

4   the second page of this letter, and I'm going to ask you to

5   zoom on the midportion of the letter with the paragraph that

6   begins DEA regulation require.

7           Go down to one more paragraph.  Thank you.

8   Q.  Ms. Carter, I'm now going to ask you to read the portion of

9   this letter that begins with, DEA regulations, and I'll ask you

10  to read down to industrial channels?

11  A.  The DEA regulations require all distributors to report

12  suspicious orders of controlled substances.  Specifically the

13  regulations state in 21 C.F.R. 1301.74(b), the registrant shall

14  design and operate a system to disclose to the registrant

15  suspicious orders of controlled substances.

16          The registrant shall inform the field division of the

17  administration in his area of suspicious orders when discovered

18  by the registrant. Suspicious orders include orders of usual

19  size, orders deviating substantially from a normal pattern and

20  orders of unusual frequency.

21          It bears emphasis that the foregoing reporting

22  requirement is in addition to, and not in lieu of, the general

23  requirement under 21 U.S.C. 823(e), that a distributor maintain

24  effective controls against diversion.

25          Thus, in addition to reporting all suspicious orders,

M1IBDOUT4                    Carter - Direct

1   a distributor has a statutory responsibility to exercise due

2   diligence to avoid filling suspicious orders that might be

3   diverted into other than legitimate medical, scientific and

4   industrial channels.

5   Q.   Just a few questions.  In the first paragraph there's a

6   citation to 21 C.F.R 1301.74(b), in general terms, what is

7   that?

8   A.   That's the federal regulations regarding the controlled

9   substances regulations.

10   Q.   And then in the third paragraph that begins, it bears

11   emphasis that the foregoing reporting requirement is in

12   addition to, and not in lieu of, the general requirement under

13   21 U.S.C. 823(e), that a distributor maintain effective

14   controls against diversion.  What does that mean?

15   A.   What this is saying is that, the distributors are required

16   to have their suspicion order monitoring system, and they are

17   required to identify and report suspicious orders.  But this

18   paragraph is pointing out that in addition to that, they are

19   required to maintain effective controls against diversion.  So

20   just reporting is not the only thing that is required to be

21   part of that system.

22        MS. ROTHMAN:  If we can zoom out of this,

23   Ms. Drescher, and zoom in on the paragraph that's second from

24   the bottom.  Thank you.

25   Q.   I'm going to ask you to read this paragraph, Ms. Carter.

M1IBDOUT4                          Carter - Direct

1   A.   In a similar vein, given the requirement under Section 823

2   (e) that a distributor maintain effective controls against

3   diversion, a distributor may not simply rely on the fact that

4   the person placing the suspicious order is a DEA registrant and

5   turn a bind eye to the suspicious circumstances.

6           Again, to maintain effective controls against

7   diversion, as Section 823(e) requires, the distributor should

8   exercise due care in confirming the legitimacy of all orders

9   prior to filling.

10          MS. ROTHMAN:  You can take that down and then turn to

11  the third page of the letter.  If we can highlight the title,

12  circumstances that might be indicative of diversion.

13  Q.   Before we talk about the content of this page, can you

14  describe in broad strokes what is being discussed on this page

15  of the letter?

16  A.   Yes, these are circumstances that might be indicative.

17  These are red flags.

18  Q.   I'm going to focus on a few.  I'm sorry, red flags of what?

19  A.   Red flags that could indicate diversion.

20  Q.   I'm going to focus on a few of them.

21          If we can zoom in on item number one in the first

22  section.

23          Could I ask you to read this and explain what it's

24  about, Ms. Carter?

25  A.   Ordering excessive quantities of a limited variety of

M1IBDOUT4                    Carter - Direct

controlled substances, e.g., ordering only phentermine,

hydrocodone and alprazolam, while ordering few, if any, other

drugs.

     So this is referring to order patterns that I was

referring to this morning.  So if they're ordering certain

controlled substances; say, for example, hydrocodone, oxycodone

and alprazolam and they're ordering very little of other drugs,

that's not a usual pattern for a pharmacy, that is a

significant red flag.

Q.  And if we can zoom out of that and zoom in on number four

at the bottom of the first section.

     Can you read this, Ms. Carter, and describe what's

going on?

A.  Ordering the same controlled substance from multiple

distributors.  When a pharmacy is ordering opioids for multiple

distributors, they're typically doing that to try to avoid

letting the distributor -- each of the distributors know how

much they're really ordering, and that's why they would go to

order for multiple.  Because typically a retail pharmacy has

one primary distributor, and then they usually have a secondary

distributor that's available to them in the event their primary

distributor can't supply them with the drugs that they need.

Q.  If we can zoom in on the second section, the numbered

bullets one to ten.

     What does this section consist of, Ms. Carter?

M1IBDOUT4                    Carter - Direct

1    A.   This section is some suggested things that the distributor

2    might ask the ordering pharmacy about an order.

3    Q.   I'm going to ask you about number seven.  Can you read that

4    and explain what's going on there?

5    A.   Are one or more practitioners writing a disproportionate

6    share of the prescriptions for controlled substances being

7    filled by the pharmacy.

8    Q.   What does that refer to?

9    A.   That's referring to, when they're looking at the dispensing

10   records of the pharmacy, are there one or more practitioners

11   that are writing, just what it says, disproportionate shares.

12   Are they writing the majority of the controlled substance

13   prescription.  Because if they are, again that's not normal and

14   that's a significant red flag that needs to be looked at and

15   inquired about.

16   Q.   Let's highlight number one.  If I can have you read that,

17   Ms. Carter?

18   A.   What percentage of the pharmacy's business does dispensing

19   controlled substances constitute.

20   Q.   What does that mean?

21   A.   So again, that's referring to the percentage of the

22   controlled substances as compared to the non-controlled

23   substances.  And I talked about that earlier today, but what

24   percentage of -- this is saying, you need to inquire about this

25   because if the percentage is high or above average, then that's

M1IBDOUT4                          Carter - Direct

1    a red flag that needs to be explored.

2              MS. ROTHMAN:  If we could zoom in on the final

3    paragraph of this page.

4              Thank you, Ms. Drescher.

5    Q.  If you could read that, Ms. Carter.

6    A.  These questions are not all inclusive, nor will the answer

7    to any of these questions necessarily determine whether a

8    suspicious order is indicative of diversion to other than

9    legitimate medical channels. Distributors should consider the

10   totality of the circumstances when evaluating an order for

11   controlled substances, just as DEA will do when determining

12   whether the filling of an order is consistent with the public

13   interest within the meaning of 21 U.S.C. 823(e).

14   Q.  If we can take this down and please pull up what's in

15   evidence as Government Exhibit 273.  If we can zoom in on the

16   top of the page again.

17             What are we looking at here, Ms. Carter?

18   A.  This is another letter that was sent to all of the

19   distributors and manufacturers in the United States by the DEA.

20   Q.  What's the date of this letter?

21   A.  December 27th of 2007.

22   Q.  To whom was this letter sent?

23   A.  This was sent to Rochester Drug Co-Operative, Inc.

24   Q.  If I could ask you to read the first paragraph of the

25   letter.

M1IBDOUT4                    Carter - Direct

1   A.   This letter is being sent to every entity in the United

2   States registered with the Drug Enforcement Administration to

3   manufacture or distribute controlled substances.  The purpose

4   of this letter is to reiterate the responsibilities of

5   controlled substance manufacturers and distributors to inform

6   DEA of suspicious orders in accordance with 21 C.F.R

7   1301.74(b).

8        MS. ROTHMAN:  Zoom out and zoom in on the second

9   paragraph.

10  Q.   I ask you to read this paragraph up until the sentence that

11  ends, suspicious orders.

12  A.   In addition to, and not in lieu of, the general requirement

13  under 21 U.S.C. 823, that manufacturers and distributors

14  maintain effective controls against diversion.  DEA regulations

15  require all manufacturers and distributors to report suspicious

16  orders of controlled substances.

17       Title 21 C.F.R 1301.74(b) specifically requires that a

18  registrant design and operate a system to disclose to the

19  registrant suspicious orders of controlled substances.

20       The regulation clearly indicates that it is the sole

21  responsibility of the registrant to design and operate such a

22  system.  Accordingly, DEA does not approve or otherwise endorse

23  any specific system for reporting suspicious orders.

24       MS. ROTHMAN:  You can take that down.  And if we can

25  zoom in on the third paragraph.

M1IBDOUT4                    Carter - Direct

1              Thank you, Ms. Drescher.

2    Q.  I ask you to read that paragraph, please.

3    A.  The regulation also requires that the registrant inform the

4    local DEA division office of suspicious orders when discovered

5    by the registrant.  Filing a monthly report of completed

6    transactions, e.g., "excessive purchase report" or "high unit

7    purchases," does not meet the regulatory requirement to report

8    suspicious orders.

9              Registrants are reminded that their responsibility

10   does not end merely with the filing of suspicious order report.

11   Registrants must conduct an independent analysis of suspicious

12   orders prior to completing a sale to determine whether the

13   controlled substances are likely to be diverted from legitimate

14   channels.  Reporting an order as suspicious will not absolve

15   the registrant of responsibility if the registrant knew, or

16   should have known, that the controlled substances were being

17   diverted.

18   Q.  Ms. Carter, let me ask you, the reference in this paragraph

19   to filing a monthly report of completed transactions, e.g.,

20   excessive purchase report or high unit purchases, what is that

21   referring to?

22   A.  Well, this is referring to -- during this time period, a

23   lot of the distributors in the United States were sending

24   monthly reports that they were -- some of them titled them

25   excessive purchase reports, and they were sending these monthly

M1IBDOUT4                        Carter - Direct

1   reports to the DEA after they had already shipped the

2   controlled substances and there was no investigation being

3   done.  They were just sending the transactions.  It was

4   literally like hundreds of pages long of all the transactions

5   that had hit a threshold for that month.  And then, you know,

6   they still shipped the order.  They would just send in these

7   transactions to the DEA.

8   Q.  What's the problem with distributors doing that?

9   A.  Well, because that's not reporting suspicious orders.

10  That's just sending us, the DEA, a list of transactions.  The

11  suspicious orders, you know, before you determine it's

12  suspicious, you need to look at it and determine that order is

13  in fact suspicious.  And then that order individually needs to

14  be reported and it needs to be reported upon discovery and the

15  order should not be shipped.

16  Q.  Thank you.

17          MS. ROTHMAN:  We can take that down and zoom in on the

18  final paragraph.

19  Q.  I'm going to ask you to read one sentence from this

20  paragraph, the sentence the size of an order alone.

21  A.  The size of an order alone, whether or not it is deviates

22  from a normal pattern, is enough to trigger the registrant's

23  responsibility to report the order as suspicious.

24  Q.  We can go to page two of the letter, and I'm going to ask

25  you to read the top paragraph and then we are done with this

M1IBDOUT4                    Carter - Direct

1   letter, Ms. Carter.

2   A.  Registrants that rely on rigid formulas to define whether

3   an order is suspicious may be failing to detect suspicious

4   orders; for example, a system that identifies orders as

5   suspicious only if the total amount of controlled substances

6   ordered during one month exceeds the amount ordered the

7   previous month by a certain percentage or more is insufficient.

8         This system fails to identify orders placed by a

9   pharmacy if the pharmacy placed unusually large orders from the

10  beginning of the relationship with the distributor.

11        Also, this system would not identify orders as

12  suspicious if the order were solely for one highly abused

13  controlled substance if the orders never grew substantially.

14        Nevertheless, ordering one highly abused controlled

15  substance and little or nothing else deviates from the normal

16  pattern of what pharmacies generally order.

17  Q.  Can you just paraphrase what's going on in the first

18  portion of this paragraph with respect to rigid formulas being

19  insufficient?

20  A.  Well, this is referring to, a lot of the distributors were

21  using formulas that -- multipliers that were -- they would have

22  an average and then they would have a multiplier.  And then if

23  the cumulative order for that month reached that quantity of

24  pills, then they would call that order suspicious.

25        But the problem with that rigid formula is, it doesn't

M1IBDOUT4                    Carter - Direct

1    identify orders of unusual pattern and orders of unusual

2    frequency.

3    Q.  Anything else insufficient with just having a formula and

4    nothing else?

5    A.  Could you repeat that.

6    Q.  Anything else insufficient with just having a formula but

7    nothing else as a wholesale distributor?

8    A.  I'm having -- the very first part of the sentence.

9    Q.  If a wholesale distributor only has a formula for

10   monitoring suspicious orders, but no other due diligence in

11   their compliance department, is that maintaining effective

12   control against diversion?

13            MR. GOTTLIEB:  Your Honor, objection.

14            THE COURT:  No.  She can answer that question.

15   A.  That would not be sufficient.

16            MS. ROTHMAN:  We can take that down, Ms. Drescher.

17   Q.  Ms. Carter, I believe you testified that you were not

18   involved in the investigation of Laurence Doud or Rochester

19   Drug Cooperative, correct?

20   A.  Correct.

21   Q.  Have you been involved in other investigation of other

22   wholesale distributors in your time at the DEA?

23   A.  Yes.

24   Q.  Did one of those investigation relate to Cardinal Health?

25   A.  Yes.

M1IBDOUT4                    Carter - Direct

Q.  I want to ask about your involvement in that case.  When

did the --

            MR. GOTTLIEB:  Your Honor, objection.  May we have a

sidebar to explain.

            THE COURT:  Yes.

M1IBDOUT4                    Carter - Direct

1             (At sidebar)

2             MR. GOTTLIEB:  Your Honor, I object to the witness

3    being asked about other investigations that she's had, asking

4    her any details about those investigations.  She, as I

5    understood it, she is not being called as an expert witness for

6    the purpose of giving an opinion.  She was going to lay out,

7    again my understanding was, what the law is, and what the

8    requirements are, but what she has done and what her findings

9    were in other cases involving other customers or distributors

10   having nothing to do in connection with this case and should

11   not be permitted.

12            THE COURT:  Is this investigation at all related to

13   RDC?

14            MS. ROTHMAN:  Your Honor, I can explain, Government

15   Exhibit 3 is an email that was forwarded to the defendant in

16   relation to the Cardinal Health case, which Ms. Carter had

17   direct involvement in.  So Mr. Doud received an email in 2012

18   about the Cardinal Health case, about the DEA cracking down on

19   wholesale distributors.  That's going to come into evidence,

20   goes to the defendant's knowledge of the responsibilities

21   placed on wholesalers, the DEA's focus on those wholesalers.

