M1JBDOU1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

          v.                          19 Cr. 285 (GBD)

LAURENCE F. DOUD III,

          Defendant.
                              Trial

------------------------------x

                              New York, N.Y.
                              January 19, 2022
                              9:45 a.m.

Before:

                HON. GEORGE B. DANIELS,

                              District Judge
                              –and a Jury–

                    APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  NICOLAS T. ROOS
     ALEXANDRA ROTHMAN
     THOMAS S. BURNETT
     Assistant United States Attorneys

ROBERT C. GOTTLIEB
DERRELLE M. JANEY
PAUL R. TOWNSEND
     Attorneys for Defendant

Also Present:  Sunny Drescher
               Jacqueline Hauck
               Paralegal Specialists
               Special Agent George Burdzy, DEA
               Investigator Kathleen Whitmore, DEA

M1JBDOU1

1            (Case called)

2            (Trial resumed)

3            (In open court; jury not present)

4            DEPUTY CLERK:  19 Cr. 285, *United States v. Laurence*

5   *Doud*.

6            THE COURT:  We're still waiting for a number of

7   jurors.  Anything we need to address before we go to the next

8   witness?

9            MR. GOTTLIEB:  Not from the defense, your Honor.

10           MR. ROOS:  Nothing from the government.  I know I've

11  asked this, is it going to be everyday that we go till about

12  12:30, 1:00 and then end at five?

13           THE COURT:  Yes.

14           MR. ROOS:  I wasn't sure if yesterday when we took a

15  little brief break, if that is your Honor's general practice or

16  if that was to deal with the objection.

17           THE COURT:  It's my general practice to give a

18  midmorning break and a midafternoon break.

19           MR. ROOS:  Okay.

20           THE COURT:  Approximately how many witnesses do you

21  think we might be able to get through today?

22           MR. ROOS:  We're thinking three.  The first one, the

23  government's direct is somewhere between 30 and 45 minutes.

24  The second one is probably a few hours, and the third is pretty

25  short, like under 30 minutes.

M1JBDOU1

1          THE COURT:  You have approximately in total a dozen

2    witnesses?

3          MR. ROOS:  That's right, your Honor.  I would say, I

4    think in terms of say we get to those three, we'll be through

5    four of the twelve.  There's a few that are long that are still

6    coming up, but there's also a few that are short, so I think

7    we'll be on a good pace if we can make it through all three of

8    these today.

9          THE COURT:  You think it's possible we might be able

10   to be on schedule if we get through the two or three witnesses

11   today?

12         MR. ROOS:  Yes, your Honor.  I think if we can finish

13   these three today, I think there's a good shot tomorrow we can

14   also do three, and then it's possible Friday we'll have a

15   longer witness, Friday or Monday.

16         THE COURT:  You may even rest by the end of next week?

17         MR. ROOS:  I guess today will give us a better sense

18   of it. I think there's a good chance if we're able to

19   accomplish what we're talking about today.

20         THE COURT:  I think our jurors are here.  Jury

21   entering.

22         (Jury present)

23         THE COURT:  Now, ladies and gentlemen, I think we are

24   on schedule to finish the testimony within three weeks or less.

25   I'm going to still see if we can move forward efficiently and

M1JBDOU1

1    get ahead of schedule.  But at this point, I think we're on

2    schedule, not behind schedule, so we'll proceed with the next

3    witness.

4              Government, call your next witness.

5              MR. BURNETT:  Yes, your Honor.  The government calls

6    Christopher Masseth. We'll be reading a couple of stipulations

7    before he testifies.

8              THE COURT:  Sure.

9              MR. BURNETT:  Before Mr. Masseth takes the stand, the

10   government first offers Government Exhibit 1003, which is a

11   stipulation between the parties about certain RDC documents and

12   data.

13             THE COURT:  Any objection?

14             MR. TOWNSEND:  No, your Honor.

15             THE COURT:  It will be admitted into evidence.

16             (Government's Exhibit 1003 received in evidence)

17             MR. BURNETT:  Mrs. Hauck, can you publish 1003 and

18   turn to page 4.

19             As paragraph 8 of the stipulation states, the records

20   in Government Exhibits 201 through 251, 255 through 262, 267

21   through 271, 275 and 277 through 279, are records of regularly

22   conducted activity that were made at or near the time of

23   occurrence of the matters set forth or from information

24   transmitted by a person with knowledge of those matters, kept

25   in the course of regularly conducted activity of RDC and made

M1JBDOU1

1    by the regularly conducted activity of RDC as a regular

2    practice.  Those materials are defined more specifically in the

3    stipulation, but the government offers the government exhibits

4    listed here on Government 1003.

5            THE COURT:  Any objection?

6            MR. TOWNSEND:  No, your Honor.

7            THE COURT:  Those records will be admitted as business

8    records.

9            (Government's Exhibits  201-251, 255-262, 267-271,

10   275, 277-279 received in evidence)

11           MR. BURNETT:  Thank you.  Ms. Hauck, you can take this

12   down, and the government would also like to offer Government

13   Exhibit 1002, which is another stipulation between the parties.

14           MR. TOWNSEND:  No, objection.

15           THE COURT:  It will be admitted into evidence.

16           (Government's Exhibit 1002 received in evidence)

17           MR. BURNETT:  Ms. Hauck, if could you please pull that

18   on the screen as well.  This stipulation applies to a number of

19   government exhibits listed in the second paragraph.

20   Specifically, Government Exhibits 1 through 67, 101 through

21   111, 272 through 274 and 276.

22           And the second page of the stipulation says that the

23   parties agree that these exhibits are admissible at trial if

24   offered subject to objections for hearsay, relevance or under

25   Rule 403.

1          At this time, the government offers the exhibits that

2    are listed on the stipulation.

3          THE COURT:  Any objection at this time?

4          MR. TOWNSEND:  No, your Honor.

5          THE COURT:  They will be admitted into evidence.

6          (Government's Exhibits 1-67, 101-11, 272-274, 276

7    received in evidence)

8          MR. BURNETT:  Thank you. That's all.  The government

9    would like to call Mr. Masseth.

10   CHRISTOPHER MASSETH,

11        called as a witness by the government,

12        having been duly sworn, testified as follows:

13         THE COURT:  You can inquire.

14   DIRECT EXAMINATION

15   BY MR. BURNETT:

16   Q.  Good morning, Mr. Masseth. Where are you from?

17   A.  Rochester, New York.

18   Q.  How old are you?

19   A.  Forty-two.

20   Q.  How far did you go in school?

21   A.  I got my master's degree.

22   Q.  Starting before your master's, where did you go to college?

23   A.  My undergrad was at Robert Wesleyan College.

24   Q.  Where is that?

25   A.  Just outside of Rochester.

 1  Q.  And your master's, what was that in?

 2  A.  Business Administration, MBA.

 3  Q.  Now, are you familiar with a company called Rochester Drug

 4  Co-Operative?

 5  A.  Yes.

 6  Q.  Does that sometimes go by RDC for short?

 7  A.  Yes, it does.

 8  Q.  How are you familiar with the company?

 9  A.  I worked there for about 23 years.

10  Q.  What jobs did you have at RDC?

11  A.  Quite a few.  I started out in the warehouse, the day crew,

12  which was putting away product and receiving product.  And I

13  also worked occasionally on the night crew, which was picking

14  orders and shipping product, was eventually promoted into the

15  office where for a short time I did data entry for price

16  changes.

17          And after that I was promoted to manage all the

18  branded RX pharmaceuticals, and after that I was promoted up to

19  general manager and finally the title was changed to chief

20  operating officer.

21  Q.  So I want to focus right now, and for your testimony, on

22  the time period between 2012 and early 2017, what was the job

23  that you held during that period?

24  A.  During that time I managed.  The title was manager branded

25  RX and trade relations.

1   Q.  Who was in charge of RDC during those years?

2   A.  Larry Doud.

3   Q.  Do you recognize Mr. Doud in the courtroom today?

4   A.  Yes, I do.

5   Q.  Could you please point him out to the jury and identify him

6   by a piece of clothing he's wearing?

7   A.  He's kind of straight ahead from me.  He's got a black suit

8   coat with a light tie on and black glasses.

9            MR. BURNETT:  Your Honor, may the record reflect that

10   the witness has identified the defendant.

11           THE COURT:  The record will so reflect.

12   Q.  What was the defendant's title when you worked at RDC?

13   A.  He was the chief executive officer, CEO.

14   Q.  What was your understanding of his role as the CEO?

15   A.  He oversaw all aspects of the company.  He was the highest

16   in command, reported directly to the board of director.

17   Q.  Do you know when he started out as CEO?

18   A.  I do not.  I know he was CEO when I started at the company,

19   so before I came to RDC he was the CEO.

20   Q.  When did he stop being the CEO?

21   A.  March 31st, 2017.

22   Q.  Now, we'll come back to Mr. Doud in a minute.  But first

23   I'd like to ask you a few questions about RDC as a company.

24   What kind of company was Rochester Drug Co-Operative?

25   A.  We were a full-line pharmaceutical distributor.

1    Q.  What does that involve?

2    A.  We purchased product directly from several different

3    manufacturers and shipped them to independent pharmaceuticals

4    or pharmacies.

5    Q.  Let's take that one at a time.  When you say you brought

6    product from manufacturers, what kinds of products did RDC buy?

7    A.  Again, we're considered what was called a full-line

8    distributor, so we stocked over-the-counter products, health

9    and beauty products, durable medical equipment,

10   pharmaceuticals, both branded and generic pharmaceuticals,

11   basically anything you would buy in the pharmacy, except

12   grocery goods and gift type items.

13   Q.  And you said that RDC sold those products to independent

14   pharmacies, what are independent pharmacies?

15   A.  Independent pharmacies are non-chains, so they're very

16   similar to like a Walgreens and a CVS, but they're usually

17   single owner, sometimes called mom and pop pharmacies, but

18   usually non-chains, one single location.

19   Q.  During the 2012 to early 2017 time period, about how many

20   pharmacies did RDC sell to?

21   A.  About 1500.

22   Q.  Now, a moment ago you mentioned that RDC was a full-line

23   distributor, do you recall that?

24   A.  Yes.

25   Q.  What do you mean when you say a full-line distributor?

1   A.   Again, just that we stocked like a breadth of products, not

2   just like one category, so from hair products like shampoo to

3   toothpaste to prescription products, generic, branded,

4   refrigerated products, controls, narcotics.

5   Q.   From your experience, why was RDC a full-line distributor

6   as opposed to specializing in some particular type of products?

7   A.   We really wanted to be a single source for our customers,

8   for the pharmacies, with the goal of having the pharmacies

9   primarily purchase everything from us instead of competitors

10  and multiple locations.

11  Q.   What was the advantage of having pharmacies buy everything

12  from RDC as opposed to going to competitors for certain

13  products?

14  A.   It was really a way to try and keep the customer.  If we

15  didn't have a product and they had to buy it from somebody

16  else, most likely our competitors -- well, a lot of the

17  competitors required them to sign some sort of customer

18  contract which could tie them into the business for a year

19  plus, multiple years, or they had order minimums. So if we

20  didn't have an item, they would have to purchase that item and

21  more, which ultimately meant lost sales and the possibility of

22  losing a customer.

23  Q.   Now, you mentioned that one type of product RDC sold was

24  prescription drugs; is that right?

25  A.   Correct.

1    Q.  What kind of prescription drugs did RDC sell to pharmacies?

2    A.  All different prescription items that we could get access

3    to.  Again, branded, generic products, controls, narcotics,

4    injectables, any pharmaceutical item that was considered a

5    retail product that a patient would get a script filled in a

6    pharmacy setting.

7    Q.  When you say controls and narcotics, what do you mean by

8    that?

9    A.  Those are items that the DEA schedules and classifies.

10   They're usually more addictive or have risk profiles, so the

11   DEA classifies them differently than every other item.

12   Q.  What are some examples of controls and narcotics that RDC

13   sold between 2012 and early 2017?

14   A.  There's a lot of pain management, a lot of like sleep

15   medication or narcotics, opioids, etc.

16   Q.  Now, earlier in your testimony you referred to the company

17   as Rochester Drug Co-Operative; is that right?

18   A.  Yes.

19   Q.  What does the co-operative part mean?

20   A.  We were owned by a subset of our customer base.  We sold to

21   about 1500 pharmacies, but about 230 of them actually owned

22   RDC.

23   Q.  Those owners, did they have something to represent their

24   ownership?

25   A.  Yes, they would have a share, like a stock certificate

1   showing that they have an ownership in the company.

2   Q.  Between 2012 and early 2017, to your knowledge were all of

3   RDC shareholders pharmacy customers?

4   A.  For the most part, I believe so, yes.

5   Q.  What, if any, financial benefits came along to pharmacies

6   for being shareholders in RDC?

7   A.  There's the value of the individual share which is the book

8   value of the company if they were to redeem it or sell it back

9   to the company.  And then beyond that, any profits that the

10  company earned would be paid out via a dividend yearly.

11  Q.  Generally speaking, what was that dividend based on?

12  A.  So the dividend was based on the company's profits.  So

13  whatever the profit was, was presented to the board, and the

14  board would determine how much to be paid out via the dividend.

15  And from that total amount, they took the total of the

16  shareholders' purchases and divided it into the determined

17  dividend amount to create a percentage, and each shareholder

18  was then paid a percentage equally.  The dollar amount would be

19  different because it was based on their total purchases.

20  Q.  Now, where was Rochester Drug Co-Operative headquartered?

21  A.  In Rochester, New York.

22  Q.  Did you work at the headquarters?

23  A.  Yes, primarily.

24  Q.  Did the defendant typically work at the headquarters?

25  A.  Yes.

1   Q.  I'm going to show you what's been marked for identification

2   as Government Exhibit 612.

3          And Ms. Hauck, if you could please show that to the

4   attorneys, the Court and the witness.

5          Do you recognize this?

6   A.  Yes, I do.

7   Q.  What is it?

8   A.  That is our Rochester, New York facility.

9   Q.  Is it a fair and accurate photograph of that facility?

10  A.  Yes.

11         MR. BURNETT:  The government offers 612 in evidence.

12         THE COURT:  Any objection?

13         MR. TOWNSEND:  No objection.

14         THE COURT:  It will be admitted into evidence.

15         (Government's Exhibit 612 received in evidence)

16         MR. BURNETT:  Permission to publish it to the jury,

17  your Honor.

18         THE COURT:  Yes.

19         MR. BURNETT:  Ms. Hauck, could you please publish it.

20  Q.  Mr. Masseth, what does this photograph show?

21  A.  That's our building that we built in 2001 in Rochester, New

22  York on Jetview Drive.

23  Q.  Can you describe how the building is laid out?

24  A.  Yes.  The parking lot that you see is in front of the

25  building, that's where the employees would park, and the part

1     with the windows and that cream color roofline is our office

2     area.  And then if you look attached to it in the back where

3     the RDC logo is, that is the start of the warehouse where all

4     the product was stored.

5     Q.  So let's take those parts of the building one at a time

6     starting with the warehouse.

7             Can you give just a general sense of how much space

8     the warehouse took up the building?

9     A.  It was the bulk of the facility as you can kind of tell

10    from the picture.  It had high ceilings, so we were able to

11    store skids of product and what we called the case section so

12    we could stack skids upwards.

13            It also had a large mezzanine area that held loose

14    product underneath and floor racks for picking, and on the

15    mezzanine above, it held also loose product and static shelves,

16    kind of like you would store product at home.

17    Q.  Now, turning to the office, you said that was in the front

18    part of the building?

19    A.  Yes.

20    Q.  How many floors was the office?

21    A.  Only one floor.

22    Q.  Could you describe in general terms how it was laid out?

23    A.  It was kind of like a big square, so the part where the

24    windows are, the outer portion had individual offices with

25    windows.  The center of the square, if you will, is primary

1    cubicles.  There's a small area of enclosed offices in the

2    center also, and the part where it connected to the warehouse

3    was a shared cafeteria between the office and the warehouse

4    space.

5    Q.  Now, during the period we've been focused on between 2012

6    and early 2017, about how many employees worked in the office

7    part of the headquarters?

8    A.  Roughly 50.

9    Q.  So I'd like to talk about some of those people.

10            Ms. Hauck, if you could please take this photograph

11   down and show to just Mr. Masseth, the attorneys and the Court

12   the following exhibits, 601, 602, 603, 604, 605, 606, 611, 625

13   and 626.

14            Mr. Masseth, without getting into the specific of each

15   photograph, do you recognize what those photographs are?

16   A.  Yes, our former RDC employees.

17   Q.  And are they fair and accurate representations of those RDC

18   employees?

19   A.  Yes.

20            MR. BURNETT:  Your Honor, the government offers

21   Exhibits 601 through 606, 611, 625 and 626.

22            THE COURT:  Any objection?

23            MR. TOWNSEND:  No objection.

24            THE COURT:  They'll be admitted into evidence.

25            (Government's Exhibits 601-606, 611, 625, 626 received

1    in evidence)

2              MR. BURNETT:  Ms. Hauck, if you could please publish

3    Government 601.

4    Q.  Who's the person in this photograph?

5    A.  Larry Doud.

6    Q.  That's the defendant?

7    A.  Correct.

8    Q.  Did he work in that Rochester headquarters that you

9    discussed earlier?

10   A.  Yes, he did.

11   Q.  What part of the building did he work in?

12   A.  In the front of the building.

13             MR. BURNETT:  Ms. Hauck, if could you turn now to

14   Government Exhibit 602.

15   Q.  Who's this person?

16   A.  Joseph Joe Brennan.

17   Q.  What was his job at RDC between 2012 and early 2017?

18   A.  I believe it started as general manager, and then his title

19   also changed to chief operating officer, COO.

20   Q.  Based on your time at the company, could you give a general

21   description of what that job involved?

22   A.  He oversaw the operations of the company, the day-to-day

23   pick, pack, ship and receiving.

24   Q.  When you say pick, pack, ship, what do you mean by that?

25   A.  We delivered six days a week to our pharmacies, so the

1   orders would come in, the warehouse would pick the orders and

2   then we would ship them out nightly to the individual

3   pharmacies.

4   Q.   Who did Mr. Brennan report to at the company?

5   A.   He reported to Larry Doud and I believe the board.

6           MR. BURNETT:   Let's turn to Government 611, please.

7   Q.   Who's in this photograph?

8   A.   Ed Kirker.

9   Q.   What was his job at RDC?

10  A.   He was -- I don't remember the exact title name, but

11  director of purchasing or procurement.

12  Q.   And what did that job involve?

13  A.   So during that time, I reported directly to Ed.  He oversaw

14  the purchasing department which was kind of broken into four

15  different categories and our contracts and pricing.

16  Q.   Who did he report to?

17  A.   He reported into Joe Brennan and ultimately Larry.

18  Q.   Now, let's take this down and publish Government Exhibit

19  604, please.

20           Who's the person who's pictured here?

21  A.   That's Lanny Doud.

22  Q.   What, if any, relationship does he have to the defendant?

23  A.   That's Larry's son.

24  Q.   Was he at RDC at some point during the period between 2012

25  and early 2017?

1    A.  Yes, I believe so.  I don't recall when he left, but, yes.

2    Q.  What was his job at the company?

3    A.  He was our director of sales in charge of the sales

4    department.

5    Q.  And what did he do in that role?

6    A.  So all the salesmen oversaw him and he -- sorry.  He

7    oversaw all of the salesmen and was kind of the customer facing

8    side of the company.

9    Q.  And when you say sales, who are the customers in this

10   context?

11   A.  That's the independent pharmacies.

12   Q.  Who did he typically report to?

13   A.  He reported I believe to Joe and then to Larry.

14   Q.  Now, let's turn to Government Exhibit 626.  Who's the

15   person pictured here?

16   A.  That's Richie Cullen.

17   Q.  What did he do at RDC during the time period we've been

18   discussing?

19   A.  So he was in charge of what we call the Metro, New York

20   territory.  The salesmen in kind of this area down here

21   reported directly in to him, and eventually he was promoted to

22   GM when we opened our Fairfield, New Jersey facility and worked

23   in that facility but still was mainly on the sale side of the

24   company.

25   Q.  Who were the people he reported to at RDC?

M1JBDOU1                    Masseth - Direct

1    A.   I believe he reported to Lanny and then Joe and Larry.

2    Q.   Let's turn now to Government Exhibit 603.   Who's pictured

3    here?

4    A.   Bill Pietruszewski, I think that's how you say it.

5    Q.   What was Mr. Pietruszewski's job at RDC between 2012 and

6    early 2017?

7    A.   He kind of had a dual role.   He oversaw the operations and

8    the compliance department.   Eventually when we opened Fairfield

9    New Jersey, he moved down to Fairfield and oversaw the

10   operations in Fairfield and compliance.

11             (Continued to next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.   Now, those jobs in operations and compliance, did he have

2    those at the same time?

3    A.   Yes.

4    Q.   Let's take them one at a time.  What did the operations

5    role involve?

6    A.   So the operations was primarily the day shift, which was

7    the incoming product, and just making sure that everything was

8    received as quickly as possible, and put away correctly.

9    Q.   And now at the same time that he was doing that operations

10   role, what was his compliance job?

11   A.   So, he oversaw the compliance department for the controls

12   and narcotics, setting up new customers, and reviewing orders

13   being shipped.

14   Q.   Who were the people who Mr. Pietruszewski reported to in

15   RDC?

16   A.   So he reported to Joe Brennan and then Larry Doud.

17   Q.   Let's turn ahead now to Government Exhibit 605.  Who is the

18   person in this photograph?

19   A.   Jessica Pompeo.

20   Q.   Was she at RDC for some of the time between 2012 and early

21   2017?

22   A.   Yes.

23   Q.   What was her role?

24   A.   She worked in the compliance department.

25   Q.   Is that the department that Mr. Pietruszewski ran?

M1j3dou2                         Masseth - Direct

1    A.  Correct.

2    Q.  Now, who were some of the people who she reported to when

3    she worked in the compliance department?

4    A.  So she reported directly to Bill Pietruszewski and then

5    Joe, and ultimately Larry.

6    Q.  Now let's turn to Government Exhibit 625.  Do you recognize

7    the person here?

8    A.  Yes.

9    Q.  Who is this?

10   A.  Amy Skibickyi.

11   Q.  What was her job at RDC?

12   A.  She also worked in compliance.

13   Q.  Did she have a similar role in reporting structure to

14   Jessica Pompeo who you just talked about?

15   A.  Yes, she did.

16   Q.  Let's turn ahead to Government Exhibit 606.  Who is the

17   person pictured here?

18   A.  Julius Morton.

19   Q.  Was he at RDC for at least some of the time between 2012

20   and early 2017?

21   A.  Yes, he was.

22   Q.  What was his job?

23   A.  He was a field auditor.

24   Q.  What's your understanding of what that means?

25   A.  So, he would visit, do onsite visits to the different

1   pharmacies that we sold to, to do compliance reviews at the

2   pharmacy level.

3   Q.  Who were the people he reported to?

4   A.  I believe he reported to Bill Pietruszewski and then Joe

5   and Larry.

6           MR. BURNETT:  Thank you.  You can take that photo

7   down.

8   Q.  I'd like to turn back to Mr. Doud, the defendant.  When he

9   was the CEO during that period between 2012 and early 2017, how

10  often was he around that main office at Rochester?

11  A.  When he was in Rochester, he was usually in the office.  He

12  would also do customer visits and stuff.  And he also spent

13  time in Florida, so, it was just when he was in Rochester he

14  was in the office.

15  Q.  About what part of the year was he in Rochester for?

16  A.  I'd say about half -- more than half the year.

17  Q.  How often did you communicate with him, either in person or

18  otherwise?

19  A.  On a regular basis.

20  Q.  Could you describe his management style?

21  A.  He was very involved with all departments.  You know, I

22  talked to him on a regular basis.  I think he, he talked to

23  every employee at the company on a regular basis.

24  Q.  What gave you that impression?

25  A.  Just being there, you know, you would see him go out into

1    the warehouse, and he knew every employee's name.  He took the

2    time to say hi to everybody, and, you know, have conversations

3    with them.

4    Q.  Based on your seeing him around the company, how involved

5    was he in the day-to-day operations of what RDC did?

6    A.  I believe he was fairly involved.

7    Q.  Now, what, if any, reports did Mr. Doud receive about what

8    was going on at the company?

9    A.  He received what we called green bar reports.  Daily, quite

10   a few a stack of papers if you will.

11   Q.  Have you received those green bar reports before?

12   A.  Yes, I got them on a regular basis, daily, too.

13   Q.  What kind of information was in those green bar reports?

14   A.  I guess the best way to describe it is like an Excel

15   printout, you know, the ones that I received were primarily

16   based on the sales last night and items that were omitted,

17   meaning, we didn't have the inventory but a customer tried to

18   order it, so I could try to replace the inventory.  I got

19   reports on the inventory levels, and what was on hand,

20   different reports on manufacturers.  But there is a multitude

21   of reports.

22   Q.  What were some of the ways that the defendant communicated

23   with his employees at the company?

24   A.  Primarily in person.  You know, he would walk down and have

25   the conversation with the different employees.  If they weren't

1   around, he would leave a note for them, you know.

2   Q.  You mentioned those notes.  Why do those notes stand out to

3   you?

4   A.  We called them blue notes.  It was a blue sticky pad, and

5   he would leave them on your desk or your chair and you would

6   just follow up on them immediately.

7   Q.  How often did you see people around the company receiving

8   those blue notes?

9   A.  It's hard to say.  I mean, I wouldn't necessarily say

10  daily.  But it was often enough that everybody knew about them

11  and would know if you got a blue note you would -- you know,

12  people would joke about it.

13  Q.  Now, based on your time at RDC, how often was the defendant

14  involved in decisions about the company's sales and operations?

15  A.  Again, I think he was very involved.

16  Q.  In your experience working at the company, were employees

17  typically free to make decisions that would affect sales

18  without the defendant's input?

19  A.  I guess -- it depends on how big of a decision it was.  You

20  know, on little stuff, I think people were free to make

21  decisions, but if it was something, you know, bigger, they

22  would either just let him know so he was in the loop, or, you

23  know, ask what he thought about it before the final decisions

24  were made.

25  Q.  What are some kinds of things that would constitute bigger

M1j3dou2                    Masseth - Direct

1    decisions?

2    A.   We were very customer focused, you know, the customer was

3    number one.  And if it impacted a customer, you know, our

4    customers were pretty vocal too.  So if there was anything

5    where they might call, you would ask or at least let him know

6    to say, hey, you might get a call from this customer.

7    Q.   Now, when you were at RDC, did you hear the defendant talk

8    about what, if any, parts of the business that he was focused

9    on?

10   A.   Again, customers, very customer focused.  Sales focused.

11   Those were probably the two main.

12   Q.   Let's take those one at a time.  When you say he was sales

13   focused, what gave you that impression?

14   A.   I think it goes back to what I was saying earlier, that,

15   you know, we wanted to always have the products that the

16   customer may need.  With the concern if we didn't, we could

17   potentially lose the customer.  We definitely lost the sale.

18   You know, if a pharmacy ultimately is providing a product to a

19   patient, and that patient can't wait.  So, if we didn't have

20   it, they would just buy it from a competitor, and again, they

21   would have to buy a multitude of product, not just that one, to

22   make the minimum.  And put us at risk of losing a customer.

23   So, it was make sure you have the product so we can sell it.

24   Q.   I want to switch from the sales to the customer focus side

25   that you just mentioned, and I'd like to show you what's

1    already been offered in evidence as Government Exhibit 271.

2                With the Court's permission, I'd like to publish that

3    for the jury.

4                THE COURT:  Yes.

5    Q.  Do you recognize this document?

6    A.  Yes, I do.

7    Q.  What is it?

8    A.  I believe it was either in our handbook or in one of our

9    annual shareholders booklet.

10               It disappeared.

11   Q.  Thank you.  Sorry.

12   A.  It was our mission statement.

13   Q.  Now, I'd like to focus on the second to last paragraph, so

14   the paragraph above the three squiggly lines that are there.

15   A.  Okay.

16   Q.  Do you see that the beginning of the first sentence there

17   refers to, says "Full line distribution is our core business"?

18   A.  Yes.

19   Q.  And I think you mentioned this briefly earlier, but again,

20   what is full line distribution?

21   A.  It's having the wide breadth of products that a pharmacy

22   would need.

23   Q.  When you were at the company, did you hear the defendant

24   talk about RDC being a full line distributor?

25   A.  Yes.

M1j3dou2                         Masseth - Direct

1    Q.  What did he say about it?

2    A.  Just, the importance of having all the different items,

3    whether it was a cane or a wheelchair, or, you know, hair

4    products, it was make sure we had everything that the customer

5    needed.

