M1K3DOU1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

           v.                          19 Cr. 285 (GBD)

LAURENCE F. DOUD III,

          Defendant.
                                 Trial
------------------------------x

                                 New York, N.Y.
                                 January 20, 2022
                                 9:50 a.m.

Before:

                  HON. GEORGE B. DANIELS,

                                 District Judge
                                 -and a Jury-

                     APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  NICOLAS T. ROOS
     ALEXANDRA ROTHMAN
     THOMAS S. BURNETT
     Assistant United States Attorneys

ROBERT C. GOTTLIEB
DERRELLE M. JANEY
PAUL R. TOWNSEND
     Attorneys for Defendant

Also Present:  Sunny Drescher
              Jacqueline Hauck
              Paralegal Specialists
              Special Agent George Burdzy, DEA
              Investigator Kathleen Whitmore, DEA

M1K3DOU1

 1              (Trial resumed; jury not present)

 2              THE COURT:  We are down, we're waiting for one juror.

 3     So we're in good shape.  I'm trying to figure out which one

 4     that is, whether that's someone who is coming from far or near.

 5              I want to go ahead and address the issue with regard

 6     to the suspicious order reports.

 7              I guess I want to quickly address it in three areas.

 8     One, I want to talk about specifically what numbers or

 9     statistics the government wants to offer; two, what specific

10     testimony the government wants to offer; and three, what

11     specific documents the government, exhibits the government

12     wants to offer.

13              Now, I did, I was trying to look at a suspicious order

14     report, but I don't apparently have one, so I have no idea what

15     it looks like.  Do you have one that I can look at?

16              MS. ROTHMAN:  We e-mailed them to chambers.

17              THE COURT:  When was that?

18              MS. ROTHMAN:  Are you talking about the Excel

19     spreadsheets or the reports?

20              THE COURT:  I'm talking about the exhibits.  I have --

21     you identify Exhibits 263 through 266.  I only have a hard copy

22     of Exhibit 265.

23              MS. ROTHMAN:  Yes, your Honor.

24              THE COURT:  I have no idea what these other exhibits

25     are.

M1K3DOU1

1          MS. ROTHMAN:  We spoke to your law clerk earlier this

2     morning.  Our paralegal is printing out hard copies of those

3     Excel files for your Honor.  We also e-mailed them to chambers.

4          THE COURT:  And when did you do that?

5          MS. ROTHMAN:  Five minutes ago.

6          THE COURT:  Okay.  I've been here 10 minutes.

7          MS. ROTHMAN:  They should be in your inbox.

8          THE COURT:  Do you have your copy?

9          MS. ROTHMAN:  Our paralegal is printing out copies.

10          THE COURT:  You don't have your copy with them?

11          MS. ROTHMAN:  Because they are Excels, they are not

12     included in our exhibit binders, and I understand the CD we

13     provided --

14          THE COURT:  So as we are doing that, because I don't

15     want to keep the jurors waiting too long.  Tell me what it is

16     that you want, what exhibits do you want, and what form of

17     those exhibits and what testimony do you want with regard to

18     those specific exhibits and with regard to overall numbers.

19          MS. ROTHMAN:  May I have one moment while I speak to

20     AUSA Roos?

21          THE COURT:  Yes.  I can't pull it up on my laptop

22     here.  Let me start with, tell me what your exhibits are, tell

23     me how voluminous they are, tell me what they say.

24          MR. ROOS:  Yes, your Honor.  So, there are four

25     exhibits.

M1K3DOU1

1          THE COURT:  Only four exhibits that you intend to

2    offer with regard to these reports and terminations?

3          MR. ROOS:  Well, for the suspicious order reports,

4    correct.  It is four spreadsheets.  They relate to the years

5    2017, 2018.  We are not trying to offer '19 through '21.  And

6    so they're numbers 263 to 266.

7          THE COURT:  What is 263?

8          MR. ROOS:  A government exhibit, number 263.

9          THE COURT:  What is it?

10          MR. ROOS:  It a spreadsheet.  What it lists, it is a

11    log that Rochester Drug would keep as it reported each

12    suspicious order to the DEA.

13          THE COURT:  Okay.  How voluminous is it?

14          MR. ROOS:  Your Honor, I think, I brought some

15    printouts.  Let me pass up one so you can see.

16          THE COURT:  That's what I've been trying to get

17    somebody to do for me.  I have no idea what these exhibits look

18    like.

19          So what you've just handed me is 263.

20          MR. ROOS:  That's correct, your Honor.

21          THE COURT:  And 263 is what?

22          MR. ROOS:  This is the 2017 SOAR log, which stands for

23    Suspicious Order Activity Report log, out of the RDC Fairfield

24    facility.  They split for each years which facility, because

25    there was two facilities for RDC was shipping.  This is the

1    '17, and then 264 is the other 2017 one.  265 and 266 are the

2    2018 reports.

3              THE COURT:  And these are reports that were submitted

4    to DEA?

5              MR. ROOS:  Yes, your Honor.  You can see going to the

6    third column over is the pharmacy that was reported, the sixth

7    column over is the activity type, and the eighth column over is

8    who at the DEA they reported to.

9              THE COURT:  Okay.  And what is the relevant time

10   period on this document?

11             MR. ROOS:  And that you can find on the seventh

12   column, which this one is just '17, and over all the four

13   proposed exhibits are '17 and '18.

14             THE COURT:  But in relationship, particularly to

15   Mr. Doud's time at the company, where does this begin.

16             MR. ROOS:  Yes, your Honor.  So while Mr. Doud I think

17   was technically employed by the company until March of 2017, I

18   think the witness testimony is that he had sort of, wasn't

19   making decisions by early 2017.  So the government's position

20   is this is the two years immediately after he's out of the

21   decision-making role.

22             THE COURT:  This document shows the suspicious

23   activity reports that were filed with DEA, the two years after

24   Mr. Doud was no longer functioning as the CEO.

25             The testimony that goes with this document, what is

M1K3DOU1

1    the testimony with regard to the number of reports that this

2    document reflects?

3            MR. ROOS:  Between this document and the three others

4    that are effectively the same, just different time periods.

5            THE COURT:  Is that different exhibits?

6            MR. ROOS:  Correct.  So 264, 265 and 266, if your

7    Honor wants, I can pass up the next one.  They all basically

8    look the same.

9            THE COURT:  Let me see all three.  They deal with

10   different time periods?

11           MR. ROOS:  Exactly.

12           THE COURT:  All right.  What would be the testimony as

13   to the number of reports filed during this period compared to

14   the number of reports filed previously?

15           MR. ROOS:  Your Honor, I wasn't planning on asking her

16   to count them up on the stand.  If you have it together, it is

17   about 600 versus zero.

18           THE COURT:  Versus zero?

19           MR. ROOS:  Yes.  I was going to add my colleague --

20   they did report four customers during the prior period.  They

21   didn't report, her testimony is going to be they didn't report

22   any orders.  So if you group them together, the answer is four

23   or zero, and this is 600.

24           THE COURT:  I have two documents in front of me.  Is

25   that three exhibits?

M1K3DOU1

1        MR. ROOS:  No.

2        THE COURT:  We'll deal with that later if it comes in.

3    I just have some more questions.

4        MR. ROOS:  Our other paralegal is printing a few more

5    copies.

6        THE COURT:  All right.  So these are the suspicious

7    activity reports that were filed in what time period after

8    Mr. Doud left?

9        MR. ROOS:  The next two years.

10       THE COURT:  And you say that there were no -- there

11   were four reported suspicious what?

12       MR. ROOS:  Customers they reported.  In '13 and '14

13   they reported a combined four pharmacy customers.

14       THE COURT:  What number of, if you intend to offer

15   that, what number of or percentage of these companies were

16   customers of RDC when Mr. Doud was in charge?

17       MR. ROOS:  What percentage of those on the list?

18       THE COURT:  Yes.

19       MR. ROOS:  So, I don't think the witness is going to

20   be able to do the math.  I will tell your Honor this morning I

21   had the witness go through all these spreadsheets and go

22   through and check off the ones that she says were both

23   customers that existed during the period Mr. Doud was there and

24   also had the same activity or existing problems or conduct

25   during that period.  So that's a subset of those lists.

1          THE COURT:  What is that approximate subset?

2          MR. ROOS:  I could count them up.  It kind of looks

3   from an eyeball test maybe half of them.

4          THE COURT:  All right.  You don't know even

5   approximately how many of these -- let me back up.

6          Are these reports with regard to pharmacies, reports

7   with regard to doctors, or both?

8          MR. ROOS:  These are suspicious order reports filed on

9   pharmacy customers.  SOAR doesn't relate to doctors.  The

10  reason it could be suspicious would be, like we've seen in some

11  of the e-mails yesterday, because they're filling for a bunch

12  of bad doctors.  But it's not reporting doctors.

13         THE COURT:  These are the orders from the pharmacy

14  customers.

15         MR. ROOS:  Exactly.

16         THE COURT:  I assume the testimony was or is

17  consistent with red flags, investigation, followed by

18  suspicious activity reports.

19         MR. ROOS:  Correct, your Honor.  For many of these,

20  they either identified red flags in the dispensing, and as part

21  of their investigation, and they report it or that same order

22  of interest computer program flagged it for hitting a

23  threshold.  But instead of just releasing it, they did the

24  investigation and reported it to the DEA.

25         THE COURT:  You don't have the actual number of

M1K3DOU1

1    reports that were subsequently submitted with regard to

2    pharmacies that were customers when Mr. Doud was in charge?

3            MR. ROOS:  It is about three-quarters of those in the

4    report are customers that existed.

5            THE COURT:  All right.  What testimony do you

6    anticipate that you want to bring out?

7            MR. ROOS:  About these reports?

8            THE COURT:  Yes.

9            MR. ROOS:  That the compliance practice, so it was the

10   same -- it was either generally the same issues with

11   pharmacies, or even specifically the same exact activity issue

12   with respect to particular pharmacies, but because the

13   defendant was no longer in his position, the compliance

14   department started following their policies and reporting the

15   suspicious orders to the DEA.

16           THE COURT:  Who made that decision?

17           MR. ROOS:  It's not so much that someone made the

18   decision that they should do that, as much as her testimony

19   will be they were no longer handcuffed from not reporting.  So

20   they just started following the policies that were written.

21           THE COURT:  Who was in charge at that point?

22           MR. ROOS:  She'll testify that people in the

23   compliance department started making the calls to report the

24   orders.

25           THE COURT:  And that would be Mister --

M1K3DOU1

1            MR. ROOS:  For a period Pietruszewski, but otherwise

2   Ms. Pompeo Bouck and some of the other people she named,

3   Skibickyi, Cullen.

4            THE COURT:  What is Pietruszewski going to say about

5   this?

6            MS. ROTHMAN:  Your Honor, so, at about this time,

7   Mr. Pietruszewski -- let me back up.

8            Mr. Pietruszewski did several things at RDC.  One of

9   those many tasks was compliance.  In 2015, 2014 and 2015, he

10  leaves Rochester and goes down to Fairfield where he opens up a

11  second facility, which further reduces the amount of time he's

12  engaging in compliance work.

13            In early 2017, right around the time that Mr. Doud

14  leaves the company, he actually is demoted, steps down from the

15  role, and other people take on more responsibility.  I don't

16  expect him to talk much about what happens in compliance after

17  2017.

18            THE COURT:  How did people in compliance wake up one

19  day, come to work, and decide to start reporting?

20            MS. ROTHMAN:  I think the government is going to argue

21  that when Mr. Doud was gone, they started following the rules.

22  That they, many of them wanted to, but they weren't able to out

23  of fear of being fired, being yelled at.

24            THE COURT:  There's no evidence of discussions or

25  coordinated effort to now begin to do this among the compliance

1       people?

2              MR. ROOS:  That's going to be part of the testimony

3       today.

4              THE COURT:  That's what I'm asking.

5              MR. ROOS:  I'm going to ask her, she'll say, you know,

6       we weren't reporting before, we're reporting now.  I'll ask her

7       what changed.  And her testimony I expect will be Larry Doud

8       wasn't there anymore, so we within the compliance department

9       were able to make these decisions ourselves, so we started

10      following our written policies and reporting customers.

11             THE COURT:  All right.

12             MR. ROOS:  I just passed your law clerk the other --

13             THE COURT:  Yes, I have the third exhibit.  All of our

14      jurors are here.  So, we'll start in a couple minutes.

15             Now, what's the exhibits, what are the documents

16      and/or testimony that you want with regard to terminated

17      pharmacies?

18             MR. ROOS:  So, we're not going to try to put in, at

19      least not right now, of course if the defense does something on

20      cross-examination, maybe it will change.  But we're not going

21      to try to put in a spreadsheet of terminated customers.  There

22      are going to be, for some particular customers, I'm going to

23      ask a question what happened with that customer.  When did that

24      happen.  Was the reason for the termination later on something

25      new in terms of the type of activity or was it the same

M1K3DOU1

1    preexisting issue.  And I expect she'll testify it was the same

2    issue.

3              THE COURT:  How many of those are you going to

4    discuss?

5              MR. ROOS:  A handful, but we are going to go through

6    some specific examples.  So we are probably talking around 10.

7              THE COURT:  Do you have exhibits?

8              MR. ROOS:  There are exhibits.

9              THE COURT:  Which exhibits?

10             MR. ROOS:  Not with respect to the terminations, to be

11   clear.  So, for instance, like one of the exhibits relates to

12   discussions around review of ProHealth, which is a pharmacy

13   customer during the period the defendant was there.  They don't

14   report or terminate ProHealth at the time.  I'm going to ask a

15   question what happened with that customer.  She'll testify we

16   terminated them in '17 or '18, because of the same compliance

17   issues that we did not terminate for before in '16.

18             THE COURT:  You said you have about 10 of these you

19   want to do?

20             MR. ROOS:  Approximate, yes.

21             THE COURT:  And these are terminated companies that

22   either became customers when Mr. Doud was in charge, or were

23   customers during the period he was in charge?

24             MR. ROOS:  Yes, your Honor.  To just roadmap it out a

25   little more.  I'm going to say to her, I want to talk about a

M1K3DOU1

1    few of RDC's customers at the time Mr. Doud was there.  I'll

2    ask her, what do you recall about ProHealth?  I expect she'll

3    say I recall that ProHealth was, in sum and substance, a bad

4    pharmacy.  Okay, let's look at an exhibit from the period

5    Mr. Doud was there.  The exhibit is people talking about it

6    being a bad pharmacy.  What happened with that pharmacy?  We

7    kept shipping, we didn't terminate them.  What ultimately

8    happened with that pharmacy?  We terminated them for those

9    compliance reasons.  When did that happen?  After Mr. Doud left

10   the company.

11            THE COURT:  Okay.  Are those the subject of suspicious

12   order reports?

13            MR. ROOS:  I think, I haven't matched them up one to

14   one.  I think most of them also had a suspicious order report

15   filed in 2017 or 2018.  For instance, ProHealth has a

16   suspicious order report in 2017 and 2018.

17            THE COURT:  Are you eliciting any testimony or have

18   any exhibits that you want to address with regard to

19   termination that are not companies that were companies that

20   became customers or were customers when Mr. Doud was in charge?

21            MR. ROOS:  No, other than those questions I raised

22   with your Honor about terminating customers, I'm not going put

23   any -- like, I'm not going to put in front of her a list of all

24   terminated customers and say, you know, were these all

25   terminated or something like that.  It's not something I'm

1    going to do.

2            THE COURT:  Is there any way to determine by testimony

3    or exhibit whether or not these customers were terminated for

4    reasons that existed while Mr. Doud was in charge?  Or new

5    reasons?  Or a combination of both?

6            MR. ROOS:  For the example, pharmacies I plan to go

7    through, these were all existing customers.  The e-mails show

8    they were existing customers and she'll testify they were

9    existing customers.

10           For the suspicious order reports, while we think the

11   entirety of the report, that spreadsheet, is admissible, she

12   also is able to say which ones she's confident were preexisting

13   customers while Mr. Doud was there, and also had the same

14   suspicious activity while Mr. Doud was there.

15           THE COURT:  Okay.  Let me hear from the other side.

16           MR. TOWNSEND:  Your Honor, I think the last --

17           THE COURT:  Pull the microphone a little --

18           MR. TOWNSEND:  Is that better?

19           THE COURT:  Yes.

20           MR. TOWNSEND:  The last question that you raised

21   there, I think really exemplifies the issue.  If you look at

22   the spreadsheet, I don't have it in front of me but I believe

23   I've seen it.  It really just lists the name of the pharmacy,

24   the date that any suspicious order activity was filed, and then

25   a couple other, the DEA code and the account number.  It does

M1K3DOU1

1   not indicate who made the decision to file it, what the

2   circumstances of the filing were, when the customer became a

3   customer.  There is a lot of information that is certainly

4   relevant and germane to the issues that you're bringing up that

5   is not there.

6          By the government's own admission, only 50 percent of

7   those can she really talk authoritatively on.  The idea that

8   Mr. Doud could have an exhibit admitted against him that shows

9   a number of pharmacies that might not have even been RDC

10  customers by the time Mr. Doud left, but had a suspicious order

11  filed on them, the implication is that every single one of

12  those customers is a bad customer that was there under Mr.

13  Doud, and it is patently unfair to him to have those, when the

14  government can't even look at you and say every one of these

15  customers is absolutely there under Doud.

16          And additionally, they want to go through the end of

17  2018.  These customers are buying on a monthly basis.  To say

18  that this same issue was there in December of 2018 that was

19  there in 2016, but now suddenly compliance feels unencumbered

20  two years after Larry Doud leaves to finally file an SAOR, your

21  Honor, that strains logic, your Honor.

22          THE COURT:  So what of the testimony and the exhibits,

23  what is it that you are objecting to and why?

24          MR. TOWNSEND:  Anything past the time period of the

25  indictment.

1          THE COURT:  What do you mean anything past?

2          MR. TOWNSEND:  Any -- any line items of that

3    spreadsheet that come after March 31, 2017.  Unless the

4    government can elicit specific testimony from Ms. Pompeo Bouck

5    that she recalls exactly the circumstances of why that pharmacy

6    was terminated, and that those exact same circumstances applied

7    during the time that Larry Doud was there.

8          Because we're also running into the issue of, well,

9    the same circumstances generally applied.  So if you look at

10   the government's letter on page two, the second bullet point,

11   they address the same categories of suspicious practices.  And

12   I know your Honor asked whether these would be the same

13   practices, different practices or both, that led to the

14   termination.  And I want to make sure that Mr. Doud is not

15   subject to inference by admitting evidence that these

16   pharmacies were doing new bad things, combined with previous

17   bad things, that led to them being terminated.  Because that is

18   not appropriate to lump in things that were discovered, bad

19   practices by the pharmacies, long after Mr. Doud left, that led

20   to their termination.  That shouldn't be ascribed to him.

21         MR. JANEY:  And your Honor, if we can just add, the

22   case law that the government cites in support of this issue, we

23   looked at it I think fairly closely last night.  And I don't

24   know if your Honor has the case, but this is the Second Circuit

25   case that Mr. Roos was referring to at length yesterday.  It's

M1K3DOU1

1    quoted in the government's letter United States v. Koppers.

2    Let's hold aside for a moment whether the factual predicates in

3    that case are similar here.

4           We do take note that the Second Circuit in Koppers

5    does say that subsequent conduct, if you will, can be relevant

6    as a probative factor as to whether the conspiracy exists.  But

7    one of the things that points out, the Second Circuit, is on

8    the issue of time frame, which is what I think is relevant

9    here.

10          In that case that Mr. Roos describes, the time frame

11   of the post conduct is not two years, it is a little bit

12   unclear from the facts of that particular case, but the Second

13   Circuit, your Honor, I think importantly makes a distinction

14   toward the end of the case decision, in saying there is a

15   difference between something that is slightly after and

16   something that is ultimately a subsequent remedial measure.

17   And this goes to the issue of time frame and why the defense

18   has the objection on two years after Mr. Doud has departed from

19   the company.

20          Lot of things changed at RDC in 24 months after

21   Mr. Doud retired, whether he was involved with the subject

22   pharmacy or not.  And a two-year time frame, your Honor, we

23   would argue, given everything that was going on at RDC, is rife

24   full of the category that the Second Circuit identifies in

25   Koppers as potential grounds for what might have been

M1K3DOU1

1    subsequent remedial measures.

2            THE COURT:  What are you saying is a reasonable time

3    period?

4            MR. JANEY:  Well, if the government, number one, had

5    an offer of proof and specific evidence for something that

6    might have happened 45 days after Mr. Doud retired or two

7    months after Mr. Doud retired, and I'm identifying those time

8    frames, your Honor, because of the reporting time periods of

9    these reports.  If the government's narrative is to be believed

10   that Mr. Doud leaves the company in early January, with a

11   reporting cycle of these reports that are done on a monthly

12   basis, and everyone felt unshackled -- let's hold aside that

13   the government cannot identify who specifically gave an

14   instruction to actually reinforce or to actually cause them to

15   do different than what they had done for years and years -- but

16   somehow they felt all of a sudden unburdened and free because

17   Larry Doud wasn't there, holding that important point aside,

18   the reports have a 30 or 45-day cycle.  So, if there were some

19   change thereafter, it would have been reflected reasonably in

20   the next or maybe even the following conceivably reporting

21   cycle.

22            What the government wants the Court to put in front of

23   the jury is reports cycle times 36 in front of the jury.  Which

24   falls, we would submit, based on the case that the government

25   even puts in support of its motion, into subsequent remedial

M1K3DOU1

1    measures, given everything that was going on at RDC at the

2    time.  So, the point being is that two years thereafter is

3    simply grossly misleading.  The witness has already testified

4    at length, not just Pompeo, but also Masseth.  He wasn't around

5    by January, Masseth's testimony is January of 2017, he's

6    basically in Florida.  He's never even there.

7             THE COURT:  I had one more question.  All right.  Did

8    you want to add something, Mr. Roos, because I want to get the

9    jury.

10            MR. ROOS:  I want your Honor to rule.  This whole

11   thing about time frame and some sort of rigid time frame rule,

12   I don't know where that's coming from.  I don't see that in the

13   case.

14            I think the question here is relevancy, which is a

15   relatively low bar, as your Honor knows, and it seems that the

16   witness can, as our letter outlined, lay relevancy for two

17   reasons.  One, because it is in fact relevant, and for all the

18   reasons we've discussed; and second, because they opened the

19   door by arguing that people didn't know how to do this under

20   the existing RDC structure that existed when Doud was there,

21   when obviously this rebuts that position.

22            MR. JANEY:  Very briefly for the record, your Honor,

23   in response to the government's question as to where in the

24   case that I'm describing, to be clear, the discussion is the

25   pin cite is 298-99 and specifically at 299.  The Second Circuit

M1K3DOU1

1    makes the distinction, based on the argument that's made by the

2    defendant in the case as to what was appropriate in that case,

3    as post-conspiracy conduct to prove the conspiracy versus what

4    the defendant is arguing as subsequent remedial measures.

5          THE COURT:  What's the testimony, and I assume it's

6    similar to the reports, suspicious order reports, but what's

7    the evidence with regard to terminated customers post and pre

8    Mr. Doud?

9          MR. ROOS:  The terminations?

10          THE COURT:  Yes.

11          MR. ROOS:  On that, your Honor, we are not going to be

12   trying to argue that, like, there were a million terminations

13   after.

14          THE COURT:  I'm trying to say, how many before

15   Mr. Doud left, how many terminations were there after he left

16   approximately?

17          MR. ROOS:  I think there were about 30 terminations

18   before and about 200 after.

19          THE COURT:  Okay.

20          MR. ROOS:  Those are not numbers I am going to try to

21   elicit from the witness.  And also, just to be clear, I don't

22   believe that's something our expert is going to try to do

23   either.  That's not something the government is going to try to

24   do.

25          THE COURT:  But there were terminations?

M1K3DOU1

1      MR. ROOS:  There were.  A lot of these people were
2  terminated.
3      THE COURT:  No.
4      MR. ROOS:  Oh before?  Yes.  There were some.  Part of
5  the reason, to be candid, why we're not trying to put in the
6  terminations is because, unlike the suspicious order report is
7  which is correlated to a compliance problem, you can also be
8  terminating somebody for not paying your bills or something
9  like that.  So the data is a little noisy.
10      THE COURT:  Okay.
11      MR. ROOS:  That's why I am going to ask about specific
12  pharmacies and whether or not they were terminated, because
13  there we can be a little more exacting on that termination
14  question.
15      THE COURT:  All right.  This is what I'm going to do
16  for now and we'll see whether the door gets further opened.
17          I am going to allow you to offer the Exhibits 264 and
18  265.  264 and 265 deal with the time period up to January of
19  2018.  You can submit those exhibits.  You can elicit testimony
20  that, with regard to whether or not they continued to submit
21  those reports after that time period, and approximately how
22  many reports they submitted.
23          With regard to the terminations, I don't think that
24  there is significant probative value with respect to the
25  terminations at this point.  The question really is, I'm not

M1K3DOU1

1    even sure whether or not, it depends on whether they opened the

2    door, because I'm not sure termination is necessarily the

3    pharmacy's legal obligation.  The legal obligation is to report

4    it to DEA and not to fill the order.  So, I think, as you say,

5    other judgments go into termination.  And I don't think that

6    that is significantly probative, unless the defense is going to

7    cross-examine in a way that opens the door further to that.

8             MR. ROOS:  Just two clarification questions so I

9    follow the rules on this.

10            I think it's 263 and 264, not 264 and 265 are the 2017

11   records.  That's what your Honor is talking about, right?  Just

12   the 2017 exhibits?

13            THE COURT:  Let me show you what I have.

14            MR. ROOS:  It is possible we are wrong.

15            THE COURT:  That's what I was given.  Is that not

16   correct?

17            MR. ROOS:  Your Honor is correct when you said -- I'm

18   not positive the sticky notes are right.  But in any event,

19   your Honor, we will only offer the ones about 2017.  Is that

20   what I take your Honor to say?

21            THE COURT:  Yes.

22            MR. ROOS:  And then to understand the question that we

23   are permitted to ask.  We are allowed to ask questions about

24   the reporting in '17 but not years after that.  Is that --

25            THE COURT:  You can ask whether they continued to

M1K3DOU1

1        report.

2                MR. ROOS:  Okay.

3                THE COURT:  And you can even ask approximately how

4        many they did report in 2018.  But I think that is the limit at

5        this point of the relevance and the probative value that

6        addresses their concern about whether or not these exhibits, at

7        least, are timely.

8                But, obviously, look, if the government's theory is

9        that they didn't submit reports because they were directed to

10       by Mr. Doud, and after Mr. Doud was no longer there to enforce

11       such a direction, that they began reporting, and particularly

12       reporting with regard to issues that existed previously by

13       while Mr. Doud was in charge, and may or may not have been

14       issues that, with regard to companies that were already

15       discussed in this case.  They were brought to the attention of

16       the compliance department and Mr. Doud.  So, I think that the

17       circumstantial evidence of four reports previously, and

18       hundreds of reports after, is probative of whether or not there

19       was a joint agreement to not report, as the government is

20       arguing.  So I think that, I think that addresses for now most,

21       if not all, of the issues that I anticipate.  I'll still hear

22       whatever specific objections there are to specific questions.

23       But, I think that is the appropriate ruling given the nature of

24       the case.

25                MR. ROOS:  On the termination question, would it be

M1K3DOU1

permissible to ask if their selling of controlled substances
was later suspended, which is a slightly narrower and more
specific question?

          THE COURT:  Well, I'm not sure -- I'm not sure the
probative value is there.  Once they filed a suspicious order
report, and they put that in the lap of the DEA, it seems that
no one can say they have any further legal obligation to
terminate.  To terminate is a judgment call.  And they could
have continued to sell drugs that were consistent with their
policy to that pharmacy.  But they made the judgment to cut off
the pharmacy, which may or may not have been the appropriate
judgment.  But that is not their role to track down the
illegalities at the pharmacy.  It is their role to identify red
flags, as a result of red flags, do an investigation, as a
result of the investigation, if it turns out that they can
define this as a suspicious order, to do a suspicious order
report and give it to the DEA.  That seems to be their
obligation.  And particularly with regard to the DEA
conspiracy, if they are, one, withholding information and not
providing the information to DEA, or two, giving the DEA false
information, and they agreed to do that, then that's the
conspiracy.

          So, I think that the termination has minimal relevance
and probative value, and I think that given the other issues
with regard to why you might want to terminate a customer, I

M1K3DOU1

1   think that gets into a whole other set of facts.

2              MR. ROOS:  Part of the reason I raise it, I think,

3   based on some of the defense exhibits, they may try to put in

4   evidence that the defendant either asked the questions should

5   we terminate a particular pharmacy, or suggested it, or

6   discussed the possibility of terminating a pharmacy.  And it

7   seems out of reciprocity, if they are going to go there, we

8   should be allowed to say when was it terminated.

9              THE COURT:  Does the defense intend to elicit

10  information with regard to terminations?

11             MR. GOTTLIEB:  Yes, your Honor.

12             THE COURT:  Is there some reason why they shouldn't

13  respond to that?

14             MR. GOTTLIEB:  I think until we ask the specific

15  question, in the context of her direct examination, I

16  understand that we may open the door and your Honor may say

17  they can do it on redirect.  But we have to hear her testimony,

18  and the issue of termination as to why, well, let's see if this

19  witness, who the government is asking that the jury rely on her

20  testimony and her credibility, whether or not she really knows

21  as much as she purports to know.

22             THE COURT:  There is a possibility or do you intend to

23  explore that issue on cross-examination with this witness?

24             MR. GOTTLIEB:  In part, I think you could expect that

25  there would be a question about termination, yes.

M1K3DOU1

1          THE COURT:  All right.  Well, then, we'll see if you

2     open the door to that.  If you do, then I'll allow them to

3     appropriately respond.  But, at this point I think the judgment

4     I made is a reasonable judgment.

5          MR. GOTTLIEB:  Thank you.

6          MR. TOWNSEND:  One final issue, your Honor.  At the

7     end of the government's letter on page four, when they indicate

8     their desire to discuss the companies that were terminated

9     after Mr. Doud left RDC, they want to discuss conversations had

10    internally among compliance.  And they specifically note,

11    including with the defendant.  Which kind of brings to mind

12    that perhaps some of the pharmacies they want to discuss did

13    not include discussions with the defendant about it, and I want

14    to make sure that when we discuss any pharmacies out there,

15    that they will be able to draw Mr. Doud's specific knowledge

16    about any issues in.

