M1LBDOU1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          19 Cr. 285 (GBD)

5   LAURENCE F. DOUD III,

6                  Defendant.
                                           Trial
7   ------------------------------x

8                                          New York, N.Y.
                                           January 21, 2022
9                                          9:45 a.m.

10  Before:

11
                        HON. GEORGE B. DANIELS,
12
                                           District Judge
13                                         -and a Jury-

14                        APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  NICOLAS T. ROOS
17       ALEXANDRA ROTHMAN
         THOMAS S. BURNETT
18       Assistant United States Attorneys

19  ROBERT C. GOTTLIEB
    DERRELLE M. JANEY
20  PAUL R. TOWNSEND
         Attorneys for Defendant

21
    Also Present:  Sunny Drescher
22                 Jacqueline Hauck
                   Paralegal Specialists
23                 Special Agent George Burdzy, DEA
                   Investigator Kathleen Whitmore, DEA
24

25

M1LBDOU1

1          (Trial resumed)

2          (Jury not present)

3          THE COURT:  Are we ready to proceed, and you still

4    intend to try to do three witnesses today, government?

5          MR. BURNETT:  Yes, your Honor.

6          THE COURT:  Any issues that we need to address

7    beforehand?

8          MR. GOTTLIEB:  Yes, please, your Honor.  Thank you

9    very much.  When I woke up this morning at 4:30, I see that the

10   government was good enough to send a letter motion timed at

11   11:50 p.m. last night.

12         THE COURT:  Well, I haven't seen it yet, so you're one

13   step ahead of me.

14         MR. GOTTLIEB:  I confess that I did not respond in a

15   timely manner.

16         THE COURT:  Can we print that out, please.

17         MR. GOTTLIEB:  What I will say, if the government had

18   given me a call, I believe I would have indicated their motion

19   in *limine* which certainly could have been filed when *motions in*

20   *limine* were due.  The *motion in limine* pertains to their first

21   witness, and they want to preclude us from introducing a report

22   that she prepared.

23         I have no intention at this point seeking to introduce

24   the report.  Now, of course, that is subject to the government

25   opening the door.  So if the government opens the door and I

633

M1LBDOU1

1    believe it's permitted, I will request permission to introduce

2    it.  But at this point, we don't have to debate it because I

3    don't intend to do it.

4              THE COURT:  Thank you.

5              MR. GOTTLIEB:  I know there's another issue that was

6    also received before we woke up.

7              THE COURT:  Yes.

8              MR. JANEY:   your Honor, the second issue pertains to

9    the second witness that is scheduled to my understanding for

10   today.  It's the government's summary witness.  I'm taking note

11   that your Honor has indicated that your Honor has not read the

12   letter.  I can certainly wait until there is a break and your

13   Honor has had an opportunity to take a look at the letter.  And

14   I say that only --

15             THE COURT:  That's in the letter that's submitted last

16   night?

17             MR. JANEY:  Yes, your Honor.  And on balance, I think

18   most of the issues, at least as I discern the letter at 7:30

19   this morning, deal with issues pertaining to the summary

20   witness and the cross examination of that witness.  My comments

21   and objections to it, your Honor, are substantive.  I have at

22   least seven.

23             And so if the Court would like for us to proceed, get

24   the first witness on the stand before the summary witness is

25   brought on.  But, your Honor, as my father use to say, my

M1LBDOU1

1    comments with respect to the summary witness are not light and

2    are quite important.

3              THE COURT:  Well, they can be heavy, but I hope they

4    will be brief.

5              MR. JANEY:  They will be, your Honor.

6              THE COURT:  What's the nature of the issue, the

7    dispute?  Just tell me that in general.

8              MR. JANEY:  In sum and substance, I'll give the nature

9    of the dispute as I understand it, and I'll also present our

10   concerns at another level.  The nature of the dispute is that

11   the government wants to limit the scope of cross examination in

12   a couple of respects.

13             Let me say in the first instance to address one of the

14   issues that the government seems to raise by implication.  We

15   have -- I'm doing the cross examination of the summary witness.

16   I have no intention of reading emails into the record.  That's

17   one of the concerns.  I have no intention of introducing

18   documents that are not admitted in evidence through the

19   government's summary witness, so we can take that off the

20   table.

21             THE COURT:  Where's the fight?

22             MR. JANEY:  The fight, your Honor, will arguably be in

23   an area where the defense's position is that it is permitted

24   under the law to mark for identification and to show the

25   summary witness on cross examination materials that the summary

M1LBDOU1

1    witness may not have included in the summary.  That's number

2    one.

3              THE COURT:  You intend to do that?

4              MR. JANEY:  I do intend to do that.

5              THE COURT:  And you intend to challenge the accuracy

6    of the summary by indicating certain information was left out?

7              MR. JANEY:  That's correct, your Honor.

8              THE COURT:  Okay.

9              MR. JANEY:  Number two, your Honor, with respect to

10   the information, as I understand it, there's a binder of

11   exhibits that I anticipate could be put through the summary

12   witness.  I have a binder here. I've tabbed it.  I'm prepared

13   to show your Honor by way of example some of the things we have

14   objection to, if I may hand this up to the Court.

15             THE COURT:  All right.  I'm not sure what you want to

16   do with it, and we can explore this later.  I'm not sure what

17   you want to do with it that you believe that you and the

18   government are at odds.

19             MR. JANEY:  This is the second aspect.  This piece of

20   it, your Honor, is not so much about what I want to do with it

21   as much as where my objections will be, and these are what I

22   anticipate to be the government's documents.  They were

23   produced to us as materials that are in connection with the

24   summary witness.

25             THE COURT:  You're objecting to the tabbed exhibits.

M1LBDOU1

1        You're objecting to those exhibits coming into evidence?

2                MR. JANEY:  Yes, your Honor.  And by way of example,

3        the second tab --

4                THE COURT:  Let's not do that now.  Give me a chance

5        to look at it.  When are you going to deal with this witness?

6        When is the government calling this witness?

7                MR. ROOS:  He's the third witness.  And just to be

8        clear, your Honor, there were two letters.  One related to a

9        pretty narrow issue that Mr. Gotlieb addressed concerning

10       Linden Care and some DEA reports.  That has to do with the

11       first witness.

12               The second letter theoretically has to do with both

13       law enforcement witness, but in particular the summary witness,

14       and that has to deal with the scope of cross and the role of

15       completeness and what is permissible and not permissible.  And

16       just to be clear, the second letter doesn't necessarily -- we

17       weren't sure what they're going to do on cross.  It's us

18       defining what we think is permissible on cross, not a specific

19       objection because we don't know what their plans are yet.

20               THE COURT:  I only have one letter in front of me and

21       that letter ends with, Accordingly, the government will

22       respectfully submit that the Court should not permit the

23       defense to offer the DEA report.

24               MR. ROOS:  That's the first letter that Mr. Gotlieb

25       referred to.

M1LBDOU1

1            THE COURT:  There's a second letter?

2            MR. ROOS:  I think it's attached to the same email

3    that was sent to your chambers, and it's the docket right

4    before the one you have.

5            THE COURT:  Let me look at those.

6            MR. JANEY:  Your Honor, I would just simply say in

7    connection with the comment that the government just made, the

8    letter -- and perhaps your Honor may view it differently, the

9    letter does, regardless of what we may or may not have

10   attempted to do, the government makes very strong statements

11   about its attempt to limit the scope of the cross examination

12   of this witness, that is, the summary witness, in a way that is

13   not permissible.

14           THE COURT:  Well, let me read the letters because I

15   don't know the issue yet.

16           MR. JANEY:  Understood, your Honor.

17           THE COURT:  We'll address it either after the first

18   witness or at least before that witness testifies.

19           MR. JANEY:  Thank you, your Honor.

20           THE COURT:  I don't want to keep the jury waiting any

21   longer.  Let's bring them in and let's proceed with the next

22   witness.

23           MR. BURNETT:  Would you like the witness in the box

24   before the jury comes in?

25           THE COURT:  No.  You can bring the witness into the

M1LBDOU1

1   front row, that way when you call the witness, he or she will

2   step up.  I'm trying to put this in context.  The defense said

3   they do not intend to do something, does that moot one of these

4   letters or not?

5            MR. GOTTLIEB:  I believe it moots letter number one in

6   regard to the investigator's report.

7            THE COURT:  That's the defense exhibit intent.

8            MR. GOTTLIEB:  Yes.

9            THE COURT:  So you don't intend to do what their

10  objecting to in their letter?

11           MR. GOTTLIEB:  Not at this point, your Honor.

12           THE COURT:  At any point do you expect to do this?

13           MR. GOTTLIEB:  Subject to what the heck happens on any

14  redirect or direct.

15           THE COURT:  Okay.

16           MR. GOTTLIEB:  At this point, we have no intention of

17  introducing the report.

18           THE COURT:  Let me concentrate on the other letter and

19  we can address that when I read it.  I think the jury is here.

20  Let's go ahead and bring them in and continue.

21

22

23

24

25

1                  (In open court; jury present)

2                  THE COURT:  Ladies and gentlemen, what I think we're

3       going to try to do is get through three witnesses.  Whenever we

4       finish those three witnesses, then we'll adjourn for the day,

5       and I think we're on schedule.

6                  I think if we get through these three witnesses today

7       we might even be a little bit ahead of schedule, so I'm going

8       to see if we can efficiently move through these witnesses.  If

9       we get through them early, we'll adjourn early.

10                 Government, call the next witness.

11                 MR. BURNETT:  Yes, your Honor. The government calls

12      Kerry Whitmore.

13                 THE COURT:  Please step up into the box.

14      KERRY WHITMORE,

15           called as a witness by the government,

16           having been duly sworn, testified as follows:

17                 THE COURT:  You can inquire.

18      DIRECT EXAMINATION

19      BY MR. BURNETT:

20      Q.  Good morning, Ms. Whitmore.

21      A.  Good morning.

22      Q.  Where do you currently work?

23      A.  I'm currently the group supervisor for the DEA's Long

24      Island district offices diversion regulatory group.

25      Q.  How long have you been with the DEA for?

1    A.   Twelve years.

2    Q.   What was the first job you did in the DEA when you started

3    out?

4    A.   When I first started with the DEA, I was assigned to the

5    New York field division's D61 regulatory group.

6    Q.   What's that?

7    A.   A regulatory group's main mission is to conduct checks on

8    DEA registrants which include manufacturers, distributors,

9    importers, exporters, pharmacies, narcotic treatment programs,

10   doctors, anyone who has the ability to produce, order or

11   dispense controlled substances.

12   Q.   About how long were you in that role for?

13   A.   I was in that role for approximately a year and a half.

14   Q.   What did you do next?

15   A.   I was then transferred to the New York field division

16   tactical diversion squad.

17   Q.   What's a technical diversion squad?

18   A.   The main objective of a tactical diversion squad is to

19   investigate the criminal aspect of diversion of the controlled

20   substances, either dirty doctors, rogue pharmacies, things like

21   that.

22   Q.   How longer were you in the tactical diversion squad for?

23   A.   I was in the tactical diversion squad in New York and

24   Westchester up until February of 2021.

25   Q.   Just to be clear about the timeframe, around when did you

1    start in the tactical diversion squad?

2    A.  I started in the tactical diversion squad in August of

3    2012.

4    Q.  What's your current apposition?

5    A.  My current position is group supervisor.

6    Q.  What does that job involve?

7    A.  I oversee a group of approximately six diversion

8    investigators whose job it is to go out to DEA registrants to

9    make sure that they are in compliance with DEA rules and

10   regulations and the Code of Federal Regulations when it comes

11   to matters of controlled substances.

12   Q.  So from your work in the DEA, are you familiar with a

13   company called Rochester Drug Co-Operative or RDC?

14   A.  Yes.

15   Q.  And when did you first learn about RDC?

16   A.  I first learned about RDC around July of 2013.

17   Q.  How did you learn about it?

18   A.  I learned about RDC during a subsequent investigation.

19   Q.  Sorry, how did RDC first come to your attention?

20   A.  RDC first came to my attention when I was out in the field

21   visiting pharmacies, pulling prescriptions for our case against

22   Dr. Robert Terdiman at the time.

23         Dr. Terdiman was a doctor who was overprescribing

24   oxycodone 30 milligrams.  It was my job to go to the pharmacies

25   and pull paper prescriptions that he wrote.

1   Q.  What were some of the pharmacies you went to when you were

2   doing that investigation of Dr. Terdiman man?

3   A.  Two of the pharmacies that I visited during that time were

4   Webster pharmacy located in the Bronx, and Russo's pharmacy

5   which was located in Queens.

6   Q.  Why did you go to those two places?

7   A.  We visited those two pharmacies because they were

8   considered high volume pharmacies, meaning that they dispensed

9   a high volume of controlled substances in the Schedule II.  We

10  went there because they were filling a lot of prescriptions

11  written by Dr. Tiderman.

12  Q.  Now, how did RDC come up when you visited those pharmacies?

13  A.  When I visited these pharmacies, one of the basic questions

14  I ask them is, who their distributor is or who their

15  distributors are.

16  Q.  What did you find out when you asked that question?

17  A.  I found out that both these pharmacies were being supplied

18  by RDC.

19  Q.  What did you do at those pharmacies?

20  A.  When at those pharmacies, I ask them for their order

21  history, both of these pharmacies utilized our CSOS ordering

22  system which is the electronic way for pharmacies to order

23  schedule II controlled substances from distributors.

24  Q.  What do those reports look like just to give a little bit

25  of a picture?

1    A.   It's a sheet showing us order by order of what product, a

2    schedule II that they ordered, so a line that would show that

3    "X" number of bottles of a certain count of say oxycodone or

4    fentanyl or any type of CII from the distributor on what date

5    and what date it was delivered.

6    Q.   Why did you ask for those reports?

7    A.   That's basic background that we ask just to see if we can

8    get a sense of volume that the store does.

9    Q.   What, if anything, did you notice after you asked for those

10   reports?

11   A.   After I asked for those reports, I took them back to the

12   field division where I compared them to our platform known as

13   ARCOS, which is the Automated Reports and Consolidated Ordering

14   System.  It's a system that distributors have to report to of

15   what they sold to their client, the pharmacy.

16   Q.   Why did you compare the reports you got from the pharmacies

17   to the ARCOS reports that you had back at your office?

18   A.   I just wanted to make sure that the numbers were true and

19   accurate.

20   Q.   What did you find?

21   A.   I found that the number did not match and that RDC was not

22   supplying the required reporting records to the DEA on sales.

23   Q.   Now, did there come a time after you noticed that

24   discrepancy that you visited RDC?

25   A.   Yes.

1    Q.  When did you go there?

2    A.  July of 2013.

3    Q.  Who, if anyone, did you go with?

4    A.  I went with, at that time, my group supervisor Eric Triana

5    (ph) and NYPD task force Danny Pawilkowski.

6    Q.  What was the purpose of that July 2013 to RDC?

7    A.  To find out why they were not reporting their sales of CII

8    controlled substances to the DEA.

9    Q.  Who, if anyone, did you speak with when you were there?

10   A.  We spoke with two individuals, Joe Brennan and Jessica

11   Pompeo.

12   Q.  Was there anyone else you communicated with not in person

13   when you were there?

14   A.  We did speak with Bill Pietruszewski on the telephone

15   because he was on vacation.

16   Q.  What, if anything, did you tell the people you spoke with

17   about the reporting issues that you saw?

18   A.  I laid out in front of them what was provided to me as the

19   ordering history from the pharmacies, and I then showed them

20   compared to what I could see on my end through ARCOS, the

21   printouts, and I showed them that the numbers did not match.

22   Q.  Now, you mentioned that you identified that discrepancy

23   after you went to particular pharmacies as part of an

24   investigation; is that right?

25   A.  Yes.

1    Q.  What, if anything, did you tell the employees at RDC about

2    the pharmacies that you visited?

3    A.  That these pharmacies were high volume and showing red

4    flags.

5    Q.  And what pharmacies specifically do you recall mentioning

6    to the employees at RDC you spoke with?

7    A.  Besides the two that I ran through ARCOS, we also mentioned

8    Plainfield pharmacy.

9    Q.  Why did you mention Plainfield pharmacy?

10   A.  Plainfield pharmacy at that time was under investigation by

11   the DEA for red flag activity.

12   Q.  Now, after you did that July 2013 visit to RDC, did you

13   continue to investigate pharmacies and doctors as part of your

14   regular work with the DEA?

15   A.  Yes.

16   Q.  What, if anything -- did RDC come up during the course of

17   your investigations?

18   A.  Yes.

19   Q.  How did it come up?

20   A.  While visiting some of these pharmacies that we were either

21   establishing cases on or had current cases on, we found a lot

22   of these pharmacies were being supplied by RDC, either from the

23   beginning or by already being cut off by another distributor,

24   such as Amerisource Bergen, McKesson, Cardinal Health.  A lot

25   of these pharmacies showed what we would have defined as red

1  flag activity, that's why we're going into these places.

2  Q.  Let's break that down a little bit.  When you say a lot of

3  the pharmacies that you were investigating saw red flag

4  activity, what was some of the red flag activity you saw?

5  A.  Some of the red flag activity that we look for in our

6  investigations are pharmacies that are filling high volumes of

7  the controlled substances for say oxycodone 30 milligrams,

8  Percocet, fentanyl, drugs usually that are abused.

9        We also look for prescriptions that are in numerical

10 order. When New York was using paper prescriptions, we would

11 see them all coming from the same doctor, at the same time,

12 written for the same drug for high volume.  These prescriptions

13 were being paid for in cash.  Some of these pharmacies were

14 filling for patients outside of what would be a close radius to

15 their location.

16 Q.  Why are those red flags?

17 A.  We consider these red flags because of the high volume, the

18 cash, and the distance the people would have to travel from say

19 either the doctors office or from their home to have these

20 prescriptions filled.

21 Q.  Now, I think you mentioned that you also saw RDC was

22 supplying to pharmacies that had been cut off by other

23 distributor; is that right?

24 A.  Correct.

25 Q.  Could you describe how you saw that?

1   A.   Before going into these pharmacies, I would make sure I

2   would check ARCOS beforehand just to have an idea of what

3   volume I was looking at that they were ordering.  And from

4   ARCOS I could see some of these pharmacies were cut off say

5   mid-year from a McKesson or Amerisource Bergen and would be

6   picked up instantly by RDC.

7   Q.   Do you recall any of the pharmacies in particular that

8   you've been referring to?

9   A.   Some pharmacies, for example, would be Clarkstown

10  pharmacies 1 and 2, Aneddonna pharmacy and Platinum pharmacy.

11  Q.   Now, after you noticed these other issues, did there come a

12  time when you made a second visit to RDC?

13  A.   Yes.

14  Q.   And when did that visit take place?

15  A.   That was around November of 2016.

16  Q.   Who, if anyone, did you go with?

17  A.   At that time I went with diversion investigator Debra

18  Caufield of the DEA Buffalo office and diversion investigator

19  Rob Schlee of the Long Island district office.

20  Q.   What kind of visit was that?

21  A.   That visit was actually what we call a cyclic investigation

22  I was asked to participate in.  A cyclic investigation occurs

23  on a DEA registrant every two to five years, depending on what

24  they do.  It's to make sure that they are in compliance with

25  the CF, Code of Federal Regulations, and DEA's policy with

1   controlled substances.

2            We go in and conduct an audit of their controls.  We

3   make sure everything that they themselves have purchased

4   have -- go out to the correct chain.  We make sure that their

5   security is up to date and working; that their vault and cages

6   meet the specks laid out in the CFR; and that there are no

7   possibilities for diversion, either in-house or in transit.

8   Q.  Now, before we talk about the specific visit to RDC, I want

9   to focus a little bit more on what you can and can't see during

10  one of these audits.

11           What are some of the compliance issues that you can

12  identify during the type of audit you just described?

13  A.  We can see, if depending on the volume, we can see if

14  there's an overage or shortage when it comes to controlled

15  substances, meaning that there's an issue somewhere.  We can

16  see if their security measures are up to standard, and if

17  they're taking some of those proper precautions that there's no

18  issue.

19  Q.  When you say security measures, what are you referring to

20  there?

21  A.  Security measures meaning that their alarm works; that they

22  have guards on duty; that their swipe keys are correct, that

23  not everyone has access to the vault and cages that are not

24  supposed to have access.  It's supposed to be very limited who

25  has access to the controlled substances to keep from diversion

1    occurring.

2    Q.   And what kind of compliance issues can you not identify

3    during one of these audits?

4    A.   You can't go through say due diligence files on a pharmacy

5    while there.  You can not see if their clients are -- all their

6    pharmacies are all legitimate, things like that.

7    Q.   And why can't you see that?

8    A.   It just takes too much time.  It's a very deep dive that

9    takes a tedious and very detailed oriented review.

10   Q.   Now, when you went to RDC -- sorry, when was this visit

11   again, that you took, the second one?

12   A.   This was in November of 2016.

13   Q.   When you were there, who did you talk with?

14   A.   At that time again we spoke with Joe Brennan and Jessica

15   Pompeo.

16   Q.   What, if any, of RDC's policy were given to you when you

17   were there?

18   A.   We asked for RDC's SOP, which is standard operating

19   procedures when it comes to how they handle controlled

20   substances, who they utilize to transport controlled substances

21   from point A to point B, what they have in place when it comes

22   to notifying in-house and DEA about their suspicious orders,

23   pretty much the whole workings of the company.

24   Q.   And do you recall during that visit if you asked for RDC's

25   policies about tracking and reporting suspicious orders?

1    A.   Yes.

2    Q.   What happened after you asked for the documents?

3    A.   We reviewed the documents while sitting in the conference

4    room.

5    Q.   I'm going to show you and request to publish for the jury

6    Government's Exhibit 276 which is already in evidence.

7             You see the document on the screen here?

8    A.   Yes.

9    Q.   Do you recognize it?

10   A.   Yes.

11   Q.   How do you recognize it?

12   A.   This was what was handed to us while during our cyclic

13   investigation.

14   Q.   And what is this?

15   A.   This is RDC's due diligence and suspicious ordering

16   monitoring reporting policies and procedures.

17   Q.   Did you talk with Jessica Pompeo and Joe Brennan about this

18   policy?

19   A.   We asked them to explain it to us.

20   Q.   What did they say?

21   A.   This is what they have in writing as to what they're

22   supposed to be doing when identifying orders that are outside

23   the norm.

24   Q.   Thank you.  Ms. Hauck, you can that down.  Now, after that

25   November 2016 visit to RDC, did there come a time when you

1    started to interview other employees at RDC?

2    A.  Yes.

3    Q.  Why did you interview them?

4    A.  We wanted to get a better idea of RDC's position on

5    compliance.

6    Q.  Is that a typical part of a cyclic audit that you just

7    described?

8    A.  No.

9    Q.  Why did you do it?

10   A.  We did it because at that point we knew that RDC was not

11   supplying DEA with suspicious orders, so we wanted to get other

12   employees' feelings on RDC's compliance.

13   Q.  And when did those interviews start taking place?

14   A.  Approximately December of the same year.

15   Q.  Did you notice anything change about RDC after you started

16   interviewing people at the company?

17   A.  Once RDC caught wind of our investigation, they then

18   started supplying the DEA with suspicious orders.

19          MR. GOTTLIEB:  Your Honor, I object to that and ask

20   that it be stricken.  Certainly when they became aware of.

21          THE COURT:  Overruled.  You can cross examine her on

22   that.

23   Q.  I'd like to switch gears.  I'm going to show you what's

24   been marked at Government Exhibit 907.  Ms. Hauck, could you

25   just please show that to the parties, the Court and the

1    witness.  Do you recognize this?

2    A.  Yes.

3    Q.  What is it?

4    A.  It's a synopsis of emails.

5    Q.  And is this synopsis based on the contents of lengthy

6    documents?

7    A.  Yes.

8    Q.  Have you reviewed those documents to make sure that the

9    chart truthfully summarizes those materials?

10   A.  Yes.

11             MR. BURNETT:  Your Honor, the government offers 907.

12             THE COURT:  Any objection?

13             MR. GOTTLIEB:  Your Honor, objection.  Can we have a

14   sidebar, please?

15             THE COURT:  I thought we didn't have an issue with

16   regard to this?

17             MR. GOTTLIEB:  Your Honor, this is a different

18   document.

19             THE COURT:  All right. Come on.

20             (Continued on next page)

21

22

23

24

25

1            (In chambers)

2            THE COURT:  I'm sorry.  This is new to me.

3            MR. GOTTLIEB:  This document is knew to us also.

4            Your Honor, apparently this witness who's being called

5   as a fact witness, what she did, now she's being asked to

6   identify a selected document, 907, with just a very few emails

7   that she didn't prepare.  I don't believe she prepared.  I

8   don't know who prepared it.

9            But even if she prepared it, if it's part of a report,

10  I would have assume that the government would object if I

11  wanted to introduce any hearsay statements, any outside

12  reports.  I'm not sure how this document comes in through this

13  witness.

14           THE COURT:  It's unclear to me what you're objecting

15  to?

16           MR. GOTTLIEB:  There's no evidentiary basis.  She is

17  not the proper witness to identify -- she's not the competent

18  witness to now testify about this.

19           MR. BURNETT:  Your Honor, if I can explain.  All the

20  underlying exhibits here are already in evidence.

21           THE COURT:  Is this exhibit in evidence?

22           MR. BURNETT:  This is the exhibit I attempted to offer

23  in evidence.  The underlying document that it refers to are

24  already in evidence.  This is a summary chart of documents that

25  are already introduced in evidence and have been admitted.  I

1    plan to have the witness walk through the summary chart to save
2    the time of having to pull up each exhibit individually and
3    like excerpt little portions of it.
4            THE COURT:  What does this witness have to do with
5    this document?
6            MR. BURNETT:  The witness, for this portion of her
7    testimony, is effectively acting as a summary witness.
8            THE COURT:  Did she prepare this document?
9            MR. BURNETT:  What she did was, she took the chart and
10   went through the documents and made sure that the documents are
11   accurately excerpted on the chart the way any summary witness
12   would.  It seemed efficient to have a witness do it who's
13   talking about the topic.  We could call a separate summary
14   witness.  It seemed pointless.
15           THE COURT:  The exhibits that are in the blue section,
16   the exhibit numbers, are all those exhibits in evidence?
17           MR. BURNETT:  Yes.
18           THE COURT:  And the "From" and the "To," are these all
19   these exhibits emails?
20           MR. BURNETT:  Yes.
21           THE COURT:  From the "From" column, the document
22   that's already in evidence indicates that these are the
23   witnesses who sent these emails?
24           MR. BURNETT:  The "From" reflects who the from line is
25   in the email. The "To" reflects who the recipients were on the

1    email, and the content part reflects a portion of the emails.

2              THE COURT:  And the content portion, I see that from

3    my quick review substantially it is quotations from those

4    emails.

5              MR. BURNETT:  Basically some of them are several page

6    emails.  Others are a bit shorter.  What we did, we took

7    excerpts and put it there to more efficiently move through the

8    content of the document.

9              THE COURT:  Have you put in this chart, any summary of

10   emails for any content about those emails that's not in

11   quotation?

12             MR. BURNETT:  Only to the extent that it's like a

13   bridge between like words I think.

14             THE COURT:  Like what?

15             MR. BURNETT:  For instance here, the last one.  It

16   says:  Jessica writes, Jessica Pompeo, a quotation, and then it

17   says in notes, because there are note sections to the email,

18   and another quotation.  So the "in notes and what Jessica

19   writes" is what we have.

20             THE COURT:  So what does this witness have to do with

21   this chart?

22             MR. BURNETT:  This witness was just testifying about

23   the topic of materials that she received from the DEA.  She

24   wasn't involved in these underlying emails.

25             THE COURT:  Where are you going to go with this, with

1    this witness.

2              MR. BURNETT:  I'm going to have her read the contents

3    of the chart.

4              THE COURT:  And you're asking her what?

5              MR. BURNETT:  She's acting as a summary witness with

6    respect to these documents.

7              THE COURT:  Who prepared this chart?

8              MR. BURNETT:  I prepared the chart, and she looked at

9    the document and made sure that they were accurately reflected

10   on the chart the way a summary witness would.

11             THE COURT:  Does she have any substantive testimony to

12   give with regard to this chart?

13             MR. BURNETT:  She's acting as a summary witness with

14   respect to this chart.

15             THE COURT:  Other than her saying that she compared

16   this chart to those emails and this accurately reflects the

17   content word for word in the quotation of those emails, what

18   other relevant testimony does she have to give with regard to

19   this chart?

20             MR. BURNETT:  The emails themselves are the relevant

21   material.  That's what she is explaining to the jury.  The same

22   as if we were to put a paralegal on to do the chart.

23             THE COURT:  That's what I'm asking you, what is she

24   going to say after you admit this document into evidence?

25             MR. BURNETT:  She's going to read the chart.

1          THE COURT:  Other than that, you have any substantive

2     questions for her?

3          MR. BURNETT:  Not about this chart.

4          THE COURT:  Why is that inadmissible?

5          MR. GOTTLIEB:  Your Honor, we were notified that there

6     is going to be a summary witness this afternoon.  That's the

7     third witness today.  We were not notified that this witness

8     was now going to also serve as a summary witness.  And to make

9     it even worse, that does not accurately reflect the emails.

10         They have cherrypicked for this witness -- they have

11    cherrypicked certain quotes in an email and an email thread, so

12    it's misleading.  It is a summary chart where she has no

13    connection to it.  She's not been involved in it

14         MR. JANEY:  Moreover, your Honor, to add, that

15    document was produced from the government with other documents

16    in connection with what purported to be the summary witness.

17    There was only one summary witness identified in the

18    government's case in chief.

19         MR. BURNETT:  Your Honor, this was produced I think

20    last week.  It summarizes a pretty small number of documents.

21    She has the exact same connection to it that any summary

22    witness would have connection to it.  If they think we're

23    misquoting the documents, they have the documents and all the

24    documents are in evidence.

25         MR. GOTTLIEB:  Your Honor, we would ask -- this is so

1    misleading.  It is so cherrypicking.  It grossly misstates the

2    emails, which the emails go beyond those few words.  She is not

3    and she was not intended -- we were not noticed that she was

4    the summary witness.

5              THE COURT:  I'm not sure that's a basis for the

6    objection that you -- that they want to highlight certain

7    portions of documents that are in evidence, and you believe

8    that in fairness you should have the opportunity to add further

9    information from those documents.

10             MR. GOTTLIEB:  She has no connection to those

11   documents.  She wasn't a party to it.

12             THE COURT:  That's not required.

13             MR. GOTTLIEB:  She is getting up there, she has no

14   role in it.  She won't even be able to answer questions about

15   what else is in the email.

16             THE COURT:  Well, why does that make the document

17   inadmissible?

18             MR. GOTTLIEB:  Because it is a created document that

19   she has no connection to.  The summary witness we were told was

20   this other individual.  We received this document apparently

21   with all the summary witness documents.

