m1o3dou1 – Corrected

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                          19 Cr. 285 (GBD)

5  LAURENCE F. DOUD III,

6              Defendant.
                                        Trial
7  ------------------------------x

8                                       New York, N.Y.
                                        January 24, 2022
9                                       9:45 a.m.

10 Before:

11
                        HON. GEORGE B. DANIELS,
12
                                        District Judge
13                                      –and a Jury–

14                      APPEARANCES

15 DAMIAN WILLIAMS
        United States Attorney for the
16      Southern District of New York
   BY:  NICOLAS T. ROOS
17      ALEXANDRA ROTHMAN
        THOMAS S. BURNETT
18      Assistant United States Attorneys

19 ROBERT C. GOTTLIEB
   DERRELLE M. JANEY
20 PAUL R. TOWNSEND
        Attorneys for Defendant

21
   Also Present:  Sunny Drescher
22                Jacqueline Hauck
                  Paralegal Specialists
23                Special Agent George Burdzy, DEA
                  Investigator Kathleen Whitmore, DEA
24

25

m1o3dou1 - Corrected

1          (Trial resumed; jury not present)

2          THE COURT:  I think we have 10 or 11 jurors so we're

3    still waiting for some jurors.  I'd like to talk a little bit

4    about scheduling and talk a little bit about what we're

5    supposed to expect from these experts.

6          What's the government's schedule at this point?

7          MR. ROOS:  So we have our special agent that's still

8    on for cross.  And then we're going to call Bill Pietruszewski.

9    And I think the current plan is to have him testify and then to

10   have our expert testify.

11         THE COURT:  Okay.  So is that two more witnesses?

12         MR. ROOS:  And then there a few more people that are

13   on the government's witness list.  To give your Honor the full

14   universe, Michael Paulsen, Larry Houck -- who else?  Deborah

15   Komoroski and Sunny Drescher, who is our paralegal as a clean

16   up.  So we're not sure about the order of anything after the

17   expert.  But, none of those people are long.

18         THE COURT:  Does the defense, is there some issue with

19   regard to the experts or the exhibits that we were discussing

20   last week or you resolved that?

21         MR. JANEY:  No, your Honor, we have a full submission

22   as we promised that we would provide, you'll have it today.

23         THE COURT:  Okay.  I don't have it yet.

24         MR. JANEY:  No, your Honor.  It's almost done.

25         THE COURT:  And you are objecting to the witness or to

1     the exhibits?

2               MR. JANEY:  We are not objecting to the witness.  At

3     this point we're objecting to the exhibits.

4               THE COURT:  And both exhibits or just one of the

5     exhibits?  I believe there is an income exhibit and then --

6               MR. JANEY:  Thank you, your Honor.

7               THE COURT:  Suspicious --

8               MR. JANEY:  What we're trying to do, consistent with

9     what your Honor asked us to do, is to identify exhibit by

10    exhibit where we have issues and that's what we're endeavoring

11    to do to be as complete as possible.  And again, your Honor

12    will have that full submission today.

13              THE COURT:  Again, are you objecting to both of those

14    exhibits or just one of those exhibits?

15              MR. JANEY:  I understand when your Honor says both,

16    what we've endeavored to do is identify in the 81 pages or the

17    81 slides wherever we have objections to be as complete as

18    possible.

19              THE COURT:  When I say both, my understanding is that

20    one witness has the income exhibit, and another witness has the

21    suspicious order activity.

22              MR. ROOS:  Just one.

23              THE COURT:  That's just one witness?

24              MR. JANEY:  With respect to all those.  My

25    understanding, your Honor, is all of those 81 slides are going

m1o3dou1 - Corrected

1    to be used in support of the testimony of the single government

2    expert witness.

3              THE COURT:  Just so I get a feel as I wait for your

4    submission, what is your objection with regard to the income?

5              MR. JANEY:  Well, the income is discussed in a couple

6    of different respects, but one, as we were discussing last

7    week, on Friday, the income gives an inference, we believe

8    strongly, that the income from the pharmacies is a red flag.

9              THE COURT:  That's not what the exhibit says.

10             MR. JANEY:  Well, again, to answer your question --

11             THE COURT:  It doesn't qualify as a red flag under the

12   suspicious order procedures.

13             MR. JANEY:  I agree with that, your Honor, and I

14   believe that's part of the issue.  And our submission will more

15   fully elaborate.

16             THE COURT:  Who will testify that the income was a red

17   flag?

18             MR. JANEY:  I don't know who the government intends --

19             THE COURT:  You think the witness is going to try to

20   testify that Mr. Doud's income was a red flag?

21             MR. JANEY:  Well, presumably, and even if those words

22   don't literally come out of his mouth, your Honor, the way in

23   which the slide is designed, it gives rise to that impression.

24             THE COURT:  No.  It gives rise to the impression that

25   during the period of time that the government contends that the

m1o3dou1 - Corrected

1    company was not following its suspicious order procedure, that

2    Mr. Doud's income was significantly benefiting during that

3    time.

4              MR. JANEY:  I'm sorry, your Honor.  I wasn't

5    immediately understanding what income you were referring to.

6              THE COURT:  I am trying --

7              MR. JANEY:  I thought you were referring to -- when

8    you said "income," I thought you meant the sales dollars in

9    connection with the pharmacies.  That's what I was referring

10   to.

11             THE COURT:  That's why I was given two separate sets

12   of exhibits.

13             MR. JANEY:  Yes.

14             THE COURT:  Do you have an issue with regard to

15   Mr. Doud's personal income, exhibit and testimony?

16             MR. JANEY:  The way in which it's described, yes, your

17   Honor.  And that's also part --

18             THE COURT:  In what way is it described?

19             MR. JANEY:  Well, the slide gives an impression, I

20   think in a way that's misleading, that Mr. Doud's income, his

21   compensation was driven by controlled substances sales.

22             THE COURT:  What does that have to do with the

23   exhibit?  The exhibit doesn't say that.

24             MR. JANEY:  Well --

25             THE COURT:  The exhibit just indicates what his income

m1o3dou1 - Corrected

1   was over the years.

2           MR. JANEY:  Well, the exhibit in and of itself, and

3   listen, with respect to that particular slide, your Honor, we

4   can certainly reserve the objection upon hearing the testimony

5   of the witness.

6           THE COURT:  I want to try to see if I can resolve it

7   long before that.

8           MR. JANEY:  I certainly believe, as we'll lay out in

9   our submission, we anticipate that the witness is going to say

10  and the government on its offer of proof with respect to this

11  witness has indicated that he is talking about controlled

12  substances sales during the time frame.  And your Honor --

13          THE COURT:  I'm sorry?

14          MR. BURNETT:  I can explain, your Honor.  That's just

15  not correct.  I think I may be able to speed this to get to

16  this more efficiently.

17          The one slide just charts out what Mr. Doud's bonuses

18  were over the course of time.  The expert will say that bonus

19  was based on total sales, and the expert will testify that a

20  portion of it is directly attributable to controlled substances

21  sales, but not by any means the full thing.  And he'll talk

22  about what the connection is between the controlled substance

23  sales and the non-controlled substance sales,.

24          THE COURT:  What connection is he going to make?

25          MR. BURNETT:  He is going to explain when you have a

m1o3dou1 - Corrected

1    whole line distributor like RDC was, that RDC didn't just sell

2    controlled substances to some pharmacies and non-controlled

3    substances to other pharmacies.  They would sell them usually

4    both types of goods to one pharmacy at a time.  So if RDC were

5    to hold up an opioid order or to hold up a controlled substance

6    order, RDC would risk not only losing those opioid sales, but

7    risk that customer going to a competitor for those sales, other

8    sales, and maybe losing the customer entirely.  That is

9    something that Chris Masseth also mentioned during his direct

10   testimony.

11              THE COURT:  I'll get their submission, but I am trying

12   to figure out whether or not this debate is over the testimony

13   or over the exhibit and I'm not right now --

14              MR. JANEY:  If the testimony is as the government has

15   just articulated, then it will be about the testimony and the

16   slide.  Because, what the government has just described is

17   factually incorrect.

18              THE COURT:  Okay.  And with regard to the income

19   figures?

20              MR. JANEY:  We're not disputing the veracity of the

21   numbers.

22              THE COURT:  Okay.  With regard to the foundation for

23   these slides, you have some foundational objection to these

24   slides or that is not an issue?

25              MR. JANEY:  The foundational issue doesn't -- there is

m1o3dou1 – Corrected

1    no foundational issue.

2              THE COURT:  All right.  So you're not just going to

3    object to it because there is not a 6-foot high stack of

4    papers.

5              MR. JANEY:  No, your Honor.

6              THE COURT:  With regard to the second exhibit or

7    exhibits, which have to do with the summary of red flags.

8              MR. JANEY:  Yes, your Honor.

9              THE COURT:  And I guess that's only one -- no.  I

10   guess there is more than one.

11             MR. JANEY:  It's pretty replete, because it goes

12   through -- the issue extends, your Honor, to each one of the

13   supporting slides.

14             THE COURT:  So, again, my focus is this.  Is it your

15   position that the information on these slides is inaccurate?

16             MR. JANEY:  It is -- the position, or the objection

17   isn't as to the veracity of the data.  The issue is really a

18   403 in large part issue, your Honor, depending on how you view

19   the exhibit.  I don't know whether the government views these

20   exhibits as something that the expert will use as a

21   demonstrative in support of his oral testimony, or if the

22   government is seeking to have these exhibits admitted in

23   evidence.  But, either way, our submission will address either

24   aspect.

25             THE COURT:  Again, that's why, my first question is

m1o3dou1 - Corrected

1    whether or not, whether you have a foundational objection,

2    whether you object because the slides are inaccurate in some

3    way, or you have an objection to the nature of this testimony.

4              MR. JANEY:  It's not about the veracity of the

5    information.  That's not the nature of the objection.

6              THE COURT:  All right.  So, how soon will I be able to

7    review that?

8              MR. JANEY:  You'll have it before 6 p.m., your Honor.

9              THE COURT:  Okay.

10             MR. BURNETT:  Just so you know, and for Mr. Janey's

11   preparations, we are planning to add I think one additional

12   slide after that bonus slide that we discussed, which breaks

13   out numbers based on controlled substance sales.

14             MR. JANEY:  And the only thing I would say, your

15   Honor, is that to the extent that there is an additional slide,

16   that this expert would speak to, particularly given this

17   conversation and we're making the Court aware we intend to make

18   a submission before 6 p.m., it would be helpful if by midday,

19   that we could receive the slide from the government.

20             MR. BURNETT:  We'll have it to you.

21             THE COURT:  One quick thing, and I think all the

22   jurors are here.  You indicated that your expert was a lengthy

23   witness.  And I find that, I'm not sure I find that this is

24   particularly driven by expert testimony.  First of all, my

25   first question is this:  Is there an expert report for me to

m1o3dou1 - Corrected

1    review?

2              MR. JANEY:  No, your Honor.  We have provided

3    preliminary slides to the government in connection with the

4    expert.  And maybe if I can help, your Honor, because I

5    certainly didn't -- it might have been that it was a Friday

6    afternoon, after a week of trial, and perhaps I spoke

7    inartfully.  I don't anticipate a two hour testimony from the

8    defense expert.

9              THE COURT:  Oh, okay.

10             MR. JANEY:  If that's the question.

11             THE COURT:  Well, I'm trying to figure out what the

12   parameters are of these experts.  It's unclear to me what kind

13   of expert testimony this witness is going to offer.  And I

14   think the reason I asked about expert reports is I'm not sure

15   what the nature of this expert's opinion is going to be.

16   That's what I'm concerned about.  And so, if there is a debate

17   over whether or not this expert should testify, my first

18   analysis is to figure out, since we don't have an expert

19   report, I can't go there.  But to figure out what it is that

20   this expert, what area this expert will testify about, and what

21   opinions is this expert going to offer.

22             MR. JANEY:  So, to that, your Honor, what we can, if

23   it addresses the issue from the Court's perspective, we can

24   provide the slides that we've submitted to the government to

25   your Honor, with a very brief one-and-a-quarter page cover

m1o3dou1 - Corrected

1    letter describing what this expert is going to say, and what

2    the expert's -- what we will elicit in terms of the expert's

3    opinion.  And if the Court agrees, we can have that to your

4    Honor by 6 o'clock tomorrow.

5              THE COURT:  That would be helpful.  Does the

6    government still have some objection to this witness?

7              MR. BURNETT:  So I think it sounds like Mr. Janey --

8    correct me if I am wrong -- is referring to Mr. Martinovic.

9              MR. JANEY:  Yes.

10             MR. BURNETT:  I think we have one pretty narrow

11   objection.  He should be able to testify.  There is one narrow

12   objection which I don't know if this is something that

13   Mr. Martinovic plans to get to.

14             MR. JANEY:  The disclosure will be tomorrow.

15             MR. BURNETT:  There are two experts noticed though.

16   The thrust of our objections were as to the other expert,

17   Mr. O'Neil, where we don't have any slides and I'm unclear.

18             THE COURT:  What is Mr. O'Neil going to testify about?

19             MR. JANEY:  He is a compliance expert, your Honor, but

20   we can address that as well in the further offer of proof we

21   provide by 6 o'clock tomorrow.

22             THE COURT:  Let me tell you where I'm focused.  I'm

23   focused on the fact that the ultimate issue for this jury is

24   not an expert issue.  It seems to me, and you can convince me

25   otherwise, it seems to me that the company was required to have

1  suspicious order procedures that they follow.  Those suspicious

2  order procedures are the rules.  They set the rules.  So, the

3  question is not whether or not certain things are red flags or

4  not red flags.  They've already defined the red flags.  Those

5  suspicious order procedures define the nature of the red --

6  seems to me what they are.  So, the question is whether or not

7  the company and Mr. Doud followed those procedures.

8          And so, that's an evidentiary issue, that's not a

9  expert issue.  Clearly no expert can come in and say, well,

10  they didn't have to follow their procedures, if that's the

11  nature of the witness's testimony.

12          MR. JANEY:  That's not the position of the defense,

13  your Honor, for sure.  We haven't elicited testimony to suggest

14  such.  That will not be certainly the testimony from

15  Mr. Martinovic, your Honor.

16          There is an issue where we believe that the jury can

17  be helped by an expert and it is on some of the financial

18  issues.

19          THE COURT:  When you say some of the financial issues,

20  you're talking about Mr. Doud's financial income or are you

21  talking about broader financial issues with regard to the

22  profits made by the company?

23          MR. JANEY:  Both, quite candidly, your Honor, and they

24  are hook and groove.  The government opened in its opening

25  statement argued and put forward and opened the door to the

m1o3dou1 - Corrected

1    issue that Mr. Doud was motivated to take certain acts based

2    on -- and I believe I'm quoting the government -- based on

3    greed.  And indicated that the jury would see evidence of that,

4    presumably also by and through this particular expert in what

5    he describes.  I think it is reasonable to view Mr. Martinovic

6    as a counter expert.  We take issue and object to some of the

7    factual explication --

8              THE COURT:  What is going to be the nature of his

9    expert testimony to counter their testimony?

10             MR. JANEY:  I'm not sure I'm understanding your Honor.

11             THE COURT:  Well, you say he's --

12             MR. JANEY:  There is a question, I believe as an

13   example, your Honor, I believe there is a legitimate question

14   as to the analysis of Mr. Doud's compensation arrangement and

15   how that specifically -- how controlled sales and overall sales

16   actually drove how he was compensated, and I believe there is a

17   legitimate dispute about that.

18             THE COURT:  Okay.  Well, and we haven't gotten to

19   that, so I haven't focused on that.  But my understanding of

20   the way the case has proceeded so far is that I don't

21   understand at this point it to be any more complicated than the

22   government contends that Mr. Doud was motivated to overlook and

23   not follow suspicious order procedures and not report

24   suspicious order reports to the DEA because he would personally

25   profit by the more drugs, controlled substances the company

m1o3dou1 – Corrected

|     |
|-----|

1    sold.  And they want to show that during the period of time

2    when this, during the period of time he made the most money,

3    that was the period of time when they were not reporting, and

4    that reporting made up a substantial portion of his

5    compensation.

6          MR. JANEY:  And that, your Honor, is where the

7    controversy is.  I anticipate that the government's expert

8    takes one -- let me back up.

9          There are materials that have not been offered in

10   evidence yet, and as an example of that, your Honor, Mr. Doud's

11   employment agreement, which lays out in detail a relatively

12   complicated formula as to how that compensation is computed, is

13   not something that I believe that the jury would naturally

14   understand through lay testimony.  And to relate that

15   computation to the sales of the company, is an aspect where I

16   believe an expert can assist the trier of fact.  I believe that

17   is important in this particular case.

18         THE COURT:  Okay.  That may be the case and I don't

19   know, because I've not gotten that far yet.  But it seems to me

20   from the jurors' perspective, they're not analyzing this in

21   that complicated manner.  And nor have I so far, based on this

22   evidence, analyzed it in that complicated manner.  That the way

23   it seems that so far, the evidence that the government has

24   attempted to offer is, that, look, the numbers -- there was an

25   increase in sales that contributed to Mr. Doud's bonuses and

1       income.  That significant or a portion of that increases in

2       sales is attributed to the sale of controlled substances.

3                   So the analysis, the simple analysis as opposed to the

4       complicated analysis before me and the jury is that if Mr. Doud

5       was making $10 off of all of the sales, and now during this

6       period of time he's making $15 off of the sales, and a

7       substantial portion of that extra $5 is as a result of the sale

8       of controlled substances, then it's for the jury to determine

9       whether or not that's what motivated him.

10                  MR. JANEY:  I understand, your Honor.  I would simply

11      submit in advance, submit to your Honor in advance of our

12      submission to the Court, that that is precisely the fact that

13      we take issue with.

14                  THE COURT:  Okay.

15                  MR. JANEY:  I understand that is the government's

16      presentation.  I anticipate that the government's expert will

17      articulate it in the way in which your Honor just described.

18      And you can anticipate that our expert will say that's wrong.

19                  MR. BURNETT:  To be clear, I don't have, sorry.  We

20      don't have an objection to that type of testimony from the

21      expert.  I think the one narrow piece I had mentioned was from

22      some notes that were turned over it seemed like there might

23      have been at least some time when Mr. Doud might have had a

24      conversation with the expert, and I want to make sure the

25      expert is not going to effectively channel Mr. Doud's testimony

1    about what was or wasn't an important part of the business,

2    because we can't cross-examine Mr. Doud unless he takes the

3    stand.

4            THE COURT:  So you two can focus and narrow the issue

5    to me and I'll rule on that.  To the extent either side doesn't

6    have an objection to the nature of the expert's testimony, then

7    it's not an issue for me.

8            MR. BURNETT:  The compliance person is the one we have

9    the more substantial concerns about, but it seems like that

10   might get sorted out.

11           THE COURT:  At some point we'll have to resolve the

12   issue about the government's exhibits.

13           MR. JANEY:  That's why we're going to get it to you by

14   6 o'clock.

15           THE COURT:  We won't be dealing with those exhibits

16   today?

17           MR. ROOS:  Tomorrow.  That's why we thought they'd

18   file over the weekend.

19           MR. JANEY:  No.  What we articulated is the Court

20   would have it by Monday.  Today is Monday.

21           MR. ROOS:  Morning.

22           THE COURT:  Let's try to get it as early as possible.

23   Let's bring the witness back and let's get the jury in.

24           MR. ROOS:  One other issue.  On Thursday night, and I

25   know your Honor didn't see it until Friday, we filed this

m1o3dou1 - Corrected

1    letter about the scope of the cross-examination of this witness

2    that's on.  The summary witness.  I can hand up a copy.

3              THE COURT:  Do you have that?  I was looking for it.

4    I don't think -- do we have that, I don't think we got that.  I

5    was looking for, did you file this?  Is this one of the two

6    letters you submitted?

7              MR. ROOS:  On Thursday night that your Honor saw

8    Friday morning.

9              THE COURT:  This is --

10             MR. ROOS:  I think your Honor probably saw it and read

11   already.  I just want to reraise it because I don't know what

12   Mr. Janey is planning on cross and maybe --

13             THE COURT:  I have it highlighted, as a matter of

14   fact.

15             MR. ROOS:  Okay.

16             THE COURT:  Focus me on what issue you want to be

17   resolved.

18             MR. ROOS:  I don't need an issue resolved.  I want to

19   flag for your Honor if the defense starts trying to offer a

20   bunch of exhibits through what's just a summary witness, we're

21   going to having a series of objections which are set forth in

22   our letter, and I wanted to flag that, that way your Honor knew

23   what I was talking about as I'm objecting.

24             MR. JANEY:  I think we addressed this pretty

25   thoroughly on Friday in response to this letter.  The defense

1          indicated that we are not going to read e-mails into the

2          record.  We're not going to try to offer documents that are not

3          admitted in evidence through this witness.

4                  However, to the extent that there are materials that

5          we believe that may not have been incorporated in the summary

6          witness's review, we will mark those for identification.  And

7          as I think about it now, I don't think that any of that exists.

8          I think to the extent we ask him questions about things that

9          might have been left out of his review, they will be documents

10         that have already been admitted in evidence.

11                 THE COURT:  Okay.  All right.  Is it possible that the

12         government will rest this week?

13                 MR. ROOS:  I think there is a pretty strong chance of

14         that.  Assuming -- I can't assume anything.  But say we at

15         least start if not finish the government's expert tomorrow,

16         then it's possible the remainder could be Wednesday.

17                 THE COURT:  Let's bring the jury in.

18                 (Jury present)

19                 THE COURT:  Good morning, ladies and gentlemen.

20         Ladies and gentlemen, my best estimate at this point is that I

21         believe we should be finished with the witnesses hopefully by

22         the middle of next week.  At this point I think we're on that

23         schedule.  I'm going to try to see if we move efficiently, I

24         want to see if we can move that schedule up a day or two.  But

25         that's my best estimate of where we are.

1           So at this point we'll proceed with the

2     cross-examination of this witness.

3           MR. JANEY:  Thank you, your Honor.

4      JEREMY ROSENMAN,

5     CROSS-EXAMINATION

6     BY MR. JANEY:

7     Q.  Agent Rosenman, good morning.

8     A.  Good morning.

9     Q.  On Friday, you testified that you did not have a role in

10    investigating RDC, correct?

11    A.  That's correct.

12    Q.  You did not participate in the criminal investigation

13    relating to Laurence Doud, correct?

14    A.  Correct.

15    Q.  Your role here as a witness is limited to testifying about

16    the accuracy, the accuracy, of the government's summary slides,

17    based on your review of the underlying case material the

18    government provided you, correct?

19    A.  Yes.

20    Q.  If we could have Government Exhibit 902 that we were all

21    viewing on Friday.

22          Agent Rosenman, do you recall this exhibit?

23    A.  Yes.

24    Q.  Drawing your attention to slide six of the presentation.

25    Do you have that there?

M1o3dou1                        Rosenman - Cross

1    A.  Yes, I do.

2    Q.  Drawing your attention in particular to what I'll call the

3    first bubble, which is the first box and if we could illuminate

4    that for the witness.  Thank you.

5         You testified here about an e-mail from Carlos Aquino

6    to William Pietruszewski copying Larry Doud and others at RDC.

7    Correct?

8    A.  Yes.

9    Q.  Among other things, what Aquino is saying in the e-mail,

10   and drawing your attention to the last line in this bubble if

11   we can highlight that for the witness.  The last thing, it

12   reads:  The last thing RDC needs is to have DEA place their

13   crosshairs on RDC because of their willful blindness and

14   deliberate ignorance.

15        Correct?  Is that what that says?

16   A.  Yes.

17   Q.  And this box is, this quotation from the e-mail is just an

18   excerpt of a broader e-mail; is that correct?

19   A.  Yes.

20   Q.  Let's look at the underlying document that's identified

21   here in relation to the bubble, what's marked as Government

22   Exhibit 24.  If we could have that on the screen.

23        Drawing your attention now to Government Exhibit 24,

24   and looking at the part of the e-mail chain immediately below

25   the portion you read on Friday captured in the bubble, and

M1o3dou1                          Rosenman - Cross

1    immediately below is the e-mail chain from Bill Pietruszewski

2    to Carlos Aquino dated February 3.  If we could pop that out

3    for the witness.

4              MR. ROOS:  I'm sorry.  I don't mean to interrupt

5    Mr. Janey.  My monitor is not working.

6              THE COURT:  We'll get tech up here and let's see if it

7    is plugged in or turned on.

8              MR. ROOS:  I don't mean to interrupt the -- oh, it's

9    on, it's on.  Thank you.

10             THE COURT:  Okay.

11   BY MR. JANEY:

12   Q.  Just to refocus, Agent, we're looking at Government Exhibit

13   24, correct?

14   A.  Yes.

15   Q.  And drawing your attention to the broader e-mail chain and

16   the e-mail specifically below that's been drawn out for your

17   attention from Bill Pietruszewski to Carlos Aquino.  Do you see

18   that e-mail there?

19   A.  Yes, I do.

20   Q.  Drawing your attention in particular to the first two

21   sentences in that e-mail.  If you could read it for the jury.

22   A.  Yes.  It says:  We could ask 10 customers for dispensing

23   information today, and I probably would receive all 10 in a

24   different format.  I have asked and gave all salesmen how it

25   must be for us and we still do not receive it in the correct

M1o3dou1                          Rosenman - Cross

1   format.

2   Q.  Now, pausing there for a moment.  Isn't it fair to say that

3   Mr. Pietruszewski is discussing receiving dispensing

4   information from customers and receiving it in the correct

5   format?

6   A.  Yes.

7   Q.  In the next sentence, well, the sentence thereafter

8   beginning with "so."  Do you see that?

9   A.  Yes.

10  Q.  If we can draw that out for the witness, please.  He goes

11  on to say:  So this at times can be challenging for us -- that

12  is receiving dispensing information in the correct format --

13  but with Jessica on board I see this will improve.

14          That's what he says, correct?

15  A.  That's what the e-mail says, yes.

16  Q.  Mr. Pietruszewski then says:  For me to tell a customer

17  could be a stockholder they must respond or supply the

18  information asked within 10 days and that we would suspend

19  their orders must be a talk with upper management, something

20  that is not my ultimate decision.

21          Correct?

22  A.  Yes, that's what it says.

23  Q.  So, when Mr. Aquino in the bubble excerpt that you

24  testified about on Friday, when Mr. Aquino responds the last

25  thing RDC needs is to have DEA place their crosshairs on RDC

M1o3dou1                        Rosenman - Cross

 1   because of their willful blindness and deliberate ignorance,

 2   based on your review of the entire e-mail, and this thread,

 3   Aquino is not making a specific assessment about any particular

 4   condition at RDC, is he, Agent Rosenman?

 5   A.   I don't know specifically what he was thinking when he

 6   responded.

 7   Q.   But you see what the e-mail chain below reads, correct?

 8   A.   Yes.

 9   Q.   In fact, with respect to the dispensing issue

10   Mr. Pietruszewski describes, when he describes it there,

11   Aquino's response -- just drawing your attention back to the

12   e-mail thread above, and looking at the last paragraph, he says

13   if you want, PCG -- let's pause there for a moment.

14           What is PCG, Agent Rosenman?

15   A.   I don't know offhand.

16   Q.   It is Aquino's company, correct?

17   A.   That's what it seems from the signature block.

18   Q.   He says:  If you want, PCG can contact customers on your

19   behalf and get their information.

20           Correct?  That's what he says, right?

21   A.   That's what the e-mail says.

22   Q.   And Aquino goes on to say:  You chose the customer and we

23   will see that they provide the information.  Correct?

