M1PBDOU1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                        19 Cr. 285 (GBD)

LAURENCE F. DOUD III,

            Defendant.
                           Trial
------------------------------x

                         New York, N.Y.
                         January 25, 2022
                         10:30 a.m.

Before:

               HON. GEORGE B. DANIELS,

                         District Judge
                         -and a Jury-

                 APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  NICOLAS T. ROOS
     ALEXANDRA ROTHMAN
     THOMAS S. BURNETT
     Assistant United States Attorneys

ROBERT C. GOTTLIEB
DERRELLE M. JANEY
PAUL R. TOWNSEND
     Attorneys for Defendant

Also Present:  Sunny Drescher
                 Jacqueline Hauck
                 Paralegal Specialists
                 Special Agent George Burdzy, DEA
                 Investigator Kathleen Whitmore, DEA

M1PBDOU1

1          (Case called)

2          (Trial resumed; jury not present)

3          THE COURT:  Our jurors are here.  We can continue.  As

4    you've been notified as of yesterday our Covid protocols have

5    changed, and anyone who is going to unmask has to have a test

6    that day.  That's basically the protocol.  How soon do we need

7    to get to the exhibits the expert witness issued?

8          MS. ROTHMAN:  There were two letters filed last night.

9    Our objection to certain exhibits I think is going to come up

10   during Mr. Pietruszewski's testimony, unless the defense says

11   they're not using those exhibits.  I think the expert issue

12   will come up after Mr. Pietruszewski is off the witness stand.

13         THE COURT:  Do we need to address this before we call

14   our next witness?

15         MS. ROTHMAN:  We're talking in terms of as to the

16   order, whether we'll put Mr. Paulsen on after Mr. Pietruszewski

17   or Mr. Cutler.  Mr. Paulsen is very short, so I think the

18   Cutler issue is rapidly approaching.

19         THE COURT:  We'll have to address this after this

20   witness.  With regard to the government's objections, do you

21   intend to use these exhibits with this witness?

22         MR. GOTTLIEB:  Your honor, interesting enough after

23   court yesterday what I did -- what my office did, we went

24   through all of the exhibits we intended to spend time on.  And

25   what I was going to propose and what I do propose this morning,

M1PBDOU1

1   assuming your Honor's decision on the continuing objection

2   about the emails that are contained in their letter from last

3   night, assuming your Honor's ruling continues, I've actually

4   separated a great number of the emails.  And subject to, I

5   assume, the continuing objections that are stated by the

6   government, just having them placed in evidence without

7   questioning the witness about it, just put it in evidence.  The

8   other handful of emails that I would question him certainly do

9   include the emails that the government highlighted in their

10  letter.  They're the same type of emails that your Honor has

11  permitted in evidence throughout this trial.  There's no

12  evidentiary basis to keep them out.

13          THE COURT:  I'm just trying to figure out what we need

14  to resolve before we move forward with this witness.  What

15  exhibits are going to come up with this witness that we need to

16  resolve before we bring the jury in?

17          MR. GOTTLIEB:  Just focusing on the exhibit that they

18  have objected to.  It will be Exhibit A18, A22, A35, A37, A38,

19  A40 and A71.

20          THE COURT:  So every one of them?

21          MR. GOTTLIEB:  That's correct.

22          THE COURT:  That was my question.  We have to resolve

23  all of these issues before you can conclude your cross

24  examination?

25          MR. GOTTLIEB:  Yes, your Honor.

M1PBDOU1

1          THE COURT:  All right.

2          MR. GOTTLIEB:  I would point out, because obviously we

3     received this late last night.  We have taken a look at it, but

4     your Honor, it's the same objection.  This issue has been

5     raised time and time again during this trial.  And to make it

6     clear, your Honor, these emails and the response, putting aside

7     the issue of completeness, it is state of mind.  It is not

8     hearsay.

9          Specifically, your Honor, your Honor knows full well

10    the government's entire thrust of their case has been that

11    Mr. Doud did not want compliance.  Mr. Doud did not want

12    anything done, did not want any checking, and time and time

13    again, the evidence that is coming in, the evidence that is

14    being objected to once again goes to what Mr. Doud is being

15    told.  What he is being told affects his state of mind

16    obviously and affects and can be considered as to why he did or

17    did not do something else.

18         So, your Honor, for the same reasons that we have

19    argued before, it is relevant.  It is not hearsay.  It explains

20    his state of mind.  It goes to the issue, your Honor, of his

21    intent; why he did or why he did not do certain things.

22    There's no difference between the continuing objection that's

23    contained in their letter focusing on these issues than any of

24    the other emails that your Honor has previously permitted in

25    evidence.

M1PBDOU1

1          THE COURT:  The jury is outside, so I don't want to

2     keep them too long.  I guess, Ms. Rothman, you have to tell

3     me -- let's just quickly go through them. A18, what's the

4     hearsay you're objecting to?  What hearsay statement?

5          MS. ROTHMAN:  "I look forward to getting as compliant

6     with the suggestions as we can."  That is a statement being

7     offered for the truth, why Mr. Doud wants to get compliant with

8     the suggestions.

9          The second issue on that email is, it's not even about

10    compliance in the sense of what this case is about.  It's about

11    recordkeeping.  It's about recording the ways they purchased

12    controlled substances.  So what the defense is trying to do is

13    get a little soundbite of the defendant saying, I want us to be

14    compliant, when that's not really what's going on here.  If the

15    defendant wants to convey that, he needs to take the witness

16    stand and tell that to the jury.

17         THE COURT:  What is the statement you object to in

18    A22?

19         MS. ROTHMAN:  "I agree too."  Mr. Cullen says, "If the

20    reason we are taking on additional business is profit, that is

21    usually the wrong reason to proceed."  And Mr. Doud says, "I

22    agree."

23         If the defense is willing to redact Mr. Doud's

24    statements, we have no problem with that underlying email

25    coming in.  They can then argue that Mr. Doud was told all

M1PBDOU1

1  these things and he relied upon that.  But again, introducing

2  the defendant's own statements in these emails is

3  inappropriate.

4           THE COURT:  What about A35?

5           MS. ROTHMAN:  The defendant's statement:  "We do not

6  want any real risk."

7           THE COURT:  What about 37?

8           MS. ROTHMAN:  The defendant's statement, "We have

9  spent a lot of money to keep Linden Care compliant or to try

10  to.  The laws must be obeyed."  These are self-serving

11  statements by the defendant he's offering for the truth of the

12  matter asserted.

13           THE COURT:  What about A38?

14           MS. ROTHMAN:  This is a statement from an individual

15  at Linden Care saying, "The Linden Care team is striving to

16  achieve the highest level of compliance and will work closely

17  with your team in this regard."

18           THE COURT:  Say that again.

19           MS. ROTHMAN:  Sure.  This is the statement from Inder

20  Tallur from Linden Care.  "The Linden Care team is striving to

21  achieve the highest level of compliance."

22           THE COURT:  That's the statement by Linden Care?

23           MS. ROTHMAN:  Correct.  It's hearsay.

24           THE COURT:  And what about A40?

25           MS. ROTHMAN:  There's a lot of A40 that's problematic.

M1PBDOU1

1    I'll quote and it's quoted in our letter.  That the DEA

2    completed an audit of Linden Care.  The audit went well.  Art

3    did a great job.  We are very pleased with Linden Care and the

4    audit could not have gone better.

5            THE COURT:  Whose statement is that?

6            MS. ROTHMAN:  These are statements from Inder Tallur

7    from Linden Care summarizing the purported findings of DEA's

8    audit.  If the Court will remember, we put in a letter

9    objecting to this admission of that DEA report on the Linden

10   Care audit.  The defense said they weren't going to go down

11   this path.  This is another way of getting in those same

12   hearsay statements.

13           THE COURT:  What about A71?

14           MS. ROTHMAN:  There's two issues in A71.  The first is

15   a statement from Joe Brennan that two ex-DEA agents said that

16   RDC could move forward with opening accounts if the paperwork

17   was in Ms. Pompeo's hand, but before the dispensing data was

18   analyzed.

19           And the second equally problematic statement is that

20   Ms. Pompeo agrees with the change.  On that point, they had

21   Ms. Pompeo on the witness stand for days.  If they wanted to

22   ask her about her views on the change, they should have asked

23   her when they cross examined her.  To introduce the statement

24   that Jessica agrees with the change is hearsay, being offered

25   for the truth of the asserted, and it should be excluded or at

M1PBDOU1

1    a minimum redacted.

2           THE COURT:  Any of these emails in which the defendant

3    Mr. Doud is not copied on these emails?

4           MS. ROTHMAN:  Mr. Doud is copied on every email, and

5    most of the statements are his own statements.  The only

6    exception would be in 38, 40 and 71 where it's statements of

7    someone from Linden Care or from Joe Brennan.

8           What I would say this, your Honor, is two things.  If

9    they want to argue state of mind, they don't need Mr. Doud's

10   statement to do it.  They can rely upon the underlying email

11   that puts facts in front of him, but his response should not be

12   admitted before the jury unless he wants to testify.

13          The second thing is, if your Honor is inclined to

14   allow these in -- and again we would oppose -- there should be

15   a limiting instruction, that anything in here is not coming in

16   for the truth of the matter asserted, meaning the defense

17   cannot argue that Linden Care had a great audit by the DEA.

18   The defense cannot argue that these facts are true, which I

19   think they're going to do in summation.

20          Mr. Janey opened on, I'm going to read to you a Linden

21   Care report about great findings.  It's improper.  It's

22   hearsay.  It should be excluded.

23          THE COURT:  It seems to me that at this point, one, I

24   don't totally agree with the government as to all of these

25   statements are hearsay.  They put in statements that reflect

M1PBDOU1

what they consider to be statements that are consistent with

the defendant's involvement in a conspiracy.  Defendant has the

right to put in statements in that regard that are not

consistent with that.  However, the defendant does not have the

right to put in statements that make factual representations

about the past, about whether or not certain events occurred.

I believe that there are a number of these exhibits

that do that.  I believe that A37, A38, A40 and A71 are those

type of statements.  I find that those statements are not

admissible with regard to what has occurred with regard to

investigations or prior actions or prior statements of

witnesses.  I agree with the defense that unless otherwise

pointed out to me that A18, A22, A35 are not offered for the

truth of any particular facts that are being alleged by a

witness.

It does reflect -- its purpose is to demonstrate

whether or not the defendant's actions at that time were

consistent or inconsistent with his knowledge and intent to be

involved in a conspiracy.  To the extent that is consistent

with that it is admissible and not hearsay, to the extent it's

submitted for the opposite purpose to demonstrate that at the

time the defendant made statements that the defense can

legitimately argue are inconsistent with someone who had

knowledge and intent to join a conspiracy and is not a

representation about some previous fact that's being offered

M1PBDOU1

1    for the truth of those facts.

2              MS. ROTHMAN:  Thank you, your Honor.

3              MR. GOTTLIEB:  Your Honor, may I.

4              THE COURT:  One at a time.  Mr. Gotlieb.

5              MR. GOTTLIEB:  Your Honor, I would just like to

6    address the issue statements by, let's say Linden Care.  That

7    is exactly what is state of mind.  And what I mean by that --

8              THE COURT:  No, that's not his state of mind.

9              MR. GOTTLIEB:  This is what I mean, if you introduce a

10   statement to prove that the statement was made to Mr. Doud,

11   somebody's statement stated to Mr. Doud about Linden Care doing

12   its best to clean up its act, whatever.  The fact that the

13   statement was made to Larry Doud goes directly to his state of

14   mind and would be what's in his mind when he then says, As a

15   result of information I received, even if it's wrong, even if

16   it's not true, any statements made by people about Linden Care

17   being in compliance, that's not being introduced for the truth

18   of what's asserted.  It's simply being introduced to show that

19   Larry Doud heard it and therefore may or may not explain why in

20   this case he may have released pharmaceuticals.

21             THE COURT:  I don't agree, because I don't think that

22   that is particularly probative of whether or not Mr. Doud was

23   involved in a conspiracy with others as charged in this

24   indictment by the fact that Linden Care said that they got a

25   clean bill of health in an email to Mr. Doud.  I don't agree

M1PBDOU1

1   with that.  I think that other statements in which Mr. Doud --

2   as a matter of fact, I think that Mr. Doud's statement

3   themselves is a greater reflection of his state of mind rather

4   than someone else's statement about what occurred.

5          For someone else to say -- at Linden Care to say that

6   they got a clean bill of health is not what is at issue here.

7   What is at issue here is whether or not Mr. Doud agreed with

8   others that he was going to distribute drugs without -- even

9   though there were red flags and it was inappropriate to do so.

10         I don't think that -- I think that the statements by

11  someone else at Linden Care don't reflect an innocent or guilty

12  state of mind, and I think that -- and don't reflect and is not

13  probative of whether or not Mr. Doud joined the conspiracy with

14  others not at Linden Care, as the government has charged.

15         As I said, I've limited the nature of my ruling as to

16  do with, again, whether or not their factual statements that'

17  are being offered for the truth of those statements about

18  events that occurred in the past, to the extent that it falls

19  into that category.

20         I agree with the government that it's simply

21  self-serving hearsay.  And to the extent that the defendant

22  wants to talk about his state of mind, about what he knew and

23  what he believed and what he intended, those things are

24  reflected in comments that he has made consistent with the

25  government's offer of emails, and comments that they say he's

M1PBDOU1

1    made that reflect otherwise but are not reflected by someone

2    else coming to him and just making a statement.

3            It doesn't make it any less likely or more likely that

4    he was involved in this conspiracy because someone from Linden

5    Care said they got a clean bill of health, unless you accept

6    the fact that they did get a clean bill of health, and I don't

7    think we can accept that fact.  To the extent that those are

8    the nature of the statements, as I said, my position has been

9    very clear.  And Mr. Doud being put on emails, communicating

10   himself and those people who communicated who are alleged to

11   be -- that the government alleges are co-conspirators, those

12   statements are appropriate and completeness for non-hearsay

13   reasons.  I agree with you that they can reflect Mr. Doud's

14   state of mind.  I think it's inappropriate to attempt to

15   reflect Mr. Doud's state of mind by statements of a third

16   person about events that happened in the past, and to offer

17   those statements on the basis that one must assume that those

18   facts are true in order to give the defendant benefit of the

19   inference that you want to give him on that.

20           MR. GOTTLIEB:  Your Honor, may I just quickly respond?

21           THE COURT:  Yes.

22           MR. GOTTLIEB:  Within some of those emails, there may

23   be lines that would not fall in the category of statements that

24   your Honor is now precluding.  Again, we only got this late

25   last night.  But also, this other issue which I had raised is

M1PBDOU1

1    that we had separate and a part from the exhibits that the

2    government has now pointed out they object to, I have a number

3    of emails which I was going to ask -- again consistent with the

4    Court's ruling -- that the government stipulate to their

5    admissibility and I wouldn't even question the witness about

6    them.  They have not been objected to.

7         I know the government clearly has gone through all of

8    the defense exhibits that we previously provided them, so the

9    ones that have not been subject to a similar objection, I would

10   propose having them marked and received, and I don't even

11   intend to question the witness.

12        THE COURT:  Well, if the parties agree they're

13   admissible into evidence, I will accept that stipulation, but I

14   don't have such an agreement before me at the moment.

15        MR. GOTTLIEB:  May I make a suggestion which I think

16   it would save an enormous amount of time.  I think this is the

17   way we should proceed.  If we could take a short break now, go

18   through all the ones that we would propose are not covered by

19   your Honor's ruling and just have them admitted.  I would just

20   put in the record which exhibits now are in evidence before the

21   jury.

22        THE COURT:  Well, are you going to use those exhibits

23   before this witness?

24        MR. GOTTLIEB:  If I know they're being admitted, no, I

25   will not use it.  If the government is going to raise

M1PBDOU1

1    objections again, then I'll go through each one as we've done

2    previously and as the government has done.

3             THE COURT:  I hope we would be beyond that at this

4    point.  If you want a few minutes to do that, I have the jury

5    standing outside cooling their heels.

6             MR. GOTTLIEB:  Judge, I'm ready to go.  We did our

7    best to see if we can pare it down.

8             MS. ROTHMAN:  Your Honor, I don't know what their

9    emails are.  If they're not going to ask the witness questions

10   about them, it seems like they should come in on the defense's

11   case.  I'm happy to look at them now and give my objections.

12   They could have been sent to us last night or a week ago.

13            THE COURT:  Look, you want me to send the jury back to

14   the jury room?

15            MR. GOTTLIEB:  Your Honor, the government's not

16   interested.  I'm ready to go.  I will proceed the way we were

17   proceeding.  I was trying to shorten it.  I don't need the

18   government to say when we should have sent them something when

19   the objections today could have been raised and are the same

20   objections that were not successful up until now.

21            MS. ROTHMAN:  It might help things if the defense

22   tells us the exhibit number.  I can look at them.  Rather than

23   objecting on the fly, I could review them in advance and that

24   could save time.

25            MR. GOTTLIEB:  Exactly what I was proposing.

M1PBDOU1

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | THE COURT:  Look, I'm not here to force you to agree                    |
| 2  | to anything.  If you can work it out, you can work it out or            |
| 3  | you can fight it out.  You got two choices.  I don't want to            |
| 4  | waste the jury's time.                                                  |
| 5  | If there's something you want to offer and give it to                   |
| 6  | them now and have them start looking at it and tell which ones          |
| 7  | they object and which ones they don't, then go ahead and do             |
| 8  | that, but I'm worried about the jury's time.                            |
| 9  | MR. GOTTLIEB:  Your Honor, I will do whatever the                       |
| 10 | Court wants.                                                            |
| 11 | THE COURT:  I don't want anything.  I want whatever                     |
| 12 | makes you happy.                                                        |
| 13 | MR. GOTTLIEB:  I'm not sure that's the case.                            |
| 14 | THE COURT:  Procedurally.                                               |
| 15 | MR. GOTTLIEB:  Your Honor, can I suggest if we can                      |
| 16 | send the jury back.  I will give them -- I have them                    |
| 17 | segregated.  I will show it to the government.                          |
| 18 | THE COURT:  Tell the jury that we want to put them                      |
| 19 | back into the jury room for another ten minutes so we can               |
| 20 | resolve some issues and then we'll bring them back in.                  |
| 21 | (Recess)                                                                |
| 22 | MS. ROTHMAN:  I can let your Honor know to what the                     |
| 23 | government objects.  There aren't too many, but there are some          |
| 24 | that we object to, I think, consistent with your Honor's ruling         |
| 25 | on what is appropriate and what is not appropriate to come in.          |

M1PBDOU1

1          THE COURT:  Why don't you give me copies of those and
2     I can start looking.
3          MS. ROTHMAN:  Of the exhibits?  I have some of them,
4     your Honor.  I can give them to you.
5          THE COURT:  I want to get started.
6          MR. GOTTLIEB:  Your Honor, most of it's been resolved.
7     We're ready to proceed and I'll put them on the board.  And if
8     they have an objection, they can have an objection.
9          THE COURT:  Why don't you show me the exhibits if you
10    have copies so I can read them while we proceed.
11         Let's bring the witness back in.
12         MR. GOTTLIEB:  Your Honor, we can give you the defense
13    binder that has all of the exhibits, and the government now I
14    assume will be saying which ones they are continuing to object
15    to.
16         MS. ROTHMAN:  I'm putting together a list right now.
17         THE COURT:  Let's put the witness back in the box.
18    I'm going to start looking at those and we'll bring in the jury
19    so we can continue.
20
21
22
23
24
25

1          (In open court; jury present)

2          THE COURT:  Good morning.  Thank you for your

3    patience.  I think we're still on schedule to finish the

4    witnesses by the middle of next week.  We're trying to make

5    sure that we proceed efficiently, particularly with exhibits.

6          Thank you for your patience, but we're ready to

7    proceed.  Continue with the cross examination at this time, Mr.

8    Gotlieb.

9          MR. GOTTLIEB:  Thank you very much, your Honor.

10   CROSS-EXAMINATION (CONTINUED)

11   BY MR. GOTTLIEB:

12   Q.  Good morning, Mr. Pietruszewski.

13   A.  Good morning.

14   Q.  Where we were yesterday with regard to compliance, you told

15   us there was a compliance program; you were the head beginning

16   and 2006, correct?

17   A.  Yes.

18   Q.  And you were busy doing compliance among other duties even

19   before 2017, correct?

20   A.  Yes.

21   Q.  And you told the jury that one of the problems, there

22   wasn't enough personnel to do everything that you thought

23   should be done, correct?

24   A.  Yes.

25   Q.  And included in what you were able to do was to recommend

M1PBDOU1                        Pietruszewski - Cross

1    that certain pharmacies be either suspended or terminated,

2    correct?

3    A.   I presented the facts to Larry and Joe.  It was their

4    decision to decide whether they should be, what they wanted to

5    do.

6    Q.   Is it your testimony that every decision to suspend a

7    pharmacy from purchasing controlled substance had to be sent to

8    Larry Doud?

9    A.   To go through Joe and Larry Doud.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1p3dou2                        Pietruszewski - Cross

1    Q.  My question is, did every decision to suspend a pharmacy,

2    while you were the head of compliance, did it first require the

3    approval of either Joe Brennan or Larry Doud?

4    A.  It was supposed to, yes.

5    Q.  I didn't ask you if it was supposed to.  Did you suspend,

6    not send out controlled substances on your own, without ever

7    speaking with Larry Doud beforehand?

8    A.  Maybe one store.

9    Q.  What store was that?

10   A.  It might have been Casey Prescription Pad.

11   Q.  And other than Casey, you never put a hold on controlled

12   substances or suspended a pharmacy without first speaking to

13   Larry Doud?

14   A.  That and maybe AJ.  I don't totally, I don't remember

15   exactly.

16   Q.  What's AJ?

17   A.  I think it was one of the four stores that we did report.

18   Q.  Did you report it on your own?

19   A.  I don't totally remember.  I thought I sent an e-mail about

20   it.

21   Q.  Would you agree that prior to the DEA visit to RDC in

22   November of 2016, can we agree that RDC conducted approximately

23   over 200 field compliance visits to prospective or established

24   customers?

25   A.  I'm not -- I don't know if it was 200.

M1p3dou2                          Pietruszewski - Cross

1    Q.  Can you give us your estimate of the number of pharmacies

2    that were the subject of an internal RDC internal visit,

3    inspection?

4    A.  There was maybe 100.

5    Q.  And that would be between 2012 to 2017?

6    A.  2016, I thought you said.

7    Q.  Okay.  2016.

8    A.  Yes.

9    Q.  Is it fair to say that Jessica Pompeo conducted most of the

10   analysis and review of customers while she was working for RDC?

11   A.  Her and others.

12   Q.  Did she train other individuals to conduct field

13   inspections?

14   A.  Not field inspections.  Analyze the data.

15          MR. GOTTLIEB:  Can we put on the screen, please,

16   Government Exhibit 278.  I don't believe, your Honor, it's

17   everywhere.  I don't think it's on the screen in the back for

18   the jurors.

19          THE COURT:  They should have it now.

20          MR. GOTTLIEB:  I think it's happening.  Okay.

21   Q.  Now, this is a Government Exhibit, 278, and I believe you

22   were asked questions already about this.  Do you recognize it?

23   A.  I don't recognize this particular one, no.

24   Q.  Have you seen this exhibit before?

25   A.  Not -- I don't think I saw this particular exhibit, no.

1          MR. GOTTLIEB:  This is a government exhibit in

2    evidence; is it not, Ms. Rothman?

3          MS. ROTHMAN:  I think the witness's testimony is he's

4    never seen it before.  It is in evidence.

5          MR. GOTTLIEB:  This is a government exhibit.  Thank

6    you.

7          MS. ROTHMAN:  Yes.

8    Q.  Now this particular exhibit includes a list of companies

9    that were suspended or terminated, correct?

10         MS. ROTHMAN:  Objection.  The witness doesn't know.

11         THE COURT:  Overruled.  He can examine and determine

12   whether that's correct, if he knows.

13   Q.  If you look at the right-hand corner, looking at where it

14   says "action" and then to the right of that it says "date."

15   This is a list of pharmacies that were either suspended or

16   terminated during the period of time, 2017 being the beginning,

17   going down to 2018.

18         Can we just scroll it down so the jury can see.

19         It goes down to 2019 and 2020, correct?

20   A.  Yeah, I haven't seen this, no.

21   Q.  If we can go back to the top, please.  Now, looking at this

22   exhibit that's before you, on the bottom, on the left-hand

23   side, can we highlight that.  That can't be highlighted.  Take

24   a look, it says 4.25.13-10.20.  4.25.13-2.10.20 suspended and

25   terminated.

M1p3dou2                         Pietruszewski - Cross

1          Do you see that?

2    A.  I see that.

3    Q.  April 25, 2013, to February 10, 2020.  That's what this

4    chart is supposed to be?

5          MS. ROTHMAN:  Objection.  The witness doesn't know

6    anything about this chart.

7          THE COURT:  Overruled.  He can answer.

8    A.  Again, I don't remember seeing this chart, this time frame.

9    Q.  This is a government exhibit that has on it 4/25/2013 to

10   February 10, 2020.  If we can just go to the bottom and see

11   what the dates are.  The last date here is 2/10/2020 concerning

12   Newtown Pharmacy being suspended.  Do you see that?

13   A.  Yes.

14   Q.  Now, do you know who prepared this chart and put on it

15   April 25, 2013, to February 10, 2020?

16   A.  No.

17   Q.  Were you shown a similar chart?  Not this particular one,

18   were you shown a similar chart?

19   A.  I don't remember, no.

20         MR. GOTTLIEB:  I'd like to show you, and just your

21   Honor, the witness and counsel, Defense Exhibit 82.

22   Q.  Now, this document appears to be a similar type of document

23   as the government introduced, correct?

24         MS. ROTHMAN:  Objection.  I think we need a sidebar,

25   your Honor.

M1p3dou2                       Pietruszewski - Cross

1              THE COURT:  Come up.

2              (At the sidebar)

3              THE COURT:  Yes, Ms. Rothman?

4              MS. ROTHMAN:  What's going on here is -- let me back

5      up.  The witness has never seen the government exhibit that is

6      in evidence.  He's testified to that and Mr. Gottlieb wants to

7      ask questions which he has done.  The witness has never seen it

8      before.

9              What Mr. Gottlieb is trying to do is put in a

10     different version of a termination spreadsheet, that the

11     witness has also never seen, and thus he is the wrong person to

12     try to get this in through.

13             What I think the defense is going to start doing is

14     trying to read information on this chart, ask him if it looks

15     similar, and attempt to offer this chart in evidence.  That's

16     improper and should not happen.

17             If the defense wants to ask Mr. Pietruszewski

18     questions about pharmacies that were terminated earlier, they

19     can do that.  What they can't do is try to get in a document

20     the witness has never seen before through cross-examination.

21     And my concern is that's what's happening here.

22             I don't want to make this argument in front of the

23     jury.  I'd like to move on and get this cross-examination done.

24     But again, even though Mr. Gottlieb didn't like the answer from

25     Mr. Pietruszewski, he's never seen these charts before.  He is

M1p3dou2                        Pietruszewski - Cross

1   the wrong witness.

2            THE COURT:  Mr. Gottlieb, what --

3            MR. GOTTLIEB:  I don't disagree.  We are not seeking

4   to introduce the chart.

5            THE COURT:  Stop.  Let me ask you a very simple

6   question.  What is the admissible evidence that you want from

7   this witness about this chart he has never seen?

8            MR. GOTTLIEB:  That there are two different charts to

9   begin with.  I'm not seeking to introduce this chart.  But more

10  specifically, I intend to ask this witness about suspensions

11  and terminations before 2017.

12           THE COURT:  What does that have to do with this chart?

13           MR. GOTTLIEB:  Interestingly enough, the first chart

14  we received from the government had the suspensions and

15  terminations beginning in 2013, going to February 10, 2020.

16  The one that they placed in evidence kept out all of the

17  suspensions and terminations before 2017, because the

18  government is trying to argue that the only time they suspended

19  or terminated is once Larry Doud left the company.  This

20  witness is in a position, because he's already testified --

21           THE COURT:  To say what?

22           MR. GOTTLIEB:  To testify about in 2013, '14 or '15

23  which pharmacies were either suspended or terminated.

24           THE COURT:  That's not the question.  The question

25  really is what testimony do you expect this witness to give

M1p3dou2                          Pietruszewski - Cross

1      with regard to this exhibit?

2                  MR. GOTTLIEB:  I would only use this exhibit to

3      refresh recollection if that became necessary.

4                  THE COURT:  Well, that's not what you've done.

5                  MR. GOTTLIEB:  Your Honor, I was laying a foundation.

6      Once now he says he didn't see it --

7                  MS. ROTHMAN:  No, no.

8                  THE COURT:  Slow down.  Mr. Gottlieb, the witness says

9      he's never seen this document before.  He's got no testimony to

10     give about the accuracy of the document.  The document

11     additionally is not in evidence.

12                 MR. GOTTLIEB:  One document is in evidence.

13                 THE COURT:  This document is not in evidence.

14                 MR. GOTTLIEB:  Government Exhibit 278 is in evidence.

15     The one that is similar but includes 2013, 2017, is not yet in

16     evidence.

17                 THE COURT:  The one you are questioning him about is

18     not in evidence.

19                 MR. GOTTLIEB:  Correct.

20                 THE COURT:  You cannot read off the document and you

21     cannot ask him what's on the document, because he has no

22     knowledge of the document.

23                 MR. GOTTLIEB:  I agree.

24                 THE COURT:  So, why are we still on this document?

25                 MR. GOTTLIEB:  Your Honor, I didn't know what his

M1p3dou2                        Pietruszewski - Cross

1    answer was going to be, whether or not he saw this document.  I

2    heard it for the first time as you did.

3            THE COURT:  Well, it seems to me everybody else knew

4    it but you.  It was clear to me.

5            MR. GOTTLIEB:  Well, that's -- your Honor, that --

6            THE COURT:  He never saw the document.  He already

7    said he never saw the document.

8            MR. GOTTLIEB:  I had no idea.  I didn't know he didn't

9    see the one the government put in evidence.

10           THE COURT:  I want to go forward.  Is there any

11   admissible question that you intend to ask him about this

12   document?

13           MR. GOTTLIEB:  I am --

14           THE COURT:  Yes or no?

15           MR. GOTTLIEB:  Your Honor, I am going to be asking him

16   now, I'm going to put the document down, and I'm going to ask

17   the witness --

18           THE COURT:  I didn't ask you that.  I asked you is

19   there any admissible question and answer that you intend to ask

20   him about this document?

21           MR. GOTTLIEB:  Not about the document.

22           THE COURT:  Then put the document aside, and let's

23   move forward.  What else are you going to ask him?  Why are we

24   on this document?

25           MR. GOTTLIEB:  Your Honor, I am done asking about the

M1p3dou2                          Pietruszewski - Cross

 1    document.  I didn't know what he was going to say.  Now I

 2    intend to now put the document aside, and to say tell me in

 3    2013, was that suspended.  If he needs something to refresh

 4    recollection, then I'll do what I can do under the rules of

 5    evidence.

 6            THE COURT:  What do you intend to do with this

 7    document?

