M1q3dou1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                         19 Cr. 285 (GBD)

LAURENCE F. DOUD III,

                 Defendant.
                                      Trial
------------------------------x

                                      New York, N.Y.
                                      January 26, 2022
                                      9:50 a.m.

Before:


                  HON. GEORGE B. DANIELS,

                                      District Judge
                                      -and a Jury-

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  NICOLAS T. ROOS
     ALEXANDRA ROTHMAN
     THOMAS S. BURNETT
     Assistant United States Attorneys

ROBERT C. GOTTLIEB
DERRELLE M. JANEY
PAUL R. TOWNSEND
     Attorneys for Defendant

Also Present:  Sunny Drescher
               Jacqueline Hauck
               Paralegal Specialists
               Special Agent George Burdzy, DEA
               Investigator Kathleen Whitmore, DEA
```

M1q3dou1

1             (Trial resumed; jury not present)

2             THE COURT:  Good morning.  I want to just discuss a

3     couple of issues before we continue.  First of all, let's talk

4     about scheduling.  The government anticipate that they will

5     probably rest today?

6             MR. ROOS:  Yes.

7             THE COURT:  All right.  What I'd like to do is have

8     the government rest today and have the defense fill up tomorrow

9     with witnesses.

10            MR. GOTTLIEB:  Your Honor, yes.  After court

11    yesterday, we do have a witness for tomorrow.

12            THE COURT:  And that witness is going to take how

13    long?

14            MR. GOTTLIEB:  We also informed the government, we've

15    actually reduced the witnesses, we will only have two

16    witnesses.  One is available that is flying in tonight.  The

17    final witness would be on Monday, your Honor.

18            THE COURT:  How long would that witness be?

19            MR. JANEY:  I think it's fair to say, your Honor, the

20    direct on that witness would last somewhere around 45-plus

21    minutes.  And whatever the cross would be.

22            THE COURT:  How long do you anticipate tomorrow's

23    witness will be?

24            MR. GOTTLIEB:  A short witness.

25            THE COURT:  All right.

M1q3dou1

1          MR. GOTTLIEB:  A character witness, your Honor,

2     tomorrow.

3          MR. ROOS:  If the other one is the paid expert, can't

4     he come here this week?

5          MR. GOTTLIEB:  The answer is no, your Honor.  In light

6     of -- until yesterday, we were told they were going to be at

7     least another two witnesses, which we knew were going to take

8     more time.

9          THE COURT:  I don't know why you had that impression.

10    I didn't have that impression.

11         MR. GOTTLIEB:  No, no, but we did because we had a

12    list of their witnesses and we knew what those witnesses were

13    going to say, and what the cross-examination was going to be.

14         THE COURT:  Well, so you want to bring in the jury for

15    45 minutes, an hour tomorrow, and then you want me to bring

16    them in for an hour Monday?

17         MR. GOTTLIEB:  Your Honor, listen, we will do whatever

18    your Honor wants.

19         THE COURT:  What I want is I want both witnesses to

20    testify tomorrow so we could be ready to go forward with

21    summations and charge by Monday.  That's what I want.  Can you

22    satisfy me in that regard?

23         MR. GOTTLIEB:  I regret to say that we are unable to

24    do that.  But I want you to know, your Honor, it is not because

25    we weren't gearing up.  Based on what information we had as of

M1q3dou1

1    yesterday evening, we understood there were going to be at

2    least another two witnesses, and they were not insubstantial

3    witnesses.

4            THE COURT:  As I say, I didn't have that impression

5    and I don't know why you did.  And I've been telling this jury,

6    every day, where I thought we were at least.

7            MR. GOTTLIEB:  That's why I say.  Based on what it is,

8    I thought this was consistent with what we were all operating

9    on, that we would be able to rest on Monday.

10           THE COURT:  Is your second witness available Friday

11   morning?

12           MR. GOTTLIEB:  I don't believe so.  We just -- we made

13   contact yesterday.  We understand the witness, based on the

14   scheduling we had laid out for the witness was for, is

15   available on Monday, your Honor, first thing Monday.  Actually,

16   we also, there are other things that will have to be done.  We

17   have a significant Rule 29 motion that will be filed by the end

18   of today.

19           THE COURT:  Yes, but that doesn't help me, because the

20   Rule 29 motion shouldn't delay the witnesses.  I'd like you to

21   speak to that witness, and tell that witness that I'd like that

22   witness here tomorrow.  And I need to know specifically if

23   that's not possible, why that is not possible.  I want to

24   finish these witnesses tomorrow.  And I don't want to waste the

25   jury's time bringing them in an hour tomorrow, no testimony on

M1q3dou1

1    Friday and bringing them in for an hour on Monday.  That's not

2    the way I want to proceed.  And this is an expert witness that

3    you're paying him for his time.  So, unless he can give me some

4    real good excuse why what he's doing tomorrow is more important

5    than this trial, I want to see him here tomorrow.  Let's wind

6    these witnesses up.  All right?

7            Can you do that?

8            MR. GOTTLIEB:  We'll definitely make contact; yes,

9    your Honor.

10            THE COURT:  All right.  Do that and let me know as

11   soon as possible whether we can accomplish that.  If we can

12   accomplish that, then I can give the jury a better idea.  But

13   right now I'm sort of, they're sort of hoping and wishing we

14   wind up some time soon.  There is supposed to be a big storm

15   this weekend.  I'd rather not have the jurors in on Friday.  If

16   necessary, if your witness is available Friday morning and is

17   only going to be an hour, I think the jurors would probably

18   prefer to do Friday morning for an hour and then go home for

19   the weekend and then come back on Monday.  But to sort of say

20   to them an hour on Thursday, no trial on Friday, an hour on

21   Monday, I don't think they should be happy about that.

22            MR. JANEY:  If we can pull the thread on that, it may

23   be easier for the expert to be here Friday morning than

24   tomorrow.  So if we can take leave of that option.

25            THE COURT:  I'd like you to first take leave of the

1    option of getting that witness here tomorrow.

2                MR. JANEY:  I understand.

3                THE COURT:  If this witness shows up tomorrow, I'll

4    put this witness on, and given the schedule that you informed

5    me about, we will do that witness until that witness is

6    finished tomorrow so that witness won't have to come back.  You

7    can emphasize that to the witness.  But, as they say, this is a

8    paid witness, this is not a witness that's dragged in here by

9    subpoena.  They know there is a trial, and if he has any

10   experience at all, he knows he should be available during that

11   trial and not telling us he has something better to do.

12              Talk to him right away and let me know before lunch

13   whether or not we can accomplish that so I can inform the jury

14   about what the schedule is like.  The first option is getting

15   him here tomorrow.  If he says, if he gives a good reason why

16   he can't be here tomorrow afternoon, then you can tell me

17   whether or not he's available Friday morning, and tell me

18   whether or not he's available Monday morning.

19              MR. GOTTLIEB:  Your Honor, with regard to scheduling

20   also, as a result of obviously the changes that the government

21   informed us of yesterday, and not calling certain witnesses, we

22   sent over to chambers last night and filed on ECF two

23   subpoenas.

24              THE COURT:  Yes.  That's the next issue.

25              MR. GOTTLIEB:  And those subpoenas in fact are

M1q3dou1

1   business records so we believe, either, one, the government

2   should be able to stipulate to it, but if not, that's their

3   choice.  We'll get a custodian of records, but we've already

4   been in touch with the parties, they are working to put them

5   together.

6            THE COURT:  That was part of my question.  First of

7   all, I was going to say, isn't it a little late to be

8   requesting to subpoena, to issue a trial subpoena for these

9   documents and aren't these documents documents that were

10  produced by the government?

11           MR. GOTTLIEB:  No.

12           THE COURT:  Okay.

13           MR. GOTTLIEB:  Well, one document, which is the chart

14  of terminated and suspended pharmacies from 2012 to 2017, the

15  relevant time of the indictment.

16           THE COURT:  You have all of that, don't you?

17           MR. GOTTLIEB:  We do.  But if you recall, that's the

18  document that the government originally, we had that

19  information as a government exhibit, but then the exhibit that

20  they introduced only covered 2017, if you recall.  So we have

21  the actual document that was provided by the government to us,

22  but being they didn't introduce it, it now befalls on us to get

23  the full document in evidence.

24           THE COURT:  I thought it was your position that any of

25  this evidence post-2017 was irrelevant to this case.

M1q3dou1

1        MR. GOTTLIEB:  Yes, but the document they put in was

2   2017 going forward.  The part of the document which we thought

3   is relevant is 2012 to 2017.

4        THE COURT:  Right.  Don't you have those documents?

5        MR. GOTTLIEB:  No.  That was left out of the document

6   that they introduced.

7        THE COURT:  Was that left out of the documents that

8   were produced to you by the government in response to your

9   request?

10       MR. ROOS:  They have it.

11       THE COURT:  They have it?

12       MR. ROOS:  Yes.

13       MR. GOTTLIEB:  Yes, we have it.

14       THE COURT:  Why are we subpoenaing these individuals

15  to produce this voluminous documents by tomorrow?

16       MR. GOTTLIEB:  It's not voluminous.  I am simply --

17  your Honor, I'm simply asking if the government will stipulate

18  to their original exhibit, then I don't need a subpoena.  Then

19  we'll just stipulate, it will take 20 seconds.  If they're not

20  going to stipulate to it, then I need somebody from RDC, the

21  custodian of records, they are aware of that chart, to be able

22  to put it in evidence as a business record.

23       THE COURT:  So which chart are you talking about?

24       MR. GOTTLIEB:  278.  Government Exhibit 278 as

25  originally given to us is different than the Government Exhibit

M1q3dou1

1    278 that was placed in evidence, because it leaves out all of

2    the terminated and suspended pharmacies from 2012 to 2017.

3    We're interested in getting in the business record of the

4    pharmacies that were terminated, suspended from 2012 to 2017.

5            THE COURT:  Okay.  So, you have two charts, but what

6    you want to subpoena is the underlying documentation?

7            MR. GOTTLIEB:  Nope.

8            THE COURT:  But I thought those charts were created by

9    the government.

10           MR. GOTTLIEB:  No.  Well, we don't believe the charts

11   are actually created by the government.  We believe it is a

12   business record of RDC.

13           THE COURT:  And you say that both the original one you

14   received and the second one you received are business records

15   of RDC?

16           MR. GOTTLIEB:  Yes.

17           THE COURT:  Okay.  So, what's the government's

18   position as to whether or not we need to subpoena these

19   documents and they need to lay some foundation with regard to

20   the admissibility of these documents?

21           MR. ROOS:  Yes, your Honor.  The document in question

22   which your Honor has seen a few times is 278, which is in

23   evidence, which is a log that was produced by Rochester Drug to

24   the government back in 2020, and it was produced to the defense

25   in discovery, and marked as an exhibit.  The document that's in

M1q3dou1

1    evidence lists all of the terminations and suspensions that

2    Rochester Drug did from 2017 to 2020.  And Jessica Pompeo Bouck

3    testified she created it, and it was part of their normal

4    practice in 2017 through that period to log the suspensions and

5    terminations.

6              THE COURT:  That's not the document that they're

7    interested in.

8              MR. ROOS:  Correct.

9              THE COURT:  That document is already in evidence.

10             MR. ROOS:  That's in evidence, no problem.

11             THE COURT:  They say there is a different document

12   that has different information, has either additional

13   information or less information on it.

14             MR. ROOS:  Exactly, your Honor.  They want a version

15   of the spreadsheet that has additional data which is the period

16   predating 2017.

17             THE COURT:  What's the problem?

18             MR. ROOS:  The problem is that the pre-2017 stuff was

19   an after-the-fact creation.  The document starts being put

20   together once RDC is under investigation.  So they're under

21   investigation in 2017, and they're logging everything

22   afterwards.

23             Because the government's asked RDC what happened

24   before 2017, they had people try to recreate what the

25   terminations were.  And so but there's problems with it.  Like

1    for instance, when defense counsel asked on cross of Jessica

2    Pompeo about that document, she said I don't recall that.  Or I

3    wasn't there during some of those terminations.  So she wasn't

4    able to authenticate the underlying data.

5        THE COURT:  Is the underlying data inaccurate or

6    accurate?

7        MR. ROOS:  I think it is inaccurate.  I'll give you

8    two examples.  One is it says ProHealth was suspended at a time

9    in 2015.  In the documents we have from RDC we haven't seen

10   evidence of that.  When the witness has been asked about that,

11   for instance, the witness yesterday said he didn't recall it.

12   On the flip side the defense has put in an exhibit that says

13   Waschko was terminated.  But there is no termination listed on

14   the spreadsheet of Waschko.

15       THE COURT:  They got that document from you, didn't

16   they?

17       MR. ROOS:  Yes.  Totally.  The point is, I'm not

18   questioning whether or not Waschko was actually terminated.  I

19   am saying the part of the spreadsheet that they want to put in

20   seems to be factually inaccurate because it's both, maybe

21   including either have wrong dates and/or just missing data.

22       THE COURT:  Who prepared that document?

23       MR. ROOS:  Jessica Pompeo.

24       THE COURT:  Is there a reason why Jessica Pompeo's

25   document that she prepared is inadmissible?

M1q3dou1

1          MR. ROOS:  Well, they tried -- they tried to

2     authenticate it with her and she said I'm not sure, I don't

3     recall those things.  The reason it is inadmissible --

4          THE COURT:  The question is not whether she recalls

5     the information on the document.  The question is whether or

6     not that was a document created by her.

7          MR. ROOS:  Which is admissible because it's a business

8     record, but it is not a business record if it is after the fact

9     and inaccurate.

10         THE COURT:  What's your position with regard to this

11    document?

12         MR. ROOS:  That portion of the document is

13    inadmissible because it is factually inaccurate or is missing

14    data or is over-inclusive.  It is going to mislead the jury.

15         THE COURT:  Your position is that they're not in a

16    position to be able to admit this document into evidence.

17         MR. ROOS:  Through a record custodian.

18         THE COURT:  Not through anybody period.  I didn't ask

19    you about that.

20         Is it your position that they're not in a position to

21    admit this document in evidence?  Period.

22         MR. ROOS:  Yes.  With one caveat, which is with

23    Jessica Pompeo --

24         THE COURT:  No, but I don't care about Jessica Pompeo.

25    I want to know what you are fighting about.  I want to know why

M1q3dou1

1     you are trying to keep it out if you say they can't

2     authenticate it.

3              MR. ROOS:  Bottom line, I think there are either

4     inaccuracies or potential inaccuracies in that part, so it is

5     inadmissible.

6              MR. GOTTLIEB:  Your Honor, first of all, the reason

7     why that's really is not logical is Jessica Pompeo, in creating

8     the document, also had to look back at records going back to

9     2017.  There is no difference between looking back at records

10    and creating the document starting in 2017, versus going back

11    to 2012.  They just don't like the information on the document.

12    It is a business record.

13              I contacted the government to the avoid even this

14    colloquy and even the subpoena.  For some reason they are

15    trying to block the business record of 2012 to 2017.  And if

16    that's the case, then our option is to get a custodian of

17    records on the stand, or to recall Jessica Pompeo.

18              THE COURT:  When you say it is a business record, is

19    it a record that was created for the government in this

20    prosecution or is it a record that was created in the regular

21    course of business of RDC?

22              MR. GOTTLIEB:  So, the answer is I don't know.

23              THE COURT:  That's important, isn't it, to define it

24    as a business record?

25              MR. GOTTLIEB:  Well, but if RDC is going to -- we've

M1q3dou1

```
 1    been in touch with them -- is going to certify that this is a

 2    certified business record, I rely on the custodian of records

 3    or the recipient of a subpoena.  I will also mention, your

 4    Honor, that it is our understanding that their expert on the

 5    stand now has relied, and on their one of their charts, they

 6    have Government Exhibit 278 with regard to terminations, and it

 7    appears that that's a source material, the earlier, the one

 8    that we are trying to introduce, may be the source material

 9    that their expert reviewed in preparing one of the charts on

10    page 18 of the exhibit.

11                THE COURT:  Did you attempt to offer that second

12    document -- which document are we talking about?  The one that

13    you are interested in now, what's the number of the exhibit?

14                MR. GOTTLIEB:  It was marked --

15                MR. JANEY:  Government Exhibit 278.

16                THE COURT:  No, but 278 I thought was the one that was

17    admitted in evidence.

18                MR. ROOS:  Do you remember yesterday when they were

19    asking Bill Pietruszewski about a spreadsheet he said he hadn't

20    seen?  That's the document.

21                THE COURT:  Right.  But that was even, that was even

22    shown to a previous witness.

23                MR. ROOS:  Yes.

24                THE COURT:  So what is the exhibit number of that?

25                MR. GOTTLIEB:  I'm sorry, Defense 82.
```

M1q3dou1

1                    THE COURT:  Defense 82.

2                    MR. GOTTLIEB:  Marked for identification.

3                    THE COURT:  I don't remember, did you attempt to offer

4          Defense 82 in evidence?

5                    MR. GOTTLIEB:  I believe --

6                    THE COURT:  I don't have that recollection.

7                    MR. GOTTLIEB:  No, because we didn't reach that point.

8          Because the person on the stand -- it was clear they were not

9          going to be able to establish the foundation.

10                   THE COURT:  So, I'm trying to understand what the

11         government's position is.  Is it the government's position that

12         this document is inadmissible and that you are going to oppose

13         them offering that document in evidence?

14                   MR. ROOS:  I'm sorry.  That we are going to what?

15                   THE COURT:  Oppose their offering that document in

16         evidence.

17                   MR. ROOS:  Yes, your Honor.

18                   THE COURT:  What do you contend that that document is?

19                   MR. ROOS:  So the document is back in either late 2019

20         or in 2020, the government asked the lawyers for RDC, can you

21         send us a list of all the terminations and suspensions of RDC

22         customers.  And they sent us this list.

23                   THE COURT:  How was that list created?  Was it already

24         in existence or was that list created at that time?

25                   MR. ROOS:  Some of this came out in testimony and some

M1q3dou1

1    of it is just in the 3500.  I'll try and parse it for your

2    Honor.

3              As we understand it, the metadata on the document says

4    it is created by Jessica Pompeo.  Jessica Pompeo testified that

5    they were keeping logs of some of this stuff, and she pulled

6    that together to put it into the spreadsheet.  When we were

7    analyzing it with her, we determined that some of this was

8    stuff, once RDC was under investigation, they just started

9    logging these things.

10             THE COURT:  What does that --

11             MR. ROOS:  That's fine.  That's fine.  That's a

12   business record.

13             But the stuff before, because the government said to

14   RDC's lawyers, we want to know back to 2013, or 2012, so the

15   stuff before they had to recreate.  And as we're analyzing the

16   work product they created, it looks like it is inaccurate.  It

17   just looks like it's wrong.

18             THE COURT:  But, that's an issue for testimony.

19   That's not an issue with regard to the document.  Whether or

20   not a document has wrong information on it doesn't affect its

21   definition as a business record.  And I don't understand why if

22   they -- and even if the government, even if the U.S. attorney's

23   office asked them to create this document, and I'm not even

24   sure you are saying you asked them to create this document.

25             MR. ROOS:  We requested the information and they

M1q3dou1

1    created the spreadsheet.

2              THE COURT:  You didn't ask them to create any

3    document.  You didn't ask them to create a spreadsheet.

4              MR. ROOS:  I said we said can you send us a list.

5              THE COURT:  They sent you that list.  Your position

6    is, because you asked for the list, that that makes it

7    inadmissible?

8              MR. ROOS:  No.  It's not because we asked for the

9    list.  The point is, the document is inadmissible for two

10   reasons.  Number one is it's not a business record because they

11   just, they just as part of their response to the government's

12   request, did a counterfactual recreation of when they --

13             THE COURT:  Why is that excluded as a business record?

14             MR. ROOS:  It is not made in the regular course of

15   business activity.

16             THE COURT:  It was to respond to whatever request the

17   government made of them and they responded by creating this

18   document.  You didn't tell them to create this document.  They

19   created this document and they put it in their files.

20             MR. ROOS:  I don't think that's the definition of a

21   business record.

22             THE COURT:  What do you think is the part of business

23   activity?

24             MR. ROOS:  Part of their regular activity.

25             THE COURT:  You don't think this is part of their

M1q3dou1

regular activities, to respond to government requests for

information?

          MR. ROOS:  Jessica Pompeo, no, I don't.

          THE COURT:  Don't they respond to requests from DEA on

a regular basis?

          MR. ROOS:  Sure, but not the U.S. attorney's office

pursuant to subpoena.

          THE COURT:  You say that if the testimony is that this

is a document that was created in the regular course of

business and kept in the regular course of business because it

is a document that we have a responsibility to respond to law

enforcement requests.  Law enforcement made a request.  Law

enforcement did not tell us to create this document.  We

created this document in the regular course of our business to

respond to government requests for documents.  We gave this

document to the government and we put it in our files, and we

kept it in our files since that day.  You don't think that

qualifies a business record?

          MR. ROOS:  If that's a business record, then why isn't

Rochester Drug's factual admissions in response, in letters in

response to the government, also a business record?

          THE COURT:  Because it could be.  It depends.  It

depends on whether they are going to keep those letters in

their files, and it's their regular course of business to

respond by e-mail and to keep those e-mails in their files, so

M1q3dou1

1    if somebody wants to review those documents, law enforcement or

2    civil litigation, they can say yes, we have such a document, we

3    keep it in our files, we don't care whether or not the

4    president of the United States asked us for the information and

5    that's what prompted us to create this document in the regular

6    course of business.  But that's what we do.

7            Pompeo would say, I didn't create this out of the

8    regular course of business.  This is my job.  I created this

9    when they asked for it, because they asked for that kind of

10   information.  They didn't ask me to create the document.  They

11   asked me to provide them the information.  So I created the

12   document, and I supplied that information to the government,

13   and I put that information in our file because that's what we

14   would do.  I wouldn't tear it up after I give it to the

15   government and not keep it.  I would create it, I created it

16   and I put it in our files, and it's been in our files since

17   then and will remain in our files until and unless somebody

18   else asks for it.

19           I don't understand why that doesn't qualify as a

20   business record.

21           MR. ROOS:  The rule says at the time the data is

22   created, and this is after the fact.

23           THE COURT:  What's after the fact?

24           MR. ROOS:  The spreadsheet is just a summary.  The

25   data is not at or near the time of the date of its creation.

M1q3dou1

| | |
|---|---|
| 1 | THE COURT:  You are making an argument about that |
| 2 | sheet which is not the argument that you even make about the |
| 3 | sheet that's in evidence. |
| 4 | MR. ROOS:  That data was created at around the time. |
| 5 | THE COURT:  How is that data -- |
| 6 | MR. ROOS:  They logged it at the time. |
| 7 | THE COURT:  At what time? |
| 8 | MR. ROOS:  When they terminated them. |
| 9 | THE COURT:  That was not the testimony, that that |
| 10 | large sheet of Government Exhibit 278 was created at the time |
| 11 | that is listed as to each one of the terminations? |
| 12 | MR. ROOS:  I think at 598 and 599 of the transcript |
| 13 | she says we were logging this stuff. |
| 14 | THE COURT:  That's not even possible.  You can't, if |
| 15 | she gave us a spreadsheet that covers a period of time from |
| 16 | 2012 to 2017, you cannot argue that that spreadsheet was |
| 17 | created in 2012.  That wasn't created in 2012. |
| 18 | MR. ROOS:  I agree.  The original version was created |
| 19 | in 2017. |
| 20 | THE COURT:  So... |
| 21 | MR. ROOS:  And we only offered 2017 onwards. |
| 22 | THE COURT:  How does that make that admissible and |
| 23 | make the other one not admissible? |
| 24 | MR. ROOS:  Every time they'd go in and type it in. |
| 25 | THE COURT:  Creating the document. |

M1q3dou1

1          MR. ROOS:  Then the final version.  But it is a log.

2     It is different than an after-the-fact creation, and the other

3     issue, your Honor, is the 403 issue.

4          THE COURT:  What's the 403 issue?

5          MR. ROOS:  It is inaccurate data.

6          THE COURT:  Isn't that --

7          MR. ROOS:  It's going to mislead the jurors.

8          THE COURT:  Isn't that an issue for the jury to

9     determine?

10         MR. ROOS:  Well, the issue is --

11         THE COURT:  Who is going to say it is inaccurate data,

12    you?

13         MR. ROOS:  We'd like an opportunity to.

14         THE COURT:  I can't take your word for it.  You don't

15    know.  You know it's different data.  And you think yours is

16    right and the other one is wrong, but you don't know that.

17    Nobody said that.

18         MR. ROOS:  There is two examples which is the

19    ProHealth date being wrong and Waschko not being on there.

20         THE COURT:  That doesn't prove which one of those is

21    inaccurate.

22         MR. ROOS:  Both would be inaccuracies in the chart.

23         THE COURT:  All right.

24         MR. ROOS:  A date being wrong -- the issue, your

25    Honor, is if they are going to put this in without a witness,

M1q3dou1

1    there is no one we can cross-examine.

2              THE COURT:  I'm not particularly sympathetic to that

3    because you asked the document to be created, and it was

4    created by RDC, and was given to you and then kept in RDC's

5    files.

6              MR. ROOS:  I think they are sandbagging us.

7              THE COURT:  How are they sandbagging you?

8              MR. ROOS:  They didn't offer it and now they are

9    trying to offer it.

10             THE COURT:  You knew you had two different documents

11   that said two different things.  You knew that when we started

12   this trial.  You weren't sandbagged by it.  You knew it and you

13   decided that you would just, whatever records you wanted to

14   create with regard to that, you created that record.  I think I

15   ruled appropriately at the time with regard to this document,

16   because I don't think they were in a position at that point in

17   time to authenticate that document.  And there was a genuine

18   dispute about what was the accurate document.  And they may

19   have to be put to the burden of demonstrating that.

20             But I don't understand your argument that if they

21   bring, if I issue a subpoena and the company checks its files

22   and in its files they pull out this document, and somebody says

23   yes, this document was created, and what we do is when somebody

24   asks us for information, we create a spreadsheet, and we

25   provide that information and then we put that record in our

M1q3dou1

1    files in case you have to retrieve it again some other later

2    time or somebody else requests it and we keep it in the regular

3    course of business.

4            Is this document dated as to when it was created?

5            MR. ROOS:  The final version is in 2020.

6            THE COURT:  They created that document at that time.

7    Right?

8            MR. ROOS:  Yes.

9            THE COURT:  So, the question is whether or not that

10   document was created at or about the time that the document

11   says it was created.  Right?  Not at or about the time as to

12   each company.

13           MR. ROOS:  We obviously disagree so I don't want --

14           THE COURT:  I'm trying to understand.  I am not here

15   to disagree with you.  I am trying to understand your argument.

16   I don't understand your argument about why -- I understand your

17   argument that they have not yet established its admissibility.

18   I don't understand your argument that simply because the

19   government requested the information, that when they created

20   the spreadsheet, took one copy, put it in their files, took

21   another copy and gave it to you, that that somehow makes it not

22   a business record.  It may be an inaccurate business record.

23   But that's for you guys to fight about.

24           But I don't understand if they can establish that it's

25   in the files of RDC, that somehow it's not a business record

M1q3dou1

1    because it was created in response to your requests for

2    information.

3            MR. ROOS:  I think the point about it being created in

4    response to our request is not so much why the document was

5    created.  But the fact that the underlying facts in the

6    document are not, as the business record rule requires, logged

7    in real time.

8            THE COURT:  That's true about the 278.

9            MR. ROOS:  No, it's not.  Because those, her testimony

10   is we did log them at the time we were doing the terminations.

11           THE COURT:  Not on that document.

12           MR. ROOS:  On other versions she pulled together in

13   the document.

14           THE COURT:  She created a document.  The document in

15   evidence is not the underlying documentation.  It is the

16   document she created.  So the rule is not that it's

17   inadmissible unless she created it on the date as reflected as

18   to each termination of each company.  That's not the rule.  The

19   rule is, is this document, this compilation, is that

20   admissible.  And the rule that you ask yourself was this

21   created at or about the time that it says it was created on the

22   document.  And it has a single date when she created that

23   document.  And she testified appropriately that, yes, that

24   document was created at that time and we put it in our files

25   and we kept it in our files.

M1q3dou1

1              Now, I assume that if there is testimony with regard

2      to the other document, that whatever date is on the other

3      document, that that document was created at that time, and that

4      document was put in the files, regardless of who else got the

5      document, the government or anybody else.  If that document was

6      created at that time, and that was put in the file, I don't

7      understand your argument that it's not a business record.

8              MR. ROOS:  I think the difference is when the

9      underlying data was logged on it.  If it was logged when the

10     event happened versus whether it was logged after the fact.

11             THE COURT:  If you ask me to give you a document that

12     shows every day that I logged into the courthouse, and I say to

13     you, well, there is no such one document, but we have that

14     underlying information, and what I'll do is I'll pull that

15     together and I'll create a list and I'll give you that

16     document.  And our procedure is, if I create that document, I

17     do it in the regular course of business, and I'm supposed to

18     put that document in our files.  So, if they put that document

19     in their files, you can't argue that it's inadmissible because

20     it said that I logged in on January 23 of 2004, but this

21     compilation wasn't created on that date.

22             MR. ROOS:  So I agree with you on that example.  But I

23     think the question is, well, how are you making that log of

24     when you logged in.  If you're going to the courthouse and you

25     are saying give me the swipe cards, that's a computer system

M1q3dou1

1        that logs when they happen.

2                THE COURT:  No, but that's not the exhibit.  The

3        question is, what is the business record, what is the record.

4        Let's take out the business.  What is the record in dispute.

5        The record in dispute is that compilation.

6                MR. ROOS:  And the underlying data in it.

7                THE COURT:  No, no, no.  The record in dispute.

8                MR. ROOS:  Double hearsay.

9                THE COURT:  No, you can't argue double hearsay.  You

10       already got your document in evidence.  You're arguing against

11       your own document if you argue it's double hearsay.

12               MR. ROOS:  Both are business records in the government

13       exhibit.

14               THE COURT:  Why is the one they created for you that

15       you want a business record, but the one they created for you

16       that you don't want is not a business record?

17               MR. ROOS:  The one that's in is like every time you

18       swipe your card, every time that was happening, they were

19       logging it.  Versus the one that's out, is like there are no

20       key swipes, so instead, I am going to look --

21               THE COURT:  What does that have to do with whether or

22       not the exhibit itself is a business record?  That has nothing

23       to do with the business record.  Let's take it out of business

24       record.  The record is that compilation.  That is the record,

25       you didn't put in the underlying -- we are not fighting about

M1q3dou1

```
1    the underlying information that created that compilation.  It

2    is just like we are talking about Exhibit 903 with this

3    witness.  Exhibit 903 is an exhibit.  It doesn't matter when he

4    looked at this information or when this information was logged

5    in, because he created a document.

