M1R3DOU1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                          19 Cr. 285 (GBD)

5  LAURENCE F. DOUD III,

6              Defendant.
                                           Trial
7  ------------------------------x

8                                          New York, N.Y.
                                           January 27, 2022
9                                          9:45 a.m.

10 Before:

11
                       HON. GEORGE B. DANIELS,
12
                                           District Judge
13                                         –and a Jury–

14                     APPEARANCES

15 DAMIAN WILLIAMS
        United States Attorney for the
16      Southern District of New York
   BY:  NICOLAS T. ROOS
17      ALEXANDRA ROTHMAN
        THOMAS S. BURNETT
18      Assistant United States Attorneys

19 ROBERT C. GOTTLIEB
   DERRELLE M. JANEY
20 PAUL R. TOWNSEND
        Attorneys for Defendant
21
   Also Present:  Sunny Drescher
22                 Jacqueline Hauck
                   Paralegal Specialists
23                 Special Agent George Burdzy, DEA
                   Investigator Kathleen Whitmore, DEA
24

25

M1R3DOU1

1              (Trial resumed; jury not present)

2              THE COURT:  Mr. Roos, are we waiting for the rest of

3    your team?

4              MR. ROOS:  I think, I know Ms. Rothman is on her way

5    up, but Mr. Burnett is not going to be coming up until a little

6    bit later.

7              So, just a few things, your Honor.  I understand they

8    brought their character witness who will testify.  By the way,

9    we're going to rest.  We realize there is one stipulation that

10   was previously offered but not the signed version, so we'll

11   offer the signed version.  Then we'll rest.

12             I understand they have a character witness.  I

13   understand they also have two stips.  One of them is the one I

14   objected to at length yesterday.  You have heard us, so I'm not

15   going to belabor the colloquy on that.  The other is this

16   attorneys' fees thing.

17             THE COURT:  Which one?

18             MR. ROOS:  They issued a subpoena to get records of

19   the attorneys' fees paid.  My recommendation, if it is okay

20   with defense counsel, is we get the morning started so the jury

21   doesn't wait, and use the period in between when this witness

22   testifies and the expert testifies to sort of work out our

23   issues so we're not wasting time.  If that's okay with

24   everyone.

25             THE COURT:  You are saying that's the subject of a

1    possible stip?

2              MR. ROOS:  They have a business certification that

3    authenticates the invoices, and they also are going to have a

4    business certification that authenticates that spreadsheet.  We

5    don't object to the authentication.  On the legal fees, we have

6    an objection as to the relevance, which your Honor can rule on

7    in the long break between the character witness and the expert.

8              THE COURT:  All right.

9              MR. ROOS:  That would be my proposal.  We have a very

10   brief rebuttal witness who is either here or going to be here

11   this morning so he'll be ready to go, as soon as the defense

12   witness is off.  I think everyone thinks we'll be able to

13   finish today.

14             THE COURT:  At what point do you anticipate that

15   you're going to present a rebuttal witness?

16             MR. ROOS:  What's the point?

17             THE COURT:  At what point?

18             MR. ROOS:  Well --

19             THE COURT:  What are you going to rebut?

20             MR. ROOS:  Just that one spreadsheet about terminated

21   customers.  So, sequentially he should go after they offer it.

22   But, I haven't talked to the rest of the team.  If some reason

23   your Honor wanted to put them out of order or something, I

24   think he'll be here by like 11 or something, if he's not

25   already here.

M1R3DOU1

1          THE COURT:  You think he is going to rebut whose

2    testimony?

3          MR. ROOS:  He is going to rebut the offer of the

4    spreadsheet which may be by a declaration or something.

5          THE COURT:  Okay.  Mr. Gottlieb, the government is

6    resting.  Do you want to formally make your motion now?  As I

7    indicated, I am going to reserve decision and I'll give you a

8    full opportunity to argue it either orally and/or in writing.

9          MR. GOTTLIEB:  I appreciate that.  We heard that was

10   your plan.  What we'd like to do is after they rest, or

11   whenever you want me to do it, we do ask that both counts be

12   dismissed pursuant to Rule 29.  And with the Court's

13   permission, we will be filing a submission in support of the

14   Rule 29 motion, I believe it will be certainly done by

15   afternoon tomorrow.

16         THE COURT:  All right.  So I'll consider that to have

17   been made at the close of the government's case, and I'll

18   consider a renewed or we can renew it at the close of all of

19   the evidence and then I'll give you an opportunity to submit on

20   that issue.  I'll reserve decision.

21         MR. GOTTLIEB:  Thank you.  And we've done our best and

22   we will have the witness available at 1:30, your Honor, to

23   testify.

24         THE COURT:  All right.  That's helpful.

25         MR. GOTTLIEB:  I don't believe he is going to be even

M1R3DOU1

1  as lengthy as the government's expert.  And then we do just

2  have the two certified records.  I provided to chambers, your

3  Honor, we already received one of the certifications with

4  regard to the legal fees.

5           THE COURT:  You said you submitted something to me?

6           MR. GOTTLIEB:  Just this morning we received the

7  certification.

8           THE COURT:  All right.  I have two documents here.

9  One from Larry Houck and one from Dominic Pagnotta.

10          MR. GOTTLIEB:  The one that has been received by us

11 and executed is the Larry Houck legal fees exhibit, your Honor.

12          THE COURT:  Okay.

13          MR. ROOS:  What's the other one?

14          MR. GOTTLIEB:  The other one is the certification for

15 the chart which has been discussed quite a bit.  We're waiting

16 for the e-mail, the copy which will then be sent to us of the

17 certification to allow us to introduce Defense Exhibit A82 in

18 evidence.

19          THE COURT:  Now, I have the Larry Houck business

20 record certification is signed.  The business record

21 certification that I have from Pagnotta is not signed.

22          MR. GOTTLIEB:  We've been in touch with them.  We're

23 told we should be receiving it beamed to us at any moment.

24          THE COURT:  Okay.  So how do you want to proceed in

25 terms of -- you have your character witness that you want to

M1R3DOU1

1    put on, and then we're going to adjourn until 1:30 for your

2    other witness?

3            MR. GOTTLIEB:  I think that makes the most sense, your

4    Honor.

5            THE COURT:  Okay.

6            MR. ROOS:  If these things are signed, they can offer

7    them, I don't know if you are going to read any of them.

8            THE COURT:  One isn't signed yet.

9            MR. ROOS:  Right.  To fill in the time.

10           THE COURT:  We can do that too.

11           MR. GOTTLIEB:  Whatever -- this morning, your Honor,

12   I'm more than happy to ask that each one be received in

13   evidence, and just indicate what it is and leave it at that.

14   I'm not --

15           THE COURT:  What's the government's position?

16           MR. ROOS:  So, I haven't seen the Pagnotta one.

17   Assuming what I think it is, and we're just waiting on a

18   signature.  You heard our objection yesterday.  You don't agree

19   with us, so we're not going to fight this any further.  And

20   honestly, if the representation is this guy is in the process

21   of signing and scanning them, I'm okay with them just offering

22   it and we can substitute it with the signed version or

23   something.

24           THE COURT:  Look, in terms of our timing, you can do

25   it right away, you can do it after your first witness, you can

M1R3DOU1

1    do it just before your second witness or you can do it after

2    your second witness.

3            MR. GOTTLIEB:  I'm prepared to do it right at the

4    outset and then we can call the character witness, if that's

5    okay with your Honor.

6            THE COURT:  Okay.

7            MR. ROOS:  It is the legal one, the Houck one, that we

8    just have a relevancy objection to why it matters that they

9    paid the bills.

10           THE COURT:  Okay.  Go ahead.

11           MR. ROOS:  The question is, like, what's the relevance

12   of the amount of money they paid to lawyers to do this legal

13   work, and in particular, what's the relevance of the detailed

14   invoices which are partially redacted and sort of confusing

15   because they're in lawyer speak.

16           THE COURT:  Let me just read this.  You have to

17   explain to me what this evidence is.

18           MR. ROOS:  On that it is probably best for

19   Mr. Gottlieb to speak to what the evidence is.  It's his

20   evidence.

21           THE COURT:  Mr. Gottlieb?

22           MR. GOTTLIEB:  Yes.

23           THE COURT:  What is this evidence?

24           MR. GOTTLIEB:  Your Honor, you will recall -- if you

25   don't recall, I will refresh recollection -- that the

M1R3DOU1

1  government in its case in chief has introduced Government

2  Exhibits 31 and 32.  31 and 32, your Honor, 33.  31 and 33.

3  Those are the communications, letters from the law firm, Larry

4  Houck's law firm that was requested and retained by RDC and

5  Larry Doud to investigate, analyze its compliance program.

6  That's what they do.  They're experts in the DEA and compliance

7  programs.  So, the government introduced the results of the

8  work.

9          THE COURT:  What exhibit is that?

10         MR. GOTTLIEB:  31 and 33.

11         THE COURT:  Can I see those two exhibits?  31 and 33?

12         MR. GOTTLIEB:  Yes, your Honor.

13         THE COURT:  So 31 and 33.  So, let me make sure I

14  understand the nature of these documents and what you want to

15  offer.  These documents are in evidence are the reports that

16  were done by the law firm with regard to an evaluation of the

17  policies and procedures with regard to compliance.

18         MR. GOTTLIEB:  Yes.

19         THE COURT:  It is not an evaluation of whether or not

20  those policies and procedures were followed.

21         MR. GOTTLIEB:  Correct.  At the request of Larry Doud

22  and RDC, they requested Hyman Phelps & McNamara, the law firms

23  in both 31 and 33, same law firm, one, to engage in the

24  evaluation of its own RDC's compliance program, and then to

25  make any recommendations, if that's their conclusion, as to

M1R3DOU1

1    what, if any, recommendations they would make for improvement.

2            THE COURT:  Okay.

3            MR. GOTTLIEB:  Those were government exhibits.  The

4    relevance is, so the government introduces that.  They, I

5    assume, are going to say, therefore, Larry Doud was aware of

6    certain deficiencies and whatnot.

7            The flip side of that, your Honor, and the relevance,

8    therefore, is that Larry Doud and RDC reached out to this law

9    firm, requested that they conduct an independent evaluation,

10   and to give recommendations, warts and all, and the fact

11   that --

12           THE COURT:  I don't see that.  That's why I asked the

13   first question.  The reports are not about warts.  They're

14   about what they did or what they didn't do.  It is about what

15   the procedure was, isn't it?  And nobody seems to disagree as

16   to what the procedures that was supposed to have been followed.

17   Right?

18           MR. GOTTLIEB:  No.  But that's not the intent here.

19   RDC reached out for a law firm to evaluate the procedures that

20   were in place, and based on their expertise, to make

21   recommendations for improvements because of deficiencies that

22   the law firm as experts found in their evaluation.

23           THE COURT:  That's why I asked.  Because I didn't

24   understand it to be an evaluation of whether or not RDC was

25   complying with its procedures.

1          MR. GOTTLIEB:  Not only complying with its

2      procedures --

3          THE COURT:  I couldn't hear you.

4          MR. GOTTLIEB:  The issue isn't whether or not they're

5      complying with their procedures, which is an issue in this

6      trial.

7          THE COURT:  But that's not what they were

8      investigating or hired to do.

9          MR. GOTTLIEB:  That's absolutely correct.  What they

10     were investigating is the procedures, the policies you do have

11     are insufficient in this way, and therefore you should make

12     those changes.  The government obviously wanted the jury to

13     know that Larry Doud and RDC were put on notice, just as

14     shorthand, of certain deficiencies.

15         THE COURT:  That doesn't go to the evidence or lack of

16     evidence with regard to whether or not they made these changes.

17         MR. GOTTLIEB:  That's correct.  That's correct.  But,

18     what we are simply addressing on our case and putting in, your

19     Honor, just the amount of fees that RDC and Larry Doud took out

20     of their pocket to pay for an investigation evaluation, an

21     internal one, not even knowing where it would lead, and that

22     they were prepared and they did spend $34,135 for an

23     independent investigation.

24         It becomes relevant because it goes to intent.  Larry

25     Doud's thinking, his intent.  Somebody who is -- not to argue

M1R3DOU1

1    for the government, but if the government is saying he wasn't

2    interested in compliance, he was trying to hide doing all these

3    terrible things, the jury should be able to consider that Larry

4    Doud himself reached out for an independent evaluation, and

5    they're saying he was only interested in money and greed.  Yet

6    he was willing to pay money for this review of the compliance

7    program to the tune of $34,135.

8            THE COURT:  You said one thing a couple seconds ago.

9    You said that RDC and Larry Doud paid for this.  In what way

10   are you saying that Larry Doud personally paid for this?

11           MR. GOTTLIEB:  If you look at the records, it's

12   actually interesting.  But clearly this was RDC.  The invoices

13   were directed to Larry Doud.

14           THE COURT:  I'm sorry.  I'm not sure what that means.

15           MR. GOTTLIEB:  I think if you look at the invoices, it

16   is addressed to --

17           THE COURT:  I don't have your exhibit in front of me.

18           MR. GOTTLIEB:  I thought you did, I'm sorry.

19           THE COURT:  I don't know what you're referring to.

20   All I have is the certification.  I don't have the exhibit.

21           MR. GOTTLIEB:  This is the exhibit that's directed to

22   Larry Doud.

23           THE COURT:  You are not saying that Larry Doud took

24   his own personal money out of his pocket to pay for this.

25           MR. GOTTLIEB:  No.

1          THE COURT:  Because you said RDC and Larry Doud, you

2     know, went to the expense of paying for this.

3          MR. GOTTLIEB:  No.  I stand corrected.  It is just

4     that the invoice was directed, and you'll see Larry Doud.  It's

5     sent to Larry Doud and RDC.

6          THE COURT:  What do you say that this demonstrates?

7          MR. GOTTLIEB:  It is inconsistent with a person who is

8     trying to cover up, is trying to hide the fact that there are

9     problems, who doesn't care about compliance.  There is no

10    question, your Honor, the government opened in saying Larry

11    Doud did not care about compliance.  The fact of the matter is,

12    this is just a piece of what the jury should consider, that it

13    doesn't make sense and it is inconsistent with somebody who

14    doesn't care at all about compliance, and is so greedy, doesn't

15    want to spend any money in compliance, is nevertheless spending

16    money for an internal objective investigation with

17    recommendations, which were chock full, your Honor.

18         THE COURT:  I'm not sure what were the chock full

19    recommendations?

20         MR. GOTTLIEB:  That would be Government Exhibit 33.

21         THE COURT:  33?

22         MR. GOTTLIEB:  There is a September 12, this is a

23    government exhibit.

24         THE COURT:  Yes, I have it.

25         MR. GOTTLIEB:  The September 12, 2014 memorandum,

M1R3DOU1

1    Government Exhibit 33.

2              THE COURT:  Where are the recommendations?

3              MR. GOTTLIEB:  In the subject, it reads Pro Compliance

4    PVS Reporting and Compliance Department Recommendations.

5              THE COURT:  I'm sorry.  Okay.  And what type of

6    recommendations going to what?  About --

7              MR. GOTTLIEB:  To improvements that should be made in

8    their compliance program.

9              THE COURT:  Okay.  But again, these are not

10   recommendations with regard to how they're supposed to respond

11   or comply with those compliance rules.

12             MR. GOTTLIEB:  Again, the government exhibit really

13   just, you can see even on page six, after going through what

14   the law firm found deficiencies found in the compliance

15   program, they talk about prompt adoption and implementation of

16   the recommendations set forth will help RDC comply with DEA's

17   suspicious order and other controlled substance requirements

18   and establish a pattern of compliance.

19             THE COURT:  Okay.  So, again, I want to make sure I

20   understand.  You want to show that they spent $35,000 on this

21   engagement, and that what the law firm was hired to do was to

22   evaluate their compliance rules?

23             MR. GOTTLIEB:  Yes.

24             THE COURT:  But it doesn't say anything one way or the

25   other about evaluating whether or not they're complying with

M1R3DOU1

1      the rules, but it deals with an evaluation of whether or not

2      the compliance rules were adequate and recommendations to

3      strengthen those compliance rules.

4                   MR. GOTTLIEB:  Yes, your Honor.

5                   THE COURT:  We don't know from this, or I'm not sure

6      if we know from any other testimony in this record so far, as

7      to whether or not RDC made changes consistent with these

8      recommendations.

9                   MR. GOTTLIEB:  That's correct, your Honor.

10                  THE COURT:  Okay.  But you just want to demonstrate

11     that -- okay.  You want to demonstrate that they made the

12     decision to ask this firm to evaluate their compliance rules

13     and procedures and they paid this firm $35,000 to do so.

14                  MR. GOTTLIEB:  Yes, your Honor.

15                  THE COURT:  And the government's position is what,

16     with regard to whether or not they should be able to

17     demonstrate that?

18                  MR. ROOS:  So, just that, what they paid the law

19     firm -- the fact they have this law firm do this evaluation and

20     make recommendations is in evidence.  The costs of that is not

21     particularly relevant.  That's point one.

22                  Point two, to the extent the Court disagrees, this

23     Exhibit V1 is pages on pages of what seem to me cryptic,

24     somewhat redacted of details of professional services.  Why

25     not -- again, I don't think any of this should come in.  Why

M1R3DOU1

1    not just use the last page, which is this one, that just says

2    the number of hours and what they paid.

3          MR. GOTTLIEB:  Frankly, I'll agree to that.  That is

4    the only important aspect.  The subpoena required them to send

5    everything, which I wanted the government to see also.  But I'm

6    more than happy that the last page be the exhibit.

7          THE COURT:  If the two of you are in agreement and you

8    want to stipulate, then I'll go along with whatever the two of

9    you can agree to.  To the extent that you can't agree, then I

10   will rule.  So if you can agree that a particular document is

11   going to come in, and then you both can argue what you will

12   from what that document demonstrates, I'm willing to accept

13   whatever stipulation you can agree to.  But if you can't agree,

14   then you should tell me and I will rule.

15         MR. ROOS:  Okay.

16         THE COURT:  Does it appear you'll be able to resolve

17   this without my assistance?

18         MR. ROOS:  Let's chat it over.  But I think we may be

19   able to.  And if not, I think your Honor understands the issue

20   and I'm sure we can deal with it at the next break.

21         THE COURT:  So, all right.  So, all of our jurors are

22   here.  So, again, my concern was that, and I may even change

23   the rules for the day.  Part of my concern yesterday about the

24   lateness of this witness's testimony is that the procedures

25   that we've been told to follow is that when we're not in the

M1R3DOU1

courtroom, the jury is supposed to stay in the jury room.   And

I'm a little concerned about bringing the jury out here for 30

minutes' worth of testimony and then sending them back into the

jury room at 11 o'clock and telling them they've got to sit

there until 1:30 until the defense witness shows up.   That's

the choice that I have.   And I'm hesitant to say on the record

I'll break the rules and let them come out of the jury room.

But, I am a little concerned that that's not the best way to

keep their attention focused on this case.

          But, again, you think there is any possibility that

this witness is going to arrive before 1:30?

          MR. GOTTLIEB:  No, your Honor.  We have dealt with it

all evening, so 1:30 is the earliest.  He should be here at

1:30.

          THE COURT:  Okay.  All right.

          MR. ROOS:  There is one issue related to that witness,

your Honor, I can raise.  Which is we reviewed his CV and some

of the materials.  He has a background of accounting, so to the

extent he is applying accounting principles to Mr. Doud's bonus

or the sales, that seems okay and we'll cross him on it.

          One thing we are concerned about is, it's not clear to

us he has any sort of background in economics or the health

care industry, so we wanted to be sure his testimony is going

to be limited to things which are within his competency which

is accounting.

M1R3DOU1

1          THE COURT:  What is the significant difference between

2     his background and your expert witness's background?

3          MR. ROOS:  I think the significant difference is our

4     expert witness is a professor of economic, so he is able to

5     talk about supply and demand, the economics of a business.

6          THE COURT:  I thought you said that their witness has

7     a background in economics.

8          MR. ROOS:  No, just accounting.  He has a B.A. in

9     accounting.

10          THE COURT:  I'm not sure I understand the difference.

11          MR. ROOS:  The difference is Mr. Janey yesterday was

12     asking questions about, you know, bundled products,

13     distribution, CDC numbers about the increase or decrease in

14     demand.  Those are all things that make sense you'd ask an

15     economist, and he asked him on cross yesterday, so it seems

16     fine.

17          I just don't think an accountant has any sort of

18     expertise in that sort of area.

19          THE COURT:  What is it you anticipate he is going to

20     testify about that you say that he shouldn't be able to

21     testify?

22          MR. ROOS:  It would be any of those sort of

23     macroeconomic questions that came out yesterday like what was

24     the --

25          THE COURT:  I'm not that sophisticated.  What is a

M1R3DOU1

1    macroeconomic question?

2              MR. ROOS:  Basically, was the overall nationwide

3    demand and supply of opioids increasing or decreasing.  Another

4    question would be does --

5              THE COURT:  Wasn't that the subject of your expert's

6    testimony?

7              MR. ROOS:  He is an economist who studies those

8    things.  An accountant doesn't.  A accountant does a

9    calculator.

10             MR. GOTTLIEB:  If I put on --

11             THE COURT:  I think most accountants would be a little

12   insulted by that statement.  But I don't know what accountants

13   do.  They do numbers.

14             MR. GOTTLIEB:  Your Honor, this witness is Mr. Janey's

15   witness, he's not here right now.  He will be here.  We weren't

16   aware there was going to be another objection raised.

17   Mr. Janey I think is the person to respond if your Honor deems

18   it necessary.

19             THE COURT:  When Mr. Janey comes we can deal with

20   this.  But, can you just tell me how long do you anticipate

21   this witness is going to testify on direct examination?

22             MR. GOTTLIEB:  I think Mr. Janey yesterday said about

23   45 minutes.

24             THE COURT:  Okay.

25             MR. GOTTLIEB:  I believe that's what he said.

M1R3DOU1

1          THE COURT:  Do you have exhibits that go with this

2     witness's testimony?

3          MR. GOTTLIEB:  Yes.

4          THE COURT:  Do I have a copy of those exhibits?

5          MR. ROOS:  We got them last night around 9:30.

6          THE COURT:  So I probably don't have a copy.  Can I

7     see those exhibits?  That will put it in some context for me.

8          MR. GOTTLIEB:  I am going to check.

9          THE COURT:  Okay.  And how many exhibits do you have?

10         MR. GOTTLIEB:  You're really testing me this morning,

11    your Honor.

12         MS. ROTHMAN:  I can answer that.  It is like an eight

13    page PowerPoint.

14         MR. GOTTLIEB:  Thank you.

15         THE COURT:  So do you have any objections to this

16    PowerPoint?

17         MR. ROOS:  Potentially, but if Mr. Janey --

18         THE COURT:  That can't be potentially.  Now is the

19    time.  Tell me, if you have seen the exhibits, same question I

20    asked them.  Do you have an objection to the exhibits or do you

21    have an objection to the testimony?

22         MR. ROOS:  I think --

23         THE COURT:  If there's something about the exhibits

24    that you are going to fight about, you can raise now if you are

25    going to say the exhibits are inadmissible.

M1R3DOU1

1        MR. ROOS:  Yes.  So, we do have some objections to the

2   potential testimony.  On the exhibits, I want to check with

3   Mr. Burnett who is crossing the witness.  I guess we have

4   neither of the attorneys here.

5        THE COURT:  That's not helpful to me.  You don't need

6   all lawyers here, but I need the lawyers with the relevant

7   information so I can move forward.  Let's get both the defense

8   and the government's lawyers here so we can resolve these

9   issues.

