M1VBDOU1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           19 Cr. 285 (GBD)

5    LAURENCE F. DOUD III,

6                Defendant.
                                           Trial
7    ------------------------------x

8                                          New York, N.Y.
                                           January 31, 2022
9                                          9:30 a.m.

10   Before:

11

                        HON. GEORGE B. DANIELS,
12
                                           District Judge
13                                         –and a Jury–

14                          APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  NICOLAS T. ROOS
17        ALEXANDRA ROTHMAN
          THOMAS S. BURNETT
18        Assistant United States Attorneys

19   ROBERT C. GOTTLIEB
     DERRELLE M. JANEY
20   PAUL R. TOWNSEND
          Attorneys for Defendant
21
     Also Present:  Sunny Drescher
22                   Jacqueline Hauck
                     Paralegal Specialists
23                   Special Agent George Burdzy, DEA
                     Investigator Kathleen Whitmore, DEA
24

25

M1VBDOU1

1              (Trial resumed)

2              (In open court; jury not present)

3              THE COURT:  I made changes on the jury instructions in

4    response to your submissions over the weekend.  I will take you

5    through them and then I could hear you further if you have any

6    further suggestions or objections.

7              I'm going to go off my handwritten changes because I

8    hadn't read through the whole thing.  The first change that I

9    made, it looks like it's on page 29 on the law enforcement

10   witness.  In response to the government's request, I changed it

11   to read:  You have heard testimony of witnesses employed by --

12   it should say law enforcement agencies.  A witness may be

13   employed by a law enforcement agency.  The fact that a witness

14   may be employed by a law enforcement agency does not mean that

15   his or her testimony is necessarily deserving of more or less

16   consideration.  That's the change that I made.  Is that

17   sufficient for the government's purposes?

18             MR. BURNETT:  Yes.  Thank you, your Honor.

19             THE COURT:  On cooperating witnesses, I've combined

20   it.  The first sentence now would read:  You've heard testimony

21   from cooperating witnesses who pled guilty to criminal charges

22   or who the government agreed not to prosecute.  I made some

23   minor changes in that second paragraph.

24             Instead of "maybe facing," it says, "may face fairly

25   long sentencing and maybe hoping for a reduced sentence or to

M1VBDOU1

avoid prosecution."

On page 31, same thing on 31, that last paragraph. The fact that a witness is testifying pursuant cooperation or a non-prosecution agreement.

Then page 33 I added the sentence, The government is permitted to make these kinds of agreements. In response to the government's request, the government didn't object to the defense's request and I will get to that page. It was on page 44.

The defense request that if after fair and impartial consideration, all of the evidence or lack of evidence, which the defense requested. I added that since the government had no objection. But on page 37, I mean the reality is, that's the third time that I said that. It's on 37 twice.

I'm going to leave -- the first time I'm leaving in. The second time I am going to -- that last paragraph is going to read: Your concern, as I have said, is to determine whether or not on the evidence the defendant's guilt has been proven beyond a reasonable doubt. I'm going to leave in that the government has -- because you should look at all of the evidence or lack of evidence in deciding whether the defendant has been proven guilty. I'm leaving that in on that page.

I'm taking the second repeated of that statement, because in the context in which it's stated, in the last paragraph out, and I'm going to insert it in the place where

M1VBDOU1

1   the defense requested I insert it.  And then I'll hear from you

2   in a second.

3           On page 39, I'm going to substitute the charts in

4   evidence.  I don't think that we really have any charts that

5   are not in evidence and some of the exhibits that were admitted

6   into evidence were in the form of charts or summaries.  I

7   decided to admit these charts in summaries in place of or in

8   addition to documents that they represent in order to save time

9   and avoid unnecessary inconvenience.  These charts and

10  summaries, You should consider these charts and summaries as

11  you would any other evidence, and then I'm just going to drop

12  the rest of that.

13          I think that primarily comes from the government's --

14  I think it's the government's request number 33.  Then on 44, I

15  have added that requested language again, Or lack of evidence

16  as defense requested.

17          This is what I propose and this is more of a

18  substantive change particularly with regard to the verdict

19  form.  On the substantive charge, I guess that's page 45.  I'm

20  going to have it read:  Count One of the indictment charges the

21  defendant with conspiracy to distribute opioid drugs,

22  specifically, oxycodone and 400 grams or more of fentanyl to

23  pharmacies that he knew were unlawfully dispensing those drugs.

24          MR. JANEY:  That's page 46, your Honor?

25          THE COURT:  No, 45.

M1VBDOU1

1          MR. JANEY:  I have 45 as, Indictment is not evidence.

2          THE COURT:  It's the substantive charge.  The

3    beginning of the substantive charge.

4          MR. JANEY:  I think that's page 46.  What was handed

5    to me, your Honor, the next page after that is, Conspiracy

6    Generally, marked as page 47.

7          MR. BURNETT:  That's that what I have too.

8          THE COURT:  So that would be page 48.

9          MR. JANEY:  Substantive charge, is it 46, your Honor?

10         THE COURT:  Forty-eight I think.

11         MR. JANEY:  Forty-eight has multiple counts on it at

12   the bottom.

13         THE COURT:  You have a page, the heading is

14   substantive charge.

15         MR. JANEY:  Yes, sir.

16         THE COURT:  That's the page.  The language on page 47

17   should not have been eliminated.  It should have just been

18   moved to after that substantive charge page.  So on page 47, it

19   looks like it's crossed out multiple counts, but it's not

20   supposed to be crossed out.  In response to I believe the

21   government's request, I moved it to after the two substantive

22   charges.

23         MR. JANEY:  Your Honor, if I can ask, are we to hold

24   our comments under further hearing until we're done?

25         THE COURT:  Yes.  Let me go through it first and then

M1VBDOU1

1    you can see if you have further suggestions or objections.

2    Then let me go to conspiracy generally, the second page. I

3    guess that's a new page 50 of what I've just given you.  I made

4    changes on the two elements in response to the parties.

5            First, the existence of the conspiracy is charged in

6    the indictment; in other words, that there was, in fact, an

7    agreement to or understanding by two or more persons to violate

8    the law as alleged.

9            And then second, do you have conspiracy generally?

10            MR. JANEY:  Yes, your Honor.

11            THE COURT:  What page is that?

12            MR. JANEY:  I have it as 47.  It carries over to 48.

13            MR. BURNETT:  That's what I have too.  Based on the

14    page numbers, it sounds like you maybe have like a track change

15    version.  I think that's what's throwing off the pages.

16            THE COURT:  The second element should read as

17    follows -- and I don't know if you have it.  Second, that the

18    defendant knowingly and intentionally became a member of that

19    particular conspiracy at some point during the applicable

20    period, and that he joined and participated in the conspiracy

21    knowing of its illegal purpose.  Is that what you have in your

22    page?

23            MR. JANEY:  Yes, your Honor.

24            THE COURT:  On the existence of agreement, the second

25    page.  The first word of that page, the second page, is

M1VBDOU1

1    conspiracy?

2              MR. JANEY:  Yes.

3              THE COURT:  It should say, a conspiracy by its very

4    nature is in many ways characterized by secrecy.

5              MR. JANEY:  It does say that, your Honor.

6              THE COURT:  In the middle of the last paragraph it

7    should say, the fifth line:  Proof that a common design existed

8    on the part of persons involved in a conspiracy to act together

9    to accomplish an unlawful purpose.

10             On the second element, membership in the conspiracy.

11   That first paragraph should read, the next to last line of that

12   first paragraph:  Defendant knowingly and intentionally became

13   a member of the conspiracy.

14             And page 55 should read: Knowingly means to act

15   consciously and voluntarily rather than by mistake or accident

16   or mere inadvertence.

17             And then after that the order was supposed to be

18   knowingly and intentionally and then willfully, so it should

19   read:  "Knowingly" means to act consciously and voluntarily

20   rather than by mistake or accident or mere inadvertence.

21             "Intentionally" means to act deliberate and with

22   awareness of its -- no. That's wrong.

23             "Intentionally" should simply be to act deliberately.

24   The rest of that is not part of intentionally. That's part of

25   willfully.

M1VBDOU1

1          "Willfully" means to act purposefully and with an

2     intent to do something unlawful. That's the three definitions.

3          The next paragraph should say:  If you find beyond a

4     reasonable doubt that the defendant participated in the charged

5     conspiracy and did so knowingly, intentionally and willfully,

6     then the second element is satisfied.

7          And then on page the new 56, the second paragraph

8     should read:  It's important for you to know that the

9     defendant's participation in the conspiracy may be established

10    by independent evidence of his own acts or statements, as well

11    as those of any other individuals you find to be members of the

12    alleged conspiracy.

13         The next paragraph, line 3, that third line should

14    say -- it starts Connection.  I instruct you that to be a

15    member of the conspiracy.  Take out become.  To be a member of

16    the conspiracy.

17         And then on liability for acts and declaration of

18    co-conspirators, on the second paragraph:  In determining the

19    factual issues before you, you may consider against the

20    defendant any acts or statements made in furtherance of the

21    alleged conspiracy by any of the people that you find under the

22    standards I've described to have been his coconspirators.

23         And I find that the government has submitted

24    sufficient evidence to conclude that co-conspirator statements

25    can be used against the defendant.

M1VBDOU1

1        Count Two should read: The defendant knowingly and

2    intentionally joined the conspiracy charged and participated in

3    it with the awareness of its unlawful purpose and is something

4    he wished to bring about.

5        MR. JANEY:  There's a question mark there, your Honor.

6        THE COURT:  Say it again.

7        MR. JANEY:  I'm just asking a minor question about the

8    question mark after about.

9        THE COURT:  That should not be there.  That should be

10   a period.

11       MR. BURNETT:  I actually think it is a question.  The

12   question is this:

13       THE COURT:  It is a question mark.  The question is

14   this:  That's what it's supposed to be.

15       Object of the conspiracy, I just switched the order.

16   Oxycodone and fentanyl are controlled substances, and then I

17   added the government's request with regard to amount.

18       And 62 says, If you find that the government has

19   proven beyond a reasonable doubt the two elements that I have

20   just described to you, then there is one more issue that you

21   must decide.  I provided you with a special verdict form asking

22   you to fill in the amount of fentanyl that -- that's not right.

23   I'm looking to change the verdict form and that instruction.

24       I will go with the verdict form as been proposed, but

25   I think on this evidence, I think the jury can only really find

M1VBDOU1

1    that it was either more than 400 or less than 400.  I propose

2    that question no. 4 be changed to:  Did the government prove

3    beyond a reasonable doubt that the defendant, Laurence Doud,

4    III, conspired to unlawfully distribute more than 400 grams of

5    fentanyl.

6         I think that that's pretty much the only evidence, but

7    that that's the amount of fentanyl was over 400 grams, but I

8    think that if for some reason the jury is not in agreement on

9    that, then they can say no.  I do not think that this record

10   supports a finding of 40 to 400.

11        MR. BURNETT:  Your Honor, if I may on that point or I

12   can wait till the end.  We can discuss it with everything else.

13        THE COURT:  Okay.  The answer is no unless I can ask

14   Mr. Janey.  Judge McMahon called to ask if defense counsel

15   Janey will be able to appear before her today.

16        MR. JANEY:  I submitted a letter on that, your Honor.

17        THE COURT:  Should I tell her no?

18        MR. JANEY:  Yes, your Honor.

19        THE COURT:  We'll give her that message. Do you think

20   that this record could support between 40 and 400?

21        MR. BURNETT:  Yes, your Honor, and here is how.  I

22   think as you rightly pointed out when the weight issue came up

23   earlier during trial.  It's not a question of, Did everything

24   that RDC sold, was it illegal versus was nothing RDC sold

25   illegal, which is what I think would lead to the automatically

M1VBDOU1

over 400 versus or not.

1

2          THE COURT:  No, that's not true.  That's what I want

3    you to focus on. The way you just characterized it is not the

4    way I intend to instruct it.  The way I think the jury can

5    either find that it's over 400 or not.

6          MR. BURNETT:  Here's why I think that's not the case.

7    As we laid out in some of the charts that we showed about

8    fentanyl weight, there are a number of pharmacies that sold --

9    to which RDC sold less than 400 grams of fentanyl, but more

10   than 40 grams of fentanyl.  I believe ProHealth was an example.

11   Bay Ridge was an example. I think Seventh Elm is an example.

12         THE COURT:  Tell me the facts on which the jury could

13   find --

14         MR. BURNETT:  The jury could find that Mr. Doud and

15   his co-conspirators unlawfully agreed with one other to sell

16   controlled substances, but that agreement didn't pertain to

17   every pharmacy that RDC sold to.  It pertain to specific

18   pharmacies.

19         And if they find that some of the specific pharmacies

20   that they pertain to were, for instance, ProHealth or Seventh

21   Elm or Aliton, the pharmacies where there was not more than 400

22   grams sold, but there was more than 40 sold, then they can wind

23   up in that middle range.

24         THE COURT:  I'm not sure what facts they can do that,

25   that they can find that the conspiracy was simply to sell

M1VBDOU1

1    between 40 and 400 grams of fentanyl.

2              MR. BURNETT:  Here's a good example.  Seventh Elm is a

3    pharmacy.  There was testimony from Jessica Pompeo that with

4    respect to certain customers who were stockholders or important

5    customers, there was a general policy at RDC that you just

6    didn't cut off orders to those people.  There's evidence in the

7    record in the form of emails that RDC identified problems in a

8    number of its stockholders like Seventh Elm.  They saw bad

9    doctors.  They saw high cash.  They saw the red flags.  They

10   knew doctors that filled there had been arrested, but they

11   continued to sell to those pharmacies nonetheless.

12             If the jury concluded, look, there wasn't an across

13   the board conspiracy, then we're going to break the law with

14   respect to every pharmacy we sold to; but for like our big

15   customers or stockholders, we're going to look the other way.

16             THE COURT:  Even what you should say would put it over

17   400.

18             MR. BURNETT:  It actually wouldn't because for the --

19             THE COURT:  Which ones?

20             MR. BURNETT:  For instance, if they find that Seventh

21   Elm, Aliton, ProHealth, Bay Ridge are pharmacies where the

22   amounts don't add up to over 400, but they do add up to over

23   40.

24             THE COURT:  All right.  Well, I can tell you that we

25   can discuss that further if there's such a verdict, but there's

M1VBDOU1

1    a good chance that if they come back with that amount that you

2    would have to -- you would have a hard time convincing me on

3    what basis given the evidence that they've heard that they

4    could calculate that amount.

5            MR. BURNETT:  Understood, your Honor, and I think that

6    will become clear through the closing too.

7            MR. JANEY:  Your Honor, very simply on this particular

8    issue.  To iterate what I think your Honor has already

9    indicated, there is not sufficient evidence in the record of

10   this case that would allow a reasonable juror to make that

11   calculation.

12           The government can argue that point, but I believe

13   they would be arguing based on something that is not reasonably

14   adduced from the record and that would stipulate an objection

15   if the government presented that in its summation.

16           THE COURT:  Well, again, government thinks they have

17   such a theory.  And based on the evidence, I don't have in my

18   mind there is such a theory.  But, one, it may be moot.  I can

19   still give them the instruction the way they want it.  It may

20   end up being moot if the jury finds over 400 or they find that

21   there's no liability.

22           The only time it would be an issue is if they find

23   between 40 and 400, and then the government would have to

24   justify why that's a verdict that's consistent with this

25   evidence.

M1VBDOU1

1          The government wants it that way, I can give it to

2     them that way.  If they think they have a theory that is going

3     to withstand -- that will convince a jury and will withstand a

4     motion to eliminate that amount if the jury comes back with 40

5     to 400.

6          Quite frankly, I think given the broad nature of the

7     proof that the government's trying to prove, I'm not sure any

8     reasonable jury could limit this to 400 grams, if they were to

9     find the conspiracy could limit this to more than 40, but less

10    than 400.

11         MR. ROOS:  I just want to be sure I understand your

12    Honor's point.  Your Honor is saying, not that the government

13    can't establish it's 400, just that you're having a hard time

14    seeing how the government could establish it's not 400, but

15    there's like some smaller amount; is that right?

16         THE COURT:  I can imagine the jury saying that, no,

17    we're not confident that it was over 400, but we think there's

18    a conspiracy, and so they would say no.  So you would have that

19    charge without the higher penalties.

20         Or they could say, yes, we think there was a

21    conspiracy, and the amount was over 400.  And then you have the

22    charge as you charged it.  Or they could simply say, there was

23    no conspiracy, which then they don't have to reach the amount.

24    I think I'm probably at this point prepared to defer to the

25    government on how they want to try to argue this case to the

M1VBDOU1

1    jury.  But as I said, I'm just not sure that a reasonable jury

2    could make that calculation that it was 50 grams of fentanyl or

3    300 grams of fentanyl.  I'm just not sure how a jury could make

4    that determination.

5         My suggestion would simply to ask them whether it was

6    more than 400.  They find a conspiracy.  The conspiracy involve

7    more than 400.  If they say yes, then you have the appropriate

8    penalties.  If they say no, then you have the lower penalties.

9    If they say there's no conspiracy, then it's all moot.  Let's

10   come back to it.

11        With regard to the security controls for distributor,

12   I've modified that language.  If you look on the new page 66.

13   I dropped a significant portion of the first three paragraphs.

14   It would read:  All registered distributors of controlled

15   substances are also required by law to provide effective

16   controls and procedures to prevent against diversion.

17        Diversion is defined as use of controlled substances

18   for illegal and unlawful medical use.

19        MR. JANEY:  Are you reading from Count One, distribute

20   theory, your Honor?

21        THE COURT:  Yes.  After distribute.  No, the next one.

22        MR. BURNETT:  I think he's reading from the security

23   controls.

24        THE COURT:  Securities control for distributor of

25   controlled substances.  The next one.  It would say -- I'm

M1VBDOU1

going to take out "medical" though.  The first paragraph would

say:  All registered distributors of controlled substances are

also required by law to provide effective controls and

procedures to prevent against diversion.

Diversion is defined as use of controlled substance or

illegitimate and unlawful use.  That's a little awkward

language, but I'll come back to that.

Then I would drop most of the second paragraph and

say, There's not one effective mechanism for compliance.

Additionally under the law, there are no requirements for

specific security measures.

Instead, the distributor has discretion to decide

which measures to implement as part of his duties to prevent

against diversion -- part of the duties to prevent against

diversion.

Distributors also have an obligation to investigate

red flags and report suspicious orders of controlled substances

to the DEA.  I'm taking out what suspicious orders can include

because, quite frankly, I don't think that that's complete.

The government can argue that the example leaves out suspicious

doctor prescriptions.  There are a lot of other things that the

parties can argue about whether or not it does or did support

suspicious orders as determined by RDC.

The next paragraph would simply say, You should look

at whether or not the defendant failed to investigate or to

M1VBDOU1

report suspicious orders to the DEA and continue to ship

controlled substances to his customers. That's pretty much the

case as far as I'm concerned.  I made a small change.

I think the conscious avoidance charge is appropriate,

except that I made a small change with regard to what it

applies to.  The last page, page 75, the first sentence should

read:  If you find that the defendant was aware of a high

probability that controlled substances were being diverted and

sold illegally.  Everything before the comma should come out.

If you find that the defendant was aware of a high

probability, the controlled substances were being diverted and

sold illegally, and that the defendant acted with deliberate

disregard of those facts, you may find that the defendant acted

knowingly.  I think that's the context of which conscious

avoidance would apply to this indictment.

That's pretty much it. What's the government's

position with regard to those issues?

MR. BURNETT:  Your Honor, just a couple small things,

nothing particularly substantive.  I'm just making sure I have

my page records right.

The first one which is just an ordering issue.  I

think the instruction on the quantity should come at the end of

the set of instructions on Count One.

THE COURT:  Let me see where I had put it.  I think it

was just put in the wrong place.  I have that it should be --

M1VBDOU1

1          MR. BURNETT:  I think it would go right before the

2    switch to Count Two.

3              (Continued on next page)

M1v3dou2

1          THE COURT:  Okay.  I think I -- did we have it after

2     the Count One distribute?

3          MR. BURNETT:  At least in the packet I have, right

4     now, it appears right after the section titled "object of

5     conspiracy."  And I think it should instead move to right after

6     the section that's entitled "security controls."

7          THE COURT:  Yes.  I agree.  We'll put it there.

8          MR. BURNETT:  So that's one that I had.  Two other

9     things which I also think are small.  So, the second thing is

10    on the conscious avoidance instruction.  So the paragraph that

11    you were -- or sorry -- the sentence you were reading, the one

12    that begins "if you find the defendant was aware of a high

13    probability."

14         THE COURT:  Yes.

15         MR. BURNETT:  I think with that sentence and the next

16    sentence are correctly doing is distinguishing between

17    knowledge of the object of the conspiracy versus intent to join

18    the conspiracy, which I think is correct.  Just to put a finer

19    point on it, I might propose adding at the end of that sentence

20    you read "with regard to the objects of the conspiracies."  So

21    that way, the sentence would read:  "If you find that the

22    defendant was aware of a high probability that controlled

23    substances were being diverted and sold illegally, and that the

24    defendant acted with deliberate disregard of the facts, you may

25    find that the defendant acted knowingly with respect to the

M1v3dou2

1     object of the conspiracies."

2             THE COURT:  I did consider similar language, except

3     I'm not sure that is true with regard to Count Two.  With

4     regard to Count Two, I think the conscious avoidance is still

5     the same.  It's conscious avoidance of the fact that these

6     drugs were illegally in the streets.

7             MR. BURNETT:  All --

8             THE COURT:  That's not an element of the fraud claim.

9             MR. BURNETT:  I'm not trying to distinguish between

10    the two.  I am trying to put a finer point that the conscious

11    avoidance goes to knowledge of the objects as opposed to intent

12    to join.

13            THE COURT:  That's not accurate as to Count Two.  The

14    object of the conspiracy of Count Two is to defraud the DEA.

15    This does not go to whether he consciously avoided defrauding

16    the DEA.  It goes to whether or not he consciously avoided the

17    fact that these drugs were hitting the street.  If he

18    consciously avoided the fact that these drugs were hitting the

19    street, then he can't say he didn't know he was in a conspiracy

20    to distribute drugs, nor can he argue if he didn't provide that

21    information to the DEA, that he wasn't involved in a conspiracy

22    to defraud the DEA.  But that's not the object of the Count Two

23    conspiracy.

24            MR. BURNETT:  That's fine.  I think the next sentence

25    adequately covers the point, that you can't consciously avoid

M1v3dou2

1  joining the conspiracy, so I think we were okay.  I was trying

2  to draw a distinction there, but I think it's fine.

3          THE COURT:  I deliberately limited it to the knowledge

4  of whether or not these drugs were being illegally sold.  And

5  if he can't argue that, well, I didn't really know, so I

6  couldn't have either conspired to sell drugs or conspired to

7  defraud the DEA, because if I didn't know they were hitting the

8  streets, what I told the DEA didn't really matter.

9          MR. BURNETT:  That's perfectly fine.  I think the

10 second sentence adequately covers the point that I was trying

11 to get at.

12          The third and final comment I have is just with

13 respect to the -- I have it at page 58.  It is titled "Count

14 Two second element membership in the conspiracy."

15          THE COURT:  What page do you have it on?

16          MR. BURNETT:  I have it at 58.

17          THE COURT:  What is it the title?

18          MR. BURNETT:  Titled "Count Two second element

19 membership in the conspiracy."

20          THE COURT:  Yes.

21          MR. BURNETT:  So just two notes.  First, I expect

22 you're probably not reading the titles, but to make clear this

23 wouldn't be exclusively for Count Two.  And then --

24          THE COURT:  I'm sorry.  Let me make sure I have the

25 right page.  Count Two, first element, existence of agreement?

M1v3dou2

1          MR. BURNETT:  I have it as the title here Count Two

2     second element membership in the conspiracy.

3          THE COURT:  What page?

4          MR. BURNETT:  I have it at page 58.  It is probably 60

5     for you, based on the way the page numbers were different.

6          THE COURT:  Count Two and what was your page number?

7          MR. BURNETT:  I have it at 58.  I can show...

8          THE COURT:  Yes.  Okay.  I have it.

9          MR. BURNETT:  Yes.  So just two minor points.

10          THE COURT:  That's the one with the question mark.

11          MR. BURNETT:  Exactly.  I assume you're probably not

12     reading titles.  I think this applies to both conspiracies, not

13     just Count Two.  In the question, the last line, it says

14     something he wished to bring about.  I'd propose changing it to

15     intended to bring about, just to track the statutory language.

16          THE COURT:  I don't have a strong feeling one way or

17     the other about that.  Defense, do you prefer that language?

18          MR. JANEY:  Yes, your Honor.

19          THE COURT:  Intended to bring about.  Make that

20     change.

21          MR. BURNETT:  That's all from the government.

22          THE COURT:  Defense?

23          MR. JANEY:  Thank you, your Honor.  There are several,

24     your Honor.  So if I can, just one while we're on it.  This is

25     security controls for distributors of controlled substances.

M1v3dou2

1  The last paragraph there, your Honor, the version I have reads

2  "You should look at whether or not the defendant failed to

3  investigate or report suspicious orders to the DEA and

4  continued to ship the controlled substances to his customers."

5  It leaves out what I think is the heart of the question for the

6  jury to consider, and that is, that that happened knowing that

7  these customers were participating in illicit activity.  It

8  doesn't say that though as it's written, and that's the crime.

9          THE COURT:  Hold on a second.  What page are you on?

10         MR. JANEY:  Security controls for distributors of

11  controlled substances.

12         THE COURT:  What page is that.

13         MR. JANEY:  I have it as 64.

14         THE COURT:  I have -- 63 as Count One is distribute.

15         MR. JANEY:  I have it at 64.

16         THE COURT:  I have it.  So you are saying what?

17         MR. JANEY:  In the last paragraph there, your Honor,

18  it reads, "You should look at whether or not the defendant

19  failed to investigate or to report suspicious orders to the DEA

20  and continued to ship the controlled substances to his

21  customers."

22         THE COURT:  I'm sorry.  Where is that?

23         MR. JANEY:  In the last paragraph in that section.

24         THE COURT:  Security controls for distributors of

25  controlled substances?

M1v3dou2

1           MR. JANEY:  Yes, sir.

2           THE COURT:  The last paragraph?

3           MR. JANEY:  Yes, it begins should look at --

4           THE COURT:  I have it.

5           MR. JANEY:  No problem, your Honor.  There, in the

6     last paragraph there as it reads, it just strikes me, your

7     Honor, as written, it leaves out the heart of the issue, and

8     that is whether the defendant had knowledge that these

9     pharmacies were participating in the illicit activity.  It

10    simply suggests that you should look at whether or not the

11    defendant failed to investigate or to report suspicious orders

12    to the DEA and continued to ship the controlled substances.

13    What's required in addition to that is that he had knowledge

14    that the pharmacies to, who were buying the drugs were

15    participating in illicit activity.

16          THE COURT:  You want me to add knowingly and

17    intentionally?

18          MR. JANEY:  Knowingly and intentionally of the --

19    something along the lines of the objects of the conspiracy or

20    of the underlying crime.

21          THE COURT:  No.  Knowingly intentionally failed to

22    investigate or to report suspicious orders to the DEA and

23    continued to ship the controlled substances to his customers.

24          MR. JANEY:  Yes, your Honor.

25          THE COURT:  Do you have any objection to that?

M1v3dou2

1          MR. BURNETT:  No, your Honor, that's fine.  As we

2    stated in our letter, we don't have any objection to cutting

3    this instruction if the defense still wants to cut it.  But

4    we're fine with that revision as well.

5          THE COURT:  It is easier to fashion it the way I

6    fashioned it rather than to rewrite it.  Unless you want to

7    forgo any instruction with regard to this.

8          MR. JANEY:  I'm fine with that qualification, your

9    Honor.

10          THE COURT:  Anything else?

11          MR. JANEY:  Excuse me just a moment, your Honor.  Can

12    I just clarify what the government's position is on that

13    section?  Was the government's position to cut the entire --

14          MR. BURNETT:  Yes.  I think you had proposed a version

15    of this instruction originally and in your letter suggested

16    cutting this.  We said we would be fine with it.

17          THE COURT:  You want to cut the whole thing?

18          MR. JANEY:  We'd cut the whole thing.

19          MR. BURNETT:  We can cut this page.

20          THE COURT:  Just cut that whole instruction?

21          MR. JANEY:  Yes, sir.

22          MR. BURNETT:  Just the page that's titled "security

23    controls."

24          THE COURT:  That's two pages.

25          MR. BURNETT:  I just have it as one.

M1v3dou2

1          THE COURT:  Maybe because I cut it down.

2          MR. JANEY:  I have it as one page.

3          THE COURT:  I cut it down.  That's the whole

4    instruction?  All right.  Then we'll strike the whole thing.

5          MR. JANEY:  I consider that the actual instruction

6    itself.

7          THE COURT:  All right.

8          MR. JANEY:  On the conscious avoidance instruction,

9    your Honor, and I understand your Honor's comments earlier when

10   you were going through it.  But I believe there is some need

11   for further clarification.  Let me see if I can put it in

12   context, and to some degree it is sort of a reaction, given the

13   government's response over the weekend.

14          The government's objection to some of the edits, the

15   requests that we had with respect to the second element in

16   membership in the conspiracy, in terms of how we were

17   describing knowledge, we described knowledge and proposed

18   language that said actual knowledge.  Government's response was

19   we object to that, because there is an aspect where we want to

20   be free to argue conscious avoidance.  We were talking in the

21   context of membership in the conspiracy.  I think potentially

22   the government's confused.  You can't use conscious avoidance

23   to establish knowledge from membership in the conspiracy.

24          THE COURT:  Right.

25          MR. JANEY:  Right.  So, I take that objection and set

M1v3dou2

1    it aside because it's not well founded.

2            THE COURT:  That's not what the conscious avoidance

3    charge as currently worded instructs.

4            MR. JANEY:  Well, but my confusion, your Honor, and it

5    just may be my confusion.  It's not clear from the first

6    paragraph how the jury is to consider the application of the

7    conscious avoidance instruction.  In other words, it doesn't

8    set forth at the beginning some language to indicate that the

9    conscious avoidance instruction is not applicable for

10   consideration when they are determining whether the defendant

11   had knowledge insofar as the joining the conspiracy.  As

12   written, I believe a juror could interpret that, broadly

13   speaking, that conscious avoidance to apply both to the

14   membership and the conspiracy, as well as to the objectives of

15   the conspiracy.  It is just not clear.

16           THE COURT:  I don't have any problem being as specific

17   in the first paragraph as we are in the next to last paragraph.

18           MR. JANEY:  Thank you, your Honor.

19           THE COURT:  Saying as I just instructed you the

20   government must prove beyond a reasonable doubt that the

21   defendant acted knowingly.  If defendant lacked knowledge that

22   controlled substances were being diverted and sold illegally,

23   you must find him not guilty.  Even if the government proves

24   that the only reason the defendant lacked such knowledge is

25   because he was careless, negligent or even foolish in failing

M1v3dou2

1    to obtain it.

2              In determining whether the defendant acted knowingly,

3    you may consider whether the defendant deliberately closed his

4    eyes to what would otherwise have been obvious to him.  If you

5    find beyond a reasonable doubt that the defendant acted with,

6    or that the defendant's ignorance was solely and entirely as a

7    result of the conscious purpose to avoid learning the truth,

8    then this element may be satisfied.  However, guilty knowledge

9    may not be established by demonstrating that the defendant was

10   merely negligent, foolish or mistaken.

