UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>       v.<br><br>LAURENCE F. DOUD III,<br><br>                              Defendant. | Case No. 19 Cr. 285 (GBD) |

## SENTENCING MEMORANDUM ON BEHALF OF
## DEFENDANT LAURENCE F. DOUD III

ROBERT C. GOTTLIEB
& ASSOCIATES PLLC

THE JANEY LAW FIRM PC

111 Broadway, Suite 701
New York, NY 10006
Tel.: (212) 566-7766
Fax: (212) 374-1506

*Attorneys for Defendant*
*Laurence F. Doud III*

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ……………………………………………………… iii

PRELIMINARY STATEMENT ...................................................................................1

   I.    RELEVANT FACTUAL BACKGROUND...................................................4

  II.    SECTION 3553(A) FACTORS ANALYSIS AS APPLIED TO MR. DOUD'S CASE...................................................................................................................7

       A.    Consideration of Section 3553(A) Factors Merit A Lenient Sentence........9

           1.    History and Character of the Defendant ......................................9

           2.    Mr. Doud's Personal and Professional Background ..............................11

           3.    Mr. Doud Helps Others with Acts of Kindness and Compassion ..........15

           4.    Mr. Doud's Additional Community Service and Contributions ............18

       B.    Nature and Circumstances of the Offense ...........................................................20

       C.    A Non-Incarceratory Sentence Serves the Purposes of Sentencing ...............26

           1.    Deterrence......................................................................................26

           2.    Need to Protect the Public..........................................................27

            3.    Just Punishment ..........................................................................29

 III.    MR. DOUD SHOULD BE RELEASED PENDING APPEAL.................................30

       A.    Mr. Doud is not a Flight Risk and Does Not Pose a Danger to the Community ......................................................................................................................32

       B.    Mr. Doud's Appeal is not for Purposes of Delay and Raises a Substantial Question Likely to Result in Reversal or an Order for New Trial .................35

       C.    Exceptional Reasons Require the Release of Mr. Doud Pending Appeal.......38

CONCLUSION ...................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>**Cases**</u>

*City of Huntington v. AmerisourceBergen Drug Corp.,*
    No. CV 3:17-01362, 2022 WL 2399876 (S.D.W.Va. 2022) .......................................... 25

*Gall v. United States*,
    552 U.S. 38 (2007).................................................................................................. 8, 9

*Kimbrough v. United States*,
    552 U.S. 85 (2007).................................................................................................. 26

*Koon v. United States*,
    518 U.S. 81 (1996).................................................................................................. 10

*Masters Pharm., Inc. v. Drug Enf't Admin.*,
    861 F. 3d 206 (D.C. Cir. 2017) ....................................................... 3, 22, 23, 24

*Ruan v. United States*,
    597 U.S. ____ (2022)..................................................................................... *passim*

*Southwood Pharmaceuticals, Inc.*,
    Revocation of Registration, 72 FR 36487-01, Docket No. 07-7. 2007 ........................ 3, 24

*United States v. Acosta*,
    846 F. Supp. 2d 262 (S.D.N.Y. 2003)................................................................. 10

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)................................................................. 9

*United States v. Archer*,
    813 F. Supp. 2d 339 (E.D.N.Y. 2010) ............................................................... 35

*United States v. Booker*,
    543 U.S. 220 (2005).................................................................................................. 7, 8

*United States v. Carr*,
    19 Cr. 137, 2020 WL 1872571 (E.D.N.Y. 2020)....................................................... 32, 39

*United States v. Cavera*,
    550 F .3d 180 (2d Cir. 2008)............................................................................... 9

*United States v. Colon*,
    821 F. App'x 39 (2d Cir. 2020)........................................................................... 31

*United States v. DiMattina*,
    885 F. Supp. 2d 572 (E.D.N.Y. 2012) ............................................................... 34, 36, 37

*United States v. DiSomma*,
  951 F.2d 494 (2d Cir. 1991)........................................................... 31, 32, 36, 38

*United States v. Galanis*,
  695 F. Supp. 1565 (S.D.N.Y. 1988)....................................................... 34

*United States v. Giancola*,
  754 F. 2d 898 (11th Cir. 1985) ........................................................... 35

*United States v. Greene*,
  249 F. Supp. 2d 262 (S.D.N.Y. 2003)................................................... 10

*United States v. Hart*,
  906 F. Supp. 102 (N.D.N.Y. 1995)................................................... 34, 37

*United States v. Hartery*,
  351 F. Supp. 2d 14 (N.D.N.Y. 2005)..................................................... 36

*United States v. Kaplan*,
  2005 WL 3148060 (S.D.N.Y. 2005)................................................... 35, 36

*United States v. Lea*,
  360 F. 3d 401 (2d Cir. 2004)............................................................... 38

*United States v. Lopez*,
  19 Cr. 116 (KMW)(JLC), 2020 WL 1678806 (S.D.N.Y. 2020) ................................ 32, 39

*United States v. McDuffie*,
  451 F. Supp. 3d 281 (S.D.N.Y. 2020)................................................... 32, 34, 39

*United States v. Merritt*,
  988 F. 2d 1288 (2d Cir. 1993)............................................................... 9

*United States v. Miller*,
  753 F. 2d 19 (3d Cir. 1985)................................................................... 35

*United States v. Monk*,
  15 F. 3d 25 (2d Cir. 1994)................................................................... 10

*United States v. Moore*,
  423 U.S. 122 (1975)......................................................................... 1, 2

*United States v. Nkanga*,
  452 F. Supp. 3d 91 (S.D.N.Y. 2020) ..................................................... 32

*United States v. Pauling*,
  256 F. Supp. 3d 329 (S.D.N.Y 2017)..................................................... 6

*United States v. Randell,*
    761 F. 2d 122 (2d Cir. 1985).......................................................... 35

*United States v. Rioux,*
    97 F. 3d 648 (2d Cir. 1996)............................................................ 10

*United States v. Schlesinger,*
    2005 WL 1657043 (E.D.N.Y. 2005)............................................. 38

*United States v. Silver,*
    203 F. Supp. 3d 370 (S.D.N.Y. 2016)......................................... 34

*United States v. Somerstein,*
    20 F. Supp. 2d 454 (E.D.N.Y. 1998) ........................................... 10

*United States v. Thompson,*
    633 Fed. Appx. 534 (2d Cir. 2015) ................................................. 6

## **Statutes**

18 U.S.C. § 371……...............................................................................5, 20

18 U.S.C. § 3143(b)...........................................................................30, 36, 40

18 U.S.C. § 3145(c)…...........................................................................30, 31

18 U.S.C. § 3553(a) ........................................................................ *passim*

21 U.S.C. § 841 ..............................................................................*passim*

18 U.S.S.G. §2D1.1.............................................................................5

Defendant Laurence F. Doud III comes before the Court for sentencing on September 21, 2022, following his conviction on February 2, 2022.   Mr. Doud respectfully submits this memorandum, by and through undersigned counsel, to assist the Court in determining the appropriate sentence in this case.

## **PRELIMINARY STATEMENT**

Typically, that a prosecution is the first of its kind is not of any meaningful consequence, except that the defendant is the first person charged under a particular set of facts.  It might have only been a matter of time before the clear Congressional mandate under a statute was extended to a new scenario or circumstance that had not previously reared its head.  The prosecution of Laurence F. Doud III, Larry Doud, however, is not typical.  The legislative record underlying § 841 does not clearly contemplate prosecuting the chief executive officer of a distributor charged in a conspiracy for failing to prevent shipments of controlled substances to pharmacies that might be diverting those drugs.  In this case, the Government cannot credibly and does not take that position.  Second, to the extent Doud's case is viewed as merely an extension of *United States v. Moore* (423 U.S. 122 (1975)), that argument falls flat.  Doud, throughout the pendency of this case, never took the position that he was exempted from prosecution under 21 U.S.C. § 841.  Rather, he took the position that prosecution under 841 did not apply to the facts of his case.  Moreover, on the facts, the defendant Moore was conducting a methadone maintenance program for which he openly acknowledged he did not have authorization from the Food and Drug Administration. *United States v. Moore*, 423 U.S. 122, 126 (1975).  In other words, the defendant Moore, a physician, was providing his heroin addicted patients with large quantities of methadone as part of an unregistered experimental method of detoxification. *Id.*, at 143.  His idea was that the patient would be "prescribed large quantities of methadone to achieve a 'blockade' condition, in which

the addict was so saturated with methadone that heroin would have no effect…"  *Id.*, at 126. Moore's primary defense at trial was that he was able to run this unregistered program because he, as a physician, was a registrant under the CSA.  *Id.*, at 138.  The cases are simply inapposite, and Moore and its progeny have absolutely no factual or legal connection with the facts in Doud.

In fact, the *Doud* prosecution and jury verdict, and now sentencing, stand in the face of clear questions presented by Mr. Doud's post-trial motions pursuant to Rule 29 and Rule 33.  Those issues include whether the Government presented evidence to the jury sufficient for it to reasonably conclude that Mr. Doud intentionally joined a conspiracy with a purpose to distribute 400 or more grams of Fentanyl to pharmacies that he knew were unlawfully diverting those drugs. As described at length in Mr. Doud's post-trial motions, we contend that the Government failed to make such a showing at trial and any finding by the jury on that aspect is irrational and should, at minimum, be set aside.  Moreover, for the purposes of Mr. Doud's sentencing brief, here, we take the position that the Government did not make that showing and, thus, Mr. Doud is not subject to the mandatory minimum sentence on Count One that otherwise would be required.  Further, at best, evidence presented to the jury shows that Mr. Doud ignored red flags; however, that is not the basis for a criminal charge or conviction under § 841.

