UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x

UNITED STATES OF AMERICA,

    -against-

LAURENCE F. DOUD III,

                              Defendant.

------------------------------------- x

MEMORANDUM DECISION
AND ORDER

19 Crim. 285 (GBD)

GEORGE B. DANIELS, District Judge:

On February 2, 2022, a jury convicted Defendant Laurence Doud of conspiring to illegally distribute oxycodone and 400 grams or more of fentanyl in violation of 21 U.S.C. §§ 841 and 846, and of conspiring to defraud the Drug Enforcement Administration ("DEA") in violation of 18 U.S.C. § 371. Before this Court is Defendant's January 28, 2022 Motion for a Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure 29 or, in the alternative, a New Trial Pursuant to Federal Rule of Criminal Procedure 33. (ECF No. 151.) Defendant's Rule 29 motion is GRANTED as to the jury's finding that his Count One conspiracy to illegally distribute controlled substances involved at least 400 grams of fentanyl, and that finding as to weight is vacated. Defendant's Rule 29 motion is otherwise DENIED and his two convictions stand. Defendant's Rule 33 motion is DENIED in its entirety.

## I.    EVIDENCE AT TRIAL

Defendant Laurence F. Doud III ("Defendant") is the former chief executive officer of Rochester Drug Cooperative ("RDC"), a now-inoperative wholesale distributor of pharmaceutical products. On April 23, 2019, the Department of Justice announced charges against Defendant, RDC, and RDC's former chief compliance officer, William Pietruszewski, for their participation in a conspiracy to distribute oxycodone and fentanyl to pharmacy customers that RDC's own compliance personnel determined, and reported to Defendant, were dispensing drugs to individuals

1

who had no legitimate medical need for them. At trial, the Government presented evidence regarding several suspicious ordering patterns of customers that RDC ignored, including the customers' purchase of highly-abused controlled substances in abnormally large quantities or their purchase of only controlled substances and nothing else, their acceptance of a high percentage of cash payments from patients, sales to out-of-area or out-of-state patients, and routine fulfillment of controlled substance prescriptions issued by physicians operating outside the scope of their medical practice or specialty. Relying primarily on internal RDC emails and the testimonies of Pietruszewski and another RDC employee, Jessica Pompeo Bouck, the Government also presented evidence that, despite being warned by RDC's compliance and legal personnel about these red flags, Defendant continued to direct the shipment of opioids to these problematic pharmacies with the knowledge that they were diverting.

After two weeks of trial, Defendant was convicted of conspiring to illegally distribute oxycodone and 400 grams or more of fentanyl in violation of 21 U.S.C. §§ 841 and 846 ("Count One"), and of conspiring to defraud the Drug Enforcement Administration ("DEA") in violation of 18 U.S.C. § 371 ("Count Two"). Defendant filed the instant motion shortly thereafter, arguing that the Government failed to adduce sufficient evidence that these conspiracies existed or, if they did, that Defendant joined them knowingly and intentionally.

## II.     DEFENDANT'S RULE 29 MOTION

### A.     Legal Standard for Rule 29 Judgment of Acquittal

Rule 29 of the Federal Rules of Criminal Procedure states that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The Second Circuit has repeatedly observed that a defendant raising a sufficiency of the evidence challenge bears a heavy burden. *See e.g.*, *United*

States v. Lee, 834 F.3d 145, 152 (2d Cir. 2016), *cert. denied,* 137 S. Ct. 1599 (2017); *United States v. Desnoyers,* 637 F.3d 105, 109 (2d Cir. 2011); *United States v. Gaskin,* 364 F.3d 438, 459 (2d Cir. 2004); *United States v. Feliciano,* 223 F.3d 102, 113 (2d Cir. 2000). This is because the sufficiency of the evidence standard is "exceedingly deferential," *see United States v. Coplan,* 703 F.3d 46, 62 (2d Cir. 2012), requiring a court to "view the evidence, whether direct or circumstantial, in the light most favorable to the government and credit every inference that could have been drawn in its favor[,]" *United States v. Diaz,* 176 F.3d 52, 89 (2d Cir. 1999).

