UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

                                  :

UNITED STATES OF AMERICA

                                  :

        - v. -

                                  :    S1 19 Cr. 285 (GBD)

LAURENCE F. DOUD III,

                                  :

                Defendant.

                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## SENTENCING MEMORANDUM OF THE
## <u>UNITED STATES OF AMERICA</u>

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Thomas Burnett
Nicolas Roos
Alexandra Rothman
Assistant United States Attorneys
    *- Of Counsel -*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................................... 1

BACKGROUND ......................................................................................................................... 2

ARGUMENT .............................................................................................................................. 13

I.   The Probation Office Correctly Calculated the Applicable Guidelines Range. .................... 13

II.  A Sentence Of 180 Months' Imprisonment Is Appropriate. .................................................. 15

    A.   Applicable Law .............................................................................................................. 15

    B.   A 180-Month Sentence Is Appropriate to Reflect the Seriousness of the Offense, to Afford Adequate Deterrence to Criminal Conduct, and to Provide Just Punishment for the Defendant's Crimes ................................................................................................... 16

III. The Court Should Deny The Defendant's Request For Bail Pending Appeal ........................ 24

    A.   Applicable Law .............................................................................................................. 24

    B.   The Defendant Is Not Entitled to Bail Pending Appeal ................................................ 25

CONCLUSION .......................................................................................................................... 26

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the sentencing of defendant Laurence F. Doud III and in response to the arguments raised by the defendant in his sentencing memorandum dated August 22, 2022.  In February 2022, after a three-week trial before this Court, the defendant was convicted by a jury of one count of narcotics conspiracy, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A), and 841(b)(1)(C) (Count One), and one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count Two).  On February 23, 2023, the Court granted the defendant's motion for a judgment of acquittal as to the jury's finding that the defendant conspired to distribute at least 400 grams of fentanyl but otherwise denied the defendant's post-trial motions.

As the jury found, and as the evidence at trial overwhelmingly established, the defendant directed a criminal conspiracy at Rochester Drug Cooperative, Inc. that pumped large quantities of dangerous opioids into pharmacies throughout the Northeast, and did so even though he knew that the pharmacies were diverting these drugs and supplying them to people suffering from addiction.  Fueling an opioid epidemic that continues to devastate communities around the country, including here in New York City, the defendant was motivated by greed and his company's bottom line.  This Court should hold the defendant accountable for very serious nature of his extensive and ongoing scheme, for the shattering impact it has had on people suffering from addiction, and send the message that white collar drug dealers like the defendant, who abuse their authority to lawfully distribute drugs, face serious consequences when they commit crimes.

For these reasons, and as set forth in greater detail below, the Government submits that a sentence of 180 months' imprisonment is necessary and appropriate to achieve the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

## BACKGROUND

The evidence at trial proved that the defendant, the former CEO of Rochester Drug Cooperative, Inc. ("RDC"), knowingly participated in a conspiracy with RDC employees to distribute oxycodone and fentanyl in a manner not authorized by law, to pharmacies they knew were diverting.  The evidence further established that the defendant conspired with RDC employees to defraud the Drug Enforcement Administration (the "DEA") by failing to report suspicious orders to the DEA, and by lying to the DEA about the company's reporting practices. Indeed, as the Court recently noted, over the course of the trial, "the jury heard overwhelming evidence of a conspiracy within RDC—led by Defendant—to flout [DEA] regulatory obligations by selling opioids to pharmacies that they knew or had reason to know were diverting."  (Dkt. No. 210, at 5.)

RDC was among the nation's ten largest pharmaceutical distributors.  As a pharmaceutical distributor, RDC distributed both non-prescription and prescription drugs – including controlled substances – to pharmacy customers.  During the defendant's tenure as RDC's CEO, RDC supplied tens of millions of doses of opioids, including oxycodone and fentanyl, to pharmacies that the defendant and his co-conspirators knew were dispensing those drugs to individuals with no legitimate medical need for them.

In 2006 and 2007, the defendant received letters from the DEA emphasizing that distributors have "a statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."  (GX-272; *see* GX-273.)  Nonetheless, the defendant designed a plan—that was carried out by employees in compliance, including RDC's former head of compliance Bill Pietruszewski and Jessica Pompeo Bouck—that they would ship drugs to pharmacies they knew were diverting

because the defendant did not want to lose customers.  (*See, e.g.*, Tr. 612-13 (Bouck explaining that she shipped drugs to pharmacies that were diverting because she was "following direction" from the defendant); Tr. 945 (Pietruszewski explaining that he did not stop shipments to bad pharmacies "[b]ecause [the defendant] . . . . did not want us to").)

The defendant and his co-conspirators shipped pharmacy orders notwithstanding "red flags that the customers were diverting the controlled substances."  (Tr. 883.)  Pietruszewski admitted that he "ship[ped] orders of controlled substances to pharmacies that [he] believed were diverting [them]," and that he "kn[ew] that was wrong."  (Tr. 1205-06.)  And he confessed that, over the course of his time working under the defendant, he kept distributing controlled substances to "the majority of pharmacy customers that [he] believed were diverting controlled substances"—even in the face of "clear signs of diversion"—because cutting off customers was "counter to what RDC did."  (Tr. 1198-1202.)  The defendant was an active co-conspirator in these crimes, (Tr. 879), as Pietruszewski testified that he released controlled substances to these bad pharmacies because "that's what [the defendant] wanted us to do," (Tr. 1206).