22   Ms. Carter was in Florida involved in that investigation. I'm

23   going to ask her three questions.

24            THE COURT:  What is she going to say?

25            MS. ROTHMAN:  She's going to say she was involved in

M1IBDOUT4                    Carter - Direct

1    Cardinal Health's investigation.  It related to excessive

2    oxycodone supplying to pharmacies in Florida, that Cardinal

3    Health was failing to report suspicious orders, failing to

4    comply with its obligation to maintain effective controls

5    against diversion, and that's about it.

6              THE COURT:  What is the connection to the defendant?

7              MS. ROTHMAN:  What we're going to offer into evidence

8    immediately after Ms. Carter is emails in which Mr. Doud

9    receives information about Cardinal Health.  She's providing

10   some background.

11             THE COURT:  She's not going to testify about the

12   connection.  What does the email say?

13             MS. ROTHMAN:  Mr. Doud is forward an email in which --

14   we can pull it up -- in which the article is flagged that the

15   DEA is looking into Cardinal Health.  There's discussion about

16   the obligations placed on wholesale distributors.

17             THE COURT:  That's discussion between whom?

18             MS. ROTHMAN:  The defendant and other employees of

19   Rochester Drug Co-Operative who are alleged to be conspirators

20   in the conspiracy.  It goes directly to his knowledge of the

21   obligation.

22             THE COURT:  Who's going to testify to this?

23             MS. ROTHMAN:  It's likely going to come in through a

24   summary witness who is going to read some of those emails that

25   Mr. Doud is copied on in which he receives these articles and

M1IBDOUT4                         Carter - Direct

1    discussions. I believe that at least one of those emails, I

2    believe Mr. Pietruszewski, who is another witness who will also

3    talk about the increased crackdown on wholesale distributors

4    that he and others at RDC have been informed of. It goes to

5    the defendants obligation.

6              THE COURT: Can I see the email.

7              MS. ROTHMAN: Sure. Let me get it.

8              MR. GOTTLIEB: While they're getting it, can I make it

9    very clear. I'm not objecting to an email that Mr. Doud maybe

10   received, if you decide that that's relevant that he received

11   it and if it meets the other evidentiary basis. What I'm

12   objecting to is having a witness talk about her experience in

13   another case where there was a finding as to give some

14   credibility to a finding. It's an irrelevant issue.

15             I simply object to this witness testifying about

16   another case. I'm not objecting to a subsequent email to Larry

17   Doud which would go to his standing

18             MR. ROOS: Your Honor, one possibility could be the

19   government can offer the emails now and then show them to the

20   witness and say, can you explain what this Cardinal action was

21   and could then provide the context. I think that's all

22   Ms. Rothman is trying to get out.

23             MR. GOTTLIEB: What this witness's understanding, her

24   background about something that was relaid to Larry Doud is

25   irrelevant. That is not relevant, unless this witness spoke to

M1IBDOUT4                    Carter - Direct

1    Larry Doud.

2              THE COURT:  That I can't accept.  The question is, who

3    is in a position to explain what the Cardinal Health

4    investigation was.

5              MS. ROTHMAN:  That's Ms. Carter.

6              THE COURT:  If they're going to, at some point, admit

7    this document into evidence, which is an email about Cardinal

8    Health.

9              MS. ROTHMAN:  Ms. Carter is quoted in the article.

10             MR. GOTTLIEB:  The email is the relevant piece of

11   evidence.  The email speaks for itself.  What I mean by that if

12   I can, if the email says Cardinal Health was indicted or was

13   investigated because of whatever and that was relayed to Larry

14   Doud, well that certainly can be considered relevant.  But now

15   to have the investigator talk about anything else about it goes

16   beyond -- it does not impact what Larry Doud was told or knew.

17   The email itself is relevant.  I'm not objecting to the email.

18             But giving anything more than just reading the email

19   because, that's what affected his state of mind.

20             THE COURT:  I almost never accept the argument that

21   the document speaks for itself.  Document don't speak.  People

22   speak about documents and that's how you establish their

23   relevance.

24             MR. GOTTLIEB:  Your Honor knows exactly what I'm

25   talking about.  In this case, what's in the document is

M1IBDOUT4                    Carter - Direct

 1   relevant.  This is sent to Larry Doud, and therefore, he read

 2   it.  So whatever is in the document is what goes to his state

 3   of mind and would go to his knowledge.  That's what I mean by

 4   that.

 5              THE COURT:  Well, if this is sent to him notifying him

 6   of an investigation that they were doing about Cardinal Health

 7   and it's otherwise going to come into evidence, the jury at

 8   least has the right to know what Cardinal Health's

 9   investigation was.

10              MR. GOTTLIEB:  Respectfully, they are entitled to know

11   what's in the email.

12              THE COURT:  No.  I have to stop you there.  They're

13   entitled to more than just what's on the piece of paper.

14   They're entitled to relevant testimony about it and testimony

15   that makes it clear, explains what this is about.

16              MR. GOTTLIEB:  No.  No.  But if Mr. Doud wasn't given

17   that information -- let's assume the only thing that Mr. Doud

18   knows is what's is in the email.  Somebody now telling the jury

19   the blood and guts of the case like a homicide detective to

20   talk about -- it would be like calling -- I'm not saying it's

21   the same.  It would be like calling a homicide detective to

22   talk about, okay, the email was sent to this guy about a

23   homicide, let me tell you about the homicide, blood and guts of

24   the homicide.  The facts are different, but that's about,

25   judge, the state of mind based on the email.

M1IBDOUT4                    Carter - Direct

1        THE COURT:  I understand your argument, but what you

2   just said is in the email.  It says, this month the DEA accused

3   Cardinal Health, a Fortune 500 company with $103 billion in

4   revenue by endangering the public by selling excessive amounts

5   of Oxycontin.  Why is her statement that she investigated such

6   a claim, why is that somehow inadmissible through her?

7        MR. GOTTLIEB:  Your Honor, I did not object to the

8   question, did you investigate.  What I'm objecting is now if

9   this email about Cardinal was given to Mr. Doud, so he's

10  informed of that.  It would be improper now for the

11  investigator to go beyond this.

12        And quite frankly, to even testify about any of the

13  facts because the relevant issue is that this document was

14  given to Larry Doud.

15        THE COURT:  I understand your argument in the

16  abstract.  I don't know specifically what information you're

17  objecting to.  What is it that you don't want her to say?

18        MR. GOTTLIEB:  I don't want her to give any testimony

19  --

20        THE COURT:  Tell me what you don't want her to say.

21        MR. GOTTLIEB:  Any of the underlying facts of the

22  Cardinal investigation.

23        THE COURT:  What don't you want her to say?

24        MR. GOTTLIEB:  I don't know what she's going to say,

25  your Honor.

M1IBDOUT4                          Carter - Direct

1          THE COURT:  I assume she's going to say what's in the

2     letter.  I'm trying to find out what information that comes out

3     of this witness that you think is going to be somehow

4     inadmissible or prejudicial given the fact that that's exactly

5     what it says in this email that Mr. Doud received that they

6     were doing an investigation of Cardinal Health and he was later

7     notified by letter about this investigation.

8          MR. GOTTLIEB:  I understand what your Honor is saying.

9     As a matter of rule of evidence, the only thing is the witness

10    who would introduce this email can then read this, however it's

11    going to be done.  But to call the investigator to go and

12    testify about something when she never discussed it with Larry

13    Doud, she wasn't responsible for sending the email, it is the

14    wrong witness.  She is not a competent witness to testify about

15    the underlying facts.

16         THE COURT:  You have to tell me one final time what is

17    it that you want her to say in that context?

18         MS. ROTHMAN:  Ms. Carter is going to explain that in

19    2012, she was involved in a DEA investigation, an action

20    against Cardinal Health, that Cardinal Health was sending

21    excessive amounts of oxycodone to pharmacies in Florida; that

22    Cardinal Health failed to report suspicious orders and failed

23    maintain effective control against diversion, all of which is

24    in this article, your Honor.

25         She'll talk a little bit about the things she did in

M1IBDOUT4                    Carter - Direct

1   Florida, and then she's going to explain the disposition of the

2   case against Cardinal Health. That's it.

3          THE COURT:  What is always not useful is to tell me

4   what the witness is going to talk about.  What I want to know

5   is what the witness is going to say.  What is she going to say

6   about her investigation and what is she going to say about its

7   conclusion.

8          MS. ROTHMAN:  She was the team leader in the Lakeland

9   Florida in connection with the Cardinal Health.  The DEA

10  learned that Cardinal Health was shipping excessive quantities

11  of oxycodone to several pharmacies Lakeland, Florida.  They

12  filed an order to show cause for immediate suspicion of

13  Cardinal Health's license, and that the allegations against

14  Cardinal Health were for failing to report suspicious orders,

15  failing to maintain effective control against diversion, and

16  that the case was resolved with a settlement between Cardinal

17  Health and the DEA.

18         THE COURT:  And in what part of that information is

19  there going to be testimony that Mr. Doud was --

20         MS. ROTHMAN:  Ms. Carter doesn't know Mr. Doud.  She's

21  going to say nothing about Mr. Doud.  Mr. Doud did receive this

22  email, and the substance of her testimony is contained within

23  this email, except for the settlement, because time wise the

24  settlement hadn't happened yet.  So this is simply to help the

25  jury understand --

M1IBDOUT4                    Carter - Direct

1            THE COURT:  What are you trying to prove by this

2    email?

3            MS. ROTHMAN:  It's putting the defendant on knowledge

4    of his responsibilities as a wholesale distributor to maintain

5    effective controls against diversion, that the DEA was looking

6    at companies like RDC to ensure they were complying with those

7    obligations.  And yet despite knowing that, he still decided to

8    engage in the charged conspiracy.  That's the point of the

9    article.

10           MR. GOTTLIEB:  Your Honor, to actually have a witness

11   talk about, I investigated, there was a settlement in that

12   case, putting this before this jury is something that is

13   totally irrelevant to Mr. Doud and the charges in this case.

14   With all due respect, again, the email --

15           THE COURT:  Everything you say is with all due

16   respect.

17           MS. ROTHMAN:  Quite hyperbole.

18           MR. GOTTLIEB:  You never know.  Now that we heard what

19   the offer of proof is, it would be inappropriate to talk about

20   some other company wound up being fined.

21           THE COURT:  She can testify that she conducted an

22   investigation of that company.  Period.  Now if it's another

23   witness who's going to say they notified things to him and you

24   want to demonstrate that that had put him on notice of what

25   this company had done, then you can do that.  But at this point

M1IBDOUT4                    Carter - Direct

1   at least premature if not inadmissible, to have her start

2   testifying about the results of an investigation that did not

3   involve him.

4          MS. ROTHMAN:  Your Honor, would it be acceptable to

5   the Court to not talk about the settlement but to talk about

6   the allegations in the case.

7          THE COURT:  Sure.  If it's consistent.  She can say, I

8   did this investigation of this company where we investigated

9   and they did X, Y, Z.  I assume at some point it's going to

10  come out that -- I didn't look at the full document.  It's

11  going to come out that he was notified about this and whether

12  or not that other person -- and it becomes relevant -- can say

13  what the result of the investigation is.

14         But the question is not what the result of the

15  investigation is, the question is what was he put on notice

16  about and what was his responsibility once he was put on

17  notice.  And whether or not they robbed the bank after he was

18  put on notice is not particularly telling one way or the other.

19  The way to prove this case is not to prove that they warned him

20  about something and then somebody else was found guilty of

21  something.  It's about what he had notice of.

22         And it becomes relevant to go into the details of

23  these investigations and the conclusion of these

24  investigations, that's fine.  But the conclusion of

25  investigations don't, in fact, prove anything with regard to

M1IBDOUT4                    Carter - Direct

1    his knowledge.  What proves -- in regard to his knowledge, is

2    that people say he was notified and what he did and didn't do

3    having been put on notice.  And, in fact, even if they were

4    found not to have violated the regulations, it would not effect

5    the determination of whether or not he properly met his legal

6    obligations when he was provided with this.

7              MR. JANEY:  The document, this exhibit, can't come in.

8              MS. ROTHMAN:  I'm not offering this exhibit.

9              THE COURT:  Unless you want to deal with it now.  You

10   can anticipate it's probably going to come in through the

11   person that lays the proper foundation.

M1IBDOUT4                          Carter - Direct

1              (In open court)

2              MS. ROTHMAN:  May I proceed, your Honor.

3              THE COURT:  Yes.

4   BY MS. ROTHMAN:

5   Q.  We were talking about the Cardinal Health case, can you

6   provide some background on what that investigation was?

7   A.  That investigation was regarding Cardinal Health.  Cardinal

8   Health failed to maintain effective controls against diversion

9   of controlled substances in 2012 at its Lakeland, Florida

10  facility.  The DEA issued an immediate suspension order and

11  order to show cause against Cardinal Health.

12  Q.  What type of business is Cardinal Health?

13  A.  Cardinal Health is a wholesale distributor.

14  Q.  And the nature of the allegations against Cardinal Health

15  were what again?

16             MR. GOTTLIEB:  Your Honor, objection.

17             THE COURT:  Sustained.  Asked and answered.

18  Q.  What was your involvement in that investigation, Ms.

19  Carter?

20  A.  I was the team leader.  I was detailed from Seattle.  I was

21  in Seattle at the time as a supervisor.  I was detailed to

22  Florida to lead the team to conduct this investigation.

23  Q.  What does it mean to be a team leader?  What did you do?

24  A.  I coordinated all of the activities and the investigation.

25  Q.  Thank you, Ms. Carter.  Let me ask you this:  If the DEA

M1IBDOUT4                    Carter - Cross

1   had known that a distributor's practice was not to report

2   suspicious orders, what would the DEA do?

3   A.  Well, if the DEA knows that a distributor is not reporting

4   suspicious orders, the DEA would take action, such as the

5   action that was taken against Cardinal Health.  They would

6   issue an order to show cause and potentially an immediate

7   suspension order, depending on the circumstances against that

8   distributor.

9            MS. ROTHMAN:  Your Honor, may I have one moment.

10           THE COURT:  Yes.

11           MS. ROTHMAN:  Your Honor, I have no further questions

12  for Ms. Carter.