6    Q.  Again, what was the importance when he talked about it of

7    RDC having all the products the customer needed?

8    A.  To try and be the sole provider for that customer.  Make

9    sure they didn't buy product elsewhere.

10   Q.  Now let's look at the last paragraph, and Ms. Hauck, if you

11   can please blow that up just so it's easier to read.  The very

12   last paragraph in italics.

13            Could you please read the first line of this.

14            MR. TOWNSEND:  Your Honor, has this been admitted into

15   evidence?

16            MR. BURNETT:  Yes.

17   A.  Okay.  "CEO Larry Doud's goal is to make RDC the knight in

18   shining armor for independent pharmacy."

19   Q.  When you were at the company, did you hear the defendant

20   refer to RDC being the knight in shining armor for independent

21   pharmacy?

22   A.  Yes.

23   Q.  What did you understand him to mean by that?

24   A.  Well, it became our logo.  If you look at the top of the

25   page, the horse with the lance.  It was, again, putting

customer first, trying to be everything that we could for

customer.  You know, that's what differentiated us from our

competitors was high customer service and being flexible and

there to support their business.

Q.  When you say being flexible, could you give some examples

of, in your role at the company, how RDC was flexible for

customers?

A.  In my role?

Q.  Sorry.  In roles that you saw at RDC.

A.  I mean, I think it was just all aspects of customer

service.  You know, every employee was in customer service, if

you will.  I got calls from the customer, every employee would

answer calls from the customer, responding to them as quickly

as possible.  Not -- you know, having somebody that answered

the phone, they didn't go through a teleprompt when they called

in.  And being flexible in payment terms or quick deliveries,

you know, will call orders or trying to get product to them

quicker.  Or if there is a product that we didn't have,

building a relationship with that manufacturer to try to get

access to the product, and having it available for them.

        MR. BURNETT:  Thank you, Ms. Hauck.  You can take that

down.

Q.  So I want to wrap up by asking you just a few concluding

questions.

        I think you mentioned from 2012 to early 2017, RDC had

1   a compliance department; is that right?

2   A.   Yes.

3   Q.   Were you part of that compliance department?

4   A.   I was not.

5   Q.   Were you involved in participating in making compliance

6   decisions between 2012 and early 2017?

7   A.   No.

8   Q.   How much were you looped into the actual day-to-day work of

9   what was going on in the compliance department during that

10  time?

11  A.   The day-to-day, very little.

12  Q.   Did there come a time when you learned that the DEA was

13  investigating RDC?

14  A.   Yes.

15  Q.   Around when was that?

16  A.   I believe it was end of 2016.

17  Q.   Now, do you still work at RDC?

18  A.   I do not.

19  Q.   When did you leave the company?

20  A.   It was March of '21, last year.

21  Q.   Why did you leave?

22  A.   The company closed.

23           MR. BURNETT:  No further questions, your Honor.

24           THE COURT:  Cross-examination.

25           MR. TOWNSEND:  Thank you, your Honor.

M1j3dou2                          Masseth - Cross

1    CROSS-EXAMINATION

2    BY MR. TOWNSEND:

3    Q.  Good morning.

4    A.  Good morning.

5    Q.  Is it "Masseth"?

6    A.  Yes, that's fine.

7    Q.  I'd like to touch first on just some of the general topics

8    that you testified on, on direct.

9           Do you remember being asked to give a couple general

10   examples of the types of products that RDC would have in the

11   warehouse?

12   A.  Yes.

13   Q.  I think you noted over-the-counter products as one?

14   A.  Correct.

15   Q.  That would be Tylenol, Advil; things like that?

16   A.  Yes.

17   Q.  And you said health and beauty products.  So, face creams,

18   soaps; things like that?

19   A.  Correct.

20   Q.  You said durable medical equipment.  Can you explain what

21   that is?

22   A.  That would be canes, wheelchairs, walkers, knee braces,

23   something for, like, physical injuries, if you will.

24   Q.  Then you said pharmaceuticals, branded and generics?

25   A.  Yes.

M1j3dou2                         Masseth - Cross

1    Q.  You said you had 1500 pharmacy customers, right?

2    A.  Roughly.  I don't recall the exact number.

3    Q.  So, the products that you mentioned for all these

4    customers, the ones that came to mind, none of those are

5    controlled substances, right?

6    A.  The ones just listed, no.

7    Q.  Right.  And that's because the bulk of what was kept in the

8    warehouse for RDC was non-controlled substances, right?

9    A.  Correct.

10   Q.  That was the vast majority of what RDC sold to customers,

11   right?

12   A.  Yes.

13   Q.  You did mention that RDC does sell controlled substances,

14   right?

15   A.  Yes.

16   Q.  And RDC has a DEA license to do that, right?

17   A.  Yes.

18   Q.  Or did, excuse me, during 2012 to 2017.  I know you

19   mentioned the company shut down.  But during that time period,

20   it had a DEA license?

21   A.  Yes, we did.

22   Q.  I want to talk again about the dividend that you mentioned

23   briefly.

24          So the dividend was a way to pay back the customer

25   shareholders at the end of the year, right?

1   A.  Correct.

2   Q.  And it was determined by RDC's profits for the year, right?

3   A.  Yes.

4   Q.  And those profits are a factor of both non-controlled

5   substance sales and controlled substance sales, right?

6   A.  Yes, the total business.

7   Q.  The total business.

8            You were asked about Bill Pietruszewski's jobs.

9   Right?

10  A.  Yes.

11  Q.  You said he was the dayshift operations manager and he ran

12  the compliance department, right?

13  A.  Correct.

14  Q.  And you described the operations role as basically making

15  sure that the inventory that came in was put in the warehouse?

16  A.  Yes.

17  Q.  And there was a team that did that, I assume, right?

18  A.  Yes.

19  Q.  Bill Pietruszewski wasn't at the truck unloading product,

20  right?

21  A.  Occasionally he did, but...

22  Q.  But in general, he had people that would do that?

23  A.  Yes.

24  Q.  Another person who was showed to you was Julius Morton.  Do

25  you remember him?

M1j3dou2                          Masseth - Cross

```
 1   A.  Yes, I do.

 2   Q.  You testified he was a field auditor?

 3   A.  Yes.

 4   Q.  He conducted onsite visits you said?

 5   A.  Yes.

 6   Q.  That was for the compliance department?

 7   A.  Yes.

 8   Q.  And those onsite visits were to evaluate the due diligence

 9   program of those customers?

10   A.  Correct.

11   Q.  Do you know about how many compliance audits Julius Morton

12   did while he was at RDC?

13   A.  I have no idea.

14   Q.  A lot though, you'd say?

15            MR. BURNETT:  Objection.

16            THE COURT:  Sustained.

17   Q.  You were asked about Larry Doud's management style.  Do you

18   remember that?

19   A.  Yes.

20   Q.  Isn't it a fact that you thought Larry Doud was a pretty

21   good boss?

22   A.  Yes.

23   Q.  You spoke at his retirement party, right?

24   A.  I did.

25   Q.  It was very emotional for you?
```

M1j3dou2                          Masseth - Cross

1    A.  Yes.

2    Q.  Larry Doud hired you?

3    A.  Not directly, but...

4    Q.  But you've known Larry Doud since you started working in

5    the warehouse?

6    A.  Yes.

7    Q.  You said that Doud took the time to say hi to everybody?

8    A.  Yes, he did.

9    Q.  When you were asked about the ability to make decisions to

10   impact certain customers with regard to sales -- do you

11   remember being asked about that?

12   A.  Yes.

13   Q.  And you said relatively small decisions, Larry Doud would

14   not necessarily need to be involved in?

15   A.  Correct.

16   Q.  And if it was something that was a little bit larger, you

17   said Larry would need to be kept in the loop?

18   A.  Yes.

19   Q.  You testified about the importance of having all products

20   that customers might need, right?

21   A.  Yes.

22   Q.  That was a big thing for Larry Doud and for RDC, to be a

23   full line distributor, right?

24   A.  Yes, it was.

25   Q.  You testified that the reason for that is that if RDC

1  didn't have a particular product, then a customer might have to

2  go elsewhere, right?

3  A.  Yes.

4  Q.  And they might get roped into some sort of contract where

5  they were required to buy other things from other distributors?

6  A.  Yes.

7  Q.  So, the idea was to have everything and anything that a

8  customer might need so that that customer would only shop at

9  RDC?

10  A.  Yes.

11  Q.  And again, the things you mentioned, canes, wheelchairs,

12  hair products; that's what came to mind?

13  A.  All -- all the product we stocked, yes.

14  Q.  All the products and the vast majority of those products,

15  again, are not controlled substances, right?

16  A.  Correct.

17  Q.  They are things you would buy over the counter?

18  A.  We had about 25,000 different items.

19  Q.  Right.

20        And you were asked questions about RDC being a knight

21  in shining armor for independent pharmacies, right?

22  A.  Yes.

23  Q.  You talked about how the policy that Larry Doud downward

24  instituted at RDC was a customer driven -- a customer driven

25  policy?

M1j3dou2                          Masseth - Cross

1   A.  Yes.

2   Q.  And if customers had complaints, they would call and

3   anybody would take the calls, right?

4   A.  Correct.

5   Q.  And Larry Doud would even take calls from customers, right?

6   A.  Yes.

7   Q.  Because that's the type of culture that RDC wanted to put

8   forward, right?

9   A.  Yes.

10  Q.  You were a part of that customer-first mentality?

11  A.  Yes.

12  Q.  Because it's important, when you are running a distributor

13  like that, to make sure that your customers don't go to a

14  competitor?

15  A.  Correct.

16  Q.  Now, at the end of your direct testimony, you indicated

17  that between 2012 and March of 2017, you were not involved in

18  compliance, right?

19  A.  Not on the day-to-day stuff, no.

20  Q.  Not on the day-to-day.  You weren't sitting in daily

21  compliance meetings?

22  A.  No.

23  Q.  You weren't getting briefed on specific customer issues?

24  A.  Only if it pertained to items that I was purchasing.

25  Q.  And your particular role was you procured product from

M1j3dou2                         Masseth – Cross

1    manufacturers, right?

2    A.   Correct.

3    Q.   You've had conversations with Larry Doud about account

4    openings, right?

5    A.   If we got usage and it was going to be a larger account and

6    may affect inventory levels, yes.

7    Q.   You've heard in general Larry Doud complained that account

8    opening was taking too long?

9              MR. BURNETT:  Objection.

10             THE COURT:  Overruled.  You can answer.

11   A.   I don't recall any particular conversations, but I think

12   that would be fair to say.

13   Q.   Let me see if I can refresh your recollection.  If I was to

14   show you some notes of a conversation you had with the

15   government, might that refresh your recollection of what you

16   said on the topic?

17   A.   Yeah, I guess.

18             MR. TOWNSEND:  With your Honor's permission, I'd like

19   to show the witness Defense Exhibit E12.

20             THE COURT:  Okay.

21             MR. TOWNSEND:  Page 2.

22             Apologies.  For the record, that's Defense Exhibit

23   E13.  If you could just enlarge the section 3A.

24   Q.   Mr. Masseth, does this refresh your recollection regarding

25   Larry Doud's conversations with you about making sure customers

M1j3dou2                       Masseth - Cross

1   are getting what they wanted when they want it?

2   A.  I mean, I think that's what I said before, yes.

3           MR. TOWNSEND:  One moment, your Honor.

4   Q.  I'd like to talk to you about RDC's profit margins.  Are

5   you familiar with the concept of profit margins?

6   A.  Yes.

7   Q.  Profit margins for RDC were affected by a number of things,

8   right?

9   A.  Yes.

10  Q.  So RDC would offer discounts, right?

11  A.  Yes.

12  Q.  And if RDC would sell a product for a discounted rate, that

13  would mean less profit for RDC, right?

14  A.  Correct.

15  Q.  And that applies to both controlled substance and

16  non-controlled substances?

17  A.  Yes.

18  Q.  And rebates could also affect profits, right?

19  A.  Yes.

20  Q.  Would you explain to the jury how a rebate works generally.

21  A.  So there were some rebates given to pharmacies quarterly,

22  maybe more often than that, but it was based on their

23  purchases, and they might get a quarter percent on branded

24  items, and I forget the percentages on generic items, but

25  there's rebates.  It was basically like a loyalty type of

1    rebate for continuing to use RDC.

2    Q.  Just for the sake of clarity, when you're talking about

3    those percentage points, you are talking about those being off

4    the price?

5    A.  Off of what they paid for previous purchased items.  So,

6    yes.

7    Q.  It would essentially be a lower price at the end of the

8    day?

9    A.  Yup.

10   Q.  And the dividend payments that you spoke about.  Those

11   would also affect profits, right?

12   A.  It was -- it was the profit that was paid out.

13   Q.  Right.  Maybe I can ask a better question.

14          So, the year-end profits would come in, and you would

15   take a portion of those profits, and give them back to the

16   shareholders as a dividend?

17   A.  Correct.

18   Q.  So that was money that RDC wouldn't at the end of the day

19   keep as profit.  It would be returned.

20   A.  Correct.

21   Q.  The margins that RDC made on sales for controlled

22   substances and non-controlled substances were the same, right?

23   A.  I think that's too generalized.  It depends on the

24   different categories of brand and generic.  But controls to

25   non-controls, in pharmaceuticals, it was similar.

1   Q.  Do you remember having a conversation with the government

2   on March 27, 2018?

3            MR. BURNETT:  Objection.

4            THE COURT:  Overruled.  You can answer that question.

5   A.  What's that?

6   Q.  Do you remember having a conversation with members of the

7   government on March 27, 2018?

8   A.  Vaguely.

9   Q.  Do you remember during that conversation telling them that

10  margins on controls and non-controls are the same?

11  A.  That's -- when you are looking at solely RX products, that

12  would be a fair statement.

13  Q.  You don't believe that one profit -- or one line is more

14  profitable than the others?

15  A.  That's where -- it's more complicated than that.  So,

16  durable medical equipment had a higher profit range.  Along

17  with over-the-counter products.  Those usually had a higher

18  profit and we were selling at cost plus.

19            And then if you look at pharmaceuticals, you have to

20  split them into two categories, branded and generics.  Branded

21  items had a very low profit, if any.  In most cases we sold

22  them below our cost.  And it didn't matter whether it was a

23  control or non-control.

24            And then if you look at generic items, we usually sold

25  them at a cost plus, so there was a higher profit on those.

M1j3dou2                         Masseth - Cross

1   And it didn't matter if it was control or non-control.

2            But, so it depends if it was RX or non-RX, and if it

3   was RX, it depends if it was branded or generic or branded.

4   Q.  But the non-pharmaceuticals, as you said, gave you the

5   highest profit?

6   A.  I would -- in general, that would be fair, yes.

7   Q.  I'm not asking you specifically to go through it line by

8   line, but generally speaking?

9   A.  Correct.

10  Q.  Isn't it true that for RDC, somewhere around 90 percent of

11  the company's profits came from non-controlled substance?

12  A.  I -- I don't know for sure.  But that wouldn't surprise me.

13  Q.  Again, that would be products like Band-Aids and knee

14  braces?

15  A.  Correct.

16  Q.  Cough drops and wheelchairs?

17  A.  Hmm-hmm.

18  Q.  You had conversations with Larry Doud and Joe Brennan, who

19  we just heard a little bit about, regarding Linden Care, right?

20           MR. BURNETT:  Objection.  Hearsay, outside the scope.

21           THE COURT:  Overruled.  You can answer.

22  A.  Okay.  Yes.

23  Q.  You had conversations regarding your particular concerns.

24  A.  Yes.

25  Q.  You were concerned about Linden Care as a financial risk to

M1j3dou2                        Masseth - Cross

1    RDC, right?

2              MR. BURNETT:  Objection.

3              THE COURT:  We're going to take a break and we'll

4    resolve this while we give the jury a break.

5              Don't discuss the case, keep an open mind.  I'm going

6    to give you a 15-minute break.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1j3dou2

1              (Jury excused)

2              THE COURT:  You can step down.

3              THE WITNESS:  Stay here?

4              THE COURT:  No, you can step out.

5              (Witness not present)

6              THE COURT:  I'm not sure where you're going with this.

7    And I'm not sure whether you're asking him about conversations

8    with Mr. Doud, or are you asking him about conversations with

9    other people.  And I'm not clear on what the nature of the

10   government's objection is.

11             So why don't I start with you.  Where are you going

12   with this?

13             MR. TOWNSEND:  Your Honor, this case is really about

14   how Larry Doud interacted with a number of pharmacies and what

15   he did with regards to them.  And a major pharmacy is Linden

16   Care.  It is the largest RDC customer, it is a pain management

17   pharmacy.

18             And I am going to elicit from Mr. Masseth, basically,

19   that his concern about Linden Care was only that if they

20   actually went to a different distributor, then RDC would be

21   sitting on a mountain of products.  He wasn't concerned about

22   diversion.  He's concerned about the RDC financial implications

23   of what their business leaving would mean.

24             THE COURT:  His job had nothing to do with diversion.

25   Why would one expect he would give any other answer?  He's not,

M1j3dou2

1    he testified that he was not in a position with compliance, and

2    that was not his area.  So I'm not sure what way he has

3    relevant testimony to give about his concerns about, which

4    makes sense in his area, with regard to that company.

5              MR. TOWNSEND:  Your Honor, I think it's relevant.  The

6    government's position is that several high-ranking members of

7    RDC are engaged in a conspiracy to intentionally divert

8    controlled substances.  To show that other members are focused

9    more on the financial side of RDC, and are not concerned with

10   diversion.

11             THE COURT:  I know.  But this witness, from the way

12   I've heard his testimony, that wasn't his job.  He had no --

13   not only did he have no concern, that wasn't an area of his

14   employment responsibilities.

15             MR. TOWNSEND:  It is a minor point.  I can move off

16   it.

17             THE COURT:  Let me see what the government, and I'm

18   not sure what difference does it make, to tell you the truth.

19   But so, what are you objecting to and what don't you want to

20   hear?

21             MR. BURNETT:  The concerns are two fold.  So the

22   narrower concern is, as your Honor expressed, that this is

23   outside the scope of his direct examination, outside the scope

24   of his area of work within the company during the relevant time

25   period.

M1j3dou2

1          The broader concern is to the extent that, with

2     witnesses like this, they are going to begin going down routes

3     into saying what the witness said out of court or what Mr. Doud

4     said out of court to the witness about a topic, particularly

5     one that they didn't even testify about on direct, so it

6     couldn't plausibly be impeachment, it is clearly hearsay.

7          THE COURT:  We are going back and forth with that too.

8     That's why I need to know where to draw the line.  Obviously,

9     you want conversations that you contend are co-conspirator

10    statements.  That will be statements, conversations with

11    Mr. Doud, which I am not sure is hearsay at all, because

12    Mr. Doud is -- the question is, what did Mr. Doud do and say

13    with regard to the charges.  And two, whether or not it's

14    evidence of Mr. Doud's intent to join a conspiracy, or his

15    participation in a conspiracy.

16         So, I'm not sure where I'm supposed to splice the

17    conversations that you say can be inquired into, to demonstrate

18    whether or not he was or was not engaged in a conspiracy.

19         MR. BURNETT:  There are two important points there.

20    The first is right in the text of the rule on hearsay, which is

21    that the government, or the opposing party is allowed to offer

22    the defendant's statements or the statements of the defendant's

23    co-conspirators or the statement of the defendant's agent, but

24    the defendant is not allowed to offer those statements.

25         THE COURT:  The rule is the defendant cannot offer

M1j3dou2

1    those statements for the truth of the out-of-court statements.

2    So I'm trying to figure out, I mean --

3              MR. BURNETT:  To the extent there is an impeachment

4    basis laid for it, it could come in for an impeachment reason.

5    But for a situation here where there was no testimony about it

6    on direct, there is no other reason it would be coming in,

7    other than for the truth of the matter asserted.

8              THE COURT:  What is the truthful statement?  Give me

9    an example.

10             MR. BURNETT:  The example of the exchange we had right

11   there.  Mr. Masseth expressed a concern to Mr. Doud about

12   Linden Care for financial reasons.  That's going to the truth

13   of Mr. Masseth's concern about Linden Care.  That's what they

14   are trying to introduce.

15             THE COURT:  I'm not sure why it matters.  Who cares

16   whether or not Mr. Masseth's concern is truthful or not.

17             MR. BURNETT:  That's a separate reason why this line

18   doesn't make sense.  That's the logic of the hearsay problem

19   with it as well.

20             THE COURT:  The logic of the hearsay problem that I'm

21   listening for is what conversations are being offered for the

22   truth of the out-of-court statement that's being elicited.  And

23   clearly, most of the statements and conversations, particularly

24   with Mr. Doud, are the truth of whatever statements he made at

25   the time is not the issue.  For example, directions are not

M1j3dou2

1    offered for the truth.  They're either evidence of his

2    participation, his knowledge and participation in a conspiracy,

3    or it's not.

4            So, I mean, again with this pharmacy, the reason why I

5    took the time for this is because on this pharmacy, this has

6    been raised before, I'm not sure what -- obviously this is a

7    pharmacy that the defense thinks there is significant evidence

8    to support their position, and you think that it's irrelevant.

9    So I'm trying to figure out if we're going to keep going back

10   and forth with regard to the conversations about this or other

11   pharmacies with Mr. Doud, or among people that you say are

12   acting as co-conspirators, what is it that you don't want the

13   witness to say?

14            MR. BURNETT:  Well, here I don't think he should go

15   down the line of this Linden Care discussion that was mentioned

16   for the reasons you just --

17            THE COURT:  What are you afraid he is going to say?

18            MR. BURNETT:  Not a fear.  Just a side show that they

19   are introducing this person's thoughts about one of the

20   pharmacies that he doesn't have any compliance background on to

21   begin with.

22            THE COURT:  Okay.

23            MR. BURNETT:  For the hearsay point, we'll submit

24   something in writing on this.  I think you are right, there are

25   certain statements by Mr. Doud that are properly introduced as

M1j3dou2

1    directions or for non-hearsay purposes.  But at least based on

2    some of the materials we read, we think there are a

3    considerable number of hearsay statements they plan to offer

4    for the truth of the matter asserted, but it is too much now to

5    be --

6         THE COURT:  I don't have enough information at this

7    point.  In my view you have two reasons to object.  One, you

8    have to have a ground for objection, and two, you've got to

9    have a reason you want to object.  I'm trying to figure out the

10   reason you are objecting.

11        MR. BURNETT:  For this one, relevance and hearsay

12   objection.

13        THE COURT:  That's your grounds.  That's not your

14   reason.  That's the grounds in which you object.  I want to

15   know why you don't want to hear this.

16        MR. BURNETT:  The reason it's irrelevant is because

17   Mr. Masseth's perspective on the business concerns he had about

18   Linden Care are not pertinent to the compliance issues that are

19   pertinent in this case.

20        THE COURT:  I've already raised that with them, and

21   unless they've convinced me otherwise he has something to do

22   with compliance, I agree with that.  But where else am I

23   supposed to control this?  What do you anticipate there is

24   going to be further inquiry and what do you want me to limit it

25   to?

M1j3dou2

1          MR. BURNETT:  Sounds like there won't be a further

2     inquiry on this, but I don't know where he's going on

3     cross-examination otherwise.

4          THE COURT:  Mr. Townsend, is there something you need

5     a ruling on that you anticipate they are going to object to

6     before we get rid of this witness?

7          MR. TOWNSEND:  I don't believe so, but let me just

8     double check.

9          THE COURT:  My position is, unless you have a

10    different argument, my position is with regard to this limited

11    objection, that this witness's opinion about whether he had a

12    concern about compliance or didn't have a concern about

13    compliance is totally irrelevant to this case, because he's not

14    a compliance person.  And he naturally, based on this

15    testimony, would say my concern is about sales, not about

16    compliance, and I don't deal with that area, and that's not my

17    job.

18         MR. TOWNSEND:  All I would raise, your Honor, is I

19    asked the witness whether he had had conversations with Larry

20    Doud.

21         THE COURT:  Right.

22         MR. TOWNSEND:  Which is not --

23         THE COURT:  What do you expect him to say?

24         MR. TOWNSEND:  I expected him to say he had, and he

25    had.

M1j3dou2

1          THE COURT:  Okay.  And what are you implying or what

2     you are you going to elicit are the nature of those

3     conversations or substance of those conversations?

4          MR. TOWNSEND:  I asked him specifically on the

5     substance of his personal feelings about Linden Care.  I didn't

6     ask what he said to Larry Doud.

7          THE COURT:  Why do we care?

8          MR. TOWNSEND:  That's why I've already agreed to move

9     on.

10          THE COURT:  Is there any other area that's at issue

11     here?

12          MR. TOWNSEND:  I wanted to raise that, because the

13     record is reflecting that I attempted to elicit the contents of

14     a conversation, when in fact I simply asked if conversations

15     had happened, and then asked the witness his own personal

16     feeling, which may or may not be irrelevant, which I understand

17     your Honor's ruling on.

18          THE COURT:  You can explain to me why his personal

19     feelings are admissible in this case.  I'll hear you.

20          MR. TOWNSEND:  I've already agreed to move on.  I have

21     one more topic to go into and then a couple exhibits to put in

22     through him.  And that's it.

23          THE COURT:  Anything you anticipate that will be a

24     controversial topic we should address now?

25          MR. BURNETT:  Depends what the exhibits will be.

M1j3dou2

```
 1                  THE COURT:  All right.

 2                  MR. TOWNSEND:  The exhibits are a handful of e-mails

 3      that Mr. Masseth is on.  The topic, I'd like to think it's not

 4      controversial.

 5                  MR. BURNETT:  What's the topic?

 6                  MR. TOWNSEND:  RDC's ability to negotiate better

 7      prices through buying in bulk.

 8                  MR. BURNETT:  Having --

 9                  THE COURT:  Why don't you indicate to them, we'll take

10      five minutes, indicate to them which exhibits you intend to

11      use, if they have any problems with those exhibits we can

12      address it very quickly.  Otherwise, we can just move forward

13      efficiently.  And we'll take a five-minute break and we'll

14      either further resolve this or we'll go straight into the

15      witness and try to finish up with this witness.

16                  (Recess)

17                  THE COURT:  Are we ready to continue?

18                  MR. BURNETT:  Your Honor, I think we anticipate having

19      objections to a number of the exhibits.  So, we can either

20      handle them as they come.

21                  THE COURT:  Let's do it now before I bring the jury

22      in.  What's the nature of your objection?

23                  MR. BURNETT:  Sure.  It seems like there are a number

24      of exhibits, some are a little more straightforward than

25      others.
```

M1j3dou2

```
 1              THE COURT:  Could you use the microphone?  You're
 2      talking down.
 3              MR. BURNETT:  Why don't we start with Defense Exhibit
 4      looks like 5.
 5              THE COURT:  I don't have any of those exhibits.  So I
 6      don't know what they are.
 7              MR. BURNETT:  Sorry.  4.  Maybe the way to do it is
 8      have someone pull it up on the screen.
 9              MR. TOWNSEND:  We have a binder for you.  We're
10      getting it right now.
11              THE COURT:  Okay.  First tell me in general, tell me
12      in general what these e-mails are.
13              MR. TOWNSEND:  The defense is planning on putting in
14      several e-mails, all of which involve the witness, most of
15      which involve Larry Doud, which discuss certain aspects of
16      Mr. Doud's state of mind, which is the central focus of this
17      trial, whether or not he intended to participate in a
18      conspiracy.
19              We are not offering these e-mails for the truth of the
20      matter asserted.  We are offering them specifically to show
21      what Mr. Doud was either thinking or what information was being
22      presented to him to impact his thinking.
23              THE COURT:  In these e-mails, what is it that reflects
24      what he was thinking about compliance?  And what's the
25      substance of that state of mind?  I'm not sure what state of
```

M1j3dou2

1   mind that you are saying this reflects.

2           MR. TOWNSEND:  The state of mind that it reflects is

3   what Larry Doud is actually thinking about when it comes to

4   these pharmacies.  What -- and specifically regarding

5   compliance.

6           THE COURT:  Give me an example.

7           MR. TOWNSEND:  Okay.  So, starting with Defense E5,

8   your Honor.

9           THE COURT:  Yes.

10          MR. TOWNSEND:  So E5 is a chain which has Larry and

11   Chris.  Larry writes the e-mail:  Chris, the board discussed

12   the addition of a huge controlled drug purchaser today, Linden

13   Care.  They are concerned from their point of view that if we

14   sell them, we may have a service level problem for their

15   stores.  I am not sure how it would affect us.  I'm thinking it

16   might not have any effect.  What do you think?

17          Chris:  Larry, Linden Care has a tendency to take all

18   we have in stock on my items.  However, once they become more

19   consistent and establish, it should not be a problem.