17         THE COURT:  Again, you put me in a position that I

18    can't really give you a judgment on that until I see in what

19    way you open the door.  So, if you simply open the door to

20    whether or not there were terminations, they will be limited to

21    respond in kind.  But, if you open the door as to the reasons

22    for terminations and what Mr. Doud did or didn't do, and the

23    decisions he made, you may open the door further.  So I can't,

24    unless you give me some more specific indication exactly what

25    you are going to elicit on cross-examination with your other

M1K3DOU1

1    witnesses, I can't give you any further guidance at this point.

2         Now my basic guidance is unless you open the door, we

3    are not going to hear anything about this.  Once you open the

4    door, then I can make a judgment as to what's the appropriate

5    response.

6         MR. TOWNSEND:  Thank you.

7         THE COURT:  All right.  Okay.  So let's get the jury,

8    we've had them waiting a while.  They all showed up.  Let's see

9    how far we get through today.  If the weather, I think it is

10   snowing now.  If the weather keeps getting worse, we may break

11   a little early.  But, how many witnesses do you anticipate that

12   you can get through today?

13        MR. ROOS:  Every day I think I anticipate more

14   witnesses than I get to.  The government's order is finish this

15   witness, we have a very short witness also, who if there is any

16   way to get him on, would be great, because's been sitting here

17   for days and I think his direct is very short and he is from

18   Rochester and wants to return to the even snowier colder

19   weather.  And then we have two law enforcement agents.  If your

20   Honor wants to break early, I think if we can make it through

21   Sam Alaimo, then we can free our witnesses, and the law

22   enforcement agents can always have their schedules

23   inconvenienced.

24        THE COURT:  Let's try to minimally get through those

25   two.  And then plan on, if we can, to do one of the law

M1K3DOU1

1   enforcement agents.  But if it looks likes we are getting close

2   to lunch and that's not going to be possible, then we'll just

3   try to at least finish those two witnesses.

4                    (Jury present)

5              THE COURT:  Good morning, ladies and gentlemen.  I

6   want to thank you for being conscientious today.  Everybody's

7   here.  We're ready to go.  We've been working while you've been

8   waiting.  I think it is going to save us some time.

9              My best estimate is we're going to -- I am hopeful

10  we're going to stay within the time frame that I said we were

11  going to work, and we're on schedule I think, and maybe a

12  little bit ahead of schedule since we came in today, and we

13  might make good progress today.

14             My best estimate at this point is that we hopefully

15  will finish the witnesses within two weeks.  Okay.  And now

16  also remember, there's deliberations and you control

17  deliberations, I don't control deliberations, there is closing

18  argument and jury instructions on the law.  So, we'll have to

19  have some time for that.

20             But, my best guess at this point is that I want to see

21  if we can finish the witnesses no later than two weeks from

22  today, and even try to see if we can get ahead of that

23  schedule.  But I'll let you know again every day whether I

24  think we are on schedule, behind schedule, ahead of schedule.

25  Right now I think we're on that schedule.  And hopefully we can

1  efficiently move forward so we can shorten that schedule for

2  you.

3            Can we get the witness back on the stand, please.

4            You can continue, Mr. Roos.

5   JESSICA POMPEO BOUCK,

6        called as a witness by the Government,

7        having been previously sworn, testified as follows:

8   DIRECT EXAMINATION (Continued)

9   BY MR. ROOS:

10  Q.  Good morning, Ms. Bouck.

11  A.  Good morning.

12  Q.  I want to pick up by talking about due diligence on RDC's

13  existing customers during the period you worked, 2013 to the

14  end of 2016, okay?

15  A.  Okay.

16  Q.  So, what sort of things was RDC supposed to do under its

17  policy to make sure its pharmacy customers weren't diverting?

18  A.  We were supposed to analyze dispensing that came in from

19  the customers, we were supposed to collect certain

20  questionnaires or forms along with their license and

21  registration to verify that they are an actual pharmacy, so we

22  can make sure they're active with the agencies that they were

23  filed with.

24  Q.  Did RDC during that period take all those steps to prevent

25  diverting?

M1K3DOU1                        Bouck - Direct

1    A.  Not always.

2    Q.  When you say dispensing, where did that information come

3    from?

4    A.  The dispensing information came from the pharmacies.

5    Q.  What's contained in that dispensing information or data?

6    A.  It is a detailed breakdown of, like, the prescription

7    number, the date it was filled, the drug name, NDC, which is

8    its 11 digit code, the quantity that the prescription was

9    filled for, the day supply, the payment form, the doctor who

10   wrote the prescription, and the doctor's DEA number.

11   Q.  Are pharmacies required to report dispensing data to the

12   state?

13   A.  They are required to report certain data to the state, I

14   think within a 24-hour period of being dispensed.

15   Q.  How does that data compare to the data you get?

16   A.  I believe, to the best of my recollection, the difference

17   is that that data would also include the patient information.

18   Q.  But otherwise it is the same?

19   A.  To the best of my memory, yes.

20   Q.  What were you looking for in the dispensing data you got?

21   A.  We were looking for red flag activity or suspicious

22   activity.

23   Q.  So how did you go about looking for that?

24   A.  We looked for patterns in the dispensing, based on red flag

25   criteria.  We researched the prescriber who was writing for the

1   prescriptions by validating their licensing, and also seeing if

2   there's disciplinary action upon the prescriber.

3   Q.   How did you go about doing that review of prescribers or

4   doctors?

5   A.   We used the DEA's website where we could put in their DEA

6   registration number to see if they're active or inactive, and

7   then we use the state licensing agencies usually had a website

8   we could also verify their state license number.  And also a

9   lot of the states had disciplinary websites.

10          MR. ROOS:  Is it okay if I approach the witness?

11          THE COURT:  Yes.  You can hand it to my law clerk.

12          MR. ROOS:  Thank you, your Honor.

13          MR. TOWNSEND:  Your Honor, I'm not sure what the

14   witness said she doesn't remember.  If we can just have that

15   information.

16          THE COURT:  I don't have a recollection of her saying

17   she didn't remember.

18          MR. ROOS:  Me neither.

19          THE COURT:  I am not sure what your issue was.

20          MR. TOWNSEND:  I want to know what he's refreshing the

21   witness for.

22          MR. ROOS:  I am just passing her some exhibits.

23          MR. TOWNSEND:  I'm sorry.

24          THE COURT:  Okay.

25   BY MR. ROOS:

M1K3DOU1                         Bouck - Direct

```
1    Q.  Ms. Bouck, in the binder that law clerk just handed to you,

2    there is a CD in the binder.  It has an exhibit sticker on it

3    marking it as 267A through 267O.

4            Do you see that?

5    A.  I do.

6    Q.  Are you familiar with that CD?

7    A.  I am.

8    Q.  What's on it?

9    A.  This was a CD that had the list of all the prescribers that

10   we used to keep logs of the prescribers that we reviewed.  So

11   that's the CD includes that information.

12           MR. ROOS:  These are in evidence, so can we pull up

13   for everyone Government Exhibit 267A.  Let's go to the top,

14   maybe to start.

15   Q.  Ms. Bouck, what is this?  What are we all looking at here?

16   A.  This is a spreadsheet that we used or some form of it that

17   we used that we would record prescriber information that we

18   looked up from a dispensing report.

19   Q.  Do you see the little tab at the bottom where it says A?

20   A.  Yes.

21   Q.  What does that refer to?

22   A.  This specific spreadsheet is for doctors with the last name

23   starting with A.

24   Q.  So the other exhibits on that CD, are those for the rest of

25   the alphabet?
```

1   A.   Correct.

2   Q.   What's the purpose of this list?

3   A.   It was to assist us when we were analyzing dispensing, so

4   we could verify the legitimacy of the doctor, we could verify

5   that they were an active or inactive doctor, what their

6   education or expertise was, what field of medicine they

7   practiced in.

8           So it would help us to be alerted to prescribing that

9   didn't look legitimate, like a pediatrician writing for high

10  dosages of narcotics which wouldn't -- would just point a flag

11  to us.  It also helped us to flag prescribers that we felt were

12  suspicious, doctors that were arrested, doctors that were on a

13  watch list that was supplied to us.

14  Q.   Can you walk us through the columns on this.

15          MR. ROOS:  And Ms. Drescher, if you just go left to

16  right as the witness talks us through them.

17  A.   Certainly.  So, the first column, column A is the

18  prescriber's last name and first name.  The column B is the

19  state license number for the prescriber, followed by the DEA

20  number for the prescriber, the expiration date for the DEA

21  number, the status of the DEA number.  If the prescriber could

22  write for Suboxone prescriptions or not.  That would be

23  indicated by the DW or the data waiver on their DEA

24  registration.  The date of the status check.  The date we

25  checked this information against the license or DEA

1    registration.  The state that the prescriber's state license

2    was issued.  The board of medicine that the prescriber's

3    certification that they held.  Their subcertification, which

4    was another certification that they might have held in addition

5    to their original board.  Their education, meaning their

6    training that they went through that would be recorded on the

7    state websites or other websites.  Their field of medicine that

8    they practiced in, which would identify if they were an

9    internist, if they were an oncologist, pediatrician, that type

10   of category.  Health Grades was an additional website that we

11   used to look up additional information about a prescriber,

12   because it would provide more useful information on the

13   prescriber, their practices or their scope of medicine.  And

14   notes was just an additional field that we would use if we

15   wanted to put extra notes, whether it be additional pharmacies

16   that they wrote or prescriptions in or it might be even

17   disciplinary actions or just anything that we wanted others in

18   the department to know about.  And other accounts in was a

19   field that we used not all the time, but we liked to use to

20   just, whenever we saw that prescriber in a different pharmacy,

21   we like to put that pharmacy in the field.

22   Q.  Let's look at an exhibit.

23        MR. ROOS:  Ms. Drescher, can you scroll down to the

24   last name Anderson.

25   Q.  Ms. Bouck, do you see the highlighting on Carl William

1   Anderson?

2   A.  I do.

3   Q.  What does that mean?

4   A.  To the best of my recollection, that highlighting, that

5   specific color meant that we had as a department flagged that

6   doctor as suspicious.

7   Q.  Let's click on the tap that says legend.  And what does

8   this refer to?

9   A.  So this was a legend we used, especially more so all of it

10  inclusive in the beginning when we started creating the list,

11  but it was our legend of what are the colors meant if a

12  prescriber was highlighted in those colors.

13  Q.  Let me ask you about a few of them.  So, what sort of

14  things made a doctor potentially suspicious, the first color,

15  red?

16  A.  It would have been activity that we saw on dispensing

17  reports, that a lot of the prescriptions for their patients

18  were filled as cash, that they wrote for consistent high

19  quantity opioid prescriptions or combination prescription

20  called the trinity is what it was called.  A doctor that was

21  writing for the same drug strength and quantity for numerous

22  prescriptions, there is no variation.  Those are the types of

23  things we looked for.

24  Q.  And you see the fourth down, Linden DNF list equals green.

25  What does that refer to?

1   A.  Linden Care was one of our customers.  And they had

2   supplied us with a list of doctors that they did not fill for.

3   And that's how we identified them.

4   Q.  What is the yellow, watch list from JS?

5   A.  We had been prescribed a list -- not prescribed.  I'm

6   sorry.

7        We had been supplied a list from an attorney of

8   prescribers that were being watched by the government.  And so

9   the yellow identified those prescribers.

10  Q.  Let's go back then to the A tab and staying on Anderson.

11        Sorry, I missed one.  Can we go back to the legend.

12        What is the blue, the three, non-pain equal?

13  A.  That was for a physician that was not in the -- did not

14  have a board certification or a field of medicine that was pain

15  management.  It wasn't used consistently.  It was more so used

16  in the beginning, like in 2013 and '14.  I think we kind of

17  faded away from using that color.

18  Q.  Now let's go back to A.  And looking at Anderson can we

19  scroll over to the notes which is in column N.  And what does

20  it say in the notes column for Anderson?

21  A.  It reads South Shore, New Dorp, and Princess Bay.

22  Q.  What's that a reference to?

23  A.  Those were stores, pharmacies, that it was -- I was going

24  to say an overflow from column O that Dr. Anderson was writing

25  prescriptions in.

1   Q.  Let me ask you about column O then.  What is the reference

2   in column O?

3   A.  Those are other pharmacies, is the other accounts in column

4   that we use.

5   Q.  Can you read those?

6   A.  Old Town Staten Island and Wyckoff's Pharmacy 6282.

7   Q.  So, you were seeing prescriptions at those collectively

8   five pharmacies?

9   A.  Correct.  And there could have been more, but those were

10  the ones that were recorded.

11  Q.  Were there times that even though you flagged doctors as

12  suspicious, like Dr. Anderson, you were still shipping

13  controlled substances to those pharmacies?

14  A.  Yes.

15  Q.  In your position in compliance, were these pharmacies ones

16  that you believe were prescribing legitimately or

17  illegitimately?

18  A.  At times there was high suspicion about being illegitimate

19  dispensing.

20  Q.  Why did you think that?

21  A.  Because of the consistent red flags that we saw throughout

22  their dispensing reports.

23  Q.  Did RDC report these pharmacies to the DEA?

24  A.  No.

25  Q.  Why didn't RDC report these customers to the DEA?

1  A.  Because RDC didn't report its customers to the DEA.  We

2  worked with them.

3  Q.  By the way, we were just talking through when you do

4  dispensing analysis.  Did RDC's compliance department from 2013

5  through the end of 2016 always actually do dispensing analysis?

6  A.  No, we did not.

7  Q.  Why not?

8  A.  We didn't have time at points in time.  There wasn't enough

9  help to process all the dispensing reports that came in.  And

10  sometimes we didn't get the reports and it took months to get

11  them.

12  Q.  Can you give me an example of a pharmacy where you didn't

13  get dispensing reports for a lengthy period of time?

14  A.  The ones that come to mind are Linden Care was a pharmacy

15  that it took a while to get some dispensing reports from.  And

16  I think Seventh Elm, if I remember correctly, is another one.

17  And I'm sure there's others.  Those are the two that are coming

18  to my mind.

19  Q.  Let's talk a little bit about Linden Care.  What, if any,

20  concerns did you have about Linden Care?

21  A.  The concerns that we had about Linden Care or that I had

22  about Linden Care was the high amount of opioid narcotic drugs

23  that they were ordering on a daily basis, that there was high

24  dosages of those medicines be dispensed from their pharmacy,

25  they had numerous prescribers and patients out of state,

1   traveling, they had patients in Florida, all over the place.

2   And it was concerning activity, because there was a potential

3   for diversion.

4   Q.   Did RDC ever do site visits at Linden Care?

5   A.   We did.

6   Q.   Did those address your concerns about potential diversion?

7   A.   The site visits themselves, the concerns to the best of my

8   recollection were discussed with the pharmacy, with Linden

9   Care.  However, it didn't necessarily stop what was happening.

10  Q.   Let's talk about a different pharmacy.  I think yesterday

11  we talked about a pharmacy called ProHealth Pharmacy.  Are you

12  familiar with that pharmacy?

13  A.   Yes.

14  Q.   Did you have any concerns about ProHealth's dispensing of

15  controlled substances?

16  A.   Yes, to my recollection, I did.

17  Q.   What sort of concerns?

18  A.   They had, from what I remember, a number of physicians that

19  we had flagged as suspicious within their dispensing reports.

20  And those physicians that we had flagged were writing for high

21  dosages of opioid prescriptions, OxyContin, some of them had

22  high percentages of cash, along with their dispensing.

23        MR. ROOS:  Let's pull up Government Exhibit 106E which

24  is in evidence.  Ms. Drescher, can we go to the first e-mail in

25  the chain which is at page eight, I believe.  Maybe it

M1K3DOU1                     Bouck - Direct

1   straddles.

2   Q.   What are we looking at here, Ms. Bouck?

3   A.   This is an order of interest for a held order for ProHealth

4   Pharmacy on the oxycodone group.

5   Q.   Let's scroll up.  Ms. Bouck, what were we just looking at

6   here, all these numbers?

7   A.   Pastings of the dispensing report.  Information from the

8   dispensing report.

9   Q.   And what sort of things were pasted there?

10  A.   So, I'll start on the left.  So the CC meaning cash.  So

11  those are cash prescriptions.  The prescription number, the

12  date the prescription was filled, identifying the form of

13  payment again as cash.  A quantity of 240 units for a 30-day

14  supply.  The date the prescription was written on.  So I'm

15  guessing -- I won't guess -- but I think that's the

16  pharmacist's initials.  The NDC number for the drug.  The drug

17  description, the strength, the form.  The 2 would be the

18  schedule.

19  Q.   Looking right above where we zoomed in, do you see that

20  note in bold?

21  A.   Yes.

22  Q.   What's that a reference to?

23  A.   So, this would be in reference that the prescriber

24  Dr. Nitti was using Dr. Krupkin's DEA number, and that all the

25  cash prescriptions written were filled by the pharmacy were for

1   240 units.

2   Q.  Why was that a red flag?

3   A.  Can you repeat that?

4   Q.  Sure.  Why, if at all, was that a red flag?

5   A.  Well, the fact that the prescriber was using a different

6   physician's DEA number would be an issue, because why are they

7   using another doctor's DEA number.  And the fact that that

8   would be a high dosage, 240 units, that all of them were the

9   same amount and they were all cash was a concern.

10  Q.  Let's read what you wrote in the e-mail above this.  Can

11  you say who it's from who it is to and read the body.

12  A.  Certainly.  It's from myself to Julius Morton and Bill

13  Pietruszewski.  And it reads:  Guys, I don't want to release

14  this store's order below and this is why.  I haven't had time

15  to do a breakdown yet so this is nothing compared to what their

16  dispensing looks like.  Please look at.  Thank you, Jessica.

17  Q.  Let's see the next e-mail in the chain.  And can you read

18  this.

19  A.  Yup.  It's from Julius Morton to myself and Bill

20  Pietruszewski.  And it reads:  I would not release any more oxy

21  to this account.  Their exhibited dispensing for these

22  prescribers noted is very disturbing.  This account will need a

23  complete review of their dispensing report and notice of

24  unacceptable dispensing.

25  Q.  Let's go to the next e-mail.  So you say in this e-mail:

M1K3DOU1                         Bouck - Direct

1    Here is the analysis on ProHealth Pharmacy.

2              What do you mean by the analysis on ProHealth

3    Pharmacy?

4    A.  It was the detailed review that we had processed on the

5    pharmacy of their dispensing report.

6    Q.  And do you see where -- sorry.  Do you see where this

7    paragraph begins "I do not like it at all"?

8    A.  Yes.

9    Q.  Can you read from there onwards.

10   A.  Certainly.  It reads:  I do not like at all.  They are not

11   related to the Chemist Shop as far as I can see.  I do see them

12   related to (same owner) as 370 Pharmacy Corp account 4031.  I

13   just pulled out their recent dispensing and looks similar to

14   ProHealth.  Will be going through but scanned file so will take

15   time.  They are a secondary account with us who went from an

16   average for the last six months ordering 15,380 units to

17   ordering a staggering 28,600 units last month, which makes my

18   stomach sick.

19   Q.  What did you mean by that?

20   A.  That last part?

21   Q.  Yeah.

22   A.  I meant that it made my -- well, it made my stomach -- it

23   sounds, it was almost double the amount that they ordered for

24   the previous six months in one month, and it -- was disturbing.

25   Q.  Why is that?

1   A.  Because that's a large increase for a drug that is so --

2   it's very much abused.

3   Q.  Why did it make you sick?

4   A.  Because it -- looking at their dispensing and knowing what

5   was happening and seeing all the cash and seeing those

6   prescribers, it made me upset to think that there is a

7   diversion happening in that pharmacy.

8   Q.  Did RDC keep selling to that pharmacy?

9   A.  I believe so, for at least a little bit.

10  Q.  Did RDC report this order or any of the orders to the DEA?

11  A.  Not at that time, no.

12  Q.  Switch pharmacies.  Are you familiar with a pharmacy called

13  Bay Ridge?

14  A.  Yes.

15  Q.  Let me ask, ProHealth, were you aware of any sort of

16  relationship between ProHealth and any individuals at RDC?

17  A.  Not that I necessarily recall.

18  Q.  Let me go back to Bay Ridge.  Are you familiar with the

19  pharmacy called Bay Ridge?

20  A.  Yes.

21  Q.  What do you recall about that pharmacy?

22  A.  I don't remember specifics about them as far as to -- what

23  I remember about them is that there was concerning issues in

24  their pharmacy.  I just don't remember exactly what the red

25  flags were.

1   Q.  Let's look at Government Exhibit 101F which is in evidence.

2   Who is this e-mail from and to?

3   A.  It is to our compliance department from myself.

4   Q.  Can you describe what this is in this e-mail, the colorful

5   chart.

6   A.  The colorful chart is, it looks like the prescribers that

7   were found within the dispensing report.

8   Q.  And so, the color coding -- I'm sorry.  The part above it,

9   the text.  Can you read the first sentence after "hi all."

10  A.  Yes.  It reads:  Last week I received a fax from Bay Ridge

11  pharmacy asking for a listing of all their oxy purchases for

12  the last six months as they had an audit they needed it for.

13  Q.  Then what do you say in the next paragraph?

14  A.  Just the very next sentence?

15  Q.  Yes.

16  A.  That their oxy limit was 75,000 units and then I reduced

17  them.

18  Q.  Do you see where it sort of it looks like you say yikes?

19  A.  Yes.

20  Q.  Why did you say yikes?

21  A.  Because 75,000 units in a month is a very large amount of

22  oxycodone.

23  Q.  Later in this e-mail, do you see where it says, it begins

24  with "that being said, however"?

25  A.  Yes.

1    Q.  Can you read the next sentence.

2    A.  Do not like 90 percent of the prescribers and a bunch of

3    our buddies are on here with writing for 180, 240, and 360 plus

4    units of oxy 30 milligram.

5    Q.  What did you mean by a bunch of our buddies?

6    A.  Oh.  It was kind of like a thing that we would talk about.

7    The suspicious prescribers.  Not meaning that they were really

8    our buddies.  Just meaning they're ones that we knew, that we

9    consistently saw in dispensing reports that we identified as

10   suspicious.

11   Q.  By the way, in this e-mail a few times I think you say

12   units.  What is a unit a reference to?

13   A.  A pill.

14   Q.  So, when it says their oxy limit was 75,000 units, that's

15   75,000 pills?

16   A.  Correct.

17   Q.  And did RDC for the period, during the period through the

18   end of 2016, report any suspicious orders to the DEA related to

19   Bay Ridge?

20   A.  No, we did not.

21   Q.  During the period through the end of 2016, did RDC keep

22   selling to Bay Ridge?

23   A.  For the best of my recollection, yes, we did.

24   Q.  Are you familiar with a pharmacy called Old Town Pharmacy?

25   A.  I'm familiar with it, yes.

1    Q.  What do you recall about that pharmacy?

2    A.  From what I remember, I remember there being suspicious

3    prescribers in that dispensing with high dosages.  That's the

4    extent of what I can remember.

5    Q.  Let's look at an e-mail then.  Can we see Government

6    Exhibit 104C.  If we look at the bottom e-mail dated April 5,

7    2016.  And do you see the first sentence where it says "I did a

8    breakdown of Old Town's most recent dispensing after some

9    discussion about their oxy limit, during the course of which I

10   noticed they had several problematic prescribers"?

11   A.  Yes, I see that.

12   Q.  What do you understand breakdown of recent dispensing to

13   mean?

14   A.  An analysis of the dispensing.

15   Q.  You see the sentence that begins "Then Old Town's overall

16   cash"?

17   A.  Yes.

18   Q.  Can you read that and the next sentence.

19   A.  Yes.

20         Old Town's overall cash is at 15 percent (16 percent

21   cash for oxy 30 milligram specifically) which is higher than we

22   would like to see, especially considering their doctors.  Their

23   suspicious prescribers include Joseph Olivieri, Nkanga Nkanga,

24   Emmanuel Lambrakis, and Carl Anderson.  35 scripts, all 180

25   count oxy 30 milligram, 40 percent of which filled for cash.

1   Q.   Yesterday do you remember reading a list of physicians out

2   loud to the jury?

3   A.   I do remember that.

4   Q.   For a different pharmacy, right?

5   A.   Yes.

6   Q.   Were any of those names the same as those listed here?

7   A.   I believe I remember Joseph Olivieri and Carl Anderson

8   being on that other report.

9   Q.   Now, on this it says Old Town's overall cash is at

10  15 percent, 16 percent cash for oxy 30 milligrams specifically.

11  Why was that an issue?

12  A.   Because generally, anything over 10 percent triggered

13  concern, an area of a concern.

14  Q.   Let's go look at your response which is one e-mail up.  You

15  respond to that e-mail, and do you see where it says "Their

16  current limit or current limit on oxy"?

17  A.   Yes.

18  Q.   Towards the bottom.  Can you read from that to the end.

19  A.   Yes.

20           Their current limit on the oxy group is 13,000.

21  15,323 is their average dispensing.  14,929 of that is their

22  average dispensing on oxy 30 milligrams.  Their cash on Endocet

23  group is 21 percent.

24  Q.   What does that mean?

25  A.   The whole thing?

1   Q.  The whole shebang.

2   A.  It means that they were -- our limit that they could order

3   up to was 13,000 units, and that out of 15,323 oxycodone units

4   dispensed by their pharmacy, 14,900 of those plus some were oxy

5   30 milligrams, which is a very highly abused strength of that

6   drug.  And that their Endocet, which is another narcotic group,

7   was at 21 percent cash.

8   Q.  Through the period through the end of 2016, did RDC

9   continue to sell to Old Town Pharmacy?

10  A.  I believe so, yes.

11  Q.  During that period, did it report any suspicious orders to

12  the DEA?

13  A.  We did not.

14  Q.  Did it hold any orders, to the best of your recollection?

15  A.  I don't recall if we held any orders or not.

16  Q.  Are you familiar with a pharmacy called Regal Remedies?

17  A.  Yes.

18  Q.  What do you recall about Regal Remedies?

19  A.  Again, when you say their name it makes me think of another

20  pharmacy that had red flag activity within it.  I don't

21  remember the specific activity, though.

22  Q.  Let's look at Government Exhibit 103C.  That's in evidence.

23  Can we take a look at the bottom e-mail.

24  A.  Yes.

25  Q.  What's this?

1    A.   It is a high percentage alert that they had for the

2    OxyContin group, meaning they had more than their limit within

3    their pending orders.

4    Q.   Let's look at the top e-mail.  Can you read it.

5    A.   Yes.  It reads:  Hi Jessica, I was looking at your note

6    from last month about Regal Remedies' OxyContin.  It says not

7    to release any more ordered over 5,000 until further notice.

8    They're at 5,300 now.  I looked at their recent dispensing he

9    just sent for 11/17-12/27.  He was better off with his previous

10   dispensing.  Their cash for September through November was

11   25 percent for oxy.  Oy.  I just looked again at the cash just

12   on oxy on what he just sent.  It's at 32 percent cash.  What

13   are your thoughts?

14   Q.   Why was this an issue?

15   A.   Because that's a very -- that's a large percentage of cash

16   being paid for prescriptions, and specifically oxycodone.

17   Q.   To your knowledge, were any of the orders by Regal Remedies

18   reported to the DEA through the end of 2016?

19   A.   No, they were not.

20   Q.   Did RDC continue to sell drugs to Regal Remedies through

21   that period?

22   A.   As far as I am aware, yes.

23   Q.   I think I just asked you about maybe five or so pharmacies.

24   And did these same types of issues exist with other pharmacies

25   at RDC?

M1K3DOU1                          Bouck – Direct

1   A.  Yes.

2   Q.  Just a few or many others?

3   A.  Multiple others.

4   Q.  Just by name, I'm going to ask you about a few pharmacies

5   and tell me whether or not those same types of issues existed

6   at those pharmacies, okay?

7   A.  Yes.

8   Q.  Windsor Pharmacy?

9   A.  Yes.

10  Q.  Wyckoff Pharmacy?

11  A.  Yes.

12  Q.  Verree Pharmacy?

13  A.  Yes.

14  Q.  Sunset RX?

15  A.  Yes.

16  Q.  59th Street?

17  A.  Yes.

18  Q.  ADLIB?

19  A.  Yes.

20  Q.  Pro Life?

21  A.  Yes.

22  Q.  Trenton Avenue?

23  A.  Yes.

24  Q.  Vitality Drugs?

25  A.  Yes.

M1K3DOU1                          Bouck - Direct

```
 1   Q.  Organix Pharmacy?

 2   A.  Yes.

 3   Q.  Dunn Meadow?

 4   A.  Yes.

 5   Q.  Main Pharmacy?

 6   A.  Yes.

 7   Q.  Drug Mart?

 8   A.  Yes.

 9   Q.  Village Chemist?

10   A.  Yes, if I remember correctly, yes.

11   Q.  Clarkstown?

12   A.  Yes.

13   Q.  A&F?

14   A.  Yes.

15   Q.  Lagrange?

16   A.  You said Lagrange?

17   Q.  Yeah.

18   A.  Yes.

19   Q.  Barths East Moriches?

20   A.  Yes.

21   Q.  ASM?

22   A.  Yes.

23   Q.  Just Here pharmacy?

24   A.  Yes.

25   Q.  Slavins Hancock?
```

1  A.  Yes.

2  Q.  Delmar?

3  A.  Yes.

4  Q.  Oak Park?

5  A.  Yes.

6  Q.  For all those, did RDC report any suspicious orders from

7  the period 2013 to 2016?

8  A.  No, we did not.

9  Q.  Did it keep supplying them controlled substances?

10  A.  At least on some of them, yes.

11  Q.  Did there come a time when Larry Doud left the company and

12  different management was in charge?

13  A.  Yes.

14  Q.  When was that?

15  A.  Sometime -- I think he, if I remember correctly, he retired

16  sometime early 2017.

17  Q.  Prior to his retirement, was he involved in compliance in

18  the first part of 2017?