22             MR. BURNETT:  That part's just wrong. We produced

23   summary charts.  We didn't say these documents are going with a

24   particular witness.

25             MR. JANEY:  The demonstrative on its face is

1    misleading about the information that it purports to present.

2              THE COURT:  It's only misleading if it purports to be

3    something that it is not.  It doesn't purport to be the

4    complete emails.  It purports to be a summary chart of certain

5    portions of the emails.  That is not inaccurate if she says

6    that.  That is not an inaccurate representation of what it's

7    supposed to be.

8              If you want to a similar chart that either puts

9    different quotations with regard to those emails or additional

10   quotations that you think in fairness should be added, I can

11   understand that, but I don't agree with you that somehow if she

12   indicates that what the answers to the questions that I ask, is

13   where does this information come from and what does it mean,

14   and she says these are the quotations from those emails.  I

15   checked them and this is an accurate chart.  I don't see why

16   that's inadmissible.

17             MR. JANEY:  To the extent that it is not the entire

18   email, obviously the intent is to use the demonstrative to make

19   certain assertions about the truth of that document for the

20   purposes of the jury's deliberation.  To the extent that the

21   document is incomplete and only excerpt portions of those

22   emails that only go to what the government wants her to read

23   into the record, it violates the rule of completeness.

24             THE COURT:  No, it only violates the rule of

25   completeness if you don't have an opportunity to complete the

1   record.

2          MR. BURNETT:  And the complete documents are in

3   evidence already.

4          THE COURT:  The jury has these documents.  I don't

5   agree.  I think it's as if there was an email saying I robbed a

6   bank, and you're saying that the email is inadmissible because

7   it doesn't have that portion that says, I went to lunch

8   yesterday with Joe.  That's not an argument.

9          The complete documents are in evidence.  If you want a

10  similar chart, if you want attack this chart as being somehow

11  misleading to the jury, which I really haven't heard a specific

12  argument that there's something in here that's either

13  inaccurate or somehow gives the jury a different impression

14  than they have from the evidence that they have -- particularly

15  since, I might agree with your argument if these emails were

16  not in evidence.

17         But the fact that these complete emails are in

18  evidence before the jury gives you full opportunity to present

19  your own charts or to demonstrate to the jury with the complete

20  documents that are in evidence during your examination or

21  during your summation that there's a different interpretation

22  to give to these words in context, you have the right to do

23  that.

24         MR. JANEY:  Can I ask, your Honor, just so we don't

25  have to do this two or three more times and given that we're

1    now knowing for the first time as we stand here that there is a

2    summary witness.  Is she going to have any other

3    demonstratives?

4            MR. BURNETT:  The only other documents she'll testify

5    to is two documents in addition to this one, the ARCOS

6    spreadsheet that she reviewed as part of her work on this case

7    beforehand.

8            THE COURT:  Does the defense have that document?

9            MR. JANEY:  What exhibit is it?

10            MR. BURNETT:  348.

11            THE COURT:  What's the other one?

12            MR. BURNETT:  348A.  It is a pivot table that she made

13    of.

14            THE COURT:  What else?

15            MR. BURNETT:  That's it.

16            MR. GOTTLIEB:  Before we begin cross examination, I'd

17    like to take a break to pull these documents.  Certainly if the

18    government was capable at 11:50 p.m. to send us notice about a

19    motion this morning, they could have indicated that through

20    this witness, who's now suddenly transformed into a summary

21    witness is going to be shown these different demonstrative

22    documents, I'm going to ask for a very short break so I could

23    pull these documents.

24            THE COURT:  Fine.  I'll give you that opportunity, but

25    their obligation is not to tell you that this witness is

1    necessarily going to talk about this document.  Their

2    obligation is to make sure you have those documents that they

3    have as exhibits that they intend to offer into evidence.  And

4    to sort of say, I expected it to come through witness B instead

5    of witness A is not a particularly strong argument that somehow

6    it's inadmissible.

7              So I'll give you an opportunity.  If you claim

8    surprise, and the only surprise that you claim is not surprise

9    of content of the document or surprise about the exhibit, but

10   surprise that this witness is the one that it's going to come

11   in through rather than some other witness, if you want that

12   opportunity, I'll give you that opportunity.

13             MR. GOTTLIEB:  Thank you.

14             THE COURT:  I'm going to overrule your objection.  I

15   don't think you stated a particular objection that gives me

16   ground to exclude this document or even argues any real

17   potential prejudice to you because these documents -- you don't

18   argue that these documents aren't otherwise admissible.  You

19   had those documents.  If you wanted to make that argument, you

20   could have had that argument last week.  The argument that this

21   isn't the witness you expected to do is not a particular strong

22   argument, so I'm going to overrule the objection, and this will

23   be my position if they laid a proper foundation with regard to

24   these other documents through this or some other witness.

25             (Continued on next page)

1                    (In open court, jury present)

2                    THE COURT:  You can continue.

3    BY MR. BURNETT:

4    Q.  Ms. Whitmore just to reorient ourselves, you have on the

5    screen Government 907 which is not in evidence.  Can you remind

6    the jury what this is?

7    A.  A synopsis of emails.

8    Q.  Is this a summary of excerpts of the contents of those

9    emails?

10   A.  Yes.

11   Q.  And specifically it lists out Government Exhibit 6, 6A to

12   C, Government Exhibit 20, Government Exhibit 47, Government

13   Exhibit 50, Government Exhibit 64 and Government Exhibit 67,

14   which are all in evidence.  Do you see that?

15   A.  Yes.

16   Q.  Have you reviewed the documents to make sure the chart

17   truthfully summarize those excerpts from those materials?

18   A.  Yes.

19                    MR. BURNETT:  Your Honor, at this time, the government

20   offers 907.

21                    THE COURT:  In light of our previous discussion, I

22   will admit that exhibit over objection.

23                    (Government's Exhibit 907 received in evidence)

24                    MR. BURNETT:  And I request to publish it to the jury.

25                    THE COURT:  Yes.

1   Q.  Ms. Whitmore, what does each row on this chart reflect the

2   high level?

3   A.  Email date, the from, who the email was sent to and then

4   the content of said email.

5   Q.  And it looks like it list about six emails; is that

6   correct?

7   A.  Yes.

8   Q.  Who selected the documents for this chart?

9   A.  AUSA.

10  Q.  And what did you do with those documents and this chart?

11  A.  I reviewed them.

12  Q.  What did you review them for?

13  A.  To make sure they were correct.

14  Q.  Let's start with the first entry.  What exhibit is that?

15  A.  That's Government Exhibit 6 and then 6A through C.

16  Q.  According to this chart, when was this email sent?

17  A.  March 28, 2012.

18  Q.  Who was it sent from and to?

19  A.  It was sent from Bill Pietruszewski to Dale Shick, who was

20  at that time the group supervisor for the diversion group of

21  the Buffalo regional office.

22  Q.  Just to orient ourselves here, Ms. Hauck, could you please

23  put up Government Exhibit 6 side by side with this.  If you

24  could zoom in on the header information for Government Exhibit

25  6.  Do you see here that this is an email dated Wednesday,

1   March 28, 2012?

2   A.  Yes.

3   Q.  And who is it from and to?

4   A.  Bill Pietruszewski to Dale Shick.

5   Q.  Is that the same information that's reflected here in the

6   chart?

7   A.  Yes.

8   Q.  Thank you, Ms. Hauck, you can put down Government Exhibit

9   6, and if you could zoom in, please, on the first row.

10          Using this chart, could you please read an excerpt of

11   what Mr. Pietruszewski wrote to Dale Shick on March 28, 2012?

12   A.  Bill Pietruszewski writes to Dale Shick:  Enclosed two

13   letters for you to view regarding what SOP, RDC has in place to

14   monitor narcotic and controlled sales.

15          I sent a letter via mail on April 8, 2009, to inform

16   the DEA how our program works.  In looking at this letter, I

17   would also like to add that if RDC receives an order of

18   interest at any time of the day, that order is put on hold.

19   Once the order is put on hold, it then sends the sales

20   personnel in that territory an email and also sends an email to

21   their narcotic control department at RDC.

22          This order is not released until RDC receives the

23   proper information from the store.  Once RDC has researched

24   this information, it is when it is determined if the order is

25   released.  if the order would not be released due to

1   insufficient information, we then consider this an order of

2   suspicion and will phone the DEA about the order in question.

3   Q.  Thank you.  Let's take that down and now turn to the next

4   row of the chart.  What government exhibit does this reflect?

5   A.  This is Government Exhibit 20.

6   Q.  When's that from?

7   A.  This email was from July 30, 2013.

8   Q.  Who wrote it?

9   A.  This was from Joe Brennan.

10  Q.  Who did it go to?

11  A.  This email went to Larry Doud and Bill Pietruszewski.

12  Q.  What was the subject of the email?

13  A.  The subject was DEA.

14  Q.  Could you please read what Mr. Brennan wrote to the

15  defendant and Mr. Pietruszewski?

16  A.  Joe Brennan writes:  Debbie and Bill want to see our SOPs

17  on good faith detecting orders of interest, slash, suspicious

18  orders, how we adjust the purchase sealing, either up or down

19  on controls, SOP for the flags used to adjust the aggregated

20  totals when a customer exceeds their limit on oxycodone in a

21  30-day period, i.e., prevent the store from ordering oxys until

22  documentation given, etc.

23  Q.  And according to the email, what did Mr. Doud write in

24  response?

25  A.  Larry Doud responds:  Bill, are you around to help?  Sounds

M1LBDOU1                      Whitmore - Direct

1    like we may have some problems.

2    Q.  Let's take that down and turn to the next entry in the

3    chart.  Which government exhibit is this an excerpt of?

4    A.  This is Government Exhibit 47.

5    Q.  When is it from?

6    A.  May 21, 2015.

7    Q.  And whose the email from and to?

8    A.  This email is from Bill Pietruszewski to Larry Doud, Joe

9    Brennan, Mr. Kirker and Mr.Emmans.

10   Q.  What is the subject of the email according to this chart?

11   A.  The subject was DEA inspection.

12   Q.  What does the portion of the email that's excerpted here

13   say?

14   A.  Bill Pietruszewski writes:  Well, today was our DEA

15   inspection by the New York office of diversion.  Three

16   investigators came out.  They were pleased with the security of

17   the building and the processes that RDC have in place once we

18   start shipping out of Fairfield.  They told us to make sure we

19   always do our due diligence.

20   Q.  Let's turn now to the next entry.  Which Government Exhibit

21   is this entry excerpt?

22   A.  Government Exhibit 50.

23   Q.  When is that from?

24   A.  July 22, 2015.

25   Q.  Who wrote the email and who did it go to?

M1LBDOU1                          Whitmore - Direct

1   A.  Bill Pietruszewski wrote the email, and it was to Larry

2   Doud, Joe Brennan, Mr. Behannan, Lanny Doud and Jessica Pompeo.

3   Q.  What did Mr. Pietruszewski write according to this excerpt

4   the chart?

5   A.  Bill Pietruszewski writes:  We shared our process with the

6   DEA in Newark of how we look at three month dispense prior to

7   turning a customer onto controls when we apply for our DEA

8   license for Fairfield.

9   Q.  Now, let's take that down and look at the next entry.

10          Do you see that this reflects an excerpt from

11   Government Exhibit 64?

12   A.  Yes.

13   Q.  That's from July 20, 2106, correct?

14   A.  Yes.

15   Q.  Who was the email from and to?

16   A.  It was from Bill Pietruszewski to Larry Doud, Joe Brennan

17   Mr.Emmans, Mr. Kirker and Mr. White.

18          (Continued on next page)

19

20

21

22

23

24

25

1    Q.  What was the subject line of that e-mail?

2    A.  Subject was Fairfield DEA audit.

3    Q.  Please read the portion of the e-mail that's excerpted here

4    on the chart.

5    A.  Bill Pietruszewski writes:  On June 23, 2016, we had three

6    DEA diversion investigators arrive at about 10 a.m. to conduct

7    an audit for Rochester Drug Co-Operative New Jersey.  DEA

8    requested all SOP for due diligence.  One agent read the

9    document the first day on due diligence ask of customers.

10   Q.  Let's take that down now and turn to the last row of the

11   chart.  Do you see there is an excerpt from Government Exhibit

12   67?

13   A.  Yes.

14   Q.  What's the date of that?

15   A.  November 11, 2016.

16   Q.  Who is it from and who is it to?

17   A.  It's from Jessica Pompeo to Mr. Kirker and Joe Brennan.

18   Q.  What's the subject line of the e-mail?

19   A.  Subject line is DEA audit notes November 8 and 9th, 2016.

20   Q.  Is that the audit that you referred to earlier, the one you

21   conducted?

22   A.  Yes.

23   Q.  Could you please read the excerpt of what Ms. Pompeo wrote.

24   A.  Jessica writes:  Below are the notes I have from the recent

25   audit performed by the DEA on Tuesday and Wednesday this week,

M1l3dou2                    Whitmore - Direct

 1   the 8th and 9th of November.  I have also attached our current

 2   SOP.  In notes:  Not reporting suspicious orders, determine and

 3   writing into our SOPs specific steps and actions taken and

 4   after what steps are customers reported.

 5           MR. BURNETT:  Thank you.  You can take this down and

 6   take down Government Exhibit 907 as well.

 7   Q.  So, I'd like to wrap up on a different topic.  As a DEA

 8   agent, are you familiar with a system called ARCOS?

 9   A.  Yes.

10   Q.  Is that the system that you referred to a few times earlier

11   during your testimony today?

12   A.  Yes.

13   Q.  What does ARCOS stand for?

14   A.  Automated Reports and Consolidated Ordering System.

15   Q.  At a high level, what is that system?

16   A.  It is the platform maintained by the DEA where distributors

17   are required to report on a quarterly basis their sales of CII

18   narcotics and some III non-narcotics to the DEA.

19   Q.  What are some of the things that DEA agents use the ARCOS

20   system for?

21   A.  To get an idea of what distributors are supplying to

22   pharmacies and what pharmacies themselves are ordering.

23           MR. BURNETT:  Ms. Hauck, if can you please pull up

24   just for the witness, the parties and the Court, Government

25   Exhibit 702.

M1l3dou2                    Whitmore - Direct

1          Your Honor, we have here a certification regarding the

2     authenticity of certain government exhibits, specifically

3     Government Exhibits 343 through 359, as well as Government

4     Exhibit 364, certifying that those exhibits are true and

5     correct copies of excerpts of ARCOS data.  The government

6     offers the certification and would like to offer those exhibits

7     in evidence.

8          MR. GOTTLIEB:  No objection.

9          THE COURT:  It will be admitted into evidence.

10          (Government's Exhibit 702, 343 through 359, 364

11     received in evidence)

12          MR. BURNETT:  You can take this down, no need to

13     publish for the jury.

14          Instead I'd like to turn to Government Exhibit 348

15     which was just offered in evidence.  If you can publish that

16     for the jurors as well, please.

17     Q.  Ms. Whitmore, do you see the spreadsheet on your screen,

18     Government Exhibit 348?

19     A.  Yes.

20     Q.  Have you seen this before?

21     A.  Yes.

22     Q.  What is it?

23     A.  It is a spreadsheet showing the sales of fentanyl from

24     distributors to pharmacies.

25     Q.  Where was this spreadsheet from, what's the data source?

M1l3dou2                         Whitmore - Direct

1   A.  From ARCOS.

2   Q.  So, let's walk through a few of the rows just to get our

3   bearings.  So, row A, do you see that's called supplier ID?

4   A.  Yes.

5   Q.  What does the information there reflect?

6   A.  The supplier ID is a numeric number assigned to a

7   distributor, along with the title of RD -- Rochester Drug

8   Co-Operative.

9   Q.  When is it is an RDC sale, that's when there's Rochester

10  Drug Co-Operative in this chart?

11  A.  Rochester Drug is spelled out.

12  Q.  Do you see that column D is labeled buyer name?

13  A.  Yes.

14  Q.  What does the information in that column reflect?

15  A.  That would be the name of a pharmacy who purchased.

16  Q.  The pharmacy who purchased from the supplier that's lined

17  up here?

18  A.  Yes.

19  Q.  And now, columns F and G, what's the information in those

20  columns?

21  A.  It would be the year and month this transaction occurred.

22  Q.  How about the next column, labeled DU, column H, what's

23  that?

24  A.  That is dosage unit.

25  Q.  What does dosage unit mean?

1    A.   Dosage unit would be the count of how many -- dosages were

2    ordered in that transaction.

3    Q.   So just as an example, what does the first row in column H

4    here show?

5    A.   180.

6    Q.   180 what?

7    A.   180 dosage units.

8    Q.   And finally column I, what's column I?

9    A.   Column I is the NDC calculated gram of fentanyl.

10   Q.   Could you describe what you mean by that.

11   A.   It would be how much fentanyl was in those 180 dosage

12   units.

13   Q.   So using this chart, is it possible to calculate the total

14   weight of fentanyl that RDC sold to each of its pharmacy

15   customers between 2012 and 2016?

16   A.   Yes.

17   Q.   Is it possible to calculate the total weight of fentanyl

18   that RDC sold over all between 2012 and 2016?

19   A.   Yes.

20   Q.   Have you done that?

21   A.   Yes.

22   Q.   How did you go about doing it?

23   A.   We had to calculate from the microgram to the gram of what

24   each pharmacy ordered, and then the total number.

25   Q.   Let's take a look at that.

1          MR. BURNETT:  Ms. Hauck, you can please publish just

2     for the witness -- not just for the jury, just for the witness

3     and the parties, what's been marked as Government Exhibit 348A.

4     Q.  What is this?

5     A.  The sale of fentanyl by RDC to their pharmacies.

6     Q.  How did you prepare this document?

7     A.  I reviewed it.

8     Q.  Sorry.  Where does it come from?

9     A.  Oh, ARCOS.

10    Q.  Now, and what from ARCOS specifically does it come from?

11    A.  It comes from the sales reported by RDC to the DEA.

12    Q.  Is that the same ARCOS chart we just looked at, Government

13    Exhibit 348?

14    A.  Yes.

15         MR. BURNETT:  At this time the government offers

16    Government Exhibit 348A.

17         THE COURT:  Any objection?

18         MR. GOTTLIEB:  No objection.

19         THE COURT:  It will be admitted into evidence.

20         (Government's Exhibit 348A received in evidence)

21         MR. BURNETT:  Ms. Hauck, if you can please publish

22    this now for the jury.

23    Q.  Let's start with the second tab here that's titled slide

24    17.  Ms. Whitmore, is this just the same chart we were looking

25    at a minute ago?

M1l3dou2                          Whitmore - Direct

1   A.  Yes.

2   Q.  So let's look at sheet 1 now.  Is that a pivot table

3   created from the chart?

4   A.  Yes.

5   Q.  Let's start with the top of the chart here where it says

6   supplier ID.  What's in the supplier ID filter on this chart?

7   A.  It was filtered just to show RDC's sales.

8        MR. BURNETT:  Ms. Hauck, if you can please scroll to

9   the bottom there to see what's checked off.

10  Q.  Do you see Rochester Drug Co-Operative is checked off in

11  those boxes?

12  A.  Yes.

13       MR. BURNETT:  Thank you, Ms. Hauck, you can take that

14  down.

15  Q.  Now, do you see there a column that says row labels?

16  A.  Yes.

17  Q.  What's all the information below that row labels?

18  A.  Those are the names of all the pharmacies that RDC sold

19  fentanyl to.

20       MR. BURNETT:  Thank you, Ms. Hauck.  You can scroll

21  back up to the top, please.

22  Q.  Do you see there are a number of columns after those

23  pharmacies are listed?

24  A.  Yes.

25  Q.  What's each one of those columns for?

1   A.   Those were the years that the transactions occurred.

2   Q.   What's the information that's listed out in the actual body

3   of the chart?

4   A.   The weight of fentanyl sold to pharmacies by RDC.

5   Q.   Is that between 2012 and 2016?

6   A.   Yes.

7   Q.   What's that last column there reflect?

8   A.   The grand total of those years put together.

9            MR. BURNETT:   Ms. Hauck, if you can scroll now to the

10  bottom of the chart.

11  Q.   Do you see in row 754 there is a row that's titled grand

12  total?

13  A.   Yes.

14  Q.   What's the information in that row?

15  A.   It's the grand total of fentanyl sold by RDC to the

16  pharmacies.

17  Q.   Is that in each year as well as over all between 2012 and

18  2016?

19  A.   Yes.

20  Q.   So, according to this chart, what's the total amount of

21  fentanyl weight that RDC sold to its customers between 2012 and

22  2016?

23  A.   A total weight of 11,476.72.

24  Q.   Of what?

25  A.   Grams, sorry.

M1l3dou2                          Whitmore - Direct

1   Q.  Now, from your time in the DEA, are you familiar with a

2   product called Subsys?

3   A.  Yes.

4   Q.  What's the active ingredient of Subsys?

5   A.  Fentanyl.

6   Q.  Is fentanyl the same drug that's addressed in this chart

7   here?

8   A.  Yes.

9   Q.  About how much fentanyl is in a typical dose of Subsys?

10  A.  About 100 micrograms.

11  Q.  So just to kind of give some sense of scope here.  About

12  how many doses of Subsys are in just 1 gram of fentanyl?

13  A.  About 10,000.

14          MR. BURNETT:  No further questions, your Honor.

15          THE COURT:  Cross-examination?

16          MR. GOTTLIEB:  Your Honor, we discussed to take a

17  short break.

18          THE COURT:  Sure.  Ladies and gentlemen, we're going

19  to take a short break at this time.  Don't discuss the case,

20  keep an open mind.  I'll give you a 10-minute break.

21          (Jury excused)

22          THE COURT:  You can step down.  We'll take 10 minutes.

23          (Recess)

24          THE COURT:  Are we ready to proceed, Mr. Gottlieb?

25          MR. GOTTLIEB:  Yes.

1          THE COURT:  Do we need to address further any of the

2    government's letters at this point?

3          MR. GOTTLIEB:  No.

4          THE COURT:  All right.  The witness can be brought

5    back.

6          Jury entering.

7          (Jury present)

8          THE COURT:  Cross-examination, Mr. Gottlieb.

9          MR. GOTTLIEB:  Thank you very much.

10   CROSS-EXAMINATION

11   BY MR. GOTTLIEB:

12   Q.  Good morning.

13   A.  Good morning.

14   Q.  Ms. Whitmore, I want to start off right from where the

15   government did.  And if we could put on the screen Government

16   Exhibit 907 for everyone, I believe that's in evidence.

17   Ms. Whitmore, this document --

18   A.  I can't see it yet.

19   Q.  I'm sorry.

20   A.  My monitor says it's going to sleep.

21          THE COURT:  Is it on everyone else's screen?  Why

22   don't you give her the hard copy.

23          THE WITNESS:  Thank you.

24   Q.  You have the hard copy the way it used to be done, the

25   piece of paper of Government Exhibit 907?

M1l3dou2                    Whitmore - Cross

1  A.  Yes.

2  Q.  Now, that is a chart of certain e-mails, correct?

3  A.  Yes.

4  Q.  Did you prepare this?

5  A.  No.

6  Q.  Did you have any role in preparing this document?

7  A.  No.

8  Q.  Who prepared this document?

9  A.  The AUSAs.

10 Q.  When did you see this document that was prepared by the

11 prosecutors?

12 A.  During my prep.

13 Q.  When was that prep?

14 A.  Over the last few weeks.

15 Q.  Did you at any point tell the prosecutors what should or

16 should not be in what eventually turned out to be Government

17 Exhibit 907?

18 A.  No.

19 Q.  Who made the decisions about what to include from those

20 e-mails and not to include from those e-mails?

21 A.  The AUSAs.

22 Q.  Is it fair to say that these -- this chart that was

23 prepared by the government does not include in each of the

24 categories, the full e-mails?

25 A.  Can you just say that -- can you repeat that?

M1l3dou2                          Whitmore - Cross

1    Q.  This document only includes excerpts, portions, correct?

2    A.  Yes.

3    Q.  Portions that were selected by the government to present in

4    this document and to ask you about, correct?

5    A.  Yes.

6    Q.  So let's go now to the top one, March 28, 2012, Government

7    Exhibit 6, 6A-C.  With help can we put that on the screen?  Is

8    your computer awake yet?

9    A.  No.

10   Q.  Are we ready?

11         THE COURT:  She has the binder.  It's still not coming

12   up on her screen.

13         MR. GOTTLIEB:  Thank you.

14   Q.  Ms. Whitmore, first, this particular e-mail is from Bill

15   Pietruszewski to Dale Shick, correct?

16   A.  Yes.

17   Q.  Larry Doud is not on this e-mail, correct?

18   A.  Yes, correct.

19   Q.  And this e-mail from Bill Pietruszewski to Dale Shick, and

20   Dale Shick is who?

21   A.  Dale Shick was the group supervisor for the diversion

22   control group, the Buffalo regional office.

23   Q.  This is dated March 28, 2012?

24   A.  Correct.

25   Q.  It reads Mr. Shick, hello, I enclosed two letters for you

M1l3dou2                          Whitmore - Cross

to review regarding what SOP RDC has in place to monitor

narcotic and control sales.  I sent a letter via e-mail on

April 8, 2009, to inform the DEA how our program works.

          If we can stop there.  Is it fair to say that in this

e-mail, it's Bill Pietruszewski who is sending the letters

regarding the SOP, correct?

A.  Yes.

Q.  And the letter -- withdrawn.  The e-mail also indicates in

that second line that "I sent a letter."  That refers to Bill

Pietruszewski, correct?

A.  Yes.

Q.  And after that sentence, it goes on, in looking at this

letter:  I would also like to add that if RDC receives an order

of interest at any time of the day, that order is put on hold,

and then it continues what Bill Pietruszewski is saying to Dale

Shick, correct?

A.  Yes.

Q.  It ends with I hope -- that means Bill Pietruszewski,

correct?

A.  Yes.

Q.  That this helps explain what RDC has in place for SOP

orders and if you would have any further questions, please let

me know.

          Correct?

A.  Yes.

M1l3dou2                          Whitmore - Cross

1    Q.  Now, at this time, Bill Pietruszewski is who?

2    A.  He was in charge of compliance or -- that position I would

3    assume.

4    Q.  He was in charge of compliance at RDC, correct?

5             MR. BURNETT:  Objection.  Foundation.

6             THE COURT:  Overruled.  You can answer.

7    A.  Yes.

8    Q.  Let's go to the second part of this document prepared by

9    the government.  July 30, 2013.  Actually, my apologies, if you

10   can look at Government Exhibit 6A, because that's referenced in

11   that top category.  That first section.  6A.

12            Do you see that?

13   A.  Yes.

14   Q.  Now, that is a letter to the Drug Enforcement

15   Administration, specifically to agent Bill Kane dated April 8,

16   2009, correct?

17   A.  Yes.

18   Q.  And it is signed, if you go to -- you see it on the bottom

19   it is signed by William Pietruszewski, correct?

20   A.  Yes.

21   Q.  Larry Doud's name is nowhere to be seen on this document,

22   correct?

23   A.  Correct.

24   Q.  He's not referred to in any way in this document, correct?

25   A.  Correct.

M113dou2                    Whitmore - Cross

1    Q.   Let's go to the next one.  July 30, 2013, Government

2    Exhibit 20.  Do you have that in hard copy?

3    A.   Yes.

4    Q.   This is the first part of this thread, Government Exhibit

5    20, reads on July 30, 2013, at 5:12, Joe Brennan wrote -- by

6    the way, who is Joe Brennan?

7    A.   Joe Brennan was the CEO I believe of RDC.

8    Q.   Was he CEO or did he hold a different title, if you know?

9    A.   I don't remember what his title was at that exact time.

10   Q.   And here Joe Brennan wrote:  Bill, Debbie and Bill want to

11   see our SOPs.  Goes on.

12               1.   Good faith.

13               2.   Detecting orders of interest/suspicious orders.

14               3.   How we adjust the purchase ceiling either up or

15   down on controls.

16               4.   SOP for the flags used to adjust the aggregate

17   totals when a customer exceeds their limit on oxycodone in a 30

18   day period.  i.e. prevent the store from ordering oxys until

19   documentation is given, etc.

20               And it is signed by Joe, correct?

21   A.   Yes.

22   Q.   And do you know who Bill is referring to?

23   A.   You mean in his e-mail?

24   Q.   Yes.

25   A.   As Debbie and Bill?  The diversion investigators from the

M1l3dou2                              Whitmore - Cross

1    Buffalo office.

2    Q.  But it's addressed to Bill.

3    A.  Bill Pietruszewski, sorry.

4    Q.  Head of compliance, correct, as you understood it?

5    A.  As I understood it.

6    Q.  Now, after that is sent, that's the e-mail Larry Doud to

7    Joe Brennan and to Bill Pietruszewski, on July 30, 2013.

8    Writes:  Bill, are you around to help.  Sounds like we may have

9    some problems.

10           That's the extent of what Larry Doud says, correct?

11   A.  Yes.

12   Q.  Now, having seen that e-mail, during your investigation,

13   did you ever speak to Larry Doud and ask him what he actually

14   meant by saying that?

15           MR. BURNETT:  Objection.

16           THE COURT:  Overruled.  You can answer.

17   A.  This -- can you repeat the question?  This was after my

18   original visit to RDC.

19   Q.  You indicated after your original visit, you continued to

20   investigate, correct?

21   A.  Yes.

22   Q.  And during that investigation, did you ever speak to Larry

23   Doud and ask him at any time what he meant by saying "sounds

24   like we may have some problems"?  Yes or no?

25           MR. BURNETT:  Objection.

M1l3dou2                          Whitmore - Cross

1          THE COURT:  Overruled.  You can answer.

2   A.   This e-mail was after my original visit to RDC on the ARCOS

3   issue, and then after that, we would not directly speak to him.

4   Q.   What do you mean we wouldn't directly speak to him?  Did

5   you try to speak to him?

6   A.   He was not around.

7   Q.   Let's go step by step.  At any time while you were involved

8   in this investigation, looking at data, going to RDC, going

9   back to RDC, speaking to Joe Brennan, Jessica Pompeo and other

10  employees, did you, during that period of time, ever speak to

11  Larry Doud?

12          MR. BURNETT:  Objection.

13  A.   No.

14  Q.   Did you ever ask --

15          MR. BURNETT:  Sidebar.

16          THE COURT:  You have to stand up.

17          MR. BURNETT:  Just a brief sidebar, your Honor?

18          THE COURT:  No.  Not at this time.  Let's go on to the

19  next question.  I'm going to let that question stand and answer

20  stand.  She said no.

21          Let's move on.

22  Q.   Let's go to the next part of this chart that was put

23  together by the government.  May 21, this would be Government

24  Exhibit 47.  Government Exhibit 47, you have it in front of

25  you?

M1l3dou2                     Whitmore - Cross

A.   Yes.

Q.   Again, this is from Bill Pietruszewski to Larry Doud, Joe
Brennan, Ed Kirker, dated May 21, 2015.  It indicates:  To all,
well today was our DEA inspection by the Newark office of
diversion.