24   A.   Yes, that's what it says.

25           MR. JANEY:  We can take that down, please.

1  Q.  Again, you had no role in preparing the slides here that

2  you're testifying about, correct?

3  A.  In choosing the items in the slides?

4  Q.  Well, let's break it into parts.  Did you choose the items

5  in the slides?

6  A.  No.

7  Q.  Right.  Did you prepare the slides themselves?

8  A.  No.

9  Q.  Your role was simply to review these slides to is assess

10  whether they were accurate in relation to the underlying

11  information provided to you by the prosecutors in this case,

12  correct?

13  A.  Correct.

14  Q.  With respect to the underlying documents you were provided,

15  I want to draw your attention to what's been admitted in

16  evidence as Defense G6 if we could have that.

17          This is a copy of a suspicious order activity report

18  filed by RDC on January 20, 2017.

19          Do you recognize this document?

20  A.  No.

21  Q.  Was this document included among the underlying materials

22  provided to you for your review by the prosecutors in support

23  of your testimony?

24  A.  No.

25          MR. JANEY:  We can take this down.

M1o3dou1

1    Q.  Drawing your attention to what has been admitted in

2    evidence as Defense G7.  Can we have that, please.

3          This is a copy of a suspicious order activity report

4    filed by RDC on January 23, 2017, in particular, submitted by

5    William Pietruszewski.

6          Do you recognize this document?

7    A.  No.

8    Q.  Was this document included among the underlying materials

9    provided to you for your review by the prosecutors in this case

10   in support of your testimony?

11   A.  No.

12   Q.  Were any suspicious order activity reports filed by RDC

13   provided to you among the underlying documents you were asked

14   to review in aid of your testimony?

15   A.  No.

16          MR. JANEY:  No further questions, your Honor.  We can

17   take the exhibit down.

18          THE COURT:  Any further questions for this witness by

19   the government?

20          MR. ROOS:  No, your Honor.

21          THE COURT:  Thank you, sir.  You can step down.

22          (Witness excused)

23          THE COURT:  The government call its next witness.

24          MS. ROTHMAN:  Your Honor, the government calls William

25   Pietruszewski.  With the Court's permission, I'd like to read a

M1o3dou1

few exhibits and offer them.

        THE COURT:  A few stipulations?

        MS. ROTHMAN:  Two certifications.  I'll do it at that podium.

        THE COURT:  I'm sorry?

        MS. ROTHMAN:  I'll do that at the podium.

        THE COURT:  Yes.

        MS. ROTHMAN:  Your Honor, first the government would offer Government Exhibit 703, which is a certification signed by Dominic Pagnotta, the former CIO of RDC.  And pursuant to Government Exhibit 703, the government would offer into evidence Government Exhibits 281 through 290, including all subparts, which are true and correct copies of dispensing data received by RDC from the pharmacies listed on Government Exhibit 703, pursuant to Rules 803(6), 902(11) and 902(14) of the Federal Rules of Evidence.

        THE COURT:  Any objection?

        MR. GOTTLIEB:  I don't have it in front of me.  I want to make sure that is the stipulation that we signed.

        MS. ROTHMAN:  This is the certification from Dominic Pagnotta of RDC.

        MR. GOTTLIEB:  Okay.

        MS. ROTHMAN:  We can publish 703 to the jury.

        THE COURT:  Do you have any objection first?

        MR. GOTTLIEB:  No, your Honor.

M1o3dou1

1          THE COURT:  It will be admitted in evidence.

2          MS. ROTHMAN:  Thank you.

3          (Government's Exhibit 703, 281 through 290 received in

4     evidence)

5          MS. ROTHMAN:  We can flip to the second page.  We can

6     take that down.

7          The second, your Honor, we would also offer Government

8     Exhibit 701, which is a signed certification, again by Dominic

9     Pagnotta, the former CIO of Rochester Drug Co-Operative, and

10    pursuant to Government Exhibit 701, the government would offer

11    Government Exhibits 252 through 254, 260, 263 through 266, 267A

12    through 267O, 268A through 268D, 268J and 280, as business

13    records of Rochester Drug Co-Operative pursuant to Federal

14    Rules of Evidence 803(6) and 902(11).

15         THE COURT:  Any objection?

16         MR. GOTTLIEB:  No, your Honor.

17         THE COURT:  It will be admitted in evidence.

18         MS. ROTHMAN:  Your Honor the government calls William

19    Pietruszewski.

20         (Government's Exhibit 701, 252 through 254, 260, 263

21    received in evidence)

22         (Government's Exhibit 263 through 266, 267A through

23    267O received in evidence)

24         (Government's Exhibit 268A through 268D, 268J, 280

25    received in evidence)

M1o3dou1                        Pietruszewski - Direct

1          THE COURT:  You can inquire.

2          MS. ROTHMAN:  Thank you, your Honor.

3    WILLIAM PIETRUSZEWSKI,

4         called as a witness by the Government,

5         having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MS. ROTHMAN:

8    Q.  How old are you?

9    A.  55.

10   Q.  Do you currently work?

11   A.  Yes.

12   Q.  Where do you work?

13   A.  I work for Militti Sales and Promotions.

14   Q.  What do you do there?

15   A.  I am a warehouse manager.

16   Q.  Do you know the company Rochester Drug Co-Operative?

17   A.  Yes.

18   Q.  How do you know it?

19   A.  I used to work there.

20   Q.  When did you work there?

21   A.  From March of 2001 until July 2018.

22   Q.  What was your job at RDC?

23   A.  I was the operations compliance manager.

24   Q.  What responsibilities did you have at RDC?

25   A.  I would be responsible for the warehouse day and night, the

M1o3dou1                    Pietruszewski - Direct

```
 1   security of the facility, I took care of the logistics for all
 2   of the company's transportation -- deliveries, transportation,
 3   human resource as in doing the hiring and firing of employees.
 4   And also worked in compliance.
 5   Q.  With respect to compliance, who did you report to?
 6   A.  To Larry Doud and Joe Brennan.
 7   Q.  Mr. Pietruszewski, did you commit crimes at RDC?
 8   A.  Yes.
 9   Q.  What crimes did you commit?
10   A.  I participated in a conspiracy to -- distribute narcotics,
11   I participated in a conspiracy to defraud the DEA, and I failed
12   to report suspicious orders.  Failure to file suspicious
13   orders.
14   Q.  Who did you conspire with when you conspired to violate the
15   narcotics laws?
16   A.  Mr. Doud.
17   Q.  Who did you conspire with when you conspired to defraud the
18   DEA?
19   A.  Mr. Doud.
20   Q.  Do you see Mr. Doud in the courtroom today?
21   A.  Yes.
22   Q.  Can you please identify him by where he's seated.
23   A.  The second desk in the middle.
24            MS. ROTHMAN:  Let the record reflect the witness has
25   identified the defendant.
```

 1          THE COURT:  The record will so reflect.

 2    Q.  Have you pled guilty to those crimes?

 3    A.  Yes, I have.

 4    Q.  When you pled guilty, was it sworn under oath?

 5    A.  Yes, it was.

 6    Q.  Was that under penalties of prosecution for perjury?

 7    A.  Yes.

 8    Q.  Before you pled guilty, did you enter into a cooperation

 9    agreement with the government?

10    A.  Yes.

11          MS. ROTHMAN:  Ms. Drescher, can you please pull up for

12    the witness what's been marked for identification as 3529-12.

13    Q.  Mr. Pietruszewski, do you recognize that document?

14    A.  Yes.

15    Q.  What is it?

16    A.  It is -- my agreement with the government.

17          MS. ROTHMAN:  The government offers into evidence

18    3529-12.

19          THE COURT:  Any objection?

20          MR. GOTTLIEB:  No objection.  Is that marked as a

21    government exhibit?

22          MS. ROTHMAN:  We're using the 3500 number.  But we can

23    give it a government exhibit number if you'd like.

24          MR. GOTTLIEB:  Okay.  That's up to the government.  No

25    objection, your Honor.

1    THE COURT:  Then it will be admitted in evidence as

2    that exhibit.

3         (Government's Exhibit 3529-12 received in evidence)

4         MS. ROTHMAN:  May we publish to the jury.

5         THE COURT:  Yes.

6         MS. ROTHMAN:  Thank you.

7    Q.  Now that everyone can see, Mr. Pietruszewski, what are we

8    looking at?

9    A.  Looking at my -- the three counts of what I pled guilty to.

10   Q.  Is this your cooperation agreement?

11   A.  Yes.

12        MS. ROTHMAN:  Ms. Drescher, can you flip through the

13   six pages until you get to the last page.

14   Q.  Is that your signature on the last page?

15   A.  Yes, it is.

16        MS. ROTHMAN:  We can go back to the first page.  Thank

17   you, Ms. Drescher.

18   Q.  How many crimes did you commit?

19   A.  I committed three crimes.

20   Q.  What was the first crime you committed?

21   A.  I -- participation in a conspiracy to distribute narcotic

22   drugs.

23        MS. ROTHMAN:  We can zoom in on the first paragraph,

24   Ms. Drescher.  Thank you.  Just highlight the words "Count One"

25   and "participation in a narcotics distribution conspiracy from

M1o3dou1                        Pietruszewski - Direct

1   January 2012 until March 2017."

2                Thank you.  We zoom out and go to the third paragraph

3   of page one.

4   Q.  What was the second crime that you committed?

5   A.  Participation in a conspiracy of defrauding the DEA by not

6   reporting suspicious orders and not alerting the DEA of

7   customers that were diverting controlled substances.

8                MS. ROTHMAN:  We can zoom out and go to the final

9   paragraph on the first page.

10  Q.  What was the third crime that you committed?

11  A.  Not -- failure to file suspicious orders with the DEA.

12  Q.  Did you plead guilty to each of those three crimes?

13  A.  I did.

14               MS. ROTHMAN:  It we turn to page two of this

15  agreement, Ms. Drescher, and zoom in on the bottom paragraph.

16  Q.  Mr. Pietruszewski, do you see where it says (i)

17  participation in a conspiracy to distribute fentanyl and

18  oxycodone outside the scope of professional practice and not

19  for a legitimate medical purpose?

20  A.  Yes.

21  Q.  Did you participate in a conspiracy to distribute fentanyl

22  and oxycodone outside the scope of professional practice and

23  not for a legitimate medical purpose?

24  A.  Yes.

25  Q.  Did you plead guilty to that crime?

M1o3dou1                          Pietruszewski - Direct

1    A.  Yes, I did.

2    Q.  Who did you conspire with to distribute fentanyl and

3    oxycodone outside the scope of professional practice and not

4    for a legitimate medical purpose?

5    A.  With Mr. Doud.

6    Q.  What did you do that made you guilty of conspiring to

7    illegally distribute oxycodone and fentanyl?

8    A.  By releasing orders of interest that had red flags that the

9    customers were diverting the controlled substances.

10   Q.  Do you see in the same paragraph where it reads (ii)

11   participation in a conspiracy to defraud the DEA by failing to

12   file suspicious order reports and notify the DEA of customers

13   diverting controlled substances?

14   A.  Yes.

15   Q.  Did you participate in a conspiracy to defraud the DEA by

16   failing to file suspicious order reports and notify the DEA of

17   customers diverting controlled substances?

18   A.  Yes.

19   Q.  Did you plead guilty to that crime?

20   A.  Yes.

21   Q.  Who did you conspire with to defraud the DEA?

22   A.  Mr. Doud.

23   Q.  What did you do that made you guilty of defrauding the DEA?

24   A.  By not reporting the pharmacies that had the red flags that

25   were -- suspicious orders.

M1o3dou1                    Pietruszewski - Direct

1          MS. ROTHMAN:  If we can go to the top of the third

2    page.  Thank you, Ms. Drescher.

3    Q.  Do you see where it says (iii) failure to file suspicious

4    order reports with the DEA?

5    A.  Yes.

6    Q.  Did you commit the crime of failing to file suspicious

7    order reports with the DEA?

8    A.  Yes.

9    Q.  Did you plead guilty to that crime?

10   A.  Yes.

11   Q.  What did you do that made you guilty of failing to file

12   suspicious order reports with the DEA?

13   A.  I did not file suspicious order reports to the DEA.

14   Q.  Who, if anyone, directed you not to file suspicious order

15   reports to the DEA?

16          MR. GOTTLIEB:  I'm going to object to that as to being

17   leading, as to direction.

18          THE COURT:  Overruled.  She said "who."  It's not a

19   leading question.

20   A.  Mr. Doud.

21   Q.  Mr. Pietruszewski, when you conspired with Mr. Doud, did

22   you discuss with Mr. Doud RDC's suspicious order monitoring

23   program?

24   A.  Yes.

25   Q.  Did you discuss with Mr. Doud compliance problems at RDC's

M1o3dou1                        Pietruszewski - Direct

1    pharmacy customers?

2    A.  Yes.

3    Q.  Did you discuss with Mr. Doud suspicious doctors whose

4    prescriptions were being filled at RDC pharmacy customers?

5    A.  Yes.

6    Q.  Based on your conversations with Mr. Doud, what is your

7    understanding as to whether or not Mr. Doud wanted to invest in

8    RDC's compliance department?

9            MR. GOTTLIEB:  Your Honor, objection as to the form of

10   that question.  Objection.

11           THE COURT:  Sustained as to the form of the question.

12   Q.  Based upon your conversations with Mr. Doud, do you have an

13   understanding of whether or not Mr. Doud wanted to invest in

14   RDC's compliance department?

15           MR. GOTTLIEB:  Objection.

16           Withdrawn.

17   A.  Mr. Doud didn't want to spend money on compliance.

18   Q.  Why not?

19   A.  He thought it was a waste of money.  We had nothing to --

20   nothing, no return investment.

21           MS. ROTHMAN:  We can take down Mr. Pietruszewski's

22   cooperation agreement.  Thank you.

23   Q.  Let's start with some background.

24           In what year did you join RDC?

25   A.  I started in March of 2001.

M1o3dou1                          Pietruszewski - Direct

```
 1   Q.  Who hired you?
 2   A.  Mr. Doud and Jim Giambrone.
 3   Q.  What was your first job at the company?
 4   A.  I was a night supervisor.
 5   Q.  What did you do in that role?
 6   A.  I would support the night manager and I would be
 7   supervising the night shift, making sure that the orders came
 8   out, that we picked the orders in a timely fashion, and that
 9   the trucks would leave in a timely fashion.
10   Q.  What, if any, role did you take on after that?
11   A.  In 2000 -- I think it was the summer of 2004 that I went on
12   to days as a days manage -- days operations.
13   Q.  What did you do in that role?
14   A.  I would work with the receiving department, the returns
15   department, I was responsible for the control room, so doing
16   inventory of the controlled substances, filling narcotic
17   orders, billing narcotic orders, dealing with the
18   transportation and customer problems, like, if customers
19   received a mispick or a shortage, we'd have to investigate that
20   and resolve it.
21   Q.  When did you start to take on compliance responsibilities?
22   A.  In 2006 I was asked to take on the reporting of ARCOS,
23   which we would submit monthly to the DEA.
24   Q.  Were there other things you were asked to do around that
25   time?
```

1  A.  Yes.  Ed Kirker, who was my supervisor or my direct boss at

2  the time, asked if I would be, would like to take on a

3  compliance role.

4  Q.  So what are some of the things you did in that role, aside

5  from ARCOS data?

6  A.  Well, I would meet with manufacturers, and we would --

7  manufacturer would come in and they would want to know

8  processes of storage of pharmaceuticals or how we picked them

9  or just receiving the product in.

10  Q.  Did you have any involvement in organizing a questionnaire

11  that RDC used for its customers?

12  A.  I -- I did not actually organize the questionnaire.  My

13  responsibility, it was devised by the upper management of I

14  believe, like Al Emmans and Joe Brennan, and I would receive

15  the questionnaire from the customers via fax or by mail or by

16  the salesmen.

17  Q.  What would you do with the questionnaire when you got it?

18  A.  Well, when we started receiving them, I really had nowhere

19  to put them.  So we started a file for them, and we would put

20  them inside of a folder and file them on a daily basis, when

21  they would come in.

22  Q.  As you took on this compliance work, were you still working

23  in and managing the warehouse?

24  A.  Yes.

25  Q.  How many hours a week were you spending on compliance

1   tasks?

2   A.  Well, once we were doing the survey and the ARCOSing, maybe

3   15 hours a week.

4   Q.  With time, what title did you assume in the compliance

5   department?

6   A.  I ended up being the -- it was operations compliance

7   manager.

8   Q.  Was that the effective head of compliance?

9   A.  Yes.

10  Q.  Did you have any training in compliance?

11  A.  No, I did not.

12  Q.  Did you have any education in compliance?

13  A.  No, I did not.

14  Q.  Did you have any experience in compliance before joining

15  RDC?

16  A.  No, I did not.

17  Q.  In 2012, who was in the compliance department at RDC?

18  A.  It was myself.

19  Q.  Anyone else?

20  A.  Not at that time, no.

21  Q.  What about in 2013?

22  A.  2013 we did start using a consultant, Carlos Aquino, and

23  then in November 2013 we hired Jessica Pompeo.

24  Q.  What about in 2014?

25  A.  2014, I believe it was May of 2014, we hired Julius Morton.

M1o3dou1                    Pietruszewski - Direct

1    Q.  Were there additional hires to the compliance department in

2    2015 and 2016?

3    A.  Yes.  We brought on Liz Cullen, Amy -- I forget her last

4    name, and then also Karen Stevens.

5    Q.  Let me ask you about Ms. Cullen.  What, if any,

6    relationship did Ms. Cullen have to any other RDC employee?

7    A.  Liz's father was Richie Cullen.  He was the general manager

8    of Fairfield facility.

9    Q.  You also mentioned someone named Karen Stevens.

10   A.  Yes.

11   Q.  How did Ms. Stevens wind up in the compliance department?

12   A.  She used to work I believe it was in accounts receivable.

13   And she was in some type of argument with someone, and she

14   ended up being demoted to compliance.  It was like her -- it

15   was, yeah, she was demoted to compliance.

16   Q.  Were the individuals you just listed enough help to do all

17   the things that RDC needed to do with respect to compliance?

18   A.  No.

19   Q.  Did you speak with Mr. Doud about needing more help in the

20   compliance department?

21   A.  We did, yes.

22   Q.  What, if anything, did Mr. Doud say in response?

23   A.  That I had enough help and that compliance, again, there

24   was no return on investment.

25   Q.  What, if any, compliance tasks were you unable to do

1    because of the understaffing in the compliance department?

2    A.  Analyzing the data of the pharmacies, doing store audits.

3    Q.  When you worked at RDC, where were you based?

4    A.  I was based in Rochester, New York.

5    Q.  Did you stay in Rochester or did you go somewhere else with

6    time?

7    A.  Yes, I started working in Fairfield, New Jersey, in like

8    December of 2014.

9    Q.  Why did you start working in Fairfield?

10   A.  I asked to take on the responsibilities of the warehouse

11   manager of that facility.

12   Q.  Why did RDC open a facility in Fairfield?

13   A.  It was closer to the bulk of our customers.  I mean,

14   majority of our customers were growing in New Jersey,

15   Connecticut and New York City.

16          MS. ROTHMAN:  Ms. Drescher, can you please pull up

17   what's in evidence as Government Exhibit 612.

18   Q.  Mr. Pietruszewski, do you recognize this photograph?

19   A.  Yes.

20   Q.  What is this photograph?

21   A.  That is Rochester Drug's office and warehouse at 50 Jetview

22   Drive in Rochester, New York.

23          MS. ROTHMAN:  We can take this down and please pull up

24   for the witness what's been marked for identification as

25   Government Exhibit 613.

M1o3dou1                          Pietruszewski - Direct

1   Q.  Do you recognize this photograph?

2   A.  Yes.

3   Q.  What is it a photograph of?

4   A.  That is our facility in Fairfield, New Jersey.

5   Q.  Is that a fair and accurate picture?

6   A.  Yes.

7            MS. ROTHMAN:  The government offers into evidence

8   Government Exhibit 613.

9            THE COURT:  Any objection?

10           MR. GOTTLIEB:  No, your Honor.

11           THE COURT:  It will be admitted in evidence.

12           (Government's Exhibit 613 received in evidence)

13           MS. ROTHMAN:  May we publish to the jury?

14           THE COURT:  Yes.

15           MS. ROTHMAN:  Thank you.

16   Q.  What do we see on this screen, Mr. Pietruszewski?

17   A.  This is the front entrance going into the office of the

18   Fairfield facility, and to the left there is a door that would

19   lead to the cafeteria for the employees.

20           MS. ROTHMAN:  Thank you.  If we can please pull up for

21   the witness what's been marked for identification as Government

22   Exhibit 617.

23   Q.  Do you recognize this photograph?

24   A.  Yes.

25   Q.  What is it a photograph of?

1    A.  It is a photograph of the RDC Fairfield, New Jersey,

2    facilities doublechecks area.  This is upstairs in the

3    mezzanine.

4    Q.  Is it a fair and accurate photograph of the interior of

5    RDC's warehouse in Fairfield?

6    A.  Yes.

7            MS. ROTHMAN:  Your Honor, at this time the government

8    offers into evidence Government Exhibit 617.

9            THE COURT:  Any objection?

10           MR. GOTTLIEB:  No, your Honor.

11           THE COURT:  It will be admitted in evidence.

12           (Government's Exhibit 617 received in evidence)

13           MS. ROTHMAN:  May we publish to the jury?

14           THE COURT:  Yes.

15           MS. ROTHMAN:  Thank you.

16   Q.  Mr. Pietruszewski, can you tell us what we're looking at?

17   A.  Sure.  There is a -- right in front there is the table and

18   that's like a screen, computer doublecheck station.  And the

19   conveyor, the totes would travel down the conveyor, and the

20   employee would lift the tote up, put it on the table, take the

21   product out and they would doublecheck it, scan it, verify

22   everything was there, and then they would put the tote back on

23   the conveyor.  Once it's done, it would go through the conveyor

24   system, the invoices would be dropped down on it, the totes

25   would be dropped down, and the tote would be sealed and it

M1o3dou1                          Pietruszewski - Direct

1   would go down to shipping.

2   Q.  You're referring to the word "tote."  What is a tote?

3   A.  That is the blue bin that has the RDC logo that's on a

4   table and also behind us.  Yes.  That's the tote, sorry.

5   Q.  Thank you.  We can take that down.

6          I want to talk about RDC's suspicious order monitoring

7   program.  Are you familiar with that program?

8   A.  Yes.

9   Q.  When did RDC first implement its suspicious order

10  monitoring program?

11  A.  It was in -- April of 2009.

12  Q.  Generally speaking, what was the program designed to do?

13  A.  It would alert us if customers would go over their limit of

14  controlled substances.

15  Q.  If a customer went over their limit, what would happen to

16  their order under the system?

17  A.  It would send us an e-mail text alerting us, and it would

18  go on hold.

19  Q.  So if an order was held initially, is that because someone

20  in compliance wanted it held or because the program

21  automatically did that?

22  A.  The program automatically did that for us.

23  Q.  Now, did RDC have written policies that went along with the

24  suspicious order monitoring program?

25  A.  Yes, we did.

M1o3dou1                    Pietruszewski - Direct

1  Q.  Under RDC's written policies, what was RDC supposed to do

2  when an order was flagged as an order of interest by the

3  suspicious order monitoring program?

4  A.  We were to look at our dispensing for the store or obtain

5  dispensing from the pharmacy, review it.  And then if it was

6  sufficient enough data, we would release the order.  And if the

7  information we received was not, we were not to release the

8  order, and we would -- should have reported it to the DEA.

9  Q.  Did RDC do that?

10 A.  No, we did not.

11 Q.  What instead did RDC typically do with orders of interest

12 flagged by the suspicious order monitoring system?

13 A.  We would release the orders.

14 Q.  I think you testified that there were two requirements, the

15 first to investigate and the second if an order was held, to

16 report that to the DEA.  Is that right?

17 A.  That is correct.

18 Q.  Did RDC report suspicious orders to the DEA?

19 A.  Very few.

20 Q.  Did you and Mr. Doud discuss reporting suspicious orders to

21 the DEA?

22 A.  Yes.

23 Q.  What, if anything, did Mr. Doud say about reporting

24 suspicious orders to the DEA?

25 A.  That it wasn't our responsibility to police the pharmacies.

1    That that was the DEA's responsibility.

2    Q.  Did Mr. Doud say that RDC would not report customers?

3            MR. GOTTLIEB:  Your Honor, objection.  If we could

4    just have a direct questions.  Objection.

5            THE COURT:  I'll sustain the objection to the leading

6    nature.

7    Q.  What, if anything, did Mr. Doud say RDC should do about

8    reporting customers to the DEA?

9    A.  We didn't report the pharmacies.

10   Q.  What, if any, concerns did Mr. Doud have if RDC were to

11   report customers?

12           MR. GOTTLIEB:  Objection as to what concerns he had.

13           THE COURT:  Overruled.

14           MR. GOTTLIEB:  Not to the question about what was said

15   to him, your Honor.

16           THE COURT:  Overruled.  He can answer that in that

17   context.

18           THE WITNESS:  I can answer?

19           THE COURT:  Yes.

20   A.  That other customers wouldn't trust RDC and that, you know,

21   that they wouldn't want to order from RDC, because we were

22   turning customers in.

23   Q.  Based upon those conversations with Mr. Doud, did you

24   report suspicious orders to the DEA?

25   A.  No.  Very, very few.

M1o3dou1                      Pietruszewski - Direct

1    Q.   Why not?

2    A.   We didn't -- we worked with our customers.  We tried to

3    help the independent pharmacy.

4    Q.   Part of working with the customers is that you didn't

5    report them; is that right?

6    A.   Yes.

7    Q.   Now, would you discuss every order of interest held by

8    RDC's suspicious order monitoring system with Mr. Doud?

9    A.   No.

10   Q.   Would you have released all of those orders of interest if

11   Mr. Doud hadn't approved of you doing so?

12   A.   No.

13   Q.   I want to talk about the suspicious order monitoring system

14   in a little more detail, and specifically, how the program got

15   started.

16           Ms. Drescher can we pull up what's in evidence as

17   Government Exhibit 273.  If we can flip through to the second

18   page.  And then go back to the first page.

19           Do you recognize this letter?

20   A.   Yes.

21   Q.   What is it?

22   A.   It is a letter from the DEA government saying that

23   wholesalers or manufacturers had to have a robust suspicious

24   monitoring program.

25   Q.   Where did you first see this letter?

1   A.   Inside my mail bin at the office.

2   Q.   Was there anything on the letter?

3   A.   Yes.  It was a blue sticky note saying that we had to meet

4   to discuss.

5   Q.   I'm sorry, continue.

6   A.   No, I was saying the blue note had the RDC logo as well.

7   Q.   Who was the blue note from?

8   A.   From Mr. Doud.

9   Q.   How did you know the blue note was from Mr. Doud?

10   A.   He was the only one that did use blue notes, but he would

11   sign it as well.

12          MS. ROTHMAN:  If we can zoom in on the second

13   paragraph and highlight the sentence that begins "in addition

14   to."

15   Q.   And Mr. Pietruszewski, can you read the first two sentences

16   of this paragraph.

17   A.   Yes.

18          In addition to, and not in lieu of, the general

19   requirement under 21 U.S.C. 823 that manufacturers and

20   distributors maintain effective controls against diversion, DEA

21   regulations require all manufacturers and distributors to

22   report suspicious orders of controlled substances.

23          MS. ROTHMAN:  Thank you.  We can zoom out.  Thank you,

24   Ms. Drescher.

25   Q.   What did you do after receiving this letter in your mail

M1o3dou1                    Pietruszewski - Direct

1    bin at RDC?