 8            MR. GOTTLIEB:  If he says I don't know, I would say is

 9    there anything that might refresh your recollection.  And show

10    him a --

11            THE COURT:  No.

12            MR. GOTTLIEB:  Your Honor, we already --

13            THE COURT:  What you're permitted to do is you're

14    permitted to put the document in front of him, ask him to look

15    at the document, without identifying the document, and ask him

16    does that refresh his recollection.  Period.  That's all you

17    are entitled to do.  You are not entitled to describe the

18    document to him.  You're not entitled to put in evidence things

19    from the document that the document does not in evidence

20    reflect.

21            MR. GOTTLIEB:  We are in full agreement, your Honor.

22    I understand how to refresh recollection.

23            THE COURT:  That's not what you were doing here and

24    this witness did not say he doesn't remember anything.  So you

25    weren't asking the proper question, if you were attempting to

refresh his recollection.  If you think he doesn't remember

something, then you ask him, you show him something that you

think is going to refresh his recollection.  It's real clear

that this document is not going to refresh his recollection.

MR. GOTTLIEB:  It's not so clear at all, your Honor.

It is not clear when he looks at the document and says, oh,

yes, Amato Pharmacy was suspended in 2013, if it refreshes his

recollection.  It is not so clear it wouldn't refresh

recollection.

THE COURT:  What is your next question?

MR. GOTTLIEB:  I'm going to ask him Amato Pharmacy in

2013, was that suspended by the company.  I don't recall.  Let

me show you this document, does that refresh your recollection

as to whether or not Amato Pharmacy was suspended in 2013.

That would be the way I would do it.

THE COURT:  If that's what you were going to do, I

wish you had already gotten there.  You haven't gotten there.

All right?

MR. GOTTLIEB:  Okay.

THE COURT:  Get there.  Let's move on this.  This

document is not in evidence, you can't put it in the back door

if you can't get it in the front door.  If there is some other

witness that's admissible, do it.

MR. GOTTLIEB:  Just because the government prescribes

some sort of motive like that to me doesn't mean it's true.

M1p3dou2                          Pietruszewski – Cross

1          THE COURT:  It doesn't have anything to do with

2    motive.  It means you are a very experienced and fine lawyer.

3    You know what the rules are.  The rules are not you can slip a

4    document in front of a witness who has no idea what this

5    document is and start quoting from the document.

6          MR. GOTTLIEB:  I understand that.

7          THE COURT:  That's what you were doing.  That's what

8    you did.  You want the transcript read back to you?  That's

9    what you did.

10         MR. GOTTLIEB:  No.  I want to move forward.

11         THE COURT:  Let's move forward.  Let's not waste any

12   more time.

13         MS. ROTHMAN:  Thank you, your Honor.

14         (Continued on next page)

M1p3dou2                         Pietruszewski - Cross

1            (In open court)

2            MR. GOTTLIEB:  May I proceed, your Honor?

3            THE COURT:  Yes.

4            MR. GOTTLIEB:  Thank you.

5    BY MR. GOTTLIEB:

6    Q.  Mr. Pietruszewski, going now to 2013.  Is it not true that

7    Amato Pharmacy was suspended by RDC from purchasing controlled

8    substances?

9    A.  I'm not sure if it was Amato Pharmacy.

10   Q.  Is there anything that might refresh your recollection that

11   Amato Pharmacy was suspended in April of 2013?

12   A.  I don't remember if it was Amato Pharmacy.

13   Q.  Will you please take a look at A82.  Just take a look at

14   it, don't read it, and this is only for the witness, your

15   Honor, and counsel.

16           Looking at A82, and just direct your attention to the

17   top.  Does it refresh your recollection that Amato Pharmacy was

18   suspended in April of 2013?

19   A.  I don't remember if it was Amato.

20   Q.  Total Care Pharmacy.  Can you tell us whether or not that

21   was suspended in 2013 by RDC from purchasing controlled

22   substances?

23   A.  They weren't suspended from purchasing controlled

24   substances.

25   Q.  And do you remember when that was or what year

1   approximately?

2   A.   They weren't suspended from purchasing controlled

3   substances.

4   Q.   So, your testimony is at no time was Total Care Pharmacy

5   ever suspended?

6   A.   Only, it was oxycodone.

7   Q.   So, you do recall that Total Care Pharmacy was suspended

8   from purchasing oxycodone in April of 2013?

9   A.   They refused to sign the agreement that the attorneys drew

10  up.

11  Q.   And as a result of that, they were suspended by RDC,

12  correct?

13  A.   Until they signed the agreement, and then they were being

14  sold to again.

15  Q.   Were they suspended when they refused to sign the

16  agreement; yes or no, sir?

17  A.   I don't remember if it was immediate, no.

18  Q.   When was it that you can best recall that Total Care

19  Pharmacy was suspended by RDC?

20  A.   I don't remember the date, sir.

21  Q.   Can you give us the approximate year?

22  A.   It probably was in 2013, but they ended up signing our

23  agreement, and then they were turned back on.

24  Q.   And that was not unusual, was it, specifically, it's true

25  that if a problem arose, there were times, beginning in 2013,

M1p3dou2                         Pietruszewski - Cross

1  that RDC would halt the purchases, and then if they seem to be

2  in compliance, resume the purchases, correct?

3  A.   There were times, yes.

4  Q.   What about Specialty Care Pharmacy; you were asked

5  questions about these pharmacies on direct examination when the

6  government questioned you.

7  A.   This was the same owner as that other pharmacy.  It was in

8  the same agreement, sir.

9  Q.   So in 2013, Specialty Care Pharmacy was also suspended; yes

10  or no?

11  A.   Two of the pharmacies I believe were suspended.  I don't

12  know if all four were suspended, because they started buying

13  more from the other locations and I reported that.

14  Q.   What about Medical Center Pharmacy in 2013, were they

15  suspended?

16  A.   I don't remember Medical Center.  I don't remember the

17  name.

18  Q.   If we can look at A28, just the witness, does that refresh

19  your recollection -- A82.  Defense Exhibit 82, does that

20  refresh your recollection?

21  A.   I don't know, I don't remember --

22  Q.   I have to complete -- so the record is clear.  I'm sorry.

23  A.   That's fine.

24  Q.   Does that refresh your recollection that in April of 2013,

25  Medical Center Pharmacy was suspended?

M1p3dou2                    Pietruszewski - Cross

1    A.  I don't remember Medical Center Pharmacy.

2    Q.  What about Main Avenue Pharmacy, July of 2013.  Is it not

3    true that Main Avenue Pharmacy was terminated by RDC from

4    purchasing controlled substances; yes or no, sir?

5    A.  They weren't terminated in 2013.

6    Q.  They weren't?

7    A.  No.

8    Q.  Okay.  You're sure of that?

9    A.  They were reinstated I believe.

10   Q.  Were they first terminated before they were reinstated,

11   sir?

12   A.  Terminated as a customer you're saying?

13   Q.  Terminated from purchasing controlled substances.  That's

14   what I mean.

15   A.  I think they may have been turned off for a while and then

16   they were turned back on after.  It was not that long because

17   we were told by the B&E that the pharmacy did what they were

18   supposed to do.  And we turned them back on.

19   Q.  Based on information you received from B&E.  What is B&E

20   for the jury?

21   A.  The board -- I'll be honest of you.  The board of pharmacy

22   in Albany I believe it is.

23   Q.  So what you told the jury, so it can be clear, is they were

24   terminated but then reinstated when you received information

25   that they were now in compliance, correct?

1   A.  They said the pharmacist did their due diligence.

2   Q.  And with that information, RDC then reinstated their

3   rights, their power to purchase controlled substances, correct?

4   A.  Yes.

5   Q.  And Plainfield Pharmacy -- I asked that?

6           K R D Pharmacy.  Is it not true in August of 2013, K R

7   D Pharmacy was terminated from ordering controlled substances?

8   A.  They may have.  I don't remember specifically if that's

9   when it was.

10  Q.  Looking at Defense 82.  Would that refresh your

11  recollection, just take a look at it, a little ways down.  K R

12  D Pharmacy.  Does that refresh your recollection that that

13  company was terminated by RDC from purchasing controlled

14  substances in August of 2013?

15  A.  I mean, I'm not 100 percent sure.

16  Q.  AJ Family Pharmacy.  Is it not true that in November of

17  2013, AJ Family Pharmacy was suspended from purchasing

18  controlled substances; yes or no?

19  A.  I'm not sure.

20  Q.  Would looking at Defense Exhibit 82 refresh your

21  recollection as to whether or not AJ Family Pharmacy was

22  suspended?

23  A.  I'd have to check my e-mails.  I -- I'm not sure what the

24  chart came from.  So I'm not 100 percent sure.

25  Q.  I'm simply asking you, based on your recollection, you're

1  testifying in front of the jury about what you recall as you

2  did in direct examination.  This doesn't refresh your

3  recollection that AJ Family Pharmacy was suspended in November

4  of 2013?

5  A.  They may have.

6  Q.  What about Neighbor Pharmacy at Pearl River?  Directing

7  your attention to December 9, 2013.  Was Neighbor Pharmacy at

8  Pearl River suspended from purchasing controlled substances?

9  A.  Well, I don't see it on the screen.  But...

10 Q.  Before you see anything on the screen, just from your

11 recollection.

12 A.  I don't remember us turning them off in 2013.

13 Q.  Taking a look at Defense 82.  Does that refresh your

14 recollection that Neighbor Pharmacy at Pearl River, Neighbor

15 Prescription Pharmacy at Pearl River was suspended by RDC in

16 December of 2013?

17 A.  I don't remember.

18 Q.  Wellness Pharmacy, directing your attention to December of

19 2013.  Was Wellness Pharmacy suspended from purchasing

20 controlled substances in 2013?

21 A.  I'm not sure.  I know we did an audit.  We sent Carlos

22 Aquino.  But I don't remember if we turned them off at that

23 time.

24 Q.  What about Casey's Prescription Pad in April of 2014.  Was

25 Casey's Prescription Pad suspended from purchasing controlled

1    substances?

2    A.  Yes, they were.

3    Q.  By the way, was AJ Pharmacy ever terminated by RDC after

4    being suspended?

5    A.  I'm not sure, sir.

6    Q.  Directing your attention to June of 2014.  Do you recall

7    that AJ Family Pharmacy was terminated from its ordering

8    privileges?

9    A.  I don't remember.

10   Q.  Looking at Defense 82.  Does that refresh your recollection

11   that in June of 2014, AJ Family Pharmacy was terminated from

12   ordering controlled substances?

13   A.  I don't remember.

14   Q.  Greenwich Pharmacy in September of 2014, is it not true

15   they were terminated by RDC from ordering controlled

16   substances?

17   A.  I do not remember.

18   Q.  Looking at Defense 82 for identification, does that refresh

19   your recollection that Greenwich Pharmacy was terminated from

20   ordering in 2014?

21   A.  I don't remember the name of the pharmacy.

22   Q.  What about Kingston Pharmacy, Yakob Pharmacy Inc.  In

23   September of 2014, September 1, 2014, did RDC terminate its

24   privileges from ordering controlled substances?

25   A.  I don't remember, sir.

M1p3dou2                        Pietruszewski - Cross

1   Q.  Now, every time you're saying you don't recall, you're not

2   telling the jury that didn't happen.  You just don't have a

3   recollection, correct, one way or the other?

4   A.  Yeah, I do not remember.  I don't have the recollection of

5   that.

6   Q.  Stanton & Negley, September of 2014.  Isn't it true that

7   they were suspended from ordering controlled substances?

8   A.  I think they were only suspended from buying Suboxone.

9   Q.  So you recall that even before 2014, RDC suspended Stanton

10  & Negley from purchasing some controlled substances?

11  A.  Julius Morton went to Stanton & Negley, I don't remember

12  when it was, and we -- investigated about them purchasing the

13  substance Subutex.

14  Q.  That was approved by management, correct?

15  A.  It was approved by Larry and Joe, yes.

16  Q.  Yeah, so, even before we continue now, every time you have

17  indicated to the jury that RDC either suspended or terminated,

18  is it fair to say that they can conclude that management,

19  whether it's Joe Brennan or Larry Doud, approved of that

20  decision, correct?

21  A.  Yes.

22  Q.  Austin Chemists, directing your attention to 2014.  Was

23  Austin Chemist terminated from purchasing controlled substances

24  by RDC?

25  A.  They were, but I don't remember if that was the date, sir.

M1p3dou2                    Pietruszewski - Cross

1    Q.  All Care Pharmacy.  December 2014.  Is it not true, sir,

2    that All Care Pharmacy had its privileges to purchase

3    controlled substances suspended by RDC?

4    A.  I don't remember if All Care did or did not.

5    Q.  Please take a look at Defense 82.  Does that refresh your

6    recollection, and this is going down a little less than halfway

7    down.  Does that refresh your recollection that All Care

8    Pharmacy was suspended in December of 2014?

9    A.  I don't remember.

10   Q.  Coatesville Pharmacy.  Is it not true that Coatesville

11   Pharmacy had its ability to order controlled substances from

12   RDC in December of 2014, that those privileges were suspended?

13   A.  I don't remember.  I remember the pharmacy, but I don't

14   remember.

15   Q.  Looking at Defense 82, does that refresh your recollection

16   that Coatesville Pharmacy had its ability to purchase

17   controlled substances suspended in December of 2014?

18   A.  I don't remember, sir.

19   Q.  Cuidamed Pharmacy?

20   A.  Cuidamed?  I don't remember, sir.

21   Q.  You don't recall that it had its ability --

22   A.  I remember -- I'm sorry, sir.

23   Q.  No.  You don't have to apologize.  Just that the court

24   reporter is taking everything down.

25   A.  Yes.

M1p3dou2                       Pietruszewski - Cross

1    Q.  You don't recall that that pharmacy in January of 2015 now

2    had its ability to purchase controlled substances suspended?

3    A.  I do not remember, sir.

4    Q.  Still in 2015, Mt. Airy, do you recall that Mt. Airy

5    Pharmacy had its authority to purchase controlled substances

6    terminated by RDC on May 5, 2015?

7    A.  No, I do not remember.

8    Q.  Do you remember the name Mt. Airy?

9    A.  I know Mt. Airy, but I don't remember the pharmacy.

10   Q.  Wellness Pharmacy appearing again, High Falls.  Is it not

11   true that in May of 2015, it had its authority to purchase

12   controlled substances suspended?

13   A.  I just remember Wellness was one time, so if it was the

14   last time, then this time maybe is when they were suspended

15   when you brought it up before.  I don't think they were

16   suspended twice and then reinstated, sir.

17   Q.  K-E-W-A-N, is not true that Kewan Pharmacy had its license

18   suspended for refusal to permit an onsite inspection by RDC in

19   May of 2015?

20   A.  That may be true, but I don't remember, sir.

21   Q.  Abigail's Pharmacy.  Do you recall in July of 2015, that

22   Abigail had its authority to purchase controlled substances

23   suspended by RDC?

24   A.  I don't remember.

25   Q.  EZ Care Pharmacy.  Do you recall in August 2015, EZ Care

M1p3dou2                          Pietruszewski - Cross

1    had its authority to purchase controlled substances from RDC

2    terminated?

3    A.  I don't remember.

4    Q.  And now in the last four or five that I've asked you, is it

5    fair to say looking at this document wouldn't refresh your

6    recollection, right?

7    A.  That is correct.

8    Q.  ATA Pharmacy.  September of 2015, did it have its authority

9    to purchase controlled substances terminated by RDC?

10   A.  I don't remember.

11   Q.  Cedar Care pharmacy, did it have its license, its authority

12   to purchase controlled substances terminated by RDC in

13   September of 2015?

14   A.  I don't remember the name of the pharmacy, sir.

15   Q.  Organix, is it not true they had their authority to

16   purchase controlled substances suspended by RDC in October of

17   2015?

18   A.  I remember the pharmacy name, but I don't remember them

19   being suspended at that time.

20   Q.  Do you remember them being suspended at some time?

21   A.  Might have been in 2017.  I don't remember.  I think it was

22   later on.

23   Q.  The Chemist Shop, is it not true that they had their

24   authority to purchase controlled substances terminated,

25   terminated in November of 2015?

M1p3dou2                        Pietruszewski - Cross

 1  A.  I remember they were terminated.  I don't remember the

 2  date, sir.

 3  Q.  Was it approximately 2015?

 4  A.  It may have been, sir.

 5  Q.  Prime Health, Inc., do you recall that their authority to

 6  purchase controlled substances was terminated by RDC in

 7  November 2015?

 8  A.  I do not remember.

 9  Q.  Poplar Pharmacy, did they have their authority to purchase

10  controlled substances terminated by RDC in November of 2015?

11  A.  I do not remember, sir.

12  Q.  ProHealth Pharmacy, Inc., is it not true that they had

13  their authority to purchase controlled substances suspended in

14  December of 2015?

15  A.  I thought it was later.  That was the sister store of

16  Chemist Shop.  I thought that was in 2017.

17  Q.  You recall at some point?

18  A.  I wasn't in compliance, but I remember a report after, I

19  think that was in 2017.  But I don't have my e-mails so I don't

20  remember.

21  Q.  Toms River Pharmacy, directing your attention now to

22  January 4, 2016.  Is it not true that Toms River Pharmacy had

23  its authority to purchase controlled substances suspended by

24  RDC?

25  A.  It may have, sir.

M1p3dou2                           Pietruszewski - Cross

Q.  Kings Way Pharmacy in February of 2016.  Is it fair to say
that they had their authority to purchase controlled substances
suspended by RDC?

A.  They may have, sir.

Q.  Vital Drugs in March 17, 2016, did Vital Drugs have their
authority to purchase controlled substances suspended -- I'm
sorry -- terminated from purchasing any controlled substances?

A.  I do not remember.

Q.  And then just, we have four more.

        Superstar Pharmacy.  Fair to say Superstar Pharmacy
was terminated by RDC from ordering controlled substances in
March of 2016?

A.  I do not remember, sir.

Q.  Sheely's.  Is it not true they had their authority to
purchase controlled substances suspended in May of 2016?

A.  I remember they -- I believe, I don't know if that was the
time frame, but I do remember Sheely's.

Q.  You remember them being what, suspended or terminated?

A.  They were suspended from buying.

Q.  And Lake Carmel Pharmacy, do you recall that they were
suspended from purchasing controlled substances in May of 2016?

A.  I do not remember, sir.

Q.  And finally, covering this period of time, Allerton Park,
do you recall that Allerton was terminated by RDC from ordering
controlled substances in August of 2016, do you recall that?

M1p3dou2                        Pietruszewski - Cross

1   A.  I do not recall that, sir.

2            MR. GOTTLIEB:  May I have one moment, please.

3            THE COURT:  Yes.

4            MR. GOTTLIEB:  If we can put up on the screen, your

5   Honor, for the witness and counsel, A43, please.

6   Q.  Mr. Pietruszewski, do you see this is an e-mail on the top

7   from you to Carlos Aquino, correct?

8   A.  It is an e-mail from me to Carlos, yes.

9   Q.  And it concerns a Wellness Pharmacy and an audit, correct?

10  A.  I see, yes, it has to do with Wellness RX, yes.

11  Q.  It's dated January 14, 2014, correct?

12  A.  Yes.

13           MR. GOTTLIEB:  Your Honor, I ask that this be received

14  in evidence, please.

15           MS. ROTHMAN:  Objection for reasons we discussed

16  earlier, your Honor.

17           MR. GOTTLIEB:  Your Honor, we don't believe this is

18  covered by what we had discussed before.

19           THE COURT:  I have a list here, and it is on that

20  list.

21           MR. GOTTLIEB:  That's a list that the government

22  wrote, your Honor.

23           THE COURT:  Right.  So they do, they say they object.

24           MR. GOTTLIEB:  No, they object.

25           THE COURT:  Let me take a look at it.

M1p3dou2                          Pietruszewski – Cross

1          MR. GOTTLIEB:  Thank you.

2          (Pause)

3          THE COURT:  I'm going to need some more information

4   about this exhibit.

5          Do you want to come to the sidebar.

6          MS. ROTHMAN:  Sure.

7          THE COURT:  Quickly.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  I have a bunch of exhibits, maybe about 10

3    exhibits that the government put on that list and said they

4    objected to.  So what is this exhibit and why are you offering

5    it?

6          MR. GOTTLIEB:  Your Honor, this goes directly to

7    compliance, it is an e-mail from Bill Pietruszewski, this is

8    843, authorizing the audit on behalf of RDC to conduct an

9    audit.  It is directed to Carlos Aquino, the outside

10   consultant.  And this is simply the part of the evidence that

11   RDC did have compliance, and was communicating with Mr. Aquino

12   to go out and to conduct an audit on behalf of RDC, at

13   Wellness.  This does not include Larry Doud's -- any alleged

14   hearsay.  This is consistent with everything your Honor

15   permitted up until now.

16         THE COURT:  And you're trying to demonstrate what by

17   this exhibit?

18         MR. GOTTLIEB:  That RDC was actively involved in

19   compliance.  It may not have been a great compliance program.

20   But RDC was contacting Carlos Aquino, the outside consultant,

21   to go to Wellness, a pharmacy, for the purpose of conducting an

22   audit investigation.  And it's January of 2014.

23         THE COURT:  Ms. Rothman, what's your objection?

24         MS. ROTHMAN:  I think there are two groups.  It is

25   prime good acts evidence which is impermissible in a case like

M1p3dou2                          Pietruszewski - Cross

1   this.  We have not alleged that Wellness Pharmacy, which is the

2   pharmacy here, is one of our pharmacies that we're speaking

3   about with respect to diversion.  There are I'm sure plenty of

4   pharmacies where there was not diversion happening.

5            THE COURT:  Why isn't that relevant evidence in this

6   case, that there are pharmacies that they did in fact --

7            MS. ROTHMAN:  I think that's improper good act

8   evidence.  You typically can't offer proof that on some

9   instance you didn't commit a crime as probative of why you

10  didn't on another one.  The second issue I have is the letter

11  that's attached on page -- I don't know -- six of the exhibit

12  which are statements from Ed Ullmann the owner of the pharmacy

13  about what's happening at his pharmacy.  This is hearsay.  So

14  if the defense --

15           THE COURT:  What's hearsay.

16           MS. ROTHMAN:  His statements about what's going on in

17  his pharmacy, what he's agreed to.

18           THE COURT:  What does he say?

19           MS. ROTHMAN:  He says no new patients will be filled

20  by these doctors.  He says that we will, we are going to

21  provide reports.  He makes lots of statements that are being

22  offered for the truth.

23           THE COURT:  Those aren't offered for the truth.  Those

24  facts haven't happened yet.  That's the future.  That's not the

25  past.

M1p3dou2                        Pietruszewski - Cross

1    MS. ROTHMAN:  We did review Dr. Terdiman on New York

2    Profile and there were no reported deficiencies or reported out

3    of state actions.  Those are statements offered for the truth,

4    that there were no issues with respect to a particular doctor.

5    THE COURT:  This is the way I am going to go and this

6    is going to be my guidance with regard to these issues.  And

7    part of it is we have to have a further in-depth discussion

8    about the experts and the charge.  This seems to be exactly

9    within the realm of what you want your expert to testify about,

10   what percentages of instances were investigated, not

11   investigated.  I'm not sure why your percentages are admissible

12   but an instance he wants to point out where it was in fact

13   investigated is not admissible.

14   MS. ROTHMAN:  I don't think the example of Bill

15   Pietruszewski asking Carlos to go to a pharmacy has anything to

16   do with what our expert will talk about with respect to orders

17   of interest and the observations that he saw.  I think there

18   are two separate issues, your Honor.

19   THE COURT:  I assume this is part of the percentage of

20   instances where he did in fact, they did in fact investigate

21   and they did in fact suspend.

22   MS. ROTHMAN:  I don't think our expert will speak

23   anything about Wellness Pharmacy.

24   THE COURT:  That's not my question.

25   MR. JANEY:  Those numbers are captured in those

M1p3dou2                    Pietruszewski - Cross

1    charts, is what I understand your Honor to be describing, and I

2    believe that's correct.

3          THE COURT:  And you think that, I'm trying to

4    understand your position generally.  Your position generally is

5    that they shouldn't be allowed to offer evidence of instances

6    where they did in fact investigate?

7          MS. ROTHMAN:  That's our view.  I think you rejected

8    that view, your Honor.  My concern is --

9          THE COURT:  That's what I'm trying to understand.

10         MS. ROTHMAN:  There are statements both in the letter

11   from Mr. Ullmann and in Mr. Pietruszewski's e-mail to Carlos

12   are being offered for the truth, and I am not sure what the

13   basis for admission is, your Honor.

14         THE COURT:  I don't understand what you claim is being

15   offered for the truth.  None of those things have occurred yet.

16   So it is not true, we don't know if they did this or they

17   didn't do this in the future.

18         MS. ROTHMAN:  As of today, Mr. Ullmann still mentions

19   to a letter to me regarding Dr. Terdiman how the doctor has no

20   suit against him.

21         That's a statement being offered for the truth.

22         THE COURT:  Okay.  I'm just not sure, I don't

23   understand what you're fighting about.  I just don't understand

24   what it is, why you don't want the jury to hear this.

25         MS. ROTHMAN:  Well, I think it's improper, your Honor,

M1p3dou2                        Pietruszewski - Cross

1    for the jury to hear about an instance when Carlos Aquino went

2    to a pharmacy in 2013.

3            MR. JANEY:  This is an objection we've heard time and

4    time again, your Honor has ruled on.

5            THE COURT:  We have to have a broader discussion.  Are

6    you going to ask further questions of this witness of this

7    document now?

8            MR. GOTTLIEB:  I was just going to have it received in

9    evidence and just have a portion read, your Honor.

10           THE COURT:  What portion?

11           MR. GOTTLIEB:  Your Honor, I have a number that --

12   they haven't agreed to everything, so I have a number of --

13           THE COURT:  That's why I asked the question.  What's

14   the answer to my question?  You said you wanted to read a

15   portion.  I asked you what portion you wanted to read.

16           MR. GOTTLIEB:  Actually, I only intend on reading a

17   portion of the e-mail, not this letter that they are talking

18   about.

19           THE COURT:  What portion do you want to read?

20           MR. GOTTLIEB:  The first two paragraphs.  First two

21   paragraphs.

22           THE COURT:  Which says what?

23           MR. GOTTLIEB:  As we spoke earlier on the phone, I am

24   requesting that you conduct a DEA audit on behalf of RDC at

25   wellness.  Pharmacist in charge is, and then back on

M1p3dou2                          Pietruszewski – Cross

1    December 20 and read that paragraph.  It's very short.

2                THE COURT:  All right.  I'm going to admit the

3    document.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1p3dou2                          Pietruszewski - Cross

1           (In open court).

2           THE COURT:  I'll admit the document in evidence.

3           (Defendant's Exhibit A43 received in evidence)

4           MR. GOTTLIEB:  May we publish that to the jury,

5    please?

6           THE COURT:  Yes.

7    Q.  Mr. Pietruszewski, this is a January 14, 2014 e-mail from

8    you to Carlos Aquino, cc'd Joe Brennan and Larry Doud, and its

9    subject request DEA audit statement of work.

10          And you wrote:  Carlos, hello.  As we spoke earlier on

11   the phone, I am requesting that you may conduct a DEA audit on

12   behalf of RDC at Wellness Prescription LLC, with the address.

13   The owner of the store is Ed Ullmann, the store number is with

14   a phone number.  The pharmacist in charge is Nelson Cuevas whom

15   actually is the only pharmacist on the payroll.  This store has

16   been filling narcotics for seven weeks.

17          Back on December 20, I spoke to Mr. Ullmann in length

18   that Dr. Terdiman, Santos, and the fraudulent scripts of

19   Madaline Rosado NP that they cannot fill for any of those

20   prescribers.  Since then I spoke to Mr. Ullmann on this past

21   Friday the 10th again explaining to him why they cannot fill

22   scripts by Dr. Terdiman due to his field of medicine is not

23   pain management.  He seems to understand after an hour and a

24   half conversation, but as of today Mr. Ullmann still mentions

25   to a letter to me regarding Dr. Terdiman I enclose for you to

```
1    read how the doctor has no suit against him.  Clearly

2    Mr. Ullmann does not understand that a doctor needs to be in

3    the correct field of medicine to prescribe oxycodone products.

4            Ending there, Mr. Pietruszewski, you would agree that

5    this reflects the request of Mr. Aquino to conduct an audit for

6    the reasons that you laid out in this e-mail, correct?

7    A.  Yes, that's correct.

8    Q.  If we can have Defense Exhibit 39 shown to the witness.

9            Do you see that up there, sir?

10   A.  Yes, I see it.

11   Q.  This is an e-mail on the bottom part from Larry Doud to

12   Donald Bilgore.  Again, Donald Bilgore is the attorney for RDC?

13   A.  Yes, for 40 years I believe or so.

14   Q.  This is April 12, 2014?

15   A.  Yes.

16   Q.  And this concerns Linden Care, correct?

17   A.  Yes.

18   Q.  Now, Mr. Pietruszewski, is it not true that there were

19   times that Mr. Doud expressed concerns about Linden Care's

20   practices?

21   A.  Maybe.

22   Q.  In fact, do you recall that Carlos Aquino conducted audits

23   of Linden Care and prepared reports, correct?

24   A.  He did do an audit, yes.

25   Q.  And you are aware that Larry Doud read Mr. Aquino's
```

M1p3dou2                          Pietruszewski - Cross

1   reports, correct?

2   A.  Yes.

3   Q.  Is it fair to say that there were times that Larry Doud

4   indicated that he could not believe what he was learning about

5   Linden Care, and that he had a level of concern based on what

6   he was reading.  Do you recall that?

7   A.  He may have.

8   Q.  And these e-mails deal directly with what you've now been

9   testifying about concerning a report of Mr. Aquino, Larry

10  Doud's reaction, and then your comments, correct?

11  A.  Yes.

12              MR. GOTTLIEB:  I ask that A39 be received in evidence.

13              THE COURT:  Any objection?

14              MS. ROTHMAN:  No objection.

15              THE COURT:  It will be admitted in evidence.

16              (Defendant's Exhibit A39 received in evidence)

17              MR. GOTTLIEB:  May we publish it, please?

18              THE COURT:  Yes.

19              MR. GOTTLIEB:  Thank you.

20  Q.  I think it is on the screen, if we can go to page two.

21  This is, on the top of -- bottom of page one.  It is from Larry

22  Doud, April 12, 2014, to Donald Bilgore, and it reads in part

23  at the beginning:

24              I read Carlos's report this morning.  I can't believe

25  that his report wasn't that of someone looking to cut their

M1p3dou2                    Pietruszewski - Cross

 1   wrists.  He sure didn't seem to express the level of concern
 2   that I felt in reading the report.  It is my opinion that we
 3   should share this report with BelHealth, the parent company,
 4   and give them a week or so to come up with the process they are
 5   going to use to correct things and then go meet with them at
 6   our earliest opportunity.  They need to put this all in order,
 7   for them and for us.  We need a program that they will adhere
 8   to and report to us on a regular basis, quarterly or more
 9   frequently if that is what we need.  Monday, if you agree, I
10   will contact Harold Blue or Inder Tallur about this and see
11   what we can get going.  They should have a copy of this report
12   as poorly written as it is.  I'll be in Monday and I know you
13   said you would call.  You know if we were off like this it
14   would be all over.  Thank goodness for Bill's aggressive care
15   of our DEA business.  But no matter how well we do at RDC, it
16   is our responsibility to oversee what our customer is doing and
17   Linden Care's sloppy procedures could severely impact us.
18              Correct?  That's what it reads?
19   A.  Yes, it does.
20   Q.  Going up to page one without reading it.  It has in the
21   middle on April 12 your response, correct?
22   A.  Yes.
23   Q.  And your response was:  Lind Care is supplying RDC with
24   quarterly dispensing reports.
25              So just stop you right there.  There were times you at

M1p3dou2                          Pietruszewski - Cross

1  RDC were obtaining dispensing reports from customers, correct?

2  A.  In 2014, yes.

3  Q.  You continue:  But this is the first time we had Carlos

4  conduct inventory counts of the drugs of concern.  We as a

5  company do not conduct inventory counts normally at our stores,

6  but with an account like Linden Care you can see we must.  I am

7  glad you feel the same way as I do about this report, for this

8  is huge.  What concerns me, and I told Don this, is that Carlos

9  does not seem overly concerned.  I just think of CVS in

10  California missing 70,000 units of hydrocodone and they will

11  subject to huge fines, so I feel Carlos needs to explain to RDC

12  in details why he is not overly concern.