6              MR. ROOS:  Sure.

7              THE COURT:  So they created a document, and they

8    didn't create a document that Ms. Pompeo could take home and

9    put in her desk drawer.  They created a document that had to do

10   with the business of RDC, and it was her responsibility in the

11   regular course of that business to create that document at the

12   time it was requested, and to give a copy to the government,

13   and then put another copy of that document in their files, and

14   to keep it in their files as a regular business record.  I

15   don't understand, I just -- we can end this, but I'm not

16   debating with you, I don't understand your argument.  If I do

17   understand your argument, you're right, we disagree.  If your

18   argument is simply because she created that exhibit on a

19   certain date, and that exhibit reflects other dates, unless she

20   can prove that she created the document on the dates where the

21   exhibits reflect that the terminations happened that doesn't

22   qualify as a business record because she created at a later

23   time.  No, the business record is that document.  The business

24   record is not the underlying documents that she used to create

25   it.  That's not the exhibit that you offered in evidence.  You
```

M1q3dou1

         1   offered an exhibit that you say -- and it is up to the jury to

         2   determine if that's accurate.  She said she created it, you

         3   laid the proper foundation, she put it into evidence.  If they

         4   are going to argue that you should ignore it because it's not

         5   accurate, they can argue that, even though if it's in evidence.

         6        But I just don't understand what is the difference.

         7   The only difference between the document they want and the

         8   document that you put in evidence is that you don't like what

         9   their document says.  That's the only difference.  They were

        10   both -- so if you tell me, let's put it this way.  If they were

        11   both created on the same date, all right.  Let's say they were

        12   created, let's say they were created last week, they were both

        13   created last week.  She gave you, because you asked her for

        14   that information.  She says to you, here, here's one document.

        15   And then she says, oh, I'm sorry, I made a mistake.  Here's a

        16   document with different information.  Then she puts both of

        17   those in her file.  How is it that one of them is a business

        18   record, and the other one is not?

        19        MR. ROOS:  I think the question of whether it is a

        20   business record has to do with what's the data on each of those

        21   things.  Not the fact that she threw it in her drawer.

        22        THE COURT:  No.  The thing that makes it a business

        23   record is it was created at the time it's represented that that

        24   exhibit was created, and it was kept in the regular course of

        25   business after she created it on that date.  So, what you

M1q3dou1

1  asked, you say if you want to establish it as a business

2  record, what you say is, you ask the witness, Did you create

3  this document?  Yes.  Did you create this document in the

4  regular course of business when it was requested by the

5  government that you give them the information?  Yes, I did.

6  When you created this document, is this the kind of document

7  that you would store in your files and keep as a business

8  record?  Yes, it is.  Did you in fact put this document,

9  exhibit whatever it is, put this document in your files and

10  keep it there until you were asked to retrieve it at this

11  trial?  Yes, I did.

12         What else is requested?

13         MR. ROOS:  I just think there is an additional step

14  there, otherwise every single record that a business keeps is a

15  business record.  Every e-mail, every document, every court

16  file.

17         THE COURT:  No, no.  Every e-mail, every document that

18  is their routine practice to file those, and keep those, are

19  business records.

20         MR. ROOS:  If they archive them?

21         THE COURT:  Sure.  You think it is not a business

22  record if they keep it in their files, if I go to their records

23  and I say do you have e-mail X, and they say, oh, yeah, we keep

24  all e-mails and we keep them in the regular course of business

25  in case there is a problem later and we need to check the

M1q3dou1

1    e-mails.  We got a whole file of e-mails, which one do you

2    want.

3                You don't think those are business records?

4                MR. ROOS:  I don't.  But, your Honor --

5                THE COURT:  I don't know why, I don't understand that

6    argument.

7                MR. ROOS:  Your Honor, I don't want to waste the

8    jury's time.  Two proposal on this.  One is, I think they are

9    not intending to offer this until their defense case.  And so,

10   we can put in a brief --

11               MR. JANEY:  Well --

12               THE COURT:  I am ready to issue the subpoena for them.

13               MR. ROOS:  Here he is the thing though.  I don't

14   think, I don't think we need the subpoena.  Because --

15               MR. GOTTLIEB:  We want the subpoena.

16               MR. ROOS:  If your Honor thinks the document is

17   admissible, we all have the document.

18               THE COURT:  No.  I don't say the document is

19   admissible.  I say that it appears to me that they have the

20   information to establish its admissibility.  They have not yet

21   established its -- their question is are you going to force

22   them to go through the process to get somebody from the company

23   to come and say they retrieved this document out of their

24   files, that they keep it in the regular course of business,

25   this isn't their personal document, and therefore make it

M1q3dou1

admissible.  You say you don't want to concede it's admissible,
so they'll have to prove it.  If they can prove it, fine.  If
they can't prove it, then that's their problem.

I'm not saying in advance.  I am just saying that I
don't understand why you say that they are in a position that
they cannot establish this document is a business record, when
you've already established the other document's admissible.
Which is pretty much the same document that was handled the
same way and came from exactly the same source.

MR. JANEY:  Your Honor, if I can raise a related issue
not having to do with the subpoena.  But I'll be very brief.

MR. ROOS:  If I can just finish with this thought.
So, your Honor, I don't think if what the defense's plan is to
call the IT record custodian for RDC, and have him say this is
on our server or whatever, like, that does not need to happen.
If your Honor believes it is a business record, and it's coming
in as a business record and there is no other objection that
applies, we'll just stip it in.  We don't need to unnecessarily
call another witness.

THE COURT:  I only say it is a business record if I
think that they can establish the elements of a business
record.  If you want to concede it, then concede it.  But,
there is no ifs here.  You don't say I am going to give them X,
Judge, if you rule in their favor.  You make your decision
first, and then I make my ruling.  Are you going to fight this

M1q3dou1

1    or not fight this.

2                MR. ROOS:  I want to confer with the rest of the team.

3    Maybe this recommendation.  If your Honor signs the subpoena

4    during break, I'll talk to Mr. Gottlieb.  Maybe we can work out

5    a stipulation on this, based on how your Honor has indicated

6    this.  I do think --

7                THE COURT:  If you can think you can convince me and

8    you can overcome what seems to me to be a routine argument

9    about a record that's in the business records of the company,

10   and if somebody pulls it out and shows up here and said we got

11   a subpoena, I don't know anything about this case, but I went

12   to our records and this was in our records and it is going to

13   stay in our records and I produced it and this is the kind of

14   document we put in the file, that's why it's in the file.  And

15   we keep it in case somebody wants the information.  And this is

16   the information in the file.  If they say that, which is pretty

17   much the basis for the document that you already have in

18   evidence, if they say that, then it seems to me that I'm not

19   sure what your argument is that it's not a business record, if

20   some custodian of records comes in and brings the document and

21   says I don't know anything about this document, I just know

22   it's in our files and I retrieved it.

23               MR. ROOS:  I think the other issue though, your Honor,

24   is the inaccuracies in the document.

25               THE COURT:  That's a dispute among the parties.  How

M1q3dou1

1    you want to explain the inaccuracies in the document, or point

2    out and explain the inaccuracies in the document, is not the

3    issue with regard to its admissibility.  The document you may

4    have in evidence, their contention is that's not accurate.  I

5    don't know which one is accurate, and whether it's accurate or

6    not does not go to the issue of its admissibility.  It goes to

7    the issue of its weight and its relevance and the purpose for

8    which the jury can legitimately establish that.  So, if you

9    think it is inaccurate, and you have a good faith basis to

10   believe that, then you should point that out to the jury and

11   let them come to the same reasonable rational conclusion that

12   you come to.

13        But I can't tell you that, in my view, I know which

14   one is accurate and which one is inaccurate.  I don't know how

15   you know that.  Pompeo didn't say, oh, this one is right, but

16   yeah, I looked at this one and this one is wrong.  That's not

17   what she said.  So, you think it's inaccurate.  You hope it's

18   inaccurate.  But that doesn't make it inaccurate.  It makes it

19   a dispute.  Because they say, well, look, you got two different

20   documents that say two different things, and the government

21   wants you to rely on the document they think is favorable to

22   you, and they don't want you to see the document that's

23   unfavorable to you.

24        MR. ROOS:  That's what I'm worried about also.  It is

25   going to come in and they are going to make these arguments in

M1q3dou1

1     closing this is what the government hid from you.

2              THE COURT:  They can't make that argument.  And I

3     would preclude them from making that argument.  I will admonish

4     them right in front of this jury if they attempt to make that

5     argument.  Motives or the tactics of the lawyers is not at

6     issue here.  The question is, is whether or not the information

7     on the document that the government submitted in evidence is

8     accurate and something the jury should rely on as truthful.

9     They say it is inaccurate.  They say they have another

10    document, and, quite frankly, this is not a surprise to this

11    jury.  It's clear that Mr. Gottlieb has already asked questions

12    of the witness implying that and indicating to the jury that he

13    has seen a document and he has a document that has different

14    information on it than the document that the government has.

15    So, that's a dispute.  How either one of you can prove your

16    point is a different issue.

17             But, my only issue is whether or not the document

18    itself is going to come into evidence.  I will issue the

19    subpoena.  If they get the information in enough time, maybe

20    they can use it.  We are not going to delay this trial for

21    this, because this is something, quite frankly, that should

22    have been addressed long before this point in time.  So, to say

23    we are going to subpoena the document for the last day of

24    trial, I don't think that's necessarily timely.  If they can

25    get the document and the company is ready to hand it over as

M1q3dou1

1   soon as they see the subpoena, let them hand it over.  And they

2   can decide once they get the document in their hands, if you

3   want to make further argument about why it shouldn't be in,

4   then I'll hear you.  Or if you want to say, well, it's not

5   worth fighting about, because I'm not going to convince the

6   judge, then you can agree to put it in.

7          I'm perfectly willing to be convinced of your position

8   if you have a reasonable rational basis to make that argument.

9          MR. ROOS:  Okay.  I don't want to take more of the

10  Court's time on the subpoena.

11         THE COURT:  Mr. Janey.

12         MR. JANEY:  If I can, just in particular, given the

13  government's comments about the errors or inaccuracies of the

14  particular document that we're seeking by way of the subpoena.

15  It has implications for the witness that is currently

16  testifying.  The slide number 18, which I believe your Honor

17  has with respect to Exhibit 903, has a time frame of 2012 to

18  2016 on it.  It says it relies on a document Government Exhibit

19  278.

20         THE COURT:  That's not my issue at this point.

21         MR. JANEY:  I understand.

22         THE COURT:  Whatever proper questions that you can ask

23  this witness about the information that this witness relied

24  upon, and about what was in front of this witness when he put

25  together his chart, if they are relevant questions, then you

can ask that.  But obviously, you are not in a position at this

point to display this document to the jury or to read off this

document.

MR. JANEY:  Understood, your Honor.  I understand that

fully.

THE COURT:  So whatever you want to ask this witness

about, what information this witness relied upon, if it's a

proper question, and a relevant inquiry, then you have it.

But, obviously your inquiry at this point is limited, and

because you don't have the document in evidence, so you don't

have the document to display to the jury and go through with

this witness.

MR. JANEY:  No, but do I believe along those lines, at

least in my way of thinking, your Honor, that I have the right

on cross-examination to ask the witness to show me the document

he relied on.

THE COURT:  That's fine.  Well, you have the right to

ask the witness whether or not he relied on the document in

evidence or whether or not there was some other document he

relied on.  You don't have the right to ask him about the

document that is not in evidence.

MR. JANEY:  Understood.

THE COURT:  Let's be clear about that.

Did you have something did you want to raise?

MR. BURNETT:  No.  I think Mr. Janey's misreading the

M1q3dou1

1    chart and we'll have him point out as part of his direct what

2    documents he relied on.

3              MR. GOTTLIEB:  Just so we end this discussion of

4    subpoenas, there is that second subpoena with regard to the

5    amount of the legal fees.  If you recall, the government

6    introduced in evidence legal work performed by Larry Houck in

7    reviewing the compliance program and his recommendations.  And

8    we simply have asked for the dollar amount, how much was paid

9    by RDC for the review of its compliance.  We've also been in

10   touch with that law firm.  They're prepared to provide that

11   information, but they requested a subpoena.

12             THE COURT:  All right.  Well, at this point I'm not

13   going to rule on whether or not this is admissible or relevant

14   to anything at this point.  Unless there is some objection to

15   my issuing the subpoena, I'll issue the subpoena.  If they want

16   to respond, if they say no, we are not going to give you that

17   information, then you come back to me and tell me that.  If

18   they say yes, you can have that information, once you have it

19   in hand, then we can debate about whether or not it's

20   admissible, and how it's admissible and what relevance it has

21   to the issues before the jury, as to whether or not the

22   defendant was involved in a conspiracy to distribute drugs or

23   involved in a conspiracy to defraud the DEA.

24             And I'm not sure how the amount of money they paid the

25   lawyers advances that inquiry.  But, you can make that argument

M1q3dou1

1    once you have reviewed the documents if you determine that the

2    documents help prove your point.

3          MR. GOTTLIEB:   Thank you.

4          MR. ROOS:   We also the same relevancy questions, but

5    have no objection to your Honor issuing the subpoena and we ask

6    for a copy of whatever they get back.

7          THE COURT:   At this point, let's finish up the

8    government's case today.  I'll hear your motions, Mr. Gottlieb.

9    It's likely anyway I'll give you an extended period of time to

10   argue that motion orally or in writing.  I'll probably reserve

11   decision on that motion so we can move forward.  And then I

12   would hope that we could move forward, put in all the witnesses

13   tomorrow.  If we can, as soon as you know that, let me know, so

14   I can tell that to the jury that they don't have to be here

15   until Monday.  If not, if we have to either consider just doing

16   an hour tomorrow and not doing Friday, or doing a half a day

17   Friday, or doing an hour on Monday, I want to be able to at

18   least inform the jury, particularly in light of what is

19   anticipated is a nor'easter Friday night, Saturday.

20         MR. JANEY:   Is it possible we let you know after the

21   lunch break, just given the time now?

22         THE COURT:   All right.

23         MR. JANEY:   We have to make a telephone call.

24         THE COURT:   Okay.  How much more do you have with this

25   witness?

M1q3dou1

1          MR. ROOS:  Probably about an hour and a half.  Could

2     be less.  Something like that.

3          THE COURT:  All right.

4          MR. ROOS:  I might be wrong.

5          THE COURT:  How long are we going to be on cross with

6     this witness?

7          MR. JANEY:  Probably about 45 minutes, your Honor.

8          THE COURT:  All right.  So let's see if we can finish

9     this witness before lunch.  And do you anticipate one more

10    witness after that?

11         MR. JANEY:  It's Paulsen, who is a short witness, and

12    then a paralegal.

13         THE COURT:  Those two witnesses, hopefully we can do

14    those two this afternoon.

15         MR. ROOS:  That should not be a problem.  We have some

16    questions about the defense witnesses, but given the time maybe

17    we'll just do them at the end of the day.

18         THE COURT:  Sure.  We can do that later.  Let's get

19    the jury.  The exhibit that's already in evidence that we were

20    talking about is 278?  And the exhibit that you want?

21         MR. GOTTLIEB:  Defense A82.

22         THE COURT:  All right.  Let me see if I have it.

23         You can bring the witness back.

24         Bring in the jury, please.

25         (Jury present)

M1q3dou1                    Cutler - Direct

1          THE COURT:  Seems like every day I am apologizing for

2     the delay.  But I want to tell you that the hour that we spent

3     while you were waiting I think has saved us a day.  And I think

4     we move up earlier, we will probably be finished with the

5     witnesses no later than Monday.  And so, remember, if I'm

6     dealing with issues that don't concern you, it usually either

7     has to do with scheduling of witnesses or resolving legal

8     disputes that don't involve you, so we don't have to keep going

9     back and forth.  So I think that we are going to try to see if

10    we can finish up the witnesses -- I don't want to say on what

11    schedule at this point.

12         I know that some weather conditions may be coming this

13    weekend, so I am going to see how soon we can get in all the

14    witnesses, whether we have to sit on Friday a full day or part

15    of the day, or not at all.  And whether or not we can still be

16    in a position to finish the witnesses no later than Monday.

17    All right?  So that's where we are.

18         So, we'll turn to the government.  You can continue,

19    Mr. Burnett.

20         MR. BURNETT:  Thank you, your Honor.

21     DAVID CUTLER,

22        called as a witness by the Government,

23        having been previously sworn, testified as follows:

24    DIRECT EXAMINATION (Continued)

25    BY MR. BURNETT:

M1q3dou1                           Cutler - Direct

1   Q.   Good morning, Professor Cutler.

2   A.   Good morning.

3   Q.   I'd like to begin with Exhibit 903 with slide -- sorry.

4   903 on slide number eight.

5        This is a slide that you've testified about already,

6   correct?

7   A.   That's correct.

8   Q.   I just want to recap to start out today, can you use this

9   chart to explain the total amount of revenue that RDC received

10  from opioid sales between 2012 and 2016?

11  A.   Yes, you see those in the left-hand side chart.  For the

12  years 2012 to 2016 are the five bars to the right of the

13  left-hand chart.  And then the dark blue down at the bottom is

14  the revenue from opioids.

15       So that's 44.8 million in 2012, rising up to 241.8

16  million in 2015, and then declining to 167.5 million in 2016.

17  Q.   So putting you on the spot with a little mental math.

18  About how much money over the course of those five years?

19  A.   It would be about 500 million, 600 million.

20  Q.   Now, these charts you were looking at yesterday, they

21  separate opioid revenues from other revenues; is that right?

22  A.   That's correct.  The light gray area on top of that is

23  non-opioid revenue.

24  Q.   Now, is that because it's right as an economic matter to

25  treat controlled substance sales and non-controlled substance

M1q3dou1                          Cutler - Direct

1   sales completely independent of one another?

2   A.  No.  As we were talking about yesterday, RDC is a full

3   service distributor.  So, part of a full service distributor is

4   they will sell both opioids and non-opioids, and in fact, a

5   benefit of being a company that sells opioids is that it also

6   makes some pharmacies more likely to buy all of their products,

7   include the non-opioid products from RDC.

8   Q.  Let's take this slide down for the time being.

9        I want to turn away from sales data and ask you a

10  little bit about Mr. Doud.  Are you familiar with what his role

11  was at RDC?

12  A.  Yes, he was the CEO.

13  Q.  What, if anything, have you reviewed in this case about

14  Mr. Doud's employment at the company?

15  A.  I've reviewed his employment contracts.

16  Q.  In your work as an economist, have you looked at employment

17  contracts for people?

18  A.  Yes, I have.

19  Q.  Why do economists look at that type of thing?

20  A.  We want to understand what are the amounts of payment, and

21  what are the incentives operating, that is, how would an

22  individual increase, if at all, the money that they received.

23  Q.  At a high level, could you explain for the jury what, if

24  any, economic incentives were in the defendant's contracts when

25  he was the CEO at RDC?

M1q3dou1                          Cutler - Direct

1   A.   So, the defendant's compensation had two forms.   First

2   there was a salary, which increased a little bit over time, but

3   was a relatively constant number.   And then second there was a

4   bonus.   And the bonus was on top of the salary, and the bonus

5   was -- had a couple of parts, but it was related to what was in

6   essence the profit of the company.   So the greater the profit,

7   the greater the bonus for the defendant.

8   Q.   Now, let's explore that in more detail.   I want to show you

9   what's already in evidence and the parties have stipulated is

10  one of Mr. Doud's employment contracts, which is Government

11  Exhibit 270.

12            Have you seen this document before?

13  A.   Yes, I have.

14  Q.   Do you see it says "employment agreement" at the top there?

15  A.   Yes, I do.

16  Q.   Looking at that first paragraph, who is this an employment

17  agreement between?

18  A.   This is an employment agreement between Rochester Drug

19  Co-Operative, RDC, and the defendant, Mr. Doud.

20  Q.   What time period does this --

21            THE COURT:   Let me interrupt you for a second.   If you

22  can pull back just a little bit.

23            THE WITNESS:   My apologies, your Honor.

24            THE COURT:   It's okay.   You can continue.

25            MR. BURNETT:   Thank you, your Honor.

M1q3dou1                         Cutler - Direct

1   Q.  What time period does this contract cover?

2   A.  This covers the period from 2014, April of 2014, through

3   the end of 2019.  Excuse me.  Through the end of March 2019.

4   Q.  If you could go to the next page, please.  I want to take a

5   look at section four.  Do you see that section is titled

6   "compensation"?

7   A.  Yes, I do.

8   Q.  Have you reviewed that section of the contract?

9   A.  Yes, I have.

10  Q.  Let's start by looking at Subsection A that says "annual

11  base compensation."

12          What is in that section of the contract?

13  A.  Yeah.  So we are talking about how there was a salary

14  payment and then there was a bonus payment.  So the annual base

15  compensation is the salary part of that.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

M1QBDOU2                        Cutler - Direct

Q.  Do you see there's a subsection B titled annual bonus?

A.  Yes.

Q.  If you could flip to the third page, please.  You see that continues over?

A.  Yes, I do.

Q.  What part of the contract is that?

A.  That is the bonus part of the contract.

Q.  Thank you.  Going back to page 2.  What are the parts of the bonus under this contract?

A.  There are two parts to the bonus, although they tend to work very synergistically.  The first part is 2 1/2 percent of the adjusted net earnings, and that's a number like the profits, so that 2 1/2 percent of the profits is the first part of the bonus.

        Then the second part of the bonus, which is on the top of page 3, is 1 percent of the net cash provided, and the net cash is defined as very similar to the adjusted net earnings differing by a very small amount.  So effectively it's like 3 1/2 percent of the net earnings of the company are the bonus paid to Mr. Doud.

Q.  Going back to page 2. Could you please zoom in from subsection B to the end of this page.

        Do you see there's a description here of annual adjusted net earnings?

A.  Yes.

M1QBDOU2                          Cutler - Direct

Q.   Could you read what the definition is of that term?

A.   RDC's annual adjusted net earnings for Doud's annual bonus

compensation as used herein shall mean the amount calculated

annually as follows:  The amount of RDC's annual net earnings

before one patronage dividends and federal and state income

taxes per RDC's annual audited financial statements

consistently prepared by the certified public accountants then

servicing RDC.

Q.   You see that it says patronage dividend in there?

A.   Yes.

Q.   Are you familiar with what that term means in the context

of RDC?

A.   Well, RDC is a cooperative, so it's owned by the members

and so the patronage dividend is kind of the payment to the

members who own it, in the same way that if there were

shareholders, there would be payments through dividends to the

shareholders, so it's a comparable type of payment there.

Q.   And according to this contract, is Mr. Doud's bonus

calculated on profits before that dividend is paid?

A.   That's correct.  So his bonus is calculated on the profits

before the dividend and the taxes.

Q.   So I want to take a look at how this bonus operates, and we

could turn to the second to last page of this contract.

        What's this?

A.   This is the earning statement for RDC showing you how you

M1QBDOU2                        Cutler - Direct

go from the revenues down to the profits of the company, and

this is going to indicate how one gets to Mr. Doud's bonus.

Q.  From your work as an economist are you familiar with

reading consolidated earnings statements like this?

A.  Yes, I am.

Q.  Using this statement, could you please identify on this

statement what the line item is where Mr. Doud's bonus is

calculated from?

A.  You see about two-thirds of the way down, there's the

earnings before patronage dividend and income tax, which in

2013 is the number $15,084,763.  That's exactly the number,

that's the net earnings before the patronage dividend and the

income tax.

Q.  And the information below that, what's that?

A.  That's the amount that's paid out after that.  So there's

the federal income tax, the state income tax and then the

patronage dividend.

Q.  And so under Mr. Doud's contract, is it 2 1/2 percent of

that earnings before patronage dividend and income tax that

makes up the first piece of the bonus?

A.  That's correct.  So if this was for a year under that

contract, it would be 2 1/2 percent of that $15 million.

Q.  Using this chart here, could you explain what factors go

into getting to that earnings before patronage dividend and

income tax number?

M1QBDOU2                         Cutler - Direct

A.  Yes.  So the first line is the net sales that the total

revenue that we were looking at yesterday and --

          THE COURT:  I'm not sure the jury can see all of this.

If you can highlight or increase that size.

          MR. BURNETT:  Thank you, your Honor.

A.  So the net sales is the total revenue.  The next row is the

cost of the goods sold, so that's the cost of the

pharmaceuticals and other items purchased from the

manufacturers, so the difference between those is in the third

line which is called the gross profit on net sales.  And then

out of that come all of the subsequent items which are the cost

of running RDC as a business, the selling general

administrative, depreciation, interest, all of that goes into

those next rows.  They're subtracted out, and then you get the

earnings before patronage dividend and income taxes.

Q.  Does this chart also show what RDC's profit margin is at

different points in calculation?

A.  Yes, it does.  You see that in the column just to the right

of the dollars, so there's the amount and then there's the

profit margin which is what percent of sales is each of these

items.

Q.  So according to this chart, what's the gross profit --

what's the profit margin on the gross profit on net sales?

A.  If you look, that's in the third row there, so that's gross

profit on net sales, it's $31 million in 2013, which is 3.71

M1QBDOU2                              Cutler - Direct

1   percent of net sales.

2   Q.  Thinking about the calculation you just described, how if

3   at all is this first part of Mr. Doud's bonus based on the

4   amount that RDC sales?

5   A.  The first part is going to be based on the total amount of

6   earnings net of the cost, so it's going to be based on the

7   total of the 15 million, which includes the revenues from all

8   sales net of the costs.

9   Q.  So does Mr. Doud's bonus depends exclusively on the sales

10  of controlled substances?

11  A.  No, it does not depend exclusively on the sales of

12  controlled substance.

13  Q.  So how, if at all, does the sales of controlled substances

14  affect Mr. Doud's bonus?

15  A.  It effects it in two ways.  The first way is because sales

16  of controlled substances do add to profit, so any profit from

17  those comes down into the earnings before the patronage

18  dividend and income taxes, and then part of that shows up as

19  compensation for the defendant. That's the first way.

20          And the second way, remember we were talking about RDC

21  being a full service distributor, and so any amount by which

22  the total business increases as RDC supplies opioids, all of

23  the profit from the business that it gets implicitly because of

24  the selling of the controlled substances, that shows up as

25  earnings to and net earnings and translates into the

M1QBDOU2                          Cutler - Direct

compensation.

Q.  Let's go back now to page 3 of Mr. Doud's contract.  I
think you mentioned at the top of this page there's the second
piece of Mr. Doud's bonus?

A.  That's correct.  That's the 1 percent on the net cash.

Q.  Can you describe how that work?

A.  There's a separate statement called a cash flow statement.
It's close to the net earnings statement for a business like
RDC, and so 1 percent of the net cash is also a part of the
bonus for Mr. Doud.

Q.  So how, if at all, does that second part of Mr. Doud's
bonus depend on the amount that RDC sales?

A.  The same way.  The more that RDC sales net of what it
costs, the greater is the net income, the greater is the net
cash to RDC, and therefore the greater is the bonus.

Q.  And again, what, if any, impact does the sale of controlled
substances have on that second piece of the bonus?

A.  The same two ways.  First, directly because the sale of
controlled substances contributes to cash, net cash for RDC,
and therefore that's a part of the compensation; and then also
because the sale of controlled substances allows the company as
a whole to have more business.  And to the extent that that
business brings in additional net cash to the company, that
contributes to the bonus to the defendant.

Q.  Now, the contract you've been looking at I think you said

M1QBDOU2                          Cutler - Direct

1    covers April 2014 through March 2019; is that right?

2    A.  That's correct.

3    Q.  Have you reviewed a contract for prior set of years?

4    A.  Yes, I have.

5           MR. BURNETT:  And if we could publish please for the

6    jury Government Exhibit 269 which is also already in evidence.

7    Q.  What's this?

8    A.  This is a prior employment agreement dating from April 2005

9    up through the period where the subsequent employment agreement

10   was in effect.

11   Q.  Have you reviewed the compensation provision in this

12   contract?

13   A.  Yes, I have.

14   Q.  So without going through step by step like we did for the

15   last contract, could you describe how, if at all, the

16   defendant's bonuses in this agreement compare to the bonuses in

17   the other agreement that you just analyzed?

18   A.  The bonus here is somewhat smaller and the bonus in this

19   case is 2 percent of the adjusted net earnings.  So remember

20   last time there was 2 1/2 percent of adjusted net earnings plus

21   the 1 percent of the net cash, this is just 2 percent of the

22   net earnings.

23   Q.  Is it based on the same underlying set of inputs, the bonus

24   in this contract?

25   A.  That's correct.  It's based on the same inputs as the 2 1/2

M1QBDOU2                              Cutler - Direct

1    percent was in the prior contract -- or in the subsequent

2    contract, excuse me.

3    Q.  Have you identified the amount that the defendant was paid

4    at certain points during his tenure?

5    A.  Yes, I have.

6    Q.  Let's go back to Government Exhibit 903 and turn to page

7    10, please.  What's on this slide here?

8    A.  This slide is the total compensation of the defendant in

9    each year from 2009 to 2017.  It's divided into two parts, so

10   the blue at the bottom is the salary payment and the orange

11   just above, that is the bonus payment.

12   Q.  Let's take a look at an example starting in 2012.  Can you

13   describe what this shows about Mr. Doud's compensation that

14   year?

15   A.  Yes.  So Mr. Doud's total compensation in 2016 was $664,

16   660.  That's the number that you see on the top of that bar.

17   Just about half of that, 45 percent of that, so about $250,000

18   was the salary payment, and then 55 percent of that, the rest,

19   probably about $300,000 was the bonus payment.

20   Q.  How about in 2015?

21   A.  In 2015 the total compensation was 1,502,320.  You can see

22   that the salary part had grown a little, but the primary

23   increase in total compensation which was about 900,000, the

24   vast bulk of that was from the increase in the bonus.

25   Q.  Looking across this entire chart from 2009 through 2017,

M1QBDOU2                          Cutler - Direct

1    could you describe what this shows about how the defendant's

2    compensation changed over that time period?

3    A.  Yes.  So the defendant's compensation increased quite a

4    lot.  So between, for example, 2009 and 2015 and 2016, it

5    increased roughly by four, so it rose by a factor of four.  The

6    vast bulk of which was the increase in the bonus payments.

7    Q.  What, if any, relationship to those bonuses have to RDC's

8    sales?

9    A.  The bonuses are related to the total net cash, so the total

10   income net of the cost of running the business.

11   Q.  Have you analyzed, what, if any, portion of the defendant's

12   bonuses over these years were attributable to sales of

13   controlled substances?

14   A.  Yes, I have done that direct part, so we're talking about

15   the two different parts.  I've done the direct, which is how

16   much would have come directly from the sales of controlled

17   substances.

18   Q.  Now, were you able to precisely determine how much came

19   from sales of controlled substances?

20   A.  Not precisely because you would need to know exactly the

21   profit rate from the controlled substances relative to all the

22   other products that RDC was selling.

23   Q.  So what did you do to come to an estimate of the amount

24   that's directly attributable to controlled substances?

25   A.  The data from the company suggest that the profit rate was

M1QBDOU2                              Cutler - Direct

roughly the same for controlled substances as non-controlled

substances.  That is the profit rate was the same.  In which

case, then the bonuses is effectively what percent of the total

sales are controlled substances because the profits from each

one are about the same.

So I earn $10 out of every 100 is profit, therefore, I

just need to say how big was the money from the controlled

substances, how big was the money from the non-controlled

substances.

Q.  Let's take a look now at slide 11.  What's on this slide?

A.  This is my estimate of the amount of bonus for the

defendant that came directly from the sales of controlled

substances.

Again, this is from the net revenue from those

controlled substances sales.

Q.  Let's start towards the beginning of this chart.  According

to your calculations, approximately how much of the defendant's

bonuses between 2009 and 2011 were attributable directly to

controlled substances?

A.  Here it's about $60,000 between 2009 and 2011 which would

have come directly from the sale of controlled substances.

Q.  How did that change during the period between 2012 and

2017?

A.  You can see that that grew quite a lot.  So in 2012 it was

36, 521.  At the peak in 2015, it was 163, 535 before declining

M1QBDOU2                              Cutler - Direct

1   to 90, 941 in 2017.

2   Q.  Again putting you on the spot a bit for some mental math.

3   Between 2012 and 2017 according to this chart, approximately

4   how much in total did the defendant make in bonuses directly

5   related to the sales of controlled substances?

6   A.  Somewhere around $550 or $600,000.

7   Q.  Does this chart show the full impact that the sale of

8   controlled substances had on Mr. Doud's bonuses?

9   A.  No, it doesn't.

10  Q.  Why not?

11  A.  Remember we were talking about those two parts, so there's

12  the direct part which is the net revenue from the controlled

13  substances, and then there's the fact that selling the

14  controlled substances was a part of being a full service

15  pharmacy -- a full service distributor, and therefore it

16  brought in potentially more business to the company as a whole,

17  and that additional business brought in would have also

18  contributed to the bonus payments.

19  Q.  I want to turn away from this topic now and switch over

20  back to RDC's sales of controlled substances including opioids.

21          Based on your work for this case, have you reviewed

22  any written polices that RDC had for monitoring the sales of

23  controlled substances?

24  A.  Yes, I have.

25  Q.  Just to orient ourselves, could we please look at

M1QBDOU2                           Cutler - Direct

1    Government Exhibit 276 which is already in evidence.  Have you

2    seen this before?

3    A.  Yes, I have.

4    Q.  What is it?

5    A.  This is the due diligence and suspicious order monitoring

6    policies and procedures.

7    Q.  Let's turn ahead to section 8 which is on page 6.  Have you

8    seen section 8 before?

9    A.  Yes, I have.

10   Q.  What is it?

11   A.  This is how one defines an order of interest, so what does

12   it mean for an order that comes in from a pharmacy to be an

13   order of interest or a suspicious order.

14   Q.  Do you see one of the subsections, subsection A is titled

15   purchase thresholds?

16   A.  Yes, I do see that.

17   Q.  Could you describe in general terms what's in this

18   subsection?

19   A.  One way to determine whether an order is an order of

20   interest is to say was the amount that was ordered greater than

21   some average of past orders or past shipments.

22            So they would look at the past years worth of

23   shipment, average those, and then bump them up by roughly 50

24   percent.  And say any order that's above 50 percent over that

25   average of past years is an order of interest, so that's

M1QBDOU2                          Cutler - Direct

1    roughly what's going on here.

2    Q.  From your work on this case, have you analyzed data that

3    was generated from this threshold based order of interest

4    system that RDC had?

5    A.  Yes, I have.

6    Q.  What did you do with that data?

7    A.  I did a couple of things.  One is, I look to see how common

8    they were, that is how frequent were the orders of interest

9    that came from the thresholds; and then second what happened,

10   that is, were the shipments made, were they not made, were they

11   reported to the DEA, what happened to them.

12   Q.  On the high level, what did you find from that analysis?

13   A.  The vast bulk of the orders that exceeded the orders of

14   interest were shipped to the pharmacy, well over 90 percent

15   were shipped to the pharmacy.

16   Q.  Now before we go further into this, I just want to make

17   something clear, have you analyzed what, if anything, RDC did

18   to investigate before shipping orders of interest?

19   A.  No, I haven't.

20   Q.  Why didn't you do that investigation?

21   A.  There are people in the company who will know much more

22   about that, so that was not asked of me because I'm an outsider

23   looking at what happened in the company, and that's a much

24   better question for the people in the company to say what

25   happened.

M1QBDOU2                          Cutler - Direct

1   Q.  Let's turn back to Government Exhibit 903 and take a look

2   at slide I believe it's 12.  What's the data that's chartered

3   out here on this slide?

4   A.  This is showing you the orders of interest, how many orders

5   of interest there were in each quarter and then what happened

6   after it became an order of interest.

7   Q.  So let's take one bar, let's say the first quarter of 2015

8   as an example.  Do you see the bar there?

9   A.  Yes, I do.

10  Q.  According to this chart, approximately how many orders of

11  interest for controlled substances did RDC receive in the first

12  quarter of 2015?

13  A.  It's a little below 1500, so roughly 1400 orders of

14  interest.

15  Q.  What does the blue part of the bar reflect?

16  A.  The blue part is an order that's shipped, that's fully

17  shipped, so that part of the order of interest were fully

18  shipped.

19  Q.  What does the orange part of the bars reflect?

20  A.  Those are partially shipped.

21  Q.  Can you explain what you mean by partially shipped?

22  A.  It would be a part of the order was shipped, but a part of

23  it would not have been shipped.

24  Q.  Do you see that there are gray parts of some of these bars?

25  A.  Some of the bars do have gray parts.

M1QBDOU2                         Cutler - Direct

1   Q.   What do those gray parts reflect?

2   A.   Those gray parts were denied shipment.

3   Q.   Those are orders of interest that RDC did not ship?

4   A.   That's correct.

5   Q.   And so finally at the top of the bar there are percentages;

6   is that right?

7   A.   That's correct, and those percentages are what share of the

8   total order of interest were either fully shipped or partly

9   shipped, so the blue and the orange.

10  Q.   Let's take a look at some of the data here, and I want to

11  start in 2010 and 2011 as a reference point.

12          About how many orders of interest for controlled

13  substances was RDC receiving per quarter in those years?

14  A.   It was receiving roughly 50 to 100 orders of interest per

15  quarter.

16  Q.   How did that change between 2012 and the beginning of 2017?

17  A.   You can see a very sharp rise, starting a little bit in the

18  end of 2013, particularly the middle of 2014 up through 2015

19  very, very high increase in orders of interest.

20  Q.   Focusing on 2015, about how many orders of interest per

21  quarter was RDC receiving during that year?

22  A.   Roughly 1500 orders of interest per quarter.

23  Q.   According to this chart, what did the data show about what

24  RDC was doing with those orders?

25  A.   In each case in over 90 percent of the cases, it was

M1QBDOU2                          Cutler - Direct

shipping them full or in part, almost entirely in full.

Q.  Let's turn ahead now to the next slide, slide 13.  What's
the data portrayed on this slide?

A.  This is the same chart, the same outline of the chart, but
this is for oxycodone and fentanyl, the two particular drugs we
were talking about yesterday.

Q.  Just to make sure I have it clear, the prior chart showed
orders of interest for all controlled substances, and this
chart focuses only on oxycodone and fentanyl which are a subset
of those controlled substances?

A.  That's correct.

Q.  Again, let's begin by focusing on 2010 and 2011, about how
many orders of interest was RDC receiving on those drugs in
those first two years?

A.  Probably about 20 to 30 orders of interest per quarter for
those drugs in 2010 and 2011.

Q.  And how did the number of the orders of interest that RDC
received for oxycodone and fentanyl change between 2012 and the
beginning of 2017?

A.  It shows the same pattern, which is a very large increase
starting in 2013, particularly picking up through 2014, very
high in 2015, and still high but somewhat lower in 2016.

Q.  So looking at 2015, about how many orders of interest per
quarter was RDC receiving on oxycodone and fentanyl?

A.  Roughly 500 orders of interest per quarter.

M1QBDOU2                          Cutler - Direct

Q.  Let's stay focus on that 2015 set of bars.  During that

year when the orders of interest were at their highest, what

did the data show about what was happening to the orders of

interest?

A.  Over 95 percent of the orders of interest were shipped in

whole or in part, the vast bulk shipped in whole.

Q.  The data you've just been looking at focused on the number

of orders of interest that RDC received and released, have you

looked at RDC's order of interest data in any other way?

A.  Yes, I've looked at the doses that were ordered and then I

look to see what happened with the doses of controlled

substances.

Q.  Where did that data on doses come from?

A.  It comes from the information from the company.

Q.  Why did you look at doses separately from the numbers of

orders of interest?

A.  The orders of interest, each order can have a lot of doses

or a little, so I wanted to look -- I wanted to take the unit

which is kind of dosing unit and see how that would -- what I

found for those dosing units.

Q.  Let's turn to the next slide which is slide 14 in

Government Exhibit 903.

        Can you explain what this slide shows?

A.  If you just look.  There are the three different types of

opioids; fentanyl, oxycodone and all opioids.  And then what

M1QBDOU2                      Cutler - Direct

you see in the different columns are the number of flagged

doses, so those are doses that were flagged by the order of

interest system; how many of those doses were then shipped, and

therefore what percentage of the flagged doses were shipped.

Q.  Let's take that one at a time.

Starting with fentanyl, how many doses were flagged?

How many doses were shipped, and what was the percentage?

A.  621,504 doses were flagged by the order of interest system.

516,844 were shipped, and that's 83 percent of the flagged

doses were shipped.

Q.  How does that compare to the second line item for

oxycodone?

A.  There were many more flagged doses.  The same percentage

were shipped, so 85 percent, roughly the same percentage.

Q.  And finally, how does that compare to opioids overall.

A.  Very similar pattern.  For all opioids there were over 6

million flags does, 83 percent of which were shipped.

Q.  I'd like to turn back to Government Exhibit 276 now.  Turn

back to section 8 which is on page 6.

Do you see under subsection 8 the third paragraph

begins with the words, orders of interest.

A.  Yes, I do.

Q.  Can you read the three paragraphs.

A.  Orders of interest are potential suspicious orders that

meet or exceed the customer's establishing purchasing threshold

M1QBDOU2                         Cutler - Direct

1   or other criteria.  RDC will investigate orders of interest to

2   determine whether they are suspicious orders.  Suspicious

3   orders cannot be filled and must be reported to DEA.

4   Q.  Now, again, have you analyzed whether RDC investigated

5   orders of interest?

6   A.  I have not.

7   Q.  Have you review data on the number of times that RDC

8   reported suspicious orders to the DEA?

9   A.  Yes, I have.

10  Q.  Could you describe at a high level what you did?

11  A.  We have the orders of interest, and so I know how many were

12  shipped, how many were denied.  There's also data on how many

13  of those orders were reported to the DEA.

14  Q.  Why did you look at that information together?

15  A.  It's very clear in the policies what's supposed to happen,

16  so I wanted to see how frequently that did occur.

17  Q.  Let's go back to Government Exhibit 903 and turn to the

18  next slide which is slide 15.  What does the data on this chart

19  show?

20  A.  These are all the orders of interest, so the units here are

21  the orders of interest from 2010 to 2016.  The first bar is how

22  many of them were shipped, so that's adding up over all the

23  previous charts that we were looking at.  So 12,784 orders of

24  interest were shipped.

25              The second bar is how many were fully or partially

M1QBDOU2                        Cutler - Direct

1    denied, so that's a much smaller number, 1200.  You know that's

2    smaller because we were looking at that on the prior page, and

3    then how many were reported as suspicious orders to the DEA.

4    Four were reported.

5    Q.  Have you compared the number of orders of interest that

6    were either partially totally denied to the number of

7    suspicious orders that were filed?

8    A.  Yes, the number of suspicious orders that are filed.  Four

9    is obviously much, much smaller than the number that were

10   partially or totally denied.

11   Q.  Have you done any other analyses of suspicious order

12   reports that RDC filed with the DEA?

13   A.  Yes, I looked in the time series to see how those compare

14   while Mr. Doud was running the company and then after he

15   stopped running the company, what happened to the suspicious

16   order reports.

17   Q.  Let's turn to the next slide which is slide 16.  Without

18   getting into the specifics of the data just yet, what's

19   generally charted out on this slide?

20   A.  These are all the suspicious order reports that RDC filed

21   to the DEA by month from 2012 up through the end of 2017.

22   Q.  What does the blue bar reflect?

23   A.  The blue bar reflects the period of time where Mr. Doud was

24   there and actively running the company, the number of

25   suspicious order reports.

M1QBDOU2                          Cutler - Direct

1    Q.  And what do the red bars reflect?

2    A.  The red bars reflect the fact the suspicious order reports

3    either after he had formally left or in the couple of months

4    just before.  Where based on prior testimony that I reviewed,

5    it was reported that Mr. Doud was not particularly involved

6    with the company, so the first three months of 2017, so for all

7    of 2017 how many suspicious order reports are there.

8    Q.  Just to be clear, when exactly did Mr. Doud officially

9    retire according to what you've seen in the information you

10   reviewed?

11   A.  According to what I've seen, he officially retired at the

12   end of March 2017.

13   Q.  Why don't you have red bars going back to the beginning of

14   January of 2017?

15   A.  Several of the earlier witnesses that I read the testimony

16   of reported that starting in January of 2017 he was generally

17   not around.  He was in Florida.  He was having less to do with

18   the company, and so therefore those orders of interest would

19   more properly be characterized as post-Doud than during

20   Mr. Doud tenure.

21   Q.  What does this chart and the data you analyzed show about

22   the number of orders of interest filed between 2012 and the end

23   of 2016 compared to the number of the orders of interest filed

24   in the year after?

25   A.  You can see the four reports which are in early 2014.

M1QBDOU2                          Cutler - Direct

That's the -- remember we were looking at the very high number

of orders of interest of 2015 and 2016, there are no suspicious

order reports filed in those years at all.  And then you can

see after Mr. Doud left the company, the number of suspicious

order reports increased quite markedly.

Q.  Let's turn ahead now to the next slide, slide 17.  I want

to talk about one last slide on this topic.

          Now, have you reviewed data on the number of

pharmacies that RDC either terminated as a customer, suspended

due to a red flag or filed a suspicious order report on in the

years after Mr. Doud left the company?

A.  Yes, I have.

Q.  Specifically was that Government Exhibit 278, which is

listed here in the source categories?

A.  That's correct.

Q.  What did you do with that information in the first chart

that we have here on the left?

A.  I took all the companies that had been reported, that had

been suspended or terminated after Mr. Doud left the company;

and then I said, for how many of those companies was there at

least one order of interest during the period 2010 to 2016 when

Mr. Doud was in charge of the company.

Q.  What did you find?

A.  Seventy-five percent of the customers who were suspended or

terminated after Mr. Doud left the company had an order of

M1QBDOU2                      Cutler - Direct

interest in those years while he was the CEO of the company.

Q.  Why did you look at that data?

A.  I wanted to see whether -- given that we know that
afterward the company decided they were not appropriate
purchasers, whether there had been any indication beforehand
that they were potentially inappropriate purchasers.

Q.  Now let's take a look at the data on the right part of this
slide, and can you explain what that shows?

A.  For those 75 percent for which there was an order of
interest, so these are pharmacies that ultimately were
suspended or terminated, and there was an order of interest,
what happened to those orders of interest during the period
where Mr. Doud was the CEO of the company.

        So you can see there were 6, 000 roughly total orders
of interest for those companies that were later suspended or
terminated.  Only 374 of those orders were denied in full, and
there was only one suspicious activity report to the DEA.

Q.  Now, I want to set this aside and go back to Government
Exhibit 276.  Up until now you've been testifying about orders
of interest generated by this threshold based system that RDC
had; is that correct?

A.  That's correct.

Q.  In your review of these RDC policies like the one in
Government Exhibit 276, are there other things that could
qualify as orders of interest that aren't based on those

M1QBDOU2                          Cutler - Direct

1   numerical thresholds?

2   A.  Yes, there are.

3   Q.  Let's look back at section 8.  Just to orient ourselves,

4   this is the order of interest, slash, suspicious order section

5   that you looked at earlier?

6   A.  That's correct.

7   Q.  Let's go to the next page.  Do you see that the next

8   subsection after thresholds is called controlled substance

9   percentages?

10  A.  Yes.

11  Q.  Could you read the first sentence of that, please?

12  A.  As a general matter, RDC investigates controlled substances

13  orders and purchases by any customer that meets or exceeds 30

14  percent of all controlled and non-controlled substance

15  purchases per month.

16  Q.  Let's take that down.  Do you see at the bottom of the page

17  there's a subsection D titled red flags?

18  A.  Yes.

19  Q.  Could you read the first sentence there?

20  A.  DEA has identified red flags that may indicate that a

21  pharmacy may be dispensing controlled substances for other than

22  legitimate medical purposes and whose orders are therefore

23  potentially of interest and suspicious.

24  Q.  Do you see that after that it said red flags include, and

25  there's a list that extends on to the next page?

M1QBDOU2                          Cutler - Direct

1   A.  Yes.

2   Q.  Now without having us go through and read each of those,

3   could you describe in general terms what are some of the red

4   flags that are listed out here?

5   A.  They tend to be characteristics of the purchasers of the

6   controlled substances, so people who are paying cash.  Cash

7   doesn't literally mean dollar bills, it means non-insurance.

8   So people who are paying not through insurance or people who

9   are buying extremely high quantities of pills or people who are

10  buying from out of state.  Those are all red flags.  Those are

11  things that tend to be associated with abuse and diversion of

12  drugs from legal to illicit purposes, and so the DEA identified

13  those as red flags that pharmacies and distributors should be

14  looking out for.

15  Q.  Now, are all of the criteria that RDC used to identify red

16  flags listed out here specifically in this document?

17  A.  Not all.  Some of them are numeric and some of them are not

18  numeric.

19  Q.  Are there other sources or testimony that you've relied on

20  to identify more specific criteria for the red flags that are

21  listed out here?

22  A.  Yes.  I've relied on these documents.  I've also relied on

23  the testimony of Ruth Carter DEA agent in terms of what they

24  thought, and I also reviewed the testimony of Jessica Pompeo

25  who indicated some of the red flags, and also some of -- I'm

M1QBDOU2                        Cutler - Direct

1  going to mispronounce his last name, David --

2  Q.  Mr. Pietruszewski?

3  A.  Mr. Pietruszewski, who also commented on some of them.

4  Q.  And let's take a look at another document.  Could you

5  please put up Government Exhibit 21C.  Is this an example of

6  another one of the documents you relied on?

7  A.  Yes, it is.

8  Q.  What is this?

9  A.  This is the due diligence, the pharmacy due diligence

10 document.

11 Q.  And if you look down, let's zoom in on the last bullet

12 here.  Could you read that sentence there?

13 A.  A schedule 2 prescription written for pain should not

14 exceed 120 dosage units unless the prescriber provides the

15 necessary information that the patient is being treated for

16 cancer, intractable pain or is terminally ill.

17 Q.  Just to give an example, what did you use this type of

18 document and the testimony you've identified to do?

19 A.  What I did was, I looked at individual orders from

20 pharmacies and I would see how many of them exceeded the dose,

21 but I actually applied a more stringent criteria, a more

22 conservative criteria.

23        I said, if it was not 120, which is what it said here,

24 but if it was a 180 dosage units, then I'm going to say that

25 that exceeded what the target was and that was a red flag.

M1QBDOU2                        Cutler - Direct

1   Q.  Let's take this down.  Just zooming out, at a high level,

2   have you done anything to analyze whether RDC sold to

3   pharmacies that had dispensing data that exhibited some of the

4   red flags that were listed in RDC's documents and in the

5   testimony you reviewed?

6   A.  Yes, I have.

7   Q.  What did you do?

8   A.  I had data from the New York state prescription drug

9   monitoring program where they collect all the information that

10  pharmacies submit daily to New York state in terms of

11  dispensing of controlled substances, and then I had all that

12  information so I could look and see what share of the

13  prescriptions at each pharmacy hit one of those -- one or more

14  of those red flags.

15  Q.  Now, before we get to those examples, I want to ask you

16  about how you chose the pharmacies that you examined.

17          Were you able to analyze every pharmacy that RDC sold

18  to?

19  A.  No, I was not.

20  Q.  Why not?

21  A.  There are a lot of different pharmacies and they weren't

22  all able to be pulled.

23  Q.  So how did you decide what pharmacies to analyze?

24  A.  I analyzed every pharmacy for which data was made

25  available.

M1QBDOU2                          Cutler - Direct

Q.   Is that data made available by the prescription drug

monitoring program system that you mentioned earlier?

A.   That's correct.

Q.   About how many pharmacies was that?

A.   Forty-one pharmacies.

Q.   Where are those pharmacies located?

A.   They're all in New York.

Q.   Now, you mentioned that chose pharmacies because you had

data from this prescription drug monitoring program, what is

that?

A.   That's a data source that most states now have because

their intensely interested in preventing the abuse of

controlled substances, so they require all prescriptions, all

filled prescriptions to be sent into the state, and then they

collect information which doctors can query to find out how

frequently patients are getting medications, which government

officials can look at to see which medications are being

provided and whether there are red flags associated with them

and any number of things like that.

Q.   Now, did RDC have access to that exact database that you

used?

A.   It did not.

Q.   So why did you use that database?

A.   RDC had access to the pharmacies and it could ask the

pharmacies, and remember the pharmacies are submitting this

M1QBDOU2                         Cutler - Direct

data to the state.  So RDC could have gotten the data with one

or who exceptions.  Like it couldn't get the name of the

patient, but other than that, it could get all that data from

the pharmacy.

Q.  Just to be clear, how, if at all, was the data you reviewed

related to the data that was available to RDC?

A.  I did not use any information on the name, so I did not

need to know any of that, the name of the customer, so all of

the data that I reviewed would have been available to RDC.

Q.  At a high level, could you explain what you did for each

pharmacy that you analyzed?

A.  I looked at how many orders it placed with RDC first to see

what the controlled substance share was, and then I looked at

the total orders from the pharmacy as reported in the data to

see was this a pharmacy that was hitting the red flag criteria.

Q.  Now, I want to be clear, did you analyze what, if anything,

RDC did to investigate these pharmacies or investigate the red

flags you identified in the data?

A.  I did not.

Q.  Why didn't you do that?

A.  I'm not in the best position to that.  I'm an outsider.

I'm looking at the data.  It's much better to get information

from the company on what it did in response to these.

Q.  I'm going to show you -- and let's please just show for the

witness, the Court and the parties, Government Exhibit 904, and

M1QBDOU2                      Cutler - Direct

1   Government Exhibit 906.

2           Do you recognize these documents?

3   A.  Yes, I do.

4   Q.  What are they?

5   A.  Government Exhibit 904 is a summary for all the 41

6   pharmacies.  Government Exhibit 906 has information on each of

7   the 41 pharmacies with information about their orders and the

8   red flags for that pharmacy.

9   Q.  And are these the charts that you were referring to just a

10  moment ago?

11  A.  That's correct.

12  Q.  Do these charts summarize voluminous sets of data and

13  records?

14  A.  They summarize a lot of data.

15          MR. BURNETT:  At this time, the government offers

16  exhibits 904 and 906 in evidence.

17          THE COURT:  Any objection?

18          MR. JANEY:  No objection.

19          THE COURT:  They will be admitted into evidence.

20          (Government's Exhibits 904 and 906 received in

21  evidence)

22  Q.  Let's publish 906 and let's go ahead to page 55 of that.  I

23  just want to walk through one example to clarify what it is you

24  did.  What pharmacy is this page about?

25  A.  This is about ProHealth pharmacy.  You see that at the very

M1QBDOU2                     Cutler - Direct

1    top row.

2    Q.   And what is the data that's portrayed on this first page

3    about ProHealth pharmacy?

4    A.   The first page here is showing you for each month the

5    number of dosage units that were submitted by -- requested by

6    ProHealth pharmacy to RDC.

7    Q.   What does the blue part of each bar reflect?

8    A.   The blue is, as we were looking at in the prior charts,

9    blue is the shipped and never flagged.

10   Q.   What are the red and orange bars reflect?

11   A.   The red were the flagged orders that were shipped, and the

12   orange or the yellow is the flagged orders that were flagged

13   and stopped.

14   Q.   When you say flagged, is this flagged by that threshold

15   based order of interest system you talked about?

16   A.   That's correct.  This is from the threshold base order of

17   interest system.

18   Q.   According to this slide, about how many dosage units of

19   opioids was RDC selling to ProHealth in say 2015?

20   A.   It was about 40 to 50,000 dosage units per month.

21   Q.   Let's look at the next slide 56.  Is this also about

22   ProHealth pharmacy.

23   A.   That's correct. This is a summary for ProHealth pharmacy.

24   Q.   I just want to walk through this slowly one, because is

25   this a model for what your other charts look like?

M1QBDOU2                        Cutler - Direct

1   A.  All of the pharmacies have an exactly similar chart.

2   Q.  Let's start with the first two rows.  What's the data

3   that's portrayed there about ProHealth in the first two rows?

4   A.  The first two rows are from RDC.  They're the total sales

5   from RDC to ProHealth up through the first quarter of 2017, and

6   then the second row is the controlled substances sales over the

7   same time period.

8   Q.  How much revenue according to these charts did RDC make

9   from ProHealth by selling controlled substances?

10  A.  Roughly $5.5 million, so that's the 5.4 million in the

11  second row.

12  Q.  Do you see the third row is called controlled substances

13  share of sales (30 percent)?

14  A.  Yes, I do.

15  Q.  What's that?

16  A.  This is what share of the sales -- so what I'm going to

17  calculate is what share of the sales to ProHealth pharmacy were

18  controlled substances.  And remember early it said that in the

19  document, RDC was going to treat as something to investigate if

20  it's above 30 percent, so that's why the 30 percent is in

21  parenthesis there.

22  Q.  What percentage of ProHealth's purchases from RDC were from

23  controlled substances?

24  A.  61.8 percent.

25  Q.  Why is that in red?

M1QBDOU2                    Cutler - Direct

1   A.  It's in red because it exceeds the 30 percent.

2   Q.  Now, the next row that's titled percent of opioid dosage

3   units flagged as above limits that were shipped, was that

4   referring to?

5   A.  If you remember going back to the previous chart, there was

6   the blue which was shipped, and then the red which was -- the

7   orange which was not shipped, so this is what share of the

8   flagged dosages were shipped.

9   Q.  And according to the chart, what percentage of ProHealth's

10  orders of interest flagged by the system were shipped?

11  A.  93.3 percent.

12  Q.  Why is that in red?

13  A.  It's in red because that's a very high number.

14  Q.  Do you see that the next row is cash share schedule 2

15  prescriptions?

16  A.  Yes, I do.

17  Q.  What does that mean?

18  A.  So I was talking about one of the red flags was the

19  customer paying in cash, that is, either literally in cash or

20  just not through insurance.  It's the cash share of the

21  schedule 2 prescriptions.  The 10 percent comes from the

22  testimony of Jessica Pompeo and also from Ruth Carter, both of

23  whom suggested that that was a natural number to think of.

24  Q.  So according to this chart, what percentages of ProHealth

25  schedule 2 controlled substance sales were for cash?