10       MR. ROOS:  My understanding, though, is Mr. Burnett's

11  cross is going to be shorter than what's projected for the

12  direct.  And Ms. Rothman will be able to speak to the rebuttal

13  witness's length.  30 minutes or less.

14       THE COURT:  Does somebody have those exhibits that I

15  can review?

16       MS. ROTHMAN:  The defense exhibits?

17       THE COURT:  Yes.

18       MR. GOTTLIEB:  The answer is yes and I think we are

19  sending it and beaming it as we speak.

20       THE COURT:  Let me look at the exhibits.  And I'm not

21  quite sure, again, let me take the time now.

22       What is it that you anticipate the witness is going to

23  say that you think you are going to object to?

24       MR. ROOS:  Okay.  So two categories.  So number one

25  is, yesterday Mr. Janey asked some questions about the

M1R3DOU1

1    relationship between different types of products and what he

2    called bundling.  And I am not an economist either.  But my

3    understanding is that's sort of a theoretical economics concept

4    of one price in one sort of product line affecting another.

5         And our position is, while an economist can testify

6    about it, so it was permissible for Mr. Janey to have crossed

7    our expert about it, it is not permissible for an accountant to

8    testify about economic principles.

9         THE COURT:  What is it on this issue that you believe

10   that your witness testified to?

11        MR. ROOS:  So, basically, it was just questions of

12   whether --

13        THE COURT:  Tell me the answer.  What did he testify

14   to?

15        MR. ROOS:  What our witness testified to?  That

16   whether or not a pharmacy buys controlled substances can affect

17   the overall sales.  Because a pharmacy is not interested in

18   buying a particular product line, it wants to buy all of the

19   products available to it.

20        THE COURT:  Why isn't that common sense, not

21   expertise?

22        MR. ROOS:  I think there is a common sense element to

23   it.

24        THE COURT:  I'm trying to understand in what way do

25   you say your witness is uniquely situated to point that out,

M1R3DOU1

1    and that a layperson or their expert is unqualified to say the

2    same thing?

3              MR. ROOS:  He can say the same thing.  What I'm

4    concerned about is he is going to say, I am an expert

5    accountant, and I'm telling you here, you, jury, that's not how

6    the world works.

7              THE COURT:  What do you think he is going to say about

8    how the world works otherwise?

9              MR. ROOS:  I'm concerned -- maybe this is totally off

10   base, in which case we won't have an objection on this point.

11   But I am concerned he is going to say something like, as an

12   expert accountant, I can tell you that, actually, companies and

13   the pharmaceutical industry, their customers don't care about

14   whether or not they can buy all the products, contrary to what

15   your common sense may be.  Then the jury will be like, well, my

16   common sense made me think that they would want to buy all the

17   products from one place, like the grocery store example.  But I

18   am hearing from this expert this is something else.  But

19   actually, our position is the expert isn't qualified to talk

20   about those types of things.

21             THE COURT:  Do we need to wait for Mr. Janey on this

22   issue?  Because I'm not quite sure what the parameters of this

23   witness's testimony is.

24             MR. GOTTLIEB:  That would make sense.  If I say

25   anything, I'm not relevant on this issue.

M1R3DOU1

1          THE COURT:  All right.  So, are you prepared to go

2     forward with your first witness?

3          MR. GOTTLIEB:  We are, your Honor.  But while we're

4     talking, and I can appreciate that we can try to resolve all

5     issues.  On the issue of the rebuttal witness, we received word

6     last night that they did intend to call a rebuttal witness on

7     that exhibit that will be received in evidence.

8          THE COURT:  Which exhibit?

9          MR. GOTTLIEB:  Defense Exhibit A82.

10          THE COURT:  Which is what?

11          MR. ROOS:  The chart we were talking about yesterday.

12          MR. GOTTLIEB:  The spreadsheet of the terminated and

13     suspended pharmacies.

14          THE COURT:  And?

15          MR. GOTTLIEB:  Apparently, and they were good enough

16     to share with us that this witness is being brought down as

17     somebody who has just now looked at records and is going to say

18     and inform the jury of something which the jury has already

19     heard from numerous witnesses.

20          Specifically, in reviewing Defense Exhibit A82, this

21     spreadsheet, some of the pharmacies that are listed as being

22     either suspended or terminated, subsequently purchased

23     pharmaceuticals from RDC.  Now, there has already been quite a

24     bit of testimony, a number of times, that even if a pharmacy

25     was suspended or terminated, that did not preclude turning them

1   back on.

2              THE COURT:  That was not the subject of the testimony

3   with regard to the exhibit that you want to offer.

4              MR. GOTTLIEB:  That's correct.

5              THE COURT:  My recollection is, after we spoke I went

6   back to the transcript.  It appears to me this issue arose on

7   Friday, Whitmore.  Which one is Whitmore?

8              MR. GOTTLIEB:  The DEA agent.

9              THE COURT:  All right.  So this arose during that

10  witness's testimony.  And you said:  "If we can put on the

11  board Government Exhibit 268 -- I'm absolutely wrong.  It was

12  278.  Thank you.

13             "Mr. Roos:  Objection, your Honor.  This is not the

14  version that's in evidence.  This is not 278 that's in

15  evidence.

16             "Mr. Gottlieb:  I just asked for Government Exhibit

17  278.

18             "Mr. Roos:  It might be a prior version.  It looks

19  like this is being shown to the jury, and this is not the

20  proper version."

21             Now, that's where we had that conversation about two

22  different exhibits.

23             MR. GOTTLIEB:  And --

24             THE COURT:  I'm not sure there is anything we already

25  have in evidence that is determinative of who is going to

1    testify to what and what's going to be rebutted.

2              MR. GOTTLIEB:  Let me try to clarify.  What I'm

3    raising about the rebuttal witness has nothing do with what

4    your Honor just read.  Apparently, the rebuttal witness is

5    simply going to testify, looking at that exhibit, Defense

6    Exhibit 82, I have looked at the pharmacies that were either

7    suspended or terminated before 2017, and determined that some

8    of those pharmacies subsequently, apparently, were turned back

9    on and made purchases.

10             THE COURT:  So that accounts for the difference

11   between their exhibit and your exhibit.  Is that right?

12             MR. GOTTLIEB:  I won't speak for them.

13             THE COURT:  You are saying you are objecting to their

14   rebuttal, so I assume you are speaking to it.

15             MR. GOTTLIEB:  The reason I'm objecting to their

16   rebuttal is that if all he's going to say is that some of those

17   pharmacies subsequently purchased, there has already been

18   testimony, it's repetitive, it's duplicative, because already

19   there is testimony before the jury that any pharmacy that was

20   terminated or suspended, at any time, could be turned back on.

21             THE COURT:  I know, but that doesn't go to the issue

22   you just raised.  If you are going to put in a document and you

23   say its relevance is that that may be the accurate information,

24   and imply to the jury that the document that the government put

25   in is inaccurate, or unreliable information, their rebuttal is

M1R3DOU1

1   once you put in that document, to explain the difference

2   between those two exhibits, to argue that, well, it's not as

3   nefarious as Mr. Gottlieb wants you to believe, and it's not,

4   it doesn't go to the inaccuracy.  This is why those two

5   documents are different.

6            Isn't that the whole issue with regard to this

7   document?

8            MR. GOTTLIEB:  No.

9            THE COURT:  Okay.

10            MR. GOTTLIEB:  No.

11            THE COURT:  For what purpose are you offering your

12   exhibit?

13            MR. GOTTLIEB:  Your Honor, I'm going to withdraw my

14   questions about the rebuttal.  I just thought it was repetitive

15   of what had already come in.  But we can go right to it.

16            THE COURT:  Again, I need to concentrate on what you

17   intend to do with your exhibit and the purpose that you're

18   offering it.  And what I understand is the purpose that you're

19   offering it is to show that the 278 cannot be relied upon as

20   accurate information because there is another document that

21   says something different.  If that's not the relevance, tell me

22   what the relevance is.

23            MR. GOTTLIEB:  No, it's not.

24            THE COURT:  What is the relevance?

25            MR. GOTTLIEB:  I have no intention of arguing that.

M1R3DOU1

The relevance is during the time of the indictment, 2012,
during that period of time, there has already been testimony on
both direct and cross from witnesses that in 2012, 2013, at
various times, pharmacies were either suspended for a time
period, or terminated.  But then they went on to say, and in
some cases they were then reinstated.

          I just want to get in front of the jury the business
record to show that during that period of time relevant to this
indictment, in fact there were some that were suspended and
some that were terminated.

          THE COURT:  But your argument against their stuff is
the exact thing that you want to do.  The argument is that we
shouldn't be dealing with this at all, because it is already in
evidence.  That's your argument against their argument.  Then
you are the ones that want to raise it again.  I don't
understand, okay.

          That's fine.  If you're withdrawing that objection at
this point in time.  But, look, I'm giving you full opportunity
to put in this document.  If the government believes that your
putting in this document at this point in time is misleading
with regard to what the testimony is, then they have the right
to have somebody come back and explain that.  And otherwise,
I'm not even sure why you're just not putting in evidence
that's already in the case, because I don't hear what this
document is.

M1R3DOU1

1          I always ask this question:  How is your evidence of

2     this document going to make the jury smarter?  Okay?  That's

3     the basic rule I use.  What information are you giving them

4     that they don't already have?  You argued that the government

5     is trying to give them the same information they have.  And I

6     don't understand how in applying that rule, somehow your

7     putting in this document is giving them more information than

8     they already have.

9          MR. GOTTLIEB:  Your Honor, I hear you.  This has been

10     something that we've argued so much.  But I'm withdrawing any

11     concern.  Thank you.

12          THE COURT:  But the reason I take time with it is

13     because I don't want to, in the middle of your examination,

14     have to keep taking sidebars and keep going over this issue.

15     Because both of you are objecting back and forth, then I am

16     sitting here saying why didn't we resolve all of this when you

17     knew you were going to raise this before we started and use the

18     jury's time.

19          MR. GOTTLIEB:  I understand and appreciate that.

20     There is not going to be any examination.  So we are going to

21     be able to go right through it, your Honor.

22          THE COURT:  So you're not going to have any testimony

23     with regard to this document?

24          MR. GOTTLIEB:  That's correct.

25          THE COURT:  And if I can ask you this, and I hope it's

M1R3DOU1

1    in fairness, but what do you intend to argue from that

2    document?  What is the relevance?  If you are not going to have

3    any testimony relevant testimony that goes along with it, what

4    is the conclusion that you are going to tell the jury that they

5    should reach based on having received this document?

6            MR. GOTTLIEB:  During time period of the indictment,

7    2012 to 2017, certain decisions were made by RDC, either

8    suspending or terminating the following pharmacies and using

9    that document.  Their rebuttal will say some of them at some

10   point afterward were obviously reinstated and purchased.  But I

11   believe we are entitled to at least get in front of the jury

12   that during the time period RDC made certain decisions, there

13   were certain actions taken.

14           THE COURT:  And only because of my ignorance, not your

15   inadequacy.  What you say is the issue is that your document

16   shows that people were suspended or terminated because they're

17   not on that list.

18           MR. GOTTLIEB:  No.  They are on the list, but it's

19   checked off that they were either suspended or terminated.

20           THE COURT:  But their argument is that doesn't make

21   our exhibit inaccurate, because our exhibit includes those

22   companies that were reinstated.

23           MR. GOTTLIEB:  Your Honor --

24           THE COURT:  No?

25           MR. GOTTLIEB:  Listen, I can't make it any more clear.

M1R3DOU1

1   I have what you --

2            THE COURT:  Just answer that question.  Is that right?

3            MR. GOTTLIEB:  The answer is no.  I have no intention

4   of saying their exhibit is inaccurate.

5            THE COURT:  I understand that, but I'm saying the

6   difference between those two exhibits, the two of you are not,

7   neither one of you is arguing that one is the truth and the

8   other is the untruth.  Okay.  You're just saying that their

9   document reflects people that came, were suspended and then

10  came back and came back later.  And your document shows those

11  people who were suspended.  Period.

12           MR. GOTTLIEB:  No.  But the relevant part is their

13  document only begins in 2017, and after the time of the

14  indictment.  The one we are seeking to introduce just gives a

15  more complete and completes the record that in 2012 to 2017,

16  this is the list.  It just is really more completeness.  It

17  covers an additional time period.

18           THE COURT:  Don't they have the right in rebuttal to

19  bring in a witness to explain why that is a legitimate

20  difference between these two documents?

21           MR. GOTTLIEB:  Yes, they do, your Honor.

22           THE COURT:  All right.

23           MR. ROOS:  On a totally different subject.  I think

24  Mr. Burnett informs me we don't have any objections to the

25  exhibits.

M1R3DOU1

1      MR. BURNETT:  As long as it is just the PowerPoint

2   presentation, then there is no objection.

3      THE COURT:  Okay.  Do you know right now a subject

4   area that you anticipate that this witness is going to testify

5   to, either related to these charts or otherwise, that you

6   specifically have an objection to?

7      MR. BURNETT:  Just one thing, your Honor.  I'm not

8   100 percent sure he is going to go here.  So the charts are

9   basically financial analyses of RDC's sales and bonuses

10  attributable to different types of sales.  No objection to what

11  I expect will be testimony related to that.

12      Based on some handwritten notes I've seen, it seems

13  like the expert has gathered some other information about RDC's

14  businesses, either from conversations with the lawyers,

15  conversations with Mr. Doud, or I don't know, potentially from

16  other sources.  I don't think he's a financial expert.  He is a

17  CPA.  He didn't work at RDC.

18      To the extent he is going to comment on how RDC viewed

19  different parts of its business, I think that would be outside

20  the scope of his -- for instance, there is nothing in his

21  expertise or his background that would let him comment that RDC

22  thought one type of drug was more important than another type

23  of drug, that sort of thing.

24      THE COURT:  Unfortunately for me, I have no idea what

25  you're talking about because I don't know what this witness is

M1R3DOU1

1    going to say.  I am not sure you know what this witness will

2    say or whether that will be an issue.  I'm surprised you two,

3    you didn't have, you don't have an expert report?  You guys

4    never exchanged expert reports?

5                MR. ROOS:  They sent it in on Tuesday.

6                THE COURT:  Say it again?

7                MR. ROOS:  I thought they said they were going to file

8    one on Tuesday.

9                THE COURT:  You never requested or received an expert

10   report and they never requested or received an expert report

11   from your expert?

12               MR. BURNETT:  There was an expert disclosure a month

13   before trial that went out with respect to this witness, had a

14   paragraph that said he was going to be testifying about the

15   financial information about RDC's sales and Mr. Doud's bonus.

16               THE COURT:  But it was no more specific than that?

17               MR. BURNETT:  It was no more specific than that.

18   That's why I'm kind of stabbing in the dark.

19               MR. GOTTLIEB:  Can I just ask, because, listen, I have

20   no reason to question anything that's being said.  However,

21   Mr. Janey is the person best to not only respond, but to hear

22   what's being said and to be able to respond.

23               THE COURT:  I agree.  I agree.  At this point, quite

24   frankly, at this point I have no basis on which to limit this

25   witness's testimony, because I have no idea what it is that it

1     is anticipated he is going to say that's going to be outside

2     the realm of his expertise.  We're all guessing at this point.

3          MR. BURNETT:  I am just guessing too.  Just putting a

4     flag out that this might be something we object to, if it comes

5     up.  If it doesn't, there won't be an objection.

6          THE COURT:  So, I'm going to bring in the jury.  We'll

7     call the witness.  I assume we are going to be done within the

8     next half hour, 45 minutes, then we'll take the break.  And

9     I'll tell the jury that we probably will have the next witness

10    at 1:30.

11         Did you want this rebuttal witness, did you want to do

12    that witness after your expert or did you want to do that

13    witness before your expert?

14         MS. ROTHMAN:  Your Honor, it is the government's

15    preference to do the rebuttal witness after the expert.  In a

16    typical rebuttal case.

17         THE COURT:  Before you were here, we had a discussion

18    that made me think you might want to do it otherwise.

19         MR. GOTTLIEB:  After the character witness, would you

20    like me, I am prepared to introduce and to request that both

21    exhibits, Defense V3 and Defense A82, and just to indicate on

22    the record for the jury the business record certification so

23    they understand what those documents are.

24         THE COURT:  Yes.  I'd like to put in all evidence that

25    the parties have, other than the rebuttal testimony, and all

M1R3DOU1

1    evidence that will be placed before this jury, other than the

2    expert's testimony so we don't have to waste any time.

3          I'm going to ask the government do they rest their

4    case in chief and they'll say yes.  I'll turn to defense and

5    ask you if you want to call any witnesses and you will call

6    your first witness.  I will instruct the jury that the next

7    witness is not available until 1:30, but I still anticipate we

8    can finish the witnesses today.  And then I will give them the

9    break.  And tell them I will bring them out here hopefully

10   promptly at 1:30.  As a matter of fact, let's anticipate

11   reconvening at 1:15.  If the witness is here by then, then I'm

12   going to bring the jury out and we'll start.  If the witness is

13   not here by then, I'll expect the witness within 15 minutes of

14   that so we can start.  And then if the defense rests, the

15   government can call their rebuttal witness and hopefully we'll

16   be done for the day.

17         MR. ROOS:  Your Honor, this is the signed 1006

18   stipulation.  We previously read it and so my proposal would

19   just to be to reoffer it, not even read it.  And then say the

20   government rests its case.

21         THE COURT:  Which exhibit?

22         MR. ROOS:  1006.  It is the one about -- do you

23   remember there was the dispute about the ARCOS consent decree,

24   on the fly the parties wrote a stipulation, the version we

25   offered at the time wasn't signed.  So just in an abundance of

M1R3DOU1

1    caution, I'm going to reoffer it with the signature.  Then

2    we'll say we rest.

3              I think it would just be appropriate, if it is your

4    Honor's practice, to allocute the defendant on not testifying.

5    I don't know if you want to do that.

6              THE COURT:  Do you want to do that now?

7              MR. GOTTLIEB:  Your Honor, I'm sorry.  I was actually

8    reading something.  My apologies.

9              THE COURT:  I anticipated and they were suggesting

10   that I inquire as to whether or not you discussed with your

11   client his right to testify, and it is his decision at this

12   point that he does not anticipate testifying.

13             MR. GOTTLIEB:  Your Honor, can I have one moment,

14   please?

15             THE COURT:  Sure.  You can have more than that.

16             (Conferring)

17             MR. GOTTLIEB:  Thank you very much.  We can proceed

18   with that inquiry if your Honor wants to do it at this time.

19             THE COURT:  Yes.  What's your position at this point

20   in time?

21             MR. GOTTLIEB:  Mr. Doud is not going to testify, your

22   Honor.

23             THE COURT:  Okay.  And Mr. Doud, do you understand you

24   have the right to testify, you're not required to testify.

25             Is it your decision, after consulting with your

M1R3DOU1

1    attorney, that you do not intend to testify?

2         THE DEFENDANT:  Yes, I do.

3         THE COURT:  All right.  Thank you.  So, let's do this

4    one witness, and then we'll reconvene at 1:15.

5         MR. GOTTLIEB:  Your Honor, when the government does

6    rest, we've already discussed it, our Rule 29 motion will be

7    deemed to have been made?

8         THE COURT:  Yes.

9         MR. GOTTLIEB:  We will submit our written submission

10   to the Court some time tomorrow.

11        THE COURT:  Okay.  And I'll consider it renewed at the

12   close of your case, but if you remember, you can put on the

13   record that you are renewing that motion.

14        MR. GOTTLIEB:  Thank you.

15        THE COURT:  And I'll await the submissions.  So the

16   jury is on their way up.

17        (Pause)

18        THE COURT:  Let's bring in the jury.

19        (Jury present)

20        THE COURT:  Good morning.  We obviously kept you

21   waiting a little bit.  It's been very helpful, because I

22   believe now that we have approximately three more witnesses to

23   hear.  I'm hopeful we can hear all of those witnesses today.

24   The only issue is that we have a witness that's ready now, the

25   scheduling has been a little awkward.  We have a witness that's

M1R3DOU1

1    ready now.  We have another witness who may not be ready until

2    about 1:30.  So, when we finish this witness, we're probably

3    going to take a longer break until 1:30, maybe 1:15,

4    particularly if the witness arrives a little early, we can do

5    that witness, and then there is one other witness after that.

6    I anticipate that witness would be short and we can do that

7    witness after as the third witness.  And I believe I'll ask the

8    parties, but I believe that at that point we might have all of

9    the evidence before you.  If that's the case, we're going to

10   adjourn for the day after that.

11          We will not sit tomorrow.  So, tomorrow we'll take

12   off.  I know the weather is not predicted to be very good,

13   particularly late tomorrow.  So we are going to take tomorrow

14   off.

15          And if we finish the witnesses today, as I plan, on

16   Monday morning we will have the summations, closing arguments

17   of the lawyers, and then after we finish the closing arguments,

18   depending on how much time we have left in the day, I may give

19   you the jury instructions, and send you in to begin your

20   deliberations, but there is a possibility if we don't have

21   enough time for that, we'll do that Tuesday morning.  I'll give

22   you instructions on the law and send you in to begin your

23   deliberations at that time.

24          So that's pretty much the schedule as I anticipate it.

25   I think I'm fairly confident we can meet that schedule.  So we

1    do have a witness who is here now available to testify.  And

2    we'll proceed with that witness at this point in time.

3           Let me first turn to the government.  Anything further

4    by the government at this point?

5           MR. ROOS:  Yes.  The government offers Exhibit 1006,

6    which is a stipulation between the parties.  It was previously

7    offered.  But the version we're now offering, which is dated

8    January 14 is, 2022, has the signatures of all the parties.

9           THE COURT:  That stipulation will be admitted in

10   evidence.

11          (Government's Exhibit 1006 received in evidence)

12          MR. ROOS:  With that, your Honor, the government rests

13   its case in chief.

14          THE COURT:  Mr. Gottlieb, do you wish to call any

15   witnesses on behalf of the defense?

16          MR. GOTTLIEB:  Yes, we do, your Honor.

17          THE COURT:  Would you call your first witness.

18          MR. TOWNSEND:  The defense calls Donna Blythe.

19          THE COURT:  She is where?

20          MR. TOWNSEND:  She's out in the hallway, your Honor.

21          THE COURT:  Bring her in.  Would you step up, please,

22   ma'am.

23          Mr. Townsend, you can inquire.

24          (Continued on next page)

25

M1RBDOU2                          Blythe- Direct

1    DONNA BLYTHE,

2         called as a witness by the Defendant,

3         having been duly sworn, testified as follows:

4              THE COURT:  Mr. Townsend, you can inquire.

5              MR. TOWNSEND:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MR. TOWNSEND:

8    Q.  Good morning.  Are you employed?

9    A.  Yes.

10   Q.  What do you do for a living?

11   A.  I'm an ordained elder in the United Methodist church

12   currently serving Edgewater United Methodist church in

13   Edgewater, Florida.

14   Q.  What's your specific role at Edgewater church in Florida?

15   A.  I am the lead pastor and oversee all activities of the

16   church, preach, teach, administer the sacraments, visit those

17   who are sick, do all administrative duties, oversee christian

18   education, community programs for those in need.

19   Q.  How long have you been doing that?

20   A.  I have been at Edgewater for two and a half years, but I've

21   been in ministry for twenty-six.