11             If you find that the defendant was aware of a high

12   probability that controlled substances were being diverted and

13   sold illegally, and that the defendant acted with deliberate

14   disregard of those facts, you may find the defendant acted

15   knowingly.

16             MR. JANEY:  Thank you, your Honor.

17             THE COURT:  Government have any problems with that?

18             MR. BURNETT:  No objection.

19             MR. JANEY:  Now let me see if I can venture into

20   something that is a bit more detailed, your Honor, and I'm

21   looking at Count One, distribute, which I have as page 61.  I'm

22   going to wait for your Honor to get there before I start

23   speaking.

24             THE COURT:  I have it.  Is that the object of the

25   conspiracy?

M1v3dou2

1          MR. JANEY:  Count One, distribute.

2          THE COURT:  Okay, yes.  I have that.

3          MR. JANEY:  Okay.  So, let me see if I can put some of

4    this in context, your Honor, so that I'm clear as to what my

5    concern is.

6          So, to be clear, the defense doesn't dispute that a

7    person, any person along the pharmaceutical value chain that

8    distributes controlled substances without a legitimate medical

9    purpose can be found guilty of violation of law.  That's not

10   the issue.

11         The defense doesn't dispute that the jury is entitled

12   to take into consideration all of the evidence, including

13   evidence about red flags, held orders, customer due diligence

14   at RDC, when it is considering whether Larry Doud intentionally

15   and knowingly illegally distributed controlled drugs.

16         THE COURT:  He's not charged with illegally

17   distributing drugs.  He's charged with a conspiracy to do so.

18         MR. JANEY:  I'm sorry, your Honor, you're correct and

19   I said it inartfully.  I'm trying to eliminate, make clear to

20   the Court that --

21         THE COURT:  That may be the critical distinction.

22   That's why I'm not clear on the point.

23         MR. JANEY:  The critical issue for us with respect to

24   how this section, this instruction is written, is language

25   about RDC that a reasonable juror could infer that that

M1v3dou2

language, to the extent that they believe that RDC has

committed a violation of law, that they are finding the

defendant guilty because they believe that the entity, who is

not charged in the indictment, who has not been presented as a

co-conspirator in this case, because the entity committed a

crime in the mind of the jury --

            THE COURT:  Do you want me to name Mr. Doud or name

the defendant as the person --

            MR. JANEY:  My concern, your Honor, for example, is

the language in the second paragraph toward the end, a

registered distributor is required to, among other things,

maintain effective controls against diversion of controlled

substances into other than legitimate medical channels.

            THE COURT:  You want me to say Mr. Doud was required

to do that?

            MR. JANEY:  I think the sentence should be struck.

            THE COURT:  Isn't that true?

            MR. JANEY:  Well, it is true.  But it is not --

            THE COURT:  Isn't that the object of the conspiracy?

            MR. JANEY:  Well --

            THE COURT:  As the government has alleged it?

            MR. JANEY:  I read the indictment, your Honor, to say

that Mr. Doud in Count One, for example, knowingly and

intentionally participated in a conspiracy to distribute

narcotics without a legitimate medical purpose.

M1v3dou2

```
1            THE COURT:  That's exactly what he's charged with.

2            MR. JANEY:  It says Mr. Doud.  It doesn't say anything

3   about RDC.

4            THE COURT:  If you want me to make it personal to

5   Mr. Doud?  I'm not sure why you would prefer that.  But, what

6   I'm saying is I am just saying it generically.  This is what a

7   distributor's obligations are.  And distributor is defined, I

8   don't have to define it.  Distributor means the company, and it

9   means the person in the company who is making those decisions.

10           MR. JANEY:  What it goes on to say, your Honor, and

11  where I think it is potentially confusing and unfairly

12  prejudicial on the next page, it says distributors, and I'll

13  put ellipses because it says distributors or their employees

14  who sell controlled substances in a manner not authorized by

15  their registration and not in conformity with the law may be

16  found guilty of a --

17           THE COURT:  Where are you?

18           MR. JANEY:  On the next page, the last sentence.

19           THE COURT:  On 65?

20           MR. JANEY:  I have it as 62, your Honor.

21           THE COURT:  Where are you reading from?

22           MR. JANEY:  On 62, the language at the top of the

23  page, the first word is distributor.

24           THE COURT:  Right.

25           MR. JANEY:  And I'm reading from the last sentence in
```

M1v3dou2

1      that carryover paragraph.

2                  THE COURT:  In that paragraph?

3                  MR. JANEY:  Yes, sir.  Where it says by contrast.

4                  THE COURT:  By contrast distributors or their

5      employees?

6                  MR. JANEY:  Right.

7                  THE COURT:  I'm not sure how else you want me to say

8      that, other than saying distributors and Mr. Doud.  He is an

9      employee of the company.  He's got that same responsibility.

10                  MR. JANEY:  Well, you know, I'm not so sure that

11     Mr. Doud personally has the same responsibility --

12                  THE COURT:  He does.  Every one of those individuals

13     who they claim and can prove are co-conspirators had that

14     responsibility.  RDC only acts through individuals.  And those

15     individuals can't conspire, distributors or their employees who

16     sell controlled substances in a manner not authorized by their

17     registration and not in conformity with the law may be found

18     guilty of illegally distributing controlled substances.

19                  Is that an incorrect statement of law?

20                  MR. JANEY:  It's not an incorrect statement of the

21     law, your Honor.  The concern that I have is that RDC has its

22     own legal personality, whether or not it has committed a crime

23     has not been an issue in this trial.

24                  THE COURT:  The only way I can help you is say those

25     who sell controlled substances -- and I'm not sure that helps

M1v3dou2

1    you.  I mean, I'm trying to make sure that -- they have to

2    find, they have to know what Mr. Doud's obligations are, he has

3    obligations personally, and he has obligations acting on behalf

4    of the RDC.

5            MR. JANEY:  Give me one second, your Honor.

6            THE COURT:  Yes.

7            MR. JANEY:  We'll leave it alone, your Honor.

8            THE COURT:  I'm not sure that I can help you by being

9    more specific.  I'm trying to give you both the opportunity,

10   they can argue that the proof demonstrates that Mr. Doud was

11   personally involved in it and you can argue that he was

12   unaware.  He didn't have the knowledge.

13           MR. JANEY:  Thank you, your Honor.

14           THE COURT:  That doesn't change what the company's

15   obligations are and what his obligations are if he does have

16   that knowledge.  All right.

17           Anything else?

18           MR. JANEY:  I think the other concerns are taken care

19   of, your Honor.  Just one minor thing.  On the substantive

20   charge.  We had proposed language, the substantive charge, I

21   don't know the new page on it, your Honor.  I'm sorry, bear

22   with me.  I guess it's on page 46.

23           THE COURT:  You had proposed which line?

24           MR. JANEY:  I'm sorry, your Honor.  I didn't hear you.

25           THE COURT:  You had proposed what language?

M1v3dou2

1              MR. JANEY:  With respect to the beginning language in

2      Count One, as well as in Count Two, we had proposed that it use

3      the language intentionally and knowingly.

4              THE COURT:  I think I did respond to that, both sides

5      requested that.  I think I appropriately said where it's

6      appropriate knowingly and intentionally and where appropriate

7      tracking the statute willfully and defined all of those terms.

8              MR. JANEY:  I apologize.  I don't see that on the

9      substantive charge instruction in my hand.

10             THE COURT:  On the substantive charge?  Okay.

11             MR. BURNETT:  The one with the box on top.

12             THE COURT:  Which one?

13             MR. BURNETT:  The one that has the box.

14             THE COURT:  What page?

15             MR. JANEY:  It doesn't have a page number on it.  But

16     I believe it is page 46.

17             THE COURT:  Is that right?

18             MR. BURNETT:  I don't have a page number either.

19             THE COURT:  So what is your -- I'm sorry.  What is

20     your objection?

21             MR. JANEY:  My request, your Honor, consistent with

22     what we had submitted, is that it read Count One of the

23     indictment charges the defendant with intentionally and

24     knowingly entering into the conspiracy.

25             THE COURT:  I thought that it is almost exactly the

M1v3dou2

1    language you already have.

2          MR. JANEY:  It doesn't say that in the version that I

3    have, your Honor.

4          THE COURT:  I'm confused.

5          MR. JANEY:  Can I hand this up, your Honor?

6          THE COURT:  Yes.  I have "Membership in the

7    conspiracy.  Ultimately the question is this.  Has the

8    government proven beyond a reasonable doubt that the defendant

9    knowingly and intentionally joined the conspiracy charged and

10   participated in it with the awareness of its unlawful purpose

11   and as something he intended to bring about."

12         MR. JANEY:  I am reading from a different page, your

13   Honor.

14         THE COURT:  Okay.

15         MR. JANEY:  On the substantive charge.

16         THE COURT:  All right.

17         MR. JANEY:  What we had proposed is both with respect

18   to Count One and Count Two, to indicate in that first sentence

19   that he knowingly and intentionally joined the conspiracy.

20   Then it would just track and harmonize with the rest of the

21   instruction, your Honor.  And then in fact, it would track the

22   indictment specifically with that requested modification.

23         THE COURT:  But at the beginning of the second

24   element, and that's what we're talking about?

25         MR. JANEY:  Yes.

M1v3dou2

1          THE COURT:  The very first paragraph says "The second

2     element which the government must prove beyond a reasonable

3     doubt to establish the offense of conspiracy is that the

4     defendant knowingly and intentionally became a member of the

5     conspiracy."

6          MR. JANEY:  I agree, your Honor.  I am just asking on

7     the substantive charge, because they'll hear it first, that

8     that tracks the indictment in the same way, and I believe then

9     if that change is made to the substantive charge, it will be

10    consistent and harmonize with the instruction when you get to

11    the membership, the second element that your Honor was just

12    reading.  Because otherwise --

13         THE COURT:  I think you're making it more confusing.

14    The substantive charge starts out saying the defendant is

15    charged with -- you know what.  I'm not going to dispute this

16    with you.  I tried to make the charge broad enough so that it

17    includes knowing, intentional and willful.  But, you want

18    knowing and intentional in this.

19         MR. JANEY:  I'm looking at the superseding indictment,

20    your Honor, and it is what it says intentionally and knowingly

21    did...

22         THE COURT:  If you want me to say at the beginning of

23    that page the defendant is charged with knowingly and

24    intentionally participating in two separate conspiracies, I'll

25    do that.

1        MR. JANEY:  Thank you, your Honor.

2        MR. BURNETT:  No objection.

3        MR. JANEY:  If I can take back my copy.  Thank you.

4        THE COURT:  Is that his copy?  I'm sorry.  I just

5   wrote on your copy.

6        MR. JANEY:  That's okay.  I'll take the autograph.

7   Nothing further from the defense.

8        THE COURT:  Anything further from the government?

9        MR. BURNETT:  No, your Honor.

10        THE COURT:  I want to get this together.  So, let's

11   organize yourself, and we'll bring the jury out at 11 o'clock

12   and have summations.  What did you want to do about the verdict

13   form?  You want the old version?

14        MR. BURNETT:  Our preference is to leave it in still

15   as we had originally with the no weight, 40, 400.

16        THE COURT:  I'll put that in and then I'll put the

17   instruction appropriate to that.

18        (Recess)

19        (Jury present)

20        THE COURT:  All right.  Ladies and gentlemen, you've

21   heard all of the witnesses for the parties.  At this stage

22   we're going to go to the summations or closing arguments of the

23   lawyer, let me just remind you of two things before we begin.

24   One, what the lawyers say is not evidence.  And two, it is your

25   recollection of the testimony that controls.  So with those two

reminders, we'll first start with the closing argument for the

government by Mr. Roos.

          MR. ROOS:  Thank you, your Honor.

          Good morning.  Two weeks ago Mr. Burnett stood here

and told you what the evidence in the case would prove.  Now

you've seen and heard the evidence and you know it proves the

defendant is guilty.

          It began about 300 miles from here, in Rochester, New

York.  In the executive suite of a corporate office building,

Larry Doud made a decision.  He made many deliberate decisions.

He decided that in the last few years before he'd retire to

Florida, he would open doors of his company to new business,

he'd increase sales to existing customers, he would bring on

new big pharmacy customers specializing in controlled

substances, which would boost his company's sales, new

pharmacies that he knew had been cut off by Doud's competitors,

new pharmacies that would be up and running with little more

than a credit check and he'd feed all their demands.

          It did not matter, in his words, if they were good or

bad.  It did not matter that they were buying skyrocketing

amounts of oxycodone.  It didn't matter that a single pharmacy

would clear out his company's whole supply of fentanyl.  It

didn't matter that these pharmacies were filling prescriptions

for doctors on watch lists, arrested doctors, in cash, for

patients traveling from hundreds of miles away, coming for

M1v3dou2                         Summation - Mr. Roos

1    oxycodone, coming for fentanyl.

2            And it did not matter there was an opioid epidemic,

3    that thousands of lives were being lost to addiction, that some

4    of these drugs that the defendant were was selling was

5    destroying this very city, New York City.  The defendant was

6    supplying the independent pharmacies that were giving out pills

7    to people selling drugs for cash.  People suffering from

8    addiction, people like Barbara Castro, New Yorkers who had

9    their lives destroyed by addiction.

10           It did not matter to the defendant that his own

11   employees were telling him it was wrong.  They had a computer

12   system in place to hold suspicious orders.  He ordered them to

13   override it.  He demanded orders be released.  They had written

14   policies to prevent diversion, policies written by lawyers,

15   policies provided to DEA agents.  He told them not to follow

16   it.  He knew that his company was supposed to report suspicious

17   orders to the DEA, but he told his employees not to.  Even

18   though his compliance department saw sales and dispensing at

19   those pharmacy customers that made them feel sick.

20           Larry Doud commanded that they keep feeding their

21   customers' growing demand.  That they keep feeding that

22   sickness.

23           He did it for money, so that his company would make

24   money, so that Larry Doud would make money.  To him, there was

25   "no return on what compliance was doing."  Bad for business.

M1v3dou2                        Summation - Mr. Roos

1          And while his company's drugs were making communities

2     sick, and while his company's customers' sales practices were

3     making his employees sick, what made Larry Doud ill was losing

4     money to compliance.

5          By providing a full range of products, including

6     oxycodone and fentanyl, to bad pharmacies, pharmacies that had

7     been cut off by other competitors, other distributors, Larry

8     Doud was able to win their business.  He grew his company's

9     sales, he grew his bonus by taking on and selling to bad

10    customers.  His retirement.  And thanks to the way he

11    approached compliance, he made about $100,000 a year just from

12    selling controlled substances.  Half a million dollars in

13    total.  And he made thousands of dollars more because he was

14    willing to supply pharmacies that no one else would.  And

15    that's why we are we're here.

16         Today, my job is to walk you through the evidence you

17    heard and saw and explain how it matches up with the law.  What

18    you see here on the screen, that's an outline of what I'm going

19    to talk about today.  As you know, there are two charges in the

20    case, in the indictment.  First, conspiracy to distribute

21    controlled substances, specifically oxycodone and fentanyl

22    unlawfully.  And second is conspiracy to defraud the Drug

23    Enforcement Administration or DEA.  And I'll talk also briefly

24    about some of the claims defense counsel has made during this

25    trial.

M1v3dou2                     Summation - Mr. Roos

1            All right.  Count One is where we'll start.

2    Conspiracy to distribute controlled substances unlawfully.

3    Now, in this closing I have to talk about the law a bit.  But

4    I'm just talking about what I expect Judge Daniels will tell

5    you or will say about the law.  If he says anything different

6    than what I say, it's his instructions that matter.

7            On the slide are what is called elements of the crime.

8    Elements are just the parts of the crime.  If the evidence

9    proves each element beyond a reasonable doubt, then the

10   defendant is guilty of that crime.

11           For the first crime there are two elements:  The

12   existence of a conspiracy to distribute controlled substances

13   unlawfully; and second, that the defendant knowingly and

14   intentionally became a member of that conspiracy.

15           Let's start with the first element.  Was there an

16   agreement between two or more people to distribute drugs

17   unlawfully?  There are a few parts to this, so I want to break

18   it down.  Start with the agreement.  What was it about?

19   Distributing drugs unlawfully.  I expect Judge Daniels will

20   tell you that "distribute" simply means delivering or selling.

21   And obviously, that happened here because RDC is a distributor

22   of controlled substances.  That's literally what the company

23   was registered to do.  It sold hundreds of thousands of

24   oxycodone pills, over 11,000 grams of fentanyl, it made

25   millions of dollars in opioid sales.

M1v3dou2                    Summation - Mr. Roos

1          And I expect Judge Daniels will tell that you a

2     company like RDC that distributes controlled substances like

3     those drugs is required to maintain effective controls against

4     diversion.  And you heard that throughout this trial.  That

5     shouldn't surprise you.  You heard it from people like Ruth

6     Carter who headed up the Antidrug Diversion Group at the DEA.

7     And you heard it from RDC employees like Jessica Pompeo.

8          So the question is, was at least some of RDC's

9     distribution of controlled substances unlawful?

10         And I expect Judge Daniels will tell you what's up on

11     the screen here.  Distribution of controlled substances is

12     illegal when the distributor ships controlled substances

13     without maintaining effective controls and procedures to guard

14     against those controlled substances they sell being diverted

15     outside of legitimate medical channels or without attempting to

16     do so in good faith.  And also distribution of controlled

17     substances is illegal when the distributor does not distribute

18     controlled substances to be dispensed by doctors and

19     pharmacists in the regular course of professional practice and

20     for legitimate medical purpose, or does not attempt to do so in

21     good faith.

22         So there was a ton of evidence in this case about RDC

23     not maintaining effective controls against diversion or

24     attempting to do so in good faith.  There was also a lot of

25     evidence about RDC selling controlled substances to pharmacies

M1v3dou2                        Summation - Mr. Roos

that were not dispensing controlled substances for legitimate

medical reasons.  And there was also a lot of evidence, by the

way, about this defendant and his employees failed to

investigate or report suspicious orders and continued knowing

what was going on to ship to those pharmacies.

        Let's start by walking through all of that evidence.

Let me say at the outset, this is a point that has not been

meaningfully disputed during trial.  For almost every pharmacy

we've talked about, there has been a lot of evidence that the

pharmacy was really bad.  No one was saying they were

particularly good.

        On the screen is Government Exhibit 904.  Professor

Cutler did an analysis of 41 pharmacy customers in New York,

and found the vast majority displayed significant red flags.

And that's just a small sample of how many pharmacies RDC was

selling to.  Many of the names of these pharmacies are now

pretty familiar to you I think.  Old Town Pharmacy, Regal

Remedies, ProHealth, Bay Ridge, Seventh Elm, Linden Care.

        The pharmacies filled many prescriptions for

controlled substances, in particular Schedule II controlled

substances like oxycodone and fentanyl.  And many times a

significant percentage of the customers came from out of state.

They were filling prescriptions written by doctors that were

flagged on RDC's suspicious or arrested watch list.  The

prescriptions for large quantities of pills, and a large

M1v3dou2                    Summation - Mr. Roos

1    percentage of their customers paid in cash.

2           Now, I'm not going to go through all of RDC's

3    customers, not even all the ones in the case study.  They are

4    in evidence and you folks have been paying close attention

5    throughout the trial.  And also, frankly, it's not necessary

6    for you to decide whether every single one of RDC's pharmacy

7    customers were good or bad.

8           Remember what Ruth Carter said at page 94 of the

9    transcript.  You can't do even a little bit of diversion

10   knowingly.  It is illegal to sell controlled substances to

11   someone who is diverting them.  It doesn't matter, it doesn't

12   need to be every one is diverting them.

13          Let me give you a simple example.  Say you've got a

14   pharmacist run a nice pharmacy, beautiful pharmacy.  Sells a

15   bunch of oxycodone pills to a drug dealer that doesn't need

16   them.  He's not free to do that just because he follows the law

17   for everyone else.  He can't say, you know, listen, nine times

18   out of 10, I follow the law.

19          I mention this because I expect defense counsel is

20   going to tell you about how there were a bunch of pharmacies

21   that didn't do bad stuff.  Or there were pharmacists that were

22   doing bad stuff, and then RDC stopped selling to them.  And

23   that may be true.  But that doesn't mean that Larry Doud and

24   his company were free to sell controlled substances to even a

25   single pharmacy that were diverting pills.

1          So here is the plan.  I am going to give you a few

2    examples of the pharmacies RDC was selling to.  The evidence

3    that RDC, the company, was selling controlled substances

4    unlawfully, and that RDC's employees, including Doud, knew

5    about it.  And then we'll get into the key element that Doud

6    knowingly and intentionally joined that conspiracy with other

7    RDC employees.

8          So let's get to work.  The first example I want to

9    talk is Old Town Pharmacy.  that's the pharmacy that Barbara

10   Castro went to which was supplied by Doud's company.

11         You remember Ms. Castro.  In the 1990s, she got

12   addicted to opioids.  She didn't seek them out.  She had a

13   medical condition, was prescribed a painkiller, and became

14   addicted.  This is an all too common story.  We heard through

15   this trial about how millions of Americans have been prescribed

16   opioids for medical procedures.  The tragedy of the opioid

17   epidemic is while these drugs are used following surgeries,

18   totally legitimately, some people like Ms. Castro become

19   addicted through no fault of their own.  And once addicted, as

20   Ms. Castro told you, she like thousands of other New Yorkers

21   suffering from addiction, sought out more opioids.  She got

22   those prescriptions from dirty doctors like Carl Anderson and

23   David Taylor and Felix Lanting, names that RDC saw over and

24   over again, and you've learned through this trial.

25         Make no mistake.  These dirty doctors were drug

M1v3dou2                        Summation – Mr. Roos

1   dealers.  They saw their customers in the dead of night,

2   without an appointment, or with bodyguards flanking their

3   offices.  They took cash, they kept it in their socks, they saw

4   multiple people in the exam room.  They were all dispensing

5   oxycodone and fentanyl and other opioids, and they weren't

6   running legitimate medical practices.  They literally were just

7   selling these pills to people who were coming in with cash.

8   Everyone in the exam room was there for the same reason.  These

9   doctors were drug dealers in lab coats.  Many later got

10  arrested.

11          And RDC knew about it because they were keeping a

12  spreadsheet tracking it.  RDC kept a list of these people.

13  Thousands of doctors' names kept on a spreadsheet the

14  compliance department was tracking.

15          This is just an example up on the screen.  They were

16  flagging them as suspicious, flagging them as arrested or on a

17  do not fill list or a watch list.  And they were keeping track

18  of which RDC pharmacies they were going to.

19          So going back to Old Town Pharmacy.  It was filling

20  prescriptions for tons of these dirty doctors, and the people

21  at Doud's company knew it.  Here is an e-mail from Jessica

22  Pompeo to Bill Pietruszewski and Julius Morton in

23  November 2014.  It's Government Exhibit 104B.

24          And by the way, if you want to see any of the

25  government exhibits or any of the exhibits in the trial, I've

M1v3dou2                    Summation - Mr. Roos

1    got the little stickers on the bottom of each of these slides

2    so you can call for it after.

3             Here is what they say.  Do you happen to notice all

4    the cash transactions?  Over 40 percent.  I see multiple

5    doctors that are on my suspicious list as well as couple of the

6    DEA watch list.

7             When you look at the watch list, which is Government

8    Exhibit 267, you see it's the same, some of the same doctors

9    Barbara Castro was going to.  Dr. Anderson, David Taylor -- and

10   by the way, the thing about that list is they didn't use it

11   actually to stop selling to particular pharmacies.  That's the

12   whole problem here.  They were flagging these pharmacies as

13   filling for these bad doctors, and then they just kept selling

14   to them, kept filling their prescriptions.  But despite the red

15   flags that the compliance department was seeing in 2014 with

16   Old Town, RDC just kept shipping opioids to Old Town Pharmacy.

17            This is Government Exhibit 908.  From the middle of

18   2012, as you can see on your screen, until shortly after Larry

19   Doud left RDC, RDC just kept shipping opioids to Old Town.  RDC

20   kept shipping even after Jessica Pompeo flagged in

21   November 2014, as you can see on your screen, multiple

22   suspicious doctors and high cash.

23            And nothing changed at Old Town as RDC kept shipping.

24   Here is an e-mail from April 2016, Government Exhibit 104C.

25   And what did RDC's compliance department see?  High cash.

Higher than we'd like to see, especially considering the

doctors.  Suspicious prescribers like Joseph Olivieri, Nkanga

Nkanga, Emmanuel Lambrakis, and of course Carl Anderson.

          Here is this chart again.  Doud's company kept

shipping after those red flags we saw in April 2016, and notice

the red on this chart.  That means RDC's computer system

flagged some of these orders as suspicious because of their

quantity and held them.  But RDC released the orders.  That's a

theme we are going to come back to.

          As you can see, even though RDC's compliance

department kept flagging the same doctors year after year, saw

high cash and saw order limits being exceeded, it kept

shipping.  In fact, there were tons of red flags in the

dispensing for Old Town Pharmacy that RDC's compliance

department was looking at.  High pill counts, high cash.  And

this part is really pretty unbelievable.  55 percent of the

prescriptions for these opioids are written by the flagged

doctors on RDC's watch list.  That's what's at the bottom

there.

          Old Town Pharmacy was diverting controlled substances.

It was obvious if you were in the store.  As Barbara Castro

told you, most of the customers were coming from a doctor's

office, Dr. Anderson's office from the night before or the

morning.  And after they got their oxycodone prescriptions from

Carl Anderson at 2 a.m., without an appointment, without a

M1v3dou2                     Summation – Mr. Roos

1    medical need, they went right over to Old Town.  And everyone

2    at Old Town had to pay cash for their oxycodone.  That's why

3    the cash was so high.  Old Town was printing money selling to

4    people like Barbara Castro, people that were visibly addicted

5    to drugs, who had track marks, who had no clear injuries that

6    would require oxy and who were selling her pills.

7             The employees at RDC knew all of this.  They saw the

8    dirty doctors, they saw the prescriptions for 30 milligram

9    oxycodone, they saw the growing sales, they saw the cash

10   payments.  But it wasn't until 2017, after Doud left the

11   company, that they reported the pharmacy to the DEA.  They

12   never filed a suspicious order report through all the years

13   Doud was at the company.  And RDC never terminated or suspended

14   Old Town while Doud was at the company, despite all these red

15   flags.

16            Let's do another example.  Regal Remedies, the

17   pharmacy owned by Michael Paulsen who testified up there last

18   week.  Now, there is absolutely no doubt that Michael Paulsen

19   and Regal Remedies were diverting controlled substances.  There

20   is no doubt because the guy who ran Regal Remedies literally

21   sat there and told you under oath that he was diverting

22   controlled substances.  Page 1438 of the transcript.  He

23   testified, I basically diverted oxycodone and other pills,

24   conspiracy.  And he did that at Regal Remedies until he got

25   arrested.

M1v3dou2                    Summation - Mr. Roos

```
1        Paulsen opened Regal Remedies in March 2016.  His

2   supplier was RDC.  He was able to open an account quickly.

3   Just filled out a credit application and he was able to

4   purchase controlled substances.  He started buying oxycodone,

5   Percocet, fentanyl.  And Paulsen testified that when he opened

6   the shop, he wasn't trying to divert controlled substances.

7   But, he started getting a lot of customers and oxycodone

8   prescriptions.  Young guys coming in with cash, from doctors

9   like, again, Carl Anderson, Nkanga Nkanga, David Taylor.

10   75 percent of the prescriptions he said were coming from those

11   doctors.  Many of them looked young and healthy he said.

12   Others looked like they were addicted to drugs.

13        Of course, Paulsen said his goal wasn't to divert

14   controlled substances, but he knew what these customers were up

15   to, so he kept selling them drugs.  And while his pharmacist

16   slept in the back, he filled prescriptions for oxycodone and

17   fentanyl for cash.  And sometimes he sold pills to people who

18   didn't even have prescriptions.

19        RDC knew all about what was going on at Regal

20   Remedies.  This Government Exhibit 103 A.  In November 2016,

21   RDC's compliance department saw the problems in Regal Remedy's

22   dispensing report.  21 percent cash, high oxy counts, written

23   by those suspicious doctors like Tesher, Pietropinto, Olivieri

24   and Taylor.  Many of the same names we were seeing at Old Town

25   Pharmacy.
```

1          Look what happened.  Government Exhibit 908.  RDC kept

2     selling controlled substances to Regal Remedies, even after the

3     compliance department identified all those red flags of

4     diversion.  They kept selling to Regal Remedies even after the

5     compliance department recommended to upper management, Larry

6     Doud and Joe Brennan, that they terminate sales to Regal

7     Remedies.

8          That's what the reference to Government Exhibit 103B

9     is on this chart.  November 2016.  The first box.  Let's look

10    at that e-mail.  Here is that e-mail.  The compliance

11    department tells Larry Doud and Joe Brennan that Regal Remedies

12    should "be suspended from ordering controlled substances."  You

13    might remember this e-mail, by the way.  The attachment was the

14    one that defense counsel put up on the screen that said Larry

15    Doud isn't on this.  Of course you had seen Larry Doud was on

16    the top e-mail to which the attachment is listed.

17         And RDC didn't terminate or report Regal Remedies

18    while Doud was at the company, despite the compliance

19    department's recommendation that they suspend or terminate.  It

20    wasn't until Doud left the company in 2017 that RDC reported

21    Regal Remedies to the DEA, suspended sales, and ultimately

22    terminated it.  Paulsen told you about that.  In 2017, RDC

23    suspended sales, sent a new outside compliance company.  It was

24    such a change that Paulsen had to start doctoring the

25    dispensing reports and lying to RDC to get pills.  And RDC's

1    compliance department then terminated his stores.

2         Let's just pause here and note the significance of

3    that.  Paulsen didn't need to lie or doctor his dispensing

4    reports while the defendant was at the company.  They were just

5    willing to send him pills no matter what.  It wasn't until the

6    compliance department tightened up, after the defendant left

7    the company, that the drug dealer who testified last week

8    started having to lie to his supplier.  Because it was only

9    then they were implementing compliance procedures.

10        We've seen many other stores like Old Town and Regal

11   Remedies.  Take ProHealth pharmacy in Manhattan.  Millions of

12   dollars in controlled substances, high percentages of

13   controlled substances, shipping flagged orders, high cash, high

14   amounts of cash for oxy, many out of state prescriptions,

15   massive pill counts, and a large percentage of flagged doctors.

16   The employees at RDC knew all about this, including Doud, but

17   didn't do anything to stop it.

18        As soon as the ProHealth account was opened, they had

19   high Schedule II controlled substance sales.  The salesmen told

20   that to Doud.  RDC kept shipping controlled substance orders,

21   and they kept getting bigger, generating orders of interest

22   that were being held by RDC's computer system.  But even though

23   RDC's compliance department didn't like their dispensing, and

24   that's a quote, and was saying not to release any more orders,

25   another quote, RDC kept shipping the drugs.  Over and over the

M1v3dou2                    Summation - Mr. Roos

1    compliance department raised concerns.

2            Here is another one from October 2015.  I would not

3    release any more oxy to this account.  Their exhibited

4    dispensing to these prescribers noted is very disturbing.

5            Here is another one.  Government Exhibit 106E.

6    ProHealth ordering a staggering 28,600 units, making Pompeo's

7    stomach sick.  Multiple doctors on watch list.  Multiple

8    doctors writing for high dosages.  There are too many doctors

9    to list as suspicious.  Many, many, many more docs screaming

10   red.