Mr. Doud's sentencing also stands in the face of the Supreme Court's ruling in *Ruan v. United States* where Justice Breyer raised critical points about prosecutions under § 841 similar to what was argued by the defense during this case and the holding in *Ruan* has direct implications for the approach the Government took to its case in chief in *Doud*.  597, U.S. ____ (2022).  First, the Government argued that any shipment made to a pharmacy which displayed red flags was unlawful.  Second, the Government told the jury that it was unlawful for RDC to ship to pharmacies in instances where RDC employees believed or suspected the pharmacies were diverting.  Third,

the Government argued at trial that Mr. Doud had actual knowledge of diversion occurring at RDC customer pharmacies, and thus his direction to ship orders to them proved his culpability under §841. The first two theories of prosecution presented to the *Doud* jury are legally insufficient under *Ruan* to sustain a conviction under § 841, and the Government failed to introduce sufficient evidence to prove Mr. Doud's guilt based upon the third theory. Finally, as elaborated in Mr. Doud's supplemental briefing to his Rule 29/33 motions, the jury instructions in this case allowed the jury to find Mr. Doud guilty on two bases expressly rejected under an analysis applying *Ruan* to *Doud*. *See* Dkt. 199. First, the jury was permitted to find Mr. Doud guilty if the shipments of controlled substances by RDC happened to be unauthorized, even if Mr. Doud had no knowledge or intent related to their unauthorized nature, or if Mr. Doud failed to act in a manner objectively consistent with that of a reasonable distributor, or make a good-faith effort to do so.

In short, there is nothing typical about the sentencing in this particular matter and the aspects of the charged conduct for which the jury voted to convict is currently under substantial debate. For these, and further reasons discussed herein below, the defense submits that Mr. Doud should receive a non-incarceratory term on the basis that such would be sufficient for the dimensions of the conduct the Government (a) was able to reasonably establish at trial and (b) sets aside those portions of the conduct where there is actual debate about whether a conviction under § 841 is appropriate, especially in light of *Ruan*. In this regard, it is important to consider that the conduct the Government was able to reasonably establish at trial has never resulted in criminal charges but were treated civilly. *See Southwood Pharmaceuticals, Inc.*; Revocation of Registration, 72 FR 36487-01, Docket No. 07-7, 2007; *see also, Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206, 212 (D.C. Cir. 2017). More specifically, when a pharmaceutical company failed to report suspicious orders to the DEA and did not maintain effective diversion

controls, the company's certificate of registration was revoked.  *Id*.  In other similar cases, it has been deemed appropriate to settle these matters in civil court with a fine or DEA license revocation.

For these reasons, as well as the Section 3553(a) factors, elaborated upon herein below, we respectfully submit that Your Honor should impose a non-incarceratory sentence in the case of Laurence F. Doud III.

Finally, we maintain that significant appellate issues exist regarding whether the Government sufficiently proved the formation of a conspiracy, or Mr. Doud's intentional joinder into it.  Accordingly, notwithstanding the sentence imposed by Your Honor, we submit that Mr. Doud should remain released on bail pending appeal.

## I.   RELEVANT FACTUAL BACKGROUND

Your Honor presided over a two-week trial in which the Government presented its case against Mr. Doud.  Your Honor is very familiar with the case; nevertheless, Mr. Doud wishes to emphasize the following relevant facts to fully explain his objectives in his position as CEO, so that in turn, the Court can more fully assess his conduct in the scheme.

Mr. Doud is the former CEO of RDC, a DEA registered regional wholesale drug co-operative based in Rochester, New York.  RDC, like many other DEA registered wholesalers, provided controlled substances to DEA registered pharmacies.  These pharmacies would then fill prescriptions written and given to them by registered doctors.  Mr. Doud, as CEO of the wholesaler, was entirely remote from the prescription process and pharmacy customers.  Instead, given Mr. Doud's background and expertise in sales throughout his tenure at RDC, his primary focus was on the expansion of the business by catering to the needs of independent pharmacies to facilitate their growth.  The evidence at trial showed that Mr. Doud was largely isolated from not only the

intricacies of the pharmacies' prescription process, but also from the individual patients who obtained the medications from the various pharmacies.

On February 2, 2022, a jury convicted Mr. Doud of (1) Narcotics Conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(a) and; (2) Conspiracy to Defraud the United States in violation of 18 U.S.C. § 371.  It is not our intention to minimize the conduct that occurred under Mr. Doud's leadership, but instead provide further context as to events that ultimately transpired and, in that light, the reasons certain approaches taken by the Government are still being litigated here at sentencing.  There is no more significant area in this regard than the implication of fentanyl (and oxycodone) weight for sentencing in this case.

To sustain the conviction relating to the narcotics conspiracy charge involving fentanyl, the Government is required to clearly establish that the defendant entered into a conspiratorial agreement to unlawfully distribute a minimum weight of 400 grams of the drug.  *See* 21 U.S.C § 841(b)(1)(A).  The PSR holds Mr. Doud responsible for the unlawful distribution of 3,619 grams of fentanyl, well above the 400-gram requirement, in addition to 14,375 grams of oxycodone, for a total of 105,360 kilograms of converted drug weight.[1]  PSR ¶¶ 33, 44.  Mr. Doud objects to this determination to the extent that it is meant to suggest that the **entirety** of the drug shipments identified as creating red-flags are being considered as the object of the purported conspiracy, as the record does not contain evidence which establishes that as a fact.  Indeed, the issue as to whether the Government presented evidence corroborating the fentanyl weight as well as the

---

[1] The total weight of 105,360 kilograms is calculated based on the United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1 Application Note 9.  The typical weight per pill of oxycodone is 30 mg, which converts to 14,375 grams of oxycodone, and pursuant to U.S.S.G § 2D1.1 Application Note 8(D), 14,375 grams of oxycodone totals 96,312.50 kilograms of converted drug weight.  PSR ¶44.  Likewise, 3,619 grams of fentanyl is equivalent to 9,047.50 kilograms of converted drug weight, which calculates to 105,360 kilograms total concerted drug weight involved.  *Id.*

amount of oxycodone subject to the conspiratorial agreement remains a subject of post-trial motions.

During the trial, the Government elicited testimony from DEA agent Kerry Whitmore, who testified that over the indictment period, RDC distributed 11,476.12 grams of fentanyl in total.  Tr. 676:20–23.  However, neither Ms. Whitmore, nor any other Government witness, **was able to identify any specific amount of fentanyl**— or oxycodone for that matter— that the purported coconspirators agreed to illegally distribute.  The Government introduced evidence regarding the total amount of fentanyl and oxycodone received by certain pharmacies but was unable to elicit any evidence or testimony relating to what specific portion of those substances was subject to an unlawful agreement as opposed to the legitimate business practice of RDC.

Instead, the Government relies on inference and conjecture raised during the trial to reach the statutorily required totals referenced above.  But inference is **insufficient** to support the mandated weight for illegally distributing fentanyl in this case.  *United States v. Pauling*, 256 F.Supp.3d 329, 337 (S.D.N.Y. 2017).  A reasonably foreseeable inference is only permissible if the Government presented evidence of specific drug quantities and subsequently produced a concrete link from those quantities to a basis for inferring that the diversion of these quantities would have been reasonably foreseeable to the defendant.  *United States v. Thompson*, 633 Fed.Appx. 534, 540 (2d Cir. 2015).  That was not done here.  In this case, the evidence at most indicated that some pharmacy customers exhibited red flags, but no evidence was ever presented linking Mr. Doud or the purported coconspirators to any concrete identifiable amount of unlawfully distributed controlled substances.  Simply put, the evidence introduced at trial does not support the proposition that any portion of these particular sales was the subject of a conspiratorial agreement, much less the statutorily required minimum amount.

There are no facts in evidence that support the conjecture, let alone inference, that the entirety of the 105,360 kilograms were intended by the purported coconspirators to be shipped contrary to law.  Alternatively, the weight identified in the PSR is predicated on the notion that large distributions of these drugs in and of itself creates an implication of diversion and therefore a conspiratorial agreement to further that diversion which is somehow sufficient for purposes of proving the statutory weight requirement; this interpretation is inappropriate and falls flat on the case law.  It is not disputed that RDC sold 3,619 grams of fentanyl and 14,375 grams of oxycodone to these various pharmacies; however, the Government failed to prove that any amount of these sales was pursuant to an unlawful agreement, or even unlawful in the first place.  In the Government's own words, Mr. Doud knew, "that some [] pharmacies were selling [opioids] illegally" but he would also "turn[] off customers along the way."  *See* Tr., at 40:1 – 4 and 1763:6 – 10.  Accordingly, holding Mr. Doud responsible for conspiring to distribute 105,360 kilograms of controlled substances in a manner not authorized by law is a baseless generalization and improper.

As the Government cannot point to any specific weight that the purported coconspirators agreed to unlawfully distribute, it has not carried its burden, and thus there is simply no mechanism to calculate the total weight of narcotics for sentencing purposes.  It is for these reasons that for the purposes of this sentencing brief Mr. Doud takes the position that the mandatory sentencing otherwise imposed under § 841 does not apply here.