To prove its case, the government is not "required to preclude every reasonable hypothesis which is consistent with innocence." *United States v. Chang An–Lo,* 851 F.2d 547, 554 (2d Cir. 1988). It must instead "show more than evidence of a general cognizance of criminal activity, suspicious circumstances, or mere association with others engaged in criminal activity." *United States v. Archer,* 671 F.3d 149, 160 (2d Cir. 2011) (quotation omitted). A court must then "assess the evidence not in isolation but in conjunction . . . and the conviction[] must be affirmed, so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt[.]" *Diaz,* 176 F.3d at 89–90 (citation omitted). Moreover, "[t]he weight of the evidence is not for us to consider, and thus any lack of corroboration is irrelevant because that speaks to the weight and not the sufficiency of the evidence." *United States v. Burden,* 600 F.3d 204, 214 (2d Cir. 2010) (citing *United States v. Hamilton,* 334 F.3d 170, 179 (2d Cir. 2003)).

**B.  The Proof as to the Existence of, and Defendant's Knowing and Intentional Participation in, the Conspiracy Charged in Count One was Sufficient**

Count One charged Defendant with violating the Controlled Substances Act, which makes it "unlawful for any person" to distribute controlled substances "except as authorized." 21 U.S.C. § 841(a). To show guilt on Count One, therefore, the Government must prove that Defendant agreed with others to ship opioids in a manner that he knew or intended was "unauthorized" by

law. A defendant unlawfully distributes drugs that are unauthorized by law if he distributes drugs that he knows are being diverted for illegal use. As Defendant himself recognizes, (*see* ECF No. 199, at 8), a shipment of opioids is "unauthorized" in one of two situations: first, where the distributor did not maintain effective controls against known diversion, 21 C.F.R. § 1307.71(a); or, second, where such shipment was known to be not for a legitimate medical purpose, 21 U.S.C. § 823(b)(5).

Viewed in the light most favorable to the Government, the proof supports Defendant's conviction under either analysis. Starting with the former, the Government presented considerable evidence that Defendant knew what was required to distribute drugs in an "authorized manner," *i.e.*, his obligations to maintain effective controls against diversion, and that Defendant repeatedly directed other RDC employees to conduct business in a way that flouted those obligations. First, the Government brought in Ruth Carter, a former employee with the DEA's diversion control division to explain the parameters of "effective controls." Carter explained that each DEA registrant has specific responsibilities and requirements by which they must abide in order to satisfy their obligation to maintain effective controls against diversion. (Transcript of Trial Proceedings ("Tr.") 88:19–20.) The mere fact that a company holds a DEA license does not necessarily mean they are complying with that obligation. (Tr. 82:17–20.) She explained that a wholesale distributor's (such as RDC) obligation to "maintain effective controls" "require[s]" them to "design a system that identifies to them suspicious orders," and "report those suspicious orders to the DEA upon discovery." (Tr. 89:20–25; *see also* Tr. 92:5–7 ("the DEA requires the orders be reported because … the federal law requires they be reported").) Carter also told the jury that distributors are required to investigate any flagged orders to determine whether they are indeed suspicious, and that, "[i]f they cannot dispel the suspicion, [] then they should not ship

those orders." (Tr. 90:1–7; *see also* Tr. 91:15–92:2 (Q. What is a distributor required to do under the law with respect to suspicious orders? A. Well, the requirements are that they are to review the order, investigate it, and determine if it's suspicious. And if it is suspicious, if they can't dispel the suspicion that originally caused it to be flagged by their system, then they should not ship that order. And they shouldn't ship any subsequent orders until and unless they can dispel that suspicion. So if they never dispel the suspicion, they shouldn't ship the orders to that customer.).)