The defendant, Pietruszewski, and others in compliance together carried out their common plan.  The jury heard testimony and saw documents showing that RDC identified certain issues as "red flags" for diversion.  (*See* Tr. 308-10.)  Those "red flags" included unusually large narcotics orders, a high percentage of prescriptions being purchased with cash, routinely filling prescriptions for high pill counts, filling for out of state doctors, and filling for suspicious doctors.  (*Id.*)  RDC's written policies required employees to hold orders with "red flags," investigate those orders, and not ship the order unless the employees could determine it was not going to be a source of diversion.  (GX-276.)

Despite these policies, the defendant directed his co-conspirators, like Pietruszewski, and

others to routinely ship controlled substances to pharmacies that showed clear signs of diversion, and that they believed were diverting. (Tr. 1198-1202.) Pietruszewski testified that when RDC's computer system flagged unusually large orders by pharmacy customers—a "red flag" that should have triggered an investigation—he and others would typically release the orders. (*See, e.g.*, Tr. 894, 906, 931.) Pietruszewski also explained that he and others in compliance saw "red flags of diversion at RDC's pharmacy customers," (Tr. 935-36), including many prescriptions being purchased with cash, high pill counts, and suspicious doctors, (*see* Tr. 945, 947-48). Under RDC's policies, they should have held the orders to investigate. (GX-276.) But instead, RDC generally continued "selling controlled substances to stores that displayed these red flags of diversion," without the necessary investigation. (Tr. 945.) Except in rare circumstances, RDC did not cut off shipments of controlled substances to pharmacies that showed clear signs of diversion, (Tr. 1198-1202).

The defendant knew about "red flags of diversion" at pharmacy customers, but did not stop sending controlled substances to these pharmacies. (Tr. 945; *see also* Tr. 914, 935-36, 1206.) The defendant made it clear that he "didn't care to turn off stores because that would affect the sales of RDC." (Tr. 923.) The defendant also expressed his view that it was the DEA's job, not RDC's job, to police pharmacies and that there was no return on investment for compliance. (*See* Tr. 889, 894, 954.) Acceding to the defendant's demands, Pietruszewski testified that he had his subordinates carry out the defendant's orders, directing them to ship controlled substances to pharmacies that displayed "red flags" of diversion. (Tr. 936.)

The defendant also intervened in specific transactions, directing Pietruszewski and others in compliance to ship orders that had been automatically stopped by RDC's computerized suspicious order monitoring system. (*See, e.g.* Tr. 903, 906, 908, 985.) The defendant required

that any decision to stop selling controlled substances to pharmacies had to be approved by the defendant.  (*See, e.g.*, Tr. 923, 926-27, 931.)  Given the defendant's stated desire not "to turn off stores because that would affect . . . sales," (Tr. 923), the upshot of this policy was that RDC rarely stopped problematic pharmacies from receiving controlled substances, (*see* Tr. 1198-1202).

Bouck testified that it was no accident that RDC distributed controlled substances to pharmacies she believed were diverting.  Rather, it was a plan carried out by co-conspirators like Pietruszewski and others, at the defendant's direction.  The defendant, Bouck explained, had "verbal procedures" about compliance practices that were different from RDC's written policies, and those verbal rules often required releasing controlled substances to customers that showed "red flags" of diversion, without investigation.  (Tr. 474-75; *see, e.g.*, Tr. 325-26, 330-31.)  Bouck admitted that she let RDC ship controlled substances to pharmacies she "believed were diverting," that she "kn[ew] it was wrong," but that she did it because she was "following directions"— specifically, directions from the defendant.  (Tr. 612-13.)

For many orders flagged by the suspicious order monitoring system, the compliance employees—following the defendant's verbal rules—released the orders without conducting any investigation, which meant compliance was not "following the requirement to ensure that th[e] medicine wasn't being used for illicit reasons." (Tr. 325-26, 330.)  Because of this practice, which came from the defendant and upper management, RDC shipped controlled substances to pharmacies where there "was high suspicion about . . . illegitimate dispensing" because of "red flags . . . throughout their dispensing reports."  (Tr. 329, 451.)

Following the defendant's directions, Bouck and others released orders for multiple pharmacies despite believing those pharmacies were diverting.  RDC, for instance, shipped controlled substances to a pharmacy called ProHealth, even though it made Bouck "sick" to do so

because of the signs "that there [was] diversion happening in that pharmacy." (Tr. 457.) RDC also distributed controlled substances to pharmacies called BayRidge, Old Town, and Regal Remedies, even though Bouck and others knew the pharmacies were filling prescriptions for bad doctors and taking cash for many prescriptions—strong signs of diversion. (Tr. 458-59.) And Bouck provided a list of other pharmacies that she recalled presenting similar "red flags" of diversion, but to which RDC kept sending controlled substances. (Tr. 464-66.)

The defendant also directed Bouck and others in the compliance department to allow RDC to begin shipping controlled substances to new pharmacy customers, without doing any diligence to ensure those pharmacies were not diverting drugs. (*See* Tr. 377-78.) Many of the pharmacies that Bouck identified as displaying "red flags" of diversion, or that were taken on as customers without employees first conducting due diligence, were eventually suspended or cut off from buying controlled substances after the defendant left RDC. (Tr. 380-81; GX-278.)