13           THE COURT:  Did you have questions for this witness?

14           MR. GOTTLIEB:  Yes, your Honor.

15  CROSS-EXAMINATION

16  BY MR. GOTTLIEB:

17  Q.  Ms. Carter, good afternoon.

18  A.  Good afternoon.

19  Q.  Let me just start by what you were just asked about with

20  regard to Cardinal Health.  Is it fair to say that

21  investigation did not involve RDC?

22  A.  Can you repeat that.  I'm having a hard time understanding.

23  Q.  Is it fair to say that the Cardinal Health investigation

24  had nothing to do with RDC?

25  A.  Yes, RDC had nothing to do with Cardinal Health.

1    Q.  Is it fair to say that the RDC -- withdrawn.

2    Is it fair to say that the Cardinal Health investigation had

3    nothing to do with Larry Doud?

4    A.  As far as I know, yes, it's fair to say that.

5    Q.  Well, you were the lead investigator, correct?

6    A.  Yes, the team leader.

7    Q.  And as the team leader, you would know whether or not it

8    involved Larry Doud, correct?

9    A.  As far as I know, it did not, yes.

10   Q.  Now, with regard to this case, you were not asked to

11   undertake an investigation of RDC, correct?

12   A.  That's correct.

13   Q.  You had no dealings with RDC, correct?

14   A.  That's correct.

15   Q.  You had no dealings or conversations with Larry Doud,

16   correct?

17   A.  That's correct.

18   Q.  You've never spoken to him, correct?

19   A.  I have not.

20   Q.  Now, have you worked at DEA for a long time, that's

21   somewhat 31 years, correct?

22   A.  Yes, almost 31 years.

23   Q.  And you've done a lot of traveling over those years,

24   haven't you?

25   A.  I did, yes.

M1IBDOUT4                          Carter - Cross

1   Q.  Is it fair to say that through your knowledge and your

2   experience, you have a good idea of what the law specifically

3   says with regard to the issue for this jury that concerns

4   diversion, correct?

5             MS. ROTHMAN:  Objection.

6             THE COURT:  I'm going to sustain as to the form of the

7   question.

8   Q.  You have a lot of experience in training with regard to the

9   law as it pertains to controlled substance diversion, correct?

10  A.  Yes.

11  Q.  And you testified about the rules and regulations that the

12  law, henceforth, concerning compliance programs and efforts to

13  stem diversion, correct?

14  A.  Yeah, I testified about certain regulations involving the

15  compliance programs, yes.

16  Q.  Now, you mentioned on direct examination the CFR, the Code

17  of Federal Regulations, correct?

18  A.  Yes.

19  Q.  And what is that?

20  A.  The Code of Federal Regulations are the implementing

21  regulations that were derived from the Controlled Substances

22  Act, so it's the federal regulations.

23  Q.  And when you say it's a regulation, it's not a criminal

24  statute, it's not criminal law, correct?

25            MS. ROTHMAN:  Objection, your Honor.

1          THE COURT:  Overruled.  You can answer.

2    A.  The regulations, again, they're the implementing

3    regulations.  They're not the CSA, yes.  Is that what you're

4    asking me?

5    Q.  No.  Thank you.  So the CSA, that's the Controlled

6    Substances Act, correct?

7    A.  Yes.

8    Q.  That was passed, I guess, by Congress, correct?

9    A.  Yes.

10   Q.  And that is a criminal statute, correct?

11   A.  There are criminal statutes in it, yes.

12   Q.  Now, the Code of Federal Regulations, that's not a criminal

13   statute, correct?

14   A.  No, it's the implementing regulations.

15   Q.  And it's the implementing regulations pertaining to the DEA

16   and the requirements that registrants have in part to stem

17   diversion, correct?

18   A.  It's the regulations that the registrants have to follow in

19   order to comply with keeping their registration, yes.

20   Q.  In order to keep the DEA registration, the CFR, the Code of

21   Federal Regulations lays out what's required, correct?

22   A.  Yes.

23   Q.  You would agree that a violation of the CFR does not in and

24   of itself mean that you are committing a crime, correct?

25   A.  Well, that's not necessarily correct because the

1    regulations all are derived from the Controlled Substances Act,

2    so they do stem back to certain provisions under the Controlled

3    Substances Act, under different portions of the Controlled

4    Substances act.

5    Q.  The question is, though, can we agree that a violation of

6    the CFR, the Code of Federal Regulations, does not in and of

7    itself mean that the person or registrant has committed a

8    crime?

9            MS. ROTHMAN:  Objection.

10           THE COURT:  Overruled.  She can answer.

11   A.  Again, it depends on the regulation because some of the

12   regulations -- yes, if they fail to report suspicious orders,

13   then they're failing to file a record that's required to be

14   kept, which means they have violated the federal law, yes.

15   They violated the federal law under 842 and 21 U.S.C. 842 and

16   21 U.S.C. 843.

17   Q.  When you say the law, you're talking about the aspects of

18   the Controlled Substances Act, correct?

19   A.  Yes.

20   Q.  Would you agree that the DEA regulations in the CFR codify

21   the responsibilities that distributors and others must adhere

22   to when dealing with controlled substances?

23   A.  Is that a question?

24   Q.  Yes.

25   A.  Okay.  It did codify what the distributors had to adhere

M1IBDOUT4                    Carter - Cross

1   to, yes, and others.

2             MR. GOTTLIEB:  Can we put up, and I would ask that the

3   Court take judicial notice of the two CFR regulations that were

4   referred to.  Specifically if I can show the witness.

5             THE COURT:  You want to show the witness or you want

6   this in evidence?

7             MR. GOTTLIEB:  I'll show the witness and your Honor

8   will also be able to see Defendant's L9 and Defendant's L10.

9             THE COURT:  I see something in a little box.  I see

10  it, but I cannot read it.

11            MR. GOTTLIEB:  It's like really small or something.

12            THE COURT:  Yes.  Okay.  Go ahead.

13            MR. GOTTLIEB:  Your Honor, I'm going to ask that

14  Defendant's L9 -- that your Honor take judicial notice of

15  21 CFR 1301.71.

16            THE COURT:  And you're offering that exhibit in

17  evidence?

18            MR. GOTTLIEB:  Yes.

19            THE COURT:  Any objection?

20            MS. ROTHMAN:  Your Honor, relevance.

21            MR. GOTTLIEB:  The relevance is that the witness has

22  made reference to the CFR and the provisions that pertain

23  directly to a registrant's obligations and responsibilities.

24            THE COURT:  You have any questions with regard to

25  these particular regulations of this witness?

1          MR. GOTTLIEB:  I will, your Honor.

2          THE COURT:  Why don't you lay somewhat of a foundation

3     for its relevance and then I can decide whether I should take

4     judicial notice.

5     BY MR. GOTTLIEB:

6     Q.  Ms. Carter, do you see 21, CFR 1301.71?

7     A.  Yes.

8     Q.  And what is that, please?

9     A.  That's the section of this particular -- part of the CFR?

10    Is that what you're asking me?

11    Q.  What's this regulation about?  What does it pertain to?

12    A.  It's entitled security requirements generally.

13    Q.  Ms. Carter, doesn't it pertain to registrants being

14    required to have effective controls and procedures to guard

15    against theft and diversion of controlled substances, the first

16    sentence, Ms. Carter?

17    A.  You want me to read the first sentence?

18    Q.  If you can just look at it.  Doesn't this regulation of the

19    CFR pertain to the very issue we're talking about that you've

20    been testifying about?

21    A.  This does in part refer -- discuss what I was talking

22    about, but I think we were referring to the 21 CFR 823(e).

23    Q.  Let's just take this one.  It's marked for identification.

24    This pertains in part to the requirements in the CFR concerning

25    procedures to guard against diversion of controlled substances,

M1i3dou5                        Carter - Cross

1    correct?

2    A.  That is what this states here, yes.

3    Q.  Well, you have seen this regulation before, haven't you?

4    A.  I have.

5         MR. GOTTLIEB:  Your Honor, I ask that this be received

6    in evidence because this is one of the regulations that's

7    already been testified to.

8         MS. ROTHMAN:  Objection, relevance, your Honor.

9         THE COURT:  Overruled.  I admit it into evidence.

10   Let's move forward.

11        MR. GOTTLIEB:  Your Honor, can this be shown to the

12   jury.  Is it shown to the jury.

13        THE COURT:  Yes.

14        MR. GOTTLIEB:  If we could highlight that first

15   paragraph small case A.  Thank you.

16   Q.  This section of the CFR indicates that all applicants and

17   registrants shall provide effective controls and procedures to

18   guard against theft and diversion of controlled substances,

19   correct?

20   A.  Yes, that's what it states.

21             (Continued on next page)

22   Q.  We can move up to the second subparagraph, paragraph which

23   is lowercase (b).  And 1301.71(b), this section of this

24   regulation deals with substantial compliance with the standards

25   set forth in 1301.72, 1301.76 may be deemed sufficient by

M1i3dou5                              Carter - Cross

1    administrator after evaluation of the overall security system

2    and needs of the applicant or registrant, correct?

3    A.  Yes, that's what it states.

4              MS. ROTHMAN:  Your Honor, I think we need a sidebar.

5    I'm sorry.

6              THE COURT:  Come up.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1i3dou5                        Carter - Cross

1                    (At the sidebar)

2            MS. ROTHMAN:  I don't want to interrupt Mr. Gottlieb's

3       cross-examination.  I think there is a real problem with

4       introducing statutory text for the jury.  The Court can

5       instruct the jury on what the law is.  I think there is

6       confusion here that the jury is going to read in this and form

7       their own opinion about what the law requires, whether the

8       defendant has violated the law.  Just as an example,

9       substantial compliance within the standards set forth in

10      1301.72 and 76, none of which the defendant is offering, may be

11      deemed sufficient by the administrator.  That's extremely

12      confusing, suggesting that substantial compliance with -- let

13      me finish.  Substantial compliance with whatever obligations

14      means that a distributor or the defendant is following the law.

15           I think the Court needs to tell the jury, if your

16      Honor is going to allow this to continue, that the Court will

17      tell the jury what the law is, the instructions they should

18      follow in determining the questions of the defendant's guilt,

19      and not some language in a statute, CFR, the defense has

20      decided to put into evidence.

21           That's the government's objection.

22           MR. GOTTLIEB:  Your Honor, as a basic fundamental

23      rule, judicial notice can always be taken of a statute.  I am

24      not going to be asking her to evaluate this.

25           THE COURT:  That's not the relevance issue.  That's my

1    issue.  It has nothing to do with taking judicial notice.  I

2    can't take judicial notice of information that's not relevant

3    to the case.  So what are you going to do with it?  Is she

4    correct that you simply want to argue that because of the

5    general language in the regulations, that it doesn't violate

6    the criminal law?

7         MR. GOTTLIEB:  No.  That's not what I'm saying.  She

8    referenced on her direct that the Code of Federal Regulations

9    requires a steps to prevent diversion.  I am now on

10   cross-examination pointing out what she is referring to.  The

11   government would simply like this general notion the law

12   requires diversion, when the jury is entitled, we are entitled

13   to lay the foundation as to what is in the law and what is not

14   in the law.

15        THE COURT:  Well, I'm not sure you are entitled to do

16   that.  You are not entitled to argue to the jury what you say

17   is the law and what is not in the law.  In this case, I will

18   give you some leeway, if you get to the point of relevant

19   questions about whether or not the Code of Federal Regulations

20   and/or the statute requires he follows certain procedures.

21        It seems to me that the government is right, that it

22   doesn't give you the ability to argue that, oh, well, you can't

23   convict him if he followed the code of regulations but violated

24   the federal statute.

25        MR. GOTTLIEB:  I am not saying that, your Honor.

1          THE COURT:  That's her concern.  That you want to

2     imply that to the jury.  Look, she testified about rules and

3     regulations that he has to follow.  If you want, if you want to

4     ask her some questions about that, that's fine and dandy.  If

5     you're getting particularly close, I don't think you've crossed

6     the line yet of instructing the jury that if he complied with

7     this exhibit, therefore he's not guilty.  The government has

8     the full opportunity to go back on redirect, if you wish, and

9     have this witness say what she has already said, that this is

10    part of what he has to do, among other things.  He has to do

11    some other things.  And that's why I sustained the objection

12    with regard to whether or not it was about the issue before

13    this jury.  It's not about the issue before this jury.  The

14    jury is not supposed to decide whether or not he violated the

15    Code of Federal Regulations.  This jury is supposed to decide

16    whether or not he violated the conspiracy statute.  That's

17    where we're going.

18          I will give you some leeway in this regard.  We are

19    not going to go a whole lot further.  I'll give you some

20    opportunity to argue that somehow he's not guilty of the crimes

21    with which he is charged because of some interpretation of the

22    Code of Federal Regulations.

23          MS. ROTHMAN:  The whole premise of this being a civil

24    versus criminal violation is entirely inappropriate in this

25    case.  This is a criminal trial.  The defendant is charged with

M1i3dou5                       Carter - Cross

federal criminal violations, crimes your Honor will instruct

the jury on the law.  Any suggestion this is really a civil

thing is entirely inappropriate.

            THE COURT:  I haven't addressed that because I haven't

gotten any objection to that argument or those issues to this

point.

            MR. GOTTLIEB:  Your Honor --

            THE COURT:  You know what her concern is.

            MR. GOTTLIEB:  I do.

            THE COURT:  She is afraid of where you are going.

Don't go there.

            MR. GOTTLIEB:  I want your Honor to understand when

the witness says the law required to set up a diversion

program, the law is required to do this.  That's her direct

testimony.  I certainly should be entitled to say, okay, what

law are you talking about?

            THE COURT:  You didn't say that.  You didn't say what

law are you talking about.  You showed this exhibit in front of

her and you want to say that this is what controls here, and

it's not what controls here.  We all know that.  It's not what

controls here.

            I'll give you some leeway, but I will anticipate, if I

think you crossed that line, giving the jury specific

instruction that he's not on trial or any violation of the Code

of Federal Regulations.  He is on trial for violating criminal

statutes, and that's their determination to make, and it is not

a determination of any other witness or lawyer to argue that

simply because they want to argue that the code of regulations

says a certain thing, that means that you must be necessarily

not guilty.

MR. GOTTLIEB:  That's not remotely what I intend to

argue.  I simply want the jury to know when she says the law

requires diversion, this is the law.