20   Manufacturers will adjust our usage if we provide them store

21   information, which I have in some cases for Linden Care and ***

22   omit issues I this I would be short term the bigger concern I

23   have is if they decide not to buy from us and we are left with

24   high levels of inventory.

25          THE COURT:  So, what state of mind do you say this

M1j3dou2

1  reflects?

2          MR. TOWNSEND:  They are going back and forth on Linden

3  Care as a customer, and what their feelings are with regard to

4  onboarding.

5          THE COURT:  I'm not sure what that proves.  What is

6  that supposed to be reflective of?

7          MR. TOWNSEND:  How Larry Doud is viewing this

8  potential customer.

9          THE COURT:  You guys have to give me more information

10  about Linden Care.  Is Linden Care at all one of the pharmacies

11  that is at issue with regard to the illicit distribution of

12  drugs?

13          MR. TOWNSEND:  Unquestionably.

14          THE COURT:  And you say that this is reflecting his --

15  what state of mind?

16          MR. TOWNSEND:  The state of mind regarding what the

17  potential issues are with Linden Care.  He is concerned about

18  service level problems for the stores, saying we might be left

19  with high levels of inventory.  That's what they're concerned

20  about.

21          THE COURT:  Do you have an objection to E5?

22          MR. BURNETT:  Yes.  So our objection there is that

23  this is not about compliance.  The fact that Mr. Doud asked the

24  guy who handles buying product if there is going to be a

25  concern about buying product for Linden Care doesn't go to

M1j3dou2

```
1    whether or not Larry did or didn't have other concerns about
2    compliance.
3              THE COURT:  What are you going to offer in terms of
4    evidence with regard to Linden Care?
5              MR. BURNETT:  We'll offer other e-mails and testimony
6    from actual compliance people as well as data about Linden Care
7    sales that go to the compliance issues.
8              THE COURT:  What's your position as to what the
9    evidence reflects with regard to Linden Care?
10             MR. BURNETT:  The evidence will reflect that Linden
11   Care, from early on, beginning around 2013, was a significant
12   compliance concern at RDC.  RDC discussed actively those
13   compliance concerns, including with Mr. Doud, and did some
14   compliance work, but then basically dropped the ball and
15   stopped doing compliance on Linden Care entirely,
16   notwithstanding significant red flags.
17             THE COURT:  Why isn't discussions about Linden Care in
18   which Mr. Doud is directly involved not relevant to that issue?
19             MR. BURNETT:  Two things.  First, obviously, as with
20   any customer, a number of possible things you might talk about.
21             THE COURT:  Right.  And you say it is criminal and
22   they say it is otherwise innocent.
23             MR. BURNETT:  Not criminal or innocent.  Just the fact
24   you might be talking about a customer's purchasing doesn't say
25   anything about what you think about their compliance issues.
```

M1j3dou2

1          THE COURT:  You say the compliance discussions are

2     criminal with regard to Linden Care.  The concerns were

3     advancing a criminal conspiracy.  They say that there are other

4     issues and not advancing a criminal conspiracy.  But there were

5     other issues and concerns about Linden Care which were driving

6     and where the primary motive for them to have concerns or not

7     to have concerns about Linden Care.

8          I'm not sure how I'm supposed to only allow e-mails

9     that you want to put in that you say reflect a criminal

10     conspiracy involving Linden Care, but not allow e-mails which

11     they say are about Linden Care, which they contend reflect that

12     those are innocent conversations about Linden Care.

13          MR. BURNETT:  Your Honor, I think it is because they

14     are about totally different subjects.  If Linden Care, if --

15          THE COURT:  The subject is Linden Care.  The subject

16     is whether or not the object of the conspiracy was to profit

17     off of illicit drugs, and that's the way they were handling

18     Linden Care.  They say no, there are other concerns about

19     Linden Care that they expressed, and it doesn't give the jury

20     an accurate picture or complete picture of the concerns or

21     non-concerns about Linden Care, if you only let in what the

22     government contends is lack of compliance with regard to Linden

23     Care.  If they believe that they have other conversations with

24     regard to Linden Care, the subject of Linden Care, which

25     reflect a different concern.

M1j3dou2

1              MR. BURNETT:  I think if it was one thing about

2      e-mails about compliance or not compliance of Linden Care.  An

3      e-mail about something that's not compliance period of Linden

4      Care.  Whether or not there are other concerns or not concerns

5      about Linden Care doesn't go to whether or not there are or not

6      compliance concerns.

7              MR. TOWNSEND:  May I be heard on that?

8              THE COURT:  Yes.

9              MR. TOWNSEND:  The government's position seems to be

10     that unless the e-mail specifically uses the word "compliance"

11     in it, that it is inadmissible.  Compliance is a massive part

12     of what RDC does, and it affects a number of different

13     functions of the company.  Purchasing is intertwined with

14     compliance.  The amount of products bought, the amount of

15     products sold, that is a core function of what compliance looks

16     at.  The idea that it's not about compliance but that it is

17     about purchasing is absurd.

18             MR. JANEY:  The government's expert is going to sit in

19     the witness box and is going to attempt to attest that during

20     the relevant time frame that Linden Care in particular drove

21     the sales of RDC out the wazoo, and that Larry Doud was

22     intimately involved in that criminal relationship.  That expert

23     and others are going to testify that the Linden Care sales

24     activity, your Honor, were in fact criminal.  Not just how

25     Larry Doud and others thought about the compliance as applied

M1j3dou2

1    to Linden Care.  The government's argument on this is obtuse.

2    Everything relating to Linden Care, based on what the

3    government's expert is going to say and other witnesses, is a

4    part of the criminal conspiracy that they allege Larry Doud

5    joined and participated in.

6              MR. BURNETT:  That's just not true.

7              THE COURT:  Other than your general objection to these

8    conversations about Linden Care, what else, what other exhibits

9    do you object to and on what other basis do you object?

10             MR. BURNETT:  I think there are a couple of

11   categories.  First are Exhibits 4, 7, and 8.

12             THE COURT:  I don't think I have those.  Oh I see.

13   What's your objection to 4.

14             MR. BURNETT:  Those couldn't plausibly go to

15   Mr. Doud's state of mind because Mr. Doud isn't on them.

16             THE COURT:  I'm not sure what this e-mail is about.

17   What's this e-mail about that's relevant to this case?

18             MR. TOWNSEND:  This e-mail is between the witness and

19   a representative from a company called Insys, which is a

20   manufacturer and a supplier of Subsys, which is fentanyl, which

21   RDC purchased, which is one of the drugs at issue in this

22   indictment.  And it concerns Linden Care.  So this e-mail --

23             THE COURT:  How does this concern Linden Care?

24             MR. TOWNSEND:  Because in the second e-mail in the

25   chain, from Dion Reimer to Chris Masseth, he says your favorite

M1j3dou2

1    guy called me.  That's a reference to a rep from Linden Care.

2              THE COURT:  Okay.  So what is this conversation

3    supposed to reflect?

4              MR. TOWNSEND:  This conversation --

5              THE COURT:  It obviously doesn't reflect the argument

6    you made the state of mind of Mr. Doud.

7              MR. TOWNSEND:  This conversation reflects the -- it

8    actually does go to compliance, your Honor.  Because it

9    reflects that the buying power of Linden Care was already

10   increased considerably over the last month, they're

11   investigating the store, which the store knows about and they

12   don't feel comfortable raising the amount they can buy again.

13   Those are all compliance related issues.

14             MR. BURNETT:  It is the definition of hearsay.  They

15   are introducing evidence, an out-of-court statement for the

16   truth of the matter asserted.

17             THE COURT:  You said which other exhibits?

18             MR. BURNETT:  4, 7, and 8 I think fall into this

19   category.

20             THE COURT:  I don't have -- oh.  4, 7 and what?

21             MR. BURNETT:  8.

22             THE COURT:  What is 7 and 8?

23             MR. TOWNSEND:  7 is an e-mail between the same two

24   people, the sales rep for Insys and the witness, which is

25   discussing the increase in fentanyl sales, and basically an

M1j3dou2

1    expected growth based on market demand system.

2            THE COURT:  Where is that in 7?

3            MR. TOWNSEND:  In 7 if you look four lines down.  It

4    says:  I suggest you are experiencing a shift in business to us

5    coupled with an expected growth in market demand for the Subsys

6    product.

7            THE COURT:  What is in 8?  What's the substance of 8?

8            MR. TOWNSEND:  8 is between the actual supervising

9    pharmacist and the chief operations officer of Linden Care and

10   the witness.  And what the witness is doing here is explaining

11   how the different holds get put on their account, why their

12   purchasing gets put on hold, and what that means for Linden

13   Care.

14           THE COURT:  What's the relevance of this?

15           MR. TOWNSEND:  It's a compliance function.

16           THE COURT:  What's a compliance function?

17           MR. TOWNSEND:  Holding the orders.

18           THE COURT:  Where does it say that?

19           MR. TOWNSEND:  So, if you look down at the bottom,

20   where the e-mail from Jordan Fogel at the very bottom of the

21   page:  Chris, can you tell me our allocation on Nucynta and

22   Lazanda?  Thanks again, Jordan.  That's the supervising

23   pharmacist.

24           And Chris Masseth responds:  Jordan, allocation is

25   really not the correct term.  What cuts your orders is our

M1j3dou2

1    filtering system, which is in place to prevent errors.

2            This is a compliance function to weed out problematic

3    ordering, whether it is by clerical error or whether they hit a

4    specific limit that they are capped at.

5            The filtering works -- in the middle of that first

6    paragraph -- the filtering works by looking at your last three

7    months average per SKU and adds a percentage to allow for

8    normal growth.  If an order goes above this amount, it cuts

9    that order down to that amount and allows six per day.

10           Linden Care -- the next paragraph -- hits this

11   filtering because for these items you are well beyond normal

12   growth.

13           THE COURT:  All right.  Look, this is my position.

14   With regard to the e-mails with Mr. Doud, I'll admit the

15   e-mails, the conversations with Mr. Doud that have to do with

16   Linden Care, because I anticipate that there are going to be

17   other e-mails that the government is going to want to admit

18   into evidence with regard to Linden Care.

19           Am I correct about that?

20           MR. BURNETT:  Yes, your Honor.

21           THE COURT:  With regard to these e-mails between

22   Mr. Masseth and someone else, I see no relevance with regard to

23   those conversations and state of mind of Mr. Doud.

24           Now, if you want to ask this witness some basic

25   questions about whether or not he was involved with Linden Care

1    and what they did with Linden Care, you can ask him those

2    questions.  And if it turns out that the e-mails turn out to be

3    relevant, that's one thing.  But those e-mails that he has with

4    other people that have absolutely, as you would agree, have

5    absolutely nothing to do with any criminal conspiracy, then

6    there is very little, if any, relevance about what Mr. Masseth,

7    the innocent conversations that Mr. Masseth is having outside

8    of the presence of Mr. Doud with regard to an area that he's

9    concerned about.

10           The question, as you appropriately put it, is what is

11   the state of mind of Mr. Doud.  Did Mr. Doud join a conspiracy.

12   And e-mails between people and Mr. Doud is not copied on can't

13   reflect one way or the other on whether or not he's involved in

14   a conspiracy.  And e-mails between people who are not claiming

15   to be co-conspirators have absolutely no bearing on whether

16   there was a conspiracy that others were involved in, and that

17   Mr. Doud joined that conspiracy.

18           So, I'll allow those e-mails that Mr. Doud is copied

19   on.  You can get whatever testimony you want from either this

20   witness or Mr. Doud or another witness as to his innocent

21   behavior, and the government can put in their e-mails and they

22   can put in their testimony about what e-mails and conversations

23   he had with Mr. Doud that reflect that he was a knowing

24   participant.

25           MR. BURNETT:  If I may, I want to make sure I'm

M1j3dou2

preserving the objective to these other e-mails.  It's not

purely a relevance concern we have here.  The law is clear that

a defendant can't be offering his own self-serving statements

about his state of mind through out-of-court materials.  If he

wants --

THE COURT:  I agree with that and I would accept that

argument if you weren't representing to me that you were going

to offer e-mails.  You do intend to offer e-mails that reflect

what Mr. Doud was involved in, with regard to these

conversations.

MR. BURNETT:  Different parties are allowed to -- the

hearsay rule --

THE COURT:  I know.  But once you've offered the

conversations about this company, and you say that you want to

offer e-mails that reflect that he's having criminal

conversations, he has the right to say, no, I have other

conversations about this and this is not criminal, this

reflects my business judgment, and I can show you that the

completeness of the conversations about this particular

company, by showing you I have e-mails that don't reflect any

attitude or mental state that the government wants you to imply

with regard to this company.

MR. BURNETT:  I would like to preserve it.  We'll put

in a letter on this, this evening.

MS. ROTHMAN:  Your Honor, respectfully, I don't think

M1j3dou2

1  that's entirely correct.  And we can brief this.

2          THE COURT:  What's not entirely correct?

3          MS. ROTHMAN:  The idea that the defendant can offer

4  e-mails into evidence that suggest he's innocent through his

5  own self-serving statements.

6          THE COURT:  No.  But he can respond to your e-mails.

7  I'm not going to waste our time.  If you are going to put in

8  e-mails where the defendant you say are criminal conversations

9  about this company, and about doing business with this company,

10  no, you can't argue that, in response, they can't offer the

11  complete conversations that he had about this.

12          MS. ROTHMAN:  Sure.

13          THE COURT:  If your argument is, well, they have to

14  wait until after we put in our e-mails, I guess that's

15  technically an argument, but that's a total waste of time if we

16  know your e-mails are going to come in.

17          MS. ROTHMAN:  Here's what I might respectfully

18  propose.  It sounds like the Court has found that e-mails that

19  Mr. Doud is not on cannot come in through this witness.  There

20  are a couple of other e-mails that Mr. Doud is on.  We would

21  request the opportunity to brief this question for the Court.

22  And if the Court finds they should be admitted, we can admit

23  them after this witness's testimony.  It sounds like this

24  witness has very little, in fact, nothing to say --

25          THE COURT:  This witness is a person who's on the

M1j3dou2

e-mails.  I'm not going to bring this witness back a second

time.

          MS. ROTHMAN:  My concern is these are statements of

Mr. Doud that should not be coming into evidence.  This is not

one conversation for completion.  We can brief it, your Honor,

and we will.  Because this is going to come up in some other

e-mails I believe the defense may try to offer through Bill

Pietruszewski or even --

          THE COURT:  I can tell you my position is going to be

consistent on this.  If you intend to offer e-mails with regard

to certain companies, then you say those e-mails reflect a

criminal conspiracy that Mr. Doud was involved in to overlook

their non-compliance, then they have the right with regard to

those same companies to offer e-mail conversations that

Mr. Doud was involved in, which they can argue lead to a

different conclusion about all of his conversations and his

activities and his intent.

          So, I don't know if there is anything you are going to

convince me of that's going to convince me you can put in every

e-mail that you want about a particular company, about how he's

in a criminal conspiracy with regard to his activities in that

company, and they have a stack of e-mails that they say don't,

that reflect just basic business judgment, and it is the wrong

interpretation, and they can't offer those e-mails.

          I understand your argument with regard to self-serving

M1j3dou2

1    hearsay of other individuals who have nothing to do with

2    Mr. Doud.  But, I don't know what argument you're going to make

3    that, after you offer e-mails of Mr. Doud discussing this

4    company, that you have the right to keep out other e-mails

5    where Mr. Doud is discussing this company.

6              MS. ROTHMAN:  We'll brief it, your Honor.

7              THE COURT:  Well, okay.  You can brief it and we can

8    deal with it with other issues.

9              But, as to these e-mails, my position is, they can ask

10   this witness about these e-mails, and they can admit these

11   e-mails in evidence in this case.  If there are other e-mails

12   that are similar in the future and you want to brief it, try to

13   convince me that I should only let in your e-mails on those

14   subject matters or not and not their e-mails on that subject

15   matter, I'll listen to it.  But we are not to bring this

16   witness back just to do that.

17             All right.  So let's get the jury in and let's finish

18   up with this witness.

19             (Continued on next page)

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  I apologize for the delay.  Let me remind

3     you, if we're in here working, it ultimately saves us time in

4     the long run rather than adding to the trial to resolve these

5     issues.

6           So let's continue.  Bring the witness back.  And let's

7     continue.

8     BY MR. TOWNSEND:

9     Q.  Welcome back, Mr. Masseth.

10    A.  Thanks.

11    Q.  I want to discuss RDC's purchasing power.  That's what you

12    were involved in, right?  Purchasing for RDC?

13    A.  Correct.

14    Q.  So, based on your role, you know that RDC could negotiate

15    better prices from manufacturers when they bought in larger

16    volumes?

17    A.  In general, yes.

18    Q.  So from a practical standpoint, it could make sense to keep

19    a customer, even one that wasn't necessarily profitable, if

20    they increased RDC's purchasing volume from a manufacturer.

21    A.  I guess that would be fair to say, yes.

22    Q.  Because it allowed for RDC to negotiate better prices

23    overall, right?

24    A.  Potentially, yes.

25    Q.  And that could apply to controlled substances and

1   non-controlled substances?

2   A.   Yes.

3   Q.   The more lip balm you are buying, the better price you are

4   going to get on it?

5   A.   In general, yes.

6   Q.   So, isn't it true that that's why Linden Care was an

7   essential customer for RDC?

8   A.   There's differences of opinion on that.

9   Q.   To you, the volume that Linden Care purchased allowed RDC

10  to get better prices?

11          MR. BURNETT:  Objection.

12          THE COURT:  Overruled.  You can answer.

13  A.   In some cases, yes.

14  Q.   And better prices for manufacturers meant more profits for

15  RDC as a company?

16  A.   In general, yes.

17  Q.   If you buy a bottle for 95 cents and sell it for a dollar,

18  you make 5 cents, right?

19  A.   Yes.

20  Q.   But if you buy 100 bottles at 90 cents and sell them for a

21  dollar, now you're making 5 more cents per bottle, right?

22  A.   In that example, yes.

23          MR. TOWNSEND:  With your permission, I'd like to show

24  the witness and the government what's been marked for

25  identification as Defense Exhibit E3.

1            THE COURT:  Yes.

2    Q.  Mr. Masseth, do you recognize your name on the top of this?

3    A.  Yes, I do.

4    Q.  It is an e-mail chain involving you from January 21, 2013,

5    right?

6    A.  Correct.

7            MR. TOWNSEND:  At this time I offer Defense E3 in

8    evidence.

9            THE COURT:  Any objection?

10           MR. BURNETT:  The same as earlier, your Honor.

11           THE COURT:  I want to make sure the record is clear.

12   You do have an objection to E3?

13           MR. BURNETT:  Yes, objection.

14           THE COURT:  I'm going to reserve decision and I want

15   you to lay a further foundation with regard to this exhibit

16   before I decide whether to admit it.

17   Q.  These e-mails are about Linden Care, right?  That's the

18   subject line?

19   A.  Yes, it is.

20   Q.  And they discuss monitoring Linden Care, right?

21   A.  Yes.

22           MR. TOWNSEND:  Your Honor, I would offer E3.

23           THE COURT:  I'll admit that into evidence.

24           (Defendant's Exhibit E3 received in evidence)

25   Q.  This chain specifically includes Larry Doud?

M1j3dou2                         Masseth - Cross

1    A.  Yes, it does.

2              MR. TOWNSEND:  Your Honor, was this admitted?

3              THE COURT:  Yes.

4              MR. TOWNSEND:  Can we please publish to the jury.

5              THE COURT:  Yes.

6    Q.  It looks like it's up.  If we could highlight that second

7    e-mail, one that starts from Larry Doud to the end there, and

8    maybe make it a little bigger for the jury.

9              This is an e-mail sent by Larry Doud to, among other

10   people, you, right?

11   A.  Yes, I was copied on it.

12   Q.  And Lanny Doud and Chris Noulis and Richie Cullen, and Joe

13   Brennan?

14   A.  Correct.

15   Q.  And Larry writes:  Chris, as you have from the beginning

16   with Linden Care, please stay on top of these developments.  I

17   believe this is a difficult account, and that we really want

18   this business, as long as we do not get burned in the process.

19   If things should seem strange or out of place, we need

20   immediate notice for the good of RDC.  Larry.

21             That's what it says, right?

22   A.  Yes.

23             MR. TOWNSEND:  Can we go up to the top e-mail.

24   Q.  We're going to zoom in on the top e-mail which is a

25   response from Chris Noulis, right?

M1j3dou2                          Masseth - Cross

1   A.  Yes, Chris Noulis.

2   Q.  At the end of the e-mail, Noulis says:  I'll be keeping my

3   ears and eyes open.

4            Right?

5   A.  That's what it says, yes.

6   Q.  And what was Chris Noulis' role?

7   A.  He was a salesman.

8   Q.  He oversaw the Linden Care account, right?

9   A.  I believe so, yes.

10            MR. TOWNSEND:  You can take down E3.

11  Q.  You're familiar with a company called Insys?

12  A.  Yes, I am.

13  Q.  Insys made a product called Subsys?

14  A.  Yes.

15  Q.  Subsys was a fentanyl spray?

16  A.  Yes, it was.

17  Q.  That was a product that Linden Care would buy?

18  A.  Yes, they did purchase it.

19  Q.  Isn't it true that in January of 2013, Linden Care tried to

20  increase their purchasing amount of Subsys?  Do you remember

21  that?

22  A.  I don't recall.

23  Q.  If I were to show you an e-mail that you wrote on the

24  topic, would that refresh your recollection?

25  A.  Yes.

M1j3dou2                          Masseth - Cross

1            MR. TOWNSEND:  I request permission to just show the

2       witness and the government Defense E4.

3            THE COURT:  Yes.

4       Q.  Do you see that there?

5       A.  Yes.

6       Q.  It is an e-mail from you to Dion Reimer?

7       A.  Correct.

8       Q.  I want you to read it to yourself and let me know if it

9       refreshes your recollection about whether or not Linden Care

10      was attempting to increase their purchasing.

11      A.  Yes.

12      Q.  At the time RDC was conducting an investigation of Linden

13      Care?

14      A.  I don't know.

15      Q.  Well, if I were to show you that e-mail again, would that

16      possibly refresh your recollection?

17      A.  It does say that, yes.

18      Q.  I don't want you to read it.  I want you to testify.

19           THE COURT:  He didn't say he didn't remember.  He said

20      he didn't know.  So, I'm not sure what you were refreshing his

21      recollection about, if he says he doesn't know.

22           MR. TOWNSEND:  Okay.

23      Q.  Is it that you don't remember or that you are unfamiliar?

24           MR. BURNETT:  Objection.

25           THE COURT:  Overruled, you can answer.

M1j3dou2                        Masseth – Cross

1    A.  As it pertains to what?

2    Q.  As it pertains to whether RDC was conducting an

3    investigation of Linden Care in January 2013.

4    A.  I don't recall that we were.

5    Q.  Okay.  So, looking at Defense E4, does that refresh your

6    recollection as to whether RDC was investigating Linden Care?

7    A.  It appears that we were.  Yes.

8    Q.  And the request by Linden Care to increase their purchasing

9    ability was denied by RDC at that time, right?

10   A.  It appears it was.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1JBDOU3                    Masseth - Cross

1          MR. BURNETT:  Objection.

2          THE COURT:  I'm going to sustain the objection.  He

3   doesn't say any of this document refreshes his recollection.

4   He's testifying from a document that he says that he doesn't

5   remember anything about.  He says, that's what the document

6   says.  The document is not in evidence.  He's not reviewed this

7   document.

8          So the question is, Does he remember this.  And by

9   looking at this, Does it make him remember something that you

10  want him to remember, and he says it does not.  He didn't say

11  that he has any independent memory

12         MR. TOWNSEND:  Your Honor, with your permission, I

13  would like to show the witness and the government Defense E5.

14         THE COURT:  Yes.

15  BY MR. TOWNSEND:

16  Q.  Mr. Masseth, do you recognize this?

17  A.  Yes.

18  Q.  It's an email from you to Larry Doud in February of 2013,

19  right?

20  A.  That's correct.

21  Q.  It's regarding Linden Care?

22  A.  Yes.

23         MR. TOWNSEND:  Your Honor, at this time I offer

24  Defense E5 in evidence.

25         THE COURT:  It will be admitted into evidence

M1JBDOU3                          Masseth - Cross

1   consistent with your previous discussion.

2              (Defendant's Exhibit E5 received in evidence)

3              MR. TOWNSEND:  If we could publish to the jury.

4              THE COURT:  Yes.

5              MR. TOWNSEND:  If we could zoom in on the bottom

6   portion.

7   Q.  This is an email from Larry Doud to you, right?

8   A.  Yes, it is.

9   Q.  It writes:  Chris, the board discussed the addition of a

10  huge control drug purchaser today, Linden Care.  Their concern,

11  from their point of view, that if we sell them, we may have a

12  service level problem for their stores.  I'm not sure how it

13  would effect us.  I'm thinking it might not have any effect.

14  What do you think?  Manufacturers like Purdue, Mallinckrodt or

15  say Watson.  Larry.  Do you see at the top where you responded?

16  A.  Yes.

17  Q.  And you responded:  Larry, Linden Care has the tendency to

18  take all we have in stock on my items.  However, once they

19  become more consistent and stable, it should not be a problem.

20  Manufacturers will adjust our usage if we provide them the

21  store information which I have in some cases for Linden Care.

22  Any omit issues, I think, will be short-term.  The bigger

23  concern I have is if they decide not to buy from us and we are

24  left with high levels of inventory.  Chris.

25              That was your response, right?

```
         M1JBDOU3                      Masseth - Cross
 1   A.  Yes, it was.
 2              MR. TOWNSEND:  We can take down E5.  Request
 3   permission to show the government and the witness defense
 4   Exhibit E6.
 5              THE COURT:  Yes.
 6   Q.  Do you see that, Mr. Masseth?
 7   A.  Yes.
 8   Q.  That is an email chain involving Larry Doud, you, Bill
 9   Pietruszewski, Joe Brennan, Lanny Doud, Ed Kirker and Kim
10   Perry, right?
11   A.  Yes.
12   Q.  In July 2013?
13   A.  Yep.
14              MR. TOWNSEND:  Your Honor, I offer this as Defense E6.
15              THE COURT:  It will be admitted into evidence.
16              (Defendant's Exhibit E6 received in evidence)
17              MR. TOWNSEND:  Can we publish to the jury?
18              THE COURT:  Yes.
19              MR. TOWNSEND:  We can go to page two.
20   Q.  You see the email at the bottom of the page from Inder
21   Tallur?
22   A.  Yes.
23   Q.  And that's to Larry Dowd, Joe Brennan, Kim Perry, Lanny
24   Doud, you, Ed Kirker and Bill Pietruszewski, right?
25   A.  Correct.
```

M1JBDOU3                      Masseth - Cross

1   Q.  And Inder Tallur was at Linden Care, right?

2   A.  Inder Tallur is part of Bell Health.

3   Q.  And Bell Health is the company that owned Linden Care?

4   A.  Correct.  Well, they're an investment firm.

5   Q.  Which had a controlling stake in Linden Care?

6   A.  Yes.

7   Q.  Inder Tallur writes:  Larry and Team, thanks so much for

8   hosting us today at RDC.  And Larry, thanks again for the ride

9   two and fro.  You all seem like a close net team and we're

10  excited about the opportunity of working closely with you and

11  growing together.  The following are some follow-ups from our

12  meeting.

13          We'll provide a summary about all town total buying

14  group purchases, including generic mix.  Mark Weiner will

15  provide non-RDC generic buying at Linden and see if we can move

16  some of the generic purchases to RDC.  However, please bear in

17  mind that the drugs in this category are oxycodone,

18  hydromorphone, etc., so that will increase your exposure in

19  controlled substances. Mark will provide the details.

20          If we can go to the next page at the very top, that

21  top bullet point.

22          Then he writes:  Carlos Aquino, it would be very

23  helpful to have Carlos involved in our compliance initiative.

24  We want to have a stellar compliance program in place.  And as

25  discussed, we are planning on hiring McDermott Will & Emery, a

M1JBDOU3                          Masseth – Cross

renowned healthcare law firm to drive our compliance

initiative.

         We expect to hire McDermott over the next two weeks,

provide them with the requisite data and let them begin late

August.  I will confirm the timeline.  As Joe said, we want to

be the model for dispensing pain management drugs, and we will

go overboard in ensuring the best compliance processes.

         That was the email that you received from Inder

Tallur, right?

A.  Yes.

Q.  You can take down E6.  Do you remember back in March 2015

Linden Care had placed an order and the order was held for

being excessively high?

A.  Not in particular, no.

Q.  If I was able to show you an email regarding this, would

that perhaps refresh your recollection?

A.  Sure.

         MR. TOWNSEND:  If we could show Defense E8 to just the

government and the witness.