19  A.  I don't recall him being involved.  He was out of the state

20  from what I remember.

21  Q.  After Mr. Doud left the company, was there a time when you

22  met with the United States attorney's office and agents from

23  the DEA?

24  A.  Can you say it one more time?  Because I'm kind of --

25  Q.  Sure.  In 2017, or afterwards, was there a time when you

1   met with the U.S. attorney's office and the DEA?

2   A.  Yes, there was.

3   Q.  Since then, have you met with law enforcement agents and

4   the government?

5   A.  Yes, I have.

6   Q.  How many times?

7   A.  At least eight, nine.

8   Q.  Have you entered into any agreements with the government?

9   A.  I have.

10  Q.  What sort of agreement?

11  A.  A non-prosecution agreement.

12  Q.  Is that a written or an oral agreement?

13  A.  It is a written agreement.

14  Q.  Can you describe what it says?

15  A.  The non-prosecution agreement says that I would not be

16  tried for the crimes of violating the Controlled Substances Act

17  and defrauding the government, as long as I met certain

18  stipulations set within the agreement.

19  Q.  What are those things that you have to do?

20  A.  I have to tell the truth.  I have to -- not participate --

21  well, I was to participate with any meetings.  Supply --

22  "cooperate" was the word I was looking for.  I have to

23  cooperate with the government.  I have to supply any

24  documentation that's requested.  I have to be a witness on

25  trial.

1  Q.  Now, can anything happen to you if you lie while you

2  testify?

3  A.  Yes, I can be charged with perjury.

4  Q.  And the agreement doesn't protect you if you lie?

5  A.  No, it does not.

6  Q.  Does the outcome of this trial have any impact on whether

7  or not you're prosecuted?

8  A.  It does not.

9  Q.  You mentioned cooperating.  Does cooperating mean you have

10  to give a particular answer?

11  A.  No.

12  Q.  I believe you said you worked at RDC until 2021; is that

13  right?

14  A.  Yes.

15  Q.  In the year after Doud left the company, were most of the

16  same people in the compliance department?

17  A.  Most of the same people, with a change in some of the

18  analysts.

19  Q.  What, if anything, changed in the compliance department's

20  practice in the year after Doud left the company?

21  A.  We immediately started to analyze dispensing reports again

22  before turning customers on for controlled substances.  We

23  started reporting suspicious customers and suspicious orders.

24  We started ensuring that we were collecting dispensing reports

25  and analyzing them on existing customers as well.

1    Q.  Why did that change?

2    A.  Because it was required of us to do so, and we could now do

3    it freely.

4    Q.  What do you mean you could now do it freely?

5    A.  We didn't -- well, with Larry not being there, we didn't

6    have to not analyze dispensing anymore before turning an

7    account on.  Because management had changed and their

8    authorization changed.  And we didn't have to get approval to

9    take action on pharmacies anymore.

10   Q.  So were suspicious orders reported after Mr. Doud left the

11   company?

12   A.  Yes, they were.

13   Q.  Do you know approximately how many?

14   A.  I would --

15   Q.  You can estimate.  Tens, twenties, hundreds?

16   A.  I would probably say over 100.

17   Q.  What types of suspicious practices did the reports relate

18   to?

19   A.  Those suspicious practices would have been suspicious

20   orders activities, so held orders and that we determined were

21   suspicious.  Or suspicious red flag activity that was occurring

22   within the pharmacy.

23   Q.  Were those types of suspicious activity new to the company,

24   new to RDC?

25             Was that the first time RDC was seeing those things?

1   A.  No.

2   Q.  Well, then what changed?

3   A.  Again, we -- started reporting customers, we didn't have

4   to -- our procedure actually followed our policy that we would

5   report suspicious activities.

6   Q.  I'd like now to show you what's been marked as Government

7   Exhibits 263 and 264.  Should be only for the witness and the

8   Court and the attorneys.  Let's start with -- let's do both of

9   them.

10          Do you see those up on screen?

11  A.  I do.

12  Q.  And what are these?

13  A.  These are records of our suspicious ordering activity

14  reports.

15  Q.  Can you see, just looking at the column on the furthest to

16  the left here, what year they relate to?

17  A.  2017.

18  Q.  Is this a log that was made in the regular course of the

19  compliance group's activities in 2017?

20  A.  Yes.

21  Q.  And is it a fair and accurate log, to the best of your

22  recollection?

23  A.  Yes, it is.

24          MR. ROOS:  The government offers 263 and 264.

25          THE COURT:  It will be admitted.

1           MR. TOWNSEND:  Just for the record, our objection

2    maintains.

3           THE COURT:  Yes.  Pursuant to our previous

4    conversation it will be admitted into evidence.

5           (Government's Exhibit 263, 264 received in evidence)

6           MR. ROOS:  Let's put up 263 for the witness.

7    Q.  Ms. Bouck, can you just describe what we're looking at here

8    for the jury?

9    A.  So this is a suspicious order activity report log for our

10   Fairfield facility.  And it lists the -- we assigned a log

11   number for the store.  We call it the SOAR report.  The date

12   the report was made, who the pharmacy was, the pharmacy's

13   account number, the pharmacy's DEA registration number, what

14   the type of activity was that we were reporting as suspicious,

15   who the reporter was, who the report was made to, and the form

16   it was made in, whether it was telephoned or e-mailed or

17   mailed.

18   Q.  Now, let's go back over and scroll down to the bottom of

19   this.  And can you see how many of these were filed from the

20   Fairfield facility in 2017?

21   A.  Yes.  108.

22   Q.  Let's look at 264.  Same question.  Can we scroll to the

23   bottom.

24   A.  74.

25   Q.  How many were filed in the years prior, since you began

1    working there, 2013 to 2016?

2    A.  We never reported any suspicious orders.  And I believe we

3    reported one or two suspicious customers.

4    Q.  Let's go back to Government Exhibit 263.  And let's go to

5    the top.  Did you report orders on any customers that you had

6    issues in the past?

7    A.  Yes, there is orders on here for customers that we had

8    issues with in the past.

9    Q.  Why don't you just -- we are not going to go through the

10   whole thing.  For the ones on the screen, can you read some of

11   the ones you either had compliance issues with in the past?

12   A.  Yes.  Windsor Pharmacy, Wyckoff Pharmacy, Verree Pharmacy,

13   Sunset Pharmacy, 59th Street, ADLIB Pharmacy, Pro Life

14   Apothecary, Trenton Avenue, Dedale Pharmacy, Vitality Drugs,

15   Regal Remedies, Organix Pharmacy, ProHealth Pharmacy, Dunn

16   Meadow Pharmacy, Windsor Pharmacy.

17   Q.  The types of issues you reported for them in 2017, did they

18   exist in the years prior?

19   A.  To the best of my recollection, yes.

20   Q.  Why did you report them in 2017?

21   A.  Because we started reporting and following procedure and

22   reporting suspicious activities on customers.

23   Q.  What was the cause of that change?

24   A.  We didn't need permission to do so anymore.

25   Q.  Who did you not need permission from anymore?

M1K3DOU1                          Bouck - Direct

1    A.   From Larry Doud.

2    Q.   More generally, did you believe that Mr. Doud knew the

3    problems with RDC's pharmacy customers?

4              MR. GOTTLIEB:  Objection, your Honor.

5              THE COURT:  Sustained as to the form.

6    Q.   What's your understanding about what Mr. Doud knew about

7    the problems with RDC's customers?

8              MR. GOTTLIEB:  Your Honor, objection.

9              THE COURT:  Again as to the form of the question

10   sustained.

11   Q.   I'll start with based on your conversations with Mr. Doud

12   and other employees at RDC, what do you know about Mr. Doud's

13   knowledge of other customers?

14             MR. GOTTLIEB:  Objection, your Honor.

15             THE COURT:  Again, I'm going to sustain it as to the

16   form.

17             Why don't you break that down into one question with

18   regard to one, with regard to Mr. Doud's knowledge and

19   conversations.

20             MR. ROOS:  Okay.

21   Q.   Did you have conversations with Mr. Doud about pharmacy

22   customers?

23   A.   Via e-mails at times.

24   Q.   Did you talk to other employees in the compliance

25   department about their conversations with Mr. Doud?

1    A.  Yes, with Bill Pietruszewski I would have.

2    Q.  Okay.  And did you ever participate in any meetings or

3    one-on-one conversations with Mr. Doud about various pharmacy

4    customers?

5    A.  In the sense of we would talk when he would inquire about a

6    pharmacy being set up for controlled substances, and if there

7    was, like, what was holding that customer's ability to buy

8    controls from us, what was holding that process up.  So I would

9    have talked to him about what I was seeing on the dispensing

10   report.

11   Q.  In one or more of those contexts, was he told about

12   problems at RDC customers?

13               MR. GOTTLIEB:  Your Honor, I'm going to object to that

14   and I would ask now, especially in light of the questions and

15   answers, that there be no leading questions.

16               THE COURT:  Overruled.  I'm going to allow that

17   question.  And you can proceed.

18   A.  I don't remember the question.  I'm sorry.

19               THE COURT:  What's your question?

20               MR. ROOS:  If you want to read it back.

21               THE COURT:  Why don't you ask it again.

22   Q.  Based on those conversations and interactions, what's your

23   understanding about what he knew about RDC customers?

24               MR. GOTTLIEB:  Objection, your Honor.

25               THE COURT:  Overruled.

M1KBDOU2                          Bouck - Cross

```
1   A.  My understanding is that, simply put, that he was on

2   e-mails about customers that we had concerns with, because we

3   needed permission to terminate the ability for those stores to

4   order controlled substances.

5            MR. ROOS:  One second, your Honor.

6   Q.  Throughout the period that Mr. Doud and you were both

7   working at the company, did you report suspicious orders?

8   A.  No, we did not report any suspicious orders.

9   Q.  For orders that you believed were suspicious, what did you

10  do with them?

11  A.  Well, they were sometimes released.  And sometimes they

12  were just canceled.

13  Q.  Why didn't you do what the RDC policy said you do?

14  A.  Because our verbal procedure on how we handled customers

15  was different.

16  Q.  Where did that come from?

17  A.  It came from management, from my boss.

18  Q.  Who are you talking about when you say management and your

19  boss?

20  A.  It came from Bill Pietruszewski and Larry Doud.

21           MR. ROOS:  No further questions.

22           THE COURT:  Cross-examination.

23           (Continued on next page)

24  CROSS-EXAMINATION

25
```

1    BY MR. TOWNSEND:

2    Q.  Good morning.

3    A.  Good morning.

4    Q.  I just want to clarify one thing right off the bat.  During

5    your time at RDC, you never entered into any agreement with

6    anyone to intentionally divert controlled substances; is that

7    right?

8            MR. ROOS:  Objection.

9            THE COURT:  Sustained as to the form of the question.

10   Q.  While you were at RDC, did you ever intend to divert

11   controlled substances?

12   A.  Did I personally ever intent to divert, no, I did not.

13   Q.  Did you ever have conversations with other people about

14   intentionally diverting controlled substances?

15   A.  Intentionally, no.

16   Q.  While you were at RDC, did you intentionally defraud the

17   DEA?

18   A.  Did I, no.

19   Q.  Did you have conversations with other people about

20   intentionally defrauding the DEA?

21           MR. ROOS:  Objection.

22           THE COURT:  Overruled.  You can answer.

23   Q.  You can answer that.

24   A.  Can you ask it one more time.  When I hear that I kind

25   of --

Q.  Not a problem.  While you were at RDC, did you have

conversations with other people about intentionally defrauding

the DEA?

A.  Specific to those words, no.  Did I have conversations

about specifically not doing what was required, yes.

Q.  My question was specifically regarding defrauding the DEA.

        MR. ROOS:  Objection, asked and answered.

        THE COURT:  Sustained as to the question.  What is the

question?  Ask her the question again.

Q.  You equivocated your answer. I'm just looking for a yes or

no.

        MR. ROOS:  Objection for characterizing.

        THE COURT:  Sustained. What is your question.

Q.  Did you have conversations with other people where you

specifically talked about intentionally defrauding the DEA?

        MR. ROOS:  Asked and answered.

        THE COURT:  overruled.  You can answer.

A.  This is a yes or no answer?

Q.  Correct.

A.  No.

Q.  Based on your testimony, it's fair to say that while you

were at RDC, you were actually trying your hardest.  You were

giving your best effort to make sure that RDC followed the laws

and rules and the regulations it was required to; is that fair

to say?

1   A.  To the best of my ability, yes.

2   Q.  And when you felt like that wasn't happening, you testified

3   that it made you upset, right?

4   A.  Yes.

5   Q.  Because you wanted to follow the law, right?

6   A.  Correct.

7   Q.  You said you vented about it when it didn't happen, right?

8   A.  Vented about?

9   Q.  Vented about the decisions that were made.

10  A.  At times, yes.

11  Q.  You said you complained to other people in the compliance

12  department?

13  A.  Yes.

14  Q.  When an order of interest came in and you felt

15  uncomfortable, you would hold that order, wouldn't you?

16  A.  Unless told to do otherwise.

17  Q.  And someone else may have released it, but you personally,

18  you held it?

19  A.  It really wasn't up to me.  The system held it.  I didn't

20  hold it.  And if it was a customer that we were told to take

21  care of, we released it.

22  Q.  But if nobody told you to release it, you wouldn't do that

23  on your own?

24  A.  No.

25  Q.  Between yesterday and this morning, there's a lot of

1    testimony spent talking about the decision to change the

2    process by which new customer accounts were opened, right?

3    A.  Yes.

4    Q.  You testified regarding an email sent on June 5, 2016, from

5    Larry Doud about that policy, right?

6    A.  Yes, there was an email.  I don't remember the specific

7    date.

8    Q.  Well, let's bring up Government 57.  Just for the witness

9    and the parties. Actually, it's in evidence.  We can publish

10   it. You recognize this email, Ms. Bouck?

11   A.  Yes.

12   Q.  Under the new policy as -- I'm sorry.  The email, if we

13   could go to the back, scroll down.  So that's June 5, 2016,

14   right?

15   A.  Yes.

16   Q.  So under the new policy as you understood it, you would be

17   getting dispensing data, surveys, pictures of the pharmacies,

18   questionnaires, and protocols, plus credit info.  And once

19   those were in your hand, the store could be turned on?

20   A.  No, I don't believe that that's what it said.

21   Q.  I'm not asking what it said.  The policy as you understood

22   it was, those things would be in your hand?

23   A.  I disagree.  I wanted them to be in my hand.

24   Q.  You understood that you were supposed to be getting the due

25   diligence reports, right?

1  A.   The dispensing report.

2  Q.   The dispensing reports, excuse me.  And Larry Doud --

3  withdrawn.

4          And you understood that you were supposed to analyze

5  those dispensing reports as they came in?

6  A.   What point in time are you referencing?

7  Q.   As the dispensing reports came in, it was your

8  understanding that you would look at them, right?

9  A.   Yes.

10  Q.   And you would conduct an analysis and determine if anything

11  about them was troublesome?

12  A.   Yes.

13  Q.   And you would report that to Larry Doud or Bill

14  Pietruszewski or somebody in compliance, right?

15  A.   Correct.

16  Q.   With the understanding that they would then terminate the

17  customer if there was a problem?

18  A.   That would depend on who was reviewing the dispensing

19  report.

20  Q.   When Larry Doud changed the policy, it was open for

21  discussion, right?

22  A.   That's what was on the email.

23  Q.   Ultimately these changes were discussed by

24  upper-management, right?

25  A.   I wasn't -- I was only involved in what was on the email.

1    I don't know what upper-management discussed.

2    Q.  Did you ever have any conversations with Bill Pietruszewski

3    regarding this change?

4    A.  That we were waiting to determine whether we were going to

5    start doing it or not.

6    Q.  Did he ever voice his opinion to you about it?

7    A.  That I remember, just that he didn't like it.

8    Q.  Well, Bill Pietruszewski was in favor of the policy.

9    Compliance was okay with it, right?

10   A.  I don't know.  I'm not Bill Pietruszewski.

11   Q.  Well, at the beginning you were okay with it, right?

12   A.  No, I was not.

13   Q.  I want to be very clear about this.  It's your testimony

14   that you never indicated to anyone that you were on board with

15   this program?

16   A.  I have no idea what I said.  I don't recall what I would

17   have said in the past.  I just know I didn't like it, but I

18   was -- if that's what we were going to do, because that's what

19   I was told we were going to do, then that's what we were going

20   to do.  I went along with it.

21   Q.  Well, if I showed you --

22          MR. TOWNSEND:  One moment, your Honor.  We're getting

23   the exhibit up.

24   Q.  Ms. Bouck, I'm going to ask you to read the first email in

25   this chain to yourself, and can you let me know when you've

1    done so.

2              MR. ROOS:  Objection, she's not on it.

3              THE COURT:  Overruled.  Let's see where we're going to

4    go with it.

5    Q.  Just read it to yourself, the top email.  Does this email

6    refresh your recollection that at the time of the change of the

7    policy you agreed with it?

8    A.  No, it does not.

9    Q.  I'd like to talk about setting up new customers prior to

10   this rule change.  Prior to June of 2016, when a new customer

11   was being set up, there were a number of things they had to

12   supply to RDC before they could make controlled substances

13   purchases; is that right?

14   A.  Yes.

15   Q.  One of the major things that they had to provide was again

16   these dispensing records; is that fair to say?

17   A.  Yes.

18   Q.  And that was to ensure that there weren't suspicious

19   patterns of filling prescriptions by the pharmacies, right?

20   A.  That was one of the processes, yes.

21   Q.  And you never brought a customer on board without checking

22   their dispensing first?

23   A.  To the best of my recollection, yes, but not necessarily

24   always.

25   Q.  Well, you had a conversation with the government.  You told

1   them that, didn't you?

2   A.  I told them unless I was told otherwise, cause there was

3   times that I was told otherwise.

4   Q.  You remember meeting with the government on July 12, 2017?

5   A.  I do remember meeting with them in July of 2017.

6   Q.  And you discussed setting up new accounts during that

7   meeting?

8   A.  I don't remember what was discussed during that meeting.

9            MR. TOWNSEND:  Your Honor, there seems to be a slight

10  technical issue.  May I approach the witness.

11           MR. GOTTLIEB:  Judge, this would be an appropriate

12  time to take a break.

13           THE COURT:  Yes, obviously, if we can get the

14  technology.  We'll take a break till noon.  Don't discuss the

15  case.  We'll come back at that time.

16           (Recess)

17           (In open court; jury present)

18           THE COURT:  You can continue, Mr. Townsend.

19           MR. TOWNSEND:  Thank you, your Honor.

20  BY MR. TOWNSEND:

21  Q.  Ms. Bouck, isn't it a fact that you've only had maybe ten

22  conversations one on one with Larry Doud during the entire time

23  you were at RDC?

24  A.  I have no way of knowing that's a fact or not.  I don't

25  recall how many times I talked to him.

1    Q.  Well, ten versus a hundred versus a thousand, you would

2    agree it happened infrequently?

3    A.  It was less than a hundred, yes.  I would agree to that.

4    Q.  It happened infrequently?

5    A.  Well, if I walked by him in the hallway, I said hello to

6    him.  That's talking to him, so.

7    Q.  I'm talking about any substantive conversation, not just

8    passing in the hallway.

9    A.  Okay.  Then, yes.

10          MR. TOWNSEND:  If you could put up Government's 101F.

11   Q.  You recall seeing this email, Ms. Bouck?

12   A.  I do.

13   Q.  Larry Doud is not on this email, is he?

14   A.  It does not look like it, no.

15   Q.  This email indicates that the oxy limit was at 75,000

16   units?

17   A.  Yes.

18   Q.  And then you reduced them, right?

19   A.  That's what it says, yes.

20   Q.  And then they had on order that went on hold, right?

21   A.  Yes.

22          MR. TOWNSEND:  Bring up 104C.

23   Q.  You also testified about this email regarding Old Town?

24   A.  Yes.

25   Q.  Larry Doud is not on this email?

1   A.  No, he is not.

2   Q.  You didn't follow-up with Larry Doud about this email?

3   A.  I have no idea if I did that or not.

4   Q.  You don't recall following up with Larry Doud about this

5   email?

6   A.  I do not have a recollection of that.

7   Q.  In this email in the second line, Anthony informs me that

8   he is buying more for us because of our pricing which started

9   the ball rolling and prompted us to request dispensing.

10         And then in the second paragraph, he was very

11   receptive during the conversation that I had with him.  Do you

12   see that?

13   A.  I see that.

14         MR. TOWNSEND:  Bring up 103C.

15   Q.  You see this email?

16   A.  I see it.

17   Q.  Between you and Amy Skibickyi?

18   A.  Yes.

19   Q.  Larry Doud's not on this email, right?

20   A.  Correct.

21   Q.  And you didn't speak to Larry Doud about this email, right?

22   A.  I don't recollect that.

23   Q.  These emails that you testified to, Larry Doud wasn't on

24   any of them, right?

25   A.  He was on other emails, yes.

1    Q.  I'm just talking about these.

2            MR. ROOS:  Objection, vague question.

3    Q.  The three emails that we just discussed?

4    A.  No, he was not.

5            THE COURT:  The three emails.

6    Q.  The three emails that we just discussed, Larry Doud not

7    involved in them, right?

8    A.  No.

9    Q.  And you don't recall speaking to Larry Doud about the

10   contents of these emails, do you?

11   A.  I do not.

12           MR. TOWNSEND:  Can you bring up 103C again.

13   Q.  You testified that these types of alerts would generate

14   when a customer put an item into their cart, right?

15   A.  Yes.

16   Q.  So it's not actually a purchase, it's just in the cart?

17   A.  When it's a high percentage alert, it's just in the cart.

18   Q.  So this isn't even actually showing that Regal Remedies

19   bought over 100 percent.  It just shows that they put something

20   in their cart?

21   A.  It's showing that whatever was in their cart brought them

22   to 104 percent.

23   Q.  If they put something in their cart at the end of the

24   month, and then the following day it reset and then they went

25   ahead and bought, that wouldn't trigger a compliance problem,

1   would it?

2   A.  If it was the last day of the month and they took it out

3   and ordered it the next day, it would not.

4   Q.  So this alert in and of itself isn't indicative of

5   anything?

6   A.  I don't know what you're asking.

7   Q.  This alert only says that something was in the cart.  It

8   doesn't actually say that this pharmacy even attempted to buy

9   over their limit?

10  A.  The actual alert itself sent at 2:43 p.m. says that, yes.

11  Q.  Let's go back to onboarding new customers.  You didn't

12  accept any new customer that wanted to open an account with

13  RDC.

14  A.  Me personally?

15  Q.  You or RDC as a company.

16  A.  I don't understand the question.

17  Q.  There were customers that attempted to open accounts that

18  were rejected?

19          MR. ROOS:  I'm not sure that's a question.  Is that a

20  question?

21  Q.  Is that true?

22  A.  From a compliance standpoint, there was customers that

23  weren't allowed to order controls.

24  Q.  And at times, actually two out of every five pharmacies

25  that were trying to become RDC customers would be denied

1   because of compliance issues; isn't that true?

2   A.  I don't remember.

3   Q.  You met with the government on July 12, 2017, right?  We

4   talked about that?

5   A.  Yes.

6   Q.  And you told them that at times two out of five customers

7   would be denied, potential customers would be denied opening

8   accounts?

9   A.  I don't know what you're asking.

10  Q.  Didn't you tell the government that at times two out of

11  every five potential customers would be denied by RDC from

12  opening accounts?

13  A.  I don't remember what I told them on July of 2017.

14          MR. TOWNSEND:  Your Honor, with your permission, I'm

15  showing the witness Defense Exhibit B4, page 4.

16  Q.  Ms. Bouck, I'm going to ask you to read just the last

17  sentence on page 4 and then scroll to page 5.

18  A.  Am I reading it out loud?

19  Q.  No.  Just to yourself.  Does this refresh your recollection

20  that during that meeting you told the government at times two

21  out of every five customers would be denied?

22  A.  I'm kind of not -- I saw it and then I didn't see.  The

23  last sentence on that one page to the other page, what's up

24  right now doesn't let me see the beginning of the sentence or

25  who said it.  Okay.  Thank you. I was able to read it.

M1KBDOU2                          Bouck - Cross

```
 1   Q.  Does that refresh your recollection that you told the
 2   government that at times two out of every five customers would
 3   be denied?
 4   A.  I personally still do not remember saying it, but it is
 5   documented, so I suppose I said it.  I just don't remember that
 6   conversation.  It doesn't recollect that to me.  Sorry.  It
 7   doesn't, but it's written, so.
 8           MR. ROOS:  Your Honor, the government would just move
 9   to strike the portion about it's written since the document is
10   not in evidence.
11           THE COURT:  The document is not in evidence.  I'll
12   strike that portion of the testimony.
13   Q.  Isn't it true that between 80 and 100 pharmacy accounts
14   were rejected during the time that you were there?
15   A.  I don't know.
16   Q.  You told the government in July 2017 that between 80 and
17   100 accounts were rejected, you don't remember that?
18   A.  I do not.
19   Q.  You remember the government asking you about Franklin
20   pharmacy?
21   A.  When?
22   Q.  Yesterday.
23   A.  Yes.
24   Q.  There were some issues with that pharmacy as it was being
25   onboarded?
```

1   A.  Yes, I believe that's what I remember.

2   Q.  So Larry Doud sent somebody out to that pharmacy, right?

3   A.  I don't remember seeing that part.  I don't remember that.

4   Q.  Julius Morton was sent to that pharmacy by Larry Doud,

5   right?

6   A.  Again, I don't remember seeing that, so I can't confirm

7   that.

8   Q.  If you could read the bottom paragraph on this.  For the

9   record, this is B4, Defense B4?

10          MR. ROOS:  The government objects.  He hasn't laid a

11   foundation to refresh her recollection.

12          THE COURT:  Overruled.  She can read it.

13   A.  Out loud?

14   Q.  No, to yourself.  Does it refresh your recollection that

15   Larry Doud sent somebody out to that pharmacy to audit it?

16   A.  Vaguely.

17   Q.  That didn't surprise you, did it?

18   A.  According to what I just read, it didn't surprise me.

19   Q.  It didn't surprise you that Larry Doud would send an

20   auditor out to a pharmacy, right?

21   A.  No, it did not surprise me that we would send auditors to

22   pharmacies.

23   Q.  In fact, RDC utilized a bunch of third-party vendors and

24   pharmacy auditors, right?

25   A.  We used -- I wouldn't call it a bunch.

1   Q.  Well, let's go through them.  Larry Doud contracted with

2   Carlos Aquino, right?

3   A.  Yes.

4   Q.  And Carlos Aquino is an ex-DEA agent, right?

5   A.  Yes.

6   Q.  He had a company called Pharma Compliance?

7   A.  I believe so, yes.

8   Q.  And Larry Doud entered into an agreement with Pharma

9   Compliance to do third-party audits of pharmacies, right?

10  A.  Analysis of their dispensing.

11  Q.  Analysis of their dispensing, so they would look at the

12  dispensing and identify any compliance issues?

13  A.  They would look at their dispensing and provide us with an

14  analysis.

15  Q.  They would look at the dispensing and provide you an

16  analysis as an ex-DEA agent, right?

17  A.  Two different companies. Pro Compliance did the analysis.

18  Q.  Is Carlos Aquino also affiliated with Pro Compliance?

19  A.  Not that I'm aware of.

20  Q.  So Pro Compliance did the analysis and Pharma Compliance

21  did the audit?

22  A.  That was what they both did for RDC, not necessarily on the

23  same store.

24  Q.  Not on the same store.  And they're two different

25  companies?

1   A.  Yes.

2   Q.  Let's take Pharma Compliance first.  Pharma Compliance is

3   Carlos Aquino's company?

4   A.  Yes.

5   Q.  And Carlos Aquino and Larry Doud entered into a contract

6   for Pharma Compliance to audit pharmacies?

7   A.  I don't know.  I wasn't privy to contracts.

8   Q.  But you were aware that Carlos Aquino audited pharmacies on

9   behalf of RDC and Larry Doud?

10  A.  Yes.

11  Q.  And you're aware that Pro Compliance analyzed dispensing

12  for Larry Doud?

13  A.  For RDC, yes.

14  Q.  RDC, who is run by Larry Doud?

15  A.  Yes.

16  Q.  These are third-party vendors?

17  A.  Yes.

18  Q.  They were being paid?

19  A.  Yes.

20  Q.  Larry Doud was, in fact, paying them?

21  A.  RDC was, yes.

22  Q.  And you as a compliance specialist, you were paid, right?

23  A.  I certainly was.

24  Q.  And Larry Doud was paying you?

25  A.  RDC was paying me.

1    Q.  And Amy Skibickyi?

2    A.  What about her?

3    Q.  She was getting paid?

4    A.  As far as I know.

5    Q.  And Karen Stevens?

6    A.  I believe so.

7    Q.  Elizabeth Cullen?

8    A.  As far as I know.

9    Q.  Julius Morton?

10   A.  Yes.

11   Q.  William Delgado?

12   A.  Yes.

13   Q.  All of them getting paid by RDC for compliance, right?

14   A.  Yes.

15   Q.  And now these third-party vendors, Carlos Aquino, looking

16   at the pharmacies, he would conduct an audit based on DEA

17   regulations?

18          He would evaluate the store's due diligence policies;

19   isn't that right?

20   A.  I know he would conduct an audit.  I don't know if he

21   evaluated the stores.  I don't remember specifically if he

22   looked at policies or not.

23   Q.  You received his reports as they came in, right?

24   A.  Not always.

25   Q.  You relied on the reports?

1    A.  I did not always receive them, no.  I couldn't be -- they

2    didn't always go to me.

3    Q.  They went to Bill Pietruszewski?

4    A.  Yes.

5    Q.  And then you would speak to Bill Pietruszewski about the

6    customers?

7    A.  It depends on what it was.  I can't say.  There might have

8    been circumstances where I didn't if I wasn't involved in it.

9    I don't know.

10   Q.  It's fair to say your day to day as a compliance specialist

11   under Bill Pietruszewski involved speaking to him about

12   customers?

13   A.  Yes, that is fair to say.

14   Q.  And it's fair to say that if a customer exhibited anything

15   that would trigger an RDC investigation, that might be a

16   subject of conversation for you and Bill Pietruszewski?