        So if we can just stop there.  It's fair to say that
this e-mail and the response is after the DEA had been at RDC,
correct?

A.   Yes.

Q.   It goes on to say, from Bill Pietruszewski:  Three
diversion investigators came out, Molly Callahan, Tony Rego,
Billy Salera.  They were pleased with the security of the
building and the processes that RDC will have in place once we
start shipping out of Fairfield.  They will submit their report
to Washington and they said that RDC can expect our DEA number
sometime next week from what they can see.  They said the final
decision comes from Washington of whom is granted a DEA
license.

        The agents at the end did speak with us to deliver a
message.  They told us to make sure we always do our due
diligence and that we need to submit all information on the
outstanding subpoena (Plainfield case).  I told them all that
we are waiting, all we are waiting for is Apple/Verizon to
release the text messages from our phone.  With that said,
agent Billy Salera said "it may not be your phone" so I do not

M1l3dou2                    Whitmore - Cross

1    know what to think.  I phoned Don Bilgore and Larry Houck to

2    fill them in on today's inspection and the message the agents

3    delivered.  If any questions, please let me know.  Have a great

4    evening.

5              And it is from William Pietruszewski.  Correct?

6    A.  Yes.

7    Q.  And the end of that thread is an e-mail from Larry Doud,

8    May 21, 2015.  And he simply says FYI.  Correct?

9    A.  Yes.

10   Q.  It's fair to say in this e-mail there is no mention of the

11   SOP, correct?

12   A.  Not specifically, no.

13   Q.  There is no mention that Larry Doud told them to give them

14   any particular document, correct?

15   A.  No.

16   Q.  The next one, July 22, 2015, government Exhibit 50.  In

17   this e-mail which is in evidence, Government Exhibit 50, the

18   summary prepared by the government wrote, shows it was from

19   Bill Pietruszewski, correct?

20   A.  Yes.

21   Q.  Larry Doud to Brennan, Emmans, Kirker, and White, correct?

22   A.  Yes.

23              You said 50 -- White is not on it.  Exhibit 50,

24   correct?

25   Q.  Government Exhibit 50.

M1l3dou2                         Whitmore - Cross

1   A.  Yeah.  And who did you say it's to?

2   Q.  The government exhibit that was turned over to us has White

3   as somebody it was sent to.  Was it sent to White?

4   A.  At Government Exhibit 50, I don't -- see his name, no.

5           MR. BURNETT:  Objection.  It is the wrong document.

6           THE COURT:  I think you're talking past each other.

7           MR. GOTTLIEB:  Government Exhibit 50.

8           THE COURT:  Do you have 50 in front of you?

9           THE WITNESS:  Yes, I do.

10          THE COURT:  Why don't you point her to what you say.

11          MR. GOTTLIEB:  I didn't say anything.

12          THE COURT:  You are asking whether it was to White.

13  Why don't you point her attention, show her where it is.

14  Q.  The government exhibit that they put together has that it

15  was sent to White.

16          MR. BURNETT:  Objection.  It is the wrong exhibit.  It

17  is Government Exhibit 64.

18          MR. GOTTLIEB:  You're absolutely correct.  My

19  apologies.  You're absolutely correct.

20  Q.  In this exhibit --

21  A.  Which exhibit?

22  Q.  We're looking at 50, the one that doesn't have White.  It

23  is indicated on the document that Bill Pietruszewski, head of

24  compliance, wrote:  We shared our process with the DEA in

25  Newark of how we look at three months' dispensing prior to

M1l3dou2                        Whitmore - Cross

1    turning a customer on to controls when we applied for our DEA

2    license for Fairfield.

3              Is it fair to say that this reflects this e-mail and

4    that statement after the DEA was at the offices?

5    A.  Yes.

6    Q.  And there is no indication that Larry Doud told him what to

7    do, what to say to the DEA diversion investigators when they

8    were there on June 23, in this e-mail?

9    A.  No.

10   Q.  The next one, that's the e-mail, July 20, 2016, Government

11   Exhibit 64, we don't need that on the board.  This one

12   indicates Bill Pietruszewski writes -- this is 64.

13             On June 23, we have the three DEA diversion

14   investigators arrive at about 10 a.m. to conduct an audit for

15   Rochester Drug Co-Operative in New Jersey.  DEA requested all

16   SOP for due diligence.  When agent read the document the first

17   day on due diligence, ask customers.

18             Again, this is written after the investigators were at

19   the offices, correct?

20   A.  In Fairfield, yes.

21   Q.  And the last one, on this exhibit, prepared by the

22   government, November 11, 2016.  If we can have that on the

23   board.  That is 67.  Government Exhibit 67.

24             Government Exhibit 67 is from Jessica Pompeo.  Now at

25   this time, what was your understanding, this is November of

1    2016.  What is Jessica Pompeo's title?

2    A.  Compliance for Rochester Drugs' location in Rochester, New

3    York.

4    Q.  And in this e-mail, she simply sends it to Ed Kirker and

5    Joe Brennan, correct?

6    A.  Yes.

7    Q.  It is not sent to Larry Doud, is it?

8    A.  No.

9    Q.  And the e-mail is:  Hi, Ed, below are the notes I have from

10   the recent audit performed by the DEA on Tuesday and Wednesday

11   this week, the 8th and 9th of November.  I have copied Joe in

12   on this e-mail in case he has any other points/thoughts or

13   omissions from the below list.  I've also attached our current

14   SOP.  Please let me know if you have any questions.  Regards,

15   Jessica.

16           Correct?

17   A.  Yes.

18   Q.  And that first bullet there is not reporting suspicious

19   orders.  Determine in writing into our SOPs our specific steps

20   and actions taken and after what steps our customers reported.

21           Is it fair to say that this e-mail also concerning the

22   SOPs is a discussion by Jessica Pompeo about what happened

23   before she wrote this e-mail and reflecting something about

24   SOPs being shared with the DEA?

25   A.  Can you repeat that?

1    Q.  That was a lousy question.  I agree.

2             THE COURT:  Go ahead.  I'm having a tech guy.  You can

3    continue.

4    Q.  Is it fair to say that this e-mail follows the recent audit

5    and visit by DEA, correct?

6    A.  Yes.

7    Q.  I want to address some additional questions that you were

8    asked on direct examination about that chart that listed all of

9    the sales that you indicated involved fentanyl.  Can we put

10   that up?  Do we have that number?  348A.

11            Do you have it in front of you?

12   A.  I'm back.

13            THE COURT:  I think her screen is working.

14            MR. GOTTLIEB:  Okay.  So the screen is awake.

15   Q.  You can see it?

16   A.  Yes.

17   Q.  You testified that this is a document that reflects sales,

18   distribution of fentanyl to all the listed pharmacies, correct?

19   A.  That RDC supplied, yes.

20   Q.  And is it fair to say that other than reflecting that these

21   were pharmacies that received fentanyl, this chart doesn't

22   indicate what specifically of the fentanyl that was distributed

23   was diverted for illegal purposes, does it?

24   A.  It's just showing the volume of sales.

25   Q.  So there is no way from looking at this and the whole list

M1l3dou2                    Whitmore - Cross

1   of pharmacies, there is no way to know whether or not any

2   portion of any of those sales were in fact diverted, correct?

3           MR. BURNETT:  Objection.

4           THE COURT:  Overruled.  You can answer.

5   A.  Can you repeat it?  I'm sorry.

6   Q.  There was no way that you are able to determine, by looking

7   at this document, how much of any of these sales were diverted?

8   A.  No, just the volume that was purchased.

9   Q.  And you're not suggesting -- and it appears you're not

10  suggesting that this document reflects the amount of illegally

11  diverted fentanyl, correct?

12          MR. BURNETT:  Objection.

13          THE COURT:  Overruled.  You can answer.

14  A.  Again, just what was purchased from RDC.

15  Q.  Ms. Whitmore.  Thank you.  Continuing.  You told us on

16  direct your investigation of RDC began after ordering records

17  from certain pharmacists, correct?

18  A.  Can you repeat that?

19  Q.  Your investigation of RDC started after ordering records

20  concerning certain pharmacists, correct?

21  A.  Actually, after I performed an onsite visit to these

22  pharmacies.

23  Q.  So after you performed onsite visits of certain

24  pharmacists, that led you, just based on data, looking at

25  numbers and records, that led you and brought you to RDC for

1    further investigation, correct?

2    A.  Yes.

3    Q.  And the investigation kicked off because of an

4    investigation that was within your purview, your investigation

5    was of potentially unscrupulous doctors, correct?

6    A.  Yes.

7    Q.  You were looking at the pattern that pharmacies were being

8    supplied with controlled substances, correct?

9    A.  We were looking at how the pharmacies were dispensing their

10   controlled substances, specifically oxycodone 30s.

11   Q.  And you saw just by looking at the records that there was

12   certain -- certain data that didn't match up involving sales by

13   RDC to these pharmacists, correct?

14   A.  Correct.  What these pharmacies purchase was not matching

15   what RDC reported to the DEA.

16   Q.  And you determined at that time, or you at the outset of

17   the investigation, considered that RDC wasn't supplying either

18   the right documents or the DEA wasn't properly receiving the

19   data, correct?

20   A.  We made sure to check with our headquarters that was not a

21   glitch on the DEA's side.

22              (Continued on next page)

23

24

25

M1LBDOU3                      Whitmore - Cross

1    Q.  Cause that is always, I guess a possibility, correct?

2    A.  Yes.

3    Q.  That investigation was based on the data, that was not an

4    investigation initially of diversion, correct?

5    A.  No, it was just based on the data.

6    Q.  Now, with regard to ARCOS and the data and the reporting

7    through ARCOS based on your investigation, and you told us

8    about subsequent conversations and what you did, who was in

9    charge specifically of handling the ARCOS management system?

10   A.  That's headquarters.

11   Q.  Did anyone ever tell you that Larry Doud was involved in

12   inputting the data into ARCOS?

13              MR. BURNETT:  Objection.

14              THE COURT:  Overruled.  You can answer.

15   A.  Can you repeat that.

16   Q.  Did anyone ever tell you that Larry Doud was the person who

17   actually inputted the data into ARCOS?

18   A.  No.

19   Q.  Based on your experience in this area, is it fair to say

20   there could be a number of reasons why orders don't appear in

21   ARCOS, correct?

22   A.  I'm not sure.

23   Q.  You've seen problems with software and even computers,

24   right?  Right?

25   A.  Yes.

1   Q.  So when you saw the discrepancy, understandably it

2   warranted further investigation, correct?

3   A.  Yes.

4   Q.  So that's when you tell us that leads to that first visit

5   in July.  What year was it?

6   A.  2013.

7   Q.  Is it fair to say that when you first spoke to the

8   government in this case, you didn't recall whether or not the

9   first visit was in 2013 or 2014, correct?

10  A.  Excuse me.

11  Q.  When you first spoke to the prosecutors in this case, is it

12  fair to say that you didn't recall specifically whether or not

13  the first visit was in 2013 or 2014?

14  A.  No, I don't remember.

15  Q.  Going back to December 28, 2021, did you meet with

16  Mr. Burnett?

17  A.  Yes.

18  Q.  Do you recall telling Mr. Burnett that the visit to RDC

19  took place in July 2013 or 2014?

20  A.  I might have said that.

21  Q.  At that first visit, where did it take place?

22  A.  At RDC's facility in Rochester, New York.

23  Q.  And when you went to RDC in Rochester, you told us you met

24  with Joe Brennan, correct?

25  A.  Yes.

1    Q.  And Jessica Pompeo, correct?

2    A.  Correct.

3    Q.  And did you request to meet with the two of them?

4    A.  No, those were the two that met us.

5    Q.  Had you arranged that you were going to be coming up there

6    and that you wanted to --

7    A.  No, it was unannounced.

8    Q.  So unannounced you went up there and you meet with Joe

9    Brennan and Jessica Pompeo, correct?

10   A.  Correct.

11   Q.  And while you're there, you spoke to William Pietruszewski

12   on the phone, correct?

13   A.  Correct.

14   Q.  Is it fair to say that all three of them cooperated with

15   you, correct?

16   A.  Yes.

17   Q.  They sat down with you.  They answered all your questions,

18   correct?

19   A.  Yes.

20   Q.  How long were you there on that first day?

21   A.  All day.

22   Q.  And that's when you learned that William Pietruszewski was

23   the head of compliance, correct?

24   A.  He had a role in compliance.  I don't remember if they said

25   head or what, but a role.

```
1    Q.  By the way, when you were there that first day and
2    Mr. Brennan, Ms. Pompeo and Mr. Pietruszewski got involved, is
3    it fair to say the name Larry Doud came to your attention in
4    some way?
5    A.  I don't remember.
6    Q.  Well, did you ask anyone who was in charge of RDC during
7    that visit?
8             MR. BURNETT:  Objection.
9             THE COURT:  Overruled.  You can answer.
10   A.  I don't remember.
11   Q.  It's fair to say that on the first visit you didn't ask to
12   speak to Mr. Doud and you did not speak to Mr. Doud, correct?
13   A.  I don't remember asking; but, no, we did not speak to him.
14   Q.  At that first meeting, you told these three individuals
15   that you were there because documentation that you had received
16   reflected that RDC was improperly reporting the sales to the
17   DEA of controlled substances, correct?
18   A.  Correct.
19   Q.  And you also told them of certain pharmacies that you were
20   investigating and that was Websters, Russo's and Plainfield,
21   correct?
22   A.  I was just looking at Websters and Russo's.  Plainfield was
23   a different office.
24   Q.  With regard to Mr. Doud, during this meeting after the
25   meeting and during your investigation, did you learn how often
```

1    he was even at the RDC offices?

2            MR. BURNETT:  Objection.

3            THE COURT:  Overruled.  You can answer.

4    A.  It never came up.

5    Q.  Did it come up about how much he travels and is out of the

6    RDC offices?

7            MR. BURNETT:  Objection.

8            THE COURT:  Overruled.  You can answer.

9    A.  No.

10   Q.  Now, when you told Mr. Brennan and Ms. Pompeo and

11   Mr. Pietruszewski that there was a problem with the

12   documentation of controlled substances, is it fair to say that

13   they were surprised?

14   A.  Yes.

15   Q.  So when you mentioned that there was a problem involving

16   controlled substances and documentation, specifically Joe

17   Brennan, Jessica Pompeo and Bill Pietruszewski both reacted in

18   a way that concluded -- that you concluded was one of surprise,

19   correct?

20           MR. BURNETT:  Objection.

21           THE COURT:  Overruled.  She already answered that

22   question.  You can answer.

23   A.  In regards to the issues for reporting to ARCOS, yes.

24   Q.  And they indicated to you that they would go to make

25   efforts to solve the problem in the future, correct?

1          MR. BURNETT:  Objection.

2          THE COURT:  Overruled.  You can answer.

3  A.  Can you repeat the question.

4  Q.  They indicated to you that they were going to make efforts

5  to solve the problem in the future, correct?

6  A.  Yes.

7  Q.  So when you're talking to them about this problem with the

8  data and what is being reported, did any of them say to you

9  that they were told not to report data to the DEA?

10         MR. BURNETT:  Objection.

11         THE COURT:  Overruled.  You can answer.

12 A.  No.

13 Q.  Did any of these three individuals during -- you were there

14 for a full day on the first day, did they say they felt

15 pressured to do anything wrong?

16 A.  Can you repeat that again.

17 Q.  During your day long visit, did any of these three

18 individuals say that they felt pressured to do anything wrong?

19 A.  In regards to the reporting to ARCOS issue, no.

20 Q.  Regarding any issue?

21 A.  We were only focused on the ARCOS at that point, so.

22 Q.  Now, during this first visit, did you discuss red flags

23 with them?

24 A.  When we brought up the Plainfield pharmacy.

25 Q.  After that full day of meeting with them, you leave and you

1    continue with your investigation, correct?

2    A.  We're talking about the ARCOS one still?

3    Q.  No.  No.  Your investigation of RDC.  After you left that

4    day after speaking with them, did you continue investigating

5    RDC?

6    A.  I continued to monitor them, yes, to see if they fulfilled

7    saying that they were going to fix their ARCOS problem.

8    Q.  During that -- following July visit, you told us you

9    visited RDC another time?

10   A.  Yes.

11   Q.  And that was in November of 2016, correct?

12   A.  Correct.

13   Q.  And you were at RDC for two days?

14   A.  Yes.

15   Q.  And now in the second visit that was November 8 and 9,

16   correct?

17   A.  Correct.

18   Q.  It's fair to say you met again with Joseph Brennan and

19   Jessica Pompeo?

20   A.  Correct.

21   Q.  Spoke to William Pietruszewski again over the phone,

22   correct?

23   A.  Yes, because he was at Fairfield at that point.

24   Q.  And this time you told us you also spoke to other

25   employees?

1    A.  After the on site.

2    Q.  And this visit, it's fair to say now you were focusing on

3    the issue of suspicious orders and the filing of suspicious

4    orders, correct?

5    A.  The lack of supplying suspicious orders, correct.

6    Q.  And again, while you were there on that day, Joseph

7    Brennan, Jessica Pompeo, William Pietruszewski, they were

8    cooperative with you, correct?

9    A.  Yes.

10   Q.  They answered your questions, correct?

11   A.  Yes.

12   Q.  None of them refused to speak with you, correct?

13   A.  No.

14   Q.  By this time you knew Larry Doud was the CEO, didn't you?

15   A.  I don't recall.

16   Q.  As you sit here today now that you're going back to speak

17   to these individuals about suspicious orders, did you ask who

18   the CEO or who was in charge?

19   A.  We asked for a list of employees.

20   Q.  And you learned that Larry Doud was the CEO, correct?

21   A.  Yes.

22   Q.  So when you're there now in November for two days, did you

23   ask to speak to Larry Doud?

24   A.  I don't remember.

25   Q.  Did you speak to Larry Doud?

M1LBDOU3                          Whitmore - Cross

1    A.  No.

2    Q.  Now, I asked you before regarding ARCOS, but now with

3    regard to suspicious orders, did Jessica Pompeo while you were

4    with her on November 8 and 9 tell you that she felt pressured

5    not to file suspicious orders?

6            MR. BURNETT:  Objection.

7            THE COURT:  Overruled.  You can answer.

8    A.  Can you repeat it.

9    Q.  When you were there in November on two days, 2016, did

10   Jessica Pompeo tell you at any time that she felt pressured not

11   to file suspicious orders?

12   A.  No.

13   Q.  What about William Pietruszewski, did he say that he felt

14   pressured in any way not to file suspicious orders?

15   A.  We didn't talk to him that much, so.

16   Q.  So the answer is no?

17   A.  No.

18   Q.  And with regard to Mr. Brennan, is the answer no also that

19   he didn't say anything about feeling pressured or anything like

20   that to not file suspicious orders?

21   A.  He didn't say anything.

22   Q.  During this meeting you discussed certain sales, and on the

23   issue of suspicious orders, correct, that was all in connection

24   with suspicious orders, correct?

25   A.  Can you repeat that.

1   Q.   During this meeting when you were there to discuss the

2   suspicious orders, it's fair to say that these three

3   individuals also appeared to be surprised?

4   A.   Can you repeat that.  I'm sorry.  It's the way you're

5   asking it.

6   Q.   Okay.  I'm sorry.  These individuals when you told them

7   about the issues involving suspicious orders and your concerns

8   about not filing suspicious orders, did they appear to be

9   surprised?

10  A.   I don't know how to -- that they didn't supply.  I'm sorry.

11  Can you do it again.

12  Q.   Ms. Whitmore, you spoke to prosecutors December 28, 2021,

13  correct?

14  A.   Yes.

15  Q.   And on that day, is it fair to say that you told them that

16  Jessica Pompeo and Joseph Brennan seemed surprised all in

17  connection with the November 2016 discussion, correct?

18  A.   Volume of sales, yes.

19  Q.   You were there not only to talk to them about sales, you

20  were there to talk about how it relates to suspicious orders,

21  correct?

22  A.   The lack of suspicious orders, yes.

23  Q.   And, in fact, on that day when you say they look surprised,

24  Jessica Pompeo began to cry, correct?

25  A.   She would --

1    Q.  And Jessica Pompeo, even crying, she said to you, did she

2    not, she didn't know how it was possible that there was not the

3    filing of suspicious orders, because she didn't see the full

4    picture of ordering patterns over time?  Isn't that what she

5    said to you?

6            MR. BURNETT:  Objection.

7            THE COURT:  Overruled.

8    A.  Can you repeat that.  I'm sorry.

9    Q.  Didn't Jessica Pompeo when discussing sales and suspicious

10   orders and not filing suspicious orders after she seem

11   surprised and began to cry, didn't Jessica Pompeo then say she

12   didn't know it was possible because she didn't see the full

13   picture of ordering patterns over time.  Isn't that what she

14   said to you about that?

15   A.  Yes, she couldn't see the overall number.

16   Q.  And she had no time said, the reason there wasn't

17   suspicious orders filed was because anybody pressured her not

18   to file, correct?

19   A.  I believe that's because it didn't capture the complete

20   number for the year, the overall sales.

21   Q.  Ms. Whitmore, this is a different question.  When you spoke

22   with her after she made her statements, she didn't say that

23   anybody pressured her not to file suspicious orders, correct?

24   A.  Correct.

25   Q.  Specifically she never said that Larry Doud ordered her,

1    directed her not to file suspicious orders, correct?

2    A.   Correct.

3    Q.   During your visit with them in November, Jessica Pompeo did

4    confirm that the multiplier, in effect -- and before I ask you

5    any questions about it, do you know what I'm referring to when

6    I say "multiplier"?

7    A.   No.

8    Q.   Are you aware of the concept in this area of controlled

9    substances and the sales of controlled substances that the

10   amount that a pharmacy could order over their average monthly

11   number is computed by a multiplier, a percentage, are you aware

12   of that?

13              MR. BURNETT:  Objection, hearsay.

14              THE COURT:  Overruled.  You can answer.

15   A.   Within RDC are you asking or just in general?

16   Q.   RDC sets a multiplier for its customers to control the

17   amount of controlled substances that could be ordered and

18   delivered to the pharmacies?

19   A.   She explained it to us.

20   Q.   And did you learn that that multiplier while Larry Doud was

21   CEO had been reduced?

22   A.   Can you say that again.  I'm sorry.

23   Q.   Were you informed -- did you become aware that while Larry

24   Doud was the CEO, the multiplier, the percentage of the average

25   that pharmacies had bought previously, that multiplier came

M1LBDOU3                        Whitmore - Cross

1   down; are you aware of that?

2   A.  No, we were not told.

3   Q.  Now, you prepared a report of an investigation on November

4   14, 2016, did you not say and put in your report, Pompeo stated

5   that RDC allows their customers to offer no more than 1.5

6   percent more controls than the month previous?

7           MR. BURNETT:  Objection.

8           THE COURT:  Overruled.  You can answer.

9   A.  That they were allowed to increase 1.5 percent every month.

10  Q.  Now, based on the information that you have developed and

11  obtained, it's fair to say that you learned that Jessica Pompeo

12  was responsible for RDC's recordkeeping and controlled

13  substance ordering?

14  A.  Repeat that again.

15  Q.  You learned as a result of your investigation, as of this

16  time in November, you learned that Jessica Pompeo was the

17  person who was responsible for RDC's recordkeeping and

18  controlled substance ordering, correct?

19  A.  She was one person.

20  Q.  In your report of investigation, date prepared November 29,

21  2016, did you not writes:  Ms. Pompeo is responsible for RDC's

22  recordkeeping and CSOS ordering?

23  A.  And CSOS ordering, yes.

24  Q.  And that's true, correct, that was your understanding?

25  A.  Yes.

M1LBDOU3                        Whitmore - Cross

1    Q.   And CSOS stands for what for the jury?

2    A.   It's a Controlled Substance Ordering System.

3    Q.   While you were there, you also reviewed RDC's customer

4    purchases of controlled substances for accuracy and

5    completeness, correct?

6    A.   Yes.

7    Q.   And you noticed and concluded that there were no violations

8    noted?

9    A.   In recordkeeping, no.

10   Q.   You audited a number of specific controlled substances

11   while you were there, correct?

12   A.   I participated in it, yes.

13   Q.   And those controlled substances included, subsys,

14   oxycodone, adderall, ritalin, suboxone, xanax, correct?

15   A.   Correct.

16   Q.   And with what you audited then, no problem or discrepancies

17   were noted?

18   A.   In RDC's recordkeeping sales of it, no.

19   Q.   And its inventory, correct?

20   A.   Correct.

21   Q.   You also looked at the records and you utilized computer

22   printouts provided to you to ascertain the amount of schedule

23   II controlled substances distributed by RDC during that audit

24   period, correct?

25   A.   Yes.

M1LBDOU3                          Whitmore - Cross

1  Q.  And the printouts were verified for accuracy, correct?

2  A.  Yes.

3  Q.  No discrepancies were noted, correct?

4  A.  In RDC's inventory, no.

5  Q.  You also described you looked at security at RDC, correct?

6  A.  Yes.

7  Q.  To make sure the controlled substances are safeguarded,

8  correct?

9  A.  Yes.

10 Q.  Can't be tampered with?

11 A.  Or stolen, no.

12 Q.  And no discrepancies, no problems were noted, correct?

13 A.  No.

14 Q.  After you conducted these analysis that day, looked at the

15 records, you sat down, did you not, with Joseph Brennan and

16 Jessica Pompeo to discuss the findings, correct?

17 A.  Yes.

18 Q.  And you told them that the audit of the selected controlled

19 substances revealed no discrepancies, correct?

20 A.  Correct.

21 Q.  And again, in giving them the reports, it's fair to say as

22 you indicated before, there was no conversation with Larry

23 Doud, correct?

24 A.  Correct.

25 Q.  You didn't ask to speak to Larry Doud, correct?

1    A.  I don't believe so.

2              MR. GOTTLIEB:  Your Honor, may I have just one moment.

3    I have a few more, but I want to check something.

4              THE COURT:  Yes.

5    Q.  I believe on direct examination you were asked by the

6    government, did you review all the dispensing reports of RDC,

7    and I believe your answer was no.  Am I correct?

8    A.  You mean their sales to the pharmacies?

9    Q.  Right.

10   A.  We just looked at the total number of the drugs that we

11   were auditing.

12   Q.  And the reason you gave for not doing, was what, it was too

13   much paperwork?

14   A.  For our purposes of that exact moment for the audit, we

15   just looked at the total number of sales.

16   Q.  And the reason you don't go beyond just the total number of

17   sales is because it's too time-consuming?

18   A.  To be on location and in their way, yes.

19   Q.  And when you left, or as you were leaving, did you ask them

20   to send you these records so that you could do a complete

21   analysis when you had more time?

22             MR. BURNETT:  Objection.

23             THE COURT:  Overruled.  You can answer.

24   A.  We requested different documentation then.

25   Q.  Did you ask them for the sales documents that we were just

M1LBDOU3                        Whitmore - Cross

1    talking about?

2    A.  I wouldn't have asked.  That would have been the main

3    investigator at that time if she asked for it to complete her

4    audit.

5    Q.  You didn't?

6    A.  I myself personally, no.

7    Q.  With regard to the SOP, right, the suspicious order filings

8    and records, on direct you were asked and you were directed

9    attention to November of 2016, and that's when you said that's

10   when it was turned over to you, correct?

11   A.  Yes.

12   Q.  When you spoke to the government, do you recall indicating

13   initially that you might have received it in 2013?

14   A.  I don't remember.

15   Q.  January 18, 2022, just a few days ago, do you recall

16   meeting with AUSA Burnett?

17   A.  Yes.

18   Q.  Do you recall saying that you can't recall if you received

19   the SOPs on the 2013 visit?

20   A.  Yes.

21   Q.  And is that still accurate, you don't know if you received

22   it in 2013?

23   A.  The investigators from Buffalo requested it after my visit.

24   Q.  When it was provided to you in 2016 -- you told us before,

25   we're not going to go over it -- Joe Brennan and Jessica Pompeo

1   turned them over, where were you when you asked for it?

2   A.  Within RDC you're asking?

3   Q.  Yes.

4   A.  I believe their conference room.

5   Q.  And who else was present?

6   A.  Myself, diversion investigator Deb Caufield and diversion

7   investigator Robert Schlee.

8   Q.  And you specifically requested that information, correct?

9   A.  We did, yes.

10  Q.  And you had learned that Jessica Pompeo, in fact, was the

11  "keeper of the files," correct?

12  A.  Electronically, yes.

13  Q.  And it was Jessica Pompeo, I'm focusing on, it was Jessica

14  Pompeo who was the keeper of the files, correct?

15  A.  I believe it was the compliance department.  I don't know

16  if it was her specifically.

17  Q.  Do you recall telling the government when you met with

18  them, this was the meeting December 28, 2021, that you asked

19  for the copies of the SOPs to see what RDC's policies were, and

20  Joseph Brennan and Jessica Pompeo gave them to you.  Jessica

21  Pompeo was the keeper of the files?

22          MR. BURNETT:  Objection.

23          THE COURT:  Overruled.  You can answer.

24  A.  Electronically, yes.  Her, per se, I'm not sure, but she

25  was the one who did provide it to us.

M1LBDOU3                        Whitmore - Cross

1   Q.  And after you asked for it, how quickly did Jessica Pompeo
2   come back and give you those policies?
3   A.  A little bit after.
4   Q.  When you say a little bit, how much approximately?
5   A.  The time it took her to go to get to a computer and print
6   it, I'm not entirely sure.
7   Q.  That's all she did.  You asked for the policies, Jessica
8   Pompeo went to a computer, printed it and brought it right
9   back, correct?
10  A.  I don't know if she stopped anywhere between printing it
11  and us.  I'm not sure.
12  Q.  Well, that's what I'm asking you. Can you give us any
13  better idea.  You said the total amount of time was as long as
14  it took for her to get to a computer, print it and come back;
15  is that the best you can do?
16  A.  Yeah, I really don't remember how long it took her to bring
17  it back to us.
18  Q.  If we can put on the board just for the attorneys and the
19  witness and the Court, please, G6.  Do you see it?
20  A.  Yes.
21  Q.  Looking at Defense Exhibit G6.  Do you recognize what this
22  is?
23  A.  This would be a suspicious order activity reporting report.
24  Q.  Prior to me showing it to you right now, have you seen that
25  before as part of your investigation?

1   A.  This specific one or a report just like this?

2   Q.  Well, you've seen suspicious order reports, correct?

3   A.  Correct.

4   Q.  And this is a suspicious order report, and the date is

5   January 20, 2017, correct?

6   A.  Correct.

7   Q.  It involves compliance and this is an RDC suspicious order

8   report, correct?

9   A.  Yes.

10          MR. GOTTLIEB:  Your Honor, I ask that that be received

11  in evidence.