2    A.  The blue note had other people's names on it.  Had Ed

3    Kirker's name on it as well, he was my supervisor.  So I went

4    and spoke with him about it, and about how we were going to get

5    started on this project.

6    Q.  Did you meet with Mr. Doud about the letter?

7    A.  We did.  Yes.

8    Q.  What happened at that meeting?

9    A.  We presented some ideas that we had of how we could make

10   the program and that we were going to need, you know, IT

11   support for this.

12   Q.  What did you do after the meeting with Mr. Doud?

13   A.  I know we had a CFR handbook, and I referred to the CFR

14   handbook, and I went on to the section that the -- 21 CFR

15   1307.74 I believe it was.  And I saw that there was, like,

16   factors that we could use and mentioned about a rolling

17   average, and I shared that information with Mr. Kirker, and we

18   sort of devised an idea of how the program would work, and then

19   we worked with the IT department as well.

20               (Continued on next page)

21

22

23

24

25

M1OVDOU2                         Pietruszewski - Direct

1  BY MS. ROTHMAN:

2  Q.  Had you ever developed a suspicious order monitoring

3  program before?

4  A.  No, I did not.

5  Q.  Had you ever read the CFR before that day?

6  A.  No, I have not.

7  Q.  How long did it take RDC to develop its suspicious order

8  monitoring program?

9  A.  About a year.

10  Q.  Why did it take that long?

11  A.  It was pretty complex.  It was like, I believe, 300 drug

12  groups.  We had to put the drugs into the groups, we had to

13  figure out about the rolling average for a year.  IT just had,

14  you know, issues developing it.

15  Q.  Did you speak with Mr. Doud while the suspicious order

16  monitoring program was in progress?

17  A.  I did, yes.

18  Q.  What, if anything, did Mr. Doud say about the development

19  of the suspicious order monitoring program?

20  A.  That it was just taking too long to develop, and to push

21  along the IT staff to get this project done so then they could

22  work on, you know, more pressing needs.

23  Q.  By when was the program up and running?

24  A.  It was April of 2009.

25         MS. ROTHMAN:  Ms. Drescher, if we can pull up for the

1    witness what's been marked for identification as Government

2    Exhibit 274.

3    Q.  Do you recognize this document?

4    A.  I do.

5    Q.  What is it?

6    A.  It is a letter to Agent Bill Kane of the Buffalo office

7    that we reported to explaining to him that we had a suspicious

8    monitoring program and how it would work.

9    Q.  Is this a fair and accurate copy of your letter to Agent

10   Kane?

11   A.  Yes.

12            MS. ROTHMAN:  Your Honor, the government offers into

13   evidence Government Exhibit 274.

14            THE COURT:  Any objection?

15            MR. GOTTLIEB:  No objection.

16            THE COURT:  It will be admitted into evidence.

17            (Government's Exhibit 274 received in evidence)

18            MS. ROTHMAN:  May we publish to the jury?

19            THE COURT:  Yes.

20            MS. ROTHMAN:  Thank you.

21            If we can just zoom in on the top half of the letter,

22   please.  Thank you, Ms. Drescher.

23   Q.  Mr. Pietruszewski, what is this letter?

24   A.  Again, it's a letter explaining our SOM and also letting

25   the DEA know that we did devise one.

M1OVDOU2                    Pietruszewski - Direct

Q.  You can read the first paragraph beginning at "We."

A.  Yes.

        We at RDC have been working to establish a better way

to monitor our sales of narcotic and controlled substances to

the pharmacies that we service.  This has been a program that

has taken us a year to complete, and we now can better monitor

all transactions on the front side.  So any order that is

placed and is over a particular customer usage which was

determined by the DEA CFR handbook would be stopped.  Once

proper documentation from our customer is obtained, we will

ship them the drug in question.

Q.  Just a few questions about this paragraph.

        Where you wrote:  Once proper documentation from our

customers is obtained, what type of information was RDC relying

on at that time?

A.  We were relying on usage information.

Q.  What is usage information?

A.  That is most of our customers would buy from multiple drug

wholesalers like ourselves.  And that would be all the

purchases of that drug or that group of drugs for a month.

Q.  And what would you do with the usage information?

A.  We would tabulate it.  We would add up for the month, and

then we would use our factor.  If it was a control, it was

multiplied by five times; if it was narcotics, it was three

times.  And then we would increase the limit.

M1OVDOU2                        Pietruszewski - Direct

1    Q.  Basically, if a customer wanted more oxycodone and they

2    could show they were using more oxycodone, RDC would ship them

3    held orders and give them more oxycodone?

4    A.  Yes.

5    Q.  At the time was RDC looking at the doctors who were

6    prescribing that medication?

7    A.  No, we were not.

8    Q.  Was RDC looking at the pill counts of the different

9    prescriptions?

10   A.  No, we were not.

11   Q.  Was RDC looking at the distance between the pharmacy and

12   the patient?

13   A.  No, we were not.

14   Q.  Was RDC looking at the method of payment for those

15   controlled substances?

16   A.  No, we were not.

17   Q.  Now, if you look at the second paragraph.

18          MS. ROTHMAN:  Ms. Drescher, we can just highlight

19   that.

20   Q.  And I'll ask you to read that paragraph, Mr. Pietruszewski.

21   A.  Sure.

22          The report labeled DEA month-end orders of suspicious

23   order report is an order that we feel is suspicious, such as

24   ordering three times greater their normal usage and the

25   customer would not supply RDC with any documentation to support

1   the purchase.

2   Q.  Did RDC routinely report suspicious orders to the DEA?

3   A.  No, we did not.

4   Q.  Were there times when RDC would release held orders, even

5   if it didn't have usage data for a customer?

6   A.  Yes.

7   Q.  Why would RDC do that?

8   A.  We would do it because we would be notified.  We get an

9   order of interest, and the salesman would generally either call

10  Joe Brennan or Larry Doud and complain about the customer not

11  receiving an order that was held.  And we would end up many

12  times releasing the order.

13          MS. ROTHMAN:  We can take that down.

14          If we can now pull up what's in evidence as Government

15  Exhibit 6, please.  Thank you, Ms. Drescher.

16          If you can just zoom in on the text of this letter.

17  Let's focus on the header, too.  Thank you, Ms. Drescher.

18  Q.  All right.  Who is this email from and who is it to?

19  A.  It is from me and it was sent to Dale Shick.

20  Q.  Who is Dale Shick?

21  A.  He was the area manager of the Buffalo DEA that we reported

22  to.

23  Q.  What's the date of this email?

24  A.  It is March 28th, 2012.

25  Q.  And what's the subject?

1    A.  Anthony Watson request.

2    Q.  Who was Anthony Watson?

3    A.  Anthony was a diversion investigator at the Buffalo

4    facility as well.

5    Q.  Why did you send this email to Dale Shick?

6    A.  They came in and did an audit in 2011.  And they wanted to

7    know if we had a suspicious order monitoring.  And we ended up

8    sending them the information at their request.

9    Q.  Thank you.

10            MS. ROTHMAN:  Ms. Drescher, if we can zoom in on the

11   text of the email now.

12   Q.  Mr. Pietruszewski, can you read the final two sentences of

13   this letter -- of this email, beginning with "This order is not

14   released."

15   A.  This order is not released until RDC receives the proper

16   information from the store.  Once RDC has researched this

17   information is when it is determined if the order is released.

18   If the order would not be released due to insufficient

19   information, we then consider this an order of suspicion and

20   will phone the DEA about the order in question.

21   Q.  At the time of this email, was RDC still relying on usage

22   data?

23   A.  Yes, we were.

24   Q.  And as, I think, you testified, RDC would at times release

25   orders without even having usage data; is that right?

M1OVDOU2                        Pietruszewski - Direct

1    A.   That is true.

2    Q.   I want to look at where you write in this email "once RDC

3    has researched this information is when it is determined if the

4    order is released."  What did you mean by "research"?

5    A.   That we received the usage information; that we added up,

6    tabulated, the amount that they purchased; and then -- I mean,

7    that's what we meant by that.

8    Q.   And then the last sentence, when you write:  If the order

9    would not be released due to insufficient information, we then

10   consider this an order of suspicion and will phone the DEA

11   about the order in question.

12            Was that the truth?

13   A.   We didn't do that, no.

14   Q.   Did RDC report suspicious orders to the DEA?

15   A.   No, we did not.

16   Q.   Did RDC report suspicious customers to the DEA?

17   A.   No, very few.

18   Q.   Why not?

19   A.   Because RDC did not do that.  Larry did not want to report

20   our customers.

21   Q.   Thank you.

22            MS. ROTHMAN:  We can take this email down.

23            Thank you, Ms. Drescher.

24   Q.   Now, over time, did RDC start collecting information other

25   than usage data from its customers?

M1OVDOU2                     Pietruszewski - Direct

1    A.  Yes, we did.

2    Q.  What type of information did RDC collect?

3    A.  We started collecting dispensing information.

4    Q.  What type of information was included in dispensing

5    information?

6    A.  The dispensing information, we generally would ask for 30

7    or 90-day dispensing; and that would include the prescription

8    drug in question, the NDC, the strength, how many tablets of

9    the drug were dispensed, the doctor's name, the doctor's DEA

10   number, and also how many days a prescription was for, and as

11   well as the customer's ZIP code.

12   Q.  Now, under the written policies of RDC's suspicious order

13   monitoring program, what was RDC supposed to do with that

14   dispensing data before releasing an order of interest?

15   A.  We should analyze the information.

16   Q.  Did RDC do that?

17   A.  No, we did not.

18   Q.  Were there times RDC released orders of interest without

19   even having dispensing data?

20   A.  Yes.

21   Q.  Why did RDC do that?

22   A.  RDC was told to by Larry Doud.

23   Q.  Now, the suspicious order monitoring program for RDC had

24   limits for each customer; correct?

25   A.  Yes, each customer would have been different.

M1OVDOU2                        Pietruszewski - Direct

1    Q.  Were there certain customers that frequently hit those

2    order limits?

3    A.  Yes, there was.

4    Q.  And in those situations -- withdrawn.

5            In those situations, typically, what would RDC do?

6    A.  We would release the orders.

7    Q.  Were there times that you would raise a pharmacy customer's

8    order limits?

9    A.  Yes.

10   Q.  Why would you do that?

11   A.  So the customer could get its order.

12   Q.  And what, if any, impact did RDC increasing order limits

13   have on the amount of controlled substances that a particular

14   pharmacy could purchase?

15   A.  It would create more diversion.

16   Q.  Did you ever discuss releasing orders of interest with

17   Mr. Doud?

18   A.  Yes.

19   Q.  If you held an order of interest, would you have let

20   Mr. Doud know?

21   A.  Yes.

22   Q.  Why would you do that?

23   A.  To try to beat the salesman to getting a hold of Larry or

24   to Joe Brennan, because I would want them -- I'd want him to

25   know if I could before that.

M1OVDOU2                        Pietruszewski - Direct

1    Q.  Did you ever get in trouble with Mr. Doud for holding an

2    order of interest?

3    A.  Yes.

4    Q.  What happened?

5    A.  He wanted an order to go out to a customer, and we ended up

6    filling it early in the morning.  And we ended up sending out

7    the maintenance person to meet the salesman at, like, a halfway

8    point.  And then the salesman ended up delivering the order to

9    the customer.

10   Q.  Now, were there occasions when RDC did not release orders

11   of interest that had been flagged by its suspicious order

12   monitoring system?

13   A.  Yes.

14   Q.  Did RDC report those orders to the DEA?

15   A.  No, we did not.

16   Q.  Why not?

17   A.  Because Larry did not want us to report our pharmacies.

18   Q.  Now, between 2012 and 2016, did RDC report a small number

19   of suspicious orders to the DEA?

20   A.  I believe it was about four orders.

21        MS. ROTHMAN:  Ms. Drescher, can you please pull up

22   what's in evidence as Government Exhibit 262.

23   Q.  Do you recognize this document?

24   A.  Yes.

25   Q.  What information is contained in this document?

1    A.   Four stores that were reported for suspicious orders.

2    Q.   Between 2012 and 2016, how many controlled substance orders

3    did RDC fill for its customers?

4    A.   Probably thousands.

5    Q.   Between 2012 and 2016, how many pharmacy customers did RDC

6    have?

7    A.   Probably about 1500 customers.

8    Q.   Between 2012 and 2016, how many orders were flagged by

9    RDC's suspicious order monitoring system?

10   A.   Probably a couple thousand orders.

11   Q.   How many did RDC report?

12   A.   Four.

13   Q.   Mr. Pietruszewski, did you investigate the thousands of --

14   withdrawn.

15            Did you investigate the thousands of orders of

16   interest that were flagged by the suspicious order monitoring

17   system to determine whether or not they were suspicious?

18   A.   No.

19   Q.   In most instances, what did you do with those orders of

20   interest?

21   A.   They were released.

22   Q.   Why did you do that?

23   A.   Because a lot of the times those were our orders that

24   customers that we -- repeatedly were spoken to by Larry or Joe

25   and they ended up releasing the orders.

1          MS. ROTHMAN:  You can take this down.

2          Thank you, Ms. Drescher.

3    Q.  Now, during your work at Rochester Drug Co-Operative, did

4    you attend meetings regarding what RDC was supposed to be doing

5    with respect to compliance?

6    A.  Yes, I did.

7    Q.  Generally, what was discussed at those meetings?

8    A.  Red flags or -- of pharmacies, or, you know, maybe, how

9    to -- customers reporting on ARCOS data or maybe showing us

10   pharmacies that were diverting controlled substances.

11   Q.  Did Mr. Doud also attend those meetings?

12   A.  He did when we had the outside consultants.  They would

13   come in in that, yes.

14   Q.  During your work at RDC, did you receive emails regarding

15   what RDC was supposed to be doing with respect to compliance?

16   A.  Yes.

17   Q.  Was Mr. Doud also on those emails?

18   A.  Yes, he was.

19   Q.  Would you at times forward emails to Mr. Doud?

20   A.  Yes, I would.

21   Q.  During your time at Rochester Drug Co-Operative, did you

22   attend presentations by outside professionals regarding

23   compliance at RDC?

24   A.  Yes, I did.

25   Q.  Can you give a few examples of different presentations,

1  conferences, you would attend?

2  A.  Sure.  I think it was in 2012, we went to Buzzeo

3  conference.  In 2015 -- or 2013, there was one in HDMA

4  conference.  Then we would also go to conferences occasionally

5  that the DEA had that were free to learn information.

6        MS. ROTHMAN:  If we can pull up what's in evidence as

7  Government Exhibit 8.  Thank you, Ms. Drescher.

8        All right.  We can zoom in on the top email that ends

9  with "Bill."  Thank you.

10  Q.  Do you recognize this document?

11  A.  Yes.

12  Q.  Who is the email from and who is it to?

13  A.  It is from myself.

14  Q.  Who is it to?

15  A.  To Larry Doud.

16  Q.  What is the date of the email?

17  A.  April 20th, 2012.

18  Q.  What's the subject?

19  A.  "Out of the office."

20  Q.  Why is the subject of your email "out of the office"?

21  A.  Because I was out of the office attending the conference

22  and I was just responding.

23  Q.  Can you read the body of your email to Mr. Doud, beginning

24  with "We did learn a lot."

25  A.  Sure.

1          We did learn a lot, but we have even more questions.

2     I am sure you will be speaking to Richie, but maybe next sales

3     meeting Richie and I could speak with you about our findings.

4     I feel we have a good system, but hearing more due diligent

5     that wholesalers need to do, I feel strongly we need to do more

6     work.  For example, they said that everyone conducts yearly

7     inventory counts, so you do complete yearly store reviews at

8     the locations?  They feel if you get usage from an account,

9     then you should get it each year moving forward.  They feel the

10    customer could have lost half of their business and a

11    wholesaler could still be sending 40,000 units of Oxycontin

12    each of the last two years, which would not be good on our

13    part.  They also mentioned if a store cannot supply you with

14    the information you want or it may feel they are receiving too

15    much product, you should call the DEA and you should no longer

16    do business with that customer.

17    Q.  Let me stop you right there for a moment,

18    Mr. Pietruszewski.

19          MS. ROTHMAN:  If we can just highlight that last

20    sentence:  If a store cannot supply you with the information

21    you want or if you feel they are receiving too much product,

22    you should call the DEA and you should no longer do business

23    with that customer.

24    Q.  Did RDC follow the DEA's instruction to call the DEA and no

25    longer do business with customers that would not provide

1    information requested?

2    A.  No, we did not.

3    Q.  Can you also read the sentence at the bottom of the email

4    that begins "Also," Mr. Pietruszewski.

5    A.  Also, we need to practice the same procedures for all

6    customers.  There should be no special circumstances the DEA

7    says, because they would use it against you.

8    Q.  Mr. Pietruszewski, did RDC treat different customers

9    differently with respect to compliance?

10   A.  Yes.

11   Q.  Were there certain types of customers that RDC treated more

12   favorably?

13   A.  Yes, at times.

14   Q.  Can you give an example?

15   A.  It seemed the stockholders of the company.

16   Q.  What would RDC do with respect to stockholders?

17   A.  Just be more lenient.  Let orders -- release the orders, or

18   maybe if we didn't have the dispensing, we still would release

19   the orders of the customers.

20            MS. ROTHMAN:  Thank you.  We can take this email down.

21            Ms. Drescher, can you please pull up what's in

22   evidence as Government Exhibit 14.  Just zoom in on the top

23   email.  Thank you.

24   Q.  All right, Mr. Pietruszewski.  Who's this email from and

25   who is it to?

M1OVDOU2                        Pietruszewski - Direct

1   A.  It is from myself; and I sent it to Larry Doud, Joe

2   Brennan, Lanny Doud, and Richie Cullen.

3   Q.  What's the date of the email?

4   A.  January 31st, 2013.

5   Q.  What's the subject?

6   A.  RX news.  South Philadelphia doctor to be sentenced for

7   running a pill mill.

8   Q.  Can you please read the body of the email that you sent to

9   Mr. Doud and others.

10  A.  Sure.

11          Carlos sent some light reading to me, and I thought

12  you would like to see what was said in this article.  I would

13  like to point out the DEA is saying that wholesalers are

14  obligated to self-police, along with everything else.

15  Q.  Mr. Pietruszewski, did RDC self-police as directed --

16  withdrawn.  Did RDC self-police its customers as directed by

17  the DEA?

18  A.  No, we did not.

19  Q.  Why not?

20  A.  Because that's not what Larry Doud wanted us to do.

21          MS. ROTHMAN:  We can take that down.  Thank you.

22  Q.  I want to pause for a moment and talk about the DEA

23  inspection of RDC in July of 2013.  Do you remember that event?

24  A.  I do, yes.

25  Q.  Were you present for the inspection?

1    A.  I was not for the first day.

2    Q.  Were you there for the second day?

3    A.  I was.

4    Q.  Where were you the first day?

5    A.  I was camping, Cub Scouts with my youngest son.

6    Q.  How did you learn that the DEA was at RDC?

7    A.  I received a phone call from the camp that I had a call.

8    Q.  And who had called you?

9    A.  It was Joe Brennan.

10   Q.  What, if anything, did Joe Brennan say?

11   A.  Just said that the DEA were at the office and they needed

12   me to come back.

13   Q.  Did you go back?

14   A.  Yes, I was there the next morning.

15          MS. ROTHMAN:  We can pull up what's in evidence as

16   Government Exhibit 20, please.  Thank you, Ms. Drescher.  We

17   can zoom in on the bottom email to start.

18   Q.  All right.  If we can read, Mr. Pietruszewski, the email

19   from Joe Brennan to you on July 30th, 2013.

20   A.  Sure.

21          Bill, Debbie and Bill want to see our SOPs.  Number

22   one, good faith; two, detecting orders of interest/suspicious

23   orders; three, how we adjust the purchase ceiling either up or

24   down on controls; four, SOP for the flags used to adjust the

25   aggregate totals when a customer exceeds their limit on

M1OVDOU2                        Pietruszewski - Direct

1   oxycodone in a 30-day period, i.e., prevent the store from

2   ordering Oxys until documentation is given, etc.

3   Q.  And can you read Mr. Doud's response?

4   A.  Yes.

5           Bill, are you around to help?  Sounds like we may have

6   some problems.

7   Q.  And Mr. Pietruszewski, these microphones are a little

8   tricky; so it might make sense to take an inch or so back from

9   the microphone.

10  A.  Is that better?  This is okay?

11  Q.  Yes.

12  A.  Apologize.

13  Q.  That's okay.  Thank you.

14          All right.  So if the DEA had asked for RDC's SOPs,

15  would RDC have given them to the DEA?

16  A.  Yes.

17          MR. GOTTLIEB:  Objection, your Honor.

18          THE COURT:  I'm sorry.  You object?

19          MR. GOTTLIEB:  The question if something happened,

20  would RDC do something.  It's highly speculative.  He's not in

21  a position to know at that time.

22          THE COURT:  I'll sustain as to the form of the

23  question.  I'm not sure that there's a genuine dispute about

24  that.

25          MS. ROTHMAN:  I think that's right.

1   Q.  Let me ask you a few questions, Mr. Pietruszewski.

2                In Mr. Brennan's email to you, who does Debbie and

3   Bill refer to?

4   A.  Debbie was a DEA diversion investigator in Buffalo; and so

5   was Bill Kane a diversion investigator from Buffalo DEA.

6   Q.  So when Mr. Brennan wrote:  Bill, Debbie and Bill want to

7   see our SOPs, and number two is suspicious orders, what did you

8   understand Mr. Brennan to be emailing you about?

9   A.  That they would like to see our policies.

10  Q.  Thank you.

11               Now, Mr. Pietruszewski, separate and apart from RDC's

12  suspicious order policies, do you recall an issue with ARCOS

13  data coming up at the July 2013 inspection?

14  A.  Yes, I did.

15  Q.  What was the issue?

16  A.  DEA came in and they were saying that RDC was not reporting

17  CSOS purchase orders, and also CSOS customer sale orders.

18  Q.  Did RDC fix its ARCOS issue immediately after the July 2013

19  inspection?

20  A.  No, we did not.

21  Q.  What ultimately happened?

22  A.  We ended up fixing the problem, and eventually RDC ended up

23  paying a fine.

24  Q.  To the DEA?

25  A.  Yes.  Sorry.

M1OVDOU2                          Pietruszewski – Direct

1          MS. ROTHMAN:  We can take down Government Exhibit 20

2     and pull up for the witness what's in evidence as Government

3     Exhibit 12.

4     Q.  All right.  Do you recognize this document?

5     A.  Yes.

6     Q.  Who is the email from, who is it to, and what's the date?

7     A.  It is from myself to Lorraine Perotta, and it is January

8     9th, 2013.

9     Q.  This is about six months before the DEA inspection of RDC

10    in the summer?

11    A.  Yes.

12    Q.  Who was Lorraine Perotta?

13    A.  She worked for Ascend Labs compliance.

14    Q.  Was that a manufacturer?

15    A.  Yes, it was.  Sorry.

16         MS. ROTHMAN:  I want to focus on page 2 of this

17    exhibit.  We can just zoom in on this caption for a moment.

18    Q.  Can you read the title.

19    A.  Overview of suspicious order monitoring of RDC.

20    Q.  What was this document?

21    A.  It explained how our program would work.

22    Q.  If you look in the first paragraph, there's a reference to

23    a multiplier.  So at this time what was the multiplier that RDC

24    used for narcotics?

25    A.  We used a multiplier of three.

1   Q.  Did there come a time when RDC reduced its multiplier?

2   A.  Yes, there was.

3   Q.  Remember when that was?

4   A.  It was in January of 2017 -- or '15, I'm sorry.  Sorry.

5   2015.

6   Q.  And did RDC start reporting suspicious orders to the DEA

7   once it had dropped its multiplier?

8   A.  No, we did not.

9           MS. ROTHMAN:  We can go to the bottom of the second

10  page and going into the third page of this exhibit.

11  Q.  And I'll ask you to read the sentence that begins, "Once

12  these answers are given," Mr. Pietruszewski.

13  A.  Once these answers are given, it would be helpful to

14  determine RDC will allow the order to be filled or still keep

15  order on hold.  If RDC files that we have insufficient

16  documentation, we will alert the local DEA office of our

17  findings and see how they would like RDC to proceed.

18  Q.  Did RDC follow its written policies with respect to

19  notifying the DEA?

20  A.  No, we did not.

21          MS. ROTHMAN:  We can take this exhibit down.

22          Thank you.

23  Q.  Now, before we move past the July 2013 inspection, do you

24  recall any pharmacy customers of RDC being specifically

25  discussed at that inspection?

M1OVDOU2                        Pietruszewski - Direct

1  A.  Yes.

2  Q.  Which pharmacy came up?

3  A.  Plainfield Pharmacy.

4  Q.  Tell us how it came up at the inspection.

5  A.  They just asked -- the DEA agents asked if we supply

6  Plainfield Pharmacy, and we said yes.

7  Q.  So after the DEA brought Plainfield Pharmacy to RDC's

8  attention, what did you do?

9  A.  We contacted Carlos Aquino and asked if he could go to

10  Plainfield and to do an audit of the pharmacy.

11  Q.  Did Mr. Aquino go and do that audit?

12  A.  Yes, he did.

13  Q.  And what did Mr. Aquino find at the audit?

14  A.  He found that the pharmacy was shipping oxycodone 30 to

15  Florida, and they were all like cash prescriptions.

16  Q.  Ultimately, what did RDC do with Plainfield Pharmacy?

17  A.  We ended up turning them off and reporting them to the DEA.

18  Q.  And that was after the DEA had first brought Plainfield to

19  your attention?

20  A.  Yes.

21  Q.  Now, while we're on the topic of terminations, did RDC

22  sometimes resume selling to pharmacy customers after turning

23  them off?

24  A.  Yes, we did.

25  Q.  Do you recall a pharmacy named AJ Family Pharmacy?

1    A.  Yes.

2    Q.  What do you remember about that pharmacy?

3    A.  The -- we saw that the pharmacy filled prescriptions for a

4    doctor-headed -- but it was a nurse practitionist with the same

5    last name different, first name, I believe.  And we reported it

6    to the DEA.

7    Q.  What did RDC do after that?

8    A.  We didn't get a hold of the DEA.  I sent a letter or a

9    email to Dale Shick.  And I also reported it to the BNE in

10   Albany.

11   Q.  And after you notified the DEA, did you send anyone in to

12   look at AJ Pharmacy?

13   A.  Yes, we sent Carlos in.

14   Q.  What happened after that?

15   A.  He did his audit review and we ended up turning on the

16   pharmacy again.

17   Q.  So after turning them off and telling the DEA, RDC turned

18   them back on for controls; is that right?

19   A.  Yes.

20   Q.  Did the pharmacy continue to have problems after RDC turned

21   them back on?

22   A.  They ended up having problems, yes.

23   Q.  What types of problems?

24   A.  They were filling for cash prescriptions, and they -- we

25   saw that points Julius went to the pharmacy.

1    Q.   And did RDC later turn them off again?

2    A.   Yes.

3    Q.   Now, did RDC turn off all of its pharmacy stores that had

4    problems?

5    A.   No, we did not.

6    Q.   Thinking back to your time at RDC, did RDC -- with respect

7    to stores that had problems, did RDC turn off more stores or

8    keep on more stores for controls?

9    A.   We probably kept more stores on.

10   Q.   All right.  Now, we've been talking about compliance; but I

11   want to talk for a bit about management at RDC.

12            Who did you consider management with respect to

13   compliance issues at the company?

14   A.   That would be Larry Doud and Joe Brennan.

15   Q.   Were you part of management?

16   A.   No.

17   Q.   Now, did you need Mr. Doud's approval to go to a DEA or

18   compliance conference?