13         Correct?

14  A.  Yes.

15  Q.  And right above that, finally, just Larry Doud's response.

16  His responses to those last comments is "I understand."

17  Correct?

18  A.  Yes.

19         MR. GOTTLIEB:  If we can go next to A68.  And just for

20  witness and counsel, your Honor.

21  Q.  A68 is a thread of e-mails from you to Larry Doud, correct,

22  and Joe Brennan is included in one, correct?

23  A.  I'm looking at the top.  Oh.  I'm sorry.  I was looking at

24  the top of the e-mail.

25         MS. ROTHMAN:  We have no objection to this.

1            THE COURT:  It will be admitted in evidence.

2            (Defendant's Exhibit A68 received in evidence)

3   A.  I see in the middle.

4            MR. GOTTLIEB:  Your Honor, can we just show it to the

5   jury?

6            THE COURT:  Yes.

7            MR. GOTTLIEB:  Thank you.

8   Q.  If we can go to the second page, please.  I'm sorry, bottom

9   of the first page.  I'm sorry.

10           We have your e-mail to Larry Doud, Joe Brennan and Don

11  Bilgore August 7, 2013.  And you say:  I have some upsetting

12  news.  Carlos went to visit Plainfield Pharmacy account 3900

13  due to high percentage of controls and DEA visit.  Carlos said

14  first 20 minutes was going smooth and Bobby manager of store

15  was cooperating.  Carlos asked to see the pharmacy most recent

16  narcotic prescription that were filled, and Bobby brought out a

17  few piles to view.  Just about all of them were prescriptions

18  from Florida, Florida doctor fills the script out, patient

19  mails to Plainfield, customer sends cash, and Plainfield mails

20  to customers address in Florida.  The customer never steps foot

21  into the store.  Pete called me at about 4 p.m. to tell me this

22  and he said there is only 28 prescriptions like this last

23  month.  I asked Pete who else he buys from and what they kicked

24  out McKesson or ABC about six or eight months.  He said they

25  use RDC and Top RX but RDC gets majority of business.  Carlos

M1p3dou2                        Pietruszewski - Cross

1    called me after Pete and said that the 28 scripts Pete was

2    referring to was only one pile.  he did not look at the other

3    three piles.  Also Carlos said that they buy oxycodone from Top

4    Prescriptions RX, QK Health and the bulk from RDC.  He also

5    uses Harvard for normal RX, so RDC is not primary business.

6    With talking to Carlos, I turned off their controls and so you

7    are aware we stopped filling the narcotics since our visit from

8    DEA last week.

9          If we can end it there, sir.  You informed Mr. Doud

10   that, in talking to Carlos, you then turned off Plainfield's

11   controls, correct?

12   A.  Yes.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

M1PBDOU3                    Pietruszewski

1   Q.  We can go to Defense 62, please.  This is just for the

2   witness, your Honor and counsel.

3          Now, this email again is from you, Lanny Doud, a

4   thread concerning Waschko's, and this is in June of 2014,

5   correct?

6   A.  Yes.

7   Q.  And it concerns investigating and then making a decision to

8   turn off controls being able to purchase controlled substances,

9   correct?

10          MS. ROTHMAN:  We have no objection.

11          THE COURT:  You're offering this into evidence.

12          MR. GOTTLIEB:  Yes, please.

13          THE COURT:  It will be admitted into evidence.

14          (Defendant's Exhibit A62 received in evidence)

15          MR. GOTTLIEB:  Having it published to the jury, your

16   Honor.

17   Q.  Just briefly, on the bottom it's your email to Paul Kearns,

18   Larry Doud, Lanny Doud, Joe Brennan.  The subject is Waschko's,

19   correct?

20   A.  Yes.

21   Q.  June of 2014?

22   A.  Yes.

23   Q.  You write:  I just spoke to Falcon Express about Waschko's

24   pharmacy.  It seems that the DEA were at the store.  They

25   allowed the driver to make the delivery and they inventory the

M1PBDOU3                        Pietruszewski

1    product.  When the driver was leaving, he saw the DEA putting

2    the computer and files in clear bags.  I let Paul know of it.

3    I am not sure do wee want to place them on do not sell.  And

4    continuing to the top.

5        Lanny Doud responds:  This is interesting.  Paul

6    claims we are were primary and all their business was $6,000,

7    of which 15 percent was controls and CIIs, nothing that would

8    have put up a red flag.  I wonder if they were buying somewhere

9    else and made us believe that was all they had.  I would just

10   shut them off controls and CIIs.

11       And your response, then, was:  Okay.  I will turn off

12   the controls until I hear different, correct?

13   A.  Yes.

14   Q.  So you made the final decision to shut off the controls

15   after Lanny Doud spoke to you, correct?

16   A.  Lanny said we should turn them off, so I turned them off.

17   Q.  May we have shown to the witness, your Honor, A23A for

18   identification.  Just show it to the witness.

19       Now, you testified on direct about the SOP, the

20   standard operating procedures, correct, concerning compliance?

21   A.  Yes.

22   Q.  And this particular document, it's fair to say, is

23   statements you made in June of 2016 regarding the potential

24   change in the SOP concerning the control -- sale of controlled

25   substances, correct?

```
M1PBDOU3                    Pietruszewski
```

1   A.  I'm not sure.  I mean, I have to read it.

2   Q.  Again, if you could just look down your email, if we could

3   highlight that for the witness.

4        Does that indicate that this thread is about the SOP

5   and the changes?

6   A.  It's just stating that RDC --

7   Q.  It's not in evidence, yet.  Does it pertain to the standard

8   operating procedures and potential change?

9   A.  I'm not sure.

10  Q.  Does that refresh your recollection, looking at it?

11  A.  I remember the email.  I see it.

12  Q.  In fact, you recall that you asked and suggested that any

13  new SOP, standard operating procedure, should provide that RDC

14  will conduct a review prior to opening a pharmacy up to

15  controls, correct?

16  A.  Yes.

17       MR. GOTTLIEB:  Your Honor, I ask this email be

18  received in evidence.

19       THE COURT:  Any objection?

20       MS. ROTHMAN:  No objection.

21       THE COURT:  It will be admitted into evidence.

22       (Defendant's Exhibit A23A received in evidence)

23       MR. GOTTLIEB:  Your Honor, that's now in evidence.

24  I'm not even going to put it up on the board.  It's in

25  evidence.

M1PBDOU3                    Pietruszewski

1            Looking at Defense Exhibit A53.  Perhaps before I ask,

2    I don't know if the government has any objection to the receipt

3    of this email?

4            MS. ROTHMAN:  One moment.  No objection.  No

5    objection.

6            THE COURT:  Offering it into evidence?

7            MR. GOTTLIEB:  Yes.

8            THE COURT:  It will be admitted.

9            (Defendant's Exhibit A53 received in evidence)

10           MR. GOTTLIEB:  If we could publish it to the jury.

11   Q.  Now, this email thread, if we could look at page 3 going

12   down at the bottom, bottom of page three beginning with Joe

13   Brennan.  If we could highlight that, please.

14           This is an email from Joe Brennan, November 12, 2015

15   to Larry Doud and others here and it reads:  Larry, Juice

16   called to go over his second audit at the Chemist Shop.  He has

17   real concerns.  Juice explained the DEA is currently

18   investigating a doctor that the Chemist Shop has a relationship

19   with.  Joe and Roberto said the doctor Joseph Olivieri writes

20   30 percent of their business controls CII to CV.  The doctor's

21   service is upstairs from the pharmacy.

22           Juice said confidentially that he has spoken to the

23   DEA unit doing the investigation and strongly recommends that

24   we stop doing control business with the Chemist Shop.  I don't

25   see a choice on this one.  Joe and Roberto refuse to stop doing

M1PBDOU3                        Pietruszewski

1   business with Joe Olivieri and four other doctors that are

2   questionable.  Juice knows at least two are being investigated.

3   A majority of pharmacies follow the advice Juice provides.  Joe

4   and Roberto will not.

5         And then continuing to the part of the thread right

6   above that from Richie Cullen.  Richie Cullen again to Joe

7   Brennan, Larry Doud and to you included.  It reads:  Joe,

8   unfortunately RDC has gone as far as it can with Roberto and

9   Joe if they choose not to listen to Juice's advice.  We have no

10  alternative but to cease selling them controls and narcotics.

11        Pro Compliance it appears is of the same opinion.  It

12  appears the Chemist Shop is already made a decision to split

13  their business between RDC and Cardinal, preparing for the time

14  when they will switch all their business over to Cardinal

15  Kinray based on RDC's decision to stop selling them controls.

16        We know based on the climate in the industry, RDC is

17  better served erroring on the side of caution, and I agree with

18  your proposal.

19        And then if you continue up above on November 12, 2015

20  Julius Morton responds, if we could highlight the email on

21  November 12, 2015 at 3:15 p.m.

22        Your Honor, I can expedite this if I could just --

23  I'll be right back. That was entirely my fault.  It was page 1.

24  All right.

25        Page 1 on November 12, 2015 Julius Morton wrote: All

M1PBDOU3                      Pietruszewski

1   my thoughts. I will do whatever RDC management would like me to

2   do.  I can call and try to have another sitdown with them.  No

3   guarantee they want to see me again, but all they can say is

4   no.

5          The question I have is, What would you like me to say

6   or do that I have not already said or done.  I have already

7   told them my opinions and concerns, and they have in turn told

8   me they disagree with my opinion particularly on Dr.Olivieri.

9   They feel as license practitioners, they are acting

10  appropriately and beyond reproach filling for this doctor who

11  is not board certified in pain management.

12         I think they are making such statements more as

13  businessmen than as practicing pharmacists.  But again, that is

14  just my opinion.  We had Pro Compliance PVS review their data.

15  And although Pro Compliance reviewed the same report period,

16  our analysis was confirmed and corroborated.  This account has

17  many concerns.  The cash is only one of the issues we have

18  discussed with them.  Unfortunately, they did not say to Richie

19  we have decided to stop filling for Dr. Olivieri.

20         Going to the next paragraph without reading the rest

21  of that particular paragraph it reads:  But I will again go

22  into them and present my case.  I will, however, not disclose

23  my confidential information, as I respectfully ask all in

24  contact with the customer to do as well.

25         These gentleman are supposed to act responsibly as

M1PBDOU3                         Pietruszewski

 1   professionally licensed practitioners.  If they cannot

 2   understand our concerns based upon the soundness of the

 3   clinical argument, then it should be abundantly clear that we

 4   are risking our reputation standing and possibly more by

 5   continuing to do with business with them.

 6            Why does the threat of DEA scrutiny and attention have

 7   to be the impetus for the responsible and ethical change?  I

 8   would only suggest that another meeting take place after we

 9   have received a reviewed their current dispensing.  Having that

10   data will begin tell us whether they are all about the talk and

11   not action.

12            If the report shows that there is no change in their

13   dispensing, then I guess management will need to consider how

14   much more time and opportunity RDC is willing to extend to this

15   customer before the decision is made to take some appropriate

16   action.  I remain hopeful for best resolution possible.

17            If we can go then to the response above.  The email

18   above from Larry Doud.  November 12, 2015, 11:47 to Julius

19   Morton:  Juice, thanks for remembering that.  I think in this

20   case it really justified that you elaborate.  We really need to

21   act strongly here and take a leadership role.  As I understand

22   it, this guy's been threatening us for a while so let's be

23   tough on him.

24            Can we have A54, please, placed before the witness,

25   your Honor and counsel.

M1PBDOU3                         Pietruszewski

1           Mr. Pietruszewski, this is a thread of emails

2     concerning Specialty Care pharmacy update, correct?

3     A.  Yes, that's what it says, yes.

4     Q.  And it includes a report from Richie Cullen and responses

5     to Cullen's report regarding Specialty Pharmacy, correct?

6     A.  Says Specialty Care pharmacy, yes.

7           MR. GOTTLIEB:  Your Honor, I ask that this be received

8     in evidence.

9           THE COURT:  Any objection?

10          MS. ROTHMAN:  No objection.

11          THE COURT:  It will be admitted into evidence.

12          (Defendant's Exhibit A54 received in evidence)

13          MR. GOTTLIEB:  And published to the jury, your Honor.

14          THE COURT:  Yes.

15    Q.  Go to the second page, please, just briefly if we could

16    highlight Richie Cullen on April 25.  On April 25 Richie Cullen

17    writes:  Guys, the visit to Tony Semenitilli.  Who is Tony

18    Semenitilli?

19    A.  I think Tony Semenitilli is the owner I believe.

20    Q.  The visit to Tony Semenitilli's stores over the last two

21    days was an eyeopener for both Carlos and myself.  Yesterdays's

22    visit to the Crosby store went pretty much as we expected.  The

23    blatant filling of prescriptions, regardless of the validity of

24    the doctor being checked out was rampant.  The amount of cash

25    narcotic prescriptions being dispensed was grossly negligent at

M1PBDOU3                    Pietruszewski

best.  In my opinion had the supervising pharmacist James Amato

been allowed to do his job, two-thirds of these prescriptions

would have never been filled.  And then it continues about the

rest of his finding.  We don't need to read that to the jury.

But if we can go now to the response.

        Your response on April 25 at 10:37 p.m.  In response

to what he is providing to you.  You write:  Just remember who

wanted to cut them down to 12,000 units a month and wants only

4,000 units purchased every week for the first three weeks of

the month.

        Also Total Care dispensed 21,000 units to the four

doctors in the Virey Group in March and Specialty, and

Specialty dispensed 19,000 units, same group in March.  We need

to call Tony and tell him he must supply monthly usage.  And if

not, we should consider cutting them off.  Have a good night.

        And the response right above that from Larry Doud to

Bill Pietruszewski, and if we could highlight that and put it

in yellow.

        Larry Doud's response was: I agree with you, Bill, and

I would urge Jonathan to tighten their clamp regardless of the

deal we made for repayment.

        And then right above that if we could now just go to

page 1 to the top on the bottom of page 1 there.

        Richie Cullen in response to the same thread

indicates:  I posed this option of dropping them from controls

M1PBDOU3                          Pietruszewski

1    and narcotics to Tony and have them find another supplier.

2              Can you go to the email right above that.

3              You then respond.  I'm sorry Larry Doud in response to

4    what you just said says: I agree with that.  Who writes the

5    agreement?

6              And then the email right above that.  You report on

7    April 26.  Your response to Larry Doud is:  I feel we need to

8    get a report back from Carlos on Monday or Tuesday.  We then

9    ask Carlos to put on one page all requirements that both stores

10   need and have Tony sign off on this.

11             And then continuing above that.  Larry Doud's response

12   to you on what you presented in this email to him.

13             He said:  Sounds like a good plan, Bill.  Thank you.

14   May we have A63 shown to the witness, your Honor?

15             THE COURT:  Yes.

16   Q.  Now, A63, Mr. Pietruszewski, this is some emails concerning

17   another pharmacy Aliton's Managed Care, correct?

18   A.  It says Aliton's, yeah, and do not sell.

19   Q.  I'm sorry.

20   A.  It says Aliton's and do not sell, what was highlighted.

21   Q.  These are emails concerning Aliton's and whether or not

22   they should be put on the, Do not sell list, correct?

23   A.  Purchasing quantities of large controls.

24             MR. GOTTLIEB:  Your Honor, I ask this be received in

25   evidence.  I'm not even going to show it to the jury at this

```
M1PBDOU3                    Pietruszewski
```

 1    time.

 2              THE COURT:  Any objection?

 3              MS. ROTHMAN:  No objection.

 4              THE COURT:  It will be admitted into evidence.

 5              (Defendant's Exhibit A63 received in evidence)

 6              MR. GOTTLIEB:  Looking at A78, just the witness, your

 7    Honor.  Looking at this thread, Mr. Pietruszewski, this has to

 8    do with the continued compliance involving the Chemist Shop.

 9    It's November, your Honor, 2015, involving you and others.  I

10    ask that this be received in evidence, your Honor.

11              THE COURT:  Any objection?

12              MS. ROTHMAN:  No objection.

13              THE COURT:  It will be admitted into evidence.

14              (Defendant's Exhibit A78 received in evidence)

15              MR. GOTTLIEB:  If we could publish this to the jury,

16    please.

17              THE COURT:  Yes.

18    Q.  Now, again, without reading this because now it's in

19    evidence.  It will be available to the jury.  Looking at this

20    email, is it fair to say that it is being reported certain

21    results of the audit, the RDC audit, of the Chemist Shop and

22    certain concerns that were raised in the audit.  Do you see

23    that?

24    A.  Yes, I was looking.  I'm sorry.

25    Q.  It will probably be easier for me to point you to it.

M1PBDOU3                        Pietruszewski

1    Looking at the page that is up from Joe Brennan.  Highlight

2    Larry Juice called to go over.

3         This email indicates:  Larry, Juice called to go over

4    his second audit at the Chemist Shop.  He has real concerns.

5         And then it continues to indicate his concerns,

6    correct?

7    A.  Yes.

8    Q.  Now, if we can go just to page one after the back and forth

9    about this.  If we could highlight from Larry Doud, his

10   response:  Then please stop their controls.  Please have them

11   send in their stock shares.  Do not resell them, please.

12   Correct?

13   A.  Yes.

14   Q.  Finally in this group.  If we can show the witness, your

15   Honor, A80.

16        Now, to the witness, this is Defense Exhibit A80.

17   This is an email from Larry Doud to you and to sales people,

18   June 14, 2016 pertaining to what you testified about on direct

19   about the possible change in the standard operating procedure,

20   correct?

21   A.  I'm not sure.  I see the email names if that is what it is.

22   Q.  No.  No.  Now looking at what I believe is on the board?

23        THE COURT:  Slow down.

24        MS. ROTHMAN:  We object to this document, your Honor.

25        THE COURT:  This is which one?

M1PBDOU3                    Pietruszewski

1          MS. ROTHMAN:  A80.

2          THE COURT:  I'll admit it into evidence.

3          (Defendant's Exhibit A80 received in evidence)

4          MS. ROTHMAN:  Your Honor, could we perhaps address

5     this at the lunch break.  I don't know how long Mr. Gottlieb

6     has.

7          THE COURT:  We're going to take the lunch break now.

8          Ladies and gentlemen, don't discuss the case.  Keep an

9     open mind.  I'm going to give you a little bit of a longer

10    lunch break.  There's a bunch of issues I want to resolve, so

11    we're going to have to take your time to do that.

12          I'll ask you to take your lunch break and we'll

13    continue at 2:00 p.m. sharp.

14

15

16

17

18

19

20

21

22

23

24

25

M1PBDOU3                        Pietruszewski

1            (In open court; jury not present)

2            THE COURT:  Ms. Rothman, what's your objection?

3            MS. ROTHMAN:  I think there's a couple.  I mean, this

4    is the defendant explaining the reason why they are going to

5    move forward with the change about turning on stores before

6    reviewing dispensing data.  I think there's two issues.

7            The first is, it's the defendant testifying through a

8    document, and I don't get the chance to cross-examine him with

9    respect to the statements being offered for the truth.  I think

10   there's statements about the past successes of RDC.  I think

11   they're statements about the dividend in the bottom of the

12   email.  I'm speaking to it vaguely because I don't have an

13   actual copy.  The defense showed it to me.  I think it was a

14   late produced email, but I did review it.

15           "Bill tells me there are about 2 percent of the time

16   we will stop shipping controls until we can get the issues

17   resolved." That's a statement about the past, what RDC has seen

18   when its done new account opening that the defense --

19           THE COURT:  I'm sorry, where did you read from?

20           MS. ROTHMAN:  The bottom of the second paragraph which

21   says:  "The compliance department will do our due diligence.

22   And if everything is good, we will go forward.  If there should

23   be a problem and Joe tells me there are about 2 percent of the

24   time, we will stop shipping controls until we can get the

25   issues resolved."

M1PBDOU3                        Pietruszewski

1          So that statement, "Joe tells me there are about 2

2    percent of the time," meaning problems with new stores, we will

3    stop shipping controls.  That's a statement by Joe Brennan

4    about what he'd seen in the past about stores that RDC is

5    turning on and problems that have arisen.

6          THE COURT:  The 2 percent statement?

7          MS. ROTHMAN:  Yes.  Joe tells me there are about 2

8    percent of the time.  There being an artful reference to

9    problems with stores being turned on.  That's a statement being

10   offered for the truth past looking about issues that RDC is

11   seeing with its stores.

12         And then the bottom paragraph talks about past

13   dividend returns, the success of RDC.  Those are all statements

14   by the defendant being offered for the truth.

15         THE COURT:  Why is that being offered for the truth?

16   Who cares what the dividend is?

17         MS. ROTHMAN:  I think it should be redacted.  It's

18   irrelevant.  I'm not sure what the relevance is to get that

19   statement in.

20         THE COURT:  You can't have it both ways.  It is

21   hearsay or it's not relevant.

22         MS. ROTHMAN:  I think it's different problems with

23   different parts of the emails.

24         THE COURT:  That's what I'm trying to understand.

25   What's the objectionable part of that statement?  Why do you

M1PBDOU3                        Pietruszewski

1    object to that statement?

2              MS. ROTHMAN:  About the dividend?

3              THE COURT:  Yes.

4              MS. ROTHMAN:  I don't think it's relevant.

5              THE COURT:  How is that going to somehow mislead the

6    jury?

7              MS. ROTHMAN:  I don't think it's relevant.

8              THE COURT:  That wasn't the original argument you

9    made.

10             MS. ROTHMAN:  I think Larry Doud's view of how to do

11   compliance by turning on stores more quickly leads to the

12   success of the company, so it's improper to put before the jury

13   facts about the success of the company.  My concern in this

14   email is really --

15             THE COURT:  You're going to put in even higher numbers

16   than that, aren't you, in your chart?

17             MS. ROTHMAN:  We're not going on the defendant's words

18   to do that.

19             THE COURT:  Technically I understand your argument

20   that you're not doing it using the defendant's words, but it

21   doesn't support your relevance argument because you say that

22   the dividend that -- matter of fact, it seems to be in dispute

23   with regard to the experts, and you say the dividend is a

24   significantly relevant issue to this case.

25             MS. ROTHMAN:  There's a couple of problems.  Maybe I

M1PBDOU3                         Pietruszewski

1    can step back and go step by step.  I have a problem with the

2    entire email and that the defendant should not be able to put

3    forth his own explanation for why he's putting forth a change

4    in due diligence that they don't report to the DEA.

5             THE COURT:  I don't accept your basic premise that's

6    been throughout your objection.  That's not true.  The

7    defendant has the right if there's evidence out there of what

8    he was doing at the time, whether he was taking actions or

9    making statements that were in furtherance of a conspiracy or

10   he was taking actions or making statements that he contends

11   were not consistent with being in a conspiracy.

12             You say the things that you want to offer against him

13   are consistent with being in a conspiracy.  He argues that

14   there's other evidence out there in fairness that juries are

15   entitled to know.  This isn't a statement he was making when he

16   was being interviewed by police officer investigating this

17   case.  It's in the course of his business dealings with other

18   individuals at a time when you claim that the only thing he

19   could be doing is either saying these things aren't true or to

20   cover up his conspiracy.

21             The defense argues that, well, look, you would expect

22   there would be different statements that he was making at the

23   time if his knowledge and intent was to be involved in criminal

24   conspiracy.  I don't understand why that's not relevant.  I

25   understand your technical arguments, but I don't understand why

M1PBDOU3                      Pietruszewski

1   that's not a central issue in this case.  As you say, did he

2   act like a guilty person or did he act like an innocent person.

3   That's a crucial issue.

4          MS. ROTHMAN:  Maybe I can zoom in and then zoom out.

5   Looking at a particular line that I have a problem with which I

6   think is hearsay which the same way you've articulated why you

7   might let in some of Mr. Doud's statement should not apply

8   here.

9          Joe tells me there are about 2 percent of the time,

10  meaning there are problem stores about 2 percent of the time.

11  That's a statement being offered for the truth that should not

12  come in evidence.

13         THE COURT:  I'm not sure why that's being -- who cares

14  whether it's two, four?

15         MS. ROTHMAN:  What I expect the defense is going to

16  argue is that this change of doing due diligence after --

17  reviewing dispensing after we turn on accounts, isn't a problem

18  because we're only seeing issue with a small percent of stores,

19  and so we can get the stores on more quickly.

20         THE COURT:  Except you want to offer evidence that you

21  say clearly refutes that and puts the lie to that statement.

22         MS. ROTHMAN:  But our proof isn't hearsay.  Our proof

23  is admissible.  This is hearsay.  Joe Brennan could be lying

24  about this fact.  And they're going to argue to the jury,

25  there's no problem because as Joe Brennan said, only 2 percent

M1PBDOU3                    Pietruszewski

of the time there's issues, meaning it's a valid business

judgment.

Just as your Honor kept out statements about Linden

Care because they assumed the truth, your Honor should keep out

that statement by Joe Brennan about there only being problems 2

percent of the time.

THE COURT:  What I don't understand is, how does it

make it more or less likely that you have proof of his

involvement in a conspiracy depending on whether this is 2

percent or whatever number you claim it is.  Why does it

matter?

MS. ROTHMAN:  Your Honor, I don't think the defense

should be able to offer justifications for Mr. Doud's actions

when they're hearsay.

THE COURT:  I'm glad you put it that way.  The answer

to that question is, yes, he does have the right to do that.

He has the right to indicate what he did during the time that

you claim he was involved in a conspiracy and if he was taking

actions or saying things at the time.  The jury has the right

to examine those to determine at a time when he believed he was

engaged in a conspiracy before he was caught, he was making

statements that were either consistent with or inconsistent

with his guilt or innocence.

That doesn't matter.  It doesn't matter whether it's

true or not.  The question is, How did he act?  Did he act like

M1PBDOU3                        Pietruszewski

1   a guilty person and did he make statements that a guilty person

2   would make?  Did he have conversations that a guilty person

3   would have, or did he have conversations that at least would

4   give someone the impression that he's trying to either

5   legitimately or illegitimately indicate that he's not involved

6   in criminal activity.

7        I can't accept your premise that you could offer every

8   single statement that hurts him, against him at the time, but

9   he cannot offer any other statements at the same time that are

10  reflective of innocence, that the only way he can offer that is

11  to get on the witness stand, because the jury doesn't care

12  whether it's 2 percent or 3 percent.  They can about the nature

13  of the communication of whether or not he's talking to people

14  perfidiously, whether he's hiding information, whether he's

15  pretending like he's really doing the right thing.  Those are

16  the things that the jury needs to evaluate, and I don't

17  understand why the substance of 2 percent is at issue for you.

18       MS. ROTHMAN:  Your Honor, I think the problem we have

19  is that the defense is putting in now several self-serving

20  statements which under the rules of evidence they're not

21  allowed to do.

22       THE COURT:  That's not true the way you just said it.

23  You meant to say that you believe he was putting forth

24  self-serving hearsay, but there's no rule that says he can't

25  put in self-serving statements.

M1PBDOU3                        Pietruszewski

1           MS. ROTHMAN:  What if Joe Brennan had actually told

2     Larry Doud, 98 percent of our stores are bad.  We have to do

3     due diligence first, otherwise we're turning on all of these

4     pills.

5           THE COURT:  And the jury's relevant question would be,

6     How did Mr. Doud react to that information, not whether that

7     information is true.  It's how does he react?  If Mr. Doud

8     says, no problem.  Let's go to lunch.  That means one thing.

9     If he says, oh my God.  We better hide this stuff.  That means

10    something different.  It doesn't matter what's true.  It

11    matters how the jury interprets those comments and those

12    actions.

13          I understand what you're saying is that, oh, well, he

14    shouldn't have the benefit of this sounding like he's just

15    trying to come up with a good legal explanation for what he's

16    doing.  Well, I mean, that's true, but you put the lie to that

17    by showing his activities that are inconsistent with the

18    statements that he's making at the time.

19          The defendant doesn't -- what he doesn't have the

20    opportunity to do is to argue to the jury, Because I said it,

21    it must be so.  But he has the right to say, well, look at my

22    conduct.  Look what I did.  Did I act like I was trying to

23    commit a crime?  Did I make statements that you would expect me

24    to make if I was involved in criminal activity with these

25    people if I was involved in a conspiracy to commit crimes?

M1PBDOU3                        Pietruszewski

1   That's what the jury needs to evaluate.

2          As you say, sure, whatever statement he made at the

3   time during the conspiracy that indicates that he had the

4   guilty knowledge and intent, you have the right to point that

5   out.  But he has the right to say, look, I didn't act like I

6   was a guilty person.  I acted like I was an innocent person at

7   a time when I had no reason to believe that anybody was

8   accusing me of any crime.  That's the relevance of it.

9          My position has been the same throughout with this

10  case is that you can't simply say because it's self-serving and

11  characterizing it as self-serving hearsay that means the jury

12  doesn't have the right to examine in total how he responded to

13  these incidents.  The reality is, if you have a reasonable

14  explanation why a guilty person would have acted this way and

15  said these things, then that should support the government's

16  case.

17         If they want to argue that, no, the government doesn't

18  have a reasonable explanation as to why he's saying all these

19  things that had nothing to do with committing a crime and don't

20  indicate what you would expect from a person who's committing a

21  crime, they have the right to argue that and try to convince

22  the jury of that.  I don't see just because your position is

23  that if the defendant -- he wrote an email and the email says,

24  oh, no, we're not -- we can't do that because that would be

25  against the law.  Your argument would be that the jury doesn't

M1PBDOU3                         Pietruszewski

1   have the right to hear that except if he takes the witness

2   stand.  I don't agree with that.

3          If you're offering every single bad email, you can't

4   say that you get to give the jury an impression that there are

5   only bad emails and then not also good emails and have a

6   reasonable explanation for the jury as to why they exist and

7   why that's not inconsistent with the defendant still being

8   guilty of the crime.  I don't accept that premise.