```
        M1QBDOU2                  Cutler - Direct
```

1    A.  12.6 percent.

2    Q.  And is that in red because it's over that 10 percent

3    threshold?

4    A.  It's in red because it's over the 10 percent 0threshold.

5    Q.  The next row is similar, it's another cash share row.

6    What's that?

7    A.  This looks specifically at oxycodone which is one of the

8    most abused drugs.

9    Q.  Why did you break out a particular drug to look at the cash

10   percentage of that?

11   A.  Not all opioids are the same. Some are more likely to be

12   abused than others.  Oxycodone was one of the most abused ones,

13   so I wanted to look specifically at one of the most abused

14   opioids.

15   Q.  What percentage of ProHealth's oxycodone sales were for

16   cash?

17   A.  13.9 percent.

18   Q.  Is that also red because it's over that 10 percent

19   threshold?

20   A.  That's correct.

21   Q.  Now, the next entry in the row says, out of state shares

22   schedule 2 prescriptions.  What does that mean?

23   A.  That's what share of the prescriptions that were filled by

24   ProHealth were to people who were outside of New York state,

25   whose address was outside of New York state.

M1QBDOU2                    Cutler - Direct

Q.  Why did you select that as one of the criteria you were

using?

A.  It's both referred to in Government Exhibit 276, which is

the red flags and the specific numbers were also suggested by

Jessica Pompeo's testimony.

Q.  That's the 5 percent threshold?

A.  That's correct.  So that testimony said, look, if there's

one or two customers from out of state, you're not going to

make that big a deal; but if it's a significant number, that's

a red flag, and a significant number would be 5 percent.

Q.  And according to this chart, what percentage of ProHealth's

controlled substance sales went to out of state patients?

A.  Fifteen percent.

Q.  Is that red because it's over the 5 percent?

A.  That's correct.

Q.  The next is the share of oxycodone prescriptions with 180

plus pills.  I think you touched on this briefly earlier, but

what does that mean?

A.  So remember the red flag analysis was getting a lot of

doses.  And in specific, in Government Exhibit 21C, a lot was

defined as 120 doses.  So for 30 days, that's six pills per

day.  I actually took the more conservative number which is 180

pills.

Q.  Why is there 20 percent in parenthesis there?

A.  The 20 percent -- so obviously if there's one or two

M1QBDOU2                          Cutler - Direct

prescriptions, you don't want to say that that pharmacy is

automatically doing something suspicious.  There's no -- the 20

percent is not labeled in any document, but I thought 20

percent was a sufficiently high number, that if it was above

that -- it seems likes that something that ought to be

investigated.

Q.  What percentage of ProHealth's oxycodone sales were for

over 180 pills?

A.  44.9 percent.

Q.  And again it's red because it's over 20 percent?

A.  That's correct.

Q.  Finally, the last entry is flagged doctor share of schedule

2 prescription, what did you mean by flagged doctor?

A.  RDC kept a list of doctors who it thought might be

prescribing for other than just medical purposes who might be

doing suspicious prescribing, and so I took that list of

doctors and said, what share of the prescriptions from each

pharmacy were written by those doctors.

Q.  Why do you have 5 percent in parenthesis here?

A.  Again, if it's just one or two you may says that okay, so I

wanted to impose more than just a minimal number, and 5 percent

seemed like a number that was a significant amount of it.

Q.  So according to this chart, what percent of ProHealth's

schedule 2 prescriptions were written by doctors that RDC had

flagged in its system?

M1QBDOU2                    Cutler - Direct

1   A.  28.3 percent.

2   Q.  And again, why is that red?

3   A.  That's red because it's above the 5 percent.

4   Q.  Did you do this same set of analyses for all of the 41

5   pharmacies you looked at?

6   A.  Yes, I did.

7   Q.  We're not going to go through all of them.  But instead, I

8   want to go back to Government Exhibit 904 which is already in

9   evidence.

10          What's this chart here?

11  A.  This is those same rows, and what I'm giving you here is

12  the count out of the 41 pharmacies, how many of them surpass

13  those criteria, each of the criteria.

14  Q.  For the information on the left, that's the same red flag

15  criteria you just walked through in detail?

16  A.  That's correct, those are exactly the same.

17  Q.  And how about the information on the right, what's that?

18  A.  That's the number of the 41, so it's up to 41, the number

19  of the 41 that met that red flag criteria.

20  Q.  So just to move through this efficiently, how many of the

21  41 pharmacies had a red flag because the controlled substance

22  share was over 30 percent?

23  A.  Ten.

24  Q.  How many had a red flag because they exceeded their

25  purchase limit?

M1QBDOU2                    Cutler - Direct

1    A.   Thirty-seven.

2    Q.   How many had a red flag because they sold over 10 percent

3    of schedule 2 sales for cash?

4    A.   Thirteen.

5    Q.   How about how many had a red flag because they sold over 10

6    percent of oxycodone for cash?

7    A.   Fourteen.

8    Q.   How many had a red flag because the share of out of state

9    prescribers for schedule 2 substances was over 5 percent?

10   A.   Nine.

11   Q.   How about how many had a red flag because the share of

12   oxycodone prescriptions for over 180 pills was more than 20

13   percent?

14   A.   Eleven.

15   Q.   And finally, how many had a red flag because they sold more

16   than 5 percent of schedule 2 controlled substance prescriptions

17   for doctors that RDC had flagged?

18   A.   Twenty-three.

19   Q.   Let's go back to Government Exhibit 906 now.  I actually

20   just want to flip through a few examples. Let's start on page

21   25.  What pharmacy is this?

22   A.   This is Bay Ridge pharmacy in Brooklyn.

23   Q.   Did you do the same two slides for Bay Ridge that you did

24   for ProHealth?

25   A.   Yes, I did.

M1QBDOU2                          Cutler - Direct

1    Q.  What do you see about the sales data for Bay Ridge

2    pharmacy?

3    A.  Bay Ridge pharmacy had a very, very rapid increase in

4    sales, part of which was flagged, but most of it was shipped

5    without being flagged.  And then of the flagged orders, a lot

6    of them were shipped.

7    Q.  Let's go to the next slide now, 26.

8              I want to focus in on the bottom two of the red flags

9    criteria that you used, could you explain what you saw in the

10   data for those?

11   A.  So the bottom two here are the share of oxycodone with a

12   lot of pills, remember this is 180 pills.  And the red flag

13   that I put in was 20 percent, and here it's 24 percent.  And

14   similarly what share of the schedules 2 prescriptions were by

15   doctors who were flagged by RDC, that's over 30 percent, that

16   31.5 percent relative to the 5 percent red flag.

17   Q.  Let's go ahead now to page 35.

18             What pharmacy is this for?

19   A.  Seventh Elm Drug Corporation in New York.

20   Q.  What's this first slide show?

21   A.  Again, it shows you the total orders, and you could see

22   it's increasing particularly rapidly through 2011 and remains

23   high for many years.

24   Q.  So say between 2013 and 2014, about how many dosage units

25   per month was RDC sending to Seventh Elm?

M1QBDOU2                         Cutler - Direct

1   A.   Maybe 70 to 80,000 per month.

2   Q.   Let's go to the next slide.  Is this also for Seventh Elm?

3   A.   That's correct.

4   Q.   And here let's look at the bottom three criteria that you

5   analyzed for red flags.

6        Could you describe what you saw in the data?

7   A.   The bottom two are the same as what we were just looking

8   at, and again you see high shares of lots of oxycodone pills,

9   22.8 percent; high share of prescriptions to doctors who were

10  flagged by RDC, 34.9 percent.

11       And in addition, this pharmacy had a very high share

12  of out of state prescriptions, prescriptions to people out of

13  state, 19.1 percent of the schedule 2 prescriptions compared to

14  the limit of 5 percent, the red flag target at 5 percent.

15  Q.   Let's go ahead to page 53.  You see this is called Double G

16  pharmaceuticals in Astoria, New York?

17  A.   Yes.

18  Q.   What do you see about the sales data here?

19  A.   Again, a very rapid increase, particularly in 2014 and

20  2015.

21  Q.   Let's go to the next slide.  Could you talk about what you

22  saw in the data, this time focusing on the cash share metrics

23  and the flagged doctors?

24  A.   This one picks up a different metric which is what share of

25  the customers are paying cash that is not through insurance,

M1QBDOU2                      Cutler - Direct

both for schedule 2 prescriptions overall and for oxycodone

prescription in particular, each of them are 10.9 percent and

10.3 percent, above the 10 percent flag.  And also in that last

row, 18.9 percent of the prescriptions were written by doctors

who were on the flagged list from RDC.

Q.  Let's turn ahead to page 59.  You see this is for Linden

Care pharmacy?

A.  That's correct.

Q.  What do you see about the sales in Linden Care in this

chart?

A.  Linden Care sales increased a lot.  First off the numbers

are much higher.  Linden Care bought a substantial number of

opioids or of schedule 2 drugs, lots of red flags, most of

which were flagged and shipped.

Q.  Now, you mentioned that Linden Care purchased a large

number of opioids.  Just for reference around 2015, about how

many dosage units per month was Linden Care buying from RDC?

A.  Around the start of 2015, it was roughly 400 to 500,000

dosage units per month.

Q.  Let's look at the next slide.

        Could you describe the red flag criteria that you saw

with respect to Linden Care?

A.  Some of this is consistent with the specifics of Linden

Care, so it had a very high controlled substances share and it

had a very high out of the state share because it's a mail

M1QBDOU2                          Cutler - Direct

1    order pain management pharmacy, so not every red flag is

2    obviously something that would invalidate it; but also the more

3    troubling ones here are the last two ones which are the share

4    of oxycodone prescriptions with a lot of pills, 180 plus pills,

5    that's 25.6 percent; and the flagged doctor shares, that's 21.4

6    percent of all the schedule 2 prescriptions.

7    Q.  Let's go ahead now to page 81.  You see this is for Windsor

8    pharmacy?

9    A.  Yes.

10   Q.  And this chart is a little bit different than some of the

11   other charts you looked at?

12   A.  It's a shorter time period.

13   Q.  And what do you see about the data on sales to Windsor

14   pharmacy?

15   A.  Windsor pharmacy is about 100,00 dosage units per month,

16   and particularly toward the end of 2016 it has a lot of red

17   flags, but those red flags are predominantly shipped.

18   Q.  Let's look ahead to the next slide.  What did you see in

19   the data here?  Let's focus on the flagged doctor share.

20   A.  In the last row there you can see the flagged doctor share

21   is 22.3 percent of the prescriptions at Windsor pharmacy for

22   schedule 2 prescriptions at Windsor 2 pharmacy were by doctors

23   who were flagged by RDC.

24   Q.  Now looking up you see the controlled substance share line?

25   A.  Yes.

M1QBDOU2                         Cutler - Direct

1   Q.  What do you see about the information for Windsor there?

2   A.  So 75.7 percent of all the sales from RDC to Windsor

3   pharmacy are controlled substances. That's well above the 30

4   percent that's in the RDC documents as the threshold.

5   Q.  I just want to look at one last one of these examples on

6   page 61.  What pharmacy is this?

7   A.  Old Town pharmacy in Staten Island.

8   Q.  Now, about how many dosage units was Old Town pharmacy in

9   Staten Island buying from RDC between say 2015 and early 2016?

10  A.  About 15 to 20,000 dosage units per month.

11  Q.  Are you familiar with the system called ARCOS that's

12  maintained by the DEA?

13  A.  Yes, I am.

14  Q.  How are you familiar with it?

15  A.  I've used it in my research.  I've used it in doing various

16  type of analyses, a very common database.

17  Q.  Are you reviewed the ARCOS data about RDC's shipments of

18  oxycodone to Old Town pharmacy?

19  A.  Yes, I have.

20  Q.  What did you find about RDC's shipments to Old Town

21  pharmacy around 2016 compared to the shipments from other

22  distributors?

23  A.  RDC was the predominant supplier of oxycodone to Old Town

24  pharmacy over this time.

25  Q.  And was there a period of time where it was the only

M1QBDOU2                          Cutler - Direct

provider of oxycodone?

A.  Yes, in 2016 -- so over part of this period of time, it was

one of several, and then in 2016 it was the only supplier of

oxycodone to Old Town pharmacy.

Q.  Now, let's go to the next slide.  Could you describe what

you saw about the red flag in the data for Old Town pharmacy?

A.  So you can see that -- let me focus on the last five rows

or the middle of those.  There was a very high share of cash

prescriptions.  So the share of schedule 2 prescriptions and of

oxycodone in particular, was 38 and roughly 43 percent, well

above the 10 percent limit.  A lot of the prescriptions was for

many, many pills, so almost a third of them were for 180 or

more pills.  And half of the prescriptions, over half of the

prescriptions were written by doctors who were on the flagged

list of RDC.

Q.  Now, I just have a few more questions I want to ask you.

Before we get to those, could we have for the witness and the

parties and the Court Government Exhibit 908A.

          If you don't mind flipping through those quickly.

          Have you reviewed these?

A.  Yes, I have.

Q.  What are they?

A.  These are the exact same charts that I've been showing you

for a number of different pharmacies.

Q.  And do they summarize the contents of voluminous records?

M1QBDOU2                        Cutler - Direct

1    A.  Yes, they do.

2              MR. BURNETT:  At this time the government offers 908

3    A.

4              THE COURT:  Any objection?

5              MR. JANEY:  No objection.

6              THE COURT:  They will be admitted into evidence.

7              (Government's Exhibit 908 A received in evidence)

8              MR. BURNETT:  We don't need to cover that.  We can

9    take that down.  Instead, I would like to go back to 903 and

10   turn to the very last slide which is 18.

11   Q.  Do you recall that earlier in your testimony you talked

12   about reviewing data on the number of pharmacies that RDC

13   terminated after Mr. Doud left the company?

14   A.  Yes, I do.

15   Q.  And that's referred to as Government Exhibit 278, right?

16   A.  Yes.

17   Q.  Actually for the moment let's pull up and publish for the

18   jury Government Exhibit 278.

19             You see that document on your screen?

20   A.  Yes, I do.

21   Q.  How did you use this to identify terminated pharmacies?

22   A.  You see in the action column here, column E, you can see

23   exactly what RDC's actions were, so there's red flag,

24   suspension, there's termination and so forth. I used that.

25   Q.  Let's take that down and go back to the last slide on

M1QBDOU2                          Cutler – Cross

1    Government Exhibit 903.

2              using that chart you just looked at, were you able to

3    identify all the pharmacies that RDC terminated after

4    Mr. Doud's departure from the company?

5    A.  Yes, using that spreadsheet.

6    Q.  After identifying those terminated pharmacies, what did you

7    do to create data on this chart?

8    A.  After identifying those pharmacies, I then went back into

9    earlier years and I said, what share of RDC's opioid sales were

10   in those prior years were from pharmacies that were later

11   terminated by RDC.

12   Q.  Let's walk through that.  In 2014, what does the data show?

13   A.  71.7 percent of RDC's opioid sales in 2014 were to

14   pharmacies that were terminated after Mr. Doud left the

15   company.

16   Q.  How about in 2015?

17   A.  73.4 percent.

18   Q.  And how about in 2016?

19   A.  63.4 percent.

20             MR. BURNETT:  No further questions, your Honor.

21             THE COURT:  Cross examination, Mr. Janey.

22             MR. JANEY:  Yes, your Honor. Thank you.

23   CROSS-EXAMINATION

24   BY MR. JANEY:

25   Q.  I was going to say good morning.  I think it's now noon, so

M1QBDOU2                         Cutler - Cross

1    I'll say good morning or good afternoon depending on your
2    preference, Mr. Cutler.
3    A.   Good afternoon to you too.
4    Q.   Mr. Cutler, during your testimony particularly yesterday
5    you remarked that some of your research in healthcare policy
6    has given you insight into the potential harmful effects of
7    opioids, correct?
8    A.   That's correct.
9              (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

M1q3dou3                         Cutler - Cross

1    Q.  You recall that testimony?

2    A.  Yes, I do.

3    Q.  Nevertheless, based on your research -- answering yes or

4    no -- you would agree that oxycodone and fentanyl are

5    prescribed in this country for severe chronic pain, correct?

6    A.  Yes.

7    Q.  Cancer-related pain, correct?

8    A.  Yes, that is a primary indication.

9    Q.  Severe arthritis pain, correct?

10   A.  I'm going to say correct.  I also just want to note that

11   there is a lot of debate whether they are appropriate for some

12   of these.

13   Q.  That wasn't my question.

14   A.  Okay.

15   Q.  That wasn't my question.

16           Breakthrough pain, correct?

17   A.  Yes.

18   Q.  And you know about the pain management application of

19   oxycodone and fentanyl through your health care policy

20   research, correct?

21   A.  That's correct.

22   Q.  That being said, you are not a medical doctor, correct?

23   A.  No, I am not.

24   Q.  You have never prescribed either oxycodone or fentanyl to a

25   patient, correct?

M1q3dou3                        Cutler - Cross

1    A.  I have never prescribed.

2    Q.  You don't have a license from any authority in the United

3    States as a medical professional to monitor patients prescribed

4    either oxycodone or fentanyl, correct?

5    A.  That's correct.

6    Q.  In general terms, your knowledge about oxycodone and

7    fentanyl is based on your research, what you've read, correct?

8    A.  What I've read and the research that I've conducted.

9    Q.  And you testified yesterday that you have views about

10   health care and are willing to talk about it with anyone.  Is

11   that correct?

12   A.  That's correct.

13   Q.  Now, turning to some of your testimony yesterday, with

14   respect to what I'll describe as the market.  And with respect

15   to the analysis you performed for this case, and in particular,

16   regarding RDC, you testified that RDC opioid shipments

17   increased while industry sales fell.  Do you recall that

18   testimony?

19   A.  Yes, I do.

20   Q.  Now, when we say "industry," I'd like to better understand

21   how many other market suppliers, suppliers, distributors, to

22   use them interchangeably, did you count to constitute the

23   industry that you referred to in that testimony?

24   A.  So there are three big distributors, and then there are a

25   number of other smaller ones.  What I took was all the data

1    from the ARCOS database, which includes all the three big ones

2    and all the small ones in those three states.  So it was the

3    universe outside of RDC.

4    Q.  And to be clear, you counted market participants, to use

5    that word, competitors, other wholesale suppliers, as an

6    industry for three specific states, correct?

7    A.  That's correct.

8    Q.  And those three specific states that you used to create the

9    industry are sales in New York, correct?

10   A.  Correct.

11   Q.  New Jersey?

12   A.  Correct.

13   Q.  And Pennsylvania?

14   A.  That's correct.

15   Q.  And you did that because that's where 95 percent of the RDC

16   opioid sales were made, correct?

17   A.  That's right.

18   Q.  So, when you say that opioid sales for the industry as

19   opposed to sales for RDC fell from 2010 to 2015 for the

20   industry, you're only taking into account the market

21   participants' sales in New York, New Jersey, and Pennsylvania,

22   correct?

23   A.  I thought that was the fairest comparison.

24   Q.  Yes or no?

25   A.  Yes, and because I thought that was the fairest comparison.

M1q3dou3                         Cutler - Cross

1    Q.  Answering yes or no, in your testimony on this issue,

2    you're not comparing RDC's sales to those of other suppliers

3    across the country, correct?

4    A.  In the testimony yesterday, I did not; that is correct.

5    Q.  Now, based on your research and analyzing data related to

6    controlled substances, you are familiar with the Drug

7    Enforcement Administration, the DEA, I'll shorten it, that the

8    DEA publishes aggregate production quota data, correct?

9    A.  Yes, I am familiar with that.

10   Q.  In fact, this data is made public in the Code of Federal

11   Register, the CFR, correct?

12   A.  Yes.

13   Q.  Production quota data describes the amount of controlled

14   substances manufacturers are permitted to make, correct?

15   A.  That's correct.

16   Q.  And the aggregate production quota data describes the

17   amount the DEA has authorized, and some might use the term

18   across the board, correct?

19   A.  That's correct.

20   Q.  Now, directing your attention to the 2010 to 2015 time

21   frame.  The amount of fentanyl authorized for production by the

22   DEA actually increased substantially, correct?

23   A.  That's correct.

24   Q.  In the year 2015 alone, the DEA authorized increases in the

25   production of fentanyl that actually increased above the 2014

1    level that it had authorized, correct?

2    A.  I don't have the numbers at the top of my head.  I wouldn't

3    be surprised if that's true.  But I don't have those specific

4    numbers memorized.

5    Q.  Directing your attention to the 2010 to 2015 time frame.

6    The amount of oxycodone authorized for production by the DEA

7    actually increased exponentially from 2011 to 2013, correct?

8    A.  Again, I don't have the numbers off the top of my head, so

9    I don't want to agree or disagree.

10   Q.  But is it fair to say, based on your experience and your

11   research, that you understand that that actually took place?

12   A.  Yes, over most time periods the DEA was increasing the

13   production quotas.

14          MR. JANEY:  Showing the witness for identification

15   what is premarked as Defense Exhibit T1.  Showing it to the

16   parties and just to the witness.

17   Q.  This is an aggregate production quota history issued by the

18   DEA for the period 2009 to 2019.  Do you see that there?

19   A.  Yes, I do.

20   Q.  Based on your testimony, you're familiar with this data,

21   correct?

22   A.  Yes.

23   Q.  Have you used this data in your research?

24   A.  Yes, I have.

25          MR. JANEY:  Your Honor, at this time we request that

M1q3dou3                          Cutler - Cross

1    what's premarked as Defense Exhibit T1 be admitted in evidence.

2              THE COURT:  Any objection?

3              MR. BURNETT:  Objection, relevance.

4              THE COURT:  Overruled.  It can be admitted.

5              (Defendant's Exhibit T1 received in evidence)

6    Q.  Drawing your attention to the lower part of the chart, and

7    I'll ask that it be highlighted or popped out, describing

8    oxycodone production quotas.  That we can highlight -- I'm

9    sorry, your Honor, everyone has it.  Thank you.

10             Let the record reflect that the exhibit has been

11   published to the jury.

12             There are two lines, Mr. Cutler, they're describing

13   oxycodone.  Do you see that?

14   A.  Yes, I do.

15   Q.  The first line describes production quotas for something

16   called oxycodone conversion.  Correct?

17   A.  Yes.

18   Q.  Now, that line is meant to denote production quota for

19   oxycodone that has been converted from prior opioids, including

20   oral oxycodone, to OxyContin, correct?

21   A.  That's my understanding of that line, yes.

22   Q.  The line below labeled as oxycodone sales describes

23   production quotas for non-conversion forms of oxycodone.

24   Correct?

25   A.  That's correct.

M1q3dou3                        Cutler - Cross

1    Q.  Let's focus there.  In that line, specifically, drawing

2    your attention to the time frame 2010 to 2013 in particular.

3    Please describe to the jury what we're looking at.

4    A.  So those are the DEA production quotas for the oxycodone

5    for sale.

6    Q.  The production quota reduces slightly between 2010 to --

7    I'm sorry.  Between 2012 to -- it increases from 2012 to 2013.

8    Do you see that there?

9    A.  Yes, I do.

10   Q.  How is it measured?  How do we think about the measurement

11   of the increase?

12   A.  So, these are in kilograms of particular substance, so we

13   need to convert that into MMEs, and I don't know off the top of

14   my head how to convert that into MMEs.

15   Q.  If we think of it in the form of kilograms, how would you

16   characterize just in orders of magnitude the increase in the

17   production quota?

18   A.  In that year, it's roughly a 50 out of 100 million.  So

19   roughly a 50 percent.

20   Q.  Thank you.  Now, if we can look above the top of the chart

21   in the area that's describing fentanyl.  And I believe that the

22   fentanyl is in the third line.  And drawing your attention from

23   the 2010 to the 2015 time frame, just across that time frame,

24   isn't it fair to say that the production quota for fentanyl

25   increased substantially in that time frame?

M1q3dou3                    Cutler - Cross

1   A.  I tell my students that "substantial" is not a scientific

2   term.  So I don't want to use that.  But it absolutely

3   increased.  Any individual, I tell them, is allowed to decide

4   if it is substantial or not.

5   Q.  Based on your experience as an economist and viewing it as

6   an economist who has testified with experience in data

7   analysis, isn't it fair to say that you would characterize the

8   growth in the production quota between '09 and 2015 as

9   significantly increasing over the time frame?

10  A.  I would describe it that way.  That's a value statement,

11  not a scientific statement.

12  Q.  I'm asking for your view of the databased and your

13  experience and background that you've testified about.

14  A.  Okay.

15  Q.  We can take that down.

16          In your discussions yesterday, you described the

17  overview of the pharmaceutical distribution chain.  Do you

18  recall that exhibit?

19  A.  Yes, I do.

20  Q.  You testified about the relationship between the

21  distributor and the retail pharmacy.  Do you recall that

22  discussion?

23  A.  Yes, I do.

24  Q.  Is it fair to say that the distributor sells to the retail

25  pharmacy?

1    A.   Yes.

2    Q.   And in layman's terms, sales of oxycodone and fentanyl are

3    driven by the demand that the distributor receives from the

4    retail pharmacy, correct?

5    A.   Yes.

6    Q.   So, again, focusing within the 2010 to 2015 time frame.

7    Let's consider the actual prescriptions written for opioids.

8    The Centers for Disease Control and Prevention, the CDC,

9    publishes U.S. opioid dispensing rate maps, correct?

10   A.   Yes, they do.

11   Q.   And are you familiar with this data?

12   A.   Yes, I am.

13   Q.   What is this data?

14   A.   They have information on all the prescriptions of opioids

15   and then they collect it and they make certain summary

16   statistics about it.

17   Q.   And this data is publicly available, correct?

18   A.   That's correct.

19   Q.   And when the CDC publishes U.S. opioid dispensing data,

20   it's very disaggregated, correct?  In other words, to state it

21   differently.  You can look at opioid dispensing data by state,

22   correct?

23   A.   That's correct.

24   Q.   You can look at it by county, correct?

25   A.   The -- I can't remember if the CDC data are by county, but

certainly the ARCOS data is by county.

Q.   Again, focusing on the 2010 to 2015 time frame, and taking

into account actual prescriptions for opioids, for 2012, are

you familiar that the CDC reported that the total number of

prescriptions dispensed was more than 255 million, a rate of

81.3 prescriptions per 100 persons?

        Are you familiar with that?

A.   So, I don't keep that exact number in my head.  But sounds

like the order of magnitude that it was.

Q.   Now, going back to your discussion about RDC opioid

shipments increasing during the 2010 to 2015 time frame, to put

things into context.  DEA production quotas increased during

this time frame, correct?

A.   Yes.

Q.   Prescriptions for opioids increased during this time frame,

correct?

A.   I -- I -- I would want to look at the data on that, because

I know that the overall shipments in the country fell.  So I

don't know whether prescriptions were falling or rising.  So I

just don't want to agree to that.

        MR. JANEY:  Marking for identification what's

premarked as Defense Exhibit T2.  Showing it to the parties and

to the witness.

Q.   This is a U.S. state opioid dispensing rate chart published

by the CDC for 2010.  Are you familiar with this data?

M1q3dou3                        Cutler - Cross

1    A.  Oh, yes.

2              MR. JANEY:  We request that Defense Exhibit T2 be

3    admitted in evidence.

4              THE COURT:  Any objection?

5              MR. BURNETT:  No objection.

6              THE COURT:  It will be admitted in evidence.

7              (Defendant's Exhibit T2 received in evidence)

8    Q.  Mr. Cutler, if we can consider some of the states or at

9    least one of the states that you used in your analysis in

10   describing to this jury the industry for RDC, the industry

11   scope, New Jersey, New York, Pennsylvania.  Let's look at

12   Pennsylvania.

13             So can you describe for us the data, there is only one

14   data statistic there, but can you describe what that means?

15   We're in the year of 2010.

16   A.  So, it's -- I just want to look at the units.  So it is the

17   dispensing rate per 100 people, and it is 81.  And I don't

18   remember if that's the number of prescriptions or what exactly

19   that is, so I would want to look at the units for it.

20   Q.  Certainly.  Does that help you, Mr. Cutler?

21   A.  It doesn't say it here exactly what the rate is.  So it's

22   probably in the detailed data description somewhere.

23   Q.  Well, if I direct your attention to the far-right-hand

24   column next to state abbreviation.  It defines it as opioid

25   dispensing rate per 100, correct?

M1q3dou3                         Cutler - Cross

1   A.  I just don't know what it is exactly.

2   Q.  But let's look at the number.  Right.  So on its face, what

3   the chart is describing, what the CDC is describing there with

4   the example of Pennsylvania and we'll go back down, is that the

5   rate is 81 opioid dispensing volumes per 100, correct?

6   A.  That's correct.

7   Q.  Let's consider the same information for the year 2011.

8           MR. JANEY:  Marking for identification what's

9   premarked as Defense Exhibit T3.  Showing it only to the

10  parties and to the witness.

11          MR. BURNETT:  Did you mind just scrolling down?

12          MR. JANEY:  We request that this document be received

13  in evidence.

14          MR. BURNETT:  No objection.

15          THE COURT:  It will be admitted in evidence.

16          (Defendant's Exhibit T3 received in evidence)

17  Q.  And there scrolling down to Pennsylvania, this is the year

18  2011.  Correct, Mr. Cutler?

19  A.  Yes.

20  Q.  The number has increased slightly to 81.7, correct?

21  A.  Yes, that's correct.

22  Q.  And now, looking at the year, considering the year 2012.

23          MR. JANEY:  Marking for identification what is

24  premarked as Defense Exhibit T4.

25  Q.  And again, you recognize this data, correct, Mr. Cutler?

M1q3dou3                          Cutler - Cross

1    A.  Oh, yes.

2    Q.  Right.

3          MR. JANEY:  We request that the exhibit be received in

4    evidence.

5          MR. BURNETT:  No objection.

6          THE COURT:  It will be admitted in evidence.

7          (Defendant's Exhibit T4 received in evidence)

8    Q.  Now looking at Pennsylvania for 2012, it's increased even

9    more, correct?

10   A.  That's correct.

11   Q.  And considering the year 2013, marking for identification

12   what's premarked as Defense Exhibit T5.  This is a U.S. state

13   opioid dispensing rate chart published by the CDC for 2013,

14   correct, Mr. Cutler?

15   A.  That's correct.

16   Q.  Drawing your attention to the area discussing Pennsylvania.

17   It declines slightly to 81.6, correct?

18   A.  That's correct.

19   Q.  And again, the dispensing rate is measured in prescriptions

20   per 100 persons, correct?

21   A.  That's my guess as to what that rate is.

22   Q.  Right.  So, viewed in that way, as dispensing rates of

23   prescriptions per 100 persons, using the year of 2012 as an

24   example, is it fair to say that the dispensing rate in

25   Pennsylvania was 83, approximately 83 prescriptions per 100

1    persons?

2    A.   That's correct.

3    Q.   So now --

4              MR. JANEY:  I'm sorry, your Honor.  One moment.

5              THE COURT:  Yes.

6              MR. JANEY:  Your Honor, I just want to clarify the

7    record to be sure that I requested that Exhibit T5 be admitted

8    in evidence.

9              THE COURT:  Yes.  There was no objection?

10             MR. BURNETT:  That's right.

11             THE COURT:  All right.  It's admitted in evidence.

12             (Defendant's Exhibit T5 received in evidence)

13   Q.   Thank you, Mr. Cutler, for your patience.

14             Now, viewing this data for one of the markets you

15   testified about where RDC sold opioids, again, we're using

16   Pennsylvania as an example.  Is it fair to say that the market

17   demand for prescriptions in Pennsylvania was strong as compared

18   to some other states, based on your knowledge and experience;

19   yes or no?

20   A.   I don't know the market for Pennsylvania relative to the

21   U.S. average.

22   Q.   If we consider it from the perspective using this

23   measurement and these exhibits that we've been discussing,

24   measured as prescriptions per 100 persons, is it fair to say

25   that the market demand for prescriptions in Pennsylvania was

M1q3dou3                          Cutler - Cross

1   strong as compared to other states?

2              MR. BURNETT:  Objection.  That's a totally arbitrary

3   cutoff.

4              THE COURT:  Sustained as to the form of the question.

5   Q.  Based on your knowledge and experience --

6              THE COURT:  Was it what?

7   Q.  Based on your knowledge and experience, was the dispensing

8   rate as measured in prescriptions per 100 persons in

9   Pennsylvania in the time frame of 2010 to 2013 strong as

10  compared to other states?  Again, based on your knowledge and

11  experience.

12  A.  So, when you say -- so I'm not going to answer yes or no.

13  When you say that, I would want to look at the same averages

14  for the U.S. as a whole, and I would compare the Pennsylvania

15  prescription rate to the U.S. prescription rate, and I haven't

16  found those here.  If you show me the U.S. rate, I can make a

17  judgment.

18  Q.  Certainly you would agree, based on the exhibits we've been

19  discussing, that the dispensing rate for Pennsylvania during

20  the time frame that we've been discussing, 2010 to 2015, is

21  hardly declining; isn't that fair to say?

22             MR. BURNETT:  Objection.  He hasn't shown him data up

23  to 2015.

24             THE COURT:  Overruled.  If he is aware of that data,

25  he can answer the question.

M1q3dou3                    Cutler - Cross

1    A.  Between 2010 and 2013, the prescription rate went up by

2    less than 1 percent.

3    Q.  But my question was about the decline.  Right.  It's not

4    declining, is it?

5    A.  No, it increased very slightly.

6    Q.  Based on the data you've received for this case,

7    Mr. Cutler, you have no way of knowing whether dispensing made

8    by RDC to pharmacies in Pennsylvania were for prescriptions

9    that were legitimate or illegitimate, correct?

10   A.  That's correct.

11   Q.  You can only make the observation that RDC distributed to

12   pharmacies during this time frame for X amount of

13   prescriptions, correct?

14   A.  That's correct.

15   Q.  You are not an expert in diversion, correct?

16   A.  I don't think that's correct.  I've done a lot of work on

17   diversion.

18   Q.  Well, my question is different.  Do you consider yourself

19   to be an expert on diversion?

20   A.  On the economic aspects of diversion, yes.

21   Q.  Are you an expert on compliance?

22   A.  I think --

23   Q.  Is that why you are here today, to talk about your

24   expertise in compliance?

25   A.  I -- I think I need you to be a little more detailed about

1  what you mean by the question of expert on diversion.  I have

2  done research that looks at, for example, what the relationship

3  is between over time opioid shipments and the share of people

4  who report obtaining opioids from other than legal sources,

5  which is a form of diversion.

6  Q.  Well --

7  A.  So I've done that research.  So, as an economic matter, I

8  have done work on it.

9  Q.  Does that research in your view make you an expert on

10 diversion?

11 A.  On some aspects of diversion.

12 Q.  You testified earlier when the government, when counsel

13 asked you whether you were here today, yesterday, today, to

14 provide your opinion about investigations at RDC, and whether

15 the conduct that you reviewed might have been something for you

16 to testify about.  Do you recall those questions?

17 A.  Yes.

18 Q.  And your answer was that you are an outsider, correct?

19 A.  With respect to anything happening within the company, I am

20 absolutely an outsider.

21 Q.  And your testimony, both yesterday and today, was that

22 you're not in a good position to talk about RDC's responses to

23 issues like red flags, correct?

24 A.  That's correct.  I am not testifying about anything RDC did

25 or did not specifically do.

M1q3dou3                         Cutler - Cross