22   Q.  Thank you.  Do you know an individual by the name of Larry

23   Doud?

24   A.  Yes.

25   Q.  How you do know him?

M1RBDOU2                          Blythe- Direct

1    A.  He is a parishioner and a church member.

2    Q.  Do you see him in the courtroom today?

3    A.  Yes, I do.

4    Q.  How long have you known Larry Doud?

5    A.  Since I started at Edgewater in July of 2019.

6    Q.  Would you describe your relationship with Mr. Doud?

7    A.  I am his pastor and have seen him in worship and in many

8    activities of the church and have provided pastoral care with

9    Mr. Doud.

10   Q.  Would it be fair to say that you know him in the context of

11   the church community?

12   A.  Yes.

13   Q.  Would you describe his relationship with the church

14   generally?

15   A.  He is very active in the church.  Did you have something

16   more specific?

17   Q.  Does Larry Doud have any leadership positions in the

18   church?

19   A.  He has agreed to be in leadership.  His name always comes

20   up as somebody that we should ask to be in leadership.  Because

21   of this situation, he has sometimes been reluctant because he

22   doesn't want ever anything negative to reflect on the church,

23   but he is this year serving as our staff parish relations

24   community chair person. He's a member of the board of trustees.

25   Those are leadership roles that he has now.

M1RBDOU2                          Blythe- Direct

1    Q.  Is he active in those roles?

2    A.  He's very active in those roles.  He doesn't just go to

3    meetings.  He participates in the living out of those roles and

4    goes above and beyond.

5    Q.  Can you just explain what that means, the living out of

6    those roles?

7    A.   In terms of trustees, he's a part of decisions that we've

8    made with major renovation in the last two years.  He takes an

9    active role -- not just in decision making, but he's there

10   serving.  If I need something, he's someone I can call on and

11   Larry will show up and do what's needed, including mowing the

12   grass weekly on a regular basis.

13   Q.  In addition to mowing the grass, just generally speaking

14   what other service related things does Larry Doud do for the

15   church?

16            MS. ROTHMAN:  Objection.

17   A.  He's active --

18            THE COURT:  Overruled.  She can answer.

19   A.  He's active in the food pantry ministry and goes and picks

20   up food from Second Harvest which is where we get a lot of our

21   food from.  He serves those who are in need and come to the

22   food pantry on Saturdays.  He has served as an usher, a

23   liturgist.  He has narrated cantatas.  Larry is just somebody

24   who we can call on.  He has many gifts and graces and is

25   generous with his time and his service.

M1RBDOU2                        Blythe- Direct

1   Q.  How would you describe his dedication to the various things

2   you've described?

3   A.  He is very committed and has a very deep faith that's life

4   long.  He's one of the persons that when I recently had a

5   service where men gave their testimony or their faith of

6   journey, their story, Larry did that during the Sunday morning

7   worship service.

8   Q.  And with regard to all of the things you've testified to,

9   you've personally observed Larry do them?

10  A.  Yes.

11  Q.  As a result of the various roles that Mr. Doud has in the

12  church, is he well-known in the church community?

13  A.  He is well-known, well-respected, well thought of and has

14  many people that I've seen him help, and he has a church family

15  that is very concerned and in prayer for him.

16  Q.  Is Larry Doud trusted by members of the church?

17  A.  I would completely trust him, and I believe members of the

18  congregation do and they are aware of this current situation.

19  Q.  What makes you say that members of the church would trust

20  him?

21  A.  I have observed it and I believe with 46 years of

22  professional experience in helping ministries, I have the

23  ability to discern when people trust one another.  He is

24  listened to.  His opinion is sought out, and he is a person of

25  integrity and good character.  I don't know anybody that does

M1RBDOU2                              Blythe- Direct

1    not trust him in our faith community.

2    Q.  Have you spoken generally to members of the church

3    community?

4              MS. ROTHMAN:  Objection.

5    A.  Yes.

6              MS. ROTHMAN:  Calls for hearsay.

7              THE COURT:  Well, I'm going to sustain the objection.

8    I ask you to rephrase the question.  What specifically are you

9    asking?

10             MR. TOWNSEND:  Yes, your Honor.

11   Q.  Are you familiar with generally with the sentiments of the

12   church community towards Larry Doud?

13   A.  Yes.

14   Q.  What are those sentiments generally regarding Larry Doud's

15   view of material goods, whether he's greedy?

16             MS. ROTHMAN:  Objection.

17             THE COURT:  Sustained, unless you can establish some

18   foundation in regard to those kinds of conversations.

19   Q.  How would you describe Larry Doud's representation for

20   honesty?

21   A.  He has an excellent reputation for honesty, for being a

22   caring person of good character.  I cannot think of any

23   adjective about Larry that's negative.

24   Q.  What leads you to the conclusion that he has a

25   representation for honesty?

M1RBDOU2                    Blythe- Direct

A.   Conversation with other parishioners that are known to him

through service.

          MS. ROTHMAN:  Mindful of the hearsay, your Honor.

          THE COURT:  You have something to say, say it.

Otherwise, let's move forward.

Q.   Is Larry Doud's representation one for being flashy?

          MS. ROTHMAN:  Objection, leading.

          THE COURT:  Yes, I'll sustain that objection.

Q.   Generally speaking, how would the church community describe

him?

          MS. ROTHMAN:  Objection, calls for hearsay.

          THE COURT:  I'm not going to sustain on hearsay

grounds.  You have to be more specific as to what qualities

you're talking about.

Q.   How would they describe his reputation for integrity?

A.   In conversations I have personally had with other members

of the congregation, they describe him as a man of integrity,

as somebody that they trust, as someone that they are -- most

people who know him well have great difficulty believing he's

in the situation.

          MS. ROTHMAN:  Objection, your Honor.  Move to strike.

          THE COURT:  I'll strike that testimony.

          MR. TOWNSEND:  Thank you very much, your Honor.

          No further questions.

          THE COURT:  Any further questions for this witness?

1           MS. ROTHMAN:  Yes, your Honor.  Very briefly.

2    CROSS-EXAMINATION

3    BY MS. ROTHMAN:

4    Q.  Good morning.

5    A.  Good morning.

6    Q.  How would you prefer that I refer to you, as Ms. Blythe or

7    Pastor Blythe, what's your preference?

8    A.  Reverend.

9    Q.  Reverend Blythe, thank you for being here.

10          Reverend Blythe, you first met Mr. Doud in 2019; is

11   that right?

12   A.  Yes.

13   Q.  And that was after he had been charged in this case,

14   correct?

15   A.  Yes.

16   Q.  And that was years after he had left RDC?

17   A.  Yes, I guess.

18   Q.  Well, you're aware that Mr. Doud left RDC in 2017, right?

19   A.  I'm aware of that from what's out on the media, yeah.

20   Q.  And Mr. Doud spent many years at RDC, right?

21   A.  Yes.

22   Q.  And RDC is a company with employees?

23   A.  I'm assuming so, yes, from what I've read.

24   Q.  Senior executives like Mr. Doud?

25   A.  Yes.

M1RBDOU2                         Blythe - Cross

1    Q.  A board of directors?

2    A.  Yes.

3    Q.  Shareholders?

4    A.  I have not really researched the whole history of that

5    company.

6    Q.  You would agree with me, Reverend Blythe, that the

7    employees of RDC worked at the company with Mr. Doud, right?

8    A.  I would assume so.

9    Q.  And they interacted with Mr. Doud when he was CEO of the

10   company, right?

11   A.  I would assume so.

12   Q.  You didn't work at RDC, right?

13   A.  No, ma'am.

14   Q.  You didn't know Mr. Doud in 2012?

15   A.  No.

16   Q.  2013?

17   A.  No.

18   Q.  2014?

19   A.  No.

20   Q.  2015?

21   A.  I met him in 2019 as I've stated.

22   Q.  So you don't know what it was like to work for Mr. Doud, do

23   you?

24   A.  No.

25   Q.  You don't know what it was like to report to Mr. Doud, do

M1RBDOU2                         Blythe - Cross

1    you?

2    A.  No.

3              MS. ROTHMAN:  No further questions.

4              THE COURT:  Any further questions of this witness?

5              MR. TOWNSEND:  No, your Honor.

6              THE COURT:  Thank you, ma'am.  You can step down.

7              (Witness excused)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1RBDOU2

1          THE COURT:  Is there anything further we can do at

2     this point?  Do you have anything else you want to offer?

3          MR. GOTTLIEB:  Your Honor, at this time if I can read

4     one of the business record certification.

5          THE COURT:  Yes, sir.

6          MR. GOTTLIEB:  Your Honor, at this time we move for

7     the receipt in evidence of what has been marked Defense Exhibit

8     V3.

9          THE COURT:  Any objection?

10          MS. ROTHMAN:  No objection.

11          MR. GOTTLIEB:  If we can just put it up on the screen,

12     I will then read the business record certification.

13          THE COURT:  Yes, sir.

14          MR. GOTTLIEB:  I, Larry K. Houck, a director of Hyman,

15     Phelps & McNamara, P.C., do hereby certify the following: One,

16     I am duly authorized custodian of the subpoenaed business

17     records and have the authority to make this certification.

18          Two, the invoices or documented payments in connection

19     With legal services supplied to Rochester drug Co-Operative,

20     Inc, regarding the evaluation of its compliance program and

21     recommendations made thereto between July 1, 2014 and September

22     12, 2014, provided in response to the order for the issuance of

23     subpoena issued on January 26, 2022, in the above referenced

24     case, the subpoena, are in Hyman, Phelps & McNamara, P.C.'s

25     possession, custody or control.

M1RBDOU2

1          Three, the invoices prepared in connection with legal

2    services supplied to Rochester Drug Co-Operative, Inc.,

3    regarding the evaluation of its compliance program and

4    recommendations made thereto between July 1, 2014 and September

5    12, 2014, provided in response to the subpoena are true and

6    correct copies, maintained in the course of regularly conducted

7    activity of Hyman, Phelps & McNamara, P.C., and made in regular

8    practice of Hyman, Phelps & McNamara, P.C., except that I have

9    caused to be redacted portions of the narratives related to

10   work performed by Hyman, Phelps & McNamara, P.C.,  that is not

11   in response to the subpoena.

12         Four, the invoices provided responsive to the subpoena

13   were created by persons of knowledge or created from

14   information transmitted by persons with knowledge of the

15   information shown and were created at or near the time the

16   information became available.

17         Five, the Rochester Drug Co-Operative, Inc.,  paid the

18   fees billed in the invoices in full.

19         Six, using the invoices and my recollection of the

20   work performed, I created a chart estimating how much work was

21   expended on legal work within the scope of the subpoena,

22   excluding portions of billing entries that were based on legal

23   work performed and bills on the invoices but outside the scope

24   of the subpoena.

25         This record replicates the type of record that Hyman,

M1RBDOU2

1   Phelps & McNamara, P.C., regularly create for clients who

2   request a division of fees when billing narratives cover

3   multiple matters.

4           Seven, I declare under penalty of perjury that the

5   foregoing is true and accurate.

6           Signed Larry K.  Houck, Director.

7           If we could put on the screen that one page chart that

8   is referenced in paragraph six, and this is marked V1A001, and

9   it's entitled estimated fees for RDC's controlled substance

10  compliance, July 17, 2014 to September 12, 2014.  Without going

11  through all the numbers, the cost estimate is $34,135, and the

12  business record indicates that all fees had been paid in full.

13          Your Honor, thank you very much.

14          THE COURT:  It will be admitted into evidence.

15          (Defendant's Exhibit V3 received in evidence)

16          MR. GOTTLIEB:  Your Honor, we actually have a

17  stipulation.  And if we if I can read that and show the

18  exhibit.  The parties stipulate and agree that, one, defense

19  Exhibit A82 is a spreadsheet created and maintained by RDC in

20  the regular course of business.  Defense A82 is admissible in

21  evidence, and if we could put on the screen, and your Honor I

22  ask that that be received in evidence, specifically Defense

23  Exhibit A82.

24          MR. ROOS:  No objection to the stipulation or the

25  exhibit.

M1RBDOU2

1              THE COURT:  It will be admitted into evidence.

2              (Defendant's Exhibit A82 received in evidence)

3              MR. GOTTLIEB:  Your Honor, without going through the

4    entire document beginning at the top if we can scroll down

5    slowly, if we could stop right there.

6              Your Honor, I just stopped at account number 4178

7    Lake Carmel pharmacy where the action that's in the records is

8    red flag suspension.

9              The date of that is May 26, 2016.

10             The next one is Allerton Park, termination of RDC's

11   CS ordering privileges. That's dated August 11, 2016.  Now if

12   we can continue down to the bottom covering 2017, '18 and '19,

13   '20.

14             The last entry, your Honor, is Newton pharmacy with a

15   red flag suspension, dated February 10, 2020.

16             Your Honor, thank you very much.

17             THE COURT:  Is there anything that we should do or you

18   want to do before we do the next witness at 1:30?

19             MR. GOTTLIEB:  The next matter would be the testimony

20   of that next witness, your Honor.

21             THE COURT:  Ladies and gentlemen, we're going to

22   adjourn until 1:15.  I'm going to see, obviously, if the

23   witness shows up a little early, I want to go ahead and start.

24   The witness is anticipated to be here by 1:30, so hopefully

25   that's the latest.  We'll proceed with that witness.  We're on

M1RBDOU2

1    schedule to finish the witnesses and the testimony sometime mid

2    or toward late afternoon, so don't discuss the case.  Keep an

3    open mind.  I'll see you at 1:15 p.m.

4              (In open court; jury not present)

5              THE COURT:  Let's adjourn to 1:15. See if the witness

6    shows up early, otherwise I anticipate the witness to be here

7    at 1:30 and we can start no later than that time.

8              MR. GOTTLIEB:  Thank you very much.

9              THE COURT:  Thank you.

10             (Recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1r3dou3

AFTERNOON SESSION

1:15 p.m.

1    (In open court; jury not present)

2    THE COURT:  We ready to proceed with the next witness?

3    MR. JANEY:  Yes, your Honor.  And just for the Court's

4    information, I'm embarrassed to say that I broke the home test

5    that I was supposed to use this morning.  So, when I entered

6    the courthouse building today, I went to the appropriate place

7    to -- oh, I may have the result here.

8    THE COURT:  You're waiting for results?

9    MR. JANEY:  I didn't know how to put together the

10   machine myself, your Honor.

11   THE COURT:  Did you get the notice?

12   MR. JANEY:  Not yet.  So, unfortunately, I may have

13   to -- if I understand the rule, I may have to examine with the

14   mask on.

15   THE COURT:  Why don't you, hopefully you'll get it in

16   the next few minutes.  As a matter of fact, I'll have my

17   secretary call.

18   MR. JANEY:  I took the witness there, also.

19   THE COURT:  Give me the name of the witness also.

20   MR. JANEY:  Martinovic.  Martin Martinovic.

21   MR. GOTTLIEB:  Your Honor, we informed the government

22   that we have a certified copy of Michael Paulsen's indictment,

23   and under 803(6) as a certified copy of the public record, we

M1r3dou3

1    are going to ask that be received in evidence for the following

2    reason.

3            Yesterday, he was simply asked did you plead guilty,

4    I'm sure you recall that, and, yes, I pled guilty to conspiracy

5    to illegally distribute narcotics.  The impression that the

6    government, by not going into it further, left the jury, is

7    that that conviction, that conspiracy, was this alleged

8    conspiracy in this case.

9            So all we want to do, your Honor, is to make sure that

10   the jury knows, and has access therefore to his indictment, to

11   see it's not this case, it is not this indictment.  Otherwise,

12   they could say, okay, not only did Mr. Pietruszewski plead

13   guilty, but Michael Paulsen as a co-conspirator pled guilty.

14   So we simply want to put in this public record and

15   specifically, under 803(6), it is permitted, your Honor.

16           MS. ROTHMAN:  A couple of responses.  We are not going

17   to argue that Mr. Paulsen is a co-conspirator of Mr. Doud.

18   We've been clear on who the co-conspirators are.  So if that's

19   Mr. Gottlieb's concern, that's not going to happen.

20           My concern is this is hearsay.  It is an out-of-court

21   statement, allegations in the indictment being offered for the

22   truth.  If the defense thought --

23           THE COURT:  That's your favorite objection.

24           MS. ROTHMAN:  It is your least favorite, but I think

25   I'm right on this one.  That's because there are assertions in

M1r3dou3

1    the past in this indictment that are being offered for the

2    truth.

3           If the defense wanted to clarify the scope of the

4    conspiracy, they could have asked Mr. Paulsen questions.  We

5    don't think there is an admissible basis for this coming in.  I

6    also don't think there is confusion.  His Rule 35 agreement is

7    in evidence.  It makes it clear it is a different case.

8           MR. GOTTLIEB:  It's not hearsay.  That's what 806 --

9    exceptions to hearsay make clear.  It's this clearly is in

10   subdivision (6) cuts it out of hearsay.  And while I appreciate

11   that the government's not going to argue, I'm not worried about

12   the government, I'm worried about any of the jurors having a

13   misimpression, based on the questioning and the answers

14   yesterday.  We want to avoid the possibility.

15          THE COURT:  Of what?

16          MR. GOTTLIEB:  That they understand that the

17   conspiracy to which he pled guilty is not this conspiracy that

18   they are considering.

19          THE COURT:  When you say is not this conspiracy.  I'm

20   not sure exactly what you are splicing here in terms of the

21   argument.  He pled guilty to selling, independently selling

22   drugs illegally out of his pharmacy.  He never said that

23   Mr. Doud had anything to do with that, never said that Mr. Doud

24   was a co-conspirator.

25          I don't know what it is that you think that the jury

M1r3dou3

1    is going to assume if they don't see his entire indictment.

2              MR. GOTTLIEB:  Your Honor, this is the concern, your

3    Honor.  If a juror heard this guy get up, called by the

4    government, and with the leading questions he says that I pled

5    guilty to conspiracy to distribute, and then was asked

6    questions about where did you get the drugs, I got them from

7    RDC, I think a reasonable juror might say, ah-ha, he must be

8    involved in the conspiracy charge that we are going to be

9    deliberating about.

10             THE COURT:  Well, the problem is, is that it depends

11   on what you mean by involved.  He obviously said he got drugs

12   from RDC, and he illegally sold them.

13             MR. GOTTLIEB:  But he didn't --

14             THE COURT:  RDC is involved.  He never said that

15   Mr. Doud was a co-conspirator in his crime.  And he never said

16   anything about it.  And he was the most specific of all the

17   witnesses to indicate that the conspiracy he pled to was based

18   on his own individual conduct and the decisions he made about

19   what he was going to do with the drugs.

20             MR. GOTTLIEB:  Your Honor, see, I don't disagree with

21   anything you just said.  I really don't.  But, you are an

22   astute jurist, and we have 12 jurors who are just listening to

23   the testimony, and they don't have the necessary talents to be

24   able to distinguish between that.  All they heard is that he

25   pled guilty to conspiracy.  And under the rules of evidence --

M1r3dou3

1          THE COURT:  That's not all they heard.  They heard

2     that specifically what were the underlying facts that he said

3     constituted his crime.

4          MR. GOTTLIEB:  But under the rules of evidence, it was

5     raised by the government, what did you plead guilty to.  They

6     then put in what your sentence is.  And then what did you do in

7     the facts.  All we are doing on our case, pursuant to 803(6),

8     is putting in the indictment to which he pled guilty.  There is

9     no basis, because it is not hearsay.

10          THE COURT:  Explain to me how that indictment

11     addresses the issue of whether or not the conspiracy that he

12     pled guilty to involved Mr. Doud.

13          MR. GOTTLIEB:  If you just read it, it's clear.  It

14     doesn't raise anything about Mr. Doud or RDC.

15          THE COURT:  So did his testimony.

16          MR. GOTTLIEB:  But then we have something I can hold

17     up and the jury can have as -- no, your Honor.  Then the jury's

18     entitled then to see the actual evidence that establishes, when

19     I argue --

20          THE COURT:  That's the problem.  The problem I have is

21     exactly the way you appropriately phrased it.  This jury can

22     see the evidence.

23          The indictment is not evidence.  I'm going to tell the

24     jury an indictment is not evidence so they don't use the

25     indictment against Mr. Doud as evidence.  So if you're offering

M1r3dou3

1    it for that purpose, that is not a proper purpose to show that

2    that's the evidence of which he pled guilty to.  Quite frankly,

3    I have no idea whether that's what he pled guilty to.

4           MR. GOTTLIEB:  But the indictment that we've marked as

5    V5, your Honor, is United States of America v. Michael Paulsen.

6           THE COURT:  I understand that.

7           MR. GOTTLIEB:  And it lays out the allegations, it is

8    the proof, it's no longer speculation or wondering.  It is the

9    proof --

10          THE COURT:  The indictment is never the proof.

11          MR. GOTTLIEB:  But, your Honor, he said he pled guilty

12   to it and the jury then can see the indictment and see it is

13   not involving Larry Doud.

14          THE COURT:  Okay.  I understand your position.  Do you

15   have anything further on this?

16          MS. ROTHMAN:  I think your Honor, I think your Honor

17   is inclined to keep this out so I'm not going to talk anymore.

18   If your Honor is inclined to let it in, I'll talk more.

19          MR. GOTTLIEB:  I'm sorry.

20          THE COURT:  There's several reasons why I think it is

21   inappropriate at this point to do that.  One is that the

22   indictment is not evidence of anything.  He pled guilty to what

23   his allocution made out the crime to which he pled guilty to.

24   And the only evidence of the crime that he pled guilty to is

25   what he said in his allocution.

M1r3dou3

1          Second of all, if you wanted to do that, if you wanted

2     to make that point, you should have made that point on

3     cross-examination.  You did not make that point on

4     cross-examination.

5          And three, the indictment itself, the jury should not

6     read this indictment to make any conclusions about whether or

7     not anything in that indictment is truthful, accurate, or

8     represents the complete or partial crime that he testified to.

9     So, and I think the fact alone that no one raised this on

10    cross-examination and make that clear, and to now say you want

11    to offer his indictment, I think that alone should preclude

12    this at this point.

13         But I think there are legitimate reasons otherwise

14    that it is not appropriate for the jury to take Mr. Doud's

15    indictment and say that that's proof of nothing, and then to

16    take the witness's indictment and argue that that's proof of

17    the crime he pled guilty to.

18         MR. GOTTLIEB:  Your Honor, the truth of the matter is,

19    hearing the government representing that they are unrelated,

20    and so that it's not necessary to introduce the indictment

21    itself, is fine with me.  As long as it can be made clear that

22    what he pled guilty to was not a conspiracy that was charged,

23    it's not the same indictment as in this case.

24         THE COURT:  Well, as long as --

25         MR. GOTTLIEB:  If that's the case, then there is no

M1r3dou3

1      problem.

2              THE COURT:  The way you phrased it there may be a

3      problem.  The only way you can do that is point to the evidence

4      in this case that's before this jury.

5              MR. GOTTLIEB:  No, your Honor.

6              THE COURT:  I am not sure that evidence in this case

7      is before this jury.  If the two of you want to stipulate that

8      evidence in this case before this jury, but there is no

9      evidence before this case about what conspiracy he pled guilty

10     to, who was involved in that conspiracy, who was excluded from

11     that conspiracy, how that conspiracy related to RDC or

12     Mr. Doud.  Except to the extent that he testified that the

13     drugs he got, those were the drugs that he bought from RDC.

14     And there is no basis for this jury to come to the conclusion,

15     based on this evidence, that he is saying that he and Mr. Doud

16     agreed as co-conspirators to do this.