11           RDC momentarily suspends sales to ProHealth.  But then

12   they kept shipping the drug.  The problems just continued at

13   ProHealth with dispensing data that was very concerning.  But

14   yet again, the decision of what to do was left to management.

15   To Larry Doud.  Doud's company never stopped sales, though.  In

16   fact, as orders of interest were put on hold, RDC just kept

17   releasing them.  That's what the red on the chart means.  Huge

18   quantities of flagged orders were released.  And while, as you

19   can see on this chart, RDC's compliance department was flagging

20   all these issues with this pharmacy, bad doctors, high cash,

21   high oxy, the pharmacy, again, wasn't terminated until Doud

22   left the company.

23           Bill Pietruszewski told you why.  ProHealth was a

24   stockholder.  It had millions of dollars in controlled and

25   non-controlled substance sales.  It had a sister store, 370

1    Pharmacy that also sold a ton.  This is another pharmacy that

2    wasn't permanently terminated and reported until Doud was gone.

3         Let's talk about Linden Care.  Linden Care was RDC's

4    largest customer.  And you'll remember that Larry Doud was

5    really involved in Linden Care's business.  He told Bill

6    Pietruszewski to tell other employees that they needed to check

7    with Doud "before changing anything" with respect to Linden

8    Care.  Doud said to tell them how aggressive I am toward the

9    account and how I threatened you.  Doud said tell them it is

10   not funny, and you know it won't make them happy to cut down

11   sales to the account.  Doud told Pietruszewski to tell other

12   employees he doesn't care what other people think, he really

13   wanted to sell to Linden Care because Linden Care was great for

14   business.

15        These are the sales to Linden Care Pharmacy.  A few

16   things jump out to you.  The first is that opioid sales

17   skyrocketed.  They started out small and they just kept growing

18   and growing and along the way Linden Care keeps exceeding its

19   order limits.  But RDC's compliance department keeps releasing

20   these held orders.  And Jessica Pompeo testified about this.

21   She said there was a standing instruction from upper

22   management, from Larry Doud, to release Linden Care orders.

23        So throughout this period, while Doud is at the

24   company, at the direction, they were releasing thousands of

25   opioid orders to Linden Care that are flagged by RDC's system

M1v3dou2                    Summation - Mr. Roos

1   and are not reporting any of this to the DEA.

2         Now, you see all those little bubbles on the chart.

3   Sarah Rosenberg, a paralegal who testified toward the end of

4   the case, she told you that the exhibits for each of the

5   pharmacies are on a little box on the chart.  These are all the

6   e-mails in evidence about Linden Care, from both sides,

7   government and defense.

8         Let's take a look at a few of them.  Let's start with

9   the first half of this chart.  Early on, when Linden Care sales

10  were lower, in 2013 and 2014, there are a lot of e-mails about

11  concerns with Linden Care.  And these aren't all government

12  exhibits, by the way, there are defense exhibits here too.

13  Let's take a look at a few.

14        By January 2013, Larry Doud knows Linden Care is "a

15  difficult account" and that RDC could "get burned in the

16  process."  He tells a bunch of folks to "stay on top of these

17  developments" and to give him immediate notice if there a

18  problem.  This is a defense exhibit, but it is evidence against

19  Doud because it shows he was in the weeds on Linden Care from

20  the beginning.

21        And then, Joe Brennan, Doud's number two, is telling

22  him he is "very concerned with the growth of Subsys at Linden

23  Care."  You remember Subsys.  It's that dangerous fentanyl

24  spray.  He thinks Linden Care could potentially become a real

25  problem for RDC.

1    So they send in Carlos Aquino.  He's the outside

2    consultant that RDC hired in the early years.  Defense counsel

3    made a big deal about the fact that RDC hired Carlos Aquino.

4    But obviously the importance of Aquino is not that he was

5    employed by RDC.  The importance is what he said and what Doud

6    did afterwards.  And Aquino does a report.  Doud reads it and

7    he has a pretty strong reaction, actually.  Again, this is a

8    defense exhibit, but what it actually shows is that Doud knows

9    the problems with Linden Care.  He acknowledges his own

10   concerns about Linden Care's business and says the pharmacy's

11   "sloppy procedures" could severely impact us.

12   Things get worse with Linden Care.  A doctor who wrote

13   a lot of prescriptions that were filled by Linden Care is

14   arrested, and Pietruszewski tells Doud.  So they have Aquino go

15   back in, in September 2014.  Here's what he writes in the

16   report.  He says Linden Care should only take opioid

17   prescriptions paid for by insurance.  No cash.  And he says

18   RDC's management, Doud, should continue to receive dispensing

19   information from Linden Care because of the excessive

20   quantities of controlled substances being sold at Linden Care.

21   So RDC gets the dispensing information, and what do

22   they see?  Linden Care is filling cash prescriptions for

23   doctors on the DEA watch list.  Exactly what Carlos Aquino said

24   shouldn't be happening.  RDC's compliance department asks for

25   more dispensing so that Pro Compliance can analyze it.  And

M1v3dou2                    Summation - Mr. Roos

1   then, Linden Care refuses.  And Joe Brennan then again tells

2   Doud that his "gut feeling on BelHealth Linden Care has not

3   improved."

4        So what happens next.  Jessica Pompeo and

5   Pietruszewski both told you that a lengthy period went by where

6   they didn't get any information from Linden Care.  Can you

7   believe that?  The largest customer at RDC and they're just

8   getting no dispensing information from Linden Care.  They

9   weren't able to analyze the dispensing.  Linden Care just kept

10  ordering more and more and more opioids, and RDC kept filling

11  those orders, even though RDC's due diligence policy said RDC

12  had to get dispensing and investigate.  It didn't do anything

13  like that.  The company was not following its own policy.  The

14  employees were not following its own policy.  The guy who is

15  running the company is not following its own policy.  It is

16  mostly just releasing orders, as you can see from all the red

17  in late 2014 and 2015.

18       I want to make one other comment about this chart.

19  You will notice that all the defense exhibits about Linden Care

20  are at the very beginning of the time period or towards the

21  very end there is one, once sales have dropped off.

22       I want to be clear about something.  The defendant has

23  no burden of proof in this case.  The government bears the

24  burden of proof, proof beyond a reasonable doubt, and we

25  embrace that burden.  The defendant doesn't have to put forward

M1v3dou2                    Summation - Mr. Roos

1   any evidence or argument in the case.  But when the defendant

2   decides to put forward evidence and argument, you should

3   scrutinize it just like you would scrutinize any other evidence

4   and argument.

5          So here I want to put out that basically all the

6   defense exhibits bookend the Linden Care story.  They show that

7   at the very beginning, Larry Doud was focused on Linden Care,

8   that he knew there were issues and he said keep me posted.  And

9   then there is this period in the middle where things goes

10  absolutely totally crazy with Linden Care.  They are not

11  getting dispensing and they are giving them tons of drugs and

12  they keep releasing all these flagged orders.  And Linden Care

13  is selling to dirty doctors and taking prescriptions in cash.

14  And RDC, at Doud's direction, they just keep shipping to this

15  pharmacy that's pumping out fentanyl and oxycodone.

16         And the only exhibits during that time period are

17  these government exhibits.  Here is one.  All the evidence from

18  2015, when sales to Linden Care are peaking, show Linden Care

19  was diverting controlled substances.  Take for instance this.

20  An e-mail from Jessica Pompeo lots cash on Subsys, tons of

21  suspicious doctors who are having their prescriptions filled in

22  cash.

23         And Doud's hearing about all of this.  Pietruszewski

24  is keeping him posted.  Here is an e-mail from April 2015:  No

25  new dispensing from Linden Care.  But one of Linden Care's

1   doctors under investigation.

2           Listen, this could go on for a while.  But here is the

3   bottom line.  Linden Care is RDC's biggest customer.  Doud

4   really cares about it.  He doesn't want to lose it.  Linden

5   Care takes a ton of controlled substances.  Doud knows that's

6   an issue.  He keeps close tabs on it.  And everyone around him

7   is saying there are problems, there are red flags like the one

8   on this chart.  High percentages of controlled substances, high

9   dosages, lots of out of state.  While some of these red flags

10  maybe could be explain by the fact that Linden Care had a mail

11  order business for controlled substances, and therefore was

12  sending out of state, or maybe they specialize or focused in on

13  pain management, there are other red flags on this chart that

14  are just totally inexplicable, like why such a large percentage

15  of the customers are getting their prescriptions written by

16  flagged doctors by RDC.  Or why such a large percentage are

17  going for huge pill counts.

18          RDC employees were telling Doud about the cash and the

19  arrested doctors.  But they kept shipping.  They kept releasing

20  flagged orders, and they never reported Linden Care to the DEA.

21  It wasn't, again, until Doud left the company, that RDC

22  terminated Linden Care as a customer.

23          The story is the same for a lot of RDC's other

24  customers.  Take Bay Ridge.  Similar red flags to the

25  pharmacies we talked about.  High dosages, lots of dirty

M1v3dou2                    Summation - Mr. Roos

1    doctors.  Once again, RDC's compliance department flags the

2    issue.  Lots of oxycodone, exceeding limits, high cash, dirty

3    doctors, the same names, it is color coded here on the chart by

4    RDC's compliance department.  Carl Anderson, Howard Adelglass,

5    Joseph Olivieri, the same doctors at Old Town, the same at

6    Regal Remedies, the same at Linden Care, the same at ProHealth.

7    Yet they keep shipping really large amounts of drugs under

8    Doud's watch.  Some of them are flagged and released, and

9    nothing changes until Doud is gone.  When he's gone, Bay Ridge

10   reported to the DEA.

11           Take Aliton's.  Red flags, out of state customers,

12   lots of oxycodone, suspicious doctors.  Everyone knew what was

13   going on, especially Doud.  Here is an e-mail from August 2013.

14   Aliton's filling prescriptions for suspicious customers.  And

15   then the pharmacy gets raided and Doud knows about that too.

16   Nonetheless, RDC is still filling for Aliton's a year later,

17   and Bill Pietruszewski is telling Doud that Aliton is buying a

18   ton of oxycodone because it is sharing the drugs with two other

19   stores that are on the do not sell list.  Pietruszewski says

20   this could be a jam for RDC.  He suggests that RDC stop selling

21   to Aliton's.  But management didn't want to cut Aliton's off.

22   As Jessica Pompeo told you at page 333 of the transcript,

23   that's a store that fell into the "have to" bracket.  Meaning

24   compliance just had to keep releasing flagged orders because

25   management, Larry Doud, said to.  They literally had to.  So

1    the compliance department did as instructed for Aliton's.  Even

2    though the pharmacy had suspicious customers, was raided, had a

3    ton of red flags, RDC just kept shipping the orders even when

4    the orders were held by RDC's compliance system.  They just

5    pressed on without investigation.  That was Doud's decision.

6            Let's talk about just one more pharmacy while we are

7    on the topic of "have to" stores.  Seventh Elm Pharmacy.  This

8    was a store owned by a board member, and Jessica Pompeo told

9    you that as a result it was also in the "have to" bracket for

10   pharmacies, meaning they had to ship to it.  The problem was

11   there was a ton of red flags with this pharmacy.  Tons of

12   controlled substances, growing order sizes, 20 percent of the

13   patients were from out of state, large dosages of oxycodone.

14   And most troubling, 35 percent of the prescriptions were

15   written by doctors who were on RDC's watch list.  RDC just kept

16   shipping and they released orders, even when Seventh Elm

17   exceeded its threshold.  They did that even though, as Jessica

18   Pompeo told you, they weren't getting dispensing.

19           Under RDC's written due diligence policy, when an

20   order exceeds a threshold, like all these little red marks on

21   the screen, they're required to get the dispensing,

22   investigate, dispel suspicion, and only then release the order.

23   Instead, as you can see, they were just releasing Seventh Elm

24   orders without investigation.

25           And it wasn't just these pharmacies we've been talking

about.  Across the board, RDC's compliance department and
computer system were flagging potentially suspicious orders,
and RDC was just releasing almost all of them.  It wasn't until
after Doud left the company that RDC terminated suspicious
customers.

          And the thing about those suspicious customers they
terminated in 2017, as well they were the ones being flagged as
suspicious back in 2012, 2013, 2014 is, 2015, and 2016.  The
pie chart on the left of your screen that shows that 75 percent
of the pharmacies that were terminated or suspended after Doud
left the company had been flagged in at least one order of
interest before he left the company.  So these weren't a
mystery to RDC when Doud was there.

          And the chart next to it shows that 70 percent of the
opioids sold while Doud was in charge went to pharmacies that
were later terminated by RDC.  Which means that a large, large
percentage of the customers that were doing controlled
substance business while Doud was in charge are the ones that
RDC's same compliance department later determined could not be
sold to.

          So let's just take a step back now that we've gone
through the number of pharmacies and talked about what the
evidence proves.  The first element of the first charge is the
existence of a conspiracy to distribute controlled substances
unlawfully.  And the evidence proves that RDC was distributing

M1v3dou2                    Summation - Mr. Roos

controlled substances.  And the evidence also proves that RDC

was distributing controlled substances illegally in several

ways.  It shipped drugs to pharmacies that were diverting.

Regal Remedies is a good example.  They weren't doing any due

diligence.  When orders are flagged by RDC's customers and

held, RDC just released the orders without getting dispensing

or doing an investigation.  And there wasn't even an attempt

with many of these, let alone a good faith attempt.  RDC also

didn't report these diverted customers, these orders to the

DEA.  Every one of these pharmacies is an example of that.  And

when there were red flags, reasons to believe that pharmacies

and doctors were dispensing pills for illegitimate or

non-medical reasons, the employees, the people at RDC didn't

stop selling.  They didn't terminate customers.  All the

pharmacies we have talked about are an example of that.

       Ladies and gentlemen, you heard throughout this trial

that it is illegal to sell controlled substances without

effective controls against diversion to pharmacies that are

believed to be diverting or that are diverting controlled

substances.  And that's exactly what was happening at RDC.

       And it wasn't a mistake.  This is exactly how Larry

Doud wanted to do business.  The evidence proves beyond a

reasonable doubt that RDC was distributing controlled

substances unlawfully.  Does that mean that a conspiracy

existed at RDC to distribute controlled substances?  And the

1    answer is yes.

2              This is what I expect Judge Daniels will tell you

3    about conspiracy.  Conspiracy just means an agreement of two or

4    more people to join together to accomplish some unlawful

5    purpose.  And I expect Judge Daniels will also tell you it

6    doesn't need to be a formal agreement.  It doesn't need to be

7    express.  There doesn't need to be any magic words.  There

8    needs to be a mutual understanding, spoken or unspoken, between

9    two or more people to cooperate with each other to achieve some

10   unlawful act.

11             So that's actually very easy to find that a conspiracy

12   existed at RDC.  And it just takes people in the compliance

13   department.  When two of the people in the compliance

14   department, like Bill Pietruszewski and Jessica Pompeo, agreed

15   or had an understanding that they were to release orders to

16   these dirty pharmacies, that's an agreement or understanding to

17   do an unlawful act.

18             This isn't an issue in this case that is meaningfully

19   in dispute because both Pietruszewski and Pompeo admitted this

20   when they testified.  Here's what is Pietruszewski said.  Page

21   881 of the transcript.  He committed the crime of participating

22   in a conspiracy to distribute narcotics.  He said repeatedly it

23   was Larry Doud who he conspired with, and we are going to come

24   back to that.  Pietruszewski testified that he participated in

25   a conspiracy to illegally distribute oxycodone and fentanyl,

1  because he released orders of interest that had red flags that

2  customers that were diverting controlled substances.  That's

3  page 883.  And then, the next day of his testimony,

4  Pietruszewski again testified that when he worked at RDC, he

5  shipped orders of controlled substances to pharmacies that he

6  believed were diverting, and that he knew it was wrong.

7          It's particularly easy for you to conclude at least

8  one other person, besides Larry Doud, was part of the

9  conspiracy, because Pietruszewski admitted to conspiring to

10  illegally distribute drugs.

11          And here's what Pompeo said.  RDC shipped orders of

12  controlled substances to pharmacies she believed were

13  diverting.  She knew it was wrong at the time, she did it

14  because she was following directions, specifically Larry Doud's

15  directions.  That's page 612 and 613 of the transcript.

16          So, there was a mutual understanding, both spoken and

17  unspoken, at Rochester Drug by at least two people and more to

18  ship controlled substances they believed were being diverted.

19  That's the first element of the conspiracy and it's been met.

20          Now, before we move on, I want to address something

21  that may come up in the defense summation.  A few times during

22  cross-examination, we saw a clever little trick which is to ask

23  a witness a question about whether they wanted something to

24  happen.

25          MR. GOTTLIEB:  I'm going to object.

1    THE COURT:  Overruled.

2    MR. ROOS:  Here is an example of Mr. Gottlieb's

3    cross-examination of Mr. Pietruszewski.  Mr. Gottlieb asked

4    Mr. Pietruszewski whether he wanted or intended to have

5    narcotics diverted by pharmacies, and Mr. Pietruszewski said I

6    didn't want them to be, but they were diverted because we let

7    them go.  And Mr. Gottlieb apparently didn't like the answer

8    and so he said, I am just asking you what you intended and what

9    you wanted to do, and then he asked it again.  You didn't want

10   them or intend them to have them diverted these medications,

11   correct?  And I think Mr. Townsend did the same little thing

12   with Ms. Pompeo.  And you should expect in the defense closing

13   that you are going to hear them claim that no one ever wanted

14   to do anything intentionally, because the witnesses said they

15   didn't want diversion to happen.

16   And here is the thing about this little argument.  The

17   lawyer question implies something different than what

18   "intentionally" means.  What do I mean by that.  Well, I expect

19   Judge Daniels will tell that you "intentionally" just means to

20   act deliberately and with a bad purpose rather than innocently.

21   I don't expect Judge Daniels to use the word "want" or "desire"

22   when he defines "intentionally."  And that's because it's not

23   part of it.

24   I want to give you an example.  Living in New York,

25   give you an example.  You live in New York City, you got a car,

1  and you park it on the street.  And there is a spot right in

2  front of your building, right in front of the apartment

3  building.  It's convenient, and you can see your car out the

4  window, which is great.  You'll know if anything's happening to

5  it.  And the parking spot, it saves you money on the garage.

6  And there is really only one problem, which is you are not

7  allowed to park there, because it's a handicap spot.  But you

8  also know they don't ticket very often, so when you see the

9  spot, you pull right in, you turn the wheel to the right, you

10  pull up to the curb, you put it in reverse, beautiful parallel

11  parking job.  And you know where you parked.  You deliberately

12  parked there.  And you know you are not allowed to park there,

13  because it's a handicap spot.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           MR. ROOS:  But you did it anyways.  So it wasn't some

2      sort of innocent parking there.  You know where your car is.

3      Now, you then get a ticket.  Okay.  You didn't intend to get a

4      ticket, and your goal wasn't to inconvenience the person who

5      needs to park in a handicap spot, right.  You didn't want to do

6      that.  You didn't want to get a ticket.  You don't wake up in

7      the morning and say, You know what, today's going to be the day

8      I'm going to get that ticket and inconvenience that person who

9      can park in a handicap spot.

10          That's not the result you wanted to bring about, but

11     you still acted intentionally, right?  You still knew what you

12     were doing and you knew it was against the rules and that's

13     intent.  And that's the same here.

14          Pietruszewski, he participated in unlawful

15     distribution of controlled substances, controlled substances

16     sold to diverting pharmacies.  He acted deliberately when he

17     participated in the conspiracy.  Having diversion happen, that

18     wasn't his goal.  It's not what he wanted, but he still acted

19     intentionally in violating the law.  And the same is true for

20     Pompeo.  All right.  So that's the first element of Count One

21     and a mutual understanding of at least two people at RDC, a

22     conspiracy existed to distribute controlled substances

23     illegally.  There's overwhelming evidence of that.  There's

24     overwhelming evidence of diversion at those pharmacies, but the

25     defendant and his employees kept shipping, so that's the first

1    element.  That's done.  Let's check it off on the screen.

2          The second element is what we're going to move onto

3    now.  The second element, Whether Larry Doud knowingly and

4    intentionally became a member of the conspiracy?

5          So let's talk about that. I expect Judge Daniels will

6    tell you that in deciding whether the defendant was a member of

7    the conspiracy, you have to find he had some knowledge of its

8    unlawful objectives, and that he intentionally and willfully

9    helped accomplish those.  There's no magic to that.

10         Let's start with knowledge of the scheme's unlawful

11   objectives.  I expect Judge Daniels will tell you that

12   knowledge just means acting consciously, rather than by

13   accident.  Willfully means to act purposefully with intent to

14   do something unlawful.  Unlawful just means been contrary to

15   the law.  And intentionally means to act deliberately with an

16   awareness of the unlawfulness.

17         That just means the defendant understood it wasn't

18   legal, not that he knew the particular or specific law that he

19   was breaking.  That all boils down to a pretty simple question

20   for all of us to walk through now which is, Did Larry Doud know

21   his employees of RDC were distributing controlled substances

22   illegally, and did he intentionally help them or direct them do

23   it.

24         I want to talk about how we all know, having sat

25   through this trial, that Larry Doud knew that his employees of

M1VBDOU3                    Summation - Mr. Roos

RDC were distributing controlled substances illegally and
intentionally helped them do it.  There are a few parts to
this, so I want to break it down a bit.  Let's start with the
easiest part.

       Doud was the CEO of RDC.  Everyone reported to him.
You heard the testimony.  He was pretty hands on.  He got in
the weeds.  He obviously knew that his company and his
employees were distributing controlled substances.  You heard
that he look at sales reports.  He knew all the customer.  He'd
get on the road sometimes, so there's no question that Doud
participated in RDC's sale of controlled substances.  He
certainly had an understanding that they were selling
controlled substances to pharmacies.

       And I'm stating an obvious point here, RDC is a
business that literally distributes controlled substances to
pharmacies, so that aspect of the distribution is not in
dispute.  They were intentionally distributing controlled
substances.  It's not like they accidentally sold them or
anything.

       So the real question is whether Doud knew that RDC was
making an unlawful controlled substance sales to some of its
pharmacies, and he intentionally helped bring it about.  Before
we go into all the reasons the evidence shows Doud was
knowingly involved in its illegal distribution, I want to talk
briefly about the evidence there is that Doud knew the laws and

the regulations that applied to him.

In 2016, he gets a letter from the DEA telling him about RDC's legal obligations.  The letter says a distributor has a statutory responsible to exercise due diligence to avoid filling suspicious orders that might be diverted to other than legitimate channels.  The letter told Doud that RDC was required to maintain effective controls against diversion, and it couldn't turn a blind eye to suspicious circumstances.

Finally, the letter told Doud that RDC was required to report suspicious controlled substances orders to the DEA.  A year later in 2017, the DEA sent RDC and Doud another letter, and it basically just says the same things; maintain effective controls against division, report suspicious orders to the DEA.  We know it went to Doud because Doud gave it to Pietruszewski with a blue sticky note.

RDC's employees talk to Doud about the laws as well.  Here's an example.  In April of 2012, a law professor told Doud that a pharmacy who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted for knowingly and intentionally distributing controlled substances.

And Pietruszewski tells Doud, that's right.  It's the same for any wholesaler also.  In other words, a distributor like RDC can't deliberately ignore a questionable prescription when there is reason to believe it was not issued for a

1    legitimate medical purpose.  Here's another example.  Bill

2    Pietruszewski forwards an article to Doud, Brennan and others

3    about an arrested doctor in Philadelphia, and points out that

4    the DEA is saying that wholesalers are obligated to

5    self-police, and you'll remember that Ruth Carter from the DEA

6    told you about that too.  Because distributors like RDC, well,

7    they're entrusted with the responsibility of distributing

8    controlled substances, dangerous drugs, and so they have a

9    corresponding responsibility of self-policing and making sure

10   those drugs don't go to illegitimate channels.  You can't just

11   rely on DEA to police.  That's what Pietruszewski is referring

12   to here in the email to Doud.

13        People from outside of RDC were also telling Doud all

14   about these laws.  Here's an email from Carlos Aquino, the

15   consultant, who did some work for RDC in 2013 and 2014.  And

16   here's what he emails Doud about the law and RDC's

17   responsibilities.  "As a distributor, you need to comply with

18   the DEA's, know your customer due diligence policy.  The last

19   thing that RDC needs is to have the DEA place their crosshairs

20   on RDC because of their willful blindness and deliberate

21   ignorance as to what customers are doing."

22        And RDC's lawyers which got paid around 30 grand to

23   make recommendations about the problems with RDC's compliance

24   department said similar things to Doud.  Here's a letter he

25   got.  In the letter the lawyers tell Doud that RDC is required

1    to disclose suspicious orders to the DEA and that

2    non-compliance can result in legal action.  And a lawyer cites

3    all these other cases where the DEA and the department of

4    justice brought charges or lawsuits against distributors; Value

5    Drug, McKesson Corporation, Harvard Drug, Cardinal Health, and

6    Doud was familiar with these DEA actions against other

7    distributors because he saw news about them.

8         Here's an article from 2012 about Cardinal Health.  He

9    was sent articles about the DEA's allegations.  For instance in

10   this one it says, the DEA alleged that Cardinal Health was

11   dispensing controlled substances based on prescriptions that

12   were issued for other than legitimate medical purposes, and

13   that Cardinal Health failed to conduct meaningful due diligence

14   to ensure that controlled substances were not diverted and to

15   other than legitimate channels.

16        And here's another article that said basically the

17   same, again from February 2012.  It says, Cardinal Health was

18   charged with being aware of high volume orders, but failing to

19   have on site visits and delivering more pills per month than

20   the company's own limits allowed.  So he's familiar with these

21   allegations, and here's what the lawyers told Doud in that

22   letter we looked at a few moments ago.

23        The common thread throughout the Cardinal case and the

24   other cases, "has been DEA's allegation that the distributors

25   have failed to identify or otherwise ignore red flags

M1VBDOU3                        Summation - Mr. Roos

1   indicating that customers are ordering controlled substances

2   for illegitimate purposes.  It's incumbent on distributors to

3   ensure that their compliance programs and policies and do

4   sufficient due diligence just so at a quantity frequency and

5   pattern of shipments to its pharmacy customers."

6           All right.  So, big picture.  It's clear that Larry

7   Doud knew the laws and the rules that applied to distributors.

8   They must have effective controls against diversion.  They have

9   to look for red flags.  They can't ship them to pharmacies that

10  are diverting.  I want to make one more comment about what Doud

11  knew, which is that Doud also knew about what was going on in

12  this country in the tristate area in terms of the opioid

13  epidemic.  He got articles that said more than 5 million people

14  in U.S. abused narcotic pain killers, the article saying that

15  there was were 92,000 overdoses in one year; an article stating

16  that overdose deaths involving prescription pain medications

17  exceeded the deaths of heroin and cocaine combined, so he

18  obviously knew the drugs his company were selling were very

19  dangerous and very addictive.

20          All right.  So where are we?  Together we've

21  established that Doud knew the laws applied to his company.

22  The laws made it illegal to distribute controlled substances

23  illegally, and we've established that RDC was in fact

24  distributing controlled substances, and we've established that

25  Doud knew the dangers of the drugs that RDC was distributing.

1    So there's one last aspect to this which is, Did Larry Doud

2    know that RDC was distributing controlled substances illegally?

3    Did he intentionally participate?  And the answer is yes.

4         He knew the rules.  He didn't follow them.  He knew

5    that wholesalers were responsible for keeping controlled

6    substances away from inappropriate users.  He just thought it

7    was crazy.  He had to do it. That's what the evidence shows,

8    and there are eight reasons the evidence shows that Doud

9    knowingly and intentionally participated in the conspiracy;

10   that is, RDC's unlawful distribution of controlled substances.

11        The first reason Larry Doud is guilty, the documents

12   and the email evidence.  He knew about the suspicious customers

13   that RDC was selling to which were diverting their controlled

14   substances, but he directed his employees not to terminate or

15   report them, to not let compliance stand in the way of sales,

16   and instead to keep shipping them.

17        Let's start with Government Exhibit 1. It's early 2012

18   and the DEA has just brought its case against Cardinal for not

19   having effective controls against diversion, and Doud's

20   thinking about the own problem at his company, and here's what

21   he says.

22        One problem I see is that we are doing so much

23   business, or maybe I should say servicing so many stores in New

24   York City that our reps never get around enough to make the

25   connection.  Maybe some stores they never see.  And why is he

1    saying this is a problem?  Because he knows even his salesmen

2    are not doing site visits at some of RDC's customers in New

3    York City, let alone compliance auditors.  And he knows it's a

4    problem because this is one of the problems that Cardinal

5    Health had that we discussed a few minutes ago.  They weren't

6    doing site visits.

7         And here is Larry Doud later that some month and he

8    says, he's been thinking about what the media might do if they

9    realize we are here with regard to distribution of controlled

10   drugs since Cardinal is in deep do-do.  Of course the media

11   already literally knows RDC is there since it's a real company.

12   What he's talking about is what the media might do if it

13   realize that RDC was distributing controlled substances in the

14   same way Cardinal was.  That's why he tells his employees not to

15   comment, no callbacks, keep a very low profile.

16        By the way, these comments are pretty telling I think.

17   You might expect that a law-abiding person who sees someone

18   else get in trouble reflects and say, let's immediately clean

19   up the operation and not go down that path.  That's not Doud's

20   reaction, despite the parallels he see in Cardinal Health.

21        He says, lie low.  Don't get caught.  Don't comment.

22   And Larry Doud's son Lanny actually suggest, "With all this new

23   DEA stuff going on, maybe RDC should cut any and all customers

24   off that have not returned the survey sheet."

25        In other words, seeing the problems with Cardinal

M1VBDOU3                    Summation - Mr. Roos

1   Health, maybe we should cut off our bad customers.  The ones we

2   don't have any diligence on, who, for instance, haven't even

3   returned a survey sheet.  And here's Larry Doud's son again

4   telling Larry Doud that RDC has some, "very suspicious

5   customers due to their buying."  What he adds tells you what's

6   going on here.  This is important.

7        Bill Pietruszewski is in a, "very tough spot" and

8   thinks for his quote "willingness to accommodate everyone." He

9   adds, If anyone other than Bill Pietruszewski were to look at

10  the reports we get, well a scary story is told.  So Bill

11  Pietruszewski is the head of compliance as we all know, and

12  he's in a very tough spot because so many of RDC's customers

13  are very suspicious.

14        And Lanny Doud is telling Larry Doud, it's great we

15  have Bill Pietruszewski to accommodate everyone.  Because

16  basically if anyone else was in charge of compliance, these

17  would all be pharmacies that were shut down.  And take a look

18  at the last thing Lanny Doud says:  Our competitors made

19  changes for a reason.  It's time we take a closer look before

20  it's RDC that is looked at.

21        But as we've seen through this trial, things didn't

22  change.  It wasn't like Larry Doud knew that there were

23  suspicious customers but didn't know who they were.  Here's a

24  report that Larry Doud gets in July 2013, Government Exhibit

25  18A.  It shows all of the RDC customers with high percentages

1    of controlled substances sales.  They're all highlighted in

2    green on the spreadsheets, and these are excerpts.  That was

3    just page one, here's another page and another one.  And this

4    isn't all of them by the way.  I'm not going to show you

5    another page of 18A because I think you get the idea.