## II.   SECTION 3553(A) FACTORS ANALYSIS AS APPLIED TO MR. DOUD'S CASE

Since the Supreme Court decision in *United States v. Booker*, district courts have not been bound to sentence within the determined guidelines range.  543 U.S. 220 (2005).  Instead, the guidelines have become a factor which judges are instructed to take into account when determining

an appropriate sentence.  Courts are permitted to tailor the sentence in consideration of other statutory concerns.  *Id.*, at 245.  With that in mind, the factors to be considered pursuant to § 3553(a) include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentence range established for –
>     (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[;]
>     …
> (5) any pertinent policy statement –
> …
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7); *see also Booker*, 543 U.S. 220.

In *Gall v. United States*, the Supreme Court emphasized the importance of an "individualized assessment based on the facts presented."  552 U.S. 38, 39 (2007).  Essentially, *Gall* instructs the sentencing court that a Guidelines calculation is the **initial benchmark** for determining a sentence, but it is not the only consideration.  *Id.*  Indeed, the Second Circuit has confirmed that district courts "must form [their] own view of the nature and circumstances of the offense and the history and characteristics of the defendant," and it is "**emphatically clear**" that

the guidelines are "**truly advisory**." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (internal quotation marks omitted) (emphasis supplied).  Relatedly, the Supreme Court has made evident that a district court judge may depart – upwards or downwards – from the Guidelines, as long as serious consideration is given, and an explanation is provided as to the unusually lenient or harsh sentence; extraordinary circumstances are no longer required.  *Gall*, 552 U.S. at 46.  This notion is particularly salient as applied to Mr. Doud where the Guidelines range as calculated by the Government and by the Probation Department, driven by controlled substance sales when Mr. Doud's company was licensed to sell controlled substances, proposes 360 months to life.

Implementing a 360-month sentence would be so patently unreasonable that **Your Honor must place a greater emphasis on other sentencing factors to determine a sentence that comports with federal law**.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 506 (S.D.N.Y. 2006).  Thus, we submit for the reasons described in this memorandum, that the guidelines range overstates the offense conduct, especially after consideration of the **Section 3553(a)** factors.

A.   **CONSIDERATION OF SECTION 3553(A) FACTORS MERIT A LENIENT SENTENCE**

1.  **History and Characteristics of the Defendant**

Mr. Doud's history and characteristics strongly demonstrate the appropriateness of a non-incarceratory sentence.  Section 3553(a) compels the Court to consider the intricacies of a defendant, rather than make a determination solely based on his immediate misconduct.  In other words, Mr. Doud's history and character are "**central consideration[s] in the fashioning of [his] sentence**." *United States v. Merritt*, 988 F.2d 1298, 1307 (2d Cir. 1993) (emphasis supplied). While Section 5H1.11 of the Sentencing Guidelines states that "civic, charitable, or public service…and similar prior good works are not ordinally relevant in determining whether a sentence should be outside the guidelines range," the Supreme Court has explained that a court still may

depart if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case. *Koon v. United States*, 518 U.S. 81, 96 (1996). Even holding aside for the moment the exceptional nature of this case with respect to the broader legal issues at work, New York District Courts have routinely granted downward departures based on a defendant's charitable contributions in contemplation with various additional factors. *See e.g., United States v. Greene*, 249 F. Supp. 2d 262 (S.D.N.Y. 2003) (granting a 7-level departure in a tax case based on the defendant's extraordinary charitable good works in devoting his life to orphaned children and because the defendant was sixty-five years old with no criminal history, making him unlikely to reoffend); *United States v. Acosta*, 846 F. Supp. 278 (S.D.N.Y. 1994) (the defendant's heroic act of saving a life considered in combination with his mental illness authorizes a downward departure); *United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996) (the Court of Appeals upheld a downward departure of ten points as a result of the defendant's good deeds and medical condition); *United States v. Somerstein*, 20 F. Supp. 2d 454 (E.D.N.Y. 1998) (charitable efforts, exceptional work history, and experiences as a child victim of the holocaust justifies a three level departure).

Notably, "the Second Circuit has emphasized that a district court **not only can, but must, consider the possibility of downward or upward departure when there are compelling considerations** that take the case out of the heartland factors upon which the Guidelines rest." *Somerstein*, 20 F. Supp. 2d at 460 (quoting *United States v. Monk*, 15 F.3d 25, 29 (2d Cir. 1994)).

As described below, Mr. Doud has lived an exemplary life, where his primary priorities encompass religion and family. The attached letters written in support of Mr. Doud describe an individual with remarkable kindness, good moral character, and consistent willingness to go out of his way to help and assist those around him. Given Mr. Doud's positive impact on his family,

community, and in business **over the last 78 years**, we submit that Mr. Doud's charitable contributions and personal characteristics justify a non-incarceratory sentence.

### 2.  Mr. Doud's Personal and Professional Background

Laurence Doud was born in Scranton, Pennsylvania on July 26, 1943, the son of Laurence Field Doud, Jr., and Harriet Doud.  His father was a salesman of industrial and packaging supplies and worked in real estate.  His mother was a Vice President at Loffit Publications, which published federal tax guides for law universities.  Both of Mr. Doud's parents have passed away; his father passed in October 1993, at the age of 73, from an aortic hemorrhage, and his mother in 2006, at the age of 92, when she succumbed to injuries due to a fall that caused her to fracture her skull. Growing up, Mr. Doud had two younger sisters to whom he was very close: Donna Lou and Edna Francis.  Edna Francis Ferrano, age 71, is a retired schoolteacher who resides in Walkersville, Maryland.  Unfortunately, Donna passed away in 2003 from throat and tongue cancer.

Throughout his life, the Doud family was extremely close.  Although his sister Donna was 20 months younger than him, and Edna seven years younger, the gaps in age did not impact the tight-knit dynamic between the siblings.  Every week, Mr. Doud would attend Sunday school and go to services with his family at Abington Baptist Church.  As a family, they would regularly participate in various activities offered by the church: bible study, plays, pageants, summer camps, and potluck dinners.  Religion was paramount in the Doud household, which was instilled in him from a very young age.

In addition to being raised in a religious household, Mr. Doud's parents imparted on him the importance of a strong work ethic.  Each of the children were required to keep their rooms tidy and take turns cleaning up after dinner, among other household tasks (*i.e.* shoveling snow, mowing grass, painting walls, etc.).  From the age of fourteen, Mr. Doud worked to earn an income by

-11-

waxing and washing cars, mowing lawns, and organizing his neighbors' garages.  By the age of

fifteen, Mr. Doud was a pin setter at the local bowling alley, and he also worked at a grocery store

packaging groceries.  Towards the end of high school and throughout four years of college, Mr.

Doud worked as a waiter at the Sacks Lodge resort.  Even through Mr. Doud certainly kept busy

with various employment throughout his teenage years, he also participated in recreational sports,

as much as his work schedule would permit, and belonged to various language clubs in high school.

Mr. Doud attended Hartwick College, located in Oneonta, New York.  Prior to graduation,

he began working for McKesson in an entry level position earning $1.35 an hour.  He continued

to work for McKesson where he applied for a sales position and ultimately worked as a salesperson

for the next eight years.  Not long after his time at McKesson, in 1987, Mr. Doud began working

at RDC as the general manager until 1991, where he was swiftly promoted to CEO and served in

that capacity until his retirement in March 2017.

During his tenure at RDC, he is credited with expanding its distribution network to over

1,300 independently owned community pharmacies in seven states, making RDC the seventh

largest wholesaler in the United States. His sales strategies caused revenues to skyrocket from

sixteen million to over two billion and he expanded from several dozen employees to over two

hundred. Shareholders' dividends also reached record highs under Mr. Doud's leadership.  As a

result of RDC's economic growth, the company opened a second distribution warehouse and a

new primary office space.

To be clear, RDC's growth occurred over a larger time-period and was not due to the sales

of controlled substances.  In fact, RDC's growth was seemingly attributable to sales of non-

controlled substances, while the sales of controlled substances grew at a much steadier and more

stable pace. *See* Defense Trial Exhibit R-1 at 3, attached as **Exhibit A**.  More specifically, during

the trial, defense expert and forensic accountant, Martin Martinovic, discussed the breakdown of RDC sales from 2011 through 2017. *See* **Ex A.**, at 2. With regard to the breakdown of sales, the chart prepared by Mr. Martinovic indicated that from 2011 through 2017, approximately 12.95% of RDC sales were controlled substances, and **the remaining 87.05% of sales were non-controlled substances**. *See* **Ex A.**, at 2. Additionally, when comparing RDC's annual sales during the indictment period, from 2012 through 2017, RDC sales of controlled substances grew from $83,178,140 to $248,386,294, **while sales of non-controlled substances grew exponentially from $761,840,153 to $1,833,263,516**.[2] *See* **Ex. A.**, at 2. There is no dispute that the majority of RDC's sales and the tremendous growth it experienced during Mr. Doud's tenure, was primarily due to the increase in sales of non-controlled substances.

Regardless of whether Mr. Doud worked in the warehouse, as a salesperson or CEO, he treated his colleagues as though they were family. Mr. Doud routinely hired people he would come across in his personal and daily life. He offered employment to a young man who he saw every morning at Dunkin' Donuts simply because he struck up a conversation with Mr. Doud about pursuing another career. On another occasion, an RDC warehouse employee traveled to work by bus, where the closest stop was approximately a quarter mile from the facility, and Mr. Doud would wait every morning at the bus stop in order to drive the employee to the warehouse. Oftentimes, Mr. Doud advanced employees money needed for heating bills or simply due to personal financial hardships. *See* April 4, 2022 Letter from Carol Doud, attached as **Exhibit B-1**. He also hired a childhood friend who was looking for a second chance after he found himself in a troubling situation. *See* March 26, 2022 Letter from Edna Doud, attached as **Exhibit B-2**. These are merely a few examples of the gestures exhibited by Mr. Doud while he served as CEO at RDC.