Second, Carter's testimony and other evidence adduced by the Government proved that Defendant was well-aware of these obligations. For example, Carter testified that the DEA regularly reminds distributors, via written correspondence, that they are required to report suspicious orders and refrain from fulfilling those orders. (Tr. 92:14–93:5.) The Government furnished two such letters that the DEA sent RDC in 2006 and 2007. Among other things, these letters reminded RDC of its reporting obligations and its "statutory responsibility to exercise due diligence to <u>avoid filling</u> suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels." (Gov't. Ex. 272 (emphasis added); Gov't. Ex. 273.) So as to avoid any doubt as to RDC's obligations under the law, Carter testified that merely having a compliance system does not mean that a distributor is maintaining effective controls against diversion, and she repeatedly emphasized that distributors must actually carry through with their requirements to identify, investigate and report suspicious orders to the DEA and "immediately cease all sales" to any registrants displaying red flags. (*See e.g.*, Tr. 93:19–26.)

Third and finally, the jury heard overwhelming evidence of a conspiracy within RDC—led by Defendant—to flout these regulatory obligations by selling opioids to pharmacies they knew or had reason to know were diverting.[1] As detailed in the Government's submission, the jury heard

---

[1] Mere non-compliance with the DEA's regulations does not rise to the level of a criminal conspiracy. What makes this conspiracy a crime is Defendant's knowledge or reasonable belief that diversion was occurring.

5

testimony and saw documents showing that RDC identified multiple "red flags" of diversion at several of its pharmacy-customers. (Tr. 308–10.) Such "red flags" included unusually large narcotics orders, a high percentage of prescriptions being purchased with cash, routine filling of prescriptions for high pill counts, filling for out-of-state doctors, and filling for suspicious doctors. (*Id.*) RDC employees alerted Defendant to these issues on numerous occasions. By way of example, in January 2013, Defendant's son emailed Defendant that RDC "ha[s] some VERY suspicious customers due to their buying." (Gov't. Ex. 13.) He further cautioned Defendant that if anyone other than Defendant's co-conspirator, William Pietruszewski, was in charge of compliance, "a scary story is told." (*Id.*) In another email, Defendant's son forwarded Defendant a list of customers who had been making very high and unexplained controlled substance purchases, saying, "[s]ome of this makes me want to vomit!" (Gov't. Ex. 18.) Indeed, the Government showed the jury several emails between Defendant, his co-conspirators, and other RDC employees discussing red flags of diversion at a handful of RDC's pharmacy-customers. (Gov't. Ex. 908.) In 2014, an attorney cautioned Defendant: "we could foresee the Government raising concerns about RDC's compliance program." (Gov't. Ex. 31; *see also* Gov't. Ex. 33.)

Notwithstanding both these causes of concern and RDC's written policies that required employees to investigate and hold orders to "red-flagged" pharmacies, Defendant directed RDC employees to fill such orders on several occasions. (Tr. 1198–1202.) Pietruszewski, RDC's former head of compliance, told the jury of instances in which Defendant personally intervened in specific transactions to direct him and others to fill orders that had been automatically stopped by RDC's suspicious order monitoring system. (*See e.g.,* Tr. 903, 906, 908, 985.) Another RDC employee, Bouck, corroborated Pietruszewski's testimony. Bouck told the jury that Defendant directed compliance employees to release flagged orders without conducting any investigation

whatsoever, which meant compliance was not "following the requirement to ensure that th[e] medicine wasn't being used for illicit reasons," *i.e.*, the requirements set out during Carter's testimony. (Tr. 325–26, 330.) As a result, RDC shipped controlled substances to pharmacies where there "was high suspicion about . . . illegitimate dispensing" because of "red flags . . . throughout their dispensing reports." (Tr. 329, 451.) Like Pietruszewski, Bouck gave examples of specific pharmacies to which she released orders at Defendant's direction, despite evidence that those pharmacies were diverting. (Tr. 354–55, 366–68, 377–81, 457–59, 464–66.)