In addition, the defendant made sure Bouck and others in compliance were following his rules. At times, Bouck explained, the defendant directly told her to release orders to customers or to allow RDC to begin selling controlled substances to pharmacies that showed "red flags" of diversion. (*See, e.g.*, Tr. 354-55, 366-68, 377-81.) The defendant also indirectly controlled the compliance department by prohibiting compliance employees from terminating customers' abilities to buy controlled substances without the defendant's approval. (Tr. 329.) Given the defendant's repeated insistence on customers getting orders notwithstanding "red flags" of diversion, the clear implication of this system was that compliance employees should continue selling controlled substances, even to pharmacies they believed were diverting.

The defendant and RDC employees also knowingly and willfully did not comply with their obligation to report suspicious orders to the DEA, and then lied to the DEA about the company's

6

reporting practices. RDC was required to "inform" the DEA of "suspicious orders when discovered." (DX-L9, DX-L10.) The evidence at trial proved that the defendant and his employees were aware of that rule: they were informed by the DEA (*see* GX-272, GX-273), the requirements were set forth in RDC's policies that the defendant was involved in drafting (*see* GX-276; Tr. 324), and Bouck and Pietruszewski testified that they understood the requirement, (*see* Tr. 306, 894).

Despite knowing the rules, RDC employees—including the defendant, Pietruszewski, and Bouck—deceitfully and fraudulently impeded the regulatory functions of the DEA by not reporting suspicious orders. Pietruszewski testified that he participated in a conspiracy to defraud the DEA by failing to report suspicious orders, and that he conspired with the defendant when he committed that crime. (Tr. 883.) He explained that, at the defendant's direction, RDC did not report suspicious orders to the DEA. (Tr. 894-895.) He and other employees in compliance needed the defendant's approval to report suspicious customers. (Tr. 923.) But the defendant, Pietruszewski testified, was concerned that if RDC reported their orders to the DEA, the customers would not trust RDC and RDC would lose those customers' business. (Tr. 895.) So RDC consistently did not comply with its reporting requirements.

Bouck testified that RDC "did not report any suspicious orders" because its "verbal procedure on how [RDC] handled customers was different" than its written policy. (Tr. 475.) The defendant made a business decision, which he relayed to compliance, that RDC should not report customers to the DEA for suspicious orders. (Tr. 348.) Bouck recounted attending a DEA conference where, after hearing about distributors' reporting requirements, Pietruszewski directly told her that RDC did not follow those requirements and did not report its customers. (Tr. 352-53.) Bouck went on to give examples of RDC's failure to report, identifying several of RDC's

customers that had suspicious ordering activity that was not reported to the DEA.  (Tr. 459-466.)
Bouck and Pietruszewski admitted that they knew what they were doing was wrong when they did
not report suspicious orders.  (Tr. 353, 882.)

Their testimony was corroborated by emails, which stated, among other things, that orders
had to be released to certain customers, and that RDC did not report customers.  (*See, e.g.*, GX-
110G.)  There was also significant amounts of data introduced at trial, which showed that RDC
regularly released over 90 percent of its held orders, and reported just a tiny fraction of flagged
suspicious orders to the DEA.  (GX-275, GX-903.)  It was only after the defendant left RDC that
RDC started reporting suspicious orders. (Tr. 468-69; GX-903.)

The defendant and his employees, including Bouck and Pietruszewski, also misled the
DEA about their reporting practices.  Even though the defendant and his employees did not report
suspicious orders, RDC's written policies said the exact opposite—stating, unambiguously, that
RDC would file suspicious order reports with the DEA.  (*See* GX-12; GX-276.)  The defendant
and his employees defrauded the DEA by giving DEA agents their written policies and informing
those agents that the company followed them when, in fact, they did not.  For example, in July
2013, the defendant was told that RDC gave the DEA its standard operating procedure, which
stated that RDC would "alert the local DEA office" about suspicious orders.  (GX-12, GX-20.)
Similarly, in July 2015, Pietruszewski told the defendant that RDC had provided its standard
operating procedure to the DEA, which included that RDC would report suspicious orders. (GX-
50, GX-276.)  In July 2016, the defendant again was told by Pietruszewski that the DEA had
requested, and RDC had provided, the procedure for doing due diligence and reporting suspicious
orders. (GX-64.)

The evidence at trial also proved that the defendant misled the DEA about the due diligence

the company was doing on new accounts. RDC's written standard operating procedure stated that, "prior to selling controlled substances," RDC would obtain and reviewing drug dispensing data and "assess whether each prospective and current customer dispenses controlled substances for legitimate medical purposes." (GX-276.) But the defendant did not like this policy. The defendant told Pietruszewski, Bouck, and several other employees that the policy was "handcuffing [RDC's] efforts to sell [to] new accounts" and was "the tale [sic] wagging the dog." (GX-65.) He tried to change the policy in 2015 but, after a meeting with attorneys, RDC's practices did not change. (*See* Tr. 956-59.)