THE COURT:  No, it's not the only law.  See, that's

the thing.  That is not giving the jury an accurate portrayal

of what the law requires.  That requires certain things and the

criminal law requires certain other things.

MS. ROTHMAN:  Your Honor --

THE COURT:  It is not the same.  And no, you shouldn't

go that way to try to imply to the jury that what controls here

is the Code of Federal Regulations.  It doesn't.

MR. GOTTLIEB:  Your Honor --

THE COURT:  You couldn't make this argument if he was

a street drug dealer and you wanted to say, well, that isn't

required by the Code of Federal Regulations.

MR. GOTTLIEB:  Think about it.  The government on

direct puts in two guidance letters.  If you violate the

guidance letters, that's certainly not in and of itself a

crime.  I have to be able to cross-examine to put it in

perspective.

1    THE COURT:  You know this witness will not say, nor

2    will any witness say, that simply because the defendant

3    complies with this code of regulation, that he can't be guilty

4    of a conspiracy to distribute or a conspiracy to defraud the

5    DEA.

6    MR. GOTTLIEB:  I wouldn't expect her to say that.  I

7    am not saying that, Judge.

8    THE COURT:  I'm not sure where else you are going by

9    the nature of what you're trying to establish.

10    MR. GOTTLIEB:  Okay.  Just so you know, the next one

11    is specifically the CFR that she mentioned, which talks about

12    the diversion.  I'm asking for judicial notice of that and I am

13    moving on.

14    MS. ROTHMAN:  I don't know why we are allowing defense

15    to be arguing what the law is to the jury.  It is the Court's

16    job to instruct on the law.  The Court will do that at the end.

17    The letters were offered because they were sent to the

18    defendant's company.  In fact, there will be testimony they

19    were sent to the defendant, and what he chose to do and didn't

20    do is directly relevant to the charges in this case.  This is

21    pure grounds for confusing the jury and suggesting --

22    MR. GOTTLIEB:  Your Honor, we just sat here for over

23    an hour with the witness instructing or being asked about what

24    the law says.  We sat here with her saying the law requires

25    this, the law requires this, the law requires this.  How can we

M1i3dou5                         Carter - Cross

1    not be entitled to say, okay, what law are you talking about?

2              THE COURT:  That's not what you are asking.

3              MR. GOTTLIEB:  Because that's what -- that is what she

4    is referring to.  We know.

5              THE COURT:  I will give you some leeway.  I'll let you

6    walk this line.  But I am going to shut you down real quick if

7    I think that you ask her any question that implies that

8    argument.  And I am going to consider strongly giving the jury,

9    either now or later, an instruction that I will instruct them

10   on the law and the lawyers don't instruct them on the law and

11   the Code of Federal Regulations is not the controlling law with

12   regard to what they have to decide as to whether or not he

13   violated the law.

14             MR. GOTTLIEB:  Thank you.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Continue, Mr. Gottlieb.

3              MR. GOTTLIEB:  Thank you.  If we can put on the screen

4    for identification, your Honor, Defendant's L10.

5    Q.  Now, Ms. Carter, on direct examination, you referenced 21

6    CFR 1301.74.  Is it fair to say that that section talks and

7    addresses the issue in the Code of Federal Regulations

8    regarding a requirement that a registrant design and operate a

9    system to disclose to the registrant suspicious orders of

10   controlled substances?  Just yes or no?

11   A.  Yes, 1301.74(b), yes.

12   Q.  And that was the section of the law that you referred to on

13   direct, correct?

14   A.  Yes, I think it was in the letter.

15   Q.  Yes.

16             MR. GOTTLIEB:  I would ask that this as well as L9,

17   both documents be received in evidence.

18             THE COURT:  I'll admit those documents in evidence.

19             (Defendant's Exhibit L9 and L10 received in evidence)

20             MR. GOTTLIEB:  Thank you.  If we can just look at L10

21   and if we can show it to the jury.  If we can highlight (b).

22   Q.  This section indicates "The registrant shall design and

23   operate a system to disclose to the registrant suspicious

24   orders of controlled substances.  The registrant shall inform

25   the field division office of the administration in his area of

1   suspicious orders when discovered by the registrant.

2   Suspicious orders include orders of unusual size, orders

3   deviating substantially from a normal pattern, and orders of

4   unusual frequency."

5        Correct?

6   A.  Yes.

7   Q.  Thank you.  You would agree, I think, that the mission of

8   the DEA diversion control is to investigate DEA registrants

9   with the aim of preventing diversion of controlled substances?

10  A.  That's part of the mission, yes.

11  Q.  Part of that mission is also to ensure an adequate

12  uninterrupted supply of controlled substance for legitimate

13  medical, commercial, and scientific needs, correct?

14  A.  Yes.

15  Q.  I'm sure we can agree there are millions of people who need

16  and require legitimately pain medications.

17  A.  Yeah, I mean, it's -- I don't know the number of people

18  that require them.

19  Q.  You would agree there are a lot of people who require

20  medications following an operation, chronic pain, and for a

21  host of other legitimate medical reasons, correct?

22  A.  Yes.  There are a lot of -- a lot of people that require

23  them for legitimate medical purpose.

24  Q.  Can we also agree that distributors play an important role,

25  a vital role in ensuring that pharmacies have sufficient

1    supplies of drugs --

2           MS. ROTHMAN:  Objection.

3    Q.  -- to fulfill patients' legitimate medical needs?

4           MS. ROTHMAN:  Objection.

5           THE COURT:  I'm going to sustain the objection.

6    Q.  You were asked on direct examination whether or not it's

7    legal or illegal to have a business of distributing controlled

8    substances.  Correct?

9           MS. ROTHMAN:  Objection.

10           THE COURT:  Overruled.  You can answer.

11    A.  Can you repeat that?

12    Q.  Is it legal for a company to be in the business to

13    distribute controlled substances; yes or no?

14    A.  It's legal if they're registered by the DEA.  They have to

15    have a DEA registration to do so, yes.

16    Q.  Would you agree that the vast majority of prescribers,

17    doctors, are trying to do the right thing, based on your

18    experience over the years?

19           MS. ROTHMAN:  Objection.

20           THE COURT:  Sustained.

21    Q.  Well, not all doctors or pharmacies are committing crimes

22    if they prescribe or sell controlled substances, correct?

23    A.  No, not -- I mean, no.

24    Q.  While you were working at DEA for quite a long time, you

25    told us, I believe you said about 2000 or so, that oxycodone

1   exploded in America.  Is that fair to say?  An epidemic of

2   oxycodone?

3   A.  I said there was an epidemic in -- starting in the late

4   '90s into the early 2000s, yes.

5           MR. GOTTLIEB:  Can we put up on the board, your Honor,

6   Government's Exhibit 901 which was received in evidence.

7           THE COURT:  Yes.

8   Q.  I think everyone has it.  This was the diagram of I think

9   you said it was the chain of supply, correct?

10  A.  Registrants in the supply chain, yes.

11  Q.  Now, this starts with the manufacturer of the controlled

12  substances and goes all the way to the medical provider,

13  correct?

14  A.  Yes.

15  Q.  But the DEA is also part of the supply chain and plays a

16  role in setting the supply, doesn't it?

17  A.  DEA is not part of the supply chain, no.

18  Q.  Does the DEA play any role in deciding how much controlled

19  substances are available for distribution?

20  A.  Are you asking me if the DEA sets a quota?

21  Q.  I didn't ask that, but that will be my question now.

22          The DEA sets a quota of how much controlled substances

23  can be manufactured and put into the supply chain, correct?

24  A.  The DEA is tasked with -- yes, the DEA is required to do

25  that, yes.

1    Q.  And the way the amount of controlled substances that can be

2    placed and are placed in the marketplace for people to obtain

3    is determined by specific quotas that the DEA is required to

4    set pursuant to law.  Correct?

5    A.  The -- can you repeat the first part of that again?

6    Q.  The amount of controlled substances, the way that it's

7    determined, the amount that can be placed in the marketplace

8    for people to obtain pain medications and other controlled

9    substances, is determined by quotas that the DEA is required to

10   set under the Controlled Substances Act, correct?

11   A.  No, I don't think that that's a correct statement.

12   Q.  Do you know what an annual production quota is?

13   A.  I do.

14   Q.  What's an annual production quota?

15   A.  That's the amount of aggregate production quota is the

16   term, and it is the amount that a specific manufacturer's

17   authorized to produce.

18   Q.  Who makes the decision as to how much the manufacturer is

19   authorized to produce?

20   A.  Well, the DEA makes the decision, but the decision is based

21   upon the projected estimated medical need that was submitted to

22   them by the manufacturer.

23   Q.  So all I asked you, the DEA makes the decision, correct?

24   A.  The DEA does make the decision, yes.

25   Q.  The DEA makes the decision based on a number of factors, on

1   how much to put into our marketplace for distribution and use,

2   correct?

3   A.   The DEA sets the quota based upon the estimated medical

4   need.

5   Q.   And the way they set this estimated need, do they go out

6   and do their own investigation, do they count -- how do they go

7   about determining what the quota should be?

8   A.   The manufacturers submit the information to the DEA.

9   Q.   So the DEA makes the first decision as to how much

10  controlled substances to put in the marketplace by going to the

11  manufacturers and getting their data?

12          MS. ROTHMAN:  Objection, relevance.

13          THE COURT:  Overruled.  You can answer that.

14  A.   The DEA doesn't go to the manufacturers to seek the

15  information.  The manufacturer comes to the DEA to request to

16  produce the drugs.

17  Q.   Would you agree then that from 2010 to 2016, the DEA

18  routinely increased production quotas for opioids by

19  substantial amounts?

20          MS. ROTHMAN:  Objection, your Honor.

21          THE COURT:  I'm going to sustain this.  I'm not sure I

22  see the relevance.

23  Q.   Well, when the DEA makes its decision, they rely on data

24  that they receive from, you said, manufacturers, correct?

25          MS. ROTHMAN:  Objection.

1          THE COURT:  Overruled.  You can answer.

2   A.  Yes, as the manufacturers make the request, and they

3   provide the data.

4   Q.  And the DEA is assuming that the data that they are

5   receiving from manufacturers is truthful, correct?

6   A.  The DEA has to go upon the assumption that the information

7   provided is factual, yes.

8   Q.  And would you agree that the DEA, in deciding to increase

9   the amount of opioids into our marketplace, if the manufacturer

10  is lying, or falsifying the data, is making an important

11  decision based on false information?

12          MS. ROTHMAN:  Objection.

13          THE COURT:  Sustained.  I'm not sure where you are

14  going with this, Mr. Gottlieb.

15          MR. GOTTLIEB:  I'll rephrase it, your Honor.

16          THE COURT:  Okay.

17  Q.  The DEA as the decision maker in how much controlled

18  substances can be placed in the marketplace, they are relying

19  on accurate, what they hope is accurate data, correct?

20          MS. ROTHMAN:  Objection.

21          THE COURT:  Sustained.  Asked and answered I believe.

22  Q.  Just between then 2010-2016, would you agree that the

23  amount authorized to be distributed increased each year?

24          MS. ROTHMAN:  Objection.

25          THE COURT:  I'll let her answer that.

1   A.  I would have to see the numbers.  I don't know off the top

2   of my head whether, when the quota was increased and when it

3   was decreased.

4   Q.  As you sit here today, you can't say that the DEA that you

5   were working for at this time that I'm referring to, you are

6   not able to say one way or the other whether or not the

7   production quota increased each year?

8            MS. ROTHMAN:  Objection.

9            THE COURT:  Overruled.  You can answer.

10  A.  Again, you would have to show me the numbers because I

11  don't know the years of what the quotas were each year.

12  Q.  You are aware of the attorney general's investigation of

13  West Virginia that investigated the DEA during the time you

14  were there showing the failures of the DEA to account for

15  diversion, aren't you?

16           MS. ROTHMAN:  Objection, your Honor.  Relevance.

17           THE COURT:  I'm going to sustain the objection.  We're

18  going to take a break, Mr. Gottlieb.

19           Ladies and gentlemen, don't discuss the case, keep an

20  open mind.  We'll take a 10-minute break and I'll bring you

21  back in and we can continue.

22           (Jury excused)

23           (Continued on next page)

24

25

M1i3dou5                    Carter - Cross

1          (In open court)

2          THE COURT:  Let me address my issue first so we can

3   save some time.

4          Mr. Gottlieb, it is not clear to me what you are

5   blaming the DEA for that has any relevance to whether or not

6   your client distributed drugs or defrauded the DEA.  You can

7   blame them for the --

8          MR. GOTTLIEB:  I was waiting.

9          THE COURT:  Sure, I'm sorry.

10          It seems to me you want to blame them for the increase

11   in opioid use, but I don't see any relevance whatsoever how it

12   makes your client more or less likely that he violated --

13          MR. GOTTLIEB:  I agree 1,000 percent with your Honor.

14          THE COURT:  Why don't you stop asking those questions?

15          MR. GOTTLIEB:  No, no, I'll tell you why.  Because my

16   client, Mr. Doud, is being accused of a criminal violation.

17          THE COURT:  Right.

18          MR. GOTTLIEB:  When investigations are done, Linden

19   Care and all of these pharmacists and reporting are coming back

20   that they are in compliance, and he's getting information from

21   this investigator, this consultant, he's getting this

22   information from the owners of Linden Care that everything is

23   okay.  We start off there.  That certainly affects his intent.

24          THE COURT:  That's an interesting argument that has

25   absolutely nothing to do with the questions you just asked her.

M1i3dou5                          Carter - Cross

1          MR. GOTTLIEB:  No, but if I can, let me try to connect

2     it.  The DEA, which is primarily responsible in selling and

3     getting opioids out in the market, much more than RDC or

4     Mr. Doud, the DEA --

5          THE COURT:  I am not sure about that.  But go ahead.

6          MR. GOTTLIEB:  Well, but, they also are going through

7     the same process that the evidence is going to show that

8     Mr. Doud and RDC went through.  They relied on the same

9     process.  If the --

10         THE COURT:  So what?  What they did or didn't do with

11    regard to their investigations, how does that make him more or

12    less likely that he violated the criminal conspiracy law?

13         MR. GOTTLIEB:  Because, the fact of the matter is he's

14    being charged with criminal conspiracy.