Q.  Now, Mr. Masseth, I'd like you to read the top email from

Government E8, and let me know if that refreshes your

recollection regarding a March 2015 hold on Linden Care

purchases?

A.  Okay.

Q.  Does that refresh your recollection?

M1JBDOU3                    Masseth - Cross

1    A.  Of orders being cut?

2    Q.  Yes.

3    A.  Yes.

4    Q.  So when you say an order was cut, can you explain what that

5    means?

6    A.  So a customer, as an example, might order 100 pieces, but

7    we only ship 50.

8    Q.  And why would that happen?

9    A.  Multitude of reasons.

10   Q.  Some compliance related?

11   A.  Potentially, yes.

12   Q.  Some non-compliance related?

13   A.  Yes.

14   Q.  Do you recall in this particular instance with Linden Care

15   whether it was compliance or non-compliance related?

16   A.  This was not compliance related.

17          MR. TOWNSEND:  Your Honor, with your permission, I'd

18   like to show the government and the witness Defense E9.

19          THE COURT:  Yes.

20   Q.  Can you see that, Mr. Masseth?

21   A.  Yes.

22   Q.  This is an email from Larry Doud to you, Richie Cullen, Joe

23   Brennan and Lanny Doud in June of 2015; is that right?

24   A.  Yes.

25   Q.  And this is regarding a pharmacy called Dunn Meadow, right?

M1JBDOU3                         Masseth – Cross

1     If you look down towards the bottom.

2     A.  Yes, it is.

3              MR. TOWNSEND:  Your Honor, I offer E9 in evidence.

4              THE COURT:  Would you give me a further offer,

5     identify what this is.

6     Q.  Are you familiar with Dunn Meadow?

7     A.  Yes, I am.

8     Q.  Dunn Meadow was a pain management clinic similar to Linden

9     Care, right?

10    A.  I just know them as a pharmacy, but, yes.

11    Q.  Are you aware that they purchased a high volume of

12    controlled substances?

13    A.  Yes.

14    Q.  And a high volume of non-controlled substances?

15    A.  I'm not sure about the non-control.

16    Q.  But they were a high prescriber of oxy and fentanyl?

17    A.  What do you mean by prescriber?

18    Q.  I'm sorry.  They filled prescription for oxy and fentanyl?

19    A.  They purchased it from us, so I can only assume they filled

20    it.

21    Q.  But they were a large purchaser?

22    A.  Yes.

23             MR. TOWNSEND:  Your Honor, with that, I offer E9.

24             THE COURT:  It will be admitted into evidence.

25             (Defendant's Exhibit E9 received in evidence)

M1JBDOU3                    Masseth - Cross

1           MR. TOWNSEND:  May I publish to the jury?

2           THE COURT:  Yes.

3   Q.  If we could zoom in on that bottom email from Dion Reimer.

4   Dion Reimer was a representative from Insys, right?

5   A.  That's correct.

6   Q.  And Insys was the company that made Subsys?

7   A.  Yes.

8   Q.  And Dion is asking you if you know anything about Dunn

9   Meadow pharmacy, right?

10  A.  He was asking if Bill Pietruszewski knew anything about

11  them.

12  Q.  But he sent the email to you?

13  A.  Correct.

14  Q.  You can bring that down.  And then you reached out to other

15  members of RDC regarding Dunn Meadow?

16  A.  Yes.

17  Q.  You forwarded them Dion's email?

18  A.  Yes.

19  Q.  And Larry Doud responded at the top.  And Larry said, I

20  believe we are sending Juice in to work with them; is that

21  right?

22  A.  Yes.

23  Q.  And Juice is a nickname for Julius Morton, right?

24  A.  Yes.

25  Q.  And you previously referred to him as a compliance field

M1JBDOU3                         Masseth - Cross

1    auditor?

2    A.  Yes.

3    Q.  And it was his job to go in and evaluate either current

4    customer or potential customers for compliance related issues,

5    right?

6    A.  Yes.

7           MR. TOWNSEND:  Your Honor, with your permission, I'd

8    like to show the witness and the government Defense E10.

9           THE COURT:  Yes.

10   Q.  You recognize this?

11   A.  Yes.

12   Q.  This is an email from Larry Doud to you and Joe Brennan on

13   July 1st, 2015, right?

14   A.  Correct.

15   Q.  If you could just go to page two.  The beginning of this

16   chain is an email from Mark Weiner to you, right?

17   A.  Yes.

18   Q.  And Mark Weiner was the CEO of Linden Care?

19   A.  Yes, he was.

20          MR. TOWNSEND:  Your Honor, I offer E10.

21          THE COURT:  It will be admitted into evidence.

22          (Defendant's Exhibit E10 received in evidence)

23          MR. TOWNSEND:  Publish to the jury?

24          THE COURT:  Yes.

25   Q.  Mark Weiner writes to you:  Chris, can you please discuss

M1JBDOU3                        Masseth - Cross

this issue with Joe and Larry.  The Horizon product increased

in price at 12:01 a.m. on July 1, 2015.  Our order was picked

and invoiced at 18:38 on June 30th. It seems that RDC raised

the price a bit early. Can you please discuss this with Larry,

Joe and Horizon if necessary.

        So again, Mark Weiner was the CEO of Linden Care,

right?

A.  Yes.

Q.  And he was one of the people who would make purchases from

RDC?

A.  Yes.

Q.  And issues with purchases and pricing would sometime get

routed to you?

A.  Correct.

Q.  Let's go back to page one.  At the bottom email there you

responded, right?

A.  Yes.

Q.  So you indicated, that pricing is based on invoice date,

which was July 1st.  Also the letter states that all orders

after 2:00 p.m. CST, on June 30th, will be at the new price or

canceled.  Your order came in at 6:08 p.m.  I copied Joe and

Larry.  I will talk with Horizon also.

        That was your response, right?

A.  Yes.

Q.  So essentially you were saying that the price was right?

M1JBDOU3                        Masseth - Cross

1    A.  Yes.

2    Q.  And then Larry Doud responds to you -- he responds to you

3    and Joe Brennan and says, my vote is to give him the price.  He

4    has a point, right?

5    A.  Yes.

6    Q.  And you respond to Larry by explaining in the middle of

7    that document, in the middle of that email.  We do not have an

8    agreement with Horizon and only make up our losses selling to

9    Linden when they have price increases.

10         We did them a favor on the Subsys order today charging

11   them an old price, even though the price change happened

12   yesterday.  On that order alone, they are saying $641,532.  The

13   difference on the horizon items would be $78, 834.  Let me know

14   if you want me to give them the credit.

15         And Larry responded to that, right?  And Larry wrote

16   back to you, Chris, I only said what I would do.  If you can

17   handle it another way, I'm good with it.  It did sound like we

18   entered it ahead of schedule from what he said.  That was

19   Larry's response, right?

20   A.  Correct.

21         MR. TOWNSEND:  With the Court's permission, I would

22   like to show the witness Defense E11.

23         THE COURT:  Yes.

24   Q.  You see that, Mr. Masseth?

25   A.  Yes.

M1JBDOU3                     Masseth - Cross

1   Q.  And that's an email chain between you and Larry Doud?

2   A.  Yes.

3   Q.  And the email chain discusses Linden Care?

4   A.  Yes, it does.

5           MR. TOWNSEND:  Your Honor, I offer E11.

6           THE COURT:  It will be entered into evidence.

7           (Defendant's Exhibit E11 received in evidence)

8           MR. TOWNSEND:  May I publish?

9           THE COURT:  Yes.

10  Q.  We can go to page two.  Mr. Masseth, the beginning of this

11  chain starts with Chris Noulis sending a link to an article.

12  You see that?

13  A.  Yes.

14  Q.  And the article concerned arrests made at the company

15  Insys; is that right?

16  A.  I can assume that by what the link says.

17  Q.  You can go back to page one.  Insys, again, is the company

18  that makes Subsys?

19  A.  Correct.

20  Q.  In response to that email, Larry Doud sent you an email and

21  the title was, Forward, CBS news today on Subsys exec arrest,

22  right?

23  A.  Correct.

24  Q.  And he said, Chris, how much of this are we selling, how

25  many accounts and who are they.  Would it be worth dropping the

1    line?  And then you responded, right?  You responded?

2    A.  Yes.

3    Q.  And you wrote:  Larry, this is why the DEA is investigating

4    us and Linden Care.  Linden Care, Dunn Meadow and Windsor are

5    the current big customers of Subsys.  We are closely monitoring

6    their purchases through Bill P, Jessica and compliance.  I do

7    not know how the compliance manages their use, but I believe we

8    should consider strongest restrictions on sales for Subsys.

9    That was your response?

10   A.  Correct.

11            MR. TOWNSEND:  Your Honor, if I could have one moment?

12            THE COURT:  Yes.

13            MR. TOWNSEND:  Nothing further, your Honor.

14            THE COURT:  Any further questions for this witness?

15            MR. BURNETT:  Yes, your Honor.

16   REDIRECT EXAMINATION

17   BY MR. BURNETT:

18   Q.  Mr. Masseth, do you recall that you were asked a question

19   about a document that referred to Dunn Meadow?

20   A.  Yes.

21   Q.  You mentioned that's one of the pharmacies RDC sold to,

22   correct?

23   A.  Correct.

24   Q.  Are you aware about any of the details of RDC's compliance

25   reviews of Dunn Meadow?

1   A.  Not in particular, no.

2   Q.  Now, there was another email that you were on that was

3   called Horizon.  Do you remember that one, that was the title?

4   A.  Yes.

5   Q.  What was Horizon?

6   A.  Horizon was a branded manufacturer.

7   Q.  What kind of drugs did it make?

8   A.  They had just a couple of products non-controls, Pennsaid,

9   Rayos, and I can't remember the other one, but it was only like

10  three different items.

11  Q.  Were any of those products that they sold opioids?

12  A.  They were not, non-controls.

13  Q.  And your email about Horizon, the one that you were showed,

14  did that have anything to do with compliance issues at Linden

15  Care?

16  A.  No.

17  Q.  Let's pull up now Defense Exhibit 5.

18          MR. TOWNSEND:  For the record, that's E5.

19          MR. BURNETT:  Defense Exhibit E5.

20  Q.  Do you recognize this as a document that you looked at a

21  few minutes ago?

22  A.  Yes.

23  Q.  What, if anything, did this conversation between you and

24  the defendant have to do about compliance at Linden Care?

25  A.  Probably nothing on compliance.

Q.  What, if any, role did you have with respect to compliance at Linden Care?

A.  Very little.

Q.  Do you see -- I want to focus on the first sentence of your response to Mr. Doud.  Do you see that you wrote, Linden Care has a tendency to take all we have in stock on my items?

A.  Correct.

Q.  What were you referring to there?

A.  It was all the branded RX items.  I said, all the stock we have, meaning individual items.  We could have say 200 items on hand or 200 individual bottles, and Linden Care would place an order for 300.  So we would ship them all 200 and then have no net of 100 pieces and no inventory to sell to any other customers.  So they would take all of our inventory on individual items.

Q.  What did that have to do with compliance?  Was that just an inventory issue?

A.  Just an inventory issue.

Q.  That email was from February 2013, correct?

A.  Correct.

Q.  Let's turn now ahead to Defense Exhibit E11.  This is another exhibit that you looked at a few minutes ago, correct?

A.  Correct.

Q.  This one's from about a little over three years later, right, in December of 2016?

1    A.  Yes.

2    Q.  Do you recall that you read out Mr. Doud's questions to you

3    that he sent in these emails?

4    A.  Yes.

5    Q.  What was your reaction when Mr. Doud sent you these

6    questions?  What did you think?

7    A.  I was surprised.

8    Q.  Why were you surprised?

9    A.  Cause in my belief, he knew about Linden Care, Dunn Meadow

10   and Windsor.

11   Q.  Why did you believe that?

12   A.  They're very big customers.  We talked about them on a

13   regular basis, so we knew they were purchasing a lot.

14   Q.  When you say we talked about them, did that include

15   conversations with Mr. Doud?

16   A.  Yes.

17   Q.  I want to talk about an email that was sent between 2013

18   and 2016 when this email comes in.

19        We can take this down.  Ms. Hauck, if you could please

20   pull up Government Exhibit 108G which is already in evidence.

21        MR. BURNETT:  Your Honor, may I have permission to

22   publish this to the jury?

23        THE COURT:  Yes.

24   Q.  When is this email from, Mr. Masseth?

25   A.  May 2014.

M1JBDOU3                          Masseth - Redirect

1   Q.  Who wrote it?

2   A.  Bill Pietruszewski.

3   Q.  Who is it to?

4   A.  To Ed Kirker and myself.

5   Q.  And what's the subject line there?

6   A.  Linden Care/Bell Health.

7   Q.  And is Linden Care one of the pharmacies that you looked at

8   some documents about a few minutes ago?

9   A.  Yes.

10  Q.  And I think you mentioned Bell Health is the parent company

11  for that pharmacy, correct?

12  A.  Yes.

13  Q.  Could you please read what Mr. Pietruszewski wrote to you

14  in that email in 2014?

15  A.  Yep.  I thought I would share with both of you, you both,

16  that Larry Doud and I had a meeting with Inder from Bell Health

17  in regards to Linden Care.  Larry wants Linden Care to receive

18  what they want, he, I, being very aggressive, and not to cut

19  anything from their orders.

20          Larry wants our venture to work with Linden Care/Bell

21  Health, and if anyone disagrees, will need to answer to him.

22  So moving forward, I will not cut from their orders.  And if

23  you do not agree with me, Larry said to ask him for yourself.

24  Larry threatened me to be on board with this or I may not like

25  the outcome.  I thought you both would like to know this.

1              Kind regards.

2              MR. BURNETT:  No further questions, your Honor.

3              THE COURT:  Further questions of this witness?

4    RECROSS EXAMINATION

5              MR. TOWNSEND:  If we could just bring up that same

6    exhibit.

7    BY MR. TOWNSEND:

8    Q.  You just read this email, right, Mr. Masseth?

9    A.  Yes.

10   Q.  And Larry Doud's not on this email, right?

11   A.  He is not.

12   Q.  Did you ever speak to Larry about this email?

13   A.  I don't know.

14   Q.  You don't remember?

15   A.  No.

16   Q.  Did you ever specifically address the topics of this email

17   with Larry?

18   A.  I don't recall.  I don't know.

19             MR. TOWNSEND:  Thank you.

20             THE COURT:  Any further questions of this witness?

21             MR. BURNETT:  No, your Honor.

22             THE COURT:  Thank you, sir, you can step down.

23             (Witness excused)

24             THE COURT:  Could we take the lunch break now because

25   their lunches are here?

1          MR. BURNETT:  Yes, your Honor.

2          THE COURT:  We'll do that, ladies and gentlemen.

3     Don't discuss the case.  Keep an open mind.  I'm going to bring

4     you back in at 1:55 and we'll continue with the next witness.

5          All right.  I'll see you at that time.

6          (Jury not present)

7          THE COURT:  We'll continue at 1:55 with the next

8     witness.

9          (Luncheon recess)

10          (Continued on next page)

M1j3dou4                         Bouck - Direct

                            AFTERNOON SESSION

                               1:55 p.m.

1  |||      THE COURT:  Is there anything we need to address

2  ||| before we get the jury?  Let's bring the jury in.

3  |||      (Jury present)

4  |||      THE COURT:  Would you call the government's next

5  ||| witness.

6  |||      MR. ROOS:  The government calls Jessica Pompeo Bouck.

7  |||      THE COURT:  Would you step into the box, please, thank

8  ||| you.

9  |||      You can inquire.

10 |||  JESSICA POMPEO BOUCK,

11 |||      called as a witness by the Government,

12 |||      having been duly sworn, testified as follows:

13 ||| DIRECT EXAMINATION

14 ||| BY MR. ROOS:

15 ||| Q.  Good afternoon, Ms. Bouck.  It looks like you lost the

16 ||| little white thing on your speaker, which might be okay, but it

17 ||| may create a little static.

18 |||      THE COURT:  Let's give her another.

19 ||| A.  Got it.

20 ||| Q.  Are you currently employed?

21 ||| A.  Yes.

22 ||| Q.  Where do you work?

23 ||| A.  Avantor.  A-V-A-N-T-O-R.

M1j3dou4                          Bouck - Direct

1   Q.  Where did you work before Avantor?

2   A.  Rochester Drug Co-Operative.

3   Q.  Is Rochester Drug Co-Operative sometimes referred to as

4   RDC?

5   A.  Yes.

6   Q.  What's RDC?

7   A.  It was a pharmaceutical wholesaler.

8   Q.  What kind of things did RDC wholesale or distribute?

9   A.  We sold pharmaceutical drugs, we sold over-the-counter

10  medicines like Tylenol, Neosporin, things of that nature.

11  Durable medical equipment.  Part of the controlled substances

12  was also part of the pharmacy prescription drug part we would

13  sell.

14  Q.  What's a controlled substance?

15  A.  It is a -- give me a second.  Sorry.

16  Q.  That's okay.

17  A.  It is a scheduled drug that is scheduled by the FDA and the

18  DEA because it is regulated because it can be abused.

19  Q.  Okay.  Give us some examples of controlled substances.

20  A.  OxyContin, Suboxone, hydrocodone, tramadol, methadone.

21  Q.  And when did you start working at RDC?

22  A.  November of 2013.

23  Q.  How long did you work at RDC?

24  A.  Until March of 2021.

25  Q.  When you were hired, what job were you hired to do?

1    A.  I was hired as a compliance specialist.

2    Q.  So what's that job?

3    A.  My job was to work in compliance for the controlled

4    substances.  I was to analyze pharmacy dispensing data, set up

5    new customers, handle customer controlled substance orders.

6    Q.  By the way, here is a tough question for you:  When you

7    started at RDC, did you have a different name?

8    A.  I did.

9    Q.  What was your name at that time?

10   A.  Pompeo.

11   Q.  Why did you change it?

12   A.  I got married and my husband made me.

13   Q.  From November 2013 through 2016, did your title change?

14   A.  It did.

15   Q.  Can you explain your title change?

16   A.  I just went from being a compliance specialist to at some

17   point in time we changed it to a compliance analyst, that was

18   for all the specialists, and then I became a compliance

19   manager.

20   Q.  So just to be clear, were the responsibilities different of

21   a compliance analyst or specialist, or is that just sort of a

22   title change?

23   A.  It was just a title change.

24   Q.  When you were hired in November 2013, were there other

25   employees at RDC responsible for doing the job of compliance?

1    A.  When I started, it was really just Bill Pietruszewski.

2    Q.  And what was his job?

3    A.  He was the compliance manager.  He also was the operations

4    manager I believe.

5    Q.  And we'll go back to the compliance manager part.  What is

6    operations manager?

7    A.  Operations manager?

8    Q.  Yes.

9    A.  He just was in charge of warehouse operations.  That's --

10   yeah.  Whatever that would entail.  Managing the employees back

11   there and the product shipments and receiving product.

12   Q.  Now, from when you were hired in 2013, through 2016, were

13   there any other analysts or specialists in the compliance

14   department?

15   A.  Yeah, eventually we hired more analysts.

16   Q.  Who is that?

17   A.  Elizabeth Cullen was one of them, Amy Skibickyi, and Karen

18   Stevens.

19   Q.  What experience did they have in compliance before working

20   at RDC?

21   A.  They didn't really have any compliance experience.

22   Q.  Do you know their backgrounds?

23   A.  Amy, if I remember correctly, was an administrative

24   assistant.  Elizabeth, I just remember she worked at like Jam

25   Studios or something like that.  And Karen Stevens worked at

1   RDC in our accounting department.

2   Q.  From the time you started until the end of 2016, were there

3   other employees besides ones you've named in the compliance

4   department?

5   A.  Yes.

6   Q.  Who is that?

7   A.  Julius Morton, and I believe during that same time, around

8   that time somewhere was William Delgado.

9   Q.  What was those two individuals' jobs?

10  A.  They were, they were auditors, they were compliance

11  auditors, they would go to the stores.

12  Q.  Within the compliance department, who did you report to

13  directly?

14  A.  Bill Pietruszewski.

15  Q.  Who did you ultimately answer to?

16  A.  Larry Doud.

17  Q.  From the time you started, through the end of 2016, were

18  there enough compliance specialists or analysts to do all the

19  responsibilities you described in compliance?

20  A.  No.  We were -- no.

21  Q.  Why not?

22  A.  There was just a lot of work to do.  We had, if I remember

23  correctly, over 700 customers, and there was a lot happening on

24  a daily basis we had to do, and there just wasn't enough help.

25  Q.  Can you give some examples of the things you weren't able

1    to do?

2    A.  We weren't able to closely watch all the customers ordering

3    that was supposed to be coming in, at least to the point of --

4    we weren't able to analyze the data that was coming in with

5    their orders to investigate their orders.  We weren't able to,

6    we didn't have time to thoroughly or even at all go through

7    dispensing reports that came in that would show us what was

8    going on within the pharmacy.

9    Q.  Were people outside the compliance department aware of

10   these problems?

11   A.  Yes.

12   Q.  Who, to your knowledge, was aware?

13   A.  Outside the compliance department, upper management.

14   Q.  What do you mean by upper management?

15   A.  Larry Doud and Joe Brennan.

16   Q.  How do you know they were aware?

17   A.  I personally talked to them about having a hard time

18   getting the work done that we needed to do.

19   Q.  During the time period, did you ever talk to Doud and

20   Brennan about hiring more people in compliance?

21   A.  I think my conversation with them had to do that we needed

22   more help.

23   Q.  Okay.  And what happened?

24   A.  Karen Stevens was assigned to our department.

25   Q.  What was the circumstances of that assignment?

```
1    A.   Just that we needed -- that we needed more help, and I was
2    in a meeting with them about wanting to get the assignments we
3    had, the analysis done faster so we could get stores turned on
4    faster.  And one of the areas that I had mentioned that would
5    be helpful is to have more assistants.
6    Q.   And specifically, what's your understanding of why Karen
7    Stevens was moved from accounting over to compliance?
8    A.   My understanding was that that -- whether it was the
9    accounting department or herself that she was -- she wasn't
10   supposed to be there.  I don't know if they didn't want her
11   anymore or she didn't want to be there anymore, but the
12   position she'd been in for a very long time, and they wanted to
13   keep her within the company.
14   Q.   So, did her reassignment solve the understaffing problem?
15   A.   No.
16   Q.   What types of work was the compliance department unable to
17   do because of the understaffing?
18             There is some water up there if you need it.
19   A.   Okay.  I brought mine.  Thank you.
20             Just, we weren't able to completely fulfill the
21   assignments or the obligations that we had of reviewing and
22   analyzing dispensing data.  We weren't able to thoroughly
23   investigate orders that went on hold before releasing them to
24   the customer, selling them to the customer.  We were always
25   behind.
```

M1j3dou4                          Bouck - Direct

1    Q.  Did you ever have any conversations with Larry Doud about

2    paying for compliance?

3    A.  About paying for compliance -- in general?

4    Q.  Yeah, let's start with in general.

5    A.  The only conversation I -- I personally specifically -- I

6    don't know if it was me talking to Larry.  I just remember at

7    least being in the room, and I don't know or remember what the

8    conversation was.  I just remember Larry talking about

9    compliance and not wanting to spend money on compliance.  And

10   that he thought it was like an insurance policy that he had to

11   pay for, because you have to have it, but he didn't want it.

12   Q.  What do you mean by like an insurance policy?

13   A.  I took it as like an auto insurance, you have to pay for

14   it, you have to have coverage on your vehicle.  But you don't

15   necessarily want to have to pay for it.

16   Q.  As in it keeps you safe or you're legally required?

17   A.  I took it as you're legally required because that's --

18   that's how I took it.

19   Q.  I want to take a step back and talk a little bit about the

20   compliance department generally.

21        Rochester Drug, you said, was a company that

22   distributed controlled substances?

23   A.  Yes, yes.

24   Q.  And are companies like Rochester Drug that distribute

25   controlled substances regulated?

1    A.  Yes.

2    Q.  Who regulates them?

3    A.  The government.

4    Q.  Do you know what -- I'm sorry.

5    A.  The DEA.

6    Q.  Are you familiar with the regulations and requirements on

7    distributors like Rochester Drug?

8    A.  Yes.

9    Q.  What are some of those requirements?

10   A.  Manufacturers and distributors are supposed to design and

11   operate a system to ensure that the distribution of controlled

12   substances are for a legitimate -- are being sold for

13   legitimate purpose to customers for legitimate needs, and we're

14   supposed to monitor that.  And to the best of our ability to

15   make sure that the customers are legitimate customers, that

16   they're dispensing them correctly, and we're supposed to report

17   any suspicious activity or suspicious ordering.

18   Q.  When you are monitoring for legitimacy, what are you trying

19   to prevent?

20   A.  We're trying to prevent diversion of controlled substances

21   being used illicitly, like street drugs.

22   Q.  So I want to break down each of those things.

23        Let's start with what do you mean by diversion of

24   controlled substances?

25   A.  Being used other than for a purpose than what they are

1    intended to use.  Being sold on the streets for someone to get

2    high.

3    Q.  When you talk about a drug being diverted, who is doing the

4    diversion?

5    A.  We were watching -- we didn't know the end patient.  We

6    were watching the doctors that were writing for the opioid or

7    the controlled substance prescriptions, we were watching the

8    pharmacy to see if they were selling to patients that were

9    always paying cash and things like that.  So we were watching

10   the doctors and the pharmacies, we didn't know the end user so

11   that was -- we were watching.

12   Q.  Okay.  And I think you earlier mentioned doing diligence on

13   the prescriptions.  What do you mean by due diligence?

14   A.  We had to, we had -- we would analyze the dispensing

15   reports, and we would research the doctors on the dispensing

16   report, and we would look at patterns within the dispensing

17   report to make sure there was no red flags.

18   Q.  So I should have asked maybe earlier.  What is a dispensing

19   report?

20   A.  A dispensing report is when you have a prescription filled

21   in a pharmacy, a pharmacy dispensing a prescription to a

22   patient.  So a dispensing report was a report that it didn't

23   list the patient information, but it listed like the

24   information about the prescription, when it was filled, perhaps

25   when it was written, the doctor who wrote it, the drug it was

M1j3dou4                          Bouck - Direct

1   for, and identifying information for the drug.  And so we

2   analyzed that data.

3   Q.  So what are we talking about practically, a spreadsheet or

4   a PDF document that just lists --

5   A.  It could be both.  But that's kind like an activity, like a

6   daily log of all the prescriptions that went out of their

7   pharmacy.

8   Q.  So it shows every filled prescription and who the doctor

9   was and the amount and the drug?

10  A.  Yup, with some other information, yes.

11  Q.  You also said you would analyze that dispensing data for

12  red flags.  What do you mean by red flags?

13  A.  So, there was red flags that could potentially be an

14  indication of them being used illegally or diversion.  So there

15  was red flags that were a lot of cash being paid for the

16  prescriptions, high dosages of narcotics, high dosages of a

17  controlled substances, patients coming from a -- a long

18  distance traveling to the pharmacy or out of state or the

19  prescriber being out of state.  Like there was stuff we called

20  a cocktail combination.  So it would be an opioid, a

21  benzodiazepine, an upper and a downer.  It would be called the

22  trinity combination.  So we would look for things like that.

23  Q.  Why is a cocktail combination a red flag?

24  A.  Because, it was a red flag if it was the same prescriber

25  writing it for the same patient.  Although we didn't

1    necessarily know the patient, sometimes we would have a patient

2    code.  So you could see it was the same patient code or the

3    same zip code or same address.  So that's how we could -- and

4    it meant that it was being abused or -- generally, it meant

5    that it was being abused because of the combination of the

6    upper and the downer and like the sedative, I think it was a

7    tramadol or carisoprodol, oxycodone, and a benzodiazepine,

8    alprazolam.

9    Q.  You mentioned high cash.  So what is high cash?

10   A.  We usually looked at anything over 10 percent as high cash.

11   Meaning the customer paid cash instead of having the pharmacy

12   run the prescription through their insurance company.

13   Q.  I should have asked earlier.  When you are doing all this

14   compliance work, is this on all prescriptions or just

15   controlled substances?

16   A.  On just controlled substances.

17   Q.  So we are talking about 10 percent, we're talking about

18   10 percent of the controlled substance prescriptions being paid

19   for in cash?

20   A.  Yes.

21   Q.  Okay.  And you mentioned having a bunch of out-of-state

22   customers or patients.  How would you quantify that; what was a

23   bunch?