17   A.  That is fair to say.

18   Q.  In addition to Carlos Aquino-- well, withdrawn.  Carlos

19   Aquino audited how many pharmacies?

20   A.  I don't know.

21   Q.  Fifty.

22   A.  I don't think so.

23   Q.  In addition to Carlos Aquino, Julius Morton would also

24   audit pharmacies, right?

25   A.  Yes.

1    Q.  And he's an ex-DEA agent?

2    A.  Yes.

3    Q.  Thirty plus years with the DEA?

4    A.  I don't know how many years.

5    Q.  And he also with Bill Delgado would go out and do site

6    visit evaluations?

7    A.  Yes.

8    Q.  And he would review the dispensing?

9    A.  He would review the analysis.

10   Q.  And he would review their due diligence policies?

11   A.  If they had one.

12   Q.  And he would look at whether or not they were buying too

13   much with cash or selling too much with cash, excuse me?

14   A.  If he would look at that?

15   Q.  Sure.  Part of the dispensing analysis was looking at say

16   prescribers, right?

17   A.  Yes.

18   Q.  And how many controlled substance purchases were made with

19   cash, right?

20   A.  Yes.

21   Q.  And he would evaluate and put everything into a report,

22   right?

23           MR. ROOS:  Compound.  There were two questions there.

24           THE COURT:  Overruled.  She can understand if she

25   understands.

1   A.  If I remember the question correctly, yes, he would look at

2   the dispensing analysis, at the cash percentage on it.

3   Q.  And you would submit these reports to Bill Pietruszewski?

4   A.  I believe so, yes.

5   Q.  And it's your testimony that you believe he went to half

6   the pharmacies at RDC, right?

7            MR. ROOS:  Objection, that's not what she said.

8            THE COURT:  Overruled.  She can answer.  You can

9   answer.

10  A.  I don't remember how many pharmacies that he went to.  If I

11  remember correctly, I said maybe 50 percent, but I'm not sure

12  what -- how many he went to.

13  Q.  But as you sit there today, you think maybe 50 percent?

14  A.  It's possible.  I don't know.  I really don't.

15  Q.  It's your testimony from yesterday that RDC had roughly 700

16  pharmacy customers that purchased controlled substances?

17  A.  That's a number that I remember, yes.

18  Q.  So if Julius Morton went to maybe 50 percent, that would be

19  about 350 pharmacies, right?

20  A.  If that's how many he went to, 50 percent.

21           MR. TOWNSEND:  Can we bring up Government's 41.

22  Q.  You want to go back to this email which you testified about

23  yesterday regarding Parkdale and Franklin Square pharmacies.

24  Do you remember looking at this yesterday?

25  A.  I do.

M1KBDOU2                          Bouck - Cross

Q.   I think there were a couple of lines that may have been

left out.

          MR. ROOS:   Is that a question?

Q.   I want to zoom in on the email from Bill Pietruszewski.

Right there.

          Bill writes:   Jessica, you did right by not turning on

Franklin Squares, no documentation, no controls, simple.

That's what he wrote to you, right?

A.   That's what it says.

Q.   In February of 18, 2015?

A.   That is the date.

          (Continued on next page)

M1K3DOU3                           Bouck - Cross

1   Q.  You can highlight, so this e-mail is from Julius Morton to

2   Bill Pietruszewski, right?

3   A.  Yes.

4   Q.  So that middle paragraph, Elina Yakubov, wife of Roman, is

5   running Colony Drugs, I spoke with her for over an hour this

6   past Saturday morning after Noulis texted me on Friday night to

7   please reach out to her.  I did not mind and told him that I

8   would give her a quick call.  When I spoke with her Saturday,

9   she was really being indignant about having RDC having a

10  compliance auditor come to her store.  She told me she thought

11  the review was intrusive and could not understand why RDC was

12  picking on her as she was so very careful not to do anything

13  wrong while other stores like Austin Chemist were filling oxy

14  like crazy.  She actually brought them up because she knew the

15  female pharmacist there and knew they had been shut down by

16  their distributor.  So once I told her that it was us who had

17  cut them, off she became a little nervous and less defiant.

18          Do you see that?

19  A.  I do.

20  Q.  This is an e-mail from Bill Pietruszewski to Julius Morton

21  and you, right?

22  A.  Yes.

23  Q.  February 19, 2015?

24  A.  Yes.

25  Q.  And that big paragraph in the middle.

 1              I am assuming that Elina worked for a change or is

 2      younger and never had the DEA come into her store?  So sad that

 3      we, the wholesaler, is trying to help the pharmacist and they

 4      feel as if we are attacking them.  That is the same way the

 5      pharmacist in Rochester felt.  Jessica spent an hour on the

 6      phone with the guy and sent over pamphlets which in this case

 7      seemed to work.  It will be interesting to see if Elina will

 8      supply a well done due diligence policy.  If written well, she

 9      got it.  If just taken the information you gave her, well no

10      need to say it.

11              No need say it means no controls, right?

12      A.  I don't know.

13      Q.  You also talked about 59th Street Pharmacy yesterday,

14      right?

15      A.  From what I remember.

16      Q.  You testified about this e-mail at the bottom of the page

17      from Elizabeth Cullen.

18      A.  Yes.

19      Q.  That e-mail was March 10, 2017.

20      A.  Yes.

21      Q.  Isn't it a fact that on March 15, 2017, just five days

22      later, Julius Morton recommended that RDC shut down all sales

23      of controlled substances to 59th Street Pharmacy in a

24      compliance audit?

25      A.  I have no idea if that is a fact or not, without showing me

M1K3DOU3                        Bouck - Cross

1   something showing me that that's a fact.

2   Q.  You see what's on the screen?

3   A.  I do.

4   Q.  An e-mail from Julius Morton to, among other things, the

5   compliance department?

6           MR. GOTTLIEB:  This exhibit is which one?

7           MR. TOWNSEND:  M2.

8           MR. GOTTLIEB:  Defendant's M2?

9           MR. TOWNSEND:  M2.

10  Q.  Do you see that?

11  A.  I do see that.

12  Q.  Julius Morton to, among other things, compliance, right?

13  A.  Yes.

14  Q.  You would receive this if it went to compliance, right?

15  A.  I would have received it.

16  Q.  Now, if we can zoom in on the first paragraph -- to 59th

17  Street Pharmacy, right?

18  A.  Yes.

19  Q.  And the subject is suspension of controlled substance

20  ordering privileges.  If we can highlight that first paragraph.

21          MR. ROOS:  Your Honor, I don't know if --

22          THE COURT:  If you would stand up so I can see you.

23          MR. ROOS:  My apologies.  So, it is not clear to me if

24  they are trying to offer this or they're just refreshing the

25  witness's recollection.

1              THE COURT:  Is this in evidence?

2              MR. TOWNSEND:  I'm offering it, your Honor, right now.

3       I offer M2.

4              THE COURT:  Any objection?

5              MR. ROOS:  No objection.

6              THE COURT:  It will be admitted in evidence.

7              (Defendant's Exhibit M2 received in evidence)

8              MR. TOWNSEND:  If we can publish to the jury.

9       Q.  We can look at the first paragraph.  The report on 59th

10      Street Pharmacy says the RDC compliance team has completed an

11      analysis of the dispensing and payment data recorded in your

12      pharmacy's submitted dispensing records received in connection

13      with your pharmacy's application for an RDC account.  The

14      results obtained from such analysis dictate that RDC will not

15      be able to distribute controlled substance pharmaceuticals to

16      your company at this time.  In adherence to RDC's own federally

17      mandated due diligence program, the compliance team has

18      determined that the dispensing practices exhibited by your

19      pharmacy are not in alignment with the RDC interpretation of

20      standards of best practices and operative due diligence

21      currently suggested by the Drug Enforcement Administration.

22             Do you see that?

23      A.  I do see that.

24      Q.  You received a copy of that report.  Right?

25      A.  I was on the e-mail, so I must have.

M1K3DOU3                           Bouck - Cross

1   Q.  Isn't it a fact that 59th Street Pharmacy was actually shut

2   down on March 13, 2017, and terminated as a customer?

3   A.  On March 13?

4   Q.  March 13, two days before this?

5   A.  I don't know.  I don't remember.  I need to see something

6   that shows me that.

7          MR. TOWNSEND:  I'd like to show the witness and the

8   government Defense M3.

9   Q.  If you look just at the bottom of the page there.  The last

10  two sections.  Does this document refresh your recollection

11  regarding controlled substances purchasing suspended due to red

12  flags and failure to follow due diligence procedures and that

13  the red flag activity was reported to the DEA?

14  A.  Because it's written.  That's the only thing that it does

15  for me.

16  Q.  You also testified regarding a pharmacy called The Chemist

17  Shop, right?

18  A.  Yes.

19          MR. TOWNSEND:  If we can highlight the first sentence

20  of that top e-mail.

21  Q.  Jessica, yes, we all agree about Chemist Shop not listening

22  to Julius' suggestions and now that they do not want to allow

23  Pro Compliance is putting compliance in a tough spot.

24          Then if you move down to the right side halfway down

25  to that paragraph.

1              Again, if they were filling illegal prescriptions or

2      mailing to Florida then we would turn them off and report them

3      to the DEA.

4              Next paragraph.

5              Julius and I agree with you, if they do not cooperate,

6      we should turn them off, but we need to Larry and Joe know.

7              You testified on direct that when Bill Pietruszewski

8      told you that RDC chooses to work with customers, it made you

9      upset and angry, right?

10     A.   It upset me.

11     Q.   You felt like RDC shouldn't be working with The Chemist

12     Shop, right?

13     A.   I -- I don't think we should have had them as a customer.

14             MR. TOWNSEND:   I'm showing the government and the

15     witness Defense B17.

16     Q.   Ms. Bouck, do you recognize this e-mail?

17     A.   I don't.

18     Q.   Do you see you were named in the cc line?

19     A.   I do.

20     Q.   Do you see it's from Larry Doud?

21     A.   I do.

22     Q.   Do you see the subject is Chemist Shop possible risk?

23     A.   I do see that.

24             MR. TOWNSEND:   I offer Exhibit B17 in evidence.

25             THE COURT:   Any objection?

1           MR. ROOS:  Yes, objection.  Hearsay and also the

2     termination relevance question we talked about earlier.

3           THE COURT:  No, overruled.  I think she's

4     sufficiently, even though she doesn't specifically remember,

5     she is sufficiently identifiable.  I'll admit it.

6           (Defendant's Exhibit B17 received in evidence)

7           MR. TOWNSEND:  Thank you, your Honor.  Go to page 3.

8     I ask it be published to the jury.

9           THE COURT:  Yes.

10    Q.  See this first e-mail from Bill Pietruszewski to Larry Doud

11    and you, among other people?

12    A.  Yes.

13    Q.  And Bill writes:  Hello Larry and Joe.  Back some months

14    ago, Julius made a visit to the Chemist Shop to complete a DEA

15    audit for RDC due to the high volume of cash that Jessica/Liz

16    uncovered by analyzing their three months of dispensing.

17    Julius supplied Roberto and Alex with information on doctors

18    that should be writing for pain medication and inform them that

19    their cash levels were too high.  RDC still have not seen a

20    reduction in their ordering of pain medications and still see

21    The Chemist Shop filling for doctors on our watch list which

22    have the compliance team concerned.  Jessica requested an audit

23    be done by Pro Compliance but The Chemist Shop is refusing to

24    allow Pro Compliance to obtain their customer information.  Now

25    Chris Noulis was nice enough to go to the store and speak to

M1K3DOU3                         Bouck - Cross

both Alex and Roberto, but they still refuse to work with RDC

compliance.  This is concerning for the compliance team and we

are at a point where we need to make a decision on how we

should proceed.  There are many doctors of concern that this

store is filling cash prescriptions for and we need to at least

move forward with the Pro Compliance audit.  We are suggesting

we turn our controlled substances off completely until they

work with giving Pro Compliance the data.  We know ultimately

this is a management decision.  Please let us know if we need

to speak about this more in detail or how management would like

us to proceed.

          At the bottom of page 1 there is an e-mail -- I'm

sorry.  The middle of page 1 there is an e-mail from Bill

Pietruszewski.  You see that?

A.  Yes.

Q.  September 24, 2015, right?

A.  Yes.

Q.  If you look halfway through that second paragraph, in the

middle it says The Chemist Shop dispensing a high volume of

controlled substances for cash that scripts are written by

doctors not in the correct field of pain management.  I am

speaking on behalf of all the compliance team.  If we do

nothing, the DEA will be in at some time and question why RDC

did not do our due diligence.  Jessica and I spoke to the sales

team in May of 2014 introducing the use of Pro Compliance for

1    an outside perspective to see that the pharmacy is following

2    their due diligence.  They give us a detailed explanation of

3    all doctors and cocktails of drugs that customers are taking

4    and they try to rule out if we are in any danger supplying the

5    questioned pharmacy.

6           And then at the very top, this is an e-mail directly

7    from Larry Doud, right?

8    A.  It's from, yes, Larry Doud.

9    Q.  He writes:  Great Bill.  The Pro Compliance issue is very

10   helpful.  But also needs to be explained.  These guys are

11   acting strange and we should continue to investigate.  We

12   should document what we are doing too.

13          Right?

14   A.  That's what it says, yes.

15          MR. TOWNSEND:  I'd like to show the government and the

16   witness what's marked as Defense B18.

17          THE COURT:  Yes.  After this we'll take the lunch

18   break.

19          MR. TOWNSEND:  Very good.

20   Q.  Ms. Bouck, do you see what's on the screen?

21   A.  Yes.

22   Q.  It is an e-mail chain involving Larry Doud and you, among

23   other people?

24   A.  Yes.

25   Q.  And the subject line is Chemist Shop possible risk?

1    A.  Yes.

2              MR. TOWNSEND:  I offer Defense B18 in evidence.

3              THE COURT:  Any objection?

4              MR. ROOS:  No objection, your Honor.

5              THE COURT:  It will be admitted in evidence.

6              (Defendant's Exhibit B18 received in evidence)

7    Q.  At the bottom of this page is an e-mail from Richie Cullen.

8    And Richie writes:  It sounds like we have two situations here,

9    one is the pricing of a competitor, and the other is the

10   compliance regarding The Chemist Shop DEA issues.  If I was

11   working for Kinray, I would be using price matching to pull a

12   customer away from RDC as well.  It is my understanding that

13   Pro Compliance is an accredited outside auditing firm whose

14   business model is to look at stores' DEA information, analyze

15   it, and make suggestions on deficiencies and abuses regarding a

16   particular store, when it comes to DEA practices.  I also

17   understand not one store we introduced to Pro Compliance liked

18   the idea of them coming in and going through their store files,

19   but once they did, the stores were grateful for the experience,

20   unless they were hiding something.

21             MR. ROOS:  Your Honor, I have no objection to my

22   colleague reading e-mails, but I think there has to be a

23   question at the end of it.

24             THE COURT:  Is there a question?

25   BY MR. TOWNSEND:

1    Q.  Do you see that?

2    A.  What you just read, yes, I saw that.

3    Q.  Did you receive that e-mail?

4    A.  This is the same one that's up on the screen?

5    Q.  Yes.

6    A.  I'm on -- actually, that one is from -- I need to see who

7    it was sent to.  I don't see that part.

8    Q.  Jessica Pompeo, do you see your name?

9    A.  The e-mail that you just read was from Richie Cullen I

10   believe.

11   Q.  You were forwarded this entire thread.  Right?

12   A.  That's what it looks like, yes.  I guess I'm on the one

13   after it.

14   Q.  Okay.  That first paragraph.  Second line from the bottom.

15          This is a business decision, we either address it or

16   ignore it and hope, hope it doesn't come back and bite us in

17   the butt.  One way or another, do nothing and we will see it

18   again.  Richie.

19          You see that?

20   A.  I do see that.

21   Q.  The e-mail in the middle is from Larry Doud.  Right?

22   A.  I do.

23   Q.  You are on that e-mail?

24   A.  I'm on that e-mail.

25   Q.  And Larry writes "we cannot ignore it."  Right?

M1K3DOU3                        Bouck - Cross

1    A.  That's what it says.

2    Q.  That was Larry's position.  We can't ignore it.

3    A.  I -- that's what it says.  That's what it says.  I don't

4    know what that is.  You know.

5              MR. TOWNSEND:  We can break for lunch now.

6              THE COURT:  Ladies and gentlemen, let's take the lunch

7    break.  Don't discuss the case, keep an open mind.  We'll start

8    up at 2 p.m.  I believe your lunch is here.

9              (Jury excused)

10             THE COURT:  You can step down.  We'll continue at 2.

11             MR. ROOS:  One issue, your Honor.  I'll wait until the

12   witness is --

13             So on the issue of terminations, I think at this

14   point, the barn door is open, the horses have left, there has

15   been, they put into the record the termination report from

16   late -- from late March 2017, they are eliciting questions

17   right now about terminating Chemist Shop.  Out of reciprocity,

18   we should be able to put in the later terminations.

19             THE COURT:  Any argument to be made?

20             MR. GOTTLIEB:  There is no rule of reciprocity.  What

21   it's got to be is relevant.  To --

22             THE COURT:  It only has to be relevant to something

23   you put in.  What you put in has to be relevant.  When you put

24   in about terminations is relevant, then their evidence about

25   terminations should also be relevant, unless you have a legal

M1KBDOU4                          Bouck - Cross

1    argument to make that it should be excluded.

2              MR. GOTTLIEB:  Your Honor, to the extent that we

3    opened the door with regard to a specific issue, we understand

4    that the government is going to respond to that specific issue.

5    It does not open the door to everything that the government --

6              THE COURT:  It is only talking about terminations.  Do

7    you have any legal basis to now object to them having redirect

8    on terminations?

9              MR. GOTTLIEB:  As a general principle, no objection.

10   As long as it's limited to what we opened the door on.

11             THE COURT:  Then you can inquire with regard to that

12   subject matter.  And if there's specific objections, to

13   specific questions, I will rule on those objections at that

14   time.  Have a good lunch.

15             (Recess)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

M1KBDOU4                          Bouck – Cross

                                AFTERNOON SESSION

2                                    2:03 p.m.

3               (In open court ; jury present)

4               THE COURT:  You can continue.

5               MR. TOWNSEND:  Thank you, your Honor.

6    BY MR. TOWNSEND:

7    Q.  Good afternoon, Ms. Bouck.

8    A.  Good afternoon.

9    Q.  Before the break, we were discussing compliance's response

10   to the Chemist Shop, do you remember that?

11   A.  I remember discussing that and looking at documents.

12   Q.  Let's continue looking at documents regarding the Chemist

13   Shop.  Can I have Defense B21 on the screen for the government

14   and the witness.

15              Ms. Bouck, do you see that?

16   A.  I do.

17   Q.  This is an email between Larry Doud and you, subject,

18   follow-up on the Chemist Shop.  Is that accurate?

19   A.  Which one are you referring to?

20   Q.  The top of the chain.

21   A.  Yes, Larry Doud and others including myself, yes.

22              MR. TOWNSEND:  Your Honor, I offer B21 in evidence.

23              THE COURT:  Any objection.

24              MR. ROOS:  Same objection.

25              THE COURT:  It will be admitted into evidence.

M1KBDOU4                        Bouck - Cross

1            (Defendant's Exhibit B21 received in evidence)

2            MR. TOWNSEND:  May we publish to the jury?

3            THE COURT:  Yes.

4   Q.  If we could go to page 4.

5            Ms. Bouck, do you see the email from Julius Morton on

6   page 4?

7   A.  Yes.

8   Q.  And that's November, 16, 2015; is that right?

9   A.  Yes.

10  Q.  Julius writes:  All, I just wanted to follow-up regarding

11  the Chemist Shop account before heading down to the annual

12  NADDI conference in Orlando.  To the brief, the new dispensing

13  report received from owners Joe Gallo and Roberto Viti exhibits

14  more in the same type of concerning dispensing that we have

15  documented previously.  Keeping in mind that this new report

16  only reflects one month, mid-October through November of

17  dispensing activity.  I should note that their overall cash

18  payment for all controls, CII-V, was 14 percent.  This amount

19  is reduced from their previously noted amount of 17 percent

20  from April through June of 2015 and almost the same as the 12

21  percent reported from the Pro Compliance PVS analysis from

22  September 2015. So the owners' statement regarding the

23  reduction of cash payment for controls is somewhat supported.

24            It then follows.  However, the report still exhibits

25  that the store is filling a great deal of controls,

M1KBDOU4                           Bouck - Cross

particularly in Oxy 15 and 30 milligrams for prescriptions

written by Joseph Olivieri, Barry Sloan, Norman Marcus, Jeffrey

Goldstein, John Ventrudo and Todd Schifstein.

          All the doctors that I have been talking to them about

since this past spring. This is where the biggest concerns and

risk lie.  In my opinion, the continued relationship that the

Chemist Shop and their sister store, Prime Health, account

3828, maintains with these physicians is troubling and may put

RDC at risk as being seen supportive of irresponsible and

negligent behavior.

          If need be, maybe we can put together a spreadsheet

snapshot of the analysis that we have conducted on the accounts

over a six month period of time since last spring.  This may

offer a more direct picture and presentation what we are seeing

in the compliance department relative to these accounts.

          In light of the Chemist Shops continued resistance to

my repeated warnings, my recommendation to terminate or at

least suspend from controls the account remains the same.  If

there are any points, suggestions or strategies that anybody

may want to suggest in dealing with this account going forward,

I am all ears.

          Please note, we have two similar accounts to deal with

on the horizon, that would be ProHealth and 370 Pharmacy Corp,

account 4031, again, sister stores I believe.  They are in the

same locale as the Chemist Shop and would be a competitor of

M1KBDOU4                          Bouck - Cross

 1   Gallo and Viti I would imagine.  Their exhibited dispensing is

 2   almost identical to the Chemist Shop and they fill from the

 3   same troubling doctors. RDC must devise an appropriate

 4   strategy/response for these accounts as well.  I visited the

 5   stores in 2014 and noted that they filled questionable

 6   prescriptions written for oxycodone.  You see that, right

 7   A.   What you just read, yes.

 8   Q.   Julius Morton sent that email to Larry Doud, Joe Brennan,

 9   Richie Cullen, Bill Pietruszewski, Jay Shire and you, correct?

10   A.   Yes.

11   Q.   And isn't it true that Joe Brennan responded to that email?

12   A.   That would appear to be so, yes.

13   Q.   He writes: Juice, you provided ample time for Joe and

14   Roberto to comply.  We need to follow your advice as mentioned

15   in your email.  That was his response?

16   A.   Yes.

17   Q.   If we could turn to page 3 of B21.  At the bottom of the

18   page there's an email from you.  Do you see that?

19   A.   Yes.

20   Q.   And you responded on November 16, 2015.  Hello.  Good

21   afternoon.  From the aspect of reviewing the data and seeing

22   the lack of due diligence, I am of the same mindset as Juice's

23   expressions below.  We sit with the knowledge that we have from

24   Juice's inside associates investigating the very prescribers

25   the Chemist Shop fills prescriptions for, as well as the lack

M1KBDOU4                        Bouck - Cross

1    of due diligence indicative from the patterns of dispensing

2    high dosages of oxycodone 30 milligrams for cash on their

3    dispensing.  I believe without some of action, we leave

4    ourselves open to the vulnerability of being accused of having

5    the terminology referred to by the DEA as deliberate ignorance.

6    That's what you wrote, right?

7    A.  That is what I wrote.

8    Q.  And Larry Doud followed up with an email just to you,

9    right?

10   A.  Yes.

11   Q.  And on November 16, 2015, Larry Doud writes:  I agree to

12   the sanctions Juice has mentioned; is that right?

13   A.  That's what it says, yes.

14   Q.  If we could go up to page 2, the bottom of the screen.  The

15   email there starts from you, correct?

16   A.  Yes.

17   Q.  And it's to Larry Doud and Joe Brennan?

18   A.  Yes, it is.

19   Q.  If we can go to the next page.  You write:  Are we

20   terminating indefinitely or are we allowing them to resubmit no

21   dispensing no sooner than three months for review and

22   reconsideration, suspending them until further notice.  I

23   desire to be clear on the information I am providing to Richie,

24   and in turn Chemist Shop/Prime Health.  That was your email,

25   right?

M1KBDOU4                      Bouck - Cross

1   A.  Can you just scroll up a little.  I believe it is.  I just

2   want to see.  I kind of missed the top of it.

3           Yes, it was.

4   Q.  Larry Doud again responds; isn't that right?

5   A.  Yes.

6   Q.  And Larry Doud's response is to ask Juice what he thinks,

7   right?

8   A.  Yes.

9   Q.  Larry Doud is asking for input from compliance on this

10  matter?

11  A.  From Julius, yes.

12  Q.  Julius is in compliance?

13  A.  Yes.

14  Q.  The top of page 2, there's a response from Julius Morton on

15  this issue, right?

16  A.  Yes.

17  Q.  If you look at the last line.  Frankly, I would just opt to

18  close the accounts altogether and be done with them.  That's

19  what Julius says in this email?

20  A.  Yes, that is what it says.

21  Q.  Going to page 1. See in the middle there, there's an email

22  from Richie Cullen.  You see that?

23  A.  Yes, I do.

24  Q.  And you're on that email, right?

25  A.  I am.

M1KBDOU4                          Bouck – Cross

1    Q.   About halfway down it says:  Bottom line, they have made

2    the decision.  They will not stop doing business with these

3    doctors based on Julius say so.  That's when I said, based on

4    that we could no longer sell them controls and narcotics.  I

5    told them they need to sign the bottom of their stock

6    certificate and have a medallion of seal affixed by a bank,

7    send it in for redemption and we will see that it is taken care

8    of.  That was what Richie Cullen responded, right?

9    A.   That's what it reads, right.

10   Q.   And then there's an email from Larry Doud at the very top,

11   right?

12   A.   Yes.

13   Q.   He sends an email to Richie, to you, to Julius Morton and

14   to Joe Brennan, right?

15   A.   Yes.

16   Q.   He says:  Tough call, Richie.  Thanks for taking care of

17   it.  That's what he says, right?

18   A.   That's what it says, yes.

19   Q.   I'd like to show the witness what has been marked B22.

20   Ms. Bouck, do you see this?

21   A.   I see a document in front of me, yes.

22   Q.   It's an email chain again involving Larry Doud and you

23   among other people, right?

24   A.   Yes.

25   Q.   And again the subject line is, follow-up on the Chemist

M1KBDOU4                         Bouck - Cross

1    Shop, right?

2    A.  Yes.

3            MR. TOWNSEND:  Your Honor, I offer Exhibit B22 into

4    evidence.

5            THE COURT:  Any objection?

6            MR. ROOS:  Same objection.

7            THE COURT:  It will be admitted into evidence.

8            (Defendant's Exhibit B22 received in evidence)

9            MR. TOWNSEND:  May we publish to the jury?

10           THE COURT:  Yes.

11   Q.  You see at the bottom of the page there's that same email

12   from Richie Cullen where he says, bottom line, they've made a

13   decision.  You see that?

14   A.  Yes.

15   Q.  But in this chain Julius Morton responds to that email,

16   right?

17   A.  Yes.

18   Q.  And that one line there, Like I said, I think we are better

19   off not dealing with them at all.  That was his response,

20   right?

21   A.  That was part of his response, yes.

22   Q.  And Larry Doud again responds to Julius Morton, to Richie

23   Cullen, to you and to Joe Brennan.  And he says, We are backing

24   your suggestion Juice.  That's how Larry Doud responded, right?

25   A.  That is the response in the email.

M1KBDOU4                         Bouck - Cross

1    Q.   He backed compliance's suggestion to close the account?

2    A.   Okay.  I don't know what you're asking me.

3    Q.   Is that what Larry Doud writes in this email?

4    A.   He wrote that he's backing Juice's suggestion.

5    Q.   Do you remember testifying regarding Old Town pharmacy.

6    Earlier today you were shown an email from Elizabeth Cullen

7    regarding Old Town pharmacy?

8    A.   I believe I recall looking at that email.  There's been a

9    lot of emails.  Sorry.

10            MR. TOWNSEND:  If I could have Defense M196 up for

11   just the witness and the parties.

12   Q.   Ms. Bouck, do you see this document in front of you?

13   A.   I do.

14   Q.   And this is a chain that starts from Bill Pietruszewski to

15   you, Elizabeth Cullen and Julius Morton on April 6, 2016; is

16   that right?

17   A.   Yes.

18   Q.   And is the subject line Old Town pharmacy dispensing check?

19   A.   Yes.

20            MR. TOWNSEND:  Your Honor, I offer M196 in evidence.

21            THE COURT:  Any objection?

22            MR. ROOS:  No.

23            THE COURT:  It will be admitted into evidence.

24            (Defendant's Exhibit M196 received in evidence)

25            MR. TOWNSEND:  May I publish for the jury, please?

M1KBDOU4                        Bouck - Cross

1              THE COURT:  Yes.

2    Q.  Ms. Bouck, you look at the bottom of this document and

3    you'll see the email from Elizabeth Cullen that you previously

4    spoke about.  Do you see that?

5    A.  I see an email from Elizabeth Cullen, yes.

6    Q.  Do you recall reading, the suspicious prescribers, and this

7    is in the middle of the paragraph, the suspicious prescribers

8    include Joseph Olivieri, Nkanga Nkanga, Emmanuel Lambrakis, and

9    Carl Anderson. Do you recall testifying about that?

10   A.  Yes.

11   Q.  You said that you recognized the names Joseph Olivieri and

12   Carl Anderson; is that right?

13   A.  I do.  Was this the same document, though, because I feel

14   like it's other --

15   Q.  It's not the same document, but that email is the same

16   email.  It's a different thread.

17              If we can go to the next email, the response by Bill

18   Pietruszewski.  Bill Pietruszewski on April 6, 2016 writes:

19   Liz or Jessica, when did they stop filling for the two doctors

20   below?  Did we see a reduction or must we wait another month to

21   tell?

22              Do you remember that?  That was Bill Pietruszewski's

23   response?

24   A.  In the email, yes.

25   Q.  You wrote back to Bill.  Bill, this just took affect within

M1KBDOU4                    Bouck - Cross

1   the last two weeks, so we will have to request dispensing to

2   verify, which we can either do now or at the end of this month,

3   whichever is preferred.  That was your response, correct?