12          MR. BURNETT:  No objection.

13          THE COURT:  It will be admitted into evidence.

14          (Defendant's Exhibit G6 received in evidence)

15  Q.  If we can see G7 please. Do you see it?

16  A.  Yes.

17  Q.  This is a suspicious order report dated January 23, 2017,

18  prepared by William Pietruszewski of compliance, correct?

19  A.  Yes.

20          MR. GOTTLIEB:  I ask that be received into evidence.

21          THE COURT:  Is this a different one?

22          MR. GOTTLIEB:  It's a different one.

23          THE COURT:  Any objection?

24          MR. BURNETT:  No.

25          THE COURT:  It's admitted.

1          (Defendant's Exhibit 67 received in evidence)

2          MR. GOTTLIEB:  Next G8, please.

3   Q.  You recognize this as a suspicious order report filled out

4   by William Delgado compliance auditor dated February 21, 2017?

5   A.  Yes.

6          MR. GOTTLIEB:  We ask that be received in evidence,

7   your Honor.

8          MR. BURNETT:  No objection.

9          THE COURT:  It will be admitted into evidence.

10          (Defendant's Exhibit G8 received in evidence)

11  Q.  G9, this is a suspicious order report.  The date is on the

12  last page, March 3, 2017?

13  A.  Yes.

14          MR. GOTTLIEB:  I ask this be received in evidence,

15  your Honor.

16          THE COURT:  Any objection?

17          MR. BURNETT:  No objection.

18          THE COURT:  It will be admitted into evidence.

19          (Defendant's Exhibit G9 received in evidence)

20  Q.  G10, this is a suspicious order report dated March 13,

21  2017, Julius Morton RDC compliance?

22  A.  Yes.

23          MR. GOTTLIEB:  I ask that this be received in

24  evidence, your Honor.

25          MR. BURNETT:  No objection.

1          THE COURT:  Admitted into evidence.

2          (Defendant's Exhibit G10 received in evidence)

3   Q.  G11, this is a suspicious order report dated March 15,

4   2017, prepared by William Delgado?

5   A.  Yes.

6          MR. GOTTLIEB:  Your Honor --

7          MR. BURNETT:  I'll consent to all the suspicious order

8   reports coming in.

9          MR. GOTTLIEB:  Great.

10          THE COURT:  Just give me the numbers.

11          MR. GOTTLIEB:  G12, G13, as well as G11.

12          THE COURT:  Those will be admitted into evidence

13   without objection.

14          (Defendant's Exhibits G11, G12, G13 received in

15   evidence)

16          MR. GOTTLIEB:  If we could have G14 shown to the

17   witness.  This is a list of suspicious orders reported

18   regarding Plainfield, AJ pharmacy, Wellness and Casey's, RDC,

19   going back August 2013, December 2013, December 2013, and April

20   22, 2014.  I ask that this be received in evidence, your Honor.

21          MR. BURNETT:  No objection.

22          THE COURT:  It will be admitted into evidence.

23          (Defendant's Exhibit G14 received in evidence)

24          MR. GOTTLIEB:  If we could put on the board Government

25   Exhibit 268.  I was absolutely wrong.  It was 278.  Thank you.

M1LBDOU3                         Whitmore - Cross

1            MR. ROOS:  Objection, your Honor.  This is not the

2    version that's in evidence.  This is not 278 that's in

3    evidence.

4            MR. GOTTLIEB:  I just ask for Government Exhibit 278.

5            MR. ROOS:  It might be a prior version.  It looks like

6    this is being shown to the jury, and this is not the proper

7    version.

8            THE COURT:  Let's take it down.  Let's figure out

9    which exhibit we have that's in evidence.

10           MR. GOTTLIEB:  Your Honor, I'm relying on what the

11   government has.  This is a government exhibit.

12           THE COURT:  Where is the exhibit that we admitted into

13   evidence?

14           MR. ROOS:  If it's helpful, I think our paralegal can

15   put up the copy that was admitted yesterday.

16           THE COURT:  All right.  Then let's do that.  Is that

17   the exhibit that was admitted into evidence as 278?

18           MR. ROOS:  Scroll up, your Honor.  Yes, it is.

19           THE COURT:  Mr. Gotlieb?

20           MR. GOTTLIEB:  Your Honor, may I have a moment,

21   please.

22           THE COURT:  Yes.

23           MR. GOTTLIEB:  Your Honor, this isn't what we believe

24   was marked.  We'll take this off, and I'll ask the questions

25   directly.

1          THE COURT:  All right.  Make sure the two of you agree

2     as to what exhibit you have in evidence.

3     BY MR. GOTTLIEB:

4     Q.  I want to ask you, as a result of your investigation, did

5     you learn that Main Avenue pharmacy was terminated on July 24,

6     2013, terminated by RDC?

7     A.  I don't remember.

8     Q.  Plainfield pharmacy that you talked about, did you learn,

9     in fact, that it was terminated by RDC August 6, 2013?

10    A.  I don't remember.

11    Q.  What about KRD pharmacy, terminated August 28, 2013; is

12    that correct?

13    A.  I don't remember.

14    Q.  Waschko's, terminated June 12, 2014, are you aware of that?

15    A.  I don't recall.

16    Q.  AJ Family pharmacy suspended on November 25, 2013 and

17    terminated by RDC June 26, 2014, are you aware of that?

18          MR. BURNETT:  Objection, your Honor.  I'm not sure

19    what the foundation is for why she would know any of that.

20          THE COURT:  Is there any basis for her to know any of

21    this information that she's saying that she has no recollection

22    about?

23          MR. GOTTLIEB:  The basis was, I know on direct she was

24    talking about investigations of certain other pharmacies, and

25    I'm just looking to see, as a result of her investigation, if

1  she learned that RDC terminated these pharmacies.

2            THE COURT:  Well, why don't you ask in general about

3  what she knows about terminations rather than you reading every

4  termination when she's saying she knows nothing about it.

5  Q.  Are you able to answer any questions about any pharmacies

6  that were terminated by RDC, specifically not in 2017 or 2018,

7  but as early as 2013 and 2014?  Are you able to answer any

8  questions based on your investigation?

9  A.  No, my investigation was just on the reporting to ARCOS.

10            MR. GOTTLIEB:  Your Honor, may I have one moment,

11  please?

12            THE COURT:  Yes, sir.

13            MR. GOTTLIEB:  Your Honor, thank you very much.  No

14  further questions.

15            THE COURT:  Any further questions of this witness?

16            MR. BURNETT:  Yes, your Honor.  Your Honor, can we

17  have a brief sidebar first?

18            THE COURT:  Yes.

19            (Continued on next page)

20

21

22

23

24

25

1              (Sidebar)

2              MR. BURNETT:  One of the topics that was addressed on

3      cross examination was statements by RDC employees that were

4      going to fix the ARCOS problem that Ms. Whitmore had pointed

5      out to them.  I believe Mr. Gotlieb elicited that the employees

6      told her they were going to take steps to fix the problem she

7      identified.

8              The truth is that they did not fix that problem, and

9      that RDC ultimately entered into a consent decree where they

10     admitted that during the time period after they were alerted of

11     this problem and they did not fix it and continued to have

12     ARCOS reporting issues.

13             The government had agreed with the defense not to

14     admit the consent decree during their case in chief unless the

15     defense had opened the door for that to be admitted.  I wanted

16     to, before springing it on anyone and alert the Court, we think

17     given the line of questioning the defense introduced, we think

18     it's appropriate rebuttal to the inference that the company was

19     diligently trying to fix problem with ARCOS, that they in fact

20     did not do so, and entered into a consent decree signed by

21     Mr. Doud where they admitted that fact.

22             THE COURT:  Mr. Gotlieb.

23             MR. GOTTLIEB:  Your Honor, we have been very careful

24     not to open the door with regard to any court order or

25     government finding or fine or anything like that.  The only

1    question was, When you were there, was there an issue about

2    fixing it.  And she said, I determined or I then continued to

3    investigate whether or not they fixed it, and we have

4    absolutely no objection to her saying that it was determined

5    that they had not fixed it.  I have no objection to that.

6             THE COURT:  Is she a witness in a position to testify

7    to that?

8             MR. BURNETT:  She knows that she continued to monitor

9    and that they didn't fix the problem and that they ultimately

10   entered into a decree with the government and they agreed to

11   pay $360,000 and admitted fault.

12            THE COURT:  Which part do you want out?

13            MR. GOTTLIEB:  Just that there was a consent decree

14   which is a court order and they paid a fine of 306. The only

15   fact that was actually testified to was that there was a

16   problem regardless and they said that they were going to fix

17   it.  Beyond that to then state that it wasn't fixed, we're not

18   objecting to.

19            But that the government then came upon them and there

20   was a consent decree and a fine, that's a whole different

21   level, and certainly the door was not open for the results of

22   not having fixed it.

23            MR. BURNETT:  Your Honor, I think there are two

24   important points:  The first is that the consent decree, the

25   document in which RDC formally admits that it did, in fact, not

1   fix the problem.  And the second thing is, Mr. Gotlieb's

2   questions also focused on Mr. Doud's alleged non-involvement

3   with ARCOS reporting and ARCOS reporting issues in the consent

4   decree, he's the one who signs the decree.

5          THE COURT:  It might affect my judgment as to whether

6   or not the defense -- if I decide to let in evidence that they

7   didn't fix the problem and they were subsequently fined, is it

8   your position that you want the jury to know that that was on

9   consent, or is it the position that you don't want the jury to

10  know that it was pursuant to a consent judgment?

11         MR. GOTTLIEB:  There is no way to remedy the unfair

12  prejudice that, for reasons which could be financial or

13  otherwise, he entered into a government consent decree and

14  there were fines. That's not the issue.

15         Your Honor, the issue is the investigation was into

16  ARCOS and whether or not there was a problem with ARCOS.  We

17  have never said that there was no problem.  We don't intend on

18  summation to say there was no problem and that they did

19  everything properly.  That's not the issue.  We just object to

20  the government presenting or the jury hearing that it led to

21  government action prior to this indictment where they paid

22  $360,000.

23         THE COURT:  How do I address the issue of giving the

24  jury an accurate picture that, in fact, these problems were not

25  solved?

1          MR. GOTTLIEB:  The witness can testify to that.  The

2    witness can say, At no time was the problem solved.

3          MR. BURNETT:  Your Honor, I think it's certainly more

4    important, not only that they were not solved, but that RDC

5    also admitted they are not solved.  Mr. Doud clearly tried to

6    implant the impression that he was not involved in these type

7    of issues.  He was the one who signed the document admitting

8    that they didn't solve the problem.

9          MR. GOTTLIEB:  Your Honor, the government is imputing

10   an argument that is not and has never been made.  He is the

11   CEO.  He has to sign every document.

12         THE COURT:  He didn't have to sign any document.

13         MR. GOTTLIEB:  But as the CEO --

14         THE COURT:  As the CEO, he could still refuse to sign

15   the document.  That's not the issue.

16         MR. GOTTLIEB:  The only issue is, there was an

17   agreement that was worked out between the defense and the

18   government that they were not going to elicit testimony with

19   regard to the consent decree of compliance.  And whether or not

20   there was a problem with ARCOS and it continued to be a

21   problem, we're not objecting to that.  We have never objected

22   to that.

23         We simply object that at a subsequent date, the

24   government worked out a consent decree and that they paid a

25   fine as a prior bad act or a prior conviction in the terms that

1    we often use.  There was no opening the door that would in any

2    way abrogate that agreement that we entered into, your Honor.

3            THE COURT:  I'm not sure how you expect them to

4    respond to your evidence that you elicited that gives the jury

5    the impression that somehow this was all fixed and that they

6    suffered no adverse consequences as a result of this activity.

7            MR. GOTTLIEB:  First of all, we never said that, and

8    we would never say that it was all fixed.  The way they I

9    assume would handle it, they would ask this witness as far as

10   the ARCOS problem, was that resolved, and I'm assuming she's

11   going to say no.

12           THE COURT:  But it was resolved.  Is resolved by a

13   consent.

14           MR. GOTTLIEB:  No, it wasn't resolved by a consent.

15   You can agree to something.  We're talking about the operation

16   itself.  That just meant that they paid a fine.

17           THE COURT:  No, it meant they entered into a

18   stipulation of settlement by paying the fine of $360,000.

19           MR. GOTTLIEB:  We're not talking about what the

20   penalty might have been.  The issue that is being raised is

21   whether or not there was an issue with ARCOS and that was her

22   continuing investigation and she said that it continued to be a

23   problem.  We didn't cross her to say that it wasn't a problem.

24           This would be grossly unfair, prejudicial, your Honor,

25   to bring in that there was -- whether it's an admission,

1    whatever the date is on this document which I think is June of

2    2015, and that there was a fine.  It brings on the power --

3              THE COURT:  You walked the line on this one.  You give

4    the jury an impression, which I think is a false impression,

5    that somehow these problems were solved, and the jury has no

6    reason to conclude anything other than from the nature of your

7    questions that they found there were no violations.

8              MR. GOTTLIEB:  Think of this, Judge.  Let's say it was

9    solved.  Let's say, right.  And let's say the government still

10   said, For what you did, we're still going to bring a suit, and

11   we're going to enter a consent decree. You're going to pay a

12   fine for past misdeeds. It has nothing to do with whether or

13   not it was solved or it wasn't.

14             THE COURT:  No.  It has a lot to do with whether it

15   was solved.  If it was solved, then there would be no further

16   litigation and there would not have been a settlement and there

17   would not have been a fine of 360,000.

18             MR. BURNETT:  On that same point, your Honor.  The

19   consent decree actually doesn't leave any ambiguity. Paragraph

20   1A says that between July 2013 and when Ms. Whitmore went to

21   RDC in July 2014, the defendant failed to report any

22   distribution transactions through ARCOS, which is exactly the

23   time period about not fixing it after the meeting.  There's not

24   ambiguity about what this is about.

25             MR. GOTTLIEB:  Your Honor, we are not contesting this

 1    witness is able to testify that through that period of time up
 2    to the time that Mr. Burnett even just mentioned, it was not
 3    solved.  We are not arguing that.
 4         THE COURT:  You didn't bring that out.  You didn't
 5    give the jury that fairly relevant information.  You gave them
 6    the information that -- you tried strongly that there was no
 7    determination that they did anything wrong.
 8         MR. GOTTLIEB:  Your Honor, it is up to the government.
 9    The government is very powerful.
10         THE COURT:  So are you.  You're both equal in this
11    court.
12         MR. GOTTLIEB:  The government has the opportunity now
13    on redirect to make it very clear that it was not resolved.
14         THE COURT:  But it was resolved.  That's the problem.
15         MR. GOTTLIEB:  That's not a resolution to the problem.
16         THE COURT:  How is that not a resolution?
17         MR. GOTTLIEB:  People resolve lawsuits irrespective to
18    whether they continue doing bad things, your Honor.
19         MR. BURNETT:  This isn't a settlement, and there is no
20    finding of fault.  They consented to the entry of a stipulated
21    fact that they did not properly report after the meetings.
22         MR. GOTTLIEB:  Your Honor, we were very careful here.
23         THE COURT:  You were not that careful.  You can't tell
24    me that the jury doesn't have the impression that from your
25    questions and answers that they went in and there they

1    investigated and they found no problem and then they went away.

2    That's the impression that this jury has.  That's a false

3    impression.

4              MR. GOTTLIEB:  That wasn't her testimony.  She said

5    she came back because of continuing problems.  My questions

6    came directly from her investigation report.  I just made a

7    list having nothing to do with ARCOS, with everything else what

8    she said there was no problem with.  It had nothing to do with

9    ARCOS.  It had to do with the recordkeeping and all the other

10   things.

11             THE COURT:  What is it that you want to ask?

12             MR. BURNETT:  I'd like to elicit that Ms. Whitmore

13   continued to monitor ARCOS reporting after the July 2013 visit,

14   that she saw that RDC did not fix the ARCOS reporting problem.

15   That as a result of that failure to fix the problem, RDC

16   ultimately was fined $360,000, and to introduce the exhibit.

17   And in that exhibit, I would like to just show the jury that in

18   paragraph 1 of the exhibit which shows what RDC admitted and to

19   show the last part of the signature block of the consent decree

20   where it shows that Mr. Doud signed the consent decree.

21             MR. JANEY:  Your Honor, that's where the prejudice

22   comes up.

23             THE COURT:  What's the issue?

24             MR. GOTTLIEB:  I have no problem with the initial

25   proffer that was just made, what he wants to bring out, that it

1    continued afterward.  But to introduce the document, to

2    introduce Larry Doud's signature signing as the CEO, which can

3    mean many things, is so unfairly prejudicial without us having

4    opened the door that something that was stipulated to.

5         THE COURT:  Here it says that the defendant admits,

6    acknowledges and accepts responsibility for the following

7    violations of the Controlled Substance.

8         MR. GOTTLIEB:  We had an agreement, your Honor, that

9    it was not going to be elicited, Judge.

10        MR. JANEY:  Can we look at the record.  This seems to

11   be a dispute as to whether the line was crossed.

12        THE COURT:  Let me send the jury to lunch and look at

13   the transcript on that.  You know what page of the transcript,

14   let us know so we can try to get those pages from the court

15   reporter and to give them some opportunity to respond.

16        I may not allow the document itself to come into

17   evidence, but I think in fairness, clearly I was sitting here

18   waiting to hear whether or not somebody was going to say that,

19   all right, it ended favorably or unfavorably.

20        You clearly gave the jury the impression that it ended

21   favorably, and I don't see how in good faith you can say that

22   this jury, given the information before them, is in no position

23   to conclude that somehow they continued this investigation and

24   that it resulted in favor of sanctions.

25        MR. JANEY:  We need to talk to the court reporter to

M1LBDOU3                        Whitmore – Cross

1    figure out where that is in the transcript.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1LBDOU3                          Whitmore - Cross

1                   (In open court; jury present)

2                   THE COURT:  I'm going to give the jury lunch. We're

3       going to address these issues and we're going to bring you back

4       at 1:40.  Don't discuss the case.  Keep an open mind and we'll

5       be ready to proceed efficiently at that time.

6                   (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1LBDOU3                          Whitmore – Cross

1           (In open court; jury not present)

2           THE COURT:  See if you can get the relevant pages from

3    the court reporter on this issue.  And if you can get it before

4    we come back, get it to my chambers and I'll review it and

5    we'll discuss this again at 1:30 and then we'll see to what

6    extent the government has an opportunity, reasonable

7    opportunity to respond to the arguments.

8           I'll see you at 1:30.

9           I'm going to hold on to the consented order.

10          (Recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
1                        AFTERNOON SESSION

2                          1:30 p.m.

3              THE COURT:  Are we waiting for Mr. Roos?

4              MR. BURNETT:  We can begin.

5              THE COURT:  So let me start with the government.

6    What's the government's position?  I'm looking through the

7    transcript and what's the government's position with regard to

8    what you think is appropriate for cross-examination?

9              MR. BURNETT:  We didn't receive a copy of the

10   transcript.

11             THE COURT:  You didn't?

12             MR. JANEY:  Our understanding is it was e-mailed to

13   chambers.

14             THE COURT:  Neither side received it?

15             MR. JANEY:  We haven't.

16             THE COURT:  I'll print it as we speak.  I haven't had

17   a chance to completely go through it either.

18             MR. BURNETT:  I can say without looking at the

19   transcript the three impressions we were concerned about.

20             The first is the impression that after the July 2013

21   meeting between Ms. Whitmore and employees at RDC, that RDC

22   employees had said they were going to fix the problem, the

23   implication being that they did go on to fix that problem.

24   That's point one.

25             Point two is the narrow point that Mr. Doud did not

M1l3dou4

1    have responsibility for or a role in RDC's ARCOS reporting

2    system.

3              And then the third point, which is a kind of broader

4    version of that ARCOS point, is Mr. Doud wasn't really the one

5    who was responsible for compliance-related issues and had a

6    limited, if any, role in compliance period.

7              I think the consent decree answers each of those three

8    points.  The first one for obvious reasons, and the second and

9    third because the fact Mr. Doud signs the consent decree,

10   including the facts stated therein, shows his involvement with

11   compliance and ultimately that the buck stops with him on these

12   issues.

13             THE COURT:  Well, let me hear from the other side.

14   Let me say that, that's very consistent with my analysis as I

15   was looking at this over the lunch break.  That the defense

16   clearly gave the impression that what was represented to the

17   government -- the government agents is that, well, that

18   everybody showed surprise, that they were going to fix it, that

19   Mr. Doud was never spoken to, Mr. Doud had no involvement or

20   knowledge about these issues, and that's all a false

21   impression.  Mr. Doud clearly knew about these issues, because

22   he signed the consent decree.  And the impression that somehow

23   that this problem just went away, or that they solved it, is a

24   false impression to the jury.

25             Mr. Gottlieb.

M1l3dou4

```
1          MR. GOTTLIEB:  Your Honor, respectfully, and I say
2     that just not as a matter of form.  The testimony wasn't that
3     it was going to be fixed.  What it was, she was asked about the
4     reaction, and she said, and the witness said they were
5     surprised.  And then when I was asking questions, I included in
6     the section straight from the proffer, this is from the
7     proffer, your Honor.  She said they would make an effort to
8     solve problems in the future.  That was the extent of what she
9     has said.  She didn't say they made -- it was repaired.  There
10    was no testimony after the conversation that it was repaired.
11    It was just at the time she said -- I don't have a copy of the
12    transcript that your Honor has, but I'm looking straight at the
13    proffer which I was referring to.  All she said is they would
14    make an effort to solve the problem in the future.
15         THE COURT:  Right.
16         MR. GOTTLIEB:  So that was the extent of whatever
17    impression the jury might have.  Based on the rules of
18    evidence, what your Honor is going to instruct them, they can
19    only know that she said they would make an effort to solve the
20    problem in the future.
21         THE COURT:  What do you think the record gives them a
22    basis to conclude?  That this issue was fixed or went away or
23    that this issue was not fixed and the government had to take
24    legal action against the company?
25         MR. GOTTLIEB:  Okay.  I understand.  What the jury can
```

M113dou4

1    take from that is exactly what was said on this date in

2    November of 2016.  That they would make an effort to solve the

3    problem in the future.  Now, I understood -- I understood, and

4    can understand how on redirect the government is empowered and

5    may say was it remedied.  And the answer was, and I assume the

6    answer would be, to this witness's idea, the answer is no.

7    That then, by doing that, your Honor, the record is clear for

8    both sides.  On the one hand, they represented, they said they

9    would make an effort to solve it.  The government elicits that

10   it wasn't solved.  We're just talking about the ARCOS problem

11   now.  And that should be the extent of it.  That's number one.

12            THE COURT:  But it was solved.  It was ultimately

13   solved by litigation.

14            MR. GOTTLIEB:  No, your Honor.  It wasn't solved.  If

15   you do something wrong, and you are then either sued or

16   prosecuted, that doesn't mean that the problem is solved.  It

17   means you're slapped.  You're punished.  What happens is the

18   company then agrees to pay a fine, as a result of its ARCOS

19   failures.  That's all we're talking about here.

20            THE COURT:  So the part that you think that you are

21   entitled to keep from this jury is what?

22            MR. GOTTLIEB:  The consent -- the fact that there was

23   a consent decree, and they paid a fine of $360,000.  I made it

24   clear before, your Honor --

25            THE COURT:  Why is that?

M1l3dou4

1          MR. GOTTLIEB:  Because that is unrelated to the

2     testimony, it doesn't open the door to bring in a subsequent

3     action by the government where the company then agrees to pay

4     it.  The testimony was limited to they would make an effort.

5     The government witness is going to say, I assume, it was not

6     solved, and that really should be the end of that inquiry.

7          There was no attempt on our part to have this jury

8     believe that it was in fact solved.  Under the rules of

9     evidence, the testimony was they would make an effort, and on

10    redirect, the government is going to, I assume, bring out that

11    it wasn't solved.  Therefore, the jury now hears their witness

12    saying it wasn't solved.

13         THE COURT:  And it wasn't solved in what manner?  What

14    is the extent of the testimony that they are entitled to elicit

15    about what's the evidence that it wasn't solved?

16         MR. GOTTLIEB:  That's already in evidence.  But the

17    way they --

18         THE COURT:  What's in evidence?

19         MR. GOTTLIEB:  It's already in evidence.  That the

20    company failed to file the necessary ARCOS data.

21         THE COURT:  Where's solving the problem?  Where is

22    that are in the record?

23         MR. GOTTLIEB:  It's not solved.  It is already in the

24    record from their other witnesses.

25         THE COURT:  That the problem was not solved?

M1l3dou4

1           MR. GOTTLIEB:  That it was not solved.

2           THE COURT:  Who gave such testimony?  I don't remember

3      that.

4           MR. GOTTLIEB:  Jessica Pompeo said that we didn't.

5      They asked question after question.  Did you file ARCOS, did

6      you put notice in of all the DEA purchases, and her answer time

7      and time again, your Honor, is that no, we didn't comply with

8      that aspect of the law.

9           THE COURT:  Well, part of the problem that I have is

10     also a secondary problem.  You clearly asked questions and

11     elicited testimony that gave the jurors an impression that

12     Mr. Doud had no knowledge and no involvement in this issue.

13     And that is not true.  He signed the consent decree.  You can't

14     say that he doesn't have any knowledge of this issue if he

15     signs the consent decree.

16          MR. GOTTLIEB:  Your Honor, my questions, my questions

17     wasn't that he was not aware of ARCOS.  My questions, your

18     Honor, was whether or not he was involved in putting in the

19     data in ARCOS.  My questions were, who is in charge of the

20     bookkeeping, it was Pompeo.  All of my questions had to go to

21     who was actually in control of the data gathering in ARCOS.

22     That's all it was.  I never suggested, and it's not our

23     defense, that Mr. Doud is unaware of ARCOS, or the reporting

24     requirements.  That has not been what we have been saying.  All

25     of my questions went to who, in fact, because we have -- your

M1l3dou4

1    Honor, please.  The government witnesses tried to make it

2    appear that -- the government witness tried to make it appear

3    that Mr. Doud is ordering them not to do ARCOS, not to do this.

4    These questions were directed at making it clear that, in

5    reality, the people who were in charge of inputting the data,

6    those were my questions, your Honor.

7              THE COURT:  Well, now I have to say, Mr. Gottlieb,

8    with all due respect, you're splitting hairs here.  All right.

9    And you're making an argument that is not consistent with what

10   you intended, the impression you intended to give to the jury,

11   and it is not even -- I find it almost a disingenuous argument

12   for you to stand here and say that you didn't give the jury the

13   impression that there was no problem.  As a matter of fact, you

14   went through the whole list of all of the companies that were

15   suspended, and to give the impression that they said that they

16   were going to fix issues and they went forward and fixed it.

17   And clearly gave them the impression, and I have the transcript

18   and you have the transcript now, too.

19             MR. GOTTLIEB:  May I just have a moment to read the

20   transcript?  I haven't seen it.

21             THE COURT:  Let me direct your attention to some pages

22   that I have identified.  On page 21 at line 15:  So when you

23   mentioned that there was a problem involving controlled

24   substances and documentation, specifically Joe Brennan, Jessica

25   Pompeo and Bill Pietruszewski both reacted in a way that

M1l3dou4

1    concluded -- that you concluded was one of surprise, correct?

2              Then there was an objection and I overruled the

3    objection.

4              And the answer was:  In regards to the issues we're

5    reporting in ARCOS, yes.

6              Question:  And they indicated to you that they would

7    go to make efforts to solve the problem in the future, correct?

8              Again, objection.  Which I overruled the objection,

9    and let you further ask the question:  They indicated to you

10   that they were going to make efforts to solve the problem in

11   the future, correct?

12             Yes.

13             Now that is an incomplete, at best, amount of

14   information.  Because, in fact, you know that that did not

15   happen.  And you did not, and you stopped short to give the

16   jury only the impression that they assured DEA that they were

17   going to fix the problem, and then, you went on to ask -- I

18   have another.  And again I'm not looking at every line.  And on

19   page 31 of the transcript, line 14:  After you conducted

20   these -- analysis that day, looked at the records, you sat

21   down, did you not, with Joseph Brennan and Jessica Pompeo to

22   discuss the findings, correct?  Yes.  And you told them that

23   the audit of the selected controlled substances revealed no

24   discrepancies, correct?  And again, in giving them the report,

25   it's fair to say as you indicated before, it was no

M1l3dou4

1    conversation with Larry Doud.

2              MR. GOTTLIEB:  Your Honor, to say that I am being

3    disingenuous, when those specific questions that your Honor

4    just read, and are using in a way to say that somehow I opened

5    the door about a consent order, that is directly from her

6    official report.

7              THE COURT:  I don't care where it's from.  The

8    question is what use you are putting it to.  The only relevance

9    that that question has was to give the jury the impression that

10   Mr. Doud had no knowledge or involvement in this issue.

11             MR. GOTTLIEB:  Your Honor, please, that's just not

12   true.

13             THE COURT:  Why did you ask whether or not she spoke

14   to Doud and whether or not Doud was a participant in the

15   conversation?

16             MR. GOTTLIEB:  In no question your Honor just read or

17   in the transcript am I saying did you give this a clean bill of

18   health with regard to ARCOS in the sense that we're talking

19   about.

20             THE COURT:  You surely didn't give them the true facts

21   that they didn't get a true bill of health.

22             MR. GOTTLIEB:  Well, I gave them exactly what was in

23   her report and it's marked as G4 for identification.

24             THE COURT:  She's not the lawyer.  You are the one

25   asking the questions.

M1l3dou4

1            MR. GOTTLIEB:  She has a right to say, Mr. Gottlieb,

2      you're wrong.

3            THE COURT:  No, she doesn't.  She has the right to

4      respond directly to your questions.

5            MR. GOTTLIEB:  And she said yes.

6            THE COURT:  You control those questions.

7            MR. GOTTLIEB:  She confirmed.  I asked her a question,

8      didn't you say this and that, and she said yes.

9            THE COURT:  Okay.

10            MR. GOTTLIEB:  She was the one who confirmed it.  Not

11      the attorney.

12            THE COURT:  Well, I'll hear further from the

13      government.

14            MR. GOTTLIEB:  Can I --

15            THE COURT:  Yes.

16            MR. GOTTLIEB:  Because I understand the issue, I'm

17      sensitive to the issue.  This is what I would propose.

18            THE COURT:  All right.  I'm not sure I'm in a position

19      to protect you at this point.  Go ahead.

20            MR. GOTTLIEB:  Your Honor, I think it's appropriate,

21      and consistent with law, for your Honor to not only allow them

22      to ask the question and to get the answer, but even for us to

23      enter into a stipulation that the problem, the issue, in

24      effect, with ARCOS, was not remedied.  Was not solved.  I have

25      no problem stipulating to that.  I have no problem.  It's not

1    an issue, it has never been an issue.