19   A.   Yes.

20   Q.   Would you ask him for permission?

21   A.   Yes, I would.

22   Q.   What, if anything, would you offer to Mr. Doud to make it

23   more likely that he would approve?

24   A.   You know, that instead of flying, that we would, you know,

25   drive to the conference to save some money.

1    Q.  Why would you make those offers?

2    A.  Because Larry felt that it was a waste of money.

3    Q.  Would management get involved in orders of interest that

4    were held by compliance?

5    A.  Yes.

6    Q.  What would happen?

7    A.  We would either get a call from Larry or Joe or possibly an

8    email or even a text asking, you know, what are we doing about

9    it.

10   Q.  And then what would happen?

11   A.  We had released the orders.

12   Q.  If you wanted to terminate controls to a particular

13   customer, did you need Mr. Doud's approval?

14   A.  Yes.

15   Q.  Would you speak with Mr. Doud about those decisions?

16   A.  Yes.

17   Q.  From those conversations with Mr. Doud, what was your

18   understanding as to how Mr. Doud felt about turning off stores?

19   A.  He didn't care to turn off stores because that would affect

20   the sales of RDC.

21   Q.  If you were going to report a customer to the DEA, did you

22   need Mr. Doud's approval?

23   A.  Yes.

24   Q.  Did RDC report its customers to the DEA?

25   A.  No, we did not.

1    Q.  Let's look at a few examples.

2           MS. ROTHMAN:  Ms. Drescher, can you please pull up

3    what's in evidence as Government Exhibit 17.

4           All right.  We can just zoom in on the caption to

5    start.  Thank you.

6    Q.  All right.  I'm going to ask you about the full chain; but,

7    generally, who is this email between?  Who is this email chain

8    between?

9    A.  It is between myself and Larry Doud.

10   Q.  What's the subject?

11   A.  Distributor briefing.

12   Q.  What is this email chain about, Mr. Pietruszewski?

13   A.  What that is is actually the DEA wanted to do a briefing to

14   wholesalers and manufacturers to learn -- know your customers.

15   Q.  So let's go to the bottom of the email.  And I'm going to

16   ask you to -- thank you.  Go to the bottom of the chain, and

17   just zooming in on that first bottom email.  I want to ask you

18   to read this email, but who's it from?

19   A.  It's from Levin, Leonard.

20   Q.  Is he with the DEA?

21   A.  Yes, he is.

22   Q.  What is he informing you of?

23   A.  About coming to -- down to Washington for a briefing,

24   distributor briefing.

25   Q.  Okay.  We can zoom out and go to your email.  Thank you.

1    And who did you forward Mr. Levin's email to?

2    A.   I forwarded the email to Larry and Joe.

3    Q.   Why did you forward it to Larry and Joe?

4    A.   To let them know that the DEA reached out to us, and that

5    they would like to speak to us.

6    Q.   Now, I want to go through the emails that you exchanged

7    with Mr. Doud.  I'm going to read Mr. Doud's emails, and I'm

8    going to ask you to read your emails in response.

9          So starting with May 2nd, 2013, Mr. Doud writes:

10   Geez, they are demanding.  We come there and we are number 100?

11   Who all are they talking to?  Annual meeting is June 18th.

12         You can look at your response.  You can read that,

13   Mr. Pietruszewski.

14   A.   Larry, I need to do inventory first thing in the morning.

15   If you have five to ten minutes, I can give you better details

16   about it, if you like.  Have a nice evening.

17   Q.   We can go up.  We can skip Mr. Brennan's email.  Thank you.

18         And what do you say to Mr. Doud and Mr. Brennan?

19   A.   Would we be open to going on Wednesday the 19th or Thursday

20   the 20th?

21   Q.   And then I'll read Mr. Doud's response:  Am I needed?  If

22   not, go when you wish.  If so, those days work.

23         You can read your response to Mr. Doud.

24   A.   Sure.

25         Larry, when I spoke to Lenny, he said those who should

1    attend are the ones that hold responsibility of the DEA

2    functions and authority to make decisions.

3    Q.  And continuing up the chain, Mr. Doud writes:  About what?

4         If you can read your response.

5    A.  Regarding the DEA and placing practices in place to prevent

6    diversion.

7    Q.  And then I'll read Mr. Doud's response:  Do I make those

8    decisions or do you just do whatever you feel like doing?

9         Now, before we go on, Mr. Pietruszewski, did you

10   understand Mr. Doud to be asking you a serious question here or

11   speaking in jest?

12   A.  It wasn't necessary serious about -- about that.  I mean he

13   was just sort of, like, you know, he ultimately made the

14   decisions.

15   Q.  Let's go up to your response to Mr. Doud.  What do you say?

16   A.  I consult with you and Joe if we need to make major changes

17   if a policy that would affect our sales.

18   Q.  And then Mr. Doud responds:  Oh, new policy?

19        And then can you please read your response to

20   Mr. Doud?

21   A.  Sure.

22        Larry, if I were to go and they tell me that we must

23   do an due diligence on 100 stores or we have to stop selling to

24   even one store, I would always consult with you first.

25   Q.  What did you mean by that, Mr. Pietruszewski?

1    A.  Well, anything that they told us that we had to do, I had

2    to inform Larry before.  And it was ultimately his decision

3    what we would do.

4    Q.  And let's look at Mr. Doud's response to your email:  You

5    are a good man, Bill.

6            What did you understand Mr. Doud to be saying in that

7    final email?

8            MR. GOTTLIEB:  Objection, your Honor.

9            THE COURT:  Sustained as to that question, the form of

10   that question.

11   Q.  Mr. Pietruszewski, when Mr. Doud wrote to you, You are a

12   good man, Bill, what did you understand him to be saying?

13           MR. GOTTLIEB:  Objection.

14           THE COURT:  Again, I will sustain the objection.

15           MS. ROTHMAN:  We can take that down.

16           All right.  Let's go to Government Exhibit 24, please.

17   Q.  All right.  Do you recognize this email?

18   A.  Yes.

19   Q.  What is it?

20   A.  It's an email from Carlos Aquino.

21   Q.  And who did he send this email to?

22   A.  He sent it to me, Matt Murphy, Don Bilgore, Larry Doud, Joe

23   Brennan, Jessica Pompeo.

24   Q.  So I think what makes the most sense is to start at the

25   bottom of the email, so at the second page.  We can zoom in on

1    Carlos's email to you.

2              All right.  Can I have you -- I know it's quite

3    lengthy, but can I have you read Mr. Aquino's email,

4    Mr. Pietruszewski?

5    A.  Sure.

6    Q.  Thank you.

7    A.  Bill, it is obvious when you ask for dispensing

8    information, the customer has been placed in the crosshairs of

9    RDC for dispensing controlled substances, and their dispensing

10   information is requested in order for you to do your due

11   diligence as required by RDC internal policies.  With these

12   customers, it is essential for them to provide dispensing

13   information.  These are my recommendations:

14             One.  Have the sales representative communicate

15   directly with the customer that dispensing information is

16   required for the last three full months.  For example, if they

17   go there on February 10th, the dispensing period will be from

18   November 1, 2013 to January 31, 2014.

19             Two.  After the initial contact by the RDC sales

20   representative or no more than seven days after the customer is

21   officially notified by the RDC representative, the information

22   should be received by your group.

23             Three.  The format of the dispensing information

24   should be in an Excel format or an HTML format that can be

25   formatted into an Excel format.  It is important for the

1   customer to fully provide the information.

2          Number four.  Customers will tell you that their

3   pharmacy service provider will need to be contacted by them

4   and, in most cases, will ask for an extension.  Remember, you

5   gave them seven days, and the most I would allow is an

6   additional three days.  It is important that RDC sales

7   representative needs to understand the information is required

8   in order for RDC to determine the legitimacy of their

9   dispensing.

10          Five.  Most likely your customer concerns is the

11   dispensing of oxycodone and hydrocodone.  After the tenth day,

12   you should suspend any order containing either drug.

13   Q.  Let me just stop you there.  And I'll let you keep reading,

14   Mr. Pietruszewski, but Mr. Aquino writes:  After the tenth day,

15   you should suspend any order containing either drug if RDC

16   didn't have dispensing data.

17          Did RDC follow that practice?

18   A.  No, we did not.

19   Q.  You can keep reading.  Thank you.

20   A.  Okay.  This is where the DEA due diligence comes into play.

21   Personally, the customer needs to comply with the request.  The

22   RDC sales representative should be kept aware of the lack of

23   cooperation.  To continue to sell those drugs of concern can

24   come back to hurt RDC.  No customer should be excused from

25   providing the information.

M1OVDOU2                    Pietruszewski - Direct

 1          I have seen some of the information that has been

 2     provided by those selected customers, which makes it hard for

 3     you to analyze their information.  Their sad excuses were

 4     ridiculous.  The DEA is very clear that you need to do your

 5     part to prevent diversion of controlled substances, and that

 6     was clear with the Plainfield Pharmacy investigation.  I think

 7     those few customers and their sales representative need to

 8     be -- to understand their compliance with the DEA regulations.

 9          This is what management needs to decide as to what

10     policy to follow when handling those customers who are subjects

11     of your compliance review.

12     Q.  Mr. Pietruszewski, did Mr. Doud receive this email?

13     A.  Yes, he did.

14     Q.  Let's go up to your response.

15          MS. ROTHMAN:  Thank you, Ms. Drescher.

16     Q.  I'd like to ask you to read your response to Mr. Aquino.

17     A.  Sure.

18          Carlos, we could ask ten customers for dispensing

19     information today, and I probably would receive all ten in a

20     different format.  I have asked, and I gave all the salesmen

21     how it must be for us, and we still do not receive it in the

22     correct format.  It is sad, but true, that my customers still

23     do not want to give this information freely to their

24     wholesaler.  So this at times can be challenging for us, but

25     with Jessica on board, I see this will improve.  For me to tell

1    a customer, could be a stockholder, they must respond or supply

2    the information asked within ten days and what we would suspend

3    their orders must be a talk with upper management team.

4    Something of that is not my ultimate decision.

5    Q.  When you wrote "upper management team," who were you

6    referring to?

7    A.  About Joe Brennan, Larry Doud.

8    Q.  And when you said:  They must respond or supply the

9    information asked within ten days and that we would suspend

10   their orders must be a talk with upper management team,

11   something of that is not my ultimate decision, what did you

12   mean by that?

13   A.  Meaning that it had to come from Larry and Joe if we were

14   to say that, you know, we're not going to ship them anything

15   after ten days.

16   Q.  Did you, as the head of compliance, have the authority to

17   tell a customer that if you don't give RDC dispensing data in

18   ten days, we'll cut you off from controls?

19   A.  No, I did not.

20   Q.  And did RDC generally continue to supply pharmacy customers

21   with controlled substances even if they hadn't provided

22   updating dispensing information?

23   A.  Yes.

24          MS. ROTHMAN:  We can take this email down.

25          Thank you, Ms. Drescher.

1          We can pull up what's in evidence as Government

2     Exhibit 52 -- your Honor, I realize we haven't taken a morning

3     break.  I'm happy to pause now and take a break.

4          THE COURT:  Yes, let's do that.  We'll break till 12

5     o'clock.  Don't discuss the case, keep an open mind.  I'll see

6     you at noon.

7          (Jury not present)

8          THE COURT:  All right.  We'll take a 15-minute break.

9          MS. ROTHMAN:  Your Honor, can the witness step down?

10         THE COURT:  Yes.

11         (Witness not present)

12         (Recess)

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

M1o3dou3                         Pietruszewski - Direct

```
1              (In open court)

2              THE COURT:  You can bring the witness back.

3              (Jury present)

4              THE COURT:  You can continue.

5              MS. ROTHMAN:  Thank you, your Honor.

6              Ms. Drescher, can you please pull up what's in

7    evidence as Government Exhibit 52.  Thank you.  If we can zoom

8    in on the top e-mail.

9    Q.  Mr. Pietruszewski, who is this e-mail from and who is it

10   to?

11   A.  It is from me and it's to Julius Morton, Jessica Pompeo and

12   Richie Cullen.

13   Q.  What's the date?

14   A.  September 24, 2015.

15   Q.  What's the subject?

16   A.  The Chemist Shop Pro Compliance denial.

17   Q.  Do you remember what was happening with the Chemist Shop

18   and Pro Compliance around that time?

19   A.  Yes.  They were refusing to let Pro Compliance get the data

20   from their computer system dial.

21   Q.  What was Pro Compliance?

22   A.  It was a company that we entered a contract with that would

23   do analyzing a 90-day snapshot of all the controlled substances

24   that a store -- would purchase and dispense, I mean, from their

25   pharmacy.
```

1  Q.  If I can have you read your e-mail to Ms. Pompeo beginning

2  with "yes."

3  A.  Okay.

4          Yes, we all agree about Chemist Shop not listening to

5  Julius' suggestions and now that they do not want to allow Pro

6  Compliance is putting compliance in a tough spot.  This has ran

7  its course and this must be decided by management on how we

8  proceed.  Though, we do not turn in a store unless we can see

9  that they are dispensing to people that are diverting these

10  controlled substances.  You do not know this for a fact, so

11  please do not say this loosely.  Again, if they were filling

12  illegally prescriptions or mailing to Florida, then we would

13  turn them off and report them to the DEA.  If you are to report

14  someone to the DEA due to the high cash, you would have to

15  follow that for all of our customers, but we choose as an

16  independent wholesaler to educate and work with our customer.

17  This is what RDC is all about and I know you know that.

18  Q.  You can stop right there.  Thank you.  Mr. Pietruszewski,

19  just a few questions.

20          In the second sentence when you write "this has ran

21  its course and this must be decided by management on how we

22  proceed," who were you referring to as management?

23  A.  Joe Brennan and Larry Doud.

24  Q.  What were you saying had to be decided by management?

25  A.  If we were going to turn a customer off and report them to

1     the DEA.

2     Q.  Now, within this e-mail there are a couple of sentences

3     about what RDC does and does not do.  Were those your ideas or

4     did they come from somewhere else?

5     A.  They, that came from Larry.

6     Q.  So, let's look at the bottom sentence which reads, "if you

7     are to report someone to the DEA due to the high cash, you

8     would have to follow that for all our customers, but we choose

9     as an independent wholesaler to educate and work with our

10    customers.  This is what RDC is all about and I know you know

11    that."

12           From where did that idea come?

13    A.  That came from Larry.

14    Q.  Did you see red flags of diversion at RDC's pharmacy

15    customers?

16    A.  Yes, we did.

17    Q.  Was high cash one of the red flags of diversion?

18    A.  Yes, it was.

19    Q.  Did you stop shipping controlled substances to pharmacies

20    that displayed red flags of diversion?

21    A.  No, we did not.

22    Q.  Did you report those pharmacies to the DEA?

23    A.  No, we did not.

24    Q.  Why not?

25    A.  Because that's not what RDC was about.  That's not what

M1o3dou3                         Pietruszewski - Direct

1    Larry wanted us to do.

2    Q.  Now, you sent this e-mail to Mr. Morton and Ms. Pompeo and

3    you copied Mr. Cullen.

4            With respect to Mr. Morton and Ms. Pompeo, did they

5    work in the compliance department?

6    A.  Yes.

7    Q.  Did they and the other folks you mentioned earlier in your

8    testimony in compliance, did they report to you?

9    A.  Yes, they did.

10   Q.  Did they take directions from you?

11   A.  Yes.

12   Q.  You directed them to release orders of interest?

13   A.  Yes.

14   Q.  Did they follow your directions?

15   A.  Yes, they did.

16   Q.  Did you discuss problems at pharmacy customers with those

17   individuals?

18   A.  Yes.

19           MS. ROTHMAN:  We can take down Government Exhibit 52.

20   Q.  Let me ask you one more question.  We can pull it back up.

21   In the last line where you say, "this is what RDC is about and

22   I know you know that" in reference to not reporting customers.

23   Would you have told Ms. Pompeo that RDC doesn't report

24   customers if Mr. Doud hadn't said that to you?

25   A.  No.

M1o3dou3                        Pietruszewski - Direct

1            MS. ROTHMAN:  Thank you.  We can take that down.

2    Let's pull up what's in evidence as Government Exhibit 106L,

3    please.  We can zoom in on the text.

4    Q.  Who is this e-mail from and who is it to?

5    A.  It is from me and it's to Jessica Pompeo and Julius Morton.

6    Q.  What's the date?

7    A.  October 21, 2015.

8    Q.  What's the subject?

9    A.  ProHealth.

10   Q.  Can you read the subject -- withdrawn -- the body of your

11   e-mail to Ms. Pompeo?

12   A.  Yes.

13           I wanted to send you an e-mail at 6:30 about this but

14   as usual there were too many other fires today.  I asked Liz to

15   release the ProHealth narcotic orders last night and here is

16   why.  It looks as we have not done a complete analyze of their

17   dispensing report and that we made a decision to stop their

18   orders on a glimpse.  Now even though this glimpse looked to be

19   troublesome, we need to look at the complete picture.  So I am

20   asking if you can break their dispensing down as soon as

21   possible.  This is the sister store of The Chemist Shop, so if

22   we do not do our due diligence and tell management we turned

23   them off, we need the information to back it up.  If any

24   questions, please give me a call.

25   Q.  Thank you.  Just a few questions.  What, if any,

M1o3dou3                          Pietruszewski – Direct

1    relationship was there between RDC and ProHealth?

2    A.  I mean, they were a customer, they were a stockholder.  I

3    know Joe Brennan was pretty close to the store.  He really

4    seemed to admire the owners of the pharmacy.  You know, he used

5    to brag about how they had nice cars and they would go out to

6    dinner and enjoy themselves.

7    Q.  When you write to Ms. Pompeo, "I asked Liz to release the

8    ProHealth narcotics orders last night and here is why."

9            What orders, what types of orders are you referring

10   to?

11   A.  Well, it was -- it must have been a narcotic order that

12   night.

13   Q.  Would it be a held order of interest?

14   A.  Yes.

15   Q.  Then when you write, in the third sentence, "now even

16   though this glimpse looked to be troublesome, we need to look

17   at the complete picture."

18           Now, under RDC's written policies with respect to its

19   suspicious order monitoring program, if an order looked

20   troublesome, what was RDC supposed to do?

21   A.  We should have not shipped it, and reported it to the DEA.

22   Q.  What had RDC represented to the DEA that it would do?

23   A.  That we would report the pharmacy.

24   Q.  Is that what you did in this instance, Mr. Pietruszewski?

25   A.  No, it was not.

1    Q.  Why did you release the order, why did you direct that the

2    order be released?

3    A.  Because, again, it was -- it was -- I know a relationship

4    that Joe had with this customer, and that if we didn't know,

5    have all the facts -- well, I would have to answer to them why

6    they didn't get their order.

7    Q.  When you write in the second-to-last sentence, "if we do

8    not do our due diligence and tell management we turned them

9    off, we need the information to back it."

10            What did you mean by that?

11   A.  Meaning that we had to -- have all the information, you

12   know, if it was bad doctors or if it was cash prescriptions,

13   that we needed to know that for a fact so we could present it

14   to Joe and Larry.

15            MS. ROTHMAN:  Okay.  We can take this down.

16            Let's go to Government Exhibit 53, please.

17            MR. GOTTLIEB:  Which?

18            MS. ROTHMAN:  53.

19   Q.  Are you familiar with this e-mail, Mr. Pietruszewski?

20   A.  Yes.

21   Q.  Let's look at the captions for a moment.  Who is the e-mail

22   from and who is it to?

23   A.  Sure.  It is from me, and it's to Larry Doud and Richie

24   Cullen.

25   Q.  What's the date?

M1o3dou3                          Pietruszewski - Direct

1   A.  October 24, 2015.

2   Q.  Can you read the subject.

3   A.  Sure.  Dispensing needed from Echo Drugs Incorporated

4   account 2965 for held order.

5   Q.  Do you recall what happened with an Echo Drugs order in

6   October of 2015?

7   A.  Yes.

8   Q.  What happened?

9   A.  Order came in on Friday, it was held, and the compliance

10  reached out via e-mail for dispensing information from the

11  customer.

12  Q.  Who was the owner of Echo Drugs?

13  A.  It was -- Lev -- I'm forgetting his last name.  I know it

14  was Lev.  I have to think about it.

15  Q.  Do you remember anything in particular about Lev, any other

16  groups he belonged to?

17  A.  Yes, he did.  He was the president or the head of the Drug

18  Guild.  It was like 120, 150 pharmacies.

19  Q.  What did the Drug Guild do, if you know?

20  A.  They were all pharmacies, but it was like a -- they would

21  buy together to get, I believe, get a purchasing price from

22  wholesalers.

23  Q.  And I want to go to the bottom of the e-mail and work our

24  way to the top.  Looking at Amy Skibickyi's e-mail on

25  October 23, 2015.  Can you read the first paragraph of that

M1o3dou3                    Pietruszewski - Direct

1   e-mail, Mr. Pietruszewski?

2   A.  Yes.

3            We have an order from Echo Drugs Incorporated in

4   Brooklyn, New York, that went on hold this afternoon for

5   exceeding the allowed amounts based on average ordering and

6   multiplication factors for growth.  In order to have the

7   documentation for the release of this order, as well as be

8   proactive regarding high percentage alerts, RDC is requesting

9   updated dispensing from your account in order to prevent any

10  further controlled substance orders from being unnecessarily

11  held.  The last dispensing received doesn't provide records

12  needed for this increase.

13  Q.  On October 23, 2015, did RDC have the appropriate

14  dispensing information for Echo Drugs?

15  A.  No, we did not.

16  Q.  Let's go to the e-mails higher up in the chain, and

17  specifically your e-mail the following day to Mr. Doud.  You

18  can read your response to Mr. Doud.

19  A.  Sure.

20           Larry, I will see that Lev receives his order this

21  weekend.  Also moving forward I will ask anyone on compliance

22  whom sends out an request that I am copied.  Also, we are to

23  call the store first and request information and then e-mail as

24  a follow up or if we cannot get ahold of our customer.  I am

25  not sure if Amy was told by someone to handle it like this or

1    not, but if the customer would prefer a call or the personal

2    touch.  I will speak to Jessica about how this was handled to

3    avoid possible future situations.  Thanks, Bill.

4    Q.  Mr. Pietruszewski, did you release that order over the

5    weekend?

6    A.  I did.

7    Q.  Did RDC have updated dispensing data to do so?

8    A.  No, we did not.

9    Q.  Is that against its written policy to release the order at

10   that time?

11   A.  Yes, it is.

12   Q.  I want to now just go down in the chain to see what

13   Mr. Doud said before your e-mail.

14         Mr. Doud writes "This could be trouble."

15         And just to go down one more e-mail to see what

16   Mr. Doud is referring to.  So, what is this e-mail that

17   Mr. Doud is referring to, Mr. Pietruszewski?

18   A.  About the order being held.

19   Q.  Who is this e-mail from?

20   A.  It's from Amy, from Lev Rifkin, I mean, to Amy and everyone

21   else on e-mail chain.

22   Q.  Can you read what Lev Rifkin writes.

23   A.  Sure.

24         Hi.  On which basis you are holding weekend order.

25   Did you try contacting us previously.  Did you make any

1    attempts.  Why does RDC holds a customer guilty of a crime

2    without committing a crime.  What type of company does this,

3    when a patient is in pain do you understand the consequences of

4    a cancer patient.  Hello hello.  I will hold you guys

5    responsible for patients well being.  And I will relate this

6    type of problem issue to all parties at RDC level.

7              Thank you, Lev.

8    Q.  We can just zoom out.  After Lev sends his e-mail, Mr. Doud

9    responds "This could be trouble"?

10   A.  Yes.

11   Q.  At that point what do you do, Mr. Pietruszewski?

12   A.  I sent out an e-mail to Lev.

13   Q.  Did you release the order?

14   A.  Yes, I did.

15             MS. ROTHMAN:  We can take this down.

16   Q.  We haven't yet spoken about the process RDC went through to

17   turn on stores to controlled substances.  I want to focus on

18   that process before 2015.  Okay?

19   A.  Yes.

20   Q.  So what was the process like to turn on stores to

21   controlled substances before 2015?

22   A.  We would have to request their state license, their DEA

23   license, they would want the three-page survey that was devised

24   in like 2007, and we would also ask for pictures of inside the

25   store and outside the store.

M1o3dou3                          Pietruszewski - Direct

1    Q.  Did RDC do any due diligence on the pharmacy customer

2    before allowing them to purchase controlled substances at that

3    time?

4    A.  No, we did not.

5    Q.  Did RDC review past dispensing data before allowing

6    customers to purchase controlled substances?

7    A.  No, we did not.

8    Q.  I think you mentioned a survey that stores would complete.

9    A.  Yes.

10   Q.  Would RDC -- withdrawn.

11         Do you recall if there were RDC customers who had not

12   completed their survey, but still were receiving controlled

13   substances?

14   A.  Yes.

15         MR. GOTTLIEB:  Your Honor, can we clarify what time

16   period the last two or three questions, what time period are

17   you referring, is the government referring to?

18         MS. ROTHMAN:  I think my question was focused before

19   2015.  But I think the defense will also have

20   cross-examination.

21         THE COURT:  Go ahead.  You can continue.

22   A.  I'm sorry?

23   Q.  Mr. Pietruszewski, were there RDC customers who had not

24   completed their customer questionnaire, but were still

25   receiving controlled substances from RDC?

M1o3dou3                    Pietruszewski - Direct

```
1    A.  Yes.

2    Q.  Now, what, if any, problems or red flags arose with RDC

3    pharmacy customers?

4    A.  Well, customers would be ordering more controls and it

5    could have been for cash, or the prescriptions could have been

6    for cash or high amount pill counts.  I mean, we had no idea.

7    Q.  Did you see any suspicious doctors in the stores you were

8    supplying?

9    A.  Yes, we did.

10   Q.  Would you speak with Mr. Doud about these issues at

11   pharmacy customers?

12   A.  Yes, we would.

13   Q.  As a general matter, did RDC stop selling controlled

14   substances to stores that displayed these red flags of

15   diversion?

16   A.  No, we did not.

17   Q.  Why not?

18   A.  Because Larry did not, you know, did not want us to.

19   Q.  Let's pull up what's in evidence as Government Exhibit 21.

20   Do you recognize this document?

21   A.  Yes.

22   Q.  What is it?

23   A.  This about control drug comparison.  30 percent -- actually

24   it showed all the pharmacies, but all control drugs versus all

25   the other purchases from the customer.
```

1   Q.  Let's break that down.  Let's zoom in on the caption to

2   start.

3              Who is the e-mail from and who is it to?

4   A.  It is from myself, it's sent to all the salesmen on the

5   sales team, to Lanny Doud, Joe Brennan and Larry Doud.

6   Q.  What's the date?

7   A.  August 7, 2013.

8   Q.  What is the subject?

9   A.  It is the customer letter and handouts.

10  Q.  I'm going to through the attachments, but can you read the

11  first attachment that's on this page.

12  A.  Sure.  Copy of control drug comparison 30 percent notes.

13  Q.  What did the 30 percent notes refer to, Mr. Pietruszewski?

14  A.  They were everything that we were lacking information from

15  the pharmacies, or if we had it all.  It would have said it was

16  complete or done.

17  Q.  So, what was the purpose of sending out this e-mail to all

18  the salesmen?

19  A.  To show them what we were lacking from the stores, and also

20  to show them the percentage of how high the controlled

21  substances were being purchased from their customers that they

22  were selling to.

23  Q.  Was there a particular percentage of sales being controlled

24  substances that you were flagging in this e-mail?