9          I think I understand the nature of your objection and

10  I think it's been consistent and I've considered it, but I

11  don't think, no, the defendant -- if you have emails that you

12  want to use against him and he has other related emails,

13  similar emails that indicate -- that he wants to argue from

14  that reflect his knowledge and intent at the time, he has the

15  right to offer those and has the right to say, look, this exist

16  out there.  I'm not making this up now.  This isn't a recent

17  fabrication for me.

18         Whether or not I was still -- I was committing a

19  crime, was trying to cover it up at the time by acting like I

20  was an innocent person, that's an argument that you can make.

21  To simply say that if the defendant says -- if the defendant

22  were to say in one of these emails -- if someone had sent him

23  an email saying, let's break the law by selling drugs and you

24  put that email in, it is not a legitimate argument that he

25  can't put in the email response that says, No, we're not going

M1PBDOU3                         Pietruszewski

1    to sell drugs because that's against the law.  It's not the

2    argument that's self-serving hearsay and he can't put that in

3    unless he takes the witness stand.

4         MS. ROTHMAN:  That may come in under 106, Rule of

5    Completeness.  I understand your Honor's ruling, and as Mr.

6    Gottlieb said, I respectfully disagree.  I have one question

7    and then I will stop.  Would you agree that it would be

8    inappropriate for the defense to argue this business change

9    wasn't a big deal because Joe Brennan told you only a small

10   percentage of the stores had problems.  Would that be

11   inappropriate?

12        THE COURT:  Say that again.

13        MS. ROTHMAN:  For the defense to argue, this business

14   change in 2016 of turning on stores before reviewing dispensing

15   wasn't a big deal, wasn't criminal because only 2 percent, a

16   small percent of the stores had problems?

17        THE COURT:  No, I don't think he can make that

18   argument.  I don't think they've offered any evidence that the

19   jury can accept for its truth, and that's not the case.

20        Now, if somebody else gets on the stand and testifies

21   to that, that's something else.  But, no, I don't think he is

22   in a position to argue that unless -- not from this document.

23   That's all I'm saying.  Clearly not from this document.

24        MS. ROTHMAN:  Could he redact that line from this

25   document?  My concern is that's going to go before the jury and

M1PBDOU3                    Pietruszewski

1    they're going to make that argument.

2            THE COURT:  No, because I don't think that the jury --

3    I think it's unfair to make the jury think that there's

4    something in this document that they should not see.  I don't

5    think that's an appropriate way. There's no reason to redact

6    this.  You have direct evidence.  As a matter of fact, doesn't

7    one of your charts directly address this issue?

8            MR. ROOS:  You mean that came in last week?

9            THE COURT:  It's going to come in through your expert.

10           MS. ROTHMAN:  About the percentage of stores with

11   problems?

12           THE COURT:  Yes.

13           MR. JANEY:  Yes.

14           THE COURT:  Don't you have a chart on that and you

15   have direct expert testimony?

16           MR. ROOS:  Not on the new customer issue.  There is

17   expert testimony on the overall customers.  So your Honor is

18   right that we will have data relating to all the customers.

19           THE COURT:  Well, my position with regard to that

20   issue is this: You have the right to point to the evidence in

21   this case and emphasize to the jury that the evidence supports

22   your position and doesn't support the defense's position, and

23   you have full opportunity to do so.

24           And if they get up there and they want to say, oh,

25   it's only 2 percent, you have the right to say, yeah, the only

M1PBDOU3                          Pietruszewski

1    person that said that is Mr. Doud, the person who has the

2    greatest interest in this case.  And they don't need an

3    instruction from me.  They don't even need an expert opinion on

4    that.

5         The jury is common sense and the jury can evaluate

6    that.  As they say, I sort of have a basic rule of ultimately

7    evaluating admissibility, if you can't win your case without

8    this, then you shouldn't have brought this case.  You should be

9    confident enough that you have the evidence to be presented and

10   it's being presented to the jury to overcome what you contend

11   are irrelevant, flimsy arguments and you have the full

12   opportunity to do that.  You know all these facts and you still

13   think the defendant is guilty.

14        If you give all those facts to the jury, I assume you

15   assume that a reasonable juror would think the same thing.  I

16   think that this whole thing about because a statement that the

17   defendant makes that he wants to use that was made years ago

18   may help him because it doesn't -- that statement doesn't

19   reflect a guilty mind or guilty conduct, that's not a reason to

20   keep that out of the case.

21        I think that with regard -- I think in the total

22   context -- and I'm also thinking this in the total context of

23   what you want to offer through your expert -- and what I need

24   to do is, I need to focus.  We're going to come back a little

25   early from lunch and maybe we'll take a little more, five or so

M1PBDOU3                    Pietruszewski

 1  minutes now, this is what I need from the defense.  I need to

 2  know which charts you're objecting to.  I do have that.  I need

 3  to know whether or not you're objecting to the chart as being

 4  inaccurate or you're objecting to the chart being misleading.

 5          I need to know besides the charts that you're

 6  objecting to, I need to know what specific testimony, whether

 7  it's an objection to the chart, whether it's an objection to

 8  the chart being accurate or whether it's an objection to the

 9  chart being misleading or is it an objection to what you

10  anticipate the testimony is going to be and what you object to

11  the testimony.

12          For example, I'll start out with -- and obviously I've

13  looked at these exhibits and I have some views as to what these

14  exhibits are suppose to be showing -- for example, you object,

15  defense objects to chart Exhibit 903, chart page 12.

16          MR. JANEY:  Your Honor, if you can refer me based on

17  the exhibit.

18          THE COURT:  903.

19          MR. JANEY:  We organized the different documents by

20  exhibit number.

21          THE COURT:  Exhibit 903, page 12 of Exhibit 903.  That

22  should be the annual compensation salary.  You have it as a

23  different number.

24          MR. JANEY:  We organized them Exhibit 1 through 7, but

25  I'm with you.

M1PBDOU3                    Pietruszewski

1           THE COURT:  Is there anything about this chart that

2      you contend is false?

3           MR. JANEY:  No.

4           THE COURT:  That's the first thing.  You're not

5      objecting this chart is an inaccurate representation of his

6      compensation.

7           MR. JANEY:  On 903, your Honor?  903 is overview of

8      the pharmaceutical.

9           THE COURT:  I have Dowd's annual compensation and

10     salary and bonus.  You identified it as page 12 and you said

11     you objected to 12 through 20 I think, so that's why I'm asking

12     you.  Maybe that's not where you wanted to point my attention.

13          MR. JANEY:  I have it as page 10, Doud's annual

14     compensation salary and bonus, 09-2017.

15          THE COURT:  Is there anything about that chart that is

16     factually inaccurate?

17          MR. JANEY:  Yes.

18          THE COURT:  What is it about the chart that is factual

19     inaccurate?

20          MR. JANEY:  The percentage of allocation of Mr. Doud's

21     bonus from controlled sales.

22          THE COURT:  Where is that?

23          MR. BURNETT:  It's not on that chart.

24          THE COURT:  What on this chart is inaccurate?

25          MR. JANEY:  I understand.  From that standpoint, no,

M1PBDOU3                    Pietruszewski

1    your Honor.

2            THE COURT:  You're not arguing about this chart being

3    inaccurate.  You're arguing about it being misleading?

4            MR. JANEY:  Yes, your Honor.

5            THE COURT:  That's what I'm trying to focus on.  If

6    this chart is factually accurate, why is this inadmissible?

7            MR. JANEY:  The argument -- and I think that we put

8    this in our cover brief, your Honor, our argument here isn't

9    that the numbers are inaccurate.  Our argument is this is a

10   misleading chart, one.  And two, what we also argue --

11           THE COURT:  In what way is it misleading?  If it's

12   factually accurate, in what way it is misleading?

13           MR. JANEY:  We anticipate -- this goes to one of your

14   Honor's question, we anticipate that this is a foundational

15   chart to set up the testimony about Mr. Doud's -- allocation of

16   controls sales to Mr. Doud.

17           THE COURT:  You're not objecting to the chart, you're

18   objecting to the testimony?

19           MR. JANEY:  Yes, Judge.  But going back to the chart,

20   what we also say and the government responds to it in the

21   filing they made last night, we object to the timeframe that is

22   exhibited in the chart.  The chart describes Mr. Doud's bonus

23   from 2009 to 2017.  We say beyond 2012 is irrelevant to this

24   case.

25           THE COURT:  All right.  That's what I understand too.

M1PBDOU3                         Pietruszewski

1    My first focus on any of these exhibits, particularly these

2    demonstrative exhibits as you described them is whether or not

3    this is somehow an inaccurate representation of the facts, and

4    you're saying to me that there's nothing on this chart that you

5    claim is inaccurate or false?

6              MR. JANEY:  Yes, your Honor.

7              THE COURT:  You say that any testimony -- you say that

8    the timeframe is too broad?

9              MR. JANEY:  Yes.

10             THE COURT:  And you say that any testimony that goes

11   along with this -- and I'm not sure which testimony you say

12   goes along with this that's going to be inadmissible.

13             MR. JANEY:  I'm making an assumption.  But what I

14   believe is that this is a foundational chart.  This would be

15   the initial predicate of setting up, these were the numbers

16   that Mr. Doud earned with respect to his bonus and overall

17   compensation.  The follow-up question that the government, we

18   anticipate, will then get to either as the next question or the

19   one after is, What components of Mr. Doud's bonus is allocated

20   or driven by the controlled sales percentage.

21             THE COURT:  That's not on this.

22             MR. JANEY:  That's not on this chart.

23             THE COURT:  Your objection to the chart itself, your

24   only articulable objection to the chart itself is that the

25   chart covers a timeframe that you think is irrelevant?

M1PBDOU3                      Pietruszewski

1            MR. JANEY:  Yes.  If I can elaborate on that point for

2    the moment.  The government says that's wrong.  The expert

3    needs to go back to 2009 in order to demonstrate how Mr. Doud's

4    bonus scaled up during the development or growth of controlled

5    substance.  That argument doesn't make any sense.  Even by the

6    evidence that's been admitted before this jury, the controlled

7    substances sales are really taking off in -- first growth in

8    2014, but really in 2015 and 2016.

9            THE COURT:  Let me make sure I understand what you're

10    arguing because you think that you're better off if this chart

11    only starts in 2013 as opposed to 2009?

12            MR. JANEY:  We give them 2012.

13            THE COURT:  You think you're better off if this chart

14    is limited to 2012 as opposed to 2009.

15            MR. JANEY:  From my perspective, yes, your Honor.

16            THE COURT:  Why?

17            MR. JANEY:  I don't think that what Mr. Doud earned in

18    2009 is probative in any way as to whether he was motivated by

19    bonus compensation during the timeframe of the conspiracy.  And

20    I don't need, from the defense perspective, to show that he

21    made fewer dollars in '09, '10, '11, which is totally

22    irrelevant and not probative.

23            THE COURT:  You don't think that you want to be in a

24    position to argue that his income was trending that way even

25    before?

M1PBDOU3                         Pietruszewski

1           MR. JANEY:  I don't need that argument, your Honor.

2      And the idea that the expert needs to look that far to the

3      left-hand side --

4           THE COURT:  How are you prejudiced by this chart?

5           MR. JANEY:  Well, one -- my first argument, your

6      Honor, is that it's not probative.  It's not probative of the

7      government's theory which is that he was motivated by greed

8      during the timeframe of the indictment.  Those earlier years

9      are not probative of what's at issue in this trial.

10          THE COURT:  How are you prejudiced?

11          MR. JANEY:  It shows, look at all the money this guy

12     made.

13          THE COURT:  In 2014 he made $899, 000.  You mean all

14     the money he made.  If anything, he made less than half of that

15     in 2009.  That's prejudice to your client?

16          MR. JANEY:  In 2009, if you start adding it up --

17          THE COURT:  -- he made 154, 000.

18          MR. JANEY:  It's the impression.

19          THE COURT:  He made less than you.  How does that

20     prejudice him?

21          MR. JANEY:  Your Honor, the chart gives the impression

22     of look at the scaling up of all of the money accumulated by

23     this man.

24          THE COURT:  As opposed to if the chart only starts in

25     2013 and it indicates he made three-quarters of $1 million in

M1PBDOU3                        Pietruszewski

1   2013, and then it shows that's he made twice as much of that in

2   2015 and 2016.

3              MR. JANEY:  Your Honor --

4              THE COURT:  That's a more accurate picture of what's

5   going on here.

6              MR. JANEY:  The subtext I think, and I don't --

7              THE COURT:  It's the subtext that's important, isn't

8   it?

9              MR. JANEY:  Well, the subtext that I feel toward the

10  energy from your Honor if I may say is, Are you sure that you

11  want to say that because the government -- You sure you want to

12  confine it to that period because the government is saying that

13  he made all this money because of controlled sales allocating

14  to his compensation and bonus.  And what I'm saying is that our

15  expert is going to say, that's not what occurred.

16             THE COURT:  You don't intend to elicit -- and because

17  if I rule, it's not coming in.  It's not coming in from either

18  side.  You don't intend to elicit what his salary range was in

19  2011 or 2010 or 2009?

20             MR. JANEY:  Absolutely not.  The timeframe of this

21  indictment is 2012 to 2017.

22             THE COURT:  Okay.  Your argument with regard to this

23  chart is solely that to go back before 2012 is irrelevant?

24             MR. JANEY:  As to the chart itself, yes, your Honor.

25             THE COURT:  Okay.

M1PBDOU3                    Pietruszewski

1          MR. JANEY:  Your Honor, the Court has heard my comment

2     about what I believe this chart serves as the predicate of the

3     setup of testimony.  Even if it's not the actual words that

4     come out of his mouth, it's the impression of what is left

5     unspoken by the expert when he starts talking about the bonus

6     allocation.  That's the problem with demonstrative exhibits.

7          THE COURT:  No, depends on what I let in.  If his

8     testimony is that his salary increased significantly during

9     this period of time and a portion of that was attributable to

10    the increased sales of controlled substances, what's wrong with

11    that?

12         MR. JANEY:  Can you say the last sentence again, your

13    Honor.

14         THE COURT:  Part of that increase was the increase in

15    the sales of controlled substances.

16         MR. JANEY:  Because the defense's position, if I can

17    make three -- four comments about that, your Honor.  That is

18    factually inaccurate.

19         Now, whether that -- and if I can just say.

20         THE COURT:  It may be disputed, but I'm not sure how

21    it's factually inadequate.

22         MR. JANEY:  There's a mathematical formula.  This is

23    science.  It is something that can be known as to whether the

24    allocation is true or not.

25         THE COURT:  The only difference I see is that you want

M1PBDOU3                         Pietruszewski

1   to use the post-profit numbers and they say that his agreement

2   says, no, you use the pre-profit number.

3           MR. JANEY:  If that's something that we can -- if that

4   ends up be being left up to cross-examination, we'll deal with

5   that.

6           THE COURT:  That's what I'm trying to understand.

7           MR. JANEY:  I've read the government's summary from

8   last night, your Honor this morning.  I think that the

9   government misreads the formula.

10          THE COURT:  Because you say the expert -- because you

11  disagree with the expert, that's not a basis --

12          MR. JANEY:  I understand and I've observed during the

13  course of this trial, I'm not trying to make Mr. Burnett's head

14  move anymore than it already is potentially separating from his

15  shoulders.  Where I'm permitted --

16          MR. BURNETT:  I'm just sitting here.

17          MR. JANEY:  I get it.  Those sorts of things are

18  subject to cross examination.  I understand, but I think that

19  the Court has heard my argument with respect to this slide.

20          If I can say one other thing, your Honor, because this

21  is something -- if you'll permit me, it's very, very important.

22  We have raised the issue about this expert in written

23  submissions to the Court during the *motion in limine*.  We have

24  raised the issue about these slides on the first day of the

25  trial.  I raised it on the record.

M1PBDOU3                          Pietruszewski

1          The reason I say that, your Honor, if I can be

2     permitted because this isn't a digression. The government's

3     submission late last night suggest that the defense is playing

4     games by submitting this writing challenging these slides in

5     what is described as the 11th hour.  That's just not the case,

6     your Honor.  The government has submitted endless 11:50 p.m.

7     submissions with witnesses on the witness stand.  That's not

8     what this is about.

9          THE COURT:  That's not what this is about for me, so

10    I'm not focused on that.  I'm focused on what are your

11    legitimate objections.

12         For example, I have exhibit page 17 which is supposed

13    to be the shipment of oxycontin and fentanyl orders that had

14    been flagged.  What is inaccurate about that chart, or is this

15    a similar argument that you're making that, well, we just don't

16    like the chart in conjunction with what we anticipate the

17    testimony is going to be?

18         MR. JANEY:  Here, your Honor, and what we say in our

19    submission is the chart is misleading.

20         THE COURT:  So it's not inaccurate?

21         MR. JANEY:  I'm not sure.

22         THE COURT:  You should be sure at this point.  If

23    you're not sure, you can't make that argument.  If you're not

24    sure, I'm not sure, and I won't give you a ruling on that

25    basis.

M1PBDOU3                        Pietruszewski

1          MR. JANEY:  I was being inartful, your Honor.

2          THE COURT:  But it's not inaccurate?

3          MR. JANEY:  It doesn't appear to be inaccurate, but it

4    is confusing and misleading.  To elaborate on that, your Honor,

5    the chart -- and I'm also relying on the government's comments

6    from yesterday where -- and in the government's letter

7    submission of last night -- the government is suggesting that

8    there's testimony before this jury where a pharmacy has orders

9    above the threshold of 30 percent, that that has been a red

10   flag that's been commonly described.

11         THE COURT:  Hasn't everybody who testified in this

12   case said that that's what they use under their procedure as a

13   red flag?

14         MR. JANEY:  I haven't heard 30 percent.  What I heard

15   is a number higher than at times 10.

16         THE COURT:  I heard a number less than 30 percent.  I

17   didn't hear a number over 30 percent. Who said over 30 percent?

18         MR. JANEY:  I don't think anyone has. I'm looking at

19   the chart.  I don't think anyone said 30 percent.  I'm looking

20   at the chart.  This is the same issue that I raised yesterday.

21         THE COURT:  You just said the chart is not inaccurate?

22         MR. JANEY:  It's confusing and misleading.

23         THE COURT:  But it's not inaccurate, so don't say look

24   at the chart.  I can't look at the chart and glean what your

25   argument is because it's not on the chart.  You say those

M1PBDOU3                        Pietruszewski

1    numbers on the chart are accurate.

2              MR. JANEY:  What I was about to describe, your Honor,

3    is how I believe the chart is confusing and misleading.

4              THE COURT:  I'm going to give you further opportunity

5    to argue that.  I'm just trying to focus myself first because I

6    don't want to spend a lot more time on going through all of

7    these charts and ask you the same question.

8              To the extent that you have an objection to the chart

9    because the chart you say is factually inaccurate, then I want

10   you to identify that for me right away, not now, when we come

11   back.  Identify that for me so I can address that.  If that's

12   not your argument, then I can put that part of it aside.

13             And you have a different kind of an argument to make,

14   and obviously a more difficult argument to make when you say

15   the chart itself is not factually inaccurate, but you want to

16   keep it out because you think it's misleading.  Well, that's

17   what a trial is for, isn't it?  It's for you to dispute what

18   the jury should conclude from those facts if those facts are

19   accurate.

20             So it doesn't mean that you get to kick out every

21   chart that you say is accurate because you don't want them to

22   make an argument that you say that the jury should reject.

23             (Continued on next page)

24

25

1        MR. JANEY:  I understand, and that's not the

2   objective, your Honor.  I want to envision a scenario where the

3   defense argues that a chart is confusing, misleading and/or

4   unfairly prejudicial, and the chart has to be changed.

5        THE COURT:  Right.  Right.  But it's difficult for me

6   to understand your argument that the chart is accurate, but

7   misleading.

8        MR. JANEY:  Well --

9        THE COURT:  Now, you know, put aside the testimony.

10   The testimony that goes along with the chart, you may argue to

11   me is either inaccurate or misleading, but because there is

12   anticipated testimony about the chart, it doesn't make the

13   chart itself inadmissible, because you say you don't like the

14   testimony that goes along with the accurate chart.

15        MR. JANEY:  Certainly, your Honor has in other

16   cases --

17        THE COURT:  Done what?

18        MR. JANEY:  Has determined that charts, where even

19   accurate information is on the page, is organized in such a way

20   that it is misleading or confusing to the jury.

21        THE COURT:  All right.  But you don't make that

22   argument here.  You don't make the argument that the chart is

23   organized in a way that the chart is misleading.  The only

24   misleading part of this you say is the testimony.  That doesn't

25   make the chart, it may mean you can convince me they shouldn't

M1P3DOU4

1       be able to make certain arguments about the chart, or shouldn't

2       be able to rely on the chart for that conclusion, or you should

3       be able to argue to the jury that they shouldn't reach that

4       conclusion.  But, I don't know why you say, if they put out a

5       chart that says the point they want to make is that during the

6       period of time when they claim that there was a conspiracy to

7       sell as many opioids as you possibly can, and that was

8       motivated by Mr. Doud's own self-interest and monetary gain,

9       and they want to show a chart that is consistent with the fact

10      that when he was selling opioids, he was making more money than

11      when he wasn't selling opioids.  And the jury should conclude

12      that that's consistent with his guilt, not consistent with his

13      innocence.

14              MR. JANEY:  I don't -- well --

15              THE COURT:  How does that make the chart inadmissible?

16              MR. JANEY:  Your Honor, with that example, if I can

17      just say three things.  One, I agree with you.  I opened up and

18      made that very statement in my opening statement.  So clearly,

19      I don't have an objection to that.  The third point that I

20      would make is, perhaps I misunderstood.  I thought you told me

21      to wait on my argument.

22              THE COURT:  I did.

23              MR. JANEY:  As to whether it is misleading.

24              THE COURT:  I'm trying to focus you because I'm not

25      sure you are going to come back on a solid argument on this

M1P3DOU4

1    unless you understand exactly where my concern is.  My concern

2    is you want me to keep the chart out, because you don't like

3    the testimony that goes along with it.

4              MR. JANEY:  In the first instance, your Honor, my

5    argument would always be that such a chart where I have that

6    type of objection should be precluded.  Now, if the government

7    then responds by saying, listen, we can make modification to

8    the chart, it is not for me to make that argument on behalf of

9    the government.  It is for the government to the say, listen --

10             THE COURT:  It is for you to make the argument that

11   would convince me that the chart itself is inadmissible.

12   Because, what you're saying is that to solve your problem is

13   not changing the chart.  What you are saying would solve your

14   problem is changing the testimony.

15             MR. JANEY:  Well, no.  What I would say, and I'm now

16   venturing into what your Honor has asked me to wait to do, so I

17   want to be clear, I would suggest on the one chart that you

18   asked me about, 904, that the chart should be organized in a

19   way that doesn't make it misleading.

20             THE COURT:  In what way would that be?

21             MR. JANEY:  The first column on the horizontal axis of

22   the chart, where it says controlled substance share of sales

23   30 percent is confusing and misleading.

24             THE COURT:  You say that's accurate.

25             MR. JANEY:  Your Honor, when you look at this chart,

M1P3DOU4

1     it is the same thing that I said yesterday.  When you look at

2     this chart, it is true in fact that it is trying to sum up --

3     this is a summary chart, right.  So it is being used, in

4     addition with the chart, similar charts behind it, like 905

5     from Ullmann Pharmacy, it's summarizing all of these total

6     sales.

7                THE COURT:  It is summarizing those facts.

8                MR. JANEY:  Those numbers, the veracity of those

9     numbers aren't in question.  But when the summary is presented

10    in this way, it is suggestive that in that line that these

11    numbers are all of these grossly ridiculous numbers.

12               THE COURT:  You don't think you are capable of

13    explaining to the jury that's not the case?

14               MR. JANEY:  Your Honor, I can.  And I believe that I

15    can.  But, the reason that we have the doctrine of confusion,

16    of jury confusion and misleading is so a determination is made

17    where the cross-examination isn't bogged down and takes two

18    hours in order to clear up all these charts.

19               THE COURT:  You think it is confusing and unfair for

20    the government to have a chart that indicates that the time

21    period that Mr. Doud made the most money was the time period he

22    was selling opioids?

23               MR. JANEY:  Now we're talking about two different

24    charts.  We're talking about different charts.

25               THE COURT:  I just went back to the first chart.

M1P3DOU4

1      MR. JANEY:  The first chart, your Honor, my objection

2  is about the time frame.

3      THE COURT:  So why, what is the objection that you

4  have to the chart that indicates the sales order of interest

5  and dispensing data as to these pharmacies?  Is there something

6  wrong with that chart?  Is that chart inaccurate?

7      MR. JANEY:  The chart is not, your Honor.  It would go

8  into the realm of testimony of the anticipated testimony that

9  we would anticipate from the witness.

10      THE COURT:  I guess this is what I want to focus you

11  and then we can take a lunch.  What is it you want me to limit

12  the expert, in what way do you want me to limit the expert to

13  not say what?

14      MR. JANEY:  The expert cannot, for reasons I can

15  elaborate, cannot opine on why those orders of interest were

16  stopped, the underlying reasons, whether he knows whether they

17  were on hold for periods of time and then released, the

18  circumstances under which that occurred.  He can only

19  testify --

20      THE COURT:  I don't know if he can testify to that.

21      MR. JANEY:  If I can continue without interruption.

22      MR. BURNETT:  He's not going to do that.

23      THE COURT:  The government just wanted to toss in he's

24  not going to do that.

25      MR. JANEY:  That's great.  The government also gave us

96 slides and for the first time last night and said he is only going to testify potentially to some of them.

THE COURT:  I guess the last part of what you need to focus for me, focus on whether it's inaccurate, or accurate but misleading.  Or whether you object to the chart, object to the testimony, also indicate to me what it is that you say that, based on the evidence in this case, and the charts that are not misleading, without misleading testimony.  What is it that you want to limit the government in the way they argue what conclusions that the jury should draw from these charts, because a lot of this is not expert testimony.  It is common sense.  Okay.  And common sense, inferences, as I will instruct them with regard to cases, it is inferences that they could but are not required to draw with regard from the facts as they find them.

So if you are trying to tell me that I should not just limit the testimony of this witness, but the government should be precluded from making certain arguments, and particularly that they should be precluded from making certain arguments because you want me to tell the expert he can't say it, so the government won't have it in the case to argue.

So, I need you to focus on those issues.  You have not made, as you can tell, you've not made even in the abstract a compelling argument to toss out exhibits if you keep telling me the exhibits are factually accurate.  That's not the solution

M1P3DOU4

1    to your problem, to throw out the factually accurate exhibits.

2    If you are just afraid of what conclusions that the expert or

3    the government is going to argue to the jury that they should

4    draw from those slides.

5         MR. JANEY:  I understand and I will focus my comments

6    after the lunch on the testimony and on the government's

7    argument aspect.  I will take a look back at what we provided

8    last night to the Court or yesterday evening, and I'll deal

9    with the things in that order.  I am afraid of very few things,

10   your Honor.

11        THE COURT:  I can tell you my initial reaction to

12   this, that there may be some particular change headings that

13   can be appropriately changed in order to not be misleading.  If

14   those headings are modified to describe the chart factually,

15   rather than describe the expert's opinion.  And you would have

16   to spell out for me, I don't think that makes either the chart

17   or the expert's testimony necessarily inadmissible.

18        MR. JANEY:  I'm not suggesting that the expert's

19   testimony in the main as a whole is inadmissible, your Honor.

20   We're not trying to, and I think we've all moved beyond it

21   during the course of this trial.  We are not trying to preclude

22   the government's expert.  That's not where the dispute is here.

23        THE COURT:  I had focused, I think I've understood

24   that and focused on the fact that your submission primarily

25   deals with the exhibits.

1    MR. JANEY:  Yes, your Honor.

2    THE COURT:  Saying you think these exhibits should not

3    be admitted in evidence.  And I'm trying to figure out if the

4    exhibits are accurate, what would preclude the exhibit.  And to

5    say that there is certain testimony you don't want to hear

6    along with the exhibit isn't particularly compelling to exclude

7    the exhibit.  Or, I guess if you can convince me that the

8    government should be precluded from making a particular

9    argument, and that argument would be based solely on an

10   exhibit, maybe the exhibit is totally irrelevant, I say they

11   can't make the argument.

12        But based on the leeway I've given the defense with

13   regard to the individual sales and transactions with certain

14   pharmacies, and now the government wants to show that despite

15   your anecdotal evidence, they have statistical evidence that

16   shows something to the contrary, they have the right to do

17   that.

18        MR. JANEY:  We are not trying to preclude the expert.

19        THE COURT:  All right.

20        MR. JANEY:  I want to be very clear about that.

21        THE COURT:  In that vein, then after lunch you come

22   back and tell me what it is you are trying to preclude and why

23   based on the parameters we've just finished.  You just said to

24   me you are not trying to preclude the expert.  You stated to me

25   there is nothing wrong inherently with the exhibit.  So I'm not

M1P3DOU4

1    quite sure how I can help.

2              MR. JANEY:  Okay, your Honor.  I understand.

3              THE COURT:  All right.  Let's take lunch and come back

4    in a half an hour.

5              (Recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1P3DOU4

AFTERNOON SESSION

2:00 p.m.

1

2

3          (In open court; jury not present)

4          THE COURT:  Are we waiting for Ms. Rothman?

5          MR. ROOS:  Before the jury or before the exhibits?

6          THE COURT:  Before the exhibits.

7          MR. ROOS:  We can go on for the expert without her.

8          THE COURT:  Mr. Gottlieb, do you anticipate finishing

9   your cross this afternoon?

10          MR. GOTTLIEB:  Not only this afternoon, but within

11   minutes.

12          THE COURT:  Promises, promises.

13          MR. GOTTLIEB:  You didn't hear me say promise.  All I

14   said is within minutes.

15          MR. ROOS:  60 minutes, 90 minutes, 360 minutes.

16          MR. JANEY:  That's the funniest thing Mr. Roos has

17   said.

18          THE COURT:  Mr. Janey, you want to identify what, if

19   any, exhibits that you are objecting to?

20          MR. JANEY:  Yes, your Honor.  If I can.  Bearing in

21   mind your Honor's comments from prior to the lunch break.  I'd

22   like to divide my comments into three buckets.  First dealing

23   with the exhibits, then discussing where we are seeking the

24   testimony of the witness and/or the government to be limited.

25          First, with respect to the exhibits, and looking in

1    particular at exhibits that are under the 903, Government

2    Exhibit 903 series.  If I can first and I'll go through exhibit

3    by exhibit where we have an objection.  And the objection is

4    not as to all exhibits, your Honor.

5            THE COURT:  I just want to, before you do that.  I

6    have a page 19 and it says it goes through 20 and I don't have

7    a page 20.

8            MR. BURNETT:  We have another --

9            MR. JANEY:  I have, my version is 19 of 19.

10           THE COURT:  Okay.

11           MR. BURNETT:  It goes through 20.  We can get you

12   another copy.

13           THE COURT:  I thought there were -- in your second

14   bullet point in your letter, you say that the slides in 903 at

15   pages 7 and then 12 through 20.  That's what you say.

16           MR. JANEY:  I apologize, your Honor.  That's

17   incorrect.