```
 1   Q.  Right.  And you certainly are not in a position to testify
 2   about what this defendant Larry Doud did or did not do,
 3   correct?
 4   A.  That's correct.  I have not testified at all nor am I able
 5   to on what the defendant did or did not do.
 6   Q.  By 2017, based on your knowledge and research, you know
 7   that, in general terms, there were less prescriptions for
 8   oxycodone and fentanyl, correct?
 9   A.  That's correct.
10   Q.  And you also know, based on your knowledge and research,
11   that the DEA cut production quotas in 2017, correct?
12   A.  That's correct.
13   Q.  The pharmacy dispensing data shows that there were less
14   prescriptions in 2017, correct?
15   A.  As in some earlier years.  It wasn't just 2017.
16   Q.  But my question is with respect to 2017.
17   A.  Hmm-hmm.
18   Q.  I'm sorry, can you say yes or no?
19   A.  Oh, I apologize, to you, sir.
20           MR. BURNETT:  Objection.  2017 compared to what?
21           MR. JANEY:  No.
22           THE COURT:  Overruled.  I don't think that's the
23   question.
24           What's your question?
25           MR. JANEY:  I think the witness understood it and
```

M1q3dou3                          Cutler - Cross

1    answered it.

2    A.   If you could just repeat the question.

3    Q.   Again, drawing your attention to the year 2017, the

4    pharmacy dispensing data shows that there were less

5    prescriptions, correct?

6    A.   Than in 2016?

7    Q.   Yes.

8    A.   Yes.

9    Q.   Is it fair to say that naturally wholesalers would be

10   distributing less of these drugs in 2017, because there was

11   less demand, correct?

12   A.   That's correct.

13   Q.   Drawing your attention to slide 11 and what's been admitted

14   in evidence as Government Exhibit I believe it's 903.  The 18

15   page.

16            Putting this information from slide 11 into

17   perspective, just based on the sales data --

18            MR. JANEY:  I'm sorry.  Just one moment, your Honor.

19            THE COURT:  Yes.

20   Q.   I'm going to do it the old fashioned way, Mr. Cutler.  We

21   can take the exhibit down.

22            You testified about the sales data at RDC during the

23   time frame through 2017, do you recall that, of opioids?

24   A.   Yes, I do.

25   Q.   So, putting some of this into perspective then, just with

M1q3dou3                    Cutler - Cross

respect to the sales data, part of the reason there was less

concentration of opioid sales at RDC as reflected by customers

in 2017, is because there was less supply of opioid approved by

the DEA, and fewer prescriptions being written by doctors,

correct?

A.   I would guess the second of those would have been more

important than the first.  Because RDC was not a big part of

the national total.  But, probably any change through 2017

would definitely reflect changes in physician prescribing,

among other things.

Q.   So, if we can look at slide seven.  So viewing the

government's exhibit slide seven and these shipments compared

to other industries, and in particular drawing your attention

to the middle bar graph with the 222 percent.

        First just to orient all of us, what year is that?

A.   So these are the changes from 2010 to 2015.

Q.   Yes.  The 222 percent is meant to say what?

A.   There was a large increase in fentanyl shipments by RDC.

Q.   And is that meant to indicate over the entire time frame of

2010 to 2015?

A.   That's cumulative change from beginning to end.

Q.   So between 2010 to 2015?

A.   That's correct.

Q.   In compiling data for this chart, you reviewed RDC sales

data, correct?

M1q3dou3                          Cutler - Cross

1   A.  That's correct.

2   Q.  And based on your review of the sales data, what component

3   of this growth is represented by the RDC customer Linden Care?

4   A.  I don't have the exact number in front of me.

5   Q.  It's fair to say that Linden Care was the largest consumer

6   of this drug from RDC?  Is that fair to say?

7   A.  Based on everything I know, that is correct.

8   Q.  Right.  But you are not able to identify for us what

9   component Linden Care comprised of that statistic?

10  A.  I don't remember the exact number.  I do remember that even

11  when I made this chart without Linden Care, it was still a

12  sizable increase in the fentanyl shipments.

13  Q.  Right.  So, let's consider another very large customer of

14  RDC, Dunn Meadow.  Are you familiar with that name?

15  A.  Yes, I am.

16  Q.  What component of that growth is reflective of Dunn

17  Meadow's consumption of opioid shipments from RDC?

18  A.  So I don't have that exact number in front of me.  I

19  remember also having done this figure excluding both Linden

20  Care and Dunn Meadow, and there was also -- and even then there

21  was an increase in the fentanyl shipments.

22  Q.  And as you sit here today, though, acknowledging that both

23  Dunn Meadow and Linden Care were some of the largest consumers

24  of opioids from RDC, even assuming that these numbers are

25  correct, you're not able to testify whether the Linden Care

1    opioid shipments or the Dunn Meadow opioid shipments were

2    legitimate or illegitimate, correct?

3    A.  With respect to all the shipments, I'm making no -- I'm

4    pointing out the facts, not specific to those two pharmacies.

5    Q.  Either way.  Okay.

6           In your testimony, part of what you described in the

7    area of Larry Doud's compensation is that there were two

8    elements, if I'm understanding correctly, that contributed to

9    his bonus compensation.  Do you recall that testimony?

10   A.  Yes, I do.

11   Q.  And you characterized it in terms of the contribution of

12   controlled substances to Mr. Doud's bonus as a direct and an

13   indirect effect.  Do you recall that?

14   A.  Yes, I do.

15   Q.  And part of your testimony is that with respect to the

16   direct impact that the controlled substances had a specific and

17   direct impact on profit, assuming certain things about the

18   sales.  Do you recall that?

19   A.  Yes, I do.

20   Q.  And you described the indirect effect, in sum and

21   substance, as Mr. Doud received a benefit from the controlled

22   sales by the sales of the non-controlled, because they were in

23   effect bundled together.  In other words, your testimony was

24   that a customer would want both controlled and non-controlled.

25   Do you recall that testimony?

M1q3dou3                          Cutler - Cross

1    A.  Yes, I do.

2    Q.  In coming to that view, did you survey any of the RDC

3    customers to test whether bundling is more than just a mere

4    theory in this particular instance?

5    A.  No, I did not survey any of the customers.

6    Q.  Did you review any customer contracts where you were able

7    to identify that this type of bundling was a requirement in the

8    contract?

9    A.  No, I didn't.

10   Q.  We can see Government Exhibit 278, please.  I'm sorry, can

11   we -- let's take that down for a minute.

12          We're bringing it up.

13   A.  Okay.

14   Q.  Do you have it there, Mr. Cutler?

15   A.  Yes, I do.

16   Q.  Great.  Now, I understood your testimony today with respect

17   to this particular slide to say that you looked at 2017 data,

18   correct?

19   A.  These data are for the years 2012 through 2016.

20   Q.  That's not my question.  My question is I understood your

21   testimony earlier to be that you first looked at 2017

22   termination data, correct?

23   A.  The termination data were all times after Mr. Doud's

24   departure.

25   Q.  Let's do it this way.  Pull up Government Exhibit 278,

M1q3dou3                    Cutler - Cross

1    please.  In conjunction with the slide 18 that I just showed

2    you, the government first asked you on direct, I'm not sure

3    first or second, but certainly in relation, the government

4    asked you whether you looked at this slide as a part of your

5    analysis.  Do you recall that testimony?

6    A.  Yes.

7    Q.  And you testified that this chart is about 2017 termination

8    data, correct?

9    A.  Also 2018.

10   Q.  And 2018?

11   A.  And 2018.

12   Q.  Thank you.  So this is the chart that you looked at and

13   analyzed in developing slide 18; is that correct?

14   A.  That's correct.  Earlier you had said 2017, so I was just

15   trying to correct it and say also 2018.

16   Q.  Okay.  Thank you.  Now if we can look at slide 18.

17   A.  I apologize for not being clearer.

18   Q.  I apologize for being confusing.  But we are on same page.

19          If we can see slide 18, please.  Looks like everyone

20   has it.

21          Now to come back to the exhibit, in developing this

22   slide, you looked at termination data for 2017 and 2018,

23   correct?

24   A.  That is correct.

25   Q.  And to be clear about what this slide is showing, you did

M1q3dou3                    Cutler - Cross

1    not actually look at termination data for 2012, 2013, '14, '15

2    and '16, correct?

3    A.  Not for this slide; that is correct.

4    Q.  You looked at 2017 and 2018 data, and you made an inference

5    about what the allocation would be for terminations in this

6    time frame.  Correct?

7    A.  No, that's not correct.

8    Q.  Please clarify then.

9    A.  Okay, I didn't make an inference.  What I did was I

10   calculated what share of all the opioid shipments were to

11   pharmacies that were later terminated.

12   Q.  But you didn't do that on a bottoms up basis, correct?  In

13   other words, you didn't look at termination data from 2012, did

14   you?

15   A.  No, I didn't.  It wasn't relevant for the point I was

16   trying to make here.

17   Q.  I am asking the question, you didn't look at data for 2013

18   in developing this chart, did you?

19            MR. BURNETT:  Objection.  What data?

20            THE COURT:  Overruled.  You can answer.

21   A.  I'm stumbling because I'm not quite sure what you're trying

22   to ask.  But, no, I did not look at 2013 termination data.

23   Q.  You didn't look at 2014 termination data, did you either?

24   A.  No.  Again, this is based on, I wanted to see based on

25   subsequent terminations what were the shipments like.  So those

M1q3dou3                          Cutler – Cross

1   terminations wouldn't have been relevant.

2   Q.  You don't know what the actual terminations were in, for

3   example, 2015, do you?

4   A.  No.

5   Q.  You don't know what the actual terminations were in 2016?

6   A.  They're in the data but --

7   Q.  Yes or no?

8   A.  Oh.  They are not here.  They are in the data that I have,

9   but I haven't analyzed them.

10  Q.  You have not analyzed them.  Right?  You did not analyze

11  for the purposes of this slide actual termination data for

12  2013, did you?

13  A.  No, not for this slide.

14  Q.  We can take it down.  Let's look at exhibit 905, please.

15          THE COURT:  Mr. Janey, unless you're almost done, I'd

16  like to take the lunch break.

17          MR. JANEY:  I was in my own world.

18          THE COURT:  You're in this world.

19          MR. JANEY:  I'm not almost done.  So I'm happy to

20  break for lunch.

21          THE COURT:  Ladies and gentlemen, we are going to take

22  lunch.  Don't discuss the case, keep an open mind.  I am going

23  to try to bring you out at 2 o'clock.

24          (Jury excused)

25          THE COURT:  You can step down, sir.

M1q3dou3                         Cutler – Cross

1              Mr. Janey, where are you about?

2              MR. JANEY:  Not too much longer, your Honor.

3              THE COURT:  Let's come back at 1:55 so we can talk

4    about where we are and how we are going to proceed.

5              (Recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1QBDOU4

AFTERNOON SESSION

2:00 p.m.

1          (In open court; jury not present)

2          THE COURT:  Mr. Gottlieb, can we wind up witnesses

3     tomorrow and sum up Monday.

4          MR. JANEY:  Your Honor, if I may.  I did as your Honor

5     instructed.  I spoke with the second witness where we had the

6     question.  The issue is, your Honor, he is an expert in two

7     different cases.  I asked him to elaborate to me.  And based on

8     what he could, only because of confidentiality reasons.  He is

9     an expert for a reinsurer where Merck has filed a $1.5 billion

10     claim and that is in litigation.

11          He is the expert in that case.  That litigation is at

12     a critical juncture.  He anticipated based on the work he was

13     doing for us and the work in the Merck case that he would have

14     this week and testify next week based on the schedule that we

15     had previously advised him on.  He has moved things around and

16     is able to be here on Friday morning, but he is not able,

17     because of the commitment in the Merck, in the reinsurance

18     litigation where's an expert to be here tomorrow.

19          THE COURT:  But he's not testifying tomorrow in that

20     case?

21          MR. JANEY:  That's correct, your Honor.  He's not

22     testifying.  But based -- he could not elaborate to me because

23     of confidentiality reasons all of what is involved there.  He

M1QBDOU4

has not testified and cannot be here tomorrow, but can be here

Friday.

   THE COURT:  I still don't hear good reason why he

can't be here tomorrow.

   MR. JANEY:  I'm trying my level best to relay and

convey the explanation.  There's apparently something going on

in that litigation that impedes him from being here tomorrow.

   THE COURT:  But what's the difference between tomorrow

and Friday?

   MR. JANEY:  Whatever that commitment is with Merck, he

believes that it can be resolved by tomorrow.

   THE COURT:  Where is he?

   MR. JANEY:  Physically right now?

   THE COURT:  What state is he in?  Where he's coming

from?

   MR. JANEY:  I think he's coming from New Jersey, your

Honor.

   THE COURT:  That's not a good enough excuse.  If

you're telling me he was flying from California --

   MR. JANEY:  No, he's not flying from California.

   THE COURT:  If you want us to accommodate him any

particular time tomorrow, I'm willing to do that, but, no,

that's not a good excuse that he needs to consult and sit with

them at their trial tomorrow and I'm not even sure that's what

you're saying.  You're not saying he's testifying tomorrow and

M1QBDOU4

1   so he can't be here tomorrow because he's in Jersey.

2          MR. JANEY:  He's not testifying tomorrow, your Honor.

3          THE COURT:  That's not good enough.

4          MR. JANEY:  I don't have that representation.

5          THE COURT:  As I said, we can accommodate him.  If you

6   want to accommodate him in the morning or accommodate him in

7   the afternoon, I'm willing to work with you on that.  But, no,

8   that's not a good reason that he can't be here because he's

9   getting paid by somebody else to consult with them and he

10  doesn't want to come over from Jersey.

11         MR. JANEY:  I understand, your Honor.  Just to

12  clarify, because I don't want to leave your Honor with the

13  impression that the expert simply doesn't want to come over

14  from Jersey.  I understand --

15         THE COURT:  That's the impression that I have.  I

16  don't have any reason to believe he can't be here tomorrow.

17         MR. JANEY:  I understand, your Honor.  I don't want to

18  give you that impression.  That's not the impression that I

19  have.  The impression that I have is the nature of that

20  litigation requires him -- he anticipated in scheduling his

21  work that he would be testifying on Monday.  He asked

22  alternatively could he testify on Friday morning and that's

23  what I'm coming back with.

24         THE COURT:  Tell him I'll accommodate him any time

25  tomorrow, but he must rearrange his schedule and tell the other

M1QBDOU4

lawyers who are paying him in another litigation that he cannot
be there.  He hasn't said to me that he's in front of a judge
testifying.  He hasn't said to me that there's anything
preventing him from making a choice as to which case is more
important to be at.  My position is, it's more important for
him to be at the case where he has to testify, and he's the
last witness in that case than to simply sit and consult with
another set of lawyers on another case.

        If we were in the opposite position and the judge in
Jersey was telling me that he wanted him over in Jersey and I
was saying to that judge, well, he's consulting with his client
over here so he can't come and testify, I think that wouldn't
be an appropriate thing for me to do to prevent what is
important testimony, particularly important testimony in a
criminal case.

        MR. JANEY:  I understand, your Honor.

        THE COURT:  Tell him I want him here tomorrow and that
what I've been told is not a good enough excuse for us to have
to, one, make this jury come in here on Friday; and two, delay
this trial another several days after only having and you say
you have a character witness tomorrow, which is usually in my
experience -- I'd be surprise if it takes more than 20 minutes
to deal with that witness, given the limited nature of
character testimony.

        MR. JANEY:  I understand, your Honor.

M1QBDOU4

|   | |
|---|---|
| 1 | THE COURT:  Tell him to get here.  Tell him we'll |
| 2 | accommodate him any time he wants to be here.  Tell me before |
| 3 | the end of the day if there's something we need to adjust for |
| 4 | him tomorrow, but I'd like to finish with the testimony |
| 5 | tomorrow, give the jury Friday off, don't drag them here on |
| 6 | Friday just for this witness and for us to be prepared and give |
| 7 | you the whole weekend to prepare yourself for summations and |
| 8 | have summations on Monday.  Okay. |
| 9 | MR. JANEY:  Understood, your Honor. |
| 10 | THE COURT:  Thank you. |
| 11 | MR. GOTTLIEB:  Your Honor, before we begin, over lunch |
| 12 | I just had conversations with Mr. Roos.  We heard that the last |
| 13 | witness is a paralegal, so I inquired as to the offer of proof |
| 14 | of calling a paralegal now. |
| 15 | THE COURT:  Are there charts that go with this |
| 16 | paralegal?  Are there exhibits?  Does defense have those |
| 17 | exhibits? |
| 18 | MR. ROOS:  Yes. |
| 19 | MR. GOTTLIEB:  Your Honor, I point out we already had |
| 20 | a summary witness. We already had our time spent, the jury's |
| 21 | time spent listening to email after email read.  It struck me |
| 22 | that there was only going to be one summary witness, and it |
| 23 | seems unnecessary for her just to get on the stand and in |
| 24 | effect give two summary witnesses and maybe you can even call |
| 25 | it a third summation for the government. |

M1QBDOU4

1      THE COURT:  I don't disagree with you in the abstract.

2  Is this something substantive that this witness is going to add

3  to this case that we don't already have in this case?

4      MR. BURNETT:  Your Honor, the witness is going to be

5  talking about two things:  So first, there are a few charts of

6  sales data to particular pharmacies that have not been entered

7  in evidence through the expert, and what the summary witness

8  has done is mapped exhibits that are evidence onto those

9  charts.  I think our concerns there are few pharmacies in

10  particular where there's been some testimony about, some emails

11  offered from both sides, to elicit a timeline of how things

12  work and to line that up with actual sales to real pharmacies.

13      THE COURT:  What will be the relevant testimony that

14  goes along with this exhibit?

15      MR. BURNETT:  What she's going to do is present the

16  charts to the jury, say what those charts are, how she mapped

17  the exhibits onto the charts, and she'll be reading by no means

18  all emails that are on the chart, just reading several emails

19  that are on each of the charts.

20      THE COURT:  This is a chart similar to what chart?

21      MR. BURNETT:  Basically Government Exhibit 908 is the

22  one that Professor Cutler entered into evidence earlier this

23  morning.

24      THE COURT:  This is similar to his charts as opposed

25  to similar to the email charts?

M1QBDOU4

1          MR. BURNETT:  What it is, is, it's his charts and then

2     there are basically lines drawn into the charts where they line

3     up with dates that mark off where certain exhibits line up in

4     the timeline.

5          MR. GOTTLIEB:  Your Honor, I'd like to point out --

6          THE COURT:  Can I see a copy of it.

7          MR. GOTTLIEB:  I didn't see these until I did reach

8     out to Mr. Roos and he was good enough apparently to send me an

9     email.  I haven't even seen these charts.

10          THE COURT:  You're one step ahead of me.  You have

11     them and I don't.  What do you want me to do?

12          MR. BURNETT:  We can bring up a copy.  There was a

13     version that was produced I believe two or three days ago and

14     then an updated version that was produced yesterday.

15          MR. GOTTLIEB:  We haven't had time to analyze them,

16     your Honor. Quite frankly, now hearing that they're putting in

17     documents that we haven't even seen, the fact of the matter is

18     as a summary witness without having had giving us the chance to

19     analyze it, we object to it.  We're all in a rush and a hurry

20     to finish this up. It seems to be a colossal waste of time and

21     it's improper.

22          MR. BURNETT:  Couple of things.  First, the exhibits

23     that are marked on the chart are in evidence.  They're not new

24     exhibits.  The charts themselves were produced a couple of days

25     ago to defense, and an updated version was produced yesterday.

M1QBDOU4

This is going to be the bulk of the testimony.

              THE COURT:  What are in the boxes?

              MR. BURNETT:  Those boxes refer to government and

defense exhibits that are already in evidence.

              THE COURT:  Are those emails?

              MR. BURNETT:  Yes.

              THE COURT:  Are they all emails?

              MR. BURNETT:  Almost all emails.  I think there are a

couple like compliance report or like a spreadsheet.

              THE COURT:  What is the testimony that's supposed to

go along with this?

              MR. BURNETT:  The paralegal will be explaining just

what it is these charts show, like how she put them together.

And second, she'll be going through some of the emails that are

marked off on the chart.

              THE COURT:  How many of those emails?

              MR. BURNETT:  I think it depends on the pharmacy.  For

some it's like two or three, others five or six.

              THE COURT:  How many total?

              MR. BURNETT:  She's not reading full emails.  The

total, she'll read pieces of probably like in the 30 range.

She's reading a sentence or two from them for the most part.

              THE COURT:  How is that testimony not cumulative?

              MR. BURNETT:  Your Honor, I think for starters, some

of the emails -- many of the emails are in evidence but have

M1QBDOU4

1    not been read to the jury yet at this point.  There are others

2    that are in evidence that have been read which she wouldn't be

3    reading again to the jury.  We'll note that the jury's seen

4    them and move on from them.

5                THE COURT:  What are the second set of charts?  I

6    don't understand what the difference is.  What is 908A?

7                MR. BURNETT:  908A is just the raw charts that

8    Professor Cutler entered that the paralegal mapped the exhibits

9    onto.

10               THE COURT:  This second envelope that you gave me

11   which has 908A in it is the exact same exhibits we already have

12   in evidence?

13               MR. BURNETT:  908A is in evidence.

14               THE COURT:  These are not new exhibits that you intend

15   to offer?

16               MR. BURNETT:  They're offered.

17               THE COURT:  They're already in evidence through this

18   witness?

19               MR. BURNETT:  Yes.

20               THE COURT:  Let's put those aside for a second.  The

21   new testimony and new exhibits that you want to offer is that

22   this paralegal has placed on certain spots on these emails

23   certain -- I mean certain spots on 908 indications of what

24   month and year certain emails were generated?

25               MR. BURNETT:  Yes, and those emails are in evidence.

M1QBDOU4

1   Some of them the jury has actually seen already.  Others they

2   haven't.

3          THE COURT:  I understand the purpose of creating the

4   document and I don't hear that that's inconsistent with what

5   the testimony is and what the documents themselves

6   demonstrates.  What is the purpose of having this witness go

7   through the same emails that we went through before?

8          MR. BURNETT:  Many of these are not emails that the

9   jury has heard before.  They're in evidence from much earlier

10  in the case.

11         THE COURT:  But why is this the relevant witness to

12  question with regard to the content of these emails if you

13  didn't think they were relevant to ask the witnesses about who

14  had direct on these emails?  What relevant testimony is this

15  witness -- the appropriate witness for these emails?

16         MR. BURNETT:  Your Honor, I think what's important is

17  that the witness has basically put these in the order in which

18  the events occurred.

19         THE COURT:  I understand that testimony. That's five

20  minutes worth of testimony.  What else once she does that?  I

21  don't understand why she's in a position to now read through a

22  series of new emails that you during the course of this trial

23  didn't think was important enough for any witness who had any

24  relevant knowledge about these emails to testify about.

25         MR. BURNETT:  She's not uniquely qualified above

M1QBDOU4

1    anyone else to read the emails.  I believe we're entitled to

2    present the jury with the evidence that's in evidence already

3    and she can convey that to the jury as a summary witness.

4            MR. GOTTLIEB:  Your Honor, frankly, they're not

5    entitled to do it two, three times.  There's nothing that

6    entitles them to do that. And looking at this chart right now,

7    we're going to have a witness say, well, this email falls to

8    this and this is an accurate email.  Well, I'm going to need

9    time to now review.

10           THE COURT:  This witness is not stating anything about

11   the accuracy of the email.

12           MR. GOTTLIEB:  What I'm saying is, she has this chart

13   with boxes saying this email belongs here.

14           THE COURT:  No, she has a chart that says I reviewed

15   this chart and I reviewed the e-mail and this is the timing of

16   this email in relationship to events that happened on this

17   chart.  Do you object to that part of it?

18           MR. GOTTLIEB:  Yes, because any witness on the stand,

19   if she says on this particular exhibit, Seventh Elm Drug Corp,

20   it looks like it's number 6 on the bottom, she's has all of

21   these boxes, which she clearly puts in here, I'm entitled now

22   to pull them out to review it to make sure that she's even

23   accurate about it.

24           THE COURT:  No, you're not.  You're entitled to, if

25   you want, to spend your evening doing that to look and see if

M1QBDOU4

1  that email that she put in April 2012, in fact was written in

2  2012.

3         MR. GOTTLIEB:  So I need time, therefore --

4         THE COURT:  How much time do you need to do that?

5         MR. GOTTLIEB:  I need sufficient time to analyze this

6  particular --

7         THE COURT:  No, you don't, because these exhibits are

8  already in evidence.  They could do whatever they want to

9  without giving you further opportunity to analyze them.  They

10 were in evidence.  You had them.  You didn't object to the

11 admission into evidence.  They're in evidence.

12        MR. GOTTLIEB:  Your Honor, how does anybody know she's

13 going to get up there and say this particular email now

14 properly belongs there.

15        THE COURT:  Because it will take you 10 minutes to

16 check each one of these emails to see whether or not that's the

17 date on the email.

18        MR. GOTTLIEB:  So before cross examination.  All I'm

19 saying your Honor --

20        THE COURT:  But you had the opportunity to do that.

21 This is not a good excuse about why she can't testify.

22        MR. GOTTLIEB:  We didn't have an opportunity to do

23 that.

24        THE COURT:  You didn't have an opportunity to verify

25 whether or not the exhibits that are in evidence that represent

M1QBDOU4

1   an email of a certain date?  You didn't have the opportunity,

2   if you wanted to challenge, whether that in fact was the

3   correct date on that email?

4   　　　　MR. GOTTLIEB:  Your Honor, so let me be clear.  We had

5   the emails.  This is the first time I'm seeing this chart with

6   those emails superimposed.

7   　　　　THE COURT:  What is it you need to know?  You're

8   making an argument that sounds like a rationale argument, but

9   it's not a reasonable argument.  Government Exhibit 101A and

10  Government Exhibit 101B.  It says it was April of 2012.  How

11  much time do you need to verify if you haven't already verified

12  it that whether or not that was issued in April of 2012?

13  　　　　MR. GOTTLIEB:  Your Honor, you have been involved in a

14  lot of trials.  I have been involved in a lot of trials.  The

15  government usually has one summary witness.

16  　　　　THE COURT:  I understand that.  I'm trying to

17  understand -- I know you don't want them to do this.  I'm

18  trying to understand what you are trying to claim your

19  prejudice is, and you don't make a strong argument to say

20  somehow this is a big surprise that they're going to claim that

21  these emails were written on a certain date, in a certain month

22  and a certain year. That's not a legitimate argument to say

23  you're somehow prejudiced by that.  You had these exhibits.

24  You agreed that these exhibits could come into evidence.  These

25  exhibits are in evidence.

M1QBDOU4

1    MR. GOTTLIEB:  You know how the defendant is

2    prejudiced, if I can explain that.  A defendant sits here.  The

3    government gets a bite of the apple, then they call a summary

4    witness, now they're calling a second summary witness, then

5    they're going to have a summation.  So the government, in fact,

6    has three summations versus a defendant having one summation.

7    THE COURT:  The government can call this witness.  The

8    government can have this witness testify about what this

9    witness did.  This witness took exhibits that were in evidence

10   and put them in the relevant month in which they're dated.  And

11   then, to the extent that there is a relevant portion that

12   becomes relevant since this trial began, a relevant portion

13   that you want this witness to read, I'll allow you to let this

14   witness read some relevant portions.

15   But if it appears to me that you're simply having this

16   witness read portions that you could have done with the

17   relevant witnesses and now just to go over the same kind of

18   material, I mean, I just don't understand for what good reason

19   if these emails are relevant that you did not ask the relevant

20   witnesses who were on these emails about these emails or to

21   read these emails.

22   So Mr. Gottlieb is right, you're not entitled to three

23   summations and you're not entitled to five different witnesses

24   reading the same email.  If you want selectively to select some

25   of these emails that have not already been read to indicate to

M1QBDOU4

1   the jury why you think this email is important in relation with

2   this timing, I'll allow you to do that.  We're not going to

3   spend a lot of time going through dozens of emails that are

4   already in evidence and that you decided not to ask any

5   relevant witness who has any knowledge of the email about those

6   when we went through them painstakingly with the jury all of

7   these emails with all of these relevant witnesses who were on

8   the emails.

9        So get her up there, have her say what she did.  You

10   want to pick a few, I'll give you some leeway.  But if you

11   should indicate to us before the witness testifies how many of

12   these emails you're going to have this witness read, and then

13   I'll see if that's a reasonable number and see how strenuously

14   Mr. Gottlieb has an objection and then we'll move forward.

15        I assume that your representation is accurate that

16   none of these emails, these government exhibits, are reflected

17   on this chart, all of those are already in evidence?

18        MR. BURNETT:  Yes, your Honor.  That's accurate and

19   understood.  There's one other thing that she'll be testifying

20   about which I think should take all of five minutes.

21        If you recall, Kerry Whitmore when she testified

22   offered in evidence a spreadsheet that showed the fentanyl

23   weight of sales by RDC distributed to RDC customers.  The chart

24   that she offered showed the weight to every pharmacy that RDC

25   ever sold to between 2012 and 2016.  The paralegal has taken

M1QBDOU4

1    that chart and identified a subset of pharmacies specifically,

2    she's gone through and identified pharmacies that were

3    terminated after Mr. Doud left and then the eight pharmacies

4    that are listed.

5              THE COURT:  Where is that exhibit?

6              MR. BURNETT:  That's Exhibit 909.  I have a copy here.

7              MR. GOTTLIEB:  Your Honor, based on what we've heard,

8    it only underscores, they already had testimony about it.  Now

9    they want to bring on another witness to talk about the same

10   thing but highlight what would normally be done in a summation.

11   If they want to have a demonstrative piece of evidence for

12   summation, God bless the government, but they're not entitled

13   to now have a witness now take something that somebody has

14   already testified about and now to clean up a problem that

15   developed with that witness to now clarify through a paralegal.

16             THE COURT:  Well, what is this chart?

17             MR. BURNETT:  One of the charts is the fentanyl weight

18   of RDC's sales to the list of customers that were terminated

19   after Mr. Doud's departure from the company.

20             THE COURT:  And which one is that?  None of these have

21   an exhibit number on them.

22             MR. BURNETT:  It should be the second page of 909.

23   It's the one that has more pharmacies.

24             THE COURT:  What's the first page?

25             MR. BURNETT:  The first page is the fentanyl weight of

M1QBDOU4

1    sales to the eight pharmacies that are listed in Exhibit 908.

2              THE COURT:  And the second one, what is what?

3              MR. BURNETT:  The fentanyl weight of sales to the

4    pharmacies that were terminated after Mr. Doud's departure.

5              THE COURT:  And the third?

6              MR. BURNETT:  I think there should be just -- you may

7    have multiple copies there.

8              THE COURT:  So you have the fentanyl weight.  I'm just

9    trying to understand the import and the relevance.  Why is

10   8A different than the second longer one?

11             MR. BURNETT:  The second longer one is the weight of

12   sales to all pharmacies that were terminated after Mr. Doud's

13   departure which is relevant to the argument that, as Ms. Pompeo

14   stated, the problems that many of those pharmacies predated

15   their termination and were present while Mr. Doud was there.

16             THE COURT:  These are the weight of the drugs that

17   were ordered and shipped during these years?

18             MR. BURNETT:  Yes, that's correct.

19             THE COURT:  And the first one is what?

20             MR. BURNETT:  The first one is that same information,

21   but as it pertains to the eight pharmacies that are listed in

22   Government Exhibit 908 which is the summary chart that she was

23   going to present about.

24             THE COURT:  I'm sorry, 908?

25             MR. BURNETT:  Yes.

M1QBDOU4

1        MR. GOTTLIEB:  Your Honor, they've already introduced

2   the chart, so now they want to introduce the chart but minus

3   all the other things, just highlighting one, two, three, six or

4   seven of the pharmacies.  Where do they come off calling a

5   paralegal to be testifying about a chart that's already been

6   in.  There's already been testimony.

7        THE COURT:  She's not testifying about a chart that's

8   already in.  She's testifying about a new chart she created.

9        MR. GOTTLIEB:  It all pertains to the chart that's

10   already in.  There's already been testimony about it.

11        THE COURT:  But this goes straight to the weight of

12   the fentanyl.

13        MR. GOTTLIEB:  That's already in.  They already

14   introduced the chart with all the pharmacies that were sold

15   fentanyl. That's already in evidence.  Now they want to argue

16   to the jury like in summation with these particular

17   highlighting what's already in that chart, here's another

18   exhibit that we can add on for you.

19        THE COURT:  Why is that illegal to do?

20        MR. GOTTLIEB:  It's not illegal.  It's repetition.

21   It's improper.

22        THE COURT:  Why is that improper?

23        MR. GOTTLIEB:  It's regurgitation of the old

24   testimony.

25        THE COURT:  No, it's a different exhibit.  I'm going

M1QBDOU4

1    to allow it.  I'm going to allow those exhibits.  I'm going to

2    allow minimal testimony about those exhibits.  This is not --

3    as far as I'm concerned, the only relevant testimony of this

4    witness is that she created these two exhibits and she can

5    explain what those exhibits are supposed to reflect, and then

6    the parties obviously have their right to argue with regard to

7    the underlying facts.  These exhibits being based on items that

8    are already in evidence, and argument import of those

9    underlying facts.

10           Let's get the witness back in the box and get the jury

11   in here so we can can finish.

12           Let's bring in the jury.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Mr. Janey, any further questions for this

3   witness.

4          MR. JANEY:  I do, your Honor.  Thank you.

5   BY MR. JANEY:

6   Q.  Good afternoon, Mr. Cutler.

7   A.  Good afternoon.

8   Q.  If we could see slide 8 of Government Exhibit 903, please.

9   Do you have that there, Mr. Cutler?

10  A.  Yes, I do.

11  Q.  With respect to this slide, I just want to try to clarify

12  what it shoes with respect to the bar chart on the right-hand

13  side that's labeled opioid sales 10 percent of the total

14  revenue of 2010 to 2016.  Do you see that?

15  A.  Yes, I do.

16  Q.  Is it fair to say that for the year 2014 which is really

17  what I would describe as the peak year, if that's fair to say,

18  that the percent of opioid sales overall as a percent of total

19  revenue for RDC is the 11.6 number; is that correct?

20  A.  That's correct.

21  Q.  And the second highest number is the 2015 year, and that's

22  10.8, correct?

23  A.  That's correct.

24  Q.  And the opioid sales for RDC falls substantially in the

25  2016 year to less than 8 percent; is that correct?

1    A.  Again, without reference to substantial which is a personal

2    choice, it does fall to 7.9 percent.

3    Q.  Thank you.  If I can see slide 11, please.

4           Now, slide 11 is -- well, let me ask.  Again, what is

5    slide 11, Mr. Cutler?

6    A.  This is my estimate of the amount of the bonus for the

7    defendant that would have come from the direct effect of the

8    revenue to RDC from controlled substances.

9    Q.  By the direct effect going back to what we discussed prior

10   to the lunch break, is it fair to say that you mean the result

11   of the mathematical calculation that you did calculating the

12   contribution of controlled sales to the company's profits?

13   A.  That's correct.

14   Q.  If I can ask to be sure -- well, let me ask it this way.

15   Assume for the moment, Mr. Cutler, that oxycodone and fentanyl

16   were sold at cost or cost minus, would that change this chart?

17   A.  What I've done here is, I've assumed based on evidence that

18   I saw that the profits to RDC were approximately the same if

19   not slightly higher for opioids or controlled substances than

20   for the business as a whole.

21   Q.  When you looked at the data -- and we'll get into the data

22   in a moment -- did you observe whether the controlled

23   substances oxycodone and/or fentanyl were sold to pharmacies at

24   cost or cost minus?

25   A.  The page that I saw did have the net profits of both

1    generic opioids and specifically of fentanyl.

2    Q.  I'm not sure that answers my question.  Did you observe in

3    looking at the data that RDC sold fentanyl and/or oxycodone to

4    its pharmacy customers at either cost or cost minus?

5    A.  The data had the revenue, so I didn't observe the price,

6    but I did observe the total revenue.

7    Q.  So is it fair to say judging from your testimony that you

8    did not make an observation about or did not have the data

9    available to you as to the cost at which RDC sold the fentanyl

10   or the opioids to its customers?

11   A.  That's correct.  I did not know the price.  I knew the

12   total revenue.

13   Q.  Is it fair to say then that it's challenging at best to

14   calculate the profit of the oxycodone or fentanyl unless you

15   know the cost?

16   A.  No, that's not correct because on the sheet that I

17   reviewed, it, in fact, had the profits for those.

18   Q.  Is it fair to say that you don't know whether there were

19   further deductions on the sheet that you're referring to that

20   might reflect that those were sold at cost or cost minus?

21   A.  If that sheet was inaccurate, then that would not -- then

22   that would factor in.  Taking the sheet --

23   Q.  I'm sorry.  Let me continue.  Let me then go back to my

24   earlier question.

25              Assume for the moment that oxycodone and fentanyl were

M1QBDOU4                         Cutler - Cross

1    sold at cost or cost minus, would this slide, slide 11 that's

2    in front of you change?

3              MR. BURNETT:  Objection, asked and answered.

4              THE COURT:  Overruled.  You can answer the question.

5    A.  No, it wouldn't because this slide is based not on what

6    it's sold for, but on the profits.

7    Q.  I don't mean to tussle with you.  I understand how you're

8    describing the chart.  I want to be sure we're not talking past

9    each other.

10             Is it fair to say that if you had calculated -- take

11   the chart off.  If you had calculated the contribution to

12   Mr. Doud's -- the direct contribution, the mathematical

13   calculation, assume for the moment the oxycodone or the

14   fentanyl were sold at cost or cost minus, would there be a

15   direct -- that is a mathematical calculation -- a direct

16   contribution of the oxycodone and/or the fentanyl to Mr. Doud's

17   bonus?

18   A.  I'm going to rephrase it because I don't think I can agree

19   or disagree with your statement.  I was given numbers from RDC

20   about the profitability of opioids.  If those numbers are

21   incorrect, that would change my view.  Assuming the numbers

22   were correct, my view is what I laid out.

23   Q.  Do you know whether you were given cost data for oxycodone

24   or fentanyl?

25   A.  I was given revenue data and expense data, so in there

1   would have been the cost.

2   Q.  I'm not sure you're directly answering my question because

3   I know that you know what cost data is, correct?

4   A.  Yes.

5   Q.  Were you given cost data for fentanyl and/or oxycodone?

6   A.  I was given total revenue, so not the cost.  I was given

7   the total revenue.

8   Q.  Thank you.

9           MR. JANEY:  If I can have a moment, your Honor?

10          THE COURT:  Yes.

11  Q.  In the course of some of your direct examination, I

12  understood your testimony to be in the discussion as it pertain

13  to red flags that you, as a part of your review, that you took

14  into account the testimony in this case from Ruth Carter and

15  Jessica Pompeo; is that correct?

16  A.  That is correct.

17  Q.  And you took that into account to better understand the

18  data; is that fair to say?

19  A.  Yes, that's correct.

20  Q.  Including both numeric and non-numeric information about

21  red flags, orders of interest; is that correct?

22  A.  That's correct.

23  Q.  Now, when you took into account the testimony of Jessica

24  Pompeo and Ruth Carter to make those assessments for the

25  purposes of your analysis, did you take into account the cross

1   examination of those witnesses?

2   A.  I was shown parts of their testimony, including all the

3   parts that were related to those discussions.

4   Q.  I want to be clear.  So you say you were given parts of

5   their testimony, correct?

6   A.  That's correct.

7   Q.  Were you given their testimony -- withdrawn.

8           Were you given Ruth Carter's testimony in her entirety

9   in this case?

10  A.  No, I don't believe I had the entirety of her testimony.

11  Q.  Were you given the entirety of Jessica Pompeo's testimony

12  in this case?

13  A.  No, I don't believe I was given the total transcript of her

14  testimony.

15  Q.  How many pages approximately with respect to Ruth Carter

16  were you given to review to take into account their testimony

17  so that you would have potentially a better assessment for red

18  flags, orders of interest, etc?

19  A.  So I didn't count the pages.  I would guess it was on the

20  order of 20 pages.

21  Q.  And with respect to Ms. Pompeo?

22  A.  There were more because there were more instances.  I would

23  guess it was on the order of 40 pages.

24  Q.  More instances of what?

25  A.  Where those two topics were brought up.

1    Q.  Do you have a recollection as you sit here right now as to

2    whether any of those pages included cross examination?

3    A.  I don't recall seeing any that included cross examination.

4    Q.  If I could have what's marked and admitted as Government

5    Exhibit 905.

6            MR. BURNETT:  Your Honor, this isn't in evidence.

7            MR. JANEY:  I'm sorry.  Okay.  Thank you for that.

8    This is only shown to counsel and the witness.

9    Q.  You testified extensively this morning about Exhibit 905,

10   and in particular a 41 page document labeled customer metrics

11   from sales, order of interest and dispensing data.  Do you

12   recall that?

13   A.  I think you said 905 and I just want to correct that it was

14   906.

15           MR. JANEY:  I'm sorry, your Honor, marking for

16   identification Defense T8, showing the witness.

17   Q.  Do you recognize this document, Mr. Cutler?

18   A.  The one that's on the screen is Government Exhibit 905.  I

19   do recognize that.

20   Q.  What is this, Mr. Cutler?

21   A.  It's a very similar chart to what we were looking at this

22   morning except it breaks out by year as opposed to just giving

23   the total.

24           MR. JANEY:  Your Honor, we request that what's been

25   premarked as Defense T8 be admitted in evidence?

M1QBDOU4                          Cutler - Cross

 1            THE COURT:  Any objection?

 2            MR. BURNETT:  No objection, although it just has the

 3   wrong exhibit label on it because it says 905.

 4            THE COURT:  This is exhibit which?

 5            MR. BURNETT:  I'm just pointing out that it will say,

 6   for the record, that it will say Government Exhibit 905.  If

 7   they want to call T8.

 8            MR. JANEY:  For the record, it will be marked Defense

 9   T8.

10            THE COURT:  Mark it at a later point.  It will be

11   admitted into evidence.

12            (Defendant's Exhibit T8 received in evidence)

13            MR. JANEY:  Can we publish this to the jury, your

14   Honor.

15            THE COURT:  Yes.

16   Q.  Do you have it, Mr. Cutler?

17   A.  Yes, I do.

18   Q.  Now that the jury has it just for orientation, this is one

19   of the pharmacies that you described and did analysis on in

20   your 41 pharmacy case study; is that correct?

21   A.  That's correct.

22   Q.  And the title here is customer metrics from sales, order of

23   interest, and dispensing data, correct?

24   A.  That's correct.

25   Q.  And in putting together the analysis, what was -- again I

1    know you testified about it on direct, but for orientation,

2    what was the purpose of this analysis?

3    A.  The purpose was to see whether there would be red flags

4    that came across in looking at specific pharmacies.

5    Q.  Now, what I'd like to try to understand, Mr. Cutler, is

6    some of what's going on in the chart, because is it fair to say

7    your testimony is that this chart for Alden pharmacy describes

8    red flags and it describes them by year, correct?

9    A.  That's correct.

10   Q.  Is it fair to say that red flags occur at moments in time?

11   A.  They occur over a period of time.

12   Q.  So there's some duration aspect to red flags; is that fair

13   to say?

14   A.  Yes.

15   Q.  By way of example, if this were January, which it is, a red

16   flag could occur in January, cease being a red flag by February

17   and potentially become a red flag again in June; is that fair

18   to say?

19   A.  Yes, it is.  Some of course extend over a longer period of

20   time.

21   Q.  Just to illustrate the point, when you measure the red

22   flags here, and let's just take the 2013 year and we can take

23   the first column controlled substance shares of sales and 2013

24   10.7 percent.  Do you see that there?

25   A.  Yes, I do.

1  Q.  When you say for 2013 Alden pharmacy had controlled

2  substance sales of -- it indicates here only 10.7 percent,

3  correct?

4  A.  That's correct.

5  Q.  So it didn't trigger the red flag; is that correct?

6  A.  That's correct.

7  Q.  Whether it triggered the red flag or not, if it triggered

8  the red flag, let's say for example, for the percent of opioid

9  dosage units flagged as above limits that were shipped in 2015,

10  you have 100 percent; is it fair to say that could have

11  occurred only one time?

12  A.  It could have occurred only one time.  I haven't indicated

13  how many times in this.

14  Q.  So what does the 100 percent mean if anything?

15  A.  That means in calendar year 2015 all the dosage units that

16  were flagged, 100 percent wound up being shipped.

17  Q.  And that could have occurred within a discrete month,

18  correct?

19  A.  That's correct.

20  Q.  And all the other months during the year that condition

21  might not have existed; is that fair to say?

22  A.  So the flag applies to each order.  So, in fact, if it

23  applied to an order and then that order was dealt with, then

24  the flag would turn off.

25  Q.  Right, but this doesn't -- well, let me ask it this way.

1   Does this take into account whether the flag turned off?

2   A.  The only -- it does because the only thing here are the

3   units that are flagged.  So if a subsequent unit was not

4   flagged, it would not contribute to this at all.

5   Q.  Let me ask the question this way, and I apologize for not

6   being clear.

7            If there were 50 units shipped in 2015 but only 10