17             MR. GOTTLIEB:  We agree with that.  We agree with

18     that.  I just do not want it to be a dangling issue when we

19     have the ability under the rules of evidence to clarify it.  If

20     your Honor is not going to allow us to introduce this

21     non-hearsay statement, then I simply want to be able to be --

22             THE COURT:  But it is a hearsay statement.

23             MR. GOTTLIEB:  That the jury is not going to be told,

24     and in fact it will be clear that what he pled guilty to, the

25     charge, the indictment that he pled guilty to, is not this

M1r3dou3

1    case.

2              THE COURT:  I don't know why that's a relevant issue

3    for argument by either side.

4              MR. GOTTLIEB:  Because it's a concern that I have.

5              THE COURT:  Ms. Rothman on this issue, she's right.

6    That is hearsay.  That's not non-hearsay.  If you want to offer

7    the allegations in the indictment because they're simply

8    allegations in the indictment as proof of the substance of

9    those allegations, that's exactly what I am going to tell the

10   jury they can't do with regard to Mr. Doud's indictment.

11             MR. GOTTLIEB:  But, the only difference is, your

12   Honor.

13             THE COURT:  What's the difference?

14             MR. GOTTLIEB:  When he testified, he said he pled

15   guilty to the conspiracy.

16             THE COURT:  Well --

17             MR. GOTTLIEB:  Therefore, the government, by not

18   saying your indictment, we are not talking about this

19   indictment, the government has presented a question and answer

20   that could very well mislead and confuse the jury.

21             THE COURT:  I know, but the one thing I know you

22   understand and agree with, is that if you thought that was a

23   relevant issue to deal with, you should have done that on

24   cross-examination.  If you thought that that's what was

25   important to do. You didn't do that.

M1r3dou3

1          MR. GOTTLIEB:  But we're --

2          THE COURT:  Now you want to do it through the

3   indictment.  If there was another legitimate way to do it, I

4   would say so.  But I am not going to tell the jury that they

5   can conclude that any facts in that indictment is evidence of

6   the crime to which he pled guilty to, just as I will emphasize

7   to them that the indictment against Mr. Doud is not evidence

8   that they should accept simply because it was alleged.  And

9   they can accept his guilty plea, but to the extent his guilty

10  plea is partially, totally, or even greater than what's in that

11  indictment, that doesn't make the indictment itself and the

12  allegations in the indictment admissible at this trial.

13         MR. GOTTLIEB:  I am sure your Honor can appreciate

14  this, and I say this recognizing you may want to chop off my

15  head.

16         THE COURT:  No, I definitely don't want to chop off

17  your head.  I want you to keep your head.  I need that.

18         MS. ROTHMAN:  Am I allowed to take a vote?

19         THE COURT:  We are not putting that to a vote, no.

20         You don't convince me, based on this, and I understand

21  what you want to do and I understand why you want to do it.  I

22  think it is a perfectly legitimate argument for you to make.

23  It is not an argument in substance that is supported by law.

24         MR. GOTTLIEB:  Your Honor, all I can say, the only

25  person who we could call to clarify it beyond the indictment

M1r3dou3

1    would be Michael Paulsen.

2              THE COURT:  I know, but that's a collateral matter and

3    I wouldn't let you call Paulsen just to say that.

4              MR. GOTTLIEB:  The reason it's not collateral is the

5    government brought it out on its direct case that he pled

6    guilty.  We didn't raise it on cross-examination.  The

7    government raised --

8              THE COURT:  You should have raised it on

9    cross-examination.  That was the time to raise it.  You can't

10   say now, oh, I remembered something I wanted to ask Ms. Pompeo

11   so I want to now offer evidence with regard to Ms. Pompeo.  You

12   should have done it when he was on the stand.

13             MR. GOTTLIEB:  Your Honor, the only --

14             THE COURT:  If that's what you wanted to make clear.

15   You could have said to him directly, the conspiracy you agreed

16   to had nothing to do with Mr. Doud.  That would have been a

17   simple question.  This afterthought, this afterthought now does

18   not make admissible the indictment as proof of the substance of

19   what he pled guilty to.

20             MR. GOTTLIEB:  Your Honor, all I can say with regard

21   to that, the trial is still going on, we are now on the defense

22   case.  And when we're on the defense case, in accordance with

23   the rules of evidence 803(6), the rules of evidence recognize

24   exactly what we are trying to do.

25             THE COURT:  I don't know any rule of evidence that

M1r3dou3

1    says that you can offer, you can offer an indictment as proof

2    of the allegations in the indictment.

3              MR. GOTTLIEB:  So, your Honor --

4              THE COURT:  Where do you get that from.

5              MR. GOTTLIEB:  803(A) of the federal rules, public

6    records.

7              THE COURT:  No, no, no.  Public records is a general

8    term and that's fine.  But public records does not include that

9    an indictment is substantive evidence of the crime alleged in

10   the indictment.  You know that that's true.

11             MR. GOTTLIEB:  But, your Honor, a public record, the

12   indictment which is a public record, in subdivision uppercase

13   (A), it would be a record or statement of a public office if

14   (A) it sets out: (iii) in a civil case or against the

15   government in a criminal case, that's where we are now, against

16   the government in a criminal case, factual findings from a

17   legally authorized investigation.

18             THE COURT:  Right.  There is no factual finding from a

19   legally constituted investigation in an indictment.  An

20   indictment, you know what, I've already told the jury what the

21   indictment is.  It is simply an accusation.  It is proof of

22   nothing.  Do you want me to take that back with regard to

23   Mr. Doud's indictment?

24             MR. GOTTLIEB:  Absolutely not.  Absolutely not.  But

25   once he was asked about the indictment, what did you plead

M1r3dou3

```
 1    guilty to, and --

 2                THE COURT:  Yes.

 3                MR. GOTTLIEB:  In fact --

 4                THE COURT:  You could have asked him at that time

 5    whether or not what he pled guilty to had anything to do with

 6    Mr. Doud.  You didn't ask him that.  You can't prove that by

 7    putting his indictment in, which again, doesn't say anything

 8    about Mr. Doud, and quite frankly, I'm not even sure what his

 9    answer to that question would have been.

10                MR. GOTTLIEB:  Your Honor, listen, I hear you.  I

11    respect it.

12                THE COURT:  As long as the record is clear and I

13    thoroughly considered your argument.  You've not convinced me

14    that this indictment is admissible for that purpose.

15                MR. GOTTLIEB:  The only problem that I will make clear

16    on the record and then we're going to move on, is that the

17    government's questioning misled the jury.

18                THE COURT:  Right.  And as I said, even without the

19    substantive argument, the appropriate response should have been

20    at the time that the witness was on the stand, for you to clear

21    that up.  Because you could have gotten testimony from that

22    witness to clear that up.  You do not have testimony from any

23    witness now to clear that up.  You forewent that opportunity.

24    And now you want to do something that you should have done, if

25    you thought it was important, while the witness was on the
```

M1r3dou3

1    stand.  That's my position.

2              All right.  So let's proceed with this witness.  Are

3    we ready to proceed?  The jury's outside.

4              MR. JANEY:  He's down the hallway.

5              THE COURT:  Your test has come back negative.

6              MR. JANEY:  Thank you.  Whatever you did, I got both

7    my test and the witness's test.  They're both negative.

8              THE COURT:  Let's bring in the jury and then let's

9    bring in the witness.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Mr. Janey, will you call your next

3    witness.

4           MR. JANEY:  Yes, your Honor.  Thank you.  The defense

5    calls Martin Martinovic.

6           Just a moment.  My colleague is getting him from down

7    the hall.

8           THE COURT:  All right.

9    MARTIN MARTINOVIC,

10       called as a witness by the Defendant,

11       having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MR. JANEY:

14   Q.  Good afternoon, Mr. Martinovic.  You can remove your mask.

15   If you can just be sure that you're close enough to the

16   microphone or pull it closer to you.

17   A.  Okay.

18   Q.  Great.  Thank you.

19          Mr. Martinovic, who is your employer?

20   A.  I am a partner at the firm of Matson Driscoll & Damico

21   forensic accountants.

22   Q.  Is that commonly referred to as MDD?

23   A.  Yes, it is.

24   Q.  If I refer to it this afternoon as MDD, will you understand

25   that I'm referring to Matson Driscoll & Damico?

1   A.   Yes.

2   Q.   Did there come a time when through MDD you were retained by

3   the defense for purposes of this case?

4   A.   Yes.

5   Q.   What was the assignment?

6   A.   The assignment was, in terms of scope of engagement, was to

7   review financial information produced, and review the

8   compensation of Larry Doud and to determine if there was

9   financial incentive with a view to sales of controlled versus

10  non-controlled or even global sales.

11  Q.   Why are you testifying here today?

12  A.   I guess everybody wants to hear my opinion on it.

13  Q.   Fair enough.

14         By way of background, please explain to the jury what

15  is your occupation.

16  A.   I am a forensic accountant.

17  Q.   Are you a certified public accountant?

18  A.   Yes.

19  Q.   In what state do you hold your CPA license?

20  A.   New York State.

21  Q.   How long have you held your CPA license in New York?

22  A.   2009.

23  Q.   When did you start working at MDD?

24  A.   I started in our Toronto, Canada, offices in 1998.  Moved

25  to our London office in 2007 and '08 in the U.K., and have been

M1r3dou3                           Martinovic - Direct

1    working at MDD New York since 2008.

2              MR. JANEY:  Marking for identification what is

3    premarked as Defense Exhibit R2.  If I can show that to the

4    parties and to the witness, please.

5    Q.  Do you see that there, Mr. Martinovic?

6    A.  I do.

7    Q.  Do you recognize this document?

8    A.  Yes.

9    Q.  What is it?

10   A.  This is my current CV I believe.

11   Q.  Do you need to take a further look at it to be sure?

12   A.  This is page one of two.  Yes.  This my current CV.

13             MR. JANEY:  Your Honor, at this time the defense

14   requests that Exhibit R2 be admitted in evidence.

15             THE COURT:  Any objection?

16             MR. BURNETT:  Objection.  It is all hearsay.

17             THE COURT:  Overruled.  I'll admit it.

18             (Defendant's Exhibit R2 received in evidence)

19             MR. JANEY:  If we can publish it to the jury.

20             THE COURT:  Yes.

21   Q.  Mr. Martinovic, what is your educational background?

22   A.  I have a bachelor of commerce degree from the University of

23   Toronto, graduated in '96.  And I am a CPA.

24   Q.  Drawing your attention to the first page of what's Exhibit

25   R2.  Just below the area described as professional experience.

M1r3dou3                        Martinovic - Direct

1   Can you read for the jury what it states in the first bullet
2   there.
3   A.   "Professional concentration has been in forensic and
4   investigative accounting determining, verifying and analyzing
5   factual matters by the examination of accounting, operating and
6   financial records, and the interpretation and communication of
7   these financial facts along with calculations and
8   recommendations, all in connection with claims under insurance
9   coverage and in litigation matters."
10  Q.   In plain terms, what does that mean?
11  A.   That we are asked to review financial records, and come up
12  with an assessment, typically in economic damage cases in civil
13  matters, and we work within the insurance litigation field
14  primarily, but then we also work on litigation matters
15  involving no insurance.
16  Q.   To be clear, have you worked non-insurance litigation
17  matters for forensic and investigative accounting assignments?
18  A.   Yes.
19  Q.   What type of non-insurance litigation matters have you
20  performed forensic and investigative matters?
21  A.   Primarily breach of contract.
22  Q.   Are there any others?
23  A.   Not that I can recall.
24  Q.   In what industries have you performed forensic and
25  investigative accounting?

M1r3dou3                    Martinovic - Direct

1    A.  Well, as you can see with bullet point or arrow two, that's

2    a cross section of various industries I've worked in.

3    Q.  Can you describe it for the jury.

4    A.  Did you want me to read this out?

5    Q.  Sure.

6    A.  "Industry experience in agriculture, automotive, casino,

7    cereal, chemical, communication, computer, concrete,

8    construction, dental, energy, fast food, fertilizer, food

9    processing, furniture, garment, glass, hospital, hotel --"

10   shall I read the rest or focus on the fact that it says

11   pharmaceutical at one point?

12   Q.  Well, have you done this work in the pharmaceutical

13   industry?

14   A.  Yes.

15   Q.  In terms of the nature of the assignment, so that the jury

16   understands, are these assignments mere theoretical exercises

17   or are they actual forensic and investigative accounting

18   assignments leading to actual business decision making?

19   A.  It is the latter.

20   Q.  How would you describe that?

21   A.  Primarily what we do is we work primarily with the

22   insurance industry.  So for instance, one of my first exposures

23   in the U.S. and in New York specifically is due to the 9/11

24   incident, where our office had 600 commercial insurance claims,

25   including the buildings themselves, the two Silverstein claims.

M1r3dou3                          Martinovic - Direct

1    Q.  We can take this down.  Thank you.

2           Within your experience in forensic and investigative

3    accounting, have you ever been retained as an expert witness?

4    A.  Yes.

5    Q.  For the jury, can you explain what some of those

6    assignments have been?

7    A.  Again, focusing on the insurance industry.  One litigation

8    involved a bad-faith allegation by an insurance policy holder,

9    commercial insurance policy holder against its insurers.  I was

10   involved in the quantification of what was being sought by

11   plaintiffs and in rebutting that.  Other matters include

12   insurance disputes amongst insurers themselves in terms of

13   damages.

14   Q.  Have you ever been a testifying expert at trial?

15   A.  Yes.

16   Q.  When was the last time you were a testifying expert at

17   trial?

18   A.  I believe May of 2017.

19   Q.  Where and in what court was that?

20   A.  Lafayette County in Louisiana.

21   Q.  Prior to then, had you been a testifying expert at trial?

22   A.  I was -- I did testify at a bankruptcy proceeding in Corpus

23   Christi, Texas, in 2009.

24           MR. JANEY:  At this time the defense moves to qualify

25   Mr. Martinovic as an expert in the area of financial analysis.

M1r3dou3                        Martinovic – Direct

1              THE COURT:  Any objection?

2              MR. BURNETT:  No objection.

3              THE COURT:  You can inquire on that basis.

4    Q.  Mr. Martinovic, prior to being engaged for this case, had

5    you done any work for Rochester Drug Co-Operative?

6    A.  No.

7    Q.  If I refer to Rochester Drug Co-Operative as RDC, will you

8    know what I mean?

9    A.  Yes.

10   Q.  Prior to being engaged for this case, had you ever been

11   retained by the defendant Larry Doud to perform any work?

12   A.  No.

13   Q.  In terms of the work that you've done for this case, is

14   there anyone that assisted you in the work?

15   A.  Yes.

16   Q.  Who are those persons?

17   A.  Two female colleagues.  First one would be Kimberly Tan,

18   spelled T-A-N.  The second colleague would be Alicia Lu, L-U.

19   Q.  To be clear, are they employees of MDD?

20   A.  Yes.

21   Q.  Did any outside vendor or firm assist you in the work that

22   you have done in this case?

23   A.  No.

24   Q.  Is MDD being compensated for its work in this case?

25   A.  Yes.

M1r3dou3                          Martinovic - Direct

1   Q.  Does that compensation include your testimony today?

2   A.  Yes.

3   Q.  Mr. Martinovic, how are you being compensated?

4   A.  On an hourly basis based on the number of hours I've

5   charged to the matter times my billing rate.

6   Q.  Approximately how much have you billed to date?

7   A.  I would estimate about 125,000.

8   Q.  How would you reflect that in terms of number of hours

9   you've spent on your analysis?

10  A.  Having checked our billing system, through this past

11  Saturday, about 650 hours.

12  Q.  Does that amount MDD gets paid depend in any way on the

13  opinions you give in this courtroom?

14  A.  No.

15  Q.  Does the amount you get paid depend in any manner on the

16  outcome of the trial in this case?

17  A.  No.

18  Q.  Once being engaged for the case, in general terms, what

19  materials did you receive to support your analysis?

20  A.  We initially received a batch of financial information from

21  your law firm.  That was initially until we got access to a

22  document management system containing around 3 million

23  documents produced on the case.  And this would have been

24  access that your law firm provided me.

25  Q.  Just focusing on the financial documents for a moment.

M1r3dou3                              Martinovic - Direct

1    Were these financial documents RDC financial materials produced
2    to the defense by the government?
3    A.  Yes.
4    Q.  And what sort of financial materials were these more
5    particularly?
6    A.  For the sake of my scope of my engagement, we received
7    financial statements, annual reports, we received employment
8    contracts concerning Larry Doud, received access to sales
9    information.
10   Q.  Did there ever come a time that you came to review RDC
11   financial materials that were subpoenaed by the defense, in
12   other words, materials that were obtained by way of court
13   order, signed by the presiding judge, Judge Daniels in this
14   case?
15   A.  Yes.
16   Q.  What were those materials?
17   A.  Essentially, it included five very large, what's called
18   .csv files, similar to Excel files, which contained about 21
19   million rows of sales data.
20   Q.  Were those materials important?
21   A.  Yes.
22   Q.  Why were they important?
23   A.  Because on a granular level it was able -- it made, it
24   allowed us to be able to analyze all the sales on an individual
25   sales basis, and if a sale to a pharmacy involved 10 different

1   product items, it gave us that level of granularity in terms of

2   how much of the product was sold, times price, equals total

3   dollar amount for each item sold on an invoice.  This allowed

4   us to then build what we call the sales database, as you may

5   have seen in my findings.  That allowed us to then be able to

6   segregate sales between controlled sales, not controlled sales,

7   and then segregate it even further as we saw fit.

8   Q.  Would your financial analysis have been complete or

9   accurate in the absence of that subpoenaed information?

10          MR. BURNETT:  Objection.

11          THE COURT:  I'm sorry.  Could you restate that

12  question?

13  Q.  Would your financial analysis have been complete or

14  accurate in the absence of the subpoenaed information?

15          THE COURT:  You can answer.

16  A.  Okay.  Most likely not.

17  Q.  When you reviewed the financial data, Mr. Martinovic, for

18  purposes of the assignment, did you ever deem it important to

19  review information about the cost of the products involved in

20  this case, namely oxycodone or fentanyl?

21  A.  Yes, as part of our scope of review, we would be interested

22  in costs by product, all products.

23  Q.  Why would you be interested in cost data?

24  A.  The reason for that is, based on Mr. Doud's compensation,

25  specifically his bonus calculation, it starts with net sales,

M1r3dou3                       Martinovic – Direct

1    you would deduct out costs or what's called costs of good sold,

2    if you've seen a profit and loss statement or an income

3    statement, to arrive at what we call accounting gross margin or

4    gross profit.

5    Q.   If we could have Government Exhibit 903, please.  Looking

6    at Government Exhibit 903, Mr. Martinovic, what's been admitted

7    in evidence, can you use this chart to explain why cost data

8    matters and the potential impact of that cost data on

9    profitability for the wholesalers?

10   A.   Yes.  So, as I understand it, RDC was a wholesaler.  So it

11   would fit within box number two in the supply chain.  That

12   starts with manufacturers, then that flow drugs, as you can see

13   with the black arrow in the diagram, goes to wholesaler.  So in

14   this instance, we have RDC as wholesaler, RDC would have

15   purchased drugs from the manufacturers, that represents a cost

16   to RDC.  Then RDC would then sell those drugs to its customer

17   base, which features pharmacies, and that would allow us to

18   understand RDC selling to the pharmacies, what are they selling

19   at versus the cost from the manufacturers, to establish if

20   there was any profit made on those sales.

21          MR. JANEY:  We can take that down.

22   Q.   Do you have an opinion about profitability calculations

23   that failed to reflect cost data?

24   A.   Sorry.  Can you repeat the question?

25   Q.   Do you have an opinion about profitability analyses that

M1r3dou3                    Martinovic - Direct

1    failed to reflect cost data?

2    A.  I suppose I would have a problem with it.

3    Q.  What is your opinion in that scenario?

4    A.  Well, to establish profitability, as I suggested, at least

5    purchase sales of the drug products less costs, if you don't

6    have the cost, you can't really determine profitability.

7    Q.  In the course of the assignment here, did you review any

8    e-mails in this case?

9    A.  I did.

10   Q.  Why did you review e-mails?

11   A.  As a result, as we went through the search of the database

12   of documents provided to us, we wanted to examine costs on a

13   granular basis, similar to the sales data, to be able to assess

14   the profitability on the drug-by-drug basis, a class of

15   drug-by-drug basis, controlled versus not controlled basis.

16   And we are somewhat baffled that we didn't have any information

17   to allow us to do that.  So, without that information, then we

18   have to look at other evidence to consider, to come up with

19   some sort of view.

20   Q.  So, we'll come back to that part.  But to be clear for the

21   jury, with respect to the e-mails that you reviewed, to be

22   clear, were these RDC e-mails?

23   A.  Yes.

24   Q.  Did you ever review -- withdrawn.

25            Did your review of materials also include information

1    from the government's expert witness, David Cutler, anticipated

2    to be in support of his testimony in this case?

3    A.  I've seen his materials.

4    Q.  What was the form of that information?

5    A.  Largely very large data set studies of drug sales, very

6    granular, number of orders filled, quantities sold, and sales

7    analysis.

8    Q.  Among the Mr. Cutler related information, were slides

9    included in your review?

10   A.  Sorry.  Can you repeat that?

11   Q.  Were PowerPoint slides included?

12   A.  Yes.

13   Q.  Were you provided any transcripts from the testimony in

14   this case as a part of what you reviewed?

15   A.  Yes, I was provided David Cutler's testimony.

16   Q.  Did you review both the direct examination and the

17   cross-examination components of that testimony?

18   A.  Yes.

19   Q.  In some form or manner, was your review of these various

20   materials reflected in your analysis and conclusions?

21   A.  To the extent it factored, yes, potentially.

22            MR. JANEY:  If we could have Government Exhibit 903,

23   please, and in particular slide eight.  This has been admitted

24   in evidence.

25   Q.  Now, Mr. Martinovic, did you make this slide?

1    A.  No.

2    Q.  Do you know who made this slide?

3    A.  Yes.

4    Q.  How do you know?

5    A.  Because this would be part of David Cutler's work product

6    that I've been provided.

7    Q.  Now, does this chart reflect opioid sales at RDC, to your

8    understanding?

9    A.  Yes.

10   Q.  Did viewing this chart, this slide eight, did the

11   controlled sales at RDC include drugs other than opioids?

12   A.  Yes.

13   Q.  Well -- withdrawn.

14        The slide notwithstanding, do you have an

15   understanding that controlled sales at RDC included controlled

16   drugs other than opioids?

17   A.  Yes.

18   Q.  So, we'll come back to that in a moment.  But holding that

19   aside, drawing your attention to the left-hand side of the

20   slide with the label sales revenue by product type 2010 to

21   2016.  Do you see that there?

22   A.  I do.

23   Q.  And drawing your attention in particular, just by way of

24   example, to the 2015 year.  Do you see that?

25   A.  I do.

M1r3dou3                    Martinovic - Direct

1   Q.  Is that the peak sales revenue year indicated by this chart

2   for sales?

3   A.  Yes.

4   Q.  Based on the chart, and your analysis for this case, what

5   type of sales, opioids versus what's labeled as all other

6   products, are driving the revenue at RDC in 2015?

7   A.  I'm sorry?

8           THE COURT:  Can you get a little closer to the mic.

9   Keep your voice up.

10  A.  Can you repeat the question?

11  Q.  Sure.  Viewing the chart, opioids versus all other

12  products, as between the two, what's driving the revenue at RDC

13  in 2015?

14  A.  It's going to be the all other products.

15  Q.  And what percentage of the business is non-opioid sales in

16  2015?