6            While moving through it pretty quickly, I think you've

7    noticed some familiar names. Bay Ridge is on here.  Total Care

8    is on here.  Linden Care is on, ProHealth, 370 pharmacy,

9    Seventh Elm, Aliton.  They're all highlighted in green on the

10   spreadsheet.

11           And here's what Lanny Doud says about this to Larry

12   Doud and others, Some of this makes me want to vomit.  And

13   here's what RDC's outside law firm says after doing a

14   compliance review of RDC's compliance program.  We could

15   foresee the government raising concerns about RDC's compliance

16   program and its sales of oxycodone.

17           As a time, RDC had gotten a subpoena about its

18   customer Plainfield pharmacy, which was under DEA

19   investigation, and the lawyers say in the memo or in the

20   letter, in addition to Plainfield, it appears that RDC has sold

21   a significant quantity of oxycodone to Linden Care which may be

22   of concern.

23           And here's more from that lawyer memo.  They tell RDC.

24   They tell Doud that RDC hasn't had effective controls against

25   diversion in place because of limited employee resources

1    dedicated to controlled substance or monitoring customer due

2    diligence, RDC suspicious order monitoring and reporting over

3    the past several years likely is not resulted in the

4    identification and investigation of every controlled substances

5    order.  We estimate that approximately 125 pharmacy customers

6    currently require further due diligence, including site

7    inspections.

8         And Doud was also getting emails about issues for

9    particular pharmacies.  I'm not going to go through all of

10   them.  We've talked about some of them already.  But, for

11   example, here's an email we looked at earlier where Bill

12   Pietruszewski is telling Doud that Linden Care is filling

13   fentanyl prescriptions for a bad doctor.

14        And here's an email where Doud is being told they

15   should cut off Regal Remedies.  And here's an email where Doud

16   is being told Aliton's been raided and it doesn't look good.

17        And here's another example I haven't talked about

18   which is Jessica Pompeo flags a pharmacy called Stanton-Negley

19   tons of prescriptions filled in cash.  Doud's in the weeds.  He

20   responds, This isn't going to end well.  And by the way,

21   Stanton-Negley though, not terminated until after Doud leaves

22   the company.

23        Despite the red flags associated with these pharmacies,

24   despite the fact that Doud's compliance head, his lawyers, his

25   son all thought the customers were suspicious, the pharmacies

1    we've been talking about weren't terminated until after Doud

2    was gone from the company.

3         On the screen are parts of the chart of all the

4    pharmacies terminated after Doud left; Linden Care, July 2017;

5    Adlib pharmacy, June 2018; Stanton-Negley, May, 2018; Windsor

6    pharmacy, June 2018; ProHealth pharmacy, June 2018; 370

7    pharmacy, June 2018; Seventh Elm, May 2019; Regal Remedies,

8    June 2019.

9         Here's the bottom line with all these customers, they

10   didn't suspend them.  They didn't terminate them, and they

11   didn't report them.  There's also no evidence in the case that

12   RDC held any orders or did an investigation into them.  They

13   just kept shipping.  Those customers, and we've seen these

14   charts, they got terminated after Doud left and three quarters

15   of them had an order of interest with Doud was there, and 70

16   percent of the controlled substance sales went to these

17   pharmacies.

18        And despite the fact that Doud was getting emails that

19   raise concerns, they kept shipping because they were large

20   customers and they were making a lot of money.  And the

21   decision not to report or terminate these customers was Doud's

22   decision to make.  We know that from the emails.

23        Here is Pietruszewski to Doud.  I consult with you and

24   Joe if we need to make major changes, if a policy that would

25   affect ourselves.

1           Here's another from Pietruszewski to Doud.  If I were

2      to go and the DEA tells me that we must do due diligence on a

3      hundred stores or we have to stop selling to even one store, I

4      would always consult with you first.  Here's an example of a

5      pharmacy that they do turn off, Chemist Shop.  And you can see

6      the decision is totally up to management, specifically Doud.

7           We're going to talk about Chemist Shop a little more

8      in a bit, but you can see from this email that the compliance

9      department wanted to take action. It just needs to be approved

10     by Doud.

11          Pietruszewski emails, this has ran its course and this

12     must be decided by management how to proceed.  We should turn

13     them off, but we need to let Larry and Joe know, so he's

14     talking about Doud  More examples. Doud and Brennan instruct

15     Pompeo to turn off two accounts, but then management turns the

16     accounts back on.  They're back on per management.  She means

17     Doud.

18          Another example, they were going to shut off a

19     pharmacy.  Then the owner called Larry Doud and the son and

20     they kept her open.  Here's another email from Pietruszewski to

21     a bunch of people including Doud.  For me to tell a custody,

22     could be a stockholder, they must respond or supply the

23     information and that we would suspend their orders.  Must be a

24     talk with upper management team.  Something that is not my

25     ultimate decision.

1         Let me say this though, just because it wasn't

2    Pietruszewski or Pompeo's ultimate decision, doesn't mean they

3    didn't conspire.  They had a mutual understanding. It was

4    simply that Doud would direct them what to do with respect to

5    these bad pharmacies.

6         And here is an email we already looked at, and it's

7    more of the same.  Check with me before changing anything.  And

8    remember on the very rare case where Pietruszewski tries to do

9    something himself, Doud yells at him.  When Pietruszewski tried

10   to share the new due diligence policy with the salesmen, Doud

11   berated him for doing something before checking with him.

12        Bill, we will have a very serious conversation on your

13   decision to address our sales force with no prior notice to Joe

14   or Lanny or me.  We will need to discuss your lack of

15   communication.  I thought we had discussions about this before.

16        So the evidence conclusively establishes that Doud

17   made the call on suspending, terminating and reporting

18   suspicious customers.  And the evidence also is clear that Doud

19   knew that many of RDC's customers were suspicious, but RDC did

20   not suspend, terminate or report those customers.

21        And listen, there isn't an email in evidence for every

22   single pharmacy at RDC where Doud is saying, Keep them open,

23   Don't terminate them.  You've got examples. And part of the

24   reason you're also not seeing an email for every single one of

25   the pharmacies is because there were standing instructions.

1   The default rule was, Ship it, Don't report the customer, Work

2   with the customer, Don't turn them in, and so on that basis the

3   employees were just following directions.

4        They knew they didn't have authority to terminate

5   customers by themselves.  And Judge Daniels I expect is going

6   to tell you that you need not find that the conspirators stated

7   or agreed on every precise detail of the conspiracy or the

8   scheme.  I expect you'll hear, Doud didn't even need to be

9   informed about every single detail of the conspiracy to have

10  joined it.

11       Now, before we move on, I want to talk about some of

12  the pharmacies that RDC did suspend and terminate while Doud

13  was the CEO.  And the first point I want to make is that it can

14  be true that Doud both directed that certain pharmacies be

15  closed and also that he participated in a conspiracy to legally

16  distribute controlled substances.  And so how is that possible?

17       Well, Doud could not participated in a conspiracy to

18  distribute controlled substances unlawfully to just one or more

19  pharmacies and he's still guilty, and let me give you an

20  example. Say you got a pharmacist and the pharmacist has a nice

21  shop and he's super diligent and he's careful not to dispense

22  controlled substances to people who don't need them.  And he,

23  in fact, sometimes even kicks people out of the store for

24  trying to come in with illegal prescriptions and he even

25  reports some of them to the cops.  But there's an exception.

1    He's got a few customers and they pay him a lot of money for

2    oxycodone and he knows they don't need the oxycodone, but he

3    does fill the prescriptions anyways because he makes a lot of

4    money and he doesn't think he's going to get caught.  And

5    that's still illegal.

6           It doesn't matter if he sometimes shuts off other

7    customers.  He's still illegally distributing controlled

8    substances.  And the same is true for a distributor like RDC.

9    The same is true for Doud.  It doesn't matter if he turned off

10   customers along the way.  What matters is if there's a

11   suspicious customer, a customer that's diverting that he keeps

12   selling to -- and you know there were customers like that and

13   they kept selling to them at Doud's direction.

14          So let's spend one more minute talking about some of

15   the terminated customers since this is a topic that kept coming

16   up during the trial.  And let me just explain some of the

17   various records that you have at your disposal.  You've got

18   Government Exhibit 278.  It's a spreadsheet that lists all the

19   customers that were suspended and terminated after Doud left

20   the company.

21          The point of this spreadsheet is that you can see what

22   the compliance department did once Doud wasn't the boss.  Then

23   there's Exhibit A82.  This is the one that the parties

24   stipulated and agreed to on the last day of trial, and it lists

25   all the customers terminated and suspended while Doud was at

1    the company and also after he left the company.  And A28 is a

2    good exhibit for you to look at to do a comparison for the

3    before and after.  There were 40 terminated or suspended while

4    Doud was at the company and over 200 afterwards.

5           And then there's Government Exhibit 1232A, and that's

6    what we're looking at on the screen.  This is just the

7    pharmacies who were suspended or terminated while Doud was at

8    the company.  And what's particularly useful about this chart

9    is, it tells you whether RDC started selling to the pharmacies

10   again.  That's what highlighted on yellow.

11          So of the 39 pharmacies that are listed on here that

12   are suspended or terminated while Doud was at the company, you

13   can see that they turn 24 back on, and that's a real important

14   point because we know that Doud had to sign off on the

15   terminations, so he knew about these pharmacies being cut off

16   in the first place and then they get turned back on.

17          So that's pretty conclusive proof of his participation

18   in selling to bad pharmacies because if they were bad enough

19   for Doud to suspend them, and yet they're turned back on, then

20   there's reason to believe that you know that he is selling or

21   continuing to sell to bad pharmacies.

22          Let's take a look at this.  Here some of the stores

23   that RDC just kept selling to.  Remember the red are all the

24   controlled substance sales after RDC suspended them.  Sheely's

25   drugs, over 8 million in sales; ProHealth drugs, over $6

million in sales; Stanton-Negley, over 8 million in sales;
Total Care, over a million in sales.  In each of these
instances and several others, they went back to selling to
these dirty customers.  And the reason because they're big
customers as you can see.

          Defense counsel mentioned, well, maybe there was an
investigation, but there's no evidence of that.  It's actually
the opposite.  There's no real break in the sales.  And in
cases like ProHealth pharmacy, we've done a deep dive on the
pharmacy, and you know the problems were just getting worse and
worse.

          Now on the other hand, let's talk briefly about the
pharmacies that were terminated under Doud's watch.  Remember,
it doesn't matter that some customers were terminated, that
doesn't make him not guilty, but look at what they were
terminating.  A bunch of these are tiny pharmacies, so it
wasn't a big deal to terminate them.  Here are some examples;
Main Avenue, AJ Family, Kingston, Mt. Airy Family, Poplar
pharmacy, Cedar Care, Superstar, Vital Drugs, ATA pharmacy,
Allerton Park, and EZ Care.  They all had less than $15,000 a
month in sales.

          There were only two pharmacies on the list of
terminated pharmacies that weren't tiny.  Plainfield pharmacy
and the Chemist Shop, slash, its sister store.  And it's no
surprise Plainfield was terminated and not turned back on

1    because they got raided by the DEA, and RDC got a subpoena

2    about it and then RDC terminated them.  And so the fact that

3    RDC terminated Plainfield is pretty meaningless.

4         That takes us to Chemist Shop and its sister store,

5    but Chemist Shop isn't a particular good store for Doud either.

6    This is Government Exhibit 257.  Throughout 2014 Chemist Shop

7    was generating tons of orders of interest that were getting

8    released because it was buying -- that were initially getting

9    held but then released because it was buying excessive amounts

10   of oxycodone and fentanyl.  It was really crazy amounts of

11   controlled substances that are being sold.

12        And it only gets worse in 2015 with even more orders

13   of interest that were being released.  This is Government

14   Exhibit 258.  And then in September 2015, the compliance

15   department is recommending to turn them in and turn them off.

16   The reason is because they continue to fill prescriptions for

17   high cash and suspicious doctors.  And Pietruszewski says, the

18   termination decision is up to Doud and Brennan.

19        So RDC continues to sell to the Chemist Shop and even

20   continues to release orders of interest in the following month.

21   At the very top of your screen you see an order of interest

22   released from the end of October of 2015.  It's only when RDC

23   learns that, "The DEA is currently investigating a doctor that

24   the Chemist Shop has a relationship who is doing 30 percent of

25   their business."  And Morton speaks to the DEA and they

1  "strongly recommend RDC stop doing controlled substance
2  business."

3          So in other words, RDC learns from the DEA that
4  Chemist Shop is basically under criminal investigation and it's
5  only then that Doud says, turn the Chemist Shop off.  Of course
6  later that day as you can see on the screen they're back on per
7  management, meaning Doud.  And then when Chemist Shop is
8  finally turned off after further lobbying from compliance, Doud
9  laments what's happens. He says, turning off Chemist Shop is
10 counter to what we do.

11         Why is he so upset about this?  Because Chemist Shop
12 was a big customer.  And while he knew they had to turn off
13 because the DEA was literally knocking at the door, it pained
14 him and it's not something they'd ever done before for a big
15 customer because it was counter to what they do.  One more
16 thing about Chemist Shop, in the same email where Julius Morton
17 told Doud about the ongoing problems at Chemist Shop, he also
18 tells him, We have two similar accounts to deal with on the
19 horizon, ProHealth and 370 pharmacy.  They're exhibiting
20 dispensing almost identical to the Chemist shop and their
21 filling for the same troubling doctors.

22         And yet because the DEA wasn't about to do arrest at
23 ProHealth like Doud thought was going to happen at Chemist
24 Shop, he didn't terminate ProHealth.  That's pretty conclusive
25 evidence that Doud was aware of the problems at ProHealth, a

1   pharmacy that was diverting controlled substances and they just

2   kept selling to them.

3          So, ladies and gentlemen, the emails and the documents

4   are the first type of proof that shows Doud knowingly and

5   intentionally joined the conspiracy.  The exhibits alone are a

6   basis to convict him, but that's just the first reason to find

7   he participated in the conspiracy.  There are a bunch more.

8          The second reason is Bill Pietruszewski's testimony.

9   We talked a bit about Pietruszewski already.  He was the

10  compliance director at RDC at the same time Doud was the CEO.

11  He has admitted that he participated in the conspiracy to

12  unlawfully distribute controlled substances.  He described what

13  he did.  He helped to ship controlled substances to pharmacies

14  he believed were diverting them.  His testimony alone is a

15  sufficient basis to convict Doud of Count One because

16  Pietruszewski testified that he conspired with Doud when he

17  committed those crimes and he acted at Doud's direction.

18         Here's some of Pietruszewski's testimony.  I

19  participated in a conspiracy to distribute narcotics.  I

20  participated in a conspiracy to defraud the DEA and I failed to

21  report suspicious orders.  Who did he conspire with when he

22  conspired to violate the narcotics law?  Mr. Doud.

23         He testified that he conspired with Doud to distribute

24  fentanyl and oxycodone outside the scope of professional

25  practice and not for a legitimate medical purpose.  He

1    testified again under oath that he was guilty of conspiring to

2    illegally distribute oxycodone and fentanyl by releasing orders

3    of interest that had red flags that customers were diverting

4    the controlled substances.

5          He testified that he told Doud about how many of RDC's

6    customers were suspicious because they were filling for bad

7    doctors.  Those customers were filling prescriptions written by

8    suspicious doctors on RDC's spreadsheet and Pietruszewski

9    testified that he discussed with Mr. Doud the suspicious

10   doctors whose prescriptions were being filled.

11         Pietruszewski also told you about how he shipped

12   controlled substances to diverting pharmacies.  He testified

13   that when RDC's computer system flagged orders as potentially

14   suspicious, they just released the orders.  And while

15   Pietruszewski didn't discuss every single order with Doud

16   before releasing it, he testified he wouldn't have released

17   them had Doud not approved of him doing so.

18         On the other hand, when it came to holding suspicious

19   orders, Pietruszewski testified that he always told Doud

20   because he wanted to try to beat the salesmen to getting a hold

21   of Larry Doud.  He explained that the salesmen would generally

22   either call Joe Brennan or Larry Doud and would complain about

23   the customers not receiving an order, and then the compliance

24   department would end up many times releasing the order.

25         And in particular Pietruszewski was told to be more

1  lenient as he testified when it came to stockholders of the

2  company.  He told you about one time as an example when he got

3  in trouble with Mr. Doud for holding an order of interest.

4  Doud wanted the order to go out to a customer, so he took all

5  these extra steps to make sure it was delivered.  And there

6  were red flags of diversion as many of these pharmacies that

7  they released the orders to.  They included high cash, bad

8  doctors and they didn't stop shipping as he testified.

9          And the reason they didn't stop shipping to those

10 diverting pharmacies was because Larry Doud did not want us to.

11 That's his testimony.  And when this was happening, when RDC

12 was shipping controlled substances to pharmacies that were

13 diverting, Pietruszewski knew it was wrong, but he did it

14 because that's what Larry Doud wanted us to do.  When it came

15 to terminating these bad customers, Pietruszewski testified

16 that RDC was still shipping to them even though he believed

17 they were diverting.

18         What's the reason RDC didn't terminate those bad

19 pharmacy customers?  Because the compliance department needed

20 Doud's approval.  And in conversations with Doud, he said he

21 didn't care to turn off stores because that would affect sales

22 of RDC.

23         So, folks, through Pietruszewski's testimony, it's

24 clear that a conspiracy to distribute controlled substances

25 unlawfully existed because the employees at RDC knew the

1    company was shipping controlled substances to diverting

2    pharmacies and Doud knowingly and intentionally directed them

3    to do so, to keep shipping, to not hold orders.

4          And I just want to say this about Pietruszewski's

5    testimony, I expect in the defense's closing they're going to

6    say a lot about it because his testimony alone is a basis to

7    convict the defendant.  So let me just say this for now.  Pay

8    attention to how his testimony is corroborated by the other

9    evidence in the case, by the emails, the documents we just

10   looked at and by the other witnesses, witnesses like Jessica

11   Pompeo which is where I'm about to turn to.

12         So the third reason you know that Larry Doud knowingly

13   and intentionally agreed with RDC's employees to distribute

14   controlled substances illegally is the testimony of Jessica

15   Pompeo Bouck.  I'm just going to call her Jessica Pompeo.

16   That's her name on all the emails.  You heard she changed her

17   last name.  Just for convenience so I won't have to say Jessica

18   Pompeo Bouck every time I read you her testimony.

19         Ms. Pompeo took the stand and testified that RDC

20   shipped, "orders of controlled substances to pharmacies she

21   believed were diverting."  She testified she knew it was wrong,

22   and she testified she did it because she was following

23   directions, ultimately Larry Doud's.

24         Specifically Ms. Pompeo testified that for most of the

25   controlled substance orders to suspicious customer, they would

1    "just release them."  RDC "just let the customers have the

2    order."  The orders went on hold, her testimony was, the orders

3    went on hold because they exceeded order limits because the

4    orders were suspicious.

5         And Ms. Pompeo testified that Larry Doud sometimes

6    personally insisted that a held order be released.  He'd come

7    to Ms. Pompeo and ask, "Why an order was held and/or tell her,

8    we need it to be released."  She testified that Larry Doud knew

9    about the problems with RDC's customers because, "He was on

10   emails about customers that we had concerns with because we

11   needed permission to terminate the ability for those stores to

12   order controlled substances."

13        She testified that when Larry Doud would come to her

14   office to tell her to release the held order, it upset her.  It

15   frustrated her.  She complained to other members of the

16   compliance department.  She complained to her neighbor.  And

17   credit, Sam Alaimo, but she testified she still released the

18   order.  She, "Didn't want to lose her job."

19        So basically Ms. Pompeo believed RDC was selling to

20   suspicious customers, customers she and others thought were

21   diverting controlled substances, but they kept shipping.  Many

22   times it was Larry Doud who intervened and told them to ship

23   the orders.  He told it directly to Jessica Pompeo that made

24   her upset because she knew it was wrong.  She knew it was

25   illegal.  She went along with it because she didn't want to

1   lose her job.  She felt that she didn't have a choice.

2           And I want to point out that Ms. Pompeo's testimony is

3   entirely consistent with Mr. Pietruszewski.  They both

4   testified they believed RDC was supplying diverting pharmacies.

5   They both testified that they were acting at Doud's direction,

6   and they both testified that they had conversations with him

7   about pharmacies and they both testified they kept shipping the

8   orders.

9           Her testimony is also corroborated by another person

10  which is Sam Alaimo.  Remember Sam Alaimo is the credit manager

11  who sat next to Ms. Pompeo and he testified that he remembers a

12  time that Doud was in Jessica's office behind a closed door.

13  When Doud left, Pompeo came into his office, quote, all upset.

14  Her eyes were red and breaking down crying, that she had to

15  release an order that she didn't want to release.

16          And Pompeo told Alaimo the reason she was releasing

17  the order was because Larry told her to. Keep this in mind. Sam

18  Alaimo has absolutely no reason to lie.  He was a short

19  witness.  He wasn't involved in compliance, but he corroborates

20  Jessica Pompeo's testimony.  He recalls a time when Larry Doud

21  goes into her office, tells her to release an order and upset

22  her so much because the pharmacy was so suspicious that she

23  came into Sam's office crying to tell about it.

24          And that, folks, that's enough right there to find

25  Larry Doud guilty of Count One.  Right there we got Larry Doud

1    instructing and agreeing with Pompeo to release an order to a

2    dirty pharmacy without any controls against diversions.  That's

3    his knowing participation in an unlawful conspiracy.

4           Here's the fourth reason Larry Doud is guilty, to

5    bring in new customers and expedite sales.  Doud told this

6    compliance department that he wanted to start selling to new

7    customers without doing due diligence.  He dispensed what the

8    controls against diversion before selling drugs, and he did it

9    even though he knew it was contrary to RDC's working policy and

10   to the law.

11          Let's start by talking about these new customers.  As

12   Cardinal Health and other distributors were being investigated

13   by the DEA and cutting off customers, Larry Doud saw an

14   opportunity and RDC started picking up customers that had been

15   cut off by other distributors.

16          Here are a few examples from the emails.  A salesman

17   emails Larry Doud and others that, quote, many pharmacy owners

18   are now scrambling to RDC as Kinray and other suppliers are

19   cutting them off due to their high controlled substance

20   percentage of sales.

21          Bill Pietruszewski was seeing that, quote, all the new

22   stores RDC was bringing on had baggage.  Julius Morton was

23   talking to RDC customers and was hearing that quote, Everyone

24   is being cut off by Cardinal, McKesson and Belco and running

25   over to RDC.  Jessica Pompeo was, quote literally cringing when

1    RDC had new account because of how the dispensing had looked.

2           So while the rest of the industry, like Cardinal and

3    McKesson, was cutting back on sales of dangerous controlled

4    substances, like fentanyl and oxycodone, RDC was picking up the

5    excess demand.  And so between 2010 and 2015, RDC's opioid

6    shipments grew 125 percent while the rest of the industry

7    decreased by 11 percent.

8           But just picking up these customers was not enough for

9    Larry Doud.  He also wanted to start selling to these new

10   customers faster.  And just thinking about how dangerous this

11   is, right.  He's got all these new customers that are castoffs

12   from the rest of the industry.  And he says, I want to start

13   selling to them without due diligence in place.  And instead of

14   being extra careful, Doud does the opposite and says, let's

15   just open the accounts and do diligence later.

16          And in January of 2015 after being audited by the DEA

17   and getting recommendations from lawyers in 2014, RDC rolls out

18   a revised due diligence and suspicious order monitoring policy.

19   Part of the policy says, they're going to do a bunch of due

20   diligence before opening a new customer account and selling

21   controlled substances.

22          Pietruszewski and Pompeo tell the RDC salesmen in March

23   2015 about the new policy and how they're going to be doing a

24   bunch of diligence on new customer accounts before selling to

25   them.  This really upsets Larry Doud.  He tells Pietruszewski,

M1VBDOU3                    Summation - Mr. Roos

1    he can't believe how much we are stuck in this compliance thing

2    and he's mad that Pietruszewski addressed the sales force.

3          Doud tells Pietruszewski he wants to change the

4    policy.  He tells him that while he knows, quote, We have to do

5    due diligence.  We have to tail wagging the dog.  In other

6    words, he's saying they have something that's not important

7    direct, due diligence, directing something that is important,

8    sales and making money.

9          And Doud insist, this has to stop because he doesn't

10   want to lose customers.  Doud tells Pietruszewski and the rest

11   of the compliance department, good or bad, do the compliance

12   after opening and close it if it looks funny.  Of course as

13   we'll discuss, closing it when it looked funny wasn't so easy

14   when Doud was in charge.

15         And Pietruszewski responds by saying, Whatever you

16   want, Mr. Doud, but says, it would be safe if RDC got the

17   lawyers to make the change to our SOP stating the updated

18   process because they gave the policy to the DEA.  And he's

19   talking about that due diligence policy we've been talking

20   about.

21         He says, This way, it's documented and the DEA cannot

22   come back and ask why we are not following the process we put

23   in place in January of 2015.  Doud responds that they can talk

24   to lawyers, but he wants to start opening accounts today.  Doud

25   says, he doesn't know if a new customer is a good guy or a bad

1    guy, but he does know it's taking too long to sell drugs.

2         Pietruszewski says, they meet with lawyers, but the

3    lawyers are saying not to change the policy.  Then in May of

4    2016 Congress passes a new law that curtails some of the DEA's

5    tools to go after distributors.  Doud sees this new and he

6    views it as an opportunity.  He tells another RDC employee, the

7    government has recently told the DEA to lay off wholesalers and

8    pharmacies and concentrate on fixing the problem with more

9    addiction programs as per the New York Times May 19 front page

10   article.

11        And so Doud says, they're going to change the

12   protocols for opening new accounts because it's taking too long

13   to open stores.  So Doud tells the whole compliance department

14   that because of this, quote, recent government change, he wants

15   to, quote, accelerate our account opening process.  Do our due

16   diligence on controls, but not before we open the account.

17        So let's just pause here for a second and be clear

18   about what's going on.  The government change wasn't that it's

19   now fine for distributors to start selling controlled

20   substances before doing any due diligence.  The law still

21   required effective controls against diversion, and the law

22   still said, You can't dispense drugs to pharmacies that are

23   diverting controlled substances.

24        It's clear from this he has a criminal purpose because

25   he's saying, not that the law change in that respect, he's

1  saying the DEA isn't going to have the tools it use to.  It

2  isn't going to be able to investigate as easily; isn't going to

3  be able to take action as easily, so let's change up our policy

4  while the DEA isn't at full strength.

5          This is a pretty intuitive idea for a criminal.  When

6  law enforcement is unavailable or doesn't have enough

7  resources, commit crimes.  Pietruszewski tells Doud once again,

8  This is a management decision, but we should get the lawyers to

9  change our SOP to state we made a change.  He adds, We just

10  want it to be documented so we may show DEA when they are in

11  the next time for an audit.  And then Doud tells Pompeo that he

12  wants to open new accounts.

13          This is part of a transcript of a voicemail she left

14  Pietruszewski at the time.  The one we listened to in court,

15  and she's a little confused because she thought the plan was to

16  change the policy first, but Doud says push ahead.  And so

17  Pompeo starts opening new accounts for controlled substances

18  sales because she didn't want to be obstinate. She wanted to

19  follow Larry Doud's own rules.

20          Pietruszewski again ask Doud about consulting lawyers.

21  He says he's concerned that we will be vulnerable if we do not

22  look at the dispensing before turning a store on to controlled

23  substances.  And by the way, Pietruszewski testified as did

24  Pompeo that they never got approval from the lawyers.  RDC

25  consulted them, but they didn't make a change.  Instead, Doud

1    just pushed ahead.  Pietruszewski also tells that the

2    compliance auditors were against the change, so Morton and Bill

3    Delgado.  But it was a, quote, Conclude decision by management

4    and they had no choice but to agree.

5         Larry Doud pushed ahead.  He told compliance they were

6    killing RDC and handcuffing our efforts to sell new to

7    accounts.  So RDC compliance department started turning on new

8    accounts without doing any due diligence.  We've already talked

9    about a few examples of this. There was Regal Remedies which

10   was turned on without any dispensing.  They just fill out a

11   credit report.  There was Cooks which RDC compliance department

12   had been refusing to open until the policy change.  There was

13   59th Street which RDC opened without doing due diligence and

14   then closed shortly after Doud left the company.

15        There's Blairsville.  The pharmacy was opened in 2015

16   without any due diligence.  It quickly started exceeding

17   thresholds and showing red flags.  Those are the exhibit

18   markers in October 2015, including times Blairsville exceeded

19   thresholds and didn't have dispensing data.  That RDC just

20   released  the orders and kept selling.

21        They kept Doud posted on the problems and how they

22   kept shipping, and the pharmacy, like other bad pharmacies,

23   opened without due diligence.  That pharmacy also stayed open

24   until after Doud was gone from the company.

25        Let me stop here and explain how this whole change in

1    the way new accounts were opened proves Doud is guilty.

2              First, it's an example of Doud agreeing with other

3    people at RDC to distribute controlled substances to

4    pharmacies, bad pharmacies, without any controls against

5    diversion, let alone effective controls. And they didn't do any

6    due diligence before opening accounts as he directed and was

7    often many months until RDC knew about dispensing. And even

8    when RDC reviewed dispensing, they kept selling to these

9    customers, and this is all the crime right there.

10             If you find Doud agreed with others to open these

11   accounts without doing any due diligence and sell to these

12   dirty customers, that's a basis to find him guilty, and also it

13   proves Doud is guilty because he acted with a bad purpose.  He

14   saw the DEA had been hampered and he seized on the moment, not

15   because he thought the change in policy was allowed under the

16   new law.  Quite the opposite.

17             His lawyers were saying, no.  But because he saw this

18   as a window to do something, to make more money.  That's the

19   type of behavior that show Doud intentionally and knowingly

20   broke the law.

21             And third, there's a lie in all this.  We're going to

22   talk more about this in a little bit.  RDC told the DEA it was

23   opening new accounts after doing due diligence, and this is why

24   Pietruszewski kept saying, We're going to be vulnerable.  They

25   have already told the DEA, we're doing due diligence first, but

1  Doud went ahead with the lie.  He said push ahead with opening

2  accounts and then do due diligence, even though their policy

3  said otherwise.  And that's how you know he knew something that

4  he believed was wrong and illegal.

5       The fifth reason you know that Doud knowingly and

6  intentionally joined the conspiracy is how he responded to the

7  ARCOS audit.  You remember Kerry Whitmore, the DEA.  She

8  testified RDC stopped reporting ARCOS data to the DEA.  ARCOS

9  data by the way is just sales data that distributors like RDC

10 provides to the DEA.

11      So she went to RDC, did an audit and spoke about the

12 problem with their ARCOS report.  And the result of that whole

13 ARCOS thing was that the United States sued RDC for its failure

14 to fix the problem and RDC ended up settling and paying a fine

15 and the settlement was signed by Larry Doud as CEO.

16      And so here's the thing about this ARCOS issue, Doud

17 tells the president of the board, Paul Pagnotta, about it and

18 he says well RDC had a full audit, ARCOS reporting seem to be

19 less troubles than we thought.  It's the, quote, suspicious

20 ordering system that is a slight concern to me.

21      Those two sentences really tell you a lot.  Kerry

22 Whitmore testified that the DEA was focus on ARCOS, not

23 suspicious orders.  So when Doud says, What he's actually

24 concern about is suspicious orders, that tells you he knows

25 something is wrong there.  He knows that RDC real legal risk is

1    suspicious orders, not ARCOS. That's where the illegality is.