---

[2] RDC sales in 2016, were at its peak. Sales of non-controlled substances were $2,014,618,810 and sales of controlled substances were $310,366,339. *See* **Ex. A.**, at 2.

In July 1961, Mr. Doud met his wife Carol when she was a freshman in high school, and he was a senior.  Five years later, they got married and have been together ever since— nearly 61 years.  Mr. Doud has three children: Laurence IV (Lanny), age 55, Tracy, age 53, and Danielle, age 48.  Growing up, Mr. Doud was actively involved in their lives.  He coached their sports teams, attended every athletic event, and drove their carpools to school.  He instilled work ethic and morals, teaching his children to stand for their principles even when it was not easy or convenient.  Additionally, even though Mr. Doud had a rigorous work schedule, he would make sure to attend family dinner every night.

This tradition continued throughout the adult lives of Mr. Doud's children.  Now, Lanny has three children: Jessica 35, Cassie 25, and Tanner 22, and a grandchild from Jessica, who is seven years old.  Tracy has two daughters, Jenna and Allee, ages 29 and 24, with two grandchildren from Jenna, two boys, ages eight and six, and three grandchildren from Allee, twin boys, age two and a half, and nine-month-old daughter.  In total, Mr. Doud has five grandchildren and six great-grandchildren and the entire family would regularly travel to the Jersey Shore for family vacations and have weekly Sunday dinners at Mr. Doud's residence.  Family has always been a central pillar of his life, a source of immense pride, and a wellspring of support.

Mr. Doud hopes to see the values introduced to him by his parents, which have transferred to his children, get passed down to his grandchildren, and great grandchildren.  Even under the current circumstances, Mr. Doud has demonstrated his unwavering commitment to religion and dedication to set a proper example for his family.  Since moving to Florida, Mr. Doud has been a member of the Edgewater Methodist Church and he continues to participate in church activities including: serving the needy and less fortunate, mowing the church's lawn, light building maintenance, and helping in any other way he is asked based on the unique needs and

-14-

circumstances.   Although Mr. Doud's financial position has somewhat deteriorated since retirement, he consistently makes monthly payments to a Pastor based in San Antonio, Texas, who the family has maintained a close relationship with, in addition to monthly payments to Time of Grace Ministries, St. Jude's, Joyce Meyers Ministries, Joshua Revolution, and many others.   Mr. Doud also annually donates fifteen percent of his income to Edgewater Methodist Church; these charitable contributions, despite Mr. Doud's recent criminal conviction, demonstrate not only his dedication to God and his congregational family, but also to his immediate family through the adherence to his religious values even through financial hardship; with his absence, the family dynamic will surely crumble.

### 3.  Mr. Doud Helps Others with Acts of Kindness and Compassion

The positive influence and ethical character of Mr. Doud is reflected in the 64 letters written by former employees of RDC, family members, friends and religious leaders, which all unequivocally agree on Mr. Doud's generosity, godliness, and caring nature.   Remarkably, nearly half of the letters submitted on behalf of Mr. Doud came from former RDC employees, prior pharmacy customers of RDC, and various former colleagues during Mr. Doud's career.   We urge the Court to read each of these letters to truly understand who Mr. Doud is and the myriad ways he has positively affected others through his good deeds.   These letters will also demonstrate how for nearly eighty years, Mr. Doud has led a law-abiding life, constantly striving to help those in need, aside from this isolated – catastrophic – mistake.   As indicated below, the following represent a handful of Mr. Doud's friends, colleagues, and business associates who have experienced, and continue to encounter, his endless thoughtfulness and generosity.

It is abundantly clear that Mr. Doud is revered by all who have crossed his path.   This is due to his generosity with his time and money for charitable purposes, as well as his life-long

endeavor to help others in need.  *See* April 15, 2022 Letter of John Thompkins, attached as **Exhibit B-3**; *see also* May 5, 2022 Letter of Laurence Miressi, attached as **Exhibit B-4**.  Specifically, Mr. Miressi recalled how Mr. Doud assisted independent pharmacies acquire specialty drugs that they would not have had access to at the time.  *Id.*  Additionally, Mr. Vena, a friend also working in the pharmaceutical field, affirms that Mr. Doud assisted hundreds of struggling pharmacies through dire straits.  *See* June 26, 2019 Letter from Victor Vena, attached as **Exhibit B-5**.  Further, Mr. Doud was exceedingly charitable to his employees at RDC.  Jim Shearer noted that Mr. Doud frequently went out of his way to take care of his own employees, restoring one individual who lost all possessions in a fire, and assisting another who had a young child with Leukemia.  *See* April 13, 2022 Letter of Jim Shearer, attached as **Exhibit B-6**.  On another occasion, Mr. Doud's son remembered when a warehouse worker told his father that the electric company tuned off her power.  Mr. Doud inquired as to why, and in response was told that she decided to get a tattoo instead of paying the bills; without hesitation, Mr. Doud reached into his pocket and gave her money to turn the power back on.  *See* March 29, 2022 Letter from Lanny Doud, attached as **Exhibit B-7**.

The kindness exhibited by Mr. Doud was consistent to all employees, regardless of your status or position.  *See* Undated Letter from Buddy Motley, attached as **Exhibit B-8**.  Mr. Doud often showed up in a t-shirt and jeans to pitch in and help with the physical labor whenever necessary.  *See* **Ex. B-6**; *see also* April 27, 2022 Letter from Jay Shearer, attached as **Exhibit B-9**.  Mr. Doud's benevolence did not stop at the threshold of the RDC offices and warehouse: he would insist that employees stay at his home if they needed a place to stay, he always provided customer guidance when asked, no matter how small the account was, and he went out of his way to help his employees both emotionally and financially, so much so that the Human Resources

Department ("HR") at RDC tried to make him stop.  *See* April 6, 2022 Letter from Kevin Taraszewski, attached as **Exhibit B-10**; *see also* March 28, 2022 Letter from Laurence Hecker, attached as **Exhibit B-11**; *See also* April 5, 2022 Letter from James Giambrone, attached as **Exhibit B-12**.

Despite these warnings from HR, Mr. Doud continued to do what he thought was right. Peaches, a former employee at RDC, remembers a specific hardship in her life where Mr. Doud singlehandedly eased her struggle:

> We had a fire at our house and it was a total loss.  Larry Doud found out about it and he had them start a clothes drive because we had nothing accept the close [sic] on our back, he even called me the day of the fire to find out how my husband and I were doing.  He had them do can goods and took up a money collection for us to live on because it would be a while before they got everything sorted out. My husband [sic] company didn't do anything like that.

*See* Undated Letter from Peaches, attached as **Exhibit B-13**.

Mr. Doud's efforts were predictably consistent with his character, he routinely went out of his way for others and aimed to instill that same quality in those around him, whether in the workplace or at home

Former RDC employee, Cindy Kirker fondly remembered her participation in the Christmas fundraisers over the years where RDC would sponsor a family for Christmas, and **Mr. Doud would fill the gap every year**.  *See* March 31, 2022 Letter from Cindy Kirker, attached as **Exhibit B-14**.  Whenever possible, Mr. Doud wants to help those less fortunate, whether it be through RDC, his time, or financially.  *See* May 14, 2019 Letter from Dennis Galluzzo, attached as **Exhibit B-15**.  Particularly, RDC employee Christopher Barry emphasized how Mr. Doud's "**integrity, honesty, hard work, and compassion**" was imparted on him and everyone around him.  *See* Undated Letter from Christopher Barry, attached as **Exhibit B-16**.  Despite the

appreciation and gratification, Mr. Doud was never one to bask in his own good works or call any attention to them.  His sole concern was helping others if he was in a position to do so.  Don Sassman, a former colleague of Mr. Doud, highlighted that attribute, "**I am sure you wont [sic.] hear of him helping out victims in N.J. from Hurricane Sandy, but he aided many in their efforts to recover and continue working**."  *See* Undated Letter from Don Sassman, attached as **Exhibit B-17**. (emphasis supplied).

Whether it was an employee, a friend, a family member, or stranger, Mr. Doud did not discriminate when it came to enlightening the lives of others; all that mattered was that he was helping people.  Importantly, the individuals who submitted these letters unanimously agree that Mr. Doud's current circumstances have not impacted the way he interacts or treats others, or how others consider his morals, ethics, or character.  He intends to continue being a positive influence on family, friends, and his fellow church goers.  Time and space do not permit us to draw from every individual who has requested to make their voice heard in support of Mr. Doud, the remainder of these letters we collectively attach as **Exhibits B-18 – B-64**, and we would petition that the Court carefully analyze these epistles as well.

### 4.  Mr. Doud's Additional Community Service and Contributions

Due to his expertise in the pharmaceutical wholesale industry, Mr. Doud has spent an immeasurable amount of time counseling hundreds of pharmacists and students of pharmacology, without any payment.  In addition, he has advised many pharmacist owners on how to open a pharmacy business or even reorganize preexisting business models that owners sought to alter and improve.  Mr. Doud championed independent pharmacies and his life goal was to help them thrive.  His efforts were validated by the industry at the time of retirement when he received multiple achievement awards.