Internal emails and sales data shown to the jury corroborate that RDC had identified red flags of diversion at several of its customers but nevertheless continued to fill their orders. As detailed in the Government's submission, these documents show that RDC was aware, for example, that BayRidge Pharmacy was dispensing oxycontin for suspicious doctors, that ProHealth Pharmacy was dispensing a "staggering" number of pills for so many suspicious doctors that the data was "screaming red," that Linden Care Pharmacy dispensed fentanyl for cash and to doctors with problematic prescribing practices, that Seventh Elm Pharmacy was like a "stick of dynamite waiting for DEA to light the fuse," and that one pharmacy, Aliton, had already been raided by the DEA for suspected diversion. (ECF No. 184 (citing Gov't. Ex. 908).) Testimony by an expert economist, David Cutler, established that, throughout the conspiracy, RDC shipped over 90% of the orders that were flagged for investigation, and that RDC consistently sold opioids to pharmacies that displayed red flags of diversion. (Gov't. Exs. 903, 904; Tr. 1314.) Cutler also found that RDC made over 70% of its controlled substances sales to pharmacies that, once Defendant left, were terminated for suspected diversion. (Gov't. Ex. 903; Tr. 1323–24.)

In sum, there was sufficient evidence in the record establishing agreements between Defendant and other RDC employees to deliberately distribute controlled substances to pharmacies

they knew were diverting in a manner that flouted RDC's obligations to maintain effective controls against diversion. The same evidence also supports Defendant's conviction under the second "unauthorized" scenario: the myriad red flags of diversion, coupled with evidence that RDC understood certain pharmacies to be diverting, sufficiently support the jury's finding that Defendant participated in a conspiracy to distribute drugs to pharmacies he knew were dispensing not for legitimate medical purposes.

Defendant's arguments to the contrary are without merit. Defendant argues that the Government failed to adduce sufficient evidence either that any conspiracy existed or that, if it did, Defendant joined such conspiracy with actual knowledge of diversion. To support this argument, Defendant relies primarily on testimony from Defendant's cross-examination of Pietruszewski and Bouck. Specifically, Defendant cites Pietruszewski's sworn statements that Defendant never explicitly said he "want[ed] to" either "divert [] opioids for non-medical purposes" or "defraud the United States," and Bouck's testimony that she spoke with Defendant only "infrequently" and never about "intentionally defrauding the DEA." (*Id.* at 4–5; ECF No. 156, at 5–8, 17.) According to Defendant, this testimony shows that neither witness "[]ever entered into an agreement to do anything unlawful either with [Defendant] or anyone else at RDC." (ECF No. 152, at 4.) Defendant's arguments miss the mark for several reasons.

First, as set forth above, the Government presented considerable evidence at trial showing that Defendant and other employees at RDC both knew of and discussed compliance problems at RDC's pharmacy-customers, including testimony from Pietruszewski and Bouck that Defendant understood such pharmacies to be diverting. (ECF No. 184, at 22–24 (summarizing evidence); ECF No. 200, at 4–6 (same).) Despite this knowledge, Defendant directed RDC employees to continue to ship controlled substances to these pharmacies. Further, as Defendant concedes, the

Government may invoke the conscious avoidance doctrine to satisfy the requirement that a defendant knew of the unlawful aims of a conspiracy. (ECF No. 156, at 10.) If not proof of actual knowledge, there was ample evidence at trial showing, at a minimum, that Defendant had reason to suspect, but consciously avoided confirming, that diversion was occurring.[2] (See e.g., id.) On this record, and mindful that Defendant's convictions were for conspiracy alone, there is no ground for a Rule 29 vacatur. See Coplan, 703 F.3d at 62 (in conspiracy cases, "deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court") (citations omitted).

Second, the Court must consider the evidence in its totality, not merely a few pieces in isolation. *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008). The significance Defendant attaches to the few snippets of testimony he identifies as favoring acquittal is therefore misplaced. That Defendant never explicitly conveyed the goal of the conspiracy to any of his co-conspirators does not undermine its existence. It is well settled under federal law that the agreement needed to support a charge of conspiracy need not be explicit.[3] *See e.g., United States v. Beech-Nut Nutrition*