The defendant took matters into his own hands in June 2016. After learning that new legislation restricted the DEA's ability to take action against distributors, he told RDC employees that he wanted to start opening new customer accounts and doing diligence later. (GX-59, GX-57; *see also* Tr. 373.) Recognizing that such an approach was inconsistent with RDC's written policy that had been given to the DEA, Pietruszewski repeatedly suggested in emails to the defendant that RDC should "make the change" to its written policy "to be safe" so that it was "documented and the DEA cannot come back and ask why we are not following the process." (GX-50; *see* GX-57.) Indeed, Pietruszewski emailed the defendant that he was "concerned that [RDC] will be vulnerable if we do not look at the dispensing before turning a store on to sell [c]ontrolled [s]ubstances." (GX-62.) But the defendant went ahead and directed compliance employees to begin opening new accounts before conducting due diligence, without making the necessary change to RDC's written procedures. (*See* Tr. 963-67.)

Bouck, Pietruszewski, and others followed the defendant's new policy, even though there was no change to the written procedures. Bouck testified that several employees were concerned about the policy change because they saw "red flags" of diversion associated with these new

9

customers, many of which had been shut off by other distributors. (Tr. 363-65.)  But in the end, Pietruszewski and other compliance department employees said they had "no choice, but to agree" because the change in policy had already been a "concluded decision by Management."  (GX-62.) Pietruszewski and Bouck testified that RDC ended up opening several new customer accounts without doing due diligence at the defendant's direction, and contrary to what had been represented to the DEA.  (Tr. 377, 964-75.)

Despite the change in practice, RDC employees continued to give RDC's written due diligence policies to the DEA, misrepresenting the company's process for opening new accounts. On June 23, 2016, Pietruszewski gave DEA agents RDC's due diligence procedures, which continued to state that RDC conducted diligence before opening new accounts.  (GX-64.)  Bouck provided that same policy to DEA agents on November 11, 2016.  (GX-67.)  Both Pietruszewski and Bouck knew that the policies contained false information about RDC's practices for opening new accounts.  (*See* Tr. 389-91, 972-74.)

Bouck's description of changes at RDC after the defendant left the company cast the conspiracy into stark relief.  After the defendant left, employees in compliance "immediately started to analyze dispensing reports again before turning customers on for controlled substances," "started reporting suspicions customers and suspicious orders" to the DEA, and "started ensuring that we were . . . analyzing [dispensing reports] on existing customers."  (Tr. 469.)  Bouck explained that these practices changed because leadership changed; compliance employees could do their job "freely," without needing the defendant's "approval to take action on pharmacies anymore."  (Tr. 470.)  The result was RDC filing hundreds of suspicious order reports and cutting off or suspending hundreds of pharmacy customers, (*see, e.g.*, GX-263, GX-264, GX-278, GX-903), all because employees could "actually follow [RDC's] policy," rather than the defendant's

rules, (Tr. 470).

At trial, the jury also heard from Professor David Cutler, an expert economist.  Professor Cutler presented data showing that, during the conspiracy period, RDC's sales of oxycodone and fentanyl, and its revenues from those sales, grew dramatically and at a significantly faster rate than RDC's sales of other products.  (GX-903, Tr. 1251-54.)  While RDC's sales of oxycodone and fentanyl were rising, sales of those products by other distributors were falling.  (GX-903, Tr. 1243-50.)  Moreover, a meaningful portion of the defendant's bonus was tied to the sale of controlled substances.  So, for instance, in 2015 and 2016, when RDC's sales of controlled substances were at their peak, Doud earned an additional hundreds of thousands of dollars in bonus, which was tied directly to RDC's sale of controlled substances.  (GX-903).

Professor Cutler also examined data from RDC's suspicious order monitoring system and performed case studies on over 40 pharmacies.  (GX-904, GX-905; Tr. 1331, 1339-42.)  He found that, during the conspiracy, RDC shipped over 90% of opioid orders that the suspicious order monitoring program had flagged for investigation and that RDC consistently sold opioids to pharmacies that displayed "red flags" of diversion.  (GX-903, GX-904; Tr. 1314.)  He also found that, at the height of the conspiracy, RDC made over 70% of its controlled substance sales to pharmacies that, after the defendant left the company, RDC terminated due to "red flags" of diversion.  (GX-903; Tr. 1323-24.)

Finally, the jury heard testimony about diversion at pharmacies to which RDC sold controlled substances and saw documentary evidence that RDC employees identified clear signs of diversion at pharmacies RDC was supplying.  Barbara Castro testified that a doctor named Carl Anderson prescribed her and others oxycodone for no legitimate medical purpose, and that she and others filled those prescriptions at Old Town Pharmacy—one of RDC's customers.  (Tr. 762-68.)

11

RDC emails showed that Bouck, Pietruszewski and others were aware of clear signs of diversion at Old Town, and knew that Anderson was a bad doctor who sent patients to a number of pharmacies that RDC supplied.  (*See* GX-908 at 3 (collecting exhibits and sales data).)

Similarly, Michael Paulsen, the former owner of a pharmacy called Regal Remedies, testified that he purchased oxycodone from RDC and diverted those pills, selling them to drug dealers and people he knew were suffering from addiction.  (Tr. 1437-39, 1442-45.)  Emails revealed that RDC employees—including Bouck and Pietruszewski—recognized clear signs of diversion at Regal Remedies.  (*See* GX-908, at 2 (collecting exhibits and sales data).)  Indeed, Pietruszewski even relayed to the defendant that a compliance employee thought RDC should stop selling to the pharmacy.  (GX-103B, GX-103B.1.)  But RDC, at the defendant's direction, continued supplying Regal Remedies with controlled substances until after the defendant left the company.  (*See* GX-908, at 2.)