15         THE COURT:  Right.

16         MR. GOTTLIEB:  Based on ignoring red flags.

17         THE COURT:  Right.

18         MR. GOTTLIEB:  The DEA also is aware of red flags, yet

19    during this entire period of time, the DEA is relying on

20    information it's receiving and increasing in making --

21         THE COURT:  That's an interesting argument that I just

22    heard for the first time.  Because that's not what you've asked

23    her.  You didn't ask her anything like that.  You wanted to

24    know whether or not there was an increase in the number of

25    opioids that were being manufactured, and whether or not the

M1i3dou5                    Carter - Cross

1    DEA was responsible for that increase.  Those questions have

2    absolutely nothing to do with the charges in this case.

3              MR. GOTTLIEB:  I was merely laying the foundation --

4              THE COURT:  Your foundational questions weren't

5    relevant.

6              MR. GOTTLIEB:  Okay.  But, the point is, your Honor, I

7    was at that question just now, about you relied on the data

8    that's being handed to you.

9              THE COURT:  And she said "yes."

10             MR. GOTTLIEB:  An important decision, and then there

11   was an objection.  I'm ready to move on.

12             THE COURT:  That's fine and dandy saying you are ready

13   to move on.  I am trying to get some guidance for the future.

14   And I don't see it is a relevant inquiry as to whether or not

15   they relied on information that was provided to them by

16   manufacturers in setting the amount of opioids that were being

17   produced by that manufacturer.  That scenario has nothing to do

18   with what the government is accusing your client of doing.

19   That's not what the government is accusing your client of

20   doing.  The government is accusing your client of not meeting

21   his obligations as a registrant, and for knowingly agreeing to

22   provide drugs when he knew that they were not being

23   appropriately prescribed and failing to give accurate

24   information, agreeing to give inaccurate information, and

25   withhold information from the DEA.

M1i3dou5                        Carter - Cross

1          That has nothing to do with the questions just asked.

2          MR. GOTTLIEB:  But your Honor, just so you can

3    understand where we are.  That's the government's argument.

4          THE COURT:  What's the government's argument?

5          MR. GOTTLIEB:  The government's argument is he

6    ignored.

7          THE COURT:  Right.  And that's the only issue for this

8    jury, isn't it?

9          MR. GOTTLIEB:  But, the reason for these questions is

10   that everybody in the chain, everybody in this type of work,

11   must rely and does rely on information.

12         THE COURT:  Right.

13         MR. GOTTLIEB:  Because the evidence --

14         THE COURT:  And nobody disagrees with that.  Nobody in

15   this room disagrees that to do this job appropriately, you have

16   to rely on accurate information being given to you.

17         But, the issue here is that you're given the accurate

18   information and you know that people are not distributing drugs

19   properly, what independent obligations do you have.  That's

20   what the issue is.  The issue is not trying to figure out who

21   relied on who.  The government has no evidence that they're

22   offering that your client relied on some information that he

23   got from somebody else.  They're making exactly the opposite

24   argument, and they're presenting exactly the opposite proof

25   that they said that they are going to offer proof that your

1    client was fully aware of what the accurate information was,

2    and he misused that information.

3           MR. GOTTLIEB:  But your Honor, what you are in effect

4    saying, if the government says they have proof contrary to what

5    I am saying, that's what then determines what I can then go

6    into?  Because the proof in this case will be the government is

7    wrong.

8           THE COURT:  No, no, no.

9           MR. GOTTLIEB:  The proof in this case is he did have

10   information that things were okay, and that's why certain

11   decisions were made, which then --

12          THE COURT:  Mr. Gottlieb, if you can make a logical

13   argument that I can follow, then I will give you some leeway on

14   that.  But that's not what you are asking this witness of and

15   it is, even to that argument, it is totally irrelevant what the

16   DEA did.  Even if the DEA sat on their hands and did nothing,

17   that is totally irrelevant to the issue before this jury.

18   Whether they relied on accurate information or inaccurate

19   information is totally irrelevant to the issues before this

20   jury.

21          And I've given you some leeway to ask these questions,

22   but these questions are not appropriate foundation to argue

23   that because the DEA relied on manufacturers' estimates of what

24   the opioid manufacture should be, that somehow that means that

25   your client must have done the same thing.

M1i3dou5                      Carter - Cross

1          MR. GOTTLIEB:  Well, but it also, your Honor, goes to

2     the government puts on a witness, who is being very

3     self-righteous and she's done everything else.

4          THE COURT:  She has the right to be self-righteous.

5          MR. GOTTLIEB:  I have the right to question her about

6     what she did and what she relied on.

7          THE COURT:  You don't get to just spank her.  You have

8     to have a legitimate basis for the substance of the information

9     you are trying to elicit from her.

10         Are you just trying to show she is a bad person?  Is

11    this impeachment?

12         MR. GOTTLIEB:  Yes, it is impeachment.

13         THE COURT:  Of this witness?

14         MR. GOTTLIEB:  It is impeachment.

15         THE COURT:  Of this witness?

16         MR. GOTTLIEB:  To put it in perspective.  To make it

17    something that's different, and, your Honor, frankly, that's

18    even why the law is important, because she and the government

19    is very careful to simply have her say the law required this,

20    the law required that.  Well, we are entitled to say where the

21    heck in the law does it explain in detail what a suspicious

22    order is?  I know what the answer is.  There is nothing beyond

23    what your Honor has already seen.

24         THE COURT:  That's an interesting argument.  It is not

25    the nature of the questions you've been asking this witness.

M1i3dou5                         Carter - Cross

1    You haven't asked this witness that.

2              MR. GOTTLIEB:  I just started.  I just started.

3              THE COURT:  No, you didn't just start.  You are asking

4    questions about whether or not she has -- not even her.  That

5    the DEA has to rely on the manufacturers' estimates.  What are

6    you going to argue from that?  That advances your argument how?

7    I still don't understand.

8              MR. GOTTLIEB:  She's testifying as somebody from the

9    DEA, as an authority on the DEA.

10             THE COURT:  No, she's not testifying that way.  You've

11   already argued at sidebar she is not an expert witness.  That's

12   not what she's testifying to.

13             MR. GOTTLIEB:  I ask that her entire testimony be

14   stricken.  Because she got up there and testified for the jury

15   what the law is, what it requires.

16             THE COURT:  She didn't say anything about whether or

17   not the DEA was doing their job the proper way.  And that's

18   what you want to inquire, and that's what you inquired about,

19   and that's totally irrelevant to the issues here, about how

20   great a job the DEA is doing.  The DEA could have been doing

21   the lousiest job, but that doesn't affect whether or not your

22   client is guilty of the charges that he's been charged with.

23   And to simply just want to throw mud at the DEA or say, well,

24   they are doing such a bad job, you should acquit my client, and

25   quite frankly, I am not even sure you have even established

1   that they are doing a bad job.

2              MR. GOTTLIEB:  That's not our argument.  It is not our

3   position and it never has been our position.

4              THE COURT:  That's the best I can do in trying to

5   articulate what it is that you have been asking this witness.

6   Because I just don't understand where you are going with this.

7   Other than just to try to throw mud at the DEA.

8              I gave you some leeway with regard to that, but we are

9   not going to go down that route of spending significant time

10  trying to figure out whether or not the DEA had to rely on the

11  manufacturers in determining how much opioids should be out

12  there.  And the implication that you want that the jury to draw

13  that it is their fault --

14             MR. GOTTLIEB:  No.

15             THE COURT:  -- because they increased the number of

16  opioids out there.  Or I don't know.  I shouldn't try to make

17  your argument for you, because it is as close as I can come.

18  It makes absolutely no sense.  And you want to acknowledge it

19  makes no sense.  So I still don't know what the purpose is.

20             MR. GOTTLIEB:  As the way your Honor has presented it,

21  it makes no sense.  But it's on me.  That makes no sense

22  because that's not our position.

23             THE COURT:  Let me hear from the government.  I don't

24  want to debate it with you.

25             MS. ROTHMAN:  I think your Honor zoomed in on the

1    issue here.  The DEA is not on trial.  What the DEA did or

2    didn't do is not a question for the jury.  There is one

3    question:  Whether the defendant committed the crimes he's

4    charged with.

5           The suggestions by the defense that the DEA increased

6    the quotas or didn't do this are improper, they're confusing.

7    I will object, your Honor.  I would ask that Mr. Gottlieb stop

8    asking those questions.  I will continue to object.  And I

9    would ask that your Court sustain any objections because it is

10   simply improper.

11          THE COURT:  Well, it is as close as I can come to

12   allowing you some leeway.  I have overruled half of the

13   government's objections.  But, I don't see any other direction

14   that you've been going, other than the direction that I believe

15   is not a proper subject of cross-examination.

16          So, if you want to take explain to us what you are

17   going to ask next, if we can resolve that, or you can just

18   abandon this area.  But if you want to tell me what else you

19   want her to say, and tell me why that's relevant to this case,

20   then articulate it now, because otherwise I am going to shut

21   this down.

22          MR. GOTTLIEB:  I'm moving on.

23          MR. ROOS:  Your Honor, on a unrelated subject.  I see

24   it's 3:45.  Is your Honor going to go until 5 or 5:30?

25          THE COURT:  5.

M1i3dou5                    Carter - Cross

1          How long were you going to go, Mr. Gottlieb?

2              MR. GOTTLIEB:  Not a lot but there is some, Judge.

3              THE COURT:  Can I get a better estimate in terms of

4      numbers?

5              MR. GOTTLIEB:  If we start at 4, I would hope to be

6      done by 4:30.

7              THE COURT:  Okay.  That's a good estimate.

8              MR. GOTTLIEB:  Without objections, I can probably

9      accomplish that.

10             THE COURT:  We'll see if you can ask some questions

11     that won't get objected to.

12             MR. ROOS:  I think we told the Court earlier it was

13     going to be Carter, then Masseth, then Castro.  It is possible

14     we switch those two witnesses.

15             THE COURT:  It's up to you.  If we finish this witness

16     before 4:30, you can be confident we can put at least another

17     half hour worth of testimony.  If it goes much beyond that,

18     then maybe we might adjourn.

19             MR. ROOS:  The other thing, your Honor, is the parties

20     have some stipulations.  Some of the stipulations are just to

21     admit certain exhibits.  Is it okay with your Honor if I just

22     read portions of it?

23             THE COURT:  Yes.

24             MR. ROOS:  And then offer it and not bother with

25     reading the entire thing?

M1i3dou5                              Carter – Cross

1            THE COURT:  That's fine with me.  You can do it any

2     time you wish to do that.  Just mark it as an exhibit if you

3     have a written stipulation, and you can offer.

4            MR. GOTTLIEB:  As long as it's vice versa.  I have

5     absolutely no objection.

6            MR. ROOS:  I know nobody loves the lengthy reading.  I

7     am looking at it, and it seems to number a few pages, so it

8     would be helpful to everyone.

9            THE COURT:  Let's take another five minutes and let's

10    continue and let's focus.

11            (Recess)

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

M1i3dou5                         Carter - Cross

1           (Jury present)

2           THE COURT:  Mr. Gottlieb.

3           MR. GOTTLIEB:  Thank you.

4   BY MR. GOTTLIEB:

5   Q.  Ms. Carter, we left off and you testified on direct about

6   suspicious orders and what they are.  Do you recall that?

7   A.  Yes.

8   Q.  And can you tell us what statute actually defines a

9   suspicious order?

10  A.  So suspicious orders are defined under the regulation that

11  we were looking at earlier, 1304.21(b) I believe.  But, maybe

12  it's 7 -- the one we were looking at right before the break.

13  Q.  And without putting it up on the screen, what you're

14  referring to is in that CFR, it reads:  Suspicious order

15  include orders of unusual size, orders deviating substantially

16  from a normal pattern, and orders of unusual frequencies.

17          Correct?

18  A.  Yes.

19  Q.  There is no further explanation of what a suspicious order

20  is, correct?

21  A.  That's -- that's what's written in the CFR, yes.

22  Q.  Is there any other statute that lays out specifically more

23  information about what a suspicious order is; yes or no?

24  A.  No, that's the -- that's the regulation that defines in

25  general terms what a suspicious order is, yes.

1   Q.  Is it fair to say there is no further definition of unusual

2   frequency?

3   A.  The regulation doesn't define unusual frequency.

4   Q.  Using the term unusual frequency, do you know of any

5   statute that actually defines what unusual frequency even

6   means?

7   A.  No, there is no regulation that is defining what unusual

8   frequency is.

9   Q.  Is there any regulation that defines what it means to

10  deviate substantially from a normal pattern?

11  A.  No.

12  Q.  Is there any regulation that quantifies what the line is

13  between usual and unusual orders?

14  A.  No.

15  Q.  You gave this jury a list of potential red flags and I'd

16  like to just briefly go through them with you.

17          You talked about the amount of controlled substances

18  versus non-controlled substances, correct?

19  A.  The percentage, yes, the difference percentage I should

20  say.

21  Q.  Would you agree --

22          THE COURT:  Excuse me.  Just could you point the

23  microphone closer to you, please.  Toward your mouth.  That's

24  good.  Thank you.

25          THE WITNESS:  Okay.  Is that better?

M1IBDOUT6                    Carter - Cross

1          THE COURT:  Much better.

2   Q.  Would you agree, Ms. Carter, that the amount of controlled

3   substances ordered by a pharmacy can be affected by the type of

4   pharmacy, what it focuses on?

5   A.  The amount of controlled substances could be affected by

6   the type of pharmacy, yes.

7   Q.  And the amount of controlled substances, would you agree is

8   affected as to whether or not the pharmacy that's putting in an

9   order is a specialty pharmacy or a specialized pain management

10  pharmacy versus a normal, typical pharmacy?

11  A.  It could be, yes.

12          (Continued on next page)

13  Q.  You talked about dispensing data from customers.  Now does

14  the -- DA, withdrawn.

15          Are distributors authorized to demand and receive

16  dispensing data from a pharmacy?

17          MS. ROTHMAN:  Objection.

18          THE COURT:  Overruled.  You can answer.

19  A.  Distributors are authorized to obtain dispensing records

20  from their customers, absolutely.

21  Q.  And are those customers obligated under the law to provide

22  dispensing data?