24   A.  Well, it would be, so we would look at out-of-state

25   patients or which we didn't always know unless we were provided

M1j3dou4                    Bouck - Direct

1   a zip code.  Or prescribers that were writing for the

2   prescriptions.  So if we would look to see the pharmacies in

3   upstate New York, but the doctor is from Florida, or West

4   Virginia or Texas, so that would be what we were watching for.

5   And if it was a consistent, it wasn't just one prescription out

6   of hundreds, it was a consistent thing that we saw throughout

7   the dispensing.

8   Q.  So if you have, say, a few percentage of patients that are

9   from Ohio filling in Florida -- or sorry.  Going to a doctor in

10  Florida and filling their prescription in New York, that's what

11  you mean by out of state?

12  A.  Right.  And it could be a patient, multiple prescriptions

13  from New Jersey filling them or even New York City filling them

14  in Rochester.  If there is a consistent pattern as to why we'd

15  have to explain why the patient was coming driving

16  five-and-a-half hours to fill a narcotic prescription.

17  Q.  When you say high dosage, what do you mean by that?

18  A.  We generally went by the New Jersey standards of six pills

19  per day or 120 total units in a 30-day period.  Actually, I

20  don't think it was six because that would put it at -- we

21  usually watch anything that was at 180 pills and over -- and we

22  would call that a high dosage prescription.  That meant that

23  the patient was getting more than six pills per day.  That's

24  what it looked at it as.

25  Q.  Switching over to the other responsibility you mentioned.

1    Suspicious order monitoring.  What do you mean by that?

2    A.  Part of our responsibility was to design a system for

3    identifying suspicious activity, suspicious ordering from a

4    pharmacy.  If they're over ordering or if there is unusual size

5    or frequency to the amount of controlled substances -- I'm

6    sorry.  I have to slow down.

7            If there was an unusual amount of ordering that they

8    were doing, they were ordering more often or they were ordering

9    in larger amounts, so we had to create a monitoring system that

10   would flag and hold those orders for us to investigate.

11   Q.  If RDC identified a suspicious order, what was it required

12   to do?

13   A.  It was supposed to investigate the order and report the

14   order to the DEA.

15   Q.  How do you know about these requirements on distributors

16   like RDC?

17   A.  Because of training that I went to at DEA conferences,

18   reading the regulations.

19   Q.  Let's dig in a little bit more on the suspicious order

20   monitoring.

21           Did RDC have a system in place for monitoring

22   suspicious orders?

23   A.  Yes.

24   Q.  What types of orders are we talking about, all orders or

25   just controlled substance orders?

1   A.   Controlled substance orders.

2   Q.   Just to be clear, did RDC have a written protocol for

3   suspicious order monitoring?

4   A.   Yes.

5   Q.   Was there also a computer system for detecting these

6   things?

7   A.   Yes.

8   Q.   So, let's start with can you describe how the computer

9   system for identifying suspicious orders worked.

10  A.   The computer system was set up that it would -- it would

11  monitor a customer's controlled substance orders that were

12  coming in to us as the distributor, and it would put controlled

13  substances into a group we previously identified it by.  There

14  is 300 different groups, whether it be oxycodone, tramadol,

15  methadone, Vicodin.  So we had different groups, so it would

16  watch those orders coming in, and they had an assigned limit,

17  an amount that they could buy, a threshold on that group.  So,

18  we would monitor it if they hit that threshold.  We would even

19  monitor it if they were getting close to that threshold by

20  percentage alerts, so we could look into why they were ordering

21  more than normal.

22  Q.   Then under RDC's written policy, what was an RDC employee

23  supposed to do when an order hit that threshold?

24  A.   We were supposed to investigate why the customer was

25  ordering more than normal, and we were supposed to call the

1    pharmacy, we were supposed to request updated dispensing

2    reports that we could look in to see if there was a legitimate

3    reason for their ordering more.

4    Q.  Let's take a look at the written policy.  I'm showing you

5    what's in evidence as Government Exhibit 29.

6            Can we have that up on the screen for the witness, the

7    Court and the jury.

8            MR. ROOS:  Ms. Drescher, can we please zoom in on the

9    first paragraph.

10   Q.  Ms. Bouck would you read the title on the document and then

11   the first paragraph.

12   A.  Sure.  The title is:  Overview of suspicious order

13   monitoring (SOM) of RDC.

14           And the first paragraph reads:  RDC has categorized

15   all controlled substances into over 300 groups which include

16   both brand and generic forms of each drug.  We measure the

17   store's historical purchases within each group, by dispensing

18   unit and derive a monthly average based on a 12-month rolling

19   history.  Once we calculate your monthly average, RDC will use

20   a multiplication factor to determine an allowable limit for

21   purchasing.  RDC will use a multiplier of 1.5 for narcotics and

22   a multiplier of 2 for controls which are sufficient for a

23   pharmacy growth of business.

24   Q.  What's this referring to?

25   A.  That was, that was our monitoring system that would

1    determine the amount of a specific controlled substance group

2    that a customer could order from RDC within a given month.

3    Q.  Can you give us example of how this works in practice.

4    A.  So, don't ask me to do the math.  If a customer ordered on

5    average every month one 500-count bottle of oxycodone

6    30 milligrams, or actually, any type of oxycodone, total it was

7    500 units, we would take a 12-month period, whether it be

8    January through December, February through January, it was a

9    12-month rolling period.  We would take the average of that

10   total units, those 500 bottles, so times 12 is, what, 7,000 --

11   I don't know.  It doesn't matter.  Anyway, we average it out,

12   we would divide it by 12, and then we would multiply it by 1.5

13   for a narcotic or 2 for a controlled substances.

14   Q.  Just to be sure it's clear.  If a pharmacy's average was

15   500 bottles a month.  And that's what they ordered every month,

16   so their average across 12 months was 500 bottles a month.

17   Then, the limit would be 1.5 times that 500 average, so 750

18   would be their limit?

19   A.  Right.

20   Q.  Okay.  And has it always been a 1.5 or 2 multiplier?

21   A.  No, when I started with RDC, it was a multiplier of 3 for

22   narcotics and 5 for Schedule III through Vs.

23   Q.  Schedule III through Vs refers to the schedule of

24   controlled substance?

25   A.  Yes.

1    Q.   Can we zoom out and zoom in on the third paragraph.  In the

2    third paragraph, but midway down, maybe I can -- I don't dare

3    touch it.

4              It says:  If for some reason a customer would go over

5    100 percent of a narcotic/control the complete order is put on

6    hold.

7              What's that referring to?

8    A.   It means if they ordered -- if their limit was 1,000 and

9    they ordered 1,001 pills, it held that controlled substance

10   order that product was on.

11   Q.   According to the policy, what would RDC do when an order

12   was put on hold?

13   A.   We would, according to the policy, we were supposed to

14   request dispensing and investigate the order and request any

15   additional information that would help us to research as to why

16   they were ordering the amount that they were.

17   Q.   Later in this policy, what sort of things does the policy

18   say you look for in the data?

19   A.   If you're referring to what type -- yeah, so you were.

20             The type of data we were looking for was the drug

21   name, the national drug code called the NDC, we were looking

22   for the quantity dispensed, the doctor's name, the day supply,

23   the doctor's DEA number so we could look into the prescriber

24   themselves, the payment form of the prescription -- and I'm

25   drawing a blank if there is more.  Sorry.

1  Q.  Let's flip to page two zoom in on the first paragraph.  You

2  see there is a sentence that begins "once these answers are

3  given."  I will read that to you.

4          Once these answers are given, it would help to

5  determine if RDC will allow the order to be filled or still

6  keep the order on hold.

7          So the question is, what determined whether RDC filled

8  the orders or kept them on hold under the written policy?

9  A.  It was determined by if we could -- by looking at the

10  explanation, the dispensing information and other data acquired

11  that it was being dispensed for a legitimate medical purpose.

12  Q.  What would happen if you couldn't determine whether it was

13  legitimate or not under the policy?

14  A.  Under the policy, we were supposed to not ship the product

15  to the customer, and we were supposed to report the customer to

16  the DEA, the local field office.

17  Q.  So, can you read from the last two sentences of this

18  paragraph that we're zoomed in on.

19  A.  Yes.

20          It reads:  If after all that, the customer still does

21  not comply, RDC management will need to determine continuing

22  with our services to this customer.  If service would be

23  stopped to a customer, RDC will then notify the local DEA

24  office of an order of interest.

25  Q.  What does that mean?

A.  It means that if we determined or we couldn't determine the

legitimacy of the order, that we would not ship the order, we

may make the decision to stop selling any controlled substances

to the customer, and we would report the customer and the

actual order that was on hold to the DEA.

Q.  The language here mentions something called an order of

interest.  What's the difference between an order of interest

and a suspicious order?

A.  An order of interest is a potential suspicious order.  It

didn't necessarily mean it was a definite one, but it meant

that it could be.

Q.  So how does an order of interest grow into a suspicious

order?

A.  It becomes a suspicious order when we can't validate the

customer's reason for ordering.  Or if we, upon looking into

why the customer was ordering more, we determined that there is

other areas that are concerning within the pharmacy.

Q.  We can zoom out here.  Let's zoom in on that little box at

the bottom.  It says a version of June 30, 2014.

        Was a version of this policy in effect when you

started in 2013?

A.  Yes.

Q.  And was it the same or different than the written policy

we're reading right here?

A.  I, from what I recall it was the same.  Except for the

1    multiplication factors were different that we looked at in the

2    beginning, they were a 3 and a 5.

3    Q.  Was the suspicious order monitoring policy written or

4    revised again between 2014 and the end of 2016?

5    A.  Yes.

6    Q.  Approximately when was that?

7    A.  I believe it was in January of 2015.

8    Q.  I'm showing you -- I'm not sure if this is in evidence so

9    I'll show it for identification -- government Exhibit 276.

10   Just for witness and the Court and the parties.

11            Ms. Bouck, what's this?

12   A.  This is a customer due diligence and suspicious order

13   monitoring reporting policies and procedures.

14   Q.  Are you familiar with it?

15   A.  Yes.

16   Q.  From your work at RDC?

17   A.  Yes.

18   Q.  Approximately when is it from?

19   A.  Revised January 22, 2015.

20            MR. ROOS:  Ms. Drescher, can we flip through it so the

21   witness can see the entirety of it.

22   Q.  Is that a true and accurate copy of the policy?

23   A.  Yes.

24            MR. ROOS:  The government offers 276.

25            THE COURT:  Any objection?

1          MR. TOWNSEND:  No objection.

2          THE COURT:  It will be admitted in evidence.

3          (Government's Exhibit 276 received in evidence)

4    Q.  Let's start at the top.  What's the title of this document?

5    A.  Customer due diligence and suspicious order

6    monitoring/reporting policies and procedures.

7    Q.  What's it dated?

8    A.  January 22, 2015.

9    Q.  This was RDC's working policy as of that date?

10   A.  Yes.

11   Q.  And let's look under the heading called suspicious order

12   overview.  Do you see that?

13          Can you read the first three sentences there.

14   A.  Yes.

15          Drug Enforcement Administration (DEA) regulations

16   require distributors and manufacturers to conduct due diligence

17   of their customers to minimize the risk that those customers

18   will divert controlled substances.  DEA regulations further

19   require distributors to design and operate a system that

20   discloses to the registrant suspicious orders.  DEA guidance

21   states that distributors cannot fill orders that they determine

22   are suspicious; DEA regulations require that they report them

23   to the local DEA field division upon discovery.

24   Q.  Does this policy say what a suspicious order is?

25   A.  It does.

1   Q.  Can we please zoom in on the next paragraph here that

2   begins "DEA regulations define" through all but the very last

3   sentence on that page.

4   A.  So --

5   Q.  And Ms. Bouck, would you mind reading the first two

6   paragraphs there.

7   A.  The first of the two paragraphs?

8   Q.  Both the first two paragraphs, paragraphs one and two that

9   are zoomed in on.

10   A.  Okay.

11          DEA regulations define suspicious orders as:

12          Orders of unusual size;

13          (b) Orders deviating substantially from a normal

14   pattern; and

15          (c) Orders of unusual frequency.

16          Orders of controlled substances that are likely to be

17   diverted from legitimate channels are also suspicious orders.

18   Q.  So for A, B and C, what's your understanding of that?

19   A.  I don't --

20   Q.  DEA regulations define suspicious orders as, and then (a)

21   orders of unusual size; (b) orders of deviating substantially

22   from a normal pattern; and (c) orders of unusual frequency.

23          My question is what does that mean to you?  What's

24   your understanding of that?

25   A.  That would -- okay.

1          That would be my understanding of that is that's why

2    we had our monitoring system, so any order that was larger than

3    normal, they're ordering more of a controlled substance than

4    they would on an average basis, so it's an unusual size for the

5    customer, they're ordering more or they're ordering more often,

6    they used to only order one bottle a month and now they're

7    ordering more, like three bottles a month, or they're deviating

8    from the pattern of what they normally order for a controlled

9    substance.

10   Q.  And the next sentence after that, can you explain your

11   understanding of that?

12   A.  So, suspicious orders were not just unusual size, frequency

13   or pattern.  A suspicious order could be also when there is an

14   indication that it's not being dispensed by the pharmacy to be

15   used for a legitimate medical reason.

16   Q.  Now, you've mentioned a few times that RDC had a system for

17   identifying orders of interest.  Let's turn to page six.  Can

18   you read the last three sentences under the heading orders of

19   interest/suspicious orders before the subheading.

20   A.  It reads:  Orders of interest are potential suspicious

21   orders that meet or exceed the customer's established

22   purchasing threshold or other criteria.

23          RDC will investigate orders of interest to determine

24   whether they are suspicious orders.

25          Suspicious orders cannot be filled and must be

1    reported to DEA.

2    Q.  Let's zoom out of this and zoom in on subheading (a)

3    purchase thresholds.  And Ms. Bouck, you don't have to read it,

4    but what does this relate to?

5    A.  This is similar to what we read on the previous policy,

6    that defines how the amount that a customer can purchase within

7    a given amount, given month was established, like what their

8    ordering limit was on a controlled substance.

9    Q.  All right.  Now let's go to page seven.  Can we look under

10   subheading (d), just zoom in on all of it.

11           The first sentence mentions red flags that may

12   indicate that a pharmacy may be dispensing controlled

13   substances for other than a legitimate medical purpose and

14   whose orders are therefore potentially of interest and

15   suspicious.

16           Do you see that?

17   A.  Yes, I do.

18   Q.  Here's the question:  If one of those red flags listed

19   below exists, is the order potentially suspicious?

20   A.  It could potentially be suspicious, yes.

21   Q.  What are some of those red flags listed here?

22   A.  So, it talks about dispensing highly abused substances.  It

23   gives examples of those, and it talks about those either being

24   dispensed by themselves or combined with other controlled

25   substances.  A customer or pharmacy that only attempts to or

1    only purchases controlled substances from RDC, not other -- or

2    distributor -- and not other products such as other

3    prescription medicine or over-the-counter medicine.  A customer

4    who would attempt to purchase only highly abused controlled

5    substances, so like oxycodone, hydrocodone, opioids that are

6    highly abused.  Dispensing quantities that are higher than

7    acceptable medical standards.  So high dosages, when they're

8    prescribing numerous pills per day for the patient, or the same

9    controlled substance being prescribed over and over for every

10   patient by that physician.  So it was every time they wrote for

11   oxycodone 30 milligrams, it was always 90 pills, there was no

12   consideration of the patient's weight, age or anything like

13   that.  It was always oxycodone 30, 120 pills, 90 pills,

14   whatever it might be.  And also, that there is a high

15   percentage of cash, the prescriptions being filled at the

16   pharmacy versus the prescriptions being run through the

17   patient's insurance.

18   Q.  And then is there also an appendix to this document?

19   A.  Yes.

20   Q.  Let's look at 11 and 12 briefly.  Pages 11 and 12.  Is this

21   that appendix?

22   A.  Yes.

23   Q.  Does it list just the red flags you mentioned or some

24   others?

25   A.  There's more.

M1j3dou4                        Bouck - Direct

1   Q.  Now, is RDC supposed to sell controlled substances to a

2   customer who does not provide requested information?

3   A.  No, we were not supposed to.

4   Q.  Let's look at the bottom of page nine.  What's RDC's

5   suppose -- RDC employees, what are they supposed to do as they

6   are evaluating whether or not an order is suspicious?

7   A.  Based on this paragraph or --

8   Q.  Let's start with this paragraph.

9   A.  Okay.  So, we were supposed to, when we were investigating,

10  we were supposed to investigate a held order, an order of

11  interest, and we were supposed to document the information that

12  we received from the customer, and it lists some specifics that

13  we were supposed to document.  And we should also, within that

14  note taking or that documentation, we were supposed to list the

15  reason why we determined it was either suspicious or not

16  suspicious.

17  Q.  Do you know whether Larry Doud saw this policy?

18  A.  Yes, I believe he was involved during the making of it.

19  Q.  How do you know that?

20  A.  Because I was also involved and I remember him being

21  present.

22  Q.  Did RDC follow the suspicious order monitoring policy as it

23  was written?

24  A.  No, we did not.

25  Q.  How did it not?

1   A.  We didn't always investigate an order of interest, a held

2   order.  We didn't report held orders, suspicious orders.

3   Q.  So when you said you don't always investigate, what did you

4   do instead?

5   A.  At times we would just release the order.

6   Q.  So let's break all this down.

7        First of all, when an order of interest went on hold,

8   what was RDC's -- what did RDC's policy say it was supposed to

9   do?

10  A.  When an order of interest went on hold, our policy stated

11  we were supposed to investigate by requesting updated

12  dispensing, by collecting further information from the

13  pharmacy, by looking at that dispensing to determine if there

14  was a good reason or a legitimate reason to sell that

15  controlled substance to the pharmacy.

16  Q.  Did RDC investigate orders of interest always?

17  A.  No.

18  Q.  What happened instead?

19  A.  We just released them.

20  Q.  What do you mean by that?

21  A.  We just let the customer have the order, whatever they were

22  ordering that went on hold.

23  Q.  If they went over the code on limit, you would just release

24  it?

25  A.  Yes.

1    Q.  Why were orders released without investigation?

2    A.  There could be various reasons.  It could be because we --

3    this was the process.  It was what we were told to do,

4    especially for specific customers.

5    Q.  So what do you mean it was what we were told to do?

6    A.  There was specific customers that we -- or myself were told

7    to release that if they went on hold or to take care of the

8    customer and we'll get the information later.

9    Q.  So before we get into specific customers, who told you

10   that?

11   A.  In some instances, it would have been my boss, Bill

12   Pietruszewski.  In other instances it would have been Larry

13   Doud who came in and -- or seen me or came into my office and

14   asked me what was going on with the customer and asked me to

15   take care of the order and we would get the documentation

16   later.

17   Q.  Let's talk about some of those customers.  So, which were

18   the customers or what were the type of customers you would just

19   release the orders for?

20   A.  The customers that -- you are asking for their names?

21   Q.  Let's start with category.  What category of customers

22   would you just release the orders for?

23   A.  Some of them would be like -- important customers is the

24   category.  They didn't fit like a definite -- business --

25   business model.  They were important customers, they were

1    sometimes it might have been a board member's pharmacy.  Or

2    customers that were our big customers, our big money customers.

3    Q.  Give me some example, some names.

4    A.  The biggest one I think of is Linden Care Pharmacy.  I also

5    think of -- I know there was other ones.  The board member one

6    I'm thinking of is -- I think it was Seventh Elm if I remember

7    correctly.  It was from Boris.  And I think there's other --

8    that's kind of foggy.

9    Q.  Okay.

10   A.  On names.

11   Q.  Let's look at a document.  Can we please have Government

12   Exhibit 109G which is in evidence.  Let's start by zooming in

13   on the bottom e-mail in this chain.

14          And who did the e-mail come from and who did it go to?

15   A.  This e-mail came from our actually order monitoring system.

16   It was the office RDC alerts.  And it went to our IT manager,

17   and members of the controlled substance or compliance team,

18   Julius Morton, Bill Pietruszewski, myself, and then Pam

19   Mercendetti and Maritza Rosa worked in our vault area.

20   Q.  Can you explain what sort of information is in the body of

21   the e-mail?

22   A.  It is a high percentage alert.  Meaning that although the

23   customer hadn't placed the order yet, it was just sitting in

24   their shopping basket, let's say, they had a bottle of

25   oxycodone 30 in their shopping basket, and with that bottle

1    there is a pending order.  It would have been put them, Seventh

2    Elm Drugstore, at 103 percent of their limit.

3    Q.   Anything stand out to you about Seventh Elm Drugstore?

4    A.   To the best of my recollection, they were owned by a board

5    member.

6    Q.   Anything about this particular drug that's covered here

7    that was a concern?

8    A.   It is oxycodone.  30 milligrams of oxycodone is a highly

9    abused opioid.

10   Q.   Let's look at the e-mail above this.  Let's start with your

11   response to the e-mail.

12   A.   My response is I asked Bill Pietruszewski what we should do

13   with the order that I had been waiting months for dispensing.

14   Q.   What did you mean by that?

15   A.   I wanted to know from him direction on what I should do

16   with the customer's order.  That we -- part of our SOP stated,

17   our monitoring policy stated we needed updated dispensing to

18   review as part of our investigation, and I was waiting, I was

19   still waiting, I had requested it multiple times, I was still

20   waiting to get that from the pharmacy.

21   Q.   Under your written policy, what were you supposed to do

22   once it exceeds the threshold?

23   A.   I was supposed to investigate as to why it was going over

24   the threshold and part of that was by requesting dispensing.

25   Q.   So what was Bill Pietruszewski's response?

A.  Bill replied saying let it go, I will try and call her
tomorrow morning.
Q.  Do you have an understanding of whether this is the type of
decision Bill would make on his own or whether he would need to
consult with upper management?

            MR. TOWNSEND:  Objection.

            THE COURT:  Sustained as to the form of the question.
Q.  Okay.  Let me ask you, what is your understanding of
whether Bill Pietruszewski needed to consult with upper
management on compliance questions?

            MR. TOWNSEND:  Objection.

            THE COURT:  Overruled.  You can answer that.
A.  So what was -- what he had to ask about compliance
questions, when it came to compliance questions?  I just that
we needed, when it came -- we needed to approve action on
customers, with the exception of a temporary suspension, we had
to approve any action that we were taking with customers with
Larry and upper management.
Q.  So, sorry.  What exactly does that mean?
A.  We couldn't -- we couldn't just terminate a customer, we
couldn't report a customer without getting approval to do so.
Q.  Was it, was letting an order go like this without review on
dispensing what RDC policy said should happen?
A.  No.
Q.  Was it your understanding that was what was required by

1    DEA?

2    A.  That we should just release it?  No.

3    Q.  Why not?

4    A.  Because if we just released it without investigating it, we

5    weren't following the requirement to ensure that this medicine

6    wasn't being used for illicit reasons, for reasons that were

7    not for legitimate reasons.

8    Q.  Speaking generally, was this just a one-time thing of

9    letting this particular order go?

10   A.  No.

11   Q.  What do you mean?

12   A.  No, there was -- there was customers that, it was just

13   procedure that when their order went on hold, we just took care

14   of them.  We just -- meaning we just released their orders.

15   Q.  And why was that?

16   A.  Because that was what was expected of us to do.  That we,

17   that we were told, either directly or indirectly, to take care

18   of the customer and that we would get the data later.

19   Q.  Who -- who raised that expectation?

20   A.  Without -- with the exception of Bill telling me about

21   Linden Care, if there was other stores he told me to, I don't

22   necessarily remember, but other stores would have been Larry

23   telling me to get the customer the order.

24   Q.  My question was, who gave you the expectation that you were

25   going to do that?

A.   I guess I don't understand what you're asking.

Q.   The question was unclear by me.

          I think you had said you had, you understood there was
an expectation you would release orders; is that right?

A.   Yes.

Q.   And I'm wondering who, if anyone, told you that, that made
you have that expectation?

A.   That's where it would have come from, from Bill or Larry,
that we took care of the customers.

Q.   Let's look at another document.  Can we please see
Government Exhibit 110G which is in evidence so it could be
shown to everyone.  Let's start on page two.  Actually I guess
if we straddle the two pages.

          And can you explain to the jury what we're seeing
here?

A.   At the bottom is an order of interest for Aliton's Managed
Care Pharmacy.  The group tramadol.  And it is showing the
customer's information, the salesman's name, the order number,
and the specific item that they were trying to order.  This
customer had a maximum units override or a maximum amount to
purchase of 2,000 units.  They were trying to order
two 1,000-count bottles of the tramadol 50, bringing them to
2,000 units, but their current month group unit sales was
already 2,000.  So this would have been brought them to 4,000
units.

1  Q.  What's tramadol?

2  A.  It is a Schedule IV controlled substance.

3  Q.  Let's go to the next e-mail up in the chain.  The next in

4  time.  Can we zoom in on that.  I'm sorry, you're right.  Let's

5  do the next two e-mails.

6          And so in the middle of the first page here we have an

7  e-mail from Elizabeth Cullen.  Who was Elizabeth Cullen again?

8  A.  She was one of our compliance analysts.

9  Q.  And she says in her e-mail -- actually.  Sorry, let's go

10  one more e-mail up.  My apologies.

11          So at the bottom e-mail here, you can see where she

12  says:  He also promised to send dispensing and I e-mailed him

13  all the info but I really don't like the idea of sending him

14  anything else until he actually does.

15          What did you understand her to be saying?

16  A.  That we needed dispensing from that customer.

17  Q.  And what was she saying she did or did not want to do?

18  A.  She didn't want to release the order that was on hold for

19  that tramadol until we received dispensing.

20  Q.  And can we highlight the sentence in the above e-mail that

21  begins "unfortunately these stores."

22          And will you read that, Ms. Bouck, the highlighted.

23  A.  Yup.  It reads:  Unfortunately, these stores fall into the

24  "have to" bracket I believe.

25  Q.  What do you mean by "have to" bracket?

1    A.   Those were the stores that I -- I just referenced that

2    there is an expectation we would take care of releasing their

3    orders.

4    Q.   Where did the "have to" bracket come from?

5    A.   I suppose, I would say the expectation like we had to, we

6    were told to, either directly or indirectly, to take care of

7    the customer.

8    Q.   Did RDC ever change the order limits for customers so they

9    wouldn't trigger orders of interest?

10   A.   Yes.

11   Q.   How did that work?

12   A.   That was, we would look, when get a high percentage alert,

13   it is usually when it would happen.  That it was indicating

14   that the customer was going to, if they hit place the order,

15   they would go over the limit and generate an order of interest.

16   We would look at the customer's dispensing, and if the customer

17   actually dispensed or filled more prescriptions for that drug,

18   more units than they actually purchased from us, we would at

19   times increase the amount that they could purchase to that

20   amount plus a multiplication factor.

21   Q.   So what was the purpose of moving the threshold up?

22   A.   It was to prevent -- I mean, it was to prevent an order

23   getting held or an order of interest.

24   Q.   Was that practice written into RDC's policy?

25   A.   No.

1   Q.  Let's look at another document, can we please see

2   Government Exhibit 107F which is in evidence.  And can we start

3   at the bottom.

4              What are we looking at here it?

5   A.  A DEA order of interest alert, so it is a high percentage

6   alert for Delmar Pharmacy for OxyContin.

7   Q.  What, if anything, do you remember about Delmar Pharmacy?

8   A.  If I remember correctly, we had issues with them.  I don't

9   remember specifically what -- but I -- issues.  By that I mean

10  that they presented areas of concern to our department.

11  Q.  When you say "concerns," you mean like the red flags?

12  A.  Yes.

13  Q.  Let's look at the next e-mail above it.  This e-mail is

14  from Amy Skibickyi.  What was Amy Skibickyi's job?

15  A.  She was a compliance analyst.

16  Q.  She writes in this e-mail that Delmar is a primary with a

17  27,500 limit on OxyContin.  They're currently at 105 percent.

18  And then she says a little later in that, she says their

19  average is 31,355.

20              So what does that mean?

21  A.  That the -- so the 27,500 was their limit and that they

22  were, they had that amount in the bucket, I'm calling it for

23  explanation purposes.  And that their recent dispensing, their

24  average dispensing was over 31,000 units.

25  Q.  So regularly exceeding their limit?

M1j3dou4                           Bouck - Direct

1    A.  Yes.

2    Q.  Let's look at the top e-mail in the chain.  And how did you

3    respond?

4    A.  I told Amy to bump up the limit to 32,000 in hopes to

5    prevent any OIs or orders of interest for the rest of the

6    month.

7    Q.  Why were you trying to avoid an order of interest?

8    A.  Probably the practice was because they could get that

9    amount because they were dispensing that amount.  And order of

10   interest caused us a lot of work.

11   Q.  All right.  Now, this practice of bumping a pharmacy up to

12   prevent an order of interest.  Is that an idea you came up with

13   yourself?