4   A.  Yes.

5   Q.  And Bill Pietruszewski wrote a response to you and he CC's

6   Elizabeth Cullen and Julius Morton and he says:  Jessica, let's

7   wait until the end of the month so we can receive a good and

8   full report.  If they push over their limit, I would suggest

9   not releasing any items until they would provide dispensing.

10  That's what Bill Pietruszewski said, right?

11  A.  That's what the email says yes.

12  Q.  Do you remember testifying on direct regarding a meeting

13  you had with agents from the DEA?

14  A.  Testifying when?

15  Q.  Yesterday.

16  A.  If you could give me a little more context.

17  Q.  Sure.  Agents from the DEA came to RDC and you met with

18  them in November of 2016?

19  A.  Yes.

20  Q.  And you offered them RDC's SOP?

21  A.  Yes.

22  Q.  And what's the SOP again?

23  A.  Suspicious ordering program policy.

24  Q.  Now, Larry Doud wasn't at that meeting, was he?

25  A.  I don't remember.  I don't remember him being there.

M1KBDOU4                          Bouck - Cross

1   Q.  If I could have the witness shown B31.  If you could read

2   that first paragraph on the screen to yourself.

3   A.  Okay.

4   Q.  Ms. Bouck, could you please tell me if B31 refreshes your

5   recollection that Larry Doud was not with you when you met with

6   the DEA agents on November 8, 2016?

7   A.  It does not because it doesn't -- no, it does not.

8   Q.  When the agents requested the SOP, you gave it to them,

9   right?

10  A.  I believe it was me.

11  Q.  Larry Doud didn't give it to them?

12  A.  Not that I'm aware of.

13  Q.  You were asked a lot of questions on direct about

14  compliance's role with orders of interest.  Do you remember

15  those?

16  A.  Those specific questions?

17  Q.  Do you remember testifying generally about the topics of

18  orders of interest?

19  A.  Yes.

20  Q.  And when you saw that an order of interest had come in, the

21  first thing you would do is see what information you had on the

22  customer; is that right?

23  A.  That would be one of the processes, yes.

24  Q.  And then you would look to see what information was needed

25  to thoroughly investigate the order of interest; is that

M1KBDOU4                         Bouck - Cross

1   accurate?

2   A.   Generally, yep.

3   Q.   You would try to make a determination as to why the order

4   was placed?

5   A.   That was part of the investigation process.

6   Q.   And possibly you would have to go to the customer sometimes

7   to obtain more information; is that accurate?

8   A.   Yes.

9   Q.   And then a determination would be made whether to release

10  the order or not; is that fair to say?

11  A.   Yes.

12  Q.   Now, I want to bring up Government's Exhibit 229, and this

13  is in evidence.  If we could just go to page 2.

14          Do you remember testifying about this document,

15  Ms. Bouck?

16  A.   I do.

17  Q.   Let's look at the top line there.  That looks like -- could

18  you tell me what pharmacy that relates to?

19  A.   Looks like it says Medical Admin Associate, Inc.

20  Q.   And the order was released?

21  A.   Yes.

22  Q.   Who released it?

23  A.   I have no idea.

24  Q.   Why was it released?

25  A.   I don't know.  I don't know who released it.  I don't know

M1KBDOU4                        Bouck - Cross

1   why they released it.

2   Q.  You don't know if Larry Doud had any involvement in it

3   being released?

4   A.  I don't know.

5   Q.  Let's go to the next one.  Looks like Clarkstown pharmacy.

6   That order was released.  If we could zoom in on the Clarkstown

7   pharmacy section.  You see the highlighted section?

8   A.  I do.

9   Q.  Clarkstown pharmacy order was released on June 18, 2014,

10  right?

11  A.  Yes.

12  Q.  Who released that order?

13  A.  I don't know.

14  Q.  Why was it released?

15  A.  I don't know.

16  Q.  Did Larry Doud authorize its release?

17  A.  I don't know.

18  Q.  If we went through every single line of this document,

19  would you be able to answer those questions about any order?

20  A.  Unless I have more detailed information about why it was

21  released, I would not be able to.

22  Q.  This document, it contains all the released orders, and

23  that would include schedules II-V, correct?

24  A.  Correct.

25  Q.  So it's not just schedule two narcotics that's contained

M1KBDOU4                          Bouck - Cross

1    here?

2    A.  Correct.

3    Q.  You remember testifying about ProHealth?

4    A.  Yes.

5    Q.  In September 2015, you reviewed this customer, right?

6    A.  I don't remember the date.

7    Q.  Do you remember looking at the government's email they put

8    up regarding this customer?

9    A.  I do.  I just don't remember the date.

10        MR. TOWNSEND:  Can we have Government's 106C put up.

11   Q.  This was September 2015, right?

12   A.  Correct.

13   Q.  You said you didn't like the dispensing records, right?

14   A.  That's what Amy said that she read on the note.

15   Q.  You put in the notes for this customer that you didn't like

16   their dispensing?

17   A.  That's what it says, yes.

18        MR. TOWNSEND:  You can take 106C down.

19   Q.  When we talk about issues with dispensing records, perhaps

20   we're talking about different patterns that you saw?  Is that

21   fair?

22   A.  Yes.

23   Q.  Perhaps you saw that there were too many purchases of

24   controlled substances for cash, right?

25   A.  That would have been a red flag, yes.

M1KBDOU4                      Bouck - Cross

1    Q.  Or possibly you felt that some of the prescribers were

2    suspicious?

3    A.  Correct.

4    Q.  Or maybe patients were traveling a distance to get to the

5    pharmacy?

6    A.  That was something we looked at, yes.

7    Q.  Or maybe there were what you referred to as cocktail

8    prescriptions being filled there?

9    A.  Yes.

10   Q.  So you requested a new copy of dispensing records for

11   ProHealth pharmacy, right?

12   A.  I think the email said I was going to be asking them, yes.

13   Q.  And that's a standard thing for the compliance to do when

14   you're conducting an investigation, right?

15   A.  Requesting dispensing?

16   Q.  Yes.

17   A.  Yes.

18   Q.  Because you wanted to be thorough, right?

19   A.  Yes.

20   Q.  And in the meantime while you waited for new information,

21   you put their account on hold?

22          There was a hold on their account?

23   A.  Are you asking me?

24   Q.  I'm asking you.  You put their account on hold, right?

25   A.  No, not always.

M1KBDOU4                    Bouck - Cross

1   Q.  I'm talking now specifically about ProHealth in that email.

2   It indicated that you put the account on hold, did it not?

3   A.  I think it said that I wouldn't release anymore, but it

4   didn't say I put the account on hold.

5   Q.  You weren't releasing anymore orders; is that fair to say?

6   A.  I said I would not release anymore orders, but I wasn't the

7   only one releasing orders.

8   Q.  I understand. I'm just asking you about what you did.  And

9   you did that on your own?

10  A.  Did what?

11  Q.  You said not to release anymore orders.  You made that

12  notation in the customer file?

13  A.  Yes.

14  Q.  Because you thought there were compliance issues?

15  A.  Correct.

16  Q.  But Bill Pietruszewski could override you, right?

17  A.  Yes.

18  Q.  And sometimes that did happen?

19  A.  At times.

20  Q.  And orders that you wanted to be kept on hold could

21  occasionally be released by Bill Pietruszewski?

22  A.  That had happened.

23  Q.  But as you sit here today, you don't know for a fact

24  whether any of those orders that were released were ever

25  diverted, do you?

M1KBDOU4                      Bouck - Cross

1    A.  How do I not know that if I suspected it.

2    Q.  You suspect.  You don't know, do you?

3    A.  It's possible.

4    Q.  It's possible.  You don't know, do you?

5    A.  If their dispense and prescribe by a physician that was

6    arrested for writing illegal prescriptions, then I kind of do

7    know.

8    Q.  You can follow any pill that comes out of RDC and tell

9    whether it's been diverted or not?

10   A.  The exact pill?

11   Q.  Sure.

12   A.  No.

13   Q.  And you don't know why Bill Pietruszewski actually released

14   those orders, do you?

15            MR. ROOS:  Objections, misstates testimony.

16            THE COURT:  Overruled.  You can redirect.  You can

17   answer the question.

18   A.  Unless he provided me with an explanation, I don't always

19   know.

20   Q.  Did you sit him down about ProHealth and talk about it?

21   A.  I believe there were times he sent me emails with

22   explanation.

23   Q.  I'm asking about ProHealth, did you sit down with him about

24   ProHealth?

25   A.  I don't remember.

M1KBDOU4                          Bouck - Cross

1    Q.  Did you go to Larry Doud about ProHealth?

2    A.  I don't remember.

3    Q.  You don't remember if you went to Larry Doud and said, I

4    have a problem with this account.  We released an order.  I

5    want to know why?

6    A.  No, I do not remember.

7    Q.  You don't know if Bill Pietruszewski spoke directly to the

8    customer before releasing the order, do you?

9    A.  No.

10   Q.  You don't know if he had any information which might have

11   affected his decision that you didn't have?

12   A.  Unless it's documented in an email, I do not know.

13   Q.  Do you remember testifying yesterday about Delmar pharmacy?

14   A.  Honestly, no, I don't remember.  It was a long day.

15   Q.  I'll try and clear it up for you.

16   A.  Thank you.

17   Q.  There was an issue with Delmar approaching their limit.

18   And you told Amy Skibickyi to raise the order limit for Delmar

19   pharmacy.  You remember that now?

20   A.  I recall that.

21   Q.  And you testified that you wanted to raise the order limit

22   so that it wouldn't generate anymore orders of interest because

23   that generated more work for you and the compliance team, you

24   remember that?

25   A.  It did give us more work, yes.

M1KBDOU4                         Bouck - Cross

1   Q.  It wasn't about diverting controlled substances, was it?

2   A.  What wasn't about that?

3   Q.  Raising the limit.

4   A.  I don't understand what you're asking.

5   Q.  Raising the limit had nothing to do with intentionally

6   diverting controlled substances, did it?

7   A.  No.

8   Q.  You remember testifying about working with customers?

9   A.  Yes.

10  Q.  Working with customers meant speaking to them, right?

11  A.  Yes.

12  Q.  Explaining the DEA regulations?

13  A.  Correct.

14  Q.  Discussing issues with high cash sales?

15  A.  Correct.

16  Q.  Going over dispensing reports?

17  A.  That was part of the process.

18  Q.  Discussing certain problematic doctors?

19  A.  Yes.

20  Q.  RDC, and specifically the compliance department, would

21  provide them with the DEA regulations?

22  A.  Yes.

23  Q.  You would examine their due diligence policies?

24  A.  If they had one.

25  Q.  You would talk them through their recordkeeping?

M1KBDOU4                         Bouck - Cross

1    A.  I believe that was part of the process.

2    Q.  You did these things, right?

3    A.  I did not, not all those processes, no.

4    Q.  But you were involved in them?

5    A.  In some of them.

6    Q.  And Julius Morton did some of them?

7    A.  Yes, he did.

8    Q.  And William Delgado did some of them?

9    A.  Yes.

10   Q.  And sometimes third-party vendors did some of them because

11   this was what working with customers meant, right?

12   A.  That was part of the processes, yes.

13   Q.  The process was there to ensure that RDC's customers were

14   following DEA guidelines, right?

15   A.  I don't totally agree with that.

16   Q.  The purpose of explaining the DEA regulations, discussing

17   issues with cash sales, going over dispensing reports,

18   discussing problematic doctors, providing them with DEA

19   regulations, examining their due diligence policies and talking

20   through their recordkeeping was not regarding DEA regulations?

21           MR. ROOS:  Objection, compound.  It's like ten things

22   in that question.

23           THE COURT:  Overruled. She can answer the question if

24   she understands it.

25   A.  You asked if we were ensuring that they were in compliance.

M1KBDOU4                          Bouck - Cross

We couldn't ensure that they were in compliance by giving them

that documentation.

Q.  Let me clarify that question.  The purpose behind doing

those things was to do your best to make sure that your

customers were DEA compliant?

        MR. ROOS:  Objection, what things.

        THE COURT:  Overruled.  You can redirect on that.

A.  We were making sure they had the knowledge to do what they

were supposed to do.

Q.  Because you wanted them to do what they were supposed to

do?

A.  Doesn't everybody?

Q.  I would agree. You remember you were played a voicemail

that you left for Bill Pietruszewski on direct?

A.  Yes.

Q.  That voicemail was from July 6, 2016?

A.  I don't necessarily remember the date, but I know it was

from 2016.

Q.  In the voicemail you discussed some confusion related to

turning pharmacies on before the full completion of due

diligence, right?

A.  Yes.

Q.  And the purpose of you calling Bill Pietruszewski was you

were trying to get clarification on the topic, right?

A.  I wanted to get clarification on the topic.  I wanted to

M1KBDOU4                        Bouck - Cross

1   find out if there was further guidance being sent out.

2   Q.  You didn't want Larry Doud to think you were being

3   obstinate, that's what you said?

4   A.  Yes.

5   Q.  You were unsure whether this new policy had actually begun

6   yet?

7   A.  Correct.

8   Q.  You wanted Bill Pietruszewski to give you guidance because

9   Larry Doud seemed to think that the policy was in effect, but

10  you seem to think that you hadn't heard anything to that effect

11  at that point; is that fair to say?

12  A.  It is.

13  Q.  You didn't bring up defrauding the DEA in the voicemail,

14  did you?

15  A.  Not that I remember.

16  Q.  You didn't discuss intentionally diverting controlled

17  substances?

18              MR. ROOS:  Your Honor, the voicemail is in evidence.

19              THE COURT:  Overruled.  She can answer.

20  A.  I don't even remember the question.  Sorry.

21  Q.  You didn't discuss intentionally diverting controlled

22  substances, did you?

23  A.  I don't remember being part of the email, no.

24  Q.  There came a time in 2015 where RDC wanted to have

25  customers fill out a questionnaire; is that right?

M1KBDOU4                        Bouck - Cross

1    A.  To the best of my recollection, yes.

2    Q.  One of the topics of the questionnaire was an in-depth look

3    at dispensing, right?

4    A.  I believe so.  I don't remember exactly what that section

5    was about.

6    Q.  The questionnaire had dispensing information requirements;

7    is that fair to say?

8    A.  I really don't know what you're asking.  There were two

9    separate requirements in the questionnaire about dispensing.

10   Q.  RDC required the customers to fill out and return the

11   questionnaire, right?

12   A.  Yes.

13   Q.  Let's start there.

14   A.  Yes.

15   Q.  And the questionnaire contained information that was

16   relevant to compliance, right?

17   A.  Yes.

18   Q.  And some of the customers returned the questionnaire,

19   right?

20   A.  Yes.

21   Q.  And some did not?

22   A.  Correct.

23   Q.  And in response to the customers who didn't return the

24   questionnaire, isn't it a fact that Larry Doud shut down their

25   controlled substances purchasing abilities until they did?

M1KBDOU4                          Bouck - Cross

1    A.  No.

2    Q.  No?

3    A.  No.

4    Q.  You remember meeting with the government on July 12, 2017.

5    A.  I should remember the date by now because you've asked me a

6    few times; but, yes, I do remember meeting them in July of

7    2017.

8    Q.  Do you remember telling the government that RDC gave

9    customers a deadline, and if they did not provide the

10   questionnaire by such date, RDC would turn off the accounts to

11   controlled substance purchasing?

12   A.  I do not remember anything from that interview.

13   Q.  If we could put Defense B4 on the monitor for the witness

14   and the government.  Go to page 6.  There's a paragraph right

15   in the middle of the screen that I would like you to read.

16   A.  Both of them?

17   Q.  The bottom paragraph.

18   A.  Okay.

19   Q.  Now, does Defense B4 refresh your recollection regarding

20   the conversation you had where you told the government that RDC

21   gave customers a deadline, and if they did not provide the

22   questionnaire by such date, RDC would turn off the accounts to

23   controlled substances purchasing?

24   A.  I remember the process only.  I do not remember the

25   conversation.

M1KBDOU4                      Bouck - Cross

1    Q.  But that is what would happen, right?

2    A.  That is something that would happen at times.

3    Q.  If the customer didn't return the questionnaire back in,

4    they get shut off?

5    A.  In the beginning, yes.

6    Q.  And that was a decision made by Larry Doud?

7    A.  I don't know who the decision was made by.

8    Q.  You said every decision regarding customer accounts and

9    whether or not they could purchase controlled substances went

10   through Larry Doud, right?

11   A.  I did say that.

12   Q.  So Larry Doud was involved in this decision?

13   A.  He must have been.

14   Q.  You remember testifying briefly about Linden Care this

15   morning?

16   A.  I have somewhat of a recollection.

17   Q.  You said that Linden Care had a lot of purchases of opioid

18   pain medication, right?

19   A.  Yes.

20   Q.  Is Linden Care a specialty pharmacy?

21   A.  They might have.  I just don't necessarily remember what

22   their business model was.  I wasn't privy to that, their

23   business model.

24   Q.  Isn't it a fact that Linden Care is a pain management

25   pharmacy?

M1KBDOU4                         Bouck - Cross

1    A.  I don't know.  I don't remember.

2    Q.  Linden Care was Rochester Drug Co-Operative's largest

3    customer, right?

4    A.  Again, I don't know.  I wasn't privy to financial things

5    and who their biggest customers were.  I don't know.

6    Q.  But you did see their purchasing?

7    A.  In the amount of what their purchasing for controls?

8    Q.  Sure.

9    A.  Yes.

10   Q.  And they were a large purchaser of controlled substances,

11   right?

12   A.  Yes.

13   Q.  And if they were a pain management clinic, then it would

14   make sense that they had a higher number of opioid pain

15   relieving controlled substances; isn't that fair to say?

16           MR. ROOS:  Objection, assumes a fact not in evidence.

17           THE COURT:  Overruled.  You can answer the question?

18   A.  There is no -- if that was their business model, there's no

19   certificate that calls them a pain management pharmacy.  But if

20   that was their business model, then that would be correct to

21   say that they would order more than others.

22   Q.  If a pharmacy had a business model as a specialty pain

23   management pharmacy, you would expect more controlled substance

24   purchases from that pharmacy, that's fair to say?

25   A.  That would be fair to say.

M1KBDOU4                         Bouck - Cross

1    Q.   Is it also fair to say that Carlos Aquino was making

2    quarterly visits to conduct evaluations of Linden Care?

3    A.   Maybe for a brief time period.

4    Q.   How many times do you think Carlos Aquino went to Linden

5    Care to conduct inspections and evaluations?

6    A.   On behalf the RDC?

7    Q.   On behalf of RDC.

8    A.   Four maybe a couple more than that.

9    Q.   Four, five, something in that area?

10   A.   Possibly.

11   Q.   So Larry Doud sent Carlos Aquino to Linden Care four or

12   five times?

13   A.   If I remember correctly.  I guess some of that would have

14   happened before I started working there so I don't know.

15   Q.   And Julius Morton when he came on board he also went to

16   Linden Care?

17   A.   I believe he did.

18   Q.   And these reports and these evaluations that were conducted

19   by either Julius Morton or by Carlos Aquino at Larry Doud's

20   request showed that Linden Care was following DEA protocols?

21   A.   I don't know.

22   Q.   But you know that Carlos Aquino and Julius Morton are

23   former DEA agents?

24   A.   Yes, I'm aware of that, yes.

25   Q.   And they conducted these type of inspections and generated

M1KBDOU4                         Bouck - Cross

1    these types of reports?

2    A.   For RDC?

3    Q.   Yes.

4    A.   Yes.

5    Q.   And you're aware that Linden Care never lost their DEA

6    license during the amount of time that they were a customer of

7    RDC?

8    A.   I don't know what happened before I started with RDC.  From

9    what I recall since I was there, I don't remember.

10   Q.   In the time period that you were there?

11   A.   I don't remember them losing their license, no.

12   Q.   Are you familiar with Jordan Fogel?

13   A.   Yes.

14   Q.   He's a supervising pharmacist at Linden Care, right?

15   A.   Yes.

16   Q.   He was a point person that either Carlos Aquino or Julius

17   Morton would have met with?

18   A.   Yes.

19   Q.   You're aware that anyone who met with Fogel for these

20   evaluations endorsed Linden Care's compliance procedures?

21             MR. ROOS:  Objection, hearsay.

22             THE COURT:  Well, she can answer whether she's aware

23   of it.

24   A.   I'm not aware.

25   Q.   You remember testifying about the multiplier?

M1KBDOU4                      Bouck - Cross

1    A.  Yes.

2    Q.  And again briefly just explain what the multiplier is?

3    A.  A multiplier was used and added to the average purchasing

4    of a controlled substance group to create an ordering limit or

5    threshold.

6    Q.  The multiplier allowed customers to buy more, fair to say?

7    A.  That would be fair to say.

8    Q.  It's a very rough explanation, but in essence that's what

9    the purpose of the multiplier was?

10   A.  It wasn't the purpose.  It was the purpose to allow them to

11   order more than their average.

12   Q.  You're aware that while Larry Doud was CEO the multiplier

13   was actually decreased?

14   A.  Yes, it was during that time he was there.

15   Q.  And that lowered the amount of controlled substances that

16   customers could buy?

17   A.  Yes.

18   Q.  And that was all customers across the board, the multiplier

19   applied to everybody, right?

20   A.  Yes.

21   Q.  I'd like to put up Government 606.  Do you recognize this

22   photo?

23   A.  That scared me.

24   Q.  Is there something scary about the photo?

25   A.  I just didn't expect a photo to pop up.

M1KBDOU4                    Bouck - Cross

1   Q.  You testified about reviewing his reports on direct, right?

2   A.  I talked about his report, yes.

3   Q.  You said that you caught things that you thought he didn't

4   see?

5   A.  That I caught things on his reports?

6   Q.  Well, you said that your reviews of certain dispensing, you

7   saw things that you felt that he missed?

8   A.  I saw things that I didn't think he saw as issues that I

9   saw as issues is what I said.

10  Q.  Were these red flags?

11  A.  At times I thought they were, yes.

12  Q.  At did it bother you that he was missing red flags that you

13  saw?

14  A.  Did it bother -- I'm not sure -- can you say that again so

15  I can make sure what you're asking me.

16  Q.  Sure.  Julius Morton became your boss, right?

17  A.  Eventually, yes.

18  Q.  Did it bother you that you felt that you were seeing things

19  that your boss missed?

20  A.  Bothering me -- I'm still not sure what you're asking.

21  Q.  Did you feel that you were more qualified to be in Julius

22  Morton's role than he was?

23  A.  No, I did not.

24  Q.  I'd like to show the witness and the government what's been

25  marked as Defendant's B7.

1    Q.  Do you see this document?

2    A.  I do.

3    Q.  You see who it's from?

4    A.  I do.

5    Q.  Do you see that you are on the list of recipients?

6    A.  I am on that list, yes.

7            MR. TOWNSEND:  I offer B7 in evidence.

8            MR. ROOS:  Objection.

9            THE COURT:  Do you want to --

10           MR. ROOS:  I can explain if you want, your Honor.

11           THE COURT:  Let me first lay a further foundation.

12   She can identify it and authenticate it.

13   Q.  Ms. Bouck, I'd like you to read the paragraph in the middle

14   of the screen -- one above that.

15   A.  Out loud?

16   Q.  To yourself.

17   A.  Okay.

18           (Pause)

19   A.  Okay.

20   Q.  This e-mail concerns compliance related issues from RDC,

21   right?

22   A.  Correct.  But it's from Bill Pietruszewski.  Not Larry Doud

23   like you had mentioned.

24   Q.  Please don't say anything about the document.

25   A.  Oh, I'm so sorry.

1              MR. TOWNSEND:  I offer B7 in evidence.

2              MR. ROOS:  Objection.  Relevancy, 403 and hearsay.

3    I'm happy, if your Honor wants to take a sidebar, to explain

4    the issue.

5              THE COURT:  I'm trying to understand the body of this

6    e-mail is an e-mail written by whom?

7              MR. TOWNSEND:  The body of the e-mail is written by

8    Bill Pietruszewski, the top of the e-mail is an e-mail written

9    by Larry Doud to Bill Pietruszewski, Ed Kirker, Chris Masseth

10   Lanny Doud, Joe Brennan, Richie Cullen, Glen Gross, Lisa

11   Pietruszewski, Jessica Pompeo, regarding the compliance issue.

12             THE COURT:  The relevant portion of this document?

13             MR. TOWNSEND:  The relevant portion is the top part as

14   a response to the bottom part.

15             THE COURT:  I'll admit it.

16             (Defendant's Exhibit B7 received in evidence)

17             MR. TOWNSEND:  We can publish to the jury?

18             THE COURT:  Yes.

19   Q.  Looking at the Bill Pietruszewski e-mail in the middle,

20   that top paragraph.  Bill writes:  To all, today I had a

21   visitor, an FDA criminal investigator Michael Felezzola out of

22   Syracuse.  It seems that Slavin's Hancock Pharmacy, account

23   3891 in Stamford, Connecticut, said they purchased a bottle of

24   Seroquel tab 25 mg number 40176307, a product of AstraZeneca,

25   but the bottle contained tramadol.  The investigator said the

1    store purchased the bottle on May 6, 2013, from RDC and someone

2    from RDC informed them that they must call the manufacturer.

3    The investigator asked how we obtain our product and if we take

4    customer returns.  I answered all of his questions regarding

5    that RDC only purchases directly from all pharmaceutical

6    companies and only accept returns from customers that purchase

7    the product from RDC.

8            That's Bill Pietruszewski's first part of his e-mail,

9    right?

10   A.   Correct.

11   Q.   And then Larry Doud responds to that e-mail, right?

12   A.   Correct.

13   Q.   And he writes it to Bill and cc's all the people we talked

14   about.  Right?

15   A.   Yes.

16   Q.   And Larry Doud's response is:  Nice work Bill.  Where is

17   that store?  Should we cut him off?

18            Right?

19   A.   That's what it reads, yes.

20   Q.   That's what Larry Doud said.  Should we cut him off?

21   A.   That's what the e-mail says, yes.

22   Q.   I'd like to put on the screen B8.  You see B8 in front of

23   you?

24   A.   I do.

25   Q.   It is an e-mail from Larry Doud to you, Bill Pietruszewski,

1    Lanny Doud, Joe Brennan, and Chris Barry, right?

2    A.  Yes.

3    Q.  The subject is Casey's Prescription Pad, right?

4    A.  Correct.

5    Q.  It's from April 2014; is that right?

6    A.  Yes.

7            MR. TOWNSEND:  I offer B8.

8            MR. ROOS:  Same objections.

9            THE COURT:  I don't see it.  Is it on the screen?

10   It's not on my screen.

11           MR. TOWNSEND:  It is on the parties' screens.

12           THE COURT:  Now I have it.  It will be admitted in

13   evidence.

14           (Defendant's Exhibit B8 received in evidence)

15           MR. TOWNSEND:  May we publish?

16           THE COURT:  Yes.

17   Q.  Looking at the e-mail at the bottom of the page from Bill

18   Pietruszewski.  I apologize it is a little bit cut off because

19   of the sticker.

20           Bill Pietruszewski writes:  Today I informed owner

21   Heather Deck at Casey Prescription Pad that RDC was shutting

22   down all sales of controlled substances (CS) due to

23   prescriptions from out of state being filled by her store of

24   controlled substances.  I would like to say this was

25   accomplished with receiving all the correct usage information

1    (how the customer pays was not included) but with that what we

2    did receive was that doctors from Florida, Maryland and

3    Kentucky were on this usage which was a red flag.  I also want

4    to say if it wasn't for RDC having Jessica Pompeo on board

5    reviewing this information we would not have saw this until it

6    was too late.  So kudos to you Jessica and thank you.

7              You see that e-mail?

8    A.  I do.  What I could see without the sticker.

9    Q.  Lanny Doud writes a response.  Now, Lanny Doud is related

10   to Larry Doud how?

11   A.  That is his son.

12   Q.  And do you know Lanny Doud?

13   A.  I do.

14   Q.  Are you friendly with Lanny Doud?

15   A.  I haven't seen Lanny in a few years.

16   Q.  During this time period you were at RDC, were you friendly

17   with Lanny Doud?

18   A.  Yes.

19   Q.  Did you ever raise any of your compliance issues with Lanny

20   Doud?

21   A.  I recollect having a couple conversations with him about

22   new stores and their dispensing.

23   Q.  When was that?

24   A.  I don't know.  Some time between -- I don't know.  I

25   actually don't know.  I remember having conversations on my way

1  home with him about stores.

2  Q.  You were on your way home.  Was anyone else involved?

3  A.  Lanny was on the other side of the phone and I was on my

4  phone in my car.

5  Q.  Let's look at Lanny Doud's e-mail.  The last line.

6          Jessica, thank you for adding this new level of

7  protection at RDC.

8          Next e-mail up from Bill Pietruszewski.  It says:

9  Lanny -- and then the two lines together -- as for Jessica she

10  a great gal and if we received all the correct information from

11  our accounts, she would be overwhelmed.  Something for us to

12  discuss at a later time.

13          That's what Bill Pietruszewski wrote, right?

14  A.  Yes, that's in the e-mail.

15  Q.  Then the top e-mail is from Larry Doud.  And Larry writes:

16  Bill, it wouldn't be you if it was short.  But no problem.  I

17  wonder if we do have a moral obligation to notify our accounts

18  when we turn them in to places like the DEA or FBI or whatever.

19  I am glad we are monitoring for sure.  Just not sure how we

20  need to proceed.  But I guess you did tell her after you told

21  the DEA, right?  I also know you have been speaking to Don

22  Bilgore a lot about this, so I assume he told you that this

23  process was the right way to go.

24          That was Larry Doud's response, right?

25  A.  Yes, that's what was written in the e-mail.

1  Q.  He says I'm glad we are monitoring for sure, right?

2  A.  Yes, that's in the e-mail.

3  Q.  He's sure that Bill Pietruszewski had been speaking to Don

4  Bilgore, right?

5  A.  He said I know you've been speaking to Don Bilgore.

6  Q.  Don Bilgore was a lawyer?

7  A.  Yes, he was.

8  Q.  Represented RDC?

9  A.  Yes.

10  Q.  I'd like to put Defense B9 on the screen.  Do you see B9?

11  A.  Yes.

12  Q.  This is another e-mail from Larry Doud to you, Bill

13  Pietruszewski, Lanny Doud, Joe Brennan, and Chris Barry with

14  the subject line Casey's Prescription Pad.  Do you see that?