2              If your Honor is concerned that the jury will think

3    that we were suggesting that all was good with ARCOS, I have

4    absolutely no problem, whether it's through the witness or by

5    stipulation, saying that contrary to that, he did not remedy

6    the ARCOS discrepancies.  I just object to going further and

7    putting in a court document, a court decree, with an order

8    which a consent decree that takes place later on.

9              And your Honor well knows, right, you've been on the

10   bench, you've seen all things that companies, subsequent to

11   doing something wrong, in this case the ARCOS, will then

12   ultimately resolve the dispute with the government by consent

13   decrees.  That's not relevant to the jury.  What your Honor is

14   suggesting is relevant is whether or not the company in fact

15   didn't have an ARCOS problem.  And that's why I propose my

16   stipulation.

17             THE COURT:  What's the government want to do?

18             MR. BURNETT:  I think the important point is not that

19   RDC did not solve the ARCOS problem.  But that RDC admitted to

20   not solving the ARCOS problem, and in 2015 Mr. Doud signed a

21   statement to the effect that the company did not solve the

22   ARCOS problem.

23             The impression or the issue we are concerned about is

24   not the issue or the impression that RDC solved this problem

25   after it was alerted to them, but that Mr. Doud had not just no

M1l3dou4

1    involvement in literally inputting data in ARCOS, but big

2    picture, Jessica Pompeo is the one who was the record keeper,

3    she is the one who handled controlled substance orders, she was

4    the one responsible for the issues.  And I think the fact that

5    during the heart of the conspiracy period here in 2015 Mr. Doud

6    sign a consent decree is certainly relevant to rebut that

7    misimpression that was left.

8            MR. GOTTLIEB:  Just following up on it.  We don't even

9    oppose to RDC entering into an agreement.  Even an agreement

10   signed by CEO Laurence Doud.  That's not an issue.

11           THE COURT:  Okay.  So what part of it is the issue?

12           MR. GOTTLIEB:  The document.

13           THE COURT:  You don't want them to put in the

14   document?

15           MR. GOTTLIEB:  The document and the fine was $360,000.

16           THE COURT:  All right.  You know what?  I'm going to

17   give you that.  They're not going to put in the document and

18   they're not going to say the amount of the fine.  But they can

19   elicit testimony that the problem with regard to ARCOS was not

20   fixed, that it resulted in a lawsuit by the government in July

21   of 2015.  That RDC entered into a settlement with the

22   government, and agreed to pay a fine.  And that the settlement

23   that was entered into was signed by Laurence Doud as CEO of RDC

24   on behalf of RDC.

25           I think that you've opened the door to that testimony.

M1l3dou4

<pre>
 1            MR. GOTTLIEB:  Your Honor, thank you.  I'm not

 2   quarreling with that now.

 3            THE COURT:  All right.

 4            MR. GOTTLIEB:  That reflects really what our

 5   intentions have been all along.

 6            THE COURT:  Government, you need anything further?

 7            MR. BURNETT:  Just two points of clarification.  Is

 8   that going to include that in that consent decree or in that

 9   settlement RDC admitted to not following the ARCOS

10   requirements?

11            That's the heart of the issue for us.  Just a

12   settlement in the abstract makes it sound like there was a

13   dispute between the parties and they reached some number.

14            THE COURT:  No, that doesn't make it sound that way.

15   Because I said you could elicit that RDC entered into a

16   settlement and agreed to pay a fine.  People who are not

17   acknowledging any responsibility don't agree to pay a fine.

18            MR. BURNETT:  The second -- understood.  And the

19   second piece then, am I right we can do that through a

20   stipulation?

21            THE COURT:  If you want -- if the two of you can

22   agree.  But, you know.

23            MR. GOTTLIEB:  Yes.

24            THE COURT:  I'm always happy to have you agree.  I'll

25   give you whatever you want if you agree.  But I'm telling you
</pre>

M1l3dou4

1    now, with regard to this witness, until we get this witness off

2    the stand, if you are going to do that, you better do it

3    quickly because we are moving on to the next witness.

4              (Counsel conferring)

5              MR. ROOS:  The issue is, the witness without the

6    document may not be able to say exactly what, what the

7    defendant signed as those admissions.

8              THE COURT:  You can go into the witness room and show

9    her the document, and tell her what the limits or the

10   parameters of the examination is going to be that I've allowed,

11   and tell her that's the extent to which she can testify.

12             MR. JANEY:  The admissions are not relevant to the

13   stipulation.

14             THE COURT:  Which admissions?

15             MR. JANEY:  The specific findings.  So let me just

16   call it that.  I believe Mr. Roos is responding, he'll correct

17   me if I'm wrong obviously.

18             THE COURT:  I thought we got beyond that point.

19             MR. JANEY:  I thought so too.  I got confused for a

20   moment with Mr. Roos' colloquy with the Court.

21             THE COURT:  They settled and agreed to pay a fine.

22   What else is particularly relevant here?

23             MR. BURNETT:  And they didn't fix the problem.

24             THE COURT:  Right.  Are you going to ask her if the

25   problem is fixed, and she'll say no.  So what happened?  We had

M1l3dou4

```
 1    to sue them, and we sued them, and then in that lawsuit, they

 2    agreed to settle and a pay a fine and we entered into a

 3    settlement agreement and it was signed by Mr. Doud.

 4              MR. BURNETT:  Okay.

 5              THE COURT:  I think that's where we are at this point.

 6              MR. BURNETT:  Okay.  That sounds good.

 7              THE COURT:  So do you want to do that with this

 8    witness or do you want to do that by some further stipulation?

 9              MR. BURNETT:  I'd like to do this at the end of the

10    witness.

11              THE COURT:  You are going to ask the witness about it

12    or doing it by stipulation?

13              MR. BURNETT:  Do it by stipulation right after the

14    witness.

15              THE COURT:  Start working on your stip and let's get

16    the jury back in because I told them 1:40.

17              MR. ROOS:  Speaking of scheduling, your Honor, we have

18    the two other witnesses.

19              THE COURT:  Two others?

20              MR. ROOS:  Barbara Castro is the next one.  And then

21    the summary witness, and --

22              THE COURT:  How long do you anticipate their directs.

23              MR. ROOS:  Castro is maybe 15 minutes.

24              THE COURT:  And the other?

25              MR. ROOS:  I'm sure defense counsel will go for an
```

M1l3dou4

1   hour.

2           THE COURT:  I'm not sure about that.

3           MR. JANEY:  I think I very well may.

4           THE COURT:  You can keep her up there as long as you

5   want.

6           MR. JANEY:  I'm referring to the summary witness.

7   What I would submit before then is, at least from the defense's

8   perspective, your Honor, is we have a substantial problem to

9   resolve before that summary witness can take the stand.

10          THE COURT:  Okay.

11          MR. ROOS:  I think we should hear that right now,

12  because they've had the exhibits for weeks, they've had the

13  summary exhibit for over a week.

14          MR. JANEY:  Come on.

15          THE COURT:  No, look, don't argue with each other.

16  Argue to me.  So, the bottom line is what we're going to do is

17  we're going to finish this witness, we are going to do Castro,

18  then we'll take a break and see how quickly we can resolve the

19  issue with the last witness and try to see if we can finish

20  that witness before 5 o'clock so we can send the jurors home.

21  That's the way we are going to do it.

22          MR. JANEY:  I would just, not to be difficult.  But

23  what I think I'm hearing with respect to the schedule, that if

24  that is the anticipated schedule, I anticipate that the cross

25  of the summary witness would not begin until Monday.

M1l3dou4

1          THE COURT:  I don't anticipate that.

2          MR. JANEY:  Okay.

3          THE COURT:  So we're going to go, if we have to go

4    until 5 o'clock, we'll go until 5 o'clock.  And then after

5    5 o'clock we may adjourn, depending on where we are.  But,

6    we're going to move forward and I'm not going to waste the

7    jury's time.  We got three witnesses here and I indicated to

8    them we would try to get through those three witnesses.

9          Mr. Janey, are your issues with regard to this third

10   witness with regard to the exhibits or beyond the exhibits?

11         MR. JANEY:  Well, both, your Honor.  Some of which I

12   articulated this morning, but I think the meat of it is with

13   respect to the exhibits themselves.  But I think that's where

14   much of the discussion will take place.

15         THE COURT:  All right.  Well, I can tell you that,

16   unless -- and I don't have any written submission from you on

17   this, I don't think.  But unless you can articulate for me in

18   what way these exhibits are inaccurate or that the information

19   in them is genuinely in dispute, I don't know what other issue

20   would make me preclude the government from offering these

21   exhibits if they are accurate.

22         MR. JANEY:  I think there is another dimension, your

23   Honor.  And I can cite the case law for the record.  But, I

24   think that my understanding, your Honor, with respect to a

25   summary witness, that a summary witness is limited insofar as

M1l3dou4

he or she can only summarize information that has been

competent evidence put before the jury at the time.

        THE COURT:  No, that's not accurate.  That's not

accurate.  You can grab a paralegal if you wanted to, tell the

paralegal sit in a room and add up some numbers, and then have

the paralegal come and testify that I sat in a room, added up

these numbers, and these numbers are accurate.

        MR. JANEY:  No, I don't mean that.  I apologize.  I am

not being clear.  What I mean is whether it is a paralegal, my

assistant, or whether it's an agent, those persons, that

summary witness can only testify to what's been in evidence at

the time they are summarizing what has been submitted in

evidence before the jury at the time of their testimony.

        THE COURT:  No, that's not true.  It depends on where

the underlying information comes from.  If I say, if I go to

the bank and I look at the accounts and write down everything

in everybody's account and then I come back and I put it in a

chart, I'm the one that can establish that that's an accurate

indication, that chart is an accurate indication of what I did,

regardless of whether or not that information has previously

been admitted into evidence, if the foundation and its

admissibility is established at the time he testifies about

what he did and that the summary chart reflects that.

        MR. JANEY:  So maybe I can give an example, your

Honor.  These charts, so there are two dimensions to some of

M1l3dou4

1    the charts.  And I believe that --

2            THE COURT:  One is about what Mr. Doud's salary is.

3    And unless you can tell me that you are fighting about this,

4    that somehow it is inaccurate and the salary is not what this

5    person is going to I assume lay the proper foundation to say

6    that they found information that accurately reflects that.  And

7    you don't have a good reason to say that this is not accurate.

8    Then I'm not going to, I don't know what your objection is.

9            And the other is about a summary of red flags

10   identified in 41 customer case studies, and I don't know where

11   that information comes from.  If they can establish that it

12   comes from information that is already in evidence, then you're

13   right.  That's appropriate.

14           MR. JANEY:  That's the point, your Honor.  There has

15   been no evidence admitted.  There is nothing admitted in

16   evidence with respect to --

17           THE COURT:  We'll address it later because the jury is

18   outside.  Let's move forward.  But I just want to focus for you

19   where my concerns are.

20           MR. JANEY:  We are on the same wavelength.

21           THE COURT:  We'll discuss it.

22           Let's bring in the jury.

23           (Jury present)

24           MR. BURNETT:  Should we bring in the witness, your

25   Honor?

M1l3dou4                          Whitmore - Redirect

1          THE COURT:  Yes, please bring the witness back.  You

2     can inquire.

3     REDIRECT EXAMINATION

4     BY MR. BURNETT:

5     Q.  Good afternoon, Ms. Whitmore.

6     A.  Good afternoon.

7     Q.  Do you recall before the break you were asked about the

8     November 2016 audit and visit that you did at Rochester Drug?

9     A.  Yes.

10    Q.  And one of the questions of many you were asked was about

11    whether Ms. Pompeo was the keeper of records for the standard

12    operating procedures, right?

13    A.  Yes.

14    Q.  Do you recall saying that she was the keeper of records?

15    A.  Yes.

16    Q.  What was your understanding of what it means for someone to

17    be the keeper of records at a company like Rochester Drug

18    Co-Operative?

19    A.  Just to maintain them in a file or make them readily

20    retrievable when asked for said file.

21    Q.  Does that mean they are the only person responsible for

22    what goes into those documents?

23    A.  No.

24    Q.  Does it mean they are the only person responsible for

25    compliance issues related to those documents?

1    A.  No.

2    Q.  You were also asked about some of the findings that you

3    made during that 2016 audit of RDC, correct?

4    A.  Correct.

5    Q.  Some of those findings were about physical security, record

6    keeping, and this counting of drugs that you did, correct?

7    A.  Yes.

8    Q.  Did your audit focus on whether RDC was performing adequate

9    due diligence on its pharmacy customers to prevent diversion?

10   A.  No.  It was just on the count of the inventory, and their

11   location.

12   Q.  Do DEA cyclic audits like the one you performed focus on

13   that issue, period?

14   A.  No.

15   Q.  So, did any of your findings during that 2016 audit of RDC

16   conclude that the company was performing adequate due diligence

17   to stop diversion of controlled substances?

18   A.  Not at that moment, no.

19   Q.  Now, staying on the 2016 audit, do you recall being asked a

20   number of questions about the conversations you had with

21   Mr. Brennan, and Ms. Pompeo, during a part of that audit?

22   A.  Yes.

23   Q.  Just to kind of situate ourselves here, during that

24   meeting, did Mr. Brennan and Ms. Pompeo tell you they had a

25   policy for investigating and reporting suspicious orders?

1    A.  Yes.

2    Q.  What, if anything, did they tell you about whether they

3    followed that policy?

4    A.  That they had an in-house policy for notifications

5    pertaining to suspicious orders, but they were not then

6    reporting it further to the DEA.

7    Q.  Now, do you recall being asked questions about whether

8    Ms. Pompeo told you that she felt pressured during the

9    interview?

10   A.  Yes.

11   Q.  Same with questions about Mr. Brennan feeling pressured?

12   A.  Yes.

13   Q.  Did you ask them if they felt pressured in any way during

14   the interview?

15   A.  No.

16   Q.  Is it your typical practice during interviews to ask the

17   people you are visiting on an audit if they are being pressured

18   to do something?

19   A.  No.

20   Q.  Now, when you were talking to Ms. Pompeo about RDC's

21   suspicious order reporting, did she admit to you that RDC

22   hadn't been filing suspicious order reports?

23   A.  Yes.

24   Q.  Did she say that was because she never saw any suspicious

25   activity in a pharmacy?

M113dou4                        Whitmore – Redirect

1              MR. GOTTLIEB:  At this point objection.  It is
2    redirect.  I would ask no leading on redirect.
3              THE COURT:  Well, I'll sustain with regard to leading.
4    Just be a little less leading.  But I think this is an area
5    that was opened during your cross-examination.
6    Q.  What, if anything, did Ms. Pompeo tell you about whether
7    the reason RDC did not report suspicious activity was because
8    it never saw suspicious activity?
9    A.  Can you repeat it?  I'm sorry.
10   Q.  Sure.  Did Ms. Pompeo give you an explanation of the
11   reasons why RDC was never reporting suspicious orders?
12   A.  Yes.
13   Q.  What did she say?
14   A.  Ms. Pompeo explained it as to the fact that she could not
15   see over a year's period how much of an increase a pharmacy was
16   ordering from the beginning to the end.
17   Q.  And what, if anything, did she tell you about what RDC was
18   actually flagging internally?
19   A.  She was -- pretty much saying that RDC was flagging -- what
20   they would in-house consider orders of interest or maybe rogue
21   doctors that they may be questioning their prescribing habits.
22   Q.  What, if anything, did she say about whether RDC was
23   reporting any of that to the DEA?
24   A.  She never said any of this -- she said nothing about it
25   being reported to us.

1   Q.  How was Ms. Pompeo's demeanor during that discussion of

2   compliance?

3   A.  She was very upset.

4   Q.  Can you describe what she looked like?

5   A.  She was physically -- she was crying, shaking, like, like

6   upset over the fact that this was happening.

7   Q.  Now, do you recall being shown a number of suspicious order

8   reports that RDC filed during 2017?

9   A.  Yes.

10  Q.  Now, when were those order reports filed in relation to

11  that meeting you had at RDC?

12  A.  After.

13  Q.  I want to wrap up with a couple questions about this RDC

14  ARCOS reporting issue that you discussed earlier.  Now, can you

15  remind the jury what was the problem that you'd seen at RDC's

16  ARCOS reporting before your visit in July 2013?

17  A.  RDC was not meeting the requirements set forth in the CFR

18  and the rules of regulations of DEA when it came to reporting

19  their sales of controlled substances and Schedule IIs to the

20  DEA.

21  Q.  Did you tell RDC employees about that problem during your

22  July 2013 visit?

23  A.  Yes, I flat out told them that they were not reporting.

24  Q.  Do you recall on cross-examination being asked about

25  whether RDC's employees told you they anticipated fixing the

M113dou4

1    problem after your visit?

2    A.  Yes.

3    Q.  Do you recall being asked about whether Larry Doud had any

4    involvement in inputting the ARCOS information?

5    A.  Yes.

6    Q.  Now, I want to talk about what actually happened after that

7    meeting.

8            Did you continue to monitor RDC's ARCOS reporting in

9    the year after you had that July 2013 meeting?

10   A.  Yes.

11   Q.  What did you find?

12   A.  That RDC did not comply with what they said they were going

13   to do, and continued to not report their sales of controlled

14   substances to the DEA.

15           MR. BURNETT:  No further questions, your Honor.

16           THE COURT:  Any further questions of this witness?

17           MR. GOTTLIEB:  No, your Honor.

18           THE COURT:  Thank you, ma'am.  You can step down.

19           (Witness excused)

20           THE COURT:  Government call its next witness.

21           MR. ROOS:  Your Honor, now is the point that we want

22   to read that stipulation.

23           MR. GOTTLIEB:  We haven't seen it.  Can we --

24           THE COURT:  You wrote it out?  Okay.  Both sides make

25   sure it's what you agreed to.

M1l3dou4

1          (Pause)

2          MR. ROOS:  I'll get the witness from the back so we

3    can bring her in.

4          MR. BURNETT:  Your Honor, if I may, I'd now like to

5    read a stipulation.

6          THE COURT:  Yes.

7          MR. BURNETT:  It's stipulated and agreed by and among

8    the United States of America through its undersigned AUSAs and

9    Laurence F. Doud III, the defendant, by and through his

10   undersigned counsel that:

11         1.  After July 2013, Rochester Drug Co-Operative Inc.,

12   RDC, did not fix the problem with RDC's reporting of ARCOS

13   data.

14         2.  The United States of America sued RDC for its

15   failure to fix the problem with RDC's reporting of ARCOS data.

16         3.  Thereafter, RDC and the United States of America

17   entered into a settlement agreement regarding RDC's failure to

18   report ARCOS data.  As part of that settlement, RDC agreed to

19   pay a fine.

20         4.  The settlement agreement was signed by Laurence F.

21   Doud III as CEO.

22         And it's stipulated and agreed that this stipulation

23   can be entered as an exhibit, which the parties will do after

24   we have a signed executed copy.

25         MR. ROOS:  The government calls Barbara Castro.

M113dou4                          Castro - Direct

```
 1              THE COURT:  Would you step up into the box.  Would you
 2    state your name and spell your last name for the court
 3    reporter.
 4              THE WITNESS:  Barbara Castro.  C-A-S-T-R-O.
 5              (Witness sworn)
 6              THE COURT:  You can be seated.  Now that you are in
 7    the box, you can remove your mask.
 8     BARBARA CASTRO,
 9         called as a witness by the Government,
10         having been duly sworn, testified as follows:
11    DIRECT EXAMINATION
12    BY MR. ROOS:
13    Q.  Good afternoon, Ms. Castro.  Can you hear me okay there?
14    A.  Yes.
15    Q.  Just speak into the microphone, because for some people it
16    can be really quiet and other people can be really loud.  So
17    just -- and I'll give you some cues if I can't hear you.  Okay?
18    A.  Okay.
19    Q.  Where were you born?
20    A.  Staten Island.
21    Q.  Where did you grow up?
22    A.  In Staten Island.
23    Q.  How old are you now?
24    A.  48.
25    Q.  Have you worked outside the home?
```

M1l3dou4                              Castro - Direct

1    A.  Yes.

2    Q.  What was your job or career?

3    A.  My last job was international trade, and I was importing

4    freight from Europe.

5    Q.  Have you ever used drugs in your life?

6    A.  Yes.

7    Q.  What drugs?

8    A.  Heroin, oxycodone, Vicodin, Percocet, cocaine.

9    Q.  How did you start using drugs?

10   A.  I was diagnosed with a medical issue.  The sweat glands

11   underneath my arms were infected.  So, I had to get -- every

12   week I was going to a specialist and he would cut open, drain

13   and pack the cysts, and he would provide me with the

14   prescription for antibiotics and a prescription for 30 Vicodin,

15   and that was on a weekly basis.

16   Q.  And what happened next?

17   A.  In eight months, after going to him every Thursday night

18   for eight months, he -- we went for surgery and he removed

19   them.  Then as soon as they were removed, it happened to my

20   other arm.  So, we didn't wait as long this time.  He went in,

21   did surgery.

22         My two week checkup after the second surgery, I went

23   to him and he checked -- we did a checkup, and he provided me

24   with one prescription.  It was for antibiotics.  And I asked

25   him where the other prescription was.  And he said you don't

M1l3dou4                        Castro - Direct

1   need another prescription.  You shouldn't be in any pain.  And

2   I didn't -- my body was looking for it.  I didn't know why.

3   So...

4   Q.  Just to be clear, what was the other prescription you are

5   you're referencing that you were no longer getting?

6   A.  Vicodin.

7   Q.  So then what happened from that point?

8   A.  From there on, I started to look for them on the street and

9   buy them from people selling them on the street, to eventually

10  finding doctors to go to.

11  Q.  Okay.  So, I want to break down the timeline a little bit.

12  Was there a point after you became addicted that you stopped

13  using drugs?

14  A.  Yes.

15  Q.  Approximately when was that?

16  A.  Around 2003.

17  Q.  Okay.  Let's move ahead.  Was there a point when you

18  started using drugs again?

19  A.  Yes.

20  Q.  I want to focus on that period.  What drugs did you start

21  using again?

22  A.  OxyContin and oxycodone.

23  Q.  How did you start using those drugs?

24  A.  I was approached by someone on the street and I had bought

25  them, and I was quickly addicted again.

M1l3dou4                         Castro - Direct

1  Q.  Just to be clear, did you have a medical need for the
2  oxycodone?
3  A.  No.
4  Q.  So why were you taking them?
5  A.  Because I'm an addict.  And I -- it triggered something in
6  my body or my brain.
7  Q.  So I think you mentioned a minute ago that you started
8  going to doctors.
9  A.  Yes.
10 Q.  Did you mean to get oxycodone or a different drug?
11 A.  Well, at that time, it was Vicodin and Percocet before I
12 got clean.  After, when I relapsed, it was for oxycodone.
13 Q.  What was the first doctor you went to to get oxycodone?
14 A.  Dr. Lanting.
15 Q.  Okay.  And where was his office located?
16 A.  On Staten Island.
17 Q.  Can you describe visits to his office?  What they were
18 like?
19 A.  He had approximately three big men letting people in.  Some
20 were charging or some were giving people money to pay for the
21 visit.  I, myself, paid out of my pocket.
22       When it was time to be seen by the doctor, they would
23 sometimes bring in three people that weren't in any way
24 together.  Never been seen together before.  We would go in the
25 office, files would just be piled up on his desk.  He would ask

M113dou4                          Castro - Direct

1    you for your name and date of birth, write the prescription

2    out, take the money, put it in his sock, and you would go.

3    Q.   And what type of prescription?

4    A.   That was for -- at the time, it was 180 oxycodone.

5    Q.   And how did you pay for it?

6    A.   Cash.

7    Q.   Was there any type of physical examination?

8    A.   No.

9    Q.   Did you continue to go to him or stop going to him?

10   A.   I continued going to him until his practice was shut down.

11   Q.   Okay.  And why was it shut down?

12   A.   I believe that -- some kind of law enforcement went in and

13   shut him down.

14   Q.   Let me just back up a second.

15          Did you ever see a doctor named David Taylor?

16   A.   Yes, I did.

17   Q.   When was that in relation to this?

18   A.   Actually, that was on or around the same time as

19   Dr. Lanting.

20   Q.   Where was he, his office based?

21   A.   That was also in Staten Island.

22   Q.   What did you get from him?

23   A.   I got 180 oxycodone.

24   Q.   Did he do any type of physical examination?

25   A.   No.

1    Q.   How did you pay for that prescription?

2    A.   Cash.

3    Q.   So let's jump back after the law enforcement action

4    involving Lanting and you stop going to Lanting.  Did you see

5    any other doctors?

6    A.   Yes.

7    Q.   Which doctors or doctor?

8    A.   I believe that was the time that I went to Dr. Anderson.

9    Q.   Do you remember when you started seeing Dr. Anderson?

10   A.   It was about 2007.

11   Q.   So, for purposes of my next few questions, I want to focus

12   in on the time period of about 2012 to 2017, okay?

13   A.   Okay.

14   Q.   Where was Dr. Anderson's office located?

15   A.   In Staten Island.

16   Q.   What, if anything, was unusual about how Dr. Anderson saw

17   patients?

18   A.   Well, when you were given an appointment, it was just the

19   date.  It wasn't, you never got a time for an appointment.  You

20   were told to come at 9, between 9 and 10 at night to sign in,

21   to sit there and wait until Dr. Anderson came in, which was

22   usually between 2 or 3 in the morning.  2 or 3 a.m.  And then

23   most of the time you would be seen by around 7 or 8 a.m. and

24   then you would leave.

25   Q.   What was it like when you got to the office?

1    A.   In the beginning, when I first started going to him, there

2    were people outside of his office, people in their cars, people

3    inside the office in the waiting room, people at the desk with

4    the office manager, and the medical assistant.

5    Q.   Did everyone wait in the waiting room or outside to see the

6    doctor?

7    A.   Not everyone.

8    Q.   Who did not?

9    A.   I don't know who they were.

10   Q.   Well, what did you observe about them?

11   A.   There were people that would drive down the long driveway

12   into the back where the parking area was, and there was a back

13   entrance into the office.  And they would go through the back

14   door directly into Dr. Anderson's office.

15   Q.   What were you there to get or see Dr. Anderson about?

16   A.   To get oxycodone.

17   Q.   What did he prescribe?

18   A.   He prescribed 180 oxycodone, he was prescribing me

19   gabapentin, he was prescribing me Synthroid, he was prescribing

20   me vitamin D, and he was prescribing me an antiinflammatory,

21   but I don't remember the name of it.

22   Q.   Were you filling all those prescriptions?

23   A.   In the beginning, I was not.  I wasn't filling any of them

24   except for the oxycodone.

25   Q.   We'll come back to the filling.  Let me ask you a few more

M1l3dou4                          Castro - Direct

1   questions about this.

2               When you'd see him for a visit, did he do a physical

3   examination?

4   A.   A very small one.

5   Q.   When you went into the examination room, were you by

6   yourself?

7   A.   Not all the time.

8   Q.   On those times you were not by yourself, who else was there

9   with you?

10  A.   Sometimes I went in with my brother, and sometimes I went

11  in with a friend of mine.

12  Q.   Why did you go in with someone else?

13  A.   Because we were all there to obtain the same medication,

14  and he said to just come in together.

15  Q.   What medication?

16  A.   Oxycodone.

17  Q.   Besides your brother and the friend, did you recognize

18  other people at the doctor's office?

19  A.   Yes.

20  Q.   How did you know them?

21  A.   From the neighborhood.  Some of them were people that I

22  purchased oxycodone from on the street.

23  Q.   When you would go into the doctor's office, did you display

24  any signs that you were addicted to drugs?

25  A.   Yes.

1  Q.  What?

2  A.  You could clearly see the track marks on my arms.  I was

3  clearly impaired.  I would nod out in the waiting room for

4  hours with my head between my legs waiting to see the doctor.

5  Q.  Now, how did you pay for those visits when you saw

6  Dr. Anderson?

7          Let me pause for a second.  There's tissues and a

8  water.  We can pause for a second if you need a second to

9  collect yourself.

10  A.  No, I'm okay.

11  Q.  You sure?

12  A.  Yeah.

13  Q.  All right.  So how did you pay for the visits to

14  Dr. Anderson?

15  A.  Cash.

16  Q.  During the period we discussed where you were seeing

17  Dr. Anderson, where did you fill your prescriptions?

18  A.  There were -- it started at Walgreens, CVS's, but, after a

19  little bit of time, they wouldn't accept Dr. Anderson

20  prescriptions anymore.  So, I started going to Old Town

21  Pharmacy.

22  Q.  Where is that located?

23  A.  In Staten Island.

24          MR. ROOS:  Let me show the witness what's been marked

25  for identification -- witness and the court participants

M1l3dou4                         Castro - Direct

1    only -- what's been marked for identification as Government

2    Exhibit 636.

3    Q.  Ms. Castro, do you see an image on the screen?

4    A.  Yes.

5    Q.  What is it?

6    A.  It is a picture of me and my brother.

7    Q.  Where are you?

8    A.  Exiting Old Town Pharmacy.

9            MR. ROOS:  The government offers 636.

10           MR. GOTTLIEB:  Objection, your Honor.

11           THE COURT:  I'll admit it into evidence.

12           (Government's Exhibit 636 received in evidence)

13           MR. ROOS:  Can we publish it to the jury.

14           THE COURT:  Yes.

15   Q.  Ms. Castro, I am waiting for it to show up on everyone's

16   screen.

17   A.  All right.

18   Q.  Ms. Castro, can you identify who the people are in the

19   picture?

20   A.  Yes.  My brother is in front.  And I'm behind him.

21   Q.  What's behind you and him?

22   A.  That's Old Town Pharmacy.  I'm in front of the door to the

23   entrance.

24   Q.  What did you have in your hand there?

25   A.  We both had our prescriptions for oxycodone.

M1l3dou4                        Castro - Direct

1   Q.   During what time period were you filling oxycodone

2   prescriptions at Old Town Pharmacy?

3   A.   Around 2013 until about 2017.

4   Q.   Did you recognize any of the customers there?

5   A.   Yes.

6   Q.   How did you recognize them?

7   A.   Most of them were coming from the doctor's office,

8   Dr. Anderson's office, as well from the night before or the

9   morning.

10  Q.   What do you mean by that?

11  A.   They waited at the doctor's while I was at the doctor's

12  office to see the doctor.

13  Q.   And then they went to the pharmacy?

14  A.   Yes.

15  Q.   When you paid for prescriptions at Old Town Pharmacy, how

16  did you pay?

17  A.   They wouldn't accept insurance.  So, I had to pay cash.

18  Q.   To the extent you know, for people that you knew going to

19  Old Town Pharmacy, did you know how they paid?

20  A.   Yes.

21  Q.   How did they pay?

22  A.   As far as my knowledge, everyone that I know that went to

23  Old Town Pharmacy had to pay cash.

24  Q.   You mentioned a few minutes ago you initially were filling

25  at CVS or Walgreens; is that right?

1    A.  Yes.

2    Q.  Why couldn't you get your prescriptions filled there at

3    some point?