25  A.  Anything over 30 percent.

1   Q.  As a general matter, did RDC stop supplying pharmacy

2   customers with controlled substances if they had a greater than

3   30 percent sales for controlled substances?

4   A.  No, we did not.

5   Q.  So let's look at Government Exhibit 21C to start and then

6   we'll go to the Excel spreadsheet.

7        What is this document?

8   A.  It's the pharmacy due diligence.

9   Q.  Who would you give this document to?

10  A.  This would be something that we would give to our

11  pharmacies.

12  Q.  I want to focus on the bottom bullet to start.  That reads:

13  A Schedule II prescription written for pain should not exceed

14  120 dosage units unless the prescriber provides the necessary

15  information that the patient is being treated for cancer,

16  intractable pain, or is terminally ill.

17       Did RDC continue to supply controlled substances to

18  customers who were filling preparations for more than 120

19  dosage units of Schedule II narcotics?

20  A.  Yes, we were.

21  Q.  If we can go to the second page and the third bullet.  This

22  reads:  The pharmacist should determine the field of medicine

23  and board certification of the prescriber to determine that a

24  prescription written for an opioid is written by a physician

25  with board or sub-board certification in a field that would

M1o3dou3                        Pietruszewski - Direct

1    permit the prescriber to write such prescription.

2              Did RDC have customers where prescribers who were

3    writing controlled substances were not in the correct field of

4    medicine?

5    A.  Yes, we did.

6    Q.  If we can go to the third page and zoom in on the first

7    bullet.

8              Cash prescriptions should not exceed 10 percent for

9    all narcotic prescriptions.

10             Did RDC have pharmacy customers who were purchasing --

11   who were selling more than 10 percent of their controlled

12   substances in cash?

13   A.  Yes.

14             MS. ROTHMAN:  We can take that down.  We can now go to

15   Government Exhibit 21E.

16   Q.  I think this was the Excel spreadsheet you were referring

17   to, Mr. Pietruszewski.  Let's go row by -- or column by column

18   to explain the information.  Okay?

19   A.  Yes.

20   Q.  So, in column B, what information is contained in that?

21   A.  The salesman that the store belonged to.

22   Q.  Column C?

23   A.  That was the customer account number.

24   Q.  Column D?

25   A.  The customer name.

M1o3dou3                          Pietruszewski - Direct

1   Q.  Column E?

2   A.  The total volume of sales through that time period.

3   Q.  Column F?

4   A.  Control drug sales, just the control drugs.

5   Q.  And column G?

6   A.  It was the total percentage of control drugs.

7   Q.  Some of the pharmacies are in green and some of them are in

8   black.  What does the green signify?

9   A.  Anything that was green was above 30 percent.

10  Q.  Let's just scroll down through this list of pharmacy

11  customers and see the amount of pharmacies that are green.

12          If you can go to sheet 1, the second sheet.  What

13  information is contained on this sheet, Mr. Pietruszewski?

14  A.  Again, it was the salesman name, the customer account,

15  customer name, the volume of the total volume, the total volume

16  just of control drugs, the percentage of control drugs versus

17  everything else they purchased from us.  "Done" was, you know,

18  we had everything that we were requesting from the pharmacy.

19  Then the last column or the last was things that we still

20  needed from that pharmacy.

21  Q.  If we can just scroll through, all of the pharmacies on

22  this sheet are green; is that right?

23  A.  Yes.

24  Q.  These are all of the flagged pharmacies greater than

25  30 percent?

1    A.  Yes.

2    Q.  Let me ask you just to look at the column I, so if you can

3    scroll to the top.  How many pharmacies appear to have all of

4    their information submitted?

5    A.  Probably about four or five.

6    Q.  You can scroll down.  I think it's about four.

7         Then for the stores that you don't have all of that

8    information, what are you missing from them, Mr. Pietruszewski?

9    A.  It's a variety different things.  Last three months of

10   usage, top 10 doctors that dispense controls, questions

11   supplied to the owners, the questionnaire, and also pictures of

12   the pharmacies inside and out.

13   Q.  Were these stores that hadn't submitted all of their

14   required information still getting controlled substances from

15   Rochester Drug Co-Operative?

16   A.  Yes, they were.

17   Q.  After this e-mail, did RDC continue to supply pharmacies

18   who had more than 30 percent of their purchases in controlled

19   substances?

20   A.  Yes, we did.

21        MS. ROTHMAN:  We can take this down.

22   Q.  Now, Mr. Pietruszewski, in January 2015, did Rochester Drug

23   Co-Operative get a new due diligence and suspicious order

24   monitoring policy?

25   A.  Yes, we did.

1    Q.   Who drafted it?

2    A.   Our attorneys drafted it.

3              MS. ROTHMAN:   Ms. Drescher, can you please pull up

4    what's in evidence as Government Exhibit 276, please.

5    Q.   Do you recognize this document?

6    A.   Yes, I do.

7    Q.   What is it?

8    A.   That is our new policy that was devised by the attorneys.

9    Q.   I'm not going to ask you to read the entire policy.  Let me

10   ask you this.  Under the new policy, what was required to

11   happen before a store could begin purchasing controlled

12   substances from Rochester Drug Co-Operative?

13   A.   We required that we receive the dispensing, and then that

14   the compliance team would have to analyze that dispensing.  We

15   asked for 30 days, and if the dispensing came back that it

16   looked good and there was no issues, the customer would be

17   turned on.  If there was problems, red flags, we would, you

18   know, we weren't supposed to turn the pharmacy on.

19   Q.   Was that a change from old practices?

20   A.   Yes, it was.

21   Q.   Did Mr. Doud approve of the change?

22   A.   Yeah, well they approved of it when I sent this to them for

23   their review.

24   Q.   But thereafter, did Mr. Doud approve of the change?

25   A.   No, he did not.

M1o3dou3                    Pietruszewski - Direct

1   Q.  Do you recall making a presentation about this new policy

2   to anyone at RDC?

3   A.  Yes, I made -- myself and Jessica Pompeo presented this to

4   all the salesmen in the Rochester facility boardroom, and also

5   Larry Doud and Joe Brennan were there as well.

6   Q.  When did the meeting take place?

7   A.  It was at I believe the end of February.

8   Q.  Which year?

9   A.  I'm sorry.  2015.

10  Q.  Did the meeting go smoothly?

11  A.  It seemed to start out to.  But then at the end, it did not

12  go well.

13  Q.  What happened?

14  A.  Larry and Joe were upset with me.  Larry was disgusted

15  that, you know, I didn't inform him that, you know, we were

16  going to analyze the stores.  And he said that, you know, I'll

17  speak to you about this at a later time.

18  Q.  Just to break that down, what had you shared with the

19  salesmen at this meeting in 2015?

20  A.  Well, we showed them the whole policy, but we went over

21  there was nine points that was -- that the policy was asking to

22  follow, and we were reviewing that with the sales team.

23  Q.  How did Mr. Doud respond when you did that?

24  A.  He wasn't happy about it.

25  Q.  How did you feel when Mr. Doud spoke to you that way at the

1    meeting?

2    A.   Sort of demoralized.  I was doing what I was told to do.

3    And then now I am being scolded for doing what I was told to do

4    and present this to the team that the attorneys had been

5    working on.  And, you know, this is supposed to be my peers.  I

6    felt, you know, belittled.

7    Q.   Let's pull up Government Exhibit 43, please.  Do you

8    recognize this e-mail?

9    A.   Yes.

10              MS. ROTHMAN:  I want to go to the bottom of the e-mail

11   chain to start.  Little bit up, Ms. Drescher.  Thank you.  We

12   can zoom in on your e-mail at the bottom.

13   Q.   What's the date of this e-mail?

14   A.   It is March 10, 2015.

15   Q.   Who is the e-mail from?

16   A.   It's from me.

17   Q.   Who is it to?

18   A.   To Larry Doud, Ed Kirker and Joe Brennan.

19   Q.   Can you read the subject?

20   A.   Sure.  HDMA weekly digest, March 10:  DEA and FDA

21   relationship should be improved GAO says.

22   Q.   Can you read your e-mail to Mr. Doud and Mr. Kirker and

23   Mr. Brennan.

24   A.   Sure.

25              Good morning.  I am requesting that Jessica must go

1    and either Liz or myself should also go to this DEA conference

2    on April 15-16.  It is free, just need to pay for hotel and

3    flight.  If I would go, I have no problem with driving.  We

4    would save a little money that way.  They will cram tons of

5    information our way since it is two days.  Please let me know

6    as soon as possible so we can register now before it fills up.

7    Q.  Can we go up to Mr. Doud's response to your e-mail.  The

8    top of the page, thank you.

9               Can you please read Mr. Doud's response.

10   A.  Yes.

11              I'm not in favor and can't believe how much we have

12   stuck in this compliance thing.  However, if Joe and Ed feel it

13   is necessary, then go.  Remember we don't know if we are wrong

14   or right and there is no return on what we are doing.  And

15   Bill, we will have a very serious conversation on your decision

16   to address our sales force with no prior notice to Joe or Lanny

17   or me.  We will need to discuss your lack of communications.  I

18   thought we had had this discussion before.

19   Q.  When Mr. Doud wrote "And Bill, we will have a very serious

20   conversation on your decision to address our sales force with

21   no prior notice to Joe or Lanny or me," what did you understand

22   that to be in reference to?

23   A.  With the presentation that Jessica and I did at the end of

24   February of 2015.

25   Q.  When Mr. Doud wrote, "I am not in favor and can't believe

1    how much we have stuck in this compliance thing," what did you

2    understand that to mean?

3    A.   Meaning that, again, we're asking to go to this meeting,

4    and that we already spent a lot of money on compliance and now

5    you are asking to spend more.

6    Q.   When Mr. Doud wrote "there is no return on what we are

7    doing," what did you understand that to mean?

8    A.   Meaning, you go, you are not going to get anything out of

9    it.

10   Q.   We can take that down.

11            Now, do you recall meeting with management after the

12   sales meeting when you presented the new policy to the salesmen

13   to discuss changing the RDC's written policy?

14   A.   Yes.

15   Q.   What do you remember about that meeting?

16   A.   I met with Joe Brennan, Richie Cullen, and Lanny Doud, and

17   we went into Richie Cullen's office and Joe spoke to me, saying

18   that, you know, that -- it wasn't right for what I presented

19   and that, you know, I'm handcuffing the salesmen from doing

20   their job.  They already have a tough enough job signing on

21   accounts, trying to get new business, and now, you know, you're

22   suggesting that when a customer signs on, they can't buy

23   controlled substances for 30 days.  And he also mentioned that

24   it was unhealthy for me for doing this, for my well being.  He

25   told me that I needed to write a letter to the attorneys that

1   drafted this and let them know that we were going to turn

2   pharmacies on prior to reviewing their dispensing.  And if I

3   had a problem to send the e-mail, that he would do it, but I

4   would be -- I would benefit if I were to do the e-mail.

5   Q.  Did you send e-mail that Mr. Brennan requested?

6   A.  Yes, I did.

7        MS. ROTHMAN:  Ms. Drescher, can you please pull up

8   what's in evidence as Government Exhibit 44.  I want to focus

9   on the bottom e-mail.  Just zoom in on that portion.  Thank

10  you, Ms. Drescher.

11  Q.  Do you recognize this e-mail?

12  A.  Yes.

13  Q.  What is it?

14  A.  It is an e-mail from me and sending an e-mail to Larry

15  Houck and Don Bilgore.

16  Q.  Who are Larry Houck and Don Bilgore?

17  A.  Larry Houck was the practice that we hired to help with our

18  policies, and Don Bilgore was the RDC attorney for over 40

19  years.

20  Q.  Is this the e-mail that Mr. Brennan asked you to send?

21  A.  Yes, it is.

22  Q.  I am going to ask you to read this e-mail and we'll start

23  with the portion that is zoomed in and continue with the bottom

24  portion of the e-mail as well.

25  A.  Okay.

1          Larry Houck and Don, good day, gentlemen.  With

2    speaking to the RDC management team on Tuesday, March 31, 2015,

3    RDC would like to make a few changes to our due diligence and

4    suspicious order monitoring/reporting policies and procedures.

5    I ask that you could look at page two of the new due diligence

6    policy, where it reads prior to selling controlled substances

7    to any customer, RDC must obtain, review and verify the

8    following.  We ask for the nine points to be accomplished prior

9    to selling the store controlled substances.  We would like to

10   change the policy to state that RDC will require completed

11   account -- completed customer account application, copy of

12   customer valid state professional license, copy of customer

13   valid DEA registration certificate, copy of customer valid

14   state controlled substance license, if applicable, drug

15   dispensing for most recent three months of controlled

16   substances.

17   Q.  I'm going to stop you right there.  So what is the request

18   to remove from the initial process before turning on stores for

19   controlled substances?

20   A.  We removed the RDC compliance doing the analysis of the

21   three months' data within 30 days.

22   Q.  If we can go to the final page of the e-mail.  I'm going to

23   ask you to read your final paragraph to the attorneys.

24   A.  Okay.

25          I know this seems like a lot of changes but RDC wants

1   to be compliant, but at the same time RDC would like to be

2   reasonable.  We currently are going into accounts demanding all

3   this information and we are not even giving our sales team a

4   fighting chance.  This is a two way street and we need to be

5   reasonable with our customers.  So if possible, I would ask if

6   next week we may have a conference call with you both, Larry

7   and Don, and with RDC management team to discuss how we need to

8   go forward to make these changes.  Thank you all for your time

9   and have a great holiday.

10  Q.  One question on this.  When you wrote "we are not even

11  giving our salesmen a fighting chance," where did you -- where

12  did you get those words from?

13  A.  I got that from Joe Brennan.

14  Q.  Did you speak, did RDC consult with its attorneys after

15  sending this e-mail?

16  A.  We did, yes.

17  Q.  Were you invited to the meeting?

18  A.  Actually, I was not.

19  Q.  Did you attend the meeting?

20  A.  I did, yes.

21  Q.  How did you wind up at the meeting if you weren't invited?

22  A.  My office in Fairfield is right next to the boardroom, and

23  I was like in the hallway, and I saw the attorneys and I just

24  sort of mingled in with them.

25  Q.  What was, in general terms, what was the purpose of the

M1o3dou3                         Pietruszewski - Direct

1   meeting?

2   A.  To discuss the change of our policy, to not have us do the

3   30 days of analyzing the customer.

4   Q.  At the end of the meeting, was RDC's written policy going

5   to be changed?

6   A.  No, it was not.

7   Q.  In practice, after that meeting, did RDC change the way it

8   opened accounts?

9   A.  No, not -- no, we did not.

10  Q.  I think my question was unclear.

11          Did the topic of turning on accounts without reviewing

12  dispensing data first come up again at RDC?

13  A.  Yes, it did.

14  Q.  Did RDC in fact start turning on accounts without reviewing

15  dispensing data first?

16  A.  Yes, we did.

17  Q.  Was RDC's policy changed, written policy changed?

18  A.  No, it was not.

19          MS. ROTHMAN:  Your Honor, now might be a time to take

20  a lunch break.

21          THE COURT:  Your lunch is here, ladies and gentlemen.

22  Don't discuss the case, keep an open mind.  We'll continue in

23  one hour.  At 1:55.

24          (Jury excused)

25          THE COURT:  You can step down.  We'll continue at

1   1:55.

2              MS. ROTHMAN:  Thank you, your Honor.

3              (Recess)

4              (Continued on next page)

M1OVDOU4                          Pietruszewski – Direct

                    A F T E R N O O N   S E S S I O N

1

2                                2:00 P.M.

3              THE COURT:  We'll get the jury.  Bring in the jury.

4              (Jury present)

5              THE COURT:  You can continue, Ms. Rothman.

6              MS. ROTHMAN:  Thank you, your Honor.

7    BY MS. ROTHMAN:

8    Q.  Before we stopped for lunch, we were speaking about RDC's

9    meeting with attorneys where it was decided that RDC's written

10   policies regarding analyzing dispensing data before turning on

11   new accounts wasn't going to change.  Do you remember that?

12   A.  Yes, I do.

13   Q.  And I asked you if following that meeting, RDC began

14   turning on accounts for controlled substances before analyzing

15   dispensing, right?

16   A.  Yes.

17   Q.  Let's look at a few examples of that, Mr. Pietruszewski.

18             MS. ROTHMAN:  Ms. Drescher, can you please pull up

19   what's in evidence as Government Exhibit 50.

20   Q.  And do you recognize this document?

21   A.  Yes.

22   Q.  I want to go to the bottom of the email.  Focusing on the

23   email from Scott Behanna to Lanny Doud, Mr. Pietruszewski, who

24   is Scott Behanna?

25   A.  He was a salesman for Rochester Drug.

1   Q.   What's the subject of this email?

2   A.   Pleasant Hills Apothecary.

3   Q.   Was that a pharmacy of RDC?

4   A.   Yes.

5   Q.   I'm going to ask you to read Mr. Behanna's email to Lanny

6   Doud.

7   A.   Okay.

8          Lanny, I wanted you to be aware that I am on the verge

9   of losing this account only a few months after opening it

10  because I can't get an answer from compliance on whether we

11  will let him buy controls and set up CSOS.  I told Kevin, the

12  owner, we couldn't do anything until we had usage,

13  questionnaires, etc.  He said okay and says he would buy some

14  other stuff and, if things worked out, he would move forward.

15  I told him the best way would be for Jessica to contact RX-30

16  to get what we needed.  He agreed and stopped buying secondary

17  from Kinray.  That was two weeks ago, and he's ready to go back

18  to Kinray.  Kevin said he didn't want to leave Value; so my

19  plan was to move Kinray out, which happened, and I started

20  eating away at Value.  I had a feeling that was about to happen

21  until hitting this roadblock.  I'm not blaming anyone, and

22  maybe his usage will be questionable, but the process is

23  frustrating.  Sorry for rambling.

24  Q.   What's the date of this email?

25  A.   July 22nd, 2015.

1    Q.  I want to look at Mr. Doud's response to this email on the

2    previous page.

3          MS. ROTHMAN:  A little higher up, Ms. Drescher.  Thank

4    you.  If we can just zoom in on Mr. Doud's response.

5    Q.  Can you read what Mr. Doud wrote.

6    A.  Sure.

7          Let's see if we can open him right away.  I was

8    thinking we could mark accounts probationary until the work is

9    done, then remove.  Some sort of limit.  If you remember, Joe,

10   Don said Anda just stopped shipping mid month with no warning.

11   Q.  If we can look at your response to Mr. Doud.  Can you read

12   that paragraph, please.

13   A.  Sure.

14         Larry, we are good if we make a change to the process.

15   I would ask, to be safe, if we could have Mr. Bilgore make the

16   change to our SOP stating the updated process.  Jessica and I

17   have been filling out manufacture due diligence request, that

18   we have included our process for turning on customers after we

19   analyze the dispensing.  We also shared our process with the

20   DEA in Newark of how we look at three months of dispensing

21   prior to turning a customer on to controls when we applied for

22   our DEA license in Fairfield.  This way it is documented that

23   the DEA cannot come back and ask why we are not following the

24   process we put in place on January 15th, 2015.  We can at least

25   show that we changed our process and documented it, but we are

1 | following it.

2 | Q.  Just a few questions, Mr. Pietruszewski.

3 |         When you wrote to Mr. Doud:  We are good if we make a

4 | change to the process, what did you mean by that?

5 | A.  If Larry wanted us to change the process of the compliance,

6 | that we -- we'll do it.

7 | Q.  Why was that?

8 | A.  Because we did what Larry wanted us to do.

9 | Q.  Now, at the bottom of the paragraph, you write:  We also

10 | shared our process with the DEA in Newark of how we look at

11 | three-month dispense prior to turning a customer on to controls

12 | when we applied for our DEA license for Fairfield.  What are

13 | you referring to there?

14 | A.  We had a on-site inspection by the DEA in New Jersey.  And

15 | one of the things that they asked once they did the site visit

16 | was our due diligence policy and that -- which we supplied them

17 | with.

18 | Q.  Did you give the DEA RDC's written due diligence policy at

19 | the site visit in 2015 at Fairfield?

20 | A.  I believe we did, but I know I emailed it.

21 | Q.  Okay.  And let's look at Mr. Doud's response to your email.

22 | Can you please read Mr. Doud's response.

23 | A.  Sure.

24 |         I will talk to Don on Friday.  However, I would like

25 | to open the account today and move his info higher in the pile.

1    I have no idea if this is a good guy or a bad guy, but I do

2    know that in this case it is taking too long no matter what the

3    problem is.  And it could be him and I am sure.  Joe has

4    committed to making this a one-week process, and I agree with

5    him.  The girls are way too busy, but we won't be adding any

6    more help at this point, so don't ask Bill.  We have to find a

7    way.

8    Q.  When Mr. Doud wrote:  I would like to open the account

9    today, what did you understand him to mean?

10   A.  Mean that we had to turn the store on today to buy

11   controls.

12   Q.  And when Mr. Doud wrote:  The girls are way too busy, but

13   we won't be adding any more help at this point, so don't ask

14   Bill, what did you understand that to mean?

15   A.  That the ladies in compliance were busy doing analyzing;

16   but that I can't bother to ask for more assistance in that

17   department.

18   Q.  Now, following this email, were stores turned on to

19   controls before dispensing data was analyzed?

20   A.  Yes.

21   Q.  And was RDC's written due diligence policy changed at this

22   time?

23   A.  No, it was not.

24           MS. ROTHMAN:  We can take this down.

25           Thank you, Ms. Drescher.

M1OVDOU4                          Pietruszewski - Direct

1   Q.  Now, do you recall the topic of turning on accounts to

2   controls before reviewing dispensing coming up again in 2016?

3   A.  Yes, it did.

4   Q.  And who raised it in 2016 again?

5   A.  Mr. Doud did.

6   Q.  What do you remember about Mr. Doud raising this topic

7   again?

8   A.  It was in reference to, I believe, Senate made mention in

9   one of the big newspapers that the DEA got in trouble for

10  not -- I don't know if it was following procedures correctly or

11  what, but his understanding was that the DEA, you know, got in

12  trouble.

13  Q.  And so what did Mr. Doud want to do based upon that

14  information?

15  A.  He wanted to make sure that stores were open up right away

16  to buy controlled substances.

17  Q.  Let's look at Government Exhibit 57.

18              MS. ROTHMAN:  Thank you, Ms. Drescher.

19              If we can go down to the bottom of this email.  And

20  zoom in on Mr. Doud's email on June 5th, 2016.

21  Q.  Can you read that email, please.

22  A.  Sure.

23              Folks, based on a recent government change, I want to

24  accelerate our account opening process.  As soon as our credit

25  managers completely approve our credit app, we will open an

1    account right away.  We will continue to do our diligence on

2    the controls, but not before we open the account.  It is open

3    for discussion.

4    Q.  Let's look at your response to Mr. Doud.

5            MS. ROTHMAN:  Thank you.

6    A.  Hi, Larry.  That is a management decision and it's fine

7    with compliance.  I only would suggest that Don Bilgore or

8    Larry Hauck change our SOP to state that we did -- we made a

9    change.

10   Q.  When you wrote that as a management decision, what did you

11   mean?

12   A.  That it was Larry and Joe Brennan's decision.

13   Q.  And when you wrote "and is fine with compliance," what did

14   you mean?

15   A.  That we didn't have a choice; we had to do what Larry

16   wanted us to.

17           MS. ROTHMAN:  We can take that down and go to

18   Government Exhibit 58.

19   Q.  Do you recognize this email?

20   A.  Yes.

21           MS. ROTHMAN:  Let's zoom in on the bottom email.

22           Thank you, Ms. Drescher.

23   Q.  Who's the email from and who is it to?

24   A.  It is from me; and it's to Jessica Pompeo, Julius Morton,

25   and Liz Cullen.

 1   Q.  What's the date of the email?

 2   A.  June 8th, 2016.

 3   Q.  That's about two days after the email we just looked at?

 4   A.  Yes, that's correct.

 5   Q.  What's the subject?

 6   A.  New SOP for turning on pharmacies.

 7   Q.  I'm going to ask you to read the body of the email,

 8   starting with "I was able to speak with Larry."

 9   A.  I was able to speak with Larry last night, and this is how

10   we would like to proceed on turning new accounts on to

11   controlled substances.

12          We are to receive all compliance paperwork when the

13   account is being set up.  We should receive the licenses, RDC

14   questionnaire, pictures of inside/outside of pharmacy, and

15   90-day dispensing in the correct format.  If we have that

16   information, the account should be turned on to order

17   controlled substances from RDC as management has requested.  If

18   we do not have all the information that was mentioned above, I

19   ask that an email is sent to the salesperson, Richie, if Metro,

20   or to Jay, if in Rochester, and to the compliance, so that

21   everyone is on the same page.  I ask that Jessica and Liz turn

22   the store on, and we will keep the chart on the "K" drive as we

23   currently do so we know if the store is on or off.

24   Q.  Thank you.

25          So if you can just summarize, what are you telling

1   Ms. Pompeo, Julius Morton, and Ms. Cullen in this email?

2   A.  Sure.  Just that we are going to collect the licenses of

3   the pharmacy, the RDC questionnaire, the pictures of the

4   pharmacy, and the 90-day dispensing in the right format.  And

5   once we have that, we are able to turn the store on to buy

6   controlled substances.

7   Q.  And whose decision was it to make that change?

8   A.  That was Larry's decision.

9        MS. ROTHMAN:  Let's go up to the top email.

10        Thank you, Ms. Drescher.

11   Q.  Who do you forward your email to the compliance team to?

12   A.  I forward it to Larry Doud, Joe Brennan, Richie Cullen.

13   Q.  Can you read the subject -- the body of the email.

14   A.  Sure.

15        I sent the email to key people in compliance to start

16   the new SOP today.  Thank you for your time last night.

17   Q.  So why did you forward your email to compliance to

18   Mr. Doud?

19   A.  I wanted him to see that I did as he asked me to do.

20   Q.  Had the written SOP been changed overnight?

21   A.  No, it was not.

22   Q.  Now, there's a reference in your email to thank you for

23   your time last night.  What is that in reference to?

24   A.  I spoke to Larry on the phone just reiterating that I will

25   send out the email.

1          MS. ROTHMAN:  Your Honor, at this time I'm just going

2     to read a portion from Government Exhibit 1005, a stipulation

3     already in evidence.

4          THE COURT:  Yes.

5          MS. ROTHMAN:  And that stipulation reads that

6     Government Exhibit 501 consists of an excerpt from a call log

7     from Pietruszewski's iPhone.

8          And Ms. Drescher, can we please publish what's in

9     evidence as Government Exhibit 501 to the jury.  And if we can

10     go to the second page and zoom in on line 559.  Thank you.

11     BY MS. ROTHMAN:

12     Q.  Who is this call to, Mr. Pietruszewski?

13     A.  To Larry Doud.

14     Q.  What's the date?

15     A.  June 7, 2016.

16     Q.  Is that the night before you sent the email to the

17     compliance team?

18     A.  Yes, it was.

19     Q.  And how long was the phone call for?

20     A.  Two minutes.

21          MS. ROTHMAN:  We can take that down.  Thank you.

22          Let's call up Government Exhibit 62, please.

23     Q.  Before we look at 62, following that phone call and that

24     email to compliance, did RDC start turning on stores to

25     controlled substances before reviewing dispensing data?

1    A.  Yes, we did.

2    Q.  Was the written policy changed at that time?

3    A.  No, it wasn't.

4    Q.  Looking at Government Exhibit 62, I want to start at the

5    bottom email.  Do you recognize this email?

6    A.  Yes.

7    Q.  Who is the email -- who do you send this email to?

8    A.  I send it to Larry Doud and Joe Brennan.

9    Q.  I'm going to ask you to read the body of the email starting

10   with "I asked the three DEA diversion investigators."