18           THE COURT:  Okay.

19           MR. JANEY:  That's incorrect.  It's through 19 because

20   they actually have -- there is an ECF number on it, on my

21   version.

22           So, one, with respect to these, your Honor, and we

23   have by the count of my tabs I have nine objections.  But here

24   is a categorical comment, your Honor, and it relates to time

25   frame.  And the time frame issue that I'll describe relates to

1    each one of the nine exhibits that I'll comment on.

2              We have a stipulation between the parties as to the

3    e-mails that have been admitted in evidence in this case.  As

4    to the time frame of 2012 through 2017 while Mr. Doud was

5    there.  And if I'm misstating the stipulation, I'm sure the

6    government will correct me but I believe that's correct.

7              Here with these exhibits, most of the exhibits that

8    I'm going to comment on begin with a time frame of 2010.  And

9    my comment with respect to that, with each one of these that

10   I'll describe is the same as I was describing prior to the

11   lunch break.  The time frames prior to the beginning of the

12   indictment are not probative of, A, whether Mr. Doud

13   participated or joined a conspiracy, and/or whether the

14   conspiracy exists.  I understand where we've had issues in this

15   case as to conduct outside or after Mr. Doud has left, but

16   isn't resonant with what's going on in these slides to the

17   extent they're beginning from the 2010 time frame.

18             So with respect to time frame, your Honor, you'll hear

19   my comment with respect to each one of the slides that I'm

20   identifying.

21             In particular, then, beginning with slide three, your

22   Honor, and there I believe that the header on the slide is

23   RDC's shipments of opioids increase by 125 percent between 2010

24   and 2015.

25             Your Honor, this slide should change.  Number one, on

1    the horizontal axis, what it is measuring is activity between

2    2010 and 2017.  It's emphasizing the increase, really as I was

3    describing earlier, the arc of the increase is really in the

4    2014 to 2016 time period with some minor dips.  But the time

5    frame outside of the course of the indictment is not probative.

6    And that slide should change.

7              THE COURT:  And you say -- I forget what date we

8    started.

9              MR. JANEY:  2012 to the end of March of 2017.

10             THE COURT:  What was the month of 2012?

11             MR. JANEY:  To my recollection your decision was

12   January 1.

13             THE COURT:  All right.

14             MR. JANEY:  So that illustrates the point with respect

15   to time frame on slide four.

16             THE COURT:  So you think the time frame should begin

17   January of 2012?

18             MR. JANEY:  Yes, your Honor.  I don't believe that the

19   time frame earlier than that is probative of what's going on in

20   this trial.

21             THE COURT:  Okay.  And you believe that it prejudices

22   your client how?

23             MR. JANEY:  It's not relevant.  It is not relevant

24   evidence.

25             THE COURT:  So --

1           MR. JANEY:  There is no -- it implies, the chart

2    implies there was something going on in 2010 and 2011, when

3    none of that is alleged in the indictment in this case.

4           THE COURT:  Well, doesn't it imply just the opposite?

5    That nothing was going on.  Very little was going on and that

6    it didn't start peaking until 2012.

7           MR. JANEY:  No, because what happens, your Honor, is

8    that if I take, if I draw your Honor's attention to slide three

9    as an example.  I think that a reasonable juror with the notion

10   that's under the arc that's written 125 percent increase from

11   2010 to 2015, on slide three, the 2010 time frame is used as a

12   part of the constant average growth rate to demonstrate that

13   beginning in 2010, that there is a substantial opioid increase

14   through 2015.  It implies that that time frame is at issue in

15   this trial and it decidedly is not.

16          THE COURT:  So, going to your next slide.  Same thing?

17          MR. JANEY:  On slide four, the same issue.  And here,

18   your Honor, it is not as egregious as, well, number one to make

19   the record clear.  Similar to slide three, the notations

20   indicated under each one of the lines implies, and a reasonable

21   juror could infer, that there was illicit activity that was

22   going on in the earlier time frame, and none that is charged in

23   the indictment in this case.

24          THE COURT:  Why would they infer that from this chart?

25          MR. JANEY:  Because the chart again, your Honor, it is

M1P3DOU4

1    measuring, even though on the horizontal axis it goes from 2010

2    to 2017, the notation under the arc describes a growth of

3    125 percent increase from 2010 to 2015.  It infers and implies

4    that the opioid -- or the oxycodone distribution problem that's

5    at issue is as a part of the evidence in this case.  And just

6    to drill down further, to pull the thread, that type of

7    constant average growth rate for periods outside of the

8    indictment should not be a part of the testimony of a witness.

9              THE COURT:  Okay.  Go ahead.  Let's move along.

10             MR. JANEY:  With respect to slide six, your Honor.

11             THE COURT:  You're skipping slide five?

12             MR. JANEY:  Yes, your Honor.

13             THE COURT:  You have no objection to five?

14             MR. JANEY:  No.  Only as to time frame categorical

15   through all the slides and in the Exhibit 903 series.

16             THE COURT:  Slide five also starts in 2010.

17             MR. JANEY:  Yes.  I started with my categorical issue

18   about time frame and now I'm trying to be specific with respect

19   to particular slides.

20             THE COURT:  Okay.  Go ahead.

21             MR. JANEY:  With respect to slide six, your Honor, the

22   header the fentanyl sales were the key driver of the increase

23   in opioid sales dollars over the period.  I guess, that's tied

24   into the time frame, so my objection there would also be about

25   time frame but it would change the header.  And at best, what

M1P3DOU4

1    the witness could testify about is the growth of fentanyl sales

2    during a time frame which we submit would be 2012 to 2017.

3          THE COURT:  So this is a chart that I guess all of

4    your fentanyl.  So your objection is to the time and again in

5    2010?

6          MR. JANEY:  If I can just sort of condense some of my

7    comments to make them brief while we have this slide.  I would

8    argue with respect to this, your Honor, the limitation that we

9    would propose with respect to both the witness and the

10   government is that neither the government nor the witness can

11   use this slide to argue, or even to elicit testimony about the

12   weight of the fentanyl.

13         THE COURT:  What, you mean the percentage?

14         MR. JANEY:  Well --

15         THE COURT:  When you say weight.

16         MR. JANEY:  The weight.  The amount of fentanyl that

17   was illicitly sold.

18         THE COURT:  Isn't that part of the indictment?

19         MR. JANEY:  Well, sure.  But there is nothing about

20   this slide and there is no evidence that has been admitted,

21   there is no material that's been in evidence in this case that

22   goes to the weight of the fentanyl.  That has not been

23   established.

24         THE COURT:  What do you mean it has not been

25   established?

1          MR. JANEY:  The government hasn't proven the weight of

2     the fentanyl.

3          THE COURT:  Obviously I am assuming that, I don't

4     remember if that's the case.  If that's the case, then --

5          MR. JANEY:  I haven't heard it.

6          THE COURT:  Before they rest they will they need to

7     put in some evidence that there is over 400 grams of fentanyl.

8          MR. JANEY:  I haven't heard it.  But I don't believe

9     it can be derived from this slide.

10          THE COURT:  All right.  Well, okay.  To the extent

11     that the record in this case reflects that, they can put it in

12     the chart.

13          MR. JANEY:  I understand.  But what I'm arguing is

14     that the record does not reflect that.

15          THE COURT:  Okay.

16          MR. JANEY:  All right.  With respect to slide seven,

17     your Honor, I think I might have skipped over it.  On slide

18     seven, the label is RDC's opioid shipments increase while

19     industry sales fell.

20          Now, here, your Honor, I don't believe changing the

21     header here is the issue.  Number one, it's not probative of

22     what the sales were in the rest of the industry on these opioid

23     sales.  It hasn't been a part of this trial.

24          THE COURT:  Say it again?

25          MR. JANEY:  It's not probative of the charged conduct

M1P3DOU4

1   as to what was going on with respect to the rest of the

2   industry in respect of opioid shipments.

3           THE COURT:  You know, I can't agree with that.  If

4   everybody else's sales are going down, and RDC's sales are

5   going up --

6           MR. JANEY:  That doesn't tend to prove a conspiracy.

7   Just because there were sales going up.

8           THE COURT:  It tends to prove an element of the

9   conspiracy, that the agreement was to increase the sale of

10  controlled substances and profit from them.

11          MR. JANEY:  But for that, your Honor, you don't need

12  to do a comparison to the rest of the industry, for instance.

13  You would simply have a chart that would establish what your

14  Honor just described, which is during the relevant time frame,

15  and they already have that chart.  And we haven't objected to

16  it, which is the opioid sales increased.  That's not in

17  dispute.

18          THE COURT:  No.  But increased compared to what?

19          MR. JANEY:  Increased from the prior period from year

20  to year.

21          THE COURT:  But it's less relevant if opioid, if

22  opioid sales increased 222 percent for RDC, and for the

23  industry as a whole, it increased 500 percent, that would mean

24  something different.

25          MR. JANEY:  But it doesn't -- I don't think --

1    THE COURT:  To say that it went down 18 percent in the

2    industry, and went up 222 percent with regard to RDC, makes one

3    question what was the legitimate reason that RDC is outside of

4    that trend.

5    MR. JANEY:  Let me just say this, your Honor, because

6    I know time is short and I don't want get bogged down on this.

7    So that your Honor understands my objection.  In order to

8    show -- this case is about diversion at the end of the day.

9    You don't need to do an industry comparison in order to show

10   diversion activity.  You need to first, as your Honor just

11   described, show, for example, the sales of the opioids or the

12   narcotics increased.  One.  Two, that the red flags were

13   ignored and there was no investigation.  Three, the evidence of

14   the diversion which the government has put on in this case is

15   that pharmacies, illicit pharmacies did things with those pills

16   they shouldn't have done.  Again, I hear what your Honor is

17   saying --

18   THE COURT:  But if the evidence was that opioid sales

19   for RDC were going down while opioid sales for the industry

20   were going up, you would be the first one in here arguing that

21   that's evidence that there wasn't a conspiracy.

22   MR. JANEY:  I don't know, your Honor.  My brain is

23   small, I think slowly, so I'd have to think about that.

24   THE COURT:  You guys are an army of smart lawyers

25   there.  Somebody would come up with that argument.  It's not

M1P3DOU4

1      logical to say that my guy is profiting off of opioid sales

2      illicitly, when my guy's making less money in opioid sales than

3      the whole industry.

4                MR. JANEY:  I hear your Honor.  I am going to move on.

5                THE COURT:  I don't disagree with you with regard to

6      the header.  I think that the header doesn't really reflect

7      what the chart says.

8                MR. JANEY:  Yes.

9                THE COURT:  The header is not talking about, the chart

10     is not talking about increase.

11               MR. JANEY:  That's right.

12               THE COURT:  Or decrease in that comparison.  It seems

13     to me a more appropriate header for this chart is RDC's opiate

14     shipments compared to industry sales.

15               MR. JANEY:  Yes.

16               THE COURT:  That's what they compare.  Maybe the

17     expert or the lawyers can argue about how that reflected.  But,

18     the header is not an argument.  The header is supposed to be a

19     description of what the chart is supposed to represent.  And

20     this chart represents the opioid -- RDC opioid sales compared

21     to industry sales, and when you look at that comparison, and

22     you make whatever conclusions and an expert or lay person is

23     supposed to make.

24               MR. JANEY:  Right.

25               THE COURT:  That's my reaction.

M1P3DOU4

1        MR. JANEY:  Yes.  With respect to slide 10, this was

2   the subject of --

3        THE COURT:  You skipped slide eight.

4        MR. JANEY:  Yes, your Honor.

5        THE COURT:  You still have the --

6        MR. JANEY:  We still have the categorical comment with

7   respect to all the slides relating to time frame where that's

8   applicable.

9        THE COURT:  And you have another objection?

10       MR. JANEY:  No.

11       THE COURT:  And what about nine?

12       MR. JANEY:  No, your Honor, except, let me put my

13   glasses on.  Nine, again the categorical objection with respect

14   to time frame.

15       THE COURT:  Right.

16       MR. JANEY:  The other thing that I'll say on the face

17   of it, your Honor, well, I think -- just with respect to time

18   frame, your Honor.

19       THE COURT:  You don't have any problems with the

20   heading?

21       MR. JANEY:  See, I was just looking at that and I

22   didn't, on balance -- see, the header has to change in order to

23   match the change in the dates.

24       THE COURT:  If that changes.

25       MR. JANEY:  Right.  Then in all fairness, if the top

1    line is demonstrating that it's moving at a faster rate, I

2    don't believe we have an objection to that and I think that the

3    competent evidence shows that.

4                THE COURT:  Okay.

5                MR. JANEY:  With respect to 10, I believe that the

6    Court understands our objections there.  That's the subject of

7    the colloquy prior to lunch.

8                With respect to slide 11, your Honor --

9                THE COURT:  You don't think that in fairness, that

10   there should be any time period prior to the first date of the

11   conspiracy that's in this chart?

12               MR. JANEY:  Well, so, I have certainly understood that

13   some experts may say, your Honor, and it's even true for me in

14   my former life at the Federal Reserve, that I would want some

15   pegging period.

16               THE COURT:  The before and after.

17               MR. JANEY:  Earlier in order to anchor it.

18               THE COURT:  What do you think is reasonable?

19               MR. JANEY:  But, I can conceive of a one-year prior to

20   going back, in order to anchor it, and I understand from an

21   economist standpoint where that may make sense.  But I think on

22   balance, years prior to that, the prejudice, for the reasons

23   that I've already explained, outweigh the probative value.  And

24   in fact, I believe there is no probative value --

25               THE COURT:  Again I still, that's why I keep asking

M1P3DOU4

1    you, I still don't think you've articulated the prejudice.

2              MR. JANEY:  The prejudice, your Honor, is that the

3    charts as constructed, particularly when they imply that there

4    was illicit activity and they explicitly imply it --

5              THE COURT:  There is illicit activity prior to 2012.

6              MR. JANEY:  Yes, your Honor.

7              THE COURT:  I don't see any evidence in this case

8    that --

9              MR. JANEY:  There is no evidence in this case.

10             THE COURT:  I don't hear anybody argue that.

11             MR. JANEY:  But the chart, again, your Honor, other

12   charts under the arcs of the lines describe, for example, and

13   several of them do this, a constant average growth rate of

14   125 percent and so on between 2010 and 2015.  That's

15   prejudicial.  It strongly gives the jury a false impression

16   that there was illicit activity in the earlier time frame years

17   outside of the time frame of this indictment.  There is no

18   evidence of that in this case.

19             THE COURT:  Well, you are going to end up with a

20   smaller -- a similar high percentage over a smaller period of

21   time.

22             MR. JANEY:  Your Honor, this is the same question that

23   you asked me.  I'm fine with that.

24             THE COURT:  All right.  Go ahead.

25             MR. JANEY:  With respect to page 11, your Honor, the

header is a problem.  Again, customers -- it gives a

conclusion.  Customers with exponential growth in opioid orders

would not be flagged by RDC's order of interest policy.  I have

no idea how this data actually supports that header.

MR. BURNETT:  Just so we are following along, that's

not what I have as slide 11.

THE COURT:  I have that slide 12.

MR. JANEY:  Okay.  There was, we received an update of

the government's slide so I have this as --

THE COURT:  Was that handed to me, the government's

update?

MR. BURNETT:  I sent an update yesterday.  Slide 11 on

that is about the bonus payments that are attributable to the

sales.

MR. JANEY:  Whatever the slide number is.  If it's 12

for the record.  I'm referring to --

THE COURT:  You say this is more accurately described

as what?

MR. JANEY:  All it's measuring, just reading at the

horizontal axis, this is actual shipments, it seems to be

measuring actual shipments and RDC threshold.  That's what the

box on the slide says it is measuring.  The header makes a very

strong statement.  It's not describing what's going on in the

chart.  It's giving a value judgment.  Customers with

exponential growth in opioid orders would not be flagged by

1    RDC's order of interest policy.  This witness is supposedly not

2    a compliance person, isn't going to opine at any level about

3    how or why orders were flagged, so forth and so on.  He is not

4    competent to reach that conclusion that's embedded in that

5    header.

6              THE COURT:  I'm not quite sure I totally understand

7    without the testimony what the chart is supposed to represent.

8    It represents the growth in dosages of opioids that was ordered

9    over this time period.

10             MR. JANEY:  As I interpret it, your Honor, the blue

11   bars are actual shipments of opioid orders during the time

12   frame.

13             THE COURT:  Right.  That's how much opioids they

14   shipped during in those months.

15             MR. JANEY:  It is labeled actual shipments, but the

16   gray line that --

17             THE COURT:  The which line?

18             MR. JANEY:  The gray line that moves, if you can see

19   right above the bars beginning in January of 2014.

20             MR. ROOS:  I think AUSA Burnett who is putting on this

21   witness can explain what the witness will say.

22             MR. BURNETT:  Yes.

23             MR. JANEY:  If I can just finish what I was saying.

24   Thank you.  The gray line appears to measure what that growth

25   is.  So that's a growth curve.  Right.

M1P3DOU4

1          MR. BURNETT:  I don't think that's right.

2          THE COURT:  I don't think that is right.  I was a

3    little confused by this too.  The end of the gray line, after

4    October '16 compared to what happened in January of '14 that

5    there was an increase, well, I guess from January '13, there

6    was an increase in opioid orders of 1800 percent.

7          MR. BURNETT:  I can explain.  I think we are going --

8    what this shows is basically RDC's order of interest system,

9    the way it created set thresholds for the orders that customers

10   were allowed to place was by looking at a 12-month rolling

11   average and taking a one and a half times multiple of that.

12          So when the chart here on page 12, and the following

13   chart on page 13, what those are, are basically what the expert

14   did is he said, okay, let me take that system, the way the

15   system operates, and plot out how with a hypothetical customer

16   who had either an unusual spike in ordering, which is what you

17   see on page 13, or that had pretty substantial exponential

18   growth in their purchasing.  Would that customer have been

19   flagged for an order of interest under the way the system was

20   designed.  And the answer is no.

21          So the gray line reflects what the order limit is

22   under the way RDC calculated its thresholds, and the blue lines

23   reflect the hypothetical ordering of the customers.

24          THE COURT:  I don't know how that reflects a

25   conspiracy.

M1P3DOU4

1          MR. BURNETT:  What it does, it shows the question that

2     the expert is trying to look at here is under RDC's system, the

3     way they designed it, would it have caught significant

4     increases or significant spikes in the ordering of controlled

5     substances at pharmacies, which is one of the factors that a

6     distributor is supposed to detect.

7          THE COURT:  If the answer is no, it would not have

8     been obvious to people at RDC or Mr. Doud, what is that

9     evidence of?

10          MR. BURNETT:  I think what it shows is, the main thing

11     it shows when the system actually was getting tripped, which is

12     the next piece of the stuff in the slides, then we're talking

13     really substantial growth and really substantial spikes for

14     that system to be triggered.

15          THE COURT:  The blue lines indicate how many doses

16     were ordered?

17          MR. BURNETT:  For a hypothetical customer.

18          THE COURT:  When you say a hypothetical customer --

19          MR. BURNETT:  The two slides, 12 and 13.

20          THE COURT:  Why are you dealing with hypothetical

21     customers?

22          MR. BURNETT:  Just to illustrate how the threshold

23     setting system worked.

24          THE COURT:  I don't understand what this is supposed

25     to be saying to a jury.

1           MR. BURNETT:  What is this saying to jury is the

2     threshold system that RDC designed would only trigger when

3     there are very substantial increases, or very substantial

4     spikes, in the ordering from a customer.  What that does is it

5     helps the jury to have context to understand what was happening

6     when a spike actually did trigger the order of interest system,

7     which is what the rest of the slides talk about.

8           MR. JANEY:  If that's in fact what these two slides

9     are, then our objection is both of these slides should be

10    precluded.

11          THE COURT:  What does the second slide show?

12          MR. BURNETT:  The second slide is another one of these

13    hypothetical examples using the way their system worked, but to

14    show a spike as opposed to a growth.

15          THE COURT:  I'm not sure why we're dealing with, given

16    the amount of sales that you demonstrated and you want to

17    demonstrate in this chart, why are we dealing with hypothetical

18    sales.

19          MR. BURNETT:  These two slides are designed to

20    illustrate how the system worked before it actually tripped.

21          If you think it's too confusing, we are happy to cut

22    the slides.

23          THE COURT:  I definitely think it's too confusing but

24    that's not my issue.  Your job is to confuse them, if that's

25    what you want to do.  I just don't understand, this isn't based

1    on any evidence that was offered, evidence of sales that were

2    offered in this case, it is based on a hypothetical.

3            MR. BURNETT:  It's based on Government Exhibit 276,

4    which lays out the formula that the order of interest system

5    used.

6            THE COURT:  But the formula changed several times,

7    didn't it?

8            MR. BURNETT:  This is the most conservative version of

9    the formula.

10           MR. JANEY:  That makes it very confusing and

11   potentially misleading.  We have a lot of actual evidence and

12   actual conduct that the government has alleged.  If you are

13   putting on a hypothetical scenario --

14           THE COURT:  I think they may be right on these two

15   slides.  If you cannot glean this kind of evidence and argument

16   from the actual sales that took place at the company, then I am

17   not sure in fairness that a hypothetical is what's appropriate.

18           MR. BURNETT:  They are not really central to the

19   testimony.  I'm happy not to cover these slides.

20           THE COURT:  I must tell you I did not get that point

21   when I read those two slides.  I was totally confused.

22           MR. BURNETT:  Slides don't really speak for

23   themselves.  You need the expert.

24           MR. JANEY:  Now understanding some of the scope and

25   nature of the witness's testimony, while we're on this, we

1    would seek that the witness be limited from giving hypothetical

2    explanations of the evidence and that the government be

3    restricted from eliciting from the witness hypothetical

4    scenarios to present actual evidence to this jury.

5              THE COURT:  Well, I'm not quite sure what

6    hypothetical.

7              MR. JANEY:  Based on what the government has just

8    described, it's certainly more than mere speculation at this

9    point.

10             THE COURT:  Does the government intend to propose

11   hypotheticals to this expert?

12             MR. BURNETT:  No.  To be clear, that's just how the

13   system works.  There are no other hypotheticals we are

14   proposing.

15             THE COURT:  Let's move on.

16             MR. JANEY:  With respect to 13 and 14, your Honor, our

17   comments are consistent with the categorical objection as to

18   time frame.

19             THE COURT:  Okay.

20             MR. JANEY:  With respect to the headers, it's not

21   entirely clear to me that the headers are actually describing

22   the activity that's going on in the charts.  RDC orders of

23   interest identified for all controlled sales during the time

24   period.  I'm not sure I understand that given what's on the

25   horizontal axis and described below.  It says --

M1P3DOU4

1          THE COURT:  Let's start with that first box.  What

2     does 89 percent mean?

3          MR. BURNETT:  May I explain?

4          THE COURT:  Yes.

5          MR. BURNETT:  You are looking at the one that's titled

6     order of interest identified for all controlled substances.

7          THE COURT:  Yes.

8          MR. BURNETT:  Each bar here reflects the total number

9     of order of interests, order of interest that RDC's system

10    flagged in each quarter.

11         THE COURT:  So these are the actual statistics with

12    regard to the flagged orders of interest?

13         MR. BURNETT:  Exactly, and the blue part of the bar,

14    that reflects the number -- that reflects the number of orders

15    that were flagged and then shipped.  The orange part of the bar

16    reflects the number of orders that were flagged and then

17    partially shipped, because an order can have, say, 200 units in

18    it so 100 gets shipped, 100 doesn't.  The gray part of the bar

19    reflects the number of orders that were flagged and then

20    actually denied.  And the percentage of, on top of the bar,

21    reflects the number of orders or the percentage of orders that

22    were either completely released or partially released.  So

23    let's say there were 100 orders of interest that were flagged

24    by the system in a particular quarter.  RDC completely shipped

25    95 of them, and partially shipped another four of them.  Then

1    it would be 99 percent of the top of that bar.

2              THE COURT:  Your numbers at the bottom, these are

3    quarters?

4              MR. BURNETT:  Yes, each quarter.

5              THE COURT:  Okay.  So, in the last quarter of 2010,

6    there were 80 -- I don't see, it doesn't tell me how many

7    orders of interest there were.

8              MR. BURNETT:  The Y axis tells you that.  We didn't

9    specifically designate the number within the Y axis.  So

10   basically, to take an example, say you look at like one that

11   kind of lines up well.  So Q1 2015.  So there are about looks

12   like about 1300 orders of interest that are --

13             THE COURT:  95 percent of those were shipped out.

14             MR. BURNETT:  Were shipped or partially shipped.

15             THE COURT:  All right.  And then the second chart

16   after that is similar?

17             MR. BURNETT:  It is the same exact thing, but narrowed

18   just to oxycodone and fentanyl.

19             THE COURT:  What are your objections to those two?

20             MR. JANEY:  The time frame, your Honor.  It is the

21   categorical objection to time frame.

22             THE COURT:  And then let's go on.

23             MR. JANEY:  Right.  I'm on what I have marked as page

24   15, the government may correct me if my pagination is wrong,

25   but it is labeled RDC shipped oxycodone and fentanyl orders

M1P3DOU4

1    even after they were flagged.  There the comment is two-fold,

2    your Honor.  It is one it's with respect to time frame.  And

3    two, is the label.  It is not just describing.  The "even

4    after," right.  It's unnecessary, it reaches a conclusion.

5    Again, the flagging, the process for the flagging, he is not

6    testifying as to that.  He is only testifying as to the

7    numbers.

8            THE COURT:  Is there any reason why it isn't accurate

9    to simply say RDC oxycodone and fentanyl orders shipped after

10   they were flagged?

11           MR. BURNETT:  We can delete "even."  I'm not losing

12   sleep over that.

13           THE COURT:  Okay.  And just put ship after orders.  I

14   think it's clearer.

15           MR. BURNETT:  Okay.

16           THE COURT:  How difficult is it for you to adjust

17   these numbers if we change the time period?

18           MR. BURNETT:  It's going to be a bit of work.  I think

19   this time frame objection, I have an answer to it, but I'm

20   happy to give it when Mr. Janey is done.  I think it is

21   unnecessary.  I think the comparison is relevant and there is

22   certainly no unfair prejudice.  It's also all in evidence, too.

23           THE COURT:  Let's go through the next couple.

24           MR. JANEY:  Right.  What I have is page 16 of 19, but

25   it is labeled RDC orders of interest compared to suspicious

M1P3DOU4

1    orders reported to the DEA 2010 through 2016.  There, to be

2    consistent, it is time period, but more importantly, your

3    Honor, if the version that I have is correct, it shows

4    suspicious order activity report to the DEA, it shows four.

5    Now first, let me confirm with the government that I'm looking

6    at the right version of the chart.

7            MR. BURNETT:  So, I think -- it does say four.  I

8    think you're missing a page somewhere along the line because

9    you are a page behind.

10           MR. JANEY:  No, I skipped --

11           MR. BURNETT:  This is 17 for me.

12           MR. JANEY:  Okay.  That's fine.  This is the slide I'm

13   talking about.  And in my comment there, your Honor, is I

14   believe it is inaccurate based on the evidence that has been

15   admitted.

16           THE COURT:  What's inaccurate?

17           MR. JANEY:  The four.  We have elicited, by my count,

18   information of at least 12.  We can go back and pull the

19   record.  But the evidence before this jury is not four.

20           MR. BURNETT:  That's wrong.

21           MR. JANEY:  Look, we can break things down.

22           THE COURT:  Why is there a discrepancy?

23           MR. BURNETT:  I think what's happening here is there

24   was a period between the beginning of Jan. 1, 2017, and the end

25   of Q1 2017.  I think there were eight or nine suspicious order

M1P3DOU4

1    reports that RDC filed during that period.  Because Mr. Doud

2    had technically not officially retired by then, I think the

3    defense has been counting them as in the group that was filed

4    while Mr. Doud was running the company.  The testimony that

5    came in from both Mr. Pietruszewski and from Jessica Pompeo was

6    that, for all practical purposes, Mr. Doud was out of the

7    compliance picture by the end of 2016.  And so that's why we've

8    been looking at the period between 2016 and prior, and in that

9    period there is four.

10           THE COURT:  So you say between 2010 and 2016 there

11   were four suspicious activity reports filed.

12           MR. BURNETT:  That's factually accurate.

13           THE COURT:  You say that there were 1,252 that had an

14   order of interest.

15           MR. BURNETT:  There were 12,000 that were orders of

16   interest that the company shipped.  There were 1,252 orders of

17   interest that the company either denied or partially denied,

18   and there were four orders --

19           MR. JANEY:  On the DEA reports, your Honor, the

20   government can't have it both ways.  They want to hold his

21   conduct, hold him responsible for conduct through March of

22   2017, but don't want to allow suspicious activity reports filed

23   with the DEA to be attributed to him for part of the time

24   frame.

25           THE COURT:  I don't know what your position is with

M1P3DOU4

1    regard to that, as to whether or not Mr. Doud had anything to

2    do with those suspicious order activity reports.

3          MR. JANEY:  Look, the government has taken the

4    position that regardless of what Jimmy or Bobby or Suzy were

5    saying to each other, the fact is that he was the management,

6    the upper management, and so whatever happened during the time

7    frame of the indictment, they are attributing that conduct to

8    him.  So, they can't have it both ways.  Those reports were

9    filed during --

10          THE COURT:  You want to have it both ways, too.  You

11   want to say that he has something to do -- you are not saying

12   he has anything to do with those reports.

13          MR. JANEY:  I don't know why, I don't know why your

14   Honor is saying that.

15          THE COURT:  Well, first of all, there is no evidence

16   in this record, and I'm not sure that you are arguing, that as

17   of that the period of time that they were talking about, that

18   he was involved at all with regard to suspicious activity

19   reports in 2017.

20          MR. JANEY:  I don't think I have to get into the

21   minutia that the government --

22          THE COURT:  You have gotten into the minutia.  That's

23   all you have done is minutia.  They want to do general

24   statistics and you want to do the minutia of going to the

25   individual report.

M1P3DOU4

1           MR. JANEY:  So I won't waste time on this now.  I'll

2       cross-examine him on it.  The documents are admitted in

3       evidence.

4           THE COURT:  That's what I was going to say.  Why isn't

5       this appropriate for cross-examination?

6           MR. JANEY:  That's fine.

7           THE COURT:  I want to be fair about it.

8           MR. JANEY:  That's fine.

9           THE COURT:  I don't hear you saying that the record

10      supports an argument that you can make that Mr. Doud was

11      involved in any of these decisions for most of 2017.

12          MR. JANEY:  Your Honor --

13          THE COURT:  The opposite, the evidence is just the

14      opposite.

15          MR. JANEY:  I'll deal with it on cross.

16          THE COURT:  Okay.  And then what about the next one?

17          MR. JANEY:  Again, everything else, I'm now going to

18      move to Exhibit 905.

19          THE COURT:  Oh.

20          MR. JANEY:  I'm good.

21          THE COURT:  Because --

22          MR. JANEY:  The time frame comment applies to all, but

23      you've heard me on that.

24          THE COURT:  Where are you going now?

25          MR. JANEY:  905, your Honor.

1           THE COURT:  Okay.  All right.

2           MR. JANEY:  Here, this goes not so much to the slides

3   themselves, your Honor.  Here my comment goes to, from the

4   defense perspective, the limitation that should be either on

5   testimony or argument.  And it's our position these charts

6   describe consistently and throughout total sales dollars and

7   then controlled substance sales dollars.