8   units were flagged, does this chart take into account that only

9   that number was flagged potentially only for a 30 day period?

10  A.  That particular row does not because that particular row is

11  looking only at the orders that are flagged.

12  Q.  But it doesn't take it into account?

13  A.  The previous chart did take it into account.

14  Q.  What chart is that?

15  A.  The one on the prior page that shows the month specific

16  estimate.

17  Q.  Do you have that?  Can you direct me?

18  A.  In Government Exhibit 906.

19  Q.  Let me see 906, please.

20  A.  You can see here, this is what we had looked at, the first

21  page of each one.  This shows you each of the monthly orders,

22  and then you can tell in each month whether there were orders

23  that were flagged or not, so you can see there for Alden

24  pharmacy there were two specific months in 2015 where orders

25  were flagged.

M1QBDOU4                          Cutler - Cross

Q.  So can we go back to 905.  If the other chart shows

duration, for lack of a better word, why isn't this chart

misleading insofar as that it suggests that these triggers are

made but not indicating specifically in this case Alden

pharmacy that the flag might have turned off or that these

occurred for a short period of time?

A.  I don't think there's anything misleading about it.  I was

trying to give a summary number which is, if an order was

flagged, what happened to that order.  So that's all I'm trying

to do here is say, if an order got flagged, what happened.

       One can tell how many orders are flagged from that

chart you were just looking at.  I'm not hiding that.  I'm just

showing it in two different charts.

Q.  I didn't suggest that you were hiding anything.  Can we

look at the next chart Brighton pharmacy.  This is slide 2 of

the same 41 examples of case study.

       So here again the 100 percent for the percent of

opioid dosage units flagged as above the limits that were

shipped; 100 percent in 2014, 100 percent in 2015.

       Again, how should the jury understand the 10 percent

number?

A.  It is exactly what it says which is if an order came in and

was flagged because it was above the limit, what ultimately

happened to it.  And out of everything that was flagged in

2014, all of it was shipped.  And out of everything that was

1    flagged in 2015, all of it was shipped.  That's what those rows

2    say. Nothing more.  Nothing less than that.

3    Q.  So all it's saying is that something was flagged, which

4    you're not making by way of this testimony in this proceeding,

5    you're not making any statements or providing an opinion about

6    the underlying investigation in connection with the red flag or

7    what was done after the red flag or whether these prescriptions

8    were legitimate or illegitimate, correct?

9    A.  That's correct.  I'm not testifying at all as to what RDC

10   did once the red flag became apparent.

11   Q.  If we can go to 906, please to slide 60. I believe that

12   this is admitted in evidence.

13        Do you have slide 60 there, Mr. Cutler?

14   A.  Yes, I do.

15   Q.  Now, this is a chart with respect to Linden Care, correct?

16   A.  That's correct.

17   Q.  And it's some version of the Alden pharmacy chart that we

18   were looking at but in a more summary fashion; is that fair to

19   say?

20   A.  Yes.

21   Q.  And here when you were testifying on direct with respect to

22   Linden Care, your testimony was that Linden Care was a

23   specialty pharmacy pain management platform, correct?

24   A.  That's as I understand Linden Care.

25   Q.  Based on your review of the documents provided by the

M1QBDOU4                    Cutler - Cross

1    government in this case, correct?

2    A.   Some of the documents were also provided by RDC, so I

3    don't -- not just provided by the government.

4    Q.   The documents you reviewed?

5    A.   The documents I reviewed, correct.

6    Q.   And your testimony was that certain of these metrics may

7    seem large or triggering, but are not given that Linden Care

8    specifically is a pain management platform.  Do you recall that

9    testimony?

10   A.   Yes, I do.

11   Q.   So for the jury, can you explain based on your experience

12   and your knowledge, your research, what you've written, what is

13   a pain management platform?

14   A.   It is kind of what the name implies.  In this case the

15   pharmacy as I understand it was directed at providing

16   medications to people who were primarily seeking pain

17   management.

18   Q.   Just to pull the thread on your earlier testimony with

19   respect to a pain management platform, why would certain

20   potential red flags be higher than we might otherwise expect,

21   let's say, as compared to a non-specialty or pain management

22   pharmacy?

23   A.   Obviously if you're treating a lot of patients who need

24   pain management, then the share of controlled substances will

25   be higher than for pharmacies treating just the general set of

1  patients in the community.

2  Q.  Again, you've testified that Linden Care based on what you

3  reviewed was one of the largest customers for RDC, correct?

4  A.  As I understand it, that's correct.

5  Q.  And so in that context in giving that some of the red flags

6  that might be triggered to RDC with respect to Linden Care

7  would not -- based on your knowledge, research and experience,

8  necessarily be alarming; is that fair to say?

9  A.  Yes.  This morning when that came up, that's why I focused

10  on the ones that would not be as alarming.

11  Q.  And again, those that would not be as alarming based on

12  your experience, knowledge and research, what are those?

13  A.  The two that I thought would be less alarming here, the

14  first one being the controlled substance share of sales,

15  because obviously if you're in pain management there will be

16  more controlled substances.  And second because it was mail

17  order, the out of state share of schedule 2 prescriptions.

18  Q.  Your testimony earlier with respect to the 30 percent, this

19  going to the controlled substance share of sales, the 30

20  percent, is it fair to say that that statistic was based on and

21  you compiling these slides, non-specialty pain management

22  platforms; is that fair to say?

23  A.  The 30 percent came from RDC and it also came from Ruth

24  Carter, and I believe they were talking in general about

25  pharmacies and they were not talking specifically about pain

M1QBDOU4                          Cutler - Redirect

1    management pharmacies.

2          MR. JANEY:  We can take that dow, please.  No further

3    questions for this witness.

4          THE COURT:  Any further questions for this witness?

5          MR. BURNETT:  Thank you, your Honor.

6    REDIRECT EXAMINATION

7    BY MR. BURNETT:

8    Q.  Good afternoon, Professor Cutler.

9    A.  Good afternoon.

10   Q.  So there are a number of things I want to touch on, but why

11   don't we start with Government Exhibit 905 which I think was

12   remarked Defense Exhibit T8.

13   A.  Okay.

14   Q.  Do you recall that just a few moments ago Mr. Janey asked

15   you a few questions about whether you examined red flags

16   appearing over time at different pharmacies?

17   A.  Yes, I do.

18   Q.  What was the purpose of creating this set of exhibits here?

19   A.  The purpose was really to look over more periods of time so

20   I could see was this a continuing issue or was this just a one

21   time issue or how repeated were these.

22   Q.  If there were issues that were repeated over time, how

23   would that be reflected in the chart?

24   A.  You would then see red in multiple years.

25   Q.  Did you see that for a number of the pharmacies that

1    appeared in here?

2    A.  Yes, I did, for many of the pharmacies that we were talking

3    about this morning where you see the red.  They appear in many

4    different years.

5    Q.  So let's just take a couple of examples.  Can we turn to

6    page 13.  Is this Bay Ridge pharmacy?

7    A.  That's correct.

8    Q.  Was there some consistency to the red flags with respect to

9    Bay Ridge?

10   A.  Yes.  For example, if you look at the last two rows, the

11   share of oxycodone prescriptions with 180 plus pills.  Remember

12   120 is in the documents, so 180 is very conservative.  It went

13   above 20 percent and that was for each of the four years; which

14   share of the prescriptions were written by doctors who were

15   flagged by RDC by 5 percent.  It's actually very consistent

16   across the years.  It ranges only from 28 1/2 to 32 1/2, so

17   it's very consistent and extremely high across all the years.

18   Q.  Let's go to page 18 for Seventh Elm pharmacy, was there

19   consistency on this chart too?

20   A.  Yes.  You see here first the controlled substance share is

21   very high.  Interestingly it doesn't trigger 30 percent in each

22   year, but it's still very high.  But again, you see the out of

23   state share of schedule 2 prescription is well above 5 percent

24   every year.

25        The share of oxycodone prescriptions with 180 plus

1  pills exceeds in every year except one where it's just slightly

2  below.  The share of prescriptions to doctors who were flagged

3  by RDC greatly exceeds 5 percent.  It's above 28 percent in

4  each of the four years, so there's in fact quite a lot of

5  consistency over time here.

6  Q.  How about page 28.  This is ProHealth pharmacy, right?

7  A.  This is ProHealth pharmacy and we also looked at that this

8  morning.  The controlled substance share is high.  It's red in

9  all of the years.  The cash share of both all schedule 2

10 prescriptions and oxycodone prescriptions especially are high

11 in every year.  The out of state share is high every year.  The

12 single dominant thing that comes across here is how constant

13 these are across the years.

14 Q.  Let's just look at one more example Old Town pharmacy on

15 page 31.  Did you see some consistency here as well?

16 A.  Once again, the single thing that most jumps out here is

17 just the consistency across years.  What you see in one year,

18 almost invariably you see in other years.

19 Q.  Let's take that down.  I'd like to next go to Government

20 Exhibit 903 and take a look at slide 7.

21         Do you recall you were asked a number of different

22 questions by Mr. Janey about your comparison of RDC opioid

23 sales to the rest of the industry?

24 A.  Yes, I do.

25 Q.  I want to clear a few things up.  First, you focused on

1    just three states here; is that right?

2    A.  That's right.

3    Q.  You started to say this was the fairest comparison but you

4    didn't get to finish.  Why do you think that's the fairest

5    comparison?

6    A.  RDC was predominantly selling in three states; New York,

7    New Jersey and Pennsylvania.  So if I wanted to see whether

8    what RDC was doing was different than what other distributors

9    were doing, it seem fairest to limit the other distributors to

10   those that are distributing in the same areas.

11           For example, if there had been more distribution in

12   California, but RDC is not in California or less distribution,

13   that wouldn't be a fair comparison to RDC.

14   Q.  Now, do you recall that you were asked about production

15   quotas?

16   A.  Yes, I was.

17   Q.  What are those?

18   A.  For controlled substances, the DEA authorizes a certain

19   amount of production each year based on how much it thinks will

20   be distributed.

21   Q.  Is it right to use production quotas for this type of

22   analysis you were doing it?

23   A.  No, it's not.

24   Q.  Why not?

25   A.  A production quota is the total amount and it applies to

M1QBDOU4                          Cutler – Redirect

1    the entire country, so that they're saying how much in total

2    fentanyl or oxycodone there can be.

3           What's going on here is a particular distributor is

4    saying how much of this should I distribute.  What that total

5    is, is irrelevant.  The pharmacy makes the order, and then the

6    distributor has to decide, is this a valid order that I should

7    fill.  And what the DEA has said is, the total amount that can

8    be produced does not enter into that decision at all you.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1q3dou5                         Cutler - Redirect

1   Q.  I actually want to take a look at some of those production

2   quotas you were shown.

3         MR. BURNETT:  Can we please take a look at Defense

4   Exhibit T1.  And let's highlight the -- or not highlight.  Zoom

5   in on the lines for oxymorphone, or, sorry, oxycodone sales.

6   Can you scroll down just a tiny bit.

7   Q.  Do you see that this shows oxycodone sales between 2009 out

8   to 2019.  Sorry.  Not sales.  The production quota?

9   A.  That's correct.

10   Q.  What's the production quota -- sorry.  What's the

11   production quota in 2010?

12   A.  In 2010, which is the second column, it is 105.5 million.

13   Q.  What's the production quota in 2015?

14   A.  2015, it's 141.375.

15   Q.  About how large an increase is that?

16   A.  About 40 percent.

17   Q.  Let's go back to slide seven we were looking at Government

18   Exhibit 903.  How does that compare to the increase in RDC's

19   oxycodone distribution during the same time period?

20   A.  It's much smaller.  RDC increased by 115 percent in

21   comparison to the roughly 40 percent.

22   Q.  Let's pull T1 back up, please.  And take a look at the

23   fentanyl line now which I believe is a little further up the

24   page.  Do you see the entry for 2010?

25   A.  1.428.

M1q3dou5                    Cutler – Redirect

1    Q.  And then how does that compare to the entry for 2015?

2    A.  That's 2.3.

3    Q.  So about how big an increase is that?

4    A.  Oh, that's on the order of 1.4.  So call it 60 percent.

5    Q.  Let's goes back to Government Exhibit 903.  Slide seven.

6    Can you compare the size of the production quota increase to

7    the size of the increase in RDC's shipments of fentanyl?

8    A.  Yeah, RDC's shipments of fentanyl increased by 222 percent

9    in comparison to the roughly 60 percent quota increase.

10   Q.  Now, with respect to this chart, you were also asked about

11   CDC prescription data; is that right?

12   A.  That's correct.

13   Q.  What is that?

14   A.  Oh.  CDC got data from a company on the number of

15   prescriptions for opioids in each year, in each state, so they

16   made that data available.

17   Q.  Now, before we talk more about the details of that data,

18   based on your work and research, are all opioid prescriptions

19   written for legitimate medical purposes?

20   A.  No, they're not.

21   Q.  What are some of the illegitimate reasons they're written?

22   A.  So opioids can be abused, obviously, and as we were talking

23   about yesterday, they can lead to addiction and death if taken

24   in overdose.  Nonetheless, they're also drugs that increase --

25   that make people high.  So people will take them to abuse them

1    as kind of like heroin.  These are substances closely related

2    to heroin.  So people will sometimes try to get a prescription

3    of oxycodone or fentanyl and then abuse it in the same way they

4    would abuse heroin.

5    Q.  Does the CDC's prescription data include only prescriptions

6    that are written for legitimate medical purposes?

7             MR. JANEY:  Objection.  Beyond scope of the cross,

8    your Honor.

9             THE COURT:  Overruled.  He can answer that.

10            THE WITNESS:  Oh, I'm sorry.  I couldn't hear you.

11            THE COURT:  Yes.

12   A.  Okay.

13            No, it includes all prescriptions.

14   Q.  Now, do you recall that Mr. Janey put a few documents in

15   front of you that were CDC prescription data?

16   A.  Yes, I do.

17   Q.  And specifically asked you questions about how

18   prescriptions for opioids changed in Pennsylvania specifically

19   between 2010 and 2013; is that right?

20   A.  That's correct.

21   Q.  Now, before we look at some of that data, did your analysis

22   only focus on Pennsylvania?

23   A.  No, it focused on the three states, New York, New Jersey

24   and Pennsylvania.

25   Q.  Was your analysis limited to 2010 to 2013?

1   A.  No, I looked at all years from 2010 through 2017.

2   Q.  So, there is a folder in front of you, and the folder I

3   believe is also with the Court and defense counsel.  In that

4   folder is Defense Exhibits T2, T3 and T4, which is the CDC data

5   already in evidence.  You should also see a few government

6   exhibits, specifically Government Exhibits 910, 911 and 12.

7   912.  Do you see that?

8   A.  I do.  I have two folders.  I'm not --

9           THE COURT:  Can you get that?

10          THE WITNESS:  I wondered why I had two folders.

11          MR. BURNETT:  Not so good on logistics.

12  Q.  So, why don't you take a look first at Government Exhibits

13  910 and 911.  Can you just say if you recognize those.

14  A.  Yes, I do.  These are the same things that we were looking

15  at but they are for later years.

16  Q.  Specifically, are they for 2014 and 2015?

17  A.  That's correct.

18          MR. BURNETT:  At this time the government offers

19  Government Exhibits 910 and 911.

20          THE COURT:  Any objection?

21          MR. JANEY:  No objection.

22          THE COURT:  It will be admitted in evidence.

23          (Government's Exhibit 910, 911 received in evidence)

24  Q.  If you take a look at Government Exhibit 912, you'll see

25  that's a chart.  What I am going to ask you to do is if you

1    could please take a look at the information in the chart on

2    Government Exhibit 912, and compare that to the information

3    that you see on the three defense exhibits I mentioned and

4    those two new government exhibits.

5    A.   I'm sorry.  I just need to find 912.

6    Q.   It should be a little chart.

7    A.   My apologies.  I skipped right by it.  My apologies.  Okay,

8    I have it right here.

9    Q.   If you could just take a moment to yourself to look to

10   compare the data on those charts to the data in the other

11   exhibits.

12   A.   Hmm-hmm.  Okay.

13   Q.   Does the data match up?

14   A.   Yes, it does.

15          MR. BURNETT:  The government offers Government Exhibit

16   912.

17          MR. JANEY:  No objection, your Honor.

18          THE COURT:  It will be admitted in evidence.

19          (Government's Exhibit 912 received in evidence)

20          MR. BURNETT:  If can you please put Government Exhibit

21   912 on the screen for the jury and all the parties and the

22   witness.

23   Q.   Now, Professor Cutler, can you please explain what the data

24   on Government Exhibit 912 reflects?

25   A.   So these are the same prescription data that we were

M1q3dou5                    Cutler - Redirect

1  looking at earlier.  These are for the three states at issue

2  here, Pennsylvania, New York and New Jersey, in each year from

3  2010 through 2015.

4  Q.  Do you see there are four entries highlighted?

5  A.  That's correct.

6  Q.  What do those entries reflect?

7  A.  Those are the entries that I was asked about by the defense

8  counsel.

9  Q.  So now, 2010 to 2015, that's the time frame that you looked

10  at for the chart you created, right?

11  A.  That's correct.

12  Q.  So can you describe how the dispensing rate changed in

13  Pennsylvania between 2010 and 2015.

14  A.  It rose very slightly from 2010 to 2012, and then it

15  declined much more from 2012 to 2015.  So that overall, there

16  was a net decline in opioid prescribing in Pennsylvania over

17  that time period.

18  Q.  How about in New York and New Jersey, the other two states

19  you analyzed?

20  A.  Exactly the same pattern.  In New York it rose very

21  slightly from 2010 to 2012 and then declined much more.  In New

22  Jersey it rose very slightly from 2010 to 2011 and then

23  declined much more.

24         Basically there was a peak in prescribing of opioids

25  in the United States around 2011, 2012, and then opioid

1   prescribing went down quite substantially.

2   Q.  And looking back at the chart on Government Exhibit 903,

3   slide seven.  Is the full set of data that you saw in

4   Government Exhibit 12 consistent with the data that you charted

5   out here?

6   A.  Yes.  You see those declines in each of the -- particularly

7   in the first set of bars there for the rest of the industry.

8   That decline in MME shipments is very strongly like the decline

9   in the prescriptions that we were just looking at on the prior

10  page.  They are both telling the same story, which is over this

11  time period, prescriptions were falling, shipments were

12  falling, and then obviously with the exception of RDC.

13  Q.  Let's go ahead now to slide 11.  And this is the slide that

14  you testified about earlier, estimates the portion of

15  Mr. Doud's bonus that's directly attributed to controlled

16  substance sales; is that right?

17  A.  That's correct.

18  Q.  Do you recall you were asked some questions about assuming

19  something about cost earlier?

20  A.  Yes.

21  Q.  Can you just explain what it is that you did to analyze the

22  actual profits on RDC's controlled substance sales?

23  A.  So, remember we were looking at the net earning statements,

24  so we saw the net earnings, and I spoke about how that

25  translates into the bonus for the defendant.  So what I did

here was I said, well, what share of those net earnings came

from opioids, because that's what I need to know.  I know the

net earnings translated into the bonus.  So what share came

from opioids.  That depends on how profitable are opioids

relative to non-opioids.  If opioids have no profit, there is

no contribution.  And if they have a high profit, there is a

high contribution.

          I looked at that, and it looks, based on the data from

RDC, that the profits from opioids were roughly similar to the

profits from non-opioids.  So therefore, whatever revenue came

from opioids roughly translated by the same amount into net

earnings for the company as revenue from non-opioids.

          Given that, I could then say, okay, what share of the

revenue to RDC is from opioids.  And that was in those years

10, 11 percent.  So therefore, that's a reasonable estimate of

the contribution of opioids to the overall profits, and,

therefore, to the bonus for the defendant.

Q.  In order to do that analysis, do you need information on

costs specifically or did you have other data that allowed you

to make that comparison?

A.  We had other data, which is the data from RDC that says

here's how much money we made from selling these, and here's

how much we paid for them, and here's what our costs were.  So

I had all the information I need to calculate profit.  I have

the revenue that they got, and I have the expenses.  And so

1    given that, I can just subtract and get the profits.

2    Q.  And to be clear, in the context of a drug distributor like

3    RDC, is the upfront cost that RDC pays a manufacturer for the

4    drug an accurate measure of RDC's overall costs on purchasing?

5    A.  No.  Because a lot of the way that a distributor makes

6    money is they pay the list price, but then they get discounts.

7    So they'll get discounts for prompt pay or they'll get

8    discounts for buying in large bulk.  So, there is the price

9    that's paid, but then there is the discount.  The price sold to

10   the pharmacy is kind of like the first of those price paid.  So

11   that discounts then winds up being the net, part of the net

12   revenue for the company.

13   Q.  Now, this chart here only reflects the direct contribution

14   from controlled substance sales to the bonus; is that right?

15   A.  That's correct.

16   Q.  You also mentioned on direct examination that there were

17   other ways that the controlled substance sales could influence

18   the bonus overall; is that correct?

19   A.  That's correct.

20   Q.  When Mr. Janey was asking you about that he was using the

21   term bundling, which I don't think is one that you used on

22   direct examination.  Could you just explain how it is the sales

23   of controlled substances can influence the sales of

24   non-controlled substances?

25   A.  Yeah.  Let me give you an analogy.  So think about grocery

stores and you want to go buy weekly groceries.  It may be

possible that one store sells fruits and vegetables and one

store sells meat and one stores sells packaged goods, but you

could go to one.  As a family, we would rather go to one place.

Look, I want to buy all my groceries at one place.

So being a full service supermarket is beneficial

because the customers only have to deal with one place, rather

than going separately to get their fruits and vegetables and

their meats and their packaged goods.

That's what I was referring to here, which is a

pharmacy is the same way.  Many pharmacies do not want to go to

one supplier for their opioids and another supplier for other

things and another supplier for something else.  They prefer to

deal with one full service distributor, just as families prefer

to deal with one full service supermarket.

And so that's the way this contributes, by being a

full service company, where you can get opioids and

non-opioids, it helps to earn that business.

Q.  I want to wrap up by asking a couple of questions about

slide 18, which is the last slide on this chart.  I really want

to make sure it's clear on how it is you created this.

Am I right you said you had data on the pharmacies

that RDC terminated after Mr. Doud left the company?  Is that

correct?

A.  That's correct.  So the base of this is all the pharmacies

1    that were terminated in 2017, 2018, after Mr. Doud left the

2    company.

3    Q.  And did you have data on the amount of opioids that RDC

4    sold to those pharmacies before they were terminated?

5    A.  That's correct.  So before they were terminated, I know

6    which pharmacies they are, and as we were showing with the

7    data, we know what RDC's sales were to each of those companies,

8    in each year.  Each of those pharmacies in each year.

9    Q.  So what did you do to create this chart?

10   A.  So I took all those companies that were terminated, and I

11   said what were RDC's sales of opioids if you were terminated in

12   2017 or 2018.  What were your sales of opioids in, for example,

13   2014.  And then I compared that to the universe of the entirety

14   of RDC's sales of opioids in 2014.  So I said, what share of

15   the entirety of their opioid sales in 2014 were to those

16   pharmacies that they terminated after Mr. Doud left the

17   company.

18   Q.  So to be clear, for 2015, for example, in that year,

19   73 percent of RDC's opioid sales went to pharmacies that were

20   terminated after Mr. Doud left the company?

21   A.  That's correct.  So roughly three-fourths of all the opioid

22   sales in that year were to companies that were terminated after

23   Mr. Doud left the company.

24            MR. BURNETT:  No further questions, your Honor.

25            THE COURT:  Any further questions of this witness?

1           MR. JANEY:  Yes, your Honor.  Thank you.

2     RECROSS EXAMINATION

3     BY MR. JANEY:

4     Q.  Can we keep that slide up, please.

5           Mr. Cutler, just very briefly, with respect to slide

6     18, you don't know in viewing the 2017 data or any data,

7     termination data for this slide, you don't know the reasons for

8     the termination's taking place, correct?

9     A.  That's correct.  I only know in the spreadsheet it says it

10    was terminated.

11    Q.  You didn't do, as you've testified, any investigation as to

12    the bases for those terminations in 2017, correct?

13    A.  That's correct, I did not do an investigation into that.

14    Q.  And with respect to the earlier years, as you testified on

15    cross, you did not look at termination data, actual termination

16    data for the years that are displayed on this chart, correct?

17    A.  That's correct.  This chart does not show anything on

18    termination data in those years.

19    Q.  You don't know who was involved or anything about the

20    underlying circumstance, correct?

21    A.  I'm really not the best person to testify on those matters.

22          MR. JANEY:  Thank you, your Honor.

23          THE COURT:  Any further questions for this witness?

24          MR. BURNETT:  No, thank you.

25          THE COURT:  Thank you, sir.  You can step down.

M1q3dou5                              Cutler – Cross

1           THE WITNESS:  Thank you.

2           (Witness excused)

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1q3dou5

1          THE COURT:  Will the government call its next witness.

2          MS. ROTHMAN:  The government calls Michael Paulsen.

3          I think our witness is in the restroom, your Honor,

4    but he should be out momentarily.

5          THE COURT:  Let's take a break.  Ladies and gentlemen,

6    we'll take a 15-minute break.  Don't discuss the case, keep an

7    open mind.

8          (Jury excused)

9          MR. ROOS:  Your Honor, so one question.  Not to rehash

10   everything we did this morning.  But on this termination

11   spreadsheet, you know, I think we still, our view is still that

12   there is a bunch of inaccuracies in there.  Some of those

13   pharmacies were reactivated and so I'm wondering if we'll have

14   an opportunity to -- particularly if there is no witness.

15         THE COURT:  I'm sorry, opportunity to do what?

16         MR. ROOS:  An opportunity to, I mean, both, first of

17   all challenge, the admissibility of that further based on the

18   inaccuracies, like a 403 argument.  Or otherwise I think we

19   need to call a very brief rebuttal witness just to talk about

20   that document.

21         THE COURT:  Okay.

22         MR. ROOS:  If that's the route your Honor would like

23   us to go, I want to know if we should have that person ready to

24   go tomorrow as soon as their people are done.

25         THE COURT:  Any rebuttal witnesses you think you might

M1q3dou5

1  call should be ready to go tomorrow.

2          MR. ROOS:  Yes, your Honor.

3          MR. GOTTLIEB:  Your Honor, all I can say is, we've

4  been in touch with them.  We trust we were going to have the

5  documents for tomorrow.  If not, I would ask that we hold off

6  formally resting.  We should have them.

7          THE COURT:  Sure.  If we finish this witness, the

8  government can hold off formally resting until tomorrow morning

9  if you'd like or you can rest this afternoon.

10          MR. GOTTLIEB:  No, no, no.

11          THE COURT:  I deal with both sides.  The rules apply

12  to both sides.  And if the defense wants to wait until Monday

13  morning to rest, you can do that.  Okay.

14          MR. ROOS:  I guess the thing is, if that document

15  comes in, we are going to want to rebut it.  I hear your

16  Honor's preference of not having us call a rebuttal witness on

17  Monday.  Is that right?

18          THE COURT:  You are calling your witness tomorrow.

19          MR. ROOS:  Okay.

20          THE COURT:  So, I want to finish all witnesses

21  tomorrow.  If we have the time.

22          MR. GOTTLIEB:  Your Honor, I have to tell you, to hear

23  that they're saying on the document, which so clearly is

24  relevant now, that there is an objection because only a portion

25  of this business record is inaccurate, whereas their portion is

M1q3dou5

 1   just perfect, no inaccuracies at all, is raising this to a

 2   level of absurdity.  Having said that --

 3        THE COURT:  What do the rules of law say I'm supposed

 4   to do about that?

 5        MR. GOTTLIEB:  At a certain point put an end to --

 6        THE COURT:  In what way?

 7        MR. GOTTLIEB:  -- to this game.

 8        THE COURT:  I don't know if we have this exhibit in

 9   this case at this point.  I don't know what you intend to do

10   with the exhibit.  I don't know if you intend to lay a

11   foundation for this exhibit.

12        MR. GOTTLIEB:  A business record, it's coming in, your

13   Honor, as --

14        THE COURT:  You still have to be able to demonstrate

15   that.  If you demonstrate that -- I hear you venting,

16   Mr. Gottlieb.  I am just not sure what you want me to do about

17   it.

18        MR. GOTTLIEB:  Well, your Honor, in light of the

19   comment that they may have a rebuttal witness, in fact now, I

20   may have a rebuttal witness.

21        THE COURT:  What do you want me to do about that?

22        MR. GOTTLIEB:  I'm informing the Court that this may

23   have to go another day.

24        THE COURT:  No.  I informed you -- see, you weren't

25   listening when I talk.  I said the rules apply to both sides.

M1q3dou5

1      If you intend to have a rebuttal witness testify, that rebuttal

2      witness should be ready and willing to testify tomorrow.

3            MR. GOTTLIEB:  I ask that Jessica Pompeo be brought

4      here tomorrow as a potential witness.  The person who prepared

5      this document.  I am asking that she be available for us to

6      call.  Clearly the government is in control of her and have

7      been in touch with her.  If we have to subpoena her, we will.

8      That shouldn't be necessary.  She should be here tomorrow.

9            THE COURT:  You should get a representation from the

10     government before we adjourn as to whether or not they're going

11     to have her available if you want to call her as a witness

12     tomorrow.  If they say for some legitimate reason that they

13     will not, then you can apply for a subpoena and I will put a

14     subpoena in your hand and you can tell her she has the

15     obligation to be available if you want to call her.

16           MR. GOTTLIEB:  Thank you.

17           MR. ROOS:  Can I say a few things about this.  She has

18     a separate lawyer who represents her, and she lives in

19     Rochester.  So, we don't own her.

20           But if the issue is Mr. Gottlieb is just getting at

21     the authentication, I was under the impression that the IT

22     person was going to be able to say, either by certification or

23     by testimony, that this meets the business record test that

24     your Honor was saying, so, maybe there --

25           THE COURT:  My issue is not whether or not I am going

M1q3dou5

1      to let in this document without any foundation.  It is the

2      defense's obligation to establish the foundation for admitting

3      this document.  Now, if you can't do it by stipulation, I don't

4      have any authority to force them to agree.  So, then it's your

5      responsibility, since you've decided on the last day of trial

6      that this is what you want to present, it's your responsibility

7      to lay the proper foundation.  If they don't want to stipulate,

8      and they lay the proper foundation, it will come in.

9              MR. GOTTLIEB:  We did not decide at the last minute to

10     put this document in.  The government produced to us a document

11     which included 2013.  When they put it in formal evidence, that

12     document transformed into only beginning in 2017.  Everything

13     else is the same.

14              I will point out to your Honor, as far as we are

15     concerned, the fact that the government took that out, the fact

16     that the government now continues to fight that is clearly

17     *Brady* material.  That information tends to exculpate the

18     defendant.

19              THE COURT:  Mr. Gottlieb, you know, you're venting

20     again.

21              MR. GOTTLIEB:  No, I'm not, your Honor.

22              THE COURT:  Okay.  Well, let me tell you why you're

23     wrong.  Two reasons.  One, if it's *Brady* material, you already

24     have it.  So, it's been disclosed to you.  Okay.  Wait a

25     minute.  If it's *Brady* material, they have an obligation to

M1q3dou5

1    disclose it.  It has been disclosed.

2              You want to say, oh, no, we didn't do this at the last

3    minute.  Well, if you didn't do this at the last minute, then

4    it's clear to me you knew the import of this document a week

5    ago.  And -- wait a minute -- and you never raised that issue.

6              MR. GOTTLIEB:  We didn't raise it because the document

7    has been changed.  We got --

8              THE COURT:  You knew, Mr. Gottlieb -- you didn't

9    listen to what I said.  You knew that document was different a

10   week ago.  A week ago.  You could have raised this issue a week

11   ago.

12             MR. GOTTLIEB:  No, your Honor.

13             THE COURT:  You raised it with the witness that the

14   document was not the same document.

15             MR. GOTTLIEB:  Your Honor, it's only during this

16   trial -- your Honor, respectfully, and I mean this, I have not

17   been clear enough.  We had Government Exhibit 278.

18             THE COURT:  When did you figure it out, Mr. Gottlieb?

19   What day?

20             MR. GOTTLIEB:  When the government --

21             THE COURT:  What day did you figure it out?

22             MR. GOTTLIEB:  When they introduced it.

23             THE COURT:  That was a week ago.  That's all I said.

24   I said you knew a week ago.

25             MR. GOTTLIEB:  Okay.

M1q3dou5

1    THE COURT:  All right.  So that doesn't help you about

2    the timeliness.  You could have raised this issue a week ago

3    when it was raised to you.  You didn't wake up this morning and

4    decide that, oh, where is the document out there that I want.

5    You knew this.

6    MR. GOTTLIEB:  Your Honor, but when I cross-examined

7    the witnesses, suddenly I was blocked in raising any questions

8    about it.

9    THE COURT:  Well, no, no, no.  I'm not going to let

10   that record stand.  Who blocked you from raising that issue?

11   Who blocked you?  Are you saying I blocked you?

12   MR. GOTTLIEB:  No.

13   THE COURT:  They can't block you.

14   MR. GOTTLIEB:  Your Honor, we had a document.  When

15   they introduced it, we saw that it had been changed.

16   THE COURT:  Mr. Gottlieb, we all know what the facts

17   are.  The facts are fairly obvious.  All I'm saying to you is

18   don't argue that, oh, you're so disadvantaged because you only

19   found this out this morning.  You didn't find this out this

20   morning.  You had at least a week to deal with this.  We could

21   have been talking about this last week.  I may have been able

22   to give you greater relief by last week, if you had raised it.

23   It wasn't until this morning that you decided you wanted to do

24   something about it.  That's why we haven't addressed this issue

25   for a week.

M1q3dou5

1    MR. GOTTLIEB:  Your Honor, okay.  We were in touch

2    with RDC a few days ago and we put this in order.  And the

3    truth is, your Honor, again, only because they changed, they

4    cut off two witnesses, that suddenly there is a time crunch.

5    THE COURT:  But Mr. Gottlieb, I don't care about the

6    time crunch.  That's not my issue.  And I'm not faulting you

7    about the time.  But I can't let you stand up here and say you

8    were sandbagged this morning because it just dawned on you that

9    this was something that you thought was important.

10   You can't tell me that you found out today, you can't

11   tell me you found out yesterday, you can't tell me even that

12   you found out the day before yesterday.  You found this out

13   last week.

14   MR. GOTTLIEB:  As far as I have said from the

15   beginning, we intend to introduce it simply as a business

16   record.  We have asked RDC to provide the standard

17   certification that your Honor has seen a million times.

18   THE COURT:  Why are you arguing with me?  What I have

19   done?  Did I hurt your feelings?  What have I done to you?  You

20   are arguing with me.  All I said to you is exactly what you

21   asked for.  If you can lay the proper foundation, it's going to

22   come in.  That's the rule I say any time anybody offers a

23   document.  If you can't lay the proper foundation, it probably

24   won't come in unless they agree, and it doesn't sound like they

25   want to agree and I can't force them to agree.  That's all I'm

1    saying to you.

2          When you're ready, you come to me for some relief.

3    Then let me know and I will try to give you whatever relief is

4    appropriate.  But at this point there is no issue before me.  I

5    can't tell you how to proceed.  You have to decide how you want

6    to proceed and what assistance you want.

7          MR. GOTTLIEB:  I'm only responding to the threat they

8    are going to call a rebuttal witness.

9          THE COURT:  Why are you letting him upset you, then

10   you're arguing with me.

11         MR. GOTTLIEB:  Mr. Roos, I'll deal with you.

12         THE COURT:  Go out in the hall, then can come back and

13   you'll feel better.

14         (Recess)

15         THE COURT:  Are we ready to continue?

16         MS. ROTHMAN:  We are.

17         THE COURT:  You want to wait for Mr. Burnett?

18         MS. ROTHMAN:  No, we can proceed without Mr. Burnett.

19         THE COURT:  Let's go get the jury.

20         (Jury present)

21         MS. ROTHMAN:  Should we get the witness?

22         THE COURT:  Will you call the next witness, please.

23         MS. ROTHMAN:  The government calls Michael Paulsen.

24         THE COURT:  You can be seated.

25    MICHAEL PAULSEN,

M1q3dou5                        Paulsen - Direct

 1           called as a witness by the Government,

 2           having been duly sworn, testified as follows:

 3     DIRECT EXAMINATION

 4     BY MS. ROTHMAN:

 5     Q.   You can remove your mask, Mr. Paulsen.

 6     A.   Okay.

 7     Q.   Mr. Paulsen, are you familiar with a pharmacy named Regal

 8     Remedies?

 9     A.   Yes, that was my pharmacy.

10     Q.   When did you work there?

11     A.   I worked there from 2016 through 2019, about

12     three-and-a-half years.

13     Q.   What was your job there?

14     A.   I just owned the pharmacy.

15     Q.   Where was Regal Remedies located?

16     A.   It was located on the corner of Olympia Boulevard off Sand

17     Lane in Staten Island, New York.

18     Q.   Did you sell controlled substances at Regal Remedies?

19     A.   Yes, I did.

20     Q.   What types of controlled substances did you sell?

21     A.   Oxycodone, Percocet and fentanyl.

22     Q.   Did you sell other products at Regal Remedies?

23     A.   Yes, I did.  We had a full line small store.  We sold

24     over-the-counter goods such as baby aspirin, deodorant,

25     diapers, waters, soda; that type of stuff, too.

1    Q.  Who supplied you with controlled substances?

2    A.  Rochester Drug company.

3    Q.  Between 2016 and 2017, did you have any other supplier of

4    controlled substances, other than Rochester Drug?

5    A.  No, I did not.

6    Q.  Would you purchase other items from Rochester Drug

7    Co-Operative aside from controlled substances?

8    A.  Yes, I would order my heart medications, my blood pressure

9    for the store.  Every single item, over-the-counter and regular

10   and prescription.

11   Q.  Was it helpful to get all of your items from one

12   distributor?

13   A.  Yes, it was.

14   Q.  Mr. Paulsen, did you commit crimes at Regal Remedies?

15   A.  Yes, I did.

16   Q.  What crimes did you commit?

17   A.  I basically diverted oxycodone and other pills, conspiracy.

18   Q.  When did you stop working at Regal Remedies?

19   A.  Unfortunately, when I got arrested in September of 2019.

20   Q.  What were you arrested for?

21   A.  I was arrested for -- selling narcotics and diverting pills

22   to patients.

23   Q.  Have you pled guilty to those crimes?

24   A.  Yes, I have.

25   Q.  Have you been sentenced for your crimes?

1    A.  Yes, I have.

2    Q.  When will you begin serving your sentence for those crimes?

3    A.  I will be serving it starting this Friday, the 28th.

4    Q.  Are you testifying here pursuant to an agreement with the

5    government?

6    A.  Yes, I am.

7         MS. ROTHMAN:  Will you please pull up for the witness

8    what's been marked for identification as 3528-544.

9    Q.  Mr. Paulsen, do you recognize this document?

10   A.  Yes, I do.

11   Q.  What is it?

12   A.  It is a document from the government that was sent over to

13   my lawyer, basically a Rule 35 agreement.

14        MS. ROTHMAN:  Your Honor, at this time the government

15   offers into evidence 3528-544.

16        THE COURT:  Any objection?

17        MR. JANEY:  No objection.  But if we could have an

18   exhibit number that would be helpful instead of the 3500.

19        MS. ROTHMAN:  Sure.  We can call it Government Exhibit

20   1220.

21        MR. JANEY:  Thank you.

22        (Government's Exhibit 1220 received in evidence)

23        MS. ROTHMAN:  May we publish to the jury?

24        THE COURT:  Yes.

25        MS. ROTHMAN:  Thank you, your Honor.

1  Q.  If we can just flip through to the last page.  Do you see

2  your signature on this document, Mr. Paulsen?

3  A.  Yes, I do.

4  Q.  Do you have any other agreements with the government, other

5  than this document?

6  A.  No, I do not.

7  Q.  I am going to come back to the terms of this agreement at

8  the end of your testimony.

9          I want to focus on the crimes you committed at Regal

10  Remedies.  When did you open the pharmacy?

11  A.  I opened the pharmacy in February of '16 with a soft

12  opening, and I mainly opened by March of '16.

13          THE COURT:  Just a minute.  Please continue.

14          MS. ROTHMAN:  Thank you, your Honor.

15  Q.  You testified that your supplier was Rochester Drug

16  Co-Operative.  How did you hear about them?

17  A.  I looked up the company online.

18  Q.  What did you do after you found them online?

19  A.  I contacted them, and tried to open up an account in

20  November of '15.

21  Q.  Why did you pick Rochester Drug Co-Operative to be your

22  supplier?

23  A.  Because when I contacted them, they said the monthly

24  minimum would be 50,000 a month, but they would start me at

25  30,000.  And a lot of other drug companies were 75 to 100,000

1  minimum ordering, so they were a lot lower of a threshold for

2  me to order.

3  Q.  What was the process like for signing up with Rochester

4  Drug Co-Operative?

5  A.  When I first signed up, I had to fill out a regular credit

6  application, my name, my address, standard form.  And then I

7  had to fill out another thing with a credit app with how much

8  money I had in the bank account at the time, checking account,

9  savings.  And then they opened up my credit line about three to

10 four weeks later of $30,000 a month to order.

11 Q.  What was the process like to be able to purchase controlled

12 substances from RDC?

13 A.  I had filled out a credit application, I believe it was on

14 February 15 of 2016.  Jessica Pompeo had sent me an

15 application.  It was like 25 or 30 questions, yes or no.  Have

16 you ever owned a pharmacy before and this and that.  It was a

17 pretty standard agreement.  And then she opened me up 24 hours

18 later I had access to controlled substances.

19 Q.  What types of controlled substances did you purchase from

20 RDC?

21 A.  Mainly, oxycodone, Percocet and fentanyl, sometimes some

22 Xanax and Klonopin.  But those were my main ones.

23 Q.  When you opened Regal Remedies, did you intend to divert

24 controlled substances?

25 A.  No, I did not.

1   Q.  Did you divert controlled substances there?

2   A.  Yes, I did.

3   Q.  What happened?

4   A.  Well, basically, when I opened up the store, I had a lot of

5   customers come from this doctor, David Suarez, and he sent over

6   a lot of patients with oxycodone and Percocet prescriptions

7   plus about four or five other scripts.  I was getting a lot of

8   people in there between 12 and 4 in the afternoon.  And, you

9   know, it was slow in the beginning, I had to pay myself and the

10  pharmacist, although it was no excuse to do what I had done.

11  And they were filling all the prescriptions walking in with a

12  lot of cash, and I saw it was easy to divert the pills.  And I

13  had one patient tell me how he was selling them, and then I

14  just started going down the road of unfortunately selling these

15  pills.

16  Q.  Did you keep filling prescriptions written by Dr. Suarez?

17  A.  Yes, I did.

18  Q.  Did you fill prescriptions for other doctors like

19  Dr. Suarez?

20  A.  Yes, I did.

21  Q.  What are some names that you remember?

22  A.  I filled for Dr. Carl Anderson, Dr. Nkanga Nkanga,

23  Dr. David Taylor, and also Dr. Howard Adelglass.

24  Q.  The second to last doctor you mentioned, I think Nkanga

25  Nkanga, how do you spell his last name?

1   A.  The same as the first.  It's N-K-A-N-G-A I believe.

2   Q.  Now, those doctors that you just mentioned, Carl Anderson,

3   Dr. Suarez, Nkanga Nkanga, what percentage of the controlled

4   substances that you were filling were prescriptions coming from

5   those doctors?

6   A.  I would say, if I was estimating, about 70 to 75 percent

7   from those doctors.

8   Q.  What happened to those doctors?

9   A.  Most of them had gotten arrested or lost their licenses or

10  both.

11  Q.  Now, you spoke a bit about the patients who were coming to

12  fill prescriptions at your pharmacy.  I want to go into more

13  detail about what it looked like.

14          So how many patients would come at a time with

15  prescriptions?

16  A.  I would have an average of about 20, maybe 25.

17  Q.  Can you describe their appearance.

18  A.  Yes.  A lot of them were young, between the ages of maybe

19  25 and 40.  They would come in, like, well dressed with nice

20  jewelry on, a lot of cash in their pockets to pay for their

21  prescriptions basically.  Most of them looked young and

22  healthy, except for like two or three that looked like they

23  were on controlled substances or had an addiction problem.  But

24  most of them were healthy.

25  Q.  What types of prescriptions were they bringing to Regal

1    Remedies to be filled?

2    A.   Oxycodone and fentanyl patches.

3    Q.   How would they pay for their prescriptions?

4    A.   Most of them would pay cash.

5    Q.   Were there any combinations of prescriptions that you

6    recall filling at your pharmacy?

7    A.   Yes.  There was like two types.  Most of them would fill

8    oxycodone 30, and alprazolam 2 milligram which was Xanax, and

9    some of them would fill oxycodone with fentanyl patches.

10   Q.   Were there any common pill counts for the prescriptions you

11   would fill at Regal Remedies?

12   A.   Yes, most them were 180 pill count of the oxycodone 30.

13   Q.   Did you know what the patients were doing with the pills

14   that you sold them?

15   A.   Yes, I did.

16   Q.   What were they doing?

17   A.   They were selling and diverting pills.

18   Q.   Now, did you also sell pills to patients without

19   prescriptions?

20   A.   Yes, unfortunately I did.

21   Q.   What would you do?

22   A.   They would basically come in and fill a prescription.  And

23   they would have a friend of them in there in the store, and

24   they would say, Mike, you know, do you have some extra pills

25   that I could possibly buy.  And I would take 100 pills that I

M1q3dou5                          Paulsen - Direct