17  A.  Well, looking at the graph on the right-hand side suggests

18  about 89.2 percent.

19  Q.  In sales dollars, by comparison, how much does the opioid

20  sales on other hand represent?

21  A.  241 million.

22  Q.  And again, viewing the slide, considering the slide and

23  based on your investigation and review, and based on your years

24  of experience, do you have an opinion as to what type of sales

25  overall drove the business at RDC in 2015?

1         MR. BURNETT:  Objection.

2         THE COURT:  Just going to sustain the objection as to

3    the form of the question.  I'm not sure I understand what

4    "drove" means.  Can you rephrase that.

5    Q.  Do you have an opinion with respect to 2015 as to what the

6    majority sales are reflected by as between opioids and all

7    other products?

8    A.  All other products.

9    Q.  And same question for 2016?

10   A.  Same answer.

11   Q.  Can you state it?

12   A.  That all other products were driving sales in 2016.

13   Q.  And going back in time, same question for 2010?

14   A.  All other products are driving sales.

15   Q.  In 2011, same question?

16   A.  All other products are driving sales.

17   Q.  Same question for 2012?

18   A.  All other products are driving sales.

19   Q.  Same question for 2013?

20   A.  All other products are driving sales.

21   Q.  Same question for 2014?

22   A.  All other products are driving sales.

23   Q.  Looking at this exhibit, and based on your investigation

24   and review for this case, and based on your years of

25   professional experience, do you have an opinion as to what type

M1r3dou3                          Martinovic - Direct

```
1    of sales for the entire time frame, 2010 to 2016, largely

2    constituted sales at RDC?

3    A.  All other products.

4            MR. JANEY:  We can take this down.  In the course

5    of -- well.  Marking for identification what's premarked as

6    Defense Exhibit R1.  Showing it to the parties and just to the

7    witness.

8    Q.  Mr. Martinovic, do you recognize this document?

9    A.  I do.

10   Q.  Does this document reflect a summary of the voluminous

11   materials that you testified about that you reviewed, in part

12   at least?

13   A.  Yes.

14   Q.  What is this?

15   A.  These are my findings based on my scope of engagement.

16           MR. JANEY:  Your Honor, we request that Defense

17   Exhibit R1 be received in evidence.

18           MR. BURNETT:  No objection.

19           THE COURT:  It will be admitted in evidence.

20           (Defendant's Exhibit R1 received in evidence)

21   Q.  If we can publish to the jury.

22           Mr. Martinovic, drawing your attention to slide two.

23   If we can scroll it up a little so it can be more effectively

24   seen.  Slide two here, Mr. Martinovic, is labeled annual RDC

25   sales - amounts.  Do you see that?
```

M1r3dou3                    Martinovic - Direct

1    A.  I do.

2    Q.  Please describe to the jury the information that's

3    reflected here on slide two.

4    A.  This basically provides a high-level recap of our analysis

5    of the sales.  As forensic accountants or anything in the

6    exercise we always start with financial statements to provide

7    us a view, audited financial statements, to give us an idea of

8    what sales should look like in terms of our analysis.  And what

9    we did, as I mentioned earlier, we received via the subpoena

10   from RDC five .csv files, about three gigabytes of sales data,

11   21 million rows.  And in order to, with our aim of

12   understanding controlled substance sales versus non-controlled

13   sales, we built up our analysis to be able to make a

14   segregation of those two types of sales.

15   Q.  Drawing your attention to the far-right side, which is

16   labeled controlled sales per .csv.  Can you explain for the

17   years you have outlined here, 2011 to 2017, the relationship

18   between the controlled sales versus the non-controlled sales.

19   A.  Well, as you can see with the numbers, we want to also

20   demonstrate on a percentage basis, I mean, you had controlled

21   sales ranging from 9 percent to as high as 16 percent in 2014

22   before they then declined to 11 percent of global sales.

23   Q.  This statistic here for controlled sales, does it include

24   all controlled sales, including oxycodone and fentanyl?

25   A.  Yes.

M1r3dou3                        Martinovic - Direct

1    Q.   Is it specific to oxycodone and fentanyl?

2    A.   Fentanyl and oxycodone would be a subset of those sales.

3    Q.   So, does this number provide a broader number, it's all

4    controlled sales?

5    A.   It does.

6    Q.   Drawing your attention to page three, labeled annual RDC

7    sales - line graph view.  Please explain to the jury what this

8    graph depicts.

9    A.   This graph takes the numbers that appeared on the previous

10   slide, and just provides a plot line to demonstrate the growth

11   in sales, all sales, but certainly the prominent item of sales

12   or type of sales that stand out is non-controlled substance

13   sales where you can see that on a steeper incline in growth.

14   Q.   Mr. Martinovic, are you familiar with a term called the

15   80-20 rule?

16   A.   I guess there's various 80-20 rules.

17   Q.   What is the 80-20 rule as you understand it in your

18   experience?

19   A.   Are with you talking in the financial --

20   Q.   In the financial terms, yes.

21   A.   I mean, sometimes, well in our industry, with insurance

22   especially, 80 percent of the claims may be 20 percent of the

23   volume.  And sometimes big, big claims, 20 percent of the

24   claims could be 80 percent of the financial value.

25   Q.   Do you know whether RDC sales can be explained by the 80-20

1    rule in your opinion?

2             MR. BURNETT:  Objection.

3             THE COURT:  I'm going to sustain as to the form of the

4    question.

5    A.  I don't know how to answer that.

6             THE COURT:  No.

7             MR. JANEY:  The question is withdrawn.

8    Q.  In your review, in using this slide, Mr. Martinovic, was

9    there a concentration of customers with respect to the

10   controlled sales revenue?

11   A.  To use 2015 as an example, because that sort of stood out

12   for me and my team in terms of growth.  Where we see revenue

13   that goes from over a billion and then jumped to 2 billion.  We

14   kind of looked at 2015 in an isolated way.  In controlled

15   sales, specifically Schedule II where opioids and fentanyl

16   would be a part of it, there was something like 750 customers,

17   but certainly one standout customer, and that would be Linden

18   Care.

19   Q.  And for the jury, can you explain more about your

20   observations in the data with respect to Linden Care?  And you

21   can use your example of 2015.

22   A.  Yes.  I mean, I believe we -- it's consistent with this

23   graph, but, about 260 million sales calendar year '15 -- mind

24   you, this is fiscal year end, so there will be some slight

25   differences.  But, if there was 260 million in sales of

1    Schedule II drugs, two of which would be oxycodone and

2    fentanyl, Linden Care accounted for about 148 million, about

3    55 percent.

4              (Continued on next page)

M1RBDOU4                    Martinovic - Direct

1   Q.  And if we could go back to the prior slide.

2            Again, viewing the controlled sales, and if we can

3   just look at 2015 because that's the example Mr. Martinovic was

4   giving.  Can we pop that out.  I'm learning the technology as I

5   go along, Mr. Martinovic. I appreciate your patience.

6            To try to get some context for the numbers you're

7   describing, viewing to the far right in 2015, the 280 plus

8   million dollars there that are in that column.

9            Can you just explain again if you would the Linden

10  Care aspect of those sales dollars?

11  A.  Well, as I mentioned to you, as you can see on the first

12  column on the left, this is fiscal year end March of 2015, so

13  the analysis that I was just mentioning would be slightly

14  afterwards because it would be all of 2015.

15           so, slight differences, this is 280 million in this

16  view, versus the $260 million that I was mentioning.  And to

17  sort of nestle in my observations on the calendar year basis,

18  Linden Care would have made up probably close to 50 percent, if

19  not more, of sales in that year on controlled substances.  Now

20  that's all controlled substances.  What I had mentioned men

21  earlier was schedule two only.

22  Q.  If we could go back to slide three, please.

23           Now, we've been very specific.  Let's draw back and be

24  a bit more general for a moment, Mr. Martinovic, and focusing

25  on this line here, the line graph view on the controlled sales

M1RBDOU4                    Martinovic - Direct

1   line on the chart, and what's the color of the controlled sales

2   line?

3   A.  It's the green one.

4   Q.  The green line at the bottom?

5   A.  Yes.

6   Q.  Viewing that particular line, based on your analysis and

7   investigation and in your professional experience, do you have

8   an opinion about the growth of the controlled sales over the

9   timeframe on this chart?

10  A.  Yes, it certainly grew.

11  Q.  I'm sorry.  What is your opinion?

12  A.  That controlled substances sales did grow.

13  Q.  And how would you describe the growth that that line

14  portrays?

15  A.  Well, I suppose I look at that compared to non-controlled,

16  and it's at a much slower pace of growth versus non-controlled.

17  Q.  Focusing on the line above now that you mentioned in making

18  the comparison, is the line describing the non-controlled

19  sales -- and to take a step back, what color is the

20  non-controlled sales line?

21  A.  It is blue.

22  Q.  So that's the line that's immediately above the green, the

23  controlled sales line?

24  A.  Yes.

25  Q.  How would you describe -- is the blue line steeper than the

1   green line?

2   A.  Yes.

3   Q.  And what should we take away from the steepness of the blue

4   line as compared to the green line?

5   A.  That non-controlled sales as part of overall sales, that's

6   where all the action was in terms of growth, or majority of

7   action in terms of RDC's overall sales.

8   Q.  We can take this down, please.

9           Mr. Martinovic, switching gears slightly.  In your

10  review and investigation for this case, did there come a point

11  where you reviewed an employment agreement between Larry Doud

12  and RDC?

13  A.  Yes.

14  Q.  Showing the witness what's been admitted in evidence as

15  Government Exhibit 270.

16          Mr. Martinovic, if you can, this is a multipage

17  document, so if you can look at this document and then I'll ask

18  a question.

19          Did you have a chance to take a look at it,

20  Mr. Martinovic?

21  A.  I did.

22  Q.  Does this appear to be the employment agreement that you

23  reviewed?

24  A.  Yes.

25  Q.  Now, drawing your attention to section 4 of Exhibit 270

1   that I believe is on page 2, do you recall this section 4,

2   Mr. Martinovic?

3   A.  Yes.

4   Q.  What do you recall this section to be?

5   A.  It sets out Mr. Doud's compensation starting with annual

6   base compensation that is on schedule A to this employment

7   agreement, and then also sets out the methodology for

8   calculating Mr. Doud's annual bonus.

9   Q.  Can you describe based on your review of the employment

10  agreement how that calculation works or worked?

11  A.  Yes, it's indicated in B under annual bonus.  It's 2 1/2

12  percent of adjusted net earnings, which is then defined in the

13  last paragraph in this view as meaning the amount of RDC's

14  annual net earnings before patronage dividends and federal

15  income taxes for RDC's annual audited financial statements.

16  Q.  If we can remove this and have Defendant's Exhibit R1,

17  please, and in particular slide 5.

18          Now, the information that you were describing viewing

19  Mr. Doud's employment agreement and particularly section 4,

20  that is his bonus calculation per the employment agreement, did

21  you reflect that information in your review for your

22  calculations of his bonus?

23  A.  Yes.

24  Q.  Please explain your approach using this slide?

25  A.  If you look in the first broad section of columns which

1    says bonus amount alone, this is the amount of bonus.  The

2    columns that are right in the middle are the calculated bonuses

3    that we saw produced in terms of the calculations on the total

4    amount of bonus that Mr. Doud received, and you see that total

5    amount.

6            And, for instance, using 2015 versus 2014, I found

7    that interesting, as I mentioned earlier.  Our team found it

8    interesting where Larry's bonus overall doubled from roughly

9    583,000 to 1.1 million.

10   Q.  Now, in your review and analysis for this case and in the

11   calculation of the bonus, did you review cost data?

12   A.  We had limited documents to review cost data.  When we did

13   our analysis on a global basis, we found that it was well

14   overstated, which meant that it wasn't reliable.

15   Q.  So let's unpack that.  Did you find any evidence that

16   controlled drugs were sold at cost or cost minus?

17            MR. BURNETT:  Objection.

18            THE COURT:  Overruled.  You can answer.

19   A.  We saw evidence in the way of emails amongst Mr. Doud and

20   his team in terms of just day-to-day business, talking about

21   customers where terms like at cost and cost minus 4 percent

22   were used.

23   Q.  And ultimately were you able to use this at cost or cost

24   minus variable in your analysis at all?

25   A.  No.

M1RBDOU4                        Martinovic - Direct

1   Q.  Were you able to use it in your calculations of the

2   contribution controlled drugs made to Mr. Doud's bonus?

3   A.  No.

4   Q.  And again why not?

5   A.  Because we just -- there was insufficient documentation,

6   and whatever documentation that we did have did not allow us to

7   do a global review of cost to be able to segregate the impact

8   of sales of control versus non-control.

9   Q.  Without the sufficient cost data information, what were you

10  left to rely upon?

11  A.  Then we have to assume that costs and profit margins,

12  whether they be based on control versus non-controlled, we had

13  to just use the cost and the profitability of the overall

14  global sales in the financial statement.

15  Q.  Is that similar to Mr. Cutler's method?

16  A.  In my findings, I'm allocating the portion of bonus related

17  to control and uncontrolled on a sales lying basis, so I did

18  not look at profitability.  I did not look at costs, but I did

19  see that in one of the slides Professor Cutler had that the

20  bonus that was allocated to controlled sales, his analysis is

21  very similar to my analysis, within 4 percent.

22  Q.  Where in both your -- withdrawn.  Where you were not able

23  to find sufficient cost data in the data that was provided to

24  you, is there a potential weakness in that approach for the

25  purpose of correctly calculating the contribution of controlled

1   drugs to Mr. Doud's bonus?

2   A.   Yes.   Because as you saw in the employment contract, it

3   says, the basis for calculating bonuses on that earnings basis,

4   so both myself and Professor Cutler only looked at it on a

5   sales basis, did not consider product cost, deduct them to

6   calculate what I called earlier accounting gross profit.   Then

7   there's all the other expenses, like your payroll and your rent

8   if you will to arrive at net earnings.

9        So, I was not able to segregate the impact on that

10  earnings outside of simply looking at sales between

11  non-controlled and controlled.

12  Q.   Even bearing in mind that limitation, with respect to the

13  percentage allocations of controls that you describe here to

14  Mr. Doud's bonus, based on your investigation and analysis and

15  your professional experience, do you have an opinion about the

16  degree to which Larry Doud was incented to sell controlled

17  drugs based on his bonus structure?

18            MR. BURNETT:   Objection.

19            THE COURT:   I'm going to sustain as to the form of

20  that question.

21  Q.   Given your analysis, do you have an opinion that Mr. Doud

22  was incented to sell controlled drugs based on his bonus

23  structure?

24            MR. BURNETT:   Same objection.

25            THE COURT:   I'm going to sustain the objection.   I'm

1    not sure he's qualified to make that opinion.

2              MR. JANEY:  One moment, your Honor.

3    Q.  Viewing the percentage allocation of Mr. Doud's bonus for

4    each of the years in this period, 2011 to 2017, what was -- as

5    between controls and non-controls, what contributed most to

6    Mr. Doud's actual bonus?

7    A.  It would be non-controlled.

8    Q.  With the limitation that we've described?

9    A.  Yes.

10             MR. JANEY:  No further questions at this time, your

11   Honor.

12             THE COURT:  Cross examination.

13             MR. BURNETT:  Thank you, your Honor.

14   CROSS-EXAMINATION

15   BY MR. BURNETT:

16   Q.  Good afternoon, Mr. Martinovic.

17   A.  Good afternoon.

18   Q.  We haven't met before, right?

19   A.  I don't think so.

20   Q.  Neither do I.  I'm Tom Burnett.  Nice to meet you.

21   A.  Nice to meet you as well.

22   Q.  And you met with some of the defense attorneys in this case

23   before as you discussed right?

24   A.  Yes.

25   Q.  Including Mr. Janey who was just questioning you?

M1RBDOU4                          Martinovic - Cross

1    A.  Correct.

2    Q.  You met with them a number of times in the course of

3    preparing for this case?

4    A.  A couple of times.

5    Q.  Did you meet with the defense attorneys this morning?

6    A.  I did.

7    Q.  Around what time?

8    A.  9:15 in the morning.

9    Q.  About how long was that meeting?

10   A.  One hour.

11   Q.  Isn't it true that yesterday you told the defense attorneys

12   you had an immovable conflict so you couldn't be here until

13   1:30?

14   A.  I did mention --

15             MR. JANEY:  Objection, your Honor.

16             THE COURT:  I'm going to sustain the objection as

17   irrelevant for the jury's determination.

18   Q.  I want to start with a bit about your background.  You

19   never worked at Rochester Drug Co-Operative, right?

20   A.  No, I have not.

21   Q.  And you weren't part of the finance team there?

22   A.  No.

23   Q.  You weren't ever hired as a consultant by RDC?

24   A.  No.

25   Q.  So you're a part of this case because the defendant

1    Mr. Doud's team hired you to be part of it, right?

2    A.  Right.

3    Q.  Not because you had any independent knowledge of RDC or how

4    the company worked?

5    A.  No independent knowledge.

6    Q.  And I want to make sure I'm clear on the scope of your

7    testimony.  You mentioned earlier that you reviewed the

8    testimony and the slides of Professor David Cutler; is that

9    correct?

10   A.  Yes.

11   Q.  Let's pull up Government Exhibit 903 on the monitors here

12   and flip ahead to slide 7.

13           Just to be clear, you haven't compared RDC's sales of

14   opioids to other actors in the industry, right?

15   A.  No.

16           MR. JANEY:  Objection, your Honor.  This is beyond the

17   scope?

18           THE COURT:  Overruled.  He can answer.

19   Q.  And if we look ahead to slide 12.  You haven't looked at

20   data from RDC's orders of interest system, right?

21   A.  No.

22   Q.  And if we go ahead to slide 18.  You haven't analyzed what

23   percentage of RDC's opioid sales in 2012 and 2016 went to

24   customers that were terminated after Mr. Doud left the company,

25   right?

M1RBDOU4                        Martinovic – Cross

1   A.  I have not analyzed it, no.

2   Q.  So these are parts of Professor Cutler's testimony that

3   sitting here today you don't necessarily have any issue with,

4   right?

5   A.  Correct.

6           MR. JANEY:  Objection to the form.  That's not his

7   testimony.

8           THE COURT:  Overruled.  He answered the question. The

9   answer will stand.  You can redirect him if you wish.

10  Q.  Let's go to your presentation which I believe is now in

11  evidence as Defense Exhibit R1.  Let's turn to the second slide

12  of this presentation.

13          This is the chart you put together where you took a

14  look at the sales of controlled substances and non-controlled

15  substances over time from RDC, correct?

16  A.  Yes.

17  Q.  The defense asked you to put together some charts that

18  separated the controlled sales from the non-controlled sales;

19  is that right?

20  A.  Yes.

21  Q.  So let's focus in by looking at the controlled substance

22  sales which is the column labeled controlled substance sales

23  per CSV. You see that?

24  A.  Yes.

25  Q.  Let's zoom in on the full control section here.  It's fair

M1RBDOU4                          Martinovic - Cross

1    to say that sales of controlled substances rose considerably

2    between 2012 and 2017, right?

3    A.  They grew, yes.

4    Q.  They started out say in 2012 at $83 million; is that right?

5    A.  Yes.

6    Q.  And they peak at about $310 million in looks like 2016,

7    correct?

8    A.  Yes.

9    Q.  Ands that's a growth of over three times, right?

10   A.  Yes.

11   Q.  And between 2012 and 2017, the total line at the bottom

12   here shows that RDC's revenue was over 1.2 billion from

13   controlled substances sales, correct?

14   A.  Yes.

15   Q.  Now, this chart here doesn't show information about

16   schedule two controlled substance sales, correct?

17   A.  No, it doesn't.

18   Q.  Now, those are the schedule two substances include opioids,

19   right?

20   A.  Yes.

21   Q.  Now, you actually did an analysis that included information

22   broken out for schedule two substances, correct?

23   A.  We had some analysis done breaking it up by schedule, yes.

24   Q.  I'd like to show for the witness and the parties what's

25   been marked for identification as Government Exhibit 1245.

M1RBDOU4                          Martinovic – Cross

1    This is one of the charts that you and your team put together

2    earlier in this case, correct?

3    A.  Yes.

4    Q.  And this is the chart that you were referring to that has

5    the schedule two controlled substance sales actually broken

6    out?

7    A.  Yes.

8             MR. BURNETT:  Your Honor, at this time the government

9    offers Exhibit 1245.

10            THE COURT:  Any objection?

11            MR. JANEY:  No objection.

12            THE COURT:  It will be admitted into evidence.

13            (Government's Exhibit 1245 received in evidence)

14   Q.  Let's please publish the chart for the jury and zoom in on

15   column I.  This is the column that shows those schedule two

16   substance sales, right?

17   A.  Yes.

18   Q.  So they started at about 38 million in 2012; is that right?

19   A.  Yes.

20   Q.  Go up to 49 million in 2013; is that correct?

21   A.  Yes.

22   Q.  Then they get up to $210 million in 2015, right?

23   A.  Yes.

24   Q.  Reach a peak of about 231 million in 2016; is that correct?

25   A.  Yes.

1   Q.  So it's fair to say RDC made several hundreds of millions

2   of dollars selling schedule two controlled substances between

3   2012 and 2017?

4   A.  Yes.

5   Q.  And just doing a little mental math here, it's about $815

6   million or so on these substances?

7   A.  Yes.

8   Q.  Now, can we also agree that RDC's growth in these schedule

9   two sales between 2012 and 2016 was significant?

10   A.  Yes.

11   Q.  You said a minute ago it was about three times for

12   controlled substances overall, correct?

13   A.  Yes.

14   Q.  And here starting in 2012 that's 38 million, right?

15   A.  Yep.

16   Q.  Going to 2016, it's 231 million; is that right?

17   A.  Yes.

18   Q.  So it's fair to say that schedule two substances during

19   that time period grow by over six times, right?

20   A.  Close to that, yeah.

21   Q.  Now, let's go back to R1, the chart we were talking about

22   earlier.

23        Do you recall you were asked on direct examination

24   when you were looking at the line chart what growth rate was

25   more significant between controls and non-controls?

1    A.  I do recall the question.

2    Q.  And you said non-controls is more significant, right?

3    A.  Yes.

4    Q.  We can actually do the math and look at the numbers, right?

5    A.  Yes.

6    Q.  And it was three times for controls, six times for schedule

7    two controls; is that right?

8    A.  Yes.

9    Q.  Let's look at the amounts here for the non-controlled

10   substances starting -- zoom in on that section, in 2012 it's

11   $761 million; is that right?

12   A.  Yes.

13   Q.  And then by 2016, it's up to just a shade over $2 billion;

14   is that correct?

15   A.  Yes.

16   Q.  So that's a growth of basically two and a half times,

17   right?

18   A.  Yes.

19   Q.  So it's fair to say that the growth rate on schedule two

20   substances and on controlled substances was higher than on

21   non-controlled substances during this time period?

22   A.  Based on that comparison, yes.

23   Q.  So it's easier to look at the numbers when you're figuring

24   that out, not the lines, right?

25   A.  Sometimes, yes.

1    Q.  Let's stay on this slide and go over back to the controlled

2    substance sales.  I want to take a look in on the percentage of

3    total sales.

4           Now, the percentage of total sales, that just means

5    you looked at what percentage of RDC's total revenue was coming

6    from the sale of controlled substances, correct?

7    A.  Yes.

8    Q.  And it's fair to say here that over time the controlled

9    substances made up a higher share of RDC's total sales,

10   correct?