2    And to put a point on this, let me give you an example.

3         A guy is driving down a highway and he's got a bunch

4    of drugs in his truck, right, and he gets pulled over by a

5    police officer who starts talking to him about how he was

6    speeding and how he's driving with expired insurance and how he

7    ran a red flight and it's looking like the driver is going to

8    pay a big fine and he gets a ticket and then he's allowed to

9    drive off and the officer never finds the drugs.

10        The guy feels ecstatic.  He says this is great.  I got

11   a ticket. That's it.  And the real thing of concern, the drugs,

12   weren't discovered. That's what you got here with Doud.  What

13   he knows is not right here at RDC is the due diligence and

14   suspicious order monitoring.  And so when he sees that they're

15   likely just going to get a fine for ARCOS and it's not about

16   suspicious orders, he feels good.  That's what he's saying to

17   Paul Pagnotta, and that's how you know he was acting knowingly

18   and intentionally with respect to suspicious order monitoring.

19        The sixth reason to conclude that Doud knowingly and

20   intentionally joined the conspiracy is what he did when the

21   walls started coming crashing down.  He made false denials

22   about Insys.  And just a reminder, Insys was the company that

23   made the fentanyl spray called Subsys.  And you've seen and

24   heard a bunch of evidence and testimony about Insys and Subsys.

25   Subsys was the highly addictive fentanyl drug and RDC bought a

1    lot of it and sold a majority of it to Linden Care as well as a

2    few other pharmacies.

3         And keep in mind as Chris Masseth told you, Doud kept

4    close track of RDC's sales and buying.  He monitored the daily

5    green sheets.  He got briefed on supply issues, and Doud knew

6    about the amount of Subsys that RDC was supplying to Linden

7    Care.  He knew.  Pietruszewski sent Doud information about

8    Linden Care and Subsys, like this article in 2014 about doubts

9    around off-label use of Subsys.  He obviously knew all about

10   this.

11        But then when Insys executives get arrested, he emails

12   Chris Masseth, How much of this are we selling.  How many

13   accounts and who are they.  This is Chris Masseth's reaction.

14   He was surprised by Doud's email because he knew about Linden

15   Care and others since they were big pharmacies.

16        So basically on the day executives get arrested, Doud

17   writes this emails.  That inconsistent with the things he said

18   in the past that says he has no idea what this is and no idea

19   that RDC is selling to them.  And isn't that convenient.

20        The day it all starts cashing down he says, I've never

21   heard of these people basically.  I don't know what pharmacies

22   they're going to.  And how does Christ Masseth respond.

23   Surprised.  Because he had those conversations and those very

24   pharmacies buying those very products before.  This is like a

25   CEO's version of, I've never seen that man before in my life.

1   So why and what was basically the last month at the company did

2   Larry Doud lie in an email about his awareness.  Because he

3   knows at this point that a criminal investigation is starting

4   into Linden Care.  He knows that Insys executives are arrested

5   and Linden Care is under investigation.  It's his company

6   that's the middleman and is likely next.

7          So he starts to cover his tracks by writing things

8   like this email.  That will look good, that look good on a day

9   like today in court.  But the very fact that he falsely denied

10  knowing about Subsys, his big customer, tells you something

11  else.  He had something to hide, and that's a reason to

12  conclude that he knew something was wrong and that he acted

13  knowingly and intentionally.

14         The seventh reason to conclude Doud acted knowingly

15  and intentionally is his financial motive.  Now motive isn't an

16  element of the crime.  Judge Daniels isn't going to give you a

17  legal instruction on it.  A person can act knowingly and

18  intentionally without a motive or they can have a motive that's

19  not financial in nature.  But when there's a personal financial

20  motive, our common sense tells us that's significant evidence

21  of intent.

22         Your common sense tells you that when a person does

23  something and they got a strong financial motive to do it, it's

24  reasonable to infer they intended to do it.  And so from

25  listening to the experts talk in this trial, we know that Doud

1    did have a financial motive to sell controlled substances.

2            Doud made $100, 000 a year on average from 2012

3    through March 2017 in bonuses directly traceable to controlled

4    substances.  Here's Professor Cutler's chart that shows this on

5    the left, and the defense expert's chart is on the right.  And

6    this isn't really in dispute.

7            You'll see that their numbers are a little different,

8    but they basically agree that from the fiscal year of 2014 to

9    2017 he was averaging over $100,000 a year, and they agree that

10   the amount of the bonus is directly traceable to controlled

11   substances sales.  That's over 500,000 over the course of five

12   years.  That's half a million dollars just based on the sales

13   directly attributable to controlled substances.

14           And before I turn the page, just notice how small a

15   share of Doud's bonuses controlled substances sales back in

16   2009.  That's less than $8,000.  Doud's bonus grew because

17   RDC's sales of controlled substances grew.  Here's the

18   evidence.  Sure, overall opioid sales were less than overall

19   sales for other products, but the driver in growing RDC during

20   this period was opioid sales.

21           And we also learn from Professor Cutler and from the

22   defense expert that over time controlled substance sales made

23   up a higher share of RDC's total sales.  Now the defense expert

24   put up this line graph which is on the left to try to say that

25   the growth of non-controlled substances was more significant.

M1VBDOU3                         Summation – Mr. Roos

1              But when he was asked about it on cross examination,

2     here's what he admitted.  Controlled substance sales grew over

3     three times.  Schedule II controlled substance sales, like

4     opioids, grew over six times, but non-controlled substance

5     sales only grew two and a half times.

6                    (Continued on next page)

1            MR. ROOS:  (Continuing) So he agreed.

2            The last question on the screen, that the growth rate

3    on Schedule II controlled substances was higher than

4    non-controlled substances.  In addition to the fact that the

5    increase controlled substance sales help Doud's bonus directly,

6    being willing to sell to these bad pharmacies meant that Doud

7    could get all those pharmacies' businesses.

8            Professor Cutler told you how pharmacies liked to buy

9    all from one distributor.  It's convenient, it saves them

10   money.  Chris Masseth who worked at RDC told you the same

11   thing.

12           So when these dirty pharmacies were coming over to RDC

13   because they couldn't get controlled substances elsewhere,

14   maybe one of the distributors had already terminated them, RDC

15   got all their business in the process.  So being willing to

16   sell controlled substances to a bad pharmacy boosted RDC's

17   overall sales, which boosted Doud's over all bonus.

18           Let me just give you one short example.  We've talked

19   about ProHealth a bunch.  ProHealth was averaging around

20   $150,000 a month in controlled substance sales and sold like $6

21   million over the course of the conspiracy.  It is a big,

22   valuable customer.  It also buys other stuff, Advil toilet

23   paper, whatever you find in a pharmacy.  By being willing to

24   sell to ProHealth, a dirty pharmacy, RDC didn't just get their

25   controlled substance sales, they got all those sales.  And in

1    turn, had RDC terminated ProHealth, because it was a bad

2    pharmacy, it would have lost those sales.  So that's how being

3    willing to sell to bad pharmacies, pharmacies that other

4    distributors decided they didn't want to touch anymore, boosted

5    RDC's overall sales and also boosted Doud's bonus.

6           The final reason that Doud is guilty of Count One is

7    deliberate ignorance, what's also called willful blindness or

8    conscious avoidance or putting your head in the sand.  You've

9    heard these terms in a few different e-mails and a few

10   different witnesses at trial already.  The law professor who

11   wrote to Larry Doud told him that deliberately ignoring a

12   questionable prescription can be a basis for criminal

13   prosecution.  And Carlos Aquino said that too.  RDC can't be

14   willfully blind or deliberately ignorant to what its pharmacies

15   are up to.

16           I expect Judge Daniels will tell that you even if the

17   defendant did not know specifically of all the diversion

18   happening at the pharmacy customers, the law allows you to find

19   that the defendant acted knowingly when the evidence shows that

20   he deliberately closed his eyes to what otherwise would have

21   been obvious.  A person can't intentionally remain ignorant in

22   order to escape the consequence of the law.

23           In other words, if you find beyond a reasonable doubt

24   that Larry Doud deliberately avoided learning or confirming

25   what was happening with RDC drugs at particular pharmacies,

1    such as by intentionally failing to investigate them, you can

2    treat that deliberate ignorance as the same as knowledge.

3    That's the basis to find him guilty.

4           There is a lot of evidence about that in the case.

5    There are all sorts of red flags associated with a bunch of

6    these pharmacies.  The high cash, the bad doctors, the patients

7    traveling from distances, the orders of interest.  But they

8    deliberately did not investigate them.  Instead, at Doud's

9    direction, the RDC employees would just release them.  And when

10   they did that, Doud and his employees intentionally turned a

11   blind eye to what would have been obvious had they investigated

12   further, as his company was required to do.

13          So, that's the second element.  There is overwhelming

14   evidence that Larry Doud knowingly and intentionally became a

15   member of the conspiracy.  There are eight reasons to find him

16   guilty.  Let's check the box off the second element is met.

17   Larry Doud is guilty of Count One.

18          After you find Doud guilty of Count One, you are going

19   to be asked a few questions about the drugs involved.  One of

20   the questions is which drugs were involved in the conspiracy.

21   And that's an easy answer, because we've seen tons of evidence

22   that these pharmacies were getting oxycodone and fentanyl.

23          You are going to be asked a question about how much

24   fentanyl was involved, 400 grams or more.  And I expect Judge

25   Daniels will tell you, you don't need to settle on a specific

M1v3dou4                    Summation - Mr. Roos

number.  I know we have a few accountants on the jury, and you
don't need to come up with a particular total.  You just need
to decide which range it was in.  So this is pretty
straightforward, so I am going to run through it quickly.

First, let's take the pharmacies that were terminated
for compliance reasons after Doud left the company and see how
much fentanyl was sold by those pharmacies while they were at
the company.  Remember, Pompeo told you at the beginning of
2017, after Doud left, they started terminating all these
pharmacy customers that had been diverting all along.  So it is
a pretty good indicator of who the dirty pharmacies were.  And
you add up the fentanyl they sold while Doud was at RDC and you
get 4,811 grams.  That's over 10 times 400 grams.  So, you can
easily check off the 400 gram box.  And by the way, even if
every prescription filled by these pharmacies wasn't illegal,
you can still easily hit that 400 gram total, because let's
just say 10 percent of the preparations were bad, that's still
over 400 grams.

Here is another way to consider it.  Let's take the
pharmacies I've talked about today, just those pharmacies sold
over 3,600 grams of fentanyl.  And again, well above the
quantity you need to find.

Here is one more way to look at this.  Let's take a
few of the pharmacies we've talked about today and only count
the percentages of the prescriptions written by flagged

1    doctors.  Just to explain what I've done here, we've taken the

2    amount of fentanyl per customer, that was on the last page, and

3    then multiplied it by the percentage for each those pharmacies

4    of flagged dirty doctors.  That's on Government Exhibit 906.  A

5    little bit of quick math shows you start, that just taking the

6    prescriptions from the flagged doctors for just these six

7    pharmacies gives you double the 400 gram quantity.

8            So it should be easy for to you conclude that there

9    was over 400 grams sold of diverted fentanyl.

10           With that, we're done with Count One.

11           We are going to talk about Count Two now and we are

12   going to move through this a lot more quickly because we've

13   already talked about a lot of the evidence that's relevant to

14   count two.

15           These are the elements Count Two.  The existence of a

16   conspiracy in this count to defraud the DEA, the defendant

17   knowingly and intentionally joined the conspiracy, that there

18   was an overt act to further the conspiracy.  And the term overt

19   act, that just means some type of outward action performed by

20   someone in the conspiracy that furthers the objectives of the

21   conspiracy.

22           THE COURT:  Mr. Roos, let me ask you, how much longer

23   do you think you have?

24           MR. ROOS:  Maybe 15 minutes.

25           THE COURT:  All right.  Okay.  If you can stay under

1  that we'll, wait to take lunch, if you are going to be longer

2  than that --

3          MR. ROOS:  I'm just starting Count Two, so I could

4  give you the option, which is I could finish or I could pause

5  here, which this is actually a pretty natural stopping point if

6  your Honor would like to give the jury a lunch now.

7          THE COURT:  I am going to say if you can finish

8  quickly, you can finish.  If you can't, then we'll adjourn for

9  lunch.

10         MR. ROOS:  Maybe lunch.

11         THE COURT:  Then, ladies and gentlemen, this is what

12 I'm going to do. I'm going to give you a shorter lunch.  Your

13 lunch is here.  We are going to take 45 minutes for lunch

14 because I want to try to see if I can make sure I can get all

15 the arguments in today.

16         Don't discuss the case, keep an open mind.  I'll call

17 you back in at approximately 1:45.

18         (Jury excused)

19         THE COURT:  Let's continue at 1:45.

20         (Recess)

21         (Continued on next page)

22

23

24

25

1       AFTERNOON SESSION

2       2:00 p.m.

3           THE COURT:  We'll bring the jurors in.

4           (Jury present)

5           THE COURT:  You can continue, Mr. Roos.

6           MR. ROOS:  Thank you, your Honor.

7       I hope everyone had a good lunch.  When we stopped, we

8    were talking about finishing up Count One, and we had gone

9    through all the evidence that proves beyond a reasonable doubt

10   that the defendant -- first of all, that a conspiracy existed

11   by two or more people at Rochester Drug Co-Operative, and

12   second, that the defendant knowingly and intentionally joined

13   that conspiracy.

14       As you know, there are two counts in the indictment.

15   The second count is conspiracy to defraud the Drug Enforcement

16   Administration, so that's what we're going to talk about now.

17       These are the elements of Count Two.  The existence of

18   a conspiracy in this count to defraud the DEA, and the

19   defendant knowingly and intentionally joined the conspiracy,

20   and there was an overt act in furtherance of the conspiracy.

21   Remember, overt act just means some outward action performed by

22   someone in the conspiracy that furthers the objectives of the

23   conspiracy.

24       So what does defrauding the DEA mean?  I expect Judge

25   Daniels will tell you that a conspiracy to defraud the DEA

1    means conspiring to impede, impair, obstruct, or defeat the

2    lawful regulatory and enforcement functions of the DEA through

3    fraud, or deceit or dishonest means.

4           I expect Judge Daniels will give you a few examples of

5    what this can look like in practice.  Providing false

6    information to the government, deceitfully not complying with a

7    regulatory obligation to provide information, deceitfully

8    processing a transaction with incomplete information or

9    engaging in some other type of fraudulent conduct toward the

10   agency.

11          There is overwhelming evidence in this case that the

12   defendant is guilty of this count.  We're going to walk through

13   the evidence together, but let me just give you a preview at

14   the outset.  Rochester Drug was required by law and regulation

15   to maintain effective controls against diversion and report

16   suspicious orders to the DEA.

17          RDC told DEA it was doing those thing.  It said it

18   followed the rules as a condition of having the registration or

19   license to sell controlled substances.  And it also showed the

20   DEA a bunch of policies and letters and e-mails that said, hey,

21   we're following those rules.

22          And there is a lot of evidence that everyone at RDC,

23   including the defendant, Larry Doud, knew these rules.  We've

24   been through it, and we're going to go through a little more

25   evidence in a minute.  But there is a lot of evidence that

1  everyone knew the rules, and yet, specifically at Doud's

2  direction, RDC defrauded the DEA by not reporting customers and

3  not reporting suspicious orders, and by not following its due

4  diligence policy that it had given to the DEA.

5       There is really no dispute that RDC had thousands of

6  suspicious orders that it didn't report.  There is no real

7  dispute that RDC wasn't following its due diligence policy for

8  new customers.  It wasn't implementing any controls against

9  diversion for those new customers that we've talked about, and

10  all the evidence shows that RDC wasn't reporting customers or

11  doing due diligence at Doud's direction.  At the defendant's

12  direction.

13       So plain and simple, RDC was providing false

14  information to the government, deceitfully not complying with a

15  regulatory obligation to provide information, deceitfully

16  opening accounts and processing transactions without any due

17  diligence, and in generally engaging in fraud.  And on this

18  count, it's really not a close case.  Larry Doud plainly is

19  guilty of defrauding the DEA.

20       So let's walk through the evidence.

21       Let's start with the regulations.  Ruth Carter of the

22  DEA told you that as a registered distributor, regulations and

23  legal requirements apply to RDC.

24       Here's one.  Provide effective controls and procedures

25  to guard against diversion of controlled substances.  That

1   includes operating procedures necessary to prevent diversion.

2   RDC had to follow this as a condition of being allowed to sell

3   drugs.

4          Here is another regulation.  As a condition of selling

5   drugs, RDC had to design and operate a program to monitor and

6   report suspicious orders when discovered to the DEA.

7          Doud knew all about these requirements, because he got

8   letters from the DEA about it.  We looked at these before the

9   lunch break, and his lawyers reminded him of it.  Distributors

10  must design and operate a system to disclose suspicious orders.

11         And RDC's own customer due diligence and suspicious

12  order policy said RDC was required by those very regulations to

13  conduct due diligence on customers to minimize the risk they

14  will divert and to report suspicious orders to the DEA.

15         And it wasn't just this was an RDC policy.  Larry Doud

16  was involved during the making of the policy.  That's Jessica

17  Pompeo's testimony.  And as we saw from all the e-mails, he

18  later wanted to change the policy.  So he obviously knew what

19  was in the policy.

20         So the regulations require RDC to do due diligence and

21  report suspicious orders, and RDC in its own policies required

22  that, too.  And RDC's giving those policies to the DEA and

23  saying they're following them.

24         Let's go through some examples.  In March 2012, RDC

25  tells the DEA that it's following a policy to report suspicious

1    orders.  That's Government Exhibit 6.  In July 2013, the DEA

2    visits RDC and asks to see the SOPs or standard operating

3    procedures for doing due diligence and reporting suspicious

4    orders.  And note Larry Doud is on that e-mail.  Here is the

5    policy that goes to the DEA in 2013.  It says RDC will alert

6    the local DEA office of suspicious orders.  It says RDC will do

7    due diligence on an account before an account is even set up to

8    order.

9            RDC rolls out a new policy in January 2015.  That's

10   the one up on the screen.  It says RDC will report suspicious

11   orders and it will review three months of dispensing

12   information before opening a new customer up to buy any

13   controlled substances.

14           And Doud knows that RDC shared this policy with the

15   DEA.  Pietruszewski e-mails that "We shared our process with

16   the DEA about how we look at three months' dispensing prior to

17   turning a customer on to controls."  Pietruszewski also told

18   you he discussed with Doud sharing the due diligence and

19   reporting policy with the DEA.

20           And again, in 2016, the DEA came in June and

21   "requested all SOP for due diligence."  The agents read, and

22   Pietruszewski let Doud know this happened.

23           And there is another audit in November 2016.  That's

24   the one that Jessica Pompeo was present at.  She testified that

25   the DEA asked for the SOP, and RDC gave the same January 2015

1    policy without any changes.

2          So big picture.  The DEA believes that RDC is

3    following regulations and policies that require it to, number

4    one, do due diligence before opening new accounts, and two, to

5    report suspicious orders to the DEA.

6          And Ruth Carter of the DEA told you that the DEA is

7    reliant upon what the registrant, meaning RDC, gives them.  The

8    DEA won't know if information is not provided.  But RDC's

9    compliance department, at Larry Doud's direction, intentionally

10   did not do what it told the DEA it would be doing.

11         Start with the suspicious orders.  RDC's policy, the

12   one Doud looked at, said RDC would flag as potentially

13   suspicious all orders that exceeded ordering thresholds or if

14   an unusual pattern or which displayed a red flag of diversion.

15   RDC's computer system did in fact flag thousands of these

16   orders of interest, potentially suspicious orders for review.

17   And here on the screen in front of you is an example of just

18   part of one month of the list of these orders of interest that

19   have been flagged by the computer system.  And under RDC's

20   policy, the compliance department was required to investigate

21   the order, and if RDC's compliance department wasn't able to

22   clear the order, that is, dispel suspicion, they were supposed

23   to hold it and report it to the DEA.

24         But RDC's compliance department did not investigate.

25   We heard from the people in the compliance department.  They

1  told you they did not investigate.  And we walked over a few

2  reports like these.  Over and over the compliance department

3  just released the orders without any investigation.  The

4  compliance department let orders go, even though they didn't

5  have dispensing.  Bill Pietruszewski, let it go.  Orders were

6  released from stores in the "have to" bracket like we talked

7  about before lunch.  The "have to" bracket set by Joe Brennan

8  and Larry Doud.  Big stores like Linden Care, board members

9  like Seventh Elm or shareholders of RDC.

10         And as a result, in its peak years, RDC released and

11  shipped over 90 percent of its orders of interest.  That's what

12  these figures on the top indicate.  The percentage of the

13  orders of interest that were shipped after being flagged.

14         Pietruszewski and Pompeo both testified they did that

15  without doing what was required by the policy, meaning

16  investigating, and throughout that period, RDC reported almost

17  no suspicious orders -- four -- even though its system was

18  flagging thousands of them.  Even though RDC had told the DEA

19  it would be reporting suspicious orders.  Even when an order

20  was denied, which under RDC's policy meant it had to report it,

21  they didn't report it.  And there is no real dispute about

22  that.

23         Let's just take an example.  The Chemist Shop.  That's

24  a pharmacy that RDC terminated.  It had hundreds of orders of

25  interest as we saw before the lunch break.  Everyone thought

M1V3DOU4                    Summation - Mr. Roos

1    there were significant red flags.  And yet, RDC never filed a

2    single suspicious order report for The Chemist Shop.

3            Bill Pietruszewski admitted that he defrauded the DEA

4    by, among other thing, "not reporting suspicious orders."

5    Here's his testimony.  He told you RDC reported "very few"

6    orders to the DEA.  He testified that he discussed reporting

7    with Doud, and Doud said "we don't report the pharmacies."

8    RDC's compliance department needed Doud's approval to report

9    suspicious orders.  That's Bill Pietruszewski's testimony on

10   page 923.

11           And Jessica Pompeo, she told you that too.  Doud made

12   "business decisions to work with our customers and not report

13   them."  That would have come from Larry Doud.  Doud was worried

14   that if RDC started doing what was required, "other customers

15   wouldn't trust RDC and they wouldn't want to order from RDC,

16   because RDC was turning customers in."  So Doud was worried

17   that reporting customers would hurt RDC's business.  That in

18   turn, as you know, would hurt his bonus.  So he told employees

19   not to report customers, not to report orders.

20           Everyone knew this was wrong though.  Here's what

21   Pompeo said.  It wasn't right.  It was very much a regulation

22   that we had to be reporting customers and reporting suspicious

23   activity, because it was something real that was happening with

24   opioids, and it upset Pompeo.  And Pietruszewski said something

25   similar.  He knew it was wrong not to report suspicious orders,

1    but went along with it because Doud told him to.

2            It wasn't until Doud left RDC that it started

3    reporting suspicious orders.  And that's how you know that Doud

4    not only participated in this conspiracy, but he was the

5    driving force.  Four suspicious orders while he was there, over

6    150 in the next year after he left.

7            And by the way, as you've heard, technically Doud was

8    employed by RDC until March 2017.  But by the end of 2016, he

9    retreated to Florida.  And several witnesses testified that he

10   wasn't involved in compliance decisions in 2017.  So don't be

11   fooled by defense exhibits that show suspicious order reporting

12   in early 2017.  That's not Doud's doing.  That's as a result of

13   the fact he wasn't actively involved in the company anymore.

14           The fact that RDC didn't report suspicious orders had

15   the effect of impeding and impairing the regulatory enforcement

16   functions of the DEA.  As we just saw in the testimony from

17   Jessica Pompeo, the requirement was important.  It helped fight

18   the opioid epidemic by alerting the DEA to problem pharmacies.

19           And here's the testimony on the screen from Ruth

20   Carter of the DEA.  The purpose of the reporting would be to

21   alert the DEA that this particular pharmacy or customer is

22   placing suspicious orders, and it would alert the DEA so the

23   DEA could conduct investigations.  That's what the effect was

24   of not reporting the suspicious orders.

25           Let's stop here for a moment.  I told you that Doud

and his employees conspired to defraud the DEA by being

deceitful about suspicious orders and about new customer due

diligence.  We've talked about the first of those categories.

About why they didn't report suspicious orders, because that

was good for business, and good for Doud's bonus.  I'm about to

talk about the other way, the other type of lie, and that is

around due diligence before opening new accounts.

        But I want to make something clear.  You can convict

Larry Doud of Count Two on the basis of the suspicious order

reporting lies alone.  You don't also need to find that he was

deceitful in the due diligence they were representing to the

DEA.  And conversely, if you find that he's guilty of being

deceitful in the statement he made to the DEA about due

diligence, you don't need to find the lies about suspicious

reporting.  Either one is sufficient.

        So let's go to the second category, and that's the

category of deceit about false statements about RDC's due

diligence policy for new accounts.  We've talked about this a

bit before so I am going to go through it quickly now.

        The January 2015 policy that RDC handed to the DEA

says prior to selling controlled substances to any customers,

RDC must obtain, review and verify the drug dispensing data.

RDC will assess whether each prospective and current customer

dispenses controlled substances for legitimate medical

purposes.  And the policy says when RDC reviews the drug

1    dispensing data, it will look for red flags and areas of

2    potential concern.

3         Doud hated this because it was taking a lot of time to

4    open accounts.  He said it was the tail wagging the dog.

5    Things are backwards.

6         So when Congress restricted some of the tools that the

7    DEA had, Doud seized on the opportunity and decided to open

8    accounts without doing any due diligence, contrary to RDC's

9    policy that it had shown the DEA on the various visits that we

10   talked about, and right there, that's the deceitful conduct.

11   But in case there was any doubt, Pietruszewski kept telling

12   Doud that they should get lawyers to change the written policy

13   so they weren't saying something false to the DEA.  To be safe,

14   make the change to our SOP, this way it's documented and the

15   DEA cannot come back and ask why we are not following the

16   process.  And again, Pietruszewski telling Doud they need to

17   change the SOP, so that it is "documented" so we may show DEA

18   when they are in the next time.  Pietruszewski even tells Doud

19   that he's concerned RDC will be vulnerable if we do not look at

20   the dispensing before opening because the way the due diligence

21   policy is written.

22        But Doud decides to push ahead.  It's a concluded

23   decision, the compliance department has no choice, and RDC does

24   sell controlled substances as we talked about.  They turn on

25   Regal Remedies and Blairsville and 59th Street and others.  And

1  nonetheless, RDC never changes its written policies, it keeps

2  handing the same policy to the DEA.  It does it in 2015, in

3  June 2016, and November 2016.  They never update the DEA and

4  say there has been any sort of change in the way they are doing

5  operations.

6          Doud's briefed on all of it, and they never tell the

7  DEA they are not following their written policy.

8          So this is another way that Doud is guilty of Count

9  Two.  RDC had a written policy, Doud knows about, it says RDC

10  will do diligence on new accounts, Doud decides it's bad for

11  business, so they changed the internal policy.  He creates his

12  own set of unwritten rules.  As Jessica Pompeo said in that

13  voice mail, Larry's rules, and RDC never changes its written

14  policy.

15          DEA has no idea RDC is distributing controlled

16  substances to new customers without doing any form of

17  diligence.  It is just giving them the same policy over and

18  over and relying on that.

19          You know that Doud is guilty, that he knowingly and

20  intentionally joined the conspiracy, because he decides it

21  secretly.  He decides secretly to change the policy, and not

22  tell the DEA, and he does it at a time when he thinks the DEA

23  has been hampered by Congress.  He didn't do it because he

24  thought it was legal or legitimate.  He did it because he

25  thought it would be a way to make more money and to speed up

1    account openings.

2           So let's go back to the elements.  Check off the first

3    element.  A conspiracy existed to defraud the DEA.  The

4    employees of RDC did not report suspicious orders, despite

5    being required to and saying they would.  They did it so as not

6    to turn in their customers.

7           The conspiracy also existed to defraud the DEA by

8    opening new accounts without doing due diligence, despite being

9    required to do so and saying RDC would.  Check off the second

10   element too.

11          Doud became a member of this conspiracy, he actually

12   directed it.  He knew RDC had to report suspicious orders.  He

13   knew RDC had said it would do due diligence, he knew RDC's

14   policy had been given to the DEA.  And he intentionally

15   purposefully told RDC employees not to report suspicious orders

16   and not to do due diligence.

17          The last element is just that someone in the

18   conspiracy did an act to further the conspiracy of defrauding

19   the DEA.  And that's easy.  Every time RDC's compliance

20   department, which reported to Doud, gave the DEA its policy,

21   that's an overt act.  Whenever Doud and RDC employees said they

22   would report a suspicious order and made the decision not to,

23   that's an overt act.  Releasing orders and not reporting them

24   is an overt act.  Opening new accounts without doing due

25   diligence is an overt act.  So this element is easily

1    satisfied.

2          And you can see there is overwhelming proof on this

3    count.  Almost all of it isn't even meaningfully disputed in

4    the evidence.  No one during this trial has been claiming that

5    RDC was reporting tons of suspicious orders.  Larry Doud is

6    guilty on Count Two.

7          So I'm almost done.  We've gone through the crimes, I

8    just want to say a few things about what I expect you are going

9    to hear about in the defense closing.

10          The first thing is pharmacy closings.  The defense is

11    going to tell you that there were like 30 pharmacy customers

12    that got terminated under Doud's watch.  Remember, this doesn't

13    mean Doud isn't guilty.  If he conspired to illegally

14    distribute to even one or more of the pharmacies we talked

15    about, he's guilty.

16          When you take a look closely at the evidence about the

17    pharmacies that were terminated, you see, as we did together,

18    more than half got turned back on.  The ones that say

19    permanently closed were small, tiny pharmacies.  Or there were

20    two pharmacies that say closed because the DEA was all over

21    them.  They had to terminate those pharmacies.  And even still,

22    what did Doud say about it?  "Counter to what we do."  RDC

23    didn't want to terminate customers, particularly big customers,

24    because Doud was against it.

25          Here is the second thing I expect you'll hear

M1V3DOU4                     Summation - Mr. Roos

something about.  Sometimes on cross-examination, defense
counsel would read e-mails to the witness and ask them a
question or two about it, and at the end of some of those
e-mail chains there was a short statement by Doud.  "Keep me
posted" or there is one, "You are the bomb, Richie."  And I bet
in a few minutes you are going to hear a bunch of those lines
read back to you.  And here's the thing.  These are little bits
and pieces largely out of context.  Bill Pietruszewski and
Jessica Pompeo told you their full experiences at the company.
And so do those chronologies of what happened with the orders
and with the e-mails matched up on them that we saw towards the
end of the case with the paralegal.  And so did the analyses
done by the expert.

          The fact that Doud said over the course of five years
"good job," or "you make us look good," or "let's be
compliant," doesn't mean he was following the law.  Many of the
defense e-mails aren't even about compliance.  Like the ones
that were read while Chris Masseth was on the stand.  Those
were about financial risks, not DEA risk.  Or an e-mail chain
read while Jessica Pompeo was on the stand.  That was about an
FDA investigation into product safety, not a DEA investigation
into diversion.  These are all just little sound bites, many
taken out of context.  They don't establish that Doud didn't
act knowingly and intentionally with respect to the pharmacies
that were diverting.