Notably, in **July 2017, Mr. Doud was the first ever recipient of the Pharmacists Society of the State of New York Lifetime Achievement Award**. Pharmacists Society of the State of New York ("PSSNY") created the award to honor individuals who have demonstrated continued passion and dedication to New York Pharmacy and PSSNY.  *See* July 19, 2017 Pharmacists Society of the State of New York, Inc. Press Release, attached as **Exhibit C**.  A year prior, he received an **Honorary Doctor of Humane Letters from the Albany College of Pharmacy and Health Sciences** ("ACPHS").   See March 9, 2016 Albany College of Pharmacy and Health Sciences Press Release, attached as **Exhibit D**.  By providing funding, Mr. Doud helped ACPHS establish two student-operated pharmacies in needy communities.  He also received the **Mortar and Pestle Award from Pennsylvania Pharmacists Association in 2016** and inducted into the **Rochester Pharmacy Champions Wall of Fame in 2013**.

In addition to his community service with ACPHS, on behalf of RDC, he committed $25,000 (twenty-five thousand dollars) to support the Professor Karl D. Fiebelkorn Award in Independent Pharmacy at the University at Buffalo School of Pharmacy and Pharmaceutical Sciences.  *See* 2012 – 2013 Annual Review from the University of Buffalo, attached as **Exhibit E**, at 27.  Lastly, at RDC, Mr. Doud created a loan program to provide financial assistance to help pharmacies refinance or purchase other operations.  In that vein, Mr. Doud also developed a company called "Pharmacy First," which was designed to facilitate contracts, credentialing, and reconciliation specifically for independent pharmacies.  At its inception, nineteen pharmacies participated, and Mr. Doud was on the board.  Eventually, he became chairman and remained in that position for five years.  Pharmacy First was and continues to be a great success and resource for smaller independent pharmacies.

Throughout his career, Mr. Doud also served as a board member of various industry foundations and in youth sports.  On multiple occasions, Mr. Doud was responsible for raising money in support of the pharmacy profession for the National Community of Pharmacist's Association, the National Wholesalers Association, and the Pennsylvania Pharmacist's Association.  Needless to say, Mr. Doud left his mark on the pharmaceutical wholesaler industry and his successes influenced significant positive change for small business owners.

### B.  Nature and Circumstances of the Offense

Your Honor is well aware of the circumstances of the offense through the trial itself; there is no need for unnecessary repetition here.  Nevertheless, we submit that the offense conduct warrants a non-incarceratory sentence.  In addition to the reasons we have discussed herein above, we submit that such a sentence is also appropriate due to its nonviolent nature and its parallels to a white-collar offender.

The purpose behind weighing the nature and circumstances of the offense is to ensure that the sentence reflects the seriousness of the offense, promotes respect for the law, and provides a just punishment.  *See* 18 U.S.C. §3553(a)(2)(A).  Mr. Doud was convicted of one count of conspiracy to distribute and possess with intent to distribute controlled substances in a manner not authorized by law, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(a), and 841(b)(1)(c) of the Controlled Substances Act ("CSA"), and one count of conspiracy to defraud the United States through RDC's failure to make required reports of suspicious orders to the Drug Enforcement Agency ("DEA"), falsely representing to the DEA that RDC was following written policies and procedures for monitoring and reporting suspicious orders, and falsely representing to the DEA that RDC was conducting due diligence on new customers before distributing controlled substances to those customers, in violation of 18 U.S.C. § 371.

Under most circumstances, violations of the CSA concern illegal schedule I narcotics, i.e. crack cocaine, powder cocaine and heroin etc… *See* 21 U.S.C. § 841. Oftentimes, because these substances are illegal in all circumstances, these crimes accompany an aspect of violence because they typically encompass conduct involving transactions which are *per se* unlawful and which necessarily must be conducted on the black market, with no regulation and are prone to one or both parties attempting to take advantage of the other. Additionally, these narcotics are often imported from certain countries that typically produce and refine them. Indeed, during congressional proceedings regarding the Controlled Dangerous Substances Act of 1969, it is clear from the record that the bill was created to "include strict regulatory provisions aimed at preventing the illicit distribution of drugs and **stopping the illicit flow of dangerous drugs into the United States from other countries**."[3] Importantly, the Government has seemingly acknowledged that the prosecution of Mr. Doud was a novel and "first of its kind" application of the CSA.[4] This unusual application of the CSA is further corroborated through examining the Congressional Record from January 24 and 28, 1970, where the United States Senate discussed consideration of the Controlled [Dangerous] Substances Act.

In reviewing the congressional intent behind the CSA, it is obvious that concern stemmed from the alarming increase of "the quantity of abuse drugs, available on the illicit market, on the street corners, in the schoolyards, at truck stops."[5] Notably, the Congressional Record is devoid of any concern revolving around legitimate wholesaler distributors that provide controlled

---

[3] *See Congressional Record* 116 (1970) p. 998 (Text from: https://www.govinfo.gov/app/details/GPO-CRECB-1970-pt1/GPO-CRECB-1970-pt1-6); Accessed May 19, 2022.
[4] *See* https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-and-dea-announce-charges-against-rochester-drug-co-operative-and

[5] *See Congressional Record* 116 (1970) p. 998 (Text from: https://www.govinfo.gov/app/details/GPO-CRECB-1970-pt1/GPO-CRECB-1970-pt1-6); Accessed May 19, 2022.

substances to pharmacies. Instead, Congress made clear, as reflected in the January 28, 1970, Senate Congressional Record, Volume 116, Part 2, that **regulatory controls** were the best mechanism to overcome the concern that 90 percent of the drugs found in illicit channels were legitimately manufactured.[6]

Violations of regulatory controls for monetary gains are white-collar offenses. According to the Federal Bureau of Investigation ("FBI"), white-collar crime is "characterized by deceit, concealment, or violation of trust and [is] not dependent on the application or threat of physical force or violence. The motivation behind these crimes is financial…"[7] Undoubtedly, by definition, a crime involving defrauding the United States falls squarely into the category of a white-collar offense. As applied to Mr. Doud, the crime of conspiracy to unlawfully distribute narcotics falls under the same classification. Mr. Doud was (1) an executive at a DEA authorized pharmaceutical wholesaler; (2) the eventual diversion of the controlled substances stem from failures to follow **internal written policies, failure to investigate "red flags," and failure to conduct appropriate due diligence on new customers** prior to distribution and; (3) threat of physical force or violence was nonexistent. The legislative intent behind the CSA and the clear similarities between the offense conduct and a white-collar offender distinguish Mr. Doud from the typical scheme encompassed by 21 U.S.C. § 841.

This is also evident by examining the circumstances of other pharmaceutical companies that were disciplined for identical conduct as Mr. Doud in the instance case. In *Masters Pharmaceutical Inc. v. Drug Enforcement Administration*, Masters challenged the DEA's 2014 decision to revoke its certificate of registration, essentially its ability to sell controlled substances.

---

[6] *See Congressional Record* 116, Part 2 (1970) p. 1663 (Text from: https://www.govinfo.gov/app/details/GPO-CRECB-1970-pt2); Accessed May 19, 2022.

[7] *See* https://www.fbi.gov/investigate/white-collar-crime; Accessed May 19, 2022.

861 F.3d at 212.  The revocation was premised on the conclusion that Masters shirked its legal obligation to report suspicious orders for controlled substances.  *Id.*  Leading up to Masters' license revocation, the DEA issued an order to show cause that alleged that Masters had failed to maintain effective controls against diversion of hydrocodone, a powerful opioid.  *Id.*, at 213.  The order further alleged that Masters violated the reporting requirement by failing to notify the DEA when rogue internet pharmacies placed suspicious orders, and **allegedly filled those orders without performing adequate due diligence**.  *Id.*

Not long after the order to show cause was issued, the DEA and Masters agreed to settle the charges, which required Masters to pay a $500,000 dollar fine and that they would report suspicious orders to the DEA.  *Id.*  However, merely four years later, the DEA grew concerned that Masters was failing to detect and report suspicious orders to the DEA.  *Id.*, at 214. Accordingly, the DEA issued a subsequent order to show cause, alleging that, "Masters consistently ignored and/or failed to implement its controlled substance policies and failed to comply with the reporting requirement."  *Id.*, at 214.  (internal quotation marks omitted).  The order further asserted that **Masters filled orders for millions of dosage units of oxycodone for illegitimate pharmacies**.  *Id.*

Largely, the evidence demonstrated that on hundreds of occasions, Masters neither reported held orders nor implemented protocol to dispel suspicion surrounding held orders.  *Id.*, at 215.  For example, rather than employees investigating, they would delete orders or reduce their size so that they no longer triggered the hold.  *Id.*  Alternatively, employees would contact their customers to obtain explanations for held orders, and simply accepted whatever the pharmacies would tell them, without taking documentation or steps to determine whether the explanations were plausible.  *Id.* Finally, most concerning, when customers provided information that confirmed the suspicion

surrounding an order, Masters failed to report it to the DEA.  *Id*.  Masters also routinely made representations to the DEA that documentation on all held orders were permanently maintained when in fact those records did not exist.  *Id*., at 218.

Masters' conduct was characterized by the DEA as "extensive and egregious," meanwhile its punishment was revocation of its certificate of registration.  *Id*., at 226.  (internal quotation marks omitted).  Now, interestingly, Masters' actions sound eerily similar to that of RDC and/or Mr. Doud.  Nevertheless, not a single board member, executive, or employee of Masters was criminally charged, punished or even chastised, despite the fact that the DEA found that the egregiousness of the violation was "**exacerbated by the fact that Masters officials were well aware of the oxycodone epidemic**."  *Id*.  (emphasis supplied).