---

[2] The cases upon which Defendant relies do not address the conscious avoidance theory and are therefore inapplicable. Contrary to Defendant's suggestion, *Gallishaw* does not require actual knowledge. *United States v. Gallishaw*, 428 F.2d 760, 763 (2d Cir. 1970). *Friedman* and *Lopac* are likewise unanalogous. In *Friedman*, the defendant supplied firearms to individuals whom he had reason to suspect were going to commit a crime, but there was no evidence he had any idea what specific crime they intended to commit. *United States v. Friedman*, 300 F.3d 111, 126 (2d Cir. 2002). Similarly, in *Lopac*, the defendant received packages for her boyfriend but had no reason to know, or even suspect, they contained contraband. *United States v. Lopac*, 411 F. Supp. 2d 350, 369 (S.D.N.Y. 2006). Unlike the *Lopac* and *Friedman* defendants, Defendant here was not in the dark. Far from it, in fact: the evidence showed that multiple RDC employees, including Defendant's own son, alerted Defendant to indications of diversion by RDC's customers on numerous occasions. (ECF No. 184, at 22–24; ECF No. 200, at 4–6.) Finally, Defendant improperly invokes *United States v. Gurry*, 427 F. Supp. 3d 166 (D. Mass. 2019), an out-of-circuit case that was reversed on appeal. *United States v. Simon*, 12 F.4th 1 (1st Cir. 2021) (reversing *Gurry*).

[3] For this same reason, Pietruszewski's testimony that Defendant never specifically said "I want to divert these opioids" does not "clearly contradict" his testimony on direct, as Defendant claims. (ECF No. 156, at 6.) Defendant's reliance on *Coplan*, (*see id.*), which did involve a direct contradiction in witness testimony, is therefore mislaid.

*Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989); *see also United States v. Rea*, 958 F.2d 1206, 1214 (2d Cir. 1992) ("the Government need not present evidence of an explicit agreement; proof of a tacit understanding will suffice"). Nor is it dispositive that Bouck and Defendant spoke "infrequently," particularly here where Bouck also testified that—among other suggestive behaviors—Defendant issued "verbal procedures" about compliance practices that not only ran contrary to RDC's written policies but also required releasing controlled substances to customers that showed indicia of diversion (Tr. 474–75, 325–26, 330–31), that Defendant directly told her to release such orders (Tr. 35–55, 366–68, 377–81), and that Defendant prohibited compliance employees from terminating customers' abilities to purchase controlled substances without Defendant's approval (Tr. 329). These interactions, even if few in number, are sufficient to sustain the jury's conclusion that Bouck's testimony supported the existence of a conspiracy within RDC to violate the narcotics laws, as well as Defendant's knowing and willing participation in that conspiracy.

Finally, Defendant invokes *United States v. Falcone*, 109 F.2d 579 (2d Cir. 1940), for the proposition that a mere supplier, even one who knows of the illegal purpose of his purchaser, cannot be held as a co-conspirator. (ECF No. 156, at 11.) The *Falcone* decision—which has, in any event, been limited to its particular facts, and is inapplicable here where the nature of the supplied good is not inherently innocent, *see United States v. Rush*, 666 F.2d 10, 11 (2d Cir. 1981)—set an important qualification to its rule: such a supplier may become a co-conspirator when he has "a stake in [the] outcome" of the venture. *Falcone*, 109 F.2d at 581. Defendant's failure to comply with applicable regulations in selling the drugs at issue furnishes the stake in the success of the venture that *Falcone* demands.[4] *United States v. Tramaglino*, 197 F.2d 928, 931 (2d Cir. 1952) (declining to apply *Falcone* where seller made "sales that were not on the basis of

---

[4] The evidence of Defendant's financial motive to participate in the conspiracies, (*see* ECF No. 184, at 27), separately satisfies *Falcone*'s "stake" requirement.

the proper forms or pursuant to written orders of the type required" by law for marijuana transfers, and were, for that reason "illegal sales" that fell under *Falcone's* "stake" exception); s*ee also United States v. Pecoraro*, 115 F. 2d 245 (2d Cir. 1940) (in affirming conviction of dealer who supplied alcohol to distillers and failed to report the sales per regulation: "To report the sales would have stopped the [distillers'] business ... to suppress the sales was therefore to assist the distillers in their distilling ... In order to secure the business he had to abstain from disclosing the distillers' business, that is, himself [] commit a crime and expose himself to punishment. That was to take an active hand in the distillers' business, and to have a stake in their venture in a sense that an indifferent seller has none."). The general rule set by *Falcone* is therefore inapplicable.