The jury finally saw internal RDC emails and sales data showing that RDC identified clear signs of diversion at a number of other pharmacies—including BayRidge, ProHealth, Linden Care, Seventh Elm, Aliton's, and Blairsville—but nonetheless continuously sold opioids to those pharmacies.  (GX-908 (collecting exhibits and sales data).)  The emails show knowledge that BayRidge was dispensing high quantities of oxycontin for suspicious doctors; that ProHealth was dispensing a "staggering" number of pills for so many suspicious doctors that the dispensing data was "screaming red"; that Linden Care dispensed huge quantities of fentanyl for cash, and to doctors with concerning prescribing practices; that Seventh Elm was like a "stick of dynamite waiting for DEA to light the fuse"; and that the DEA had raided Aliton's as part of a diversion investigation.  But RDC, led by the defendant and consistent with the defendant's diversion scheme, kept selling to all of them until the defendant's departure.

<u>**ARGUMENT**</u>

**I.      The Probation Office Correctly Calculated the Applicable Guidelines Range.**

The Probation Office calculates the applicable sentencing range under the United States Sentencing Guidelines (the "Guidelines") as 360 months to life, based on an offense level of 42 and a Criminal History Category of I.  The offense level is based on a converted drug weight of over 105,000 kilograms—based on 3,619 grams of fentanyl and 14,375 grams of oxycodone— which results in an offense level of 38, plus a four-level enhancements for the defendant's leadership role.  (PSR ¶¶ 44-49.)  That calculation is correct, and is not affected by this Court's decision vacating the jury's finding that the defendant was responsible for conspiring to distribute over 400 grams of mixtures and substances containing fentanyl.

Calculating the correct offense level in a narcotics case is a different task than deciding whether there was sufficient evidence to sustain a jury's finding as to a particular drug weight.  For one, the Guidelines require Courts to determine whether offense-level enhancements apply based on a preponderance of the evidence, rather than proof beyond a reasonable doubt.  *United States v. Salazar*, 498 F.3d 555, 557 (2d Cir. 2007).  And second, with respect to calculating drug weight when "there is no drug seizure or the amount seized does not reflect the scale of the offense," the Guidelines direct courts to "approximate the quantity of the controlled substance" involved in the offense.  U.S.S.G. § 2D1.1 n.5.

Here, the Probation Office correctly approximated that the defendant was responsible for over 90,000 kilograms of converted drug weight and thus at a base offense level of 38.  Notably, the defendant exceeded 90,000 kilograms of converted drug weight based solely on his distribution of oxycodone.  The Probation Office calculated that the defendant was responsible for unlawfully distributing approximately 14,375 grams of oxycodone, leading to a converted drug weight of approximately 96,312 kilograms.  (PSR ¶ 44.)  That calculation was based on exceptionally

conservative inputs: it reflected the amount of oxycodone that RDC distributed to only six pharmacies (BayRidge, Aliton's, Seventh Elm, ProHealth, Linden Care, and Old Town) *and* had been flagged by RDC's suspicious order monitoring system.  Because RDC had a general practice of not performing the required diligence on suspicious orders, that oxycodone was distributed unlawfully.  Those pharmacies were also selected because there was powerful evidence, presented at trial, that they were involved in diverting controlled substances.  This calculation is conservative because the evidence showed that RDC shipped substantially more oxycodone that had been flagged by RDC's suspicious order monitoring system and shipped those drugs to many more pharmacy.  But even this conservative calculation puts the defendant well over the threshold for a base offense level of 38, as calculated by the Probation Office.

Moreover, the Probation Office also calculated that the defendant was responsible for distributing approximately 3,619 grams of fentanyl, which leads to a converted drug weight of approximately 9,047 kilograms.  (PSR ¶ 44.)  The 3,619 grams of fentanyl reflects the amount of fentanyl RDC sold to eight pharmacies (BayRidge, Regal Remedies, Old Town Pharmacy, ProHealth, Linden Care, Seventh Elm, Aliton's, and Blairsville) about which the Government presented extensive testimony and documentary evidence of RDC's knowledge of red flags and diversion.  (*See* GX-908A; GX-101 (BayRidge); GX-103 (Regal Remedies); GX-104 (Old Town): GX-106 (ProHealth); GX-108 (Linden Care); GX-109 (Seventh Elm); GX-110 (Aliton's); GX-111 (Blairsville)).  Although this Court found that this evidence was insufficient to sustain the jury's finding that the defendant unlawfully distributed more than 400 grams of fentanyl, it is nonetheless more than sufficient for purposes of calculating the applicable Guidelines range, which as explained above, involves a lower standard of proof and a directive to approximate the applicable drug weight.

14

Finally, there is no room for doubt that the defendant was the leader of the conspiracy to unlawfully distribute controlled substances.  He was the CEO of RDC, and Pietruszewski and Bouck testified extensively that they, and other employees responsible for shipping drugs to pharmacies that were diverting, acted at the defendant's direction.  The four-level enhancement for leadership is, therefore, appropriate, resulting in an offense level of 42.  Because there is no dispute about the defendant's criminal history category, the applicable Guidelines range is 360 months' to life imprisonment, as the Probation Office correctly calculated.