23          MS. ROTHMAN:  Objection, your Honor.

24          THE COURT:  Overruled.  You can answer.

25  A.  So the distributors are required to maintain effective

M1IBDOUT6                    Carter - Cross

1    controls of diversion, and part of that would be to look at the

2    prescribing patterns and the dispensing records of the

3    pharmacy.  So if the pharmacy refuses to provide that

4    information, the distributor likely should terminate their

5    business with that customer.

6    Q.  You would agree, though, that a pharmacy may have certain

7    reasons that the dispensing data is not being turned over that

8    have nothing to do with it being a suspicious order, correct?

9            MS. ROTHMAN:  Calls for speculation.

10           THE COURT:  Overruled.  You can answer.

11   A.  No, I don't think there is any reason they should turn

12   offer the dispensing data to the wholesale distributor, no.

13   Q.  In those cases where the pharmacy turns over dispensing

14   data, would you agree that the data that's turned over by,

15   let's say, a dirty pharmacist will or can include false

16   information?

17   A.  Well, any data that the pharmacy turns over could be false,

18   that's why it's incumbent upon the distributor to corroborate

19   the information that it's provided.

20   Q.  We're going to get to that.  I simply asked a question.

21   We're trying to move this.

22           Is it fair to say that the data that a distributor

23   receives from a pharmacist could be false information?

24   A.  Again, yes.

25   Q.  And it could be false information without the distributor

M1IBDOUT6                    Carter - Cross

1    even knowing it, correct, yes or no?

2    A.   Again, yes.  It could be false information.

3    Q.   You also talked about another example of a red flag.  You

4    said something about 20 percent of controlled substances of the

5    order, but then you said no, no, maybe 15 percent.  Do you

6    recall that?

7    A.   I don't recall in those words, but I do recall the

8    discussions, yes.

9    Q.   By the way, is there any statute or regulation that lays

10   out this 20 percent or 15 percent red flag that you talked to

11   this jury about?

12   A.   Again, that's all part of maintaining effective controls

13   which is in the statute.

14   Q.   I'm being very specific now with my question.  Yes or no,

15   is there any statute that says anything about, you should look

16   at whether or not it's 20 percent or 15 percent, yes or no?

17   A.   There's nothing written that states those words in the

18   statute.

19   Q.   Now, with regard to notifying the field office of DEA, what

20   statute specifically states when a registrant must contact the

21   DEA with a suspicious order?

22   A.   The regulations state that they must report them upon

23   discovery.

24   Q.   And that's the -- you testified about that on direct and

25   maybe even on cross, that's the only statute that you can refer

M1IBDOUT6                    Carter - Cross

1    to, correct?

2              I'm sorry.  My mistake, your Honor.  That was in the

3    guidance letter that was introduced, correct?

4    A.  No, that's a regulation that we looked at right before the

5    break.

6    Q.  And so other than the regulation as the jury heard it or in

7    the guidance letters, government exhibits that were received in

8    evidence, is it fair to say that there is no specific timeframe

9    that is mentioned in any statute?

10   A.  In that regulation it says upon discovery.  Is that your

11   question?

12   Q.  And that's it, correct, ma'am?  That's it, correct?

13   A.  Yes.

14   Q.  Now, you talked about compliance programs that must be set

15   up.  Can we agree that the DEA has made it clear that there's

16   more than one way to design and operate a system that can

17   identify and report suspicious orders, yes or no?

18   A.  The DEA has stated that it's up to the registrant to design

19   its own system, yes.

20   Q.  The question is, is it fair to say that as a result of

21   that, you would agree that there are many ways, different ways

22   to design and operate a compliance system, correct?

23   A.  Yes, it's up to the registrant to make.

24   Q.  We'll get to that.  We're going to get to that.

25              MS. ROTHMAN:  Your Honor, could the witness finish her

M1IBDOUT6                          Carter - Cross

1    answer.

2              THE COURT:  Overruled.  Can you redirect.

3              Mr. Gottlieb move on.

4    Q.  Would you in a compliance program there's no single feature

5    of a suspicious order monitoring program that makes the program

6    compliant with the Controlled Substances Act?

7    A.  Well, what makes it compliant is that it's maintains

8    effective controls against diversion.  So if it's not

9    maintaining effective control against diversion, it's not

10   compliant.

11   Q.  Ms. Carter, let me try again.  Would you agree that there's

12   no single feature of a suspicious order monitoring program that

13   makes the program compliant with the Controlled Substances Act,

14   yes or no?

15   A.  No.  I mean, that's not a yes or no question because the

16   feature, it has to maintain effective controls against

17   diversion.

18             MR. GOTTLIEB:  Your Honor, may I have one moment,

19   please.

20             THE COURT:  Yes.

21   Q.  Do you recall testifying under oath in a civil lawsuit?

22   A.  Yes, I do.

23   Q.  In the *State of New Hampshire v. Johnson & Johnson* on May

24   18, 2021, do you recall being asked this question?

25             MS. ROTHMAN:  Objection.

M1IBDOUT6                     Carter - Cross

1           THE COURT:  Your objection?

2           MS. ROTHMAN:  Hearsay, relevance.

3           MR. GOTTLIEB:  It's a prior inconsistent statement.

4           THE COURT:  Overruled.

5           MS. ROTHMAN:  Your Honor, there has to be a process to

6   try to do a prior inconsistent statement, and I do not believe

7   Mr. Gottlieb has followed that.

8           THE COURT:  Overruled.  She can answer.

9   Q.  Do you recall being asked this question and giving this

10  answer in May of 2021.

11          Question:  And you also agree that there's no single

12  feature of a suspicious order monitoring program that makes the

13  program compliant with the CSA?

14          The Witness, that's you.  I would agree that there's

15  not one single feature that makes a system compliant, yes.

16  Were you asked that question and did you give that answer?

17  A.  I would need to see the transcript to know.  I mean,

18  there's obviously questions before and after that that probably

19  relate to this question.

20          But what I just answered, that answer could be

21  correct, but the single feature, the feature that I've said is

22  accurate, that they have to maintain effective controls against

23  diversion.  That's what the system requires.  If that's not

24  done, then the system is not adequate.

25          MS. ROTHMAN:  Your Honor, could I ask is there a

M1IBDOUT6                    Carter - Cross

1    document number you're reading from?

2              MR. GOTTLIEB:  Defense L5.  Would you like to see it?

3              THE COURT:  What's your question.

4    Q.  What I just read to you, would you agree that you were

5    asked that question and you gave that answer, correct?  Yes or

6    no?

7    A.  Again, can you tell me where this question is.  I don't see

8    it on what was just published.

9    Q.  Can we put it on the board.  Defense Exhibit L5, page 125.

10   L5, page 125.  Do you see it, ma'am?

11   A.  Not yet.  Okay.  We are at 125.

12   Q.  Can you just take a look, beginning at line 5 going down to

13   line 11.

14             Does that refresh your recollection that that was

15   asked of you and that was your answer?

16   A.  That was the answer.  I was reading further down where I

17   explained that answer as I just explained it to you.

18   Q.  Would agree that there's no uniform set of rules applied by

19   the DEA as to what makes a suspicious order monitoring program

20   correct, yes or no?

21   A.  Again, the system has to have the outcome of maintaining

22   effective controls against diversion.

23   Q.  Ms. Carter, do you recall testifying on that same day in

24   that same deposition in that civil case in the same case being

25   asked this question and giving this answer, and this is on page

M1IBDOUT6                    Carter - Cross

1   126.

2          Question:  All right.  And there's no uniform set of

3   rules applied by DEA as to what makes a suspicious order

4   monitoring program, correct?  Right?

5          Answer:  There's no set of rules.  Can you define what

6   you mean by that.

7          Question:  Right.  There's no checklist at the DEA as

8   to what a suspicious order monitoring system must have in order

9   to be compliant, correct?

10         Answer:  Well, to my knowledge there's no checklist.

11  There wasn't when I left the DEA.

12         Were you asked those questions and did you give those

13  answers?

14         MS. ROTHMAN:  Objection, your Honor.

15         THE COURT:  Overruled.

16  A.  Yes.  And as I -- you did read it correctly, but you're

17  misstating what this says.  You're misrepresenting what this

18  says.  I asked her to rephrase that question because I didn't

19  understand the question.  And then when she asked if there was

20  a check list, I said there is no checklist and there isn't a

21  checklist.

22  Q.  The question that I asked you, were you asked those

23  questions and did you give those answers, yes or no?

24  A.  No.  I said, can you define what you mean by that.  That's

25  what I said.

M1IBDOUT6                    Carter - Cross

1        MR. GOTTLIEB:  Your Honor, can I please have this then

2   on the board, Defendant's L5, page 126.

3   Q.  Do you see it there?  Do you have it?

4   A.  I have it.

5   Q.  If you can just look at line 3 through line 12.  All I'm

6   asking, were you asked those questions?  Did you give those

7   answers.  Yes or no?

8        MR. GOTTLIEB:  Your Honor, please, I know we want to

9   get through this.  Could you just answer it.

10  A.  Yes, I did say there was no checklist.  And if you didn't

11  ask me that now, if you ask me if there's a checklist, I will

12  tell you there's not a checklist.

13  Q.  And I believe you said on direct examination that the DEA

14  does not approve -- does not endorse any specific program for

15  identifying and reporting suspicious orders, correct?

16  A.  The DEA does not approve the systems.  That is correct.

17  Q.  And there's no law under the federal criminal statutes that

18  sets forth how DEA registrants must perform a suspicious order

19  monitoring program; is that correct?

20       MS. ROTHMAN:  Objection, your Honor.

21       THE COURT:  Overruled.  You can answer.

22  A.  Can you repeat that question.

23  Q.  There is no law or even a regulation that sets forth how

24  DEA registrants must perform suspicious order monitoring,

25  correct?

M1IBDOUT6                          Carter - Cross

1   A.  What the regulation states is that they have to design a

2   system that discloses to the registrant suspicious orders of

3   controlled substances.

4   Q.  And that's it, correct?

5   A.  And in doing that, all of that still goes back to their

6   system, it has to maintain effective controls against

7   diversion.

8   Q.  If a registrant such as a distributor reached out to the

9   DEA for guidance on whether a particular order is suspicious,

10  can we agree that the DEA does not provide guidance to the

11  registrant on whether a particular order is suspicious, yes or

12  no?

13  A.  The DEA will not say whether an order is suspicious, but

14  the DEA does provide guidance, so there's two pieces to that

15  question.

16  Q.  They would not tell the distributor whether or not a

17  particular order is suspicious, correct?

18  A.  No, the DEA leaves that for the registrant to make that

19  determination.

20  Q.  If the registrant contacted the DEA, the distributor and

21  asked about a particular order size or frequency, would you

22  agree the DEA would refuse to tell the distributor whether or

23  not that's a suspicious order, correct?

24  A.  Refuse to tell is not really accurate.  They would advise

25  the registrant -- the DEA would advise the registrant that they

M1IBDOUT6                    Carter - Cross

1   have to make that determination.

2   Q.  Would you agree that distributors are not qualified to

3   determine whether a prescription on its face has a legitimate

4   medical need?

5           MS. ROTHMAN:  Objection.

6           THE COURT:  Overruled.  You can answer.

7   A.  Yeah, I don't think the distributors -- I don't believe

8   that the distributors -- the DEA ever told the distributors

9   that they're supposed to determine a legitimate medical need.

10  Q.  And, in fact, the question was, would you agree that

11  distributors are not qualified to determine whether a

12  prescription on its face has legitimate medical need, yes or

13  no?

14  A.  Again, I don't know.  I mean for me to say whether a

15  distributor has that qualification, I can't answer that.  I

16  would have to have the facts about that distributor and the

17  people that we're talking about because there may be people

18  working for that distributor that do have that ability to know

19  whether the description for a legitimate medical need.

20  Q.  Would you agree that it is the prescribers who are

21  responsible for determining medical needs when they write

22  prescriptions for opioids, yes or no?

23  A.  Yes.

24  Q.  I think we can all agree that doctors are only supposed to

25  write prescriptions for opioids if they have a doctor patient

M1IBDOUT6                    Carter - Cross

1   relationship and they make an honest judgment about medical

2   needs, correct?  You would agree with that?

3   A.  I agree they need to have a valid patient relationship and

4   there needs to be a legitimate medical need, yes.

5   Q.  And you would agree that a distributor does not have any

6   statutory obligation to go out and to determine whether or not

7   the prescription on its face has been demonstrated as for a

8   legitimate medical need?

9   A.  And again, the distributor -- the distributor does not --

10  no one expects the distributor to make a determination based on

11  the face of the prescription whether there's a legitimate

12  medical need.

13  Q.  What is a PMP?  What does that stand for?

14  A.  In some states it stands for prescription monitoring

15  program.

16  Q.  And do you agree that distributors don't have access to

17  PMPs, these monitoring programs?

18  A.  Yes.

19  Q.  Is this a computerized database that the distributors don't

20  even have access to?

21  A.  It is computerized and it's typically run by the state and

22  the distributors don't have access to it.

23  Q.  Because the DEA leaves it up to each registrant to design a

24  suspicious order monitoring system, is it fair to say that the

25  DEA has recognized that a registrant can and should consider a

M1IBDOUT6                        Carter - Cross

1    number of factors before deciding what, if anything, to be done

2    in the face of a red flag?

3    A.  Yeah, a distributor should be reviewing the red flags and

4    making a decision whether or not the red flag can be resolved,

5    yes.

6    Q.  Can we agree that there are recommendations on a number of

7    factors that a distributor or a registrant might consider in

8    evaluating a red flag, correct?

9    A.  Yes, they should be considering all -- they should be using

10   all available resources that they have to look at the orders

11   and determine whether or not they can resolve the red flags.

12   Q.  So a red flag somehow comes to the attention of a

13   distributor, is it fair to say that before the distributor does

14   anything with that red flag, would you agree that some of the

15   factors that may be investigated is the nature of the product,

16   the controlled substance itself, correct?

17   A.  Yes.

18   Q.  The characteristics of the customer, who the customer is,

19   correct?

20   A.  Are you asking if these are things they should consider?

21   Q.  Are those factors that should or can be considered, yes?

22   A.  Yes, they should consider the customer, yes.

23   Q.  And assuming there is a red flag that comes to the

24   attention of a distributor, would you agree that included in

25   what the distributor can do as part of this investigation is to

M1IBDOUT6                          Carter - Cross

1   speak to the customer directly?

2   A.  Yes, they can speak -- they can speak to the customer

3   directly.