14   A.  No.

15   Q.  Where did it come from?

16   A.  It came from my boss.

17   Q.  Who is that?

18   A.  Bill Pietruszewski.

19          MR. GOTTLIEB:  Your Honor, at this point, objection.

20   May we have a sidebar, please.

21          THE COURT:  Let me give the jury a break so we don't

22   have to do a sidebar.

23          MR. GOTTLIEB:  Thank you.

24          THE COURT:  Ladies and gentlemen, we'll take a

25   15-minute break.  Don't discuss the case, keep an open mind,

1    bring you back in 15 minutes.

2              (Jury excused)

3              THE COURT:  You can step down.

4              THE WITNESS:  I wasn't sure what to do.  Thank you.

5              (Witness not present)

6              THE COURT:  Yes, sir, Mr. Gottlieb.

7              MR. GOTTLIEB:  Your Honor, thank you very much.  Just

8    very briefly, it seemed to be the appropriate time because

9    there have been a lot of e-mails now introduced, they would be

10   hearsay unless of course there is an exception.  It's not a

11   defendant, we are not talking about anything along those lines.

12   So I would ask for an offer of proof.  Are these e-mails, for

13   example, this last series with Skibickyi to Pompeo, what is the

14   offer of proof to have those hearsay statements received in

15   evidence in the form of the e-mail, where we have the live

16   witness Jessica Pompeo on the stand.

17             MR. ROOS:  Your Honor, this is something we briefed in

18   our motion in limine.  They're plainly admissible under the

19   co-conspirator exception to the hearsay rule.  They're

20   obviously, given her testimony, in furtherance of the charged

21   conspiracy.  Second, is we also briefed that they are, she's

22   now laid the factual predication under the agency exception

23   based on her statements about who she reported to, both

24   directly and her ultimate decision maker was, and finally, many

25   of these are related to her then-existing mental state,

M1JBDOU5

1   impressions when she was doing these acts not necessarily --

2   they are not necessarily being offered, all of them, for their

3   truth.  But I don't think your Honor needs to reach that,

4   because they're plainly admissible under those exceptions and

5   ultimately I think typically the practice is conditionally to

6   admit them and the jury can make that determination.

7          THE COURT:  Well, I am assuming at this point, given

8   what I've read and what the testimony has been, that

9   Mr. Pietruszewski is going to testify, and the nature of his

10   testimony is going to be that he got these directions from

11   Mr. Doud and passed those directions down to the other

12   employees.

13          MS. ROTHMAN:  That's an accurate summary of what

14   Mr. Pietruszewski will say, among other things.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

M1JBDOU5

1        MR. GOTTLIEB:  Your Honor, I wasn't questioning that.

2    For example, the last email that was just discussed was

3    Skibickyi to Pompeo. Is the government saying that Amy

4    Skibickyi as well as Jessica Pompeo are co-conspirators,

5    because I heard that that was the number one exception to

6    permit this email to come in as statements of co-conspirators.

7        I simply want confirmation, because this has been an

8    issue for a few years that we've been in front of your Honor as

9    to who the co-conspirators are.  So I heard Mr. Roos seem to

10   confirm, at least that for this last email, that Skibickyi and

11   Pompeo are co-conspirators; am I correct?

12       MR. ROOS:  I don't think the Skibickyi one is offered

13   for the truth.  It's just context for a later email where she

14   says, release it.  And for the one above it, I think to the

15   extent it's being offered for the truth, it falls under the

16   co-conspirator exception and/or an agency exception.

17       MR. GOTTLIEB:  Thank you.  It was just really unclear

18   as to what's the extent of the co-conspirators', their emails

19   would then, therefore, be admissible.

20       THE COURT:  I think that for me to make any particular

21   determination at this point with regard to the statement, I

22   think that at this point I am simply admitting them subject to

23   connection, and I think that connection will probably be

24   Mr. Pietruszewski's testimony as to what he said he was

25   directed to do by Mr. Doud.

M1JBDOU5

1      And so I think at this point, the testimony is

2  appropriate.  And if there are any further instructions that

3  need to be given at a later point when other witnesses testify,

4  I'd be in a position to do that on request

5      MR. GOTTLIEB:  Thank you.

6      THE COURT:  Let's take a ten minute break and then

7  we'll continue.

8      (Recess)

9      (In open court; jury not present)

10      THE COURT:  Let me just say a quick word about

11  tomorrow.  I understand the weather might be a little bit

12  treacherous.  I do intend to proceed tomorrow if everyone shows

13  up.  It's not my intention -- particularly with some of the

14  jurors in the northern counties, it's not my intention to

15  excuse a juror simply because they can't get down here

16  tomorrow.  If we do get a call from a juror who says they just

17  really can't make it tomorrow, then we're going to continue on

18  Friday when that juror hopefully shows up. The weather is

19  supposed to be better on Friday and we can continue.

20      So hopefully it won't be so bad that a juror can't

21  come down, but I want them to be safe, and I'll remind them

22  that we're a team and we can't start unless everyone arrives,

23  so that's my intention at this point.

24

25

1              (In open court; jury present)

2              THE COURT:  You can continue, Mr. Roos.

3              MR. ROOS:  Thank you, your Honor.

4    BY MR. ROOS:

5    Q.  Just a few questions about where we left off.  So for

6    starters, you had mentioned releasing orders of interest for --

7    you said big stores, among others.  Do you remember that?

8    A.  Yes.

9    Q.  Just a question, were you only releasing orders for big

10   stores or was that also for other types of stores?

11   A.  It was for other type of stores as well.

12   Q.  And then just one question about some of these pharmacies,

13   for instance, Aliton's, were there some customers where there

14   was more than one store per customer?

15   A.  Yeah, there would be some stores that's either had -- I

16   guess you would call them their sister store or they had the

17   same owner, but they had one, two, three other stores.

18   Q.  I think when we left off, I asked you if there were ever

19   times when you placed an order on hold and you were overruled?

20   A.  Yes, there were times.

21   Q.  And who overruled you?

22   A.  From what I remember, it would have been Bill

23   Pietruszewski.

24   Q.  Let's look at Government Exhibit 106C in evidence.  I'm

25   going to start at the bottom.  What's this bottom email?

1   A.   What is it, is that what you asked?

2   Q.   Yes.

3   A.   It is an order of interest for ProHealth pharmacy.

4   Q.   Do you remember ProHealth pharmacy?

5   A.   Yes.

6   Q.   And what, if any, things were the issues with ProHealth

7   pharmacy?

8   A.   To the best of my recollection, they had high dosage

9   opioids, narcotic prescriptions and other prescriptions,

10   controlled substance prescriptions and they had physicians that

11   we had flagged as suspicious or to watch on dispensing.

12   Q.   Which drug is this order of interest about?

13   A.   Endocet. It's a narcotic.  It's an opioid.

14   Q.   Now, the email above this, just for context, why don't we

15   start with reading the email from Amy Skibickyi to you?

16   A.   Certainly.  It reads: I only notated this account and

17   didn't do any releasing.  On 9/24, they hit their limit with

18   the order that put them at a quantity of 7, 300 for the month.

19   They just did another order last night bringing them to 9, 400

20   for the month and someone had released that.  You had notated

21   the limit note to state you didn't like their dispensing, were

22   requesting new dispensing and not to release anymore orders.  I

23   just wanted you to be aware that they put in another big order

24   that was released by someone.

25   Q.   And how did you respond?

1    A.  I told Amy, thank you for the heads up and that I will

2    probably go through their dispensing very soon because I did

3    not like it at all.

4    Q.  Can you explain what you meant by that email?

5    A.  My response to her was, I appreciated her letting me know

6    that someone released the order and that there was -- I didn't

7    like the dispensing report from ProHealth.

8    Q.  Under RDC's written protocol, what was required to release

9    this order?

10   A.  What was required was updated dispensing and a review of

11   analysis of it to make sure it was legitimate.

12   Q.  What, if any, notations would you -- or notes or records

13   would you make about the order?

14   A.  What Amy was referring to in her email was a limit list

15   that the analyst would use to -- at times they didn't always

16   use it, but at times, especially then, they would just fill out

17   that the order went on hold.  And if they released it, why they

18   released it, and then there was also notations made in our

19   software system where you had to go in to release the order.

20   You would make a notation in there.

21   Q.  Let me show you what's in evidence as Government Exhibit

22   239.  What is this document?

23   A.  It's a DEA month end orders of interest report.

24   Q.  What sort of information is listed in this report?

25   A.  This is a report that generated automatically at the

1    beginning of each month for the prior month listing all the

2    orders that went on hold as an order of interest, as well as

3    any suspicious orders that were reported.

4    Q.  Just looking at the first page of the report, do you see

5    where it says authorized and then there's a colon and then "Y"

6    happens a bunch of times on the page?

7    A.  Yes.

8    Q.  What does that "Y" mean?

9    A.  It means that, yes, it was authorized to release.

10   Q.  Right next to that first authorized "Y" there's a notation,

11   what does that refer to?

12   A.  It was just kind of like a blanketed response by whoever

13   was releasing the order.

14   Q.  Let's take a look at page 19 at the top.  What pharmacy is

15   this order from?

16   A.  ProHealth pharmacy.

17   Q.  Is it the one we were just looking at?

18   A.  I believe so.

19   Q.  What happened with this order?

20   A.  It was released.

21   Q.  Was any investigation done on the order before it was

22   released?

23   A.  Not based on the notes that Amy had -- Amy had said in her

24   email because I said not to release anymore and that it needed

25   an analysis.

1   Q.  Let's go back to the first page of this.  Ms. Drescher, can

2   we just flip page by page here.  Ms. Bouck, if you could look

3   at the column about whether it's authorized, yes or no.

4           This document is 23 pages long.  Approximately how

5   many orders of interest are listed on this document?

6   A.  Probably close to a couple of hundreds, assuming there was

7   eight to ten orders of interest per page.

8   Q.  And approximately how many were released?

9   A.  They all say -- I did not see any noes. I saw all yeses for

10  authorized.

11  Q.  Was this typical for a month?

12  A.  Yes.

13  Q.  By the way, do you have a binder in front of you?

14  A.  I do.

15  Q.  Ms. Bouck, remind us what the first month was that you

16  worked at RDC?

17  A.  November of 2013.

18  Q.  Let's go to Government Exhibit 229.  You have it there.  If

19  not, maybe it's up on the screen.

20  A.  You said 229?

21  Q.  It's up on the screen.  Maybe that's the easiest.

22  A.  All right.

23  Q.  If we could just scroll through.  This is for July 2014.

24  Just scroll through it.

25           MR. TOWNSEND:  For the record, you said July 2014?

1              MR. ROOS:  Yes.

2              MR. TOWNSEND:  I'm seeing June 2014.

3              MR. ROOS:  My apologies, June 2014.

4    Q.  How many of the orders did you see that were not released?

5    A.  I kind of got distracted slightly, so I'd have to -- I see

6    a lot of yeses.  I didn't notice if there were any noes.

7    Q.  If we can just go through it again.

8    A.  I saw all yeses.

9    Q.  Remind me the month where -- actually, let's do this first.

10   Can we look at Government Exhibit 235.  This is December 2014,

11   right, and same thing, can we just scroll through for yeses and

12   noes.

13             Ms. Bouck, did you see any noes?

14   A.  I didn't see any, unless I missing something.

15   Q.  Were these reports generated for every month you were at

16   RDC?

17   A.  Yes.

18   Q.  I think in each of the three months we've looked at, every

19   single order was released; is that right?

20   A.  Yes, looks like it, yes.

21   Q.  Was that typical for a month?

22   A.  Yes.

23   Q.  By the way, to do an investigation like the one RDC policy

24   had to release an order, what was required?

25   A.  We needed updated dispensing from the pharmacy.

1    Q.   What would you do with that?

2    A.   We would analyze it.

3    Q.   What was entailed in that?

4    A.   We would review it, look at what was being dispensed from

5    the pharmacy for that specific group and then also look at

6    other controlled substance prescriptions being dispensed to see

7    if there was any red flags on them.

8    Q.   How long would that whole thing typically take?

9    A.   If we had updated dispensing, if it was just a brief

10   review, it would take anywhere from maybe fifteen minutes for a

11   small store that barely dispensed any controlled substance

12   prescriptions.  It would take a couple of hours or more for a

13   large store that dispense multiple prescriptions because we

14   would look up information on the prescriber.

15   Q.   And were there enough resources in the compliance

16   department to do that for all the orders of interest?

17   A.   No, there was not.

18   Q.   I want to circle back to your answer about RDC's actual

19   practice.  When orders of interest went on hold, were they

20   reported to the DEA?

21   A.   No, they were not.

22   Q.   And how many orders of interest were -- I'm sorry, how many

23   suspicious orders were reported to the DEA while you were there

24   from 2013 through the end of 2016?

25   A.   Actual specific orders that were orders of interest, I do

1  | not remember any suspicious orders being reported.

2  | Q.  Do you remember reporting any customers?

3  | A.  I have a recollection of at least one customer during my

4  | time there.

5  | Q.  Why didn't RDC -- were there more than one customer to

6  | report to the DEA?

7  | A.  No, there was more -- let me answer your question.  Yes,

8  | there was more than one customer.

9  | Q.  And why didn't RDC report the customers?

10 | A.  Because it was our practice, we didn't report our

11 | customers.  We worked with our customers.

12 | Q.  Was that written down on any policy that RDC didn't report

13 | customers or orders?

14 | A.  Not on any policy I had seen.

15 | Q.  How did you know then that RDC wasn't supposed to or RDC

16 | did not report customers or orders?

17 | A.  Because it was something I was told.

18 | Q.  Who told you that?

19 | A.  Bill Pietruszewski.

20 | Q.  Do you have any understanding of where, if anywhere, that

21 | practice came from?

22 | A.  My only understanding, it was what was he was told.

23 | Q.  What did you understand he was told?

24 | A.  What did I understand?

25 |          MR. TOWNSEND:  Objection.

1          THE COURT:  I will allow it subject to connection.

2    Q.  What did you understand that Bill Pietruszewski was told?

3    A.  My understanding was that -- we were told as a business, we

4    made a business decision to work with our customers and to

5    teach them due diligence practices.

6    Q.  And not report them?

7    A.  Correct.

8    Q.  Who said that?

9    A.  That would have come from Larry Doud.

10   Q.  Could we please see Government Exhibit 52.  Ms. Bouck, this

11   is for everyone.  I want to focus on the email at the bottom of

12   the first page.  Can you tell the jury who the email is from

13   and to?

14   A.  The email is from myself to Elizabeth Cullen, the remainder

15   of the compliance department and Richie Cullen who is on our

16   sales team.

17   Q.  Can you read, we already know, to the end of the email?

18   A.  Certainly.  It reads:  We already know that we don't like

19   their dispensing at all, and they haven't incorporated Juice's

20   direction into their daily practices and continue to fill for

21   cash and doctors who are suspicious and have been warned

22   against.  My thoughts are, turn them in and turn them off.

23   Q.  Who are you talking about in this email?

24   A.  I was talking about the Chemist Shop, one of our customers.

25   Q.  When you say, we don't like their dispensing, what did you

1   mean?

2   A.  I meant that there was activity present or that

3   demonstrated on their dispensing reports that was concerning

4   because of red flags.

5   Q.  You say they haven't incorporated Juice's direction, who is

6   Juice and what are you referring?

7   A.  That was Julius Morton.  He was one of our compliance

8   auditors, and Julius had visited the store and provided them

9   with due diligence material and information, even verbally, as

10  to what their obligation was as a pharmacy and their

11  corresponding responsibility as a pharmacy to make sure they

12  were dispensing legitimate prescriptions.

13  Q.  You say that Chemist Shop continues to fill for cash and

14  doctors that are suspicious, why was that an issue?

15  A.  That those were red flags, that we had determined red

16  flags.

17  Q.  When you wrote, "Turn them in and turn them off," what were

18  you referring to?

19  A.  I was referring to the -- turn off the Chemist Shop's

20  ability to purchase controlled substances from us and to turn

21  them into the DEA.

22  Q.  So report them to the DEA?

23  A.  Yes.

24  Q.  Let's look at the top email in this chain.  Who is it from

25  and to?

1   A.  It is from Bill Pietruszewski to Julius Morton, myself and
2   Richie Culled is CCd.
3   Q.  Now, Pietruszewski writes in the second sentence, this has
4   ran its course and this must be decided by management on how we
5   proceed.  What did you understand him to be referring to?
6   A.  We needed management -- I'm sorry.  I apologize.  My tongue
7   is -- we needed management's approval to make any or take any
8   actions of termination against the Chemist Shop.
9   Q.  Can you read the next part of the paragraph after that?
10  A.  It reads:  Though we do not turn in a store unless we can
11  see that they are dispensing to people that are diverting these
12  controlled substances.  You do not know this for a fact, so
13  please do not say this loosely.
14          Again, if they were filling illegal prescriptions or
15  mailing to Florida, then we would turn them off and report them
16  to the DEA.  If you are to report someone to the DEA due to the
17  high cash, you would have to follow that for all our customers.
18  But we choose as an independent wholesaler to educate and work
19  with our customers.  This is what RDC is all about and I know
20  you know that.
21  Q.  What did you understand him to be saying?
22  A.  That we didn't turn in our customers unless we saw that
23  they were filling illegal prescriptions, that we worked with
24  our customers.  We didn't just turn them in because they had a
25  red flag on their dispensing.

1    Q.  And was Pietruszewski's statement consistent with RDC's

2    written policy?

3    A.  No, it was not.

4    Q.  Why not?

5    A.  Because our written policy was that if we identified

6    suspicious activity, suspicious ordering, that we would report

7    the customers to the DEA.

8    Q.  He says, If you are to report someone to the DEA due to

9    high cash, you would have to follow that for all our customers.

10   Were there other RDC customers with high cash?

11   A.  Yes.

12   Q.  And were you reporting them to the DEA?

13   A.  No, we were not.

14   Q.  He ends by saying, We should turn them off, but we need to

15   let Larry and Joe know.  Who do you understand Larry and Joe to

16   be?

17   A.  Larry Doud and Joe Brennan.

18   Q.  Now, this email is from September of 2015, do you know if

19   RDC ultimately terminated the Chemist Shop?

20   A.  To the best of my recollection, we did within a couple of

21   months later, or something along those lines.

22           MR. GOTTLIEB:  Your Honor, I'm sorry.  I couldn't hear

23   the last part.

24           THE WITNESS:  I'm sorry. I couldn't hear you.

25   Q.  He couldn't hear you.

1   A.  Sorry.  Yes, we did end up suspending or terminating them

2   within a couple of months from then.

3   Q.  Do you know if you continued to sell controlled substances

4   between this time and that time?

5   A.  I can't recall that did.

6   Q.  Did RDC ever report the Chemist Shop to the DEA?

7   A.  No to my recollection, no.

8   Q.  And did it ever report any of the chemist shops orders?

9   A.  Not at this time, not that I remember.

10  Q.  Were there other times that someone at RDC told you that

11  RDC did not report customers that worked with them?

12  A.  Yes.

13  Q.  What comes to mind?

14  A.  A conference, DEA conference that I had attended with

15  Elizabeth Cullen and Bill Pietruszewski.

16  Q.  And what do you recall from that conference?

17  A.  We had just completed the session.  I think it was

18  lunchtime or a break and the session was about -- for

19  manufacturers and distributors, telling us about our obligation

20  to report customers or suspicious activity because it actually

21  helps to prevent things like the opioid epidemic.  It helped to

22  prevent diversion, for the DEA to investigate these actions.

23          And I had looked at Bill and told him we needed to

24  start -- this isn't verbatim.  I apologize.  My memory just --

25  I can't be exact.  But I looked at Bill and I had told him that

1    we needed to start reporting our customers, that we weren't

2    doing what the session just told us to do.  And Bill had looked

3    at me and said, well, we did report like cases, Prescription

4    Pad, he gave me an example of a customer he reported.

5            But I told him, we weren't reporting other customers

6    and we were not reporting ordering like we were supposed to be.

7    And he said to me that we don't report our customers.  We work

8    with our customers and we teach them about due diligence.

9    Q.  And what was your reaction to that?

10   A.  It upset me because we just were listening.  This is where

11   I get upset.  We were just listening to the DEA telling us we

12   had to -- I'm sorry.

13   Q.  There are tissues there if you need it. We can take a

14   minute.

15   A.  I'm fine.  I'm sorry.  It just upsets me.

16   Q.  What about it upset you?

17   A.  Because it wasn't right.  We were -- the DEA was very --

18   it's not an option.  It was very much a regulation that we had

19   to be reporting customers and reporting suspicious activity

20   because it was something real that was happening with opioids

21   and it upset me that we weren't doing that.

22   Q.  What's your understanding about who came up with that rule

23   that RDC wouldn't report orders?

24   A.  My understanding was that that was upper-management's rule.

25   Q.  And who are you referring?

1    A.   Larry Doud.

2    Q.   Given his involvement in the company, do you think it's

3    possible that Doud didn't know that you weren't reporting

4    orders?

5               MR. TOWNSEND:   Objection.

6               THE COURT:   Sustained as to the form of the question.

7    Q.   What's your understanding about whether or not Doud knew

8    about the reporting?

9    A.   What is my understanding of what he knew about it?

10   Q.   Yes.

11   A.   I understood that he knew what we were doing with customers

12   because ultimately it was him who decided any actions that we

13   took upon our customers.

14   Q.   Including reporting them?

15   A.   Yes.

16   Q.   Did you ever talk to Doud about releasing held orders?

17   A.   There was times that he would ask me why a order was held

18   or tell me that an order wasn't held and that we needed to

19   release it.

20   Q.   Those times you're thinking of, where were you physically?

21   A.   Physically it was possibly in his office or there was times

22   it was in my office.

23   Q.   And recognizing there's a few different times, can you

24   describe generally sort of what would happen with the

25   interactions?

1   A.   What I remember is that he would ask me about an order

2   being held.  He usually had been contacted, from what I

3   remember, by the customer, the customer complaining, and that

4   he would want the order to be released for the customer.  And

5   that if there was something we needed, that he would make sure

6   that we got it.

7   Q.   Why were those orders on hold?

8   A.   A order would have been on a hold because it exceeded their

9   order amount for the month.

10  Q.   What happened after Doud spoke to you about the orders?

11  A.   It would have been released.

12  Q.   Do you recall ever speaking to anyone about Doud telling

13  you to release the orders?

14  A.   I remember venting to or talking amongst the compliance

15  team about it and complaining about it.

16  Q.   What do you recall?

17  A.   Just complaining like that they -- we shouldn't have never

18  released the order, that's kind of -- I don't remember specific

19  conversations.

20  Q.   Why did you think you never should have released the order?

21  A.   What I do remember, it was circumstances where we're

22  waiting for something like dispensing from the store.

23  Q.   Did you ever speak to -- based on your general

24  recollection, do you ever speak to anyone outside of compliance

25  about this?

1   A.   If I spoke outside of the compliance department, there's

2   times we would have to speak to our credit managers about --

3   cause they were waiting -- sometimes if an order was on hold,

4   there's also making sure it wasn't a credit issue or that they

5   could release the order.  So we would tell the credit managers

6   about their customers order being able to be released, meaning

7   they handled the accounting for that customer.

8   Q.   And what generally would you have said?

9   A.   Just that we were able to release the order.  There might

10  have been times -- there was the credit manager across the hall

11  from me.  I might have vented to him like I would have vented

12  to my compliance team as well.

13  Q.   What sort of things are you referring to?

14  A.   Just I might have been frustrated that we had released an

15  order if we didn't have dispensing.

16  Q.   And who is that compliance manager?  I'm sorry, credit

17  manager?

18  A.   That would have been Sam Alaimo.

19  Q.   Taking a step back.  While you were working in the

20  compliance department from 2013 to the end of 2016, roughly how

21  many orders of interest were flagged and put on hold?

22  A.   Thousands would be what I would say.

23  Q.   Now, in the binder in front of you is Government Exhibit

24  275.  Can we also put this up on the screen, Ms. Drescher.

25          THE COURT:  Is that in evidence?

1              MR. ROOS:  Yes.

2    Q.  What is this?  Why don't you flip through it If you need to

3    flip through the binder just so you can familiarize yourself

4    with it.

5    A.  It's the -- we kind of looked at one similar earlier.  It's

6    the DEA month end order interest suspicious report.

7    Q.  Does this one cover a broader period?

8    A.  It starts from January of 2012.

9    Q.  I think Ms. Drescher might be able to help you.

10   A.  I'm going to say, yes, it does because it's lot of pages.

11   January of '12 through January of '17.

12   Q.  Let's go back to the first page and zoom in on the very

13   top.  This ones says, DEA month end orders of suspicion report.

14   What does that report refer to?

15   A.  It printed along with the order of interest report.  It was

16   usually the last page for each month, and it was the amount --

17   it would have listed the orders of interest that were reported.

18   Q.  Have you looked through this document, this multipage

19   document?

20   A.  Yes, I have.

21   Q.  Did you see any suspicious orders listed as reported in it?

22   A.  I did not.

23   Q.  Let's go to the next page.  What does this page show?

24   A.  That shows the order of interest for the month of January

25   2012 that were generated.

M1JBDOU5                          Bouck – Direct

1    Q.   And it's continued on next page.

2              (Continued to next page)

1   Q.  All right.  And let's go to the next page.  And sorry, one

2   more page.  And then what's this one?

3   A.  And that is the suspicious order report for February 2012

4   that were reported.

5   Q.  So just for everyone's understanding, basically, the way

6   this works is the first page is the suspicious order report

7   list, the next page is the order of interest list for a month.

8   And then, for the next month there is suspicious order report

9   and then order of interest.  Is that right?

10  A.  Yeah, the order of interest and then the suspicious order

11  report.  That's how they would print in sequence.

12  Q.  Exhibit 275 is all of the months, just in order; is that

13  right?

14  A.  Yes, it look like they are in order -- yes.

15  Q.  So, looking through that roughly, how many orders of

16  interest are listed in the binder?

17  A.  Thousands.  There is a lot per page, and there are a lot of

18  pages.  A couple thousand.  I don't know.

19  Q.  What happened with most of them?

20  A.  Most -- they were released.

21  Q.  And were there orders during the period from when you

22  started through the end of 2016 that you believed were

23  suspicious, but which weren't reported?

24  A.  Yes.

25  Q.  And what happened with those orders?

1   A.  They were released.

2   Q.  Meaning shipped?

3   A.  They were shipped, yes.

4   Q.  Let's take this down.  Let's change topics.

5            Was RDC taking on new customers in 2015?

6   A.  Yes.

7   Q.  Did you have any concerns about any of those new customers?

8   A.  From my recollection, yes.

9   Q.  I'd like to direct your attention to Government Exhibit 41

10  which is in evidence.  And let's start at the bottom e-mail

11  from February 18, 2015.  Maybe a little higher, Ms. Drescher.

12  One -- two more I think.  Thank you.

13           And so, Ms. Bouck, I'll have you focus on the bottom

14  e-mail here and we'll flip through the pages so you can see the

15  rest of it.  Okay?

16           So for starters, who is the e-mail from and to?

17  A.  From myself to Bill Pietruszewski and Julius Morton.

18  Q.  Let's the subject line is Parkdale and Franklin Square

19  Pharmacies?

20  A.  Yes.

21  Q.  What does that refer to?

22  A.  Pharmacy names.

23  Q.  Let's go to the next page.  What are we looking at here?

24  A.  We're looking at a spreadsheet of prescribers that were on

25  the dispensing report.

1   Q.  So, can you explain to us the color coding?

2   A.  Usually it was a practice of ours to any doctor that we

3   wanted to draw attention to, upon the review, or a doctor that

4   we thought was concerning or suspicious, we would highlight

5   them in a color such as yellow.

6   Q.  Now let's scroll down through the table.  And at the very

7   bottom here, you write the biggest issue with this store --

8   it's up here, sort at the very top of this last page under

9   second sentence.

10          You write the biggest issue with this store, Parkdale

11  Pharmacy, is the amount of cash they do for benzos.  Most of

12  the prescribers above were for such.

13          What are you talking about there?

14  A.  High cash was a red flag that we would review when we were

15  looking at a dispensing report.  So, they had, from what I am

16  what -- from what I had written, they had high cash on their

17  benzo prescriptions, and most of the prescribers wrote for

18  that.

19  Q.  And let's look at the e-mail in response to this one.  So,

20  if you go up a few pages, Ms. Drescher.

21          Can you read from -- this is from Bill Pietruszewski

22  and can you read from the sentence at the end beginning "man O

23  man"?

24  A.  It reads:  Man O man, you are keeping Julius busy.  That is

25  good, but it seems to be interesting all the new stores we are

M1j3dou6                        Bouck - Direct

1   bringing on have baggage.