15  A.  Yes, I do.

16          MR. TOWNSEND:  I offer B9 in evidence.

17          THE COURT:  Objection?

18          MR. ROOS:  Yes, the same objection.

19          THE COURT:  It will be admitted into evidence.

20          (Defendant's Exhibit B9 received in evidence)

21          MR. TOWNSEND:  Thank you, your Honor.  May I publish?

22          THE COURT:  Yes.

23  Q.  So in the middle of that page is an April 22, 2014, e-mail

24  from Lanny Doud.  Where he writes:  Glad Jess is everything

25  we'd hoped for.

1          Then the e-mail above that is from Bill Pietruszewski.

2     And Bill Pietruszewski is writing to Larry Doud, Joe Brennan

3     Jessica Pompeo and Chris Barry.  Is that accurate?

4     A.  Yes.

5     Q.  And he writes, starting towards the end of the first line:

6     Issue is the DEA is not telling the rules and the DEA is

7     afflicting the pain to wholesalers and manufacturers.  The

8     young pharmacist are not afraid of the DEA.  They do not

9     realize the severity of their actions.

10          That's Bill Pietruszewski's e-mail, right?

11    A.  Yes, that is Bill Pietruszewski's e-mail.

12          MR. TOWNSEND:  You can take down B9.

13    Q.  We put B10 on the screens for the witness and the parties.

14    Do you see B10 in front of you?

15    A.  I do.

16    Q.  That's an e-mail from Larry Doud to a number of people,

17    including you.  Is that accurate?

18    A.  Yes, it is.

19    Q.  Is the subject line lowering the factor multipliers for

20    controlled substances?

21    A.  Yes, it is.

22          MR. TOWNSEND:  I offer B10 in evidence.

23          THE COURT:  Any objection?

24          MR. ROOS:  Same one.

25          THE COURT:  Objection is overruled.  I'll admit it

M1k3dou5                              Bouck - Cross

1    into evidence.

2                (Defendant's Exhibit B10 received in evidence)

3                MR. TOWNSEND:  We can publish to the jury?

4                THE COURT:  Yes.

5    Q.  So the very, very bottom of the first page, you will see

6    Bill Pietruszewski writes an e-mail on June 30, 2014.  Let's go

7    to page two.

8                Bill writes:  To all.  As of today RDC has lowered the

9    factor multiplier for all controlled substances.  C2 is a

10   factor of 3, now C2 will be a factor of 2.  C3 to C5 is 5.  Now

11   C3 to C5 will be a factor of 3.  With not receiving our loyal

12   pharmacies' dispensing records the way we require them with all

13   information RDC requires to avoid pharmacies to purchase more

14   than a month's usage on hand, knowing if a customer is primary

15   or secondary with RDC, and if our customer pharmacies have a

16   due diligence in place.  RDC has lower the factors to force

17   better cooperation from our customers.  This will take effect

18   starting tomorrow morning and moving forward.  So when you

19   receive an order of interest via text or e-mail, please

20   instruct your customer to supply the compliance team with three

21   months of store's dispensing record for the group alert in

22   question.  If you have any questions or concerns please let

23   know.

24               That was Bill Pietruszewski's e-mail, right?

25   A.  Yes.

M1k3dou5                          Bouck - Cross

1   Q.  Richie Cullen sends a response, is that accurate?

2   A.  Yes.

3   Q.  And Richie Cullen says:  That will spark some attention and

4   hopefully gets the stores to send in the info we ask for on a

5   more regular basis.  Nice job.

6           That's Richie Cullen's e-mail, right?

7   A.  Yes, it is.

8   Q.  Sent July 1st, 2014.  Is that true?

9   A.  Yes.

10  Q.  Lanny Doud responds to that.  And Lanny writes:  You all

11  know my feelings.  To go step further, any secondary or lower

12  over 20 percent without needed documentation is cut from these

13  items until we receive their surveys and compliance team

14  approves.  We then send a letter to primaries requesting this

15  or they are subject to the same actions.  Thus had gone in long

16  enough.

17          That was Lanny's response.  Is that true?

18  A.  Yes.

19  Q.  And Richie writes back again on July 1st, 2014, right?

20  A.  Yes.

21  Q.  Richie writes:  You're right, Lanny.  This can't be a one

22  sided relationship.  All we can do is ask for what we need.  If

23  the stores choose to ignore our requests, then they don't get

24  what they want.

25          Richie Cullen wrote that, right?

M1k3dou5                           Bouck - Cross

1   A.   Yes.

2   Q.   And then Larry Doud chimes in at the top, right?

3   A.   Yes.

4   Q.   And he writes to Richie Cullen, Lanny Doud, Bill

5   Pietruszewski, Pete Rose, Chris Noulis, Bill Wood, Barry

6   Adesnik, Glenn Ott, Steve Finkelstein, Paul Kearns, Kevin

7   Taraszewski, Mike Boone, Chris Barry, Scott Behanna, Jay

8   Shearer, Joe Brennan, Al Emmans, you, Julius Morton, and Pam

9   Mercendetti.   Right?

10  A.   Yes.

11  Q.   And so in addition to a number of executives who we talked

12  about, the rest of those people are sales team people, right?

13  A.   And others, yes.

14  Q.   The subject matter is lowering the factor multipliers for

15  controlled substances.

16  A.   Yes.

17  Q.   And Larry Doud writes:  I second that.  We need an option

18  from IT to identify non-compliers, right?

19  A.   That's what it reads, yes.

20  Q.   Larry Doud's looking for an IT solution to identify the

21  people that are not doing what they're supposed to do.  Right?

22  A.   In context, I don't know what Larry Doud is asking.  I'm

23  not Larry.  But he is looking for an IT to identify

24  non-compliers based on the rest of the e-mail.

25  Q.   Based on the e-mail, right?

1          MR. TOWNSEND:  If I can have B11 on the screen.

2     Q.  Ms. Bouck do you see B11?

3     A.  Yes.

4     Q.  That's an e-mail from Larry Doud to you and Richie Cullen,

5     Bill Pietruszewski, Bill Wood, Lanny Doud, and Joe Brennan with

6     a subject Compashione Pharmacy; is that right?

7     A.  Yes.

8          MR. TOWNSEND:  I offer B11 into evidence.

9          MR. ROOS:  No objection.

10         THE COURT:  It will be admitted into evidence.

11         (Defendant's Exhibit B11 received in evidence)

12    Q.  There is an e-mail that says from you at the very bottom of

13    page one.  And we go to page two.  You write:  Bill, attached

14    is Compashione Pharmacy account 3765's usage information and

15    completed questionnaire.  Please notice that Joy indicated that

16    70 percent of all controlled substances, narcotics and

17    oxycodone 30-milligram prescriptions are dispensed as cash

18    prescriptions.  Also the provider who writes all the narcotic

19    prescriptions Eitel Providence has no board certification and

20    is an internist based on her education only.  I had personally

21    spoken with Joy last Tuesday regarding her questionnaire and

22    dispensing as she had questions regarding.  After informing Joy

23    that I needed the payment form on the dispensing information,

24    she said she couldn't print the report to include this.  She

25    also said she knew she had a lot of cash prescriptions due to

M1k3dou5                        Bouck - Cross

1   the fact that her customers want to pay cash instead of having

2   to submit to their insurance provider.  Red flags to me.  Let

3   me know if you have any questions.

4           That was your e-mail, right?

5   A.  Yes.

6   Q.  Bill Pietruszewski responds.  And he writes an e-mail to

7   Bill Wood, right?

8   A.  Yes.

9   Q.  And Bill Wood was the salesman covering Compashione

10  Pharmacy?

11  A.  Did I say that in my previous?  I don't know if I said that

12  in my previous e-mail, yes.

13  Q.  Bill Wood is a salesman?

14  A.  He is a salesman, yes.

15  Q.  And Bill writes:  Mr. Wood, please read Jessica e-mail

16  below.  This is say huge red flag, customers having insurance

17  but are paying cash are avoiding the system for a reason.  Also

18  look at Joy questionnaire above, it shows the 70 percent cash.

19  They don't want to get caught.  If Joy wants RDC to supply

20  controlled substances, she needs to accept the prescriptions

21  with insurance.  If customer does not want to use insurance,

22  she should not accept or fill the prescription.  Now in the

23  past we were going to close this account due to multiple issues

24  with Joy.  Once again, Joy is putting RDC in a bad position.  I

25  do not think it is worthwhile sending Julius to Joy pharmacy.

1   She needs to only take no more than 10 percent cash on

2   controlled substances.  Now she is filling cash scripts for

3   pain medication.  The word is going to get out to the streets

4   and it is going to grow.  You need to tell Joy to follow our

5   guidelines in which I provided above and to bring the cash down

6   on CS now.  We will need her dispensing information on

7   September 2nd, 2014, for all of August and we will need to see

8   the cash trending down.  Then in October 2nd, we will need her

9   dispensing information from September.  If her cash is not down

10  to 10 percent cash for CS, I will recommend we cut off CS all

11  together.  If any questions, please let me or Jessica know.

12          That's how Bill Pietruszewski responded to your

13  e-mail, right?

14  A.  That was his response to my e-mail.

15  Q.  Then Richie Cullen also responds to Bill.  Right?

16  A.  Yes.  Bill Wood.

17  Q.  On August 19, 2014, Richie Cullen writes:  You know, Bill

18  Wood, what ticks me off is we spend all this time setting these

19  stores up, funding them, merchandising them, and then they

20  force us to cut them off from controls, because they are going

21  about things the wrong way.  You need me to visit the store

22  with you, let me know.

23          Richie Cullen wrote that, right?

24  A.  Yes.

25  Q.  And Larry Doud chimes in at the top, right, with everybody?

M1k3dou5                         Bouck - Cross

1   A.  Yes.

2   Q.  He says:  I think you should go anyway, Richie, and set

3   them straight.

4            Larry Doud's response.  Is that true?

5   A.  Yes, that's his response.

6   Q.  I'd like to show the witness B12.

7            Do you see B12?

8   A.  I do.

9   Q.  It is an e-mail from Larry Doud to Jessica Pompeo.

10           MR. ROOS:  No objection.

11           MR. TOWNSEND:  Offer B12.

12           THE COURT:  I'm sorry.  You have to speak louder.

13   What did you say after objection?

14           MR. ROOS:  I was trying to move it along saying we

15   don't have an objection.

16           THE COURT:  Stand up and speak louder.  It will be

17   admitted into evidence.

18           (Defendant's Exhibit B12 received in evidence)

19           MR. TOWNSEND:  May I publish to the jury?

20           THE COURT:  Yes.

21   Q.  Ms. Bouck, this e-mail is also regarding Compashione

22   Pharmacy, right?

23   A.  Yes.

24   Q.  It is also from August 19, 2014?

25   A.  Correct.

1    Q.  If you look at the top, Richie Cullen writes:  Just so it's

2    clear, I am going in to speak with Joy and tell her she has

3    until September question mark to get her cash on controls down

4    below 10 percent or we are cutting her off from all controls

5    and narcotics.

6           Correct?  That was Richie's e-mail?

7    A.  That was his response, yes.

8    Q.  And Larry Doud writes to Bill Pietruszewski, to Lanny Doud,

9    Bill Wood, you and Joe Brennan, he writes:  If Bill agrees, do

10   it.

11          Right?

12   A.  That's what it reads, yes.

13   Q.  Bill is the ultimate arbiter of whether or not to shut her

14   down in this particular case.  Isn't that a fact?

15   A.  If he's referring -- I don't know which Bill he's referring

16   to.  But, it sounds like it by what he's saying.

17   Q.  Would Bill Wood be consulted about shutting a customer off

18   from controlled substances?

19   A.  I don't see why he would.

20   Q.  But Bill Pietruszewski might be, right?

21   A.  Yeah.

22   Q.  So it's Bill Pietruszewski that Larry Doud's referring to

23   here?

24   A.  I would assume so.

25   Q.  We could have B13 on the screen.  This is an e-mail from

1    Larry Doud to you, Kevin Taraszewski, Joe Brennan, Lanny Doud,

2    Julius Morton and Bill Pietruszewski, right?

3    A.  Yes.

4    Q.  If you look down in the middle of the page, right above

5    where you are, it is regarding Stanton Negley, right?

6    A.  Without seeing the rest of the e-mail I can't tell, but

7    that e-mail, what you just showed me is yes.

8    Q.  This is an e-mail chain regarding the customer Stanton

9    Negley; is that fair to say?

10   A.  Again, I can't, I don't -- I don't know what's in the rest

11   of the e-mail so I can't say that.  That sentence is, yes,

12   about them.

13           MR. ROOS:  On this one we don't have an objection

14   either if he just wants to offer it.

15           THE COURT:  All right.

16           MR. TOWNSEND:  We offer B13.  If we can publish to the

17   jury.

18           (Defendant's Exhibit B13 received in evidence)

19           MR. TOWNSEND:  If we can go to page four.

20   Q.  Ms. Bouck, the first e-mail in this chain is from Kevin

21   Taraszewski, offering the dispensing report for Stanton Negley,

22   right?

23   A.  Yes.

24   Q.  And then you respond, if you want to go to page three just

25   to show author the very bottom from you.  You say:  Thank you

1    for the report.  In looking at the information provided, it

2    looks like over 60 percent of August fills are dispensed as

3    cash and close to 40 percent in July.  Do you know if these

4    patients have insurance and if it has been rejected by an

5    insurance company, or?  I need to know for documentation

6    purposes anything over 10 percent is a red flag for the DEA.

7           You wrote that, right?

8    A.  Yes.

9    Q.  If we can go to page two.  About 25 percent of the way down

10   page two there is an e-mail from Kevin Taraszewski which

11   contains a forward from Riva Sommer.  Do you see those?

12   A.  Yes.

13   Q.  Who is from Stanton Negley, right?

14   A.  I have no idea, to be honest.

15   Q.  Reading Kevin Taraszewski's e-mail:  Some of you may have

16   seen this, but this is what their reasoning is behind what they

17   think is doing is okay.

18          Do you see that?

19   A.  I do.

20   Q.  Riva Sommer presents the reason that Kevin Taraszewski is

21   referencing, right?  Is that fair to say?

22   A.  It's fair to say, yes.

23   Q.  Riva Sommer writes:  95 percent of our cash pay customers

24   are from West Virginia.  Because of the prescribing limits on

25   doctors, patients are forced to travel to find doctors who can

M1k3dou5                          Bouck - Cross

1    write for these items.  Once a patient sees Pennsylvania doctor

2    who is not enrolled in West Virginia Medicaid, the patient then

3    is a cash patient regardless of the fact that they do not have

4    West Virginia Medicaid, because Medicaid will not pay for the

5    script because it is written by a non-participating provider.

6    Patients are also then forced to have the script fill in

7    Pennsylvania due to the fact that West Virginia pharmacies will

8    not fill controlled substances for out-of-state providers, also

9    anyone who does not have insurance is given a script for

10   buprenorphine because it is cheaper than Suboxone.  See

11   attached forms for further details.

12          That was what she said, right?

13   A.  Yes.

14   Q.  Then if you look at the very bottom of page one.  Larry

15   Doud responds to what Kevin Taraszewski has forwarded.  Larry

16   writes:  I don't think this is going to end well.

17          Do you see that?

18   A.  Yes.

19   Q.  And then if we go back to page one.  Kevin Taraszewski's

20   e-mail at the bottom, Ken writes:  Nope.  Steve has already

21   told me about Juice coming down.  You can bring in whoever you

22   want, he's not going to change my mind.  I think the only real

23   chance is talking sense to Myer.  Regardless, like you said

24   before, we need to try to educate them and see what happens

25   afterward.

1        That's what the salesman said, right?

2   A.  Yes.

3   Q.  Joe Brennan responds:  Looking forward to Juice's report.

4   Steve has to comply, where will Stanton Negley go if we close

5   the account?

6        That's what Joe Brennan wrote, right?

7   A.  Yes.

8   Q.  And then Larry Doud up at the top responds to the entire

9   thread and Larry writes to the salesman Kevin Taraszewski,

10  right?

11  A.  Yes.

12  Q.  And you were on list with Joe Brennan, Larry Doud, Julius

13  Morton and Bill Pietruszewski.  Right?

14  A.  Yes.

15  Q.  And Larry writes:  They will have a problem wherever they

16  go with the cash.  And certainly they will get cut off, no

17  questions asked.  That's Larry's response, right?

18  A.  That is the response.

19        MR. TOWNSEND:  I'd like to bring up B14.

20  Q.  Do you see B14?

21  A.  I do.

22  Q.  An e-mail between Larry Doud, you, Bill Pietruszewski and

23  Joe Brennan?

24  A.  Yes.

25  Q.  Its subject matter is basic and expanded report?

M1k3dou5                          Bouck - Cross

1   A.   Yes.

2            MR. TOWNSEND:  I'll offer it into evidence.  If there

3   is an objection, I'll lay more of a foundation.

4            MR. ROOS:  We have an objection to the redaction.

5            THE COURT:  Let me give the jury a break.  We'll

6   resolve that.  Save them some time.

7            Ladies and gentlemen, we'll take a 15 minute break.

8   We'll bring you back in 15 minutes.

9            (Jury excused)

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                THE COURT:  You can step down.

2                Is there some issue with regard to what's being

3       redacted?

4                MR. TOWNSEND:  It is the government's document.  It is

5       how the government produced to us.  They're pulling the

6       unredacted version for us now.

7                THE COURT:  Will you be able to resolve this issue?

8                MR. ROOS:  It is a document from a third party.  The

9       third party produced it.  We're pretty sure we've seen a

10      version without the redaction that we are looking for.  And

11      maybe, I don't know if -- I mean, they have the same document

12      so I assume they looked for --

13               THE COURT:  Is there something of import in this

14      redacted part that is critical?

15               MR. TOWNSEND:  The defense didn't redact it.

16               THE COURT:  Is there something sensitive in the

17      redaction?

18               MR. ROOS:  We'll take a look, your Honor.

19               THE COURT:  I didn't give you the sidebar because, let

20      me make something clear to everybody.  Both sides seem to be

21      using a different definition of hearsay than I am applying

22      here.  Okay.  Hearsay is an out-of-court statement offered for

23      the truth of the statement.  It is not a direction, it is not

24      an agreement, it is a statement of fact that is being offered

25      through a witness who is giving that fact and he is not a sworn

M1k3dou5                         Bouck - Cross

1    witness in court.

2              99 percent of these e-mails are not technically

3    hearsay.  They are not statements of fact that are offered for

4    the truth of the statement.  It indicates the nature of the

5    communications and the conversations.  The jury's determination

6    is whether or not those conversations are consistent or

7    inconsistent with being part of a criminal conspiracy.  And

8    although the statements clearly by Mr. Doud are self-serving,

9    it is still relevant to the jury how he's responding and

10   communicating with individuals with regard to the issues that

11   are relevant in this case.  And it's for the jury.  And even

12   the extent of his involvement, which has obviously been

13   established here because he's on almost all of these e-mails.

14             So, my position is this:  Unless you can identify some

15   statement in some e-mail that you say is a statement about a

16   fact you want the jury to accept, and it is an out-of-court

17   statement offered for that truth, I'm not going to exclude the

18   e-mails based on an argument from the government that it's

19   self-serving hearsay or from the defense that somehow a person

20   who says oh, well, things might go badly for this pharmacy if

21   they don't do better.  What part of that statement in an e-mail

22   is offered for the truth of whether or not things are really

23   going to go badly for the pharmacy?

24             So, I looked at these and I've considered your

25   arguments.  I don't want you to think I'm not understanding

M1k3dou5                    Bouck - Cross

what your positions are.  But as far as I'm concerned, unless
you can identify for me a statement in a document that you say
fits the definition of hearsay, which is an out-of-court
statement offered for the truth of the statement, I'm not going
to exclude it on that basis that you think it's hearsay.  I
don't agree.

          Now there are other issues with regard to exceptions
to the hearsay rule, and other issues, particularly from the
government's point of view that I want you to evaluate also,
but they have some other issues with regard to co-conspirator
statements and other things that, even if it were hearsay, it
might overcome those objections.

          So if you want, if you want me to seriously consider a
valid objection to keeping a document out of this case, because
of hearsay, then be prepared to tell me what part of that
statement you say is the hearsay part, that the other side is
not entitled to put into this case.  It can't be just because
somebody said it that that makes it hearsay.

          MR. ROOS:  Understood, your Honor.  And it may be my
mistake for not flagging our second objection fully.  I think
there is also a relevancy and 403 issue for some of these
pharmacy e-mails that have come in in the cross, which is some
of them, Compashione Prescription, are not the type of thing
that came up in direct.

          THE COURT:  That not the type of thing that what?

M1k3dou5                        Bouck - Cross

1            MR. ROOS:  They didn't come in direct.  Those

2     pharmacies, they're classic good evidence by the defendant.

3     Look, on this time, on this other pharmacy, which the

4     government didn't put on any proof on, I did a good thing or a

5     said a good thing.

6            THE COURT:  Right.  But, look, the one thing I rely on

7     is the jurors are smart.  Okay.  Jurors understand that.  They

8     understand that if you argue it and the evidence supports that.

9     They understand that even if you don't argue it.  Because

10    somebody says I didn't rob the bank, doesn't mean they didn't

11    rob the bank.  Or if somebody says I'm not going to rob the

12    bank tomorrow, doesn't mean tomorrow they're not going to rob

13    the bank.

14           So, just think these out.  I don't want to waste time.

15    I'll give you a real opportunity for you to argue that

16    something is improperly coming before this jury.  But for most

17    of these objections, both sides with regard to these e-mails,

18    it seems to me that the jury has the right to examine exactly

19    what Mr. Doud was saying to his employees during that time,

20    through the e-mails, that the government wants to offer, if

21    he's giving them directions, and directions are not hearsay.

22    And they have the right to see other documents.  If on Monday

23    he says don't worry about it, and on Tuesday he says worry

24    about it, that's their judgment to make whether or not the

25    evidence supports whether or not he is involved in a

1    conspiracy.

2            So, just let's stay focused and move along so we don't

3    have to keep going through this.  Because I don't want you to

4    think that I don't understand the nature of your objections.

5    But I don't agree with your basic legal analysis that somehow

6    everything that's written on a piece of paper is somehow

7    hearsay that you have the right to exclude.

8            MS. ROTHMAN:  Your Honor, may I raise one document to

9    perhaps front an issue?

10           THE COURT:  Yes.

11           MS. ROTHMAN:  If we can pull up Defense Exhibit B15.

12   You haven't offered it yet, but I suspect you might.

13           THE COURT:  B15.

14           MS. ROTHMAN:  B15.

15           MR. TOWNSEND:  I'm not offering B15.

16           MS. ROTHMAN:  We'll get a ruling on it anyway.  It may

17   provide guidance.  Just an example, here is an e-mail with

18   Lanny Doud saying something about orders of interest and

19   flagging orders.  And the top e-mail --

20           THE COURT:  Again, the something about --

21           MS. ROTHMAN:  There is an e-mail in which --

22           THE COURT:  What's the part you are concerned with?

23           MS. ROTHMAN:  The top part where Larry Doud says I

24   agree on both thoughts.

25           THE COURT:  I agree -- I agree on both thoughts.

1          MS. ROTHMAN:  So the bottom e-mail makes some

2     statements by Lanny Doud, his son.  Seems to the government

3     that Mr. Doud's statement, I agree on both thoughts, is being

4     offered for the truth of the matter asserted, contained within

5     the second e-mail.

6          THE COURT:  I'm not sure what he's supposed to be

7     agreeing to.

8          MR. TOWNSEND:  We're not offering the document so I

9     have no idea why we're going through this theoretical

10    hypothetical exercise, because we are not offering the

11    document.

12         MS. ROTHMAN:  And that's fine, your Honor.

13         THE COURT:  Well, then let me put it to you this way.

14    Your statement that you are not offering the document, I am

15    precluding this document from coming into evidence.

16         MS. ROTHMAN:  One win for the government.

17         MR. GOTTLIEB:  One?

18         THE COURT:  You're not going to get a chance to stand

19    up, as they say.  Everybody should concentrate on winning the

20    war, not the battle.

21         MS. ROTHMAN:  All right.

22         THE COURT:  Let's focus and think of this case from

23    the jurors' perspective.

24         MR. GOTTLIEB:  Can with have a few minute break?

25         THE COURT:  Yes.  Give you a couple minutes.  That

1      document is ruled out.

2                (Recess)

3                MR. ROOS:  Does this say a quarter to four?

4                THE COURT:  It is a quarter to four.

5                MR. ROOS:  So I don't know how much more the cross is.

6                THE COURT:  How much more do you anticipate?

7                MR. JANEY:  We have another 25 minutes.

8                THE COURT:  What do you want to do?

9                MR. ROOS:  I have redirect.  I was hoping and praying

10     to have Sam Alaimo go today.  Maybe it's not -- maybe it's not

11     in the cards.  If your Honor has any thoughts.  One suggestion

12     I was going to throw out if it worked for the jury to stick

13     around and leave early tomorrow.

14               THE COURT:  How long do you think you are going to be

15     on direct?

16               MS. ROTHMAN:  15 minutes on direct, if that.

17               THE COURT:  And how much more than that would you be

18     on cross?

19               MR. TOWNSEND:  Probably do the same.

20               MS. ROTHMAN:  10 minutes on direct.

21               THE COURT:  Let's put it this way.  I will, if we can

22     start this witness before 4:45, then we'll do the witness for

23     at least 20 to 25 minutes to see if we can finish the witness.

24     If your estimates are off, and you go much more, I can't

25     promise you that I'll keep them longer than that.  The weather

M1k3dou5                          Bouck - Cross

1    is sort of iffy.  I'm concerned about trying to get them home,

2    one, before it freezes over, and two, before it gets dark.  If

3    you want to try to finish this witness and deal with the second

4    witness, if we finish this witness, any time before that 4:30,

5    I will give you the half hour from 4:30.  If we can finish this

6    witness at 4:30, I'll give you until 5.

7              MS. ROTHMAN:  Thank you, your Honor.

8              THE COURT:  Let's get the witness who is on the stand.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  You can continue, Mr. Townsend.

3              MR. TOWNSEND:  Thank you, your Honor.

4    BY MR. TOWNSEND:

5    Q.  Welcome back, Ms. Bouck.

6    A.  Hi.

7    Q.  If we can get B14 put on the monitors for the parties and

8    the witness, please.  You see that, Ms. Bouck?

9    A.  Yes.

10   Q.  It is an e-mail from Larry Doud to you, Bill Pietruszewski,

11   and Joe Brennan, right?

12   A.  Correct.

13   Q.  The subject is basic and expanded report?

14   A.  Yes.

15             MR. TOWNSEND:  I would offer B14 in evidence.

16             THE COURT:  Any objection?

17             MR. ROOS:  No, your Honor.

18             THE COURT:  It will be admitted into evidence.

19             (Defendant's Exhibit B14 received in evidence)

20             MR. TOWNSEND:  May we publish?

21             THE COURT:  Yes.

22   Q.  If question go to page two.  At the bottom of the page

23   there is an e-mail from George Euson from Pro Compliance to

24   Bill Pietruszewski and you; is that right?

25   A.  Yes.

 1    Q.  And the e-mail concerns the offer of what Pro Compliance is

 2    going to do for RDC if they're hired.  Is that accurate?

 3    A.  It's -- can you say that again?  Because I'm not sure I

 4    agree.

 5    Q.  It is probably easier.  The e-mail reads:  Bill, the

 6    expanded report includes the base report, this is the

 7    spreadsheet report titled RDC TR 003799-FA 2420913-Austin

 8    Chemists Inc.-June-August 2014.

 9              Zip plot.  This report shows dots on a map where

10    prescribers are located based on DEA registration zip codes and

11    patients based on residential zip codes.  Zip plot does not

12    identify any PHI protected information.  It is a visual to

13    assist in locating any outlier red flags based on spatial

14    information.

15              DEA concerns.  Identifies in report from prescriber

16    DEA registrations that we could not verify.  Many times these

17    are typographical data entry errors by the pharmacy, but could

18    indicate suspicious activity.

19              Go to the next page.

20              Report.  This report identifies geographical

21    information regarding the pharmacy, summary information from

22    the base report, findings that were identified that could be

23    red flag indicators of suspicious or unusual activity regarding

24    the pharmacy and/or prescribers, state license verification and

25    board actions regarding the top 10 controlled substance

1    prescribers, state license verification and board actions

2    regarding the pharmacy and PIC.

3           That's George Euson, Pro Compliance PVS' e-mail to

4    you, Bill Pietruszewski, and that's it.  Just the two of you.

5    A.   That is his e-mail to us, yes.

6    Q.   If you go to the first page, Bill Pietruszewski loops in

7    Larry Doud and Joe Brennan in an e-mail to you.  And Bill

8    writes:  Larry and Joe, I received from George Euson his quote

9    for Pro Compliance to process 25 RDC customers with their basic

10   package.  I was not 100 percent sold on this, but looking in

11   more detail, the 90-day report is a complete picture and gives

12   RDC a better understanding of our customer ordering process

13   which I feel will be of great service to the compliance team.

14   If we go with Pro Compliance solution we are thinking of first

15   processing two stores in one week.  It may take Jessica two to

16   three days to do more research before we would send in Julius

17   to do a complete DEA audit from the dispensing information Pro

18   Compliance is providing RDC.  Once we get in a rhythm or a week

19   under our belt, we could process more reports in a week, but if

20   we are stores of equal or larger volume of controlled

21   substances as Austin Chemist, we probably can only manage two

22   Pro Compliance reports a week.

23          Bill Pietruszewski sent that e-mail to Larry Doud, Joe

24   Brennan and you in September 25, 2014.  Is that accurate?

25   A.   Yes.

1   Q.  And Larry Doud responds to this e-mail up at the top.  You

2   see that?

3   A.  Yes.

4   Q.  And Larry Doud's response is:  The reports don't show the

5   distance the patient travels?  Isn't that necessary?