4    A.  They would no longer take Dr. Anderson's prescriptions.

5    Q.  Now, Ms. Castro, have you been arrested in your life?

6    A.  Yes.

7    Q.  More than one time?

8    A.  Yes.

9    Q.  What generally were the arrests for?

10   A.  Possession of a controlled substance.

11   Q.  Does that include oxycodone or other drugs like that?

12   A.  Yes.

13   Q.  Were you stopped by the DEA in 2018?

14   A.  Yes.

15   Q.  Why?

16   A.  For -- selling my oxycodone.

17   Q.  And where did you get the oxycodone?

18   A.  From Old Town Pharmacy.

19           MR. ROOS:  No further questions, your Honor.

20           THE COURT:  Cross-examination?

21           MR. GOTTLIEB:  Briefly, your Honor.

22           THE COURT:  Yes.

23   CROSS-EXAMINATION

24   BY MR. GOTTLIEB:

25   Q.  Ms. Castro, good afternoon.

M1l3dou4                          Castro - Cross

1    A.  Good afternoon.

2    Q.  I'm sorry, you've had a very difficult, very difficult

3    number of years, correct?

4    A.  Yes.

5    Q.  It's been very hard on you, your family, correct?

6    A.  Yes.

7    Q.  And you were asked to come to court by the government to

8    testify in this case, correct?

9    A.  Correct.

10   Q.  Ms. Castro, do you know RDC?

11   A.  I don't know what that is.

12   Q.  Do you know Laurence Doud?

13   A.  No.

14   Q.  Do you know Jessica Pompeo?

15   A.  No.

16   Q.  William Pietruszewski?

17   A.  No.

18   Q.  Do you know anyone at all who works with Laurence Doud and

19   RDC?

20   A.  I don't know where he work, but to my knowledge, no.

21   Q.  You've never been to RDC's offices, right?

22   A.  To my knowledge, no.

23   Q.  Over the years, there have been a number of doctors who

24   really took advantage of you and prescribed narcotics, right?

25   A.  Yes.

M1l3dou4                          Castro - Cross

1   Q.  And you have suffered as a result of those doctors who

2   violated the law, their oath of office, their profession.  You

3   have suffered because of it, haven't you?

4   A.  Yes, I have.

5   Q.  This goes back to like 1999, when you had a real problem

6   that first got you involved in taking controlled substances and

7   narcotics, right?

8   A.  Yes.

9   Q.  And it just spiraled out of control since then, right?

10  A.  Yes.

11  Q.  It got to the point that not only were you really forced,

12  compelled, to go to a pharmacy to get prescriptions, but it got

13  so bad that you had to buy it from people on the street, right?

14  A.  Yes.

15  Q.  And pharmacies that you went to, you mentioned Old Town.

16  And you recall going to a pharmacy called Medicine Man

17  Pharmacy?

18  A.  Yes, I do.

19  Q.  South Shore Pharmacy?

20  A.  Yes.

21  Q.  Ocean Breeze Pharmacy?

22  A.  Yes.

23  Q.  In addition to Old Town, right?

24  A.  Yes.

25           MR. GOTTLIEB:  I hope you are well.

1              Your Honor, thank you.

2              THE COURT:  Any further questions for this witness?

3              MR. ROOS:  No, your Honor.  Thank you.

4              THE COURT:  You can step down, ma'am.  Thank you.

5              Ladies and gentlemen, we have one more witness.

6              MR. GOTTLIEB:  Actually, your Honor.  One question.

7              THE COURT:  Yes.  Sure.

8    BY MR. GOTTLIEB:

9    Q.  I'm sorry.  You're almost done.  Dr. Anderson who you

10   mentioned.  He was arrested, wasn't he?

11   A.  I believe so, yes.

12             MR. GOTTLIEB:  Thank you.  Thank you.

13             (Witness excused)

14

15

16

17

18

19

20

21

22

23

24

25

M1l3dou4

1          THE COURT:  We are going to take a short break because

2     I think we have one more witness, and I want to talk to the

3     parties about how we are going to do that.  Don't discuss the

4     case, keep an open mind.  I am going to give you a 15-minute

5     break.

6          (Jury excused)

7          THE COURT:  Mr. Janey, what are your issues with

8     regard to this next witness?

9          MR. JANEY:  With respect to the exhibits, your Honor,

10     I would divide it into two buckets.  The first bucket is

11     information that's reflected through the summary exhibits that

12     I would anticipate.  There has been a lot of information

13     material witness testimony admitted in evidence dealing with

14     red flags, dispensing data, and things related thereto.

15          If I can put that on the left side of the sheet of

16     paper.  On the right side of the sheet of paper are categories

17     of information that have not been admitted in evidence in this

18     case to this point as we stand here right now at 20 minutes to

19     3 on Friday the 21st.  That the information, as far as I can

20     recall, your Honor, pertains to sales data relating to the

21     product at issue, one.  And two, Larry Doud's compensation

22     information.  Neither of these categories of information have

23     been either testified about or in material that's been admitted

24     in evidence before this jury to this point.  And it's with

25     respect to those pieces of information, your Honor, I don't

M1l3dou4

believe that it is proper, based on the case law, and I'm

citing in particular, just for the purposes of the record, the

Second Circuit in Gypsum, your Honor.  I don't believe that a

summary witness is able to present information on a summary

basis to a jury that has not been admitted in evidence.  That's

one.

Two, in terms of the second dimension, your Honor,

even in instances where your Honor might reach a finding that

certain information should still come in through this witness,

even if it's not currently admitted in evidence, which our

position is such information is improper.  The slides, and I'm

happy to discuss which in particular, your Honor, by way of

example, are unfairly prejudicial and misleading.

As an example of that, I believe I handed up to your

Honor a binder that was tabbed with three large stickies.

THE COURT:  Yes.

MR. JANEY:  If I refer to the second sticky by way of

example, your Honor --

MR. ROOS:  We don't have the stickies, so if we could

know what page it is and which exhibit.

MR. JANEY:  Certainly.  I need to put my eyeglasses

on.  I'm referring, for example, your Honor, to Government

Exhibit 904.  If I take 904 as an example, your Honor, it

identifies and it exemplifies two of my issues.

Number one, across the top, and I understand that

M1l3dou4

these are case studies of 41 customers.  But it identifies on

the top of the page, first of all, in the right hand it says

number of customers above the threshold.  So presumably, the

numbers in that right-hand column are meant to indicate where

threshold levels have been breached.  To the left of it, the

first column, your Honor --

THE COURT:  I'm sorry.  I'm not sure I'm on your

exhibit.  Government Exhibit 904?

MR. JANEY:  Yes, your Honor.

THE COURT:  I have one page.  Right?

MR. JANEY:  Yes, your Honor.

THE COURT:  It says customer metrics from sales, order

of interest, and dispensing data.  Is that the right --

MR. JANEY:  Yes, your Honor.  I'm looking here, if I

may, your Honor, this right-hand column, which it says number

of customers above threshold.

THE COURT:  Right.

MR. JANEY:  So, there, just drawing for the moment

your Honor's attention to that column, presumably that is meant

to describe numbers that are above a particular threshold.

Okay.

THE COURT:  Okay.

MR. JANEY:  Understanding that then if I look to the

right, it describes controlled substance shares of sales.

Which presumably if you look at the underlying data, and I'll

M1l3dou4

1    give you an example, is an aggregation of sales in connection

2    with a particular set of customers.  Right.  So by way of

3    example, Government Exhibit 905 is a breakdown.  And that

4    pertains to Alden Pharmacy.

5              THE WITNESS:  Okay.

6              MR. JANEY:  That sheet gives gross sales in connection

7    with that customer by year from 2013 to 2016.  If you look at

8    the summary sheet, 904, the implication is that the sales in

9    connection to such a customer is indicative of a threshold

10   being breached.  That's one.

11             THE COURT:  I don't follow that.

12             MR. JANEY:  Again, the column to the right, your

13   Honor, which is describing the numbers.

14             THE COURT:  Right.

15             MR. JANEY:  It's labeled number of customers above

16   threshold.

17             THE COURT:  Right.

18             MR. JANEY:  It's using as an indicia of that the sales

19   relating to that customer.

20             THE COURT:  Okay.

21             MR. JANEY:  There has been no testimony or evidence in

22   this case to this point that the sales in relations to

23   customers are indicative of a red herring or a red flag.

24   That's not how red flags have been discussed in this case.

25             Second, if you look below, your Honor, I don't have

M1l3dou4

1    any issue with the other columns, the other indicia that are

2    described.  That has been what's been admitted in evidence in

3    this case.  But the sales information all of a sudden is

4    playing a large role, and describing, presumably, I would

5    imagine, the government is intending to either elicit or create

6    an inference that millions of dollars have been attributed to

7    sales in relation to these customers, which presumably the

8    government is going to somehow either elicit or characterize

9    are problematic.  And look at all the millions of dollars that

10   have been made.

11        This goes, your Honor, the government opened on this,

12   the government opened on this in saying that Larry Doud's

13   motivation is a function of greed.  But that argument has not

14   been developed by way of evidence in this case.  That's another

15   reason I would submit why the government is including Larry

16   Doud's compensation information, which hasn't been discussed in

17   this case, certainly it hasn't been admitted in evidence in

18   this case.  And those offending categories of sales

19   information, Larry Doud's compensation information, and put on

20   slides that overlay red flags, is unfairly prejudicial,

21   misleading, and improper because it's not been admitted in

22   evidence in this case.

23        THE COURT:  Okay.  Well, I'm going to take it bit by

24   bit because you're overlapping these arguments so it is

25   confusing me a little bit.

M1l3dou4

| | |
|---|---|
| 1 | With regard to 904.  What is the information on 904 |
| 2 | that you object to?  Just that first column? |
| 3 | MR. JANEY:  The first -- the horizontal label. |
| 4 | THE COURT:  That first controlled substance share of |
| 5 | sales 30 percent and the 10? |
| 6 | MR. JANEY:  Yes, your Honor. |
| 7 | THE COURT:  Is there anything else on that sheet that |
| 8 | you are objecting to? |
| 9 | MR. JANEY:  No, your Honor. |
| 10 | THE COURT:  You're objecting to that why?  Because? |
| 11 | MR. JANEY:  The implication by the title, which says |
| 12 | summary of red flags identified in 41 customer case studies, |
| 13 | suggests that the sales in connection to those customers is a |
| 14 | red flag.  That hasn't been elicited by any testimony or |
| 15 | evidence in this case. |
| 16 | THE COURT:  Articulate for me what you say that this |
| 17 | is supposed to be saying?  That the red flag was what? |
| 18 | MR. JANEY:  Is the sales in relation. |
| 19 | THE COURT:  What about the sale?  That the sale was |
| 20 | what? |
| 21 | MR. JANEY:  Well, that it is substantial.  If I use -- |
| 22 | this is just a summary sheet.  If I use as an example, your |
| 23 | Honor, Government Exhibit 905, it shows the argument, the |
| 24 | implication clearly meant to be conveyed to the jury, look at |
| 25 | the millions of dollars that were generated and made in |

M1l3dou4

1   connection with these companies year by year by year.

2              THE COURT:  But that's what I'm trying to understand,

3   and maybe I can get this better from the government.  The

4   column that says controlled substance share of sales

5   30 percent.  That means that 30 percent of the product sales by

6   RDC were controlled substances?

7              MR. JANEY:  My inference, your Honor, is that the

8   sales of the controlled substances in relation to these

9   pharmacies is what is aggregated here by this summary title,

10  and --

11             THE COURT:  Whose sales?

12             MR. JANEY:  The individual pharmacies.

13             THE COURT:  Pharmacy sales.  Okay.  Well, let me get

14  from the government what --

15             MR. ROOS:  Your Honor, a few things.  And in no

16  particular order.  First of all, the government has a business

17  record certification from a custodian of record from Rochester

18  Drug to authenticate in and put in the sales data and the

19  compensation data.  That's Government Exhibit 701.

20             THE COURT:  That's been provided I assume.

21             MR. ROOS:  They've got it.  It's marked, we can easily

22  offer it.

23             Second point, the summary witness who is about to

24  testify, these are not his slides.  These are for the expert.

25  Which imposes totally different rules about what they're

M1l3dou4

1    allowed to testify about.

2              THE COURT:  Is this witness testifying --

3              MR. ROOS:  He's not.  I don't know why Mr. Janey,

4    these are the expert's slides.

5              THE COURT:  We are not going into these with this next

6    witness?

7              MR. ROOS:  If your Honor wants, Mr. Burnett's prepared

8    to talk through --

9              THE COURT:  I don't want anything.  I want whatever

10   you want.  Tell me what you want to do.

11             MR. BURNETT:  It seems like there is some binder of

12   objections handed up to you.

13             THE COURT:  I thought the reason we were taking the

14   jury's time to discuss this now is because we had to resolve

15   this so that this next witness could testify about these.

16             MR. ROOS:  These objections, as far as I can tell, 904

17   and 905 are not the next witness's slides.

18             Understanding these are the expert's slides, if they

19   still have objections, I think it make sense to resolve those

20   before the expert testifies.  Early next week.  Not even

21   Monday.

22             THE COURT:  So we're not talking about this witness.

23   Let me start with that.  What is it about this witness, what is

24   this witness going to testify to?

25             MR. ROOS:  This witness, there is an Exhibit 902,

M1l3dou4

1    which is a timeline.

2              THE COURT:  Okay.

3              MR. ROOS:  Of e-mails that are in evidence.  Just

4    going to walk through the timeline, we used a template for the

5    timeline, which was the same one that was used in United States

6    v. Chi Ping Patrick Ho.

7              THE COURT:  Is this pretty much in a different format,

8    the excerpts, that we had seen previously?

9              MR. ROOS:  Correct, your Honor.  The witness is going

10   to do a mix of reading directly off the summary slides and

11   going to the source material which are in evidence.  Everything

12   in there is in evidence.  The only thing that would not be in

13   evidence in the witness's testimony is things like, you know,

14   things you know about the world.  Like Cardinal Health or

15   Purdue or things like that.

16             THE COURT:  I don't know where that would be.

17             MR. JANEY:  It is on the first slide.

18             THE COURT:  What are you objecting to with regard to

19   Exhibit 902?  Are you making any different objection than

20   you've made about the other exhibit, because that I --

21             MR. JANEY:  My objections on 902, your Honor, I'll

22   deal with on cross-examination.

23             THE COURT:  So you don't have an objection right now

24   for me to resolve?

25             MR. JANEY:  That's correct.

M1l3dou4

1          THE COURT:  902 is put aside.

2          MR. ROOS:  We're good to go then.

3          THE COURT:  Okay.  And then you still have, your major

4    objections are to the exhibits that are going to come in

5    through their expert?

6          MR. JANEY:  Yes.

7          THE COURT:  I assumed we were going to have

8    discussions about the expert early next week, both defense and

9    government experts.  So, as far as I know now, 902 is the only

10   exhibit that's going to be offered through this witness.  Then

11   we don't have to resolve the others.  It gives me some

12   opportunity to look through in detail at this.

13         But, I can tell you in general what my position is.

14   The first question I want to know is whether or not the

15   underlying documentation that the witness relied upon in

16   putting together the charts, whether the defense has those

17   underlying documents.  Second part is, if the defense has an

18   objection, Mr. Janey, if your objection is that that evidence

19   isn't admitted, that's not admitted into evidence, then it's

20   their responsibility to identify, authenticate, and offer those

21   underlying documents in evidence.  And then he can testify to

22   it and that's resolved, if that's what you want, to dump all

23   those documents on the jury.  As opposed to a reasonable

24   understanding that the documents are admissible and that the

25   charts accurately reflect those documents.

M1l3dou4

1          MR. JANEY:  Look, it sounds like the government

2    anticipates one of our potential objections, so we might as

3    well talk about it now which is the issue on Cardinal.  We've

4    dealt with this before.  And that's in the first column of.

5          THE COURT:  What's your objection with regard to that?

6          MR. JANEY:  It would be a relevance objection, your

7    Honor.

8          THE COURT:  I'm sorry.  Give me -- put it in some

9    context for me.  I don't know what relevance Cardinal has to

10   this case.

11         MR. JANEY:  The issue first arose earlier on in the

12   trial when an agent was -- the government sought to elicit from

13   an agent her role in an investigation of Cardinal Health.  We

14   raised, the defense raised a relevance objection in that

15   instance.

16         THE COURT:  Let me ask you this.  Short circuit.  Is

17   Cardinal Health the investigation that prompted the agents to

18   go to RDC and question the RDC?

19         MR. JANEY:  No, your Honor.  I've never heard such a

20   statement.

21         THE COURT:  I'm not sure I remember what Cardinal

22   Health had to do with this.

23         MR. JANEY:  My recollection, your Honor, is that the

24   DEA agent who testified on the first day, I apologize, I'm

25   forgetting her name, had been an investigator of Cardinal

M1l3dou4

1   Health in Florida.  And the government sought to elicit, in my

2   opinion, her experience about that investigation and tried to

3   relate it to RDC.  We made a relevance objection in that

4   instance.

5          THE COURT:  And remind me how I ruled on that.

6          MR. JANEY:  You limited the testimony.

7          Here, in this slide, it begins in the first chart, the

8   DEA accuses Cardinal Health of making certain allegations.

9   Here, what the government similarly at the time when this first

10  came up, is that there's some e-mail traffic where an e-mail

11  was forwarded to Mr. Doud about the Cardinal investigation, and

12  he responded in an e-mail to an employee about that

13  investigation.

14         THE COURT:  But you are not arguing that that's

15  somehow inappropriate.

16         MR. JANEY:  No, your Honor.

17         THE COURT:  I'm trying to figure out.

18         MR. JANEY:  The e-mail is not inappropriate.  I

19  believe the e-mail itself may already be in evidence.  But the

20  further characterization in somehow on this chart in a way

21  suggesting that things at the beginning of this timeline

22  kickstart what goes on in the context of RDC malfeasance is

23  misleading to the jury.

24         THE COURT:  I'm not sure in what way this is

25  inaccurate.

M1l3dou4

1          MR. JANEY:  Well, it's not that it is factually

2    inaccurate, your Honor.

3          THE COURT:  If it is not factually inaccurate, then I

4    need to know in what way it's misleading.

5          MR. JANEY:  The chart itself, your Honor, implies that

6    at the beginning of all of this activity, the DEA accuses

7    Cardinal Health of certain activity.  Then it says the articles

8    and information about Cardinal Health allegations are sent to

9    Mr. Doud and others.  And then they begin to respond and the

10   visual image is then there is this chain reaction that would

11   fit with the government's narrative of concealing and telling

12   people to lie and to hide information.  That's grossly

13   misleading.

14         THE COURT:  I'm trying to figure out what you say is

15   misleading.  Whether you are saying the words are misleading,

16   whether you're saying quotations are misleading, whether you're

17   saying the information outside the quotations were misleading,

18   or whether you're saying this chain of events.

19         (Continued on next page)

20

21

22

23

24

25

M1LBDOU5

1          MR. JANEY:  The chain of the events.  The impression

2     that this chart provides is misleading, and in that sense it is

3     improper.

4          THE COURT:  What do you think it misleads the jury to

5     think?

6          MR. JANEY:  To think that there was a Cardinal Health

7     investigation that somehow kicked off certain behavior at RDC.

8     That's incorrect.  There's nothing in the evidence in this case

9     --

10          THE COURT:  No, it says that there was a Cardinal

11     Health investigation.  And then after that, articles and

12     information about Cardinal Health's investigation were sent to

13     Larry Doud by Brennan and Pietruszewski and others, and then it

14     quotes language about DEA's investigations.  I don't know

15     whether or not that was in the context of whether you're

16     arguing or they're arguing whether that was or wasn't in the

17     context of Cardinal Health's discussions.

18          MR. JANEY:  Well, your Honor, I think that it is

19     reasonable to believe that a juror will infer from this chart a

20     clear impression that Larry Doud and others at RDC began to act

21     in an unlawful way once they heard about the Cardinal Health

22     investigation.

23          THE COURT:  I don't disagree with that, but it appears

24     to me that that is the inference that the government is trying

25     to get.

M1LBDOU5

1        MR. JANEY:  This is a summary witness.  This is not an

2   argument.  This is about the evidence in this case.

3        THE COURT:  It is about argument.

4        MR. JANEY:  I understand, your Honor. What I'm

5   pointing out is I'm saying, a summary witness is not supposed

6   to be presenting mere attorney argument.  A summary witness is

7   supposed to be summarizing information and materials that have

8   been admitted in evidence in this case before this jury.

9        THE COURT:  This seems to be about emails, mostly,

10  right?  This is another email chart?

11       MR. ROOS:  Emails and documents only, and one call

12  log.

13       THE COURT:  I guess the question is that -- the

14  informed judgment I need to make is you need to tell me

15  specifically what portions of these -- of this chart that you

16  object to and why.

17       MR. JANEY:  Any information about investigations that

18  are not connected to RDC should not be a part of the

19  presentation by a summary witness.

20       THE COURT:  I don't know where that is or what you

21  claim that is other than you don't want any mention of Cardinal

22  Health.  Is that it?  As I read this, Cardinal Health is what

23  Mr. Doud refers to in his communication.

24       MR. JANEY:  My objection, your Honor, doesn't relate

25  to the emails.  The emails are admitted in evidence.  I

M1LBDOU5

1   understand that.

2          THE COURT:  You're not objecting to the information as

3   cited in the quotation?

4          MR. JANEY:  That's correct, your Honor.  I'm objecting

5   to the gratuitous information about unrelated investigations

6   that are an attempt to set a frame for the emails.

7          THE COURT:  You need to identify that gratuitous

8   information for me.  Not now, but even if you just want to

9   highlight that and then I can figure out what you're arguing

10  about, and then the government can either react by responding

11  and arguing against it or taking it out.

12         The only thing that I know of at this point in this

13  multipage document is that you object to the reference to

14  Cardinal Health that's not in quotation marks, that's the only

15  thing that I understand that you have an objection to.

16         MR. JANEY:  I will go through and mark for your Honor.

17  I believe the government's in a very good position also to

18  understand what should be removed, but I will do that.

19         MR. ROOS:  Your Honor, I think all is fine because --

20  two things, it's already in evidence.

21         THE COURT:  What's in evidence?

22         MR. ROOS:  The quotes in there about Cardinal are in

23  evidence already.

24         THE COURT:  There's some information in here about

25  Cardinal that is not in quotes.

788

M1LBDOU5

1          MR. ROOS:  The agent will testify the information is

2     summarizing the three emails that are listed in the little GX

3     thing. I didn't ask the agent to look up the source materials

4     of these lawsuits.  It's purely about what was being sent to

5     Doud.

6          THE COURT:  I think if they have an objection, at

7     least technically they have a legitimate objection that it's

8     not for the agent to summarize the words, just like you have

9     done in most instances to quote the words.  If you want to

10    summarize something that they object to, then I'm not sure that

11    you have the right to put in evidence that is simply your agent

12    summary of what was said.

13         MR. ROOS:  I guess we need to know which parts are not

14    quotes.  I would have to say something about the summary is

15    more prejudicial than what's already in the emails.  If you

16    look at this, the first box just says, DEA accuse Cardinal

17    Health of quotes.  So the non-quoted part just says, DEA accuse

18    Cardinal Health, a drug distributor.  That's in other emails.

19         THE COURT:  The reality is, is that they may

20    technically have a legitimate argument that, look, that's not

21    evidence in this case.  Who puts this in this context?

22         MR. JANEY:  That's, your Honor, why there are limits

23    around demonstratives.  The government is splitting a fine

24    hair.

25         THE COURT:  This is more than a demonstrative.  I

M1LBDOU5

1    don't agree. A demonstrative is a chart or summary that's used

2    in aid of argument, but it's not admitted into evidence.  A

3    document that the foundation is laid through to admit it into

4    evidence is not a demonstrative.  It is substantive evidence.

5    This is supposed to come in when?

6            MR. ROOS:  Right now.

7            THE COURT:  What do you want?

8            MR. ROOS:  Judge, I would just point out that -- and

9    this is Second Circuit.  I'll pass it up to your Honor.  Under

10   Rule 1006, a proponent of evidence may use a summary, chart or

11   calculation to prove the content of voluminous writings,

12   including the Court has long approved the use of charts in

13   complex trials.  And in this case on timelines just like this,

14   I think under the rule, it doesn't have to be a verbatim quote

15   of everything.

16           THE COURT:  No, it doesn't, but their first argument,

17   and I don't know if they have any other argument any place

18   else, but their first argument is your very first line in your

19   very first page of your chart is not a summary of anything

20   that's before this jury.

21           MR. JANEY:  Speaking of cases, your Honor, again for

22   the purposes of the record since we're talking about cases, I'm

23   relying on *Fagiola v. National Gypsum*, at 906 F.2d 53, the

24   Second Circuit --

25           MR. ROOS:  It's a civil case though so it's a

M1LBDOU5

1    different set of rules.

2              MR. JANEY:  Not on this issue.

3              THE COURT:  Where do you get the statement that is not

4    in quotations that the DEA accused Cardinal Health, a drug

5    distributor, of supplying pharmacies?  Where does that

6    statement come from.

7              MR. ROOS:  Your Honor, I would submit each of the GXs

8    that are listed in there; for instance, 3A which is the article

9    attached to 3, the title, DEA is big in Cardinal Health

10   painkiller case.

11             THE COURT:  Say that again.

12             MR. ROOS:  My apologies, your Honor.  3A which is the

13   article that's attached to Exhibit 3 that in evidence.  It says

14   this month the DEA accused Cardinal Health, a Fortune 500

15   company with 103 billion in revenue of endangering the public

16   health by selling excessive amounts of oxycodone to four

17   Florida pharmacies.

18             THE COURT:  What does that have to do with the

19   quotation?

20             MR. JANEY:  Nothing.  And it's similar, as I'm going

21   through your Honor, on the next page, there's a similar issue,

22   an article about Amerisource Bergen, and it's being subpoenaed

23   by federal law enforcement.  These sorts of things if the

24   government is being straight forward, this timeline is riddled

25   with these sorts of things.

M1LBDOU5

1          THE COURT:  My position would be different if this was

2     actually demonstrative a chart that you wanted to use during

3     summation, that it was not going to go in evidence and was not

4     going to go in the jury room if the jury ask for it so that

5     both sides could argue whether they think it's accurate

6     reflection of the testimony or not an accurate reflection of

7     the testimony.

8          But if you want this as an exhibit, then it should be

9     as close as possible, particularly if you're quoting things

10    that have happened and events that happened that are relevant

11    to this case and/or -- I'm not even sure all of this is

12    reflected in testimony, then you should be able to quote

13    exactly where in the actual evidence before the jury.

14         MR. JANEY:  Some of these things, again, your Honor,

15    like, for example, with respect to the Amerisource Bergen.

16    That's not developed in testimony evidence in this case.

17         MR. ROOS:  That comes again from another email that's

18    in evidence.  The witness isn't going to introduce any facts

19    around that are not based on emails that are in evidence.

20         THE COURT:  This is a little different than the

21    document that we talked about earlier that had the quotations.

22    Those were quotations, and their argument was, it wasn't

23    complete quotations, but they were not in a position to argue

24    that you're recharacterizing the evidence the way you want it

25    to sound even though -- without going back to the direct

M1LBDOU5

1  quotations.  I guess the real question is, how am I supposed to

2  resolve this for this witness to testify today?

3         MR. ROOS:  I think if they would just call out which

4  of the boxes they're concerned about that have anything beyond

5  a quote, I probably can sit with the paralegal and fix it

6  really quickly.

7         THE COURT:  Do you know what specific objections you

8  have?

9         MR. JANEY:  I'm going through it now.  My second one

10 was the box on Amerisource Bergen.

11        MR. ROOS:  What page is that?

12        MR. JANEY:  It's page 3, your Honor.

13        MR. ROOS:  Your Honor, that one just says, Larry Doud

14 forwards an email to Brennan, Pietruszewski and Lanny Doud with

15 an article from Bloomberg.com titled Amerisource Bergen

16 subpoenaed by U.S. over painkillers.  The article states, and

17 then it's a quote.

18        MR. JANEY:  The statement of the article is not

19 developed in evidence in this case.  It's quoting from the

20 article.  That's not a part -- why is it probative for this

21 jury to have this issue of federal law subpoena against

22 Amerisource Bergen?  It isn't.

23        THE COURT:  Wait.  Wait.  That's a different issue.

24 My issue on that is very simple.  If it's in Government Exhibit

25 9, and Government Exhibit 9 is in evidence, then you don't have

M1LBDOU5

1  an argument to make.

2         MR. JANEY:  Can I clarify, your Honor.  So that I'm

3  clear also on the other slides that this witness is going to

4  bring in.  Can I just ask, to be clear, whether this witness is

5  going to speak at all to anything else in the 900 series?

6         MR. ROOS:  Just 902.  It sounds like the only issue we

7  have is the very first bubble.  I can go fix that right now.

8  We can get the witness on the stand. Make some headway with the

9  jury.

10        THE COURT:  How many different boxes do you have an

11 objection to?

12        MR. JANEY:  Well, I have an objection to the two.

13 We've discussed the two.  If this witness is only dealing with

14 these particular slides, if he's only dealing with these

15 slides, those are my only two objections.

16        THE COURT:  Let's see if the government can just fix.

17 If that's going to make it efficient to move forward and that

18 doesn't prejudice your case, look at those two boxes and modify

19 them in a way that they cannot object to it and then let's move

20 forward.

21        MR. ROOS:  I'm going to sit with the witness also so

22 he understands.

23        THE COURT:  That's fine.  Let's try to do that

24 quickly.

25        MR. BURNETT:  It sounds from this binder that

M1LBDOU5

1    Mr. Janey handed up to you from what he's saying, there might

2    be other objections.

3          THE COURT:  He said that he only had two objections to

4    this chart.

5          MR. BURNETT:  Can I finish what I'm saying.

6          THE COURT:  One at a time.

7          MR. BURNETT:  I'm just fronting that it sounds like

8    there are likely other objections to the 900 series that are

9    not coming up with this witness, that would be good to resolve

10   or have presented before the witness is presented.

11         THE COURT:  I agree.  You should take the lead on

12   negotiating that with them.

13         MR. JANEY:  What I will offer, your Honor, I will send

14   a document to the government outlining our concerns about the

15   expert slides, and I will not do it at 11:50 p.m. at night.

16         THE COURT:  If we can address it on Monday, we will,

17   but I'll anticipate, give everybody a chance to exchange and

18   discuss, that by Tuesday unless we have to discuss it before

19   then, we can resolve those issues by Tuesday.

20         MR. JANEY:  It's challenging to wake up at five in the

21   morning to six page letters.

22         MR. BURNETT:  It's better than doing it on the jury's

23   time.

24         THE COURT:  I understand that from my perspective.

25   See if you can quickly resolve this. The jurors are cooling

M1LBDOU5

1    their heels.  I want to get them and finish this. How long are

2    you going to take with this witness?