11   A.  Okay.

12       I asked the three DEA diversion investigators last

13   week about the Senate passed and how that would help RDC.  They

14   said that was in the works since 2013.  The only thing this law

15   would do is give a wholesaler/distributor one more chance if

16   they are going to lose their license from the DEA.

17   Q.  You can read the next two paragraphs as well.  Thank you.

18   A.  Okay.

19       So, if a pharmacy was selling oxycodone out the back

20   door and we did not report this, if we knew of this, we would

21   be a threat to society.  The DEA could pull our license ASAP.

22   With this law, they must work with the wholesaler/distributor,

23   but they would still be subjected to fines and penalties.

24       I suggest that we ask Larry Hauck his professional

25   opinion or thought in regards to changing our due diligence

1   SOP.  I understand that this is a business decision, but I am

2   just concerned that we will be vulnerable if we do not look at

3   the dispensing before turning a store on to sell controlled

4   substances.

5   Q.  Why did you send this email to Mr. Doud and Joe Brennan?

6   A.  Because I wanted them to know the interpretation I received

7   from the DEA agents so then they knew what it was that Larry

8   read and Joe read in the paper.

9   Q.  Was Mr. Doud receptive to your concerns?

10  A.  I don't believe he was, no.

11  Q.  Let's look at the top of the email.  And just focusing on

12  Mr. Doud's email at the top, how does Mr. Doud respond?

13  A.  That is bullshit.

14        MS. ROTHMAN:  We can take that down.

15        Let's pull up Government Exhibit 64, please.

16  Q.  Looking at the bottom email, can you summarize what you're

17  doing in this email?  Withdrawn.  Let me ask it better.

18        Who's the email from, Mr. Pietruszewski?

19  A.  I'm sorry.  It was from myself.

20  Q.  And who is it to?

21  A.  It's to Dan, Larry Doud, Joe Brennan, Al Emmans, Richie

22  Cullen, Ed Kirker, and myself.

23  Q.  What's the date?

24  A.  It is July 20th, 2016.

25  Q.  What's the subject?

1    A.  Fairfield DEA audit.

2    Q.  I'm going to ask you to read the first sentence of your

3    email.

4    A.  Sure.

5            On June 23rd, 2016, we had three DEA investigators

6    arrive at about 10 a.m. to conduct an audit for DEA RR0480676

7    Rochester Drug Co-Operative, Inc., New Jersey.

8            MS. ROTHMAN:  And if we can go down to the second page

9    and just zoom in on the bullet that says "DEA requested."

10   Q.  And if you can read the zoomed-in text, Mr. Pietruszewski.

11   A.  Sure.

12           DEA requested all SOP for due diligence.  One agent

13   read the document the first day on due diligence ask of the

14   customers.  Second day agent requested three customers' SOPs to

15   see RDC Fairfield follows its SOP.

16           MS. ROTHMAN:  We can zoom out and go to the top email.

17   Q.  And who do you forward your email to?

18   A.  I forward it to Julius Morton and Bill Delgado.

19   Q.  And if you can read the body of the email that begins

20   "Please see below."

21   A.  Sure.

22           Please see below the audit that we at RDC Fairfield

23   had back June 23rd.  I am only about a month behind giving my

24   superiors a snapshot of events for the two days.  As you look

25   over my outline, you can see I bring up again that RDC follows

1    due diligence SOP to our customers.  Again, I am only trying to

2    have reminders to my superiors that we need to follow the SOP

3    as they are written, and I hope that this could spur up

4    conversation on the topic.

5    Q.  And when you wrote:  I am only trying to have reminders to

6    my superiors that we need to follow the SOP as they are

7    written, what SOP were you referring to?

8    A.  To turning on the pharmacies that we should be analyzing

9    the data.

10              MS. ROTHMAN:  You can take this down.

11              Thank you, Ms. Drescher.

12              Let's pull up Government Exhibit 66 please.  And let's

13    just zoom in on the top email from Mr. Doud.

14    Q.  Who's the email from?

15    A.  It's from Larry Doud.

16    Q.  Who's the email to?

17    A.  To myself and to Joe Brennan.

18    Q.  What's the date of the email?

19    A.  August 30, 2016.

20    Q.  What's the subject?

21    A.  RDC visit protocol.

22    Q.  Can I ask you to read Mr. Doud's email to you.

23    A.  Sure.

24              Bill, please do not do anything to hinder the process

25    of this application for VAWD.  As you know better than anyone,

1   this should have been in place when we opened New Jersey.  I am

2   pissed at the BS we deal with on the DEA business now and

3   adverse effects it has had on business over the past three

4   years.  I think we spend an incredible amount of attention and

5   money to it, and we can lose our focus on moving RDC ahead.

6   I'll be glad to discuss my disappointments with you and Joe

7   when I return.  And Don Bilgore.

8   Q.  Mr. Pietruszewski, what is VAWD, V-A-W-D?

9   A.  Verification authentication warehouse distributor,

10  something of that nature.  I'm not exact that that's precise

11  wording.

12  Q.  What needed to happen with VAWD in connection with the

13  Fairfield facility?

14  A.  We had to supply SOPs and procedures of all our

15  departments.  And I was just stating that, you know, our

16  protocol wasn't updated.

17           MS. ROTHMAN:  We can take that down.

18  Q.  So now I want to ask you about some certain pharmacy

19  services of Rochester Drug Co-Operative.

20           Do you recall the pharmacy named Aliton's?

21  A.  Yes, I do.

22  Q.  What do you remember about Aliton's?

23  A.  They had, I believe, three locations.  And usually all

24  three stores would be on credit hold; and then one would be

25  able to buy.  And they would buy their pharmaceuticals.  And

1    they used to buy oxycodone, and they would be dispensing high

2    amounts of pill counts and for cash.

3    Q.  Do you remember a pharmacy named Verree?

4    A.  Yes.

5    Q.  What do you remember about Verree Pharmacy?

6    A.  Verree Pharmacy, they filled a lot of brand Oxycontin

7    manufactured by Purdue.  It wasn't the generic, so it was quite

8    expensive.  And they were next to a pain -- or not pain clinic,

9    a hospital that did cancer.

10            MS. ROTHMAN:  Let's pull up Government Exhibit 105F,

11   please.  I want to scroll down to the bottom of this email

12   chain to start.

13   Q.  Who's this email from and who is it to?

14   A.  It's from Issa Giselle.

15   Q.  And who was Giselle Issa?

16   A.  She was someone that worked in the compliance for Purdue

17   Pharma.

18   Q.  What's the subject of the email?

19   A.  Quick question on Verree.

20   Q.  What's the date?

21   A.  It is June 8th, 2015.

22   Q.  Can I ask you to read Ms. Issa's email to you.

23   A.  Sure.

24            Bill, I was updating my report, and I saw that in the

25   past you had concerns about Verree oxycodone IR-30 milligrams.

1   You stated that in the month of June 2013, out of 35,000 pills,

2   2800 were scripts for 30 milligrams IR.  Do you still see the

3   kind of data in the recent months and are you still concerned

4   about the 30 milligram IR of total oxycodone?

5   Q.  We can scroll up to Ms. Pompeo's email to you.

6          MS. ROTHMAN:  Thank you, Ms. Drescher.

7   Q.  What did you ask Ms. Pompeo to do in response to Ms. Issa's

8   email?

9   A.  To run a report to see their purchases for the last few

10  months.

11         MS. ROTHMAN:  And if we can zoom in on that.

12  Q.  Can you read what Ms. Pompeo writes to you.

13  A.  She asked if -- does this work?

14  Q.  And then at the bottom of her email?

15  A.  Their average on Oxy for the past six months is 16,850.  So

16  it has gone down.  Oxy 30 milligrams, however, is 53 percent of

17  their oxycodone purchase.  Their numbers do not include brand

18  name.  Let me know if you need them included.

19  Q.  Let's look at your response to Ms. Pompeo.

20         Can you please read your response.

21  A.  Sure.

22         Funny, I am so far behind in emails, I see you already

23  supplied this.  I would not share with Purdue the chart.  Tell

24  her that we see a decrease the last few months.  Tell her the

25  family, group Oxy family, has decreased by about 4,000 units to

M1OVDOU4                        Pietruszewski - Direct

1   about 31,000.  That is all I would share.  She does not need to

2   know 53 percent are Oxy, 30 milligrams, Verree.

3   Q.  Why did you direct Ms. Pompeo not to include that 53

4   percent of Verree's purchases were Oxy 30s in her email to

5   Purdue?

6   A.  I was concerned that they would see that as a red flag and

7   that they may shut off RDC's privileges buying Oxycontin, the

8   brand name from Purdue Pharma.

9   Q.  And why didn't you want that to happen?

10  A.  Because I know Larry would have been upset at me that we

11  got cut off and wouldn't be able to supply Oxycontin to other

12  pharmacies at RDC.

13            MS. ROTHMAN:  We can take that down.

14  Q.  Do you recall a pharmacy named Bay Ridge Pharmacy?

15  A.  Yes.

16  Q.  What do you remember about Bay Ridge?

17  A.  They had a high amount of purchasing of oxycodone 30

18  milligrams.  They would always hit their limit.  They would

19  want more and it was, you know, a lot more than an average

20  pharmacy that RDC supplied.

21  Q.  Do you remember the amount of units that Bay Ridge was

22  authorized to purchase?

23  A.  It was around 80,000, 82,000 units per month.

24  Q.  What was the average amount?

25  A.  Average amount for?

1    Q.  An average pharmacy customer, how much Oxy were they

2    purchasing?

3    A.  Maybe about 25,000 units.

4    Q.  We spoke a bit about ProHealth, but let me ask you again,

5    Mr. Pietruszewski, do you remember the pharmacy named

6    ProHealth?

7    A.  Yes.

8    Q.  What do you remember about ProHealth?

9    A.  They had doctors that were writing for oxycodone 30.  And I

10   believe there was four doctors that were writing for -- 40

11   percent of it was for cash.

12   Q.  Do you recall the pharmacy named Seventh Elm?

13   A.  Yes, I do.

14   Q.  What do you remember about Seventh Elm?

15   A.  They were filling prescriptions for Dr. Terdiman, Dr.

16   Verree, and they were usually for cash prescriptions.

17            MS. ROTHMAN:  Let's pull up Government Exhibit 109G

18   please.  You can just zoom in on the text.  The full email is

19   fine.  Thank you, Ms. Drescher.

20   Q.  Focusing on your top email, who do you send this email to?

21   A.  To Jessica Pompeo.

22   Q.  What's the date?

23   A.  August 27, 2014.

24   Q.  What's the subject?

25   A.  DEA order of interest alert, customer 3735.

1   Q.  And which customer is this email in reference to?

2   A.  This would have been Seventh Elm.

3   Q.  And what do you write to Ms. Pompeo?

4   A.  Let's go.  I will try and call her tomorrow morning.

5   Q.  I think --

6   A.  Let it go.  I'm sorry.  I apologize.

7   Q.  And when you wrote "Let it go," what were you referring to?

8   A.  I was letting Jessica know that she could release the

9   order.

10  Q.  And did RDC have dispensing data for Seventh Elm at this

11  time?

12  A.  Not updated dispensing, no.

13  Q.  It was releasing the order what RDC should have done under

14  its policy?

15  A.  No, it was not.

16  Q.  What should RDC have done?

17  A.  We should have not released it and we should have asked for

18  updated dispensing.  And if we didn't receive it, we should

19  have reported it to the DEA.

20          MS. ROTHMAN:  We could take that down.

21  Q.  Do you recall the pharmacy named Blairsville?

22  A.  Yes, I do.

23  Q.  What do you remember about Blairsville?

24  A.  Blairsville made a order for a controlled substance; and

25  the store did not receive it.  I know Larry was traveling with

1  Kevin Taraszewski in that territory.  I received a call from

2  Larry about getting it out to the customer.

3           MS. ROTHMAN:  Let's pull up Government Exhibit 111E,

4  please.  And I want to just focus on an email on the second

5  page from you -- the middle of the page on September 30th,

6  2016, at 8:22 -- little bit lower.  Thank you, Ms. Drescher.

7  Q.  And can you read what you write?

8  A.  Sure.

9           Joe, the order came in at 7:32 p.m. yesterday, and I

10 went into order of interest.  I released after Larry got a hold

11 of me this morning.  We have a courier picking the tote up to

12 make the delivery today.

13 Q.  What's the date of this email?

14 A.  It is September 30th, 2016.

15          MS. ROTHMAN:  We can take that down.

16 Q.  Now, I want to ask you a few questions about Linden Care.

17          Do you remember the pharmacy named Linden Care?

18 A.  Yes, I do.

19 Q.  What types of products did Linden Care purchase from RDC?

20 A.  They purchased a lot of oxycodone 30, purchased a lot of

21 Subsys, Actiq, Alanzia, and there were a lot of other normal

22 pharmaceuticals that they bought a lot of as well that were

23 expensive.

24 Q.  What, if any, issues did RDC have in stocking Subsys?

25 A.  We started out not having a lot, but Linden Care started

1    buying more from us and we had -- I had so much Subsys that I

2    couldn't even keep it in the vault.  It was in the cage and

3    outside in the warehouse.

4    Q.  What, if anything, did Mr. Doud tell you to do with respect

5    to orders from Linden Care?

6    A.  That all their -- anything that they order should be

7    shipped.

8    Q.  Did you follow those directions?

9    A.  Yes, I did.

10   Q.  I want to look at what's been marked for identification as

11   Government Exhibit 108BB.

12            Do you recognize this document?

13   A.  Yes, I do.

14   Q.  What is it?

15   A.  It's email from Larry Doud -- from Larry Doud to me.

16            MS. ROTHMAN:  Your Honor, the government offers into

17   evidence Government Exhibit 108BB.

18            THE COURT:  Any objection?

19            MR. GOTTLIEB:  May I just take one look please?

20            THE COURT:  Yes.

21            MR. GOTTLIEB:  No objection, your Honor.

22            THE COURT:  It will be admitted into evidence.

23            (Government's Exhibit 108BB received in evidence)

24            MS. ROTHMAN:  May we publish to the jury?

25            THE COURT:  Yes.

1     MS. ROTHMAN:  Thank you.

2  Q.  We're going to look at Mr. Doud's email to you in a moment.

3  But before we do, can you provide a little bit of context on

4  what's going on in this email chain?

5  A.  Yes.

6         Larry asked me to send a email to Ed Kirker, Chris

7  Masseth, because they were concerned that Linden Care was

8  buying all of our product from other -- that other customers

9  wouldn't be able to purchase it.  So he asked me to threaten

10  them to let them know that -- let Linden Care get what they

11  want.

12  Q.  Let's read Mr. Doud's email to you, zooming in on the top

13  email.  Thank you.  You can go ahead.

14  A.  Bill, thanks.  You should tell them you think they should

15  check with me before changing anything.  Tell them now how

16  aggressive I am towards the account and how I threatened you.

17  Tell them it is not funny and you know that it won't make me

18  happy.  I don't care that everyone else says -- what everyone

19  else says.

20  Q.  What's the date of the email?

21  A.  It is May 1st, 2014.

22  Q.  Did you do what Mr. Doud asked you to do?

23  A.  Yes, I did.

24         MS. ROTHMAN:  Let's look at Government Exhibit 108G,

25  which is in evidence.  You can zoom in on the text.

M1OVDOU4                      Pietruszewski - Direct

1    Q.  What's the date of this email?

2    A.  May 1st, 2014.

3    Q.  The same date as the email we just saw?

4    A.  Yes.

5    Q.  Who's the email from?

6    A.  It is from me.

7    Q.  Who's the email to?

8    A.  To Ed Kirker and Chris Masseth.

9    Q.  What's the subject?

10   A.  Linden Care/Bell Health.

11   Q.  Can you please read your email to Mr. Kirker and

12   Mr. Masseth.

13   A.  Yes.

14           Gentlemen, I thought I would share with you both that

15   Larry Doud and I had a meeting with Inder from Bell Health in

16   regards to Linden Care.  Larry wants Linden Care to receive

17   what they want.  He I being very aggressive and not to cut

18   anything from their orders.  Larry wants our venture to work

19   with Linden Care/Bell Health and if anyone disagrees will need

20   to answer to him.  So moving forward, I will not cut from their

21   orders and if you do not agree with me, Larry said to ask him

22   for yourself.  Larry threatened me to be on board with this or

23   I may not like the outcome.  I thought you both would like to

24   know this.

25   Q.  Now, in your email, you write Larry threatened me to be

1   onboard.  Did Mr. Doud really threaten you?

2   A.  No he did not.

3   Q.  Why did you write that Mr. Doud had threatened you if he

4   hadn't done that?

5   A.  Because he told me to tell them that.

6          MS. ROTHMAN:  We can take this down.

7   Q.  Now, with respect to Linden Care's orders -- withdrawn.

8          The direction from Mr. Doud that Linden Care would get

9   what they wanted, did that apply to all orders or only a

10  portion of Linden Care's orders?

11  A.  That would be with all orders.

12  Q.  Would that include controlled substances?

13  A.  Yes.

14  Q.  Would that include Subsys?

15  A.  Yes.

16  Q.  All right.  Did Linden Care generate orders of interest?

17  A.  Yes, they did.

18  Q.  Generally, what would you do with those orders of interest?

19  A.  I would release them.

20  Q.  Why did you do that?

21  A.  Because I was told that we released their orders.

22  Q.  Let's pull up Government Exhibit 10 which is in evidence.

23          Do you recognize this email?

24  A.  Yes.

25  Q.  Let's go to the bottom of the email.

1          MS. ROTHMAN:  A little higher actually.

2     Q.  Focusing on your email on April 17, 2012, can you read your

3     email.

4     A.  Sure.  Guys, this order for Linden Care exceeded their

5     limit.  I increased their limit so we could send it tonight.

6     But the order is stuck in the system.  I had IT trying to

7     release it, but every time the order was released, it would go

8     back to hold.  This order will be released in the morning by

9     the automatic process.  But I thought you would like to know.

10    I left Chris a voicemail about this.  Also, we should discuss

11    their ordering amounts.  They are getting to a point where we

12    may not want to go.  I was hoping I will be able to discuss

13    with Joe in the morning.

14    Q.  Let's look at Mr. Doud's response to your email.  What's

15    the date?

16    A.  It is October 17, 2012.

17    Q.  And please read Mr. Doud's response?

18    A.  Bill, that is not satisfactory.  We must get and ship that

19    order tonight.  We are in serious jeopardy there.  It is a big

20    ant and they have just about had it with us.

21    Q.  Let's scroll up to your email in response to Chris.  And

22    just focusing on the first paragraph.  Thank you.

23    A.  With speaking to Larry, it would be in our best interest to

24    get this order to Linden Care.  I will fill the order tomorrow

25    at 7 a.m. and should have it ready to go by 8 a.m.  We'll have

M1OVDOU4                        Pietruszewski - Direct

1  frank from RDC take this up to meet Chris at the Delaware gap

2  and Chris, if you could take the rest of the way to the store

3  would be great.

4  Q.  Thank you.  Mr. Pietruszewski, was it unusual for Mr. Doud

5  to get involved in particular orders?

6  A.  No.

7  Q.  Was this the only time he got involved in making sure a

8  particular order was shipped?

9  A.  No, it was not.

10 Q.  All right.  I want to talk about Linden Care beginning in

11 2014 and going until 2016.

12 A.  Okay.

13 Q.  Generally, what happened with Linden Care's purchasing

14 during those years?

15 A.  They increased substantially.

16 Q.  And did RDC have dispensing data for Linden Care during

17 that time period?

18 A.  After 2014, we did not.

19 Q.  Why not?

20 A.  They had a problem with their system.  The robot was not

21 working correctly.

22 Q.  Did RDC stop shipping controlled substances to Linden Care

23 when it didn't have the dispensing data?

24 A.  No, we still shipped.

25 Q.  Did RDC use Pro Compliance with Linden Care?

```
1   A.  Yes, we tried.

2   Q.  What happened?

3   A.  They denied Pro Compliance.

4   Q.  When Linden Care refused to allow Pro Compliance to analyze

5   their data, did RDC cut them off?

6   A.  No, we did not.

7   Q.  And did Pro Compliance later look at RDC's -- withdrawn.

8           Did Pro Compliance later look at Linden Care's data?

9   A.  They did eventually, yes.

10  Q.  Let's look at what's been marked for identification as

11  Government Exhibit 108AA.  Do you recognize this document?

12  A.  Yes, I do.

13  Q.  What is it?

14  A.  It's about off-label use of substances as a painkiller.

15  Q.  Is it an email from you to Mr. Doud?

16  A.  Sorry.  Yes, it is an email from me to Mr. Doud.

17          MS. ROTHMAN:  Your Honor, the government offers into

18  evidence Government Exhibit 108AA.

19          THE COURT:  Any objection?

20          MR. GOTTLIEB:  No objection, your Honor.

21          THE COURT:  It will be admitted into evidence.

22          (Government's Exhibit 108AA received in evidence)

23          MS. ROTHMAN:  May we publish to the jury?

24          THE COURT:  Yes.

25          MS. ROTHMAN:  Thank you.
```

1            All right.  If we can zoom in on the top half of the

2    email, including the caption on the news article.

3            Thank you.

4    Q.  So who's this email from?

5    A.  It is from me.

6    Q.  Who is it to?

7    A.  To Larry Doud.

8    Q.  What's the date?

9    A.  May 14, 2014.

10   Q.  What's the subject?

11   A.  RX doubts -- RX News Doubts Raised Off-Label Use for

12   Subsys.

13   Q.  Can you read your email to Mr. Doud?

14   A.  Should we send this to Linden Care?

15   Q.  And looking at the bottom email, what's the caption of the

16   news article that you forwarded?

17   A.  Doubts Raised About off-label Use of Subsys, A Strong

18   Painkiller.

19   Q.  Why did you forward this article to Mr. Doud?

20   A.  Because Subsys was Fentanyl and it's being used for more

21   than just helping people with retractable pain or cancer.

22   Q.  And why did you ask Mr. Doud if you should send this

23   article to Linden Care?

24   A.  So they could see this for theirselves.

25            MS. ROTHMAN:  We can take that down and go to

1    Government Exhibit 108U please.  We can zoom in on the top half

2    again, including the caption.

3    Q.  Who's this email from?

4    A.  It is from me.

5    Q.  Who's it to?

6    A.  To Larry Doud.

7    Q.  What's the date?

8    A.  April 8th, 2015.

9    Q.  Can you please read the subject.

10   A.  Sure.

11           Nurse practitioner Connecticut surrenders drug

12   license.

13   Q.  Can you please read your email to Mr. Doud.

14   A.  Sure.

15           Larry, just FYI.  Our number one customer was filling

16   Subsys for cash by this nurse practitioner.  This was based off

17   old dispensing up to December 2014.  I am still waiting for the

18   first quarter of 2015 dispensing.  Hopefully, the practitioner

19   is not on there dispensing.  Thought you would like to know.

20   Q.  When you wrote "Our number one customer was filling Subsys

21   for cash," who were you referring to as your number one

22   customer?

23   A.  It was Linden Care Pharmacy.

24   Q.  And why did you use that term, "number one customer," to

25   refer to Linden Care?

1    A.  Because they were our largest customer that we had.

2    Q.  Why did you forward this email to Mr. Doud?

3    A.  Because I wanted him to know that a nurse practitioner

4    would surrender her license and that, you know, it's possible

5    that she still was writing scripts and we didn't have the

6    dispensing.

7    Q.  Would you speak with Mr. Doud about the amount of

8    controlled substances that RDC was selling to Linden Care?

9    A.  Yes.

10   Q.  Based on those conversations, do you believe that Mr. Doud

11   was aware that Linden Care was RDC's primary purchaser of

12   Subsys?

13            MR. GOTTLIEB:  Your Honor, objection.

14            THE COURT:  Overruled.

15            You can cross-examine him on this.

16   A.  Yes, they were.

17   Q.  Based on your conversations with Mr. Doud, do you believe

18   that Mr. Doud was aware of the volume of Subsys that RDC was

19   supplying to Linden Care?

20   A.  Yes, he knew.

21            MR. GOTTLIEB:  Objection.

22            THE COURT:  Overruled.

23            MS. ROTHMAN:  We can take that down.

24   Q.  Now, moving forward to 2017 or late 2016/2017, was there a

25   time when Mr. Doud became less involved in RDC's business?

1   A.  Yes.  I mean towards the end of 2016/beginning January

2   2017, he was less involved.

3   Q.  And did there come a time when you stopped being involved

4   in compliance?

5   A.  Yes, I wasn't running compliance in April, I say, of 2017,

6   end of March.

7   Q.  Now, I want to go back to your cooperation agreement and

8   your guilty plea, Mr. Pietruszewski.

9   A.  Okay.

10  Q.  When did you plead guilty?

11  A.  April 2019.

12  Q.  Why did you plead guilty?

13  A.  Because I committed the crimes.

14  Q.  Have you been sentenced yet for your crimes?

15  A.  Yes.

16  Q.  Have you been sentenced yet for your crimes?

17  A.  Oh, no, I haven't been sentenced.  I'm sorry.

18  Q.  Do you know what sentence you'll get?

19  A.  No, I do not.

20  Q.  What is the most possible jail time you could get as a

21  result of your crimes?

22  A.  I could actually get life in prison.

23  Q.  Is there a mandatory minimum sentence that applies in your

24  case?

25  A.  Yes, ten years.

M1OVDOU4                           Pietruszewski - Direct

1   Q.  What are you required to do under the terms of your

2   cooperation agreement with the government?

3   A.  That I have to work with the government, anything

4   pertaining to RDC, and tell the truth and be honest.

5   Q.  Are you required to testify?

6   A.  Yes.

7   Q.  If you do those things, what has the government promised

8   you?

9   A.  That they would write a letter.

10  Q.  What information goes into that letter?

11  A.  Just that I cooperated with the government in a case

12  against RDC.

13  Q.  Who gets that letter?

14  A.  The judge that will be doing my sentencing.

15  Q.  What does that letter allow the judge who's going to

16  sentence you, allow that judge to do?

17  A.  He's able to pick whichever sentence he feels is

18  appropriate.

19  Q.  Can he go below the mandatory minimum sentence?

20  A.  He can, yes.

21  Q.  Is the judge required to do that?

22  A.  No, he is not.

23  Q.  Has anyone promised you a particular sentence or range of

24  sentence in your case?

25  A.  No, they have not.

1   Q.  What sentence do you want to get?

2   A.  I'd like to have no time at all.

3   Q.  What happens if you don't tell the truth today?

4   A.  My agreement is torn up.

5   Q.  And if your agreement is torn up, do you get that letter

6   from the government?

7   A.  No, I do not.

8   Q.  If your agreement is torn up, what is the minimum amount of

9   time you can expect to spend in jail?

10  A.  It could be ten years.

11  Q.  Does the jury verdict in this case have any effect on

12  whether you receive that letter from the government?

13  A.  No, it does not.

14  Q.  What is the only thing that matters with respect to your

15  testimony here today?

16  A.  That I tell the truth.

17          MS. ROTHMAN:  No further questions, your Honor.

18          THE COURT:  Cross-examination.

19          MR. GOTTLIEB:  Thank you, Judge.

20  CROSS-EXAMINATION

21  BY MR. GOTTLIEB:

22  Q.  Mr. Pietruszewski, good afternoon.

23  A.  Hi.

24  Q.  Mr. Pietruszewski, is it fair to say that during the entire

25  time that you worked at RDC, you wanted to do the best job that

1    you could do?

2    A.  Yes.

3    Q.  Is it fair to say that while you were working at RDC,

4    during the entire time that you told this jury about, can we

5    agree that you certainly didn't want to commit any crimes,

6    right?