8           And my comment here would be that neither the witness,

9   who I've been told repeatedly now will not testify about

10  diversion, but also that the government cannot argue that the

11  controlled substance sales dollars, those particular dollars,

12  so, for example, if I use the example of Alden Pharmacy, Inc.,

13  which is right after the summary slide with $330,980 of

14  controlled substance sales, that those sales dollars in and of

15  themselves represent diversion.  There's been --

16          THE COURT:  It doesn't say it represents diversion.

17  Somebody going to testify that they represent diversion?

18          MR. JANEY:  I don't know.  Earlier before lunch you

19  asked me to my understanding, your Honor, where the defense

20  would want limitations on the exhibits.  The physical

21  documents.

22          THE COURT:  How would you want me to limit this?

23          MR. JANEY:  That this exhibit cannot be used as a

24  basis for the government to argue that these controlled

25  substances sales dollars are evidence of diversion.

M1P3DOU4

1           THE COURT:  Well, the question is not just whether
2    it's evidence of diversion.  It is also whether or not they, as
3    you seem to want to dispute, that they significantly
4    contributed to Mr. Doud's income.
5           MR. JANEY:  Well, what -- yes.  But I am expecting or
6    anticipating that the other slide will be used as a predicate
7    for that.
8           THE COURT:  Which slide?
9           MR. JANEY:  The slide that we started earlier in the
10   903 series which is only about the compensation numbers.  It
11   does not include controlled sales dollars on it.
12          THE COURT:  I know, but 904 is a general exhibit, the
13   top page.  904 is a general exhibit summary of red flags.
14          MR. JANEY:  Yes.
15          THE COURT:  Okay.  Now, I assume, where is my note.  I
16   assume that, I mean, I'm trying to figure out what we're
17   dealing with.  There is red flags that were identified by RDC.
18          MR. JANEY:  Yes.
19          THE COURT:  There were red flags that apparently are
20   going to be identified by the expert that wasn't identified as
21   red flags.
22          MR. JANEY:  My expectation is the opposite.  I'll be
23   jumping up and down if this expert starts identifying red flags
24   that have not been part of this case.
25          THE COURT:  So, the summary of red flags identified in

M1P3DOU4

1    41 customer case studies is red flags that RDC identified.

2    Right?

3          MR. JANEY:  I will cross-examine on that, your Honor.

4          THE COURT:  But that's the evidence the government

5    intends to --

6          MR. JANEY:  That's the evidence that the government

7    intends to promote to the jury.

8          THE COURT:  And the red flag definition that they're

9    using is the criteria that RDC used to identify red flags.

10         MR. JANEY:  I have questions about that, to be sure,

11   but I will clarify that on cross-examination.  I want to be

12   clear about that.

13         THE COURT:  That's my understanding.  Now if they say

14   they have something on this list that their expert said, well,

15   in my opinion it is a red flag and nobody else at RDC thought

16   it was a red flag, then we can discuss that.  But that's not, I

17   didn't think we were going outside the realm --

18         MR. JANEY:  I need to hear the testimony before I can

19   make that objection.

20         THE COURT:  So the summary chart, the summary of red

21   flags identified is an accurate chart?

22         MR. JANEY:  To my understanding, as I stand here today

23   without hearing the witness testimony, that's what I expect.

24         THE COURT:  And the underlying individual charts with

25   regard to individual pharmacies, that information is accurate?

1            MR. JANEY:  Yes.

2            THE COURT:  But you say it's unfair to do what?

3            MR. JANEY:  What I am saying, your Honor, is to the

4    extent that the government plans to argue that the controlled

5    substance sales dollars in those boxes are evidence of

6    diversion activity, we have an objection, because that's not

7    true.  That is not the evidence that's been admitted in this

8    case.

9            THE COURT:  All right.

10           MR. JANEY:  The only thing it shows --

11           THE COURT:  I'm not to that point yet.

12           MR. JANEY:  I'm sorry.

13           THE COURT:  That's an argument point.  The question is

14   whether or not I should exclude the chart that reflects this,

15   or I should exclude the testimony of the expert in some way

16   with regard to this chart.  Now, if they think they have a

17   basis or if they don't have a basis to argue what you've just

18   said in their summation, then my standard practice is to remind

19   the jury that what the lawyers say is not evidence, that it's

20   their recollection of the testimony that controls.

21           MR. JANEY:  And the only thing that this witness can

22   argue with respect to using this example, Alden Pharmacy, is

23   that's the number of controlled substances that it purchased

24   from RDC.  Where it potentially becomes misleading, your Honor,

25   and I want to be clear, as to where my angst is about this

1    chart, is one could look at this because it's on a table of red

2    flags, and this goes to where earlier I said you can have

3    factual data but it's misleading or confusing even though it's

4    true in fact.  The jury may infer, a reasonable juror could

5    infer from the fact that it's on a chart and part of a context

6    of red flag analysis that that $330,000 is inherently part of

7    the illicit activity and there is no evidence of that.

8            THE COURT:  What makes you say this is a part of the

9    red flag analysis?

10           MR. JANEY:  Because, this summary chart going back to

11   the summary chart is not --

12           THE COURT:  Those are two different charts.  There is

13   904 and 905.

14           MR. JANEY:  To my understanding, subject to the

15   government saying otherwise, I understand these individual

16   charts like Alden Pharmacy and the others that follow

17   thereafter, Brighton Eggert Pharmacy, etc., to be part of the

18   41 customer case study analysis put on by the expert.

19           THE COURT:  It is only a red flag if it is one of

20   these things on the front on Exhibit 904.

21           MR. JANEY:  If that's true, your Honor, that's further

22   to the point why that shouldn't be there.

23           THE COURT:  What shouldn't be there?

24           MR. JANEY:  The controlled substances sales dollars

25   for that customer.

M1P3DOU4

```
 1              THE COURT:  No.  But that's not on that chart.  That's

 2     not on 904.

 3              MR. JANEY:  But it's on 905.

 4              THE COURT:  Those are two different exhibits.

 5              MR. JANEY:  They are part of the same set.  He is

 6     going to talk --

 7              THE COURT:  I don't know if that's determinative.  It

 8     is part of the same set.

 9              MR. JANEY:  The government is here, so what I

10     anticipate -- what I anticipate is slide 904 is going to go up

11     on the screen.

12              THE COURT:  They are going to say these are the red

13     flags.

14              MR. JANEY:  It will set the stage for him to talk

15     about the customers that underlie the numbers in the right-hand

16     column box.

17              THE COURT:  Okay.  So what part of those numbers is

18     inadmissible?

19              MR. JANEY:  Well, where I think it's misleading and

20     prejudicial, again, is the controlled substance sales dollars.

21              THE COURT:  The controlled substance -- but that's,

22     those are accurate numbers, aren't they?

23              MR. JANEY:  They are accurate numbers, your Honor, but

24     again, viewing Exhibit 905, it's misleading because it tends to

25     suggest that all of the controlled substances buys by Alden
```

 1  Pharmacy are illicit.  And that is not true.

 2          THE COURT:  No, it doesn't say that.

 3          MR. JANEY:  It doesn't say.

 4          THE COURT:  It doesn't say that at all.

 5          MR. JANEY:  A reasonable juror could infer that where

 6  the expert is giving description about red flag activity in the

 7  context of his 41 case studies.

 8          THE COURT:  Not if you make it clear on

 9  cross-examination that that's not what the expert is saying,

10  and you represent to the jury at the time of summation that

11  there is no such evidence that every one of these dollars is an

12  illicit dollar.

13          MR. JANEY:  I can certainly do it on cross, your

14  Honor.

15          THE COURT:  It doesn't say anything about illicit

16  dollars, it doesn't say anything one way or the other about

17  whether these are illicit or proper sales.

18          MR. JANEY:  Well --

19          THE COURT:  It just says they -- the two things that

20  are important on these charts with regard to that.  One, that

21  there is a significant amount of money being made off of

22  controlled substance sales.  And two, that there were a certain

23  percentage of these controlled substance sales that were beyond

24  the 30 percent threshold, which to the extent that that's

25  related to red flags, which should have obviously made someone

1   say, okay, we have a red flag here, what are we going to do

2   about it.

3        MR. JANEY:  The only thing that we are seeking is by

4   limitation on the testimony and on the government's argument

5   that in no way that it be suggested that that total dollar

6   amount attributed to controlled substance dollars in and of

7   itself represents illicit activity.

8        THE COURT:  Does the government think they are in a

9   position to make that argument?

10       MR. BURNETT:  We are not going to say every dollar

11   that -- he's just going to say this is the amount of money they

12   bought in controlled substances.  And then he is going to move

13   on.

14       THE COURT:  Okay.  Well, I am just trying to figure

15   out whether you think you are going to make the argument that's

16   going to draw an objection from Mr. Janey.

17       MR. BURNETT:  We'll be arguing in closing that there

18   is money to be made in opioids.  We are not going to say X

19   dollars from that pharmacy or Y dollars.

20       THE COURT:  Neither you nor your expert is going to

21   say that the number in this box represents the dollars that

22   were made off of solely illicit sales?

23            (Continued on next page)

24

25

M1PBDOU5

1              MR. BURNETT:  He's not going to get into that topic.

2              MR. JANEY:  That's that not the question.  The

3      question is whether the expert will testify as to that, A; B,

4      Whether the government will seek to elicit that testimony; C,

5      Whether the government will make that argument based on that

6      type of chart.

7              MR. BURNETT:  The dollars don't matter for that sort

8      of thing, and the expert is not going to talk about that.

9              THE COURT:  You're avoiding the answer.  Is that his

10     intention.

11             MR. BURNETT:  The one thing I'm trying to be aware of

12     for the closing situation, and I don't want to pennants in on

13     closing, is it's the obligation of the distributor to maintain

14     effective controls against diversion.  And I think there is a

15     good argument that we haven't actually hashed out internally,

16     but if you're not maintaining effective control against

17     diversion with respect to a particular pharmacy, then the drugs

18     you're selling to that pharmacy are going there illegally.

19             MR. JANEY:  That's the problem.

20             THE COURT:  There's a strong likelihood that at least

21     some of those drugs are going out illicitly. You don't have any

22     evidence in this case every single drug that was --

23             MR. BURNETT:  We're not trying to attribute certain

24     dollars to certain --

25             MR. JANEY:  Again, so that I'm clear so that your

M1PBDOU5

1   Honor understands what I'm asking --

2          THE COURT:  I'll answer the question for you.  They're

3   not going to make that argument.

4          MR. JANEY:  Thank you, your Honor.

5          THE COURT:  I'm not going allow them to make that

6   argument, unless they can point to someplace in this record

7   that gives them a basis to say that they've proven that every

8   single dollar that was made off of an opioid was an illicit

9   sale.  The jury's not stupid.  They know that.

10          Let's get the jury.  Let's move forward.  We'll talk

11  about it one more time.  I don't think I'm going to limit them

12  with regard to the time period.  I think we're only talking

13  about one year.  I think it's in fairness.

14          MR. JANEY:  We're talking about --

15          MR. ROOS:  The jury's entering.

16          THE COURT:  We'll talk about it again.

M1PBDOU5

1                    (In open court; jury present)

2              THE COURT:  Please be seated, ladies and gentlemen.

3    We've been a little choppy in the beginning, but I'm hopeful it

4    will save us time in the long run.

5              Mr. Gotlieb.

6              MR. GOTTLIEB:  Thank you, your Honor.

7    BY MR. GOTTLIEB:

8    Q.  Mr. Pietruszewski, good afternoon.

9    A.  Good afternoon.

10   Q.  With regard to when we broke, we were talking about the

11   time period when there were the emails that the jury has seen

12   already about changing the standard operating procedures for

13   compliance.  Do you remember that?

14   A.  Yes.

15   Q.  And you recall seeing the emails from one or more sales

16   people who had complained about the delay, the slowness in

17   completing the compliance, I believe it was from Steve Bahani.

18   Do you remember that?

19   A.  Yes, sir.

20   Q.  And do you recall that as a result of -- in following those

21   emails, word went out and Mr. Doud had indicated that he wanted

22   to change the policy.  Do you recall that?

23   A.  Yes, sir.

24   Q.  And following Mr. Doud saying that, initially a number of

25   the people in compliance initially said that they were okay

M1PBDOU5

1   with that change initially, correct?

2   A.  We did what we were told to do, sir.

3   Q.  I understand.  Initially it was relayed and said to

4   Mr. Doud that they were okay with it, correct?

5   A.  Again, we were following management's decisions.

6   Q.  And in following what you determined was management's

7   decision, it was verbalized in emails that it was okay with

8   compliance to change the policy, correct?

9   A.  Yes.

10  Q.  And after that was relayed to Mr. Doud, you would agree

11  then there was some pushback among people in compliance,

12  including yourself, correct?

13  A.  Yes.

14  Q.  And you were one of those who actually said, if there is

15  going to be a change, it should be passed by the attorneys.  In

16  this case, Don Bilgore, correct?

17  A.  Yes.

18  Q.  And any new policy should be passed by the attorneys and

19  any policy should then be put in written form, correct?

20  A.  Yes.

21  Q.  So that you had it in hand to show it to the DEA if

22  requested, correct?

23  A.  Yes.

24          MR. GOTTLIEB:  Then we were up to Defense Exhibit A80,

25  which your Honor I believe we had moved to have that received

M1PBDOU5

1    in evidence.  I know there was some discussion, but I believe

2    that to be received in evidence?

3            THE COURT:  Yes, I'll admit it into evidence.

4            MR. GOTTLIEB:  If we can put that on the board and

5    publish to the jury.

6    Q.  Mr. Pietruszewski, A80 is before you and the jury.  Is it

7    fair to say that before Don Bilgore, the attorney or any of the

8    attorneys put together another written policy, Larry Doud sent

9    out this email on June 14, 2016, to the sales people and to the

10   compliance people, correct?

11           MS. ROTHMAN:  Objection, assumes facts not in

12   evidence.

13           THE COURT:  Overruled.  You can answer if you know.

14   A.  Yes.

15   Q.  If we can look at the first paragraph, please.

16           Larry Doud writes:  Fellows maids and marion.  With

17   regards to opening new accounts, as we discussed there will be

18   a slight change in how we go.  I think it will result in

19   opening stores faster when the credit app is approved.  We will

20   require the dispensing report with the credit app and also

21   required pictures that you have taken.  So when everything is

22   here and the credit manager responsible blesses the account and

23   the dispensing report is here, we will open the account for all

24   purchases.

25           The compliance department will do our due diligence.

M1PBDOU5

1  And if everything is good we will go forth.  If there should be

2  a problem and Joe tells me, there are about 2 percent of the

3  time, we will stop shipping controls until we get the issues

4  resolved.

5          Continuing next paragraph, please.

6          In most cases, I think you know if there will be a

7  problem.  You should mark the app for Jessica to see so that we

8  do not make obvious mistakes.  But better yet, if you know

9  there will be issues, like that is why they want to do business

10  with us, you may not want to even do the application or warn

11  the account.  It will take longer to open.  We cannot be

12  careful enough about staying completely in bounds on these

13  issues.

14          I hope that the change will allow us to move more

15  quickly when you guys are successful at getting us some new

16  existing business from the competition.

17          Next paragraph, please.

18          The dividend looks like it will be 2.11 percent.  The

19  numbers are done as far as I can tell and that is the

20  percentage.  I think it is the second highest we've paid.

21  Obviously, the most dollars ever.  Also profit-sharing checks

22  are scheduled to go out this Friday.  The checks are live, so

23  you can say a prayer of thanks and ask for his continued favor

24  while you are at the bank.  I looked at your numbers and they

25  are very good.  Obviously the longer you have been here, the

M1PBDOU5

```
 1   better the bonus.  As always, we appreciate the incredible job
 2   each and every one of you do.  You are the best group I have
 3   ever worked with.  Thanks you all.  And that's signed by Larry
 4   Doud, correct?
 5   A.  Yes.
 6   Q.  If we can look at A18, your Honor.
 7            Sir, this is an email thread involving you, Jessica
 8   Pompeo, Elizabeth Cullen, Larry Doud regarding the DEA
 9   conference in Indianapolis, correct?
10   A.  Yes.
11   Q.  Dated May 12, 2016, correct?
12            MS. ROTHMAN:  We have no objection.
13            THE COURT:  It will be admitted into evidence.
14            (Defendant's Exhibit A18 received in evidence)
15            MR. GOTTLIEB:  May we publish it to the jury, please.
16            THE COURT:  Yes.
17   Q.  Beginning with the email on the bottom on the first page
18   beginning with good morning.  This is from you Bill
19   Pietruszewski dated May 12, 2016 to Larry Doud, Joe Brennan and
20   a number of other people, and this is what you write:
21            I first would like to thank everyone for allowing
22   Jessica, Liz and I to attend the DEA conference in
23   Indianapolis.  This was a great opportunity for us to learn
24   more knowledge from the DEA.  I want to just quickly bring up a
25   request and suggestions below that we took away from the
```

M1PBDOU5

conference.  The DEA is asking that all registrants have a

binder or folder ready for whenever DEA makes a visit to our

facilities.  We do have this folder for both of our facilities,

but we have a few items we need to add.

I need to ask of the buying department can supply

compliance with a SOP for purchasing CII to CV.  We currently

have receiving documents and how we check in the freight, but

they would like an SOP on how we determine when we decide to

make purchases of controlled substances, CS.  Then they are

asking that both of our facilities include the CS packing slips

of CIII to CV with the receivers that are used to check in the

product in the cage.  CII packing slip is not needed since we

have the DEA 222 forms in the vault.

The metro facility will institute this procedure today

and Jessica will be meeting with Tim Brown to start in

Rochester.  Then the DEA is asking for more open communication

of registrants, us, to our local DEA office.

For example, we should give the local office a call

and see if they would meet with metro and discuss the letter of

admonition and let them know we understand.

Next page.

We do not need Carlos for this, and I have no problem

reaching out to the local office once the attorneys approve my

letter and I may send it to the DEA.  We also learned that the

DEA is working closely with the DOJ and they are going after

M1PBDOU5

1    fraud that pharmacies may be having with medicaid or medicare.

2    I bring this up for on Tuesday RDC notified Done and Jim and

3    now the attorney also like to discuss.

4          This may have nothing to do with RDC.  And if this is

5    not a subpoena, I am not sure we want to wait to speak with the

6    attorneys and delay the information to the DEA.  I agree we can

7    notify Don, but we should still supply the information.  We

8    need to keep an open communication with the DEA.  I can discuss

9    more when it's convenient with everyone, but I wanted to at

10   least bring this up.

11         Then last I ask when the time allows that everyone to

12   go on the website below or Google FBI Chasing the Dragon.  This

13   is a very powerful video.  Please note, it is an uncut version.

14   There's a lot of swearing, but actual victims of opioid abuse

15   speak.  The ladies and gentlemen and I feel we could have this

16   video for the next sales meeting if everybody is okay with

17   this.  There's more we would like to share, but for now the few

18   items above are the most important.  Thank you, Bill.

19         Now if we can go to the top part of the thread. This

20   is an email from Larry Doud in response, Thursday, May 12,

21   2016.  Thanks, Bill.  I did notice Jessica had quite a sunburn

22   this morning and I heard Liz still has some amusement park

23   stamp on her hand.  What's up with that?  I look forward to us

24   getting as compliant with the suggestions as we can, and I

25   think the meeting with the NJ folks on the letter is excellent.

M1PBDOU5

1    Please keep me posted on when we are moving ahead with this.

2    Thank you.

3              MR. GOTTLIEB:  And then A28, may we place that on the

4    screen, your Honor?

5              THE COURT:  Yes.

6              MR. GOTTLIEB:  I don't believe there's an objection to

7    that?

8              MS. ROTHMAN:  No objection.

9              THE COURT:  It will be admitted into evidence.

10             (Defendant's Exhibit A28 received in evidence)

11             MR. GOTTLIEB:  May we publish to the jury?

12             THE COURT:  Yes.

13   Q.  Here it's an email from Bill Pietruszewski on the bottom,

14   January 9, 2013, to Larry Doud, Joe Brennan, Lanny Doud and you

15   write as follows:  The volume that Linden Care would be sending

16   to us as I mentioned do worry me for the dollars they buy a

17   month, 78 percent are of narcotic control items.

18             As I mentioned last month, Linden Care purchased

19   50,000 units of oxycontin, brand generic from RDC.  Now looking

20   at the numbers, Mark from Linden Care supplied this would

21   increase to 155,000 per month of the oxycontin over 1.8 million

22   a year.  I just think of the problems that CVS had down in

23   Florida, and do want RDC to fall victim of such an occurrence.

24   What worries me is that they want this to happen quickly which

25   just put me on the defense even more.  For all we know, HD

M1PBDOU5

1    Smith could be cutting them down on these items.  With that

2    said, I contacted Buzzeo PDMA.  If I can stop reading, what is

3    that if you know?

4    A.  Buzzeo ex-DEA.

5    Q.  Continuing.  This is the group that had the conversation

6    Richie and I attended last year.  I asked what we would need to

7    do if we wanted to hire them as a consultant group so we could

8    speak to an ex-DEA agent.

9         Ed Harris who is the salesman for the Buzzeo group

10   inform me, the first step would be that RDC would need to sign

11   a contract.  Once I heard that I told him to forward the

12   information and that I would have to pass the information off

13   to my superiors to see how they would like to proceed.

14        And then he continues or you continue.

15        And you end, I apologize for the long email, but to

16   get my opinion out there now about this rather than after the

17   fact.  I'll be at work the rest of the week, and you go on.

18        And then if we can go to the second email.  This is

19   from Richie Cullen, and Richie Cullen again is who?

20   A.  He's a salesman at that time.

21   Q.  Richie Cullen writes to you, Larry Doud is on this as well.

22   I have to agree with Bill.  The conference taught us one thing

23   that if the reason we are taking on additional business is

24   profit driven, then it is usually the wrong reason to proceed.

25   I am not against bringing on additional business, but if it

M1PBDOU5                    Pietruszewski - Redirect

1    means we're going to have a live-in DEA agent all the time with

2    us, we must proceed with caution.  I know we ultimately will do

3    the best to protect RDC.

4              And Larry Doud responds.  Well, gee thanks, Richie.  I

5    agree too.

6              MR. GOTTLIEB:  Your Honor thank, you very much.  The

7    only additional thing that I would ask to be able to do is to

8    put in -- read into the record the emails and the exhibits that

9    we discussed earlier this morning and which I believe there's

10   no objection to their admissibility, if I could just have one

11   moment.

12             The following defense exhibits, your Honor, we ask be

13   received in evidence.  I believe there's no objection to the

14   following numbered defense exhibits:  Defense Exhibit A13, A14,

15   A15, A16, A17, A19, A20, A21, A22, A49, A56, A58, A59, A60,

16   A61, A64.

17             And with that, your Honor, thank you very much.

18             (Defendant's Exhibits A13-A22, A49, A56, A58-A61, A64

19   received in evidence)

20             THE COURT:  Any further questions for this witness?

21             MS. ROTHMAN:  Yes, your Honor.  Thank you.

22   REDIRECT EXAMINATION

23   BY MS. ROTHMAN:

24   Q.  Good afternoon, Mr. Pietruszewski.

25   A.  Good afternoon.

1   Q.  I want to just get a few things straight.  You were asked

2   some questions about Mr. Doud emailing the salesmen about a

3   change in policy for turning on new accounts in 2016, right?

4   A.  Yes.

5   Q.  And Mr. Gottlieb asked you if that was before the attorneys

6   had changed the policy, right?

7   A.  Yes.

8   Q.  But just to be clear, Mr. Pietruszewski, did the attorneys

9   change the written policy as to how RDC would conduct due

10  diligence?

11  A.  No.

12  Q.  And were you present in a meeting where after consulting

13  with the attorneys it was determined the policy would not be

14  changed?

15  A.  Yes.

16  Q.  Let's pull up just a few of those documents that

17  Mr. Gottlieb just put into evidence.  Can we pull up defense

18  Exhibit A13, please.

19          What is this document?

20  A.  It was the Rochester Drug Co-Operative customer

21  questionnaire.

22  Q.  Did all pharmacy customers complete their questionnaires?

23  A.  No, they did not.

24  Q.  Were there customers that kept getting controlled

25  substances from RDC even though they hadn't filled out their

M1PBDOU5                    Pietruszewski - Redirect

1  questionnaire?

2  A.  Yes.

3  Q.  Let's look at one example, Ms. Drescher, what's in evidence

4  as Government Exhibit 101E, please.  Let's just zoom in on the

5  second email.

6        Can you read what you wrote to Julius Morton and

7  Jessica Pompeo on June 25, 2014?

8  A.  Yes.  I know we do not have the questionnaire on file.  The

9  last information we received from this account was back the end

10  of 2012.

11  Q.  Did Bay Ridge keep getting supplied with controlled

12  substances even though RDC didn't have updated information from

13  them?

14  A.  Yes.

15  Q.  Thank you.  We can take that down.

16        Now, you were also asked some questions about a

17  conference that you went to with Jessica and other folks from

18  compliance.  Do you remember that?

19  A.  Yes.

20  Q.  Can we pull up Defense Exhibit A18, please.

21        And I think this was the email that Mr. Gottlieb

22  showed you; is that right?

23  A.  It is.

24  Q.  At the top of the email Mr. Doud writes that he wants to

25  get compliant with the suggestions, right?

1    A.   Yes.

2    Q.   Now, do any of the suggestions in the bottom of your email

3    relate to reporting suspicious orders?

4    A.   No, it does not.

5    Q.   Do they relate to maintaining effective control against

6    diversion?

7    A.   No, it does not.

8    Q.   Do they relate to reporting to the DEA when you terminate

9    pharmacy customers?

10   A.   No, it does not.

11   Q.   Can we just go to the second page.  There's actually one

12   reference in this to the victims of opioid abuse and a video

13   Chasing the Dragon.  Do you see that?

14   A.   Yes.

15   Q.   Do you know if Mr. Doud watched that video?

16   A.   I'm not sure.

17   Q.   We can take that down.

18           Now, during cross examination this morning you looked

19   at some examples of pharmacy customers of RDC.  Do you remember

20   that?

21   A.   Yes.

22   Q.   Now, Mr. Pietruszewski, across the board, were you shutting

23   off pharmacies with red flags of diversion at RDC?

24   A.   No.

25   Q.   Across the board, were you shutting off pharmacies that you

1    believed were diverting controlled substances?

2             MR. GOTTLIEB:  Your Honor, objection.  It's unclear.

3             THE COURT:  Overruled.  You can recross.

4             MR. GOTTLIEB:  It's the form, across the board.

5             THE COURT:  You can clear that up if you want to

6    recross.  I'll allow it.

7    A.  Can you repeat that.

8    Q.  Across the board, were you shutting off pharmacies that you

9    believed were diverting controlled substances at RDC?

10   A.  No.

11   Q.  What happened with the majority of pharmacy customers that

12   you believed were diverting controlled substances?

13   A.  We were still shipping to them.

14   Q.  Across the board, were you releasing orders of interest

15   without investigating them first?

16   A.  Yes.

17   Q.  Across the board, were you reporting pharmacies to the DEA?

18   A.  No, we were not.

19   Q.  Now, in the few instances that you took some action, were

20   some of those occasions where the DEA had brought that pharmacy

21   to your attention first?

22   A.  Yes, it was.

23   Q.  Like Plainfield, for example?

24   A.  Yes.

25   Q.  And let's look at Defense Exhibit A62.  This is an email

1   about Waschko's pharmacy.  Do you remember that,

2   Mr. Pietruszewski?

3   A.  Yes.

4   Q.  And I think you were asked questions about turning off

5   their controls.  Do you remember that?

6   A.  Yes.

7   Q.  Let's just look at what the bottom email says.  I think

8   what it says is the DEA was at the store and when the driver

9   was leaving, he saw the DEA putting the computer and files in

10  clear bags.

11           So is it true, Mr. Pietruszewski, that after the DEA

12  raided Waschko's pharmacy, RDC decided to turn them off?

13  A.  Yes.

14  Q.  Thank you.  We can take it down.

15           Mr. Pietruszewski, when it came down to sales versus

16  compliance, which did Mr. Doud choose?

17  A.  The sales.

18  Q.  Let's look at a few more examples.  Do you remember being

19  asked some questions about the Chemist Shop on your cross

20  examination?

21  A.  Yes.

22  Q.  I think there was an email where Mr. Doud said that we

23  should stop shipping controls to the Chemist Shop?

24  A.  Yes, there was.

25  Q.  Let's look at what happened after that email.  Please put

1    up for Mr. Pietruszewski what's been marked for identification

2    as Government Exhibit 1231.  We can scroll to the bottom of the

3    email so Mr. Pietruszewski can see the email from Mr. Morton.

4            You see the email on the bottom, Mr. Pietruszewski?

5    A.  It says all.

6    Q.  Yes.  Do you recognize it?

7    A.  Yes.

8            MS. ROTHMAN:  Your Honor, the government offers

9    Exhibit 1231.

10           THE COURT:  Any objection?

11           MR. GOTTLIEB:  Your Honor, may I took a look at it,

12   please.

13           THE COURT:  Yes.

14           MR. GOTTLIEB:  No objection.

15           THE COURT:  It will be admitted into evidence.

16           (Government's Exhibit 1231 received in evidence)

17           MS. ROTHMAN:  Can we publish to the jury?

18           THE COURT:  Yes.

19   Q.  If you can zoom in on the top email.

20           After RDC decides to terminate the Chemist Shop, can

21   you read what Mr. Doud wrote?

22   A.  Counter to what we do.

23   Q.  So Mr. Doud is saying that turning off pharmacy customers

24   is counter to what RDC did?

25           MR. GOTTLIEB:  Your Honor, objection.  It's obviously

M1PBDOU5                    Pietruszewski - Redirect

1   responding to emails that are a part of this thread.

2            THE COURT:  Overruled.  You can recross.

3   A.  I believe so.

4   Q.  Mr. Pietruszewski, based on your many years at RDC, was

5   turning off pharmacy customers that displayed clear signs of

6   diversion counter to what RDC did?

7   A.  No, we didn't turn the pharmacies off.

8   Q.  It was counter to what RDC did?

9   A.  Yes.

10  Q.  I think my question was a little unclear.  Thank you,

11  Mr. Pietruszewski.  Let's go down to the bottom of this chain.

12           I want to ask about the beginning email from

13  Mr. Morton, can you remind us who Julie Morton was?

14  A.  Julius at the time was the DEA auditor that worked for RDC.

15  Q.  If we can zoom in on the second from the bottom paragraph

16  that begins, please note.

17           Can you just read that paragraph, please?

18  A.  Sure.  Please note we have two similars to deal with on the

19  horizon, that would be ProHealth and 370 Pharmacy Corp.  Again,

20  sister stores I believe.  They are in the same locale as the

21  Chemist Shop and would be a competitor of Gallo and Viti I

22  would imagine.  Their exhibited dispensing is almost identical

23  to the Chemist Shop and they will fill for the same troubling

24  doctors.  RDC must devise an appropriate strategy in response

25  for those accounts as well.  I visited the stores in 2014 and

1  noted that they filled questionable RXs written for oxycodone.