```
 1   would get an extra bottle from Rochester Drug and pour it into
 2   the vial and sell it to the person.
 3   Q.  Did you have a pharmacist at Regal Remedies?
 4   A.  I did.
 5   Q.  What was his name?
 6   A.  Robert Pilchick.
 7   Q.  What did he do all day?
 8   A.  He basically slept most of the day.
 9   Q.  So who filled the prescriptions at Regal Remedies?
10   A.  I did.
11   Q.  Are you a licensed pharmacist?
12   A.  No, I'm not.
13   Q.  Can you please pull up for the witness what's been marked
14   for identification as Government Exhibit 633.
15          Do you recognize this photograph?
16   A.  I do.
17   Q.  Mr. Paulsen, what is it a photograph of?
18   A.  It is a picture of my pharmacist sleeping in the afternoon
19   in the store.
20          MR. JANEY:  Objection, your Honor.
21          THE COURT:  Overruled.
22          MS. ROTHMAN:  The government offers into evidence
23   Government Exhibit 633.
24          THE COURT:  It will be admitted in evidence over
25   objection.
```

1    (Government's Exhibit 633 received in evidence)

2    MS. ROTHMAN:  May we publish?

3    THE COURT:  Yes.

4    MS. ROTHMAN:  Thank you.

5    Q.  Mr. Paulsen, can you describe what we are looking at in

6    this photograph?

7    A.  Yes.  You are looking at a picture of my pharmacist

8    sleeping in the chair, and I can see some sunlight in the

9    picture, so I am assuming it is the middle of the afternoon at

10   some point.

11   Q.  What do you see on the right side of the photograph?

12   A.  On the right side of the photograph, I see him sleeping in

13   a chair and a picture of my display with some medications on

14   it.

15   Q.  Where in the pharmacy is this photograph taken?

16   A.  It's in the back, in the pharmacy fill section department.

17   Q.  So like not a back room, but where prescriptions are being

18   filled?

19   A.  Correct.  There was no back room.  There was just a little

20   separate door with an entrance to close where we would fill the

21   prescriptions.

22   Q.  Thank you.  We can take that down.

23       Now, were you asked to provide dispensing data to RDC

24   in 2016?

25   A.  Yes, I was.

M1q3dou5                          Paulsen - Direct

1   Q.  How many times did you give RDC dispensing data for Regal

2   Remedies?

3   A.  Three times in the course of the 10 months I was there.

4   Q.  Do you remember when you gave them dispensing data?

5   A.  Yes, I sent them one on June 30, another one on

6   November 1st, I believe, and the other one in late December of

7   '16.

8   Q.  After you sent them dispensing data in June 2016, did you

9   hear from RDC?

10  A.  No, I did not.

11  Q.  Were you diverting controlled substances at that time?

12  A.  Yes, I was.

13  Q.  Were you filling prescriptions for doctors like Dr. Suarez

14  and Carl Anderson?

15  A.  Yes, I was.

16  Q.  I want to move forward to November 2016.

17          MS. ROTHMAN:  If we can pull up for the witness what's

18  in evidence as Government Exhibit 103A, please.

19  Q.  Let's focus on the bottom e-mail first.

20  A.  Okay.

21  Q.  Do you see where it says "from"?

22  A.  I do.

23  Q.  Do you recognize that e-mail address?

24  A.  I do, that is my e-mail address I've had,

25  MikeyBKSTS@AOL.com, yes.

1   Q.   Who did you send this e-mail to?

2   A.   I sent it to the compliance department at RDC Drug.

3   Q.   What's the date your e-mail?

4   A.   November 18 at 2:15 p.m.

5   Q.   November 17?

6   A.   I'm sorry, November 17, 2016.

7   Q.   In it you write, can you read the body of your e-mail,

8   Mr. Paulsen?

9   A.   Yes, I wrote:   Please see attached controlled substance

10  dispensing report.

11  Q.   Is this the dispensing data you sent to RDC in

12  November 2016?

13  A.   That would be it, yes.

14  Q.   Let's goes to the top e-mail which is in evidence.  I am

15  going to read this Mr. Paulsen.

16  A.   Sure.

17  Q.   "Regal Remedies RX on Staten Island, NY, reviewed this

18  pharmacy's dispensing report.  I'm not thrilled with this.

19  21 percent cash, they fill high oxy counts 180, 240 DU for cash

20  written by a number of questionable docs, including Martin

21  Tesher, David Taylor, Anthony Pietropinto, Joseph Olivieri,

22  Raja Bhatia.  Plus it's Staten Island, need I say more.  Take a

23  look of the pics from K-drive.  Really?  Why are we even

24  opening accounts in SI?"

25          Now, Mr. Paulsen, did you hear from RDC in November of

1   2016?

2   A.  I did not.

3   Q.  Let's look at the attachments to this e-mail.  If we can

4   turn to Government Exhibit 103A.2, please.

5        Do you recognize this photograph?

6   A.  Yes, I do.

7   Q.  What's it a photograph of?

8   A.  It's a picture of my pharmacy.

9   Q.  Is that a photograph of your pharmacy that you sent to

10  Rochester Drug Co-Operative?

11  A.  Yes, it is.

12  Q.  Thank you.  We can go to Government Exhibit 103A.3, please.

13       Do you recognize this photograph?

14  A.  Yes, I do.

15  Q.  What is it a photograph of?

16  A.  It is a picture of the inside of the store.

17  Q.  Is it a photograph -- it appears to be empty; is that

18  right, Mr. Paulsen?

19  A.  Correct.  That's before we got merchandising and shelves

20  when I first got the store.

21  Q.  Is this a photograph that you sent to RDC?

22  A.  Yes, it is.

23  Q.  Thank you.  We can take this down.

24       Let's pull up your dispensing data from November 2016.

25  Let's pull up Government Exhibit 103A.1, please.

1         Do you see Regal Remedies on the top of the Excel in

2    row 1, Mr. Paulsen?

3    A.  I do, yes.

4    Q.  I want to look at column H to start.  If we can expand that

5    column.  Thank you.

6         So looking down column H, do you see any doctors who

7    you filled prescriptions for who you believed were writing

8    medically unnecessary prescriptions?

9    A.  Yes, I do.

10   Q.  Can you list some of their names.

11   A.  Yes.  Dr. Nkanga Nkanga, Dr. David Taylor, Dr. Carl

12   Anderson, and Dr. David Suarez.

13   Q.  If we can scroll down.  Thank you.

14   A.  And also now as you scroll down, Dr. Joseph Olivieri and

15   Dr. Martin Tesher.

16   Q.  We can keep scrolling.

17   A.  And Dr. Anthony Pietropinto.

18   Q.  We can keep scrolling.  You can keep scrolling.  You can

19   scroll to the bottom of the Excel just slowly just to see the

20   different names.

21   A.  Then you have Dr. Bhatia Anurag.

22   Q.  Let's look at the different prescriptions you were filling.

23   If we can go to column E, please.

24        Can you read some of the different prescriptions that

25   you see in column E, Mr. Paulsen?

1   A.  Yes.  I see fentanyl 100 micrograms, oxycodone 30,

2   oxymorphone ER 40, Suboxone, Lyrica 300 milligram, then

3   fentanyl 75, and morphine sulfate.

4   Q.  Let's scroll down to show the different types of controlled

5   substances, the oxycodone and others.  Now, if we can go back

6   up to the top of the Excel.  Focus on the method of payment

7   going over to the right side of the Excel.  And where it says R

8   for plan.

9          What do the Cs in that R refer to, Mr. Paulsen?

10  A.  The Cs are patients that paid cash.

11  Q.  If we can scroll down.  I think we get the idea.  We can

12  take down this exhibit.  Thank you.

13         Did you hear from RDC in November 2016 after you

14  submitted that dispensing report?

15  A.  No, I did not.

16  Q.  Did you keep diverting controlled substances?

17  A.  Yes, I did.

18  Q.  I think you said that you also provided dispensing in

19  December 2016.  Do you remember that?

20  A.  Yes, that is correct.

21  Q.  Do you remember what happened in December 2016 when you

22  provided dispensing?

23  A.  Yes, I had sent RDC a dispensing report in late December,

24  probably a day or two after Christmas I believe.  And I told

25  them I needed a little more oxycodone to hold us over for the

1    end of the month, because I had a couple more patients coming

2    in with pain meds from their doctors.  So I sent them an e-mail

3    of my dispensing report.  And they e-mailed me back either late

4    that night or first thing in the morning and opened me up for a

5    few more bottles to hold me over until January 1.

6    Q.  Mr. Paulsen, to be clear, the patients that were coming in

7    were patients looking to purchase controlled substances to

8    divert them; is that right?

9    A.  Correct.

10   Q.  Can we pull up what's in evidence as Government Exhibit

11   103C, please.  If we can zoom in on the bottom e-mail.

12          Do you see Regal Remedies on that e-mail, Mr. Paulsen?

13   A.  Yes, I do.

14   Q.  Do you see the date?

15   A.  I do.

16   Q.  What's the date?

17   A.  It was sent Tuesday, December 27, 2016, at 2:43 p.m.

18   Q.  If we can zoom out and focus on the top e-mail.  I will

19   just read this, Mr. Paulsen.

20          "Jessica, I was looking at your note from last month

21   about Regal Remedies OxyContin.  It says not to release anymore

22   ordered over 5,000 until further notice.  They're at 5300 now.

23   I looked at their recent dispensing he just sent for 11/17 to

24   12/27.  He was better off with his previous dispensing.  Their

25   cash for September to November was 25 percent for oxy.  Oy.  I

1    just looked again at the cash just on oxy on what he just sent.

2    It's at 32 percent cash.  What are your thoughts.  Amy."

3         Mr. Paulsen, in December 2016, did RDC stop supplying

4    with you controlled substances?

5    A.   No, they did not.  They just, when I called them that night

6    when I was off, they turned me on by the next morning,

7    basically just upping the thing.  But they did not turn me off.

8    Q.   They kept providing with you controlled substances?

9    A.   Correct.

10   Q.   We can take that down.

11        Mr. Paulsen, when did you first hear from RDC about

12   issues with your dispensing data?

13   A.   When I first heard from them was middle of May of 2017.

14   Q.   And the types of issues in your dispensing data, like

15   doctors and cash, were those the same issues in 2016 that

16   appeared in 2017?

17   A.   Yes, they were.

18   Q.   Tell us what happened in the summer of 2017.

19   A.   In the summer of 2017, RDC had called me and said we were

20   filling too many cash patients and too much oxycodone for high

21   limits for a lot of the doctors, so they said they were going

22   to lower my limit.

23   Q.   What happened after that?

24   A.   After that, in May of '17, they sent down a company called

25   the Bell Buskey Group, I believe, that they had hired a

M1q3dou5                           Paulsen - Direct

1    company, an outside source to check on my store.  And that had

2    happened in September of 2017.

3    Q.  Who came to your store in September of 2017?

4    A.  I had two gentlemen come in from a company they had hired

5    from the Bell Buskey Group.  They had spoke to me to overlook

6    all my controlled substances, take a look at all the store's

7    paperwork, all the prescriptions we were filling for the

8    doctors.  And they just made me sign a form and said we'll have

9    RDC contact you within a couple of days to a week.

10           I was turned off for controls for about seven to maybe

11   10 business days tops, and then they re-turned me on.

12   Q.  Let's pull up what's in evidence as Government Exhibit

13   103D, please.  If we can zoom in on the top half of the e-mail.

14   And the date is September 5, 2017.  And focusing on the

15   sentence that begins "BBG will be sent into pharmacy ASAP to

16   conduct an onsite review.  The pharmacy's orders will be on

17   hold until the onsite review is completed."

18           If we can go to the attachment to 103D which I believe

19   is 103D.1, please.  Let's turn to the second page and zoom in

20   on the bottom paragraph, thank you.

21           "A suspicious order activity.  RDC obtained dispensing

22   reports from the pharmacy Regal Remedies RX Inc. which reflect

23   the pharmacy's dispensing activity from May 15, 2017, through

24   August 15, 2017.  The following red flag activity was noted for

25   the period reported:  Pharmacy accepted cash payments for

1    44 percent of all controlled substance transactions.  Pharmacy

2    accepted cash payment for 51 percent of oxycodone transactions,

3    53 percent of oxy 30 milligram transactions, 63 percent of

4    methadone transactions, 43 percent of morphine transactions,

5    63 percent of fentanyl transactions, and 91 percent of

6    alprazolam transactions.  Pharmacy filled prescriptions for 210

7    dosage units of oxy 30 milligrams written by Dr. Martin Tesher,

8    after Tesher was arrested by DEA in June of 2017."

9         Mr. Paulsen, were you filling for Dr. Tesher in 2016?

10   A.  I do remember vaguely filling for him a little bit, yes.

11   Q.  "Pharmacy regularly filled cash prescriptions for the

12   following prescribers:  Anthony Pietropinto, David Suarez,

13   Joseph Olivieri, David Taylor, Mohammed Hashmi, Kathryn Moran,

14   Nkanga Nkanga, Gideon Hedrych, and Carl Anderson."

15        And Mr. Paulsen, were you filling for Dr. Suarez in

16   2016?

17   A.  Yes, I was.

18   Q.  Were you filling for Carl Anderson in 2016?

19   A.  Yes.

20   Q.  David Taylor?

21   A.  Yes.

22   Q.  Anthony Pietropinto?

23   A.  Yes.

24   Q.  Thank you.  We can take that down.

25        Now, Mr. Paulsen, in 2017, did you start to lie to RDC

1    on your dispensing data?

2    A.  Yes, I did.

3    Q.  What did you do?

4    A.  When I would send them over a controlled substance report,

5    I would basically change the numbers in there to get more

6    oxycodone, so when they would send me a report to send them a

7    data dispensing report from my pharmacy, I would change the

8    numbers.

9    Q.  Did there come a time when RDC stopped selling you

10   controlled substances?

11   A.  Yes, there was.

12   Q.  When was that?

13   A.  They had fully turned me off around May of 2019.

14   Q.  When were you arrested?

15   A.  In September of 2019.

16   Q.  I want to move forward and talk about how you got here,

17   Mr. Paulsen.

18           After you were arrested in September 2019, did you

19   meet with federal prosecutors in connection with your case?

20   A.  Yes, I did.

21   Q.  In general terms, what did you talk about in those

22   meetings?

23   A.  I spoke about how I diverted oxycodone and what people I

24   dealt with and how I dealt with my illegal operation I had

25   done.

1    Q.  Did you mention RDC in those meetings?

2    A.  Yes, I did.

3    Q.  Did you later plead guilty to your crimes?

4    A.  Yes, I did.

5    Q.  Have you been sentenced for your crimes?

6    A.  Yes.

7    Q.  In this very courthouse, Mr. Paulsen?

8    A.  Yes, correct.

9    Q.  What were you sentenced to?

10   A.  I was sentenced to 78 months' incarceration.

11   Q.  If we can pull up your Rule 35 agreement which had been

12   marked as 3528-544 and is now Government Exhibit 1220.

13          I want to talk about this agreement.  Mr. Paulsen,

14   after you were sentenced in November 2021, did you meet with

15   prosecutors again?

16   A.  Yes, I did.

17   Q.  Was that in connection with your testimony here?

18   A.  Yes.

19   Q.  If you know, how did that meeting get set up?

20   A.  The government had contacted my attorney in early November,

21   and my attorney called me that the government wanted me to come

22   in and speak to them to see if they can possibly use me on this

23   case, because I dealt with Rochester Drug as my main source for

24   my pharmacy.

25   Q.  How many meetings did you have with prosecutors in

M1q3dou5                    Paulsen - Direct

1    connection with your testimony here today?

2    A.   About four or five.

3    Q.   After those meetings, did you enter into an agreement with

4    the government?

5    A.   Yes, I did.

6    Q.   Under the terms of that agreement, which is on the screen,

7    what are you required to do?

8    A.   Just required to tell the truth, the whole truth, and

9    nothing but the truth.

10   Q.   Are you required to testify?

11   A.   Yes.

12   Q.   Can you commit any other crimes?

13   A.   No.

14   Q.   If you do those things, Mr. Paulsen, what has the

15   government promised you?

16   A.   They had promised me a Rule 35(b) letter.

17   Q.   What does that Rule 35 letter allow the Court to do?

18   A.   It allows the Court to overlook the charges, and possibly

19   resentence me.

20   Q.   With that letter, you could get resentenced in your

21   underlying case; is that correct?

22   A.   Yes, that's correct.

23   Q.   Who gets that letter?

24   A.   A copy goes to my attorney and a copy to Judge Crotty.

25   Q.   If the government writes that letter, is the judge required

M1q3dou5                          Paulsen - Direct

1    to resentence you?

2    A.  No, he is not.

3    Q.  Could the judge give you the exact same sentence you

4    already have?

5    A.  Yes, he can.

6    Q.  Has anyone promised you a different sentence?

7    A.  No, they have not.

8    Q.  Sitting here today, do you know what will happen with your

9    sentence?

10   A.  No, I do not.

11   Q.  If you lie today on the witness stand, will you get that

12   letter from the government?

13   A.  No, I will not.

14   Q.  Now, Mr. Paulsen, in connection with your testimony, did

15   the government ask the Court to delay your surrender date to

16   prison?

17   A.  Yes, they did.

18   Q.  Why did they do that?

19   A.  The main reason was because the COVID, with the omicron

20   being very bad, it is hard to get someone in and out of a

21   federal prison right now without quarantining and getting into

22   the courthouse.

23   Q.  Does the verdict in this case affect whether or not you get

24   resentenced?

25   A.  No.

M1q3dou5                              Paulsen – Direct

1    Q.  Regardless of your testimony and the outcome in this case,

2    where are you going on Friday, Mr. Paulsen?

3    A.  I'm self-surrendering to Fort Dix federal prison on Friday.

4              MS. ROTHMAN:  Your Honor, I have no further questions.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Cross examination.

2           MR. JANEY:  Thank you, your Honor.

3    CROSS-EXAMINATION

4    BY MR. JANEY:

5    Q.  Mr. Paulsen, I want to be sure that we understand your

6    testimony today.  You were asked about several doctors

7    including a Dr. Suarez.  Do you recall that?

8    A.  Yes.

9    Q.  And it's certainly not Dr. Suarez's fault that you sold

10   illicit drugs at Regal's pharmacies, correct?

11   A.  Correct.

12   Q.  And nobody made you forge signatures on the prescriptions

13   where you forged signatures; is that correct?

14   A.  That's correct.

15   Q.  You falsified the signature of your pharmacist day in and

16   day out, correct?

17   A.  Yes.

18   Q.  And you've never met Larry Doud, correct?

19   A.  That's correct.

20   Q.  Never spoke with Larry Doud, correct?

21   A.  That's correct.

22   Q.  And before today, you wouldn't be able to pick out Larry

23   Doud in a room full of people, correct?

24   A.  No, because I've seen his picture.  I know who he is.

25   Q.  But aside from seeing his picture, you've had no personal

1    contact with him?

2    A.   No.

3    Q.   Never sent him an email?

4    A.   No.

5    Q.   Never gotten an email from him?

6    A.   No.

7    Q.   He never called you on the phone?

8    A.   No.

9    Q.   You were asked in your direct testimony about the crimes

10   that you committed, correct?

11   A.   Yes.

12   Q.   And you said on the witness stand today that there was no

13   excuse for those crimes, correct?

14   A.   Correct.

15   Q.   When you were sentenced by Judge Crotty, you had no

16   explanation as to why you committed the crimes you did,

17   correct?

18   A.   That's incorrect.  I told them why I did it.

19   Q.   Well, let's think about it.  Well, you were sentenced by

20   Judge Crotty as the government says in this courthouse on

21   September 9, 2021, correct?

22   A.   Yes, that's correct.

23   Q.   And at the time the Court asked you, you knew all the time

24   the dangers of oxycodone, didn't you?

25   A.   Yes, I did.

1  Q.  And you said, I did, your Honor, yes, correct?

2  A.  Yes, I did.

3  Q.  And the Court said to you, in fact, your sister had some

4  difficulty with drugs, correct; isn't that what the Court said?

5  A.  Yes.

6  Q.  And you said, yes, she did have a drug problem, correct?

7  A.  Yes.

8  Q.  And the Court said to you, so you had a firsthand knowledge

9  within your family and you said yes, correct?

10  A.  Yes.

11          MS. ROTHMAN:  Objection, hearsay.

12          THE COURT:  Overruled.  You can answer.

13  Q.  And then the Court said to you, and you continued dealing

14  with the drugs selling the oxycodone, correct?

15  A.  Yes.

16  Q.  You said yes.  And the Court asked you what other

17  explanation is there than you are doing it for the money,

18  correct, isn't that what Judge Crotty said?

19  A.  Yes.

20  Q.  And you went on in your response to Judge Crotty to say, I

21  don't know, I just went down that path.  I don't know why.

22  Isn't that what you said?

23  A.  Yes.

24  Q.  Do you still not know why, Mr. Paulsen?

25  A.  Well, I basically told them -- I mean in one sense, I knew

1   why I was greedy.  I wanted to make money.  It was a terrible

2   thing I did.

3   Q.  And no one made you do it, did they?

4   A.  No.

5   Q.  Shortly after you were arrested, you tried to provide

6   information to government prosecutors in your case captioned as

7   *United States of America v. Michael Paulsen*, correct?

8   A.  Yes.

9   Q.  Cooperation information, to coin a phrase, correct?

10  A.  Correct.

11  Q.  You pleaded guilty to one count of narcotics conspiracy in

12  March 2021, correct?

13  A.  Correct.

14  Q.  And when you pleaded guilty, you tried to offer your

15  cooperation assistance to the government prosecutors in your

16  case even then, didn't you, Mr. Paulsen?

17  A.  That is correct.

18  Q.  In fact, you met twice with the prosecutors in your case

19  after your arrest, correct?

20  A.  That is correct.

21  Q.  In an effort to provide cooperation information, correct?

22  A.  That is correct.

23  Q.  Is it fair to say that the purpose of providing this

24  information or your intent was to reduce the potential sentence

25  you might ultimately receive, correct?

M1QBDOU6                          Paulsen - Cross

1    A.  Yes.

2    Q.  At those times, the times of your case when you were trying

3    to provide cooperation information, even then, isn't it

4    correct, to say that the government prosecutors in your case

5    did not believe the information to be especially helpful?

6              MS. ROTHMAN:  Objection.

7              THE COURT:  Sustained as to the form of the question.

8    A.  They didn't tell me --

9              THE COURT:  Just a second.  You don't have to answer

10   that question.  Restate the question.

11   Q.  Certainly at no time between when you were arrested in

12   September of 2019 and when you were sentenced in September of

13   2021 did the U.S. Attorney's office provide you with a

14   cooperation agreement, did they?

15   A.  No, they did not.

16   Q.  Isn't it fair to say that you believe that cooperation

17   agreement might have benefited you by being a potential factor

18   for a lower sentence in your case?

19   A.  Yes.

20   Q.  But by sentencing, still no cooperation agreement, correct?

21   A.  Correct.

22   Q.  And as the government pointed out and elicited from you

23   here today on your direct, you were sentenced to a term of

24   imprisonment of 78 months, six and a half years, correct?

25   A.  That is correct.

M1QBDOU6                        Paulsen - Cross

1   Q.  And it is fair to say, Mr. Paulsen, that six and a half

2   years is a long time, isn't it?

3   A.  Yes, it is.

4   Q.  Again, you don't actually know Larry Doud, do you,

5   Mr. Paulsen?

6   A.  No, I do not.

7   Q.  Never spoke with him, have you?

8   A.  No.

9   Q.  But in October of 2021, you were contacted by government

10  prosecutors in this case against Laurence Doud about providing

11  information about Laurence Doud, the defendant in this case,

12  correct?

13  A.  Yes, that is correct.

14  Q.  In November of 2021, you first met with prosecutors in this

15  case against Mr. Doud, didn't you, Mr. Paulsen?

16  A.  Yes.

17  Q.  And as you testified, you were originally scheduled to

18  surrender and to begin that six and a half year sentence on

19  January 21, weren't you, Mr. Paulsen?

20  A.  Yes, that is correct.

21  Q.  On January 14, just a few days before the start of this

22  trial, you signed a cooperation agreement with the U.S.

23  Attorney's Office for information you might provide in this

24  case against Mr. Doud, correct?

25          MS. ROTHMAN:  Objection the Rule 35 letter.

1    THE COURT:  Why don't you restate the question.  I

2    think you misstated it.

3    Q.  On January 14, just a few days before the start of this

4    trial, you signed a Rule 35 letter with the U.S. Attorney's

5    Office for information you might provide in this case against

6    Laurence Doud, correct?

7    A.  Yes.

8    Q.  And again prior to today, you wouldn't have been able to

9    pick him out in a room other than the photo that you've seen,

10   correct?

11   A.  Yes.

12           MS. ROTHMAN:  Your Honor, I will stipulate that the

13   witness does not know Mr. Doud.

14           THE COURT:  Is that an objection?

15           MS. ROTHMAN:  No.

16           THE COURT:  Then let's move on.

17   Q.  Now, in your cooperation agreement, you identified that the

18   terms of your plea was in Count One of your indictment in your

19   case, correct?

20   A.  Yes.

21   Q.  Conspiring to distribute and possess with intent to

22   distribute oxycodone from March 2016 through September 2019 in

23   violation of federal law, correct?

24   A.  Yes.

25   Q.  In fact, you funneled pills onto the street of your local

1    neighborhood out the back door of your pharmacy and to addict

2    users, didn't you, Mr. Paulsen?

3    A.  Yes.

4    Q.  You enlisted the help of others directing certain

5    individuals to provide you with fraudulent prescriptions and

6    getting others to assist you in filling out the prescriptions

7    despite not having the necessary authority as a pharmacist,

8    didn't you, Mr. Paulsen?

9    A.  Yes.

10   Q.  You handed out oxycodone pills to people who would in turn

11   resell those pills so that they could generate additional cash,

12   didn't you, Mr. Paulsen?

13   A.  Yes.

14   Q.  You fraudulently held yourself out as a pharmacist, didn't

15   you, Mr. Paulsen?

16   A.  Yes.

17   Q.  Forged the name of your pharmacist at Regal Remedies to oxy

18   prescription, didn't you, Mr. Paulsen?

19   A.  Yes.

20   Q.  You were a street level drug dealer getting oxy to the

21   street, even if it meant lying to your distributor, didn't you,

22   Mr. Paulsen?

23   A.  Well, I didn't have to lie to them the first year and a

24   half.

25   Q.  That's not my question. That's not my question.  You

1    deceived them with false documents at RDC, didn't you,

2    Mr. Paulsen?

3    A.  Yes, I did.

4    Q.  You did these things even though your own sister was

5    addicted to prescription drugs and then to heroin.

6              Did you ever sell her oxy pills during that timeframe?

7    A.  No, I did not.

8    Q.  Not all of the pills that you purchased from RDC were for

9    an illicit purposes, were they, Mr. Paulsen?

10   A.  No.

11   Q.  Only some portion of them are pills you sold out the back

12   door to addicts and others, correct, Mr. Paulsen?

13   A.  Correct.

14   Q.  And RDC, because you falsified prescriptions and

15   manipulated dispensing data wouldn't know firsthand whether you

16   were telling the truth in those documents or not, correct?

17             MS. ROTHMAN:  Objection, your Honor.

18             THE COURT:  Overruled.  You can answer.

19   A.  That's incorrect because for part of the year I dealt with

20   the doctors that RDC knew were hot doctors.

21   Q.  That's not my question, Mr. Paulsen.  You submitted false

22   and manipulated documents to RDC, correct?

23   A.  Correct, but not the whole time.

24   Q.  Some of the time, didn't you, Mr. Paulsen?

25   A.  That is correct, yes.  When you question it that way, yes.

1    Q.  Is there a distinction with a difference?

2            MS. ROTHMAN:  Objection.

3            MR. JANEY:  Withdrawn.  Just one moment.

4            THE COURT:  Yes.

5            MR. JANEY:  If we can have what's been marked as

6    Government Exhibit 103C.

7            THE COURT:  In evidence?

8            MR. JANEY:  Let me confirm with the government, your

9    Honor.  I believe it's in evidence.

10            MS. ROTHMAN:  It's in evidence.

11            THE COURT:  All right.  You can display it.

12    Q.  If we could show it to the jury, please.  If we can amplify

13    the header of the email at the top of the page.

14            Can you see that there, Mr. Paulsen?

15    A.  Yes, I can.

16    Q.  Is Larry Doud in this email?

17    A.  I don't see his name in the email, no.

18    Q.  Looking at the -- let's look at the second part of the

19    email highlighting it for the witness. Is Larry Doud's name in

20    this email, Mr. Paulsen?

21    A.  No, it is not.

22    Q.  You can take down. Let's look at 103D, please, Government

23    Exhibit 103D, highlighting the top of the email, please, for

24    the witness.

25            Mr. Doud's name in this email?

M1QBDOU6                          Paulsen - Cross

1   A.  No.

2   Q.  Take this down, please.  Can I see 103D.1, please.  Do you

3   know what this is?

4   A.  Yes, it's a suspicious order activity report.

5   Q.  What is that?

6   A.  It means if a store or somebody is suspicious of narcotics

7   or something else going on there with controls.

8   Q.  You don't have a background in compliance, do you,

9   Mr. Paulsen?

10  A.  No, I do not.

11  Q.  And you don't know the process steps that it takes before a

12  suspicious order activity report is filed to the DEA, do you,

13  Mr. Paulsen?

14  A.  No, I do not.

15  Q.  Take it down, please.  Can we see 103A.2.  Now, Mr.

16  Paulsen, this is the photo of Regal Remedies that you sent to

17  RDC when you were first intending to do business with them,

18  correct?

19  A.  Correct.

20  Q.  And is it fair to say that it is the front of the store?

21  A.  Yes, that is.

22  Q.  Now, prior to starting Regal Remedies, you had actually

23  worked in a pharmacy for quite some time, correct?

24  A.  Yes, I did.

25  Q.  And that would be Eisenberg pharmacy, correct?

M1QBDOU6                         Paulsen - Cross

1   A.  Yes, I did.

2   Q.  Eisenberg pharmacy is located where?

3   A.  I don't believe it's there anymore.

4   Q.  Where was it?

5   A.  It was in Brooklyn, New York, on 86th Street.

6   Q.  Can you describe the neighborhood that it was in?

7   A.  It was in a residential neighborhood on a busy street on

8   the road where there's a lot of pharmacies and stores and

9   businesses, just a busy area where there's a lot of business.

10  Q.  Is it fair to say it's a working class neighborhood?

11  A.  Yes, that would be fair to say.

12  Q.  And viewing the exhibit here on the screen, is it fair to

13  that Regal Remedies was in a working class neighborhood in

14  Staten Island?

15  A.  Yes, it was.

16  Q.  And is it fair to say that folks who live and work in

17  working class neighborhoods should have pharmacies in those

18  neighbors, Mr. Paulsen, in your opinion?

19  A.  Yes.

20          MS. ROTHMAN:  Objection.

21          THE COURT:  Overruled, I'll let that answer stand.

22          MR. JANEY:  No further questions, your Honor.

23          THE COURT:  Any further questions.

24          MS. ROTHMAN:  Just briefly, your Honor.  Thank you.

25  REDIRECT EXAMINATION

1    BY MS. ROTHMAN:

2    Q.  Mr. Paulsen, do you remember when Mr. Janey called you a

3    street level drug dealer?

4    A.  Yes.

5    Q.  Who supplied you with those drugs?

6    A.  Rochester Drug Corporation.

7    Q.  Do you remember when Mr. Janey asked you if you were

8    deceiving Rochester Drug Corporation with information about

9    your dispensing?

10   A.  Yes, I do.

11   Q.  Can we pull up what's in evidence as Government Exhibit

12   103A, please.  If we can zoom in on the top half of the page.

13   This is dispensing data from you to RDC in November of 2016?

14   A.  Yes, it is, November 18, 2016.

15   Q.  Do you see where Julius Morton writes, 21 percent cash?

16   A.  Yes, I do.

17   Q.  And I am not thrilled with this?

18   A.  Yes.

19   Q.  And a number of questionable docs?

20   A.  Yes, I do.