11   A.  Yes.

12   Q.  So 2011, 2012, it's about 9 1/2 percent; is that fair?

13   A.  Yes.

14   Q.  And then the next year it's almost 12 percent, correct?

15   A.  Yes.

16   Q.  The following year it gets up to 16 percent?

17   A.  Yes.

18   Q.  And then it's about 13 1/2 percent over the next couple of

19   years?

20   A.  Yes.

21   Q.  So it's fair to say that controlled substances made up a

22   higher share of RDC's business in 2014, 2015 and 2016 than they

23   did in these earlier years, like 2011, 2012?

24   A.  Yes.

25   Q.  And that was the period when RDC's sales of controlled

M1RBDOU4                        Martinovic - Cross

1   substances and schedule two controlled substances was growing

2   at a faster rate than its sales of non-controlled substances,

3   right?

4   A.   Yes.

5   Q.   That's why you expect the percentage to go up?

6   A.   Mm hm.

7   Q.   When you put this chart together, you drew a separation

8   between controlled substances and non-controlled substances,

9   right?

10  A.   Yes.

11  Q.   And now earlier on direct you were saying non-controlled

12  substances drove sales; is that correct?

13  A.   Yes.

14  Q.   And when you say drove, you just mean one is bigger than

15  the other, correct?

16  A.   Yes.

17  Q.   Well, let's step back.  Is it fair to say that RDC's

18  business was selling both controlled substances and

19  non-controlled substances to pharmacies, correct?

20  A.   Yes.

21  Q.   They had pharmacy customers, right?

22  A.   Yes.

23  Q.   Lots of those customers bought both types of drugs,

24  correct?

25  A.   Yes.

1    Q.  And, in fact, you're aware that because RDC was a full line

2    distributor, its goal was having pharmacies purchase everything

3    from RDC instead of from their competitors, correct?

4                MR. JANEY:  Objection.  Beyond the scope of the

5    testimony.  None of that was elicited from the witness.

6                THE COURT:  Overruled.  You can answer.

7    A.  Repeat the question.

8    Q.  Sure.  Are you aware that because RDC was a full line

9    distributor, its goal was having pharmacies purchase everything

10   from RDC instead of its competitors, correct?

11   A.  From my understanding, yes.

12   Q.  And that's because if a customer had to go to RDC's

13   competitor for one order, they might go to that competitor for

14   other orders, right?

15   A.  Could be.

16   Q.  Now, you didn't investigate how RDC's sales of controlled

17   substances affected the sales of non-controlled substances,

18   right?

19   A.  I did not.

20   Q.  Let's take a really simple example.  Say one of RDC's

21   customers bought lots of different products, including both

22   controlled and non-controlled substances, okay?

23   A.  Okay.

24   Q.  And now imagine, just for the sake of the hypothetical,

25   that RDC said to that customer, we're not going to sell you

1    controlled substances anymore.  All right?

2    A.  Okay.

3    Q.  Now, that would obviously affect RDC's sales of controlled

4    substances, correct?

5    A.  Yes.

6    Q.  And it wouldn't be selling to that customer anymore, right?

7    A.  Yes.

8    Q.  That could also affect RDC's sales of non-controlled

9    substances, right?

10   A.  Maybe.

11   Q.  That customer might take some of its business elsewhere,

12   correct?

13   A.  Possibility.

14   Q.  Customer could take all of its business somewhere else,

15   right?

16   A.  Another possibility.

17   Q.  And we can agree that you didn't analyze the relationship

18   between the controlled and non-controlled sales?

19   A.  No.

20   Q.  So you didn't look at whether the growth in RDC's

21   non-controlled substance sales was because of the growth in its

22   controlled substance sales?

23   A.  I did not.

24   Q.  You didn't analyze whether RDC got new customers because it

25   was more willing to sell those pharmacies controlled substances

M1RBDOU4                         Martinovic - Cross

1    than other competitors, right?

2    A.  Repeat the question.

3    Q.  Sure. Did you analyze whether RDC got new customers because

4    it was more willing to sell those pharmacies controlled

5    substances than RDC's competitors were?

6    A.  I did not analyze that, no.

7    Q.  And you didn't analyze whether RDC would have lost

8    customers if it had stricter controls over opioid sales,

9    correct?

10          MR. JANEY:  Objection, your Honor.  The witness isn't

11   in a position -- he's not competent to answer anything about

12   controls.

13          THE COURT:  He's competent to answer whether or not

14   that was in his analysis.  That was the question.

15   A.  Sorry. Repeat the question.

16   Q.  Sure.  Sure.  You didn't analyze whether RDC would have

17   lost customers if it had stricter controls over opioid sales?

18   A.  I did not.

19   Q.  I want to turn to talking about Mr. Doud's bonuses, and

20   particularly I want to talk about this cost issue that you

21   discussed on direct examination.  Okay.  Let's go to Government

22   Exhibit 270.

23          This is the employment agreement that you looked at

24   during your direct examination, correct?

25   A.  Yes.

1   Q.  Let's turn to the second to last page.  This year is an

2   example of one of RDC's consolidated statements of earnings,

3   correct?

4   A.  Yes .

5   Q.  And this is important because Mr. Doud's bonus is based in

6   part on the profit calculation that comes from this

7   consolidated earning statement, right?

8   A.  Yes.

9   Q.  I want to walk through the detail here.  The top line is

10  net sales, that's just how much money RDC makes from selling

11  stuff?

12  A.  Yes.

13  Q.  Now the next line is the cost of goods sold, correct?

14  A.  Yes.

15  Q.  Now, one part of the cost of goods sold is how much money

16  RDC pays for the stuff that it sells, right?

17  A.  Yes.

18  Q.  But do you see there's actually other informations that

19  written into this line here?

20  A.  Yes.

21  Q.  And specifically it says, net of purchase discounts and it

22  lists out a little over $19 million and $17 million in 2013 and

23  2012 respectively?

24  A.  Yes.

25  Q.  And then the line below says the gross profit of net sales,

M1RBDOU4                          Martinovic – Cross

1    correct?

2    A.  Yes.

3    Q.  And that both has an amount and a percentage, right?

4    A.  Yes.

5    Q.  And the percentage is the percentage of gross profit

6    relative to net sales, correct?

7    A.  Yes.

8    Q.  So I want to break this down into two pieces.  First

9    talking about costs.

10           Now, in the context of a pharmaceutical wholesaler

11   like RDC, you agree that it's wrong or would be incorrect to

12   look just at the cost of RDC's purchases from the manufacturer

13   when assessing costs of goods sold?

14   A.  Repeat the question.

15   Q.  Sure.  The cost component for a pharmaceutical distributor

16   is not just the costs of what it pays to buy its products,

17   right?

18   A.  Correct.

19   Q.  You need to consider other factors, like rebates and

20   discounts in order to come to the correct profit number just

21   like in this statement here, right?

22   A.  Yes.

23   Q.  Now, you testified on direct examination that you can't

24   understand an accurate profit assessment unless you know costs,

25   right?

1    A.  Yes.

2    Q.  But that's not exactly true, is it?

3    A.  Why do you say that?

4    Q.  Well, sure.  You have this 3.71 percent here for gross

5    profits on net sales, right?

6    A.  Okay.

7    Q.  You could calculate gross profits on net sales by taking

8    that 3.71 percent and multiplying flying it by the net sales,

9    right?

10   A.  Yes.

11   Q.  So if you knew about profit margin on products, you can

12   calculate the profit without having specific data on the costs,

13   right?

14   A.  You can do so with using this global gross profit number,

15   yes.

16   Q.  And if you had specific profit margin numbers for

17   controlled substances, you could also do it with controlled

18   substances, right?

19   A.  If I had the information.

20   Q.  And, in fact, you did that have that information, didn't

21   you?

22   A.  No.

23   Q.  Well, I'm going to show you what's been marked as

24   Government Exhibit 1237.  This is not yet in evidence, so let's

25   just have this for the witness and for the parties and the

1   Court.  I'm showing you a document.  Do you recognize this

2   document?

3   A.  I do.

4   Q.  It's says controlled substances 2012 to 2016, correct?

5   A.  Yes.

6   Q.  And did you review this when you were preparing to

7   testified today?

8   A.  Yes.

9          MR. BURNETT:  Your Honor, the government offers

10  Exhibit 1237.

11         THE COURT:  Any objection?

12         MR. JANEY:  No objection.

13         THE COURT:  It will be admitted into evidence.

14         (Government's Exhibit 1237 received in evidence)

15  Q.  This is a document prepared by RDC, correct?

16  A.  It's a document that was attached to an email from counsel

17  for RDC to U.S. Department of Justice.

18  Q.  Sure.  And it looks at controlled substance sales between

19  2012 and 2016, correct?

20  A.  Yes.

21  Q.  Now, the first column or sorry column B, that's the

22  revenue, right?

23  A.  Yes.

24  Q.  The next column, column C, that's the cost, right?

25  A.  Yes.

1    Q.  And if you were to stop there right after cost, it would

2    like look like RDC lost money on these sales, right?

3    A.  In some instance, yes.

4    Q.  Sorry. That was a bad question.  Look at the row for

5    totals, that's row 18?

6    A.  Okay.

7    Q.  If you stopped after costs, the costs would be higher than

8    the revenue, right?

9    A.  Yes, based on this view.

10   Q.  But as we talked about before, there are other things after

11   costs that you need to factor into when determining profits,

12   right?

13   A.  Yes.

14   Q.  And there are a number of other factors, a number of other

15   line items here after costs, like rebates and discounts,

16   correct?

17   A.  Yes.

18   Q.  And let's scroll over a little bit. Do you see at the end

19   of this column 18 there's a percentage?

20   A.  Yes.

21   Q.  And that's the gross profit percentage, right?

22   A.  Yes.

23   Q.  Ands that 4.73 percent on controlled substance sales

24   between 2012 and 2016, right?

25   A.  Yes.

1    Q.  So let's go back to Government Exhibit 270.  Let's go back

2    to that second to last page again.

3            So the gross profit margin we just looked at for

4    controlled substances was 4.7 percent, right?

5    A.  Can you go back to the other document or exhibit?

6    Q.  Sure.

7    A.  Yes, I can see the 4.73 percent.

8    Q.  Let's go back to Government Exhibit 270 again.  Let's

9    highlight the gross profit on overall net sales here.

10           Now, the gross profit margin on overall sales was 3.71

11   percent, right?

12   A.  Yes, except this is looking at 3.7 percent for only fiscal

13   year ending 2013 versus the other exhibit which looked at sales

14   for Linden Care 2012 through '16.

15   Q.  Sure.  And you had data on the gross profit percentage for

16   every one of those fiscal years, didn't you?

17   A.  Only based on the statement of earnings and the financial

18   statements.

19   Q.  But did you compare those percentages in the statements of

20   earnings for the financial statements with that 4.71 percent

21   number in any of the years?

22   A.  I did.

23   Q.  And what did you find?

24   A.  That's just for one customer's controlled substance sales.

25   No one else's.

1    Q.  Let's go back to that exhibit actually.

2    A.  Two customers actually.

3    Q.  You see that this says totals in row three?

4    A.  Yes.

5    Q.  And that's $1.1 billion?

6    A.  Yes.

7    Q.  Your testimony is that's only for two customers?

8    A.  Yes.

9    Q.  But you did the analysis of the total controlled substance

10   sales overall from RDC, you looked at that revenue number,

11   right?

12   A.  On a revenue basis, yes.

13   Q.  Row B here shows revenue, doesn't it?

14   A.  It shows the revenue for Bell Health a/k/a Linden Care and

15   Dunn Meadow.

16   Q.  You're reading from row 23, correct?

17   A.  Correct.

18   Q.  You're not reading from row 3, the top line?

19   A.  Yes.

20   Q.  The top line revenue number reported here is $1.1 billion,

21   right?

22   A.  Yes.

23   Q.  Let's go back to R1.  Let's take a look at the annual

24   controlled substance sales.  You had this between 2011 and

25   2017, correct?

M1RBDOU4                         Martinovic - Cross

1    A.  Yes.

2    Q.  And between 2011 and 2017, the total of controlled

3    substance revenue that you calculated was $1.2 billion?

4    A.  Yes.

5    Q.  And the chart on that sale was $1.1 billion for a little

6    bit of a shorter time period?

7    A.  Yes.

8    Q.  Fair to say that's reflecting all of the controlled

9    substance sales?

10   A.  No.

11   Q.  Your testimony now is that all of RDC's controlled

12   substance sales was to two customers?

13   A.  A good chunk of it, yes.

14   Q.  You've done that analysis, and you can say honestly today

15   that every single dollar of RDC's controlled substance sales

16   was to two customers only?

17   A.  I can't say all of it, no.

18   Q.  Let's go ahead and turn to the analysis of Mr. Doud's

19   bonuses, and let's scroll down.  Let's stay in R1 and scroll

20   down one more slide.

21          This is the part of the presentation you put together

22   called annual bonus amounts, correct?

23   A.  Yes.

24   Q.  Now, it's fair to say that when you did this calculation,

25   you didn't an analysis that linked a portion of Mr. Doud's

1   bonus to controlled substance sales and non-controlled

2   substance sales, right?

3   A.  Yes.

4   Q.  And you did that using the same percentages from your

5   analysis earlier?

6   A.  Yes.

7   Q.  So let's zoom in on the controlled substance section which

8   is in the middle of the bonus amount subheading.

9           Now, under the analysis you performed, is it fair to

10   say that greater share of Mr. Doud's bonus was attributable to

11   controlled substance sales after 2012 than before 2012?

12   A.  Repeat the question.

13   Q.  Sure.  Is it fair to say that a greater share of Mr. Doud's

14   bonuses were attributed to controlled substance sales after

15   2012 than before 2012?

16   A.  No, a greater portion of Mr. Doud's bonuses attributed to

17   non-controlled sales.

18   Q.  I'm comparing years.  Let's just do the math, right.

19           In 2012 and 2011, you attributed 9.3 and 9.8 percent

20   of Mr. Doud's bonus to controlled substance sales, right?

21   A.  Yes.

22   Q.  That rose to about 12 percent the next year?

23   A.  Yes.

24   Q.  Sixteen percent the year after that?

25   A.  Yes.

M1RBDOU4                    Martinovic - Cross

1    Q.  And around 13 1/2 percent in the two years following that

2    before it dropped a little bit again?

3    A.  Yes.

4    Q.  Now, the next line down, that's the total, 12.9 percent,

5    correct?

6    A.  Yes.

7    Q.  And that's the percentage of Mr. Doud's bonus across all

8    those years that according to your calculation was directly

9    attributable to the sales of controlled substances, right?

10   A.  Yes.

11   Q.  It's fair to say that 13 percent of a paycheck is a

12   meaningful portion?

13   A.  Yes.

14   Q.  And you wouldn't mind a 13 percent raise, right?

15            MR. JANEY:  Objection.

16            THE COURT:  Sustained.

17   Q.  I want to switch from talking about percentages to the

18   actual money that went into Mr. Doud's pocket, and that's the

19   row just to the left of the row we were looking at, right?

20   A.  Yes.

21   Q.  So that number starts at about say $35, 000 in 2012,

22   correct?

23   A.  Yes.

24   Q.  Rises to 52, 000 the next year, right?  Then 95, 000 the

25   year after that, right?

1   A.  Yes.

2   Q.  149, 000 and 141, 000 in the next two years, correct?

3   A.  Yes.

4   Q.  And it falls a bit to 90, 000, right?

5   A.  Yes.

6   Q.  And you're aware that Professor Cutler testified about this

7   topic yesterday, right?

8   A.  Yes.

9   Q.  In his analysis of the percentages of controlled substances

10  directly attributable to percentages of Mr.  Doud's bonus

11  directly attributable to controlled substances is pretty

12  similar to your analysis here, right?

13  A.  Yes.

14  Q.  Now, all tolled, Mr. Doud made about $592, 000 directly

15  attributed to controlled substances over the course of the

16  years you analyzed, right?

17  A.  Yes.

18  Q.  And we can agree that almost $600, 000 is a lot of money,

19  right?

20  A.  Yes.

21  Q.  Now, in fact, why don't we use as a reference point

22  Mr. Doud's total bonus in 2011.  His total bonus in 2011 was

23  $284, 000, correct?

24  A.  Yes.

25  Q.  And by 2015 and 2016 about a $140, 000 in bonuses was going

1    to him based on controlled substance sales alone?

2    A.  Yes.

3    Q.  And again, Mr. Martinovic, when you did this analysis, you

4    treated non-controlled substances and controlled substances as

5    separate categories, right?

6    A.  Yes.

7    Q.  Just like you did in the sales analysis, yes?

8    A.  Yes.

9    Q.  So like in your sales analysis, you didn't look at the

10   relationship between sales for controlled and non-controlled

11   substances, correct?

12   A.  Correct.

13   Q.  So the part of the defendant's bonus here that you've

14   attributed to non-controlled substance sales, you didn't

15   analysis whether those sales were driven by RDC sales of

16   controlled substances?

17   A.  I did not.

18   Q.  And you didn't analysis whether the part of the defendant's

19   bonus that you calculated for non-controlled substances would

20   have been lower if RDC had cut off more customers from buying

21   opioids earlier?

22   A.  I did not.

23   Q.  And you didn't analyze whether that part of the defendant's

24   bonus would have been lower if RDC had refused to ship more

25   suspicious opioid orders, correct?

M1RBDOU4                    Martinovic – Redirect

1   A.  I did not analyze.

2          MR. BURNETT:  No further questions, your Honor.

3          THE COURT:  Any further questions, Mr. Janey.

4          MR. JANEY:  Yes, your Honor.

5   REDIRECT EXAMINATION

6   BY MR. JANEY:

7   Q.  Mr. Martinovic, on cross examination you were asked fairly

8   extensively about Government 1237.  Do you recall that?

9   A.  I have to see the exhibit.

10  Q.  Can we see Government Exhibit 1237.

11         Do you recall being asked about this exhibit on cross

12  examination, particularly in the context of questions about

13  whether you had cost data?

14  A.  Yes.

15  Q.  Did you rely on this information for your analysis for cost

16  data?

17  A.  This specific exhibit?

18  Q.  Yes.  Did you rely on this?

19  A.  No.

20  Q.  Why not?

21  A.  Because it only shows a part of the picture, not everything

22  on a global basis, controlled, not controlled, all customers,

23  all sales.

24  Q.  Do you believe that it would have been appropriate for you

25  to use this sheet in your analysis?

1   A.  Not by itself.

2   Q.  We can take this down.  You were asked on cross examination

3   whether the alternative method where you don't have cost data

4   of using gross profit margin was an appropriate method.  Do you

5   recall that?

6   A.  Yes.

7   Q.  And is that one method to be used?

8   A.  I mean, you want to use the method closest to the way the

9   methodology is.

10  Q.  Well, can you expand on that?

11  A.  Well, in the absence of having robust complete global cost

12  information, profitability information, outside of financial

13  statements.  I mean, to engage in doing the analysis

14  thoroughly, to be able to do it with a view to all segregated

15  -- all controlled substances versus non-controlled substances,

16  then you can only use the financial statements as a guide.

17          You can use it on a total basis, but you can't slice

18  it and dice it.

19  Q.  To obtain accurate information, would you need that

20  discrete cost data?

21  A.  Yes.

22  Q.  Was that information available to you?

23  A.  No.

24  Q.  Was that information available to Professor Cutler that you

25  observed in your view of the material he used?

1   A.  I don't know.

2   Q.  Can we take a look at R2.  On cross examination, you were

3   asked fairly extensively about this chart.  Do you recall that?

4   A.  Yes.

5   Q.  As you look at the data on this chart, are non-controlled

6   sales the larger number as compared to controlled sales each

7   year for the period of 2011 to 2017?

8   A.  Yes.

9   Q.  By what magnitude?

10  A.  Well, roughly if we see on the bottom, take total, I mean

11  87 percent of all sales is non-controlled, and the corollary or

12  the flip side of that is 12.95 percent controlled.

13  Q.  We can take this down.  At the beginning of your cross

14  examination you were asked whether you considered certain data

15  that Dr. Cutler or Professor Cutler included in his

16  presentation.  Do you recall that?

17  A.  Yes.

18  Q.  And counsel asked you whether you were okay with those

19  slides, meaning the slides that you ironically, in fact, did

20  not review.  Do you recall that?

21          MR. BURNETT:  Objection, I think it misstates the

22  question.

23          THE COURT:  What's your question, Mr. Janey?  Restate

24  the question.

25  Q.  Let me state it in a different way.  Is there a reason why

M1RBDOU4                           Martinovic - Redirect

1   you didn't review all of Mr. Cutler's slides?

2   A.  There is if it didn't apply to my scope of engagement.

3   Q.  And your scope of engagement didn't include orders of

4   interest?

5   A.  It did not.

6   Q.  And it didn't include red flags?

7   A.  It did not.

8   Q.  Is it fair to say that it's natural that you would not

9   review something that is in your area and scope of assignment?

10  A.  It makes sense.

11              MR. JANEY:  No further questions, your Honor.

12              THE COURT:  Any further questions?

13              MR. BURNETT:  All set.

14              THE COURT:  Thank you, sir.

15              You can step down

16              (Witness excused)

17              (Continued on next page)

18

19

20

21

22

23

24

25

M1RBDOU4

1    THE COURT:  Anything further on behalf of the defense

2    at this time?

3    MR. GOTTLIEB:  Your Honor, may we have one moment,

4    please.

5    THE COURT:  Yes.

6    MR. GOTTLIEB:  Your Honor, thank you very much.  There

7    is nothing additional, your Honor.  Thank you.

8    THE COURT:  Anything further on behalf of the

9    government at this time?

10   MS. ROTHMAN:  Yes, your Honor.  The government calls

11   Christopher Fiore.

12   MR. GOTTLIEB:  Your Honor, so the record is correct,

13   we had a previous conference and without repeating it on the

14   record, the motions that would be typically raised, we renew

15   now.

16   THE COURT:  Sure.  Ms. Rothman, is this a short

17   witness or should we take a break?

18   MS. ROTHMAN:  Why don't we take a quick break.

19   THE COURT:  All right.

20   Ladies and gentlemen, we will take a 10 minute break.

21   Don't discuss the case.  Keep an open mind.  I'll let you

22   stretch and use the restroom if you want, and hopefully on

23   schedule we'll finish these witnesses within the hour.

24   (In open court; jury not present)

25   (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M1RBDOU4

1           THE COURT:  Let's take a ten minute break.

2           MR. ROOS:  Judge, one very minor thing.

3           THE COURT:  Yes.

4           MR. ROOS:  I can't recall completely.  Everything on

5    the jury charge you just want us to put into a letter?  I just

6    want to know if I should be prepared to address it later today.

7           THE COURT:  If there's things that you notice right

8    now that you want to direct my attention to, we'll discuss it

9    briefly after we are finish with the witnesses.

10          Otherwise, when you get a full opportunity to review

11   it, send me a letter, hopefully by tomorrow afternoon about

12   what you suggest so I can review it in the courtroom.

13          (Recess)

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

M1r3dou5

1          (In open court; jury not present)

2          THE COURT:  Are we ready to proceed?  Did you have

3     something you wanted to raise now while we wait with regard to

4     the jury charge?

5          MR. ROOS:  Sure.  We haven't reviewed all the specific

6     language, just looking at the headings.

7          THE COURT:  I don't read headings.  I don't read the

8     headings.

9          MR. ROOS:  The categories.  One is I didn't see an

10    instruction on quantity.

11         THE COURT:  It's not in there.  I'm trying to decide

12    whether or not I am going to explain that to them when I

13    explain the verdict sheet.  I do have the quantity instruction

14    right here.