1     And one more thing.  I expect you are going to hear

2   something about how RDC hired two former DEA agents in Carlos

3   Aquino and Pro Compliance and lawyers and that somehow that

4   shows that Doud isn't guilty.  Dig into that a little bit.  RDC

5   hired Carlos Aquino and he did some reports.  But then he was

6   gone from the company by 2014.  And RDC didn't even follow

7   Aquino's recommendations.  Remember the slides we saw about

8   Linden Care?  He wrote reports that said watch the prescribers,

9   watch the cash.  And what happened?  RDC just kept supplying

10   Linden Care, even though they still had bad prescribers and a

11   lot of cash.

12     The former DEA guys Julius Morton and Bill Delgado.

13   Did Doud follow the recommendations?  No.  Morton said close

14   accounts like ProHealth and Stanton Negley.  You saw the

15   evidence they stayed open until Doud was gone.  Morton and

16   Delgado said don't open new accounts without doing due

17   diligence.  Doud pressed onwards and in the evidence he calls

18   what they have to say bullshit.

19     And what about lawyers and Pro Compliance?  It was

20   RDC, not Larry Doud, who actually paid the 30,000 to lawyers to

21   get a report on RDC's compliance program.  The lawyers said

22   there were problems.  Understaffed and not doing due diligence,

23   not reporting orders, but Doud didn't add more employees.  He

24   rejected that proposal to hire Pro Compliance for more than a

25   few basic reports.  And remember what you heard from the

1    witnesses who were actually in the compliance department.

2    Pietruszewski and Pompeo.  They told you that Doud's investment

3    wasn't serious.  He did the bare minimum to keep up

4    appearances.  But then he forced compliance to the side, it

5    wouldn't interfere with sales.

6            Doud actually hated all these things.  He didn't want

7    to spend the money.  Carlos Aquino, called him a waste of time

8    and money.  Pro Compliance and the lawyers, he said it is

9    making me ill as to how much this is going to cost us.  Why do

10   we need Pro Compliance if we still have to do the work.  Doud

11   couldn't believe how much RDC had stuck in compliance.  He said

12   there is no return on what we are doing.  As Jessica Pompeo

13   testified, he saw these guys like an insurance policy.  Not

14   something that makes you safe, that keep you out of trouble.

15   Something you're required to have that was a waste of money.

16           So folks, don't buy it.  The fact that there were

17   consultants or ex-DEA or lawyers around at the time doesn't

18   mean he acted lawfully.  It doesn't change his intent.  This

19   isn't a defense.

20           You saw the evidence in this case.  The e-mails, the

21   testimony, the sales data, the suspicious order data, Doud's

22   bonus.  It all shows Doud knowingly and intentionally conspired

23   to distribute controlled substances illegally, and that he

24   knowingly and intentionally conspired to defraud the DEA.  It

25   was under Doud's watch that hundreds of dirty pharmacies sold

M1V3DOU4                    Summation - Mr. Gottlieb

1    dangerous drugs.  Pharmacies that were terminated for illegal

2    activity, on the screen, after Doud left the company.  It was

3    under Doud's watch that RDC didn't report suspicious orders,

4    only to report over 100 the year after he left the company.

5         There is no explanation in evidence for that change,

6    other than one thing, and Jessica Pompeo told you about it.

7    Doud was no longer there.  You know he was responsible for

8    supplying opioids to pharmacies, knowing those pharmacies were

9    selling them illegally.  And he was responsible for working to

10   cover up the crime through lies and deceit to the DEA.

11        Hold him accountable.  Return the only verdict that's

12   consistent with the law, the evidence, and your common sense.

13   Larry Doud is guilty.  Thank you, your Honor.

14        THE COURT:  Mr. Gottlieb?

15        MR. GOTTLIEB:  Your Honor.  Thank you.

16        May it please the Court, Judge Daniels, counsel, and

17   ladies and gentlemen of this jury, I cannot begin my summation

18   without recognizing and thanking each of you, each and every

19   one of you for your service as jurors in this case, at this

20   time, in the midst of a pandemic, under conditions that we have

21   never seen in our lifetime anywhere.  Certainly not in our

22   courtrooms.  Wearing masks, sitting in a reconfigured courtroom

23   with a jury box that is unlike anything we have seen.  Jurors

24   who are in the back.  I apologize if during the course of the

25   trial we couldn't even look at you, because of the way this is

1    configured.

2            Ladies and gentlemen, to serve as a juror in a

3    criminal case in normal times is in the highest tradition of

4    the American system of justice.  To serve as a juror during

5    these times, under these difficult conditions, goes way beyond

6    that and truly is extraordinary.  You deserve our admiration

7    and our thanks.

8            Now, I have the privilege, I have the opportunity to

9    stand up and to sum up the evidence for this good, decent,

10   honorable, honest man, Laurence Doud.

11           Mr. Doud sits here, he sits here innocent of the

12   crimes that the government has brought against him.  He sits

13   here wrongfully accused of the crimes.  And he sits here with

14   his fate in your hands.

15           Now, I will say this.  I don't believe my

16   distinguished colleague really meant to accuse me of trickery.

17   I certainly wouldn't accuse him of trickery in any questioning.

18   But this is what I would say.  What you just heard, what you

19   just saw from the government is a very selective cherrypicking

20   of certain evidence, a selective cherrypicking and misleading

21   statement of the law.  Selective pieces of evidence out of

22   context that served already to mislead you.

23           And so I say right at the outset, not so fast.  Not so

24   fast, government.  Not based on what was presented to this

25   jury.  Not only on direct examination, but on

M1V3DOU4                    Summation - Mr. Gottlieb

cross-examination.

So to begin, let me start with clarifying and making clear what this case is not about.

You know, if you just walked in the courtroom today, if you walked in the courtroom on any day, as an observer, to listen to the testimony, you would not be faulted in believing that this case is about RDC, the company. You would not be faulted in thinking, even in hearing the summation, that this is a case against the company, a lawful distributor of controlled substances. RDC is not on trial in this case. Larry Doud, an individual, is on trial.

This case is not about RDC's internal policies or whether the company followed its own internal policies and rules. Larry Doud is not charged with any crime that he failed to follow RDC's policies. This trial is not about whether RDC, company, violated the Code of Federal Regulations. Larry Doud is not charged, and it will not be presented to you any charge that Mr. Doud violated the CFR regulations.

This trial is not about whether RDC had an effective compliance program. Larry Doud is not charged with any substantive crime, individually and personally, with not having an effective compliance program.

(Continued on next page)

1        MR. GOTTLIEB:  It is not about whether RDC followed

2   the DEA's guideline letters.  Larry Doud is not charged with

3   not adhering to the DEA's guidance letters.

4        We're going to discuss in greater detail the specific

5   and the only charges that the government chose to bring against

6   Mr. Doud and that you will then be asked to consider and to

7   deliberate on.

8        So to be clear, I stand up on behalf of Mr. Doud and

9   only Mr. Doud.  I do not represent RDC, the company.  I want to

10  be clear that no one is saying that RDC's compliance program

11  was great.  Nobody is saying that it was a perfect compliance

12  program.  No one is saying that it was as effective as it could

13  or should have been or that it could not have been seriously

14  improved, but that's not the issue.  Even though the government

15  wanted to lead you to that point in their summation, that's not

16  the issue before you.

17       This case is about Larry Doud and only Larry Doud as

18  an individual.  The government, in this case, in this trial,

19  charged one individual, Larry Doud, in his individual capacity,

20  with intentionally, knowingly entering into a criminal

21  conspiracy with others.  He is not charged as a representative

22  of a company.  He is not charged as the CEO of a company that

23  you may believe may have violated regulations.  That's not the

24  capacity in which he sits here as a defendant.

25       When Judge Daniels gives you his instructions, you

1    will see that there will not be any instructions that talk

2    about some notion of vicarious liability in this criminal case.

3    And what I mean by that, and so that you understand, when the

4    government says, hold him responsible, so you understand what

5    ultimately is going to be in front of you, this is not a trial

6    to hold somebody responsible for the horrors of the opioid

7    crisis.  This is not a case to hold him responsible because he

8    was the CEO of RDC, the company that you heard so much about.

9    Merely by virtue of his position as a CEO of that company that

10   does not mean that he is guilty of any crimes, and you may not

11   convict Mr. Doud merely by virtue of his position as the CEO.

12           So when your begin your deliberations, please start by

13   keeping in mind these threshold questions:

14           One, did Larry Doud, the individual, intentionally and

15   knowingly enter into a criminal conspiracy to violate the law?

16           Two, did the government present sufficient evidence

17   reaching the level of beyond a reasonable doubt to prove that

18   Larry Doud, the individual, agreed and did join a criminal

19   conspiracy for the specific purpose of peddling drugs illegally

20   for nonmedical purposes?

21           That's a critical issue for you, and that's Count One.

22           And then three, did the government present sufficient

23   evidence that Larry Doud, the individual, joined with others in

24   a criminal conspiracy for the purpose of defrauding the

25   government.  That's Count Two.

1          Ladies and gentlemen, this isn't a civil case.  This
2    isn't a negligence case.  This isn't a breach of company policy
3    case.  It's not a case of could RDC have done better in its
4    compliance efforts.  This is a criminal case brought in this
5    courtroom in which the government must prove that one man,
6    Larry Doud, intentionally joined a conspiracy for the purpose
7    of committing a crime.  And a review of the evidence provides
8    the answer.  An objective review of all the evidence provides
9    the answer unequivocally:  No.

10         Now, you've been chosen to sit on a jury involving
11   issues of controlled substances in the midst of an era when too
12   many people have suffered the pain of addiction.  And we all
13   are rightfully concerned about the abuse of drugs, the abuse of
14   painkillers in this nation.  Many of you may have had loved
15   ones who have developed serious problems because of certain
16   pain medications.  The opioid crisis in this country has
17   touched far too many people.  But please -- please -- Larry
18   Doud, the individual, is not to blame and should not be used as
19   a scapegoat for our national problem in pain.

20         The people who are to blame are the criminal doctors,
21   the criminal doctors who wrote the prescription in
22   ever-increasing numbers over the years for illegitimate
23   purposes.  The people who are to blame are the criminal
24   pharmacists, like Michael Paulsen, who diverted these
25   medications out the back door to innocent people on the street,

1   criminals who clearly intend to have these drugs sent out into

2   the marketplace for illegal use and don't care.

3          If the people they sell to and profit from become

4   addicts and sometimes die because of what their intended

5   purpose really is, that is not Larry Doud.  Larry Doud, the

6   individual, is no more responsible for that than the companies

7   that manufacture the painkillers that are abused.  Those

8   manufacturers are not responsible.  Larry Doud is no more

9   responsible than even the DEA that, although fully aware of the

10  epidemic, you heard increased the quota of the amount of the

11  painkillers that could be manufactured and then made available

12  to criminals to divert.

13         The DEA is not to blame, but neither is Mr. Doud.

14  Larry Doud was the CEO of a successful wholesaler of these

15  painkillers.  He's had a career in the legitimate business of

16  serving as a wholesaler of pharmaceuticals, a small portion of

17  which included oxycodone and fentanyl, a business that

18  oftentimes was a godsend for loved ones after an operation when

19  the pain was so intense that they cried out for relief, some

20  relief; for others suffering chronic pain every day.

21         Larry Doud was licensed by the DEA to work for a

22  company that was a lawful, legitimate distributor of

23  medications, a company that was registered, and he became CEO

24  of an independent distributor of these pharmaceuticals, not one

25  of the major distributors, conglomerates that may have also

M1vBdou5                    Summation - Mr. Gottlieb

distributed pharmaceuticals but one of a very small few

wholesalers whose customers were similarly very small --

mom-and-pop companies, independent pharmacies, pharmacies that

sought the relationship with a wholesaler that would show them

individual attention while the big chains gobbled up the

independent pharmacies, and they became shareholders in the

co-operative that was RDC.  And because of that relationship

and the type of business RDC was, you heard about the RDC

culture that was born, the culture that had RDC work with its

smaller pharmacies -- to educate them, to try to have them

learn and to impose compliance programs, to prevent diversion,

and to serve their needs in a world that was quickly changing.

          Mr. Doud, as CEO, was entrusted with running that

business and making business decisions, and he did that.  And

some of those decisions were right.  Some of those decisions

were wrong, but they were business decisions that were made in

good faith, based on his own best judgment, having nothing to

do with any criminal intent.  Not one, right or wrong, was

shown to have been made because of a criminal intent.  And no

matter how the government may have distorted and misled you on

the issue of intent, you're going to hear it from Judge

Daniels -- what the real meaning is of intent.  So you

understand, contrary to what you may have heard, a car going

into a spot, handicap spot, intent isn't whether or not you do

something intentionally, meaning that you're not doing it as a

M1vBdou5                    Summation - Mr. Gottlieb

1   reflex or for any other reason.  That's intentionally, that you

2   do something for an intended purpose.

3          The intent we're talking about in this courtroom, in a

4   criminal case, is what's in your mind.  What is your intent in

5   your brain?  Why are you doing something?  Are you doing

6   something for a legitimate purpose, or are you doing something

7   for a criminal purpose?  This case is all about what was

8   Mr. Doud's intent, in his mind?  And as you know, Mr. Doud has

9   been charged only with two conspiracy counts.  And this becomes

10  important.

11         So everything you heard about doing something and not

12  following the law and not following a regulation, you know, the

13  substantive act or omission, that's not what we're talking

14  about here.  The charges that are going to be presented to you

15  are whether or not Mr. Doud joined with another or more in a

16  criminal conspiracy.  It's all about the proof of whether or

17  not Mr. Doud knowingly, intentionally decided to join with

18  others to commit crimes.

19         So let's look at conspiracy.  And again, Judge

20  Daniels -- he's the boss; he's the judge -- he's going to

21  instruct you, and anything I say that's contrary to Judge

22  Daniels, forget what I say.  But this is what I suspect you may

23  hear.

24         Conspiracy, just as a general term -- we're not even

25  talking about the details of Count One or Count Two.  Just

conspiracy.  You'll learn that conspiracy is an agreement of

two or more persons to join together specifically to accomplish

an unlawful purpose.  And in this case that means that the

government must prove beyond a reasonable doubt as a first step

that a conspiracy even existed involving these multiple

individuals.

        And that applies to both counts.  Both counts are

conspiracy counts, so you have to render a verdict -- in your

own mind even, initially -- were the essential element of

conspiracy present in both Count One and Count Two?  And if you

find that the essential elements -- that's what we call this

one and two stuff, the essential elements, both of them -- have

not been proven beyond a reasonable doubt by the government,

Mr. Doud must be acquitted.  And any close, objective review of

the evidence will prove that the government did not come close

to proving the essential elements of a conspiracy.

        You'll learn that to establish a conspiracy the

government must prove, as I indicated before, beyond a

reasonable doubt that there are at least these two other

individuals who intentionally and knowingly entered into an

agreement, a plan, the same agreement and plan to violate the

law as they're alleging Mr. Doud had in his intent, in his

mind.  And that means when you strip all the legalese, verbiage

aside in a conspiracy, any conspiracy, each co-conspirator must

have the same criminal intent.  Each of the co-conspirators

M1vBdou5                    Summation - Mr. Gottlieb

1   must have the same purpose, intent in their brain, to do what

2   they did or not to do what they did not do.

3          You can't conspire with a ghost.  You can't conspire

4   with air.  You can't conspire with yourself.  So the first

5   questions are:  Who then?  Who then, government, are the

6   co-conspirators in this case?  Who did the government really

7   prove to your satisfaction, ladies and gentlemen -- to your

8   satisfaction -- who did they prove beyond a reasonable doubt is

9   really a co-conspirator with the same intent as they're

10  claiming -- falsely, but claiming -- alleging Mr. Doud had?

11         So is it Michael Paulsen?  You heard from Mr. Paulsen.

12  He was marched to the stand by the government, and it can't be

13  based on what you learned and heard from Mr. Paulsen.  While

14  Mr. Paulsen did plead guilty to illegally selling opioids and,

15  apparently, based on what we heard, may now already be serving

16  his time, you also learned that his case is separate and apart

17  from the case charged here.  He's not a co-defendant in this

18  case.  The charges in his case are separate, and they're based

19  on an entirely different set of facts.  His crime was that he

20  sold opioids out his back door.  He sold them to desperate

21  people who abused the drugs, often became addicted.

22         Most significantly, you know he's not a co-conspirator

23  in this case against Mr. Doud because he told you.  He told you

24  he doesn't even know Larry Doud.  He obviously didn't enter

25  into an agreement with Larry Doud or join in any illegal plot

1   with him if he doesn't even know him.  Paulsen is just a lying,

2   thieving criminal who intentionally went out of his way to

3   physically and mentally destroy other human beings.  While

4   Paulsen said he purchased his diverted drugs from RDC, you

5   can't believe anything this guy said to you.  He admitted that

6   even when purchasing medications from RDC, he forged signatures

7   on the prescriptions.  That's at the transcript, 1461.  And he

8   admitted and told you that he submitted documents and

9   manipulated documents that he even gave to RDC.  That's at

10  1467.

11          So there's nothing about Paulsen that added anything

12  to this case.  And to your knowledge, because you're the key

13  here now, he added nothing to your knowledge about Larry Doud

14  as an individual being charged with conspiracy.  He didn't

15  enter any agreement with Mr. Doud to commit crimes.  He is not,

16  clearly, a co-conspirators.

17          So what about Barbara Castro?  Let's pause here just

18  for a moment.  Let's just think and realize how wrong it was to

19  march her through the courtroom and onto the witness stand, now

20  that you heard what she had to say and the very little that she

21  had to say about this.  The government hauls her into this

22  courtroom for what reason?

23          Now, listen, sitting as a juror day in and day out,

24  I'm willing to bet more than once you were saying, Okay, I

25  wonder if I'm going to be hearing this.  Is the government

1    going to produce evidence of this, because you're so involved

2    in the case as it unfolds.  And I'm sure you expected

3    Ms. Castro to say something that tied her pain specifically to

4    Larry Doud, being he's the gentleman who's charged and is

5    sitting here.  So you waited and you waited, and there was

6    nothing.  Yet the government thought it was all right to put

7    her through her public humiliation

8               MR. ROOS:  Objection.

9               THE COURT:  Sustained.  Let's concentrate on the

10   evidence.

11              MR. GOTTLIEB:  The government went so far as to show,

12   and I think even in the summation they posted, a surveillance

13   picture of her and her brother walking outside a pharmacy,

14   having nothing to do with Mr. Doud.  She had to bare her soul

15   in her questioning and to publicly share for everyone her

16   personal story of addiction and pain.  She told you she knows

17   nothing about Larry Doud, no contact with Mr. Doud, no

18   conversation with him, nothing about RDC or anything about RDC

19   or any of its employees.  And I submit the government is hoping

20   that you will somehow use her pain testimony to feel the need

21   to convict and to hold somebody responsible despite the absence

22   of any evidence to even justify holding Larry Doud responsible

23   for what has happened to her.

24              She couldn't say whether or not even the drugs she

25   used at any time were, in fact, sold to her by the pharmacy,

1    sold to her by the pharmacy, had come from RDC.  She admitted

2    she had purchased these painkillers multiple pharmacies as well

3    as from street drug dealers.  So what exactly justified putting

4    her on the stand?  And what did she offer?  Nothing.  So the

5    one inescapable conclusion is Ms. Castro is not a

6    co-conspirator.

7                So who else is there?  Perhaps you thought or waited

8    for the government to call even one pharmacist or doctor who

9    would tell you that they had entered into some conspiracy, some

10   agreement with Mr. Doud to have him arrange to send them

11   controlled substances for them to sell illegally, for them to

12   sell for nonmedical purposes illegally.  So you waited to hear

13   about some secret conversations, some bribe, some gifts,

14   something from somebody out there who would offer that up to

15   you.  But that never came.  None were called.

16                You can bet if there was any pharmacist, if there was

17   any doctor who had any sort of agreement with Mr. Doud, had any

18   contact with Mr. Doud that would allow you to believe that

19   there was that sort of *quid pro quo*, that person who have been

20   hauled onto that witness stand.  That person was not called as

21   a witness because that person does not exist.

22                MR. ROOS:  Objection.

23                THE COURT:  Overruled.

24                MR. GOTTLIEB:  You also waited to see if the

25   government was going to call some of those RDC employees who

M1vBdou5                    Summation - Mr. Gottlieb

1    you also heard about, whose names were mentioned as being

2    involved in compliance:  Joseph Brennan, a supervisor.  In

3    fact, William Pietruszewski's supervisor and Jessica Pompeo's

4    supervisor.  The government didn't call him.  What about Julius

5    Morton?  You heard his name just mentioned on summation.  The

6    government could have called Julius Morton.  They have the

7    burden of proof.  No Julius Morton.  What about Elizabeth

8    Cullen?  Amy Skibickyi?  All involved in compliance.

9           The government has the burden of proving the case in a

10   criminal case if they're going to indict one person -- a CEO of

11   the company without any additional information.  Those

12   individuals were not called.  Not one.  So when it comes to

13   alleged co-conspirators, all right, you are left only with

14   Jessica Pompeo and William Pietruszewski, and it's clear the

15   government wants you to believe that they are co-conspirators.

16   But ladies and gentlemen, that's your decision now to make.

17   Just because the government says so doesn't mean it's true.

18   You now are the judges of the facts, and this is what

19   eventually comes out.

20          Remember, again, when you're evaluating them based on

21   what the government wants you to believe -- they are

22   co-conspirators -- each of them must have the same criminal

23   intent as anyone else in the conspiracy.  So let's see what

24   they told you.

25          Now here, for a moment, we're not only going to look

M1vBdou5                      Summation - Mr. Gottlieb

1    at direct examination.  If you recall the summation that you

2    just heard, a lot of the slides showed tid-bits of direct, and

3    what that means, that's the question and answer that the

4    witness gave when questioned by the government on direct

5    examination.

6           Let's look at Jessica Pompeo on cross examination,

7    page 476 of the record.

8    "Q.  While you were at RDC, did you ever intend to divert

9    controlled substances?

10   "A.  Did I personally ever intend to divert?  No, I did not.

11   "Q.  Did you ever have conversations with other people about

12   intentionally diverting controlled substances?

13   "A.  Intentionally, no."

14          So this is what you have again.  It doesn't matter in

15   the real world, knowing what you have already heard but

16   understand perhaps better now.  The government meets with their

17   witnesses before they get on the stand.  They don't meet with

18   the witness one time.  They don't meet with the witness two

19   times.  They meet, and you heard the testimony, they meet over

20   and over in their offices to prep them for their direct

21   examination, to prep them for even cross-examination, but to

22   make sure they elicit from the witness what they ultimately

23   want, to be able to put on a slide to say, Look, she says she

24   intended to do something.  She said she's a co-conspirator.

25   That's on direct, because that's what they wanted and that's

1   what she's prepped to say.

2           But on cross, when pressed about it, then you begin to

3   get a sense of what's really in her mind and what is really the

4   truth.  That's not the result of being prepped.  So Jessica

5   Pompeo, right off the bat, is saying she did not intend to

6   divert controlled substances.  Those answers immediately take

7   her out of the conspiracy under Count One, charging a

8   conspiracy to illegally divert painkillers for nonmedical

9   purposes.  The conspiracy there is this agreement, as we're

10  going to see in a moment, with the intended, the knowledge that

11  the purpose, the aim is to divert the controlled substances for

12  nonmedical reasons.

13          And Jessica Pompeo, right off the bat, tells you she's

14  not part of that conspiracy.  That wasn't her purpose for doing

15  what she did.  That's under Count One for Jessica Pompeo.

16          Under Count Two, conspiracy to defraud the United

17  States by not filing suspicious orders or providing the

18  compliance policies to the DEA.  Here's what Jessica Pompeo

19  told you:

20  "Q.  While you were at RDC, did you intentionally defraud the

21  DEA?

22  "A.  Did I?  No.

23  "Q.  Did you have conversations with other people where you

24  specifically talked about intentionally defrauding the DEA?

25  "A.  This is a yes-or-no answer?

1     "Q.   Correct.

2     "A.   No."

3          And Ms. Pompeo explained to you what her purpose was

4     to do or not do whatever she did while she was an RDC employee.

5     She shared with you what her purpose, what her plan was.  What

6     was the objective, the object of not filing suspicious orders?

7     She told you she didn't want to loss her job.  That was it.

8     There was no other reason.  It was not to divert medications.

9     It was not to defraud the United States.  And if that was not

10    her purpose, if that was not the object of what she did or

11    didn't do, she is not a co-conspirator, and she's not a

12    co-conspirator under either Count One or Count Two.

13         So, let's look at the other claimed co-conspirator,

14    William Pietruszewski, on cross-examination, question, on 995:

15    "Q.   And I believe you told the jury the reason you did that is

16    Larry Doud didn't want you to file the suspicious order

17    reports, correct?

18    "A.   Correct.

19    "Q.   And that was the reason why you did or didn't do what you

20    told the jury about, right?

21    "A.   Yes.

22    "Q.   There was no other reason why you didn't abide by the

23    written policies, correct?

24    "A.   That's correct.

25    "Q.   You didn't fail to file suspicious reports because you

1   wanted or intended to have narcotics diverted by pharmacies,

2   correct?

3   "A.  I didn't want them to be, but they were diverted because I

4   let them go, yes.

5   "Q.  I'm just asking you what you intended and what you wanted

6   to do.

7   "A.  Okay.

8   "Q.  You didn't intend -- William Pietruszewski -- did not

9   intend to divert narcotics, correct?

10  "A.  Yes.

11  "Q.  You -- you -- never intended to have those pharmacies that

12  were ordering oxycodone, fentanyl, Subsys, you didn't want them

13  or intend to have them diverted, those medications, correct?

14  "A.  Yes."

15          Continuing, on 1001:

16  "Q.  You never told the prosecutors during your meetings, your

17  many conversations, that you ever intended to divert these

18  medications for nonmedical reasons, correct?

19  "A.  Right."

20          So stop right there.  The prosecutors were told.  The

21  purpose of him doing whatever the heck he did or didn't do, it

22  wasn't for the purpose, the aim, the objective to have these

23  medications diverted for illegal purposes.

24          And he continued.  This is from transcript 108:

25  "Q.  And the reason why, you explained to the jury the reason

1    why you didn't file the suspicious orders was for that reason,

2    that Mr. Doud, for the reasons you've expressed, he didn't want

3    you to file them, correct?

4    "A.  Yes.

5    "Q.  Had nothing to do with intending to divert narcotics for

6    illegal purposes, correct?

7    "A.  I mean, no.

8    "Q.  You didn't, you didn't fail to file suspicious order

9    reports with the intention of having illegal narcotics or

10   narcotics distributed for nonmedical reasons, correct?  That

11   isn't while you didn't file suspicious orders, correct?

12   "A.  Correct.

13   "Q.  And the not filing of the suspicious orders, you didn't

14   have -- the reason you didn't have the intention in not filing

15   it because you wanted to defraud the United States of America,

16   right?

17   "A.  I did not want to, no.

18   "Q.  And again Larry Doud, it's your understanding that you

19   were asked about on direct, Larry, your understanding of

20   Mr. Doud's thinking and not wanting to file the suspicious

21   orders also was because he wanted to keep the customers, not to

22   defraud the United States of America, correct?

23   "A.  Yes."

24        Ladies and gentlemen, this says it all.  This tells

25   you -- it is critical for you to feel and to understand -- this

M1vBdou5                    Summation - Mr. Gottlieb

1    is the reality of the testimony at the end of the day, not the

2    slick slide that the government puts up there in which he says,

3    I engaged in a conspiracy with Mr. Doud as if, okay, how many

4    times did we hear the prosecutor say, oh, this is easy.  We

5    don't really have to work at this.  This is simple.  Easy

6    decision.  Yeah, he said conspiracy.  End of story.  Not so

7    fast, not with what is at stake, not because of how serious you

8    are taking your responsibilities as a juror.  Hold your horses,

9    government.

10        What was done here was for business reasons, to keep

11   customers.  The prosecutors heard that during they're prep

12   sessions.  It had nothing to do with intending or wanting or

13   even thinking of committing any other crime, whether it be

14   diversion or defrauding the United States of America.  And yet

15   the prosecution continued.

16        So on the issue, again, of intent -- and we're still

17   just on the issue of whether or not there's even a conspiracy.

18   Forget the other elements that you heard about and you're going

19   to hear about again.  Just on the threshold question, is there

20   a conspiracy, there's more for you to consider when deciding

21   whether either Jessica Pompeo or William Pietruszewski or Larry

22   Doud had any criminal intent to commit any crime, either under

23   Count One or Two.

24        Let's go to the DEA agent, Kerry Whitmore.  And

25   remember what she told you about her visits with Ms. Pompeo and

1   Mr. Pietruszewski at RDC in 2013, 2014, and 2016.  Agent

2   Whitmore told you, Investigator Whitmore told you she went to

3   RDC in Rochester starting in 2013.  Questions had arisen

4   because of discrepancies in the ARCOS data on file when

5   compared to purchases by pharmacies.  Right, that's what leads

6   her to go out and to understand, to get an explanation of these

7   discrepancies in the ARCOS reports.  She told you she met with

8   Joe Brennan, Ms. Pompeo's and -- Joe Brennan, who is Ms. Pompeo

9   and Mr. Pietruszewski's supervisor.  She appeared unannounced

10  so there couldn't be any planning or what are we going to say

11  to her?  She knocks on the door.  She shows up.  It's

12  unannounced.  They gather, and Mr. Pietruszewski joins the two

13  of them on the phone.

14        So it's Agent Whitmore with Mr. Brennan and Ms. Pompeo

15  in Rochester, and Mr. Pietruszewski joins on the phone.  And

16  when she asks them about ARCOS and certain discrepancies that

17  she tells them she saw -- right?  She's telling them, she's

18  tipping them off as to why she's even there.  How did they

19  react?  How did they react?  Because, again, in your daily

20  lives, when you have to make a decision about something, you

21  take every thing into account, and one of the things that you

22  often take into account is, well, how did the person who you're

23  referring to, how did that person react to the information?

24        So let's see how these three individuals who the

25  government is claiming are involved in this criminal

1    conspiracy.  Ms. Whitmore says, first, they all cooperated

2    fully.  Transcript 696:

3         They answered all of her questions.  And when she told

4    them there was a problem with documentation of controlled

5    substances, what was their reaction?  Their reaction was one of

6    surprise.

7         698:  Not one of them, in a daylong meeting, said

8    anything that they felt pressured to do anything wrong.  No one

9    said anything that they wanted to do things differently but

10   couldn't because Mr. Doud directed them not to.  No one said

11   anything about they felt compelled to do it because they felt

12   pressured because they were even concern about losing their

13   job.  Not one of them said anything about Larry Doud insisting

14   that they do anything wrong.  Not one person, then or at any

15   other time, pointed the accusing finger or blamed their conduct

16   on Mr. Doud.

17        Then focusing on November 8 and 9 in 2016.  It doesn't

18   end.  She goes back there.  Beginning in the transcript at page

19   700:

20        She again meets and speaks to all three people again.

21   Again everybody cooperated.  Again all of them answering all of

22   her questions, and this time she told you the focus was on

23   suspicious orders and the lack of reports and the agent, the

24   investigator confronts them about the absence of suspicious

25   orders.  And what's their reaction?  Again, cooperate fully,

1    answers all of her questions.  And again, no one says anything

2    about being asked to do anything that they thought was wrong or

3    they didn't want to do or against their will.

4           No one says anything about violating the law.  No one

5    says anything about intending to sell drugs illegally,

6    diverting drugs illegally.  No one says anything about

7    defrauding the DEA by these reports or the lack of the

8    suspicious order reports.  Not one says anything about feeling

9    pressured not to file suspicious orders.