Similarly, in a separate proceeding for renewal of Southwood Pharmaceutical Inc.'s registration, the DEA issued an order to show cause that immediately suspended its ability to sell controlled substances.  *Southwood Pharmaceuticals, Inc.*, 72 FR 36487-01.  The suspension was premised on a finding that its continued registration was an imminent danger to public health because of the likelihood that it would continue to supply pharmacies that divert large quantities of controlled substances.  *Id*.  Some of the events at issue included, wholly deficient due diligence efforts limited to verifying that a customer had a state license, distributing large quantities to what the DEA described as "targeted" pharmacies until their registrations were immediately suspended or suspended, no process in place to determine the nature of a potential customer's business, and repeatedly failing to report any suspicious orders.  *Id*., at 36498 and 36500.  Nonetheless, again, the sole punishment administered to Southwood Pharmaceuticals was revocation of its ability to sell controlled substances.  *Id*., at 36503.  Notably, no criminal charges were pursued against the company, let alone any individual.

More recently, in the Southern District of Virginia, a lengthy decision was rendered as to whether the law of public nuisance was an appropriate remedy for alleged misconduct by some of the largest pharmaceutical distribution companies in this country: AmerisourceBergen Drug Corporation, Cardinal Health, Inc. and McKesson Corporation. *City of Huntington v. AmerisourceBergen Drug Corp.*, No. CV 3:17-01362, 2022 WL 2399876, at *56 (S.D.W.Va. 2022). The litigation ensued because of assertions concerning diversion control failures and underwhelming due diligence efforts. *Id*., at *56 and *29.

Through its legal analysis, the *Huntington* Court sheds light on a distributor's obligations with regard to maintaining effective diversion controls. *Id*., at *62. The court explained that cutting off dispensers simply because a distributor has a hunch that some of pharmacy's customers may be engaged in doctor shopping or some form of fraud, is not a reasonable conception of what maintaining effective controls requires. *Id*., at *64. This is because distributor's have no power over the medical judgment of doctors, they are also not pharmacists with expertise in assessing red flags, and at most, distributors can detect an uptick in orders that **may** be traceable to doctors who **may** be violating medical standards. *Id*., at *65. In fact, the Court goes as far as to address how manufacturers of prescription opioids are responsible for deceptive advertising and marketing claims, which triggered a shift in the standard of care regarding prescription opioids, whereas the distributors did no such thing. *Id*., at *47. Overall, the court concluded that the duty to maintain effective controls **does not require distributors to block illegitimate customers of legitimate pharmacies from obtaining their medications**. *Id*., at *65.

Although the aforementioned cases are civil in nature, they have direct application and significant relevance to the instant case. For one, the conduct outlined with respect to the various pharmaceutical companies is indistinguishable to that of Mr. Doud as presented by the

Government during the trial – aside from one critical point – Mr. Doud was criminally charged and now faces thirty years to life.  PSR ¶ 90.  To impose such a punishment for conduct that has been previously adjudicated in a drastically less harsh manner would be a miscarriage of justice and unjust.  Seemingly, **if Mr. Doud is sentenced to any prison time, let alone the suggested guidelines, he would effectively be the only individual punished to this extreme for actions historically admonished by a revocation of a license to sell controlled substances.**  What is more, if the *Huntington* Court could not attribute blame to the distributors in a civil capacity, then Mr. Doud certainly should not be held responsible for similar conduct criminally, a burden that is far more difficult to prove.  Accordingly, since the nature of circumstances of the offenses have previously been addressed in a civil manner, an incarceratory sentence of any kind would be disparate treatment as applied to Mr. Doud.

### C.  A Non-Incarceratory Sentence Best Serves the Purposes of Sentencing

#### 1.  Deterrence

To impose a sentence which is sufficient but not greater than necessary, courts are instructed to examine whether the sentence would afford adequate deterrence to criminal conduct. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  The facts and circumstances at bar raise no genuine question as to the need to deter Mr. Doud from committing further crimes.  Mr. Doud is a retired 78-year-old who splits his time between family and regular participation in church activities.  He has never been charged with any criminal offense other than in connection with this case.  In fact, according to a 2017 study performed by the United States Sentencing Commission ("USSC"), Mr. Doud exhibits nearly all the factors identified as indicators of reduced risk to

reoffend.[8]  His advanced age, lack of criminal history, college-education, and the non-violent nature of this case all contribute to that determination.

### 2.  Protection of the Public

Mr. Doud poses no threat whatsoever to the public, and to the contrary, his continued presence in his community is of great benefit to its members.  The numerous supportive letters submitted to the Court from Mr. Doud's religious leaders and church constituents highlight the positive influence he has on those around him.

Since a very young age, Mr. Doud has been active in his community, and throughout the years, his involvement has only increased.  In early 2020, Mr. Doud moved to Florida with his wife, and even in the short amount of time since he has been there, his presence within the church community is tremendous.  Stephen Norman, a fellow constituent of Mr. Doud, underscores Mr. Doud's involvement within their church:

> He performs and has led this volunteer work at least two times per work for as long as I've known him…I have seen Mr. Doud wait in the Florida summer heat to hand out cold bottles of water or soft drinks to the local trash contractor and neighborhood lawn maintenance contractors.

*See* June 11, 2019 Letter from Stephen Norman, attached as **Exhibit B-18**.

Dale and Lois Bynum similarly emphasize the significant amount of time and hours Mr. Doud devotes to his congregation and the work he does for Second Harvest Food Bank, not to mention that he is admired by his entire group of friends.  *See* April 1, 2022 Letter from Dale and Lois Bynum, attached as **Exhibit B-19**.  His involvement inspires may of those who are close to him.  Particularly, Ronald Gray, describes his experience volunteering with Mr. Doud at the

---

[8] *See* December 2017 The Effects of Aging on Recidivism Among Federal Offenders, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf, at p. 3, last accessed on: June 5, 2022.

EUMC pantry, as well as their weekly trips to pick up food for the church pantry and Mr. Doud's endless involvement in the church's fundraisers and various community activities.  *See* April 2, 2022 Letter from Ronald Gray, attached as **Exhibit B-20**.

Steven and Kathy Mikell likewise confirm that, "The Douds are always volunteering with their church to help contribute to their fellow man and build a better community based on goodness and decency."  *See* April 3, 2022 Letter from Steve and Kathy Mikell, attached as **Exhibit B-21**. But Mr. Doud is never content to just perform the bare minimum when it comes to helping others, as Reverend Gary Tarleton stated, "**He is hands-on involved working in our food pantry ministry which weekly provides groceries for approximately 200 people in need of food**.  He also works on our ministry team which prepares Sunday night hot meals for the homeless in our community."  *See* June 11, 2019 Letter from Reverend Gary E Tarleton, attached as **Exhibit B-22** (emphasis supplied).  Reverend Donna Blythe also expresses Mr. Doud's positive impact to her church members:

> Mr. Doud has consistently been in ministry and service in our church.  Mr. Doud attends worship weekly; **volunteers and freely gives of his time helping in our food pantry on Saturday mornings**; **drives weekly to pick up food from the area food bank**; often serves as usher and liturgist for worship services; has narrated and participated in holiday dramas, cantatas and sings in the choir.  Mr. Doud serves on our Board of Trustees which oversees our property and manages how we spend memorial and building fund monies.  He serves as the chairperson of the Staff Parish Relations Committee which is responsible for the church's personnel needs.  Mr. Doud is part of the group of men and women of the church who maintain our grounds.  **He mows the grass, helps with landscape maintenance and the burial of members' cremains in our prayer garden.**

*See* April 7, 2022 Letter from Reverend Donna Blythe, attached as **Exhibit B-23** (emphasis supplied).

Mr. Doud is unquestionably a pillar of his community.  Both those who know him intimately as well those who encounter him peripherally recognize his commitment to religion and his endeavor to be the best version of himself, even under the most stressful and trying circumstances.  Throughout the pendency of Mr. Doud's criminal proceedings, from arrest in 2019 and through conviction in 2022, his unequivocal dedication to bettering those around him is a manifestation of the values and faith he holds.

### 3.   Just Punishment

The total offense level recommended in the PSR is grossly disproportionate to the crimes. PSR ¶ 90.  More specifically, the total offense level of 42 is predicated on the supposed unlawful distribution of 3,619 grams of fentanyl and 479,180 pills of oxycodone.  PSR ¶ 44.  As discussed above, the USSG converts these amounts to 105,360 kilograms of total concerted drug weight involved, which results in a base offense level of 38.  PSR ¶ 44.[9]  Moreover, even Your Honor recognized the novel nature of this prosecution and has previously opined that a mandatory statutory ten-year sentence may not have been contemplated for this set of circumstances.  *See* **Ex. A**, at 51:13 – 23.  This is also demonstrated by scrutinizing the manner in which other jurisdictions handled similar conduct.

Additionally, a 2017 study conducted by the USSC concluded that drug mandatory minimum penalties applied more broadly than Congress may have anticipated.[10]  Accordingly, **a recommended guidelines sentence of thirty years would be a gross miscarriage of justice.** Rather, the defense concurs with Your Honor's sentiments, and submits that Mr. Doud should be

---

[9] The calculation of fentanyl and oxycodone weight will be a subject of Mr. Doud's appeal.

[10] *See* October 2017 Mandatory Minimum Penalties for Drug Offenses in the Federal Criminal Justice System, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171025_Drug-Mand-Min.pdf at p. 6, last accessed: June 5, 2022.

sentenced to the statutory minimum of ten years.  Although a ten-year sentence is a significant departure from the recommended sentence, the USSC has revealed in a factsheet concerning Fentanyl trafficking offenses in 2020, that 27% of offenders received an average departure of 54.1% relative to their Guidelines range. [11]  As such, a substantial departure is not uncommon.