Viewing the evidence in the light most favorable to the Government and drawing all inferences in support of the verdict, a rational jury could have found, beyond a reasonable doubt, that there existed a conspiracy to illegally distribute narcotics, and that Defendant was a knowing and intentional participant in that conspiracy. Defendant's challenge to the sufficiency of the evidence on these issues is therefore rejected.

1. ***Ruan's* Applicability**

After briefing was complete, Defendant made a supplemental submission arguing that the Supreme Court's decision in *Ruan v. United States*, 142 S. Ct. 2370 (2022) requires vacatur of his convictions. (*See generally*, ECF No. 199.) Despite Defendant's urging, *Ruan* does not compel a different result. *Ruan* arose from a federal criminal prosecution of licensed physicians for over-prescribing opioids and other addictive drugs in violence of 21 U.S.C. § 841. As noted above, Section 841 prohibits distribution of controlled substances "[e]xcept as authorized." In *Ruan*, the Supreme Court considered whether "authorization" in that context should be based on a defendant's subjective knowledge or on an objective standard of reasonable care, and ultimately

held that the proper *mens rea* was one of defendant's "knowledge and intent," *i.e.*, subjectivity. *Id.* at 2375. Although Defendant relies heavily on *Ruan* in support of his motion, the *Ruan* issue of which *mens rea* applies has never been in dispute in this case. The Government has always agreed that the jury needed to decide whether Defendant "knowingly and intentionally" acted in an unauthorized manner and consistently presented its arguments accordingly. (*See* ECF No. 200, at 5–7 (detailing trial record).) The record also shows that this Court repeatedly instructed the jury as to the proper *mens rea*, as set by *Ruan*. (*See e.g.*, Tr. 1931:14–24 ("the government must prove … that the defendant knowingly and intentionally became a member of that particular conspiracy at some point during the applicable period, and that he joined and participated in the conspiracy, knowing of its illegal purpose"); *id.* 1933:19–24 ("In deciding whether the defendant was in fact a member of the conspiracy, you should consider whether the defendant knowingly and willfully joined the conspiracy. Did he participate in it with knowledge of its unlawful purpose and with the specific intention of furthering its objective?"); *id.* 1946:12–15 ("[I]f you find that the defendant did not knowingly and intentionally join a conspiracy … he may not be convicted …").[5] *Ruan*'s only relevance to this case, therefore, is that it confirms the correctness of this Court's jury charge and the theory upon which the parties and this Court have been relying all along. Defendant's arguments that the jury was permitted to convict Defendant in the absence of proof of his knowledge and intent, (*see e.g.*, ECF No. 199, at 6), are plainly belied by the record.[6]

---

[5] Defendant also argues that this Court's use of the phrase "good faith" in its jury charge runs afoul of *Ruan*. Not so. Unlike this Court's charge, the "good faith" instruction in *Ruan* was used in place of "knowing and intentional," and it was specifically defined as an objective standard. *See Ruan*, 142 S. Ct. at 2376 (2022) (trial court "instructed the jury that it should not convict if it found that Kahn acted in 'good faith,' defined as 'an attempt to act in accordance with what a reasonable physician should believe to be proper medical practice.'"). This Court's "good faith" instruction, by contrast, set a subjective test for what Defendant himself reasonably believed. (Tr. 1939:11–21.)

[6] Because this Court rejects Defendant's *Ruan* argument on the merits, it is not necessary to address the Government's waiver argument.