## II.    A Sentence Of 180 Months' Imprisonment Is Appropriate.

### A.  Applicable Law

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), *abrogated on other grounds by United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  After that calculation, however, a sentencing judge must consider the seven factors outlined in Title 18, United States Code, Section 3553(a).  *See Gall*, 552 U.S. at 50 & n.6. In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.   18 U.S.C. § 3553(a)(2).

**B.  A 180-Month Sentence Is Appropriate to Reflect the Seriousness of the Offense, to Afford Adequate Deterrence to Criminal Conduct, and to Provide Just Punishment for the Defendant's Crimes**

As set forth above, and as the evidence overwhelmingly established at trial, the defendant directed a criminal conspiracy at RDC that pumped large quantities of dangerous opioids into pharmacies throughout the Northeast, even though the defendant and others at RDC knew that the pharmacies were diverting these drugs and supplying people suffering from addiction.  The defendant's self-interested actions helped to fuel the opioid epidemic between 2012 and 2017, and caused long-term harm to desperate individuals and vulnerable communities.  For this conduct, and in light of the Section 3553(a) factors discussed below, a sentence of 180 months' imprisonment is fair, appropriate and necessary in this case.

1.  The Need For the Sentence to Reflect the Nature and Seriousness of the Offense

Section 3553(a) provides that the sentence imposed should reflect the nature and seriousness of the offense.  18 U.S.C. § 3553(a)(1), (a)(2)(A).  Here, the defendant's crimes – leading a criminal conspiracy at RDC that shipped millions of opioids to dirty pharmacies *during the opioid epidemic*, and then lying to the DEA about the company's compliance practices and policies – were extraordinarily serious.

As even the defendant understood, the opioid epidemic is a public health crisis that has wreaked havoc on our country and destroyed innumerable lives.  (*See* GX-2, GX-3, GX-11, GX-14.)  Between 2012 and 2017, hundreds of thousands of Americans died from opioid overdoses, which included deaths from prescription opioids, like oxycodone, as reflected on the charts on the following page.



**Figure 4. National Overdose Deaths Involving Prescription Opioids\*, Number Among All Ages, 1999-2020**

*Among deaths with drug overdose as the underlying cause, the prescription opioid subcategory was determined by the following ICD-10 multiple cause-of-death codes: natural and semi-synthetic opioids (T40.2) or methadone (T40.3). Source: Centers for Disease Control and Prevention, National Center for Health Statistics. Multiple Cause of Death 1999-2020 on CDC WONDER Online Database, released 12/2021.



**Figure 3. National Overdose Deaths Involving Any Opioid, Number Among All Ages, by Gender, 1999-2020**

*Among deaths with drug overdose as the underlying cause, the any opioid subcategory was determined by the following ICD-10 multiple cause-of-death codes: natural and semi-synthetic opioids (T40.2), methadone (T40.3), other synthetic opioids (other than methadone) (T40.4), or heroin (T40.1). Source: Centers for Disease Control and Prevention, National Center for Health Statistics. Multiple Cause of Death 1999-2020 on CDC WONDER Online Database, released 12/2021.

Overdose Death Rates, National Institutes of Health – National Institute on Drug Abuse (Jan. 20, 2022), available at https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates.

As the figures above make clear, the opioid epidemic has worsened dramatically over the last two decades, with a noticeable growth during the same time period when opioid shipments at RDC, under the defendant's direction, peaked.



**RDC's Shipments of Opioids Increased by 125% Between 2010 and 2015**

But overdose deaths—as horrific as they are—capture only a portion of the harm. For every opioid user who tragically dies from an overdose, innumerable others are cursed to live broken lives, unable to care for themselves or their families, without prospects or employment, their existences reduced to the need to inject, or snort, or swallow their next fix. Each one of those ruined lives in turn causes more misery: children without parents, husbands and wives who see their life partners slip into oblivion, mothers and fathers who feel helpless to save their children.

Here, the Court need look no further than the testimony of Barbara Castro to understand the link between the defendant's crimes and the devastation of the opioid epidemic. After suffering from a medical issue, Castro became addicted to opioids. She obtained illegal prescriptions from doctors like David Taylor and Carl Anderson. Both doctors had been flagged as suspicious by RDC, and RDC should have stopped sending pills to the pharmacies that filled their prescriptions.

But, under the defendant's leadership, RDC did not stop.  Rather, RDC continued to ship controlled substances to pharmacies like Old Town Pharmacy, where Castro got her supply.

Castro explained that she would go to Anderson's office "between 9 and 10 at night" and spend all night there until she got her prescription.  (Tr. 762.)  She had visible "track marks on [her] arms" and would "nod out in the waiting room for hours with [her] head between [her] legs waiting to see the doctor."  (Tr. 765.)  For good reason, CVS and Walgreens stopped accepting Anderson's prescriptions.  So, Castro turned to Old Town, pictured below, a pharmacy that was supplied by RDC.  (Tr. 766.)



Had RDC and the defendant exercised restraint and followed its policies instead of flouting them to boost sales, places like Old Town and Regal Remedies – another dirty pharmacy supplied by RDC – would not have existed, and people like Castro and others would not have had such easy access to these dangerous pills.