4   Q.  And when they speak it's for the purpose of trying to find

5   out what's going on, tell us something about this order,

6   correct?

7   A.  Yes, they should ask the customer what's going on with this

8   order.

9   Q.  And would you agree that in speaking to the customer, in

10  doing your due diligence, the distributor is relying on the

11  customer giving honest answers, correct?

12  A.  Not necessarily.  I mean, the distributor should take the

13  answers, but then the distributor should corroborate the

14  answers.

15  Q.  Now, you just mentioned corroboration.  First, you would

16  agree that manufacturers and distributors often do rely on what

17  the customer tells them, correct?

18  A.  Yes, they do rely on what the customer tells them, but they

19  should corroborate that information.

20  Q.  Well, regarding corroboration, is it fair to say that while

21  corroboration is recommended, the Controlled Substances Act

22  does not require corroboration?

23          MS. ROTHMAN:  Objection, your Honor.

24          THE COURT:  Overruled.  You can answer.

25  A.  So the Controlled Substances Act requires the distributor

M1IBDOUT6                    Carter - Cross

1   to maintain effective controls against diversion.  All of that

2   corroboration would be included in the conduct of the due

3   diligence for sure.

4   Q.  If we could get a yes or no answer.  While corroboration

5   may be recommended, yes or no, the Controlled Substances Act

6   does not require corroboration, yes or no?

7   A.  The Controlled Substances Act requires that they maintain

8   effective controlled substances against diversion.  That's what

9   it requires.

10  Q.  So that the record is clear, I don't want to spend anymore

11  time on it.  Your answer is, no, the Controlled Substances Act

12  does not require corroboration?

13  A.  No, it's not really no because part of maintaining

14  effective controlled substance controls against diversion

15  includes corroborated information that you're given by your

16  customers.

17          MR. GOTTLIEB:  May I have Defense exhibit 5L, 139,

18  140.

19  Q.  Do you recall being asked these questions and giving these

20  answers at the deposition on May 18, 2021.

21          Question, line 20 on the bottom of 139.

22          Question:  And so no statute or regulation relating to

23  the Controlled Substances Act requires specifically that

24  registrants obtain corroboration of what their customer tells

25  them is the explanation for potentially suspicious order,

M1IBDOUT6                    Carter - Cross

1    correct?

2            Answer:  Well, what the Controlled Substances Act

3    requires is that the registrants maintain effective control

4    against diversion.  And again, that's not delineated, like

5    verbatim or in writing.  Each company sets up its own system.

6    And part of the effective system would include corroborating

7    what your customer tells you.

8            Question:  And that's the last part, Ms. Carter, that

9    I want to ask you about.  Where is it written down anywhere,

10   the part an effective system would include corroborating what

11   your customers tell you?

12           The witness again.  It's not written down.  as I said

13   at least three times now because the CSA in implementing

14   regulations do not delineate in writing what a specific company

15   suspicious order monitoring system is going to entail.  Each

16   company has to make their own system based on their own

17   business practices, etc., as we discussed already.  And part of

18   having and maintaining effective controls against diversion,

19   which is part of it, would be corroborating what your customers

20   tell you.

21           Were you asked those questions and did you give those

22   answers.  Yes or no?

23           MS. ROTHMAN:  Is there a line cite I'm sorry,

24   Mr. Gottlieb.

25           MR. GOTTLIEB:  It was page 139, beginning line 20 on

M1IBDOUT6                    Carter - Cross

1   to the next page.

2   A.  Am I supposed to answer this?  Yes.

3   Q.  That's an answer?

4   A.  I did say this and I said exactly what I've been telling

5   you that they're required to maintain effective controls

6   against diversion.

7   Q.  Now, with regard to a compliance program as part of the due

8   diligence, is it fair to say that using former DEA agents as

9   consultants to conduct the investigation of a red flag, is that

10  something that's recognized as recommended?

11  A.  I think each company has to make their own decision whether

12  or not that they would like to use prior DEA employees.  I

13  think that it would depend upon the prior DEA employee's

14  experience.

15  Q.  And you would agree that based on your lengthy experience

16  and detailed experience in this field, registrants often use

17  outside consultants to assist them in investigations, correct?

18  A.  Based on my knowledge, yes, they do use them.

19  Q.  Thank you.  Now, another factor that I believe you

20  mentioned to know about or to investigate might be the

21  company's history with the customer, correct?

22  A.  Yes.

23  Q.  And the history means how long the company and the

24  registrant, the distributor, might know one another, correct?

25  A.  Well, I would define it as the business relationship.

M1IBDOUT6                    Carter - Cross

1    Q.  And history also includes prior investigations of the

2    company that requested the order of controlled substance.  Is

3    it fair to say that another area of investigations would

4    properly be prior investigations that were conducted of that

5    company?

6    A.  Prior investigations by whom, by the company?

7    Q.  Let's start with the DEA.  Prior investigations by the DEA

8    of the company and its compliance program, would that be a

9    factor that might be investigated?

10   A.  I don't know why that would be investigated.  I don't

11   understand.  Maybe I'm not understanding you, but I don't know

12   why that would need to be investigated as to why -- as to the

13   DEA investigation.

14   Q.  Let's say you have a pharmacy ABC and the DEA investigated

15   that pharmacy and its compliance program and practices and

16   reported in writing that that pharmacy is compliant, wouldn't

17   that be an important part of the investigation?

18   A.  The DEA doesn't make its investigations public and they

19   don't tell anyone in writing that someone's compliant.  That's

20   not how the DEA operates, so I don't know when that would have

21   happened.

22   Q.  Does the DEA prepare investigative reports in writing

23   concerning its activities, yes or no?

24   A.  The DEA does prepare reports of investigation, yes, but

25   those are not public.

M1IBDOUT6                    Carter - Cross

Q.  And what about internal investigations by the registrant of
the pharmacy in question, is that part of a compliance program
that is recommended to review?

A.  Yes, it should be part of a compliance program.  They
should be conducting investigations documenting all of those
investigations and then using those investigations for future
encounters.

Q.  Would you agree that if a distributor fails to adequately
enforce its own compliance program in detail, it does not
necessarily mean that anyone, including the distributor, knows
that their customers are diverting controlled substances?

        MS. ROTHMAN:  Objection to form.

        THE COURT:  Overruled.  You can answer the question if
you understand.

A.  So if I understand -- just to clarify, are you asking me
that even if the distributor doesn't follow its own policies
and procedures, that doesn't mean diversion occurred?  Was that
what you're asking me?

Q.  Even if they don't follow all of their procedures, it does
not in and of itself mean that the distributor knows that the
controlled substances are being diverted?

A.  Yeah, even if they don't follow their policy and
procedures, it doesn't mean that, but the whole purpose of the
--

        MR. GOTTLIEB:  Your Honor, I didn't ask for the

M1IBDOUT6                        Carter - Cross

1    purpose.  We've heard that many times.  I'm trying to move

2    this.  May I continue.

3               THE COURT:  Please.

4               MR. GOTTLIEB:  Thank you.

5    Q.  Based on your experience and your expertise in this area,

6    must every registrant report every suspicious order to the DEA?

7    A.  Yes, every suspicious order should be reported to the DEA

8    upon discovery.

9    Q.  If there is a red flag brought to the attention of a

10   distributor, are you saying that the distributor must

11   immediately contact the DEA?

12   A.  No, if a red flag has been brought to the attention of the

13   distributor, that is not in and of itself a suspicious order.

14   It's a red flag.

15   Q.  And the reason why that is, would you agree that the DEA

16   has taken the position that it would be pointless and worthless

17   to report every red flag because there's simply not the time

18   and resources to investigate each of those red flags, correct?

19   A.  I don't know if the DEA said don't report all red flags.

20   They may have.  I just don't recall that right now.

21   Q.  Did you meet with the government on January 13, 2022?  Do

22   you recall meeting with prosecutors on that day?

23   A.  I met with -- who did I meet with?  I don't recall what

24   you're talking about.

25   Q.  The prosecutors in this courtroom, Ms. Rothman?

M1IBDOUT6                    Carter - Cross

1   A.  On the 13th of January?

2   Q.  January 13, 2022, yes.

3   A.  I may have had a conference video chat, but I didn't meet

4   with them. I don't recall the dates that I talk to prosecutors

5   in this case, no.

6   Q.  Do you recall being asked questions about distributors

7   printing reports and sending them to the DEA.  Do you recall

8   that conversation along those lines?

9   A.  Are you talking about this morning when I was asked

10  questions about the prosecutor?  Is that what you're referring

11  to or a meeting I met with them?

12  Q.  January 13, 2022.

13  A.  I don't even know today's date.  Could you tell me today's

14  date.

15  Q.  Do all companies in your experience report every flagged

16  order, yes or no?

17  A.  No, the companies are not required to report every flagged

18  order.

19  Q.  Would it be helpful to the DEA in performing its duties to

20  have every registrant report every flagged order of potentially

21  suspicious orders, yes or no?

22  A.  The flagged orders -- they're required to report suspicious

23  orders.  There's nothing that discusses reporting flagged

24  orders.

25  Q.  My question, ma'am, would it be helpful to the DEA to have

M1IBDOUT6                    Carter - Cross

1   every flagged order sent to them for the DEA to perform its

2   duties?  Would it be helpful, yes or no?

3   A.  I'm not authorized to speak on behalf of the DEA, so I, as

4   far as that goes, I don't know.

5          MR. GOTTLIEB:  Can we have Defendant's L5 again, 135.

6   Your Honor, if I could have one moment.

7   Q.  Do you recall being asked this question and giving this

8   answer.  Page 135 in that same deposition under oath.

9          Question, starting at line 16.  Okay.  And it wouldn't

10   be helpful to DEA for registrants to be reporting every flagged

11   or potentially suspicious order to the local field office,

12   correct?

13          Answer:  Well, it would not be helpful to report every

14   flagged order.  It also would not be what the regulations

15   require.

16          Do you recall being asked that question and giving

17   that answer?

18   A.  I do, but I also have been since advised by DOJ attorneys

19   that I'm not authorized to speak on behalf of DEA.  So whether

20   it's helpful to DEA, that's not for me to say.  So I should not

21   have said this is kind of what I was told.

22          But, it is not what the regulation requires.  The

23   regulations require that the suspicious orders be reported.

24   That's what the regulation requires.

25   Q.  And some DEA attorney told you that you should not have

M1IBDOUT6                        Carter - Cross

1    answered that question?

2              MS. ROTHMAN:  Objection, your Honor.

3              THE COURT:  Sustained.

4    Q.  If an order is flagged, Ms. Carter, do you agree that

5    you're not aware of any company that literally just stops and

6    has stopped shipments of all orders that are flagged, are you

7    aware of that?

8    A.  Are you asking me if I'm aware if there's any company that

9    stops all shipments of flagged orders?

10   Q.  Are you aware that there are companies that even after an

11   order is flagged, that they literally just stop shipments of

12   all orders that are flagged.  Are you aware of that?

13   A.  If you're going back to that New Hampshire deposition, I

14   believe the attorney was referring to prior to 2007.  I believe

15   that's what he was referring to.  I'm having to be careful how

16   I'm answering.  You're making it out like I'm not being

17   truthful and that's not truthful.

18   Q.  Put it on the board.  Defendant's L5, 135, 137.  Do you

19   recall being asked these questions and giving these answers in

20   May of 2021, beginning line 7 going down to 22, page 137.

21             Question:  Okay.  Well, let me -- withdrawn.  You

22   mentioned about some attorney was asking you questions.  Just

23   so the record is clear, that's not me, correct?

24             MS. ROTHMAN:  Objection, your Honor.

25             THE COURT:  Overruled.

M1IBDOUT6                    Carter - Cross

1   A.  Well, because you keep going back to this deposition.

2   You're mixing it up.  You're trying to confuse what I said, and

3   a lot of times what these questions were asked and it wasn't

4   even -- the context wasn't the same as what you're asking me.

5   So I said I believe that that would have been what the attorney

6   was referring to in this deposition about those suspicious

7   orders, those excessive purchase reports, that were being sent.

8   Did any company ever stop all shipments, that's what I believed

9   that you were asking about.  If that's what you were asking

10  about, then that was a different context than what you're

11  asking me right now.

12  Q.  Do you recall being asked this question and being -- based

13  on what you told the jury just a few moments ago.

14        Question:  Well, let me ask that question.  If all the

15  registrants treated every order that was flagged as though it

16  was a suspicious order and would not ship it, that could have

17  adverse impacts on patients that would have a legitimate

18  medical need for the medications in that order, correct?

19        The witness:  I can't say one way or the other that it

20  would cause an adverse impact, because I don't think that's

21  ever -- I don't think that's ever happened, so you don't know

22  what the -- what the report would look like.

23        I mean, I don't know of any drug company that

24  literally just stops -- has stopped shipments of all orders

25  that they flagged, so I don't really know what impact that

M1IBDOUT6                       Carter - Cross

1    would have on the public health.  I'm not sure.

2               Were you asked that question and did you give that

3    answer in particular about stopping the shipments, yes or no?

4    A.  That is the question that I was asked and that is the

5    answer that I gave as it's written here, yes.

6    Q.  You told the jury on direct that you've, over the years,

7    you've done a lot of work, investigations, would you also have

8    attended conferences and seminars, correct?

9    A.  Yes.

10   Q.  And you've even taught, correct?

11   A.  I gave presentations, yes.

12   Q.  And at these conferences, at these seminars, is it fair to

13   say that there has been a dialogue among the participants as to

14   whether or not the DEA has been clear to registrants about what

15   a suspicious order is and what to do when you have it, has that

16   been a topic?

17              MS. ROTHMAN:  Objection.

18              THE COURT:  Sustained as to the form of the question.

19   Q.  Do you know Larry Houck?

20   A.  I do not.

21   Q.  H-O-U-C-K?

22   A.  I do not know him, no.

23   Q.  Have you read any of his writings?

24   A.  I have read his writings in depositions, yes.

25   Q.  Your answer now is you have read Larry Houck's writings

M1IBDOUT6                    Carter - Cross

1   regarding whether or not the law is clear enough concerning

2   suspicious orders and what to do; is that correct?

3          MS. ROTHMAN:  Objection, relevance.

4          THE COURT:  I'm going to sustain the objection.

5   Q.  Is Larry Houck a respected, as far as you know, authority

6   in this area of suspicious orders and regulations concerning

7   diversion?