2   Q.  Remind us, who is Julius?

3   A.  He was one of our compliance auditors.

4   Q.  By the way, what was Julius' roles -- like, what does a

5   compliance auditor mean?

6   A.  Julius was, or compliance auditor was, their job was to go

7   to the stores, to visit the stores, to see if they were in

8   compliance, or to, they would review their pharmacy records,

9   they would look at their inventory, make sure things were in

10  compliance with regulations.

11  Q.  And did Morton visit every pharmacy between 2013 and 2016?

12  A.  He did not.

13  Q.  Roughly how many?

14  A.  I -- maybe half.  I am inclined to say less than that.  But

15  maybe half.

16  Q.  And did he come into the office?

17  A.  Very rarely.

18  Q.  What, if any, issues were there with Morton's review of

19  pharmacies?

20  A.  I don't know necessarily what issues there were.  There

21  were times where I may have disagreed with his analysis for

22  review of a pharmacy.

23  Q.  What do you mean by that?

24  A.  Julius was from the DEA, and he would look at the

25  regulations that were actually in the -- in the CFR, but he had

1  never had any pharmaceutical background.  Where I came from

2  having worked in a pharmacy for 15 years or more.  And I knew

3  the practices of what happened when you filled a prescription,

4  what you looked at and what you did.  And there were times I

5  would notice things happening on the dispensing patterns that I

6  would notice on the dispensing, whether it be the physician and

7  what they were writing for or how it was paid, that it wasn't

8  necessarily a DEA regulation.  So there were times where I

9  didn't, I thought there was something wrong, and Julius,

10  because it wasn't black and white, thought there wasn't.

11  Q.  Let's go back to the e-mail then.  Actually stay on that

12  zoomed, on the highlighted portion.

13       The end of the sentence you read said:  Seems to be

14  interesting all the new stores we are bringing on have baggage.

15       What do you understand that to be a reference to?

16  A.  That we had seen issues or red flags on their dispensing.

17  Q.  Let's go up to the next e-mail.  And can you read the first

18  paragraph from Julius Morton.

19  A.  It reads:  Funny you say that.  One of the part owners of

20  Colony Drugs was present at my review today.  His name is Roman

21  and he owns a pharmacy we supply in Yonkers.  He made a

22  statement that bothered me.  He claimed that everyone is being

23  cut off by Cardinal, McKesson and Bellco, and running over to

24  RDC.  He almost suggested like we are picking up rejects from

25  other distributors.

M1j3dou6                         Bouck - Direct

1   Q.   What do you understand that to refer to?

2   A.   That Julius got the impression that other pharmacies and

3   new pharmacies thought that RDC was picking up customers who

4   had been cut off or terminated by other distributors.

5   Q.   Let's look at the top e-mail.  Can you read the first two

6   sentences.

7   A.   Just reading which ones -- where you've highlighted?

8   Q.   Yeah.  I guess that's technically three sentences.

9   A.   I said:  Thank you, Juice and Bill.  I find myself

10  literally cringing when we have new accounts now because of how

11  the dispensing has looked.  Brand new stores are amazing.

12  Q.   What did you mean by that, what did you mean literally

13  cringing when we have new accounts?

14  A.   Because there was -- I would have meant that there was

15  issues with them, that I was cringing because I knew that there

16  was going to be problems on dispensing reports, problems

17  meaning red flags on the dispensing report when we took on new

18  customers.

19  Q.   And were there ever times when Doud told you to turn on a

20  customer with red flags in the dispensing?

21  A.   To the best of my recollection, and what I reviewed, I

22  believe there was.

23  Q.   Let me ask you, do you recall a pharmacy called Cooke's

24  Pharmacy?

25  A.   I do.

1    Q.   What do you recall about Cooke's Pharmacy?

2    A.   Cooke's Pharmacy was in Pennsylvania.  And they had, they

3    had high cash and they had a lot of patients traveling from out

4    of state or that the prescribers, excuse me, were from out of

5    state that were having their prescriptions filled at the

6    pharmacy as high cash.

7    Q.   When you first got information about Cooke's Pharmacy, did

8    you turn the pharmacy on?

9    A.   No.

10   Q.   Why not?

11   A.   Because of the -- because of the red flags that were

12   demonstrated on their dispensing report.

13             MR. ROOS:  Can we please see Government Exhibit 22

14   which is in evidence.  Let's zoom in on the bottom e-mail from

15   Elizabeth Cullen.

16   Q.   Would you read it.

17   A.   It reads:  Hi all.  Attached is the dispensing analysis for

18   Cooke's Pharmacy in Troy, Pennsylvania, account number 3744.

19   Their cash percentage is at 27 percent, which is actually down

20   6 percent from the last analysis in March -- specifically their

21   cash for oxy has been reduced to 19 percent from the previous

22   25 percent.  Technically this is progress I suppose, but still

23   not great at all.  The doctors with the most cash prescriptions

24   to their name are Kari Wood (48), Richard Husband (53), Anika

25   Webb (58), and Stephen Renzi (112).  Dr. Constant Sweet, a

1    suspicious prescriber on our watch list is listed here as well,

2    but since I last researched her information, both her PA

3    license and DEA registration have been reinstated to

4    unrestricted status.

5            As for the other prescribers there are seven doctors

6    which are over 50 miles away, including one in Pensacola,

7    Florida.  Three prescribers have inactive licenses, five use

8    the DEA number for the Packer Hospital Pharmacy, and seven more

9    either didn't provide a correct verifiable DEA number or didn't

10   provide one at all.  Please let me know if you have any

11   questions.

12   Q.  Just breaking this down a little bit.  For starters, there

13   is a reference to the last analysis in March.  Right?

14   A.  Yes.

15   Q.  What's that a reference to?

16   A.  That they had reduced their cash percentage that they were

17   filling prescriptions for from the March dispensing.

18   Q.  And it says the cash percentage is at 27 percent which is

19   down 6 percent.  And then also notes the oxy percentage.

20           What was the threshold at RDC for what you deemed a

21   suspicious cash amount?

22   A.  We tried to look at anything over 10 percent.

23   Q.  There is a series of doctors names listed here and a

24   reference to a watch list.  What is that a reference to?

25   A.  We had a watch list that we -- that was provided to us for

doctors to keep an eye on, to watch for suspicious activity.

Q.  There is a reference to seven doctors which are over 50 miles away, including one in Pensacola, Florida.  Why, if at all, was that an issue?

A.  Because it was a red flag that patients would generally, if the doctor was that far away, so was the patient.  So, for patients to be traveling that far to have a prescription filled in a pharmacy from a different state, or even the same state but to travel that far to fill a prescription.

Q.  Let's look at the e-mail in response.  The one from Julius Morton there.  And he says:  Have we ever placed limits on this account from before?  Specifically since the March analysis?

        Do you see that?

A.  I do.

Q.  What was your response?

A.  My response was that we had never turned them on for controls.

Q.  Then what do you say in the next sentence?

A.  I said:  This is a stockholder Larry would like on for such and says that they are central to a large construction area and get a lot of out-of-town doctors and patients as construction workers.

Q.  What were you referring to when you said Larry would like it "on" for such?

A.  That he would want them, he wanted them turned on for their

1   ability to purchase controlled substances.

2   Q.  How did you know that?

3   A.  Because he told me.

4   Q.  Let me ask, actually, you said they had never been turned

5   on for controls.  What did you mean by that?

6   A.  Meaning prior to this e-mail, we had not allowed them to

7   purchase controlled substances from RDC.

8   Q.  Why not?

9   A.  Because of the behavior we saw in the earlier analysis in

10  March.

11  Q.  Let's look at the e-mail in response to this.  And can you

12  read it?

13  A.  It is from Julius to myself, and he says:  OK, go ahead and

14  turn them on.

15  Q.  Was the pharmacy turned on?

16  A.  Yes.

17  Q.  What ended up happening with the pharmacy?

18  A.  If I recall correctly, they ended up being suspended or

19  terminated down the road.

20  Q.  When was that?

21  A.  I don't remember.  I believe it was in 2018, but I can't

22  remember exactly.

23  Q.  Was it while Larry Doud was at the company or not?

24  A.  No, he was not.

25  Q.  What do you recall the reason was it was shut down?

1    A.   The same types of behavior.   The doctors from the far

2    distances and the cash prescriptions.

3    Q.   Did RDC have a policy in place for selling controlled

4    substances to new customers?

5    A.   We did.

6    Q.   Let's start by looking back at Government Exhibit 29 which

7    we looked at previously.   We turn to the second page.

8         What does it say will happen before selling controlled

9    substances to new customers?   It is the second paragraph here.

10   A.   It states that RDC would require certain documentation from

11   the store before the account is set up.   That we required an

12   account questionnaire, pictures inside and outside of the

13   store, along -- we wanted copies of their DEA registration

14   certificate and their state licenses, the salesman was supposed

15   to inspect the store do kind of a review of the store.   And we

16   would require a controlled substance report for the most recent

17   three months from the pharmacy.

18   Q.   It says so we can examine if any risk.   What did that mean?

19   A.   It meant so we could make sure that not only the pharmacy

20   itself, the licenses, and DEA registration were accurate and

21   that they were active.   But also that there wasn't any red flag

22   activity within the dispensing report.

23   Q.   Let's look again at the policy from 2015, Government

24   Exhibit 276.   Can we look under the heading customer due

25   diligence and have you read the first paragraph.

A.   It reads:   RDC must obtain certain information about every

prospective and current customer and their business;

investigate the customer and review documentation and

information it gathers to assist it in determining whether the

customer is ordering controlled substances for legitimate

medical purposes.

Q.   Let's go to the next page.  And do you see where it says

prior to selling controlled substances to any account, RDC must

obtain, review and verify the following?

A.   Yes.

Q.   What are the things that RDC must obtain, review and

verify?

A.   The customer's DEA registration, their state professional

license, the actual pharmacist license, any of the pharmacists

that work there.  Some states required a pharmacy to have a

controlled substance license, so we would require that from

them, as well.  The customer application, questionnaire and

photographs, a completed visit protocol, and drug dispensing

information along with any additional information we felt we

needed.

Q.   Let's go to the next page.  Under subheading (h), what's

this?

A.   It was talking about what we could do with -- with

controlled substance dispensing data, in that we would review

it for red flags, for completeness, accuracy and areas of

M1j3dou6                          Bouck - Direct

1    potential concern.

2    Q.   Did RDC always follow that policy?

3    A.   No, we did not.

4    Q.   Were there ever times that Doud told you to open an account

5    before reviewing the dispensing?

6    A.   Yes.

7    Q.   Can we please show the witness and the jury what's in

8    evidence as Government Exhibit 111B.   Let's go to the bottom of

9    the second page.

10            Can you read the e-mail you wrote on October 15?

11   A.   Yes.   It says:   Kevin, inquiring as to the status of the

12   rest of the required information, etc. needed from compliance

13   for this account?   We are still in need for the customer

14   questionnaire, visit protocol, dispensing with all required

15   fields on all controlled substances.   Please let me know if you

16   have any questions.   Currently per Larry's direction, this

17   account is on for controlled substance purchasing -- or CS,

18   controlled substance purchasing, but I am to follow up to make

19   sure we receive required info.   Thank you, Jessica.

20   Q.   And what's the subject line?

21   A.   Blairsville.

22   Q.   What's that a reference to?

23   A.   A pharmacy.

24   Q.   Is that a new customer at the time or potential new

25   customer?

1    A.   Yes.

2    Q.   And the first sentence you are asking about some materials.

3    Why were you asking for those?

4    A.   Because those were required for us to be able to review to

5    make sure that it was a legitimate pharmacy and the dispensing

6    was.

7    Q.   Under the policy?

8    A.   Yes.

9    Q.   The last sentence here says:  Currently per Larry's

10   direction this account is on for CS purchasing -- I'll get to

11   the rest of the sentence in a second.  Let me stop there.

12            What is CS purchasing a reference to?

13   A.   Controlled substance purchasing.

14   Q.   And when you said the account is on, what do you mean?

15   A.   That we had turned on their ability to order controlled

16   substances from us.

17   Q.   What are you referencing when you say per Larry's

18   direction?

19   A.   That Larry -- he is the one that wanted or told me to turn

20   them on.

21   Q.   Now, did RDC sell controlled substances before doing

22   dispensing analysis to this customer?

23   A.   Yes.

24   Q.   Was there ever a time when Doud wanted to change RDC's

25   practice with respect to all new customers?

1    A.  Yes.

2    Q.  What happened?

3    A.  He had read somewhere that the DEA was loosening up on its

4    review or visits to manufacturers and distributors, that he --

5             MR. TOWNSEND:  Your Honor, I object.

6             MR. ROOS:  What's the objection?

7             MR. TOWNSEND:  She's testifying as to what Larry Doud

8    read?

9             THE COURT:  Why don't you make clear as to how she has

10   this, come about this information.

11            MR. ROOS:  Sure.

12   Q.  Ms. Bouck, how do you know about this?

13   A.  Because it was a conversation and an e-mail that myself was

14   included to that Larry had learned or he understood that there

15   was -- basically, in so many words or less, he wanted us to

16   start turning on customers without analyzing dispensing

17   reports, because he thought that that was something we could do

18   afterward, because the DEA wasn't coming down as hard on

19   distributors, and this would expedite the process of turning on

20   new customers.

21   Q.  What reason, if any, did he give for why he wanted to start

22   opening accounts before doing due diligence?

23   A.  Because he thought that this -- because this gave us the

24   opportunity to do so.  To turn on customers faster.

25   Q.  I'm sorry.  What gave you the opportunity to do so?

1   A.  The -- the article that was read, that he had read.

2   Q.  So the fact that he DEA was not going into companies?

3   A.  Correct.

4   Q.  Can we please see Government Exhibit 57.  Can we turn to

5   the second page and start at the bottom.

6          Who is this e-mail from?

7   A.  From Larry Doud.

8   Q.  Can you read it.

9   A.  Yes.  It reads:  Folks, based on recent government changed

10  I want to accelerate our account opening process.  As soon as

11  our credit managers completely approve our credit app, we will

12  open an account right away.  We will continue to do our

13  diligence on controls, but not before we open the account.

14  It's open for discussion.

15  Q.  What did you understand him to be referring to?

16  A.  That he wanted accounts being turned on as soon as it was

17  approved by the credit department.

18  Q.  Can you read Bill Pietruszewski -- read the next e-mail,

19  the one above it from Bill Pietruszewski.

20  A.  It reads:  Hi Larry.  That is a management decision and is

21  fine with compliance.  I only would suggest that Don Bilgore or

22  Larry Houck change our SOP to state so we made a change.

23  Q.  What is SOP?

24  A.  Our suspicious ordering procedures.

25  Q.  Who are Bilgore and Larry Houck?

1    A.   They are attorneys.

2    Q.   And what did you understand him to be referring to when he

3    said change our SOP?

4    A.   I understood that to incorporate the turning on of stores

5    once the credit manager approved them for controlled

6    substances.

7    Q.   Let's turn to the first page of the document.  There is an

8    e-mail from Bill Pietruszewski at 9:08 a.m. on June 6.  Can you

9    read first who it's to?

10   A.   It is from Bill Pietruszewski to Larry Doud, and cc'd are

11   Joe Brennan, myself, Richie Cullen, Jay Shearer, Lanny Doud and

12   Bill again.

13   Q.   By the way, who are Jay Shearer and Lanny Doud?

14   A.   They were part of our sales management team.

15   Q.   Is Lanny Doud related to Larry Doud?

16   A.   Yes.

17   Q.   What's the relation?

18   A.   He is his son.

19   Q.   Can you read what he wrote in the body of the e-mail.

20   A.   Bill wrote:  The SOP just states that RDC will conduct a

21   review prior to opening them to controls.  We would just need

22   to change this, but would ask that the attorneys would do so.

23   Jessica and all compliance team must send their analysis to

24   Julius and myself and we then normally give our pleasing to

25   turn on.  As I said this morning, we have no problem changing

1   that, just want it to be documented so we may show DEA when

2   they are in the next time for an audit.

3   Q.  What did you understand that to mean?

4   A.  That Bill wanted to make sure that our SOP reflected this

5   change in how we turned on new customers for controlled

6   substances.

7   Q.  Why is that?

8   A.  Because it would have been different, we were turning them

9   on without an analysis, where the SOP stated that we would

10  review and do an analysis of the customer's dispensing so they

11  matched.

12  Q.  What was your understanding of why it mattered that they

13  match?

14  A.  Because we wanted to make sure the DEA knew what we were

15  doing, and what was written was what we were practicing.

16  Q.  The e-mail above this is from you.  Can you explain what

17  you were asking?

18  A.  My concern with just turning on the customer as soon as the

19  credit manager approved them was that it -- I wanted to make

20  sure, I was concerned we wouldn't get their license and

21  registration and pictures, so we could verify they are an

22  actual pharmacy.  So I was asking that we could at least get

23  their questionnaire and pictures as part of the credit process,

24  so we could at least have some form of verification done.

25  Q.  Let's look at the top e-mail.  Who is that one from?

1   A.  That is from Larry Doud to myself with others cc'd.

2   Q.  How did he respond?

3   A.  He said:  We do not do that through the credit app?  I do

4   not want to slow this down.

5   Q.  So did RDC start opening new accounts without doing due

6   diligence?

7   A.  We did.

8   Q.  And were you reviewing dispensing data before selling

9   controlled substances?

10  A.  No, we were not.

11  Q.  So was there any type of due diligence before selling

12  controlled substances?

13  A.  If we, the only due diligence would have been if we

14  actually did receive a questionnaire or a DEA license or

15  registration verifying them, that would have been it.  We

16  didn't know anything with the dispensing.

17  Q.  Were there any sort of controls to deal with the diversion

18  relating to those sales?

19  A.  No, because we were not reviewing what was happening in the

20  dispensing data.

21  Q.  There is a reference in the e-mail to attorneys editing.

22  Did they have do that, to your knowledge?

23  A.  Not that I am aware.

24  Q.  Did Larry Doud ever speak to you directly about opening

25  accounts?

1    A.   Yes.

2    Q.   What happened?

3    A.   Just that he -- maybe he would have been something along

4    the lines of this is a new account, that so-and-so is a new

5    account, and we want this store as one of our customers, and

6    that as soon as we got approval from credit, that he wanted

7    them turned on for controlled substances.

8    Q.   How did you react?

9    A.   I would have turned them on.  I may not have liked it, but

10   I would have turned them on.  He was the boss.

11   Q.   Can we now pull up Government Exhibit 1004 just for the

12   parties and the Court.  Not the witness.

13            MR. ROOS:  The government would now offer this

14   stipulation.

15            THE COURT:  Yes.

16            MR. TOWNSEND:  No objection.

17            MR. ROOS:  I misidentified.  It is 1005.  So the

18   government offers Exhibit 1005 and also the materials

19   referenced therein which are Government Exhibits 501 and 502.

20            THE COURT:  Received.  The stipulation is not already

21   in evidence?

22            MR. ROOS:  The stipulation is not already in evidence.

23   And so I'm offering the stipulation and I'm offering the two

24   exhibits referenced in the stipulation.

25            THE COURT:  Without objection they'll be admitted.

1          (Government's Exhibit 1005, 501, 502 received in

2     evidence)

3          MR. ROOS:  Can we publish that for the jury?

4          THE COURT:  Yes.

5          MR. ROOS:  I'll read just part of it.

6          It is hereby stipulated and agreed amongst the parties

7     that if called as a witness, a representative of the United

8     States Attorney's Office from the Southern District of New York

9     would testify that Government Exhibit 501 is a true -- 502, I'm

10    sorry -- is a true and accurate copy of data extracted on or

11    about February 21, 2019, from an iPhone 5S possessed by William

12    Pietruszewski.

13         Government Exhibit 502 consists of a voicemail from

14    Pietruszewski's iPhone dated June 7, 2016.

15         Ms. Drescher, can we now play that voicemail for

16    everyone.

17         (Audio recording playing)

18         MR. ROOS:  Can we now please show just for the witness

19    and the parties Government Exhibit 502T.

20    Q.  Ms. Bouck, take a look, and the question is, is this an

21    accurate transcript of your voicemail?

22    A.  Yes, it is.

23         MR. ROOS:  The government offers Exhibit 502T.

24         THE COURT:  Any objection?

25         MR. TOWNSEND:  No objection.

1             THE COURT:  It will be admitted into evidence.

2             (Government's Exhibit 502T received in evidence)

3             MR. ROOS:  Can we publish it?

4             THE COURT:  Yes.

5    Q.  Ms. Bouck, twice in the voicemail you say -- you first say

6    I don't want Larry thinking I am being obstinate and not

7    following rules.  And then in line 23-24 you say, like I said,

8    I didn't want Larry thinking I am being obstinate and not

9    following rules.

10            What did you mean by that?

11   A.  Well, Larry was the big boss.  He ultimately, he was the

12   boss of my boss.  And I didn't want to disobey, or not listen

13   to what he had asked me to do.

14   Q.  And you say following rules, now you had a written policy

15   relating to opening new accounts, right?

16   A.  Yes.

17   Q.  And under those rules opening new accounts without due

18   diligence was not something you would do, right?

19   A.  Correct.

20   Q.  What rules were you talking about?

21   A.  The directive that Larry made that he wanted the stores

22   turned on as soon as we got approval from the credit manager.

23   Q.  Why were you worried about not following those rules?

24   A.  Because I didn't want to lose my job.

25   Q.  What happened with those accounts that were opened without

1   any due diligence?

2   A.  Some of them remained on, and some of them ended up

3   ultimately being suspended or terminated.

4   Q.  When did that suspension or termination happen?

5   A.  From my best recollection, it didn't happen until some time

6   in 2017-2018.

7   Q.  Was Larry Doud at the company at that point?

8   A.  I don't believe he was anymore.

9   Q.  Let's look at one pharmacy in particular.  Are you familiar

10  with a pharmacy called 59th Street?

11  A.  It's familiar, yes.

12  Q.  Is that a pharmacy that sold controlled substances without

13  a full review of dispensing?

14  A.  To the best of by recollection, yes.

15  Q.  Let's take a look at Government Exhibit 23, please.  Let's

16  start at the bottom.  This e-mail is from March 2017.  Was the

17  59th open in 2016?

18  A.  I believe so, yes.

19  Q.  And what is this at the bottom here?

20  A.  This is a dispensing analysis.

21  Q.  And did this happen before, after, or at the same time that

22  the pharmacy was turned on for controlled substances?

23  A.  I believe that this analysis was done after they were

24  turned on for controlled substances.

25  Q.  And so, in this bottom e-mail it is from Elizabeth Cullen

M1j3dou6                          Bouck - Direct

1    to compliance.  Is that a group that included you?

2    A.  Yes.

3    Q.  What's the subject?

4    A.  59th Street Pharmacy dispensing analysis, account number

5    6508, Brooklyn, New York.

6    Q.  Do you see the sentence that begins:  Here are the

7    prescribers of note for this store in particular?

8    A.  Yes.

9    Q.  Can you read the bullets after that.

10   A.  Yes.

11           Wei Wang, family medicine, cocktail prescribing.

12           Michael Garbulsky, physician assistant, cocktail

13   prescribing.

14           Carl Anderson, family medicine, high quantity

15   prescribing.  2RX of 180 count oxy 30milligram.  100 percent

16   insurance.  Previously vetted with accounts Southshore/New

17   Dorp/Princess Bay.

18   Q.  Can we go to the next page.

19           MR. GOTTLIEB:  Your Honor, objection.  May we have a

20   sidebar, please?  It will be brief, your Honor.

21           THE COURT:  Fine.

22           (Continued on next page)

23

24

25

1              (At the sidebar)

2              MR. GOTTLIEB:  I just wanted the chronology.  Because

3    we are at the point now, your Honor, where this is March of

4    2017.  Mr. Doud I believe had already left, so, the objection

5    is that this could not be in furtherance of the conspiracy

6    which would have been the basis to have this admitted.

7              MR. ROOS:  It's plainly relevant what happened with

8    the pharmacies.

9              THE COURT:  Are these pharmacies that were taken in

10   during the time that he was --

11             MR. ROOS:  Correct.

12             THE COURT:  -- the CEO?

13             MR. ROOS:  If that's part of the issue, I am happy to

14   clean up the record on that.

15             THE COURT:  That may solve that issue.

16             MR. GOTTLIEB:  No, but they were then, assuming the

17   facts are that they were terminated after he left, that is not

18   relevant because there is so many other factors that may have

19   gone into that.

20             THE COURT:  Both of those are relevant.  If they

21   weren't, if they were brought in when he was the president and

22   they weren't terminated while he was there and they were

23   terminated afterwards, then the question is was there a

24   legitimate reason he brought them in and didn't terminate

25   before then.

1          MR. GOTTLIEB:  Your Honor, I don't believe this trial

2     is now going to be a trial on what happened later in 2017,

3     2018.

4          THE COURT:  No.

5          MR. GOTTLIEB:  That would be beyond what we're put on

6     notice of.

7          THE COURT:  I'll put it this way.  If it can be

8     established that the conditions that existed that resulted in

9     the termination after they left existed at the time that he was

10    there, then it's relevant.

11         MR. ROOS:  I'll work to lay that foundation.

12         THE COURT:  If they can lay that foundation, otherwise

13    I'll hear you with regard to your objection.

14         MR. GOTTLIEB:  Thank you.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2      BY MR. ROOS:

3      Q.  Ms. Bouck, I want to go back and ask a few questions just

4      to clarify.  Was this particular pharmacy, 59th Street, turned

5      on while Larry Doud was at RDC?

6      A.  I don't remember what the date was specifically.

7      Q.  It was 2016.  Was he at RDC then?

8      A.  Yes.

9              MR. GOTTLIEB:  I would ask that the witness answer the

10     question.

11             THE COURT:  Is that an objection?

12             MR. GOTTLIEB:  Yes.

13             THE COURT:  Leading?

14             MR. GOTTLIEB:  Yes.

15             THE COURT:  Sustained.

16     Q.  When was the pharmacy turned on?

17     A.  If I saw the e-mail again I could tell you.

18     Q.  Would an e-mail help refresh your recollection?

19     A.  Yeah, the document that was just up I think would tell me,

20     at least when or something.

21             MR. ROOS:  Just for the parties and the witness.

22     Q.  Ms. Bouck, do you see that?

23     A.  Yes, I do.

24     Q.  Does it refresh your recollection of when the pharmacy was

25     first turned on?

1    A.  Yes.

2    Q.  I'll withdraw the document now.  Let me ask you the

3    question.

4            What is your recollection of when 59th Street Pharmacy

5    was first turned on?

6    A.  In December of 2016.

7    Q.  Was Larry Doud at the company at the time?

8    A.  Yes, he was.

9    Q.  And when was the pharmacy terminated?

10   A.  After -- after, some time in, I don't remember exactly

11   when, but it was some time in 2017, after that March 2017

12   analysis.

13   Q.  To your recollection, was Larry Doud at the company when

14   the pharmacy was terminated?

15   A.  To my recollection, he was -- he was no longer there, no

16   longer actively there.  He was out of state.

17   Q.  And the issues, let's bring back up Government Exhibit 23.

18   The issues that are identified here, to the best of your

19   recollection, are they new problems to the pharmacy or did

20   these exist when they were opened?

21   A.  To my recollection, these existed when they opened.

22           MR. ROOS:  So, your Honor, I think the witness was in

23   the middle of reading part of the e-mail.

24           THE COURT:  Is this in evidence already?

25           MR. ROOS:  It's in evidence.

Q.  We were going through these physicians and we were just
going to the second page.

         Could we zoom in on that.  And will you pick up by
reading Joseph Olivieri?

A.  Yes.  It reads Joseph Olivieri, high quantity prescribing.
2RX of 180 count oxy 30 milligram 100 percent insurance.
Previously vetted with multiple accounts, including Bay Ridge
3850.

         Barry Savits, general surgery, high cash, 3RX
67 percent cash for oxy/Apap 10-325.

         Anthony Pietropinto, psychiatry.  High cash.  2RX
50 percent cash for oxy 30 milligram, 31 percent cash for
overall prescriptions, 5 out of 16 total RX.

         David Taylor, family medicine/internal med.  High
quantity prescribing.  3RX of 180 count oxy 30 milligram
100 percent insurance.  Previously vetted with accounts Old
Town Staten Island/Oakhurst/Todt Hill/Victory Randall.

         David Treatman, family medicine.  High quantity
prescribing.  2RX of 240 count oxy 30 milligram, 2RX of 180
count oxy 30 milligram, 3RX of 180 count oxy 15 milligram,
100 percent insurance.  Previously vetted with accounts Todt
Hill number 6126, Kingsway, Bay Ridge.