6           That was Larry Doud's concern put in this e-mail,

7   right?

8   A.  I can't agree or disagree if that's his concern.  I can

9   just agree with what he wrote here.

10  Q.  The text of the e-mail is the reports don't show the

11  distance the patient travels.  Isn't that necessary?

12  A.  That's his response, yes.

13  Q.  And the distance that a patient travels could be a

14  potential red flag for diversion, right?

15  A.  Correct.

16  Q.  If we can put B16.  You see B16, Ms. Bouck?

17  A.  I do.

18  Q.  It is an e-mail from Larry Doud to you, Gordon Kulessa,

19  Steven Finkelstein, Joe Brennan, Bill Pietruszewski and Julius

20  Morton.  Is that accurate?

21  A.  Yes.

22  Q.  And the subject is Royal Drugs number 4771 and Cedar Care

23  number 6158.  Is that right?

24  A.  Correct.

25          MR. TOWNSEND:  I offer B16 in evidence.

M1k3dou5                          Bouck - Cross

1              THE COURT:  Any objection?

2              MR. ROOS:  No objection, your Honor.

3              THE COURT:  It will be admitted into evidence.

4              (Defendant's Exhibit B16 received in evidence)

5              MR. TOWNSEND:  Go to page two.

6    Q.  Pam Mercendetti writes to you and Bill Pietruszewski.  Hi

7    Jessica, just making official account 4771 driver reported at

8    11:24 today to TXX supervisor that the FBI and DEA were in and

9    around the pharmacy.  They would not let anyone near the

10   pharmacy.  Account number 6158 at 11:10 a.m. the same problem

11   FBI and DEA.  They questioned the driver though and wanted them

12   to open the vehicle and containers to search.  The driver said

13   no unless they had a warrant so they let the driver go.  TXX

14   will be returning to RDC both stores items.

15             Back to page one.  And you write an e-mail to Larry

16   Doud, Joe Brennan, Bill Pietruszewski, Julius Morton, Gordon

17   Kulessa and Steven Finkelstein in response.  Do you see that?

18   A.  I do.

19   Q.  And you say:  Hello, good afternoon.  Please see the e-mail

20   below received this morning regarding the above-mentioned

21   accounts.  As you are aware, we recently had a subpoena issued

22   to us on the pharmacies owned by the corporation of these two

23   stores as well as Ata Pharmacy, Mt. Airy and EZ Care.  I've

24   spoken with Joe Brennan who would like you to be cognizant

25   especially regarding the credit limits pending the possible

1  outcomes of this investigation.  I had thought Value Pharmacy

2  or Value was primary for these accounts but have been informed

3  by Steve that they have recently switched to RDC as their

4  primary.  At this time under direction I have turned off Cedar

5  Care's control substance purchasing noting such until we

6  receive an explanation of the DEA activity today.  Royal Drug's

7  controlled substance purchasing abilities were denied.

8           That was your e-mail?

9  A.  That it is.

10  Q.  And then later Doud responds at the top.  Right?

11  A.  Yes.

12  Q.  And he writes to you, he writes to Joe Brennan, Bill

13  Pietruszewski, Julius Morton, Gordon Kulessa and Steven

14  Finkelstein and he writes:  Thanks, heads up.

15           Is that accurate?

16  A.  Yes.

17  Q.  I'd like to have B19.  You see this e-mail, Ms. Bouck?

18  A.  I do.

19  Q.  An e-mail from Larry Doud to you, Richie Cullen, Joe

20  Brennan, Julius Morton, Bill Pietruszewski, and Elizabeth

21  Cullen, right?

22  A.  Yes.

23  Q.  And the subject is The Chemist Shop?

24  A.  Yes.

25  Q.  You remember The Chemist Shop?

M1k3dou5                         Bouck - Cross

1   A.  I do.

2              MR. TOWNSEND:  I offer B19 in evidence.

3              THE COURT:  Any objection?

4              MR. ROOS:  No objection, your Honor.

5              THE COURT:  It will be admitted into evidence.

6              (Defendant's Exhibit B19 received in evidence)

7   Q.  Richie Cullen writes, the second e-mail:  After much

8   discussion, several phone calls scheduling options and finally

9   threatening to stop selling the account, I was able to convince

10  Joe from The Chemist Shop to agree to change his schedule and

11  have Julius come in and conduct an audit on October 7, 2015.  I

12  told him we would contact previous to the audit and spell out

13  exactly what Julius needs in the form of records.

14             Larry Doud responds to that e-mail, right?

15  A.  Yes.

16  Q.  He says:  You are the bomb Richie.  Thanks.

17             Is that's what Larry Doud says?

18  A.  Yes.

19             MR. TOWNSEND:  I'd like to have B20.

20  Q.  This is an e-mail from Larry Doud directly to you, right?

21  A.  Yes.

22  Q.  In October of 2015?

23  A.  Yes.

24  Q.  The subject is suspicious doctor around my territory.

25  A.  Correct.

1          MR. TOWNSEND:  I offer B20 in evidence.

2          THE COURT:  Any objection?

3          MR. ROOS:  No objection.

4          THE COURT:  It will be admitted into evidence.

5          (Defendant's Exhibit B20 received in evidence)

6          MR. TOWNSEND:  If we can go to page two.

7    Q.  This e-mail in the middle of the page here is from Mike

8    Boone.  Do you see that?

9    A.  Yes.

10   Q.  And Mike Boone is a salesman?

11   A.  Yes.

12   Q.  So Mike writes:  Compliance and management.  It has come to

13   my attention that there is a doctor around my territory that

14   has been writing an enormous amount of narcotics prescriptions

15   to the point that the majority of pharmacies around my area are

16   now refusing to fill his prescriptions.  This includes the

17   chains in the surrounding area as well.  The doctor's name is

18   Paul Lee and his office is at 171 W. Main Street, Randolph, New

19   York 14772.  His NPI is 1790993509 and his DEA is AL9629431.  I

20   talked with Peter over at Ellictottville tonight after hearing

21   about this doctor for the last couple days, and Peter mentioned

22   that a store may have already reported suspicious activity from

23   this doctor.  All his customers are paying cash and some of his

24   patients have even mentioned paying $100 cash for the visit and

25   the prescription.  The prescriptions have typically been for a

1    two-week supply.  Like I said stores, such as Inkley's,

2    Falconer, Westfield, Southside, Frewsburg and Ellictottville

3    are refusing to fill, and so are the CVSs, Rite-Aids and

4    Walgreens.  I did call Chris Barry and mention this to him as

5    folks are hearing that his patients are now traveling to the

6    Buffalo area as those stores aren't familiar with this doctor

7    yet.  Just wanted to give you a heads up.  Thanks.

8          That's Michael Boone's e-mail?

9    A.  Yes.

10   Q.  And Chris Barry is also a salesman, right?

11   A.  Correct.

12   Q.  Who covered the Buffalo area?

13   A.  I think so, I'm not familiar with his exact territory.

14   Q.  If you go back to page one at the bottom, Joe Brennan

15   responds to this e-mail.  Actually go back to the very, very

16   bottom of page one.  From Larry Doud.  Larry Doud responds to

17   Mike Boone's e-mail, right?

18   A.  Yes.

19   Q.  And he sends it to all of compliance, to Joe Brennan, to

20   Jay Shearer and to Chris Barry, right?

21   A.  Yes.

22   Q.  And says:  Nice move Mike.

23         That's what he says, right?

24   A.  Yes.

25   Q.  Now, let's go back to Joe Brennan's e-mail.  He writes to

1   Larry and Mike and all of compliance and Jay Shearer and Chris

2   Barry, right?

3   A.   Yes.

4   Q.   And he also says:   Thanks Mike.

5           Then he follows:   Jessica, do you have further

6   information on the doctor Mike Boone mentioned in his e-mail

7   below.   Paul Lee.

8           You see that?

9   A.   I do.

10   Q.   You responded that you were looking and you'd let everyone

11   know shortly.   Do you see that?

12   A.   I do.

13   Q.   And Larry writes to you, cc'ing again Joe Brennan, Mike

14   Boone, compliance, Jay Shearer and Chris Barry, do we need to

15   be cautious about what we say?

16           And you provided Larry the advice he was asking for.

17   Right?

18   A.   I replied to his e-mail, yes.

19   Q.   You write:   I would recommend so yes.   I believe we should

20   just make them aware that our pharmacies in the territory are

21   questioning these scripts and that the word is coming from

22   fellow pharmacists, not so much RDC telling them not to fill.

23   That our recommendation would be to follow their due diligence

24   procedures and verifying the legitimacy of the prescription,

25   documenting such things as staying away from filling any

1   narcotic/controlled substance prescriptions as cash, reminding

2   them of the red flags they are to watch for under pharmacist

3   corresponding responsibilities.

4            That was your e-mail, right?

5   A.  Yes, it is.

6   Q.  When you said the pharmacist corresponding

7   responsibilities, you meant the DEA regulations, right?

8   A.  From the Code of Federal Regulations.

9   Q.  The CFR regulations.  And Larry Doud responded to you.

10  Just to you, right?

11  A.  Yes.

12  Q.  He says:  Thanks for that.  Hope we don't step over the

13  line.  Right?

14  A.  Yes.

15            MR. TOWNSEND:  If I could have B24.

16  Q.  This is an e-mail from Larry Doud to you, Julius Morton,

17  Joe Brennan, Ed Kirker, Bill Pietruszewski, and William

18  Delgado; is that right?

19  A.  Yes.

20  Q.  And the subject is update on diagnosis codes Linden Care.

21  Right?

22  A.  Yes.

23            MR. TOWNSEND:  I offer B24.

24            THE COURT:  Any objection?

25            MR. ROOS:  No objection.

M1k3dou5                        Bouck - Cross

1            THE COURT:  It will be admitted into evidence.

2            (Defendant's Exhibit B24 received in evidence)

3   Q.  See about halfway down the page there is an e-mail from

4   Julius Morton?

5   A.  I do, yes.

6   Q.  Morton writes:  I just wanted to forward this Linden Care

7   communication for your information and consideration.  This

8   e-mail was sent because I have been waiting on

9   prescription/therapy review data from Linden Care, which I

10  intended to include in my completed compliance review report.

11  As part of my review, I am now incorporating a prescription

12  review spreadsheet, to be sent out to all reviewed pharmacies

13  that regularly fill high dosage units of problematic opioid

14  medication such as oxycodone and fentanyl.  As an additional

15  dimension of review, I will especially be focusing on the large

16  accounts, like Linden Care, that mail order controlled

17  substances.  The spreadsheet requires the pharmacy to submit a

18  very brief explanation regarding the patient diagnosis and/or

19  therapy plan for individual high dose or cash scripts.  The

20  prescription review spreadsheet I sent to Linden Care's

21  director of compliance, Art Kersey, requested explanations on

22  234 prescriptions filled between September and December of

23  2016.  As you can see from Art's forwarded e-mail below,

24  pharmacies that dispenses a large amount of opioid CS

25  prescriptions will have to put some additional effort into

 1    completing the spreadsheet.

 2              Larry Doud responds directly to Julius Morton's

 3    e-mail.  And he also includes Joe Brennan, Ed Kirker, Bill

 4    Pietruszewski, you, and William Delgado.  Do you see that

 5    A.  I do.

 6    Q.  And Larry writes:  Thanks, Juice.  How about asking them to

 7    forward the info as they get it so you can be sure they are

 8    working on it.

 9              And Julius responds:  Yes that's exactly what I did.

10    I Was thinking the same thing.

11              Isn't that fair?

12    A.  Isn't what fair?

13    Q.  Is it fair to say that's what Julius Morton's response was?

14    A.  Yes, that's what it is in the e-mail.

15    Q.  And Larry Doud writes:  Great.  Thanks.

16              Is that fair?

17    A.  Yes, that's what the e-mail says.

18    Q.  And that's to both Julius Morton, Joe Brennan, Ed Kirker,

19    Bill Pietruszewski, you and William Delgado again?

20    A.  Yes.

21    Q.  Ms. Bouck, do you remember on direct you were asked a

22    number of questions about different pharmacies that the

23    government brought up?

24    A.  Yes, yes.

25    Q.  And you were asked about specific compliance practices and

1   procedures that you either did or didn't do.  Do you remember

2   that?

3   A.  Yes.

4   Q.  But isn't it a fact that between 2013 and 2017, March of

5   2017, that Larry Doud authorized the suspension or termination

6   of a large number of pharmacies?

7   A.  I can't say that is a fact.

8   Q.  Okay.  Amato Pharmacy.  Did Larry Doud authorize the

9   suspension of Amato pharmacy on April 25, 2013?

10  A.  I wasn't there in 2013 at that time at least.  And I don't

11  know.

12  Q.  Casey's Prescription Pad.  Was that an April 22, 2014,

13  suspension?

14  A.  It was -- yes.

15  Q.  AJ Family Pharmacy.  Termination of RDC controlled

16  substance ordering privileges in June 2014?

17  A.  I don't exactly remember when.  But if you have

18  documentation that shows that, I don't remember when that was.

19  Q.  Can we show the witness Government 278.  If you look about

20  33 percent down the page.  You'll see AJ Pharmacy 4167.

21  A.  Yes.

22  Q.  Does that refresh your recollection that there was a

23  termination of RDC controlled substance ordering privileges?

24  A.  Because I'm looking it on the paper, yes.

25  Q.  What about Greenwich Pharmacy?

1   A.  I don't know.

2   Q.  They were terminated September 1st, 2014.  Is that

3   accurate?

4   A.  I don't have the document in front of me anymore, so I

5   don't know.

6   Q.  Kingston Pharmacy.  Were they terminated September 1, 2014?

7   A.  I don't know.

8   Q.  Stanton Negley.  Were they suspended September 8, 2014?

9   A.  I don't know.

10  Q.  Austin Chemists, did they have a termination of their

11  controlled substance September 23, 2014?

12  A.  I don't know.

13  Q.  All care Pharmacy.  Did they have a suspension of their

14  controlled substance ordering December 8 of 2014?

15  A.  I don't know.

16  Q.  Coatesville Pharmacy.  Did they have a suspension of their

17  controlled substance ordering privileges December 31 of 2014?

18  A.  I don't know.  I don't know any of the exact dates on any

19  of these stores.

20  Q.  Do you remember that these stores had their ability to

21  purchase controlled substances suspended or terminated?

22  A.  Some of them, I remember.  But, that's it.

23  Q.  Ciudad Pharmacy?

24  A.  What was the name?

25  Q.  Ciudad Pharmacy?

M1k3dou5                              Bouck – Cross

1    A.   I don't remember.

2    Q.   You don't remember?

3    A.   C-U-I-D-A-M-E-D?

4    Q.   Cuidamed.

5    A.   Yes, that I remember.

6    Q.   My apologies.

7    A.   That's okay.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.   You remember red flag suspension January 21, 2015?

2   A.   Again, I don't remember when action was taken on a store.

3   Q.   Mt. Airy pharmacy, you remember that one?

4   A.   Remember what about them?

5   Q.   That there was a termination of their controlled substance

6   ordering privileges in May of 2015?

7   A.   To my recollection it sounds familiar, yes, but not the

8   date, again, just the pharmacy.

9   Q.   Wellness Pharmacy of High Falls, do you remember that one?

10  A.   I remember that pharmacy.

11  Q.   You remember they had a red flag suspension in May of 2015?

12  A.   I remember them being suspended and I don't remember when.

13  Q.   Kewan pharmacy, you remember that one?

14  A.   I don't remember.

15  Q.   You don't remember that they had a suspicious for refusing

16  an on site visit in May of 2015?

17  A.   The pharmacy name sounds familiar.  That's all I remember.

18  Q.   You remember Abigails pharmacy corporation?

19  A.   I remember the pharmacy name, yes.

20  Q.   You remember they had a regular flag suspension July 21,

21  2015?

22  A.   No.

23  Q.   EZ pharmacy?

24  A.   They sound familiar.  That's it.

25  Q.   Do you remember they had a termination of controlled

M1KBDOU6                        Cross - Bouck

1  substances ordering privileges in August 26, 2015?

2  A.  I do not have them memorized, the action that we took on

3  the stores or when they happened, no.

4  Q.  Do you remember ATA pharmacy?

5  A.  Yes, I do.

6  Q.  You remember that they had a termination of their

7  controlled substance order and privileges on September 2, 2015?

8  A.  No, I don't.

9  Q.  Do you remember Cedar Care pharmacy?

10 A.  Yes, I do.

11 Q.  Do you remember they had a termination of their controlled

12 substances ordering privileges on September 15, 2015?

13 A.  No, I do not.

14 Q.  You remember Organix?

15 A.  Yes, I do.

16 Q.  You remember there's a red flag suspension on their account

17 October 20, 2015?

18 A.  I don't know when the action that was.  I don't know when

19 the action was taken on the store.

20 Q.  But you know that that action was taken?

21 A.  I know that Organix was suspended or terminated, yes.

22 Q.  The Chemist Shop?

23 A.  Yes.

24 Q.  Termination of controlled substances ordering privileges on

25 November 18, 2015?

1   A.  That was the only one that sounds vaguely familiar.

2   Q.  Prime Health Inc., you remember pharmacy?

3   A.  I remember the name.

4   Q.  You remember they had a termination of controlled

5   substances ordering privileges on November 18, 2015?

6   A.  I don't remember when the action was taken upon them, no.

7   Q.  You remember Poplar pharmacy?

8   A.  I remember the name, yes.

9   Q.  You remember they had a termination of controlled substance

10  ordering privileges on November 23, 2015?

11  A.  No, I do not know when the date was.

12  Q.  You remember ProHealth pharmacy?

13  A.  Yes, I do.

14  Q.  Remember they had a red flag suspension on their account in

15  December 28, 2015?

16  A.  I don't remember the date.

17  Q.  You remember Toms River pharmacy?

18  A.  Yes, I do.

19  Q.  Remember they had a red flag suspension January 4, 2016?

20  A.  No.

21  Q.  Remember Kingsway pharmacy?

22  A.  Yes.

23  Q.  Remember they had a red flag suspension February 26, 2016?

24  A.  No.

25  Q.  Remember Vital Drugs?

M1KBDOU6                                  Cross - Bouck

1   A.   Remember the name.

2   Q.   Remember they had a termination of controlled substances

3   ordering privileges on March 17, 2016?

4   A.   No, I do not.

5   Q.   Remember Super Star pharmacy?

6   A.   That doesn't sound familiar.

7   Q.   You remember that they had a termination of controlled

8   substance ordering privileges on March 17, 2016?

9   A.   No, I don't.

10   Q.   You remember Sheely's pharmacy?

11   A.   Yes.

12   Q.   You remember they had a red flag suspension May 23, 2016?

13   A.   Yes. No. I remember the store. I don't remember when the

14   suspension happen on them.

15   Q.   You remember the suspension?

16   A.   I do, actually.

17   Q.   You remember Lake Carmel pharmacy?

18   A.   It sounds familiar, but I don't remember anything about it.

19   Q.   You remember they had a red flag suspension May 26, 2016?

20   A.   I don't remember.

21   Q.   Remember Allerton Park pharmacy?

22   A.   I remember the pharmacy name.

23   Q.   You remember that they had a termination of controlled

24   substances ordering privileges on August 11, 2016?

25   A.   No.

M1KBDOU6                         Cross - Bouck

1    Q.   You remember Wyckoff pharmacy?

2    A.   Yes.

3    Q.   Remember they a red flag suspension January 27 of 2017?

4    A.   No.

5    Q.   You remember Sunset pharmacy?

6    A.   Sounds familiar, yes.

7    Q.   You remember they had a termination of controlled

8    substances ordering privileges March 3, 2017?

9    A.   No.

10   Q.   You remember 59th Street pharmacy?

11   A.   Yes.

12   Q.   You remember that they had a red flag suspension on their

13   account March 13, 2017?

14   A.   I believe we looked at that this morning, yes.

15   Q.   You remember New York Chemists, Inc?

16   A.   I can't remember.

17   Q.   You remember if they had a red flag suspension on March 28,

18   2017?

19   A.   No.

20   Q.   You remember 52nd Street pharmacy, Incorporated?

21   A.   Yes.

22   Q.   You remember that they had a termination of controlled

23   substances ordering privileges March 31st of 2017?

24   A.   No.  You said 52, correct?

25   Q.   Yes, 52nd.

1    A.  No, I don't remember.

2    Q.  You're testifying in this case pursuant to a

3    non-prosecution agreement, right?

4    A.  Yes.

5    Q.  You met with the government several times you said?

6    A.  Yes.

7    Q.  Eight or nine times?

8    A.  Yes.

9    Q.  Back starting in July of 2017?

10   A.  I believe that was the first time.

11   Q.  You testified in the grand jury?

12   A.  Yes.

13   Q.  You met with them subsequently since then many times?

14   A.  Yes.

15   Q.  When was the first time that anybody broach the topic of a

16   non-prosecution agreement?

17   A.  I don't remember.

18   Q.  You met with the government several times in January,

19   right?

20   A.  January of when?

21   Q.  This January, this month.

22   A.  This month.  Give me a second.  I met with them a few times

23   this month.

24   Q.  You sat down with them and you talked to them about

25   compliance, right?

1    A.  Yes.

2    Q.  About your role?  Yes?

3    A.  Yes.

4    Q.  About other people's role's in compliance?

5    A.  Yes.

6    Q.  You answered questions about dispensing reports?

7    A.  Yes.

8    Q.  You answered questions about prescribing -- troubling

9    prescribers?

10   A.  Yes.

11   Q.  You talked about high cash for controlled substances

12   purchases?

13   A.  Yes.

14   Q.  You looked at emails?

15   A.  Yes.

16   Q.  You answered all the government's questions honestly,

17   right?

18   A.  Yes.

19   Q.  And they told you -- withdrawn.

20           Are you aware that the government's position is that

21   you are involved in a conspiracy to -

22           MR. ROOS:  Objection, lawyer witness role.

23           THE COURT:  Sustained.

24   Q.  You answered all their questions honestly?

25   A.  Yes.

1   Q.  And the government told you --

2               MR. ROOS:  Objection to what the government told her.

3   Hearsay, among other things.  I don't know what the relevance

4   is.

5               THE COURT:  It goes to her state of mind.  You can ask

6   the question.

7   Q.  The government told you that you could be charged with

8   conspiracy to illegally divert controlled substances, didn't

9   they?

10  A.  That I can be charged with -- say that again.  I don't

11  remember that language.

12  Q.  When you were speaking to the government about your

13  non-prosecution agreement, what do you think that they're

14  agreeing not to prosecute you for?

15  A.  For what was written within the agreement, for violating

16  the Controlled Substance Act and lying to the DEA.

17  Q.  Right.  For conspiring to violate the Controlled Substance

18  Act by diverting controlled substances outside of a legitimate

19  stream of commerce and away from legitimate medical need,

20  right?

21  A.  Again, you're throwing me off with the conspiring thing.  I

22  understand it is just violating.  You're putting more in there

23  than I would agree with.

24  Q.  So violating the Controlled Substance Act and defrauding

25  the government?

1  A.  Correct.

2  Q.  And that scared you, didn't it?

3  A.  No.

4  Q.  The government told you that they could potentially charge

5  you with a federal crime and you weren't scared?

6  A.  I wasn't.  No, I wasn't.

7  Q.  Is that because you knew you hadn't broken any laws?

8  A.  It's because I did everything I could to try to make it

9  right.

10  Q.  But without a non-prosecution agreement, you could have

11  been charged, right?

12  A.  I suppose it could have gone either way.

13  Q.  Well, that's a terrifying concept, isn't it?

14          MR. ROOS:  Objection, your Honor.

15          THE COURT:  Sustained.

16  Q.  You weren't nervous at all that the government would charge

17  you?

18          MR. ROOS:  Objection.

19          THE COURT:  Overruled.  You can answer.

20  A.  I'm sure at some point in time I was worried about it.

21  Q.  When?

22  A.  This has been going on since 2017, so sometime between now

23  and then.

24  Q.  And sometime between now and then you didn't have a

25  non-prosecution agreement, right?

1    A.  Correct.

2    Q.  Your non-prosecution agreement was signed ten days ago?

3    A.  The current one.  I don't know if I had one before that.  I

4    can't remember.  I feel like I did.

5    Q.  Perhaps you had a proffered agreement?

6    A.  I might have.  I don't remember exactly.

7    Q.  That's not a non-prosecution agreement, is it?

8    A.  I don't remember.

9    Q.  The government first spoke to you in July of 2017?

10   A.  Yes.

11   Q.  About four and a half years ago?

12   A.  Yeah.

13   Q.  And you got a non-prosecution agreement ten days ago or so?

14   A.  Something like that.

15   Q.  And now you're here testifying?

16   A.  Yes.

17            MR. TOWNSEND:  Thank you very much.

18            THE COURT:  Any redirect?

19            MR. ROOS:  Yes, your Honor.

20   REDIRECT EXAMINATION

21   BY MR. ROOS:

22   Q.  Good afternoon.  I just want to clear something up for

23   starters.  In all your meetings with the government, was it

24   governed by something called a proffer agreement?

25   A.  I honestly don't remember.

1    Q.  Well, let me ask it a different way.  In your meetings with

2    the government, were you told that your words could not be used

3    directly against you?

4    A.  I do remember hearing that certain times.

5    Q.  And then more recently you signed a different agreement

6    that said you wouldn't be prosecuted if you did the certain

7    things you testified about on direct, correct?

8    A.  Correct.

9    Q.  You could be prosecuted though if you lied, right?

10   A.  Yes.

11   Q.  Let me start with a question about terminations.  We went

12   through a lot of questions about terminations there at the end.

13        Who had the ultimate decision making whether to

14   terminate?

15   A.  That would be upper-management.

16   Q.  Who specifically?

17   A.  Larry Doud.

18   Q.  Could you or Bill Pietruszewski terminate a customer

19   without Larry Doud's involvement?

20   A.  We could suspend one temporarily, but not terminate them.

21   Q.  And we went through -- defense counsel read a bunch of

22   names. Some of them which you recognized and sounds like some

23   of them you didn't, right?

24   A.  Yes.

25   Q.  And for those -- when a customer is suspended, does that

1   mean they're permanently not sold controlled substances?

2   A.  No, the suspension can get reversed.

3   Q.  Can we please show for the witness and the party what's

4   been marked as Government Exhibit 278.

5         Ms. Bouck, what's this?

6   A.  This is a combined report of action taken against

7   pharmacies.

8   Q.  And is this a list of controlled substance actions taken?

9   A.  Yes.

10  Q.  Was it made at or around the time of each of the

11  suspensions or terminations listed?

12  A.  The entries were added.  There were different -- a couple

13  of different spreadsheets that they were all merged together

14  onto this one.

15  Q.  But basically did you -- when a customer is terminated, did

16  you log it?

17  A.  Yes, usually.

18  Q.  And that was part of the compliance department's function?

19  A.  Yes.

20         MR. ROOS:  The government offers Exhibit 278?

21         THE COURT:  Any objection.

22         MR. TOWNSEND:  No objection.

23         THE COURT:  It will be admitted into evidence.

24         (Government's Exhibit 278 received in evidence)

25  Q.  Ms. Bouck, what's the first date on the top here?

1   A.  January 27, 2017.

2   Q.  What's the last date?

3   A.  February 10, 2020.

4   Q.  And how many terminations are there?

5   A.  Suspensions or terminations or just terminations?

6   Q.  Suspensions or termination?

7   A.  185.

8   Q.  Let's go back up to the top, please.  I just want to ask

9   you a clarifying question.

10         These are in 2017, at that point did Larry Doud have

11  any sort of active involvement in making terminations

12  decisions?

13  A.  Not that I remember.  He really wasn't at RDC anymore.  I

14  think he was down in Florida.  Not that I remember.

15  Q.  So at this point he was uninvolved?

16  A.  Correct.

17  Q.  A few moments ago on cross examination I think -- do you

18  remember having defense counsel ask you about some suspensions

19  of pharmacies?

20  A.  Yes.

21  Q.  And those were in a period before 2017, right?

22  A.  Yes.

23  Q.  Now, let me just give you an example. Organix pharmacy.  Do

24  you remember being asked a question about Organix?

25  A.  Yes.

1    Q.  Do you see a spread sheet here where three times it's

2    listed Organix, September 2017, January 2018 and February 2018?

3    A.  Yes, I do.

4    Q.  So if they were suspended back prior to 2017, why are they

5    listed on this sheet?

6    A.  Because they could have been reinstated and suspended

7    again.

8    Q.  And did that happen sometimes with pharmacies that were

9    suspended while Larry Doud was working at RDC?

10   A.  That they were suspended and then reinstated?

11   Q.  Correct.

12   A.  Yes.

13   Q.  We're going to come back to this.  Let's go through a few

14   examples.

15          I want to talk to you about the pharmacy examples that

16   defense counsel showed you emails, about.  Right.  You remember

17   when he read those emails?

18   A.  Yes.

19   Q.  So let's go through them.  Why don't we start with Casey's,

20   do you remember being asked some question about Casey's

21   Prescription Pad.

22   A.  I remember reading an email, yes.

23   Q.  Why don't I put that email up. Can we have Defense Exhibit

24   E8.  Is this one of the emails that we went through?

25   A.  Yes.

1    Q.  What's the date of this email chain?

2    A.  At the top it's April 23, 2014.

3    Q.  Do you remember what the issue was with Casey's

4    Prescription Pad?

5    A.  I do.

6    Q.  What was it?

7    A.  There was multiple prescriptions filled for prescribers

8    that were out of state that I specifically remembered was

9    prescribers from Florida.

10   Q.  Now, the date on here, like you said, is April 23, 2014.

11   Did RDC terminate controlled substance sales to Casey's

12   Prescription?

13   A.  To the best of my recollection, eventually we did terminate

14   them.

15   Q.  Do you remember when?

16   A.  No.

17   Q.  Why don't we do this.  Can we go back to Government Exhibit

18   278 and go to the third page.  Ms. Drescher in the account name

19   field, can you type in Casey's and we can just filter down to

20   that.

21           So, Ms. Bouck, when was Casey's Prescription Pad

22   terminated?