3         MS. ROTHMAN:  I think Mr. Roos has two and a half

4    hours, so it likely wouldn't happen all today.

5         THE COURT:  All right.  Let me know when you're ready

6    to proceed and we'll get the jurors in.

7         (Recess)

8         THE COURT:  Let me just first say, I don't see why

9    this should take two and a half hours.  Now I hope you don't

10   intend to go through every one of these boxes with this witness

11   who all he did was summarize in a chart other exhibits that are

12   in evidence.

13        MR. ROOS:  It's going to be a mix, your Honor. I'm

14   going to explain to the jury where the materials come from.

15   Part of the reason for the summary is we're not going to go

16   through every email.  The first three slides are going to be

17   slower than the second part.

18        THE COURT:  But you're going to go through every one

19   of these boxes?

20        MR. ROOS:  That's the idea.

21        THE COURT:  That's not the idea.  The idea is this

22   reflects exhibits that are already in evidence, and there's no

23   reason for you to go through every one of the boxes with every

24   one of the quotations in the boxes.

25        MR. ROOS:  They read like ten emails yesterday.  This

M1LBDOU5

1   isn't an attempt to do that. Otherwise, we're going to have to

2   put on somebody to just read emails.

3        THE COURT:  Why?  They're in evidence.  You already

4   read the emails.

5        MR. ROOS:  These emails weren't read out loud.

6        THE COURT:  These are different emails than you put

7   before the jury?

8        MR. ROOS:  Yes.

9        MR. JANEY:  They may not have been read out, but

10  they're emails that on discover are in evidence --

11       MR. ROOS:  They're in just by a stip.

12       THE COURT:  The one thing we're not going to do is sit

13  here and listen to a witness to read every single box when the

14  only relationship this witness has to this case is that they

15  summarize exhibits that are already in evidence.

16       MR. ROOS:  They'll be conversational.  He's a law

17  enforcement agent. He'll be able to answer some questions,

18  provide context if necessary.

19       THE COURT:  My guidance is, we're not going to go

20  through every single box.

21       MR. ROOS:  Your Honor, the jury has not seen this

22  material.  I'm not just talking about the summaries.  It's

23  emails.  Give me a little leeway.

24       THE COURT:  A little leeway. You want to go through

25  every single document and you want to go through every single

M1LBDOU5

1    box for two and a half ways.  Fine. Do it. by the time I tell

2    you to sit down, you will have lost the jury long before.  If

3    you think that's the way you want to spend that time, we're

4    going to sit here and wait.  Try and finish this witness today.

5    Two and a half hours going through every single box is not an

6    appropriate use of the jury's time.

7              MR. JANEY:  If they're going to take two and a half

8    hours to go through emails that have been admitted in evidence

9    and that we have litigated and crossed and recrossed and

10   directed and redirected in depth --

11             THE COURT:  I laid out my warning and I ask my

12   question.  If that's what you intend to do, we'll see how long

13   it's going to take you to do that.

14             MR. ROOS:  On the fly, I'm going to cut it down.

15             THE COURT:  You should. Every single word here to have

16   somebody who knows nothing about the case to read every single

17   word and every single word is not an appropriate use of the

18   jury's time.

19             MR. ROOS:  I understand.  The thing is, they read a

20   lot of emails in yesterday --

21             THE COURT:  Then you should read what you think are

22   the most pertinent emails so that when you get to summation,

23   you can refer to them again, because I assume that we're going

24   to hear pretty much the same thing from you when you start

25   summing up.

M1LBDOU5

1          MR. ROOS:  It will be based on some the materials.

2     But also, it's like we're damn if you do, damn if you don't

3     from the defense here, where they don't want us to summarize

4     these things, then the only alternative is to be quoting it.

5          THE COURT:  They don't get to make that choice.

6          MR. JANEY:  Only things that are prejudicial.

7          THE COURT:  They don't get to make that choice.  I'm

8     just telling you, this is not consistent with what I thought we

9     were going to accomplish here today.  I did not think this

10    witness who absolutely knows nothing about this case was going

11    to be on the stand for the next four hours.  All right.

12         There's no legitimate purpose for a person to get on

13    the stand to simply read every statement in every box.  That's

14    my attitude.  Let's see how it goes.  If that's the way you're

15    going to spend the jury's time, we're going to be here at least

16    to five o'clock.  If you can finish soon thereafter, then we

17    can make some progress.  I don't want to sit here and listen to

18    this for two hours and then send the jury home and tell them

19    we're going to spend another three hours going through this

20    chart.

21         MR. ROOS:  I will move mine along, your Honor, and

22    I'll skip some of the boxes.  Based on the length of the

23    defense cross and your Honor's rule of double the amount of

24    direct, I don't think we're going to finish this witness today.

25         THE COURT:  I wish you would have let me know before.

M1LBDOU5

1    That's what I asked you in the beginning.

2              MR. ROOS:  I didn't think we wouldn't be done with

3    Kerry Whitmore until 2:00 p.m.

4              THE COURT:  I'm not faulting you for where we are.

5    I'm just saying to you, it doesn't seem to be a reasonable use

6    of the jury's time now that I've given you this chart for you

7    to put a witness on the stand who knows nothing about this case

8    and all they're going to do is read all the words in the boxes.

9    As they say, that's inconsistent with the definition of summary

10   chart.

11             MR. ROOS:  The full binder is, if I read all the

12   emails in the full binder.  The point of the 10 pages is to

13   move it along.  I take your Honor's point and I've read the law

14   on 360 articles summary witnesses going to four hours, I'll try

15   to make it at least half that.

16             THE COURT:  For example, I look at one, and one can

17   debate whether or not this is the most important, Larry Doud

18   responds, loose lip sink ships.  Okay.

19             I mean, I'm not sure how greatly that advances the

20   government's theory, but that's what you're going to have the

21   witness read.

22             MR. ROOS:  Those are context of the emails that the

23   agent can summarize.

24             THE COURT:  I think you want to give the jury a little

25   bit more guidance as to what they should be concentrating on in

M1LBDOU5

1   terms of what are the critical communications and what they

2   should be talking about when they get into the jury room.  I

3   assume that's what you're going to want to point out to them in

4   summation based on this chart and other underlining documents.

5   Let's try to do this efficiently and not bore the jury to death

6   on a Friday afternoon.

7              Let's bring the jury in.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Will the government call it's next

3      witness.

4              MR. ROOS:  The government calls Jeremy Rosenman.

5      JEREMY ROSENMAN,

6          called as a witness by the government,

7          having been duly sworn, testified as follows:

8              THE COURT:  You can inquire, Mr. Roos.

9      DIRECT EXAMINATION

10     BY MR. ROOS:

11     Q.  Good afternoon.  Where do you work?

12     A.  The United States Attorney's Office for the Southern

13     District of New York.

14     Q.  What's your title there?

15     A.  Special agent.

16     Q.  How long have you been a special agent with the U.S.

17     Attorneys Office?

18     A.  Since August of 2016.

19     Q.  Generally speaking, what are your duties as a special

20     agent?

21     A.  I investigate violations of federal laws, interview

22     witnesses, collect evidence, review emails and bank records.

23     Q.  Have you ever heard the name Laurence Doud?

24     A.  Yes.

25     Q.  And how did you become familiar with his name?

1    A.  In preparation for my testimony today.

2    Q.  Were you involved in the investigation that led to the

3    charges in this case?

4    A.  No, I was not.

5    Q.  And what has your role been in the investigation?

6    A.  To review government exhibits and to ensure that the power

7    point presentation we're using as evidence is accurate.

8    Q.  Who created that power point presentation of the chart

9    you're referencing?

10   A.  A member of the prosecution.

11   Q.  And what was your role?

12   A.  I reviewed the slides of the chart to ensure that they are

13   accurate and -- are accurate compared to the underlying

14   exhibits that were used to create the chart.

15   Q.  And did you verify that all the information on the summary

16   document is drawn from the source documents that you reviewed?

17   A.  Yes.

18   Q.  Are all the source documents that are in the summary

19   document that you relied on cited in the summary document?

20   A.  Yes, they are.

21   Q.  And what types of exhibits did you review?

22   A.  I reviewed emails and spreadsheets.

23   Q.  Do you have a binder in front of you?

24   A.  Yes, I do.

25   Q.  Do you recognize the binder?

1    A.  I do.

2    Q.  What's in it?

3    A.  Copies of the exhibits.

4    Q.  Now, about how many pages are in the binder?

5    A.  Several hundred.

6    Q.  And did you review all the emails and evidence in the

7    investigation?

8    A.  No, I did not.

9    Q.  What did you review?

10   A.  Just the exhibits and emails that I was provided.

11   Q.  Special Agent Rosenman -- actually, can we put on the

12   screen for the agent Government Exhibit 902.  Do you recognize

13   this?

14   A.  Yes.

15   Q.  What is it?

16   A.  This is the summary presentation that we just discussed.

17           MR. ROOS:  The government offers 902.

18           MR. JANEY:  No objection, your Honor.

19           THE COURT:  It can be admitted into evidence.

20           (Government's Exhibit 902 received in evidence)

21           MR. ROOS:  Can we publish to the jury?

22           THE COURT:  How many page document is this?

23           MR. ROOS:  Eleven page document.

24   Q.  Special Agent Rosenman, can you explain generally what

25   Government 902 shows?

1    A.   Yes, the exhibit is a timeline starting from the left and

2    going forward towards the right advancing through time, and it

3    exhibits different excerpts of government exhibits, primarily

4    emails.

5    Q.   And what part indicates the timing?

6    A.   The top section tells you the overall time period.   In this

7    instance, February 2012 to March 2012.   The ribbon below it

8    shows you the date from which the email came from.

9    Q.   And the bubbles, what do those refer to?

10   A.   Those are the actual sections from the government exhibits.

11   Q.   In each of the bubbles there's something in bold, for

12   instance in the first one it says -- do you see GX 1, 2, 3?

13   A.   Yes.

14   Q.   What's that a reference to?

15   A.   That's a reference to the exhibit in which that excerpt

16   comes from.

17   Q.   And some of the bubbles are gray and some of them are red,

18   what's that a reference to?

19   A.   The gray bubbles are from emails.   The red bubbles are from

20   emails sent by Larry Doud.

21   Q.   The materials in each of these bubbles, are they the full

22   text of the emails or document?

23   A.   No, they're only a portion.

24   Q.   And if something is quoted in the timeline, where is it?

25   Is it available?

1  A.  Yes, it's in the underlying exhibit referenced in the bold.

2  Q.  Let's get to the substance.  Let's go on the first bubble.

3  Special Agent Rosenman, can you read this?

4  A.  Yes.  It says order alleges that four of Cardinal Health's

5  retail pharmacy customers dispense controlled substances based

6  on prescriptions that were issued for other than legitimate

7  medical purposes and outside the usual course of professional

8  practice.

9  Q.  Now, Special Agent Rosenman, do you see the part in bold

10  before it?

11  A.  Yes.

12  Q.  What does that refer to?

13  A.  That refers to the Government Exhibit 1, 2 and 3 where this

14  excerpt is from.

15  Q.  Or actual materials related to it?

16  A.  Yes.

17  Q.  Based on your review of those three exhibits, can you

18  describe what this is about?

19  A.  Yes, this quote comes from an article related to DEA's

20  allegations against Cardinal Health and their practices.

21  Q.  And what does this article say Cardinal Health was?

22  A.  It was a pharmaceutical distributor.

23  Q.  And what does it say the nature of the DEA's allegation

24  were?

25  A.  It says that they failed to ensure that the pharmacy

1    customers dispensed controlled substances properly.

2    Q.  Let's zoom out of this and zoom in on the next bubble.  Can

3    you read this?

4    A.  It says articles information about Cardinal Health's

5    allegations sent to Larry Doud by Brennan, Pietruszewski and

6    others.

7    Q.  Same three exhibits referenced?

8    A.  Yes.

9    Q.  Can we please see Government Exhibit 1. Can we flip through

10   to the back.  What's this, Special Agent Rosenman?

11   A.  This is an article that was forwarded from Anita Ducca to

12   several individuals who were members of the HDMA distribution

13   list.

14   Q.  Is the quote from the first bubble contained in this

15   article?

16   A.  Yes.

17   Q.  Page 2. Who is this email forwarded along to?

18   A.  It's forwarded from Anita Ducca to Ed Kirker, and then he

19   forward it to Bill Pietruszewski, Larry Doud and Joe Brennan.

20   Q.  Can you read the email from Bill Pietruszewski there?

21   A.  Yes.  It says:  The second sentence says it all.  The DEA

22   feels Cardinal should have known that the pharmacies were

23   inappropriately filling RXs. We currently do not ask why

24   patient receive such a high dosage or what is the medical use

25   of the drug.  Reading this, maybe we should.  Though you would

think that this is an invasion of HIPPA laws if we were to ask

if the dosages dispensed to patients were high or not.  This as

usual is putting more on the wholesaler or making us the

enforcer doing the DEA's job which is wrong.

Q.  Now, was this an email sent to Larry Doud?

A.  Yes.

Q.  Let's go to the next exhibit that's reference.  Government

Exhibit 2.  Without reading the whole exhibit, can describe for

the jury what this exhibit is?

A.  This is an email that was forwarded that contains several

other news articles.

Q.  Do you see where it says, red flags ignored, DEA says Wall

Street Journal?

A.  Yes.

Q.  What's that article about?

A.  The allegations against Cardinal Health.

Q.  Is it the same allegations you were just discussing?

A.  Yes.

Q.  And who is that email sent to?

A.  That was sent to Larry Doud, Lanny Doud and Galen Doud.

Q.  Can we please see Government Exhibit 3.  Taking a look at

the top email, who's that from?

A.  This is from Lanny Doud.

Q.  Is it to Larry Doud also?

A.  Yes.

1    Q.  Do you see the attachment?

2    A.  Yes.

3    Q.  What's the title of the attachment?

4    A.  DEA aims big in Cardinal Health painkiller case.

5    Q.  Can we see Government Exhibit 3A.  Is that the attachment?

6    A.  Yes.

7    Q.  Is this another article about that same DEA case against

8    Cardinal Health?

9    A.  Yes, it is.

10   Q.  Let's go back to the timeline, Government Exhibit 902.

11   Now, Special Agent Rosenman, do you see the third bubble under

12   February 3, 4?

13   A.  Yes.

14   Q.  What's that?

15   A.  It is an excerpt from an email that Larry Doud sent.

16   Q.  Did the email come from one of those email chains about

17   Cardinal Health?

18   A.  Yes.

19   Q.  Which one?

20   A.  The one in Government Exhibit 1.

21   Q.  Can you read what's in the bubble?

22   A.  It says:  It really is a crap shoot. Do we have a method

23   for alerting the DEA to our concerns if a story should spike

24   and/or supply us info that looks, "funny." One problem I see is

25   that we are doing so much business or maybe I should say

1   servicing so many stores in NYC that our reps never get around

2   enough to make the connection.  Maybe some stores they never

3   see except, I hope we don't ship anyone we don't have pictures

4   for, you know, store licenses, etc.

5   Q.  Let's zoom out of this.  And can we zoom in on the bubble

6   under February 29, 2012.  What exhibit did that come from?

7   A.  Government Exhibit 3.

8   Q.  Was that one of the emails about the Cardinal Health chain?

9   A.  Yes.

10  Q.  Can you read that bubble?

11  A.  It says:  I have been thinking about what the media might

12  do if they realize we are here with regards to distribution of

13  controlled drugs since Cardinal is in deep do-do.  I would ask

14  that no one comment if they reach out to us.  No call backs

15  either.  We need to stay very low profile.

16  Q.  Let's look at the next date.  What's the date?

17  A.  March 27, 2012.

18  Q.  What's the first email bubble from?

19  A.  This is an email from Chris Noulis to Larry Doud and

20  others.

21  Q.  What is the excerpt portion of the bubble?

22  A.  It seems lately that many pharmacy owners are now

23  scrambling to RDC as Kinray and other suppliers are cutting

24  them off due to their high C2 percentage of sales.

25  Q.  Have you learn from your review of the document what Chris

1    Noulis role is?

2    A.  Yes.

3    Q.  What was his role?

4    A.  He was the New York Long Island sales manager.

5    Q.  Can we zoom out of this one.  And by the way, there's a

6    reference to Kinray, do you know from your view of material

7    what Kinray is?

8    A.  They're another pharmaceutical distributor.

9    Q.  Let's zoom in on the last bubble on the first page.  Let's

10   start.  It says:  Lanny Doud emails Larry and others.  From

11   your review of the material, do you know who Lanny Doud is?

12   A.  Larry Doud's son.

13   Q.  Can you read that one?

14   A.  With all this DEA stuff going on, I wonder if it wouldn't

15   be best to cut any and all off that have not returned a survey

16   sheet.  From what we know and are reading, this is not

17   something to mess around with.  I think we have all learned

18   that we cannot and should not take what our customers tell us

19   as the truth. If we ask for something and it is not delivered,

20   there needs to be a consequence.  In a case like this, the

21   customer needs to be cut off and the DEA informed.

22   Q.  Let's go back to page 1, and let's go to the next page.

23   First, can we zoom in on both of the bubbles on April 9.

24   Special Agent Rosenman, without reading both of the bubbles,

25   can you describe what this email chain is about?

1    A.  This concerns a section of DEA regulations and an opinion

2    from a law professor that was forward to Larry Doud.

3    Q.  And what specifically was the law professor's opinion

4    related to?

5    A.  Out of state sales of controlled substances.

6    Q.  And what did he say?

7    A.  He said that there should be extra caution if someone comes

8    from an out of state -- with an out of state prescription to a

9    pharmacy, not in the same state, to try to fill it.

10   Q.  Then looking at the bottom email.  Well, sorry the top

11   email.  Who forwarded the law professor's email?

12   A.  Larry Doud forwarded the email.

13   Q.  And then do you see where it says Pietruszewski responded

14   to Larry Doud?

15   A.  Yes.

16   Q.  What was his response?

17   A.  This makes sense.  It is the same for any wholesaler also.

18   Q.  Let's zoom out of this.  Let's look at the next one.  Do

19   you see where it says GX8?

20   A.  Yes.

21   Q.  What's that a reference to?

22   A.  Government Exhibit 8.

23   Q.  Have you reviewed -- was that a single email or email

24   chain?

25   A.  It was an email chain.

1   Q.  From your review, what's the email chain about?

2   A.  It's about a prescription drug conference that was attended

3   by Mr. Pietruszewski and Richie Cullen and they are discussing

4   what they learned at the conference.

5   Q.  And so what's excerpted in the bubble?

6   A.  Something that they learned while at the conference.

7   Q.  Can you read what they learned?

8   A.  It says:  When a store gets dropped by Cardinal or show

9   shut off certain items, Richie ask, what if that same customer

10  then approach to do business with us.  Their response at first

11  was, maybe you shouldn't do business with that customer, but

12  they also said that you should ask the customer why they think

13  they were dropped by Cardinal.  Though they also said what if

14  the customer lies to you, which could be possible.

15  Q.  In the emails you reviewed, did you see any customers

16  getting dropped by Cardinal?

17  A.  Yes.

18  Q.  What do you understand that to be a reference to?

19  A.  There was increase scrutiny by Cardinal once the DEA was

20  investigating their prescription sales practices.  And in

21  response, they were cutting some customers.

22  Q.  Let's go out of this zoom and go to the next page is.  Can

23  we zoom in all the emails on August 10, 2012.  And Special

24  Agent Rosenman, are those all from Government Exhibit 9?

25  A.  Yes, they are.

1    Q.  In the exhibit, what's the email chain about?

2    A.  It's about another pharmaceutical distributor that is being

3    investigated by the DEA.

4    Q.  So can you read just the first sentence of the first

5    bubble?

6    A.  It says, Larry Doud forwarded an email to Brennan,

7    Pietruszewski and Lanny Doud with an article.

8    Q.  And what's the article about?

9    A.  It says -- the article states, Amerisource Bergen Corp, the

10   third biggest drug distributor was questioned by law

11   enforcement agencies for information about the companies

12   ability to keep controlled substances, such as painkillers,

13   from ending up in the wrong hands.

14   Q.  What's next in the email chain?

15   A.  A response by Lanny Doud.

16   Q.  To who?

17   A.  Larry Doud.

18   Q.  What does he say?

19   A.  He said, this is really starting to scare me. Why is it

20   that we as wholesalers is responsible for keeping controlled

21   substances away from inappropriate users.

22   Q.  How does Larry Doud respond in the quoted section?

23   A.  He says, you're right. It is crazy.

24   Q.  Let's zoom out of this and let's zoom in on the next bubble

25   on October 19, 2012.  Can you just read the first sentence of

1    the bubble?

2    A.   It says:  Lanny Doud forwards to Larry Doud, Brennan and

3    Pietruszewski an article from the New York Times titled, "A new

4    painkiller crack down targets drug distributors."

5    Q.   Without reading the quoted part, is this just another

6    article about the DEA going after distributors?

7    A.   Yes.

8    Q.   Just one thing, can we pull up the source email Government

9    Exhibit 11.  Let's go to the next page.  Is this the article

10   that you were just discussing?

11   A.   Yes, it is.

12   Q.   Let's scroll down towards to page 3 and look at the last

13   paragraph, and can we zoom in.  This is not the first time.

14   Can you just read that?

15   A.   This is not the first time the industry has faced scrutiny.

16   In 2008, Cardinal paid $34 million to settle charges that it

17   failed to alert the DEA suspicious orders for millions of pain

18   pills that it was shipping to internet pharmacies.  Operations

19   that for years supplied the illicit market.  The same year

20   another big distributor McKesson paid $13 million to settle

21   similar charges. As part of the agreement, both companies

22   denied wrongdoing.

23   Q.   This is from the article that was sent from Lanny Doud to

24   Larry Doud and others?

25   A.   Correct.

1    Q.  Let's go back to the timeline.  Government Exhibit 902,

2    please.  Can we go to the next page, page 4.  Let's zoom in on

3    January 9, 2013.

4             Special Agent Rosenman, are both of these emails from

5    the same email chain?

6    A.  Yes.

7    Q.  And the top one is earlier than the second one; is that

8    right?

9    A.  Yes.

10   Q.  Let's start.  Can you read the first bubble, then I got a

11   few questions for you.

12   A.  Richie Cullen emails Larry Doud, Brennan, Pietruszewski and

13   Lanny Doud, that the conference in 2012 taught us that if the

14   reason we are taking on additional business is profit driven,

15   then it is usually the wrong reason to proceed.  If it means we

16   are going to have a live-in DEA agent all the time with us, we

17   must proceed with caution.

18   Q.  Based on your review of the materials, do you have an

19   understanding of what conference in 2012 he's referring to?

20   A.  The DEA conference we had discussed earlier.

21   Q.  Now, let's take a look at the second email here, and can

22   you read that one?

23   A.  It says:  Lanny Doud responds to Larry Doud and others.  We

24   have some very suspicious customers due to their buying.  Bill

25   is in a very tough spot and admire his willingness to

M1LBDOU5                        Rosenman - Direct

1    accommodate everyone.  If anyone other than Bill were to look
2    through the reports, we'd get scary stories told.  Our
3    competitors made changes for a reason.  I think it's time we
4    take a closer look before it's RDC that is looked at.
5    Q.  Based on your review of the emails, do you have an
6    understanding of who the Bill is that's referred to in this
7    email from Lanny Doud to Larry Doud?
8    A.  Bill Pietruszewski.
9    Q.  Let's zoom out.  Let's take a look at the January 31, 2013.
10   Do you see how it says this is an email from Pietruszewski to
11   Larry Doud and others?
12   A.  Yes.
13   Q.  Is this just another article about the DEA taking action?
14   A.  Yes, it is.
15   Q.  Let's zoom out of this one.  The next one, what is this
16   email?
17   A.  It's a forwarding of an audit report of Linden Care by
18   Carlos Aquino.
19   Q.  What is Larry Doud saying?
20   A.  He said, it's a waste of time and money.
21   Q.  And based on your review of the source material, Government
22   Exhibit 15, do you have an understanding of who Carlos Aquino
23   is?
24   A.  Yes.
25   Q.  Who was that?

M1LBDOU5                        Rosenman - Direct

A.  He's a compliant consultant.

Q.  Let's zoom out and go to page 5.  What's the first date range on page 5?

A.  March 4 and 5 of 2013.

Q.  Do those emails come from the same or different emails, the source document, that is, I'm referring to?

A.  The same exhibit.

Q.  Why don't we take a look at the bubble Government Exhibit 19.  Let's scroll to the bottom.  The email bubble we were just looking at on 902 said it was about Value drug terminating Four Star pharmacy as a customer.  What's value drug based on your review of the materials?

A.  It's another pharmaceutical distributor.

Q.  Can you explain what the email chain is about?

A.  Yes, Four Star pharmacy was dropped because of their controlled substance purchasing, and at a meeting they were told this by someone from RDC and they were responding to this claim angerly in an email.

Q.  So someone at RDC told Four Star?

A.  They heard that in a meeting, right.

Q.  About Value terminated them?

A.  They knew they were terminated, but they heard the reason they were terminated was because of their controlled substances purchasing.

Q.  And let's going to the top email.  What was Larry Doud's

1   response?

2   A.   Loose lips sink ships.

3   Q.   And he says, we may find out tomorrow.  Were you able to

4   determine what that means from the email chain?

5   A.   Yes, I think it was what the response was from the

6   pharmacy.

7   Q.   Let's go back to the timeline, 902.  Did you talk about

8   both the bubbles under March 4 and 5 of 2013?

9   A.   Yes.

10  Q.   Let's talk about the next date May 3, 2013.  Let's go

11  through them in order.  Can you read the first one?

12  A.   Yes. It says, Pietruszewski emails Larry Doud and Brennan

13  that Lenny Levin at the DEA who is responsible for suspicious

14  order monitoring wants to have a meeting with RDC.  And "He

15  said those who should attend are the ones that hold

16  responsibilities of DEA functions and authority to make

17  decisions."  About "DEA and placing practices in place to

18  prevent diversion."

19  Q.   Did Larry Doud respond to that email?

20  A.   Yes.

21  Q.   Can we look at the next bubble.  Is this Larry Doud's

22  response?

23  A.   Yes.

24  Q.   Can you read it?

25  A.   It says:  Do I make those decisions or do you just do

1    whatever you feel like doing?

2    Q.  And did Bill Pietruszewski respond to that email?

3    A.  Yes, he did.

4    Q.  What was his response?

5    A.  He says, I consult with you and Joe if we need to make

6    major changes in the policy that would affect our sales.  If I

7    were to go and they tell me that we must do due diligence on

8    100 stores or we have to stop selling to even one store, I

9    would always consult with you first.

10   Q.  And all those came from the email chain Government Exhibit

11   17?

12   A.  That's correct.

13   Q.  Let's go to the next date on the timeline July 16, 2013.

14   Can you read the description in the first bubble under July 16,

15   2013?

16   A.  It says:  Lanny Doud forwarded Larry Doud, Brennan and

17   Richie Cullen controlled substance sales data for June 2013

18   that shows which customers have controlled substance sales over

19   20 percent of their total sales.  He writes:  Some of this

20   makes me want to vomit.

21   Q.  Was there an attachment to that document?

22   A.  Yes, there was a spreadsheet.

23   Q.  Let's look at the attachment.  Can we please look at

24   Government Exhibit 18A.  What's this, Special Agent Rosenman?

25   A.  It's an attachment that was referenced in the email.

M1LBDOU5                        Rosenman - Direct

1   Q.  Do you know what the green highlighting lettering refers

2   to?

3   A.  Those are the pharmacies in which their sales were 20

4   percent or more of controlled substances.

5   Q.  Ms. Hauck, can you just scroll through the spreadsheet just

6   so the jury can see the green.  You have to keep going.  I

7   think it's text and more green and more green.

8           Special Agent Rosenman, the part in the bubble where

9   it says, some of this makes me want to vomit, based on your

10  review of the email, is that a reference to the green?

11  A.  Yes, and the quantity of the green.

12  Q.  Let's exit out of this and go back to the summary timeline.

13  And then Larry Doud asks his secretary to print it?

14  A.  Yes.

15  Q.  Let's go to the next page.  Why don't we start with the

16  February 3, 2014, and can we zoom in on it.

17          Special Agent Rosenman, you testified that Carlos

18  Aquino is what?

19  A.  He's a compliance consultant.

20  Q.  And who is this email from and to?

21  A.  It's from Carlos Aquino to Larry Doud and others.

22  Q.  From looking at the email chain which is also in your

23  binder, can you describe generally what the email chain is

24  about?

25  A.  It's concerning questions regarding dispensing of

1    controlled substances.

2    Q.  And does Aquino make some recommendations?

3    A.  Yes.

4    Q.  Does he make a recommendation relating to what RDC should

5    do if it doesn't get dispensing?

6    A.  That it should not be selling controlled substances to that

7    pharmacy.

8    Q.  Now, let's read what's in the bubble.  Is this the last

9    email in the chain by the way?

10   A.  Yes.

11   Q.  Can you read what's in the bubble?

12   A.  Yes.  It says:  Carlos Aquino' emails Larry Doud and

13   others.  As a distributor, you need to comply with the DEA,

14   know your customer due diligence policy. All the DEA needs to

15   do is to do an investigation on those RDC customers that are

16   dispensing controlled substances not for the legitimate medical

17   purposes, accepting controlled substances prescriptions from

18   bad doctors or accepting cash only for bad prescriptions.  The

19   last thing RDC needs is to have DEA place their cross hairs on

20   RDC because of their willful blindness and deliberate

21   ignorance.

22   Q.  We can zoom out of this.  Can we zoom in on the bubble

23   under June 27, 2014.  This says Larry Doud emails Gary Mrozek.

24   From your review of materials, do you know who Gary Mrozek is?

25   A.  Yes.

M1LBDOU5                          Rosenman - Direct

1    Q.  Who is he?

2    A.  He's the CEO of Hometown Pharmacy Solutions and a RDC board

3    member.

4    Q.  In this email Larry Doud emails Gary Mrozek, the DEA is

5    currying all sorts from Walgreen's to CVS and Cardinal.  There

6    are some numbers. It mentions also some value and Harvard Drug.

7    What do you understand him to be referencing?

8    A.  He's referencing the government's findings against

9    pharmacies and distributors.

10   Q.  Let's take a look at the next email.  Actually, can we look

11   at the underlying document Government Exhibit 30.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.   Special Agent Rosenman, have you reviewed this e-mail chain

2    before?

3    A.   Yes, I have.

4    Q.   Can you just describe, without reading it for the jury,

5    sort of set the context of what this e-mail chain is about.

6    A.   Yes, Mr. Doud is speaking with Paul Pagnotta, who is the

7    chairman of the RDC board, about an upcoming board meeting and

8    the agenda and the DEA audit as well as the suspicious ordering

9    system and the concerns they had, and whether they would be

10   discussed at the board meeting.

11   Q.   Who is Paul Pagnotta?

12   A.   He is the chairman of the RDC board.

13   Q.   The specific e-mail at the top here, what are they talking

14   about?