7    A.  I did not want to commit any crimes, but I did.

8    Q.  Can we agree that you failed to abide by the policies of

9    RDC; correct?

10   A.  Yes.

11   Q.  You didn't file suspicious order reports; correct?

12   A.  Correct.

13   Q.  There were other aspects of the policy that you did not

14   adhere to; correct?

15   A.  Correct.

16   Q.  And I believe you told the jury the reason you did that is

17   Larry Doud didn't want you to file the suspicious order

18   reports; correct?

19   A.  Correct.

20   Q.  And that was the reason why you did or didn't do what you

21   told the jury about, right?

22   A.  Yes.

23   Q.  There was no other reason why you didn't abide by the

24   written policies; correct?

25   A.  That's correct.

1    Q.   You didn't fail to file suspicious reports because you

2    wanted or intended to have narcotics diverted by pharmacies;

3    correct?

4    A.   I didn't want them to be, but they were diverted because we

5    let them go, yes.

6    Q.   We're going to get to that, sir.

7    A.   Okay.

8    Q.   I'm just asking you what you intended and what you wanted

9    to do.

10   A.   Okay.

11   Q.   You didn't intend -- William Pietruszewski did not intend

12   to divert narcotics; correct?

13   A.   Yes.

14   Q.   You, you, never intended to have those pharmacies that were

15   ordering oxycodone, Fentanyl, Subsys, you didn't want them or

16   intend to have them divert those medications; correct?

17   A.   Yes.

18                (Continued on next page)

19

20

21

22

23

24

25

1  Q.  You never told Joe Brennan, Jessica Pompeo, that you

2  intended to have these medications put out into the marketplace

3  for non-medical reasons, correct?

4       You never said that to them, did you?

5  A.  No, I did not.

6  Q.  You certainly never said that to Mr. Doud, that you

7  intended to have these medications sent out into the

8  marketplace for non-medical reasons, correct?

9  A.  We ignored red flags, and that's what caused that to get

10  out.  We ignored that there was cash that was being -- for

11  pills, there were large amounts of doctors not in the right

12  practice.  We, we shouldn't have, we should have reported

13  pharmacies to the DEA.

14  Q.  Sir, but for the charges in this case that this jury is

15  going to be asked to consider, is it fair to say that what

16  you're sharing with them is that there were red flags that came

17  to your attention, correct?

18  A.  Yes.

19  Q.  And those red flags, are you saying that no red flags were

20  ever investigated?

21  A.  No, some red flags were investigated.

22  Q.  Is it fair to say that you're telling the jury what really

23  was wrong here that you did --

24  A.  Yes.

25  Q.  -- was that there was an insufficient investigation of red

1  flags, correct?

2  A.  Yes, since we didn't have enough help.

3  Q.  Right.  The real problem was there was insufficient

4  staffing, you told the jury that, in compliance, correct?

5  A.  Yes.

6  Q.  There was a compliance program.  You are not suggesting

7  that there was no compliance program, right?

8  A.  There was, yes.

9  Q.  And over the years, you would agree that there were many

10 red flags investigated concerning many pharmacies, correct?

11 A.  There were probably more that weren't investigated.

12        MR. GOTTLIEB:  Your Honor, may we have the witness

13 please just answer the question.

14        THE COURT:  You can repeat the question.

15 Q.  Is it fair to say that there were many red flags pertaining

16 to many pharmacies that RDC investigated while you were the

17 head of compliance?

18 A.  Yes.

19 Q.  And one of the key problems, going back to what you

20 mentioned just a moment ago, was that the compliance department

21 you believed was understaffed, correct?

22 A.  Yes.

23 Q.  You didn't have the personnel to investigate everything,

24 correct?

25 A.  That's correct.

1   Q.  And these red flags that you picked up, can we agreed that

2   the red flags were a sign that there may have been diversion

3   going on, correct?

4   A.  Yes.

5   Q.  You didn't know for a fact that there was diversion,

6   correct?

7   A.  If there were doctors that were not in the right field of

8   medicine --

9   Q.  Can you please just answer the question.

10          Did you know for a fact that there was in fact

11  diversion going on?

12  A.  No.

13  Q.  And while you discussed and you told the jury while you

14  discussed red flags with Mr. Doud, you would agree that

15  Mr. Doud never said to you, no, I want to divert these opioids

16  for non-medical reasons, correct?

17          MS. ROTHMAN:  Objection, hearsay.

18          THE COURT:  Overruled.  You can answer.

19  Q.  He never said that to you, did he?

20  A.  No.

21  Q.  Is it fair to say with Joe Brennan, who you said was also

22  part of management, he never said to you that he wanted

23  oxycodone, fentanyl, he never said he wanted those medications

24  diverted for non-medical reasons, correct?

25  A.  Correct.

1  Q.  Without going through everybody, will your answers be the

2  same regarding Jessica Pompeo?

3  A.  Yes.

4  Q.  And Richie Cullen?

5  A.  Yes.

6  Q.  And Amy Skibickyi?

7  A.  Yes.

8  Q.  Now, since you learned of the investigation, I take it that

9  you have met with the prosecutors many times, correct?

10  A.  Yes.

11  Q.  And in all of your conversations and in all of your

12  meetings, did you tell them the same thing you told this jury;

13  specifically, that you never intended to divert controlled

14  substances for non-medical reasons?

15          MS. ROTHMAN:  Objection.

16          THE COURT:  Sustained as to the compound nature of the

17  question.

18  Q.  Is it fair to say that you never mentioned, told the

19  government prosecutors --

20          MS. ROTHMAN:  Objection, vague.

21          MR. GOTTLIEB:  I didn't complete the question.

22          THE COURT:  Let's shorten the question.

23  Q.  You never told the prosecutors that you intended to divert

24  the medications for non-medical reasons, correct?

25          MS. ROTHMAN:  Objection.

1    THE COURT:  Overruled.  You can answer.

2    A.  Could you repeat that?

3    Q.  You never told the prosecutors during your meetings, your

4    many conversations, that you ever intended to divert these

5    medications for non-medical reasons, correct?

6    A.  Right.

7    Q.  And when you shared with the jury that what you did, even

8    in not complying with the written policies, was because that's

9    what Larry Doud wanted, is it fair to say that there was a

10   culture at RDC to work with its customers, correct?

11   A.  Yes, there was.

12   Q.  There was a culture at RDC to -- in the face of red

13   flags -- to educate the customer about their obligations,

14   correct?

15   A.  Yes, there was.

16   Q.  There was a culture in dealing with RDC's customers not

17   only to educate them, but to see if you could change anything

18   that they were doing that was wrong, correct?

19   A.  Yes.

20   Q.  Now, when you were there, doing the best you could as the

21   head of compliance, and that started in what, 2006?

22   A.  Yes, about.

23   Q.  So, in 2006, your focus was compliance, correct?

24   A.  No, it wasn't all compliance.

25   Q.  Primarily the focus?

M1O3DOU5                         Pietruszewski - Cross

1   A.  About 15 hours a week.

2   Q.  And so Mr. Doud was the CEO of this entire business,

3   correct?

4   A.  Yes, he was.

5   Q.  And as the CEO, you understood he had a lot of issues that

6   he had to address day in and day out, correct?

7            MS. ROTHMAN:  Objection.

8            THE COURT:  Overruled.  You can answer.

9   A.  I wouldn't know that.

10  Q.  You didn't know that the CEO addressed multiple issues not

11  having anything to do with compliance?  You didn't know that?

12  A.  Maybe he did, but I had multiple issue as well.  I headed a

13  lot different departments.

14  Q.  Did Mr. Doud travel a lot as CEO?

15  A.  Yeah, he traveled, yes.

16  Q.  When for the first time did you learn that the government

17  was focusing on you, investigating you?

18           MS. ROTHMAN:  Objection.

19           THE COURT:  Overruled.  You can answer that.

20  A.  I believe it was in 2018.

21  Q.  And at the time you learned that the government was

22  focusing on you, you retained a lawyer to represent you,

23  correct?

24  A.  Yes.

25  Q.  In all the meetings and conversations with the government,

1   your lawyer was involved also, correct?

2   A.  Yes.

3   Q.  When you first learned of the investigation, you didn't

4   immediately tell the government that you're guilty of all the

5   crimes that you told this jury about, correct?  You didn't tell

6   them that immediately, did you?

7   A.  No.

8   Q.  In fact, after you learned that the government was

9   investigating you, and after you retained a lawyer, you know

10  the lawyer engaged in conversations with the government, which

11  led to the final plea agreement that the government introduced

12  before the jury, right?

13          MS. ROTHMAN:  Objection, your Honor.

14          THE COURT:  Overruled.  He can answer that question.

15  A.  I -- yes, it did.

16  Q.  Is it fair to say that during this period of time, you

17  learned what you were facing if you were in fact convicted of

18  this conspiracy to distribute narcotics.  You learned that you

19  would be facing a minimum of 10 years in prison, correct?

20  A.  That is correct.

21  Q.  And for lying, the charge, the charge of lying to the

22  government, you learned you could get additional time tacked on

23  to that, correct?

24  A.  Yes.

25  Q.  And you told the jury you ultimately found out that if you

1    add everything up, you could face life in prison, correct?

2    A.  That's correct.

3    Q.  Can we agree that facing this, this information, that was a

4    frightening situation to be in, correct?

5    A.  Yes.

6    Q.  And I believe before you spoke to the government, and met

7    with the government prosecutors, you signed a proffer

8    agreement.  Did you know that?

9    A.  Yes.

10   Q.  And if we could put up on the board Defendant's 8A for the

11   witness and the attorneys, please.

12           All righty, Mr. Pietruszewski, do you see Defendant's

13   8A?

14   A.  I do.

15   Q.  You see that?

16   A.  Yes.

17   Q.  And is that the proffer agreement that you signed and

18   entered into before you spoke to the government prosecutors

19   even the first time?

20   A.  I'm not sure.  I don't see my signature.  I mean, I know I

21   signed a proffer agreement.

22   Q.  If we go to the second page, I'm sorry.

23   A.  Okay.  Yes.

24   Q.  Okay.  And on the front it indicates that this pertained to

25   a meeting with the prosecutors on May 24, 2018, correct?

1   A.  Yes.

2   Q.  And it is signed by you and government prosecutors,

3   correct?

4   A.  That's correct.

5            MR. GOTTLIEB:  I'd ask that this agreement be received

6   in evidence.

7            THE COURT:  Any objection?

8            MS. ROTHMAN:  No objection.

9            THE COURT:  It will be admitted into evidence.

10           (Defendant's Exhibit A8 received in evidence)

11           MR. GOTTLIEB:  May we show it to the jury?

12           THE COURT:  Yes.

13  Q.  If it's on the screen, this agreement, which you signed

14  before speaking to the government for the first time, is with

15  respect -- if we can look at the first paragraph on top there.

16  Right above that.  Beginning with "with respect."

17           This is with respect to the meeting between you and

18  Mr. Hughes, your lawyer, and the United States Attorney

19  Stephanie Lake, on May 24, 2018.  Correct?

20  A.  Yes.

21  Q.  If we can go down to paragraph two.  Before we go through

22  this, you were told, and you understood that anything you said

23  to the government during this, even this first meeting, could

24  never be used against you if the government decided to charge

25  you with crimes, correct?

M1O3DOU5                         Pietruszewski - Cross

1    A.  Yes.

2    Q.  And looking at that agreement, the paragraph 2, it

3    indicates that any prosecution brought against client by this

4    office, except as provided below, the government will not offer

5    in evidence on its case in chief, or in connection with any

6    sentencing proceeding for the purpose of determining an

7    appropriate sentence, any statements made by the client at the

8    meeting except in a prosecution for false statements,

9    obstruction of justice or perjury with respect to any acts

10   committed or statements made during or after the meeting or

11   testimony given after the meeting, or if at any time following

12   the meeting, client becomes a fugitive from justice.

13           Correct?

14   A.  Yes.

15   Q.  So, with this agreement in place, you then have a number of

16   additional meetings with the prosecutors before you enter into

17   your plea deal that you testified to on direct.  Correct?

18   A.  Yes.

19   Q.  If we can just go -- I'm sorry.  I was going to go to the

20   second page of the proffer agreement.  Page 2.

21           It indicates on page 2 dates of continuation on the

22   bottom of May 25, 2018, January 29, 2019, and March 6, 2019.

23   Correct?

24   A.  Yes, it does.

25   Q.  Those meetings took place where?

M1O3DOU5                          Pietruszewski - Cross

1    A.  At the government offices.

2    Q.  And the same terms of your meetings at this early stage

3    still applied that nothing you said in effect could be used

4    against you if the government decided to charge you, correct?

5    A.  Yes.

6    Q.  So the last entry there is March 6, 2019.  Subsequent to

7    that, we can take that off the board -- thank you.

8            Subsequent to that, that's when your lawyer continued

9    to have discussions with the prosecutors to work out a plea

10   agreement, correct?

11   A.  Yes.

12   Q.  And that is Defendant's Exhibit A9.  Can we have that on

13   the board.

14           MR. GOTTLIEB:  I believe this was even marked as a

15   government exhibit.

16           THE COURT:  I don't want to confuse things.  At this

17   trial, it doesn't have a government exhibit number?

18           MR. GOTTLIEB:  No, this was the defendant's premarked

19   exhibit number, your Honor.

20           THE COURT:  All right.

21           MS. ROTHMAN:  It is in evidence already.

22           THE COURT:  I thought it was in evidence as a

23   government exhibit.  It's not marked as a government exhibit?

24           MS. ROTHMAN:  It is, your Honor.  It is in evidence.

25           THE COURT:  What number is it?

M1O3DOU5                        Pietruszewski - Cross

1            MS. ROTHMAN:  3529-12.

2            THE COURT:  Okay.

3            MR. GOTTLIEB:  Can we -- can we just use this one,

4    this is in evidence as the government exhibit as just indicated

5    on the record, your Honor.

6            THE COURT:  That's fine.  I just wanted to make the

7    record clear.

8            MR. GOTTLIEB:  Thank you.

9    Q.  Is this is the plea agreement, and you referred to the

10   second paragraph regarding Count One, just very briefly on

11   direct examination, so, just want to take a look at that.  Can

12   we have that highlighted.

13           Count One.  It reads:  Count One of the information

14   charges the defendant with a violation of Title 21, United

15   States Code, Sections 846, 841(b)(1)(C), and 841(b)(1)(A), in

16   connection with his participation in a narcotics distribution

17   conspiracy from in or about January 2012 until in or about

18   March 2017.

19           Continuing:  This charge carries a maximum sentence of

20   life imprisonment; a mandatory minimum sentence of 10 years'

21   imprisonment; a maximum term of supervised release of life; a

22   mandatory minimum term of supervised release of five years; a

23   maximum fine, pursuant to Title 18, United States Code, Section

24   3571 of the great of $10 million, twice the gross pecuniary

25   gain derived from the offense, or twice the gross pecuniary

1    loss to a person other than the defendant as a result of the

2    offense; and a mandatory $100 special assessment.

3             Now, Mr. Pietruszewski, in entering into this

4    agreement by then, you understood that any proposed deal with

5    the government was going to include the way out of a mandatory

6    minimum of 10 years in prison, correct?

7    A.  Yes.

8    Q.  If we can go to Count Two on the same page.  And this Count

9    Two covers the count in connection with your participation in a

10   conspiracy to defraud the United States from in or about

11   January 2012 until in or about March 2017.

12            This charge carries a maximum sentence of five years'

13   imprisonment, and then it continues with supervised release.

14   But the term of imprisonment is you were facing a maximum

15   sentence of five years in prison, correct?

16   A.  Yes.

17   Q.  And Count Three on the bottom of this document, Count Three

18   of the information charges the defendant with a violation of

19   Title 21, United States Code, in connection with your failure

20   to file suspicious order reports with the DEA.  Correct?

21   A.  Yes.

22   Q.  Now, is it fair to say you already told the jury that the

23   reason you didn't file the suspicious order reports, the only

24   reason, was because you thought that's what Mr. Doud wanted,

25   correct?

1    A.  Yes.

2    Q.  You didn't, you didn't fail to file suspicious order

3    reports with the intention of having illegal narcotics or

4    narcotics distributed for non-medical reasons, correct?  That

5    isn't why you didn't file suspicious orders, correct?

6    A.  Correct.

7    Q.  So now, you said on direct, knowing that you could spend

8    the rest of your life in prison, you learned that the way out

9    is to get -- it's called a 5K letter, correct?

10   A.  Yes.

11   Q.  If we can go to page three of this document.  And if we can

12   look at the third -- if we can highlight the third paragraph.

13        So in the same plea agreement, it reads:  It is

14   understood that the sentence to be imposed upon the defendant

15   is within the sole discretion of the Court.  Right?

16   A.  Yes.

17   Q.  And no promises or representations were made to you as to

18   what the sentence would be, correct?

19   A.  That's correct.

20   Q.  But they included in this agreement -- if I can just find

21   it -- let's put starting with in addition, if this office

22   determines.  Sort of like in the middle of the document.

23   That's right.  If we can highlight that and go down.

24        Embodied in this agreement, in addition, it reads:  In

25   addition, if this office -- that means the U.S. attorney's

M1O3DOU5                          Pietruszewski – Cross

1    office, correct?

2    A.   Yes.

3    Q.   The government, correct?

4    A.   Yes.

5    Q.   Determines that the defendant has provided substantial

6    assistance in an investigation or prosecution, and if he has

7    fully complied with the understandings specified in this

8    agreement, this office will file a motion, pursuant to Section

9    5K1.1 of the sentencing guidelines and 18 U.S.C. 3553(e),

10   requesting that the Court to sentence the defendant in light of

11   factors set forth in Section 5K1.1(a)(1)-(5).

12            Now, ending the reading of this document at this

13   point.

14            Is it fair to say that you understood, after pleading

15   guilty, after meeting with the government and prepping for your

16   testimony in front of the jury, the first thing you understood

17   that it was that 5K letter that provided the way toward a

18   sentence less than the mandatory minimum of 10 years, correct?

19   A.   Yes.

20   Q.   You understood that the only way to avoid the mandatory

21   minimum is if the government, following your testimony, agreed

22   and decided to write a 5K letter to the sentencing judge,

23   correct?

24   A.   Yes.

25   Q.   And you understood that whether or not the government

M1O3DOU5                          Pietruszewski - Cross

 1    writes a 5K letter is entirely their call to make, correct?

 2    A.  Yes.

 3    Q.  You understand that to get that precious 5K letter, the

 4    government has to agree that you really helped them, correct?

 5            MS. ROTHMAN:  Objection, your Honor.

 6            THE COURT:  Overruled.  He can answer as to his

 7    understanding.

 8    A.  Yes.

 9    Q.  What you were asked on direct, part of the deal is that you

10    have to tell the truth.

11            Based on what you know, who is the final judge as to

12    whether or not the government believes that you've told the

13    truth?  Who makes that decision?

14            MS. ROTHMAN:  Objection.

15            THE COURT:  Sustained as to the form of the question.

16    Q.  Who makes the decision as to whether or not you told the

17    truth?

18    A.  The judge, the jury.

19    Q.  In fact, you were asked on direct, and I ask you now.

20    Isn't it true that it is entirely the decision of the

21    government, the prosecutors, whether or not you have told the

22    truth?  Correct?

23    A.  Yes.

24    Q.  It's not the judge, correct?

25    A.  Correct.

1  Q.  If the government decides that you haven't provided

2  substantial assistance, you understand, you're not going to get

3  that precious 5K letter, correct?

4  A.  That's correct.

5          MR. GOTTLIEB:  Would this be an appropriate time to

6  take a short break?

7          THE COURT:  Yes.

8          Ladies and gentlemen, we'll take a 15 minute break.

9  Don't discuss the case, keep an open mind.  We'll bring you

10  back in and continue in 15 minutes.

11          (Jury excused)

12          THE COURT:  You can step down.

13          THE WITNESS:  Thank you.

14          THE COURT:  We'll take a short break.

15          MR. GOTTLIEB:  Thank you, Judge.

16          (Recess)

17          THE COURT:  The witness can retake the stand.

18  Mr. Gottlieb, how much further are you going to go with this?

19          MR. GOTTLIEB:  It will go into tomorrow morning.

20          THE COURT:  Okay.

21          MR. GOTTLIEB:  Your Honor, at 4:30, would that be an

22  appropriate time?

23          THE COURT:  4:40 or so.

24          MR. GOTTLIEB:  Okay.

25          THE COURT:  I want to use as much time as we can.

1           MR. GOTTLIEB:  Thank you.

2           THE COURT:  After this witness, who can we do

3     tomorrow?

4           MR. ROOS:  Well, your Honor, I think the plan is the

5     next witness will be the expert.  The expert teaches a class,

6     we were trying -- worse comes to worst we were trying to

7     navigate things, there is a slight possibility we would put

8     Paulsen before him so he doesn't miss his class.  It will

9     either be expert or Paulsen then expert.

10          THE COURT:  Do you think that's all we'll do tomorrow,

11    two more witnesses or one more?

12          MR. ROOS:  It depends on the length of cross, although

13    we still have I think an hour today.  So hopefully cross will

14    be close to done by tomorrow morning and then we could spend,

15    get through maybe the expert tomorrow.

16          THE COURT:  And that's it, you think we're only going

17    to do one more additional witness?

18          MR. ROOS:  I don't know the length of the cross.  I'm

19    positive if we wrap up midmorning with this witness that we

20    could finish, certainly the direct, no problem with the expert.

21    And I imagine have time for cross also.

22          THE COURT:  Okay.  How many more do you have after

23    that?

24          MR. ROOS:  So, there's four people, besides the expert

25    and this witness, and we are still sort of figuring out what's

1    going to happen there.  But we'll figure that out so we can

2    give a better report to your Honor tomorrow.

3             THE COURT:  I'd like to see us get through two

4    witnesses tomorrow additional if we could.  But you know better

5    than I what the length of your witnesses might be.

6             MR. ROOS:  If we can finish this witness, I would say

7    sort of at the start of the day, then I think there is a real

8    shot we would get two in, the two I mentioned in tomorrow.

9             THE COURT:  Okay.

10            MR. ROOS:  On and off, and that would put us in a

11   great position.

12            THE COURT:  Do you think you might rest as early as

13   Wednesday or Thursday?

14            MR. ROOS:  So, let's say hypothetically we got through

15   both those witnesses tomorrow, everyone else that's left I

16   think could be accomplished in a single day.  They're very

17   short witnesses.  Some of them are, you know, as short as say

18   Castro, so, it's something I think if we got through those

19   tomorrow, then Wednesday we could be done potentially.

20            THE COURT:  All right.  Let's see where we are

21   tomorrow.  If we do finish on the government's witnesses on

22   Wednesday, I'd like to proceed with defense witnesses on

23   Thursday.  And I'm trying to figure out whether or not we

24   should do Friday or skip Friday and do Monday.  But it will

25   depend on where we are and what else we need to get

M1O3DOU5                          Pietruszewski - Cross

1    accomplished.  Because I'd like to get, if we could have

2    summations and charge Tuesday or Wednesday of next week, I

3    think that would be best.  Because again, remember, we have the

4    Friday that we'll either be excusing that one juror or we'll be

5    taking next Friday off.

6                   Jury entering.

7                   (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2        MR. GOTTLIEB:  May I, your Honor?

3        THE COURT:  Yes, Mr. Gottlieb.

4        MR. GOTTLIEB:   Thank you.

5    BY MR. GOTTLIEB:

6    Q.  Sir, everything we've been talking about up until now, both

7    on direct and cross, as far as what was done at RDC, can we

8    agree that you, you wanted to be a good employee, correct?

9    A.  Yes.

10   Q.  You respected the position that Mr. Doud had as the CEO,

11   correct?

12   A.  Yes.

13   Q.  You knew that he was, in the vernacular, he was the boss,

14   he was the big cheese, correct?

15   A.  Yes.

16   Q.  And consistent with the culture at RDC, while you were

17   there, you understood and worked to build up the business,

18   correct?

19   A.  RDC built the business, yes.

20   Q.  And there was a real interest in building up the business,

21   correct?

22   A.  That's true.

23   Q.  And building up the business meant bringing in new

24   customers and keeping them, correct?

25   A.  Yes.

1    Q.  Is it fair to say that you understood that consistent with

2    that culture, that Larry Doud didn't want to lose customers,

3    correct?

4    A.  That's true.

5    Q.  And you understood that, consistent with the culture, you

6    felt there were many things that you were asked about that you

7    didn't do, because Mr. Doud -- you thought -- didn't want you

8    to do them, correct?

9              MS. ROTHMAN:  Objection to form.

10             THE COURT:  Overruled.  You can answer if you

11   understand the question.

12   A.  Can you repeat that?

13   Q.  Sure.  You testified on direct about not filing the

14   suspicious orders.  You recall all of that, correct?

15   A.  Yes.

16   Q.  And you understood that Mr. Doud, as you told the jury,

17   didn't want suspicious order reports filed, correct?

18   A.  Correct.

19   Q.  He didn't want to lose the customers, correct?

20   A.  Correct.

21   Q.  He wanted to work with the customers, correct?

22   A.  Yes.

23   Q.  And the reason why, you explained to the jury, the reason

24   why you didn't file the suspicious orders was for that reason,

25   that Mr. Doud, for the reasons you've expressed, he didn't want

1  you to file them, correct?

2  A.  Yes.

3  Q.  Had nothing to do with intending to divert narcotics for

4  illegal purposes, correct?

5  A.  I mean, no.

6  Q.  And the not filing of the suspicious orders, you didn't

7  have the reason, you didn't have the intention in not filing it

8  because you wanted to defraud the United States of America,

9  right?

10  A.  I did not want to, no.

11  Q.  And again, Larry Doud's -- your understanding, that you

12  were asked about on direct, Larry, your understanding of

13  Mr. Doud's thinking in not wanting to file the suspicious

14  orders, also was because he wanted to keep the customers, not

15  to defraud the United States of America, correct?

16  A.  Yes.

17  Q.  When you met with the prosecutors, did you tell them

18  exactly what you told the jury now about your understanding of

19  Mr. Doud's intentions with regard to the suspicious orders?

20  Did you tell them that?

21           MS. ROTHMAN:  Objection.

22           THE COURT:  Overruled.  You can answer.

23  A.  Yes.

24  Q.  So during your meetings with the government, you told

25  them -- correct me if I'm wrong -- you told them that you

1   understood that Mr. Doud didn't intend to defraud the

2   government, he just wanted to keep the business, correct?

3   A.  We were defrauding the government, but we wanted to keep

4   the business.

5   Q.  But that was the purpose, correct?

6           MS. ROTHMAN:  Objection, vague.

7           THE COURT:  Overruled.  You can answer.

8   A.  Yes.

9   Q.  Now, you were asked about red flags?

10  A.  Yes.

11  Q.  Was it your understanding while you were working there that

12  as soon as you gained notice of a red flag, with regard to an

13  order, that you were required to immediately contact the DEA?

14  A.  We were supposed to investigate it.

15  Q.  So is it fair to say that even back then, you understood

16  the CFR that you mentioned on direct --

17  A.  I understood it --

18  Q.  I didn't complete the question.

19  A.  I'm sorry.

20  Q.  You don't have to apologize.

21          You understood the CFR required you to investigate a

22  red flag, correct?

23  A.  I learned that from Carlos Aquino instructing us that.

24          MR. GOTTLIEB:  If we can have the CFR, I believe it is

25  Defense 9 on the display.  It is in evidence.

1    Q.  When you made mention of the CFR, 21 CFR 1301.71 in

2    paragraph (b) if we can highlight that.