2  Q.  What do you understand Mr. Morton do be saying in this

3  email?

4  A.  That the 370 pharmacy and the ProHealth are doing the same

5  as the Chemist Shop.  They buy high amounts of oxy.

6  Q.  Did RDC terminate 370 pharmacy while you were in

7  compliance?

8  A.  I do not believe we did.

9  Q.  Did RDC terminate ProHealth while you were in compliance?

10 A.  No, we did not.

11 Q.  Let's look at a few examples. Ms. Drescher 106D, please,

12 that's in evidence.  Let's just zoom in on the top email from

13 Mr. Morton.  To understand what this is about, let's scroll

14 down so we can see the pharmacy.

15        What's the pharmacy's name for the order of interest?

16 A.  That is ProHealth pharmacy.

17 Q.  So ProHealth pharmacy was still a customer in October of

18 2015 even though Julius Morton had concerns in 2014?

19 A.  Yes.

20 Q.  We can take that down and go to Government Exhibit 106E,

21 please.  If we can zoom in.  Ms. Pompeo's email to you and

22 Mr. Morton.

23        It is mind boggling to me that these pharmacies don't

24 care what they are doing and practicing due diligence

25 procedures seems to be an inconvenience to them.

1          So ProHealth was still a pharmacy customer in November

2     of 2015 even though Julius Morton had concerns in 2014?

3     A.  Yes.

4     Q.  We can take that down and please pull up Government Exhibit

5     106H, please.  Zooming in on the top email, please, where

6     Mr. Morton writes:  This dispensing report analysis exhibits

7     dispensing that is very concerning.  Do you see that?

8     A.  Yes, I do.

9     Q.  So ProHealth was still an RDC customer in April of 2016

10    even though Mr. Morton had concerns in 2014?

11    A.  Yes.

12    Q.  We can take that down.  Mr. Pietruszewski, do you recall

13    being asked some questions about Total Care Crosby and

14    Specialty Care pharmacies?

15    A.  Yes.

16    Q.  What do you remember about those pharmacies?

17    A.  They were filling prescriptions for Dr. Terdiman and

18    Dr. Olivieri I believe for oxycodone.

19    Q.  I think you were shown an email from April of 2013 about

20    attempting to restrict some of their oxycodone.  Do you

21    remember that?

22    A.  Yes.

23    Q.  Let's look at what happened to Total Care Crosby after that

24    email.  Ms. Drescher, can you please pull up what's in evidence

25    as Government Exhibit 258.  If we can just filter for Total

1    Care Crosby.  Let's scroll down for all the order of interest

2    for 2016 for Total Care Crosby.  If we can go to the right side

3    of the column and focus on column P, orders of interest

4    shipped.  Just scrolling down, do you see any zeros in that

5    column?

6    A.  No, I do not.

7    Q.  So all of the orders of interest that Total Care Crosby

8    generated in 2015 were shipped?

9    A.  Yes, they would have been shipped.

10   Q.  You can take that down.

11              Now, I want to end with some final questions,

12   Mr. Pietruszewski.  When you worked at RDC, did you ship orders

13   of controlled substances to pharmacies that you believed were

14   diverting controlled substances?

15   A.  Yes.

16   Q.  Did you know that was wrong?

17   A.  Yes.

18   Q.  Why did you do it?

19   A.  Cause that's what Larry Doud wanted us to do.

20   Q.  I believe you were asked on cross examination and you said

21   you didn't want to send those drugs to bad pharmacies, but you

22   did do it?

23   A.  Yes, I did.

24   Q.  Did you know what you were doing?

25   A.  Yes.

1    Q.  Did you do it by mistake?

2    A.  No.

3    Q.  Did you know it was wrong?

4    A.  Yes.

5    Q.  So why did you do it?

6    A.  That's what was wanted of us to do.

7              MS. ROTHMAN:  Your Honor, I have no further questions.

8              THE COURT:  Any further questions?

9              MR. GOTTLIEB:  Very briefly, your Honor.

10             THE COURT:  Sure.

11   RECROSS EXAMINATION

12   BY MR. GOTTLIEB:

13   Q.  Mr. Pietruszewski, you were just asked questions about

14   ProHealth pharmacy and you seemed to have remembered when

15   questioned by the government what happened and what RDC did or

16   didn't do with regard to its authority to purchase.

17             Isn't it true that ProHealth pharmacy had its

18   authority to purchase controlled substances suspended in 2015?

19   A.  I don't think it was 2015.

20   Q.  When was it?

21   A.  I have to look and see.

22   Q.  Now, you were shown just now on redirect Government's

23   Exhibit 1231.  Can we put that up on the screen.  If we can

24   show that to the jury, your Honor, I know it's in evidence?

25             THE COURT:  Yes.

1    Q.  Mr. Pietruszewski, you were asked just to read that top

2    email from Larry Doud which said counter to what we do.  Right?

3    A.  Yes.

4    Q.  This had to do with the Chemist Shop and concerns about

5    what they are doing, correct, with regard to controlled

6    substances, right?

7    A.  Yes, sir.

8    Q.  On the bottom of page 1 Richie Cullen is writing to

9    everybody.  Richie Cullen writes:  Okay.  I just got off the

10   phone after a 45 minute conversation with Joe Gallo of Chemist

11   Shop.  We went around and around as to what was told to them by

12   Julius and what wasn't.  They even when as far as saying Juice

13   never said we would have to stop doing business with any of

14   these doctors and that all of their doctors are highly

15   respected physicians in the industry.

16           Bottom line, they've made a decision that they will

17   not stop doing business with these doctors based on Julius's

18   say so.  That's when I said, based on that, we can no longer

19   sell them controlled substances and narcotics.

20           And then if we can just continue just to complete that

21   part of the thread.

22           Richie Cullen went on to say:  I told them they need

23   to sign the bottom of this stock certificate and have a

24   medallion seal affixed by a bank, send it in for redemption and

25   we will see that it is taken care of.  Richie.

1           So now, let's go to the response to Richie Cullen's

2    email on page 1 from Larry Doud in response.  Larry Doud

3    writes:  Tough call, Richie.  Thanks for taking care of it.

4    You see that?

5    A.  Yes, I do, sir.

6    Q.  And then Richie Cullen responds to that.  Richie Cullen

7    responds and says:  They were tough, but I think they knew it

8    was coming.  Never like making those calls.

9           And then Larry Doud then in response to what had

10   already been said, that's that when he says, Counter to what we

11   do, correct?

12   A.  Yes.

13   Q.  And that's after being told --

14   A.  -- about the Chemist Shop.

15   Q.  And that it was going to be terminated, correct?

16   A.  Yes.

17   Q.  And that's after Larry Doud said to Richie Cullen, Tough

18   call, Richie.  Thanks for taking care of it, correct?

19   A.  Yes, he said that.

20   Q.  You were just asked questions about compliance.  It's fair

21   to say that all of those pharmacies that you recall and

22   testified about that were either suspended or terminated, all

23   of them sold controlled substances, correct?

24   A.  All those pharmacies sold controls, yes.

25   Q.  And for every single one that you recall being suspended or

1    terminated, that meant there would be less money paid to RDC

2    for sales and purchases of controlled substances, correct?

3    A.  Yes.

4    Q.  And for each of those suspensions and terminations, Larry

5    Doud approved it, correct?

6    A.  Yes.

7    Q.  When you were asked on redirect just now using "across the

8    board," is it fair to say that there were many pharmacies

9    across the board who were investigated by RDC when there were

10   red flags, they were investigated, correct?

11   A.  Yes.

12   Q.  Across the board if there were red flags, RDC with its

13   outside auditors, with its own internal staff did the best they

14   could with the insufficient personnel to go out and to see what

15   the problem was and something could be done to fix it, correct?

16          MS. ROTHMAN:  Objection.

17          THE COURT:  Sustained. It's argumentative.

18   Q.  Mr. Pietruszewski, you were just asked about the red flags

19   and diversion.  You told this jury yesterday, did you not, that

20   while there were red flags of diversion, you yourself did not

21   know for a fact that there was diversion, correct?

22   A.  Stores showed red flags.  I didn't necessarily know that

23   they were diversion, but they showed red flags.

24          MR. GOTTLIEB:  Your Honor, thank you very much.

25          THE COURT:  Any further questions for this witness?

M1PBDOU5                           Pietruszewski - Recross

1             MS. ROTHMAN:  No, your Honor.

2             THE COURT:  Thank you, sir.  You can step down.

3             (Witness excused)

4             THE COURT:  The government can call its next witness.

5             MR. BURNETT:  Briefly on the side before you call the

6    next witness.

7             THE COURT:  Let me give the jury a break.  We'll

8    continue at 3:45.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; jury not present)

2           THE COURT:  Yes.

3           MR. BURNETT:  We just need about 10 minutes to make a

4      change to the expert's slides.  He's the next witness.

5           THE COURT:  All right.  Are we in all in agreement

6      here?  I had some other minor suggestions regarding some of

7      these titles that either side doesn't make an objection.  I

8      think some of these titles do sort of reflect what you

9      anticipate this witness's testimony to be rather than what's

10     reflected in the document.

11          If it significantly throws you off or it's going to

12     take a significant amount of time, then maybe you can leave it.

13     I suggest that in my numbers, I'm using your numbers, I

14     suggested on number 3, and I'm going to make sure we're all

15     clear on where we're going with this.  Number 3, RDC shipments

16     of opioids.  I would recommend it just say, RDC shipment of

17     opioid between 2010 and 2015. Is that a problem?

18          MR. BURNETT:  So just deleting by V-I 25 percent from

19     the title?

20          THE COURT:  Yes, and then have the testimony.  You can

21     leave that down in the chart.

22          MR. ROOS:  Very minor.  I'm sure Mr. Burnett's got

23     this, but it's actually 2010 to 2017.

24          THE COURT:  Yes, that's true.  And then the next one I

25     would suggest that you simply say oxycontin increase in RDC's

1   opioid shipment.  Is that a problem?

2              MR. BURNETT:  It's not exactly accurate.

3              THE COURT:  I'm a little concern about this title

4   doesn't really describe this chart.

5              MR. BURNETT:  We can say RDC's increase in opioid

6   shipment, dash, breakdown.

7              THE COURT:  I don't have any problems with that if

8   there's no objection to that portion of it.  I'm not sure that

9   it makes it a whole lot clear.

10             MR. JANEY:  No, it doesn't.

11             MR. BURNETT:  I'm just trying to make it not

12   argumentative.  Everything it says is accurate.  I don't want

13   to waste too much time.

14             THE COURT:  OxyContin increase in RDC opioid shipment.

15   You want to say breakdown.

16             MR. BURNETT:  Because it also says fentanyl on there.

17             THE COURT:  That's fine.  And then the next one.  RDC

18   sales of opioids between 2010 and 2015?

19             MR. BURNETT:  I'll change it to 2017.

20             THE COURT:  And you can leave the percentage increase

21   in the chart.

22             And the next one, fentanyl.  I don't know if we

23   discussed this, fentanyl and opioid.

24             MR. BURNETT:  This is another one to revise to say a

25   breakdown because it has more than one drug that's being

1     described in it.

2              THE COURT:  I would sort of take out sales were the

3     key driver of the increase.  I think that's more argumentative.

4     Fentanyl sales -- well, fentanyl sales and opioid sales over

5     this period or something like that.

6              And the next one I think we did discuss that, RDC

7     opioid shipment compared to industry sales.

8              MR. BURNETT:  Yes.

9              THE COURT:  The next one, just take out more than

10    double in the title and have that testimony.  The one after

11    that, what I have is RDC sales growth of opioid products

12    compared to other products.

13             MR. BURNETT:  Okay.

14             THE COURT:  And you say you were going to drop 12 and

15    13.

16             MR. BURNETT:  As long as 10 and 11 are okay, then

17    we're going to drop 12 and 13.

18             THE COURT:  I'm going to allow 10 and 11, so we'll

19    drop 12 and 13 and I'll allow 14 and 15.  On 16, I suggest RDC

20    oxycontin and fentanyl orders shipped after they were flagged,

21    and 17 I think was fine. We didn't really discuss 18 and 19 and

22    20.  Defense had no objections to that?

23             MR. JANEY:  We'll deal with it on cross, your Honor.

24             THE COURT:  That's what I'm going to anticipate so we

25    can move smoothly.  How long do you think you're going to take

1    to --

2              MR. BURNETT:  Maybe 15 minutes.  I want to make sure

3    the witness can authenticate it.

4              THE COURT:  Sure.  We'll continue in about 15 minutes.

5              (Recess)

6              THE COURT:  Are we ready to go?

7              MR. BURNETT:  We're all set, your Honor.

8              THE COURT:  We'll get the jury.  What does it look

9    like scheduling wise for tomorrow?  You think you might rest by

10   tomorrow?

11             MR. ROOS:  Professor Cutler is going to go on right

12   now.  I think we wouldn't finish, but we'll finish in the

13   morning tomorrow on direct and he'll be on for the cross.

14             Our next witness after that is Paulsen who is about 30

15   minutes on direct.  We're thinking about cutting some of our

16   witnesses and concluding with a Paulsen to sort of clean up.

17   We're going to email defense counsel tonight to let them know

18   what our definitive plan is.  If we do that route, I think we

19   can rest tomorrow.  If we don't do that route, it's possible we

20   could lead a little in the next day.  We'll let them know this

21   evening.

22             THE COURT:  We'll think about how we proceed.  If you

23   rest tomorrow, I'd like to go ahead and start the defense case

24   on Thursday.  I'm trying to figure out if we're going to sit

25   all day or half a day on Friday.

1           MR. GOTTLIEB:  Obviously what we're hearing now is a

2      significant change.  What I mean by that, following Paulsen --

3      and they obviously have a right to do whatever the heck they

4      decide to do -- but we understood there would be at least two

5      additional witnesses, so we don't have a witness right now as

6      we speak for Thursday.

7           THE COURT:  How many witnesses do you anticipate?

8           MR. GOTTLIEB:  Three.

9           THE COURT:  All right.  Start talking and get them

10     available for Thursday.

11          MR. GOTTLIEB:  We'll call when we get out.

12          THE COURT:  What I don't want to do is, I don't want

13     to take Thursday off and make the jury come in here Friday.  I

14     rather do Thursday as much as we can.  If we don't finish, if I

15     have to give them the day off, I'll give them Friday off and

16     then we'll come back Monday, but I'd like to fill up the days

17     if we can.

18          MR. ROOS:  Just in terms of filling up, I think we

19     have a scenario where we rest before five tomorrow.  I'm not

20     sure if it's possible for defense to have anyone available.

21          THE COURT:  I'm not going to force them into that

22     situation.  If you rest before five tomorrow, I think the jury

23     will be happy and they'll be happy to come back the next day if

24     I can tell them we're not going to waste their time.  And then

25     particularly if I can tell them that we either have a half day

M1PBDOU5                        Pietruszewski - Recross

1    or no day on Friday and either finish up defense witness on

2    Monday or have summation on Monday.

3              MR. ROOS:  And then the only other question would be

4    with regards to the weekend, would the defense be ready to go.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1p3dou6

```
1         THE COURT:  All right.  Let's see how far we can get
2    with this witness.  But it would be good if the government
3    could rest tomorrow and we could have some defense witnesses,
4    if not all of the defense witnesses, I mean, at this point, the
5    defense witnesses that are contemplated, other than possibly
6    the defendant, do you think they would take more than a day?
7         MR. JANEY:  A single witness, your Honor?
8         THE COURT:  No, I'm talking about all your witnesses.
9         MR. JANEY:  Yes.
10         THE COURT:  Okay.  You think they'll take more than
11    two days?
12         MR. JANEY:  Probably not more than two days, your
13    Honor.
14         THE COURT:  All right.  Okay.  So let me assess it and
15    see where we are and then see what I want to say to the jury.
16         MR. ROOS:  We do we have a deadline for them to tell
17    us who the witnesses are?
18         THE COURT:  Same deadline.
19         MR. ROOS:  We were telling them a few days before.
20         THE COURT:  They should tell you a few days before.
21         MR. BURNETT:  There is also a significant expert issue
22    for one of their witnesses.  We have pretty much no idea what
23    he's going to say.  It will need to get litigated.
24         MR. JANEY:  I think we've heard from the government
25    six times in the last six seconds that they would like the
```

M1p3dou6

1    defense witness list.

2            THE COURT:  You don't want to cut them off by telling

3    them?  I have a list.  I assume it's among those people on that

4    list that I explained to the jury.  Is that correct?

5            MR. BURNETT:  They're free to call whoever they want.

6    If we want to litigate some of the issues, it would be good to

7    know.

8            THE COURT:  I have Dr. Michael O'Neil, I have

9    Dr. Martin Martinovic, I have Carlos Aquino, I have Steven

10   Norman.  I assume they are going to be some or all of those

11   witnesses.

12           MR. JANEY:  The only issue, your Honor, and which

13   we've just already mentioned, is the issue of notice.  Based on

14   the earlier schedule described by the government, and again, to

15   reiterate Mr. Gottlieb's comment, the government isn't tied to

16   calling a witness, is our witnesses are largely out of state.

17   And getting them here on Thursday is the challenge and

18   that's --

19           THE COURT:  Start talking to them tonight about trying

20   to get here to them here on Thursday.  If at all possible, I'd

21   like to have Thursday for witnesses.  If it's not possible to

22   have a full day of witnesses on Thursday, then you can tell me

23   with your best effort who you can get here so we can get those

24   witnesses out of the way.  Because I'd like to charge this jury

25   Tuesday or Wednesday at the latest next week.

M1p3dou6

1              MR. JANEY:  Understood, your Honor.

2              THE COURT:  The jury is here.  Let's see how far we

3    get with this.

4              (Jury present)

5              THE COURT:  You can be seated, ladies and gentlemen.

6    Thank you.

7              Government call its next witness.

8              MS. ROTHMAN:  Your Honor, with the Court's permission,

9    I would just read two stipulations and offer some exhibits into

10   evidence in advance of the next witness's testimony.

11             THE COURT:  Yes.

12             MS. ROTHMAN:  Thank you, your Honor.

13             The first is Government Exhibit 1001, a stipulation

14   between the parties, and I'll just read the relevant portion.

15   The parties have agreed:  (1) that venue is proper in the

16   Southern District of New York with respect to the charges in

17   Counts One and Two of the indictment in this matter.  And by

18   this stipulation the defendant hereby waives any argument or

19   defense that he might make with respect to venue not being

20   properly established in the Southern District of New York with

21   respect to those charges.

22             Your Honor, at this time we'd offer Government Exhibit

23   1001 into evidence.

24             THE COURT:  Any objection?

25             MR. GOTTLIEB:  No objection.

M1p3dou6

1            THE COURT:  It will be admitted in evidence.

2            (Government's Exhibit 1001 received in evidence)

3            MS. ROTHMAN:  Thank you.

4            Government Exhibit 1004, another stipulation between

5       the parties.  We'd offer that stipulation into evidence, your

6       Honor.

7            THE COURT:  Any objection?

8            MR. GOTTLIEB:  May I see it?

9            MS. ROTHMAN:  I can read the relevant portion.

10           MR. GOTTLIEB:  Okay.

11           MS. ROTHMAN:  Sure.

12           The parties agree that Government Exhibits 301 through

13      342 are true and accurate copies of records maintained by the

14      New York Bureau of Narcotic Enforcement relating to

15      prescriptions for controlled substances filled at the

16      pharmacies listed on the following chart between January 2012

17      and March 2017.

18           Your Honor, at this time we'd offer into evidence

19      Government Exhibit 1004, the stipulation, as well as Government

20      Exhibits 301 through 342.

21           THE COURT:  Any objection?

22           MR. GOTTLIEB:  No, your Honor.

23           THE COURT:  They will be admitted in evidence.

24           (Government's Exhibit 1004, 301 through 342 received

25      in evidence)

1           MS. ROTHMAN:   Thank you, your Honor.

2           MR. BURNETT:   The government calls Professor David

3    Cutler.

4     DAVID CUTLER,

5         called as a witness by the Government,

6         having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MR. BURNETT:

9    Q.  You are free to take your mask off, Professor Cutler.

10          Good afternoon, Professor Cutler.   Where do you work?

11   A.  I'm a professor at Harvard University.

12   Q.  What are you a professor of?

13   A.  I am an economist in the economics department.

14   Q.  What areas of economics do you focus on?

15   A.  My primary specialty is in health economics.

16   Q.  What's that?

17   A.  Health economics is the study of people's health, of

18   medical care, of all the ways that the economy and policy

19   influence our health.

20   Q.  So we'll come back to that in some more detail in a couple

21   of minutes.   But before we get there, I'd like to ask a bit

22   about your background.

23          Where did you go to college?

24   A.  I was an undergraduate at Harvard University.

25   Q.  What did you study there?

M1p3dou6                          Cutler - Direct

1    A.  I was an economics major.

2    Q.  After college, what did you do next in your career?

3    A.  I was then a PhD student at M IT.

4    Q.  What did that PhD program involve?

5    A.  So, it's a lot of empirical work and understanding of the

6    economy, and my specialty was in public sector issues,

7    especially as they relate to health care.  So a lot of work on

8    understanding health care markets, public policy, a lot of

9    empirical work.

10   Q.  Let's take that one at a time.  Could you describe some of

11   the particular areas within health economics you studied in

12   your PhD program.

13   A.  Hmm-hmm.  So, I've studied issues of population health, of

14   behaviors that people do that influence their health, smoking,

15   drinking, obesity, illegal drug use, unsafe sexual practices,

16   any number of other issues like that.

17          I've spent a lot of time studying insurance, how

18   people get insurance, how to help people get better insurance,

19   what we know about different ways of organizing insurance.

20          And I've spent a lot of time looking at medical care

21   market, markets for doctors and for hospitals and

22   pharmaceuticals, and the whole range of medical care services

23   that people need.

24   Q.  You mentioned pharmaceuticals within that medical care

25   bucket.  What specifically about the pharmaceutical industry

M1p3dou6                      Cutler - Direct

1    did you study?

2    A.   So, I've done quite a lot of work over time on what are the

3    costs of pharmaceuticals, and what are the benefits of

4    pharmaceuticals.  I've done a good deal of work looking at, as

5    people have taken more pharmaceuticals, how has that affected

6    our population's health.  How does it affect how much we spend

7    on medical care, what are the good points and the bad points of

8    all of the pharmaceutical industry.

9    Q.   You mentioned empirical work that you did in your PhD

10   program.  First, just basic question, what do you mean by that?

11   A.   Empirical work is work with data.

12   Q.   What kinds of work with data did you do?

13   A.   Yeah, a lot of work with data.  So, for example, claims

14   records, so I've looked at data with information on millions

15   and millions of people in different insurance plans so I could

16   see what utilization patterns were like and how that was

17   related to outcomes to try and improve the care that people

18   get.

19   Q.   When did you finish your PhD program?

20   A.   1991.

21   Q.   What did you do after that?

22   A.   I became an assistant professor at Harvard University.

23   Q.   Have you been on the faculty at Harvard since then?

24   A.   Yes, I have been.

25   Q.   I'd like to start with your career at Harvard on the

1  faculty.  What roles have you had?

2  A.  I started off as an assistant professor, and I was promoted

3  to associate and then full professor.

4          So I currently have appointments.  My primary

5  appointment is in the economics department.  I also have an

6  appointment at the Kennedy School of Government and at the

7  School of Public Health, so reflecting my wide engagement with

8  health care issues.  And then for five years I was an associate

9  dean of faculty of arts and sciences at Harvard.

10  Q.  What are some of the requirements for becoming a tenured

11  faculty member?

12  A.  Really three different areas.  One is one needs to do

13  research.  So you want to do research to learn about the world,

14  to educate ourselves about the world.  Second is teaching.  So,

15  you spend a lot of time obviously teaching, and I really enjoy

16  it and teaching students at all levels, from undergraduates to

17  master's to PhD students, to any students.  And then third is

18  service to the broad community of scholarship.  Being on

19  government panels, being in professional societies, being an

20  advisor to companies when they need it, being -- just trying to

21  help teach the world some of the things that we have, that we

22  have to share.

23  Q.  Let's talk a little bit more about each of those categories

24  starting with teaching.  What kinds of classes do you teach?

25  A.  I teach -- so first, I love teaching.  I teach a course for

M1p3dou6                    Cutler - Direct

undergraduates, a big lecture course on why is there no cure

for health.  We look at various health problems around the

world, and we try to look at why is it we've been unable to

solve them.  The course looks at three issues in particular.  A

third of the course is spent on pharmaceuticals, why is it that

we are so unhappy with the pharmaceutical industry.  We also

look at H.I.V. AIDS, and we look at U.S. health care reform.

Those are the three topics we look at.

Q.  Within that topic on the pharmaceutical industry, what

types of issues do you discuss with your class?

A.  So, we really frame it as many pharmaceuticals are

extraordinarily valuable to people.  They are just extremely

valuable.  They let them live longer, healthier lives, and yet

some people cannot afford them in the U.S., in poor countries

around the world, in middle income countries.  And there is

tension between how do we get people what they need and make it

affordable, versus also providing incentives for companies to

develop new drugs and to get better and to get drugs out to

people.  How do we try and bridge that divide.

Q.  What, if anything, do you do to stay up to date on those

topics about the costs and benefits of the pharmaceutical

industry?

A.  I read very widely.  So anything in health economics, there

are journals.  Of course, many of these discussions happen in

public newspapers and magazines and on TV, so I watch all of

M1p3dou6                      Cutler - Direct

1   those.  I also talk regularly with companies, so any company

2   that's buying health insurance, as most companies do or a lot

3   of companies do for their employees.  I talk with governments,

4   I am on various government panels that look at pharmaceuticals

5   in particular, and health care in general.  I've been on

6   various advisory commissions to advise the government and other

7   public and private organizations on how to think about

8   pharmaceuticals and health care in general.

9            So just a lot of reading, discussing, debating the

10  issues.

11  Q.  Now, in addition to your teaching, I think you said you

12  also have a research component of your job?

13  A.  That's correct.

14  Q.  Broadly speaking, what does your research look at?

15  A.  My research is focused on how do we improve the

16  population's health, both through the things that we do and

17  that happen in society that influence our health.  And how do

18  we structure our medical system that is as cheap as we can make

19  it while also delivering us the highest quality care that we

20  can get.

21  Q.  Could you describe some examples of topics that you

22  research within that broader subheading.

23  A.  Yeah, so I've done a lot of research on -- I told you about

24  some of the work I've done on pharmaceuticals and on the

25  benefits and costs of that.  I've done quite a lot of research

1    on, for example, differences in health care spending across the

2    country.  In some areas it is much higher, so, for example, in

3    some areas it is twice as high as in other areas per person.

4    What are we getting out of it.  And conversely, when we're not

5    getting out of it, what policies could we take that would allow

6    us to spend less than the high spending areas without giving up

7    on the -- on the benefits of care.

8    Q.  What, if any, research have you done with respect to actors

9    within the pharmaceutical distribution chain?

10   A.  So, I've done quite a lot of work on pharmaceuticals.  I

11   haven't written a specific paper on individual actors, but it's

12   been important in all of the work that I do, particularly about

13   things like the cost of medical care and the cost of

14   pharmaceuticals, and understanding all the distribution

15   channels are important in understanding those costs, and also

16   in things like making sure how do we get people the drugs that

17   they need, where in many cases we just have great difficulty

18   getting to people the drugs that they need both in the U.S. and

19   elsewhere because of cost or because of unavailability or other

20   kinds of restrictions on people's access to pharmaceuticals.

21   Q.  What are some of the methods you use in your research?

22   A.  Almost all of my research involves a mix of understanding

23   economic theory, that is, what are the incentives that drive

24   people and firms and how do they work, as well as doing data

25   work.  So working with large samples of data, I have

observations sometimes on millions of people, sometimes on

billions of people.  I have many, many observations, and I

bring them together to tell a story about what is happening to

people, what is happening to their health, to the money that's

being spent.

Q.  Has any of your research focused on the distribution or use

of opioids specifically?

A.  Yes.  I have written quite substantially on the opioid

industry, on opioids and the industry behind opioids.

Q.  Can you describe at a high level your research on those

topics?

A.  Yeah.  I talked about how many pharmaceuticals are

extremely valuable.  Unfortunately, opioids are one of the

counter-examples to that.  So I've done work, for example,

looking at what's happened over time, people are being

prescribed a lot more opioids than they used to be.  And by all

measures, it hasn't -- we haven't seen commensurate benefits.

So obviously the biggest measure is enormous amounts of opioid

overdose deaths and the opioid epidemic that the country is

facing.  But in addition, if you look at people who are in

pain, there is not a lot -- the pain is not subsiding any more

rapidly than it was before people were taking opioids.  Their

ability to participate in the labor force is not increasing any

more than it was before opioids were commonly available.

          So it's been an example of something where the medical

system has really been not just unhelpful, but actually harmful

to people, in that people have become both addicted to and

excessively using drugs which are very costly and not

beneficial.

Q.   What, if any, data have you analyzed in connection with

your study of opioid distribution and use?

A.   Yeah.  So I've looked at opioid distribution across the

country.  So I've had data from the DEA, the Drug Enforcement

Administration, they collect data on all opioids that are

distributed by zip code, so I've had data for upwards of 20

years on all opioid distribution to every county.  I added up

to every county in the country so I know of all 3,000 counties

how many opioids they were getting.  Then matched that with

data from government vital statistics on mortality rates in

different areas in the country, in those same areas, so I can

see what's been happening to opioid overdose as it's been

related to prescriptions of opioids.

          I also have data on neonates in hospitals because of

their moms addicted to opioids, emergency department admissions

for opioid overdose, inpatient admission for opioid overdose.

So a lot of measures of harm associated with opioid overdose.

And I've also tried to look at some potential benefits, like

labor force participation and things that I've matched as well.

Q.   From your research generally, have you published books and

articles?

M1p3dou6                         Cutler - Direct

1    A.  I've published three books in which I was an author or

2    co-author.  I've edited many more books.  And I've written I

3    think well over 100 articles, although I don't keep track of

4    the exact number.

5    Q.  Now, so far you have been talking about your teaching, your

6    research work as a professor.  Do you also do work with other

7    outside organizations?

8    A.  Yes, I do.

9    Q.  At a high level, what kind of organizations have you worked

10   for?

11   A.  So some are professional societies.  So there is a lovely

12   society called the American Society of Health Economists which

13   I am the president of.  Various organizations, American

14   Economic Association and professional organizations.  As I

15   mentioned briefly, I've been involved in various government

16   policy issues, so I've been an advisor to the federal

17   government.

18           I am currently on a commission on health costs in the

19   State of Massachusetts.  I've advised other state governments.

20   I've also advised many corporations, asked me, hey, what's

21   going on in health care, are there things we should be thinking

22   about that we should be looking forward to or looking into.  I

23   give talks to companies, talks to hospital societies, talks to

24   physician societies.  Basically anyone who wants to hear my

25   views about health care, I'm happy to talk to them about it.

1    Q.   Now, in addition to that public and private sector work

2    that you have you just described, have you ever worked on

3    litigation before?