21   Q.  And why are we even opening up the accounts in Staten

22   Island?

23   A.  Yes, I see it.

24   Q.  Does RDC appear to be deceived, Mr. Paulsen?

25   A.  No, not to me.

1   Q.  We can take this down.

2          Mr. Paulsen, did you want to cause people to become

3   addicted or suffer from controlled substances?

4   A.  No, unfortunately not.  I apologize for my crimes everyday

5   and it's a terrible thing I did, no.

6   Q.  But you did do it?

7   A.  Yes, I did.

8          MS. ROTHMAN:  No further questions.

9          THE COURT:  Any further questions?

10         MR. JANEY:  Nothing further.

11         THE COURT:  Thank you, sir.  You can step down.

12         (Witness excused)

13         THE COURT:  Will the government call its next witness,

14  please.

15         MR. BURNETT:  The government calls Sarah Rosenberg.

16  SARAH ROSENBERG,

17       called as a witness by the government,

18       having been duly sworn, testified as follows:

19  DIRECT EXAMINATION

20  BY MR. BURNETT:

21  Q.  Good afternoon, Ms. Rosenberg.

22  A.  Good afternoon.

23  Q.  Where do you work?

24  A.  I work at the U.S. Attorney's Office for the Southern

25  District of New York.

1   Q.   What's your job there?

2   A.   I'm a paralegal specialist.

3   Q.   How long have you worked there?

4   A.   Around a year and a half.

5   Q.   What are your responsibilities as a paralegal specialist?

6   A.   Generally assisting the Assistant U.S. Attorneys with

7   matters of discovery, co-signors and trials.

8   Q.   Now, have you reviewed exhibits in preparing four your

9   testimony today?

10   A.   I have.

11   Q.   Did you review summary charts in connection with this case?

12   A.   I have.

13   Q.   And are the charts -- and did you create or review charts

14   that other people created in connection with evidence in this

15   case?

16   A.   Yes, I reviewed charts others had created.

17   Q.   Are those charts based in part on exhibits that are already

18   in evidence at trial?

19   A.   Yes.

20   Q.   And did those exhibits consist of many pages?

21   A.   Yes, they did.

22   Q.   Now, to prepare for testifying today, have you met with

23   attorneys for the government?

24   A.   I have.

25   Q.   Have you met with me?

M1QBDOU6                          Rosenberg - Direct

1    A.  I have.

2    Q.  What role did the attorneys for the government play in

3    identifying the materials and the charts that you're going to

4    testify about today?

5    A.  They were the ones to identify all the materials I'll be

6    testifying about.

7    Q.  I'd like to show you, and just for the witness, the parties

8    and the Court, what's been marked as Government Exhibit 908.

9    Do you recognize this?

10   A.  I do.

11   Q.  What is it?

12   A.  It is a table I believe prepared by Mr. Cutler that shows

13   the dosage units for all opioids in RDC's orders per month and

14   then there are additional boxes that state specific months and

15   associated government exhibits.

16   Q.  And did you review this chart to make sure that the

17   government exhibits that are listed on this chart line up with

18   government exhibits that have been entered in evidence in this

19   case?

20   A.  Yes, I checked all of the government exhibits and ensured

21   the dates were in fact correct.

22           MR. BURNETT:  Your Honor, at this time the government

23   offers Exhibit 908.

24           MR. GOTTLIEB:  No objection, your Honor.

25           THE COURT:  It will be admitted into evidence.

1              (Government's Exhibit 908 received in evidence)

2    Q.  Let's publish Exhibit 908 for the jury and start with page

3    2.  I just want to use page 2 here as an example.  You see this

4    is for Regal Remedies, Inc., in Staten Island?

5    A.  I do.

6    Q.  Where does the underlying data, setting aside the little

7    box, where does the underlying data come from?

8    A.  I believe it comes from charts Mr. Cutler prepared.

9    Q.  I think you mentioned those charts had something to do with

10   sales; is that right?

11   A.  Yes, they show the amount of sales of dosage units of

12   opioids per month.

13   Q.  To the pharmacies listed?

14   A.  Correct, to the pharmacies listed.  It's specific to that

15   pharmacy.

16   Q.  Just to get our bearings, what are the little boxes with

17   dates in them?

18   A.  The little boxes with dates in them on the top reflect

19   associated government exhibits in those same months.

20   Q.  Let's take an example with respect to Regal Remedies since

21   we've been talking about it.  Let's take a look at Government

22   Exhibit 103B.  Do you see that this is an email from November

23   21, 2016?

24   A.  I do.

25   Q.  Did that line up with the date in the box on that chart?

M1QBDOU6                         Rosenberg – Direct

1   A.  It did.

2   Q.  Who is it from?

3   A.  It is from Bill Pietruszewski.

4   Q.  Do you see that it's to Larry Doud and a few other people?

5   A.  I do.

6   Q.  What is the text of that email say?

7   A.  It says, please see above last week's compliance auditors

8   report.

9   Q.  Do you see there are a couple of attachments there?

10  A.  I do.

11  Q.  I want to take a look at one of those attachments which is

12  103B2.  Do you see that there's this title, weekly activity

13  sheet?

14  A.  I do.

15  Q.  What's the name next to compliance auditor?

16  A.  Julius Morton.

17  Q.  Can you take a look at the paragraph where it's labeled

18  Friday, November 18.

19  A.  Yes, I see it.

20  Q.  Do you see there's a sentence that begins review Regal

21  Remedies?

22  A.  Yes.

23  Q.  Can you please read that sentence.

24  A.  Review Regal Remedies RX dispensing report, recommended to

25  Bill P.  This pharmacy be suspended from ordering CS.

1   Q.  Thank you, Ms. Rosenberg. Let's take that down.  Let's go

2   back to Government Exhibit 908.  I want to move ahead now to

3   Bay Ridge pharmacy which is listed here on page 1 of the slide.

4   Do you see that?

5   A.  I do.

6   Q.  Did you do the same thing with respect to this Bay Ridge

7   chart as you did with the Regel Remedies chart?

8   A.  I did.

9   Q.  Obviously there are quite a few exhibits compared to the

10  last chart.  We're not going to go through them all.  I just

11  want to go through two of them.

12          Let's go to Government Exhibit 101F.  Do you see that

13  from December of 2015 here?

14  A.  I do.

15  Q.  Who's this email from?

16  A.  It is from Jessica Pompeo.

17  Q.  And when is it from?

18  A.  It is from December 14, 2015.

19  Q.  You can take that blow up down.  Do you see towards the end

20  of the main paragraph here, the sentence that begins with, Do

21  not like.  Would you please read that sentence?

22  A.  Yes.  Do not like 90 percent of the prescribers and a bunch

23  of our buddies are on here with writing for 180, 240, and 360

24  plus units of oxy, 30 milligrams.  I have attached dispensing

25  as well.

1  Q.  If we were to go back to the chart on 908.  Are you able to

2  use this chart to see whether RDC continued selling to this

3  particular pharmacy after that email?

4  A.  Yes, they did.

5  Q.  Let's go to the next chart which I believe is for ProHealth

6  I think Regal Remedy is the second.  I apologize. Old Town

7  pharmacy.  What's charted out here?

8  A.  Similar to the two pharmacies we looked at prior.  It is

9  amount of dosage unit for opioid sold per month from RDC to Old

10  Town pharmacy.

11  Q.  And the exhibits that are listed here, are they already in

12  evidence?

13  A.  That is correct.

14  Q.  Let's move ahead to the next slide.  What pharmacy is it

15  for?

16  A.  This is for ProHealth pharmacy.

17  Q.  Again, what did you do with this underlying sales data

18  chart?

19  A.  I confirmed that all of the exhibits listed and the months

20  that is listed next to them are in fact correct and the dates

21  on which the exhibits come from.

22  Q.  I don't think there is anyone in particular that we need to

23  cover here, so let's move ahead to the next slide.  You see

24  that this is for Linden Care pharmacy?

25  A.  I do.

1    Q.  And again, what did you do to prep this slide?

2    A.  Again, same as with the others, I reviewed all of the

3    exhibits listed and verified that the dates listed are in fact

4    the date on which they were sent if they were emails or were

5    dated otherwise.

6    Q.  Now, I just want to look at three of these.  Obviously

7    there are a number listed.  Do you see October 2014, one of the

8    government exhibit listed in there is Government Exhibit 108K?

9    A.  I do.

10   Q.  Let's take a look at Government Exhibit 108K.  I want to

11   start with the first email in this chain, so for the one that's

12   from Arthur Kersey.  Do you see that?

13   A.  I do.

14   Q.  Who is it to?

15   A.  Bill Pietruszewski.

16   Q.  According to the signature block, what is Arthur Kersey's

17   title?

18   A.  Chief compliance officer.

19   Q.  Chief compliance officer of what?

20   A.  Linden Care, LLC.

21   Q.  What's the first sentence in his email?

22   A.  Attached is the September dispensing report.

23   Q.  Let's take that down.  Do you see that Bill Pietruszewski

24   forwards that to Jessica Pompeo?

25   A.  I do.

1    Q.  How does Jessica respond?

2    A.  She writes:  Yah, they are filling cash prescriptions for

3    two of the doctors on the DEA watch list, Jeffrey Goldstein and

4    Todd Shilfstein, hmm.

5    Q.  Let's go back to the Linden Care slide on Exhibit 908.  I

6    want to skip ahead this time to Government Exhibit 108S which

7    you see in the February 2015 bubble?

8    A.  I do.

9    Q.  Who is this from?

10   A.  From Jessica Pompeo.

11   Q.  Who is it to?

12   A.  Bill Pietruszewski.

13   Q.  What does she write?

14   A.  She writes:  Here are the top prescribers so far I found

15   from Linden Care.  Lots of cash on subsys, total 26 percent,

16   but lots of individual prescribers over 70 percent.  Let me

17   know if you have any questions, please.

18   Q.  Is it possible -- do you see there's an attachment to that?

19   A.  I do.

20   Q.  Is it possible to pull up that attachment.  I believe only

21   to be outside of trial director.  It's 108S.1.  Let's scroll

22   over to the far left of the chart, please.

23          Do you see columns A entitled top CS prescriber of

24   concerns?

25   A.  I do.

1    Q.  Can you read the titles of the three columns after that?

2    A.  Column B is trinity doc. Column C is top prescriber of

3    concern, and column D is subsys high cash.

4    Q.  Just scrolling down do you see there are yeses next to

5    prescribers of concern and subsys high cash for a number of

6    these doctors?

7    A.  I do.

8    Q.  Thank you.  Let's go back to the Linden Care slide on

9    Government Exhibit 908, and I'd like to look at just one more

10   document.  I would like to look at Government Exhibit 108T

11   which is also from February 2015 according to this chart?

12   A.  I see it.

13   Q.  And let's start with the second email from the top.  Who's

14   it from?

15   A.  It is from Jessica Pompeo.

16   Q.  Who is it to?

17   A.  Bill Pietruszewski.

18   Q.  What does Jessica write?

19   A.  Jessica writes:  This is a Linden Care doctor that is a

20   high prescriber of subsys.  Just received yesterday the

21   discipline.  It is for high prescribing of controlled

22   substances in Arkansas.  He is on the list I emailed you.

23   Q.  How does Bill Pietruszewski respond?

24   A.  Bill writes above:  This sucks.  Thank you.

25   Q.  Let's take this down and go back to Government Exhibit 908.

M1QBDOU6                        Rosenberg - Direct

1    Let's go ahead to the next slide on the chart, slide number 6.

2    Do you see this is Seventh Elm pharmacy?

3    A.   I do.

4    Q.   Have you done the same thing with respect to this chart as

5    you did with the other charts?

6    A.   I have.

7    Q.   Let's take a look at just one exhibit here, Government

8    Exhibit 109F, which according to this chart is from July 2014,

9    correct?

10   A.   Correct.

11   Q.   Could you read the first four -- when is this from?

12   A.   It is from July 2014.

13   Q.   Who's it from?

14   A.   The email at the very top is from Jessica Pompeo to Chris

15   Noulis and Bill Pietruszewski.

16   Q.   Could you read the first four lines of this email.

17   A.   Chris, good afternoon. This order was released yesterday

18   afternoon by myself.  The information I have on file was from

19   almost a year ago though.  I have personally tried --

20   Q.   I apologize.  Let's stop there and actually scroll down to

21   the bottom of this email.

22        Do you see this is one of the order of interest email?

23   A.   I do.

24   Q.   What's the drug that it's about?

25   A.   OxyContin.

M1QBDOU6                        Rosenberg - Direct

1    Q.  What's the pharmacy that it's about?

2    A.  Seventh Elm drug corp.

3    Q.  Let's go back to Government Exhibit 908 now.  Move ahead in

4    the next part of the chart to slide 7.

5         What are the pharmacies that are listed here?

6    A.  It's Aliton's pharmacy in Port Jervis, New York, and in

7    Milford, PA.

8    Q.  Do you see there are a number of red portions of the line

9    on this chart?

10   A.  I do.

11   Q.  I want to start from before the red portion of the line

12   show up with an email marked Government Exhibit 110A from

13   August of 2013?

14   A.  I see that.

15   Q.  When is this email from?

16   A.  It is from August 2013.

17   Q.  Who is it from?

18   A.  It is from Bruce Beiber.

19   Q.  Do you see that it goes to Laurence Doud and a few other

20   people, including Joe Brennan?

21   A.  I do.

22   Q.  What's the subject?

23   A.  Braunagel and Braunagel Incorporated, d/b/a, Aliton's

24   pharmacy.

25   Q.  Could you read the first paragraph of this email.

1   A.  Jonathan alerted me to a potential situation involving

2   Braunagel and Braunagel. I immediately undertook some online

3   research and came across the attached article.  Needless to say

4   the situation is quite troubling.  Apparently sales of

5   medicines exploded from patients traveling from the city.

6   Apparently the patients were "suspicious" but Braunagel filled

7   their scripts. The article is quite troubling as it appears he

8   had a reason to be suspicious.

9   Q.  Do you see that there is an attachment to this email?

10  A.  I do.

11  Q.  Let's go to that attachment which is 110A.1.  Could you

12  read the title?

13  A.  Suspicious prescriptions raise concerns at port pharmacy.

14  Q.  Just the first sentence, please.

15  A.  Eighteen people have been arrested in a two month period

16  for trying to fill illegitimate prescription at Aliton's

17  pharmacy at Port Jervis according to the police and the

18  pharmacy owner.

19  Q.  Let's go back now to 908, and we're looking back now at the

20  Aliton's pharmacy charts just to situate ourselves.  Where was

21  that email in relation to this sales chart?

22  A.  It is the first bubble above August 2013.

23  Q.  Let's go to, I believe, the final portion of this exhibit

24  which is Government Exhibit 8.  Do you see that for Blairsville

25  pharmacy?

1    A.  I do.

2    Q.  What did you do with this slide?

3    A.  The same as all of the others, I reviewed all of the boxes

4    with dates and government exhibits to ensure that they in fact

5    matched.

6    Q.  And I just want to take a look at one of these.  Can we

7    look at Government Exhibit 111D which according to this chart

8    is from October 2015?

9    A.  Sure.

10   Q.  Looking at the original email here, do you see it's one of

11   those control order of interest emails?

12   A.  Yes, it is.

13   Q.  What's the drug group?

14   A.  It is a duragesic.

15   Q.  Who's the customer?

16   A.  Blairsville pharmacy.

17   Q.  Do you see in the email above Jessica Pompeo forwards this

18   to Kevin Taraszewski?

19   A.  I do.

20   Q.  Could you please read the first paragraph of Jessica

21   Pompeo's email?

22   A.  We still need dispensing from Brian and all required

23   compliance information.  I have talked to Brian twice in the

24   last week for dispensing and will be calling him again shortly.

25   He keeps saying he will get to us, dot, dot, dot.  A little

1    concerning that he has hit so many alerts with match to Brine

2    who is a larger customer.

3    Q.  Thank you.  Let's take that down.  I believe that was the

4    last slide in Government Exhibit 908; is that correct?

5    A.  That's correct.

6    Q.  I want to wrap up on a different subject.  Have you

7    reviewed what's in evidence as Government Exhibit 348A?

8    A.  I have.

9    Q.  Is it possible to pull that up on the screen briefly for

10   the jury.  Could you just describe briefly what's in Government

11   Exhibit 348A?

12   A.  It's my understanding that it list pharmacies and then the

13   amounts of a specific drug fentanyl that was sold and dispensed

14   to them for the years 2012, 2013, 2014, 2015, 2016, and then a

15   total summation column.

16   Q.  Have you reviewed charts that were created using excerpts

17   of the data from this larger data set?

18   A.  I have and I compared the excerpts to the larger data set.

19   Q.  Did you find the excerpts to be an accurate comparison to

20   the larger data set?

21   A.  I did.

22   Q.  I'm going to show you what's been marked as Government

23   Exhibit 909.  If this could just go to the witness, the Court

24   and the parties.  Do you see that there are two sheets here?

25   A.  I do.

1    Q.  Is this the excerpt document that you just testified about?

2    A.  If I could just see sheet two.

3    Q.  Yes.  I apologize.

4    A.  Yes, it is.

5          MR. BURNETT:  Your Honor, at this time the government

6    offers Exhibit 909 in evidence.

7          MR. GOTTLIEB:  No objection.

8          THE COURT:  It will be admitted into evidence.

9          (Government's Exhibit 909 received in evidence)

10          MR. BURNETT:  Let's please publish Exhibit 909 to the

11   jury.

12   Q.  We're looking now at sheet 1 of Government Exhibit 909.

13   Can you read the title?

14   A.  Fentanyl sales to pharmacies in GX 908A.

15   Q.  What are the pharmacies that are listed out in this chart.

16   These are the same pharmacies that were listed individually in

17   Government Exhibit 908A?

18   A.  So it's SBSC, LLC; Regal Remedies RX, Old Town Pharmacy

19   Incorporated, ProHealth pharmacy, Inc.,  Linden Care, LLC,

20   Seventh Elm Drug Corp., Aliton's pharmacy in Milford and

21   Blairsville pharmacy.

22   Q.  And are those the pharmacies charts that you testified

23   about just a few minutes ago?

24   A.  Yes, they are.

25   Q.  And what does this chart show about sales to those

M1QBDOU6                        Rosenberg – Direct

1   pharmacies?

2   A.  It list the specific amount of fentanyl sold to each

3   pharmacy per year and then a grand total.

4   Q.  Let's take a look now at sheet 2 and scroll up to the top,

5   please.  What the title here?

6   A.  Fentanyl sales to pharmacies terminated between 2017 and

7   2020.

8   Q.  Now, have you seen a chart of pharmacies that were

9   terminated after Mr. Doud left the company?

10  A.  I have.

11          MR. GOTTLIEB:  Your Honor, objection.  May we have a

12  sidebar.

13          THE COURT:  You're objecting to the question?

14          MR. GOTTLIEB:  Objection to a portion of this exhibit.

15          THE COURT:  All right.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

M1QBDOU6                     Rosenberg – Direct

1            (Sidebar)

2            THE COURT:  What's the objection?

3            MR. GOTTLIEB:  Your Honor, I just notice on page 2 it

4    deals with sales from 2017 to 2020 which is beyond the

5    indictment.  I thought we had an agreement that at the outset

6    of the trial that with regard to this information it will be

7    restricted within the time of the indictment which would be

8    2012 to the beginning of 2017.

9            MR. BURNETT:  It's just a confusion with the reading

10   of the title.  These were the pharmacies that were terminated

11   between 2017 and 2020, and it was the sales to those pharmacies

12   between 2012 and 2016.

13           MR. GOTTLIEB:  Thank you for that correction.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

M1QBDOU6                          Rosenberg – Cross

1                    (In open court; jury present)

2     BY MR. BURNETT:

3     Q.  Ms. Rosenberg, are the pharmacies that are listed here

4     pharmacies that RDC terminated between 2017 and 0020, but sold

5     fentanyl to between 2012 and 2016?

6     A.  Correct.

7     Q.  And the data that's in the chart, does that reflect the

8     fentanyl sales to those pharmacies between 2012 and 2016?

9     A.  Correct, and then a final column which displays the total

10    of all of those years sold.

11               MR. BURNETT:  No further questions, your Honor.

12               THE COURT:  Any questions for this witness.

13               MR. GOTTLIEB:  Yes, your Honor.

14    CROSS-EXAMINATION

15    BY MR. GOTTLIEB:

16    Q.  Good afternoon, Ms. Rosenberg.

17    A.  Good afternoon.

18    Q.  If I could just ask you, you were given these documents to

19    superimpose on those exhibits, correct, by the government,

20    correct?

21    A.  I was not the one who created these.  I verified them for

22    accuracy.

23    Q.  With regard to this last list if we could go to 909,

24    Government Exhibit 909?

25    A.  I see it.

1   Q.  This particular list, lists the pharmacies and sales of

2   fentanyl, correct?

3   A.  Correct.

4   Q.  And is it fair to say that this list, and I believe

5   Government Exhibit 348A, you're not indicating by these

6   notations that any portion of the fentanyl was actually

7   diverted, correct?

8   A.  To my knowledge these numbers indicate the amount of

9   fentanyl sold from RDC to the pharmacies and that is the

10  meaning of the numbers.

11  Q.  So both this Exhibit 909, and if we could look at 348A,

12  your Honor?

13  A.  My understanding is the same here that these numbers

14  indicate the amount of fentanyl sold from RDC to the listed

15  pharmacy for the specific year.

16  Q.  There's nothing about these exhibits which you would

17  explain to the jury reflects that any of the fentanyl on either

18  of these exhibits ever was diverted for non-medical purposes,

19  correct?

20  A.  These exhibits -- correct, these exhibits don't indicate

21  anything about what further happened to the fentanyl.

22  Q.  Your Honor, may we have Government Exhibit -- I'm just

23  going through what they showed, 103B.2.  You were shown

24  Government Exhibit 103B.2.  This weekly activity sheet, a

25  report compliance order to Julius Morton.  Laurence Doud's name

M1QBDOU6                      Rosenberg - Cross

1    is not on this, correct?

2              MR. BURNETT:  Objection.  There's a prior document

3    that it's attached to.

4    Q.  Actually, I'm asking about this document.  Is Laurence

5    Doud's name on this document?

6    A.  If you could just give me a moment to read it.  I only

7    skimmed it before.  I do not see his name on this document.

8    Q.  And in any other email whether Laurence Doud's name is on

9    it or not, you don't know whether or not Mr. Doud actually read

10   anything that you have testified about, correct?

11   A.  I have no knowledge about what Mr. Doud does or does not

12   know.

13   Q.  Your Honor, may we have 101F, please.  Government Exhibit

14   101F which you were asked about.  You indicated was to

15   compliance from Jessica Pompeo.  Larry Doud's, Laurence Doud's

16   name is not on this email either, correct?

17   A.  Correct, from what I can see.

18   Q.  Your Honor, may I have 108K please.  Looking at 108K, this

19   email is to Bill Pietruszewski to Jessica Pompeo and the other

20   thread Bill Pietruszewski and Jessica Pompeo and then from

21   Arthur Kersey to Bill Pietruszewski.  Laurence Doud's name is

22   not on any of these emails, correct?

23   A.  Correct.

24   Q.  Your Honor, please 108F. Now looking at 108F -- I'm sorry.

25   We could take that off.  108T, your Honor, that you were asked

1    about.  Again, this is from Mary Sykes to Jessica Pompeo.

2    Jessica Pompeo to Bill Pietruszewski.  Jessica Pompeo again to

3    Bill Pietruszewski.  Laurence Doud is not on that thread,

4    correct?

5    A.  Correct.

6    Q.  May we have 109F, please.  109F here again it's from

7    Jessica Pompeo to Chris Noulis, copy to Bill Pietruszewski and

8    the original notice is to Jessica Pompeo.  Laurence Doud's name

9    is not on this one either, correct?

10   A.  On this page it is not, correct.

11   Q.  Your Honor, may I have 110A.1.  And this was the article,

12   correct?

13   A.  Correct.

14   Q.  That was attached to the emails that we just talked about?

15   A.  One of the emails, yes.

16   Q.  And may we have 111D, please.  And 111D that you were asked

17   about is the control order of interest on the bottom sent to

18   Jessica Pompeo, and then the above thread is Kevin Taraszewski

19   to Jessica Pompeo.  Again on this one no Larry Doud, correct?

20   A.  On this first page, correct.

21            MR. GOTTLIEB:  Your Honor, I have no further

22   questions.

23            THE COURT:  Any further questions?

24            MR. BURNETT:  Very, very briefly.

25            THE COURT:  All right.

1  REDIRECT EXAMINATION

2  BY MR. BURNETT:

3  Q.  Let's take a quick look at Government Exhibit 103B.2.  Is

4  this one of the documents that you were just asked about?

5  A.  It is.

6  Q.  And you were asked if Larry Doud appeared on this specific

7  document?

8  A.  I was.

9  Q.  And just to be clear, this is the document where Julius

10  Morton recommended that Regal Remedies be suspended, correct?

11  A.  Correct.

12  Q.  Was this attached to an email?

13  A.  It was.

14  Q.  Let's look at Government Exhibit 103B.  Is this the email

15  it was attached to?

16  A.  It is.

17  Q.  Do you see Mr. Larry Doud's on that email?

18  A.  I do.

19  Q.  Now, let's take a look ahead to Government Exhibit 110A.1.

20  You were also asked if Mr. Doud appears on this news article,

21  correct?

22  A.  Correct.

23  Q.  Was this news article attached to an email?

24  A.  It was.

25  Q.  Let's take a look at 110A.  Is this the email it was

1   attached to?

2   A.  Yes.

3   Q.  Do you see Mr. Doud copied on that email?

4   A.  I do.

5           MR. BURNETT:  No further questions.

6           THE COURT:  Any further questions.

7           MR. GOTTLIEB:  Very briefly.

8   RECROSS EXAMINATION

9   BY MR. GOTTLIEB:

10  Q.  As I asked you before with the two that were just shown to

11  you about Laurence Doud's name, you're not able to say that

12  Laurence Doud ever saw it or read them, correct?

13  A.  Correct.

14          MR. GOTTLIEB:  Thank you, your Honor.

15          THE COURT:  Any further questions?

16          MR. BURNETT:  No, your Honor.

17          THE COURT:  Thank you.  You can step down.

18          (Witness excused)

19          THE COURT:  Ladies and gentlemen, we're go to adjourn

20  for the day.  This is my intention.  I intend to try to attempt

21  to finish all the witnesses tomorrow.  If we do that, I'm going

22  to give you Friday off.  I know that Friday night and Saturday

23  morning, there may be a storm, so can you prepare yourselves

24  for that.  If we can finish the witnesses tomorrow, I'll give

25  you Friday off.  And Monday, we will have the summations, or

M1QBDOU6                          Rosenberg – Recross

closing arguments, of the lawyers.  And then after we finish

that, I'll instruct you on the law and send you in to begin

your deliberations.  So that will be either sometime, hopefully

sometime at the end of the day Monday or sometime on Tuesday.

OK?  So that's my intent.

         I think I'm going to stick with not having you come in

on Friday.  If we don't finish the witnesses tomorrow as I

plan, then we'll finish them up Monday and then go into the

summations after we finish up the witnesses, because I don't

anticipate at this point that there will be significantly

lengthy witness by Monday.

         Don't discuss the case.  Keen an open mind.  Plan on

that, and I'll see you tomorrow morning at 9:45.  We'll see if

we can finish the witnesses tomorrow.

M1qBdou6

1              (Jury not present)

2              THE COURT:  Will be the government be prepared to

3    rest?

4              MR. ROOS:  We want to look at the exhibit list

5    tonight, make sure there's nothing missing.  But with the

6    exception of the possibility of a rebuttal witness, if they put

7    in a chart, we don't have any other witnesses we're planning to

8    call.

9              THE COURT:  You intend to rest at this point.

10             MR. ROOS:  That's correct, your Honor.

11             THE COURT:  All right.

12             And are we prepared to do your witnesses tomorrow?

13             MR. JANEY:  We are, your Honor.  With the Court's

14   permission, the second witness will be here at 2:30 tomorrow.

15             THE COURT:  How long do you anticipate that witness is

16   going to testify?

17             MR. JANEY:  If I can just take a step back.  We have a

18   witness that can be available tomorrow morning; that's the

19   character witness, subject to your Honor's scheduling desires.

20   I believe that the expert witness is probably, given everything

21   that has now been admitted in evidence and the testimony that

22   the jury's already heard, I anticipate it to be an hour, maybe

23   an hour and a smidgen over.  And by that, I don't mean an hour

24   and a half.  If it's over, it's over by, like, four or five

25   minutes.

1           THE COURT:  Is there something magical about 2:30?

2     Can we get him here earlier?

3           MR. JANEY:  I don't know the answer to that, your

4     Honor.  After the last discussion with the Court, what I

5     relayed was that the Court is willing to accommodate whatever

6     is going to work, and 2:30 was the answer.

7           THE COURT:  Well, I would reach back out to your

8     witness.  If we start your first witness at 10:00, I assume

9     that witness will be off the stand by 10:45.

10          MR. JANEY:  Yes, your Honor.  Based on the

11     conversations that I've had with the witness, the expert,

12     moving around, etc., the two things that I've relayed to him, I

13     do not believe -- and I will certainly go about go back and

14     make a follow-up phone call -- but the witness is not going to

15     be available in the morning.

16          THE COURT:  Well, you can tell the witness that I will

17     expect the witness to be here no later than 2:30.  The earlier

18     the witness shows up the earlier the witness can get out of

19     here and that essentially the defense is going to have a gap of

20     several hours where the jury's cooling their heels, waiting for

21     this witness.  So my suggestion would be, to whatever extent

22     it's possible, for this witness to be here by -- my best

23     suggestion would be 11:00, but to be here sometime before lunch

24     if they can rather than after lunch so the jury doesn't have to

25     cool their heels, because I wouldn't have a reasonable

M1qBdou6

1    explanation to give to the jury as to why we're sitting around

2    waiting on your witness.

3            MR. JANEY:  I understand, your Honor, and I'll

4    apologize in advance.  I'm not trying to be frustrating.

5            THE COURT:  Don't apologize to me.  I don't want it to

6    prejudice your case.  This is your witness.

7            MR. JANEY:  I understand, your Honor.  Based on the

8    conversation that I had -- and I will go back -- I don't

9    anticipate that this witness will be ready at 11:00.

10           THE COURT:  All right.  Well, see if anytime earlier

11   than 2:30 this witness can be ready; the earlier this witness

12   can get here the better off we all will be, even that witness,

13   because that's the earliest we'll get the jury done.  If this

14   witness is here at 11:00 and we start this witness at 11:00,

15   there's a good chance this witness will be out of here before

16   lunchtime.  If the witness can come at two, one, 12, ten,

17   whenever the witness gets here, depending on how you want to

18   proceed, I'll put the witness on.  Whenever the witness arrives

19   here, if the witness can give us an earlier time, I would

20   prefer a much earlier time.

21           MR. JANEY:  I understand, your Honor.

22           THE COURT:  As soon as we're finished with that

23   witness, I'll be sending the jury home for the weekend.

24           MR. JANEY:  Understood.

25           MS. ROTHMAN:  Your Honor, could we raise just two

M1qBdou6