15         MR. ROOS:  Got it.

16         THE COURT:  So if both sides agree they want it in, as

17    opposed to my explanation of it.

18         MR. ROOS:  Okay.

19         THE COURT:  We'll talk about that.

20         MR. ROOS:  The second was some sort of other

21    individuals not on trial or uncalled witnesses equally

22    available type general instruction.

23         THE COURT:  I took that out, because it doesn't seem

24    to be, both sides called witnesses, and unless somebody's going

25    to argue that a particular witness wasn't called by the other

M1r3dou5

1    side, I didn't think that was an issue.

2            MR. ROOS:  That's not our plan.  And if it happened,

3    your Honor could always give it.  But I don't know if

4    Mr. Gottlieb has a view on it.

5            THE COURT:  They can think about it.  They don't have

6    to address it now.  I don't feel strongly one way or the other.

7    I had it in my first draft.

8            MR. ROOS:  We're not going to fight over the language.

9    It is standard.

10           And the final one is just I think there were two

11   documents with redactions.

12           THE COURT:  Two documents with redactions?

13           MR. ROOS:  Yes.

14           THE COURT:  I don't remember the redactions.  I saw

15   that charge and I took that out.  And it's probably my error

16   for not noticing the redactions.  Since I didn't remember

17   redactions, I didn't think it was necessary to sort of say that

18   to the jury, like there is something out there they didn't see.

19           MR. ROOS:  We agree.  We don't think it was

20   particularly material.

21           MR. TOWNSEND:  With regard to the redactions, we put

22   in the redacted, but then the e-mail previous to that which had

23   the redacted portions unredacted.  So that there is a

24   complete --

25           THE COURT:  I don't think there is any redaction that

M1r3dou5

1    the jury didn't see.  Is that correct?

2              MR. TOWNSEND:  As far as the defense knows, yes.

3              THE COURT:  I don't have a strong feeling one way or

4    another about those issues.  We can address that, depending on

5    what you think is appropriate.

6              MR. ROOS:  That was it.  Otherwise we are going to

7    look at your Honor's language.  But other than the quantity and

8    uncalled witnesses, I don't think there were any categories

9    that weren't in there.

10             THE COURT:  If you have in particular something you

11   want me to spend some time thinking about, try to get it to me

12   by tomorrow afternoon so I can have it before the weekend.  I

13   don't have to go around and try to pull it from the documents.

14             MR. GOTTLIEB:  We will.

15             THE COURT:  And then, if you get a response, send me a

16   response over weekend.  I'll make sure I get it.  But the

17   logistics getting to my staff to see whether there is something

18   up there and pulling it down and sending it over to me, just

19   try to get it to me as soon as possible.

20             I'd like to meet at 9:15 on Monday.  I'll tell the

21   jury still come in at 9:45.  We can talk, have a further

22   charging conference on Monday, and then be prepared to go

23   forward right away with the summations.

24             Yes, did you have something, Ms. Rothman?

25             MS. ROTHMAN:  To pass these to your clerk for the

M1r3dou5

1    witness.

2              THE COURT:  How long is this witness?

3              MS. ROTHMAN:  20 minutes, if that.

4              THE COURT:  This witness is rebutting what?

5              MS. ROTHMAN:  He is he rebutting Defense Exhibit A82,

6    the Excel chart that the defense put in their case.  That's the

7    chart that shows the 2013 to 2016 terminations.

8              THE COURT:  The one we were going back and forth

9    about?

10             MS. ROTHMAN:  We're going to respond to that with some

11   charts.

12             THE COURT:  All right.  Does the defense have any

13   objections to their exhibits that I can address now, rather

14   than having to bring the jury down and then send them back up?

15             MR. GOTTLIEB:  We haven't seen the exhibits that they

16   intend on using now.  Unless, of course, they are exhibits that

17   have already been received in evidence.

18             MS. ROTHMAN:  Last night we produced to you Government

19   Exhibit 913.  Those are the charts.  And I have one more to

20   give you now.

21             MR. GOTTLIEB:  Your Honor, can I have a moment to see

22   what I am being handed?

23             THE COURT:  Sure.  Where is your witness?

24             MS. ROTHMAN:  He's waiting in the witness room.  He

25   was here, he walked in and then left.

M1r3dou5

1           THE COURT:  Bring him in.  The jury is outside.

2           MR. GOTTLIEB:  Can I ask is 913, are these -- I was

3     just handed a number of pages stapled together of Government

4     Exhibit 913.  Are these charts already in evidence?

5           MS. ROTHMAN:  The data is.  These are charts that were

6     prepared from the data --

7           THE COURT:  Are the exhibit numbers already in

8     evidence?

9           MS. ROTHMAN:  913 is not in evidence.  The underlying

10    data is in evidence.

11          THE COURT:  What about, how many exhibits do you have

12    there?

13          MS. ROTHMAN:  Two exhibits.

14          THE COURT:  Neither one of those exhibits had

15    previously been admitted into evidence.

16          MS. ROTHMAN:  Not the exhibits, your Honor.  They are

17    rebuttal witness, rebuttal exhibits.

18          MR. GOTTLIEB:  If I can show you what I was just

19    handed, Government Exhibit 913, so you can appreciate why I am

20    going to ask -- I will be asking for a break after direct so I

21    can review the documents.

22          THE COURT:  All of these pages are one exhibit?

23          MS. ROTHMAN:  Yes, your Honor.  I can explain.  It may

24    help speed this along.  So, the defense put in an Excel

25    spreadsheet that reflects several pharmacies where there was a

M1r3dou5

1  notation that they were terminated or suspended between 2013 or

2  2016.  All we did is look at the sales data for those 37

3  pharmacies, that sale data is already in evidence, it's in

4  evidence.  And we had charts prepared that show the sales data

5  for those 37 pharmacies, and you'll see, your Honor, that sales

6  continue past the date of the purported suspension or

7  termination.

8          THE COURT:  How much testimony goes along with that?

9          MS. ROTHMAN:  15 minutes, if that, your Honor.  The

10  witness will explain what he did.

11          THE COURT:  I have a 37-page exhibit.

12          MS. ROTHMAN:  He's not going to go through every

13  chart.  It's in evidence.  He is going to talk how it was made

14  and point to a few charts.  It will be quick, your Honor.

15          MR. GOTTLIEB:  Your Honor, just so the record really

16  is clear.  We received word last night, which we appreciated,

17  that there was going to be a rebuttal witness to testify that

18  subsequent to the A82 that indicated that from 2013 to 2016,

19  certain pharmacies were suspended or terminated, that

20  subsequent to that, the records will, or the records indicate

21  that they, that they purchased again.  We discussed that this

22  morning.  We understood, that's very straightforward.  We were

23  not aware that they were going to create our chart, the 37

24  pages that you are looking at for the first time as I am.

25  Because while the government makes light of, well, doesn't

M1r3dou5

1    matter, I am only going to ask a few questions.  If that

2    document is going to go in evidence, I am duty bound to make

3    sure that document is accurate.  And I always start off

4    assuming that something the government gives me is accurate.

5    But there is no way as a defense attorney I can possibly make

6    any reasoned objection unless I have the opportunity to look at

7    it to see what's in it.  And if need be, to look at the source

8    information that I already have.  That's a new document.  It's

9    never been provided.

10            THE COURT:  What do you want from me?

11            MR. GOTTLIEB:  I'll just need time to review it.

12            THE COURT:  Tell me what you want.

13            MR. GOTTLIEB:  After direct, I hope within -- if you

14   give me 30 minutes, I hope that will be enough.

15            THE COURT:  Okay.  I mean, you know, as they say,

16   remember, I don't give you 30 minutes of my time, I give you 30

17   minutes of the jury's time.

18            You have another exhibit other than this one?

19            MS. ROTHMAN:  Yes.  Your Honor.  It is a one-page

20   document.

21            THE COURT:  Can I see it now so I don't have to guess

22   about it?

23            MS. ROTHMAN:  You can, your Honor.  It is a one page

24   document that is a PDF of Defense Exhibit A82, which is in

25   evidence, which is the pharmacies that are listed as being

M1r3dou5

1    terminated or suspended between 2013 and 2016.  The only

2    difference is the witness has highlighted the pharmacies where

3    sales continued after the date listed in Defense Exhibit A82.

4    That is it.

5              THE COURT:  This document is the exact same as the

6    document that's in evidence except for the highlighting?

7              MS. ROTHMAN:  It is a PDF not Excel, but yes, content

8    is identical, your Honor.

9              THE COURT:  That's what he's going to testify the

10   highlighting means?

11             MS. ROTHMAN:  Exactly, yes, your Honor.

12             MR. GOTTLIEB:  Your Honor, just so your Honor can

13   understand our position.  We have no objection to that document

14   1232A.  We do object to a whole series of bar graphs that when

15   the source, especially, your Honor, if all of that information

16   is already in evidence, that was now put in bar graphs.  It

17   seems unnecessary.  The witness who they're calling could very

18   well say that I have reviewed the highlighted pharmacies and I

19   looked at the other materials, and I was able to ascertain that

20   there was subsequent purchases.  Frankly, that's what was

21   represented to us it was going to be.

22             THE COURT:  Well, I haven't made this an issue, both

23   sides have made this an issue.  So I don't know where, I mean,

24   I won't say, as I usually say, much ado about nothing, because

25   you may think it is really the critical part of your cases.

M1r3dou5

1    But, I don't think this is where the jury's head is going to

2    be.

3            But, I will give you whatever time you need before

4    cross-examination.  What I will do is, once they rest, if you

5    think you don't need the time and you're ready to go forward,

6    you can go forward.  If you think you need some time, then

7    we'll take a break and, hopefully, we'll plan like a 20 minute

8    break.  I hope that will be enough.  Once you've heard the

9    testimony and you have reviewed the document.  My guess is the

10   document -- compared to your documents is probably fairly easy

11   for you to determine whether or not these documents reflect

12   what they say they reflect.

13           So let's bring in the jury and let's get this done.  I

14   want to send them home at a reasonable hour.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

M1r3dou5                        Fiore - Direct

1           (Jury present)

2           THE COURT:  Ms. Rothman, will you identify the witness

3    for the jury.

4           MS. ROTHMAN:  Yes, your Honor.  Christopher Fiore.

5     CHRISTOPHER FIORE,

6        called as a witness by the Government,

7        having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. ROTHMAN:

10   Q.  Good afternoon.

11   A.  Good afternoon.

12   Q.  Where do you work?

13   A.  I work at Compass Lexecon.

14   Q.  What is Compass Lexecon?

15   A.  Compass Lexecon is an economic consulting firm.

16   Q.  What do you do there?

17   A.  I do data analytics for litigation.

18   Q.  Can you tell us a bit about your educational background.

19   A.  Sure.  So I did my undergraduate degree at the University

20   of Rochester.  And then I went to graduate school at Yale

21   University to do a PhD in economics, and finished there in

22   2012.

23   Q.  Do you happen to now how far Rochester is from New York

24   City?

25   A.  Approximately 350 miles.

M1r3dou5                        Fiore - Direct

1    Q.  Thank you.

2             MS. ROTHMAN:  Ms. Drescher, can you please pull up for

3    the witness what's in evidence as Defense Exhibit A82.

4    Q.  Mr. Fiore, do you recognize this document?

5    A.  I do.

6             MS. ROTHMAN:  Ms. Drescher, can you please filter for

7    the dates that are in 2013 to 2016.

8    Q.  Looking at the pharmacies that appear to have a suspension

9    or termination date between 2013 and 2016, were you asked to do

10   anything in connection with those pharmacies?

11   A.  I was asked to calculate the monthly sales over time of

12   these pharmacies, and determine whether there were any sales of

13   controlled substances by RDC to these companies after the date

14   of suspension or termination.

15   Q.  Other than that task, which we'll get to in a moment, have

16   you had any other involvement in this case?

17   A.  Not at all.

18   Q.  Do you know anything about the pharmacies that are listed

19   on this chart?

20   A.  No, nothing.

21   Q.  Do you know anything about Rochester Drug Co-Operative?

22   A.  Nothing.

23             MS. ROTHMAN:  I'm trying to move cross-examination

24   along, your Honor.

25   Q.  Do you know anything about the reason for termination or

1   suspensions listed here?

2   A.  No.

3   Q.  Anything about the due diligence policies of these

4   pharmacies?

5   A.  No.

6           MS. ROTHMAN:  Can we pull up for the witness what's

7   been marked for identification as Government Exhibit 913.  We

8   can flip through for the witness.

9   Q.  Do you recognize this document?

10  A.  Yes.

11  Q.  What is it?

12  A.  It's the plot of monthly sales that my colleagues and I

13  created.

14  Q.  Do these charts summarize a voluminous amount of

15  information?

16  A.  Yes.

17          MS. ROTHMAN:  The government offers into evidence

18  Government Exhibit 913.

19          MR. GOTTLIEB:  Your Honor, as we indicated, until such

20  time as we can review, objection at this point.

21          THE COURT:  I'm going to admit it subject to further

22  objection.  If you have further objection for

23  cross-examination, then I'll hear you.

24          (Government's Exhibit 913 received in evidence)

25          MS. ROTHMAN:  May we publish to the jury?

M1r3dou5                          Fiore - Direct

1              THE COURT:  Thank you.

2    Q.  All right, Mr. Fiore, let's get our bearings on what we're

3    looking at here.

4              What pharmacy does this chart relate to?

5    A.  This relates to Sheely's Drugstore in Scranton,

6    Pennsylvania.

7    Q.  The X axis at the bottom of the chart, what information do

8    you see there?

9    A.  That refers to the month in which the sales occurred.

10   Q.  And then the Y axis going from bottom to top, what

11   information is contained there?

12   A.  That's the dollar amount of controlled substance sales.

13   Q.  Do you see that black line kind of towards the right of the

14   slide?

15   A.  Yes.

16   Q.  What does that black line reflect?

17   A.  That is the date of suspension or termination.

18   Q.  That's as reflected on Defense Exhibit A82?

19   A.  Correct.

20   Q.  Then looking at the top of the slide, there is some

21   information about sales.  Can you just read the sales

22   information at the top.

23   A.  Total oxycodone sales was approximately 1.6 million.  And

24   total non-oxycodone controlled sales were approximately 6.3

25   million.

1   Q.   Looking at the bar chart, there are some columns in blue

2   and some that are red.  What do the different colors mean?

3   A.   The columns in blue signify sales that occurred prior to

4   the date of suspension or termination.  And the bars in red

5   refer to the sales that occurred after the date of suspension

6   or termination.

7   Q.   So with respect to Sheely's Drugstore, did sales of

8   controlled substances continue after the date of suspension or

9   termination as reflected on Defense Exhibit A82?

10  A.   Yes.

11  Q.   Let's look at the second slide, and we're not going to go

12  through every one, Mr. Fiore, but we'll talk about a few.

13          What pharmacy does this relate to?

14  A.   This is Amato Pharmacy in the Bronx.

15  Q.   And just looking at the chart, did sales of controlled

16  substances continue past the date of termination or suspension

17  in this pharmacy?

18  A.   Yes.

19  Q.   Let's goes to slide three.  What pharmacy is this?

20  A.   This is Total Care Pharmacy in the Bronx.

21  Q.   We can zoom out.  And did sales of controlled substances

22  continue past the date of suspension or termination for Total

23  Care Pharmacy?

24  A.   Yes.

25  Q.   We can go to slide four.  Let's go to slide five.  Same

M1r3dou5                         Fiore - Direct

1    question.  Did sales of controlled substances continue past the

2    date of listed suspension or termination for Specialty Care

3    Pharmacy?

4    A.  Yes.

5    Q.  Let's go to slide six.  What pharmacy is this?

6    A.  This is The Chemist Shop in New York, New York.

7    Q.  What's the total oxycodone sales to the Chemist Shop?

8    A.  Approximately 1.4 million.

9    Q.  And the total non-oxycodone controlled substances sales?

10   A.  Approximately 10 and a half million.

11   Q.  Did sales of controlled substances continue to The Chemist

12   Shop after the date of listed suspension or termination?

13   A.  No.

14   Q.  Let's go to the next slide.  Let's goes to slide eight for

15   ProHealth.  If we can zoom in on the top.

16          What is the total amount of oxycodone sales to

17   ProHealth?

18   A.  Approximately 1.8 million.

19   Q.  And the non-oxycodone controlled sales?

20   A.  Approximately 4.3 million.

21   Q.  What's the date of the suspension or termination as listed

22   on Defense Exhibit A82?

23   A.  December 28 of 2015.

24   Q.  Did sales continue, sales of controlled substances continue

25   to ProHealth pharmacy after that listed date?

M1r3dou5                          Fiore - Direct

1    A.  Yes.

2    Q.  Let's keep flipping through the slides.  I won't ask you

3    questions about them until we get to some of the later slides.

4            Let's pause here on Kingsway.  I want to ask you one

5    question.  In the earlier slides, the number at the top on the

6    Y axis went to 300,000.  Did you see that?

7    A.  Yes.

8    Q.  What's the number for these slides?

9    A.  50,000.

10   Q.  So do these pharmacy customers have smaller sales than the

11   ones at the beginning of the packet?

12   A.  Yes.

13   Q.  Okay.  Just because we are on Kingsway, did sales of

14   controlled substances continue to Kingsway Pharmacy after the

15   listed date of suspension or termination?

16   A.  Yes.

17   Q.  We can keep flipping through.

18           Let's look at this one.  Medical Center Pharmacy.

19   What's the listed date of suspension or termination on Defense

20   Exhibit A82?

21   A.  April 25 of 2013.

22   Q.  Did sales of controlled substances continue to Medical

23   Center Pharmacy after that date?

24   A.  Yes.

25   Q.  We can keep going.

1      MS. ROTHMAN:  We can take that down.  If we can pull

2   up for the witness what's been marked for identification as

3   Government Exhibit 1232A.

4   Q.  Do you recognize this document?

5   A.  Yes.

6   Q.  What is it?

7   A.  It's the list of suspensions or terminations according to

8   Exhibit A82 that occurred prior to 2016.  And in this document,

9   the occurrences in which sales continued after the date of

10  suspension or termination are highlighted.

11      MS. ROTHMAN:  The government offers into evidence

12  Government Exhibit 1232A.

13      MR. GOTTLIEB:  No objection, your Honor.

14      THE COURT:  This document will be admitted in

15  evidence.

16      (Government's Exhibit 1232A received in evidence)

17      MS. ROTHMAN:  May we publish to the jury?

18      THE COURT:  Yes.

19      MS. ROTHMAN:  Thank you.

20  Q.  If we can zoom in a little bit, I know the text is kind of

21  small just to get our bearings.

22      So, just a few questions on this chart.  So what does

23  the highlighting reflect?

24  A.  The highlighting reflects the fact that sales of controlled

25  substances occurred after the date of suspension or

M1r3dou5                          Fiore - Direct

1    termination.

2    Q.   Looking at the action that's listed as red flag suspension.

3    Is that the case for every red flag suspension, sales of

4    controlled substances continued to that pharmacy after the

5    listed date?

6    A.   Yes, it is.

7    Q.   With respect to termination of controlled substances

8    ordering privileges, are there instances in which controlled

9    substances were sold to these pharmacies even after that listed

10   termination date?

11   A.   Yes.

12   Q.   How many occasions?

13   A.   There were two.

14          MS. ROTHMAN:  Your Honor, may I have one moment?

15          THE COURT:  Yes.

16   Q.   I want to be clear.  The dates of these listed terminations

17   and suspensions, that's in 2013, 2014, 2015, and 2016; is that

18   correct?

19   A.   Correct.

20          MS. ROTHMAN:  No further questions, your Honor.

21          THE COURT:  Mr. Gottlieb, did you need a few minutes

22   or are you ready to proceed?

23          MR. GOTTLIEB:  Your Honor, why don't I start and then

24   we'll take a break.

25          MS. ROTHMAN:  I actually, I think it should, we should

M1r3dou5                          Fiore - Cross

1    maybe do it in one shot.

2            MR. GOTTLIEB:  No, I have to start.

3            THE COURT:  Mr. Gottlieb, you can do it any way you

4    want to do it.

5            MR. GOTTLIEB:  Thank you.

6    CROSS-EXAMINATION

7    BY MR. GOTTLIEB:

8    Q.  Sir, when did you learn that you were going to be traveling

9    all those miles to come down and testify today?

10           MS. ROTHMAN:  Objection.  The witness lives in New

11   Jersey.

12   Q.  Oh I thought, the question -- I'm sorry.  How many miles

13   did, between where --

14           THE COURT:  That's what's happens when it gets late in

15   the day.

16   Q.  All right.  Sir, can we have Government Exhibit 278 placed

17   on the board, please.  This is in evidence.  Government Exhibit

18   278.  And can we just scroll down, it begins with the first

19   entry on this document is January 27, 2017, and we see on the

20   bottom it says 4/25/13 to 2/10/20 suspension and termination.

21           This document, the government exhibit, starts on

22   January 27, 2017.  Correct?

23           MS. ROTHMAN:  I don't think the witness has ever seen

24   this document.

25           MR. GOTTLIEB:  Your Honor, I'm wondering if we can

M1r3dou5                          Fiore - Cross

1    have the witness testify instead of counsel.

2             THE COURT:   What's your question, Mr. Gottlieb?

3    Q.  This document starts January 27, 2017, correct?

4    A.  I can't see the rest of the rows, but...

5    Q.  Scrolling down.  And the last row is 2/10/2020, correct?

6    A.  Yes.

7    Q.  So the first row on the government's exhibit was in 2017,

8    and now we see the end in 2/10/2020, correct?

9    A.  It appears so, yes.

10   Q.  Thank you.  And can we now have Defense Exhibit 82.  A82.

11   And this is in evidence.  May we have this -- there we go.

12   Now, sir, this document you saw, correct?

13   A.  Yes.

14   Q.  The first document that began in 2017, the government

15   didn't show you, correct?

16             MS. ROTHMAN:   Objection, your Honor.

17             THE COURT:   Overruled.  He can answer.

18   A.  Correct.

19   Q.  Now, this document, is it fair to say the first entry is

20   April 25, 2013, correct?

21   A.  Correct.

22   Q.  And this document we see on the bottom says, as the

23   previous document said, 4/25/13 to February 10, 2020,

24   suspension and termination, correct?

25   A.  Yes.

1    Q.  Now, if we can scroll down in the document that the defense

2    introduced, it started in 2013, and it continues -- let's stop

3    right there.  Go up a little bit.  It goes down and it covers

4    2012 -- 2013, 2013, 2014, 2015, 2016, and then stop right

5    there.

6            It stops in the middle here at account number 6282,

7    Wyckoff Pharmacy, there you begin to see for the first time

8    January 27, 2017.  Correct?

9            You see that Wyckoff Pharmacy, the third one?

10   A.  I do see it, yes.

11   Q.  And that is the starting date January 27, 2017, that's the

12   starting date that was in the government's exhibit, correct?

13   A.  The previous document you showed me?

14   Q.  Yes.

15   A.  Starting -- yes.  It matches the starting date.

16   Q.  So, the government contacted you and asked you to review

17   the defense exhibit, correct?

18   A.  Yes.

19   Q.  Is it fair to say that, but for the defense exhibit

20   containing the 2013, 2014, '15, and '16 entries, everything

21   else on this exhibit, everything else other than those dates is

22   what appeared on the government's exhibit, correct?