10          Investigator Whitmore's testimony, at 702, continued.

11   "Q.  When you were there in November on two days, 2016, did

12   Jessica Pompeo tell you at any time that she felt pressured not

13   to file suspicious orders?

14   "A.  No."

15          But -- and this becomes significant, Agent Whitmore

16   shines a light on what the truth is and what Ms. Pompeo's

17   immediate reaction, in 2016, is when confronted with the lack

18   of reports.  This is what she told you on page transcript 704:

19   Quote, she said she didn't see the full picture of ordering

20   patterns over time, close quote.

21          That was what Jessica Pompeo gave as the reason why

22   there were no reports -- that she didn't even see the big

23   picture.  That accounts for the lack of reports.  She didn't

24   even realize based on the patterns and what was going on,

25   again, significantly, having nothing to do with Larry Doud

M1vBdou5                    Summation - Mr. Gottlieb

1    ordering, pressuring, asking them to do anything wrong,

2    anything illegal, anything that would have them defrauding the

3    United States of America.  Nothing.  She never once mentioned

4    Mr. Doud -- this is Jessica Pompeo -- at all during these

5    meetings.

6           All these statements, all these interviews with the

7    DEA, their behavior, their reactions, their conduct are

8    inconsistent with criminal intent, inconsistent with criminal

9    conduct or behavior.  They're inconsistent with what you would

10   expect from someone who is covering up and has knowledge that

11   they've done something wrong, inconsistent with them covering

12   up their criminal conduct and their criminal intent.

13          You know, these three individuals -- from Mr. Brennan,

14   Ms. Pompeo, Mr. Pietruszewski -- here, Larry Doud isn't there;

15   nobody else is there from management -- they're free to do and

16   say whatever they want to say.  So now in 2013, 2014, 2016,

17   during all these interviews, when given the opportunity, they

18   could have said something -- something -- to indicate some

19   wrong conduct, behavior by Mr. Doud, and not one of them takes

20   that opportunity.  And the reason why they didn't take the

21   opportunity, under those circumstances, even when confronted,

22   even when in fact knowing an agent is there in effect almost

23   accusing them, not one of them, said:  Whoa.  Don't blame me.

24   Let me tell you something about Mr. Doud.

25          Not one of them said that, and there's a reason why

M1vBdou5                     Summation - Mr. Gottlieb

not one of them said it, because it wasn't true.  It never
happened.  And the government's theory and how they have
tortured the testimony and the emails out of context, putting
that aside for a second, the live testimony from the witnesses
who they are relying on told you a much different story.

        Ladies and gentlemen, this isn't a game.  This isn't a
game show, where the government does its bit and tries to
convince the audience of this, and then the defense does its
bit and tries to the convince the audience of something else.
This is serious business, and the government brought the
charges against Mr. Doud, and when they bring charges against
Mr. Doud individually, knowing what they knew, knowing what
these witnesses told the agents, you are entitled to say you
have doubt -- a doubt.

        And you know that during the hours and hours and the
days that the agent is there and they're doing the
investigation, you know that no one raises Larry Doud.  Even
when the agent's walking around speaking to other employees,
whether it be in 2013, 2014 or 2016, Larry Doud's not even in
the picture.  And you can be sure that if anybody -- anybody --
mentioned Larry Doud's name as possibly even knowing something
about what they're talking about -- the lack of orders, the
lack of information, the problems with ARCOS -- if anybody
uttered the name Larry Doud, the DEA would have been all over
Mr. Doud right then and there.

M1vBdou5                    Summation - Mr. Gottlieb

1          Mr. Doud would have received that knock on the door.
2    He would have received that telephone call.  After speaking to
3    all these other people, they would have wanted to speak to
4    Mr. Doud, but you heard that even up to the day of the trial
5    Agent Whitmore told you not once did she say I want to speak to
6    Mr. Doud.  Not once did she even try to speak to him.  And the
7    reason why is because he was not mentioned in connection with
8    any of this investigation.  And this notion that Ms. Pompeo and
9    Mr. Pietruszewski were some how robots and simply doing
10   everything and anything that Mr. Doud wanted them to do, that
11   their just functionaries, well, that's just false.  It's just
12   not true.

13          And again, we can't go over all the emails.  You've
14   already seen a lot during the trial and already, so I'm not
15   going to do that in great detail.  But when you deliberate, you
16   can see whatever emails you want.  The evidence in this case
17   puts to bed this notion that Ms. Pompeo and Mr. Pietruszewski,
18   they just are there as cogs in a machine, doing whatever Larry
19   Doud wants them to do.

20          We have defense A54.  This is an email from Larry Doud
21   to Bill Pietruszewski, and you'll see Bill Pietruszewski says:

22          "I feel we need to get a report back from Carlos on
23   Monday or Tuesday, the latest.  We then ask Carlos put on one
24   page all requirements that both stores need and have Tony sign
25   off on this, or we have Don write it up.  Or maybe the report

1    should go to Don, like the other three reports .  We're meeting

2    with Don today at 12:30 p.m.  We can ask him what he thinks.

3    Then we tell Tony they cannot purchase any oxycodone until we

4    have the papers drawn up by Don.  Then Tony can sign the

5    agreement, and we can allow his 4, 000 units a week be sent to

6    him."

7            Now, that's hardly comments made by he's just waiting

8    at his desk for Larry Doud to tell him everything that he

9    should do,

10           And Larry Doud's response, on defense A54:  "Sounds

11   like a good plan."

12           Can we see defense A62, defense A62, on the bottom,

13   see Lanny Doud to Bill Pietruszewski:

14           "This is interesting.  Paul claims we are/were primary

15   and all their business was $6,000 of which 15 percent was

16   controls and C2s, nothing that would have put up a red flag.  I

17   wonder if they were buying somewhere else and made us believe

18   that was all they had.  I would just shut them off controls and

19   C2s."  And that's from Lanny Doud.

20           And what's Bill Pietruszewski, who's the head of

21   compliance, his response is:  "Okay.  I will turn off the

22   controls until I hear different."

23           So, again, this is simply introduced to you and was

24   introduced to get a sense that Mr. Pietruszewski as well as

25   Ms. Pompeo, but certainly the head of compliance,

1   Mr. Pietruszewski, had much more authority, much more power

2   there than certainly was presented or argued by the government.

3        A68, defense A68.  This is a lengthier email from Bill

4   Pietruszewski to Larry Doud.  And on the third paragraph, just

5   what's highlighted there:  "We're talking to Carlos.  I turned

6   off their controls.  And so you are aware, we stopped filling

7   the narcotics."

8        And that's to Larry Doud and to Joe Brennan.  Again,

9   Bill Pietruszewski taking control of the situation, turning off

10  their controls

11       and then B8.  B8 is an email from Bill Pietruszewski

12  to all:  "Today I informed owner Heather Deck at Casey's

13  Prescription Pad that RDC was shutting down all sales of

14  controlled substances."  And then later on:  "I told her that I

15  had to report her to Buffalo DEA."  And "we just received the

16  usage we need from her on this last Friday, and there were

17  enough red flags on there for us to take immediate action."

18       So that's from Pietruszewski, Mr. Pietruszewski, and

19  again, it's submitted to you to begin to set the record

20  straight, to begin to level the playing field from what the

21  government chose in cherrypicking an email there, an argument

22  there, a statement there.  Let's even this out by looking at

23  all the evidence that presents a picture that the government

24  may not be thrilled with.  They may disagree with it as it fits

25  into their theory of this case, but it doesn't change the

1  facts.  It doesn't change the truth or the evidence, and all

2  that's before you for you to consider.

3           Now a word about Sam Alaimo.  He was raised on the

4  government's summation.  In the absence of any evidence of

5  pressure, the government decided, obviously, to call Sam

6  Alaimo.  He's not involved in compliance in any way.  He was

7  the credit risk manager.  All he offers is that his office is

8  near Jessica Pompeo's.  And one day, one day, one time, in all

9  the years we're talking about, he testified that Jessica Pompeo

10  came into his office crying that one time, and all you heard

11  was that she was upset that she had to release an order.

12  That's what you know about what she apparently was upset about.

13  You don't know anything more about this.  You don't know

14  whether or not Larry Doud, if she had a conversation with Larry

15  Doud that resulted in her releasing the order, had some

16  information that warranted it to be released.  You know nothing

17  about the context of why that happened, what led up to the

18  conversation, whether or not it was a longstanding dispute and

19  that Larry Doud, as CEO, made a final decision.

20           You know nothing more about it, yet the government

21  throws it in and even raises it in the summation in the hopes

22  that you will see this overbearing boss, who, both with

23  Mr. Pompeo and Mr. Pietruszewski, is just pulling their strings

24  and he's making all of the decisions.  That's just false, and

25  you can't rely on something like this, so totally out of

1    context and ambiguous, to support what the government wants you

2    to conclude based on this.

3             Ladies and gentlemen, just at this point, this is an

4    example of the problems with so much of this entire

5    prosecution.  The government is hoping that by just throwing a

6    lot out there -- a sentence there, a line there -- that you

7    will say, oh, geez, there's so much thrown up against the wall

8    he's got to be guilty; otherwise, why would the government be

9    doing it?  And I'm implore you, hold it.  Not so fast.  That's

10   not sustaining your burden of proof based on everything that

11   you learned, and that does bring us to why then, even on direct

12   examination by the government, why would Mr. Pietruszewski or

13   Ms. Pompeo give those prepped answers that fit so nicely on the

14   slide that was shown to you by the government but which was

15   contrary to their cross-examination testimony about their

16   intent, their purpose?

17            The explanation for all of you, as thoughtful,

18   intelligent, astute New Yorkers, is found in the reality of

19   what happens in a trial.  You heard one thing on direct,

20   something else on cross.  And it all focused, and you

21   understand now, it all focuses on intent.  What was the

22   criminal intent?  And the government, in order to meet its

23   burden, obviously even in summation, puts up there, Well, I

24   entered into a conspiracy, the same intent.

25            But that's not enough when there's more that they then

1    said that's inconsistent with this.  So how exactly does it

2    happen in the real world?  How does it go awry, where there are

3    these inconsistencies?

4           Let's start with the plea agreement, Government

5    Exhibit 3529-12, Mr. Pietruszewski's plea agreement.  It's a

6    plea agreement that you heard was finally entered into long

7    after he first began his meetings with the government,

8    countless meetings he told you about, talking about all of this

9    over and over, until the government finally agreed to a plea

10   agreement.  This is what you learned.  On the first page, this

11   is to his attorney, William Hughes, under Count One which is

12   the unlawful distribution and possession of the controlled

13   substances -- that's the charge here.  This charge carries a

14   maximum sentence of life imprisonment, a mandatory minimum

15   sentence of ten years imprisonment with.

16          What that means?  You can get life.  The best you can

17   hope for, under the best of circumstances if you're convicted

18   of these charges, the best you can hope for is ten years in

19   prison.

20          (Continued on next page)

21

22

23

24

25

1    MR. GOTTLIEB:  (Continuing) And you learned that under

2    Count Two of the indictment, this is the conspiracy to defraud,

3    the same here.  This charge carries a maximum sentence of five

4    years' imprisonment.

5    So, ladies and gentlemen, you start with the reality

6    of life, of people.  Especially, especially knowing that

7    Mr. Pietruszewski told you he didn't even intend to commit the

8    crime.  He didn't even intend to possess or distribute

9    narcotics and for it to be diverted for illegal purposes.  And

10   he's being told, you can go away for the rest of your life?

11   Consider it, any, any person, you're told by the

12   government that we don't care that you are saying to us you

13   didn't intend to do it, which is an essential element of the

14   case, you can go away for life imprisonment.  Do you think he

15   has a reason, a motivation, to now give the government what the

16   government wants?  To make a case and to get this gentleman,

17   Larry Doud?  You bet.  There's nobody who is immune from that

18   pressure.  Nobody.

19   So he signs this agreement and you know he's scared.

20   And he wants hope, hope that this won't happen, and hears the

21   hope.  It is set forth in black and white in the same

22   government exhibit, on page three.  Later on in this agreement,

23   this is what it read:  In addition, if this office determines

24   that the defendant has provided substantial assistance in an

25   investigation or prosecution, and if he has fully complied with

1    the understandings specified in this agreement, this office

2    will file a motion pursuant to Section 5K1.1 of the sentencing

3    guidelines, and 18 U.S.C. Section 3553(e), requesting the court

4    to sentence the defendant in light of the factors set forth in

5    section 5K1.1(a)(1)-(5).

6           So, that's legalese.  This is what it means in real

7    life.  This is his way out of the harsh prison sentence that he

8    is facing.  This is his way out of even the minimum 10 years in

9    prison.  He told you that this 5K letter, if sent to the judge,

10   can serve as the basis that even the mandatory minimum of 10

11   years, out the window.

12          And you also learned the government doesn't write this

13   letter automatically.  They still haven't written this letter

14   for Mr. Pietruszewski.  The government holds up that letter

15   until after he testifies.  That letter and that carrot that's

16   dangled is like the proverbial sword of Damocles, hanging over

17   Mr. Pietruszewski's head.  And it is ready to come down, unless

18   the government gives its stamp of approval to his performance.

19          But the government then on redirect says, but doesn't

20   the letter require you to tell the truth?  And the answer is

21   yes.  Come on.  Come on.  Come on, government.  Who decides

22   whether he's telling the truth?  Who decides whether or not his

23   testimony comports with what the government views to be the

24   truth?  Who decides whether or not Mr. Pietruszewski said and

25   did and what he said and did at this trial was sufficient to

1    satisfy the government to have them write that 5K letter?  The

2    judge doesn't make that decision, you heard.  No one makes that

3    decision.  The government prosecutors make that decision.

4    That's why the inconsistency when it comes to intent arose and

5    came before you in the person of William Pietruszewski.

6            And the same tactic, you heard, was used even with

7    Jessica Pompeo.  Now the government is saying, think about

8    this, you sat through Jessica Pompeo.  You heard what she said.

9    And the government today is continuing to claim that she is a

10   co-conspirator, meaning that she had a criminal intent?  That

11   she had the same sort of criminal intent as Laurence Doud?

12   Despite her clear testimony that there was no way, anywhere,

13   for any crime that she intended to commit the crime?  And yet

14   the government continues to make that argument?  Hoping that

15   you are going to buy it?

16           Jessica Pompeo, who told you she never intended to

17   commit any crime, to violate any law.  And you know, when the

18   government then stands up on redirect, oh, but did you think

19   something was wrong.  That's not a substitute for criminal

20   intent.  Saying something that I thought that I did was wrong

21   is like saying, yeah, I thought it was wrong to -- okay.  To

22   park in that parking lot.  That doesn't make it a crime.

23   That's not intent.  That's sure the heck not criminal intent.

24   So she meets with the government for some time, and the

25   government even just a few weeks ago, I think she said it was

1  in January, that was her testimony, just recently, tells her

2  that she could be charged with a crime, despite what she told

3  you?  That she had no criminal intent?  Wasn't involved in a

4  conspiracy?  The government in January is telling Jessica

5  Pompeo you could be charged with a crime, but if you cooperate,

6  Ms. Pompeo, we're going to give you a non-prosecution

7  agreement.  Why was a non-prosecution agreement even raised

8  based on what you heard her say?  Why is the government

9  dangling that sword of Damocles over a woman who is telling

10 them that whatever she did was because Larry Doud forced her to

11 do it, she didn't have a criminal intent, she had no intent.

12 She didn't get involved in a conspiracy intentionally or

13 knowingly.  And the government is actually negotiating with

14 her, well, we'll give you a non-prosecution but you have to

15 tell the truth, Ms. Pompeo.  If you want that non-prosecution

16 to see the light of day, just like Mr. Pietruszewski, yes, they

17 got her to say I know I have to tell the truth.  Whose truth is

18 it, ladies and gentlemen?  Whose truth are we talking about?

19 The witness's truth or the statements that the government hopes

20 and wants her to testify to in order to get Larry Doud?

21         There's something wrong.  There's something wrong.

22 And it sheds questions and doubts about Mr. Doud, because

23 that's what counts now.  Now it begins to really raise doubts

24 about the evidence against him that the government wants you to

25 rely on.

1   So this brings us to the next outrageous and reckless

2   claim that the government has made in this trial, starting at

3   the very outset, beginning in its opening statement.  And in

4   its opening the government told that you Mr. Doud had his

5   employees lie to the government about what they were doing.

6   And when the government makes a claim like that, that anybody,

7   Mr. Doud who is charged here, lied to the employees, you are

8   entitled to say and to see where is the proof that he actually

9   instructed, directed, told them to lie to the government.

10  There isn't a scintilla of proof that Mr. Doud ever

11  told, instructed, directed anyone to lie.  There isn't one

12  e-mail that he is instructing or telling anybody to lie.

13  And the government in its summation, sort of, very

14  quickly, spoke very quickly.  It was so easy for the

15  government.  So clear, it's so clear, we heard.  And they

16  glossed over the reality of what was actually being said.  It's

17  really a lie, he told them to lie because they gave them a

18  compliance program that wasn't really in effect.  That's a lie

19  so that means he told them to lie.

20  Well, the problem there, there is no evidence that

21  Mr. Doud told them to lie.  There is no evidence that Mr. Doud

22  told them to turn it over to the DEA.  In fact, the evidence is

23  to the contrary.  That the first time that Mr. Doud was even

24  told, the government put it up in an e-mail that Pompeo,

25  Ms. Pompeo and Mr. Pietruszewski had turned over the letter,

M1v3dou6                    Summation - Mr. Gottlieb

1    was after they had already done it on their own.  Right.  There

2    was testimony at that point that the DEA agent, Ms. Whitmore,

3    asked for the compliance, Jessica Pompeo left to get it, very

4    quickly came back.  Mr. Doud didn't hand it over.  Mr. Doud

5    didn't tell Jessica Pompeo, hey, give them our old 2014 or 2015

6    compliance letter.  This is one that Ms. Pompeo and

7    Mr. Pietruszewski and Mr. Brennan are doing on their own.

8    Larry Doud isn't even involved in this.

9            There's no evidence, there is no e-mail that Mr. Doud

10   told any of these people to lie to the government, to the DEA.

11           And he certainly, so much about red flags, what is of

12   interest, he never once -- talking about Mr. Doud now -- with

13   all these interviews that went over 2013, '14 and '16, he never

14   once, and there is not a scintilla of evidence because it

15   doesn't exist, that Mr. Doud ever told them to lie about

16   whether or not there was suspicious orders or orders of

17   interest or red flags.  Not one bit of evidence that he's

18   involved in telling employees to do anything, other than to

19   cooperate fully with the government.

20           Your Honor, would this be an appropriate time to have

21   a break?  I am --

22           THE COURT:  How much more time do you think you are

23   going to use?

24           MR. GOTTLIEB:  I would say another 45 minutes or so.

25           THE COURT:  All right.  We'll take a break.

1            MR. GOTTLIEB:  Thank you, Judge.

2            THE COURT:  Ladies and gentlemen, don't discuss the

3    case, keep an open mind.  We're going to take a 10-minute

4    break.  I'll bring you right back.

5            (Jury excused)

6            THE COURT:  Let's take a 10-minute break.

7            (Recess)

8            THE COURT:  We can get the jurors.

9            (Jury present)

10           THE COURT:  Mr. Gottlieb.

11           MR. GOTTLIEB:  Thank you, sir.

12           Ladies and gentlemen, let me get right to this issue

13   now of the compliance program itself.  Again, I'm not here to

14   justify it, to support the compliance program.  I want to

15   address it, because of the very plain statements made by the

16   government, more than once now, that there was in effect no

17   compliance program, it was all a sham, and even it went so far

18   as that the only thing that was done was just so that, some

19   time in the future, Mr. Doud would be able to say that there

20   was a compliance program.

21           The evidence shows otherwise.  And it could have been

22   much, much better by the company, RDC.  But, when you consider

23   this issue of the compliance program, let's start with Ruth

24   Carter's testimony.  To place it in context of whatever

25   compliance program there was, let's look at Ruth Carter.  You

M1v3dou6                    Summation - Mr. Gottlieb

1    start with Ms. Carter making it clear over and over again,

2    beginning at the transcript at 93, direct, "The DEA does not

3    tell the registrant how to design a suspicious order monitoring

4    system."

5            Second, what does the statute actually define as a

6    suspicious order.  And this is where we go to the Code of

7    Federal Regulations.  And you see the suspicious order is

8    there.  And all it says, the suspicious orders, which is in the

9    second paragraph, suspicious order includes orders of unusual

10   size, orders deviating substantially from a normal pattern and

11   orders of unusual frequency.

12           That's it.  That's the statute that we're talking

13   about.  That's the beginning, the middle and the end of the

14   statute pertaining to suspicious orders.

15           Ms. Carter told that you there are no other statutes

16   that lay out specifically more information about suspicious

17   orders.  There is no statute or law that further defines

18   unusual frequency.  No law or statute defines what unusual

19   frequency even means.  No law or statute even quantifies what

20   the line is between usual and unusual.

21           Ms. Carter further informed you that the red flags

22   that were discussed during the trial and in summations just

23   heard are not contained in any statute or regulation.  Nothing

24   is set out anywhere of how a company is to investigate.

25           Again, it must be recalled that RDC is not on trial

1   for its compliance program, but it's been raised so much and

2   again showing good faith, showing the way that Mr. Doud as an

3   individual, the context within which he is operating, it is

4   critical that you know and remember what Ms. Carter told you.

5   Ms. Carter also made clear that there is no statute that sets

6   out a limit on how long any investigation should even be, how

7   long the investigation can or should go on.

8        And you learned from Ms. Carter that the DEA doesn't

9   even require every flagged order be sent to the DEA.  On page

10  188.  "It is not what the regulation requires."  So think about

11  it.  The government is standing here, it's brought these

12  charges, is making the argument to you, is asking you to

13  convict one man, this individual, Mr. Doud, who is the CEO of

14  the company, for not filing suspicious orders in the context of

15  what the law says and what it doesn't say.  When there is no

16  proof that whatever he did was for any criminal purposes as

17  charged in this case.

18       And then the government is asking you to find that

19  Mr. Doud's reluctance to file suspicious orders was because he

20  wanted and intended to peddle drugs like Michael Paulsen or he

21  didn't file them because he intended to defraud the government.

22  When all the evidence proved was that those positions were

23  based on his making a business judgment to work with his

24  independent pharmacy base.  And again, within the context of

25  how unspecific the regulations are, and also what else I'm

going to speak about in a moment, right or wrong, the right
business judgment, the bad business judgment, that's the only
thing that is intended here.  No criminal intent.  No criminal
intent, based on the conspiracy charges that are charged in
this case.  The diversion of narcotics or to defraud the
government.  So, that's what Larry Doud's intention was, it was
not a criminal intention.

          A word about the DEA guidance letters that were
mentioned on summation.  The government points to the two
letters.  Claims that Larry Doud just blew them off.  Totally
ignored them.  Again, that is just false based on the evidence.
He did not blow off the guidelines at all.  And how do you know
that?  Well, you start off with the government's own witness,
William Pietruszewski told you that there was a compliance
program.  There was a compliance program, he was asked.  You
are not suggesting that there was no compliance program, right?
Answer:  There was, yes.

          Again, less than perfect.  We start off there was a
compliance program.  He and Jessica Pompeo explained that the
real problem with compliance was the understaffing.
Mr. Pietruszewski told you, "We didn't have enough help."
Jessica Pompeo complained of that as well.

          Ladies and gentlemen, that is not a crime.  Mr. Doud
in making those decisions as CEO, making judgments as CEO has
to balance a lot of issues, makes a judgment, makes a decision.

M1v3dou6                    Summation - Mr. Gottlieb

1   The fact that they were understaffed is not a crime.  And it is
2   not proof of a crime.  It costs money to hire employees.  There
3   is always that sort of tension, obviously, in every business
4   among the staff and among the CEO and the supervisors.

5        He wanted to serve his customers, to keep his
6   customers.  That is it.  That's the only thing that he is
7   intending.  Has nothing to do with any intent to commit a
8   crime.

9        And there is more to show from the government's
10  evidence as well as e-mails introduced by the defense that,
11  contrary to the government's claim, Mr. Doud was committed to
12  compliance and didn't just blow it off.

13       So look at, please, Defendant's A28.  This is an
14  e-mail from Larry Doud.  Last part of the thread originally
15  from Richie Cullen.  "I have to agree with Bill.  The
16  conference taught us one thing, that if the reason we are
17  taking on additional business is profit driven, then it is
18  usually the wrong reason to proceed.  I am not against bringing
19  on additional business, but if it means we are going to have to
20  live in DEA agent all the time, with us, we must proceed with
21  caution.  I know, we ultimately will do the best to protect
22  RDC."  And Larry Doud says, "Well gee, thanks, Richie, I agree
23  too."

24       A39 in evidence.  This is an e-mail from Larry Doud
25  talking about "I read Carlos' report this morning.  I can't

M1v3dou6                    Summation - Mr. Gottlieb

1    believe that his report wasn't that of someone looking to cut

2    their wrists.  He sure didn't seem to express the level of

3    concern that I felt in reading the report.  It is my opinion

4    that we should share this report with BelHealth, the parent

5    company, and give them a week or so to come up with the process

6    they are going to use to correct things and then go and meet

7    them at our earliest opportunity.  They need to put this all in

8    order, for them and for us.  We need a program that they will

9    adhere to and report to us on a regular basis, quarterly or

10   more frequently if that is what we need.  Monday, if you agree,

11   I will contact Harold Blue or Inder Tallur," who you recall is

12   the head of the company, "about this and see what we can get

13   going.  They should have a copy of this report as poorly

14   written as it is.  I will be in Monday."

15           So here you have just an indication back in 2014 Larry

16   Doud isn't blowing off, he is not blowing off compliance.  He

17   is bothered by what he reads.  He says we've got to do

18   something about it.  Those are not words, that is not an e-mail

19   of somebody who is intent on covering up his criminal intent,

20   his criminal mind.  He is acting in good faith at that time

21   based on the information he saw.  That's who this man is.  It

22   is not this person who is just ignoring everything.

23           Please, let's go to 61.  A61.  Larry Doud in an

24   e-mail, "Bill, I'm glad we are monitoring for sure," he says.

25   Again, I am throwing this out just to show you that the

M1v3dou6                        Summation - Mr. Gottlieb

1    snippets you received during the summation by the government

2    that he is just saying I hate this, I don't want to spend

3    money, we're not getting bang for our buck, whatever.  The fact

4    of the matter is Larry Doud was aware of the compliance

5    requirements, he was doing his level best.  He may not have

6    done the best that he might have or that you might think he

7    should have.  But that's not the issue.  There was a compliance

8    program and he was commenting that he was in support of it.

9           And then of course we have Defense A80.  And Defense

10   80 is the e-mail from Larry Doud June 14, 2016, which says,

11   "Fellows and Maid Marion.  With regards to opening new

12   accounts, as we discussed there will be a slight change in how

13   we go."  Again, this is at the end of all the chronology which

14   we'll talk about, about changing the standard operating

15   procedure, where you were given the impression by the

16   government, he came in, he imposed all new changes, he

17   disregarded everything.  Let's see what he said about

18   compliance.

19          "There will be a slight change in how we go.  I think

20   it will result in opening stores faster when the credit app is

21   approved.  We will require the dispensing report with the

22   credit app and also require pictures that you have taken.  So

23   when everything is here and the credit manager responsible

24   blesses the account and the dispensing report is here, we will

25   open the account for all purposes.  The compliance department

M1v3dou6                    Summation - Mr. Gottlieb

1    will do our due diligence and if everything is good we will go
2    we will go forth.  If there should be a problem and Joe tells
3    me there are about 2 percent of the time, we will stop shipping
4    controls until we get the issues resolved.  In most cases I
5    think you know if there will be a problem you should mark the
6    app for Jessica to see so that we do not make obvious mistakes.
7    But better yet if you know there will be issues like that is
8    why they want to do business with us, you may not want to even
9    do the application or warn the account it will take longer to
10   open.  We cannot be careful enough about staying completely in
11   bounds on these issues.  I hope that the changes will allow us
12   to move more quickly when you guys are successful at getting us
13   some new existing business from the competition."

14          So again, as late as June 2016, with all the e-mails
15   back and forth about changing the procedures because the
16   salespeople are bugging management that the process is too
17   slow, they are saying we're losing customers, we are not doing
18   our business.  Larry Doud, contrary to the impression that was
19   clearly given to you he didn't give a damn about anything else
20   other than opening the stuff up immediately, no compliance.
21   Well, this shows otherwise.  And there is nothing in the law
22   that says you cannot open, it doesn't say that, it doesn't give
23   you the chronology.

24          He clearly is committed to compliance, and is saying
25   if there is a problem, we are going to shut them down.

1    Now, let's go to Government Exhibit 278.  This was

2    raised again on summation and now we are going to deal with it.

3    Government Exhibit 278.  This is what the government introduced

4    on its direct case.  Government Exhibit 278 is a list of all of

5    these pharmacies, the date of it says red flag, termination.

6    You've seen this over and over.  And the date begins

7    January 27, 2017 and it goes all the way down to 2020.

8        Now, when this was introduced, just with the date

9    beginning in 2017, when Larry Doud is already moving away from

10   the CEO, the government was aware already that the typical

11   conduct and behavior of RDC was that pharmacists did their due

12   diligence, and after, even if they were terminated or

13   suspended, Mr. Pietruszewski said at transcript 1078, RDC then

14   reinstated their rights, their power to purchase controlled

15   substance, correct?  Answer:  Yes.

16       So what you have here, the government goes out of its

17   way to present to you this information beginning in

18   January 2017 for the clear purpose of having you believe, God,

19   look, all this happened after Larry Doud was there.  They did

20   not give you everything about what happened while Mr. Doud was

21   there.  The government created this exhibit just to give you a

22   misleading --

23       MR. ROOS:  Objection.

24       THE COURT:  Mr. Gottlieb, I shouldn't have to remind

25   you that you shouldn't comment on the government's motive or

1    their tactics.

2            MR. GOTTLIEB:  I apologize.  What I meant is the

3    result was it was misleading.  It was misleading because it

4    gave the implication that while Mr. Doud was there, there was

5    nothing like this going on.  But the problem arose, if you look

6    at the bottom of their own exhibit, the bottom, on the left.

7            MR. ROOS:  Objection.

8            THE COURT:  Go ahead.

9            MR. GOTTLIEB:  What?

10           THE COURT:  You can continue.

11           MR. GOTTLIEB:  It says 4/25/13 to 2/10/20 suspension

12   and termination.  But the exhibit the government put in did not

13   start 4/25/2013.  So we put in A82.

14           Can we have that.  A82.  That the defense put in.

15   Puts to bed this notion, this inference, this implication, that

16   while Larry Doud was the CEO, no compliance, nothing going on.

17   It is the same spreadsheet, it just starts at the date that the

18   government's own exhibit indicated it could have started,

19   because it begins on April 25, 2013.

20           And so, you then had these two competing exhibits when

21   in fact it really was or should have been just one exhibit.

22   Because it give a much clearer picture, not misleading in any

23   way, of all of the terminations and red flags going on of

24   pharmacies while Mr. Doud was in operation.

25           And you know that the evidence that came in that

1    subsequently many of these pharmacies wound up ordering

2    additional pharmaceuticals, well, we already knew that.  You

3    already knew that because Mr. Pietruszewski told you that even

4    after they were terminated or suspended, that situations could

5    change and they could be reinstated.