### III.    MR. DOUD SHOULD BE RELEASED PENDING APPEAL

Mr. Doud respectfully requests that his bond be continued pursuant to 18 U.S.C. §§ 3143(b) and 3145(c).  He is not a flight risk due to his age, extensive community and family ties, and he certainly does not pose a danger to the community as he was not convicted of a violent crime and RDC has dissolved, resulting in no access to the RDC apparatus.  Additionally, there is a substantial likelihood that his appeal will be granted as the defense intends to raise serious questions as to whether the Government proved its case beyond a reasonable doubt, especially in light of the recent Supreme Court decision in *Ruan*.

While Section 3143(b) presents a presumption of detention, the statute also indicates that a defendant convicted under the Controlled Substances Act can overcome the presumption through satisfying a two-part test.  First, the defendant must establish, by clear and convincing evidence, that he is not likely to flee and does not pose a danger to the community.  *See id*.  Additionally, the defendant is required to show either that the appeal is substantially likely to raise a question of law or fact likely to result in reversal, new trial, or a reduced sentence, and is not interposed for purposes of delay.  *See* 18 U.S.C. § 3143(b)(1)(A).  Furthermore, as Mr. Doud was convicted of a violation of the Controlled Substances Act which carries a penalty of ten years or more, he must also show the existence of "exceptional reasons" and explain why there exists "a unique

---

[11] *See* Fiscal Year 202 Quick Facts – Fentanyl Trafficking Offenses – https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Fentanyl_FY20.pdf at p. 2, last accessed: June 5, 2022.

combination of circumstances giving rise to situations that are out of the ordinary."  18 U.S.C §

3145(c); *United States v. Colon*, 821 F. App'x 39, 41 (2d Cir. 2020).  Neither statute nor case law

define the "unique combination of circumstances" which may qualify as "exceptional reasons,"

and legislative history on the issue is "sparse and uninformative."  *United States v. DiSomma*, 951

F.2d 494, 497 (2d Cir. 1991).

Consequently, the Second Circuit has indicated that since the legislative history is limited,

the most useful historical document for undertaking an analysis of this issue is a letter from

Assistant Attorney General T. Crawford of the Justice Department to Senator Paul Simon, which

proposed "the exceptional reasons" provision and suggested two hypothetical situations where it

might apply.  *Id*.

The first instance describes an elderly man with lifelong community ties, convicted under

the federal murder statute of the mercy killing of his wife, challenging the applicability of the

statute to mercy killings.  *Id*.  A second example outlines a seriously wounded drug dealer whose

appeal raised a novel search and seizure issue which could potentially change the outcome of his

trial.  *Id*.  Relevant to the instant analysis, the Second Circuit opined that these examples "present

a unique combination of circumstances giving rise to situations that are out of the ordinary."  *Id*.

Ultimately, the Second Circuit concluded that since one example involves a legal question and the

other merely involves a question of first impression, **there is no requirement of absolute legal**

**novelty and that an unusual legal question can be sufficient to meet the test**.  *Id*.  Essentially,

a case-by-case evaluation is warranted, and it is up to the district court judges to exercise discretion

in these matters.  *Id*.

More recently, courts have found that a defendant's age and health issues, in the context

of the COVID-19 pandemic, give rise to exceptional reasons under § 3145(c).  *See e.g. United*

*States v. McDuffie*, 451 F. Supp. 3d 281, 283 (S.D.N.Y. 2020) (granting release where defendant was 47 years old and suffered from rheumatoid arthritis); *United States v. Nkanga*, 452 F. Supp. 3d 91, 95–96 (S.D.N.Y. 2020) (Government consents to release where the defendant was 67 years old and had "multiple health issues"); *United States v. Lopez*, 19 Cr. 116 (KMW)(JLC), 2020 WL 1678806 at *1 (S.D.N.Y. 2020) (granting release where defendant was 40 years old and suffered from asthma); *United States v. Carr*, 19 Cr. 137, 2020 WL 1872571 (E.D.N.Y. 2020) (same). Accordingly, in light of the limited interpretation provided by the statute, district courts have wide latitude to determine whether a particular set of circumstances qualifies as exceptional. *McDuffie*, 451 F. Supp. 3d 281 at 286 (S.D.N.Y. 2020) (quoting *DiSomma* 951 F.2d at 497).

### A. Mr. Doud is Not a Flight Risk and Does Not Pose a Danger to the Community

There is no reason to think that Mr. Doud would pose a risk of flight or danger to others. From initiation of these proceedings in April 2019, Mr. Doud has been released on his own recognizance without any incident.

On April 23, 2019, Magistrate Judge Henry B. Pitman ordered Mr. Doud released upon execution of a $500,000 unsecured bond. *See* Dkt. 9 – 10. Mr. Doud's conditions of release included surrendering his passport, limiting travel to the Districts of New York, New Jersey, Florida, and any intervening districts as necessary for travel. *See* Dkt. 10. Since his arraignment until the present, spanning well over three years, Mr. Doud has complied with all the terms and conditions of his release. Despite living in Florida, he has never missed a court appearance, nor has he ever caused any issues with respect to his pre-trial service monitoring or been the subject of any violations. Nor has he been rearrested or had any subsequent contacts with law enforcement. In all respects, he has followed the mandates of his pre-trial release diligently.

Additionally, Mr. Doud has lived in New York for many years, has raised his family here, and is deeply invested in his community.  Mr. Doud's loving wife, Carol, has been present for the entirety of the multiple week trial, including jury selection.  His three children have also been present during the trial to support their father.

Even though Mr. Doud's primary residence is no longer in New York, he maintains a small residential property in a manufactured home community in Victor, New York, so that he has a place to stay when he visits his children and grandkids.  Due to his devout observance of Christianity, Mr. Doud maintains involvement in his local church community.  Over the years, he has regularly participated in various activities organized by his local churches.  Currently, Mr. Doud is a member of the Edgewater United Methodist Church, located in Edgewater, Florida, and he is more active than ever before.  Despite the church leadership's familiarity with the instant case and Mr. Doud's charges, they insisted that he take a leadership position as the staff parish relations community chairperson and as a member of the board of trustees.

During Mr. Doud's trial, Reverend Donna Blythe of the Edgewater Church testified as to the obligations encompassed in his leadership role:

> He's active in the food pantry ministry and goes and picks up food from Second Harvest which is where we get a lot of our food from. He serves those who are in need and come to the food pantry on Saturdays.  He has served as an usher, a liturgist.  He has narrated cantatas.  Larry is just somebody who we can call on.  He has many gifts and graces and is generous with his time and service.

Tr., at 1553:19 – 25.

Reverend Blythe further illustrated that Mr. Doud, "will show up and do what's needed, including mowing the grass on a regular basis."  Tr., at 1553:11 – 13.  His heavy involvement in his church is unquestionably and, in turn, the congregation relies significantly on his active and considerable participation.

These community ties are more than enough to ensure that Mr. Doud will not flee.  *See McDuffie*, 451 F. Supp. 3d at 284 (release granted where defendant was a lifelong New Yorker with family and community support); *United States v. Hart*, 906 F. Supp. 102, 105 (N.D.N.Y. 1995) (release granted where defendant was a local businesswoman, with substantial community ties and was married with children).

Mr. Doud also does not pose any threat of danger to the community whatsoever.  As an initial point, there was no allegation of any violence during the commission of the crime despite the nature of the charges being typically associated with violent behavior.  *See Hart*, 906 F. Supp. at 105.  Mr. Doud was convicted of conspiring to distribute narcotics through his **licensed distribution company**.  This is a far cry from the potentially violent drug conspiracies of street level drug dealers who use force to intimidate competition and wage war to control territory. Indeed, courts have ordered defendants released following convictions of more serious and/or violent crimes.  *See United States v. DiMattina*, 885 F. Supp. 2d 572 (E.D.N.Y. 2012) (defendant released pending appeal following conviction for extortion and use of a firearm); and *United States v. Silver*, 203 F. Supp. 3d 370 (S.D.N.Y 2016) (former speaker of the New York State Assembly convicted of two counts of honest services mail fraud, two counts of honest services wire fraud, two counts of extortion and one count of money laundering ordered to continue bail pending appeal).  There is simply no reason to believe that Mr. Doud poses more of a danger to his community than the defendants in *DiMattina* and *Silver*, for example, or that he poses any danger at all.

Furthermore, Mr. Doud's crimes took place entirely within the corporate framework of RDC.  It is frankly impossible for Mr. Doud to resume this order of criminal activity without access to his former company.  *See United States v. Galanis,* 695 F. Supp. 1565, 1570 (S.D.N.Y. 1988)

(finding defendant posed no threat to the community because he could not commit further fraud without access to his offices and accomplices); *United States v. Archer*, 813 F. Supp. 2d 339, 343–44 (E.D.N.Y. 2010) (defendant is not a danger because he could not commit further crimes without his law license or accomplices).  Likewise, Mr. Doud could not engage in any further distribution of narcotics without the resources of RDC, a company that is dissolved and in the midst of bankruptcy proceedings.