C.  **The Evidence as to the Existence of, and Defendant's Knowing and Intentional Participation in, the Conspiracy Charged in Count Two was Sufficient**

There was also sufficient evidence that Defendant knowingly and intentionally participated in a conspiracy to defraud the DEA in violation of 18 U.S.C. § 371. First, as detailed above, Defendant and other RDC employees knowingly and willfully did not comply with their obligations to report suspicious orders to the DEA. The evidence at trial showed both that RDC was required by law to inform the DEA of suspicious orders, *see supra* Section B, and that Defendant and his employees were well-aware of those obligations—they were regularly reminded of their reporting obligations by the DEA (*see* Gov't. Exs. 272, 273), RDC's written policies (which Defendant was involved in drafting) required such reporting (*see* Gov't. Ex. 276; Tr. 324:9–16), and Pietruszewski and Bouck both testified that they and Defendant knew that RDC was required to report suspicious orders, (*see* Tr. 306:10–17, 894:4–8). Pietruszewski and Bouck further testified that Defendant's "verbal procedure ... was different" than RDC's written compliance policies, and that, pursuant to those verbal procedures, RDC did not report suspicious orders to the DEA. (Tr. 348:2–9, 475:6–20, 894:1–95:25.) Bouck provided specific examples of several suspicious orders and customers that RDC did not report at Defendant's direction, including the Bay Ridge, Regal Remedies and Old Town pharmacies and several physicians. (Tr. 459:17–466:8.) The key role Defendant played in RDC's failure to abide by their reporting obligations was demonstrated through Bouck's testimony that RDC only began reporting suspicious orders after Defendant left the company because, without Defendant at the helm, they then became "free" to do so. (Tr. 468:15–470:5.) Reporting data examined by Cutler and presented to the jury corroborated Bouck's testimony. (Gov't. Ex. 903.)

Second, the evidence at trial also showed that RDC—at Defendant's direction—lied to the DEA about its reporting and due diligence practices. On numerous occasions, RDC employees,

following Defendant's orders, provided the DEA with RDC's written policies and represented that RDC was complying with them, (Gov't. Exs. 12, 20, 50, 64, 276; ECF No. 184, at 40–42), when, as explained above, that was not, in fact, the case. On certain occasions, Pietruszewski voiced concerns to Defendant that RDC's practices did not conform with its written policies and suggested that RDC change its policies to match its practices so that the DEA could not "come back and ask why we are not following the process." (Gov't. Exs. 50, 57, 62.) Notwithstanding, the jury saw substantial evidence that Defendant continued to direct employees not to report suspicious orders and to refrain from conducting due diligence on new accounts without any change to RDC's written procedures, and that RDC continued to provide those procedures to the DEA knowing they contained false information. (Tr. 389–91, 972–74.)

The evidence at trial was therefore sufficient to support Defendant's Count Two conviction for defrauding the DEA for his knowing and willful failure to comply with regulatory requirements to report suspicious orders and conduct due diligence on new customers, and for misrepresenting to the DEA that RDC was in fact complying with these obligations.

D. **The Evidence Does Not Support the Jury's Finding that Defendant Conspired to Illegally Distribute 400 Grams or More of Fentanyl**

Defendant also contends that the Government failed to prove that he knowingly and intentionally conspired to illegally distribute at least 400 grams of fentanyl as required by 21 U.S.C. § 841(b)(1)(A).[7] After a careful review of the trial record, this Court agrees. As stated above, the criminal conduct at issue is Defendant's conspiracy to distribute controlled substances in an unauthorized manner to pharmacies *he knew or had reason to know were diverting*. It is the

---

[7] Because Defendant raised his drug weight argument in his original Rule 29 motion, (*see* ECF No. 152, at 9–10), this issue is properly before this Court. The Government's suggestion that Defendant failed to preserve this argument, (ECF No. 188, at 1–2), is unsupported by the case law and is therefore rejected.

knowledge of diversion, not the mere flouting of DEA regulations, that makes the conduct criminal. To secure the mandatory minimum ten-year sentencing enhancement allowed by Section 841, then, the Government must have shown—not, as they suggest, the overall quantity of fentanyl RDC shipped to red-flagged pharmacies—but the quantity of fentanyl Defendant knew or could reasonably expect would be diverted. While the evidence undoubtedly shows that Defendant and his co-conspirators shipped large quantities of fentanyl to problematic pharmacies knowing that some subset of that fentanyl would be diverted, (Gov't. Ex. 904), there is no evidence that Defendant knew or had any idea how many grams would, in fact, be diverted. Nor is there any evidence that Defendant and his co-conspirators agreed or expected that any particular quantity of fentanyl would be diverted, that they had any control over the amount that would be diverted, or that the objective of their conspiracy was to achieve any particular amount of diversion. In the absence of any evidence showing that any amount of fentanyl shipped by Defendant was diverted, it is pure speculation that Defendant knew or reasonably expected that fentanyl in excess of 400 grams would be diverted.[8]