While the current incarnation of the opioid crisis extends well beyond prescription drugs and while there may be multiple causes of the epidemic overall, *see, e.g.*, Sarah DeWeerdt, Nature, Tracing the U.S. Opioid Crisis to Its Roots, (Sept. 11, 2019), *available at* https://www.nature.com/articles/d41586-019-02686-2, it is beyond serious dispute that the illicit

diversion of prescription painkillers—like oxycodone—is a key contributor to the problem.  And the defendant, the CEO of RDC, a company that supplied millions of oxycodone pills to dirty pharmacies like Old Town and Regal Remedies, bears great responsibility for this epidemic.

Overlooking all of this evidence, the defendant goes to great lengths to characterize his actions as a mere regulatory violation that is a poor fit for punishment under the Controlled Substances Act ("CSA") and more akin to conduct that have resulted in civil fines.  (Def. Mem. 21-26.)  That dramatically understates the defendant's crimes and wrongly ignores the devastating role that companies like RDC played in fueling an opioid epidemic that devastated individuals, families, and communities across the country.

Consistent with longstanding Supreme Court and Circuit precedent, this Court has repeatedly rejected the defendant's legal argument that CSA applies only to people dealing drugs on the black market, not companies and businessmen.  That argument is no more persuasive in the sentencing context.  The CSA draws a distinction between lawful and unlawful sales of controlled substances.  Once someone crosses the line from legal sales to illegal ones, the statute offers no protection—regardless of whether the person making the unlawful sales is a cartel member, a doctor, or an executive at a pharmaceutical company.  That approach is just.  For the people suffering from addiction, and the families and communities that support them, it makes no difference whether a dangerous drug like fentanyl or oxycodone comes from a drug dealer, or someone with a medical or business degree.  What matters is that the drugs were sold not for any legitimate medical purpose, but instead to profit off of a dangerous, addictive substance.  White collar drug dealers like the defendant should not receive a break at sentencing; if anything, the fact that they were entrusted with the authority to lawfully distribute dangerous drugs means they should receive stiffer sentences when they cross the line.

20

The defendant's effort to analogize his case to civil actions against drug distributors and pharmaceutical companies is no more persuasive. As this Court recognized in denying the defendant's Rule 29 motion, his actions were criminal because he did not simply run afoul of regulations, but rather knowingly and intentionally violated the laws and regulations designed to protect Americans from dangerous drugs, and did so knowing that he was selling opioids that would be diverted. (*See* Dkt. No. 210, at 3-8.) What is more, the jury found that he committed that crime beyond a reasonable doubt. His case is, accordingly, not analogous to civil cases against corporate entities, where there were different *mens rea* requirements, lower standards of proof, and responsibility assigned collectively to the corporation.

A better comparison is to the litany of doctors who have been prosecuted in this District for diversion and sentenced to lengthy prison terms. *See, e.g.*, *United States v. Ruvim Krupkin*, 19 Cr. 659 (AT) (doctor sentenced to 120 months in prison for conspiring to unlawfully distribute millions of oxycodone pills); *United States v. Emmanuel Lambrakis*, 17 Cr. 208 (KPF) (doctor sentenced to 188 months in prison for conspiring to unlawfully distribute thousands of oxycodone pills); *United States v. Gordon Freedman*, 18 Cr. 217 (KMW) (doctor sentenced to 220 months in prison for unlawfully distributing oxycodone and fentanyl, and for participating in bribery and kickback scheme); *United States v. Dante Cubangbang*, 18 Cr. 723 (PGG) (doctor sentenced to 180 months in prison for unlawfully distributing millions of oxycodone pills); *United States v. Moshe Mirilashvili*, 14 Cr. 810 (CM) (doctor sentenced to 160 months in prison). The defendant should receive a similarly serious sentence. And while there are instances of individual doctors or pharmacists in this District receiving shorter sentences than the doctors listed above,[1] the defendant – given his leadership role at RDC – is more culpable than any of these one-off individuals. This

---

[1] *See, e.g.*, *United States v. Paulsen*, 19 Cr. 666 (PAC) (pharmacy owner who was supplied by RDC was sentenced to 78 months in prison).

is particularly true where, as here, the pharmacists and doctors that have been prosecuted in this District provide essentially a laundry list of pharmacies that the defendant supplied, and doctors who sent patients to those dirty pharmacies.

2.   The Need To Afford Adequate Deterrence To Criminal Conduct

Section 3553(a)(2)(B) provides that the Court, in imposing sentence, should consider the need to deter afford adequate deterrence to criminal conduct.  18 U.S.C. § 3553(a)(2)(B).  This factor weighs heavily in favor of a sentence of 180 months' imprisonment in this case.

The defendant argues that there is no need to deter the defendant from committing further crimes, pointing to the fact that he is 78 years old, retired and has no prior criminal history.  (Def. Mem. 26).  The Government agrees that the defendant is unlikely to reoffend because he is no longer employed by a pharmaceutical company and due to his age.  But concerns about *specific* deterrence are only one factor for the Court to consider.  The Court should also consider the need to achieve general deterrence and respect for the law.  And, in this regard, there is simply no substitute for prison time.  As Judge Jed S. Rakoff explained in sentencing an insider trading defendant who the court believed would personally never re-offend to a term of imprisonment, "[o]thers similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail." *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012).