8          MS. ROTHMAN:  Objection.

9          THE COURT:  Sustained.

10  Q.  Do you agree with this statement, The DEA does not provide

11  sufficient guidance for how to conduct due diligence, yes or

12  no?

13         MS. ROTHMAN:  Objection.

14         THE COURT:  Overruled.  You can answer.

15  A.  Do I agree that that's accurate, no.  I think the DEA does

16  provide information.

17  Q.  I think I said sufficient information and guidance?

18  A.  I do believe that the DEA provides sufficient information

19  guidance.

20  Q.  Do you agree with the following: The lack of a clear

21  standard or understanding of the DEA's expectations for the

22  regulated industry, especially as related to legal and

23  regulatory requirements, is forcing companies to limit, and in

24  some cases make arbitrary distribution or dispensing decisions.

25  Do you agree with that?

M1IBDOUT6                    Carter - Cross

1   A.  I would need to see the context of this document.  I mean

2   there's -- I would need to see what you're reading from.

3   Q.  Forgot what I'm reading from.  Do you agree with what I

4   just asked you, yes or no?

5   A.  Can you say it again.

6   Q.  Do you agree that the lack of a clear standard or

7   understanding of the DEA's expectations for the regulated

8   industry as related to legal and regulatory requirements is

9   forcing companies to limit, and in some cases make arbitrary

10  distribution or dispensing decisions.  Do you agree with that?

11  A.  No.

12  Q.  Do you agree that there is any need to improve the guidance

13  concerning the regulations concerning suspicious orders and

14  compliance, yes or no?

15          MS. ROTHMAN:  Objection, your Honor.

16          THE COURT:  Overruled. You can answer.

17  A.  Can you repeat that.

18  Q.  Do you agree that DEA's regulation concerning compliance

19  and suspicious orders should be clarified?

20  A.  I mean, I think that the regulations and guidance are very

21  clear, so I don't -- I know that there's been a new -- I

22  believe the regulations and guidance have been very clear.

23  Q.  Do you agree that the DEA has failed to sufficiently

24  establish a clear understanding of what is expected of a

25  distributor when investigating a flagged order, yes or no?

M1IBDOUT6                     Carter - Cross

1   A.  Do I agree that the DEA has not provided clear guidance

2   into --

3   Q.  Sufficient clear guidance, correct?

4   A.  I don't agree with that, no.

5   Q.  In any of these conferences that you have attended, the

6   seminars, has that issue been a topic of conversation?

7           MS. ROTHMAN:  Objection, your Honor.

8           THE COURT:  Sustained.

9   Q.  Have you ever commented before today's testimony in this

10  courtroom as to whether or not there's a need for increased

11  clarification of the rules and regulations?

12  A.  I think that any time I've been asked that I've said that I

13  believe that regulations are clear.

14  Q.  Would you agree that the suspicious order regulation

15  broadly and somewhat vaguely defines suspicious orders?

16  A.  No, I think the regulations clear.

17  Q.  And you were asked on direct examination about those two

18  guidance letters to registrants, they are from 2006 and 2007,

19  correct?

20  A.  Yes.

21  Q.  You'd agree that without going over the letters again and

22  what's in it, the two formed letters stated generally what a

23  suspicious order may look like and what a distributor may do to

24  detect such orders, correct?

25  A.  Well, they're not form letters.  They were letters, the

M1IBDOUT6                          Carter - Cross

1   same letters sent to everyone, and I do believe that it did

2   give specific guidance, yes, regarding suspicious orders and

3   maintaining effective controls against diversion.

4   Q.  Is it fair to say -- would you agree that the DEA has

5   concluded in the letters by warning that distributors should

6   consider the totality of the circumstances when evaluating an

7   order for controlled substance, just as the DEA will do when

8   determining whether the filing of an order with the public's

9   interest is within the meaning of the law?

10  A.  Yeah, I agree that that's generally what the letter said,

11  yes.

12  Q.  Would you agree that the letters that the government

13  introduced did not provide any substantive guidance about what

14  distinguishes a legitimate order from a suspicious one and

15  therefore unfillable and reportable order?

16          MS. ROTHMAN:  Objection to form.

17          THE COURT:  Overruled.  You can answer if you

18  understand.

19  A.  I believe the letter did provide clear guidance or the

20  letters.

21  Q.  In that 2007 letter it indicated, and would you agree, that

22  the letter explained that whether an order is also suspicious

23  depends on the ordering patterns of the customer, the patterns

24  of the distributor's customer base and on patterns throughout

25  the relevant segment of the regulated industry?  Do you agree

M1IBDOUT6                    Carter - Cross

1   with that?

2   A.   Can you repeat the first part of that question again.

3   Q.   Do you agree that the letter explained that whether an

4   order is also suspicious depends on the ordering pattern of the

5   customer, on the patterns of the distributor customer base and

6   on patterns throughout the relevant segment of the regulated

7   industry?

8   A.   Yeah, I mean, those are things to consider, and I believe

9   that the letter said that, but I would need to go to the

10  letter.  I don't know which letter said it.  There were two.

11  Q.   At these conferences, you would agree that despite efforts

12  made by the DEA to do its job, would you agree that you have

13  heard more than once that distributors continue to lack

14  confidence that they are complying with what DEA expects,

15  especially given the lack of regulatory guidance?

16           MS. ROTHMAN:  Objection, hearsay.

17           THE COURT:  Sustained.

18           MR. GOTTLIEB:  Your Honor, I'm just about done.

19  Q.   Would you agree that there would be a benefit to DEA

20  registrants for there to be a more specific delineation of what

21  a suspicious order is and what to do each step along the way to

22  report it, would there be some benefit to registrants to have

23  that done?

24           MS. ROTHMAN:  Objection.

25           THE COURT:  Overruled.  You can answer.

M1IBDOUT6                          Carter - Cross

A.   I think that with all of the different types of businesses

and the different business practices of each registrant,

there's not really one.  There's not really a way to write out

a road map for the distributors.  The distributors are required

to maintain effective control against diversion, and there's no

way to make a complete list.  Because one thing about this, the

drug abuse problems and the drugs, the situation with the drugs

in this country and the reason these substances are classified

as controlled substances is they're very dangerous.

         And things change, so patterns change.  And then what

you'll find, what happens with people is they abuse drugs or

people that are doing the nefarious things, they change their

patterns.  So if the DEA were to put out a list, this is what

you're to do, then they'll just change their patterns.  And

another thing, the list, the DEA doesn't put out a list.

         MR. GOTTLIEB:  Your Honor, thank you very much.

         THE COURT:  Did you want to adjourn for the day or did

you want to try to wind up with her quickly?

         MS. ROTHMAN:  Your Honor, it's five o'clock.  I'm

happy to proceed with redirect in the interest of not having to

--

         THE COURT:  Only if you have five minutes worth of

redirect.

         MS. ROTHMAN:  It's a little more than five minutes.  I

defer to the Court as to how your Honor would like to proceed.

1  I can try to go quickly as possible.

2          THE COURT:  If you can finish up in five to seven

3  minutes.  If you can't finish up in that time, we should come

4  back.

5          MS. ROTHMAN:  I'll try my best.  Thank you, your

6  Honor.

7  REDIRECT EXAMINATION

8  BY MS. ROTHMAN:

9  Q.  Good afternoon, Ms. Carter.

10  A.  Good afternoon.

11  Q.  Do you recall being asked questions on cross examination

12  about the guidance that the DEA provides to distributors?

13  A.  Yes.

14  Q.  Why doesn't the DEA tell distributors exactly what their

15  suspicious order monitoring system needs to look like?

16  A.  Because each business is different and each -- only the

17  registrant is the one that knows its customers or the

18  distributors is the one that knows its customers.  The DEA

19  doesn't know the customers.  The DEA doesn't send sale reps

20  into the company or into the customer every week or every other

21  week.  The DEA doesn't know the ordering patterns of the

22  customer.

23  Q.  Do you recall being asked questions about the guidance that

24  the DEA may or may not give with respect to whether a

25  particular order is suspicious?

1    A.  Do you --

2    Q.  Do you recall guidance that the DEA may give with respect

3    to whether a particular order is suspicious?

4    A.  Are you referring to as far as in these letters or just the

5    guidance in general?

6    Q.  On cross examination --

7    A.  Yes.

8    Q.  If a distributor doesn't investigate flagged orders, are

9    they maintaining effective controls against diversion?

10    A.  No.

11    Q.  If a distributor starts selling controlled substances to a

12    customer without doing any due diligence --

13          MR. GOTTLIEB:  Your Honor, objection.  May we please

14    have a sidebar.

15          THE COURT:  I'm going to sustain as to the form of the

16    question.  You want to attempt to restate the question.

17    Q.  Ms. Cater, do you recall being asked questions about the

18    guidance that the DEA provides to distributors on cross

19    examination?

20    A.  Yes.

21    Q.  Is a fact that a customer is a particularly large customer

22    a reason not to report a suspicious order?

23    A.  No.  If the order is suspicious, the order should be

24    reported.  If they determine the order is suspicious, it's

25    required to be reported.

1    Q.  Is the fact that a customer is a board member of a

2    distributor a reason not to report a suspicious order?

3              MR. GOTTLIEB:  Objection.

4              THE COURT:  I'll allow her to answer that, but I think

5    this is going beyond cross.  You can answer.

6    A.  No, that doesn't matter.  Because if the order is

7    suspicious, it needs to be reported.

8    Q.  Do you recall being asked questions on cross examination

9    about red flags of diversion and also flagged orders?

10   A.  Yes.

11   Q.  I want to take those piece by piece.  What is, generally

12   speaking, a red flag of diversion?

13   A.  So the regular flag is the warning sign, so it's just a

14   warning sign that this pattern or this behavior could indicate

15   potential diversion.

16   Q.  What is a distributor supposed to do when they see or learn

17   of red flags of diversion?

18   A.  When they see red flags with an order, they need to

19   investigate that to determine if there's actually some truth to

20   those red flags.  Or if they cannot dispel the red flags or

21   resolve the red flags, then they shouldn't ship the order.

22   Q.  With respect to a flagged order in a suspicious order

23   monitoring system, how is that different than -- withdrawn.

24              What is a distributor supposed to do when they see a

25   flagged order and a suspicious order monitoring system?

M1i3dou7                           Carter - Redirect

1    A.  Well, the flagged orders are typically the distributors way

2    of marking -- flagging, for lack of a better term, that you're

3    flagging the order; but it must meet some type of criteria that

4    they the distributor determined that they would use to flag the

5    order.  It's not a suspicious order in and of itself.  It's a

6    flagged order, and they must then review that order and

7    determine whether or not that order is indeed suspicious.

8    Q.  Do you recall being asked questions on cross examination

9    about distributors having DEA agents on staff?

10   A.  Yes.

11   Q.  Does having a DEA agent on staff mean that a distributor

12   has an effective system to maintain effective control against

13   diversion?

14   A.  No, it does not.

15   Q.  Why not?

16   A.  Well, because, again, it depends on the experience of the

17   prior DEA employee. It has to be taken into consideration.  And

18   just because the DEA or the person worked at the DEA in the

19   past, doesn't mean that the system is effective or that they're

20   following the law and the regulations.

21                (Continued on next page)

22   Q.  Do you recall being asked questions about whether or not a

23   distributor can see if a prescription on its face is

24   illegitimate?

25   A.  Yes.

1   Q.  What is a distributor supposed to do before shipping to a

2   pharmacy any controlled substance?

3   A.  They're supposed to determine if the orders are legitimate,

4   and if they're not legitimate, they should not ship the orders.

5   Q.  Ms. Carter, do you recall being asked questions about the

6   DEA letters that were sent to Rochester Drug Co-Operative in

7   2006 and 2007 on cross-examination?

8   A.  Yes.

9   Q.  If we can pull up Government Exhibit 273, please, for the

10  witness.  If we can zoom in on the first paragraph.  I'm sorry,

11  the second paragraph.  Thank you, Ms. Drescher.

12          I am going to ask you to read the first sentence,

13  Ms. Carter.

14  A.  "In addition to, and not in lieu of, the general

15  requirement under 21 U.S.C. 823, that manufacturers and

16  distributors maintain effective controls against diversion, DEA

17  regulations require all manufacturers and distributors to

18  report suspicious orders of controlled substances."

19  Q.  Do these letters clearly tell distributors what their

20  obligations are under the law?

21          MR. GOTTLIEB:  I am going to object to "clearly."

22          THE COURT:  Sustain the objection as to the form of

23  the question.

24  Q.  Do these letters tell distributors what their obligations

25  are under the law?

1    A.  Yes, they absolutely do.

2              MS. ROTHMAN:  May I have one moment?

3              THE COURT:  Yes.

4              MS. ROTHMAN:  I have no further questions.

5              THE COURT:  Do you have anything further,

6    Mr. Gottlieb?

7              MR. GOTTLIEB:  No, your Honor.  Thank you.

8              THE COURT:  We'll excuse this witness.

9              (Witness excused)

10             THE COURT:  Ladies and gentlemen, I want to keep us on

11   schedule.  I think we are on schedule, and I am still trying to

12   get us ahead of schedule.

13             Don't discuss the case, keep an open mind.  I'll ask

14   you to be inside the jury room at 9:45 and we'll see how much

15   we can get done tomorrow.

16             (Jury excused)

17             THE COURT:  Let's prepare to move forward with the

18   next witness at 9:45 tomorrow.  I'll see everybody tomorrow at

19   9:30.

20             MS. ROTHMAN:  Thank you, your Honor.

21             (Adjourned until January 19, 2022, at 9:30 a.m.)

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                         Page

 RUTH CARTER

Direct By Ms. Rothman  . . . . . . . . . . . .69

Cross By Mr. Gottlieb  . . . . . . . . . . . 131

Redirect By Ms. Rothman  . . . . . . . . . . 199

GOVERNMENT EXHIBITS

Exhibit No.                                         Received

 631   . . . . . . . . . . . . . . . . . . .76

 624   . . . . . . . . . . . . . . . . . . .77

 634, 635   . . . . . . . . . . . . . . . . .79

 901   . . . . . . . . . . . . . . . . . . .84

 272 and 273   . . . . . . . . . . . . . . . 104

DEFENDANT EXHIBITS

Exhibit No.                                         Received

 L9 and L10   . . . . . . . . . . . . . . . . 147