         Martin Tesher, family medicine.  High cash.  3RX
67 percent cash for oxy 30 milligram, 90 percent cash for
overall prescriptions 10 of 11 total RX, previously vetted with

M1j3dou6                        Bouck - Direct

1    accounts South Shore Pro Health 3934/Todt Hill/Bay Ridge 3580.

2              Emmanuel Lambrakis, general surgery.  Arrested 12 of

3    2016.  High cash.  4RX 100 percent cash for oxy 30 milligram,

4    4RX 100 percent cash for Opana ER 40 milligram, 100 percent

5    cash on overall prescribing through this store, 12 total RX.

6              Please let me know if there is any questions.

7    Q.  All right.  Back on the first page, there was a physician

8    named Carl Anderson.  Are you familiar with that physician?

9    A.  His -- he is a very, that name is very familiar to me.

10   Q.  Why is that?

11   A.  Because I believe he was, from what I remember, he's one of

12   our doctors we flagged as suspicious.

13   Q.  The reference here where it says previously vetted with

14   account South Shore, New Dorp, Princess Bay, what's that a

15   reference to?

16   A.  Those were other stores that he -- prescriptions were

17   filled for that he had written for.

18   Q.  Let's go to the next page.  I'm sorry.  The second page of

19   this.  And some of these other names, are any of them familiar

20   to you?

21   A.  Yes.

22   Q.  Which ones?

23   A.  Joseph Olivieri, Anthony Pietropinto, David Taylor, Martin

24   Tesher, and Emmanuel Lambrakis.

25   Q.  Why were all those names familiar to you?

1    A.  Those were familiar to me because those were doctors that

2    we saw consistently in some of the dispensing reports for our

3    pharmacies we were selling controlled substances to, and they

4    were doctors, to the best of my recollection, that we flagged

5    to either watch as suspicious or they were on a suspicious

6    watch list.

7    Q.  On David Taylor, for instance, it says previously vetted

8    with accounts Old Town Staten Island/Oakhurst/Todt Hill,

9    Victory Randall.  What's that a reference to?

10   A.  Those were other accounts that David Taylor, his

11   prescriptions were being filled within.

12   Q.  Were there -- okay.  Now, I think you testified, or let me

13   ask, what ultimately happened with this pharmacy, 59th Street?

14   A.  They were ultimately suspended or terminated.

15   Q.  Were there times that DEA agents would visit RDC and ask

16   about due diligence?

17   A.  Yes.

18   Q.  And were you ever physically present for one of those

19   visits?

20   A.  I was.

21   Q.  When was that?

22   A.  That was in November of 2016.

23   Q.  Did you give them any documents at the time?

24   A.  We had provided them with our due diligence documents.

25   Q.  Which document was that?

1    A.  To the best of my recollection, it was the January 2015

2    suspicious order monitoring policy document that we looked at

3    earlier.

4    Q.  Let's please take a look at Government 67.  What's this

5    e-mail?

6    A.  This is an e-mail from -- of written by myself from myself

7    to Ed Kirker and Joe Brennan, and it was notes, my DEA audit

8    notes from their visit to our facility in Rochester.

9    Q.  Is there an attachment to the e-mail?

10   A.  There are attachments.

11   Q.  Let's take a look at the attachment.

12            MR. ROOS:  So, Ms. Drescher, if you would just flip

13   the page until we get to the attachment.

14   Q.  And what is this document?

15   A.  That is our RDC's customer due diligence and suspicious

16   order monitoring/reporting policies and procedures.

17   Q.  Is this the document that was given to them?

18   A.  Yes.

19   Q.  This is the same document we looked at earlier, right?

20   A.  Correct.

21   Q.  And what does it say about due diligence on new accounts?

22   Let's go to the second page.

23   A.  Okay.  I'm sorry.

24   Q.  You don't have to read it.  Just describe, since we've

25   already read it, what does it say about due diligence on

1    selling to new accounts.

2    A.   It says prior to selling controlled substances to any

3    customer, that we would obtain, review, and verify here are the

4    list of things, but one of them additionally besides license

5    and registration, additionally was the dispensing data.

6    Q.   And was that, when you gave this to the DEA, was it true

7    that you were doing that?

8    A.   No, we were not doing that.

9    Q.   And why not?

10   A.   Because -- because of a directive made prior to that that

11   we would analyze dispensing and review dispensing after turning

12   on a customer for controlled substances.

13   Q.   What directive are you referring to?

14   A.   A directive from Larry Doud that he wanted accounts turned

15   on as soon as a credit manager approved them.

16   Q.   After Larry Doud left the company, did you report

17   suspicious orders?

18   A.   We did.

19   Q.   And were those suspicious order reportings for new issues

20   with the pharmacies or issues that existed while he was there?

21   A.   Both.   Some were new issues and some were definitely things

22   that were happening in the past.

23   Q.   And to the extent they were customers that were there in

24   the past, were there sort of new issues that had come up or

25   were they the same issue?

1   A.  They were the same issues.

2   Q.  I'm showing you what's been marked for identification as

3   Exhibits 263, 264, 265, 266.  And there is a Redweld that's up

4   there that has these.  I think there -- yes, that's correct.

5   Let me know when you're done looking at them.

6   A.  I'm familiar with what they are.

7   Q.  Okay.  And what are they?

8   A.  They are our suspicious order reporting logs.

9   Q.  Were these made as a regular part of RDC's compliance

10  function?

11  A.  Can you ask that one more time?

12  Q.  As a regular part of the practice of RDC's compliance

13  department, did you make these?

14  A.  Yes.

15  Q.  Did you record each suspicious order report as it was made

16  on these logs?

17  A.  Yes, starting sometime in 2017, we started progressively

18  recording and then all the time recording suspicious order

19  activity reporting.

20          MR. ROOS:  The government offers 263 to 66.

21          MR. GOTTLIEB:  Objection.

22          THE COURT:  Let's try to resolve that after we send

23  the jury home.  So can we take the break now or do you want to

24  do another area?

25          MR. ROOS:  I probably can switch topics and come back

1    to it tomorrow.  If that works for your Honor or we can stop.

2                THE COURT:  Why don't we stop.  Let the jury go home.

3                Ladies and gentlemen, this is what we're going to do.

4    We are going to adjourn for the day.  I'd like to continue

5    tomorrow at 9:45.  I understand that the weather may end up

6    being a little treacherous tomorrow.  So my main concern is

7    your safety.

8                I am going to ask that you all be back here tomorrow

9    at 9:45, but use your best judgment.  Obviously those of you

10   who are in northern counties, as to whether or not you think

11   it's safe to come in.  If you determine you make the judgment

12   that it's not safe for you to come in, try to notify us as

13   early as possible.  If you just call chambers and leave a

14   message, then I can try to get my law clerks to start calling

15   everybody else, and telling them that you're delayed or you

16   were not able to come in, because we're a team and we can't

17   work unless everybody is here.  So, I would remind you of that.

18   I don't want to fall behind for tomorrow.  So hopefully, if the

19   weather isn't that bad, we can pick up tomorrow morning and

20   have a full day of tomorrow.

21               But, otherwise, as I say, use your best judgment, your

22   safety is my primary concern.  But, if we can all make it

23   tomorrow morning, I'll see you tomorrow morning at 9:45 and

24   please let us know as soon as possible if for some reason

25   you're either delayed or the weather prevents you from

M1j3dou6

1      attending tomorrow so I can notify everyone else.

2              All right.  So I'll see you tomorrow morning.  Don't

3      discuss the case, keep an open mind.  We'll start at 9:45.

4              (Jury excused)

5              THE COURT:  You can step down.

6              THE WITNESS:  Thank you.

7              MR. ROOS:  Is it okay if I say one thing to the

8      witness about her travel accommodations?

9              THE COURT:  Sure.

10             Let's see if we can quickly address this issue.  You

11     had an objection, Mr. Gottlieb.

12             MR. GOTTLIEB:  Your Honor, thank you very much.  We

13     object to the questioning about after Mr. Doud left, after he

14     retired.  Any change in policy, any decisions post 2017, the

15     date that he left, any decisions, any action that was taken by

16     RDC and other individuals is not relevant.  The time period in

17     this trial, the indictment is 2012 until I believe January

18     of -- March of 2017.  And therefore, that's what we're dealing

19     with.  Why people at a later time, that's not relevant, may

20     have taken any action is not relevant.  And in fact, creates a

21     real due process problem for us, because then, any decisions

22     that were made by anybody after he left, if that was covered by

23     a trial, then we would have investigated them.  We would have

24     gone into things that happened in 2017, 2018.  We weren't put

25     on notice that they were going to not only not going to prior

M1j3dou6

1    bad acts, but subsequent bad acts.  And therefore, your Honor,

2    we are not prepared to address that issue of what happens post

3    the time of the indictment.

4             That lays it out.

5             THE COURT:  Before I hear from the government, let me

6    narrow the issue.  Obviously, that it is admissible, anything

7    that was occurring during the time Mr. Doud was at the job,

8    that was discovered later.  So, if I stole a car a year ago,

9    and they didn't find out until last month, obviously they can

10   testify that they did an investigation and they found that the

11   car was missing and it was in my house.

12            MR. GOTTLIEB:  I agree.

13            THE COURT:  So let's narrow that issue.  To the extent

14   that the witness is going to testify that the subsequent

15   reports were either prepared during that time or there was

16   something that was discovered about that time at a later date,

17   that I think is fair game.

18            But what is the extent of the government's use of

19   subsequent actions by the company after Mr. Doud left?

20            MR. ROOS:  It's subsequent reporting and termination

21   by the compliance department at Rochester Drug, the witness is

22   going to testify, she's already said some of this, that there

23   were pharmacies that were either existing customers or new

24   customers during the Larry Doud period that were then

25   terminated and/or reported in the period afterwards.  And she

1    will say it is the same, it was the same concern, she's already

2    said that, and the reason why they started to report afterwards

3    is because she no longer felt like there was someone saying you

4    are not allowed to do this.

5        And besides, I think your Honor already at the sidebar

6    articulated the relevance of that, there is actually authority

7    for that the Second Circuit in United States v. Copper Company,

8    and we are happy to file a brief on this tonight if needed with

9    all the authorities.  I'll pass this up to your Honor.  This is

10   an antitrust case.

11       The trial court's decision to admit evidence

12   documenting the demise of the conspiracy and the subsequent

13   change in bidding patterns was correct, since post-conspiracy

14   evidence is admissible if it is probative of the existence of

15   the conspiracy.  With a long string cite.

16       That's what we have here.  The fact they subsequently

17   terminated the customers for what she'll testify were the same

18   exact issues that exist while he was there is probative of the

19   existence of the conspiracy not to report, not to do diligence,

20   to divert controlled substances.

21       THE COURT:  The only think I don't hear you saying,

22   and maybe you will be that specific.  I don't hear you saying

23   that the specific information that you are relying upon is past

24   information that existed at the time that Mr. Doud was the

25   president of the company.  Obviously, if it turns out that some

1    investigation determined that there was some improper sale in

2    2018, and that was a reason that they terminated the company,

3    that's not particularly relevant for this case, because this

4    does nothing to prove the conspiracy that Mr. Doud was involved

5    in, if the evidence that's being offered is evidence that was

6    created after Mr. Doud left.

7              So, I don't know whether you're in a position to limit

8    that testimony, I don't know whether you are in a position to

9    have your witness make that distinction.  But, it doesn't tell

10   me anything that they did a report in 2018 and the report that

11   they did in 2018 resulted in the termination of companies that

12   were doing business pre and up to 2018.

13             Obviously, if they were terminated for reasons that

14   existed in 2018, but did not exist at the time Mr. Doud was the

15   president or CEO of the company, then it's not relevant

16   evidence against Mr. Doud and it is not within the conspiracy.

17             So, I think that you should determine whether or not

18   how specific you can and wish to be with regard to companies

19   that were doing business with Mr. Doud, while Mr. Doud was at

20   the company, and whether or not the reasons for their

21   termination was evidence of their activities during the time

22   that Mr. Doud was at the company.

23             Now, you may be able to, if you can articulate

24   specifically, convince me that there is some other relevance or

25   some other post-2017/18 relevance evidence that's relevant to

M1j3dou6

1    this case.

2            But I think the first thing, my reaction is that, yes,

3    you are not limited to evidence that you discovered while

4    Mr. Doud was at the company.  But, you may be limited to

5    evidence that may have been discovered later, and was at the

6    company when Mr. Doud was at the company, and resulted in a

7    different application of the regulations by the company once he

8    left.

9            MR. ROOS:  Your Honor, I think on that, and your Honor

10   should, with respect to the specific pharmacy, 59th we talked

11   about, so, my understanding is for most all of these pharmacies

12   she will testify that it was nothing new in the pharmacy's

13   conduct.  They already had the red flags.  It is just they

14   started to report them.

15           Part of this was in interest of trying to expedite

16   this for the jury.  If what's necessary is we go down this list

17   before the exhibit's offered, every single pharmacy and ask her

18   the question and then offer it, I think we could do that.

19           THE COURT:  No, you don't have to do that.  If you are

20   in a position to demonstrate that, and the defense has prior

21   notice of it, and they have no legitimate basis to object.  So

22   you don't have to waste the jury's time.  You can waste the

23   lawyers' time.

24           MR. ROOS:  I hear your Honor saying I think on this

25   particular relevance point, I think I certainly can lay some

M1j3dou6

1    more foundational questions about the suspicious order report

2    lists and the termination lists before offering it to match up

3    these pharmacies and the conduct that was going on when they

4    were terminated with what was going on during the period that

5    Doud was at the company.

6          MR. GOTTLIEB:  Your Honor, just if I can highlight the

7    problem.  And perhaps we can pick this up once they have an

8    opportunity to really get the facts.

9          We know from the evidence, both from the government's

10   direct and cross, that if there is a red flag, the obligation

11   is to investigate.  It doesn't mean you have to terminate.  It

12   doesn't mean you have to file a suspicious order.  That's what

13   we've learned already in this trial.  So, if while Mr. Doud is

14   there, there is a red flag, and they investigate and they

15   decide to continue, the fact that at a subsequent date, after

16   he leaves, there is a red flag, another red flag, and somebody

17   else, another group, no connection to Mr. Doud, the only

18   connection being that that pharmacy existed when he was there,

19   that would not be probative of any of the issues involving

20   Mr. Doud.

21         THE COURT:  Except that if there were red flags that

22   Mr. Doud and/or the compliance department knew about while he

23   was there, and that red flag would have and should have

24   prompted them to take action to either further investigate,

25   and/or terminate, the jury is entitled to know that.  And so,

M1j3dou6

1    if there was a red flag or suspicious activity, and nothing was

2    done about it, it's the jury's determination as to whether or

3    not it was appropriate for him to do nothing about it or he

4    should have terminated.

5          Now, I'll hear you and I'll let you talk.  But I only

6    hear you arguing about whether or not the ultimate

7    determination to terminate those companies later, I don't hear

8    you making an argument that any information that was available

9    and any red flags that were available at the time Mr. Doud was

10   there, I don't hear you arguing that that can't be brought out

11   by the witness, even if it was discovered later on, in a more

12   thorough investigation.  Which is the government's argument,

13   that a more thorough investigation was what was required, and

14   that sticking one's head in the sand and allowing these

15   companies to go about their business.

16         So the question is, I'm not sure what else you are,

17   other than evidence of red flags that existed after he left,

18   that didn't exist before he left, I don't know what else you're

19   arguing about, other than the final determination that was made

20   by the company afterwards, to terminate those companies based

21   on those red flags.

22         MR. GOTTLIEB:  This is what I'm arguing.  The

23   testimony already is that the existence of a red flag or two

24   red flags, there is nothing in the law that required anything

25   other than to investigate due diligence.

M1j3dou6

1            THE COURT:  No, I stop you there.  That's not true.

2    That's not true.  The red flag requires an investigation.  And

3    an investigation that's required may result in suspicious

4    activity.  Suspicious activity may result in termination.  So,

5    it's not the only thing that you are required to do is do an

6    investigation.  It depends on what the result of that

7    investigation is, and it depends on how serious the violations

8    are, and it depends on whether or not you have a further

9    responsibility to take action as a result of that

10   investigation.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1JBDOU7

1          MR. GOTTLIEB:  But the testimony, as of right now, is

2    that there is no timeframe to take action on a red flag.

3          THE COURT:  We're not arguing about timeframe.  This

4    isn't an issue of timeframe.  It never happened at all.  It's

5    not a timely issue.

6          MR. GOTTLIEB:  Here's the predicament, if while he is

7    there, there's a red flag, we're going to object.  We know the

8    jury is entitled to hear that.  We don't object that the jury

9    hears that while he was there, he didn't take any action.

10   That's come in ad nauseam, quite frankly, already.  We're not

11   objecting to that.

12         What we object to is putting before the jury that

13   after he left, somebody else at a another time in continuing

14   the investigation, the due diligence, decided now to terminate

15   without us being able to have spoken to that person, conducted

16   our own investigation.

17         To now bring up what happens after he leaves, and

18   clearly the inference they're going to be asking the jury, look

19   what happened.  As soon as he left, these guys, they terminated

20   them.  It could have nothing to do at all towards any improper

21   activity while Mr. Doud was there.  It could just be continuing

22   part of the due diligence.

23         THE COURT:  See, the problem I have with that argument

24   is that, you want the opposite inference.  You want that

25   inference.  You want the inference that it was appropriate for

M1JBDOU7

1    him, and he had no responsibility to do anything else, other

2    than what he did.  For you to put that at issue, puts at issue

3    whether or not his conduct could have been different and should

4    have been different, and based on the evidence that he had

5    before him.

6            Now, as I said, unless I hear a more specific offer of

7    proof, I don't know exactly what information they're relying

8    upon when they say others were terminated.  But my position

9    is -- and I don't hear an argument from you that addresses that

10   position.  My position is that to the extent that there were

11   red flags that existed at the time that Mr. Doud was at the

12   company and after he left the company, those red flags and

13   further investigation ended up in a rationale decision and an

14   appropriate decision to terminate those pharmacies or those

15   doctors, then I think that's admissible.

16           It goes to exactly what you want to argue the

17   opposite, that he really had no legal responsibility to do

18   anything different.

19           MR. GOTTLIEB:  I don't think the government should be

20   able to say because what happens in the end of 2017 or 2018 is

21   proof of anything, anymore than it would be proper for us to

22   say what happened then shows something else.

23           THE COURT:  I think you've already made that argument

24   in opening statement and with the first witness.  You clearly

25   tried to imply and directly argue that the law doesn't require

M1JBDOU7

1     him to do anything further.  The law is unspecific, so nobody

2     can really figure out what they're supposed to do.  And you

3     want the inference that because there's no evidence that it was

4     appropriate for him to terminate or take different action that

5     somehow that is evidence of his innocence.

6          That's fine if you want to argue that, but it puts

7     them in a position to say, well, wait a minute.  That's not

8     true.  We have all of this evidence that was before him and

9     that evidence was sufficient for the company to terminate them,

10    those pharmacies, and that's exactly what happened.

11          And to the extent that they terminated those

12    pharmacies or those doctors based on information that was

13    gathered or pertained to the time period that he was at the

14    company, I don't see the argument that somehow the jury is not

15    entitled to know that.

16          If you want to say they're not entitled to hold

17    against Mr. Doud anything that they discovered that was going

18    on after he left and wasn't going on when he was there, you

19    might be able to convince me that should be limited in that

20    regard.

21          MR. GOTTLIEB:  Can I ask this, your Honor.  You asked

22    for the offer of proof.  I think all of us are sort of arguing

23    in the dark right now.  Can we wait.  Let's hear the offer of

24    proof and then --

25          THE COURT:  Let the government decide how and what

M1JBDOU7

they want to offer in evidence given those concerns that you

have and the concerns that I have.  I don't get them prepped

for launch as they say. I guess that's an old person phrase.  I

won't give them -- to simply just simply say, well, just

because after Mr. Doud left, they did some investigations and

gathered enough evidence that didn't exist at the time Mr. Doud

was there and Mr. Doud wouldn't have been able to figure out

because it didn't exist; that they can't hold that against

Mr. Doud for not doing a further investigation or notifying DEA

or identifying them as suspicious activity or terminating them

because he was unaware of those issues.  Those issues didn't

exist when he was the president.

        But to the extent that those issues existed when he

was there and to the extent that he would have been aware of

them and to the extent that after he left following the proper

procedures that the company determined that it was appropriate

to terminate these companies, I'm not sure that you're going to

convince me that you get to hide from that.  From the fact that

based on information that existed at the time the company was

there, they terminated these companies for these reasons.

        And the jury, they know what the criteria are about

how you're supposed to take action against these companies.

That's been gone through for the last two days, and they can

make their own judgment about that.

        As I said, I'm not quite sure what the prejudice you

M1JBDOU7

1   say that you're trying to eliminate, and the prejudice is

2   clearly not he gets to say -- the jury doesn't get to know that

3   based on the information that was available to him at the time

4   once he left, that information clearly was information that

5   could support termination, and it did support a termination

6   decision.

7           MR. GOTTLIEB:  Your Honor, just so that it's clear and

8   then I really will sit down.  To be very blunt, what's going to

9   happen, my fear is, if stuff like that comes in post the time

10   he's there, the government stands up in front of the jury and

11   says, look what happened in late 2017, look what happened in

12   2018.  They started doing it and this is proof; that when he

13   was there, that he was violating law and had the intent to

14   actually violate the law when he was CEO.

15          To ask this jury to make a decision based on what

16   other people did after he left without being able to

17   investigate what exactly those decisions were based upon,

18   severely prejudices Mr. Doud.

19          THE COURT:  You just articulated it correctly.  If

20   they can demonstrate that those decisions were based on

21   information that were known and existed when Mr. Doud was in

22   the company and known to Mr. Doud, then it's appropriate as far

23   as I'm concerned.

24          If you say it's information that wasn't known to

25   Mr. Doud or didn't exist when he was there and didn't happen

M1JBDOU7

1  until after he left, you're right.  To the extent that they

2  think they can separate that or to the extent that they can't

3  or don't want to, I'll rule on whether or not they get to go

4  through some or all of that.

5      But Mr. Doud, he can't avoid the responsibility to

6  take appropriate action with regard to information that he had

7  at the time, and he cannot avoid and you cannot be in a

8  position to argue that the jury should conclude based on the

9  evidence that they have that he did the right thing.

10      If the jury doesn't have the true facts that other

11  people having this information made a different decision and

12  that was a reasonable decision based upon the rules and

13  regulations to terminate these individuals, to determine that

14  this rises not just to the level of red flags, that it rises to

15  suspicious activity and that they have a high responsibility to

16  either report it to DEA or terminate or stop the shipment.  And

17  they're saying that's what happened after Mr. Doud left, and to

18  the extent that happened solely on the same information that

19  was available to Mr. Doud, Mr. Doud can't say, well, why is

20  that my responsibility.  Of course it's his responsibility.

21      MR. GOTTLIEB:  To quote your Honor, we had a sidebar

22  yesterday and you made it clear in talking to me that you

23  thought or you were saying that I can't argue to the jury that

24  because he complied with the CFR, he's not guilty.

25      And I said to your Honor yesterday and I'll repeat it

M1JBDOU7

1    now, that is not our position.  Whether or not he filed a

2    suspicious order, whether or not the jury thinks that he did

3    enough is not the issue in this trial whether or not he

4    violated the CFR and the requirements.  It's whether or not he

5    had the criminal intent to join a conspiracy to violate the

6    narcotics laws.  So all of my objections go to that issue and

7    to that issue in particular to ask this jury to hold it against

8    him, and therefore to find as a piece of the puzzle that he

9    intended to illegally distribute narcotics.  Because, in 2018,

10   some other people decided to file a suspicious order would be

11   turning the obligation, the obligation both the government and

12   the issues that we are going to address that is no matter what

13   he did, what he didn't do, he did not intend to join a

14   conspiracy to be a drug dealer.

15           THE COURT:  Anything further from the government?

16           MR. ROOS:  No.  My only point would be going to the

17   relevancy about opening the door to yesterday's witness.  I

18   don't have anything else to add.  I think we understand your

19   Honor's viewpoint.

20           THE COURT:  I'll take a look at the transcript.  My

21   recollection of what has been argued and implied in front of

22   this jury is a lot closer than your arguing that you stayed

23   away from trying to imply that somehow that just confusing

24   rules and regulations, and he didn't have any further

25   responsibility to do anything else based on the information

M1JBDOU7

1    that he had.  That seems to be a fairly straight forward

2    argument you made and now whether or not this is relevant to

3    the argument is fair game is a different question, but I'll

4    look at the transcript and you think about it overnight and the

5    government can give me a proffer as to what they want out of

6    this witness with regard to activity and decisions made after

7    Mr. Doud left and then I'll determine what the extent of that

8    testimony is.

9         MR. GOTTLIEB:  Thank you.  I just have one other --

10   actually, it's minor and I really debated whether or not I

11   should even raise it, but this is what I observed today.

12   Suddenly during the questioning this afternoon, our client

13   Mr. Doud is constantly being referred to as Doud.

14        Now, listen, I understand what's going on.  I

15   understand the government and prosecutors very often try to

16   make it impersonal, try to make a defendant something else

17   other than worthy of any respect.  I get that.  I know that.

18        But certainly at this table everyone who we've

19   questioned, we've shown them the respect that every person is

20   entitled to, miss, mister. For a prosecutor to constantly refer

21   to our client by his last name, Doud, is making him -- is being

22   characterized by a government in a way when it should be, let's

23   just do the evidence and decide.

24        I would ask that he be referred to -- be given the

25   same respect as any other human being in this courtroom and be

M1JBDOU7

1    referred to as Mr. Doud or Larry Doud.

2            MR. ROOS:  I mean, I think I called every person

3    Cullen, Pietruszewski, Doud, Bouk.  Sometimes I can refer to

4    him as defendant, which I wasn't even doing.  If your Honor

5    wants me to go through my Q and A and put in Laurence Doud the

6    II every time, I can do that.  I mean, people sometimes speak

7    without sir, mister, doctor or whatever before it.

8            THE COURT:  My attitude is this, that's not a ruling

9    that is appropriate for this Court. If you want to make that

10   argument to the jury that somehow they're disrespecting your

11   client, I mean, I don't know why that's relevant to whether

12   he's guilty or not guilty and whether or not he's referred to

13   by his first name, last name.  I've seen defense attorney want

14   to sit next to their client and hand them Life Savers to

15   humanize them.  That's not my issue.

16           Mr. Doud is a very well-respected businessman sitting

17   here in a suit and tie.  I'm not going to get down to that kind

18   of minutia because that's not what this case should be decided

19   on.  Unless they go wild and say something totally

20   inappropriate, I'm not going to give you a ruling to try to now

21   control the government, how much respect they want to show your

22   client.  They hear your suggestion.

23           If they want to change their pattern, that's not

24   something that I had noticed, quite frankly, until you

25   mentioned it, so I don't think it's something the jury noticed.

M1JBDOU7

1   It's clearly not something the jury is going to use to either

2   convict or acquit your client.  I'm sure of that.

3          All right.  We will adjourn till tomorrow at 9:45.

4   We'll talk about this briefly tomorrow, get this witness back

5   on the stand and try to finish this witness and get to the next

6   witness.

7          (Adjourned until January 20, 2022, 9:45 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   CHRISTOPHER MASSETH

 4   Direct By Mr. Burnett  . . . . . . . . . . . 211

 5   Cross By Mr. Townsend  . . . . . . . . . . . 235

 6   Redirect By Mr. Burnett  . . . . . . . . . . 291

 7   Recross Mr. Townsend . . . . . . . . . . . . 296

 8    JESSICA POMPEO BOUCK

 9   Direct By Mr. Roos . . . . . . . . . . . . . 298

10                      GOVERNMENT EXHIBITS

11   Exhibit No.                            Received

12    1003    . . . . . . . . . . . . . . . . . 209

13     201-251, 255-262, 267-271, 275,  . . . . . 210

14           277-279

15    1002    . . . . . . . . . . . . . . . . . 210

16    1-67, 101-11, 272-274, 276  . . . . . . . . 211

17    612    . . . . . . . . . . . . . . . . . . 218

18    601-606, 611, 625, 626  . . . . . . . . . . 220

19    276    . . . . . . . . . . . . . . . . . . 319

20    1005, 501, 502   . . . . . . . . . . . . . 379

21    502T   . . . . . . . . . . . . . . . . . . 380

22                      DEFENDANT EXHIBITS

23   Exhibit No.                            Received

24    E3    . . . . . . . . . . . . . . . . . . 274

25    E5    . . . . . . . . . . . . . . . . . . 280
```

1    E6     . . . . . . . . . . . . . . . . . . 281

2    E9     . . . . . . . . . . . . . . . . . . 285

3    E10    . . . . . . . . . . . . . . . . . . 287

4    E11    . . . . . . . . . . . . . . . . . . 290

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25