23   A.  November 9, 2018.

24   Q.  After Larry Doud left the company?

25   A.  Yes.

M1KBDOU6                          Bouck - Redirect

1   Q.  Now, between the email we saw, the defense email and this

2   termination, did RDC continue to sell controlled substances to

3   Casey's?

4   A.  Yes.

5   Q.  Can we please see what I'm going to mark as Government

6   Exhibit 1207 for identification.

7          Do you recognize this document?

8   A.  Only that it's an order of interest for Casey's

9   Prescription Pad.

10  Q.  Your email is on the top?

11  A.  Yes.

12          MR. ROOS:  The government offers 1207.

13          THE COURT:  Any objection?

14          MR. TOWNSEND:  No objection.

15          THE COURT:  It will be admitted into evidence.

16          (Government's Exhibit 1207 received in evidence)

17          MR. ROOS:  Can we publish it for the jury.

18          THE COURT:  Yes.

19  Q.  Ms. Bouck, you said this is an order of interest, right?

20  A.  Yes.

21  Q.  For Casey's?

22  A.  Yes.

23  Q.  For what drug?

24  A.  Fentanyl Duragesic.

25  Q.  What's that?

1   A.  It's a narcotic.

2   Q.  What's the date of this order of interest?

3   A.  April 25, 2016.

4   Q.  Let's take a look at another one, what's been marked for

5   identification as Government Exhibit 1208.  Is that up on your

6   screen, Ms. Bouck?

7   A.  Yes.

8   Q.  Is it an email from you?

9   A.  Yes.

10          MR. TOWNSEND:  I have no objection.

11          THE COURT:  It will be admitted into evidence.

12          (Government's Exhibit 1208 received in evidence)

13          MR. ROOS:  Can we publish it for the jury.

14   Q.  What's this, Ms. Bouck?

15   A.  It is a email that started with an order of interest.

16   Q.  What's the order of interest on?

17   A.  It's for Casey's Prescription Pad on hydrocodone.

18   Q.  What's hydrocodone?

19   A.  It's a narcotic.

20   Q.  Then do you see Elizabeth Cullen's response?

21   A.  Yes.

22   Q.  What does she say?

23   A.  She says, this is done.

24   Q.  What's your response?

25   A.  That was fast.  Lol.

```
1   Q.  What did you mean by that?

2   A.  That she took care of it quickly.

3   Q.  And what do you mean by took care of it?

4   A.  I'm guessing.  This is done makes me believe that she

5   released it.

6   Q.  Between 2014 and the time the pharmacy was shut down in

7   2018, you continued to sell them controlled substances, right?

8   A.  Yes.

9   Q.  Let's talk about another pharmacy.  You were asked about a

10  pharmacy called Compashione, right?

11  A.  Yes.

12  Q.  Let me see Defense Exhibit B11.  Do you remember being

13  asked about this?

14  A.  I do.

15  Q.  Ms. Drescher, can we go to the back page, the original page

16  of this.  That's from you, correct?

17  A.  It says thank you Jessica.  Yes, it's from me.

18  Q.  I think defense counsel already read it.  I'm not going to

19  have you reread it.  Can you summarize what the issue was with

20  Compashione pharmacy?

21  A.  The main issue with that pharmacy was the cash

22  prescriptions that they were filling for controlled substances.

23  Q.  Let's go up a little bit further to the Rich Cullen email.

24  Would you read Rich Cullen's email just to yourself.

25  A.  Okay.
```

1    Q.  Is he offering to visit the store?

2    A.  With a salesman, yes.

3    Q.  And then let's look at Larry Doud's response.  He says:  I

4    think you should go anyway, Richie, and set them straight.

5            Do you see anywhere in this email Larry Doud saying

6    you should terminate the pharmacy or suspend them?

7    A.  I did not see that in the email.

8    Q.  Do you know if he reported this pharmacy?

9    A.  At that time?

10   Q.  Yes.

11   A.  No.

12   Q.  By the way, was there any issues with Casey's in the past?

13   I'm sorry, not Casey's, Compashione?

14   A.  I recall something with them, but I'm just not sure what.

15   Q.  Let me show you for identification what's been marked as

16   Government Exhibit 1204, and take a look at the email.  Are you

17   copied on this email?

18   A.  Yes, I am.

19           MR. ROOS:  Government offers 1204.

20           THE COURT:  Any objection?

21           MR. TOWNSEND:  No objection.

22           THE COURT:  It will be admitted into evidence.

23           (Government's Exhibit 1204 received in evidence)

24   Q.  Can we zoom in on the top.  Who's the email from?

25   A.  Lanny Doud.

1  Q.  Who's it to?

2  A.  Richie Cullen and Bill Pietruszewski, as well as Bill Wood,

3  myself, Joe Brennan and Larry Doud.

4  Q.  Can you read Lanny Doud's email.

5  A.  It reads:  Guys, wasn't this a store we did an audit on and

6  she said she would do things correctly.  We were going to shut

7  her off.  She called dad and then me and I think she's friends

8  with someone who is keeping her open.

9          She is the one that calls TXX screaming to make the

10  delivery because she wasn't open when they were there I think

11  because she is working her other pharmacist job.

12  Q.  To your recollection through the end of 2016, was

13  Compashione pharmacy closed?

14  A.  I believe it was, but I don't necessarily remember when.

15  Q.  Now, let me ask you about Stanton & Negley pharmacy.  You

16  remember being asked about that?

17  A.  Yes.

18  Q.  Let's look at Defense Exhibit B13, at the bottom of this

19  email if you wouldn't mind.

20          Ms. Bouck, one of the issues here with this Stanton &

21  Negley pharmacy is they had a really high amount of cash,

22  right?

23  A.  Yes.

24  Q.  And, Ms. Bouck, do you see at the top there Larry Doud

25  writes:  I don't think this is going to end well?

1    A.  Yes.

2    Q.  Now, do you remember when it did end with Stanton & Negley?

3    A.  I don't.  They were still customers for quite a while.

4    Q.  Why don't we look at -- this is in September 2014, right?

5    A.  Yes.

6    Q.  You see what's been marked for identification as Government

7    Exhibit 1203.  Do you recognize this or at least as an email

8    sent to you?

9    A.  Yes, that was an email sent to me.

10             MR. ROOS:  The government offers 1203.

11             THE COURT:  Any objection?

12             MR. TOWNSEND:  No objection.

13             THE COURT:  It will be admitted into evidence.

14             (Government's Exhibit 1203 received in evidence)

15   Q.  The email that we saw from Larry Doud says:  This isn't

16   going to end well, in September of 2014, right?

17   A.  Yes.

18   Q.  And then, this is April of 2015, correct?

19   A.  Yes.

20   Q.  And what's going on in this email?

21   A.  An order interest was generated for Stanton & Negley for

22   buprenorphine, Suboxone, and it's an email between Elizabeth

23   Cullen and myself as to -- if we should release the order and

24   if we were going to increase their limit.

25   Q.  Elizabeth Cullen at the top says, I'll release them?

1   A.  Yes.

2   Q.  Is it your understanding that she then released the order?

3   A.  Yes.

4   Q.  Let's go back and look at Government 278.  Would you search

5   for Stanton & Negley.

6           What does this say, Ms. Bouck?

7   A.  It says that there's a red flag suspension on Stanton &

8   Negley on May 31, 2018.

9   Q.  So even though there were those issues in 2014, you didn't

10  suspend until 2018?

11  A.  That's what it looks like, yes.

12  Q.  I want to talk about the Chemist Shop.  Now, I think you

13  looked at multiple exhibits regarding the Chemist Shop; is that

14  right?

15  A.  Yes.

16  Q.  Those were from September 2015 and around then?

17  A.  If I remember correctly, yes, around September, December,

18  2015 or something like that.

19  Q.  Those weren't the first issues with the Chemist Shop

20  though, right?

21  A.  No.  Those first emails we looked at were not the first

22  issues we had.

23  Q.  Why don't we look at Government Exhibit 257 which is in

24  evidence.

25          Does this list order of interest data for 2014?

1    A.  It looks like it, yes.

2    Q.  Ms. Drescher, could we enter the customer's name and filter

3    down to Chemist Shop.  Can you scroll down so the witness can

4    see order of interest.

5            How many order of interest does it say were on Chemist

6    Shop that year?

7    A.  Forty-two, is that what I'm reading?

8    Q.  You're seeing at the bottom there?

9    A.  Yes.

10   Q.  Records found?

11   A.  Forty-two.

12   Q.  Can we scroll over to a few columns over.  And do you see

13   where it says 0I shipped item units?

14   A.  Yes.

15   Q.  What's that a reference to?

16   A.  It means how many units of the item did we generate by the

17   order of interest that we shippers to the customer.

18   Q.  Tell me how many of those were not shipped?

19   A.  There are none that were not shipped.

20   Q.  And this is the year before those emails, right?

21   A.  I believe I read 2014, yes.

22   Q.  Do you recall -- let me ask this:  Was there any back and

23   forth between whether or not the turn off chemist shop?

24   A.  There were emails back and forth on what action to take

25   against them and terminating them or being able to terminate

1    them or not.

2    Q.  And what are you referring to?

3    A.  I'm referring to the emails back and forth as far as to the

4    dispensing analysis, the Chemist Shop's refusal to allow

5    Pro Compliance to run a analysis on their dispensing or a

6    report that they would extract from their system.

7            They kept continually -- we continually saw, even

8    after Julius Morton had gone into the store red flags that they

9    were still exhibiting, and it was to the point where we needed

10   management to give us the approval to be able to terminate them

11   or not.

12   Q.  And let me show you what's marked for identification as

13   Government Exhibit 1218.  Is this email from you?

14   A.  Yes.

15   Q.  Does it appear to be a fair and accurate rendering?

16   A.  That it is from me?

17   Q.  Yes.

18           MR. ROOS:  The government offers 1218?

19           THE COURT:  Any objection?

20           MR. TOWNSEND:  No objection.

21           THE COURT:  It will be entered into evidence.

22           (Government's Exhibit 1218 received in evidence)

23   Q.  Why don't you start by reading the email.

24   A.  It reads:  Ladies and gentlemen, Larry and Joe Brennan have

25   instructed me to turn both these accounts off from controls

1   indefinitely.  Just thought you would want to know.

2   Q.  And then what's the next email up?

3   A.  It reads:  And that didn't last long.  They are back on per

4   management.

5   Q.  What do you mean by that?

6   A.  That these pharmacies were turned back on for controlled

7   substances.

8   Q.  Were they ultimately turned off?

9   A.  Eventually, yes.

10  Q.  I want to change topics wrapping up here.  Generally, I

11  want to ask you some questions.

12          Did you not report suspicious orders to the DEA

13  between 2013 and 2016?

14  A.  No, we did not.

15  Q.  Did you know that was wrong?

16  A.  Yes.

17  Q.  Why didn't you report suspicious orders to the DEA during

18  that period?

19  A.  Because we didn't report our customers.

20  Q.  Is that something you came up with or where did it come

21  from?

22  A.  I did not come up with that.  It came from management.

23  Q.  And who are you referring to?

24  A.  It came to me directly from Bill Pietruszewski.

25  Q.  And do you know if anyone told him about that?

1    A.  My understanding was that it was RDC's management.  It was

2    RDC's decision, upper-management had decided.

3    Q.  Why did you go along with something that you thought was

4    wrong?

5    A.  Because I didn't -- I didn't want to lose my job, because I

6    wanted to try and hoped that things would change.

7    Q.  Did they?

8    A.  Eventually.

9    Q.  When was that?

10   A.  In 2017.

11   Q.  Did you do diligence on all of the new and existing

12   accounts at RDC?

13   A.  Specific time or just in general?

14   Q.  From 2013 to 2016.

15   A.  No, we did not.

16   Q.  Did you know that was wrong?

17   A.  Yes.

18   Q.  So why did you do it?

19   A.  Cause that's what we were told to do.

20   Q.  Did Rochester Drug ship orders of controlled substances to

21   pharmacies you believed were diverting during that period?

22   A.  Yes.

23   Q.  Did you know that was wrong?

24   A.  Yes.

25   Q.  Why did you do it?

1   A.   Cause that's what -- I was following directions.

2   Q.   Whose direction?

3   A.   Ultimately Larry Doud's.

4   Q.   I want to cover one more topic.  You were asked questions

5   about Pro Compliance.  Do you remember that?

6   A.   Yes.

7   Q.   It was an email about a extended report.  Do you remember

8   that?

9   A.   Yes.

10  Q.   Did RDC end up signing up for that extended report?

11  A.   No.

12  Q.   How long did RDC use Pro Compliance?

13  A.   We used them for a few months after we signed that

14  contract.

15  Q.   By the way, what about Carlos Aquino, did he have a

16  significant role?

17  A.   By that time, by 2014, I think he pretty much didn't audit

18  any other stores for us.

19  Q.   One more document.  Could we see, for example,

20  Government Exhibit 1201.  Zooming in on the top.

21        Ms. Bouck, do you recognize this as an email you

22  received?

23  A.   Yes, it is.  Yes, I'm included on it.

24        MR. ROOS:  Government offers 1201.

25        THE COURT:  Any objection?

1          MR. TOWNSEND:  No, your Honor.

2          THE COURT:  It will be admitted into evidence.

3          (Government's Exhibit 1201 received in evidence)

4    Q.  Let's scroll down.  Let's zoom in on that email from Bill

5    Pietruszewski for starters, September 24, 2014.

6          Is this the email you were looking at with defense

7    counsel about those basic and expanded reports, or at least one

8    of them?

9    A.  I believe so because I remember that being the subject of

10   the email from defense.

11   Q.  Maybe it's the one below it.  Maybe we'll look at that.

12   That's the one, right?

13   A.  Yes.

14   Q.  And there's this whole discussion about how these expanded

15   reports will deal with some DEA's concerns.  Did you sign up

16   for those?

17   A.  Did I --

18   Q.  RDC?

19   A.  No, we did not do the expanded report.

20   Q.  And let's scroll up now.  Can we zoom in on the email on

21   the first page from Larry Doud.  Who's it from and who's it to?

22   A.  It is from Larry Doud to Bill Pietruszewski, Joe Brennan,

23   and I was copied on it.

24   Q.  Can you read it.

25   A.  It reads:  It is making me ill as to how much this is going

1    to cost us.  I know Don wants it and I guess everyone feels its

2    necessary.  Why does it take Jessica so long to analyze the

3    reports when they are already formatted.

4              Also, do I remember Jessica saying she could do two a

5    week or was it two a month?  Sure seems like a slow process.

6    Q.  And you received this email?

7    A.  Yes, I did.

8    Q.  What was your reaction?

9    A.  It takes time and they're not always formatted and that's

10   what it is.

11   Q.  Let's look at the very top email in the chain.  Can you

12   read Larry Doud's ultimate response?

13   A.  He said:  So why do we need Pro Compliance if we still have

14   to do the work?

15             MR. ROOS:  No further questions.

16             THE COURT:  Any further questions for this witness?

17             MR. TOWNSEND:  Yes, your Honor, very briefly.

18   RECROSS EXAMINATION

19   BY MR. TOWNSEND:

20   Q.  Ms. Bouck, on redirect you were asked a couple of questions

21   about Casey's Prescription Pad.  Do you remember that?

22   A.  Yes.

23   Q.  And you said that you recall that the issue with them was a

24   lot of out of state prescribers, right?

25   A.  That I remember there being out of state prescribers.

Bouck - Recross

1   Q.  But when you were showed Governments Exhibit 1207 and 1208,

2   these alerts weren't for out of state prescribers.  They were

3   for reaching the monthly allowance, right?

4   A.  Are those the order of interest emails?

5   Q.  Yes.

6   A.  Yes.

7   Q.  A customer could have an issue, rectify that issue and then

8   later on have a different issue that bounces in order of

9   interest, right?

10  A.  Say it again. I just want to make sure I'm understanding

11  what you're asking me.

12  Q.  Sure.  A customer could have an issue that causes you

13  concern, right?

14  A.  Yes.

15  Q.  And they could rectify that issue?  They could deal with

16  it?

17  A.  Yes.

18  Q.  And then later on there could be some other issue that

19  generates an order of interest?

20  A.  Yes, that is possible.

21  Q.  And in that situation, the new order of interest would be

22  completely separate from anything that was already fixed in the

23  past, right?

24  A.  I don't know that.

25  Q.  But it could be, right?

1    A.  It is possible.

2    Q.  If we could get Government 1203 back up.  You remember

3    testifying about this document?

4    A.  Yes.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  We'll wait for the jury to get it.  So you see this is the

2   allowed group quantity exceeded for current month alert, right?

3   A.  It is an order of interest alert.

4   Q.  Right.  And then there is an e-mail from Elizabeth Cullen

5   April 21, 2015 at 3:13 p.m.  Do you see that?

6   A.  Yes.

7   Q.  And Elizabeth Cullen writes:  I guess we should release

8   this.  Are we going to increase for them at all?  They're

9   technically still well below their average allowed limit for

10  this group.  Right?

11  A.  Yes.

12  Q.  You can take down 1203.

13          Ms. Bouck, you were asked a number of questions

14  between yesterday and today on direct and on cross regarding

15  decisions about what can be done with pharmacies and whether to

16  terminate and whether to suspend.  And when you were asked

17  who's responsible, you say upper management.  You've said that

18  a number of times, right?

19  A.  Yes.

20  Q.  And then ultimately, those decisions or the information

21  that you say comes from upper management, comes from Bill

22  Pietruszewski, right?

23  A.  Not necessarily.

24  Q.  Well, let's take the last question that you were asked.

25  Don't report suspicious orders.  Do you remember that the

1  government just asked you that question?

2  A.  What --

3  Q.  At the end of the redirect.

4  A.  I don't remember the exact question, no.

5  Q.  Said you did not report suspicious orders, right?

6  A.  Correct.

7  Q.  And then he asked who -- or why didn't you report

8  suspicious orders.  Do you remember that?

9  A.  Yes.

10  Q.  And your answer was I was directed not to, right?

11  A.  Correct.

12  Q.  And then he said by whom.  Right?  Correct?

13  A.  I think so, I think that's what he said.

14  Q.  And you responded upper management.  Right?

15  A.  Correct.

16  Q.  And then he asked, who in upper management?  And you

17  responded Bill Pietruszewski.  Right?

18  A.  Correct.

19  Q.  Because that's who told you that, right?

20  A.  In some instances, yes.

21  Q.  You just said that's who told it to you, right?

22  A.  Yes.

23          MR. TOWNSEND:  Thank you.

24          THE COURT:  Any further questions for this witness?

25          MR. ROOS:  No, thank you.

1          THE COURT:  You can step down.

2          (Witness excused)

3          THE COURT:  Ms. Rothman, what do you want to do?

4          MS. ROTHMAN:  If the jury is able to stay for a few

5    extra minutes, I think we can get this witness done.

6          THE COURT:  I will give you 20 minutes of the jury's

7    time.  So save us time for tomorrow.

8          MS. ROTHMAN:  Thank you.

9          THE COURT:  If we don't finish that witness in the 20

10   minutes, he'll have to come back.

11         Ladies and gentlemen, I am going to ask for your

12   patience.  We have a witness from Rochester who has been here

13   and we're trying to get rid of this witness.  Supposed to be a

14   short witness.  And hopefully we can do it in 20 minutes so why

15   don't you call that witness.

16         MS. ROTHMAN:  The government calls Sam Alaimo.

17         Mr. Alaimo, you can take off your mask if you'd like.

18         THE COURT:  Go ahead.

19    SAMUEL ALAIMO,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows:

22   DIRECT EXAMINATION

23   BY MS. ROTHMAN:

24   Q.  Good afternoon.

25   A.  Good afternoon.

1   Q.  Where do you live?

2   A.  Tioronda, New York.

3   Q.  Did there come a time when you started working at a company

4   called Rochester Drug Co-Operative?

5   A.  Yes.

6   Q.  When was that?

7   A.  May 2015.

8   Q.  What was your job title?

9   A.  Credit manager.

10  Q.  Were you in the compliance department?

11  A.  No.

12  Q.  What did you do as a credit manager?

13  A.  As a credit manager, I reviewed possible new accounts that

14  were coming in, new accounts being new pharmacies.  I would

15  check their creditworthiness, see if they're good enough to be

16  a customer of RDC.  In addition to that, I made sure --

17  followed up on payments that are due on a weekly basis.  And if

18  there is any issues with the customers, I would work the issues

19  out with them that are payment related.

20  Q.  Do you know what a credit limit is?

21  A.  Yes.

22  Q.  What is it?

23  A.  A credit limit is the amount of credit we extend to them so

24  they can place orders.

25  Q.  What would happen if a customer hit their credit limit at

1   RDC?

2   A.  Well, if they're not past due, we would review again and I

3   would review with the management as to being allowed to

4   increase their credit limit so they could continue purchasing

5   product.

6   Q.  What's a credit hold?

7   A.  A credit hold is when -- a credit hold can be based on the

8   customer is past due and they are not making their payments.

9   That's the majority of it.

10  Q.  Did you ever put credit holds on customer accounts?

11  A.  Yes.

12  Q.  Did Mr. Doud ever get involved in decisions to lift those

13  credit holds?

14  A.  Yes.

15  Q.  What would happen?

16  A.  We would discuss it, and depending on, you know, the

17  circumstances, and who the customer is, it would be increased

18  or not.

19  Q.  Did Mr. Doud ever ask you to lift those credit holds?

20  A.  Yes.

21  Q.  Did you follow directions?

22  A.  Yes.

23  Q.  Who did you report to at RDC?

24  A.  Larry Doud.

25  Q.  Can you describe his management style.

1    A.  Well, when issues did arise, he did get involved.  You

2    know, there were some decisions that he made, that, you know,

3    where I came from, I wouldn't have, I don't agree with some of

4    them.  But, you know, if he said to raise them, I would raise

5    them.

6    Q.  Do you know someone named Jessica Pompeo?

7    A.  Yes.

8    Q.  How do you know her?

9    A.  She was in the compliance department.  She sat right across

10   from my office.

11   Q.  Did Ms. Pompeo ever speak with you about releasing orders

12   that had been held by the compliance department?

13   A.  Yes.

14   Q.  Do any of those occasions stand out in your memory?

15   A.  Yes.

16   Q.  What do you recall?

17   A.  I recall that -- again, my office is right across from

18   Jessica's and there is a glass window between each of the

19   offices.  I know Larry was in there.  It was behind closed

20   doors so I don't know anything with regards to the

21   conversation.  But when Larry left, Jessica did come into my

22   office, all upset, her eyes were red and breaking down crying

23   that she had to release an order that she didn't want to

24   release.

25   Q.  Did she say why she released it?

1   A.  She released it because Larry told her to.

2            MS. ROTHMAN:  Your Honor, I have no further questions.

3            THE COURT:  Cross-examination of this witness.

4   CROSS-EXAMINATION

5   BY MR. TOWNSEND:

6   Q.  Good afternoon, Mr. Alaimo.

7   A.  Good afternoon.

8   Q.  You testified that Larry Doud would occasionally have you

9   release credit orders?

10  A.  Correct.

11  Q.  Larry Doud was the CEO?

12  A.  Yes.

13  Q.  It was his decision?

14  A.  Yes.

15  Q.  Nothing illegal about that?

16           MS. ROTHMAN:  Objection, your Honor.

17           THE COURT:  I'm sorry, what was the question?  I don't

18  know if he even heard the question.

19  Q.  There is nothing illegal about that?

20           MS. ROTHMAN:  Objection.

21           THE COURT:  He can answer that question.

22  A.  There's nothing illegal.

23  Q.  You reported to Larry Doud, right?

24  A.  Yes.

25  Q.  And you said there was one time that Jessica Pompeo came

M1L3DOU7

```
1    into your office and she was upset?
2    A.  Yes.
3    Q.  When was that?
4    A.  That was when Larry was in her office, and made her release
5    an order that was on compliance hold.
6    Q.  Sure.  When did that meeting take place?
7    A.  During work.
8    Q.  In 20 --
9    A.  I couldn't, I couldn't give you a date.
10   Q.  Can you give me a year?
11   A.  I can't -- well, I'll tell you what.  It was anywhere 2016
12   and 2017 when Larry was there.
13   Q.  It may be 2017?
14   A.  I can't tell you specifically.
15   Q.  Okay.  But it sticks out in your mind?
16   A.  Oh, yeah, yeah.
17            MR. TOWNSEND:  Thank you very much.
18   A.  That's the first time she ever came in crying, anybody came
19   crying to my office.
20            MR. TOWNSEND:  Thank you, Mr. Alaimo.
21            THE COURT:  Any further questions for this witness?
22            MS. ROTHMAN:  No.
23            THE COURT:  Thank you very much, you can step down.
24            (Witness excused)
25            THE COURT:  Thank you for your patience.  We wanted to
```

1   finish with this witness and get him back home and we'll

2   continue tomorrow morning at 9:45.  And we've been taking long

3   days because I am trying to keep us on schedule.  We are on

4   schedule and I am going to see if tomorrow I can tell you we

5   are ahead of schedule.

6        Don't discuss the case, keep an open mind.  I'll see

7   you tomorrow morning at 9:45.

8        (Jury excused)

9        THE COURT:  I'm trying to figure out how long we'll

10  sit tomorrow.  How many witnesses do you have tomorrow that you

11  think you can get through.

12       MR. ROOS:  Theoretically we're prepared to get through

13  all our witnesses.  Should I only give one name?

14       THE COURT:  I want to know how many.

15       MR. ROOS:  I think we are aspiring to call Kerry

16  Whitmore who is a law enforcement agent.  Barbara Castro, who

17  will be very short.  I don't know what, maybe all in an hour

18  between everyone.  And then Jeremy Rosenman who is just a

19  summary witness.  He is going to be walking the jury through

20  some summary charts of e-mails.  I can tell you his direct is

21  two hours.

22       THE COURT:  Make sure if you have new exhibits, make

23  sure you guys figure out whether there are objections to these

24  exhibits so we don't have to stop in the middle.

25       MR. ROOS:  We sent the summary charts over a few days

1   ago.  And I think for Castro it's just a picture or two?

2           THE COURT:  So tomorrow, I'll probably let them go a

3   little early.  But, I want to get at least those witnesses in

4   if we can.  I might not let them go before lunch, so you can

5   get those witnesses in.  But if we finish those witnesses say

6   3, some time between 3 and 4.

7           MR. ROOS:  So, just to be sure I understand your Honor

8   correctly.  We don't need a fourth witness sort of in the box

9   tomorrow, if we make it through those three.

10          THE COURT:  How long do you think those three will

11  take to present?

12          MR. ROOS:  One question may be for defense counsel

13  would be --

14          THE COURT:  Assume that they are going to take twice

15  as long as you.

16          MR. ROOS:  Yes.  One reason I ask --

17          THE COURT:  The cross takes twice as long as the

18  direct.  How long is the direct, double that.

19          MR. ROOS:  I was going to ask, sometimes that rule

20  doesn't hold for a summary witness.  I don't know if they have

21  any thoughts on --

22          THE COURT:  Well, I wouldn't worry about that. I think

23  in general that's a good rule of thumb.  So what do you think

24  based on that?

25          MR. ROOS:  Based on that, we won't make it through all

M1L3DOU7

1     three of them.

2             THE COURT:  If we assume that the defense will be the

3     same amount of time as the prosecution, then I assume we can

4     get through those witnesses by midafternoon.

5             MR. ROOS:  Part of the reason I am asking is I think

6     either Pietruszewski or Paulsen, one of these other fact

7     witnesses will be the next, the fourth in line.  So, I am

8     trying to understand if we should have that person on standby.

9             THE COURT:  No.  Not for tomorrow.  Tomorrow let's

10    just, let's try to make sure, let's try to get through those

11    three witnesses.  If we get through three witnesses a day, I'm

12    real confident we are doing well.  So, let's try to get through

13    those three witnesses tomorrow.  However early we finish them,

14    that's when I'll send the jury home.  Okay?

15            I'll see you tomorrow morning 9:45.

16            (Adjourned until January 21, 2022, at 9:45 a.m.)

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2     Examination of:                              Page

 3      JESSICA POMPEO BOUCK

 4     Direct By Mr. Roos . . . . . . . . . . . . . 443

 5     Cross By Mr. Townsend  . . . . . . . . . . . 475

 6     Redirect By Mr. Roos . . . . . . . . . . . . 596

 7     Recross By Mr. Townsend  . . . . . . . . . . 615

 8      SAMUEL ALAIMO

 9     Direct By Ms. Rothman  . . . . . . . . . . . 620

10     Cross By Mr. Townsend  . . . . . . . . . . . 624

11                         GOVERNMENT EXHIBITS

12     Exhibit No.                              Received

13      263, 264   . . . . . . . . . . . . . . . . 471

14      278  . . . . . . . . . . . . . . . . . . . 598

15      1207 . . . . . . . . . . . . . . . . . . . 602

16      1208 . . . . . . . . . . . . . . . . . . . 603

17      1204 . . . . . . . . . . . . . . . . . . . 605

18      1203 . . . . . . . . . . . . . . . . . . . 607

19      1218 . . . . . . . . . . . . . . . . . . . 610

20      1201 . . . . . . . . . . . . . . . . . . . 614

21                         DEFENDANT EXHIBITS

22     Exhibit No.                              Received

23      M2   . . . . . . . . . . . . . . . . . . . 501

24      B17  . . . . . . . . . . . . . . . . . . . 504

25      B18  . . . . . . . . . . . . . . . . . . . 507
```

```
 1    B21    . . . . . . . . . . . . . . . . . 512
 2    B22    . . . . . . . . . . . . . . . . . 518
 3    M196   . . . . . . . . . . . . . . . . . 519
 4    B7     . . . . . . . . . . . . . . . . . 543
 5    B8     . . . . . . . . . . . . . . . . . 545
 6    B9     . . . . . . . . . . . . . . . . . 548
 7    B10    . . . . . . . . . . . . . . . . . 550
 8    B11    . . . . . . . . . . . . . . . . . 553
 9    B12    . . . . . . . . . . . . . . . . . 556
10    B13    . . . . . . . . . . . . . . . . . 558
11    B14    . . . . . . . . . . . . . . . . . 571
12    B16    . . . . . . . . . . . . . . . . . 575
13    B19    . . . . . . . . . . . . . . . . . 577
14    B20    . . . . . . . . . . . . . . . . . 578
15    B24    . . . . . . . . . . . . . . . . . 582
```