15   A.   They're talking about the DEA audit, and in general, they

16   are talking about scheduling a board meeting and who is going

17   to set the agenda or what will be on the agenda.

18   Q.   And what's the sentence from this e-mail that's quoted in

19   the bubble.

20        Let me ask you this.  Do you see where it says the

21   ARCOS reporting seems?

22   A.   Yes.  It says the suspicious ordering system is a slight

23   concern to me.

24   Q.   Is that in reference to the DEA audit?

25   A.   Yes.

1   Q.  Let's go back to the timeline, please, 902, take a look at

2   July 18, 2014.  And what happens on that date?

3   A.  A grand jury subpoena is served on RDC.

4   Q.  What type of materials does it ask for?

5   A.  It requests policy, procedures and/or internal guidance

6   related to the distribution of controlled substances and the

7   detection of suspicious orders and activity.

8   Q.  And what's a grand jury subpoena?

9   A.  It is a document issued by either a federal grand jury or a

10  state grand jury that requests evidence or documents or

11  testimony.

12  Q.  So, let's zoom out of this.  And that's July 18, 2014?

13  A.  Yes.

14  Q.  Do you see the next one, July 31, 2014?

15  A.  Yes.

16  Q.  And so it says letter to Larry Doud and Don Bilgore from

17  outside law firm recommending a review of RDC's compliance

18  program relating to federal Controlled Substance Act,

19  especially suspicious order monitoring.

20          Have you reviewed that letter?

21  A.  Yes.

22  Q.  Can we please pull up Government Exhibit 31.  Starting on

23  the first page of this, what is it?

24  A.  This is a cover e-mail containing that letter as an

25  attachment.

1   Q.  Do you recognize the names Donald Bilgore and Larry Houck?

2   A.  Yes.

3   Q.  Who do you understand them to be?

4   A.  They are both attorneys.

5   Q.  What about Karla Palmer?

6   A.  She is an attorney as well.

7   Q.  It's from Karla Palmer to Donald Bilgore, cc'ing Larry

8   Houck.  And can you read the second paragraph of this e-mail.

9   A.  It says:  Please note that Larry Doud is cc'd on the

10  letter.  I have not cc'd him on this e-mail and ask that you

11  forward the letter to him.

12  Q.  Let's go to the letter which is the second page of the

13  document.  What's the subject of the letter?

14  A.  Recommendations for review and analysis of Rochester Drug

15  Co-Operative's suspicious order monitoring and reporting

16  policies and procedures.

17  Q.  Now, since the letter's in evidence, we're not going to

18  read the whole thing.  But I want to direct you to a few parts

19  and ask you a few questions about them, okay?

20  A.  Yeah.

21  Q.  So, at the beginning, can we zoom in on the first

22  paragraph.  What does it say the letter relates to?

23  A.  It says the letter sets forth our recommendations for

24  review of the RDC's compliance program relating to the federal

25  Controlled Substances Act and Drug Enforcement Administration

M113dou6                         Rosenman - Direct

1   regulations, especially suspicious order monitoring.

2   Q.  Is that some of the language that's quoted in the bubble on

3   the summary chart?

4   A.  Yes.

5   Q.  Let's zoom out of this and look under the paragraph

6   beginning current risks and liability.  And we can actually

7   zoom in on the entirety of that paragraph.

8           So the first part of the paragraph, which is before

9   the page break, does that summarize the law?

10  A.  Yes.

11  Q.  And then what's the part that is after the page break, what

12  does that summarize?

13  A.  Past DEA actions against pharmaceutical distributors.

14  Q.  And now let's look at the next paragraph.  If we can zoom

15  in on the one that begins a common thread.  Can you read that.

16  A.  Yes.

17          A common thread throughout these cases has been DEA's

18  allegation that the distributors have failed to identify or

19  have otherwise ignored red flags indicating that the customers

20  are ordering controlled substances for illegitimate purposes.

21  In the case of pharmacy customers, this includes DEA holding

22  distributors accountable for knowing the manner in which the

23  pharmacies are filling prescriptions, so-called know your

24  customer due diligence.  Thus, it is incumbent on distributors

25  to ensure that their compliance programs and policies include

1    sufficient due diligence to justify the quantity, frequency and

2    pattern of shipments to its pharmacy customers.

3    Q.  Can we zoom out of that and scroll down a little bit.

4           Do you see the paragraph beginning "based on just a

5    preliminary review"?

6    A.  Yes.

7    Q.  Can you read up to the point where it says "for example."

8    A.  Based on just a preliminary review of the information we

9    have received from RDC to date and our communications

10   concerning suspicious order monitoring, we could foresee the

11   government raising concerns about RDC's compliance program and

12   sales of oxycodone to Plainfield Pharmacy and possibly other

13   customers.

14   Q.  When it says "possibly other customers," does the letter

15   note any other customers?

16   A.  Yes.

17   Q.  Can we scroll down a little bit to zoom out and scroll down

18   to see what other customers are mentioned in here.  Just the

19   first paragraph on page three here.

20          Special Agent Rosenman, what other customer does it

21   mention in here?

22   A.  Linden Care Pharmacy.

23   Q.  We can zoom out of this.  And one last question about this

24   letter.  The letter from the attorneys about a preliminary

25   review and potential issues, what's the date on that?

1   A.  This letter is dated July 31, 2014.

2   Q.  Let's go back to the timeline, Government Exhibit 902.

3   What's the next little box on the timeline, August 25, there is

4   a meeting?

5   A.  That's correct.

6   Q.  And then the next one, what does that say?

7   A.  It says that a memo from outside law firm to Larry Doud

8   making recommendations regarding RDC's suspicious order

9   monitoring program including hiring Pro Compliance and more RDC

10  compliance employees.

11  Q.  Let's take a look at Government Exhibit 33.  Two e-mails on

12  this front page, I want to start with the lower e-mail.  And

13  who is it from and who is it to?

14  A.  The e-mail is from Larry Houck to Larry Doud cc'ing Don

15  Bilgore and Kathy McKinley.

16  Q.  Can you just read the content of the e-mail.

17  A.  It says:  Mr. Doud the attached memorandum contains Pro

18  Compliance PVS reporting and RDC compliance department

19  recommendations.  Please let me know if you have any questions.

20  Q.  And so let's go, let's take a look at the memo which is the

21  next page of the exhibit.  I'm sorry.  Actually one more

22  question here.

23          What's this top e-mail?

24  A.  It is a request from Larry Doud to print this memo.

25  Q.  And what's the date on that?

M1l3dou6                          Rosenman - Direct

1   A.  September 18, 2014.

2   Q.  So now, let's go to the next page of the exhibit and look

3   at the memo.  And starting at the very top, who is the memo

4   from and who is the memo to?

5   A.  The letter -- the memo is from Larry Houck to Larry Doud as

6   the CEO of RDC.

7   Q.  We can zoom out on that.  And let's zoom in on the first

8   paragraph.  Do you see the sentence that begins "this

9   memorandum"?

10  A.  Yes.

11  Q.  Can you read that for the jury.

12  A.  This memorandum sets forth several recommendations

13  regarding RDC's suspicious order monitoring program, including,

14  but not limited to, an evaluation of whether to use Pro

15  Compliance Pharma Verification Systems PVS to assist RDC in its

16  controlled substance customer due diligence, and whether RDC's

17  compliance department currently has sufficient resources to

18  conduct suspicious order monitoring required by DEA regulations

19  and guidance.

20  Q.  So basically, it's making two recommendations?

21  A.  Correct.

22  Q.  Let's look at those.  First, does the memo say what Pro

23  Compliance is?

24  A.  Yes.

25  Q.  And what does it say?

M1l3dou6                          Rosenman - Direct

1   A.  Is there a specific section?

2   Q.  You can just summarize.

3   A.  They are going to assist in analyzing dispensing data to

4   help highlight high frequency and high volume controlled

5   substance purchasers.

6   Q.  It says hire these people?

7   A.  Yes.

8   Q.  And what's the other recommendation that's made in the

9   memo?

10  A.  To hire additional individuals to work in the compliance

11  department.

12  Q.  So let's turn to page four.  Do you see under the second

13  subheading, can you read the third sentence which begins

14  "because."

15  A.  Because of limited employee resources dedicated to

16  controlled substance order monitoring and customer due

17  diligence, RDC's suspicious order monitoring and reporting over

18  the past several years has likely not resulted in

19  identification and investigation of every controlled substance

20  order of interest.

21  Q.  And the next sentence?

22  A.  Furthermore, we estimate that approximately 125 pharmacy

23  customers currently require further due diligence, including

24  site inspections, for a variety of reasons.

25  Q.  Now let's go back to the timeline, 902, please.  What was

1    the date on that memo?

2    A.   September 12, 2014.

3    Q.   What does Larry Doud say on September 25, 2014?

4    A.   He says:  It is making me ill as to how much Pro Compliance

5    is going to cost us and asks why do we need Pro Compliance if

6    we still have to do the work.

7    Q.   By the way, were you asked to look into the Pro Compliance

8    issue any further?

9    A.   No.

10   Q.   Are there any other e-mails on this page of the timeline

11   that we haven't discussed?

12   A.   No.

13   Q.   Let's goes to page seven.  Let's start on October 29, 2014.

14   And can you read it.

15   A.   Yes.  It says:  Pietruszewski e-mails Larry Doud and others

16   an e-mail with the subject line 932,000 opioid deaths, and says

17   take a look at this article, very sad what is going on in this

18   country.

19   Q.   So, we won't bother going through the whole article right

20   now.  Is this just another article describing issues with the

21   opioid epidemic?

22   A.   Yes.

23   Q.   Let's look at the next bubble.  So, this one says RDC

24   issues new customer due diligence and suspicious order

25   monitoring/reporting policies and procedures.  Have you

M1l3dou6                          Rosenman - Direct

1    reviewed that document?

2    A.  Yes.

3    Q.  And does it relate to suspicious order reporting and also

4    due diligence on new customer accounts?

5    A.  Yes.

6    Q.  Let's look at the next bubble.  And what does the next

7    bubble say?

8    A.  It says compliance department distributes the new customer

9    due diligence and suspicious order monitoring/reporting

10   policies and procedures requiring due diligence on new accounts

11   to RDC sales employees.

12   Q.  So, there's a new policy and it is handed out to the

13   salesmen?

14   A.  Correct.

15   Q.  Let's look at the next bubble.  Can you read this one?

16   A.  It says Larry Doud e-mails Pietruszewski that he can't

17   believe how much we have stuck in this compliance thing.  We

18   will have a very serious conversation on your decision to

19   address our sales force with no prior notice to Joe Brennan or

20   Lanny Doud or me.

21   Q.  From your review of e-mails, did you see any reference to

22   Pietruszewski addressing the sales force?

23   A.  Yes.

24   Q.  What reference did you see?

25   A.  That there was a meeting discussing the new policy.

1    Q.   The one that you just testified about?

2    A.   Yes.

3    Q.   We can zoom out of this.  And what's the next e-mail?

4    A.   April 1st, 2015.

5    Q.   Can you read the first bubble.

6    A.   It says Pietruszewski e-mails attorneys that after speaking

7    to the RDC management team, RDC would like to make a few

8    changes to our customer due diligence and suspicious order

9    monitoring/reporting policies and procedures to remove the

10   requirement of reviewing and analyzing dispensing data before

11   opening an account.

12   Q.   So, is this bubble referring to the suspicious order

13   monitoring and due diligence policy that was issued earlier in

14   the year?

15   A.   Yes.

16   Q.   And then what's the e-mail after that one in response?

17   A.   It says Brennan e-mails Pietruszewski and Larry Doud that

18   the requirements in the due diligence policy are driving good

19   customers away.  And Doud responds, sounds like a great change

20   to me.

21   Q.   Have we looked at all the e-mails on this page?

22   A.   Yes.

23   Q.   Let's go to page eight.  So we won't bother reading the

24   May 21, 2015, but let me just ask, that's a date of a DEA

25   inspection?

1   A.  Yes.

2   Q.  Let's look at then July 22, 2015.  And I want to go through

3   these bubbles so let's zoom in on all of them and we'll walk

4   through them.  So let's start with the first one.  Can you read

5   it.

6   A.  It says Lanny Doud complains to Larry Doud, Brennan and

7   Pietruszewski and Pompeo that a new account has not been turned

8   on for selling controlled substances because the compliance

9   department is still doing due diligence.

10  Q.  How does Larry Doud respond?

11  A.  Larry Doud e-mails Brennan, Pietruszewski, Pompeo, and

12  Lanny Doud, let's see if we can open him right way.

13  Q.  How does Mr. Pietruszewski respond?

14  A.  He says I would ask to be safe if we could have Mr. Bilgore

15  make the change to our SOP stating the updated process.  We

16  also shared our process with the DEA in Newark of how we look

17  at three months' dispensing prior to turning a customer on to

18  controls when we applied for our DEA license for Fairfield.

19  This way it is documented and the DEA cannot come back and ask

20  why we are not following the process we put in place on

21  January 15, 2015.

22  Q.  When it says "our process," what do you understand or the

23  multiple references to process, what do you understand that to

24  be a reference to?

25  A.  The due diligence process.

1    Q.   Remind us who Mr. Bilgore is?

2    A.   He is an attorney for RDC.

3    Q.   How does Larry Doud respond in the bottom e-mail?

4    A.   It says Larry Doud e-mails Brennan, Pietruszewski, Pompeo,

5    and Lanny Doud, I know we have to do due diligence but we have

6    the tail wagging the dog.  As you know, as you and I have

7    talked, Joe, this has to stop.  I hope it's not too late to

8    save our chance with this account.  Good or bad.  Do the

9    compliance after opening and close it if it looks funny.

10   Q.   Let's zoom out.  Let's look at the next day, July 23, 2015.

11   And what does the e-mail on this date say?

12   A.   Larry Doud e-mails Brennan, Pietruszewski, Pompeo and Lanny

13   Doud, saying I would like to open the account today and move

14   his info higher in the pile.  I have no idea if this is a good

15   guy or a bad guy, but I do know that in this case it is taking

16   too long no matter what the problem is.  And it could be him I

17   am sure.  The girls are way too busy but we won't be adding

18   anymore help at this point so don't ask Bill.

19   Q.   Let's zoom out.  Is there anything left on this page?

20   A.   No.

21   Q.   Let's go to the next page.  When are these e-mails from?

22   A.   October 24, 2015.

23   Q.   Are they all basically part of the same e-mail chain?

24   A.   Yes.

25   Q.   Over two exhibits?

M113dou6                          Rosenman - Direct

1    A.  Correct.

2    Q.  So let's zoom in on them and walk through them.  Let's

3    start with the first one.

4    A.   It says Amy Skibickyi, an assistant compliance specialist,

5    e-mails an owner of Echo Drugs Inc. that an order went on hold

6    this afternoon for exceeding the allowed amounts based on

7    average ordering and multiplication factor for growth and

8    requests dispensing data so RDC has documentation for the

9    release of this order.

10   Q.  So, Amy Skibickyi who works in compliance is e-mailing Echo

11   Drugs that an order is on hold?

12   A.  Correct.

13   Q.  Can we look at the next one.

14   A.   The owner of Echo Drugs gets upset, and Larry Doud writes

15   to Pietruszewski and Richie Cullen this could be trouble.

16   Q.  And the next e-mail?

17   A.  Brennan e-mails Pietruszewski, Pompeo and Larry Doud and

18   Cullen, management needs to know when an account goes on hold.

19   Q.  Does Pietruszewski respond?

20   A.  Yes.

21   Q.  What does he write?

22   A.  He responds, he will make sure the pharmacy receives the

23   order this weekend, and says next time they will call the store

24   first before putting an order on hold.

25   Q.  What is the final e-mail in this chain?

1    A.  An e-mail from Larry Doud.

2    Q.  Can you read it?

3    A.  He says:  You are the best.  Thanks for doing that.  Can't

4    imagine how this happened.  First time I have heard of this

5    happening.

6    Q.  Based on your review of the e-mail, does "first time I've

7    heard of this happening" refer to being on hold?

8    A.  Yes.

9    Q.  Let's zoom out.  Is that the last e-mail on this date?

10   A.  Yes.

11   Q.  Let's go to the next page.  Let's start with June 5.  Can

12   we zoom in.  What does the first bubble say?

13   A.  It says Larry Doud e-mails, based on recent government

14   changes, I want to being accelerate our account opening

15   process.  As soon as our credit managers completely approve our

16   credit app, we will open an account right away.  We will

17   continue to do our diligence on controls, but not before we

18   open the account.

19   Q.  A few questions about this.  From review of e-mails and

20   other documents, have you been able to determine what

21   government change was going on?

22   A.  There was a change in the law that affected how DEA could

23   enforce its regulations related to pharmacies and distributors.

24   Q.  What's the next e-mail on the timeline?

25   A.  June 6, 2016.

M1l3dou6                    Rosenman - Direct

1   Q.  Can we zoom in on that.  Can you read it?

2   A.  Yes.  Pietruszewski responds, that is management decision

3   and is fine with compliance.  I only would suggest that Don

4   Bilgore and Larry Houck change our SOP to state that so we made

5   a change.

6   Q.  What do you understand SOP to refer to based on your review

7   of the materials?

8   A.  Standard operating procedure.

9   Q.  Is this e-mail in response to the last e-mail we were

10  looking at?

11  A.  Yes.

12  Q.  So, what's he talking about when he's discussing management

13  decision?

14  A.  The decision to do -- to start selling before dispensing

15  data and other due diligence can be done.

16  Q.  What's the next e-mail bubble say?

17  A.  Pietruszewski writes, the SOP just states that RDC will

18  conduct a review prior to opening them to controls.  We would

19  just need to change this.  Just want it to be documented so we

20  may show DEA when they are in the next time for an audit.

21  Q.  And are there some other e-mails in this chain?

22  A.  Yes.

23  Q.  They're all viewable on the Government Exhibit 57?

24  A.  Yes, they are.

25  Q.  Let's look at them, at Larry Doud's response, can we look

M1l3dou6                          Rosenman - Direct

1    at them.

2    A.   He responds, I do not want to slow this down.

3    Q.   What do you understand that to be a reference to?

4    A.   The changes to the policy and to onboard new customers as

5    quickly as possible.

6    Q.   Now let's look at the next date.   What does this bubble

7    refer to?

8    A.   This refers to a phone call between Larry Doud and Bill

9    Pietruszewski.

10   Q.   It says, according to Pietruszewski, they spoke about

11   turning on stores to CS.

12          How do you know that, what the phone call is about?

13   A.   There is an e-mail from Pietruszewski where he references

14   that phone call, and then in the phone records it shows that he

15   had a call with Mr. Doud the day before.

16   Q.   What is CS a reference to?

17   A.   Controlled substances.

18   Q.   This is the day after the last e-mail we were looking at;

19   is that right?

20   A.   Correct.

21   Q.   Let's look at the next day.   June 8.   What's the first

22   e-mail bubble on this date?

23   A.   It says Pietruszewski forwards Larry Doud an e-mail to the

24   compliance department to start the new SOP today.

25   Pietruszewski's e-mail to the compliance department says RDC

M1l3dou6                          Rosenman - Direct

1   will start turning new accounts on to CS.

2   Q.  So in other words, Pietruszewski is telling the compliance

3   department to start selling controlled substances before doing

4   due diligence?

5   A.  Correct.

6   Q.  He forwards that to e-mail to Doud?

7   A.  Yes.

8   Q.  What's the next e-mail say?

9   A.  Larry Doud e-mails Ed Kirker, in our account setup for

10  controls, we have waited until we have done our due diligence

11  before turning the store on to purchase.  We are going to

12  change that because it is taking too long to open stores and

13  because the government has recently told the DEA to lay off

14  wholesalers and pharmacies.  Per The New York Times May 19

15  front page article.

16  Q.  Do you see where it says we are going to change that...

17  because the government has recently told the DEA to lay off

18  wholesalers and pharmacies per The New York Times article?

19  A.  Yes.

20  Q.  Let's look at that New York Times article, 59A.  What's the

21  title of it?

22  A.  "Congress mixes opioid messages."

23  Q.  Let's look at page two at the very top.  And can we zoom in

24  on the top paragraph.  Can you read it.

25  A.  It says more quietly, Congress passed and President Obama

1  signed a very different measure last month that curtailed Drug
2  Enforcement Administration powers to pursue pharmacies and
3  wholesalers that the agency believes have contributed to the
4  epidemic.
5  Q.  Let's go back to Government Exhibit 902.  Can you explain
6  the connection between -- we're on page 10.  Thanks.
7           Can you explain the connection between the article and
8  what we were looking at?
9  A.  So the change in the SOP was in response to the law change
10  referenced in the article.
11  Q.  Let's go to the next page, page 11.
12           On page 11, what's the first date?
13  A.  June 23, 2016.
14  Q.  And what happened on that date?
15  A.  There was a DEA audit of the RDC Fairfield facility.
16  Q.  According to the exhibit, what does Pietruszewski give
17  them?
18  A.  A copy of the RDC due diligence policy.
19  Q.  And the next date?
20  A.  June 29, 2016.
21  Q.  And let's zoom in on that whole series.  Starting with the
22  top one, can you read it?
23  A.  Pietruszewski e-mails Larry Doud and Brennan.  I would
24  suggest that we ask Larry Houck his professional opinion or
25  thought in regards to changing our due diligence SOP.  I

1    understand that this is a business decision, but I am just

2    concerned that we will be vulnerable if we do not look at the

3    dispensing before turning a store on to sell controlled

4    substances.

5    Q.   What's Larry Doud's response?

6    A.   Larry Doud responds that Juice and Bill agreed to the new

7    format.

8    Q.   From your review of materials, do you know who Juice is?

9    A.   Julius Morton.

10   Q.   And are you familiar from your review of materials of

11   someone named Bill Delgado?

12   A.   Yes.

13   Q.   Do you know what their titles are or roles?

14   A.   They work in the compliance department.

15   Q.   So what is his response?

16   A.   Pietruszewski responds, I spoke to Juice and Bill and they

17   do not agree with changing the SOP, but it appeared as a

18   concluded decision by management and they no choice but to

19   agree.

20   Q.   How does Larry Doud respond?

21   A.   That is bullshit.

22   Q.   How does Pietruszewski respond?

23   A.   We now know the SOP must be changed to follow this or we

24   may be in more harm.

25   Q.   Let's zoom out.  Can we look at the July 25 one.  And can

1   you read it?

2   A.   It says:  Larry Doud e-mails Pietruszewski, Pompeo,

3   Brennan, and others, I am very disappointed with the amount of

4   time our sales reps are spending doing DEA compliance tasks.

5   Why has it become such a pressure cooker?  You are killing us

6   and handcuffing our efforts to sell new accounts.  It is the

7   tail wagging the dog.

8   Q.   Let's look at the last one.  November 8, 2016.  It says DEA

9   audit of RDC Rochester facility.  Pompeo attaches RDC's current

10  due diligence policy.

11          Based on your review of the due diligence policy you

12  looked at from January 2015, and the due diligence policy that

13  was attached to this article from -- or this e-mail from

14  November 2016, was there any change made to the way in which

15  RDC opened new accounts?

16  A.   No.

17  Q.   What did RDC's 2016 copy of the policy say RDC would do

18  before opening new accounts and selling controlled substances?

19  A.   They would do due diligence on dispensing data and other

20  steps before opening the new account.

21          MR. ROOS:  No further questions.

22          THE COURT:  Did you want to begin the cross or do you

23  want to adjourn for the weekend?

24          MR. JANEY:  We'd like to adjourn for the weekend.

25          THE COURT:  This has been a long day and a long week.

M1l3dou6

1    So ladies and gentlemen, we are going to go ahead and adjourn

2    for the weekend.  Don't discuss the case, keep an open mind.

3    I'll see you Monday morning 9:45.  I think we are on schedule

4    and hopefully we can pick up speed next week.

5              Have a nice weekend.

6              (Jury excused)

7              THE COURT:  You can step down.

8              I think is it correct that the government has

9    approximately five more witnesses?

10             MR. ROOS:  I have to count but I think we're in that

11   ballpark.  And I think our expectation is that the defense

12   would begin its case next week.

13             THE COURT:  That's what I'm trying to understand.  How

14   many do you think we can get through Monday?

15             MR. ROOS:  The plan is it's going to be Special Agent

16   Rosenman, which I hope, given the fact I cut my direct time in

17   half.

18             THE COURT:  You did a fine job.  I'm glad I lit a fire

19   under you.

20             MR. ROOS:  All right.  That the cross is also going to

21   be measured.  And then we're going to call Bill Pietruszewski.

22             THE COURT:  Okay.  And besides Pietruszewski, what do

23   you anticipate the approximate length of the other witnesses,

24   the longest witness?

25             MR. ROOS:  I think, so your Honor, the other really,

M1l3dou6

1    the only other remaining long witness for the government, there

2    are a few others that are shorter in length that we are not

3    exactly sure we'll slot in.  But, the other long one is David

4    Cutler which is the government's expert, and the plan is for

5    him to go after Pietruszewski, and he'll be a few hours.  I

6    don't know -- sort of between the directs and crosses of those

7    two, which actually will shake out to be the longer one.

8              THE COURT:  And so, it's possible that the government

9    might rest as early as Wednesday or Thursday.

10             MR. ROOS:  I think that's right.

11             THE COURT:  And so let's try to figure out to put

12   aside some time Monday or Tuesday so that we can resolve

13   outstanding issues.  If you have submissions for me, try to get

14   them to me by Monday morning.  And I think that -- I'm trying

15   to make a decision, depending on when we break, whether we will

16   sit all day on Friday next week.  And if we're way ahead of

17   schedule, I might give them Friday off.  But I don't want to --

18   it would be good if we could at least start, if not even

19   finish, all of the testimony by next week.

20             At this point I think I had potentially four or five

21   witnesses by the defense.

22             MR. GOTTLIEB:  Yes, your Honor.

23             THE COURT:  All right.  You anticipate you might be

24   able to do that in two to three days?

25             MR. JANEY:  Well, we have equally a long witness, we

M113dou6

```
1   have an expert, your Honor.  Which I imagine would be as
2   intense as the government's expert.
3            THE COURT:  I'm not anticipating that.
4            MR. JANEY:  All right, your Honor.
5            THE COURT:  From either expert, quite frankly.  I'm
6   not sure -- you both have to convince me what they have to
7   opine on is something that the jury doesn't already know.  With
8   both of your experts, all of your experts, but you have two
9   potential experts.
10           MR. JANEY:  Right now, your Honor.  If anything
11  changes in our witness list, we'll let your Honor know at the
12  close of the government's case.
13           THE COURT:  Right now I think you've identified two
14  experts.
15           MR. JANEY:  Yes, at this point we have, your Honor.
16           THE COURT:  Let's resolve the issues as soon as
17  possible with regard to these exhibits for the government.
18           MR. JANEY:  You'll have the submission from us before
19  Monday, your Honor.
20           MR. ROOS:  Your Honor, there's certain materials
21  either for fact witnesses that have been noticed on the defense
22  witness list and/or their experts that we would put a
23  submission in on.  Although I'll note that we haven't been
24  getting 26.2 material for several of their witnesses.  It is
25  totally their right to keep thinking about who they're calling,
```

M1l3dou6

1   but if some of these are phantom witnesses, people that they

2   are no longer planning on calling, we'd appreciate knowing

3   that.

4             THE COURT:  I am going off of, at this point, the

5   witness list that was given to me when we started voir dire.

6   And there are five people on that list.  If there are

7   additional people or significantly more who are not on this

8   list, then they should start to be identified.

9             MR. JANEY:  There are no phantom witnesses, your

10  Honor.  The list is as we provided it.  We'll confer with the

11  government.  We believe that we have met our Rule 26

12  obligations.  So we'll confer where the communication gap is.

13            THE COURT:  All right.  So, hopefully, now remember,

14  the week after that, if we spill to the end of the week, with

15  either testimony or even summations or deliberations, there is

16  the one juror who has indicated about his son's graduation in

17  the military, and that's February 4.  So, I think at this

18  point, there is a good chance we might be able to get, we might

19  be able to get the case to them long before that to get a

20  verdict.  The only thing is, as we get closer, if we end up

21  Wednesday or Thursday, then you'll have to make a judgment as

22  to whether or not you want to keep him.  And if you keep him,

23  whether or not we're going to not sit on that Friday, or

24  whether or not, particularly if deliberations start before

25  Friday, obviously if the deliberations start before Friday, our

M1l3dou6

1    only choice is to adjourn and not sit on Friday if they are in

2    the middle of deliberations.  We're not going to be able to

3    pull him out of deliberations at that point in time.  So just

4    start anticipating what you might want to do.

5             I'm hopeful that some time between the end of the week

6    next week or the beginning of the week after that, that we'll

7    be finished with the witnesses, and we can have summations, and

8    get the case to the jury.  But, we'll see how we go next week,

9    how efficiently we move along.  We've been moving along very

10   efficiently so far.  But, let's try to resolve all these issues

11   as quickly as we can before the witnesses have to testify so we

12   can move along smoothly next week.

13            And I'll see everybody at 9:45 on Monday and have a

14   nice weekend.

15            MR. ROOS:  Thank you, your Honor.

16            MR. GOTTLIEB:  You too.

17            (Adjourned until Monday, January 24, at 9:45 a.m.)

18

19

20

21

22

23

24

25

```
1                          INDEX OF EXAMINATION

2    Examination of:                                Page

3    KERRY WHITMORE

4    Direct By Mr. Burnett  . . . . . . . . . . . 639

5    Cross By Mr. Gottlieb  . . . . . . . . . . . 678

6    Redirect By Mr. Burnett  . . . . . . . . . . 750

7     BARBARA CASTRO

8    Direct By Mr. Roos . . . . . . . . . . . . . 757

9    Cross By Mr. Gottlieb  . . . . . . . . . . . 768

10   JEREMY ROSENMAN

11   Direct By Mr. Roos . . . . . . . . . . . . . 801

12                         GOVERNMENT EXHIBITS

13   Exhibit No.                                 Received

14    907  . . . . . . . . . . . . . . . . . . . 663

15    702, 343 through 359, 364  . . . . . . . . 671

16    348A  . . . . . . . . . . . . . . . . . . . 674

17    636  . . . . . . . . . . . . . . . . . . . 766

18    902  . . . . . . . . . . . . . . . . . . . 803

19                         DEFENDANT EXHIBITS

20   Exhibit No.                                 Received

21    G6  . . . . . . . . . . . . . . . . . . . . 713

22    67  . . . . . . . . . . . . . . . . . . . . 714

23    G8  . . . . . . . . . . . . . . . . . . . . 714

24    G9  . . . . . . . . . . . . . . . . . . . . 714

25    G10  . . . . . . . . . . . . . . . . . . . 715
```

G11, G12, G13   . . . . . . . . . . . . . . 715

G14   . . . . . . . . . . . . . . . . . . 715