3              MS. ROTHMAN:  Objection.  Misstates the testimony.

4              MR. GOTTLIEB:  I didn't hear.

5              MS. ROTHMAN:  This didn't refer to this section of the

6    CFR.

7              THE COURT:  She said you said he referred to this

8    section and she says he did not refer.

9    BY MR. GOTTLIEB:

10   Q.  Are you aware of 21 CFR 1301.71?

11   A.  Now, this, yes, I know now.

12   Q.  When did you become aware of this section?

13   A.  It was Carlos pointed that out to us in like 2013.

14   Q.  This section that was highlighted was compliance with

15   regard to security.

16             MS. ROTHMAN:  Objection, relevance.

17             THE COURT:  What's your question, Mr. Gottlieb?

18             MR. GOTTLIEB:  Thank you.

19   Q.  With regard to this section, your understanding is this

20   sets forth the requirements with regard to security

21   requirements at RDC and other registrants, correct?

22             MS. ROTHMAN:  Objection.  Relevance.

23             THE COURT:  Overruled.  You can answer.

24   A.  I -- I never actually seen this per se about the physical

25   security of controls and operating procedures.

1   Q.  So as of right now, this is the first time you've seen this

2   particular section, just yes or no, and then we'll move on.

3   A.  I didn't remember -- I mean, we didn't work with bulk

4   chemicals or anything of that.

5   Q.  Can we go to Defense L10.  And this section, this is CFR

6   1301.74.  You were aware of this section while you were working

7   there, correct?

8   A.  Yes, this corresponds to the letter that we received in

9   2008.

10  Q.  If we can look at (b) of this section.  This is L10.

11           It reads:  The registrant shall design and operate a

12  system to disclose to the registrant suspicious orders of

13  controlled substances.  The registrant shall inform the field

14  division office of the administration in his area of suspicious

15  orders when discovered by the registrant.  Suspicious orders

16  include orders of unusual size, orders deviating substantially

17  from a normal pattern, and orders of unusual frequency.

18           Do you see that section?

19  A.  Yes.

20  Q.  Is it fair to say that, based on what you understood to be

21  the requirements, that the law does not define any further what

22  an unusual size is with regard to suspicious orders, to your

23  knowledge?

24           MS. ROTHMAN:  Objection.

25           THE COURT:  Overruled, you can answer.

1  A.  No.  This, we didn't base it off of this.  We, again, used

2  our SOM that we developed.

3  Q.  But I'm asking you specifically -- I understand.  So any

4  decisions you made, any analysis was just based on an internal

5  RDC guideline; is that fair to say?

6  A.  I mean, I don't think we used this as a guideline.

7  Q.  Are you aware of any regulation, any law that further

8  defined orders of unusual size, if you know?

9          MS. ROTHMAN:  Objection, your Honor.

10          THE COURT:  Overruled.  You can answer.

11  A.  I mean, we knew if somebody ordered large amounts, you

12  know, if it was maybe three times over the amount or something

13  of that nature.

14  Q.  Okay.  Are you aware of any law, regulation that further

15  defined orders deviating substantially from a normal pattern,

16  beyond what's in this regulation?

17          MS. ROTHMAN:  Objection, your Honor.

18          THE COURT:  Overruled.  You can answer.

19  A.  I'm not sure.

20  Q.  Okay.  And finally, for this section describing suspicious

21  orders, the term that's used there "and orders of unusual

22  frequency."

23          Are you aware of any regulation, any law that further

24  defines even what that means?

25          MS. ROTHMAN:  Objection.

1    THE COURT:  Overruled.  You can redirect.

2    A.  Is that in the second paragraph as well in (b)?

3    Q.  Yes.  Right at the end, I'm sorry.  Thank you.  That last

4    sentence.  Suspicious orders include orders of unusual size,

5    orders deviating substantially from a normal pattern, and

6    orders of unusual frequency.

7         My question is, are you aware of any other regulation,

8    any other law that further defines that term "orders of unusual

9    frequency"?

10   A.  I'm not sure.

11   Q.  You understood that due diligence under the law was a plan

12   that each registrant, each company, had to develop on its own,

13   correct?

14   A.  Yes.

15   Q.  You understood that, when developing the due diligence

16   plan, the DEA would not provide any further guidance about what

17   a good diligence plan would be, correct?

18   A.  I mean, they didn't, no.

19   Q.  The DEA would not tell you, you understood at the time,

20   they would not evaluate and decide if an order that you

21   received even warranted filing a suspicious order, correct?

22   A.  Correct.

23        (Continued on next page)

24

25

BY MR. GOTTLIEB:

Q.  Did you know, in fact, that the DEA didn't even want

registrants to notify it whenever there was a red flag?

A.  I did not know that.

Q.  Now, am I correct that you said that you worked on

developing the compliance program?

A.  I mean, yes, I wrote down myself, Ed Kirker, and IT staff.

Q.  And you spent quite a bit of time putting together the

compliance program that you worked on; correct?

A.  Yes.

        MR. GOTTLIEB:  Now, if we can look at A10 please.

This is just for the witness, your Honor, and attorneys.

Q.  Is it fair to say that there was an interview of you in

August of 2014 by the DEA?

A.  There was, yes.

Q.  Now, with regard to that --

        MR. GOTTLIEB:  Actually, we can take this off right

now.

Q.  Is it fair to say that whenever you met with the DEA,

whenever you spoke with the DEA, beginning in 2013, you

cooperated with them; correct?

A.  Yes, I did.

Q.  You answered your questions to the best of your ability;

correct?

A.  Yes.

1    Q.  And as head of compliance, would you agree that you were in

2    routine contact with the DEA in Buffalo?

3    A.  Not in a routine.  I mean, I spoke to them or I emailed

4    them, but I -- I don't know what that -- what constant -- what

5    that means.

6    Q.  Would it refresh your recollection looking at a DEA report

7    regarding your meeting with the DEA in August of 2014?

8              MS. ROTHMAN:  Objection.  The witness didn't say he --

9              THE COURT:  Sustained as to that question.

10             If you think he doesn't remember something, you want

11   to refresh his recollection, go right ahead.

12             MR. GOTTLIEB:  Thank you.

13             If you could just put up A10.

14   Q.  And if I could just refer you to page 2, right to the top.

15   A.  Okay.

16   Q.  And don't read out loud, just read it to yourself please.

17             Do you recall telling the DEA in August of 2014 that

18   you are in routine contact with the DEA Buffalo office?

19   A.  I don't remember saying it, but I don't know if -- again,

20   routine, is it once a year, once a month?

21   Q.  Nobody told you -- Larry Doud never told you not to be in

22   routine contract or contact with the DEA office; correct?

23             MS. ROTHMAN:  Objection.

24             THE COURT:  No.  Overruled.  You can answer.

25             THE WITNESS:  Oh, I can?

1    A.  No, he didn't.

2    Q.  And when issues came up about ARCOS, you cooperated with

3    the DEA in answering their questions; correct?

4    A.  Yes.

5    Q.  You met with DEA investigators many times; correct?

6    A.  I met with them, yes.

7    Q.  Actually, you know, as part of your duties, do you recall

8    seeking an in-depth briefing with the DEA to clarify the

9    company's suspicious orders responsibilities?  Do you recall

10   that?

11   A.  We never -- never went to the briefing.

12   Q.  Yes.  Do you recall that you tried in 2013 to meet with the

13   DEA on behalf of RDC to clarify the company's suspicious order

14   requirements?  You tried, right?

15   A.  Yes.

16   Q.  And do you recall that when you tried to do that in June of

17   2013, the DEA scheduled a date to meet; correct?

18   A.  Okay.  I mean, I don't remember the date, but okay.

19   Q.  But you remember a date was scheduled; correct?

20   A.  Yes.

21   Q.  And the meeting was then canceled; correct?

22   A.  It was, yes.

23   Q.  And it was canceled by Lenny Levin, the coordinator for the

24   DEA Office of Diversion Control; correct?

25   A.  Yes.

1   Q.  And you then, on behalf of RDC, tried to set up another

2   meeting to clarify suspicious order responsibilities; correct?

3   A.  Someone else from the office contacted me, someone that

4   took over for Lenny Levin, I don't remember their name.

5   Q.  And you then tried to schedule certain dates to meet with

6   the DEA to obtain this clarification; correct?

7   A.  Yes.

8   Q.  The DEA, do you recall, got back to you and said the dates

9   you offered, they would not work.  Do you recall that?

10  A.  I don't remember if that's what it was, but we didn't -- we

11  didn't end up meeting.

12  Q.  And you didn't end up meeting because the DEA never offered

13  another date after you had reached out to the DEA for guidance;

14  correct?

15  A.  I believe the person that was doing it got injured or

16  something, and that's why they had to cancel.

17  Q.  Now, let's discuss the actual compliance program and what

18  RDC did.

19          You indicated, I believe, at the beginning of the

20  cross-examination that you're not suggesting to the jury that

21  there was no compliance program; correct?

22  A.  Correct.

23          MR. GOTTLIEB:  If we could have A24 displayed for the

24  witness and attorneys and the Court.

25  Q.  Do you see that up there?

1    A.   Yes.

2    Q.   And these are the thread of emails between you and Larry

3    Doud; correct?

4    A.   Yes.

5              MR. GOTTLIEB:   Your Honor, I would ask that this be

6    received in evidence, please.

7              MS. ROTHMAN:   It's already in evidence.

8              THE COURT:   Okay.

9              MR. GOTTLIEB:   As A24?

10             MS. ROTHMAN:   No, it's a government exhibit.

11             MR. GOTTLIEB:   Okay.   What government exhibit is it,

12   please?

13             MS. ROTHMAN:   It's GX-17.

14             MR. GOTTLIEB:   17?   Government Exhibit 17.

15             And this is -- if it can be displayed for the jury

16   once again, your Honor.

17             THE COURT:   Yes.

18   Q.   And this on the bottom has an email from you, May 3, 2013,

19   to Larry Doud, which you say:   If I were to go and they tell me

20   that we must do a due diligence on 100 stores or we have to

21   stop selling to even one store, I would always consult with you

22   first.   Correct?

23   A.   Yes, that's correct.

24   Q.   And again, what you're doing here is being a responsible

25   employee speaking with your CEO; correct?

1   A.  Yes.

2   Q.  And Larry Doud's response right above is:  You are a good

3   man, Bill.

4           You didn't take offense to that, did you?

5   A.  I -- no.  I mean, I didn't take offense to it.  I was --

6   doing what I was told to do.

7   Q.  And if we go above that, please, on top of A24, Government

8   Exhibit 17, you simply say:  Thank you.  Correct?

9   A.  Yes.

10          MR. GOTTLIEB:  A25, please.

11  Q.  Do you recognize A25?

12          MR. GOTTLIEB:  These are an email thread, your Honor,

13  between Mr. Pietruszewski and Larry Doud in February of 2014.

14          I ask that be received in evidence.

15          MS. ROTHMAN:  No objection.

16          THE COURT:  It will be admitted into evidence.

17          (Defendant's Exhibit A25 received in evidence)

18          MR. GOTTLIEB:  And if we can display that to the jury,

19  please.

20  Q.  All right.  Sir, the first email on this dated February

21  18th, 2014, at 9:14 p.m., on the bottom, it's an email from you

22  to Selig, please.  Who is Selig?

23  A.  I'm not sure.

24  Q.  Was he an employee?  Was he a business -- a customer?

25  A.  I -- I don't remember, to be honest with you.

M1OVDOU6                        Pietruszewski - Cross

1    Q.  Now, is it fair to say, before we look at it, that during

2    this period of time, you had gained knowledge about compliance

3    issues; correct?

4    A.  That was during -- yes.

5    Q.  And if we look at this email then, it reads:  Selig, hello.

6           MR. GOTTLIEB:  If we can highlight that first

7    paragraph.  Thank you.

8    Q.  Hello.  I apologize for just getting to this email.  I am

9    just coming back tomorrow from a short vacation.  The DEA has

10   not placed new protocols to wholesalers, but are enforcing the

11   CFR guidelines more diligently.  I the CFR handbook stated back

12   in the late '70s that it is the wholesaler's responsible to

13   monitor report suspicious sales of controlled substances,

14   though the DEA has not started enforcing this with all

15   wholesalers until 2011 letter that they sent to us that we need

16   to know our customer's customer.  This, as I mention, was

17   always the wholesaler responsibility.

18          But then you continue to provide this information.

19          MR. GOTTLIEB:  If we could highlight that and pop it

20   up there.  Bigger?  Okay.

21   Q.  Back in November, I went to a seminar that the DEA held in

22   Virginia for wholesaler/distributors informing us that we need

23   to do more than just report ARCOS information.  We need to find

24   out why a pharmacy orders more controlled substance out of

25   their normal realm or if a pharmacy orders certain combinations

M1OVDOU6                       Pietruszewski - Cross

1    of controlled substances.

2            For example, a pharmacy may normally order 3,000 units

3    of oxycodone 30 milligrams from a wholesaler a month, but this

4    pharmacy were to order 5,000 or 6,000 the following month, we

5    must know why an increase.  Simple answer may be that the

6    pharmacy is now a primary with RDC now verse another

7    wholesaler, but we need documentation from the pharmacy to

8    support this increase.

9            We would require utilization of all strengths of

10   oxycodone from this pharmacy for the last three months so we

11   may analyze the information.  We would look at the doctors that

12   are writing for these scripts to see if their DEA is valid on

13   the DEA website, then determine the prescribers' medical

14   education, field of medicine, and board certification.  This

15   can be done in New York through the website.

16           And then you provide the website that can be checked.

17   Correct?

18   A.  Yes.

19           MR. GOTTLIEB:  If we go up to the response.

20   Q.  Larry Doud response to you and to this email:  Bill, you

21   make us look awfully good.  Where else could they go and get

22   this type of information.  Thanks.  Maybe Anda.

23           What's Anda, A-N-D-A?

24   A.  It's a -- it was a wholesaler distributor -- distributor

25   just for pharmaceuticals.

1  Q.  Now, is it fair to say that in this email, Larry Doud is

2  saying good job; a pat on the back for providing this

3  individual with the information that's in that email.  Correct?

4        MS. ROTHMAN:  Objection.

5        THE COURT:  Overruled.  You can answer.

6  A.  Yes.

7  Q.  And Larry Doud here and elsewhere, he didn't attack you or

8  yell at you or get angry with you any time you provided

9  information about due diligence; correct?

10  A.  No, he -- he did.

11  Q.  There were times that he would give you a pat on the back,

12  right?

13  A.  And there was times he didn't give me a pat on the back.

14  Q.  And at the times when you say he wouldn't give you a pat on

15  the back, did you ask Larry Doud what information, if any,

16  caused him to not give you a pat on the back?  Did you ask him

17  that question?

18  A.  He would either tell me or he would tell me that we would

19  discuss it at a later time, which we -- we would at times.

20  Q.  And looking at the email right on top, you write to Larry

21  Doud:  Larry, if you want, Carlos would call Selig and give him

22  more information.  I mentioned it to Carlos and he would speak

23  with him free of charge.  Let me know.  Thank you.

24        Do you recall that?

25  A.  I mean, I would have said that.  I mean, if Carlos

M1OVDOU6                    Pietruszewski - Cross

1    mentioned it, yes.

2    Q.  Larry Doud didn't respond and tell you, No, no, don't have

3    Carlos have any contact with this customer; correct?

4    A.  If it is a customer.  Again, I'm not sure who that person

5    is, but --

6              MR. GOTTLIEB:  If we could have A11, please, shown to

7    the witness, please.

8    Q.  Now, this is a thread email involving you and various other

9    members of RDC; correct?

10   A.  Yes.

11             MR. GOTTLIEB:  And if we can go to the bottom of it.

12   Q.  And this is from Kevin Taraszewski.  And who is Kevin

13   Taraszewski, please?

14   A.  He's a salesman with RDC or was a salesman with RDC.

15             MR. GOTTLIEB:  Your Honor, I ask that A11 be received

16   in evidence.

17             MS. ROTHMAN:  Objection to relevance, your Honor.

18             MR. GOTTLIEB:  This all goes to the follow-up and

19   compliance issues that are -- are what this trial is all about.

20             THE COURT:  Why don't you lay a further foundation as

21   to its relevance.

22             MR. GOTTLIEB:  The subject matter in the first thread

23   from Kevin Taraszewski to you, Larry Doud, Jessica Pompeo, Joe

24   Brennan, Julius Morton, Lanny Doud.  The subject is compliance

25   auditor visit and documentation.

1     Your Honor, I ask that this be received in evidence.

2     THE COURT:  I'll accept it.

3     MR. GOTTLIEB:  Thank you.

4     (Defendant's Exhibit A11 received in evidence)

5     MR. GOTTLIEB:  If we can display that to the jury.

6  Let's go to page 2, which is the beginning of the thread.

7  Q.  The beginning of this thread is Kevin Taraszewski,

8  September 2, 2014.  Subject:  Compliance auditor visit and

9  documentation.  And it reads:  Steve, as we spoke of last

10  Wednesday -- and can I ask you at this point -- it's to

11  steven.simon@verizon.net.  Do you know who he is?

12  A.  No, I don't.

13  Q.  Steve, as we spoke of last Wednesday --

14     MR. GOTTLIEB:  Reading from the document, your Honor.

15  Q.  -- our compliance auditor will be coming into Pittsburgh on

16  Friday, September 5 to speak with you regarding the situation

17  with Suboxone and Subutex.  When I have a more precise time of

18  arrival, I will let you know.

19     There are a few things we need for documentation by

20  Wednesday if you have them:

21     One, documentation that you are a West Virginia

22  out-of-state provider for medicaid.

23     Two, West Virginia state pharmacy license, if you have

24  one.

25     Three, any written correspondence between the DEA and

1    Stanton Negley giving permission to fill Suboxone/Subutex to

2    out-of-state patients.  You can either scan and email to me or

3    fax documentation to RDC compliance at the phone number.

4             It's signed:  Thanks for your cooperation.  Kevin.

5             MR. GOTTLIEB:  Can we go to the thread right above

6    that.

7    Q.  Right above that is from Kevin Taraszewski again to you, to

8    Larry Doud, Julius Morton, Lanny Doud, Jessica Pompeo, Joe

9    Brennan, saying:  Sent this to Steve this morning.  Received a

10   call from him about three or so today, and he said that we're

11   both trying to protect ourselves from lawsuits, but what we are

12   doing is so far beyond reason that it's illegal.

13            If I could stop right here.

14            Do you recall that learning and seeing these emails,

15   that somebody was accusing RDC of doing more with regard to

16   compliance than what was necessary?

17            MS. ROTHMAN:  Objection.  Hearsay.  Vague.

18   Irrelevant.

19            THE COURT:  No, overruled.

20            You can answer the question.

21   A.  Can you just repeat that?

22   Q.  Do you recall receiving this email and learning that there

23   was a customer out there, potential customer, who was attacking

24   RDC for demanding too much information; and that it was beyond

25   reason that it was illegal?  Do you recall learning that?

1   A.  I don't remember this particular email, but I remember the

2   account.

3   Q.  Then continuing, perhaps this will refresh as we go along:

4   It continues:  This plan of action is to go to the United

5   States District Attorney's Office and get guidance from them on

6   what they can and can't do, and that's what he's going to go

7   by.  The U.S. District Attorney for the Western Division of

8   Pennsylvania is David Hickton.  Steve stated they had dealings

9   with him before in other matters.  Steve's concern is that if

10  he does not fill these scripts for cash, he could possibly be

11  sued for discrimination because he could be construed as

12  stereotyping these people who have no insurance and/or must pay

13  by cash.  That's why he thinks what we are doing is illegal.

14          MR. GOTTLIEB:  Can we go to the thread -- the email

15  right above that.

16  Q.  And this is a response from Lanny Doud.  And Lanny Doud is

17  Larry Doud's son; correct?

18  A.  Yes.

19  Q.  Saying to the same group:  Did he speak to you nicely?  It

20  sounds like he semi understands our position.  And if the DA

21  would be kind enough to put his approval and we have the DEA's

22  approval both on letterhead, I would think we may be good to

23  go?  Signed, Lanny Doud.

24          Does this begin to refresh your recollection of this

25  particular thread and emails?

1    A.  I remember the accounts and what we went through with it.

2    I don't remember the specific email.

3              MR. GOTTLIEB:  Thank you.

4              We can take that off the board.

5              If we can just put up Defense Exhibit A12.  This isn't

6    in evidence.  And this is for the witness, your Honor, and

7    counsel, and the Court.  A12.

8    Q.  Do you recognize what this is?

9    A.  Yes.

10   Q.  What is it?

11   A.  It's a account survey that Al and Joe and others developed

12   from other wholesalers.

13   Q.  And when was this developed?  If you know when.

14   A.  It was around 2007, I believe.

15   Q.  And while you were the head of compliance, was this

16   particular form account survey in existence?

17   A.  Yes.

18   Q.  And was it used?

19   A.  It was used, yes.

20             MR. GOTTLIEB:  Your Honor, I ask that it be received

21   in evidence please.

22             MS. ROTHMAN:  No objection.

23             THE COURT:  It will be admitted into evidence.

24             (Defendant's Exhibit A12 received in evidence)

25             MR. GOTTLIEB:  And, your Honor, if we could just

1  display that to the jury.

2           THE COURT:  Yes.

3           MR. GOTTLIEB:  Thank you.

4  Q.  And this is the account survey that was sent to new

5  customers; correct?

6  A.  It was sent to the customers, yes.

7           MR. GOTTLIEB:  Your Honor, thank you very much.

8           Would this be an appropriate time then to break?

9  Because this is a break.

10          THE COURT:  All right.  Ladies and gentlemen, we'll

11 take the afternoon adjournment.

12          So don't discuss the case.  Keep an open mind.

13          I'm going to ask you to be in the jury room before

14 9:45; although I do have another matter quickly to handle

15 before I bring you out.  So if I'm delayed a few minutes,

16 that's why.

17          So don't discuss the case.  Keep an open mind.  I'll

18 see if we can start as early as we possibly can tomorrow

19 morning.  I'll see you then.

20          (Jury not present)

21          THE COURT:  You can step down, sir.

22          (Witness not present)

23          THE COURT:  Okay.  All right.

24          I will keep checking my box to see what I get this

25 evening, and we'll -- I'm going to have -- I have a sentencing

1    at 9:15, and a class action settlement final approval somewhere

2    around 10 o'clock.  So we may start a little bit after that.

3    But, otherwise, I'll look at whatever submissions I get

4    tonight.

5              MS. ROTHMAN:  Your Honor, can I raise two things?

6              I'm not going to tell Mr. Gottlieb how to do his job,

7    but I would just point the Court to the length of

8    cross-examination.  We were looking at a proffer agreement for

9    like ten minutes during the cross today.  I don't know if there

10   was an attempt to waste time, to drag this out.  We're ending a

11   letter early.  I just think that we're all trying to move this

12   case along, and I would ask that Mr. Gottlieb do that as he

13   continues his cross tomorrow.

14             The second thing I would note is something that we

15   raised during the cross-examination of Ms. Carter.  There again

16   is the suggestion that the DEA did something wrong here and

17   that's improper.  The DEA is not on trial, Mr. Doud is on

18   trial.  And the questions about the DEA not rescheduling, the

19   questions about the guidance and the CFR, I think the defense

20   is getting very close to an inappropriate line.  And I hope

21   that we don't hear those arguments through the rest of the

22   cross-examination and in summation because, again, there is one

23   person on trial, and that's the defendant, your Honor.

24             MR. GOTTLIEB:  Your Honor, if I may.

25             I find these comments a little strange, as an

1    understatement.

2              With regard to point two, this is a distortion of the

3    purpose of that question.  I am not blaming the DEA for

4    anything.  I'm simply showing -- I'm now bearing my entire

5    strategy.  I'm bearing the fact that there were instances,

6    contrary to their opening statement the government's opening

7    statement, contrary to the entire suggestions in this case,

8    that RDC went out of its way and did compliance.  Not a perfect

9    job, maybe woefully insufficient, but they reached out to DEA.

10   I'm not blaming the DEA because somebody got injured and

11   couldn't have it.  That is permissible evidence to support an

12   argument which is directly relevant to rebut the distortions

13   and the misleading statements even in their opening statement.

14             As far as point one, your Honor, I sat here and

15   listened, droning on, email after email.  My client's life is

16   on the stand.  And I believe, because I'm not going to be

17   repetitious, as long as I'm raising new issues, I'm entitled to

18   cross-examine.  And I don't need guidance from the government.

19             THE COURT:  All right.  Well, obviously to the extent

20   that the government believes there are any questions that are

21   inadmissible, then they should make those objections and I'll

22   rule on those objections.  I'm not here to tell lawyers how

23   best to try their case, as long as they stay within the bounds

24   of the rules.

25             As I always say, by the time I tell you to sit down,

1   you'd have lost the jury long before then.  I'd think about

2   this case from their perspective, not from the lawyers'

3   perspective.  So if I look at the jury and they are starting to

4   nod out, then I usually get an impression that maybe they are

5   not really getting what you want them to get out of it.  But

6   that's for the parties, the lawyers to decide how best to try

7   the case, as long as the questions are appropriate questions to

8   ask and they are not objectionable, all right.

9           So let's stay focused.  Let's keep moving along.  And

10  I am hopeful that I have not given the jury a false impression

11  of where I think we will be, and hopefully we will still be

12  ahead of that schedule that I gave them toward the end of this

13  week.

14          Yes.

15          MR. GOTTLIEB:  Your Honor, what I was going to say

16  before this issue came up, I wanted for both the government and

17  your Honor to know that I'm not going to be done by -- if we

18  start at 9:45 or 10, within 45 minutes or so.  There was

19  substantial information that was raised.  So I just want for

20  everyone's scheduling, I felt I wanted to inform everybody.  So

21  I think tomorrow morning is this witness.

22          THE COURT:  As long as your questions are appropriate

23  and relevant, then we will deal with them.  Otherwise, if they

24  are not, then we will shut it down.  All right?

25          So I'll see you tomorrow morning at 9:45.

M1OVDOU6                          Pietruszewski – Cross

1          MS. ROTHMAN:  Thank you, your Honor.

2          MR. GOTTLIEB:  Thank you.

3          (Adjourned to January 25, 2022 at 9:45 a.m.)

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                         Page

 3    JEREMY ROSENMAN

 4   Cross By Mr. Janey . . . . . . . . . . . . . 869

 5    WILLIAM PIETRUSZEWSKI

 6   Direct By Ms. Rothman  . . . . . . . . . . 878

 7   Cross By Mr. Gottlieb  . . . . . . . . . . 994

 8                      GOVERNMENT EXHIBITS

 9   Exhibit No.                             Received

10    703, 281 through 290   . . . . . . . . . . 877

11    701, 252 through 254, 260, 263   . . . . . 877

12    263 through 266, 267A through 267O   . . . . 877

13    268A through 268D, 268J, 280   . . . . . . 877

14    3529-12  . . . . . . . . . . . . . . . . . 881

15    613  . . . . . . . . . . . . . . . . . . . 891

16    617  . . . . . . . . . . . . . . . . . . . 892

17    274  . . . . . . . . . . . . . . . . . . . 900

18    108BB  . . . . . . . . . . . . . . . . . . 982

19    108AA  . . . . . . . . . . . . . . . . . . 988

20                      DEFENDANT EXHIBITS

21   Exhibit No.                             Received

22    A8   . . . . . . . . . . . . . . . . . . .1005

23    A25  . . . . . . . . . . . . . . . . . . .1030

24    A11  . . . . . . . . . . . . . . . . . . .1035

25    A12  . . . . . . . . . . . . . . . . . . .1038
```