4    A.   I have worked on litigation, yes.

5    Q.   At a high level, what kind of litigation?

6    A.   So in the 1990s I was involved when the State of

7    Massachusetts was suing the tobacco companies for damages due

8    to tobacco.  And then very recently -- so then I didn't do

9    anything for a while.  And then very recently I've been

10   involved in the past few years in the litigation where counties

11   and state governments are suing opioid manufacturers,

12   distributors, and dispensers.  So I'm involved in several of

13   those lawsuits.

14        And even more recently, I've been involved, there is a

15   class action lawsuit against the Juul, Juul Labs, the folks who

16   make the vaping devices, so I've in both of those, I've been --

17   and they are also being sued by the school districts and

18   counties, and in both of those I'm representing the people

19   suing, because of the damages that have occurred because of the

20   use of those products.

21   Q.   Now, with respect to the opioid related litigation, without

22   getting into the substance of any of your opinions in those

23   cases, can you describe what types of data you've analyzed in

24   connection with that work.

25   A.   Yes, so I'm really looking at issues of causality.  To what

1  extent were the excessive opioids causal in the harms that have

2  resulted from that.  So I described how I use data, how I

3  gather data on all opioid shipments from every company to every

4  area of the country, so I've been using data like that.  I've

5  matched that up to data on death from opioid-related causes and

6  non-opioid related causes in different areas, matched that up

7  to demographic and economic information on those areas, so I

8  can see what else was going on in those areas so I can draw a

9  picture about what was happening as opioids were spreading to

10  the health of each area of the country, and how important were

11  opioids relative to other things in explaining those trends in

12  health.

13             MR. BURNETT:  Your Honor, at this time the government

14  moves to qualify Dr. Cutler as an expert.

15             THE COURT:  Any objection?

16             MR. JANEY:  No objection, your Honor.

17             THE COURT:  You can inquire on that basis.

18  Q.  I'd like to ask you a few preliminary questions about your

19  involvement in this case, before we get to the substance.

20             To your knowledge, have you met any of the witnesses

21  who are testifying in this case?

22  A.  I do not believe I have.

23  Q.  Have you met the defendant, Mr. Laurence Doud?

24  A.  I do not believe I have.

25  Q.  Do you have any personal knowledge of the facts about this

1    case?

2    A.  No, I don't.

3    Q.  Is there anyone who assists you in the work that you've

4    done in this case?

5    A.  Yes.  There is a firm that helped out with the analysis

6    that I worked with on the analysis.  So, as you can imagine,

7    this involves massive amounts of data analysis, so I and

8    another -- and a firm called Compass Lexecon worked on that.

9    That's sometimes why I'll say "we," because I'm referring to me

10   and the team that I worked with.

11   Q.  Are you compensated for the work that Compass Lexecon does

12   or has done on this case?

13   A.  I'm not compensated for any work that Compass Lexecon does.

14   Q.  Are you being compensated for your own work on this case?

15   A.  Yes, I am.

16   Q.  Does that include your testimony today?

17   A.  Yes, it does.

18   Q.  How are you being compensated?

19   A.  So I charge $900 an hour.  And that's independent of

20   anything else.  There is no -- that's not contingent on

21   anything other than just the amount of time.

22   Q.  About how much have you billed to date?

23   A.  I -- if I recall -- so I meant to look this up.

24   Q.  Just an estimate is fine.

25   A.  I think it's on the order of roughly 50 hours, which would

M1p3dou6                         Cutler - Direct

1    be about $40,000.

2    Q.  What are those payments for?

3    A.  Oh.  Those are payments for the time that I put in for the

4    work that I do in terms of doing the analysis, and drawing the

5    conclusions from that.

6    Q.  Does the amount you get paid depend in any way on the

7    opinions you give in this courtroom?

8    A.  No, it doesn't.

9    Q.  Does the amount you get paid depend in any way on the

10   outcome of the trial?

11   A.  No, it doesn't.

12          MR. BURNETT:  So Ms. Hauck, if you can please put up

13   on the screen what's been marked for identification as

14   Government Exhibit 903.  If you can flip through this for the

15   Court and for Professor Cutler.

16   Q.  Do you recognize Government Exhibit 903?

17   A.  Yes, I do.

18   Q.  What is it?

19   A.  These are tables and charts that I prepared in response to

20   the questions that I was asked.

21   Q.  Do these tables and charts summarize voluminous quantities

22   of data that you have reviewed?

23   A.  Yes.  In the background there is a lot of different data

24   that we can talk about as we go through.  And obviously, you

25   can't present all of that data, so I tried to summarize it and

M1p3dou6                          Cutler - Direct

1    tell the story that the data are telling.

2              MR. BURNETT:  At this time the government offers

3    Government Exhibit 903.

4              THE COURT:  Any objection?

5              MR. JANEY:  No objection, your Honor.

6              THE COURT:  I will admit it into evidence.  I'm not

7    quite sure what I have, whether the entire thing is 903 or

8    whether it is just this.

9              MR. BURNETT:  The full packet is 903.

10             (Government's Exhibit 903 received in evidence)

11             MR. JANEY:  Can I clarify for the record that Exhibit

12   903 comprises only 18 pages?

13             MR. BURNETT:  I believe that's correct.  Is this all

14   the way at the end, Ms. Hauck?

15             Yes.

16             MR. JANEY:  Thank you, your Honor.

17             MR. BURNETT:  Ms. Hauck, can you please turn back to

18   page one and publish for the jury with the Court's permission.

19   Q.  Professor Cutler, I want to start with just a bit of

20   background.  From your teaching research, are you familiar with

21   how the pharmaceutical distribution industry works?

22   A.  Yes, I am.

23   Q.  What does this slide show?

24   A.  So, this is at a very high level how the pharmaceutical

25   distribution industry works.  It's basically showing how you go

M1p3dou6                        Cutler - Direct

from what's on the left, which are manufacturers, and the drugs

and the pills and patches and injections that they produce, to

the right, which is the use in terms of the patients.  So how

is it that drugs go from manufacturers all the way to patients.

Q.  I want to focus on the second step here in the chart, the

one that's labeled "wholesalers."

      In your teaching and research, have you studied how

wholesalers perform their role in the pharmaceutical industry?

A.  Yes, I have.

Q.  What role do wholesalers play?

A.  So wholesalers, as you can see, are the intermediaries

between the manufacturers on the one hand, and the pharmacies

on other.  So what they do is they buy the medications from the

manufacturers, they bring them together, they warehouse them,

they put them in the appropriate units, and then they

distribute them to the pharmacies.  So they're also called

distributors.  So that's their primary function here.

Q.  From your work, are you familiar with how wholesalers go

about making money?

A.  Yes, I am.

Q.  Let's turn now to slide two of Government Exhibit 903.

Using this slide, can you explain again in general terms how

wholesalers make money.

A.  So, any firm you want to think about the profit, obviously,

any firm is thinking about profit.  And so there are three

1   parts to that.  The first part is the revenue, that is how much
2   money do you make selling goods.  In this case, they are
3   selling to pharmacies, so how much money is made by selling to
4   pharmacies.  Out of that come two costs.  The one in the middle
5   are the costs of the drugs, so you remember they are buying the
6   drugs from the manufacturers and they are distributing them to
7   the pharmacies.  So there is the cost of the goods sold, the
8   cost of the pills, and that's the first part.  And then the
9   second part is the other costs of running the distribution
10  business.  There is the general administration, and the
11  warehousing and the employees and the IT system and all of
12  that.  Those are the non-drug costs.
13  Q.  Focusing on costs for wholesalers, are there any unique
14  factors that go into the cost equation for pharmaceutical
15  wholesalers?
16  A.  Yeah.  So, the biggest share of the cost, of the two costs,
17  the biggest share of the costs are the drug costs.  Those are
18  the costs of buying the pills, they then sell them at a list
19  price, but then typically, the wholesalers get a discount from
20  the manufacturers if they buy more, if they pay promptly, for
21  large-scale purchases.  So there is a sort of discount, and
22  that discount off of the cost is a lot of what it turns into
23  the profit.  They are selling at a list price, and then they're
24  winding up with discounts paying below that.
25  Q.  Do those discounts always happen before the wholesalers

1   resells the drug on to a pharmacy?

2   A.   Sometimes after.  So it's as a result of the whole

3   transaction, but it is something that the wholesaler would know

4   about.  So they know we bought this amount, and so therefore we

5   would get this discount.

6   Q.   From your teaching and research, are you familiar with the

7   phrase full service distributor or wholesaler?

8   A.   Yes, I am.

9   Q.   What does that mean?

10  A.   A full service distributor or full service wholesaler is

11  one that will carry the full range of products, ranging from

12  controlled substances like opioids to non-controlled

13  substances.  Think about statins or antihypertensives or

14  insulin and even some non-pharmaceutical products like

15  Band-Aids and aspirin and so on.  Generic drugs, branded drugs.

16  Basically the whole waterfront of what a pharmacy would want to

17  get for the kind of pharmaceutical end or the medical end of

18  what it's selling.

19  Q.   As an economist, what's the economic rationale, if any, for

20  being a whole, a full service distributor as opposed to

21  specializing?

22  A.   Yes.  So, if I'm a pharmacy, I really don't want to have to

23  deal with many different wholesalers.  I'd like to just deal

24  with one, so I'd like to get all my medicines from that one.

25  It's both easier in that I only have to deal with one, and also

M1p3dou6                          Cutler - Direct

```
 1   sometimes the prices are lower because you are buying just from

 2   one and the more you buy, the bigger the discount you can get.

 3   Also, some wholesalers have minimum constraints, like they only

 4   want to sell in certain amounts because getting drugs there is

 5   costly.

 6           So it's both lower cost and easier for a pharmacy, and

 7   therefore, the wholesalers, many wholesalers want to be full

 8   service so they can supply the entire amount of the

 9   pharmaceutical needs of the pharmacy.

10   Q.  I want to move from talking about wholesalers generally to

11   one wholesaler in particular, and that's Rochester Drug

12   Co-Operative.  Are you familiar with that pharmacy or

13   wholesaler?

14   A.  Yes, I am.

15   Q.  How are you familiar with it?

16   A.  Through this case.

17   Q.  Did you have any knowledge, have you studied it prior to

18   your work on this case?

19   A.  No, I have not.

20   Q.  What kind of company is RDC?

21   A.  So RDC is a full service distributor, full service

22   wholesaler.  It supplied the full range of pharmaceutical and

23   some non-pharmaceutical products that the pharmacy is getting

24   and then selling.

25   Q.  In your work on this case, have you reviewed data about
```

M1p3dou6                      Cutler – Direct

1    RDC's sales of different types of products?

2    A.  Yes, I have.

3    Q.  Now, I want to focus on some specific products that RDC

4    sold to begin with.  From your teaching research, are you

5    familiar with what controlled substances are?

6    A.  Yes, I am.

7    Q.  What are they?

8    A.  Controlled substances are substances that may have a

9    potential health benefit, but also have the potential for abuse

10   and harm.

11           So opioids are the classic case, where they can be

12   beneficial in terms of reducing pain, but they can also lead to

13   addiction, dependence, overdose, and death.

14   Q.  Are there different categories of controlled substances?

15   A.  Yes, there's ranging from category I, which is drugs for

16   which there is no legitimate medical use, think about heroin or

17   cocaine which are not allowed to be legally sold.  Most opioids

18   that are sold are in category II.  So they're Schedule II.  So

19   those are drugs with the high potential for abuse, but they're

20   not banned from sale, but they have to be controlled.  So under

21   the Controlled Substances Act, there are many requirements put

22   in place about the distribution of those drugs that apply to

23   those drugs, and not to other common drugs, not to any other

24   drugs.

25   Q.  Based on your review of the sales data, did RDC sell

M1p3dou6                         Cutler - Direct

1    controlled substances, including opioids?

2    A.  Yes, it did.

3    Q.  Can you give some examples of types of opioids that RDC

4    sold.

5    A.  Yup.  So the two most common types were oxycodone, which

6    was the prime ingredient in OxyContin.  That was the drug

7    launched in the mid-1990s that really led to an enormous use of

8    opioids over time.  And another example was fentanyl, which

9    you'll sometimes see as a patch or another form of dosing, and

10   that would be -- that's a synthetic opioid that's also used for

11   very severe relief of pain.

12            Those are two common ones.  There are many other ones

13   as well.

14   Q.  Are all opioids the same strength as one another?

15   A.  No, they're not.

16   Q.  Could you explain how they differ?

17   A.  So they differ in term of the potency.  That is how much

18   pain relief, and, therefore, potential for harm comes from

19   them.

20   Q.  From your research, is there a way that health economists

21   compare opioids based on their strength?

22   A.  Yes.  So there is a very, very common methodology used by

23   all researchers, by the government, and that's to put things in

24   units of equivalence to morphine.  So morphine is a standard,

25   so you think about 1 milligram of morphine, and then the

M1p3dou6                      Cutler - Direct

1    different drugs are placed relative to how much their dosage

2    relative to 1 milligram of morphine.

3    Q.   Is there a common abbreviation for those morphine milligram

4    equivalence?

5    A.   It is often abbreviated MME, for milligrams of morphine

6    equivalent or morphine milligrams equivalent.  That's the most

7    common metric people use.

8    Q.   I want to walk through how that works.  Starting very

9    simply.  What is one MME?

10   A.   One MME is 1 milligram of morphine.

11   Q.   How many MMEs is 1 milligram of a different drug, say,

12   oxycodone?

13   A.   Oxycodone is 1.5 MMEs, so it's like one and a half

14   milligrams of morphine.

15   Q.   Why is it higher than just one MME?

16   A.   Oh.  It's greater potency.

17   Q.   How about fentanyl, how many MMEs is 1 milligram of

18   fentanyl?

19   A.   Yeah, so fentanyl is often delivered not by pill, but in

20   patches or in lozenges or things, so it varies depending on the

21   exact formulation.  But, it's typically in the range of 50 to

22   100 MMEs.  So it's like 50 to 100 milligrams of morphine per

23   dose.

24   Q.   In connection with this case, have you used MMEs to analyze

25   data on RDC's sales of opioids?

1    A.  Yes, I have.

2    Q.  Just to be clear, why did you use MMEs as a metric in that

3    analysis?

4    A.  Yeah, you need to put things in common units.  It's like

5    saying someone went to the grocery store and they bought a

6    certain number of grapes and a certain number of watermelons.

7    You can't add how many grapes and how many watermelons they

8    bought.  You have to put them in some units, for example,

9    dollars or what are is the caloric input or what is the amount

10   of calories available.  So you'd add up the calories in the

11   grapes and calories in the watermelon.

12          It is doing the same thing here.  It is saying what is

13   the total morphine equivalent in what is being dispensed.

14   Q.  Let's turn now to slide three of Government Exhibit 903.

15   Could you explain for the jury what the data is that's charted

16   on this slide.

17   A.  Yeah.  So, what this chart is showing you, and I can

18   explain it more, is the quarterly shipments of milligrams of

19   morphine equivalent that RDC shipped to its pharmacies.

20   Q.  Let's break the chart down.  What's the time period that

21   this chart covers?

22   A.  So the chart is from 2010 through 2017.  And it's divided

23   into quarters, three-month periods, January, February, March

24   and so on.  So each of the years you see on the bottom axis and

25   each of those numbers is the quarter.  So the first quarter of

M1p3dou6                         Cutler - Direct

1    2010, up through 2011, and so on up through the first quarter

2    of 2017.

3    Q.  So just for our reference point, about how many million

4    MMEs was RDC shipping per quarter in 2010?

5    A.  Yeah.  So it is shipping around 250 million MMEs.  So you

6    can see the height of that is about 250 million on average.

7    Q.  Could you describe what this chart shows about how RDC's

8    shipments of opioids changed between 2010 and 2017?

9    A.  You can see there is a very sustained and large increase in

10   opioid shipments.  So between 2010 and 2015, which was roughly

11   at the peak of the opioid shipments by RDC, it had increased by

12   125 percent.  So it more than doubled over the time period.

13   Q.  And during that peak year, 2015, about how many million

14   MMEs of opioids was RDC shipping per quarter?

15   A.  It was roughly about 550 million MMEs per quarter.

16   Q.  Now, have you looked into any data that went into creating

17   this increase in MME shipments?

18   A.  Yes, I have.  And in particular, I divided it into the two

19   major drugs that we were talking about, oxycodone and fentanyl.

20            MR. BURNETT:  So Ms. Hauck, if you can please now turn

21   to slide four of Government Exhibit 903.

22            MR. JANEY:  Objection.  Just to clarify the record.

23   The witness was referred to by a different name than his own.

24            THE COURT:  Okay.

25            MR. BURNETT:  I was referring to Ms. Hauck the

1  paralegal, I wasn't referring to the witness.

2  Q.  Now, Professor Cutler, if you could please explain again

3  what the black line is on this chart.

4  A.  So the black line here is the same as the black line on the

5  previous chart.  It is showing you the milligrams of morphine

6  equivalent that RDC shipped each quarter from 2010 through the

7  first quarter of 2017, and it is exactly the same.  So it is

8  the same increase, the exact same numbers.

9  Q.  So the black line is the same line that we saw in the prior

10  slide, slide three.

11          What's the orange line?

12  A.  The orange line here is the shipments of oxycodone, so it

13  is the specific oxycodone shipments.

14  Q.  Could you describe what this orange line shows about how

15  RDC's shipments of oxycodone changed between 2010 and 2017.

16  A.  Hmm-hmm.  The trend for oxycodone looks very similar to the

17  overall trend.  In fact, it is a very high number.  It shows a

18  very steady increase, in this case 115 percent increase, or a

19  bit more than a doubling of oxycodone shipments over this time

20  period.

21  Q.  Now, the bottom line there, the blue one, what does that

22  blue line reflect?

23  A.  The blue line is MME shipments of fentanyl.

24  Q.  What does that line show about the change in RDC's

25  shipments of fentanyl between 2010 and 2017?

1   A.  You can see of course the MMEs are lower.  It's further

2   down.  But the increase is in fact bigger.  So it tripled, so

3   it was 222 percent, a tripling of the MMEs of fentanyl that

4   were shipped between 2010 and 2015.

5   Q.  Just for reference between these two lines, the blue and

6   the orange one.  About how many millions of MMEs did RDC ship

7   per quarter in 2015, focusing on the oxycodone?

8   A.  Oxycodone, it's roughly 300 million MMEs per quarter.

9   Q.  How many about with respect to fentanyl?

10  A.  Fentanyl it's about 100 million MMEs per quarter.

11  Q.  You've been testifying about RDC's sales of opioids

12  measured by MMEs.  Were there other ways that you analyzed

13  RDC's opioid sales?

14  A.  Yes.  I also looked at the dollar value of sales.

15  Q.  Why did you do that?

16  A.  It's again another way to think about that, is how much

17  revenue is RDC earning from opioids, which of course are also

18  going to contribute for profits to are for RDC.

19          MR. BURNETT:  Ms. Hauck, can you please turn now to

20  slide five of Government Exhibit 903.

21  Q.  What's charted on this slide, Professor Cutler?

22  A.  Yes.  So it the same time period, so along the flat, the

23  bottom axis it is the same time period and the same quarters.

24  In this case what I'm showing you is the quarterly sales, that

25  is the dollar value of quarterly sales of opioids from RDC.

1   Q.  So, starting in 2010 as a reference point, about how many

2   dollars per quarter was RDC making from opioid sales in 2010?

3   A.  A little bit under $10 million per quarter.

4   Q.  How did RDC's revenues from opioids change from 2010 to

5   2017?

6   A.  They rose quite rapidly.  So you can see that by 2015, it

7   was about $60 million per quarter.  That was an increase of

8   about 600 percent, so roughly a seven-fold increase in sales.

9   Q.  Let's turn ahead to slide six.  Could you explain what

10  slide six of Government Exhibit 903 shows.

11  A.  Yup.  So the black line here is the exact same as the

12  previous slide.  So that's showing the total revenues from

13  sales of opioids.  The orange and the blue are the same as two

14  slides ago, so the orange is the revenues from sales of

15  oxycodone, and the blue is the revenue from the sales of

16  fentanyl.

17  Q.  So, let's take those one at a time.  Let's start first with

18  the orange line, oxycodone like we did last time.  What does

19  this chart show about how the sales of oxycodone changed

20  between 2010 and 2017, measured now on a dollar basis?

21  A.  On a dollar basis they went up.  They just about doubled,

22  so 93 percent increase is just about doubling through 2015.

23  Q.  That was for oxycodone.  I think you said the blue line was

24  fentanyl sales; is that correct?

25  A.  That's correct.  The blue line is fentanyl sales.

Q.  How did RDC's revenue from fentanyl sales change between
2010 and 2015?

A.  It increased absolutely enormously.  So it increased by
2800 percent, about 29 times more revenue per quarter in 2015
relative to 2010.

Q.  Now, earlier you testified that the growth of RDC's MME
shipments was driven more by oxycodone than fentanyl; is that
right?

A.  That's correct, yes.

Q.  Could you explain why the revenue growth was higher for
fentanyl sales?

A.  Fentanyl was a more expensive drug than oxycodone.  So
therefore, each increment to fentanyl sales, each increment of
fentanyl shipments adds more to sales than each increment of
oxycodone shipments.  So that's why the revenue for fentanyl
rose more rapidly than the revenue for oxycodone in comparison
to the MMEs.

Q.  Now, so far you've been testifying about RDC's opioid
sales.  During your work on this case, have you also analyzed
data on opioid sales by other wholesalers during the same time
period?

A.  Yes, I have.

Q.  What, if anything, did you do with that data?

A.  So remember I told you that because of reporting, we know
how many opioids are shipped to each county in the U.S.  So, I

1  took for all the -- for three states in which RDC is biggest,

2  New York, New Jersey, and Pennsylvania, all the shipments of

3  opioids, both overall oxycodone and fentanyl, for all the other

4  distributors not RDC.  So I could compare RDC's shipments

5  relative to the everyone else in the industry not RDC.

6  Q.  Why did you decide to do that comparison?

7  A.  One thing you always want to know, is this just a time

8  period where opioid shipments are increasing so everybody is

9  expanding their shipments of opioids or was this particular to

10 RDC.

11 Q.  What did you find?

12 A.  It's quite particular to RDC.  So, while RDC's shipments of

13 opioids are increasing quite a lot, shipments from all the

14 other distributors combined were falling.

15 Q.  So let's turn now to slide seven of Government Exhibit 903.

16 And Professor Cutler, could you describe at a high level what's

17 on this chart here.

18 A.  So, at a very high level, what this chart is showing you is

19 for all opioids or for particular types of opioids, what was

20 happening to MME shipments from RDC, that's going to be in

21 blue, and then opioid shipments from everyone else, and that's

22 going to be in the orange.

23 Q.  So, let's start with the pair of columns on the left,

24 labeled all opioids.  Can you describe what that pair of

25 columns shows.

M1p3dou6                         Cutler - Direct

A.   So the blue is the increase, the percent change in RDC's

shipments of all opioids.  That's 125 percent.  That came

straight from the graph earlier.  That shows RDC increased

125 percent.

        The orange is showing all the other distributors in

those three states.  All the other opioids shipped in those

three states, and they declined by 11 percent.

Q.   How about the next pair of bars, above the label fentanyl.

What does that show?

A.   So that's the same two for fentanyl, remember we saw

earlier where fentanyl shipments from RDC increased 222

percent.  For all the other distributors together in those

three states, they declined 18 percent.

Q.   Finally, the last pair of bars is labeled oxycodone.  Can

you describe what the data there shows?

A.   So the increase for RDC is 115 percent, that was the same

as earlier.  And for oxycodone, all the other distributors in

total decline 10 percent.

Q.   So to wrap up, what does the data that you analyzed on this

chart show you about the trend in RDC's opioid sales compared

to shipments by the rest of the industry?

A.   What RDC was doing was very different from the rest of the

industry.  The rest of the industry was declining in opioid

shipments over this time period.  And RDC was increasing quite

rapidly.

1    Q.   Now, you have been testifying so far about focusing on

2    RDC's opioid sales.  Were opioids the only products that RDC

3    sold?

4    A.   No, RDC was a full service distributor, so it was providing

5    and selling drug as cross the board.

6    Q.   Have you reviewed data on RDC's sales of other types of

7    products?

8    A.   Yes, I have.

9    Q.   Let's turn now to slide eight here.  And can you start by

10   explaining what the chart on the left is.

11   A.   So that is showing you for different years, so each year

12   from 2010 over on the left to 2016, the height of each bar is

13   showing you the total revenue to RDC.  So you can see in 2010,

14   that's a number on the order of roughly 700 million.  So that's

15   700 million in total sales, rising up to a bit above 2 billion,

16   about two and a quarter billion in 2015.  So that's total.

17            And then it's dividing it into two parts.  So the blue

18   are opioid products, so that's revenue from opioid products.

19   And the gray is revenue from non-opioid products.

20   Q.   So, focusing on the blue section, you said that's RDC's

21   revenue from opioid products?

22   A.   That's correct.

23   Q.   How did RDC's revenue on a dollar basis change from 2010

24   through 2016?

25   A.   It increased quite a lot.  So you can see from 2010 through

M1p3dou6                        Cutler - Direct

1  the height it was in 2015, it rose from 34 million to 242

2  million.  It fell a little bit in 2016.  It was then $168

3  million.

4  Q.  Now, did RDC's revenues from other product also grow during

5  that time period?

6  A.  They did indeed.

7  Q.  How is that shown on this chart on the left?

8  A.  You can see the size of the gray areas also increasing, so

9  it's 685 million in 2010, up to just under $2 billion in 2015.

10  Q.  Now, have you been able to examine how RDC's opioid sales

11  changed as a percentage of overall revenue between 2010 and

12  2016?

13  A.  That's in fact what's plotted in the chart on the right.

14  Q.  Can you explain what the chart on the right shows.

15  A.  Yeah.  So for each of those years, what the chart on the

16  right is showing you is what shares of the revenue comes from

17  opioids.  If you just take those two numbers in 2010 and you

18  divide the 34 million by the 685 million, 4.7 percent of RDC's

19  revenues were opioids.  That increased to about 11 and a half

20  percent in 2014, roughly 11 percent in 2015.

21  Q.  So just to break that down a little bit.  In 2010 and 2011,

22  about what percentage of RDC's overall revenues came from

23  opioid sales?

24  A.  About four and a half percent.

25  Q.  And then looking ahead to 2014 and 2015, in those years,

1    what percentage of RDC's overall revenues came from opioid

2    sales?

3    A.  About 11 percent, a little over a 11 percent, so more than

4    twice as high.

5    Q.  Now, have you been able to compare the growth in RDC's

6    opioid revenues compared to the growth in the revenues from

7    other products that RDC sold?

8    A.  Yes, I have.

9    Q.  Can we turn ahead now to slide nine on Government Exhibit

10    903.  What does this slide show?

11    A.  Again I am showing you for every quarter here, what I've

12    done is I've kind of normalized sales in the first quarter of

13    2010 to be one.  So I've said relative to that being one, what

14    is the growth of sales of in blue opioid products, and in gray

15    non-opioid products.  So how much did they grow relative to

16    each other.

17    Q.  So let's start with the gray line.  You said that charts

18    the growth of all non-opioid products?

19    A.  That's correct.

20    Q.  What does that show you about how revenues from non-opioid

21    products changed between 2010 and 2017?

22    A.  They grew roughly by three, so a little bit over three.  So

23    relative to where they were in 2010, in 2015, and 2016, they

24    were just about over three, so three times higher.

25    Q.  And the blue line, that reflects revenue from opioid

1    products; is that right?

2    A.   That's correct.

3    Q.   So, how, according to this chart, did RDC's revenues from

4    opioid products change during that same time period?

5    A.   Here it rose much more.  So here it rose to seven or eight

6    times higher, so it was a really much bigger growth in the

7    opioid sales than in the non-opioid sales.

8             MR. BURNETT:  Your Honor, I think this is a natural

9    breaking point for the testimony if you think that's an

10   appropriate time to stop.

11            THE COURT:  We'll adjourn for the day.  Ladies and

12   gentlemen, we are going to adjourn for the day.  I'll tell you

13   I think we are a little ahead of schedule.  I'm hopeful that we

14   will finish the testimony no later than Monday or Tuesday

15   instead of midweek next week.  So I want to keep us ahead of

16   schedule.

17            I ask you to be in the courtroom at 9:45 tomorrow.

18   Hopefully we can start on time and not have as many

19   interruptions as we had today and get in a full day of

20   tomorrow.

21            So don't discuss the case, keep an open mind.  I'll

22   see you tomorrow at 9:45.

23            (Jury excused)

24            THE COURT:  You can step down.

25            So, is there anything that we need focus on now or

M1p3dou6                         Cutler - Direct

tonight?  We'll continue this witness tomorrow.  And the

government thinks that they may have one or two at the most

witnesses after this.

          MR. ROOS:  I think maximum will be four.  And the

minimum will be two.  Two being Paulsen and then probably a

paralegal as clean up.  The four would be if we called the two

other witnesses we're thinking about cutting, and we'll

definitely let the defense know tonight.

          THE COURT:  How much longer do you think you will be

on direct examination?

          MR. BURNETT:  Probably between an hour and hour and a

half.

          THE COURT:  Okay.  Let's see what we can do.  If we

can get through the government's witnesses tomorrow.  Start

talking to your witnesses for the defense.  I'd really like to

have witnesses for Thursday.  And we'll talk tomorrow about

what the schedule would look like in terms of finishing up the

witnesses and summations and charge.

          So, my best guess is that some time between maybe

Tuesday and Wednesday we'll have summations and charge.  I'll

see you all tomorrow morning at 9:45.

          MR. GOTTLIEB:  Good night.

          (Adjourned until January 26, 2022, at 9:45 a.m.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

INDEX OF EXAMINATION

Examination of:                              Page

Cross By Mr. Gottlieb . . . . . . . . . . .1061

Redirect By Ms. Rothman . . . . . . . . . .1195

Recross By Mr. Gottlieb . . . . . . . . . .1206

 DAVID CUTLER

Direct By Mr. Burnett . . . . . . . . . . .1221

                  GOVERNMENT EXHIBITS

Exhibit No.                              Received

 1231    . . . . . . . . . . . . . . . . .1201

 1001    . . . . . . . . . . . . . . . . .1220

 1004, 301 through 342  . . . . . . . . . .1220

 903   . . . . . . . . . . . . . . . . . .1235

                   DEFENDANT EXHIBITS

Exhibit No.                              Received

 A43   . . . . . . . . . . . . . . . . . .1095

 A39   . . . . . . . . . . . . . . . . . .1097

 A68   . . . . . . . . . . . . . . . . . .1100

 A62   . . . . . . . . . . . . . . . . . .1102

 A23A   . . . . . . . . . . . . . . . . . .1104

 A53   . . . . . . . . . . . . . . . . . .1105

 A54   . . . . . . . . . . . . . . . . . .1109

 A63   . . . . . . . . . . . . . . . . . .1112

 A78   . . . . . . . . . . . . . . . . . .1112

 A80   . . . . . . . . . . . . . . . . . .1114

A18    . . . . . . . . . . . . . . . . .1190

A28    . . . . . . . . . . . . . . . . .1193

A13–A22, A49, A56, A58–A61, A64   . . . . .1195