```
 1   issues with respect to the defense witnesses?  As to the

 2   character witness, we haven't received any 26.2 material, so I

 3   don't know what this witness is going to say.

 4              THE COURT:  She's going to stay Mr. Doud has a good

 5   character.  That's what character witnesses say.

 6              MS. ROTHMAN:  I would say two things.  If they have

 7   met with this witness and there are notes, we're asking for

 8   them.  And the second thing is, as the Court knows, typically,

 9   giving specific instances of good character is improper.

10              THE COURT:  It's not allowed.

11              MS. ROTHMAN:  Right.  I want to make the ground rules

12   are set for what we're going to hear tomorrow from that

13   witness.

14              THE COURT:  If you want to respond Mr. Gottlieb, you

15   can, but I'm very confident that you know what the rules are.

16              MR. GOTTLIEB:  I do, your Honor, but I appreciate that

17   guidance that we should abide by the law.

18              MS. ROTHMAN:  I just want to be clear, there are no

19   notes --

20              MR. GOTTLIEB:  No notes.

21              THE COURT:  Do you have anything to turn over at this

22   point?

23              MR. GOTTLIEB:  No.  We've said that before, and you

24   can ask me a million times.

25              THE COURT:  Mr. Gottlieb, talk to me.  Don't talk to
```

M1qBdou6

1    her.  All right?

2              You're saying we are ready to go, right?

3              MR. GOTTLIEB:  Ready.

4              THE COURT:  I take your word for it.  We'll be

5    prepared to get this witness on the stand no later than 10:00.

6    I think what I'm going to try to do, it would also be helpful

7    to get this other witness earlier, because I like to spend some

8    time talking about the jury charge, and I know you want to do

9    that as early as possible.  I'd rather not have this witness

10   get on the stand at 2:30 and then we have to go to 5:00.

11             MR. JANEY:  If I can say one further thing,

12   anticipating a potential question from the government, and a

13   lot of this is moving very quickly.  There have been some

14   revision to the expert slides.  We will make sure that the

15   government gets this email.

16             THE COURT:  Okay.

17             MR. GOTTLIEB:  Your Honor, I did have a question about

18   the charge conference.

19             THE COURT:  Yes.

20             MR. GOTTLIEB:  Did you have, was there any chance that

21   we would have a charge conference on Friday?

22             THE COURT:  Maybe, but what I propose is that I give

23   you a draft tomorrow before the end of the day, and we can talk

24   about it briefly.  I can tell you what's in it, and then can

25   you look it over and then we can discuss it further.

M1qBdou6

1    It probably makes more sense, if you have anything

2    other than minor suggestions or changes, it probably makes more

3    sense for me to just, instead of trying to meet with you

4    Friday, to get something in writing from you and I can go over

5    it over the weekend, and then Monday morning, early, I can let

6    you know whether or not I made adjustments or let you argue

7    further, if you need to argue further.  I don't anticipate

8    major, major changes.

9    The only thing I'll flag for you right now is what I'm

10   still working on, debating.  I'm not sure what the parties'

11   position is and whether this is in dispute with regard to the

12   amount of fentanyl.  I understand that the government has

13   charged over 400 grams of fentanyl.  I understand that it could

14   effect the penalty if it's 40 to 400 or if it's under 40.

15   Quite frankly, it's kind of difficult for me to understand how

16   the jury could come up with under 400 but more than 40 based on

17   this evidence.  I'm not even sure that that's really the issue

18   that you guys want to fight about, the quantity of fentanyl.  I

19   mean, obviously, there was a significant amount of fentanyl

20   sold, and more than 400 grams was sold.  To sort of say that

21   this evidence would give a reasonable jury a basis to conclude

22   that it was 35 grams of fentanyl, I'm not sure how that's even

23   possible.  It seems to me it was either over 400 or it wasn't,

24   and I'm not sure that that number is genuinely in dispute.

25   So think about that.  That's an issue I'm focusing

M1qBdou6

more on the verdict form than on the jury charge.  I'm going to

give a charge; you'll be more interested in the substantive

charge.  Most of the standard charge, general charges are out

of Sand's jury instruction.  Pretty much word for word I use

that, except I take some suggestions from the parties.  It's

fairly standard, so the only real issue that I'm spending my

last few days concentrating on is how to charge the conspiracy,

and at this point I intend to charge the conspiracy -- the only

thing that's a little tricky is that I have to make a

distinction, unless you tell me not to, between the drug

conspiracy and the overt acts and the fraud conspiracy.

Basically, a drug conspiracy don't require the overt acts that

the fraud conspiracy does.  I think I've fashioned a way to

address that, by saying that to prove a conspiracy you have to

prove these elements, and that to prove a drug conspiracy,

these are the elements, the substantive issues.  And with

regard to the conspiracy to defraud, there needs to be an overt

act in furtherance of the conspiracy.

             That's really the only distinction, that the

conspiracy to defraud requires an overt act and the drug

conspiracy does not.  But I will try to be in a position as

early as possible tomorrow to give you a draft so that you can

look at it right away and react to it, and then you can take

some time the next day and/or over the weekend.  And obviously,

if you have suggestions that you think are important, try to

M1qBdou6

get it to me as early as possible so I at least have a day over

the weekend to respond to it, so first thing Monday morning I

can tell you whether or not I've taken those suggestions and

you can note your objections, if you have objections to it,

before the charge.

I don't really anticipate that it's worth trying do

that on Friday and if I don't, if we're not going to have the

jury here, I'm not sure that it really is worth everyone

gathering into the courthouse to do what I think may not be

major discussion.  But take it tomorrow, and we can discuss it

further tomorrow; I can take a quick look at it.

The only other question that I have is approximately

how long does the government anticipate that they will be on

summation?

(Continued on next page)

M1q3dou7

1              MR. ROOS:  Definitely over an hour, but honestly, your

2      Honor, it's nowhere close to written so I really, I would just

3      be coming up with a guess at this point.

4              THE COURT:  A guess is better than no guess.

5              MR. ROOS:  Two hours.

6              THE COURT:  What about the defense?

7              MR. GOTTLIEB:  Boy, I wasn't even going to say that.

8              THE COURT:  I think he's right, that is a guess.  I

9      don't think he's basing it on anything at this point.  He

10     hasn't organized it.

11             MR. ROOS:  I have nothing right now.

12             THE COURT:  That's fine.

13             MR. GOTTLIEB:  The best I can guess would be about two

14     hours and five minutes.

15             MR. ROOS:  That's probably right.

16             THE COURT:  I'm going to assume that the summations

17     are going to be somewhere between an hour or two.  Okay?  If

18     you start to go much beyond that time period, then I'm probably

19     going to ask you are you almost finished.

20             But I don't, unless you tell me it's going to be six

21     hours, it's usually not my practice to put a time limit on your

22     summation.  As long as you're making appropriate arguments,

23     based on the evidence, and not being repetitive.  So you can

24     say whatever you need to say.

25             So, but that really means that it is going to take us

M1q3dou7

probably most of the day to do the summations.  Because we have

the government's summation, the defense summation, and then the

government's rebuttal.  So, the real question I'll have to try

to figure out is whether or not I should try charging the jury,

if we sum up on Monday morning, how quickly we can start, and

whether or not I am going to charge the jury that day or

whether I'll wait until Tuesday morning to charge the jury.

        I usually like to give the jury at least about an hour

or so to deliberate the day that I charge them.  So, if we

finish somewhere between 3 or 4 o'clock, it's likely I will

charge the jury.  If we finish somewhere like 4:30, then I

probably will wait until the next day to charge the jury.  So

that's my process.

        As I say, consider this a rough draft.  So if you have

suggestions, and some of this stuff will have changed already

by the time you give me the suggestions.  But if you have

suggestions or objections, let me know, and but just consider

this to be a draft at this point that I'm working on.  I'm

going to go through it a couple more times, and then hopefully

I'll have it to you, definitely have it to you before the end

of the day tomorrow.  If I can, I may try to get it to you by

lunch time if I have time to address it tonight and tomorrow.

        So let's be prepared to wind up tomorrow.  And let's

try to get these witnesses in here as quickly as possible.  I

think that my sort of feeling is that your witness is a little

M1q3dou7

1   loosey-goosey about what time he can show up.  That if I said

2   yesterday I don't care what's got to do, to be here at

3   11 o'clock, he'd be here.  So, let's try and figure out, let's

4   see him work a little bit more with us if he can.

5             MR. JANEY:  I understand, your Honor.

6             THE COURT:  So I won't have to tell the jury at 10:30

7   that the next witness will be here at 2:30.

8             MR. JANEY:  Understood, your Honor.

9             MR. ROOS:  If we have a rebuttal witness, should we

10  have the person come early in the day?

11            THE COURT:  Depends what you are going to rebut.  I

12  think that if you have a rebuttal witness, that if the

13  government can get some sort of at least response or commitment

14  that this witness is going to be here early, notify both the

15  Court and the other side tonight, and let us know that the

16  witness says that they can come at 1 o'clock instead of 2:30 or

17  11 o'clock, and so we'll know then.  If you are going to have a

18  rebuttal witness, I would say plan on that witness being here

19  like noon.

20            MR. ROOS:  Okay.

21            THE COURT:  And either we'll do them just before lunch

22  or if we have to do them after lunch, they can wait around for

23  a couple hours if we do a rebuttal at all.

24            MR. GOTTLIEB:  Can we find out tonight who the

25  rebuttal witness is.  Because there is no secret, the only

M1q3dou7

1    issue is we are going to seek to have that chart introduced.

2            MS. ROTHMAN:  We'll send you his name.

3            THE COURT:  Okay.  See you tomorrow morning.

4            (Adjourned to January 27, 2022, at 9:45 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                                  Page

3     DAVID CUTLER

4    Direct By Mr. Burnett  . . . . . . . . . . .1297

5    Cross By Mr. Janey . . . . . . . . . . . . .1347

6    Redirect By Mr. Burnett  . . . . . . . . . .1410

7    Recross By Mr. Janey . . . . . . . . . . . .1426

8     MICHAEL PAULSEN

9    Direct By Ms. Rothman  . . . . . . . . . . .1437

10   Cross By Mr. Janey . . . . . . . . . . . . .1461

11   Redirect By Ms. Rothman  . . . . . . . . . .1473

12    SARAH ROSENBERG

13   Direct By Mr. Burnett  . . . . . . . . . . .1474

14   Cross By Mr. Gottlieb  . . . . . . . . . . .1492

15   Redirect By Mr. Burnett  . . . . . . . . . .1496

16   Recross By Mr. Gottlieb  . . . . . . . . . .1497

17                        GOVERNMENT EXHIBITS

18   Exhibit No.                                 Received

19    904 and 906  . . . . . . . . . . . . . . .1331

20    908 A  . . . . . . . . . . . . . . . . . .1346

21    910, 911   . . . . . . . . . . . . . . . .1418

22    912  . . . . . . . . . . . . . . . . . . .1419

23    1220  . . . . . . . . . . . . . . . . . . .1439

24    633  . . . . . . . . . . . . . . . . . . .1446

25    908  . . . . . . . . . . . . . . . . . . .1477

1   909   . . . . . . . . . . . . . . . . . .1489

2                          DEFENDANT EXHIBITS

3   Exhibit No.                              Received

4   T1   . . . . . . . . . . . . . . . . . .1354

5   T2   . . . . . . . . . . . . . . . . . .1359

6   T3   . . . . . . . . . . . . . . . . . .1360

7   T4   . . . . . . . . . . . . . . . . . .1361

8   T5   . . . . . . . . . . . . . . . . . .1362

9   T8   . . . . . . . . . . . . . . . . . .1402

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25