23   A.  Can you restate the question?

24   Q.  Sure.  Looking at A82, Defense A82, that contains

25   everything and more than appeared on the government's exhibit

M1r3dou5                         Fiore - Cross

1      that was showed to you a moment before, correct?

2                  MS. ROTHMAN:  Objection to form.

3                  THE COURT:  Overruled.  You can answer.

4      A.  I'm not sure I compared it line by line, so I can't say

5      it's exact.

6      Q.  All right.  Fair enough.  They're both in evidence now.

7      Thank you.

8                  Before we take just a brief break, you were good

9      enough to identify Government Exhibit 1232A.  Can we put that

10     on the board, please.

11                 So now, this is an exhibit that was created by the

12     government, correct, to your knowledge, if you know?

13     A.  Using the information that my colleagues and I -- using our

14     analysis, yes.

15     Q.  Now, this one reflects a portion of the Defense Exhibit A82

16     that I showed you before.  Do you recognize that?

17     A.  Yes.

18     Q.  What you did, let me see if I understand.  What you did is

19     you looked at the defense exhibit now that was received in

20     evidence covering 2013 to 2020, and you went through each of

21     the pharmacies that were listed to see if after the action that

22     was shown on this exhibit was taken, whether or not

23     subsequently there were new sales, correct?

24     A.  For the suspensions and terminations that occurred in 2016

25     and prior, yes.

1   Q.  And what you did is you highlighted all those in which

2   there was some indication that there were subsequent sales to

3   the time they were either suspended or terminated, correct?

4   A.  Correct.

5   Q.  And everything in this document, 1232A with the highlights,

6   this represents and reflects that between 2013 and 2017, all of

7   those actions, either suspensions or termination, were taken by

8   the company, RDC, correct?

9   A.  That's what the document appears to show.

10  Q.  When I say it was taken by RDC, we are talking about RDC

11  the company, not specifically Larry Doud, correct?

12  A.  I don't know.

13  Q.  Okay.  But I believe you've indicated that this reflects

14  either suspensions or terminations by RDC.  Correct?

15  A.  Correct.

16  Q.  All right.  So now, just if we can, your Honor, just to go

17  through it.

18          Amato Pharmacy, April of 2013, there was a red flag

19  suspension.  Correct?

20  A.  Yes.

21  Q.  Total Care Pharmacy April 25, 2013, a red flag suspension,

22  correct?

23  A.  Yes.

24  Q.  Total Care Pharmacy Crosby red flag suspension April 25,

25  2013.  Correct?

M1r3dou5                          Fiore - Cross

1    A.   Yes.

2    Q.   Specialty Care Pharmacy, Inc. red flag suspension April 25,

3    2013, correct?

4    A.   Yes.

5    Q.   Medical Center Pharmacy, Inc. red flag suspension April 25,

6    2013, right?

7    A.   Yes.

8    Q.   And you've put this highlight that reflects that, based on

9    your analysis you saw, that some time subsequent to these

10   pharmacies' suspensions, they were able to purchase additional

11   controlled substances, correct?

12   A.   Correct.

13   Q.   And you don't know what happened between the time of the

14   suspension and the subsequent time that they were permitted to

15   order opioids again.  You don't know what RDC or any of its

16   employees did to investigate any of these pharmacies, correct?

17   A.   No, I don't.

18   Q.   Now, let's go to the next one here.  Main Avenue Pharmacy.

19   This doesn't have the highlight.  Correct?

20   A.   Correct.

21   Q.   And this shows termination of RDC CS ordering privileges

22   July 24, 2013.  And there is no highlight there.  What does

23   that mean?

24   A.   That means that there were no sales of controlled

25   substances after July 24 of 2013.

M1r3dou5                         Fiore - Cross

1    Q.  So after it's indicated they were terminated, that's the

2    end of any purchases, correct?

3    A.  Correct.

4    Q.  Then we go to Plainfield Pharmacy.  That also shows

5    termination of RDC controlled substance ordering privileges

6    August 6, 2013.  Correct?

7    A.  Correct.

8    Q.  And being it's not highlighted, is your answer the same

9    that after it was terminated by RDC, they didn't order anymore,

10   right?

11   A.  Correct.

12   Q.  Now then we have K R D Pharmacy, and there, you said this

13   was one I think of the two where you said there was a

14   termination of RDC controlled substances ordering privileges,

15   August 28, 2013.  Correct?

16   A.  Yes.

17   Q.  And as you sit here, you can't say that between the time

18   they were terminated and the time subsequently they were

19   authorized to purchase again, you don't know if there was any

20   investigation of K R D Pharmacy by RDC, correct?

21   A.  That's right.

22   Q.  You don't know if there were any conversations, any outside

23   consultants who met with K R D Pharmacy after they were

24   terminated, correct?

25   A.  Correct.

1  Q.  Were you told by the government when they prepared and

2  prepped you for your testimony that the jury had already heard

3  testimony that in instances when a pharmacy was either

4  suspended or terminated, there were times that they were

5  reinstated and permitted to order again?  Did they tell you

6  that the jury had already heard that?

7           MS. ROTHMAN:  Objection.

8           THE COURT:  Sustained.

9  Q.  Are you aware, as you analyzed this, were you aware of the

10 circumstances by which a pharmacy, even if it was suspended or

11 even if it was terminated, that they could obtain authorization

12 subsequently to purchase opioids again?

13          MS. ROTHMAN:  Objection.

14          THE COURT:  Overruled.  You can answer.

15 A.  The question was whether I was aware?

16 Q.  Were you aware of the circumstances which would permit them

17 and grant them authority to purchase again?

18 A.  No.

19 Q.  So now we look at AJ Family Pharmacy red flag suspension

20 November 25, 2013.

21          Neighbor RX Pharmacy at Pearl River red flag

22 suspension December 9, 2013.

23          Wellness Pharmacy High Falls red flag suspension

24 December 18, 2013.

25          And Casey's Prescription Pad red flag suspension

M1r3dou5                         Fiore – Cross

1   April 22, 2014.

2              Correct?

3   A.   Correct.

4   Q.   And again, the same question, without going through it

5   again.  Fair to say you don't know what, if anything, was done

6   by RDC after the suspension that led them to sell opioids

7   again, correct?

8   A.   That's correct.

9   Q.   Now we go down to AJ Family Pharmacy termination of RDC CS

10  ordering privileges dated June 26, 2014.  Correct?

11  A.   Correct.

12  Q.   And that is not highlighted, which means that there is no

13  subsequent sales, right?

14  A.   Correct.

15  Q.   Now we have Greenwich termination of RDC controlled

16  substances ordering privileges September 1, 2014.  And that one

17  is highlighted, correct?

18  A.   Correct.

19  Q.   And fair to say your answer would be the same, you don't

20  know what, if anything, was done by RDC that led to them being

21  reinstated for purchases, correct?

22  A.   Correct.

23  Q.   Now we have Stanton & Negley, red flag suspension

24  September 8, 2014.

25              Austin Chemist termination of RDC CS ordering

1  privileges, September 23, 2014.  And that one is not

2  highlighted.  Austin Chemist.  So that means that once they

3  were terminated, couldn't buy again, right?

4  A.  At least they didn't, correct.

5  Q.  Okay.  And in fact, that means that RDC didn't permit them

6  to purchase again, correct?

7  A.  Correct.

8  Q.  You are not saying that Larry Doud had any involvement in

9  that, you don't know anything involving any of this list

10  involving Larry Doud, correct?

11       MS. ROTHMAN:  Objection, compound.

12       THE COURT:  Overruled.  You can answer.

13  A.  No, I don't know.

14  Q.  Then we have All Care Pharmacy red flag suspension

15  December 8, 2014.

16       Coatesville Pharmacy red flag suspension by RDC

17  12/31/2014.

18       Cuidamed Pharmacy red flag suspension January 21, now

19  we're into 2015, correct?

20  A.  Correct.

21  Q.  Mt. Airy termination of RDC CS ordering privileges May 5,

22  2015.  Correct?

23  A.  Correct.

24  Q.  Mt. Airy, there is no highlight there, which means once

25  they were terminated, no more purchases, correct?

M1r3dou5                        Fiore - Cross

```
 1    A.  Correct.
 2    Q.  Wellness Pharmacy High Falls again, red flag suspension
 3    May 15, 2015.  Right?
 4    A.  Yes.
 5    Q.  Now, what's interesting there, we had already mentioned
 6    Wellness Pharmacy High Falls up above.  Right?
 7    A.  Yes.
 8    Q.  Right.  That's account number 4161.  Wellness Pharmacy High
 9    Falls.  You told the jury there was a red flag suspension
10    December 18, 2013.
11            Is it fair to say it appears after their suspension,
12    something happened to reinstate them, putting them in a
13    position to purchase again which led to a suspension on May 15,
14    2015, correct?
15            MS. ROTHMAN:  Objection, your Honor.
16            THE COURT:  Sustained.  He wouldn't know that.
17            MR. GOTTLIEB:  I'm sorry, Judge?
18            THE COURT:  He wouldn't know that.
19    Q.  Then we have Kewan Pharmacy, LLC, suspension, refusal of
20    onsite visit May 27, 2015.
21            Abigail's Pharmacy Corp red flag suspension July 21,
22    2015.  Correct?
23    A.  Yes.
24    Q.  And again, you have no knowledge about what led to them
25    being able to purchase again, right?
```

M1r3dou5                          Fiore - Cross

1   A.   Correct.

2   Q.   Then we have three terminations, EZ Care pharmacy, ATA

3   Pharmacy, Cedar Care Pharmacy.   In August of 26, 2015,

4   September 2, 2015, September 15, 2015.   These three pharmacies,

5   sir, your records show were terminated, no subsequent

6   purchases, right?

7   A.   Correct.

8   Q.   Then we have Organix a red flag suspension October 20,

9   2015.

10          And then we go, you were asked about The Chemist Shop

11  termination of RDC CS ordering privileges, November 18, 2015.

12          Prime Health, Inc. termination of RDC CS ordering

13  privileges November 18, 2015.

14          Poplar Pharmacy Inc. termination of RDC CS ordering

15  privileges November 23, 2015.

16          Sir, those three pharmacies aren't highlighted which

17  means end of story, they were not able to purchase again,

18  right?

19  A.   Correct.

20  Q.   Then we go to ProHealth Pharmacy, Inc. red flag suspension

21  December 28, 2015.

22          Toms River Pharmacy red flag suspension January 4,

23  2016.

24          Kingsway Pharmacy red flag suspension February 26,

25  2016.

M1r3dou5                         Fiore - Cross

1                And then we come to two more terminations.  Vital

2       Drugs, termination of RDC CS ordering privileges March 17,

3       2016.  And Super Star Pharmacy termination of RDC CS ordering

4       privileges, March 17, 2016.  And those two pharmacies are also

5       included among -- it's not highlighted, which means once they

6       were terminated, end of story, no more purchases, right?

7       A.  Correct.

8       Q.  And then we have Sheely's red flag suspension May 23, 2016.

9                Lake Carmel Pharmacy red flag suspension May 26, 2016.

10               And it ends on this exhibit, which comes from the

11      period of time 2013 to 2017, that was included in the defense

12      exhibit, it ends with Allerton Park termination of RDC CS

13      ordering privileges August 11, 2016.  There is no highlight

14      there, correct?

15      A.  Correct, there is no highlight.

16      Q.  And once it was terminated, no record of any subsequent

17      purchases, correct?

18      A.  Correct.

19      Q.  You know, can I ask you, you know when you were given

20      documents by the government to analyze, you were given the

21      documents that showed the terminations and suspensions

22      beginning in 2017 until 2020, correct?

23      A.  I was asked to analyze the ones 2016 and prior.

24      Q.  So if we just break that down.  I recall that being your

25      testimony.  But you were given the document, the government

M1r3dou5                    Fiore - Cross

1    document that only began in 2017 to 2020, correct?

2    A.  The other document that began in 2017, no.

3    Q.  Withdrawn.  That was inartfully stated.

4           You were given this spreadsheet that included

5    everything beginning in 2013 that went until 2020, correct?

6    A.  Correct.

7    Q.  All right.  So, for those pharmacies you did see, beginning

8    in 2017, there also was a list of a lot of pharmacies that were

9    suspended and/or terminated, correct?

10   A.  Correct.

11   Q.  And were you asked to look at those pharmacies beginning in

12   2017 to see if after they were suspended or terminated, whether

13   or not they subsequently were authorized to purchase again?

14   A.  I was not asked to analyze that, right.

15   Q.  So you are not able to say whether or not the information

16   beginning in 2017 until 2020, you are not in a position to say

17   whether or not that information is accurate or not accurate,

18   correct?

19   A.  Which information is accurate?

20   Q.  Everything beginning in 2017 down to 2020 that was included

21   only in the government's exhibit, you are not able to say

22   whether or not that information was accurate?

23          MR. ROOS:  Objection.  It is also in the defense

24   exhibit.  He's misstating.

25          THE COURT:  Overruled.  That's not a basis for an

M1r3dou5                      Fiore - Redirect

1    objection.

2             Mr. Gottlieb, do you have anything further?

3             MR. GOTTLIEB:  May I just check my notes, your Honor.

4    Thank you.  Your Honor, I have nothing further.

5             THE COURT:  Thank you.

6             Ms. Rothman, do you have any further questions?

7             MS. ROTHMAN:  Just a few, your Honor.  Thank you.

8    REDIRECT EXAMINATION

9    BY MS. ROTHMAN:

10   Q.  Good afternoon again.

11            Mr. Fiore, just so everyone is clear, Government

12   Exhibit 278, the one that Mr. Gottlieb showed you, and

13   Government Exhibit 1232A, that one pager with the highlighting,

14   they have the same list as Defense Exhibit 82, right?

15   A.  Correct, for 2016 and prior.

16   Q.  And 1232A, Government Exhibit 1232A, is just an analysis of

17   whether there is a sale after the listed date, right?

18   A.  Correct.

19   Q.  Sitting here today, do you know whether RDC actually

20   stopped and restarted selling, or if the defense exhibit is

21   just inaccurate?

22            MR. GOTTLIEB:  Objection as to the form.

23   A.  Can you repeat that, please?

24            THE COURT:  He can answer the question.  Everybody

25   knows the answer is going to be "no."

M1r3dou5                        Fiore - Redirect

1   Q.  Let's pull up Government Exhibit 1232A.

2               THE COURT:  Do you want an answer to that previous

3   question?

4               MS. ROTHMAN:  In case he needs to look at it.

5   Q.  The simple question is this:  The dates you see here,

6   Mr. Fiore, which are from Defense Exhibit A82, do you know if

7   RDC actually stopped selling on that date or if the defense

8   exhibit is just inaccurate?

9   A.  No, I don't know.

10  Q.  Let's do one other thing.  We can take that down and pull

11  up Government Exhibit 913, please.  Just to look at a few of

12  the terminations.

13              Can we look at page 37.  This is one of the examples

14  of the termination that Mr. Gottlieb asked you about.

15              How much were the sales to Poplar Pharmacy for

16  oxycodone?

17  A.  About $2,200.

18  Q.  And let's go to slide 36, another terminated pharmacy.  How

19  much were the sales of oxycodone?

20  A.  $41.

21  Q.  Let's go to slide 34, Mt. Airy Pharmacy.  How much were the

22  sales of oxycodone?

23  A.  About 8,300.

24  Q.  Let's go to slide 31, Kingston Pharmacy.

25              How much were the sales of oxycodone?

M1r3dou5

1   A.  About 5,700.

2   Q.  Let's go to the first page, Sheely's.  How much were the

3   sales of oxycodone?

4   A.  Approximately 1.6 million.

5   Q.  Let's go to slide eight, please.  ProHealth.  How much were

6   the sales of oxycodone?

7   A.  Approximately 1.8 million.

8   Q.  A pharmacy that RDC kept selling to?

9   A.  Correct.

10          MS. ROTHMAN:  No further questions.

11          THE COURT:  Any further questions?

12          MR. GOTTLIEB:  No, your Honor.

13          THE COURT:  Thank you, sir.  You can step down.

14          (Witness excused)

15          THE COURT:  Anything further by the government?

16          MS. ROTHMAN:  I don't believe so, your Honor.

17          THE COURT:  Anything further at this time by the

18   defense?

19          MR. GOTTLIEB:  No, your Honor.

20          THE COURT:  Ladies and gentlemen, we are going to

21   adjourn for the weekend.  If there is any further evidence to

22   be presented, we'll do it first thing Monday morning.  If there

23   is nothing further, as I just indicated, we will have the

24   summations and closing arguments as we call them of the

25   lawyers.  We are going to be here earlier, probably about 9:15.

M1r3dou5

1    I am going to ask you to be here before 9:45 so we can start

2    fairly early so I can give the parties a full opportunity to

3    argue their cases.

4            Don't discuss the case, keep an open mind.  I'll see

5    you Monday morning at 9:45 and hopefully at that point in time

6    we'll be able to begin with the summations.  Have a good

7    weekend.

8            (Jury excused)

9            THE COURT:  Mr. Gottlieb, technically I'll consider

10   your motion renewed at this time.  At the close of the

11   government's case, and at the close of all testimony, I'll

12   consider that motion, those motions to be made.

13           MR. GOTTLIEB:  Thank you.

14           THE COURT:  So, is there anything else we need to

15   address at this point in time?  You want to talk any further

16   about the jury instructions or any other issues?

17           MR. ROOS:  Three very brief matters from us.  So

18   number one, I think you indicated tomorrow you'd like letters

19   to the extent we have anything about the jury instruction.  Is

20   there a time by which you'd like them?

21           THE COURT:  I'd like to have them before 2 p.m.

22   tomorrow if I can.

23           MR. GOTTLIEB:  On the jury charge?

24           THE COURT:  Yes.  And then if you want to respond,

25   I'll start looking at those as soon as I get them.  If you want

1    to respond by noon Saturday.  And then I'll work on it, and

2    then we'll talk about it first thing Monday morning.  If I

3    haven't already just gone ahead and incorporated your

4    suggestions.  I think that's reasonable.  You want any other

5    time frame than that?

6              MR. ROOS:  That's fine.

7              One other thing.  I guess, so my understanding is

8    since the pandemic, many of the trials, the exhibits have been

9    sent back to the jury have been put on to a drive and loaded on

10   to the computer for them as opposed to paper.  I think the

11   district then sort of relaxed that idea.  But then with the

12   variant spike, it kind of went back to that.

13             So I was wondering if your Honor has a thought -- if

14   it's loading data that's no problem.  If it's printing, our

15   paralegal will need to print a complete set.

16             THE COURT:  I'll have to check to see what the

17   protocols are for now.  Obviously my preference would be, if

18   it's safe, if they want a particular exhibit, to give them a

19   particular exhibit rather than having them to try search for an

20   exhibit, particularly given the numerous exhibits, by giving

21   them a drive.  Let me find out what that protocol is.

22             In what way are you now prepared to do that?

23             (Continued on next page)

24

25

1          MR. ROOS:  Well, two questions:  One is, if it's your

2     Honor's practice to just give them -- not send all the exhibits

3     back and give them particular exhibits, I think that makes it a

4     little bit easier.

5          THE COURT:  That is my practice.  My practice is not

6     to send the exhibits in when I send them to deliberate.  If you

7     look at my instructions, I give them instructions, if they want

8     any particular exhibit, they should tell us which exhibits they

9     want.  And once the parties agree that that's the exhibit

10    they're asking for, I will send it directly in, but I do not

11    send unmasked all the exhibits in this case.  I like to have

12    the jury focused on what they think at the time is relevant to

13    their deliberations.

14         MR. ROOS:  I mean, I think, you know, obviously the

15    easiest thing for the paralegals is just to put it on a disk,

16    but obviously before the pandemic, we were doing printing.  If

17    that's your Honor practice, I think we can print a set and just

18    have them ready.

19         THE COURT:  I would have them ready.  Maybe if you

20    could even -- and I'll see if we have any available -- if you

21    can get some plastic sleeves to put the documents in.  That

22    might be useful, that might be helpful for safety.  Otherwise,

23    I think that it depends how many documents they ask for, but I

24    just don't think it's particularly conducive to effective jury

25    deliberations to give them a disk with a thousand exhibits on

1    it.

2            MR. ROOS:  No problem.  One other thing related to the

3    exhibits is, some of them, as you've seen, are spreadsheets.

4    Spreadsheets like the ones we were just going through I think

5    are the type that could be printed.  There are others like some

6    the experts testified to that are sales data.  I'm kind of

7    guessing that the jury is not going to ask for the underlying

8    sales data, so we're not going to print it if that's okay with

9    your Honor.  We want to see the massive thing, then we can

10   figure it out.

11           THE COURT:  As long as we can do it in a timely manner

12   if they request something and we can respond to them quickly

13   up.

14           MR. JANEY:  Just on that, some of the sales data we're

15   talking about as a practical matter takes like 10 minutes to

16   load.  It may be worth conferring because if we get a note

17   requesting some of the underlying sales data, your Honor, quite

18   frankly, I'm not sure, as a practical matter, how we even show

19   it to them.

20           As an example, there are these enormous CSV files that

21   both parties have that we obtained from RDC.  It practically

22   requires a program to run them.

23           THE COURT:  Well, my approach with regard to those

24   issues is to -- if we confront those kinds of problems, we

25   bring the jury out, tell them what the problem is and have them

M1RBDOU6

1    either refocus their specific request or have them tell us,

2    yes, that's what we want.  We want the ten-inch stock of

3    documents so we can go through it. That's their right.  But

4    hopefully if we get to the point where it's something awkward

5    like that, we can bring them out, explain it to them, have them

6    go back and give us a particular note as to whether they really

7    want that or whether they're looking for something in

8    particular.

9              MR. ROOS:  A similar type thing, I had a few trials

10   where the Court asked the government to provide notepads for

11   the jurors.  I don't know if that's --

12             THE COURT:  We'll take care of all of that.  We will

13   have pencils and pads for the jury in the jury room.

14             Anything else right now?

15             Have a good weekend.  I will see you Monday morning

16   9:15.  I'll keep a look at my email to see whether or not you

17   submit anything to me.

18             Take care.

19             (Adjourned to January 31, 2022, at 9:15 a.m.)

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION
 2    Examination of:                              Page
 3    DONNA BLYTHE
 4    Direct By Mr. Townsend . . . . . . . . . . .1551
 5    Cross By Ms. Rothman . . . . . . . . . . . .1557
 6     MARTIN MARTINOVIC
 7    Direct By Mr. Janey . . . . . . . . . . . .1579
 8    Cross By Mr. Burnett . . . . . . . . . . . .1607
 9    Redirect By Mr. Janey . . . . . . . . . . .1632
10     CHRISTOPHER FIORE
11    Direct By Ms. Rothman . . . . . . . . . . .1647
12    Cross By Mr. Gottlieb . . . . . . . . . . .1656
13    Redirect By Ms. Rothman . . . . . . . . . .1670
14                      GOVERNMENT EXHIBITS
15    Exhibit No.                              Received
16     1006    . . . . . . . . . . . . . . . . .1550
17     1245    . . . . . . . . . . . . . . . . .1612
18     1237    . . . . . . . . . . . . . . . . .1623
19     913     . . . . . . . . . . . . . . . . .1649
20     1232A   . . . . . . . . . . . . . . . . .1654
21                      DEFENDANT EXHIBITS
22    Exhibit No.                              Received
23     V3      . . . . . . . . . . . . . . . . .1562
24     A82     . . . . . . . . . . . . . . . . .1563
25     R2      . . . . . . . . . . . . . . . . .1581
```

```
 1    R1     . . . . . . . . . . . . . . . . . .1595
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```