6              Now I will also say, with regard even to all of that

7    list of pharmacies that were suspended or terminated, while

8    Mr. Doud was the active CEO, I say to you, the government's

9    entire theory is all Mr. Doud was interested in was his own

10   personal greed.  That's the essence of this motive that they

11   have placed before you.  It doesn't make sense.  It doesn't

12   make sense that even looking at that exhibit, A82, all of it,

13   that Mr. Doud, if he was really only interested in continuing

14   to sell controlled substances, that he would have authorized

15   suspension or termination, at any time, while he is the

16   operating CEO.

17             And all the testimony that you heard from the rebuttal

18   witness about how he reviewed it and found that some of these

19   pharmacies repurchased it.  There is no question about it.

20   There was no reason to call that witness because that evidence

21   was already before you.

22             So now, from the testimony and from the full exhibit,

23   this is what you learn.  Between 2013-2017, two and only two

24   that were terminated were allowed to purchase again.  Two of

25   all those that were listed on that first page.  And K R D chart

M1v3dou6                    Summation - Mr. Gottlieb

1    14, we're not going to show that, shows there are only two

2    orders after the August 28 termination.  Greenwich was

3    terminated and had only three very small orders after they were

4    terminated.  That's chart 26.  All the others that were

5    terminated remained terminated that were terminated under Larry

6    Doud's supervision.

7         Now let's goes to The Chemist Shop, chart six.  And

8    before we look at that, now I want to set it up based on the

9    summation.  The government introduces an e-mail, it's

10   Government Exhibit 1218.  One moment, your Honor.

11        So on this e-mail that the government used -- your

12   Honor, thank you.  The government showed you, they're using

13   that to show that Jessica Pompeo says regarding something being

14   shut down and that didn't last long.  They are back on per

15   management.  That became an important point during the

16   summation.

17        So now, let's look at chart six, which is Government

18   Exhibit 913.  Interestingly enough, the government has now said

19   to you, look at that.  It was shut right back on, right, so the

20   whole thing was a sham.  But then you look at chart six, after

21   it's shut down, there are no additional purchases.  So in fact,

22   whatever was said in that e-mail is shown in this exhibit,

23   Government Exhibit 913, to reflect that in fact it was shut

24   down.

25        This is an example of what I say, you have to go slow.

M1v3dou6                    Summation - Mr. Gottlieb

1   You can't reach conclusions just based on something you hear.

2   So when the government says, look, this was just the attitude

3   now, it was brought right back down.  Well, if you compare it

4   to Government Exhibit 913, it shows that it remained shut down.

5   And all the other pharmacies that are listed on that exhibit,

6   and you are going to be able to go through all of the evidence,

7   whether it's Austin Chemists, EZ Care, Main Avenue, Vital Drugs

8   Super Star, Cedar Care, all of them, all of them, had no

9   additional subsequent purchases of controlled substance.

10          You can take that down.  Thank you.

11          I want to make a comment now about the charts, because

12   charts are a funny thing.  I think we all know that people can

13   create charts and they can see in the charts what they want to

14   see and you can play with the numbers and talk about

15   percentages versus gross.  That's the nature of math.  Not that

16   I ever understood math.  But, that's what I understand, that's

17   what happens with charts and these numbers.

18          The fact of the matter is, that when there was a

19   sudden increase, whether it's Linden Care or anybody else in

20   controlled substances, what's missing here, in evidence, and

21   what you don't know, and what you can't guess, assume or

22   speculate about, is what's going on with Linden Care as a

23   specialty pharmacy.  Or Dunn Meadow a specialty pharmacy.  Why

24   is it that after Larry Doud leaves there is a sudden reduction

25   in purchases or there's a sudden increase in terminations or

M1v3dou6                    Summation - Mr. Gottlieb

1    suspensions.  You don't know.  There is no evidence before you

2    as to what happened in 2017 with these pharmacies.  You don't

3    know if it was because there was additional media attention

4    that was exploding about opioids and RDC may have then decided,

5    after Larry Doud had left, we better start terminating and

6    suspending.  You don't know if those subsequent suspensions or

7    terminations in 2017 were the result of increased credit risks,

8    financial reasons having nothing to do with diversion.

9          You just can't assume in a criminal trial to know the

10   answer, unless the government presents the evidence to explain

11   why something happened.  And in this case, knowing what's going

12   on in the opioid crisis, and credit issues and financial

13   issues, there could be a host of reasons which I'm imploring

14   you not to figure out because there is no way to figure it out

15   in the absence of the evidence before you.

16         As far as compliance, you recall that Larry Doud never

17   told Mr. Pietruszewski that he should not have routine contact

18   with the DEA office.  I asked him that specifically at the

19   transcript 1027.  So here's this man Mr. Doud who the

20   government is trying to paint as somebody not interested in

21   compliance and certainly in having the DEA involved in his

22   business.  That is put to rest with Mr. Pietruszewski having

23   contact with the DEA and Larry Doud never telling him not to

24   remain in contact with the DEA.

25         Mr. Pietruszewski also told you, and this is all in

1    the context of the compliance program and what Mr. Doud knew

2    the context in which he was operating at this time.

3    Mr. Pietruszewski told you that should be something of concern,

4    that when he sought to meet with the DEA, on behalf of RDC, to

5    clarify, he told you, he wanted to meet with them to clarify

6    the company's suspicious order responsibilities, the DEA

7    frankly couldn't be bothered.  He called, this is at transcript

8    1028.  He called to set up a meeting, the meeting was canceled.

9    He called again, he tried to set up the meeting, he offered

10   dates, the DEA got back to him because those dates weren't

11   good.  The DEA though never reached out to him again with any

12   additional dates.

13          And this was all because the company, Larry Doud

14   clearly had to have known it, but Mr. Pietruszewski wanted a

15   clarification of how we should handle it.  What are we doing.

16   And you know that that wasn't forthcoming, the DEA wasn't

17   interested.  And you know the DEA made it clear and Ms. Carter

18   made it clear the DEA doesn't get involved in any of this to

19   give this sort of give and take, to explain it, to look at your

20   program and to answer any of your questions about any

21   suspicious orders.

22          Yet Mr. Doud stands in jeopardy today because the

23   absence of this information, when it could readily have been

24   obtained if the DEA had met with Mr. Pietruszewski could very

25   well have made it clear what Mr. Doud should or should not do.

1           So now I want to go to the specific charges.  Again,

2     we can look at Count One.  Remember in discussing this, you

3     only get to this once you agree that there is even a criminal

4     conspiracy involving Mr. Doud and somebody else.  We've already

5     addressed that.  If you find that there was not sufficient

6     proof beyond a reasonable doubt of a criminal conspiracy, he

7     must be acquitted.

8           But here, you can see, Count One, the object of the

9     conspiracy charged is in paragraph two.  It was a part and an

10    object of the conspiracy under Count One, that Laurence F. Doud

11    III, the defendant, and others known and unknown, would and did

12    distribute and possess with intent to distribute controlled

13    substances in a manner not authorized by law, in violation of

14    U.S.C. 841(a)(1).

15          Now, what we're talking about here and it has become

16    clear, the part that was unauthorized by law is that it was

17    going to be distributed for purposes other than non-medical

18    reasons.  That's the issue.  So, even here, if you find that

19    the government failed to prove beyond a reasonable doubt that

20    Mr. Doud or anyone else allegedly part of the conspiracy

21    knowingly joined a conspiracy knowing that the purpose was to

22    divert drugs, that element of the crime has not been proven,

23    and Mr. Doud must be declared not guilty.

24          So in other words, a conspiracy to have oxycodone and

25    fentanyl sold by criminal pharmacists and doctors out the back

M1v3dou6                    Summation - Mr. Gottlieb

1    door for non-medical purposes, if that's not proven, then

2    Mr. Doud cannot be found guilty under this charge.

3                And that means the government has the burden of

4    proving beyond a reasonable doubt that Larry Doud knew that the

5    purpose of the conspiracy, alleged conspiracy was to have

6    painkillers sold by RDC diverted for non-medical reasons, and

7    there simply is not a shred of evidence that that remotely was

8    his purpose in joining any so-called conspiracy.

9                Jessica Pompeo told you she didn't know there was

10   diversion.  While she may have suspected, she didn't have

11   actual knowledge.  William Pietruszewski may have suspected, he

12   told you he didn't have actual knowledge.  And Larry Doud

13   certainly did not have knowledge and never joined with anybody

14   to achieve that purpose.

15               Conscious avoidance next.  I want, because something

16   was said about it, and again, Judge Daniels is going to give

17   you the instructions.  But let's be clear about what it is and

18   what it isn't.  You cannot join a conspiracy without knowing

19   the specific purpose of the conspiracy.  That I believe is

20   going to be made clear to you.  If there is no evidence that

21   Larry Doud joined a conspiracy for the specific purpose of

22   diverting the drugs, he must be acquitted.  And conscious

23   avoidance, as will be explained by Judge Daniels, does not

24   overcome the lack of knowledge of the alleged conspiracy's

25   purposes and aims.  Conscious avoidance is not a substitute for

1    the knowledge of the alleged conspiracy's purpose.  Using

2    conscious avoidance is not a substitute for actual proof that

3    Mr. Doud entered into a criminal conspiracy with knowledge that

4    its purpose was to divert drugs illegally.

5          So in considering the purposes of the government's

6    alleged conspiracy, consider what Jessica Pompeo told you, and

7    I must point out also that this notion of conscious avoidance,

8    and the limited purpose for which it's going to be charged to

9    you, applies both to the conspiracy count in Count One, and the

10   conspiracy count in Count Two.  It has the same impact and

11   effect under both counts.

12         So I ask you to consider what Jessica Pompeo told you

13   and what she told you about her purpose was that on 611 of the

14   transcript:

15   "Q.  Why didn't you report suspicious orders to the DEA during

16   that period?

17   "A.  Because we didn't report our customers.

18   "Q.  Why did you go along with something that you thought was

19   wrong?

20   "A.  Because I didn't -- I didn't want to lose my job, because

21   I wanted to try and hoped that things would change."

22         Nothing here, ladies and gentlemen, about wanting or

23   intending the diversion of drugs.  And nothing to do with the

24   purpose of a conspiracy to defraud the United States government

25   or the DEA.  She simply didn't want to fall out of favor as an

M1v3dou6                    Summation - Mr. Gottlieb

1   employee.  And many people have that concern.  But that doesn't

2   make it a crime.  That is not criminal.  And that is not the

3   charge here.

4           Mr. Pietruszewski echoed that as well.  I showed that

5   and discussed his statements from transcript 995 and 996 that

6   he never intended to have narcotics diverted by pharmacies.  We

7   went over that earlier in the summation.  And he made it clear

8   he didn't file suspicious orders for the purpose of any illegal

9   distribution or that he wanted or that Larry Doud even wanted

10  him to do that.

11          Again, if Mr. Pietruszewski did not join any alleged

12  conspiracy with the purpose of committing those illegal acts,

13  then Mr. Doud is not guilty of that crime, of that conspiracy.

14          What is clear, ladies and gentlemen, from all the

15  evidence, is that Larry Doud did, what he didn't do, everything

16  that he is alleged to have done or not done, was done for one

17  single solitary purpose and aim and object.  And that was to

18  continue to build RDC's business.  That was his role.  That was

19  expected of him by the shareholders, that's what drove him.

20          It is preposterous, it is preposterous to even suggest

21  that Mr. Doud, knowing what you know about him, and having read

22  his e-mails, would ever conclude that his actions had any other

23  intended purpose or object.  It defies logic.  It defies common

24  sense.  That is not who Larry Doud is.

25          You can listen to Chris Masseth.  He was the witness,

M1v3dou6                    Summation - Mr. Gottlieb

he was the manager of branded prescriptions and trade

relations.  He described Mr. Doud as very involved with all

departments.  He talked to him on a regular basis.  He talked

to every employee at the company on a regular basis.  You would

see him go out into the warehouse and he knew every employee's

name.  He took the time to say hi to everybody, and, you know,

have conversations with them.  He was a good boss.

          And you heard from Reverend Donna Blythe, Mr. Doud's

pastor.  I completely trust him.  He is active in the food

pantry, ministry, he picks up food from Second Harvest.  He

serves those who are in need.  He has many gifts and graces.

          That's who we're talking about.  He is not some

statue, he's a real person.  And you have to evaluate all the

evidence and what the government wants you to find about him,

about being this manipulative criminal, in their words.  That's

not Larry Doud.  And there is nothing in evidence to suggest

otherwise.

          Now a word about the issue of fentanyl that you heard

about.  And it was so easy, again, the government in summations

said, listen, this is easy.  All you have to do is look at this

chart and you add this up and you can conclude anything as long

as it helps convict Larry Doud.

          But, so under Count One, let's make sure the facts are

clear and understood.  Under Count One, there is a requirement

that the amount of fentanyl that was diverted -- was diverted

M1v3dou6                    Summation - Mr. Gottlieb

1  is the key -- was 400 grams or more of fentanyl.  And there is

2  not bit of evidence that any specific sales of fentanyl were

3  diverted.  Not one shred of evidence that in all the fentanyl

4  that was sold, there is no evidence that any portion, any

5  particular sale resulted in diversion.

6           All the government is able to put forward is that

7  chart Government Exhibit 909, and you heard that that chart

8  doesn't indicate what specifically of the fentanyl was

9  distributed or was diverted, if any.

10          Kerry Whitmore just told you it shows the volume of

11 sales.  You can't say that because Paulsen purchased from RDC

12 at some point any specific amount or approximate amount, that

13 therefore, it even related to RDC.  Paulsen is a worthless, not

14 credible witness.  You can't rely on anything that he says.

15 His motive to lie is unmistakable as well.  He's hoping also to

16 get a break, even once he starts serving his sentence to

17 shorten his sentence some time in the future.  That's the

18 evidence that came out about Paulsen.

19          Let's go to Count Two now.  This is incredible when

20 you are at trial based on evidence like this to have the

21 government in summation say, oh, Count Two.  Not even close.

22 Like, why are we even talking about Count Two.  Well, let's

23 talk about Count Two.

24          One, there was no conspiracy.  So it's not so easy.

25 It's not so clear.  No conspiracy, not guilty under Count Two

1    even without looking further about the specifics.

2           Under Count Two, it was a part and object of the

3    conspiracy under Count Two that Laurence F. Doud III, the

4    defendant, and others known and unknown, willfully and

5    knowingly using deceit, craft, trickery, and dishonest means

6    defrauded the United States and its agency DEA by impeding,

7    impairing, defeating, obstructing the lawful function of the

8    agency.

9           Government, you're right.  It isn't close.  There is

10   nothing in this evidence to show that whatever Larry Doud did

11   with regard to the DEA, the policies and the statistics with

12   regard to suspicious orders, that anything that Larry Doud did

13   was done for the purpose of obstructing or interfering with the

14   DEA.

15          Putting aside anything that Ms. Pompeo,

16   Mr. Pietruszewski did, there is not one scintilla of proof,

17   evidence, that any of that information was done at the behest

18   or the direction of Larry Doud or that he directed anybody or

19   instructed anybody to provide false information to the DEA.

20   That is a false charge.  And saying it's easy and it doesn't

21   really require much consideration belies the truth about that.

22          On the issue of greed.  The motive of greed.  We've

23   already talked about the evidence contained in the government's

24   chart.  The facts and the evidence in this case show that

25   Mr. Doud was not motivated by greed to commit crimes.  And I

1    don't care how often the government decides to say it over and

2    over again and the charts the government spent so much time

3    discussing do not prove that point at all.

4           Looking at the charts, and the government's own

5    witness, Chris Masseth, confirmed the truth, that

6    non-pharmaceutical gave the highest profits, the

7    non-pharmaceuticals, not the controlled substances, items like

8    cough drops or Advil.  And the sales of controlled substances,

9    you heard, had an insignificant impact on Mr. Doud's bonus and

10   compensation.

11          We have 903 on the board.  This is a bar graph.  The

12   sale of opioids as a percent of RDC's total sales revenues from

13   2010 and 2016.  And looking at that slide during the height of

14   the epidemic, 2013 to 2016, it shows sales of controlled

15   substances pale in comparison to sales of non-controlled

16   substances.  Both in percentage, and in total gross sales

17   revenue.  Opioids account for at most 11.6 percent in 2014 of

18   sales of total revenue.

19          Now look at Defendant's Exhibit R1.  The annual RDC

20   sales line, this is where the bottom line, the green is

21   controlled substances.  Although that increases, it is fairly

22   flat in increasing very moderately.  The sale of non-controlled

23   substances during that same period of time increases much more,

24   and at a much steeper rate than the controlled substances and

25   that matches the orange line of the total sales.

M1VBDOU7                        Summations - Mr. Gottlieb

1          MR. GOTTLIEB:   Look at slide R1.  Now we get to the

2     annual bonus amount.  And again, the way the government tries

3     to provide a spin to it that is so misleading that I would ask

4     that you take a step back and just look at the documents.

5          You go to the annual bonus amount.  You take 2015 for

6     example.  Controlled substances accounted for only 13.5 percent

7     of his total bonus.  2014, it is only 16.3 percent.  The

8     percent of bonus from non-controlled substances runs from 86.4

9     percent in 2015 to 83.7 percent in 2014.

10          The bottom line here, ladies and gentlemen, the bottom

11     line is the total amount of Larry Doud's bonus because of

12     controlled substance even added size point in 2015 is $149, 696

13     out of a bonus of over 1.1 million dollars, so the total

14     percentage of the bonus compared to the total sales of the

15     controlled substances is significantly reduced and

16     significantly lower.

17          That percentage and that amount is hardly so high that

18     someone like Larry Doud would intentionally commit a crime, and

19     remember that most of the sales come from the two largest

20     pharmacies.  It's not just across the board.  They come from

21     Linden Care and Dunn Meadow, the two speciality pharmacies that

22     would order the most of the pain killers because of their

23     particular business; and therefore, there would be more red

24     flags.  There would be an increase.  That's what was happening

25     as doctors more and more are writing prescriptions and

M1VBDOU7                          Summations - Mr. Gottlieb

1    pharmacies are more and more getting those prescriptions and

2    then ordering controlled substances from RDC.

3           More proof that greed has nothing to do with anything

4    that Larry Doud did.  Outside consultants, Mr. Aquino was

5    hired.  Why would Larry Doud pay money for an ex-DEA agent to

6    undertake independent investigations, read his reports?  If he

7    was only conscious of spending money, why would he actually

8    bring in somebody with that background, that training to look

9    into his business if he actually was involved in any crime?  It

10   doesn't make sense.

11          In slide -- we have Defense Exhibit A39.  That was the

12   slide that we had talked about before where Larry, Mr. Doud,

13   actually raises concerns, but obviously is interested in the

14   compliance.  It just doesn't make sense that he is spending

15   money as well as terminating or suspending pharmacies if he was

16   motivated solely by greed.

17          Then we look at ProCompliance.  He hires a third-party

18   vendor to independently audit.  Again, why would he do that if

19   he's motivated only by greed?  Now, let's go to Larry Houck.

20   He's the lawyer.  He was raised on the summation.  So the

21   question that you could probably ask is, Why would Larry Doud

22   pay money for an outside independent law firm to come into his

23   business to investigate the RDC compliance program and make

24   recommendations for improvement if all he was interested in was

25   saving or making money?  Why would he bring in an independent

M1VBDOU7                         Summations – Mr. Gottlieb

1   attorney to look into the deepest recesses of his business to

2   see what is going on with the compliance program if he wanted

3   to get away with a continuing conspiracy to commit those

4   crimes?

5         I would point out in Government's Exhibit 31 or is it

6   33?  Government Exhibit 31 was the first paragraph of the

7   attorney's recommendations.  And it's dear Mr. Bilgore. He's

8   the attorney for RDC.  Per our discussion this letter sets

9   forth our recommendations for a review of The Rochester Drug

10  Co-Operative's compliance program.

11        And then going down, Especially we believe this review

12  is necessary to minimize the risk of administrative action

13  against the company's DEA registrations and the imposition of

14  civil monetary penalties for recordkeeping and reporting

15  violations under the CSA.  Also, this review likely will be

16  helpful in light of RDC's pending application for a DEA

17  registration.

18        Now we can go to the next page.  And he talks about,

19  if you read this paragraph on page 2.  As you know, Value Drug

20  of Altoona Pennsylvania recently agreed to pay $4 million to

21  resolve allegations that it failed to detect and report

22  suspicious oxycodone memoranda.  It talks about Value Drug.

23  Then it talks about Cardinal Health, the company; Mckesson

24  corporation, the company; Harvard Drug Group, the company for

25  failing to report suspicious orders in violation of 21 CFR.

M1VBDOU7                          Summations - Mr. Gottlieb

1      This is in evidence by the government.  Ladies and

2 gentlemen, this shows what's going on as more and more

3 investigations are going on, is that the companies, the

4 corporations are being investigated.  They are paying fines.

5 That's been the focus.  Not one of these involve the CEO of any

6 one of these companies.

7      But here, you suddenly are being asked to say to the

8 CEO of RDC -- and we don't represent RDC, that the CEO somehow

9 falls within the purview of the narcotics pushing, peddling

10 crimes which Paulsen and doctors have pled guilty as

11 individuals.  This is unacceptable because it's just not true.

12 He is and he should not, under the law -- again, if the law --

13 if the facts justify that he had the intent, that would be one

14 thing.  But as we discussed, it just isn't there.

15      And again you heard the total amount of the bills was

16 over $34,000 that he spent for the attorney.  On the issue of

17 greed you also heard testimony, this is the amount, multiplier

18 is the amount of the average monthly purchases that RDC allows

19 customers to order.  And you heard that the company RDC reduced

20 this twice between 2012 and 2017.  The company with Larry

21 Doud's approval reduced the percent that they could even order

22 from 3 percent to 1.5 percent of their average monthly

23 purchases.  Why would Larry Doud lower the rate if greed drove

24 his conduct?

25      Now I want to talk about the standard operating

M1VBDOU7                    Summations – Mr. Gottlieb

 1   procedures.  We already read the last email that Larry Doud

 2   wrote that was A80 after the back and forth about the standard

 3   operating procedures.  Let's look at the chronology so that you

 4   can get a real sense of what was driving Mr. Doud to do this.

 5         We looked at Government Exhibit 50.  This is an email

 6   from Scott Behanna July 22, 2015.  "I wanted you to be aware

 7   that I am on the verge of losing this account only a few months

 8   after opening it because I can't get an answer from compliance

 9   on whether we will let him buy controls and set up CSOS."

10         And then he continues, then we go to page 2 of this

11   email. Scott Behanna as part of this thread then continues.

12   "This account has been buying a little since April, just

13   controls.  His first intent of sending his usage was no good

14   because it did not contain method of payment.  I let it go for

15   a while and he call me and said, let's try again.  That's when

16   I suggested getting Jessica involved, and she did a great job

17   getting what we needed.

18         The problem is, I can't give an answer when he ask how

19   long will this take.  Any answer I give could be wrong, five

20   days, ten days, maybe more than 30 days.  All the information

21   is there and I understand it takes time, but it's two weeks and

22   I have to call him tomorrow and hope he accepts my vague

23   answer.

24         Everyone including Mr. Doud wants the attorneys to

25   look into it. That's clearly expressed in the emails that you

M1VBDOU7                           Summations - Mr. Gottlieb

1    saw.  Everyone is on board with the attorneys help along with

2    compliance to reduce the time.  It's not consistent to do that,

3    to take that position that all you're going to do is impose a

4    change and you don't care about compliance.  You don't care

5    about the law.  You're just interested in greed.  Everybody

6    including Mr. Doud is looking to the attorneys.  It certainly

7    has nothing do with diverting drugs.  It has nothing to do with

8    defrauding the government.

9         Look at slide Defense Exhibit A23A 001.  Again, this

10   is all part of the emails, the chronology of what leads

11   Mr. Doud to say, We've got to make a change for no illegal

12   purpose or part of the conspiracy.  Larry Doud says on the

13   bottom, we are above the bar and should stay there with all the

14   folks we have, but we are slow to open.  Four or five weeks is

15   too long.

16        Bill Pietruszewski above says the SOP just states the

17   RDC will conduct a review prior to opening them to controls.

18   We would just need to change this, but we would ask that the

19   attorneys would do so also.  And then we showed you already

20   Defense Exhibit A80.  So even without the attorneys making the

21   changes, and now we're all the way into June of 2016. Larry

22   Doud expresses and tells everybody, the very minor changes

23   still requiring dispensing reports and other information.  This

24   is hardly consistent with somebody who is flaunting and

25   ignoring the law.

M1VBDOU7                          Summations – Mr. Gottlieb

1           Ladies and gentlemen, that is it.  That is it.  This

2    has been a trial with a lot of exhibits.  Your patience has

3    been unbelievable.  Your patience listening to me is

4    appreciated and I have tried to the best of my ability to

5    crystalize the real issue that gives a much different story and

6    color to what the government has tried to convince you this

7    case is about.

8           And once I sit down, you will not hear from me again.

9    And even though you're wearing mask, I can tell some of you are

10   smiling, but you're going to get a chance to hear from the

11   prosecutors one more time.  That's the way it works, so I ask

12   you while you are listening attentively to what is being said

13   to you on their second summation, knowing I cannot respond, I

14   ask that you ask these two questions.

15          Every time some new chart is shown or some email is

16   shown or some new argument is presented to you as you are

17   sitting there listening and when you deliberate, I ask you to

18   ask this, How does that prove that Larry Doud, the individual

19   sitting here, intentionally joined a criminal conspiracy?

20          Second question, how does that prove that Larry Doud

21   intended to divert controlled substances or defraud the

22   government?

23          So I will end with this: Thomas Jefferson once said, I

24   consider trial by jury as the only anchor ever yet imagined by

25   man, by which a government can be held to the principles of its

M1VBDOU7                          Summations - Mr. Gottlieb

1    Constitution.

2             Right now.  Right now Mr. Doud is presumed innocent,

3    and he can only be stripped of that innocence if the government

4    proved by way of evidence, not emotion, not conjecture, that

5    Mr. Doud and only Mr. Doud the individual is guilty of the

6    charges in this case.  Not RDC, not the company, but as an

7    individual who the government claims committed crimes in this

8    case.

9             While the government's motives are admirable, the

10   effort to end the abuse of controlled substances should be

11   applauded.  We all do.  The government in this case, ladies and

12   gentlemen, in this case that you had the privilege of sitting

13   as a juror for, the government made a terrible error in

14   prosecuting an innocent man.  Larry Doud does not deserve to be

15   here.  He has lived with this nightmare of being wrongfully

16   accused and charged with crimes for more than three years.

17            This trial has shown that while Mr. Doud may not have

18   done everything he could have as CEO, he's not perfect, but he

19   never, ever and would never intend to have those pain killers

20   peddled illegally.  Never.  He assume the CEO position and he

21   did the best he could and he looks to you now to set the record

22   straight.  His fate is in your hands.  You stand between

23   justice and a wrongful conviction of an innocent man.

24            MR. ROOS:  Objection.

25            THE COURT:  Overruled.

M1VBDOU7                        Summations - Mr. Gottlieb

1           MR. GOTTLIEB:  The evidence clearly shows when you

2    look at everything that the government has failed to meet its

3    burden, its constitutional burden of proving a case beyond a

4    reasonable doubt before Mr. Doud or anyone can be declared

5    guilty of the charged crimes.

6           We now wait for your verdict with our thanks. Your

7    Honor, thank you.

8           THE COURT:  Ladies and gentlemen, we're going to

9    adjourn for the day to 9:45 tomorrow morning.  The government

10   is entitled to a rebuttal summation, so we'll do that first

11   thing in the morning before I instruct you on the law.

12          Let me also remind you at this point in time because

13   the lawyers, both sides, have commented on what they think I'm

14   going to say in my jury instructions, and I want to tell you

15   right now that you are to take the law as I give it to you.

16   And if any attorney is stating a legal principle that's

17   different from any that I state to you in my instruction, it's

18   my instructions you must follow.  So I want to see if we can in

19   the first hour finish up the government's rebuttal summation.

20   In the second hour give you the instructions on the law and

21   send you in by lunchtime to begin your deliberations so you at

22   least for tomorrow have most of the afternoon to deliberate.

23          Don't discuss the case.  Keep an open in mind until I

24   finally charge you on the law and send you to begin your

25   deliberations.  I'll see you tomorrow morning at 9:45.

M1VBDOU7                        Summations - Mr. Gottlieb

1              (In open court; jury not present)

2              THE COURT:  I remind them, because, Mr. Gottlieb, I

3      think you misstated a legal principle and probably not

4      intentionally, you said that the government has to prove that

5      they sold over 400 grams of fentanyl.  That's not what they

6      have to prove.  They have to prove that they conspired to sell

7      that amount, not the actual amount was sold.  So you misspoke

8      on that.  That's the reason I gave that instruction.

9              MR. GOTTLIEB:  I didn't realize that.  Thank you.

10             THE COURT:  Ms. Rothman, are you going to give the

11     rebuttal tomorrow?

12             MS. ROTHMAN:  Yes, I will be less than an hour, your

13     Honor.  I got the hint.  Just one thing, I don't think there is

14     an uncalled witness equally available charge in the current

15     draft.

16             I know it was spoken about and I think your Honor has

17     said that's not really at issue here.  There was a lot in

18     Mr. Gottlieb's summation.  You have it. You're showing me.

19             THE COURT:  That's it.  Mr. Gottlieb, you several

20     times indicated that certain witnesses who were not here and

21     certain evidence that testimony that was not presented.  I

22     think they're entitled to such an instruction.

23             Obviously, it's a balance instruction as to both

24     sides.  I think I made a slight change.  At this point it says

25     that there are several people whose name you heard during the

M1VBDOU7                          Summations - Mr. Gottlieb

1    trial but who did not appear here to testify.  I instruct you

2    that both sides had an equal opportunity or lack of opportunity

3    to call any of these witnesses; therefore, you should not draw

4    any inference or reach any conclusion as to what they would

5    have testified to had they been called.

6           The last paragraph says, You should, however, remember

7    my instruction that the law does not impose upon the defendant

8    in a criminal case the burden of duty of calling any witnesses

9    or producing any evidence.  The burden remains with the

10   government to prove the guilt of the defendant beyond a

11   reasonable doubt.

12          Ms. Rothman, did you want that instruction?

13          MS. ROTHMAN:  I think that's fine, your Honor.  We do

14   want an uncalled witness instruction.  What you proposed, I

15   might want to look at it, but it sounds --

16          THE COURT:  I think I took it out of your request.

17          MS. ROTHMAN:  Then it's great. Your Honor, I feel like

18   we're starting to hit a stride of thinking similarly.  Hearsay

19   was a problem.  I think we're making progress, your Honor.

20          THE COURT:  I will find an appropriate place to put

21   that next to witnesses who testify and I'll give that

22   instruction probably after expert witness instruction

23   because -- between the expert witness instruction and the

24   defendant's right not to testify which will be in between pages

25   35 and page 36.

M1VBDOU7                        Summations – Mr. Gottlieb

1          All right.  See if we can start promptly at 9:45

2    tomorrow.  See if we can give the jury the case so they can

3    begin their deliberations by lunchtime at the latest, and so

4    I'll see everyone tomorrow morning at 9:45.

5          I think I have a nine o'clock sentence so I should be

6    here and ready and that shouldn't take me more than a half

7    hour.  Okay.  I'll see you tomorrow morning.

8          (Adjourned to February 1, 2022 at 9:45 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25