### B.  Mr. Doud's Appeal is not for Purposes of Delay and Raises a Substantial Question Likely to Result in Reversal or an Order for New Trial

Mr. Doud also satisfies the second condition for bail pending appeal because his appeal raises a substantial question, and the substantial question is integral to the merits of the conviction. A substantial question, "**is one of more substance than would be necessary to a finding that it was not frivolous**."  *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (quoting *United States v. Giancola*, 754 F.2d 898, 900 – 901 (11th Cir. 1985) (emphasis supplied).  The Second Circuit determined that it is **unreasonable to construe that the district court predict the probability of reversal**, and instead, the language must be read as to the significance of the "substantial issue" on appeal.  *Id*.  Essentially, courts must determine whether the question is "so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.  *Id.* (quoting *United States v. Miller*, 753 F.2d 19, 23–24 (3d Cir. 1985)).  Mr. Doud's anticipated appeal unquestionably satisfies this standard.

The Southern District has concluded that a substantial question exists when the defendant raises on appeal that the conscious avoidance instruction should not have been given at trial due to the prosecution's theory that the defendant had actual knowledge of the fraud.  *United States v. Kaplan*, 2005 WL 3148060, at *1 (S.D.N.Y. 2005).  The *Kaplan* Court looked to the Second

Circuit on this issue, where it was determined that the question of whether evidence proves actual knowledge or conscious avoidance is a fine line, which makes the decision to give the conscious avoidance charge a close question. *Id.*, at *2 (internal quotation marks omitted). Ultimately, *Kaplan* concluded that despite the "contention that there was significant evidence of red flags that should have alerted the defendant to the fraud, defendant has raised a substantial question as to whether it was shown at trial that he deliberately avoided learning facts relative to the crime, and not merely negligent." *Id.* (internal quotation marks omitted).

Even if a Rule 29 motion is denied, a substantial question for appeal can still exist. *DiSomma*, 951 F.2d at 497. In *DiSomma*, the Second Circuit upheld the district court's determination to release the defendant pending appeal because along with satisfying the other factors, the evidence supporting conviction was not overwhelming, and the question as to whether evidence was insufficient to show that the defendant conspired to use actual or threatened force or violence was substantial. *Id.* (quoting *United States v. DiSomma*, 769 F. Supp. 575, 576 (S.D.N.Y. 1991). Other District Courts have concluded that issues based on probable cause present a close question sufficient for § 3143, and also when a defendant convicted of conspiracy to commit extortion and use of a firearm in connection with the extortion, facing a five-year mandatory minimum, was seriously disadvantaged in demonstrating his innocence due the lack of opportunity to present a substantial alibi. *See United States v. Hartery*, 351 F. Supp. 2d 14, 17 (N.D.N.Y. 2005); *see also United States v. DiMattina,* 885 F. Supp. 2d 572, 588 (E.D.N.Y. 2012).

Here, Mr. Doud's basis for appeal is incontrovertibly substantial. As in *Kahn and DiSomma*, the issues on appeal concern factual underpinnings of the alleged conspiracy, and if Mr. Doud's appeal is granted on any of the grounds presented, the conviction will likely be overturned. This is particularly true in light of the recent Supreme Court decision in *Ruan*, which has direct

application to the instant case.[12]  Some of the issues Mr. Doud intends to raise on appeal are as follows:

- Lack of evidence on whether Mr. Doud knowingly and intentionally entered into the conspiracy;

- Due to the lack of testimony from co-conspirators on their intent to enter into any conspiracy, whether a conspiracy existed;

- Whether Mr. Doud's and/or his co-conspirator's conduct was solely for purposes of illegally diverting narcotics; and

- The misrepresentation to the jury of the total weight of controlled substances unlawfully distributed.[13]

Every issue identified has the potential to impact Mr. Doud's conviction tremendously. Additionally, the appeal is not being filed for purposes of delay because "there is no pattern of dilatory defense tactics" during the course of this litigation or any other extrinsic evidence of such conduct.  *United States v. Hart*, 906 F. Supp. 102, 105 (N.D.N.Y. 1995).  The fact that Mr. Doud is facing a statutory minimum does not impact the possibility of releasing him pending appeal, especially in light of the critical issues that need to be addressed.  *See e.g. DiMattina,* 885 F. Supp. 2d at 588.  In the Court's own words, this is an "unusual case," and one with complicated legal theories that likely need to be resolved by the Second Circuit.  *See* **Ex. A**, at 12:7 – 8.

---

[12] *See* Mr. Doud's Supplemental Submission Regarding ECF Nos. 151 and 156.
[13] This is not intended to be an exhaustive list of potential issues to be raised on appeal, as Mr. Doud has retained separate counsel for his appeal.

### C.  Exceptional Reasons Require the Release of Mr. Doud Pending Appeal

Having established that Mr. Doud is neither a flight risk nor a danger to his community, we turn now to the question of whether exceptional circumstances exist.  The test for finding exceptional circumstances is flexible, and district courts have broad discretion to determine whether a particular set of circumstances qualifies.  *DiSomma*, 951 F.2d at 497; *see also United States v. Lea*, 360 F.3d 401, 403 (2d Cir. 2004) (internal quotation marks omitted).  There are a wide range of factors a court may consider, including but not limited to the following: (1) the nature of the defendant's criminal conduct; (2) the defendants prior record; (3) the length of prison sentence; (4) circumstances that may render the hardships of prison unusually harsh, such as illness or injury (i.e. COVID-19); (5) the likelihood of success on a pending appeal; and (6) whether the defendant was unusually cooperative.  *United States v. Schlesinger*, No. CR. 02-485ADSARL, 2005 WL 1657043, at *3 (E.D.N.Y. 2005).  There is no doubt that Mr. Doud fits squarely into the circumstances under which courts have previously released defendants pending appeal.

As a threshold matter, **at nearly 80-years-old, Mr. Doud has no prior criminal record**, and the instant offense is his first contact with the law.  Moreover, since his arrest over three years ago, in April of 2019, Mr. Doud has proven to be more than cooperative.  For every appearance, Mr. Doud and his wife have driven from Florida to New York in order to ensure attendance.

The crimes Mr. Doud was convicted of, by definition, are not inherently violent crimes as they do not have any elements surrounding actual or threatened use of force (*See DiSomma*, 951 F.2d at 496) and also, because a significant amount of time has transpired since Mr. Doud's arrest, many of the circumstances surrounding the commission of the crimes no longer exist.  For one, RDC has dissolved, and thus, it is incredulous to conceive that Mr. Doud would have an

opportunity – or be in any position – to commit similar crimes.  Also, for the last two years, our country and the world have been combatting a global pandemic due to Coronavirus.

Mr. Doud is an elderly man who suffers from high blood pressure and high cholesterol. According to the Center for Disease Control and Prevention ("CDC"), older adults and those with high blood pressure have an increased risk in getting very sick from COVID-19.[14]  Therefore, he is clearly at a heightened risk of both contracting COVID-19 and suffering a serious, if not fatal, reaction to the disease; subjecting him to confinement would be putting him in extreme danger.

In several instances, **courts have released defendants** because of concerns over only a handful of COVID-19 cases at the relevant detention centers.  *See McDuffie*, 451 F. Supp. 3d at 284 (6 cases); *Lopez*, 2020 WL 1678806 at *1 ("at least several" cases); *Carr*, 2020 WL 1872571 at * 1 ("at least several" cases).  The COVID-19 pandemic continues to tremendously effect America's jails.  As of April 19, 2022, MDC Brooklyn housed 1,688 inmates and **over 50% of those inmates**, approximately 868, have tested positive for COVID-19.[15]  Given his age, exposing Mr. Doud to such a high risk that he could contract the disease in his current state would serve no purpose and would be a "callous gamble on his life."  *McDuffie*, 451 F. Supp. 3d at 287.

Finally, there is no question that Mr. Doud intends to raise multiple substantial issues on appeal that would categorically alter the outcome of his trial.  As addressed in **Section B**, *supra*, the question as to whether the Government has proven its case on the weight of the fentanyl, and the specific diverted weight of the fentanyl and oxycodone, is paramount not only to a proper conviction but also sentencing.  The significance of this issue has also been highlighted by Your

---

[14] *See* May 2, 2022, People With Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, last accessed on June 5, 2022.

[15] *See* April 19, 2022, Letter re: Administrative Order No. 2020-14, written by F. Martinez, Jr. https://www.nyed.uscourts.gov/pub/bop/20220419_MDC_Report.pdf.

Honor, which, if granted in favor of Mr. Doud, validates the potentially devastating impact on the Government's case.  Moreover, this being a case of first impression in the circuit, we anticipate the Second Circuit will thoroughly analyze the evidence presented and anticipate Mr. Doud's position will be vindicated.  With this issue hanging in the balance, coupled with Mr. Doud's health concerns, exceptional reasons surely exist.

## CONCLUSION

For the reasons set forth herein, Mr. Doud respectfully requests a non-Guidelines sentence as that would provide sufficient punishment, in accordance with the sentencing factors enumerated in 18 U.S.C. § 3553(a).  Additionally, Mr. Doud requests to continue bail pending appeal under § 3143.

DATED:       August 22, 2022
             New York, New York


                                        RESPECTFULLY SUBMITTED,

                                        THE JANEY LAW FIRM PC
                                        By: Derrelle M. Janey, Esq.

                                        /s/ Derrelle Janey_____
                                        Derrelle M. Janey, Esq.

                                        ROBERT C. GOTTLIEB &
                                        ASSOCIATES PLLC
                                        By:  Robert C. Gottlieb, Esq.

                                        /s/ Robert Gottlieb_____
                                        Robert C. Gottlieb, Esq.
                                        Paul Townsend, Esq.
                                        Kaylee S. Kreitenberg, Esq.

cc: All Counsel of Record