The dearth of quantifying evidence is laid bare by the Government's failure to present any evidence even as to the far simpler issue of how much fentanyl actually was diverted. To get there, the Government urges the Court to multiply the amount of fentanyl shipped by RDC to red-flagged pharmacies (3,619 grams) by the percentage of prescriptions at those pharmacies that were written by doctors RDC had flagged as dirty. (ECF No. 188, at 4–5.) Applying this arithmetic, the Government concludes that at least 800 grams of fentanyl were diverted. This reasoning rests on

---

[8] With respect to weight, the Government asked the jury to decide whether the quantity of fentanyl involved in the conspiracy was: (a) less than 40 grams; (b) between 40 and 400 grams; or (c) 400 grams or more. The Government's failure to adduce any evidence as to the quantity diverted other than RDC's aggregate sales means that these were not real choices. The jury simply did not have the information necessary to make an actual quantity determination.

several unreliable assumptions, however, including, among others, that every prescription written by a dirty doctor is a bad prescription, and that all 800 of those grams were supplied by RDC and not some other pharmaceutical distributor.

Based on the record before this Court, there is no evidence that Defendant or his co-conspirators had actual knowledge of the quantity of illegal narcotics involved in the conspiracy, or that they could have reasonably foreseen what quantity of those drugs would be diverted. This Court therefore vacates the jury's finding that Defendant conspired to illegally distribute 400 grams or more of fentanyl.

### III. DEFENDANT'S RULE 33 MOTION FOR A NEW TRIAL

Rule 33(a) of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Because the grant of "a Rule 33 motion requires 'a real concern that an innocent person may have been convicted[,]'" *see United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (citing *United States v. Ferguson*, 246 F.3d 129, 134 (2d. Cir. 2001)), "[t]he standard applied is whether 'it would be a manifest injustice to let the guilty verdict stand[,]'" *United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015) (citing *United States v. Guang*, 511 F.3d 110, 119 (2d Cir. 2007)). District courts are directed to grant Rule 33 motions "sparingly and in the most extraordinary circumstances." *Ferguson*, 246 F.3d at 134 (citation omitted). Accordingly, the court must satisfy itself that the verdict is supported by "competent, satisfactory and sufficient evidence," *id.*, and in analyzing the evidence, the court "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses," *United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir. 1982), *cert. denied*, 459 U.S. 1174 (1983) (citation

omitted). A trial court may only disregard a witness's testimony where it is "patently incredible or defies physical realities." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

As discussed above, this Court is satisfied that "competent, satisfactory and sufficient evidence in the record supports the jury verdict" as to the existence of, and Defendant's knowing and intentional participation in, both of the charged conspiracies. *Ferguson*, 246 F.3d at 134. There is no "manifest injustice" in allowing Defendant's guilty verdicts on both counts to stand in that regard. *Id.* Because this Court has decided to vacate the jury's finding as to the weight of the drugs contemplated by the conspiracy, Defendant's motion for a new trial on the issue of drug weight is also denied as moot.

## IV.  CONCLUSION

Defendant's motion for a judgment of acquittal pursuant to Rule 29, (ECF No. 151), is GRANTED as to the jury's finding that his Count One conspiracy to illegally distribute controlled substances involved at least 400 grams of fentanyl, and that sentencing enhancement as to weight is vacated. Defendant's Rule 29 motion is otherwise DENIED and his two convictions stand. Defendant's Rule 33 motion is DENIED in its entirety.[9]

Dated: February 23, 2023
      New York, New York

SO ORDERED.

*George B. Daniels*
GEORGE B. DANIELS
United States District Judge

---

[9] Defendant's motion to strike the Government's sur-reply, (ECF No. 189), is DENIED.