As the Court knows, in almost all cases where physicians and pharmacists are convicted and sentenced for opioid diversion, they are first time offenders who will never practice medicine again—and in many of the cases, they are of advanced age.  Nonetheless, because of the requirements of general deterrence, lengthy sentences are routinely imposed in such cases.  Here, because this was the first prosecution of an opioid distributor under the CSA, the length of the sentence in this case is particularly important to send a message that corporate executives and

22

employees will face significant periods of incarceration for flouting the CSA and allowing opioids to be diverted. Indeed, the reaction to the defendant's conviction and expected lengthy sentence has been the subject of advisories to pharmaceutical distributors and manufacturers about the risks associated with knowing violations of the narcotics laws. *See, e.g.*, Jaime Jones et al., *With Successful Prosecution of CEO, DOJ Raises the Stakes for Executives*, Corp. Gov. Adv. 1341539 (May 1, 2022). Thus, given the scale and scope of the defendant's crimes, and his position at the very top of RDC, a sentence of 180 months' imprisonment is appropriate in this case.

### 3. The Need to Impose a Just Punishment

Section 3553(a)(2)(A) provides that the Court must consider the need for a sentence to "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). In this regard, a term of 180 months' imprisonment is critical.

The defendant was the leader of narcotics conspiracy who made money off of the addictions and hardships of others. He was well-educated and surrounded by a supportive family and friends. Though he committed his crimes from a corner office and not a street corner, he should not be treated any more favorably than the countless other narcotics defendants that this court routinely sentences to prison terms. As Judge Colleen McMahon explained in *United States v. Binday*, 12 Cr. 152 (CM), a case that involved an insurance fraud scheme where the defendant was sentenced to 144 months' imprisonment, "[o]nly if white collar crime is punished commensurate with the damage it inflicts on society will citizens actually believe that the law metes out equal right to the poor and to the rich, which words are the cornerstone of the judicial oath." *Id.* (Dkt. No. 349, Sent. Tr., at 46); *see id.* at 45 ("There are crimes for which a critically important component of sentencing should be to send a message to the community, for the industry that this kind of behavior is intolerable, and to send a message to the community and to the industry

23

that this sort of behavior is every bit as reprehensible as the types of crimes for which I and others like me routinely send poor, disadvantaged persons to prison for dozens of years."); *see also Gupta*, 904 F. Supp. 2d at 355 ("While no defendant should be made a martyr to public passion, meaningful punishment is still necessary to reaffirm society's deep-seated need to see justice triumphant. No sentence of probation, or anything close to it, could serve this purpose.").  Thus, the need for the sentence to provide just punishment for the offense also weighs heavily in favor of a 180-month sentence.

### III.   The Court Should Deny The Defendant's Request For Bail Pending Appeal.

### A.   Applicable Law

A court "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment" be detained pending appeal unless the court finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community if released," and

> that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—(i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b).

This provision gives effect to Congress's view that "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even to permit it in the absence of exceptional circumstances." *United States v. Miller*, 753 F.2d 19, 22 (3d Cir. 1985).  Following a guilty verdict and sentencing, there is a "presumption in favor of detention." *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).  It is the defendant's burden to "rebut that presumption with clear and convincing evidence."  *Id.*

24

Under the second prong of the standard, a "substantial question" is "a close question or one that very well could be decided the other way." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985).

> If a court does find that a question raised on appeal is 'substantial,' it must then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'

*Id*. With respect to all of these issues, "the burden of persuasion rests on the defendant." *Id.*

### B.     The Defendant Is Not Entitled to Bail Pending Appeal

This Court's decision denying the defendant's Rule 29 and 33 motions shows that the defendant is not entitled to bail pending appeal.  The only meaningful legal argument that the defendant advanced was his claim that the jury instructions were inconsistent with *Ruan v. United States*, 142 S. Ct. 2370 (2022).  But as this Court found, "the *Ruan* issue of which *mens rea* applies has never been dispute in this case" because "[t]he Government has always agreed that the jury needed to decide whether the Defendant 'knowingly and intentionally' acted in an unauthorized manner," and this Court instructed the jury accordingly.  (Dkt. No. 210, at 11-12.)  There is, then, no substantial question related to *Ruan* presented by this case that could even plausibly lead to reversal.

Nor do the defendant's challenges to the sufficiency of the evidence present a basis for bail pending appeal.  As this Court explained in denying the Rule 29 and 33 motions, the defendant bears a "heavy burden" to overturn a conviction or obtain a new trial based on challenges to the sufficiency of the evidence.  (*Id.* at 2-3.)  And the defendant did not come remotely close to meeting that burden here: there was overwhelming evidence of the defendant's guilt, not only in the form of witness testimony from the defendant's co-conspirators, but also from internal RDC emails and

data that gave an inside look at how the defendant's criminal conspiracy functioned.   The likelihood of a vacatur or reversal based on the sufficiency of the evidence is, accordingly, not sufficiently significant to warrant bail pending appeal.   The defendant should be remanded following sentencing.

## **<u>CONCLUSION</u>**

For the reasons set forth above, the Court should impose a sentence of 180 months' imprisonment.

Dated: New York, New York
       March 1, 2023

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:    _____/s/_____
       Thomas Burnett
       Nicolas Roos
       Alexandra Rothman
       Assistant United States Attorneys
       (212) 637-1064/-2421/-2580

Cc:    Defense Counsel
       (Via ECF)

26